# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,

v.

LEZMOND CHARLES MITCHELL

Case No.: CV-09-8089-MHM (MEA)

## MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY, OR IN THE ALTERNATIVE, PURSUANT TO 28 U.S.C. § 2241

SEAN KENNEDY (CA bar # 145632)
Federal Public Defender
STATIA PEAKHEART (CA bar # 200363)
Deputy Federal Public Defender
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:   (213) 894-0081

Attorneys for Defendant-Movant
LEZMOND CHARLES MITCHELL

**TABLE OF CONTENTS**

PAGE(S)

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.   ISSUES FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    A.   COUNSEL'S FAILURE TO INVESTIGATE, PREPARE AND PRESENT EVIDENCE OF INTOXICATION RESULTED IN INEFFECTIVE ASSISTANCE AT GUILT PHASE . . . . . . . . . . . . . . . . . . . . . . . 24

        1.   Trial Counsel's Failure to Thoroughly Investigate Intoxication Was Unreasonable . . . . . . . . . . . . . . . . . . . . . . 28

        2.   The Lack of Intoxication Evidence Prejudiced the Most Viable Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    B.   COUNSEL'S FAILURE TO INVESTIGATE, PREPARE AND PRESENT EVIDENCE OF ADDICTION AND INTOXICATION RESULTED IN INEFFECTIVE ASSISTANCE AT PENALTY PHASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        1.   Trial Counsel's Failure to Investigate Addiction and Intoxication as Mitigation Was Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        2.   The Failure to Prepare and Present Evidence of Addiction and Intoxication Prejudiced the Mitigation Defense . . . . . . . . . . . . . . . . . . . . . 47

    C.   TRIAL COUNSEL'S CONFLICT OF INTEREST DEPRIVED MITCHELL OF THE RIGHT TO EFFECTIVE ASSISTANCE . . . . . . . . . . . . . . . . . . . . . 48

    D.   COUNSEL VIOLATED MITCHELL'S RIGHT TO EFFECTIVE ASSISTANCE AT THE PENALTY PHASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        1.   Trial Counsel's Performance Was Deficient . . . . . . . . . . . . . 54

        2.   Trial Counsel's Deficient Performance Prejudiced Mitchell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

            a.   Evidence of Family Mental Health History and Its Effect on Mitchell . . . . . . . . . . . . . . . . 69

            b.   The Abuse and Neglect Endured by Mitchell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**TABLE OF CONTENTS**

PAGE(S)

c.    Mitchell's Drug and Alcohol Abuse  . . . . . . . . . . . . . . 76

d.    Mitchell's Permanent Brain Dysfunction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

e.    Failure to Present a Complete and Accurate Social History and Supporting Expert Testimony  . . . . . . . . . . . . . . . . . . 79

3.    Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

E.    TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE FOR FAILING TO CHALLENGE MITCHELL'S STATEMENTS AS INVOLUNTARY DUE TO HIS BRAIN DAMAGE, HIS ADDICTION, AND HIS CULTURAL HERITAGE  . . . . . . . . . . . . . . . . . . . . . . . . 82

F.    COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND CHALLENGE THE MEDICAL EXAMINER'S TESTIMONY AND AUTOPSY REPORT RESULTED IN INEFFECTIVE ASSISTANCE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

G.    COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND CHALLENGE DNA TESTIMONY AND DNA EVIDENCE RESULTED IN INEFFECTIVE ASSISTANCE OF COUNSEL  . . . . . . . . . . . . . . . 88

1.    The Prosecution's Expert Witness Withheld Potentially Exculpatory DNA Information From the Jury  . . . . . . . . . . . . . . . . . . . . . . . . . 89

2.    The Prosecution's Expert Witness Misled the Jury by Presenting Partial Results and Misconstrued Outcomes To Make DNA Evidence Seem More Inculpatory  . . . . . . . . . . . . . . . . . . 91

3.    The Prosecution's Expert Witness Made it Appear That She Had Identified the Contributors of a Multi-source Samples of  DNA Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

4.    Defense Counsel's Performance Was Prejudicially Ineffective Because He Did Not Seek the Advice of an Independent DNA Expert to Give Him a Basic Understanding of the DNA Test Results . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

ii

## TABLE OF CONTENTS

PAGE(S)

5.  Defense Counsel's Performance Was Prejudicially Ineffective Because He Was Not Prepared to Challenge the Testimony of the Prosecutor's Expert Witness . . . . . . . . . . . . . . . . . . . . . . . 9

6.  Defense Counsel's Failure to Consult a DNA Expert to Prepare a Defense Theory Led Him to an Unreasonable, Unsound, and Constitutionally Ineffective Defense Theory . . . . . . . . . . . . . . . 97

H.  INEFFECTIVE ASSISTANCE REGARDING JURY SELECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

1.  Failing to Challenge or Adequately Question Jurors Whose Convictions About the Death Penalty Substantially Impaired the Performance of Their Duties . . . . . . . . . . . . . . . . . . . . . . . . . 99

    a.  Juror # 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    b.  Juror # 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    c.  Alternate Juror #51 . . . . . . . . . . . . . . . . . . . . . . . . . 102

2.  Failing to Adequately Question or Attempt to Rehabilitate Prospective Jurors Who Initially Suggested That They Could Not Vote for the Death Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

3.  Appellate Counsel was Ineffective for Failing to Appropriately Object to the Improper Excusal of Native American Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

I.  THE TRIAL COURT DEPRIVED MOVANT OF HIS RIGHT TO AN IMPARTIAL JURY BY ERRONEOUSLY EXCLUDING POTENTIAL JURORS WHOSE CONCERNS ABOUT THE DEATH PENALTY WOULD NOT HAVE SUBSTANTIALLY IMPAIRED THE PERFORMANCE OF THEIR DUTIES . . . . . . . . . . . . . . . . . . . . . 109

J.  THE TRIAL COURT FAILED TO ENFORCE THE LEGAL STANDARD FOR HARDSHIP DISMISSAL, RESULTING IN A "JURY OF VOLUNTEERS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

1.  Venireperson #77 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

**TABLE OF CONTENTS**

2.    Venireperson #78 and
Venireperson #20 . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

K.    *VOIR DIRE* AT MOVANT'S TRIAL WAS
INADEQUATE TO SECURE HIS
CONSTITUTIONAL RIGHT TO AN
IMPARTIAL AND  LIFE-QUALIFIED
JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

L.    THE CUMULATIVE EFFECT OF ALL
ERRORS DURING THE JURY SELECTION
PROCESS RESULTED IN A JURY THAT WAS
NOT IMPARTIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

M.    MITCHELL'S RIGHT TO A JURY
CHOSEN FROM A FAIR AND
REPRESENTATIVE JURY VENIRE WAS
VIOLATED WHEN NATIVE AMERICANS
WERE SYSTEMATICALLY EXCLUDED
FROM JURY SERVICE . . . . . . . . . . . . . . . . . . . . . . . 138

N.    THE JUROR QUESTIONNAIRE CREATED
FOR JURY SELECTION IN MOVANT'S TRIAL
LACKED SPECIFICITY RENDERING IT
INADEQUATE TO SECURE HIS
CONSTITUTIONAL RIGHT TO AN IMPARTIAL
AND  LIFE-QUALIFIED JURY . . . . . . . . . . . . . . . . . . 140

O.    THE PROSECUTION'S FAILURE TO
PRODUCE EXCULPATORY EVIDENCE
VIOLATED MITCHELL'S CONSTITUTIONAL
RIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

P.    THE GOVERNMENT'S COLLUSION WITH
THE TRIBE VIOLATED MITCHELL'S
CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . . . . . 149

1.    The Court Violated Mitchell's Rights
Through the Admission of Statements
Obtained After His Right to Counsel
Had Attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

2.    The Court Violated Mitchell's Rights
Through the Admission of Post-Arrest,
Pre-*Miranda* Statements . . . . . . . . . . . . . . . . . . . . . 157

**TABLE OF CONTENTS**

PAGE(S)

3. The Court Violated Mitchell's Rights
Through the Admission of Involuntary
Statements Improperly Induced Through
Deception and Lies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Q. MOVANT WAS INCOMPETENT FROM THE
CONCLUSION OF THE GUILT PHASE THROUGH
THE PENALTY PHASE, AND THUS DEPRIVED
OF HIS CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . . 160

1. Doubt Raised as to Movant's Mental
Competency Following the Jury's Return
of a Guilty Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

2. Defense Counsel's Failure to Request a
Competency Proceedings Violated Movant's
Constitutional Right to Effective Assistance
of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

3. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

R. LEZMOND MITCHELL'S CONVICTION
AND SENTENCE SHOULD BE REVERSED
BECAUSE THE VICTIMS' FAMILY'S CONDUCT
UNDULY PREJUDICED MITCHELL AT BOTH
THE GUILT AND PENALTY PHASE. . . . . . . . . . . . . . . . . . . . 167

1. Mitchell's Conviction and Sentence
Should Be Reversed Because Family Members
of the Victims Wore Buttons Depicting Slim
and Lee During the Guilt Phase of Trial . . . . . . . . . . . . . . . 168

2. Mitchell's Trial Counsel Provided Ineffective
Assistance for Failing to Object in a Timely
Manner to the Family's Conduct . . . . . . . . . . . . . . . . . . . . 170

S. COUNSEL PROVIDED INEFFECTIVE
ASSISTANCE FOR FAILING TO REQUEST
THE TRIAL COURT TRIFURCATE THE
PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

1. To Be Constitutional under *Ring v. Arizona*,
Proceedings under the Federal Death Penalty
Act Must Be Trifurcated . . . . . . . . . . . . . . . . . . . . . . . . . 176

2. Counsel Should Have Moved for Trifurcation
to Avoid Unfair Prejudice, Confusion of the
Issues, and Misleading the Jury . . . . . . . . . . . . . . . . . . . . . 179

**TABLE OF CONTENTS**

3.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

T.    THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT MOVANT'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

U.    THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING CASES IN WHICH THE FEDERAL DEATH PENALTY IS IMPOSED FROM THOSE IN WHICH IT IS NOT IMPOSED RENDERS THE FDPA UNCONSTITUTIONAL . . . . . . . . . . . . . 188

V.    A SYSTEM WHERE THE DEATH PENALTY IS SOUGHT ON THE INVIDIOUS BASIS OF RACE, AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED AND THIS COURT SHOULD VACATE MR. MITCHELL'S SENTENCE . . . . . . . . . 196

1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

2.    The invidious circumstances of race-of-defendant and race-of-victim . . . . . . . . . . . . . . . . . . 200

W.    LEZMOND MITCHELL'S SENTENCE IS DISCRIMINATORY AND THEREFORE MUST BE SET ASIDE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

1.    Explicit Statutory Right to Justice Without Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

2.    Supervisory powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

X.    BY OMITTING THE "PLAIN-ERROR" REVIEW, CONGRESS, HAS FAILED TO PROVIDE FOR MEANINGFUL APPELLATE REVIEW, AND THEREFORE THE FDPA IS UNCONSTITUTIONAL . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

Y.    MITCHELL WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE THE CUMULATIVE IMPACT AND EFFECTS OF ERRORS AT EACH PHASE OF HIS TRIAL REQUIRE REVERSAL OF HIS CONVICTION AND SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

III.    PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

**MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE,**
**OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY,**
**OR IN THE ALTERNATIVE, PURSUANT TO 28 U.S.C. § 2241**
**PRELIMINARY STATEMENT**

1.     In this Motion, Lezmond Mitchell ("Mitchell") moves to set aside his convictions and death sentence because they were  obtained in violation of the United States Constitution and federal law in multiple respects.

2.     The following is based on information that was available to trial counsel:

3.     Lezmond Mitchell ("Mitchell") graduated from Rough Rock High School, on the Navajo Reservation.  Although his grades were far below those of the valedictorian's, the administration allowed him to address his class.  Everyone agreed Mitchell, the senior class president, gave a rousing speech.

4.     For Mitchell, his senior year had been unusual in some ways and typical in other ways.  As for what was typical, the only family members who came to Mitchell's graduation, who heard his speech and saw him graduate, were his uncle Auska and possibly his grandfather George.  His mother Sherry did not attend, nor did his grandmother Bobbi Jo.  Their nonattendance was not unusual really, because these three – who had been his caretakers, together and individually, since he was eight-months-old – had not made Mitchell much of a priority in their lives for a long time, if ever.  As another example, when Mitchell was in high school at Red Mesa, a police report states that he was a passenger in a motor vehicle accident in which the drunk driver, a friend of Mitchell's, was ejected and killed.  No one knows if Mitchell suffered a head injury, or lost consciousness from any injury.  Seemingly, as if no mind to her, and despite a police report, Sherry doubts this happened to her son.

1

5.     Still, for the first time in his life, when Mitchell graduated, he lived with someone other than his grandmother Bobbi Jo in California, his grandfather George at the home site near Lukachukai, or with his mother Sherry, who lived elsewhere on the Reservation. Some months earlier, Mitchell had moved from his grandfather's empty house to his best friend Lorenzo Reed's, in Round Rock. George was not at the house anyway, and had not been for some time because he was taking care of Bobbi Jo in California, she had just had surgery.

6.     The Reeds enjoyed their new family member, and vice versa. The family matriarch had told Mitchell that he was to abide her rules, and Mitchell did so willingly. She never saw Mitchell use drugs or drink alcohol. He enjoyed being with the rest of the kids in the household. He did chores just like Lorenzo, his sister Tara and their cousin Tammy. Even Mr. Reed trusted Mitchell. The Reed parents trusted Mitchell – for example, when they went to Phoenix for the weekend, they left him in charge of the house and the sheep.

7.     Although no one in his own family would notice, other praiseworthy events were happening in Mitchell's life. At Rough Rock, for the first time since he was a kindergartner, when an instructor believed him "gifted," it is fair to say that Mitchell flourished. Shy and withdrawn when he started at Rough Rock, by the time he graduated, Mitchell was elected senior class president, he campaigned for then directed the building of a landscaped courtyard where the students could gather and visit. His grades improved. Before Rough Rock, his grades had been barely average, and even worse, but now he did all right in his classes. Because he could read so well, one instructor used him as a teaching assistant. He joined other activities, such as playing linebacker on the football team, which was small and appeared to lack for players, but it did well his senior year. There was even talk that Mitchell would play for a college team, possibly a junior college in Kansas

whose student body was Native American or elsewhere, although that never came close to happening.

8.      For some reason, around this time, Mitchell, Lorenzo and Lorenzo's cousin Herman, all friends, formed a "gang."  They tattooed themselves with "EST," the acronym for East Side Thugs (Round Rock is on the east side of the Reservation), listened to loud music, wore baggy pants, and pretended they were gang members.  They did not act like gang members, however; they committed no crimes, did their chores, helped their sisters, washed dishes, went to school, and herded the sheep.

9.      Mitchell did have disciplinary problems at the Rough Rock school as he did in his prior high school, Red Mesa, but the severity of the infractions decreased.  Besides other reasons, this may have been because now he was such a participant in his own education that he made friends with several educators at Rough Rock, he actually knew his teachers and they came to know him, and they liked and encouraged him.

10.      Mitchell was born in September 1981 to Sherry Mitchell, a single mother and college student.  His birth was difficult for Sherry.  She almost died during the delivery and Mitchell suffered as well.

11.      Mitchell, an only child, never knew his father Foster Hemil, a Marshall Islander, who met Sherry when they attended a community college on the Navajo Reservation.  Hemil, as it turned out, was later convicted of sexual assault and had at least three successive relationships that produced children.  While none of that information is extraordinary, it is unusual that Hemil never saw his firstborn son, Mitchell, and that Hemil's Marshallese children never even knew they had several half-siblings.  Hemil died of alcoholism-related illness not long after

3

Mitchell was arrested.  Hemil's widow never knew her husband had fathered a child before their children.

12.     Sherry had never wanted to marry, she only wanted many children. However, that dream apparently ended after Mitchell was born.  The other dream of Sherry's was a college degree, just like her mother.  Mitchell and Sherry lived in an apartment near the college, but when he was eight months old, Lezmond pulled hot fluid down on himself.  For that, and because of her school schedule, Sherry sent Lezmond to live with his grandmother Bobbi Jo.  Thereafter, Mitchell and his mother never lived together, just the two of them.  The strongest memory of Mitchell's childhood, in fact, is of his mother walking away from him:  after a fight with her mother, Sherry abandoned him to his grandparents when he was twelve years old.

13.     Although Mitchell's grandmother Bobbi Jo came from Scottish stock, she claimed a Native American heritage, sometimes Cherokee, sometimes Sioux. Perhaps because she was married to a Navajo, George, Bobbi Jo considered herself an authority on the Navajo way.  By the time of her death after Mitchell's trial, she claimed to have been ordained a crystal gazer, although that role is naturally a Navajo medicine man's.  Her interpretations also may have been to her own ends – for one, she claimed the Navajo raise their children with shame and humiliation.  In any event, she shamed and humiliated Mitchell constantly.

14.     Bobbi Jo had a doctorate in education and had some knowledge about the Navajo; her dissertation subject was children who live in border towns of the Reservation.  However, apparently due to her meanness and temperament, eventually she could not find a position on the Reservation, and ended her career in central California.  Records describe Bobbi Jo as depressed.  While she had a disorder exacerbated by stress, it appeared she did little (or could do little) to cope

with stress. Still, it seemed her temperament exploded beyond an inability to cope with stress. Former employees describe her as manipulative, angry, abusive, and paranoid. One workplace even had a party with a cake after Bobbi Jo was terminated. Adults could not bear being around Bobbi Jo and celebrated when she was banished from them, yet she was Mitchell's main caretaker.

15. Like his wife, George, who was sixteen years older than his wife (Bobbi Jo was a teen when they married), was an educator, he taught children the Navajo culture. George, who died at age eighty after Mitchell's trial, practiced the peyote faith with the Native American Church. Neither he nor Sherry taught Mitchell his native language; schoolmates teased Mitchell because he was monolingual, and because he was not full-blooded Navajo and large for his age.

16. Sherry heard rumors that her father had molested children at a Reservation school. As an adult, she encountered people who believed she was her father's wife. While rumors are often simply that, for her part, Bobbi Jo often and readily accused her daughter of having sex with George, and of coming between her and George's marriage. Whether true or not, George may have encouraged that rumor as well. Oddly, when the teen-age Sherry still accompanied George to Native American Church events (Bobbi quit going), they shared the same hotel bed, as the three of them had done when Sherry was a child.

17. Sherry's brother, Auska, remembers that it was his sister, who was almost nine when he was born, not Bobbi Jo, who did all the "mother" activities with him such as painting Easter eggs. Auska also remembers his mother's verbal and physical abuse, and his sister and parents' constant fighting. He remembers, as a child, wanting to leave the house as soon as possible – he joined the Army after high school and was a war veteran – and until she died, he still could not be around his mother very long because of her temperament, and how being near her

reminded him of how she mistreated him as a child and teen. He also remembers teenage Mitchell telling him that he too could not wait to leave Bobbi Jo's house, because of her verbal and physical abuse and the constant berating and name-calling. Auska reassured Mitchell that time would come.

18.    One parallel bears noting. After a particular time when Bobbi Jo beat Sherry, on this occasion, she beat her on the head with a thick steel tube, Sherry swore she would never call her "Mother" again, only by her given name. So too, Mitchell calls Sherry by her given name, not by the term for one's caregiver or parent, Mother. The parallel is also significant here because Sherry likewise physically and psychologically abused Mitchell horribly.

19.    Another point is notable. Before Mitchell left Red Mesa, a psychologist who treated Mitchell after the school disciplined him for marijuana possession, noted that he was "truely [sic] distressed about family conflict." The therapist knew of the psychological and physical abuse Mitchell suffered. Because of his family's controlling behavior, the clinical psychologist noted, Mitchell "feels like going out and killing himself." The psychologist indicated that Mitchell was a "rather disturbed young man. Feeling of no security and lost." His last substantive notes stated:

> Intensive psychotherapy is in order. It can be done on an out pt basis if he will cooperate and attend scheduled appointments. Failing that, a residential placement may be necessary. He could be in serious jeopardy otherwise. The risk is anti-social behavior that could produce serious law encounters

20.    Not surprisingly, despite the clear indication of suicidality and his mother's and grandmother's advanced degrees in education, and given eighteen-

year-old Mitchell's own lack of insight and, by then, his immersion in drugs and alcohol, he did not undergo the recommended intensive psychotherapy.

21. The "family conflict" noted by the psychologist was beyond the three Mitchell adults fighting. In fact, it began in Sherry's childhood; she fought with her mother constantly, and Bobbi beat Sherry regularly. Once, after hitting her mother back, Sherry walked away from the house. When a schoolmate encountered her a short time later, Sherry told her, "I think I killed my mother." George beat Sherry as well, sometimes with a hammer. Another time, after George and Bobbi argued, Bobbi left the house with a gun. Sherry heard the gun's report, but George said to leave Bobbi alone, "If she killed herself, she killed herself."

22. After Mitchell was a toddler, he lived with Bobbi and George, sometimes Sherry joined the household, depending on where she was in her education. (By now, Auska had left the Mitchell household entirely for good.)

23. Not surprisingly, the strife in family continued, and this time, the adults centered their abuse on Mitchell, he became their focus. Bobbi bullied Mitchell. Bobbi required a house in tip-top shape, which meant that Mitchell had to clean, and re-clean, to meet her standards. Once, when she grew angry about his inability to clean her stove (he was a child still), she shoved his head into the oven.

24. Bobbi beat Mitchell with whatever was handy; she slapped him daily, and the beatings occurred at least twice a week. Anything, and most times nothing, could set off Bobbi onto Mitchell.

25. The relatively brief period Mitchell lived with his mother (and grandmother), Sherry berated him about sleeping and eating too much. Once Christmas, she and Mitchell argued. Sherry walked away from Mitchell, and they never lived as a family again.

26.    When Bobbi had had enough of Mitchell, she sent him to live with George, who lived at the Reservation.  During Mitchell's earlier school years, George was lax and likely negligent with Mitchell, but Mitchell did not mind taking care of himself.  Later, when Mitchell was sent to George's, and Mitchell was acting out in school, George was strict and accused Mitchell of being a hard-core drug addict, which he was not, yet.  By now, during Mitchell's junior and senior high school years, the abuse and violence Mitchell suffered at home was reflected in his school work.  Also, he incurred infractions for disobeying teachers, fighting, smoking, and other violations.

27.    Mitchell's year as a senior high student saw a good reversal of his life: he did better in school, he graduated, and he actually enjoyed himself – and others, the Reeds, enjoyed Mitchell as well.  After Mitchell graduated from high school and his productive year with the Reeds, he left for Phoenix, Arizona, where some Reed family lived.  He tried several entry-level jobs, but he was unable to keep those jobs.  Because he had never received any parental guidance or direction, only orders and commands, he had no realistic plan for himself.  He certainly had no one to whom he could confide – the Reed children and cousins were well on their way.  Lezmond had no one, but what he did have, instead of anyone who cared about him, was drugs.  Drugs removed him from his reality, and relaxed his anxiety and fear.

28.    Mitchell smoked his first marijuana cigarette when he was twelve, and huffed paint thinner when he was in junior high.  Thereafter, he smoked marijuana about twice a week and into high school, laying off it during the football season.  It was the same with alcohol:  he had his first beer when he was twelve or thirteen, and maintained drinking for the rest of his life.  He tried cocaine powder when he was in ninth grade, but it was not his drug of choice, its high did not last long

enough for him, although he never gave it up. He used crack (cocaine in a solid, smokeable form), and methamphetamine in high school, and while neither held his interest much, he continued to use them. His drug use was not unusual for Navajo adolescents and teenagers. Although the Reservation is "dry," alcohol is forbidden, both alcohol and every type of illicit drug are available, and addiction and alcoholism levels among Navajo youth surpass the national average.

29.     By the time he left the Reservation for Phoenix, while Mitchell's drugs of choice were marijuana and alcohol, he never gave up the other drugs, PCP, meth, LSD, cocaine, and crack. Nevertheless, his Phoenix housemates, Reeds and their family who visited, note that he maintained sobriety, they never saw him drunk or high. He visited Auska and his family, who also lived in the Phoenix, and enjoyed entertaining his niece and nephews. Auska, though, had to confront Mitchell about marijuana paraphernalia; Mitchell cried and apologized.

30.     Although he gave the Reeds and his uncle his best, Mitchell could not keep sober, he continued smoking marijuana and drinking beer. Still, despite his inability to maintain even an entry-level job, life still wasn't too bad for Mitchell: he had some family and other people who cared about him – and he was away from Bobbi Jo, George and Sherry.

31.     That changed however in 2001, when Mitchell left Phoenix and returned to Bobbi Jo's. He had run out of money, and the Reeds could not support him in Phoenix anymore. Initially, he and Bobbi Jo declared a truce, but Bobbi could not maintain it. Bobbi's random violence against Mitchell continued through his junior high and high school years. The last time he lived with her, in California, she became angry and violent with him about whether he had replaced a trash bag in the garbage can. This living arrangement ended with Bobbi's berating and name-calling and abuse. Bobbi Jo reported him for theft. She also reported

9

that he was likely headed to the Reservation because he had no friends in California.

32.    After Mitchell left Bobbi Jo's, in early 2001, he did not return to the Reeds in Phoenix or to the Reed's mother in Round Rock.  He did not return to his grandfather's.  Of course, he did not go to his mother's.  He was homeless.  Eventually, the Nakais took him in,

33.    The Nakai brothers were a notorious lot.  Tribal police knew them well, and kept an eye on their Round Rock household – actually, several homes clutched together where Nakais and their extended family lived.  The police suspected the Nakais of bootlegging and other crimes.

34.    As poor as the Nakais were, they gave Mitchell clothing and shoes because he had only a small bag of possessions with him.  At the Nakais, Mitchell went from not-too-bad to very much worse.  Even Herman and Lorenzo no longer had anything to do with him – their mothers, who kept a tight rein on their children, forbade them from the Nakais, and consequently, they could no longer visit Mitchell.

35.    At the Nakais, Mitchell's drug and alcohol addiction, while just maintained the few months he lived with the Reeds in Phoenix, now careered uncontrollably.  The excess partying with drugs and alcohol was near-constant.  Mitchell used every drug regularly now, and in enormous amounts:  crystal meth, LSD, PCP, crack, ecstacy, cocaine and mushrooms.  He consumed these drugs when they were available, and as much was available.  When he was not trying to recover from withdrawal, Mitchell smoked his marijuana, seasoned heavily with other drugs, and drank beer to extreme.  Food was a luxury – when they had it, it could nothing to make Mitchell feel better.  Likewise, a restful, healthy sleep was unattainable given the amounts of drugs and alcohol Mitchell used.

36.     By now, the partyers at the Nakai household included other addicts and throwaways, like Mitchell, Padrian George, and Johnny Orsinger.

37.     Johnny Orsinger was another discarded teenager.  As Auska reported, even educators at Rough Rock, a school for difficult students, had been scared of Orsinger, who attended Rough Rock only because he could sell there the marijuana that Gregory Nakai brought into the Reservation.

38.     Unlike Mitchell and his school infractions, Orsinger had been involved in significant, felony criminality before he was sixteen:  he had served time in juvenile custody in New Mexico.  By then, he had left Albuquerque for the Reservation, where his father lived, when he needed to be away from juvenile authorities.

39.     Whatever Orsinger's own criminality, Gregory, not the oldest Nakai brother Jimmy Jr., managed the Nakai compound's illicit activities.  Gregory manipulated and planned every act perpetrated by his brothers and their "houseguests"; he purchased marijuana and other drugs off the Reservation, and had the younger set, Johnny and Jason Kinlicheenie, sell the pot at the schools.  Gregory was so organized about his business, he kept track of what was sold, and by whom.  Other than that, saying what Gregory himself did is difficult until the Summer of 2001.

40.     Continuing the bootlegging and managing the marijuana sales, Gregory got the household of addicts and throwaways to the Round Rock Lake in August 2001.  They sold two drunks beer, and when they wanted more, sixteen-year-old Orsinger killed one, and Gregory the other.  While Orsinger's actions were horrible and wrong, they were instantaneous and bizarre.  Gregory, however, thereafter executed the other stranger point-blank because Gregory had wrecked his brother's car.  Gregory then instigated the mutilation of both mens' bodies.

11

After this, Orsinger tried to escape what had happened. Meanwhile, Gregory continued his direction of the criminality, and actually conducted his own criminality throughout that Fall.

41. Try as he might not to, Orsinger returned to the Nakais later that Fall. Orsinger, now serving a life sentence, describes his and Mitchell's drug use in 2001 and before their arrests that November:

> During this time, 2001, at the Nakais, we used a lot of drugs and drank a lot of beer. Everyday, we drank as much as we could get a hold of and used all the drugs we could get our hands on. On the weekend, we used even more drugs and drank more beer. We smoked marijuana, used meth, smoked or snorted cocaine and used LSD. We smoked as much PCP as we could get and that our brains could take. We never used heroin or took pills, we didn't take any drug with a needle, just smoked or snorted it. Staying awake for days at a time partying was very normal for us, never sleeping and not eating. Lezmond definitely used these drugs and drank beer as much as the rest of us. A typical Friday night, Lezmond drank one or two twelve-bottle cases of 40 ounce beers (called '40s'), plus he took as much drugs as he could handle; so did I. Sometimes I wonder ho[w] we survived because of the amount of drugs and beer we used during that time; it should've killed us but it didn't.
>
> . . .

12

> In October 2001, Lezmond and I decided to go to Gallup, New Mexico. We used as much drugs as we ever did, everything we could get a hold of by any means. We didn't smoke just marijuana - we always added something to our cigarettes to make the marijuana stronger. I always added cocaine and meth to my marijuana before I smoked it; I don't know exactly what Lezmond added to his marijuana but it was along those lines. By the time we got to Gallup, Lezmond and I had been awake for several days drinking beer and using drugs. We'd been awake for so many days, it felt like walking around in a cloud. It was like we were puppets, our bodies kept moving forward, but I'm not sure how.

42. Just like at Mitchell's graduation, the only family to show up at Mitchell's capital trial was his uncle Auska. Mitchell never again saw in person his grandmother Bobbi Jo, who raised him as a child and adolescent, or his grandfather George, who lived with him as a teenager. His mother didn't even show up for his capital trial.

43. Trial counsel relied heavily upon Mitchell to build a guilt phase defense, but counsel should have known that Mitchell was far too unreliable to share a large partnership role in the building of his case. Mitchell was young, 20 to 21, when discovery began yet he had already spent a decade as an addict and alcoholic. Mitchell's drug addiction followed him into prison where he spent much of the time before and during his capital trial high on heroin, alcohol and Artane. Even if Mitchell had become adept at hiding his addictions and alcoholism, defense counsel had multiple clues that Mitchell's mind was not right.

13

44.    There were Mitchell's contradictory statements to law enforcement. Those statements were not the measured tale of a calculating liar but more the slow reveal of a story  by somebody with no idea of what happened, the statements of a black-out drunk waking up high, coming off a binge, heading into withdrawal, and willing to say whatever would end the questioning.  In any other case, defense counsel might not have even used Mitchell as a witness let alone rely on him to build a guilt defense.

45.    Thoroughly investigated forensic evidence would have revealed an exculpatory version of events and provided reasonable doubt, but counsel did not thoroughly investigate.  Counsel relied entirely upon the Government's DNA expert including a pre-trial interview where counsel apparently became convinced the expert results could not be challenged.  But the Government's DNA expert was making claims unsupported by science, and a defense expert could have revealed that fact in a matter of minutes.

46.    Cause of death was an issue, but counsel made an unreasonable decision to forgo interviewing the medical examiner explaining to the Court that it would have been too great a financial burden.  Counsel did not seek the advice of any pathology expert.

47.    Where counsel did employ defense experts, their advice was seemingly disregarded.  Most importantly, counsel was advised that Mitchell was a young man with brain damage and an addiction to alcohol and drugs; all of which seriously affected Mitchell's decision making.  This should not have come as a surprise to trial counsel who knew that Mitchell had based a decision to speak to police on the flip of a nickel.

48.    Yet at trial and in opening statements, counsel began to tell a story that took its lead from Mitchell. Counsel opened with "(W)e are not suggesting that

14

you even consider the possibility that Lezmond Mitchell was not there." It seems that counsel took his own advice and did not consider the possibilities. A thorough investigation and a willingness to look beyond the client's limited mental capacity could have unraveled Mitchell's memory of events and provided reasonable doubt for the jury.

49.    Although all of the above information regarding Lezmond's tragic life history was readily available to trial counsel, only a fraction of it was ever presented to the jury that sentenced him to death. Indeed, the defense presentation during the penalty stage of trial was abbreviated, largely superficial, and failed to meaningfully explain the trajectory of Lezmond's life. Instead, the jury was presented with a misleadingly rosy picture of Lezmond's upbringing and background which failed to explore the abuse and neglect he suffered from infancy and the lack of stability and positive forces throughout much of his critical developmental years. Nor did trial counsel present the ample evidence of Lezmond's drug use, or explore how his addiction was the result of the young Lezmond's attempts to self-medicate in order to cope with the fears and anxieties that came with growing up in a home where he was regularly beaten and humiliated by his primary caretakers. The defense mitigation investigation stopped far short of what is required of competent capital counsel. If Lezmond's jury had heard testimony describing the nature and depth of his family's dysfunction and the manner in which it shaped the course of his life, there is a reasonable probability that at least one juror would have voted for a life sentence.

50.    Mitchell's exhibits 1-72, 92-123, as well as forthcoming exhibits, support the preceding information.

## I.

## INTRODUCTION[1]

51.   This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255 and 28 U.S.C. § 2241.

52.   Mitchell is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register #486585-008).

53.   (a)   Name and location of court that entered the judgment of conviction you are challenging:  United States District Court, District of Arizona, Prescott Division, Phoenix, Arizona

(b)   Criminal docket or case number:   CR-01-1062-MHM

54.   (a)   Date of the judgment or conviction:  May 20, 2003

(b)   Date of sentencing:  September 15, 2003

55.   Length of Sentence:  Death

56.   Nature of crime (on all counts):

| | |
|---|---|
| Counts 1 and 5: | CIR-First Degree Murder, Aid and Abet, 18 U.S.C. § 1153, 1111, and 2, a Class A felony. |
| Count 2: | Carjacking Resulting in Death, Aid and Abet 18 U.S.C. § 2119 and 2, a Class A felony. |
| Count 3: | CIR-Felony Murder, Robbery, Aid and Abet, 18 U.S.C. § 1153, 1111, 2111, and 2, a Class A felony. |
| Counts 4, 8, 10: | Robbery, Aid and Abet, 18 U.S.C. § 1153, 2111, and 2, Class C felonies. |

---

[1]   References to transcripts of the trial proceedings before this Court are cited first by the date of the proceedings then as "RT" (Reporter's Transcript) followed by a page number or numbers.

Mitchell is filing exhibits with this Motion containing documents relevant to the issues asserted herein.  The exhibits are cited as "Ex. ___" followed by a number assigned to each document.

Count 6:            CIR-Felony Murder, Kidnaping, Aid and Abet, 18 U.S.C. § 1153, 1111, 1201(a)(2), and 2, a Class A felony.

Count 7:            CIR-Kidnaping, Aid and Abet, 18 U.S.C. § 1153, 1201(a), and 2, a Class, A felony.

Counts 9 and 11:   Use of a Firearm in a Crime of Violence, Aid and Abet, 18 U.S.C. § 924(c)(1)(A)(i, ii, and iii), and 2, Class A felonies.

57. What was your plea?  Not Guilty

58. If you went to trial, what kind of trial did you have?  Jury

59. Did you testify at a pretrial hearing, trial or post-trial hearing?  No

60. Did you appeal from the judgment of conviction?  Yes

61. If you did appeal, answer the following:

(a)    Name of court:  United States Court of Appeals for the Ninth Circuit

(b)    Docket or case number:  9th Cir. Case No. 03-99010

(c)    Result:  Affirmed

(d)    Date of result:  September 5, 2007

(e)    Citation of the case:  502 F.3d 931

(f)    Grounds raised:

1.    The application of the federal death penalty to a carjacking offense that occurred on the Navajo Indian Reservation involving members of the tribe violates the opt-in provision of the Federal Death Penalty Act.

2.    The use of the kidnaping offense, which was prosecuted under the MCS, as a gateway factor violated the opt-in provision of the FDPA.

17

3.     Mitchell was denied his rights to have his petit jury chosen from a fair and representative jury venire when Native Americans were systematically excluded from jury service in his case.

4.     Mitchell was denied due process and equal protection of the laws when jury selection procedures were used to exclude Native Americans and members of other racial minorities from service on his jury.

5.     The court failed to excuse biased members of Mitchell's jury venire in violation of his rights to due process, a fair trial, and a reliable sentencing determination.

6.     The court committed reversible error in excusing for "cause" Veniremember  # 39 based on her belief that the death penalty should be used in approximately two percent of all homicides, an accurate description of this penalty's use nationwide during the past two decades.

7.     The trial court informed members of Mitchell's jury that material elements of the crimes charged were true, impermissibly alleviating the prosecution's burden under *In re Winship* to prove these elements beyond reasonable doubt.

8.     Procedures used to obtain members of Mitchell's jury venire resulted in the under-representation of Native Americans in violation of the Religious Freedom Restoration Act and the American Indian Religious Freedom Act.

9.     The court erred when it admitted Mitchell's post-arrest statements in violation of his rights to remain silent and to counsel, secured by the Fifth and Sixth Amendments.

10.    The court erred in not serving counts.

18

11. After its last minute decision to sever out Mitchell's co-defendants, the court erred by not continuing his trial.

12. The numerous violations of the government's obligation to turn over evidence in a timely way requires reversal of Mitchell's conviction and death sentence.

13. The court erred in many instances by improperly admitting evidence, violating Mitchell's rights to due process, a fair trial and a reliable sentencing determination.

14. The court erred in excluding portions of his post-arrest statements to law enforcement in violation of Mitchell's right to due process, a fair trial, to present evidence and to confrontation.

15. The court violated the dictates of *Bruton v. United States* through the admission of Orsinger's statements.

16. Mitchell's Sixth Amendment Right to confrontation was violated.

17. The questions and references to the race of the decedents and witnesses and the argument that suggested that Mitchell should be sentenced to death because he had offended Navajo culture were improper and violated the FDPA and Mitchell's rights to equal protection, due process, a fair trial, and a reliable sentencing determination.

18. The instructions given by the court on aiding and abetting were inadequate.

19. The improper statements and arguments of the government counsel in both the opening and closing and both the guilt and the penalty phase warrant reversal of Mitchell's conviction and sentence.

20. The court violated Mitchell's right to be present when it questioned the United States Marshal Service on two occasions about different issues outside of the presence of Mitchell.

21. The court erred in accepting Mitchell's waiver of his presence during the penalty phase without conducting a competency determination.

22. The court erred in permitting Mitchell to waive his presence during the penalty phase under Federal Rule of Criminal Procedure 43.

23. Given the total breakdown in communication that occurred between the defendant and defense counsel before the penalty phase began, the court erred in not appointing new counsel.

24. The FDPA is unconstitutional.

25. The jury instructions and verdict forms given during the penalty phase violated Mitchell's rights to due process, and a reliable sentencing determination.

26. The court erred during the penalty phase by admitting information that was irrelevant and unduly prejudicial and in excluding admissible information which Mitchell attempted to introduce.

27. 18 U.S.C. § 3593(c) is unconstitutional in that it does not allow the defendant rebuttal on the issue for which he carries a burden.

28. Mitchell's conviction should be reversed because during the trial family members of the decedents sat in the courtroom wearing buttons depicting the pictures of Slim and Doe.

29. The application of the death penalty to Mitchell, the less culpable co-defendant, violates Mitchell's rights to due process and a reliable sentencing determination.

30. The death penalty is cruel and unusual punishment and a per se denial of due process.

31. Death by lethal injection constitutes cruel and unusual punishment.

32. The application of the death penalty to Mitchell is unconstitutional.

33. The sentences imposed on all non-death counts must be remanded in light of *U.S. v. Booker*.

34. Each of the alleged aggravating circumstances were unconstitutional either facially or as applied, or both.

35. A weighing scheme may not constitutionally utilize non-statutory aggravating factors without also providing for mandatory proportionality review and, therefore, the FDPA is unconstitutional.

36. The Fifth and Eighth Amendments forbid both the execution of Mitchell and his current conditions given that he is prohibited from participating in the Sweat Lodge Ceremony.

37. The federal death penalty is unconstitutional in its application because it is applied disproportionately to racial minorities, to males in female victim cases in violation of due process, equal protection and the Eighth Amendment.

(g) Did you file a petition for certiorari in the United States Supreme Court?  Yes

(1) Docket or case number:  No. 07-9351

(2) Result:  petition for writ of certiorari denied

(3) Date of result: June 9, 2008.

21

(4)    Citation to the case:  128 S. Ct. 2902, 171 L. Ed.2d 843 (2008)

(5)    Questions presented:

a.    Can a court of the United States, by virtue of "decisional authority," assume jurisdiction of a criminal case arising in Indian Country, involving a crime between tribal members, and impose a death sentence in the absence of express congressional authorization, where the tribe had not 'opted-in' to the death penalty provisions of the Federal Death Penalty Act, and where the imposition of that penalty would violate inherent tribal sovereignty interests?

b.    Did the district court's removal for cause of 433 of 434 (99.8%) of the Native American prospective jurors in a case involving the novel application of the Federal Death Penalty Act to a tribal member for offenses arising between Indians and Indian Country, violates due process, equal protection, the right to a fair trial and this Court's holding in *Alexander v. Louisiana*, 405 U.S. 625 (1972) particularly where the corresponding excusal rate for non-Native American jurors was 66%, and the district court repeatedly questioned only the prospective Native American jurors about the effect their race would have on their ability to be fair and impartial?

c.    Are the protections of the Fifth and Sixth Amendments to the United States Constitution and 18 U.S.C. § 3501 violated when federal agents and a federal prosecutor direct tribal authorities to arrest a tribal member to facilitate federal interrogation of that tribal member, who was held in tribal custody for twenty-eight days, and interrogated by federal authorities many

22

times during that period, without counsel and without presentment to a Federal Magistrate?

     d.  Where the government files an untimely Appellee brief and fails to mention or discuss issues that were expressly raised and argued in Appellant's brief, does it violate equal protection, due process and a fair determination on appeal for the court of appeals to apply waiver rules against the appellant, and to overlook the waivers by the government?

  62. Other than the direct appeals listed above, have you previously filed and other motions, petitions, or applications concerning this judgment of conviction in any court?  No

  63. Name of each attorney who represented you in the following stages of the judgment you are challenging:

    (a) At preliminary hearing:  Not applicable

    (b) At arraignment and plea:  Jeffrey Williams, Deputy Federal Public Defender, Office of the Federal Public Defender, 222 North Central Avenue, Suite 810, Phoenix, Arizona.

    (c) At trial and sentencing:  John M. Sears, Esq., 107 North Cortez Str., Ste 104, Prescott, Arizona; Deputy Federal Public Defenders Jeffrey Williams and Gregory Bartolomei, Office of the Federal Public Defender, Phoenix, Arizona.

    (e) On appeal:  Celia Rumann, Esq., Office of the Federal Public Defender, Phoenix, Arizona; Michael O'Connor, Esq., 2617 S. Palm Drive, Tempe, Arizona.

    (f) In the post-conviction proceeding:  Sean Kennedy, Federal Public Defender, and Statia Peakheart, Deputy Federal Public Defender, 321 East 2nd Street, Los Angeles, California.

64.     Timeliness of Motion:  The motion is filed within the one-year statute of limitations in 28 U.S.C. § 2255, therefore, it is timely.

## II.

## ISSUES FOR RELIEF

65.     Mitchell moves for relief pursuant to 28 U.S.C. § 2255.  However, should the Court determine that any of his issues are not cognizable under § 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241, which is an instrument for relief as to any claim for which § 2255 is not an effective or adequate mechanism to test the legality of his detention and sentence.

A.     **COUNSEL'S FAILURE TO INVESTIGATE, PREPARE AND PRESENT EVIDENCE OF INTOXICATION RESULTED IN INEFFECTIVE ASSISTANCE AT GUILT PHASE**

66.     A defendant in a federal criminal trial has a Sixth Amendment right to receive effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("The right to counsel is the right to effective assistance of counsel.").  The Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), set forth a two-prong test to establish ineffective assistance of counsel.  An allegation of ineffective assistance must show: 1) trial counsel's performance was deficient; and 2) the deficient performance prejudiced the defense at trial.  *Id.*  Counsel's performance is deficient if it was "objectively unreasonable under the circumstances."  *Id.* at 688.  To show prejudice under *Strickland*, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

24

67.     The Ninth Circuit has specifically held that in a capital murder trial, counsel's failure to prepare and present evidence of intoxication at the time of the offenses is ineffective assistance of counsel. *See Jennings v. Woodford*, 290 F.3d 1006, 1013 (9th Cir. 2002) (finding ineffective assistance at guilt phase because counsel failed to prepare and present mental-state defense where defendant had told the police that he was high on the night of the murder and had been "strung out on goddamn crank for over a year"). Counsel in this case did not prepare and present a mental-state defense at either phase even though they were confronted throughout their trial preparation with evidence of their client's longstanding drug and alcohol problem and of his intoxication on the night of the crime.

68.     In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

69.     Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

70.     On the day of his arrest (Nov. 4, 2001), Mitchell gave a recorded statement in the presence of Tribal Criminal Investigator Leander Morris and FBI Special Agents Ray Duncan and Trace Kirk. (*See* Ex. 18, 11/04/2001 Recorded Statement Transcript.) In the statement, Mitchell admitted that he and co-defendant Johnny Orsinger planned to steal a truck and that he was present when Orsinger killed Alyce Slim and her granddaughter Tiffany in order to obtain the truck. (*Id.* at pp. 2-4.) He also stated several times that he drank so heavily throughout the day that his memory was blank as to significant events related to the instant offenses. Mitchell told the agents that after the murders he and Orsinger

25

drove the victim's truck towards Tsaile and that "[he] just started drinking again, just like, fuck, sat shot gun just started reaching for my shit, start drinking. Somewhere along there I blacked out."  (*Id.* at p. 5.)

71.    Mitchell said that they drove the truck to a remote location in the mountains so that Orsinger could dispose of the bodies.  They eventually stopped at a sheep camp in the mountains that had been used by Orsinger's late uncle. Mitchell said that Orsinger dragged the bodies out of the truck while "[he] just started grabbing some more liquor and just started fucking drinking again."  (Ex. 18, at p. 6.)  FBI Special Agent Duncan asked Mitchell how long it took for them to drive from the sheep camp where the bodies had been disposed of to the nearest highway.  Mitchell replied, "It felt like a long time, but I mean, when you're drinking and shit, everything feels like a long time."  (*Id.* at p. 8.)  Duncan asked whether Mitchell and Orsinger spoke on the way home from the sheep site. Mitchell stated,

> Not really man.  I don't remember any conversations
> 'cause I know I just started drinking when he was trying
> to drag the bodies off.  I was just drinking, drinking, just
> kicking back, drinking, drinking, then fucking here, all of
> a sudden, he's all, let's go.  Then I was still drinking,
> then we took off, shit I don't even remember making it
> back to the highway, man.  Truly, I don't remember
> making it back to the highway.

(*Id.*)

72.    Special Agent Duncan asked Mitchell where he and Orsinger went after the bodies had been disposed of.  Mitchell replied, "We just started fucking driving, probably coming back down to Round Rock or some shit.  I don't know.

26

Here, probably fucking blacked out during that whole time." (Ex. 18, 11/04/2001 at p. 9.) When the investigator pressed Mitchell about where they hid the truck, he said Orsinger told him that he had stashed it on "the east side of Round Rock," but that he didn't really know because "during that time [he] blacked out." (*Id.*) He stressed that he didn't know whether he directly participated in hiding the truck because he was "just too fucked up that night." (*Id.*)

73.    The next day, November 5, 2001, Navajo Criminal Investigators went with Mitchell to the sheep camp, where the bodies were. Special Agent Kirk re-interviewed Mitchell inside a truck at the sheep camp. Kirk memorialized the interview in a report. According to Agent Kirk, Mitchell stated that Orsinger was stabbing Alyce Slim and that he joined in and stabbed her, too. (Ex. 20, 11/5/2001 FBI interview at p. 1.) The report notes that, "Mitchell said he was so drunk (at the time of the murder) that he could not remember how many times he stabbed [the victim]." (*Id.*) Kirk also claimed that Mitchell also admitted cutting Tiffany's throat twice. (*Id.*)

74.    On November 29, 2001, FBI Agents Duncan and Kent Hush drove Mitchell from the Navajo custody facility to Mitchell's initial appearance in federal court in Flagstaff. Prior to the first appearance in federal court, the agents re-interviewed Mitchell once again. He told them that on October 28, 2001, he and Orsinger made plans to travel from Round Rock, Arizona to Gallup, New Mexico to "purchase liquor." (*See* Ex. 21, 11/29/2001 FBI interview at p. 1.) According to Agent Duncan's report, "Mitchell indicated that he had consumed a couple of forty ounce bottles of beer prior to going to Gallup." (*Id.*)

75.    Jail records reflect that Mitchell was evaluated and recommended for alcohol treatment in November, 2001, shortly after his arrest. The record does not reflect that he underwent treatment, however. In fact, Mitchell continued to

27

consume drugs and alcohol while incarcerated prior to and during trial.  He used heroin and drank "hooch" at the Madison Street detention facility and was drunk or high when he appeared at trial.  (*See* Ex. 96, Eric DeLuca declaration at ¶¶ 3-4.)

76.     Besides these specific indications that Mitchell had an alcohol problem that bore directly on his behavior during his encounter with the victims as well as on his ability to recall relevant events, there were more general reasons to investigate intoxication.  The defense team's social historian, Vera Ockenfels, had warned them that "[a]lcohol abuse and addiction is a leading cause of health problems, early death and criminal activity on the Reservation.  Alcohol is major factor in 50% of all homicides committed in Navajo Country."  (*See* Ex. 93, Ockenfels' Social History at p. 2.)

### 1.     Trial Counsel's Failure to Thoroughly Investigate Intoxication Was Unreasonable

77.     Despite all of these case-specific and more general indicators that alcohol was involved in the offenses, trial counsel did not conduct a reasonable investigation of Mitchell's drug and alcohol use, either generally or near the time of the killings.  Fact investigator Karl Brandenberger did not conduct any investigation regarding Mitchell's state of intoxication at the time of the homicides.[2]  The trial team did not seek any evidence independent of their own client regarding his state of intoxication.  If trial counsel had conducted an independent, reasonable investigation of Mitchell's history of drug and alcohol use, they would have learned that he had a serious, longstanding substance abuse

---

[2]   Brandenberger told a post-conviction investigator that he did not prepare any reports of investigations but that he took notes of all of his interviews. Trial counsel stated Brandenberger's notes were in the file provided to appellate counsel. Appellate counsel informed post-conviction counsel that they never received any investigator's notes in the trial file. (*See* Ex. 115.)

problem since he was at least 11 years old, and that he was severely intoxicated at the time of the homicides.

78.     Mitchell came from a family of alcoholics.  His biological father, Foster Hemil, was a heavy drinker who died of an alcoholism-related illness.  (Ex. 35, Foster Hemil Death Certificate.)  His maternal uncle, Auska Mitchell, is also an alcoholic.  Mitchell told the trial mitigation investigator that Auska drank a "30-pack" of beer in one day.  (*See* Ex. 93, at p. 32.)  Mitchell lived next to two cousins who are serving time in prison for alcohol-related murders on the Reservation. (*Id.*)

79.     Mitchell himself had a serious drinking problem and used many different types of drugs.  Before trial, Mitchell reported to defense mental health expert Barry Morenz, M.D., that he first used alcohol in the sixth grade and was drinking "regularly" by eighth grade.  (Ex. 94, Morenz Report at p. 15.)  Mitchell told Dr. Morenz that he started smoking marijuana in sixth grade and was using crack and cocaine powder in high school.  (*Id.*)  Mitchell's childhood friend, Lorenzo Reed, reported that he and Mitchell were smoking five joints per day in high school.  (Ex. 111, Lorenzo Reed declaration at ¶ 6.)  Mitchell's grandmother, Bobbi, reported that he "could drink two six-packs of beer in less than one hour" while he was living with her in California when he was 19 years old.  (*See* Ex. 93 at p. 33.)

80.     Barry Morenz, M.D., the mental health expert trial counsel retained, reported that "Mr. Mitchell stated that he had been using heroine, cocaine and methamphetamines in at (sic) the Madison Street Jail."  (Ex. 94 at p. 3.)  These reports do not suggest casual, ordinary use of alcohol or recreational drugs.  They bespeak a serious substance abuse problem.  Yet, despite all these red flags apparent in counsel's files, the trial lawyers did not further investigate Mitchell's use of alcohol and drugs on the day of the homicides.  The Supreme Court in

29

*Wiggins v. Smith*, 539 U.S. 510 (2003), found a similar failure to investigate unreasonable because counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of circumstances." *Id.* at 524.  The Court stressed that because counsel were confronted with "evidence that would have lead a reasonably competent attorney to investigate further," their failure to more thoroughly investigate mitigating factors could not be justified as a reasonable tactical decision, but was instead ineffective assistance.  *Id.* at 534.  The same is true here. Based on the discovery and the preliminary investigation of mitigation, counsel should have investigated Mitchell's alcohol and drug use further.

81.    A thorough investigation also would have revealed that Mitchell's use of drugs had rapidly escalated during the months prior to the crimes.  During the summer of 2001, George Mitchell, Movant's maternal grandfather and primary caretaker, kicked Mitchell out of the house because George believed Movant had been stealing from him to buy drugs and alcohol.  Having no money and nowhere else to go, Mitchell appeared on the doorstep of a home occupied by Gregory, Jakegory and Jimmy Nakai.  The Nakai brothers were well-known drug users and sellers on the Reservation.  (*See* Ex. 111 at ¶ 16.)  They were known for accepting young men on the Reservation who had no where else to stay.  The Nakais gave Mitchell food and clothing and allowed him to live with them in exchange for his assistance in selling marijuana out of their house.  (*See* Ex. 107, Gregory Nakai declaration.)

82.    All of the residents of the Nakai house (including Mitchell) used marijuana, crystal meth, cocaine (crack or powder), PCP and mushrooms.  (*See* Ex. 107 at ¶ 5.)  Mitchell and the others commonly used drugs by rolling meth or cocaine into their marijuana cigarettes or by dipping their marijuana cigarettes into

30

liquid PCP.  (*See* Ex. 109 Johnny Orsinger declaration at ¶ 6.)  Mitchell also commonly drank one or two cases of forty-ounce beers each weekend.  (*See id.* at ¶ 5.)  Mitchell bought alcohol from Kellywood Harvey, who conducted illegal sales of alcohol on the reservation.  (*See* Ex. 19, 11/4/01 Interview Report with FBI.)

83.    The evidence of substantial drug use in the months prior to the crime is not limited to participants in the crimes.  Padrian George, who lived in the Nakai house but was not charged with any crime, has declared:

> During the summer and through early November of 2001 all of us, including Lezmond Mitchell, who were staying at the Nakai house used a lot of drugs and drank beer and other alcohol.  We smoked marijuana and drank beer nearly every day.  We also used cocaine, both as powder and as crack cocaine, ecstasy and meth.  We used any drug we could get a hold of.  We used a lot of drugs.  We commonly rolled our marijuana cigarettes with some other stronger drug, like cocaine or dipped our marijuana cigarettes in something much stronger such as meth.  We figured out how to make crack form powdered cocaine; we smoked crack whenever we could get it.  Lezmond Mitchell used all the same drugs, drank as much beer or other alcohol as anyone else and stayed high when he could.

*(See* Ex. 100, Padrian George declaration at ¶ 4.)

84.    Prior to traveling to Gallup, Mitchell and Johnny Orsinger had been up for days smoking marijuana cigarettes laced with cocaine or PCP and drinking

beer. (*See* Ex. 109 at ¶¶ 5-6.)[3]  Both Mitchell and Orsinger were significantly impaired due to lack of sleep and drug and alcohol use.  Orsinger has declared,

> By the time we got to Gallup, Lezmond and I had been awake for several days drinking beer and using drugs. We'd been awake for so many days, it felt like walking around in a cloud.  It was like we were puppets, our bodies kept moving forward, but I'm not sure how.

(*See* Ex. 109 at ¶ 6).

85.    Mitchell in his statements to the police consistently stated that they continued drinking (to the point of blacking out) at the time of the homicides and during their later efforts to dispose of the bodies.  He also had reported to social historian Verna Ockenfels that he was engaged in "heavy use of crystal methamphetamine during the months immediately preceding this incident." (Ex. 93 at p. 33.)  He had specifically described his typical use of methamphetamine as buying it "whenever [he] could afford it" and splitting an "8 ball" with the Nakais, resulting in everybody staying up "3 nights in a row." (*Id.*)

86.    Trial counsel have advised post-conviction counsel that they did not pursue a mental-state defense because they understood that Mitchell had not consumed drugs or alcohol prior to the killings.  It is true that at some time during the representation Mitchell claimed to be "sober" when he saw co-defendant Johnny Orsinger kill the victims.  Because they did not know the extent of Mitchell's longstanding substance abuse problems, trial counsel accepted Mitchell's claim, even though it was contradicted by significant portions of the discovery and by percipient witnesses.

---

[3]  Orsinger has declared that during the trip to Gallup "[they] used as much drugs as they ever did, everything [they] could get a hold of by any means." (Ex. 109 at ¶ 6.)

87.    The ABA Guidelines direct capital defense counsel to investigate guilt issues "regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt." *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.7 (Feb. 2003).  The ABA Standards are a good mark for assessing the reasonableness of counsel's preparation for a capital trial.  *Wiggins*, 539 U.S. at 524 (the Supreme Court has long referred to [the ABA standards] as 'guides for determining what is reasonable'"), quoting *Strickland*, 466 U.S. at 688; *see also Summerlin v. Schirro*, 427 F.3d 623, 629 (9th Cir. 2005) (noting that ABA standards are a guide to assessing reasonableness).

88.    Thus, Mitchell's single, false claim that he was sober during the offenses should not have dissuaded counsel from investigating such a significant defense as intoxication.  This is particularly true where, as here, the discovery contradicts the defendant's single claim of sobriety, and the defendant had previously revealed a long history of serious substance abuse during childhood to defense mental health experts.  As the Ninth Circuit has noted, "Strategic decisions based on information provided by the defendant are often reasonable and entitled to deference.  However counsel must consider all of the defendant's statements, not just those that make his job easier." *Duncan v. Ornoski*, 528 F.3d 1222, 1238-39 (9th Cir. 2008) (internal citations omitted).

89.    A thorough investigation of Mitchell's substance abuse history and his use of drugs and alcohol prior to the killings would have revealed that it was unreasonable to rely solely on Mitchell's claim to defense counsel that he was sober during the crimes.  In fact, both he and Orsinger were severely intoxicated at the time of the crimes.

90.     It is true that counsel consulted mental health experts about traumatic brain damage, but it does not appear that these experts were advised that information from numerous sources indicated that Mitchell was severely intoxicated at the time of the offenses.  The mental health reports do not address this aspect of the case.  To the extent that Dr. Morenz addressed intoxication as a potential defense or mitigation, his report should have alerted trial counsel that more investigation was needed, and that evidence of intoxication could and should have been presented.  Dr. Morenz stated,

> Mr. Mitchell has abused alcohol, marijuana, cocaine, ecstasy and other drugs for a number of years.  His drug use contributed to some of the problems Mr. Mitchell has had in maintaining stability in his life and thus he warrants the diagnosis of polysubstance abuse that is now under some control because he is in a secure environment.[4]

(Ex. 94 at pp. 17-18.)  Trial counsel's investigation was not reasonable because whatever was done to investigate the issue of Mitchell's mental state during the offenses did not uncover his long history of substance abuse, including substantial drinking and drug use on the day of the homicides.

### 2.    The Lack of Intoxication Evidence Prejudiced the Most Viable Defense

91.     Trial counsel's failure to present a mental state defense based solely on the client's claim of sobriety had serious negative consequences at guilt phase. At the beginning of trial, counsel conceded to the jury that Mitchell was present

---

[4]   Dr. Morenz did not reconcile the last part of this statement with his previous statement that Mitchell admitted using heroin in the jail. (Ex. 94 at p. 3.)

during the homicides and did nothing to help the victims. He explained, "There's no question and we are not suggesting that you even consider the possibility that Lezmond Mitchell was not there." (RT 2563-64.) Counsel also stressed that the evidence would give the jury "a complete understanding of how this nightmare began, how it progressed, and how it ended." (*Id.*) He then suggested that Orsinger initiated the homicides in an act of rage, stressing "that this was not, contrary to the government's suggestion, a premeditated plan to steal a truck and kill the occupants of the truck." (*Id.*) Given this opening statement and the evidence to follow, voluntary intoxication was Mitchell's best (if not only) chance to escape conviction of the specific intent offenses, including car-jacking resulting in death, which was the only death-eligible offense charged in the indictment.

92. The evidence that Mitchell was present at the scene of the killings and participated in some manner in the killings was strong. One day after his arrest, Mitchell led the police to the site of the killings and identified where the victims' heads and hands had been buried. (*See* Ex. 20.) FBI Special Agent Trace Kirk claimed that at the site Mitchell had confessed to stabbing Alyce Slim several times after Orsinger had already stabbed her. (*Id.* at p. 1.) Agent Kirk also claimed that Mitchell admitted that the evidence would show that he had cut Tiffany's throat a couple of times before ordering her to lie down on the ground and die. (*Id.*) He also said that Mitchell admitted that he threw rocks on top of Tiffany's head after Orsinger had done so first. (*Id.*) Jason Kinlicheenie, an accomplice in the robbery of the trading post who became a cooperating witness, claimed that after Mitchell and Orsinger returned from Gallup, Mitchell said they had found a truck and gotten rid of rid of two people, an "old one" and a "small" one. (RT 2783.) DNA testing revealed that Alyce Slim's blood was similar to blood on the butterfly knife that fell out of Movant's pocket when he was arrested at the Nakai house.

35

93.    Throughout guilt phase, trial counsel represented to the court that they intended to call witnesses.  They specifically mentioned the Nakais and Johnny Orsinger.[5]  However, the defense rested without calling any witnesses or introducing any evidence.  (*See* RT 3366.)

94.    Given the state of the guilt phase evidence, it was important to develop a defense in which trial counsel could reasonably concede Defendant's participation in the offenses, but still argue that he lacked the specific intent to cause the victims' deaths.  Absent such intent, Mitchell could not be convicted of of car-jacking resulting in death, which was the only death eligible offense.

95.    It is well established that voluntary intoxication is a defense to any specific-intent crime.  *See United States v. Burdeau*, 168 F.3d 352 (9th Cir. 1999).[6] Carjacking requires proof that the defendant had "specific intent" to cause death or serious bodily injury.  *United States v. Randolph*, 93 F.3d 656 (9th Cir. 1997) (reversing conviction because evidence of specific intent to cause death or serious bodily injury was insufficient as a matter of law).  Thus the *mens rea* element of carjacking resulting in death can be negated by voluntary intoxication.  Perhaps this is why there are several Ninth Circuit opinions reflecting that a defendant charged with carjacking tendered voluntary intoxication to negate specific intent to

---

[5]    The defense subpoenaed Johnny Orsinger to testify at guilt phase.  (RT 3332.)  In response to the Court's questions, trial counsel said that they wanted to question Orsinger about the "narrative that the government laid out." (RT 3327.) They specifically mentioned the trip to and from Gallup, as well as "the events that took place in the truck, what [Orsinger's] involvement was and what was Mr. Mitchell's involvement, if any." (RT 3327.)  Orsinger appeared in court and invoked his privilege against self-incrimination, which the court ruled was a proper invocation.  (RT 3332.)  Orsinger's observations of Mitchell's use of alcohol and drugs would not have implicated his right against self-incrimination.  Yet, trial counsel did not request an opportunity to ask Orsinger about this.

[6]    Ninth Circuit Model Jury Instruction 6.8 (intoxication--diminished capacity) reads:  "You may consider evidence of intoxication in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with intent to commit (crime charged)."

36

cause death or bodily harm.  *See, e.g.*, *United States v. Nakai*, 413 F.3d 1019 (9th Cir. 2005); *United States v. Cortes*, 299 F.3d 1030 (9th Cir. 2002); *United States v. Goss*, 241 Fed.Appx 440 (9th Cir. 2007).

96.     Trial counsel recognized the importance of voluntary intoxication to the defense of these specific-intent crimes.  They filed a memorandum requesting Ninth Circuit Model Instruction 6.8 (intoxication/diminished capacity) and citing *United States v. Lilly*, 512 F.2d 1259 (9th Cir. 1975), in support of that request. (*See* CR 301.)  The Ninth Circuit in *Lilly* held that a defendant who claimed to be drunk at the time of the offense was entitled to an instruction "to the effect that intoxication may negate the existence of specific intent."  *Lilly*, 512 F.2d at 1261. The prosecution in its memorandum opposed giving a voluntary-intoxication instruction, noting "There is currently no evidence in the record that the defendant was intoxicated at the time of the offense."  (*See* CR 304.)

97.     At the jury instruction conference, the judge stated that she would give the instruction even though the evidence was weak.  (RT 3403.)  The prosecutor argued against it because:  "There has been absolutely no evidence of intoxication in this case."  (RT 3404.)  He reminded the Court that he had objected to the only question that defense counsel had asked Agent Duncan about intoxication and that the hearsay objection had been sustained.  (RT 3404.)  The prosecutor stressed that, "There's no evidence that anybody was intoxicated, that there was any alcohol involved at during the commission of these offenses."  (*Id*.)

98.     The judge asked defense counsel to "enlighten" the Court about what evidence supported the requested voluntary-intoxication instruction.  (RT 3404-05.)  Because the defense had not developed any evidence of intoxication, counsel was forced to admit that the prosecution was right.  (RT 3405.)  He explained that

the defense had "submitted the proposed instruction some time ago[7] when [they] thought there was a chance of some additional statement. . . . But [he] couldn't disagree with [the prosecutor] on the state of the evidence now. It doesn't support the instruction." (RT 3405.) In light of this concession, the judge denied the requested instruction. (*Id.*)

99.     Armed with the knowledge that no voluntary-intoxication instruction would be given, the prosecutor was emboldened to portray the killings as the product of cold and calculated reflection, rather than the irrational result of drug and alcohol abuse. (*See* RT 3482-88.) He argued that Mitchell clearly had the required *mens rea* for first-degree murder and aggravated carjacking. He argued that Mitchell car-jacked the victims in order to get a truck to carry out the later robbery of the Red Valley trading post and that he killed the victims in order to eliminate any witnesses. He made no mention of Mitchell's recorded statement that he had been drunk before and during the homicides. He did not mention Mitchell's other statements to FBI agents, which were also documented in the discovery, that he had been drunk during the homicides. (*See* RT 3480-90.)

100.   Instead, the prosecutor stressed that the homicides were committed with a plan in mind, stating that "none of this was thoughtless. None of this was impulsive. None of this was spur of the moment. Might not have been the best plan in the world, but it was a plan." (RT 3493.) Although defense counsel had promised at opening to explain how Mitchell became involved in this "nightmare," he had no response at closing to the prosecutor's claim that Mitchell planned out the killings. Defense counsel had denied, at the opening argument, that there was any "premeditated plan to steal a truck and kill the occupants," but he did not

---

[7]   Actually, the defense had filed a memorandum requesting a voluntary instruction only the day before this concession. (CR 301.)

follow up with evidence of intoxication and expert testimony explaining how such intoxication interfered with the defendant's judgment and executive function, resulting in his involvement in impulsive, violent activity. The prosecutor's closing argument simply highlighted that the defense had offered nothing in support of its claim that Mitchell lacked specific intent to kill the victims. When the prosecutor during closing argument capitalizes on defense counsel's error, the likelihood that the error affected the outcome of the trial increases. *See Reynoso v. Giurbino*, 462 F.3d 1099, 1118 (9th Cir. 2006) (finding *Strickland* prejudice for failure to investigate benefits given to witnesses when prosecutor emphasized witnesses' credibility during closing argument).

101.   A showing that Mitchell had been up for days before the offense smoking marijuana laced with cocaine, methamphetamine or PCP and drinking large quantities of alcohol would have enabled defense counsel to rebut the prosecutor's assertion that Mitchell was not impulsive and that he planned the brutal killings for the purpose of "witness elimination." If trial counsel had thoroughly investigated Mitchell's substance abuse history and his use immediately before the homicides, they would have been able to give the mental health experts substantial evidence in support of such a defense. In turn, the mental health experts would have been able to explain how consuming large quantities of drugs and alcohol for several days had affected Mitchell's executive functioning and impulsiveness. Mental health experts could have explained that just because Mitchell, while under the influence of alcohol and drugs, followed Gregory Nakai's orders to obtain a truck, this did not mean that he had engaged in extensive planning and willful conduct, as argued by the prosecution.

102.   Mental health experts would also have explained how so much drug and alcohol use caused Mitchell to become impulsive during the carjacking. If trial

counsel had developed mental health expert testimony about the effects of alcohol and drugs use on brain structure and human behavior, they would have discovered many more mitigating factors. Mitchell had a serious alcohol problem. Alcohol can affect judgment reflected in impaired decision making. Alcohol is also known to affect memory, and increased doses of alcohol can result in partial or complete memory loss for events that transpired while a person was drinking.

103. Mitchell used methamphetamine on a regular basis and around the time of the homicides. Methamphetamine, which causes increased activity, talkativeness, and a general sense of well-being, is a highly addictive stimulant that affects the central nervous system. This drug is known to cause severe structural and functional changes in the areas of the brain controlling emotion and memory. Emotional and cognitive problems are common in methamphetamine abusers.

104. Mitchell also used cocaine regularly and around the time of the homicides. Powder and crack cocaine, like methamphetamine, are also highly addictive stimulants. They cause increased energy and mental alertness, but produce a relatively brief "high" which tends to result in users binging on the drug. In addition to myriad physical problems, cocaine addicts tend to experience periods of irritability, restlessness, anxiety and paranoia. Cocaine abusers can also experience temporary states of paranoid psychosis, where they lose their grip on reality and experience auditory hallucinations.

105. In terms of hallucinogenic drugs, Mitchell was known to abuse, among others, LSD and phencyclidine (PCP). One trait common to these hallucinogenic drugs is that they are highly unpredictable and can produce totally different effects in different people or even in the same person during different periods of abuse. While a PCP high generally lasts four to six hours, LSD and other hallucinogen trips can last up to twelve hours. Hallucinogens are known to

40

distort the user's perception of reality. They can cause rapid, intense emotional swings and affect behavior, muscle control and general responses to environment. Users can experience severe, frightening thoughts and may also suffer psychosis. Until 1965, PCP was used as an anesthetic in humans. Its use was discontinued due to its ability to make patients agitated, delusional and irrational. PCP is known, like other hallucinogens, to produce schizophrenic-like symptoms and can cause severe mood disturbances. Unlike other hallucinogens, PCP is considered an addictive drug.

106. A thorough presentation of Mitchell's use of alcohol and drugs, coupled with the testimony of appropriate mental health experts (such as a psycho-pharmacologist) about how such use affects brain structure and human behavior, would have allowed the defense to rebut the prosecutor's unsupported claims that Mitchell knew exactly what he was doing immediately before and during the bizarre homicides. In short, a person intoxicated by high potency stimulants will be impaired in all areas of mental function. As a consequence of a drug-induced psychotic state, the individual is unable to separate fact from fantasy (psychosis), and is subject to irrational fear (paranoia) that can trigger responsive and impulsive behavior from him. Events occur, and behaviors are seen that would not occur if it were not for stimulant intoxication. The appearance of drug-induced psychosis includes episodes of violence. Stimulant-related violence is typically impuslive, not planned, and the degree of violence is greater than that which is expected from the actions of the intoxicated individual. In a methamphetamine intoxicated person, the rate of thought is extremely fast, and there is little ability to ponder the consequences or reasonableness of behavior. By virtue of stimulant intoxication, such individuals are unable to premeditate or form specific intent; their actions are

41

not truly planned out, but should be viewed as arising from extreme irritability and distorted perceptions created by the drug.

107.   A proper mental health investigation would have revealed that Mitchell was in just such a drug-induced, sleep-deprived state at the time of the homicides.  The defense certainly would have been entitled to receive the voluntary intoxication instruction that it had requested if it introduced all of some of the ample evidence of severe intoxication.  If the instruction had been given, there is a reasonable probability that the result of the guilt phase would have been different.  Trial counsel's failure to prepare and present such important evidence in support of the most viable defense at guilt phase constitutes ineffective assistance.

**B.**     **COUNSEL'S FAILURE TO INVESTIGATE, PREPARE AND PRESENT EVIDENCE OF ADDICTION AND INTOXICATION RESULTED IN INEFFECTIVE ASSISTANCE AT PENALTY PHASE**

108.   Even if a defendant's intoxication does not rise to the level of negating intent at guilt, addiction and intoxication may be a mitigating factor at penalty phase, particularly if, as in Mitchell's case, the defendant turned to drugs and alcohol in response to childhood abuse , neglect and mental illness.  The Federal Death Penalty Act explicitly categorizes "impaired capacity" as a statutory mitigating factor.[8]  Consequently, counsel may be ineffective for failing to investigate, prepare and present evidence of drug and alcohol abuse at penalty phase. *See Jackson v. Calderon*, 211 F.3d 1148, 1163 (9th Cir. 2000)(finding ineffective assistance at guilt phase because counsel failed to prepare and present

---

[8]    Section 3592 defines "impaired capacity" as "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(1) (West 2009).

evidence that defendant was addicted to PCP); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001) (finding ineffective assistance for failure to investigate troubled childhood, history of substance abuse and emotional problems).

109.    The Ninth Circuit has stressed that "the reasonableness of counsel's investigatory and preparatory work at the penalty phase should be examined in a different, more exacting manner than other parts of the trial." *Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006).  Even if evidence of Mitchell's state of intoxication would not have changed the outcome of the guilt phase, it creates a reasonable probability of a different outcome at penalty phase.  The Ninth Circuit in *Frierson* found ineffective assistance because counsel failed to prepare and present intoxication evidence.  The panel stressed, "Evidence of a history of chronic drug abuse may not have been sufficient to demonstrate that [the defendant] lacked the requisite mental state for the crime, but the extent of [the defendant's] drug use from an early age was an important mitigating factor that the jury did not have an opportunity to discover." *Frierson*, 463 F.3d at 994.

110.    In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing. Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

111.    Mitchell's troubled, dysfunctional upbringing provided a compelling story for why he turned to drugs and alcohol so early in life.  Mitchell never met his father, and his mother, Sherri Mitchell, showed little interest in him after the first few months of his life.  She actually gave him to her parents to care for as she pursued an education even though her own parents had physically abused her as a

43

child.  (*See* Ex. 93 at p. 1.)  Not surprisingly, Mitchell was beaten both by his mother and his grandmother, Bobbi Jo Mitchell.  (*Id.* at p. 9; Ex. 111 at ¶ 8.)

112.   Later, Bobbi Jo Mitchell also moved away to teach at a school off the Reservation, leaving Mitchell to be raised by his elderly grandfather.  Friends and educators all remarked that nobody in the Mitchell family appeared to care about the upbringing and education of Lezmond Mitchell.  Despite this, Mitchell became a successful student-athlete and graduated from high school.

### 1.   Trial Counsel's Failure to Investigate Addiction and Intoxication as Mitigation Was Unreasonable

113.   When Mitchell entered adolescence, he became increasingly disenchanted with his mother's abandonment of him and his grandparents' abuse and neglect of him.  As Mitchell descended into serious substance abuse, his behavior became self-destructive and erratic, culminating in his participation in the killings.  The reality of Mitchell's situation is a far cry from the cold, calculating gang leader who plotted a murder to eliminate witnesses, as was argued by the government. The failure to investigate Mitchell's substance abuse deprived the defense of its best opportunity to give an explanation for Mitchell's participation in such brutal crimes.

114.   Trial counsel recognized the potential value at penalty phase of Mitchell's state of intoxication during the killings.  They knew that the Federal Death Penalty Act listed "impaired capacity" as an enumerated mitigating factor. (*See* 18 U.S.C. § 3592(a)(1).)  They requested that the Court give an instruction at penalty phase that impaired capacity could be considered as a statutory mitigating factor.  (RT 4068.)  But as in the guilt phase, counsel had not sufficiently prepared and presented evidence of addiction and intoxication to make use of them as a mitigation defense.

115.    Counsel called FBI Special Agent Duncan to testify at penalty phase that in his taped statement on Nov. 4, 2001, Mitchell repeatedly told the police that he had been so drunk during the killings that he "blacked out" and thus couldn't remember all of the details. (RT 3959.) However, relegating the presentation of voluntary intoxication to merely presenting this snippet of testimony from the case agent without readily available corroborating evidence proved hurtful to the defense. While Agent Duncan conceded that Mitchell volunteered he had been intoxicated during the offenses, he also used the opportunity to testify why he believed Mitchell had been lying about this and other issues. (RT 3975-76.) Specifically, he testified that Mitchell had falsely claimed he had no involvement in the killings and simply watched Orsinger kill the victims. Agent Duncan opined that Mitchell could not have been drunk during the killings because they happened on a Sunday evening, and Mitchell and Orsinger had just come from Gallup, where the sale of alcohol is banned on Sundays. (RT 3996.)

116.    Because trial counsel had done so little to develop this aspect of their mitigation presentation, they had no real response to the case agent's assertions. Agent Duncan was the last penalty phase witness. Thus, the defense ended with the case agent's assertion that Mitchell had been lying about his participation in the homicides and his state of intoxication. There was no mental health expert testimony describing how or why Mitchell's intoxication affected his behavior during the homicides. Having precluded the giving of a voluntary-intoxication once, the prosecutor tried to preclude it again. Seizing on the absence of mental health expert testimony about intoxication at the penalty phase, he opposed the instruction, noting, "The mere fact that [Mitchell] says he was drinking doesn't establish any inability to appreciate the wrongfulness." (RT 4030.) Although the judge ultimately rejected the prosecutor's argument that no instruction on

45

"impaired capacity" should be given at penalty phase (RT 4068), the reality is that the prosecutor had identified the fundamental weakness of presenting evidence of alcohol use through the case agent alone.  The little evidence that there was of alcohol consumption came from the defendant himself and was called into question by the case agent's testimony.  There was no attempt to link intoxication to the events of the crimes, nor were there any efforts to place Mitchell's use alcohol or drugs in the context of his entire background and character.

117.   Because trial counsel did not introduce any mental health expert to testify how drugs and alcohol consumption affected Mitchell's executive functioning and impulsivity, the jury had no way to evaluate how his claim of intoxication would have affected his "capacity to appreciate the wrongfulness of [his] conduct" or his ability to "conform his conduct to the requirements of law," even if his capacity was not so impaired as to constitute a defense to the charge. (*See* 18 U.S.C. §3592(a)(1).) Thus, one of the most important statutory mitigators in this case went unaddressed because trial counsel unreasonably failed to work up this aspect of the mitigation defense.

**2.     The Failure to Prepare and Present Evidence of Addiction and Intoxication Prejudiced the Mitigation Defense**

118.   The special verdict form demonstrates how the failure to develop mental health expert testimony about addiction and intoxication prejudiced the mitigation defense.  Only one juror found "impaired capacity" was present in this case. (RT 4200.)  This suggests that the jury was left with the misimpression that Mitchell was sober during the crimes, when, in fact, he was severely intoxicated, to the point of blacking out.  If trial counsel had presented all of the evidence of addiction and intoxication and called a mental health expert to explain how addiction had affected Mitchell's entire way of thinking, including his decisions to

befriend Johnny Orsinger and participate in the carjacking, there is a reasonable probability that the result of the penalty phase would have been different.

119. The special verdict also demonstrates that his was not an open-and-shut case for death. All twelve jurors found that Mitchell's lack of a criminal record and the fact that Orsinger would not face the death penalty to be mitigating factors. (*See* RT 4199.) Seven jurors found that the Navajo Nation's opposition to the death penalty in this case was mitigating. (*See* RT 4200.) Six jurors found that Mitchell's background and upbringing were mitigating. (*Id.*) All of this suggests that there were substantial mitigating factors to counterbalance the aggravating circumstances of the capital crime. If counsel had presented more compelling evidence of intoxication to explain how and why Mitchell participated in such brutal killings it may have made a difference to at least one juror. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003)(finding prejudice where "there is a reasonable probability that at least one juror would have struck a different balance"). Counsel's failure to adequately investigate, prepare and present evidence of Mitchell's addiction and intoxication at penalty phase requires relief.

## C.   TRIAL COUNSEL'S CONFLICT OF INTEREST DEPRIVED MITCHELL OF THE RIGHT TO EFFECTIVE ASSISTANCE

120. The Sixth Amendment right to counsel includes the right to undivided loyalty. *Wood v. Georgia*, 450 U.S. 261, 272 (1981). The test for determining whether an alleged conflict of interest has deprived the defendant of his right to counsel in violation of the Sixth Amendment was established in *Cuyler v. Sullivan*, 446 U.S. 335 (1980). The Supreme Court explained that "in order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his counsel's performance." *Id.* at 350. Therefore to obtain habeas relief on the basis of an alleged conflict, Mitchell must

47

show 1) that counsel actively represented conflicting interests, and 2) that an actual conflict of interest adversely affected his lawyer's performance.  *See id.*

121.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

122.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

123.   The Ninth Circuit has found a *Cuyler* violation where counsel represented two clients who had conflicting interests even though they were not defendants in the same case.  *See Lockhart v. Terhune*, 250 F.3d 1223 (9th Cir. 2001).  In *Lockhart*, an attorney represented a defendant charged with murder and attempted murder.  The prosecution also alleged that Lockhart had committed a prior shooting that was not charged, but was used to buttress the prosecution's case that Lockhart committed the charged murder and attempted murder.  The same attorney also represented another client who had been identified by the informants as the shooter in the earlier murder that the prosecution now alleged Lockhart had committed.

124.   The Ninth Circuit held that this was an "actual conflict" under *Cuyler* because "[the attorney] could not fairly represent those conflicting interests." *Lockhart*, 250 F.3d at 1230; s*ee also United States v. Christakis*, 238 F.3d 1164 (9th Cir. 2001) (holding that defense counsel represents conflicting interests when one client possesses information that he could use to implicate another client in exchange for a reduced sentence).

125.   As in *Lockhart*, there is evidence in this case to suggest that the Federal Public Defender's Office represented two clients who had actively conflicting interests even though they were not co-defendants in the same case.  At some point before trial, Assistant Federal Public Defender Karen M. Wilkinson notified Federal Public Defender Jon Sands that she was representing a client who had some involvement in the Mitchell case.  Sands directed Wilkinson to seek to be relieved as counsel based on a conflict-of-interest.  He also imposed an "ethical wall" around Wilkinson, which prohibited her from disclosing any information about her former client's participation in the Mitchell case to fellow assistant federal public defenders currently representing Mitchell in this capital case.  (Ex. 115, Celia Rumann declaration at ¶ 7.)

126.   The problem with this solution is that, as in *Lockhart*, it raises the specter of pitting one client against another.  The Federal Public Defender's efforts to protect Wilkinson's client resulted in a diminution of trial counsel's options to thoroughly investigate Mitchell's case.  As a defendant facing the death penalty, Mitchell had a strong interest in investigating all evidence and every potential witness in his case.  Indeed, the ABA Guidelines command trial counsel to do just that.  (*See* ABA Guideline 10.7(advising that counsel should investigate all eyewitnesses, potential alibi witnesses, life-history witnesses, members of the victim's family and should also review all police and forensic reports and view the scene of the crime)).  Mitchell also had a strong interest in ensuring that his counsel were not prohibited from probing any aspect of the investigation and prosecution of this case due to either a conflict or an ethical wall designed to resolve the conflict. The Federal Public Defender's restrictions on trial counsel prevented them from looking into how Wilkinson's unnamed affected the investigation of this case. Thus the conflict adversely affected their performance.

49

127.   The problem only worsened with time.  In August 2007, Assistant Federal Public Defender Celia Rumann, who was representing Mitchell on direct appeal, learned that Wilkinson had conflicted off a case where Wilkinson's client had some involvement in the Mitchell case.  (*See* Ex. 115, at ¶ 2.)  Although Federal Public Defender Jon Sands and Wilkinson knew the nature and scope of Wilkinson's client's involvement in the Mitchell case, neither of Mitchell's current counsel on appeal had any idea about the basis of the conflict.  Rumann notified private attorney Michael O'Connor, who was co-counsel on appeal.  After discussing the matter with O'Connor, Rumann sent an e-mail to Sands asking for "more information to assess whether an actual or potential conflict exists and the extent of any such conflict and how to meet my obligations to protect my client's interests."  (Ex. 115 at ¶ 4.)

128.   Sands subsequently met with Rumann, O'Connor and the trial lawyers about the conflict.  O'Connor argued that the Federal Public Defender's Office had "an obligation to reveal the nature of the conflict so that [current counsel] could properly assess it."  (Ex. 108, Michael O'Connor declaration at ¶ 2.)  Sands persisted in his determination that no information about Wilkinson's former client would be shared with the Mitchell team, but agreed that Rumann could move to be relieved as counsel based on a conflict of interest.  (Ex. 115, at ¶ 5.)  Rumann did not move to be relieved as appellate counsel and the conviction and sentence were affirmed.

129.   It does not appear that in the course of any of these discussions about the conflict that trial or appellate counsel ever advised Mitchell of the conflict to determine whether he agreed with going forward in this manner.

130.   Trial counsel have no written records regarding the conflict or discussions about how to proceed in light of the conflict except one e-mail from

Rumann to Sands objecting to the secrecy surrounding Wilkinson's withdrawal. Consequently, post-conviction counsel contacted Wilkinson in an attempt to obtain the name of the case in which she had moved to be relieved as counsel based on the conflict. After consulting with her office, Wilkinson declined to disclose any information about her former client, including his name.

131. Trial counsel's continuous refusal to share any information about their former client with Mitchell puts him in an "impossible position" because Mitchell cannot know or prove to a court what his own lawyers certainly know, but feel bound not to tell him. *See Lockhart*, 250 F.3d at 1231. The failure to provide the requested information draws an inference that trial counsel "actively represented conflicting interests." *See Cuyler*, 446 U.S. at 350. The conflict is real and continuing because the Federal Public Defender feels such loyalty to the unnamed witness that it still will not provide Mitchell with the information that he needs to support his post-conviction claim. The Federal Public Defender's refusal to share even the name of Wikinson's former client is not compelled by law. There is no basis in attorney-client privilege to withhold the name of a client. *See United States v. Reiserer* , 479 F.3d 1160, 1165-66 (9th Cir. 2007) (holding that attorney could not oppose production to documents simply because they would disclose the identity of his clients); *United States v. Horn* (*In re Horn*), 976 F. 2d 1314, 1317 (9th Cir. 1992) (holding that the attorney-client privilege does not protect a client's identity from disclosure). Thus, it appears that counsel has risked the rights of a capital client in order to protect the rights of another client over and above what the law requires. This is the essence of legal conflict of interest.

132. Counsel in Lockhart tried to obviate any Sixth Amendment problem by having each client waive the conflict. *See also United States v. Martinez*, 143 F. 3d 1266, 1269 (9th Cir. 1998) (valid waiver of conflict-free representation because

51

court informed defendant of right to conflict-free attorney and ability to receive outside legal advice and defendant affirmed desire to retain attorney).  The Ninth Circuit has stressed that a court "must 'ascertain with certainty' that [a defendant] knowingly and intelligently waived his right to conflict-free counsel . . . by 'focusing on what the defendant understood.'"  *Lockhart*, 250 F.3d at 1233 (internal citations omitted).  The panel ultimately rejected the waiver because counsel had not fully disclosed all of the evidence to Lockhart that his other client was the primary suspect in the earlier murder that the prosecution now accused Lockhart of committing.

133.   Here there is nothing in the record or in trial counsel's files to suggest that Mitchell was even notified of the conflict, what is more that he knowingly and intelligently waived the conflict.  Trial counsel admitted during trial that there was a breakdown in communication between them and Mitchell.  It is not likely that he would have waived any conflict if it had been brought to his attention by counsel.  Counsel's failure to notify their client in a capital case of a significant conflict of interest is further evidence of ineffective assistance of counsel.

134.   At the very least, Mitchell has made a prima facie showing of a conflict that adversely affected trial counsel's representation of him at trial and on appeal.  The court should grant discovery and compel the Office of the Federal Public Defender to disclose the basis of the conflict that prompted Wilkinson to move to be relieved as counsel for the unnamed client who has some involvement in this capital case.

## D.   <u>COUNSEL VIOLATED MITCHELL'S RIGHT TO EFFECTIVE ASSISTANCE AT THE PENALTY PHASE</u>

135.   In support of this claim, Mitchell alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

136.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

### 1.   Trial Counsel's Performance Was Deficient

137.   In the third phase of a capital trial, the penalty phase, the jury decides the nonstatutory aggravating factors and the mitigating factors, undertakes the process of weighing, and determines the sentence.  In the issues A and B, *supra*, Mitchell shows that his trial counsel provided ineffective assistance at the merits/guilt and eligibility phases of his trial.  Here, he shows that his trial counsel provided ineffective assistance at the penalty phase.

138.   As discussed fully in issues A and B, *supra*, to establish ineffectiveness, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  In considering counsel's performance at the penalty phase, the Supreme Court has stated that the central question for this Court

> is not whether counsel should have presented a mitigation case.  Rather, [the] focus [is] on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*.

53

*Wiggins v. Smith*, 539 U.S. 510, 523 (2003)(emphasis in original); *id.* at 521.  As the Ninth Circuit has explained, "[t]he Supreme Court has conveyed a clear, and repeated, message about counsel's sacrosanct duty to conduct a full and complete mitigation investigation before making tactical decisions, even in cases involving . . . egregious circumstances." *Earp v. Ornoski*, 431 F.3d 1158, 1175 (9th Cir. 2005) (rape-murder of a toddler).

139.   "Together, *Wiggins* and *Williams* [*v. Taylor*] . . . emphasize counsel's duty to conduct a thorough investigation, and *Williams* in particular shows that counsel's duty is not discharged merely by presenting some limited evidence." *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004).  Courts "closely scrutinize an attorney's preparatory activities." *Foster v. Lockhart*, 9 F.3d 722, 726 (9th Cir. 1993); *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments."); *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) (holding that counsel is deficient if he "neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so"); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) ("[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client . . . ."(emphasis omitted)).

140.   Because the jury in a capital case must consider in mitigation "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant,"[9] capital defense counsel's

---

[9]   ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases P 10.7 (2003), at pp. 80.  *See Tennard v. Dretke*, 542 U.S. 274, 284-87 (2004) (describing the "low threshold for relevance" that applies to mitigating evidence; such evidence need "not relate specifically to petitioner's culpability for the crime he committed"; "the question is simply

54

"penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." 2003 ABA Guideline 10.7, Investigation, at p. 81; *see also Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976) (the Constitution requires an individualized determination that death is the appropriate sentence); *Clemons v. Mississippi*, 494 U.S. 738 752 (1990) (emphasizing the importance of the jury considering a defendant's mitigating evidence).

141. The duty to thoroughly investigate and present mitigating evidence existed at the time of Mitchell's trial in 2003. *Wiggins*, 539 U.S. at 514, 522, 524 (1989 trial); *Williams*, 529 U.S. at 368 (1986 trial); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c), at 93 (1989) (quoted in *Wiggins*, 539 U.S. at 524); 1 ABA Standards for Criminal Justice 4-4-1, cmt., at 4-55 (2d ed. 1980) (cited in *Williams*, 529 U.S. at 396). Here, counsel did not conduct a reasonable mitigation investigation, although many facts for an investigation were readily apparent and available to them.

142. Where counsel's investigation did not discover or develop a fruitful area of mitigating evidence in the first place, the movant must show only that counsel failed in their duty "to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances. . . ." *Williams v. Taylor*, 529 U.S. 362, 415 (2000) (O'Connor, J., concurring).

---

whether the evidence is of such a character that it might serve as a basis for a sentence less than death" (internal quotation marks omitted)); *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1984) (capital sentencer cannot refuse to consider or be "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (internal quotation marks omitted)).

143. Mitchell's capital defense team was comprised of three attorneys, two with no capital defense experience and one experienced in capital defense ("learned counsel"),[10] an investigator whose role was limited to only guilt investigation (See Ex. 123, Debra Garvey declaration), and a mitigation specialist.

144. Learned counsel John Sears did not join the team until several months after the Government had arraigned Mitchell on the capitally-eligible charges.[11] This was a crucial period for Mitchell's case. The Commentary to Guideline 10.2 states:

> [E]arly investigation to determine weaknesses in the [prosecution]'s case and uncover mitigating evidence is a necessity, and should not be put off in the hope that the death penalty will not be requested, or that the request will be dropped at a later point.[ ] Moreover, early investigation may uncover mitigating circumstances or other information that will convince the prosecutor to forego pursuit of a death sentence.[ ]

Commentary to Guideline 10.2, 2003 ABA Guidelines, pp. 58-59 (footnotes omitted).[12] Failing to convince the Government to withdraw the death penalty,

---

[10] "Learned counsel" refers to defense counsel who is "learned in the law applicable to capital cases." 18 U.S.C. § 3005.

[11] The Government withheld its notice of intent to seek the death penalty against Mitchell until September 13, 2002. (CR 87.)

[12] Counsel's mitigation evidence to the Government in support of their request to "de-authorize" or withdraw the death penalty stated that Mitchell suffered from "substance abuse and lethargy" and eye twitching. *See* U.S. Dep't of Justice, United States Attorneys' Manual § 9-10.030 (1998) ("At the time an indictment charging a defendant with an offense subject to the death penalty is filed or unsealed, or before a United States Attorney's Office decides to request approval to seek the death penalty, whichever comes first, the United States Attorney should give counsel for the defendant a reasonable opportunity to present any facts, including any mitigating factors, to the United States Attorney for

counsel must begin and accomplish a thorough, sophisticated mitigation investigation that starts when at their appointment.  *See* footnote 12 to Guideline 1.1 (citing, *e.g.*, *Williams v. Taylor*, 529 U.S. at 415; ABA Standards for Criminal Justice: Standard 4-4.1(a), in ABA Standards for Criminal Justice:  Prosecution Function and Defense Function (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . . The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.").  Here, by the time Sears became counsel for Mitchell, Ockenfels had completed most of her investigation.  As it turned out, learned counsel Sears did not work with the mitigation specialist anyway.  (*See* Ex. 93)

145.   Mitchell is unaware of any substantive investigation conducted and developed by the guilt investigator Brandenberger, save his pretrial interview of the co-perpetrator Johnny Orsinger.  (*See* Ex. 123; Ex. 109.)  Section 2255 counsel requested Brandenberger's trial notes and memoranda to counsel but have been informed that they no longer exist (*See* Ex. 123 at ¶ 3), and he has no recollection of the substance of his conversation with Johnny Orsinger.  (*Id*.)  Orsinger state that he,

> remember[s] meeting with so many people before and
> during the trial so if someone from Lezmond Mitchell's
> defense met with me, I don't remember.  If it'd been
> explained to me that our drug and alcohol use, and how

consideration.").
       While no court has held that defense counsel's insufficient de-authorization presentation, like counsel's here, comprises ineffective assistance of counsel, the Government has withdrawn the death penalty in many capital cases, once it is informed of the substantial mitigation evidence.  (*See* Exs. 82 & 83.)

> many days we had been awake by then, could've been
> helpful to my case too, I would've provided the
> information in this declaration.

(Ex. 109, at ¶ 7.)

146.   Brandenberger drove Ockenfels to some of her interviews.  (*Id.* at ¶ 4.) He was, for example, at Ockenfels' interview with Sherry Mitchell, the client's mother.  After that, because of the language he used with her, and because Ockenfels broke a promise she had made to Sherry, Sherry no longer cooperated with the defense. (Ex. 105,  Sherry Mitchell declaration at ¶ 35.)  Before sentencing, Sherry, of her own accord, sent a letter to this Court asking it to spare her son's life.  (*See* Ex. 105, addendum)

147.   As for Ockenfels, the mitigation specialist, her document titled, "Social History," is sufficient in some areas, incomplete in others, and overall is inadequate. That is not surprising, since at some point, the trial team stopped the already-limited communication they provided her.  Instead of a "social history" of the type courts are used to seeing in capital trials where counsel have provided effective assistance (*cf. Wiggins*, 539 U.S. at 517), and the type the ABA Guidelines direct are mandatory to provide effective assistance in capital cases, Ockenfels' "social history" document is clearly for counsel's use only.

148.   Still, Ockenfels' "social history" document gave counsel abundant sources of potential mitigation evidence that would have prompted any reasonable capital attorney to investigate further.  For example, an educator on the Reservation, who also knew the Mitchell family, was not alone in stating that, "Lezmond 'had no love' from George or anyone else in his family and 'was abandoned by his mother and grandparents.'"  (*See, e.g.*, Ex. 93 at p. 10.)  The Social History also described the abuse perpetrated against him by his mother Sherri and his grandmother Bobbi

Jo. *See*, section Preliminary Statement, *infra*.  Unfortunately, counsel failed to follow up on many of the leads, and as a result, important mitigation evidence was not presented.

149.   Counsel did not consult the mitigation investigator before presenting the witnesses they did at the penalty phase.  (Ex. 93.)

150.   Another area of strong mitigation that counsel failed to adequately develop from their mitigation specialist's document was this:

> Lezmond also experimented with 'acid' (LSD) in his sophomore year of high school.  He first smoked crack cocaine in his junior year of high school, and thereafter indulged about once every 2 months.  He reports 'heavy use' of crystal methampheamine [sic] during the months immediately preceding this incident.  While he was living with the Nakais immediately before his arrest in this case, he and the Nakais typically bought an 8 ball, split it between them 'and stayed up 3 nights in a row.' Lezmond reports he took crystal meth 'whenever [he] could afford it,' and used it last in September, 2001.

(Ex. 93, p. 33.)  *See* Section B, *supra*, regarding counsel's ineffective assistance regarding the gateway intent and aggravating factors.

151.   No mental health or other experts or professionals testified on Mitchell's behalf despite red flags showing that he grew up in violent, abusive homes and he had long suffered from drug addiction.  Indeed, trial counsel's files reveal that they had decided long before not to develop further or present any mental health expert testimony.  While the failure to present mental health testimony may not necessarily comprise ineffective assistance, counsel received

59

mental health evaluations before trial that were fertile with potential mitigation evidence.  (*See, e.g.*, Ex. 94, Morenz; Ex. 93 and Ex. 92, Fields' therapy notes and pre-trial interview, submitted under seal.)  Yet, counsel abandoned those efforts and presented only a scattershot of disorganized lay testimony.  Considering the rich mitigation evidence they could have had, if they had developed it, coupled with the evidence they failed to develop (*see infra*), counsel's performance was deficient. *See also Jells*, 538 F.3d at 495 (6th Cir. 2008) ("[I]n *Wiggins v. Smith*, the defendant was found to have been deprived of competent counsel when his 'counsel abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources,'" (quoting *Wiggins*, 539 U.S. at 524)).  As the forthcoming declarations by Mitchell's mental health experts will show, counsel unreasonably failed to consult with appropriate and necessary experts, and failed to prepare and present expert testimony on Mitchell's life history, including his executive functioning deficits, his substance abuse and its consequences, and his upbringing and his family background.

152.   Besides learned counsel Sears, counsel had available to them other resources to aid in providing Mitchell effective assistance, all of whom counsel vastly underutilized.  One, a member of counsel's own Office, had performed as counsel and learned counsel in several other capital cases previously.  Another was a learned counsel whose job is actually to assist capital counsel – he is with the Federal Death Penalty Resource Counsel, a program designed to assist federal defenders and appointed counsel in federal capital cases where the Government seeks the death penalty.  Yet, Mitchell's defense attorneys – two of whom had never represented a federal capital defendant previously – underutilized the experience and expertise of these two capital defense attorneys.  Except for one notable meeting, their contributions were limited to the few occasions that trial counsel

consulted with them briefly.  At that one meeting, counsel asked one of these attorneys to convince Mitchell to accept a sentence less than death.  Although the failure to consult other capital defense attorneys is not necessarily ineffective assistance, here, Mitchell's counsel unreasonably failed to utilize the mitigation evidence they did have, and presented, by way of a handful of witnesses, an unfocussed and brief mitigation presentation.

153.   While the 2003 Guidelines state confidently that "having a qualified mitigation specialist assigned to every capital case . . . insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict" (Commentary to ABA Guideline 4.1 at p. 33), the requisite "close scrutiny" of counsel's performance at the penalty phase reveals that having such a specialist on Mitchell's team failed to ensure this goal.

154.   It appears that all the penalty phase witnesses, whose role was to provide information that would "militate against the appropriateness of the death penalty," were unprepared for their testimony.  If counsel's unreasonable performance was because they were "still in shock at the guilty verdict," it is of no moment.  The case law is clear that counsel must prepare for the penalty phase even if counsel believe they have a strong defense to the guilt case-in-chief.

155.   The witnesses describe being interviewed – most, just briefly – by the mitigation investigator well before the trial even began, then being summoned to testify at Mitchell's penalty phase with a few instructions from counsel just minutes beforehand.  (*See* Ex. 104, Auska Mitchell declaration; Ex. 111, Lorenzo Reed declaration; Ex. 121, Sonja Halsey declaration; Ex. 116, Tammy Rose Sebahe declaration.)  One mitigation witness had only escorted her mother to testify for Mitchell, but ended up replacing her mother without much ado, or any preparation,

from trial counsel.  (Ex. 116 at ¶ 5.)  The mitigation specialist had interviewed Auska, Mitchell's uncle, several times before trial.  However, trial counsel did not tell him what they would ask him when he testified.  (Ex. 104 at ¶ 23.)

156.   Almost all the witnesses state that counsel showed them the photographs of the deceased victims, then asked if they were still sure they wanted to testify for Mitchell, and if they were sure Mitchell should not receive the death penalty.  (Ex. 104 at ¶ 23; Ex. 111 at ¶ 19; Ex. 116; Ex. 121 at ¶ 5.)  All of the witnesses passed this test, apparently, and testified as well as they could.

157.   Still, only two of the eight defense penalty witnesses knew Mitchell longer than four years.  In response to counsel's questions, Auska stated that he saw Mitchell "off and on" during Mitchell's childhood; he never met Mitchell's father; Mitchell was close to his children, and he believed Mitchell's life should be spared. Auska's direct testimony comprised only nine pages, including his own biographical information and his descriptions of five photographs of Mitchell.  (RT 3888-97.)

158.   As its last mitigation witness, the defense played a video-deposition of the only other mitigation witness who knew Mitchell before 1998:  Bobbi Jo Mitchell, his grandmother.  As counsel later remarked to the jury, Bobbi spent a significant portion of the barely-one-hour video discussing herself.  (RT 4156.)

159.   As discussed in Section, B, *supra*, counsel could have used much of this evidence to rebut evidence introduced to show intent and aggravation.  Because of counsel's failures, the jury had an incomplete, and in many ways, false, portrait of the man they sentenced to death.  *Bean v. Calderon*, 163 F.3d 1073, 1080-81 (9th Cir. 1998) (granting relief to a capital habeas petitioner because at the penalty phase defense counsel presented a portrait of the defendant's family that was an

"unfocused snapshot" and mitigating evidence was presented "only in the vaguest terms").

160.   As for the mental health professionals counsel did consult, counsel did not give them adequate background information about Mitchell so they could give counsel a reliable, sound evaluation of and accurate testimony about him (which was impossible given the limited nature of the mitigation investigation); failed to guide them about the meaning of "mitigation evidence" as the case law broadly defines it; and failed to call them to testify before the jury.  These failures were unreasonable.

161.   Mitchell's counsel failed "in their obligation to conduct a thorough investigation of the defendant's background," *Williams v. Taylor*, 529 U.S. at 396, and "to 'present and explain the significance of all the available [mitigating] evidence.'" *Mayfield*, 270 F.3d at 927.

### 2.   Trial Counsel's Deficient Performance Prejudiced Mitchell

162.   Prejudice from counsel's errors must be "considered collectively, not item-by-item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).  The Ninth Circuit has emphasized that in ineffective assistance of counsel claims, "prejudice may result from the cumulative impact of multiple deficiencies." *Harris ex. rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc).  Thus, the Court must consider the cumulative prejudice resulting from trial counsel's deficiencies in all phases of Mitchell's trial, as opposed to considering prejudice based only on each individual instance of inadequate representation by counsel.[13]

---

[13]   Some of the errors counsel committed at the guilt phase (incorporated herein by reference) prejudiced Mitchell at the penalty phase too.  In addition, although each subclaim below provides an independent basis for relief on

163.   Here, not surprisingly, only half the jurors found the existence of "[o]ther factors in Lezmond Mitchell's childhood, background, record, character or any other circumstance of the offense . . ." as mitigating against the death sentences. (CR 945, 955.)  Seven jurors found as mitigating evidence the January 22, 2002 letter from the Navajo Nation to the Government expressing its opposition to the death penalty for Mitchell.  (*See* Defendant's Penalty Phase Exh. 22.)  These findings suggest strongly that this was not an open and shut case for death.

164.   The "classic mitigating evidence," *Correll v. Ryan*, 465 F.3d 1006, 1011 (9th Cir. 2008) (as amended), that could and should have been presented at trial, but was not presented, includes the following:

165.   Lezmond Mitchell was an abandoned and abused child; an abandoned and abused teenager; and an abandoned young adult.  His mother and father may have contributed the biology that brought him into life, but neither of them were ever parents to Lezmond.  Lezmond never met his father nor any members of his father's family.  Under his mother's care, Lezmond was so badly burned at the age of eight months that his mother sent him to live with his maternal grandmother.  In his grandmother's care, Lezmond was beaten, bullied and shamed on a nearly daily basis.  When Lezmond's grandmother would no longer take time for even minimal care of Lezmond, his grandmother sent him to live with his maternal grandfather.  Lezmond's maternal grandfather was at best lax in Lezmond's care, and negligent at worst.  There were years in Lezmond's life where his grandparents and mother moved him from household to household without regard for his schooling, his connections to the few friends he had, or even whether there would be an adult who would take care of him.

---

Mitchell's claim of ineffective assistance at the penalty phase, relief is also appropriate based on the cumulative prejudice arising from these different acts and omissions.

64

166.   Lezmond's maternal grandfather was Navajo, his grandmother was Scottish, and his mother a product of these two lineages.  Lezmond's grandfather was a well-regarded elder on the Navajo Reservation.  Lezmond's grandmother had a doctoral degree in education.  Lezmond's mother has an advanced degree also in education.  Despite all the traditional measures of success and internal resource this heritage might have been for Lezmond, no one took the time to teach him, raise him in a spiritual life, or help him see a productive place for himself on the Navajo Reservation.  His grandfather or mother never taught him the language, never explained his mixed race or even supported in his exploration of the Native American Church.  Lezmond was a boy without both internal and external resources.

167.   Lezmond Mitchell's immediate family had so little regard for him, it did not matter if school authorities requested their attention for problems, or cared about accomplishments he achieved – they had no time for Lezmond.  When a concerned school official called Lezmond's mother asking her to come to a school conference regarding her son, she not only refused to attend, she forbade the school official ever to call her again.  When Lezmond was a passenger in a car involved in an accident that killed the driver, no one from his family ensured that he received medical attention.  In fact, despite various official documents recording the event, Lezmond's mother questions whether the accident and death of Lezmond's friend, the driver, even happened.  Lezmond was a football player in high school, yet no one from his family ever attended a football game.  Lezmond was chosen to give a graduation speeches at his high school graduation.  None of his caretakers attended graduation.  Lezmond Mitchell's childhood was neither witnessed, nor celebrated by anyone in his immediate family.

168.   The attention Lezmond did receive from his family came almost exclusively as verbal or physical abuse.  His mother hit and whipped him.  His grandmother smacked and beat him, she shoved his head shoved into a stove.  His grandparents and mother called him names, and told him that he would never amount to anything.  They accused him of criminal activity before there was any in his life.  They told him he was the product of rape, and that his mother was the product of incest.  This only child witnessed violence in his household and was the target of violence himself.  Lezmond watched the mental illness of his grandmother and mother play out in horrible ways in his own life, including a struggle for power over Lezmond between them, where the only goal of the struggle was who would inflict abuse on him.  A psychologist evaluating Lezmond in high school urged treatment for Lezmond's depression and suicidal ideation emanating from the family discord and his abandonment.  No one in Lezmond's family sought the treatment Lezmond needed, nor encouraged him to seek treatment for himself.

169.   In high school, for a brief period, Lezmond sought out a small community of support, the Reed family.  The Reeds took Lezmond in, cared about, fed him, housed him and he flourished.  He was the positive influence for his classmate, Lorenzo Reed.  He was the babysitter for Tara Reed's baby daughter, he did chores, came home on time and was considered family.  Lezmond's family homestead was no more than five miles away from the Reed's home, but that distance made a world of difference for Lezmond.  He became a student body officer and graduated with some distinction from high school.

170.   Untreated depression, the abandonment of a child who has grown to a young man with so little support from his family, and the slide into drug use came to define Lezmond's life after high school.

171.   He tried working but had little ability to stay focused and substance free.  When he ran out of money and had no job, Lezmond had to leave the Phoenix apartment of a Reed family member.  He went back to living with his maternal grandmother, an arrangement destined to end badly.  Lezmond left his grandmother's home when she violently berated him over his placement of a trash bag in a trash can, accused him of theft and sent him into the world knowing he really had no where to go. Lezmond headed back to Round Rock, disconnected from anyone in his family and homeless.

172.   The Nakai household was notorious in their community.  The three oldest Nakai brothers were known drug and alcohol sellers and suspected in many other criminal activities in and around their community.  A band of misfits collected at the household; young men who had nowhere else to go and were addicted to the illegal substances easily available through the Nakais.  Staying at the Nakai house had its own set of obligations, including supporting the drug and alcohol sales and consumption that went on there. One Nakai brother, Gregory, was the acknowledged manager of the household's illicit activities.  Gregory kept the records, engineered the sales of drugs and alcohol and ultimately murdered a man that bought beer from him, by shooting him in the head for simply being drunk at the wrong place and wrong time.

173.   Another young man who stayed periodically at the Nakai house, Johnny Orsinger, came there with a significant criminal background and a serious drug addiction.  In October 2001, he and Lezmond went to Gallup, New Mexico after a binge of many days on marijuana, meth, and cocaine. They had not slept, and they had been drinking beer along with their drug use.  Johnny described feeling as though he and Lezmond were walking as puppets, with their bodies moving

67

forward, but unsure how that could happen.  The capital crimes that occurred happened in that context.

174.   A predictable conclusion to Lezmond's abandonment throughout his life, neither Lezmond's grandmother, grandfather, nor his mother attended his capital trial.

### a.   Evidence of Family Mental Health History and Its Effect on Mitchell

175.   Trial counsel presented no evidence that Mitchell had a family history of mental illness, and its effect on him.  Mitchell's grandmother, Bobbi Jo, who was his primary caretaker as a child and adolescent, suffered from a mental illness.  (*See generally* Exs. 95, 96, 98, 99, 117, 120; Ex. 105 at ¶¶ 32, 35; Ex. 104 at ¶¶ 8-16) She was paranoid.  She could not maintain a steady position, despite having an advanced education and degree, because of her mental state.  (*See, e.g.,* Exs. 95, 104, 117)[14]  Had counsel not alienated Mitchell's mother at the outset (*See* Ex. 105), and had counsel investigated Bobbi Jo thoroughly, they would have discovered this information readily.  As it was, counsel never found the evidence of Bobbi Jo's mental illness, thus they were never able to explain the implications of the grandmother's illness to Mitchell's upbringing and development, particularly since Bobbi Jo abused Mitchell physically and psychologically.

176.   Counsel did not consult with a psychiatrist or any other mental health professional to investigate the implications of family mental illness for Mitchell and his case.  Counsel's deficient performance in failing to present evidence of this family history of mental illness and its implications for Mitchell requires relief.

### b.   The Abuse and Neglect Endured by Mitchell

---

[14]   There was also evidence that Bobbi Jo's family, the Erwins, had a history of mental illness.  (Ex. 71.)  This too was undeveloped by counsel.

177.    "[Counsel's] investigation should include inquiries into social background and evidence of family abuse." *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (citing *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005)). Here, trial counsel presented no evidence of the physical, and emotional abuse Mitchell endured growing up, although counsel's mitigation specialist had found the fruits of that evidence:

> Lezmond's bond with his mother was severed as early as 9 months of age when Sherry delivered Lezmond to her father – for the first of several times – to raise.  Lezmond had multiple caretakers before and after Sherry's abandonment, including several babysitters.

(Ex. 93, at p. 7.)

> After Lezmond sustained unexplained injuries – 'second degree burns all over his chest and stomach when Sherry spilled hot coffee on him and got a big bump on his head,' Sherry dropped Lezmond for George to raise in Chilchinbito, Arizona, back on the Reservation.  Lezmond he was only about 9 months old, but according to Sherry, her NAU schedule was unmanageable, and she was 'too tired trying to do too much and not paying enough attention [to Lezmond].'

(*Id*. (emendments and quotations in original).)

> Lezmond was defiant with his mother, and when he started school, with his teachers.  In 3rd grade, he embarrassed Sherry when he 'got into a lot of clashes' with his teacher.  After all, Sherry reports, she was an

educator, but 'couldn't even control her own son.' According to Sherry, she 'told Lezmond to stop acting out,' and that she 'could lose [her] job over him, but Lezmond wouldn't stop.' Again choosing her career over son, and concerned more about her reputation than her son, Sherry withdrew Lezmond from school in the middle of the semester and shipped him to his grandfather to deal with. Lezmond recalls this move with regret. He reports feeling the sting of rejection, which never went away, but subsided instead into anger. From Sherry's point of view, Lezmond 'cut [her] out of his life in third grade' from this time forward.

(*Id.* (emendments and quotations in original).)

Lezmond and Sherry 'got into a big fight' and Lezmond refused to go back to California with Sherry after a visit to the Reservation during Christmas of 7th grade. According to Lezmond, Sherry hit him for the last time during this incident, and he'd 'had it.'

(*Id.*, at p. 9 (quotations in original).)

Before 'the Christmas Incident', Bobbi, George and Sherry report that Lezmond told his grandparents Sherry had been beating him, a 'story', Sherry reports, her parents 'chose to believe.'

(*Id.* (quotations in original).)

Bobbi states that, when Sherry 'lost it' with Lezmond, she would 'sock him.' According to Lezmond, Sherry started

whipping him when he was in 3rd grade, and his mother and he got into several scuffles as a child.  Lezmond told Bobbi and George that his mother frequently beat him when they went home for 'The Christmas Incident' in 7th grade. And, during The Christmas Incident, he reports Sherry grabbed Lezmond, 'hit [him], and shoved [him] up against the wall, and [he] reached [his] breaking point.' Bobbi and George, who 'cannot recall' the physical tussle Lezmond and Sherry got into during Christmas, ignored his reports of abuse, but offered him a place to live. When Sherry packed the car and demanded he get in it to return to California, 'he wouldn't budge.'

(*Id*. (emendments and quotations in original).)

Auska, Lezmond's uncle, Lorenzo Reed, Lezmond's friend, and Delilah, Lezmond's girlfriend, report that Lezmond reported verbal and physical abuse by both Bobbi and Sherry.  Lezmond told Lorenzo when he was a senior in high school that his mother constantly 'put him down' and was 'always angry with him.'  He told Lorenzo that his grandmother 'slapped him, and pushed him around all the time.'  Once when Lezmond was cleaning the oven, Bobbi 'pushed him and he hit his head on the oven door handle.'

(*Id*., at p. 9 (quotations in original).)

According to Delilah, Lezmond reported that his mother was 'mean' and 'slapped him around' when he was little.

71

During a recent interview, Lezmond reported he's 'gotten into pushing matches with Bobbi' several times.

(*Id.*, at p. 10 (quotations in original).)

According to Lezmond, Sherry 'didn't want to have anything to do with [him]' and 'stopped being affectionate with him' by the time he vias in 3rd grade. He 'hated living with Bobbi [in California] because she rarely hugged [him] and always insisted that things be done her way or no way.' Dr. Robert Roessel, George Mitchell's friend who lived on the Reservation all of Lezmond's life, agrees that Bobbi and Sherry were both 'cold, domineering and stubborn.' According to Dr. Roessel, Bobbi and Sherry were 'opinionated, brash and the type that tolerates things being done only their way.' Auska agrees his mother was 'picky, overbearing and demanding.'

(*Id.* (emendments and quotations in original).)

According to Lezmond, George was 'never affectionate,' and life on the Reservation was 'boring and isolated.' Lezmond recalls wondering as a child 'what [he] did wrong to deserve his banishment to George's house in the middle of nowhere.'
According to George's friend, Dr. Robert Roessel, Lezmond 'had no love' from George or anyone else in his family and 'was abandoned by his mother and grandparents.' Dr. Roessel 'knows no one who really

72

> loved Lezmond,' who was 'on his own from the time he was born.'  He was dumped into George's lap, a man who was 'not capable or interested in providing love or direction to anyone.'  According to Dr. Roesse1, George was a 'dour, sour man, who was never happy.'  Bobbi, too, was an 'unhappy woman' and her absence 'was probably better' for all, as there was so much conflict between her and George, and together, they 'could see only the negative side of life.'

(*Id*. (emendments and quotations in original).)

> Lezmond's uncle, Auska, reports that neither Bobbi or George were 'huggers,' and showed Lezmond affection instead by 'buying things.'  According to Auska, Lezmond looked in the wrong places for the affection he never got from his family.  Auska stated during a recent interview that Lezmond 'never had a chance' with his family.

(*Id*. (emendments and quotations in original).)

> 'Outsiders' noticed a troubled Lezmond in high school, and attempted to intervene with 'damage control,' but by then the neglect Lezmond had endured had taken Its toll and had hardened him.  Dr. Roessel and his wife, Ruth, 'tried to help provide Lezmond direction because his family was not there for him.'

(*Id*. (quotations in original).)

73

According to Rough Rock High School Vice Principal John Fontes, Lezmond once told him 'every body had let [him] down.' Mr. Fontes noticed Lezmond's general 'disappointment with adults because the adults most important to him were not there for him.' Mr. Fontes recalls approaching Auska 'to encourage Lezmond [to graduate high school],' because it was obvious that 'Lezmond needed family support.' Rough Rock High School English teacher, Sonja Halsey, noticed that Lezmond's family had 'turned their backs on him' and tried to boost his self-esteem by focusing on his academic successes.

(*Id.* at p. 12 (quotations in original).)

Sherry reports she attempted to 'take control' of Lezmond when she moved back to the Reservation in connection with employment she obtained during Lezmond's junior year. However, her attempt was lame, fleeting and disingenuous. According to John Fontes, Sherry didn't want any day to day involvement' with Lezmond or his issues at Rough Rock High School. When he telephoned Sherry to discuss Lezmond's poor attendance and disciplinary problems, Sherry hung up on him in response. She told him she 'didn't want to know about Lezmond's status or progress, and not to call again.'

Indeed, Sherry celebrated her son's failures.

(*Id.* (quotations in original).)

74

> According to Dr. Roessel, Sherry was 'furious' when he convinced the school board to allow Lezmond stay in school to graduate when Lezmond faced expulsion for passing marijuana in the school hall. *Dr. Roessel reports that Sherry was 'ecstatic' when Lezmond was arrested in the present charges.*

(*Id*. (emendments and quotations in original; emphasis added).)

178.   As described in this Motion, the reality of Mitchell's childhood was much different than the vague and brief portrait of his childhood that trial counsel presented.  Counsel's failure to present readily available evidence of Mitchell's abusive upbringing requires relief.  *Boyde,* 404 F.3d at 1177(granting penalty relief where defense counsel failed to present evidence of physical and sexual abuse in defendant's household but instead presented testimony suggesting defendant had a nonviolent childhood); *Karis v. Calderon,* 283 F.3d 1117, 1136 (9th Cir. 2002) (finding failure to present evidence of childhood abuse by stepfather prejudicial); *Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2003) (vacating death sentence where "counsel failed to present testimony at the penalty phase of trial explaining the effects of the severe physical, emotional and psychological abuse to which [defendant] was subjected as a child").

### c.    Mitchell's Drug and Alcohol Abuse

179.   As discussed *supra*, Sections A and B, counsel was aware that Mitchell abused significant amounts of polysubstances.  "When put on notice that the defendant might be a drug user . . . [a capital defense] lawyer . . . ha[s] a duty to investigate the extent of the defendant's drug use and its effect on his behavior." *Belmontes v. Ayers*, 529 F.3d 834, 848 (9th Cir. 2008).  In addition to defeating the gateway intent and mitigating factors with the powerful evidence of Mitchell's

polysubstance abuse and addiction – particularly since it escalated before the capital offense – such evidence is "classic mitigation evidence." *Correll*, 465 F.3d at 1011; *Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006). In sum, counsel's failure to present evidence of the extent and breadth of Mitchell's polysubstance abuse was unreasonable because this evidence, if presented effectively, rose to the degree of a statutory mitigator. *Correll*, at 1015-16.

180. Here, this Court directed the jury to consider "Lezmond Mitchell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, despite whether his capacity was so impaired as to constitute a defense to the charge." (CR 945, 955.) Although Mitchell *was* impaired at the time of the offense, as well as by permanent mental dysfunction stemming from heavy substance abuse, the jury heard only, regarding his substance abuse, that (1) he had one disciplinary problem at the Rough Rock school for smoking marijuana, which a witness described as "typical behavior" for Navajos who "don't know who they are," and resulted in Mitchell's suspension from school for several days (RT 3798; RT 3914-15), and (2) after smelling marijuana, his uncle Auska found Mitchell's pot pipe. (RT 3891.) Thus, it was no surprise that only one juror found that Mitchell's impaired capacity was mitigating. (CR 945, 955.)

181. As discussed *supra*, Mitchell has a history of addiction and substance abuse.[15] (*See* Ex. 100 at ¶¶ 1-2, 4; Ex. 102 Dennie Leal declaration at ¶¶ 2, 5; Ex. 107 at ¶¶ 4-5; Ex. 109 at ¶¶ 4, 6; Ex. 111 at ¶¶ 4, 6, 11, 14, 16; (Ex. 119 Herman

---

[15] Mitchell's purported statements that he was not drunk are an insufficient basis for counsel to forego an intoxication investigation and presentation in light of all the information available to counsel. *See Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008).

Tsosie declaration at ¶¶ 4, 10, 15.)  Further, his polysubstance abuse escalated at the time of the offenses.  (*See id.*; *also see* sections A and B, *supra*.)

182.   Counsel failed to investigate Mitchell's anomalous use of enormous amounts of illicit substances and alcohol prior to the offenses alleged, and failed to present this information to the jury in the context of a well-detailed mental health history.  This history was available to trial counsel had investigated Petitioner's life history adequately.  This failure to adequately investigate and present mitigation evidence concerning Petitioner's life history was unreasonable under the prevailing professional standards and was highly prejudicial to Petitioner. *Correll*, 465 F.3d at 1016-17 (granting penalty relief where trial counsel failed to present evidence of drug use of defendant and his siblings); *Ainsworth v. Woodford*, 268 F.3d 868, 875 (9th Cir. 2001) (finding prejudice because omitted evidence of defendant's drug and alcohol use "would have been extremely important to the jury in its effort to decide whether to impose the death penalty"); *Mayfield*, 270 F.3d at 929 (reversing death judgment because counsel failed to present additional evidence of defendant's drug and alcohol use and failed to present expert testimony on the subject; prejudice found although "[t]he mitigation evidence presented at trial through the testimony of [an expert psychologist] was substantial").

### d.   Mitchell's Permanent Brain Dysfunction

183.   Counsel had information that Mitchell has executive functioning deficits, in comparison to his other abilities, and had those deficits at the time of the crimes and trial.  These deficits, along with the several head injuries he suffered, including an auto accident in which the driver was killed, Mitchell's life history and

his substantial polysubstance abuse counsel could have developed were substantial mitigating evidence.[16]

184.    The failure to present evidence of Mitchell's permanent brain dysfunction requires habeas relief.  *Frierson*, 463 F.3d at 993-94 (9th Cir. 2006) (granting penalty relief where trial counsel failed to present evidence of defendant's drug use and of brain injuries "that may have resulted in organic brain dysfunction");  *see Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (counsel deficient for failing to investigate readily available evidence of mental impairment).

### e.    Failure to Present a Complete and Accurate Social History and Supporting Expert Testimony

185.    To the extent not already alleged in the foregoing sections, counsel was prejudicially ineffective in failing to investigate, prepare, and present a thorough and adequate social history of Petitioner, along with competent, adequately prepared experts to explain the effects of that history on Mitchell's development and functioning.  A well-prepared, competent social history exemplifies the type of presentation defense counsel could and should have made, particularly one that would explain to the jury why Mitchell's polysubstance abuse escalated significantly before the capital offenses.

186.    Counsel was ineffective for not presenting a social historian to discuss Mitchell's life history and mental health experts to present and explain evidence of his brain dysfunction, and substance abuse and addiction.  Counsel also failed to

---

[16]    Moreover, a qualified and effectively prepared mental health professional could have testified that Mitchell's executive functioning deficits are such he would have done well as an inmate serving a term of life in prison.  And, a qualified and effectively prepared mental health professional could have testified that Mitchell is not so brain damaged that the structured environment of prison setting can not control him.  *See Skipper v. South Carolina*.

consult with appropriate and necessary experts and, as for the experts he did consult, he failed to give them adequate background information about Mitchell, which would have been impossible given the limited nature of the mitigation investigation; failed to guide them about the meaning of "mitigation evidence" as the case law broadly defines it; and failed to call them to testify before the jury. *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997) (finding counsel ineffective for failing to provide expert with sufficient background information relating to defendant).

### 3.   Conclusion

187.   The different types of mitigating evidence presented herein and readily available to counsel were likely to evoke sympathy for Mitchell.  "It is difficult to imagine . . . a tactical reason for failing to investigate and present the substantial mitigating evidence available."  *Ainsworth*, 268 F.3d at 874; *see also Bean*, 163 F.3d at 1080-81 (9th Cir. 1998) (finding prejudice where defendant's family portrait was an "unfocused snapshot"; other mitigating evidence was presented "only in the vaguest terms").

188.   It cannot credibly be argued that the aggravating evidence presented against Mitchell at trial preclude relief on this claim.  In a leading capital case, the jury heard an enormous amount of aggravating evidence, including convictions for armed robbery, burglary and grand larceny; two auto thefts; two separate violent assaults on elderly victims; an arson; another "brutal[] assault[]" on an elderly woman, resulting in the victim being in a "vegetative state"; and an arson in jail while awaiting trial.  *Williams*, 529 U.S. at 368.  Despite all this aggravating evidence, the Supreme Court granted the writ because the omitted mitigating evidence "might well have influenced the jury's appraisal of [defendant's] moral culpability."  *Id*. at 398; *see also Lambright v. Stewart*, 241 F.3d 1201, 1208 (9th

Cir. 2001) ("Evidence of mental disabilities or a tragic childhood can affect a sentencing determination even in the most savage case."); *Smith v. Stewart*, 189 F.3d 1004, 1013 (9th Cir. 1999) ("The horrific nature of the crimes involved here does not cause us to find an absence of prejudice. In *Hendricks*, we rejected the argument that heinous crimes make mitigating evidence irrelevant, noting that the fact finder . . . has broad latitude to weigh the worth of the defendant's life."); *Silva v. Woodford*, 279 F.3d 825, 828, 847-50 (9th Cir. 2002) (finding prejudice where defendant kidnapped and robbed two college students; the male student was chained to a tree while the female student was repeatedly sexually assaulted; and defendant shot and killed the male and ordered his accomplice to dismember him with an axe); *see Mak*, 970 F.2d 614 (finding prejudice where defendant was convicted of murdering thirteen people).

189. Moreover, in evaluating prejudice, the Court must examine the cumulative impact of all the mitigating evidence that could and should have been presented. *Williams*, 529 U.S. at 397 (trial judge properly assessed prejudice where his conclusion "rested on his assessment of the totality of the omitted evidence" rather than on individual items of evidence). Viewing all of the evidence presented in this Motion that counsel failed to raise at trial, the prejudice to Mitchell is apparent.

190. Counsel's deficient performance cannot be passed off as being the result of "strategic" decisions because any such decisions were not informed by adequate investigation and trial preparation. *Mayfield*, 270 F.3d at 927 ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments." (citing *Strickland*, 466 U.S. at 691)); *Jackson v. Herring*, 42 F.3d 1350,

80

1367-68 (11th Cir. 1995) (decision to forego presentation of mitigating evidence cannot be reasonable if it is supported by insufficient investigation).

E. **TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE FOR FAILING TO CHALLENGE MITCHELL'S STATEMENTS AS INVOLUNTARY DUE TO HIS BRAIN DAMAGE, HIS ADDICTION, AND HIS CULTURAL HERITAGE**

191. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

192. Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

193. In making a full and proper determination of the voluntariness of a *Miranda* waiver, courts must take into consideration "all the surrounding circumstances – [including] the characteristics of the accused." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). While the mental state and capacity of the accused are not entirely determinative of the voluntariness of a waiver of Fifth Amendment rights (*see Colorado v. Connelly*, 479 U.S. 157, 164 (1986)), mental state issues are particularly relevant in combination with police malfeasance, as is present in this case.

194. As "interrogators have turned to more subtle forms of psychological persuasion," as was done here by Duncan, Hush, and the tribal police, "courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Connelly*, 479 U.S. at 164.

81

195.    Some characteristics of the accused relevant in making a voluntariness determination are:  his age, any substantial drug addiction, lack of education, low intelligence, emotional state, and sophistication.  *See, e.g.*, *Schneckloth*, 412 U.S. at 226 (discussing age, education, and intelligence).

196.    At the time of Mitchell's interrogations, he was young, unsophisticated, had only a high school education, and suffered from severe drug and alcohol problems.  Further, as shown in the Motion, Mitchell suffered from mental deficiencies at the time of the interrogations.  These mental deficiencies, in combination with the lies and deceit employed by the FBI and tribal police, and Mitchell's history of polysubstance addiction at the time of his arrest, rendered Mitchell's waivers involuntary.  Thus, his statements should not have been admitted into evidence at trial.

197.    The wrongful introduction of the statements prejudiced Mitchell. It allowed the prosecution to argue that Mitchell knew immediately where the bodies were located, that he had lied about his involvement in the crime, and that the purported lies were an admission that the charges against him were true.

198.    Mitchell's statements to the FBI influenced the outcome of the trial.

199.    The *Miranda* waivers were invalid because they were the product of a manipulative "softening up technique" prohibited by the Fifth and Fourteenth Amendments to the Constitution, as well as the collusion between the Government and the tribal police.  (*See* Claim P, infra.)

200.    Mitchell was raised by his Navajo grandfather, his grandmother, and his Navajo mother.  Counsel additionally provided ineffective assistance for failing to challenge Mitchell's statements as involuntary and unknowing because of his Navajo up-bringing and heritage.

201. The statements should not have been admitted for the additional reason that because of Petitioner's profound cognitive impairments, as set forth *infra*, thus waiver was not voluntary.

202. Defense counsel's performance in litigating the waiver issue constituted ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668.

203. These violations of Petitioner's constitutional rights warrant the granting of this Motion without any determination of whether those violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. at 638 n.9. Furthermore, the constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, the violations of Movant's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, and resulted in a miscarriage of justice.

**F.** **COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND CHALLENGE THE MEDICAL EXAMINER'S TESTIMONY AND AUTOPSY REPORT RESULTED IN INEFFECTIVE ASSISTANCE OF COUNSEL**

204. A defendant in a federal criminal trial has a Sixth Amendment right to receive effective assistance of counsel. *McCann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("The right to counsel is the right to effective assistance of counsel."). The Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), set forth a two-prong test to establish ineffective assistance of counsel. A movant who is alleging ineffective assistance must show: 1) trial counsel's performance was deficient; and 2) the deficient performance prejudiced the defense at trial. *Id.* Counsel's performance is deficient if it was "objectively unreasonable under the circumstances." *Id.* at 688. To show prejudice under *Strickland,* the movant must

demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

205.   Defense counsel's performance was ineffective for failing to seek the advice of any medical examiner to investigate and clarify whether victim Tiffany Lee's neck wounds could not have caused her death and whether Medical Examiner Jerri McLemore or some other examiner had discovered  Lee's neck wounds at the autopsy.  "It is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field."  *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008).  "Defense counsel's failure on that matter may constitute deficient performance."  *Id.*

206.   An expert in forensic pathology could have advised the defense that McLemore's autopsy report was inconsistent, inaccurate, and misleading.  But even assuming defense counsel made a legitimate strategic and financial decision not to consult with an independent medical examiner, no reasonable explanation existed for defense counsel's failure to interview McLemore before trial.  By way of explanation, defense counsel cited the fact that McLemore would have charged the defense for her time and that was "financially impossible."  (RT 3270, 3273).  The Court reminded defense counsel, "You also had a reasonable . . . obligation to investigate, didn't you?"  (RT 3275-76).  The Court seemed taken aback by the defense's decision not to interview McLemore and commented, "(I)n this case . . . I think it worked to their detriment.  The defense did have the opportunity to interview the M(edical) E(xaminer), did not make a request for funds to do so.  I can't imagine the Court would have denied the opportunity for the defense to interview such a critical witness."  (RT 3280).

84

207. Absent a thorough and adequate investigation of the autopsy report and without the assistance of any medical examiner, defense counsel relied upon a faulty trial strategy based on their mistaken belief that the prosecution was missing a forensic anthropologist's report. The defense counsel focused, to Mitchell's prejudicial detriment, on FBI agent Duncan's report, which stated that a medical anthropologist and not McLemore had discovered Lee's neck wound. (RT 3262-63). The Court commented upon this unreasonable defense strategy, "(Y)ou were going to try to catch the medical examiner in an error. And that error, as you're finding out, is not an error." (RT 3275). The strategy compelled defense counsel's request that the Court limit all discussion of Lee's neck wounds. (RT 3264-65, 3268, 3270-72, 3280). The request was contrary to the plausible defense theory that Mitchell lacked the specific intent to murder Lee and that Mitchell's capacity to make decisions regarding Lee's life had been diminished due to his extensive alcohol and drug use. "The failure to investigate is especially egregious when a defense attorney fails to consider exculpatory evidence." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002). Had defense counsel conducted a pre-trial interview of McLemore, she could have clarified the confusion and explained that forensic anthropologists are not typically consulted for soft tissue wounds. (RT 3266, 3268.) Similarly, an independent defense expert would have advised counsel regarding the role of forensic anthropologists and rightly focused defense counsel's attention on the true contradictions and specific error in McLemore's autopsy report on Lee's neck wounds which positively impacted defense theories negating specific intent.

208. A defense expert's testimony would have given the jury a proper basis to accept the defense theory that Mitchell had attempted to save Lee's life and reject Medical Examiner McLemore's written opinion that Lee's neck wounds were a

cause of death.  (*See* RT 3353.)  Counsel knew McLemore's report was incorrect but McLemore only offered vague responses on the topic of Lee's neck wounds and whether they were only superficial.  (RT 3325, 3337-39, 3346, 3353.)  McLemore testified in contradiction to her autopsy report that "unfortunately, (she) could not assess how deep it went or what structures, if any, it had involved."  (RT 3353.)  In her autopsy report McLemore wrote that Lee's "strap muscles, . . . large vessels, and larynx (were) intact."  McLemore left the jury with her opinion that she could not rule out the neck wounds as a cause of death with the facts that she had.  (*Id*.)  A defense expert could have debunked McLemore's testimony since McLemore's own report listed specific facts that proved Lee's neck wounds were only superficial.  By highlighting McLemore's exaggeration about the significance of Lee's neck wound, a defense pathology expert could have provided reasonable doubt and discredited  McLemore's memory of the autopsy and level of expertise.

209.   A defense expert could have prepared defense counsel to effectively cross-examine Medical Examiner Jerri McLemore.  Counsel understood vaguely that McLemore's report was incorrect but did not recognize the specific error and its impact on the defense theory that Mitchell had tried to spare Lee's life.  With the help of a defense expert, counsel could have inferred bias in McLemore's over-inclusiveness of neck wounds as a contributing cause of death on the autopsy report.

210.   Defense counsel failed to investigate, develop or present autopsy evidence on Mitchell's behalf.   The defense failed to interview the Government's medical examiner before trial.  The defense did not offer contrary expert testimony to rebut the unfounded opinions of the Government's medical examiner.  Expert testimony would have established that the prosecution's evidence was erroneous.  The autopsy report contradicted itself by including neck wounds as a cause of death

and also describing the neck wound as superficial, causing no damage to the muscle or the larynx below the skin.  McLemore's testimony contradicted the autopsy report and was purposely vague about Lee's neck wounds.  Defense counsel relied upon an unreasonable and unsound defense regarding the anthropologist to counter the autopsy report.  In the absence of an adequate investigation, counsel missed eliciting relevant facts which discredited the prosecution's theory that Mitchell specifically intended to kill Lee.  Counsel missed an opportunity to discredit an important Government witness through cross-examination and to argue at closing that Mitchell tried to spare Lee's life by superficially hurting her in a manner that would appear to Orsinger to be fatal.  This theory would have provided reasonable doubt in two ways.  First, it supported Mitchell's lack of specific intent to kill Lee.  Second, it was such a poorly planned idea to spare Lee's life that it supported a defense of diminished capacity.  For all these reasons, defense counsel fell below reasonable standards of effectiveness and prejudiced the defense at trial.

G.    **COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND CHALLENGE DNA TESTIMONY AND DNA EVIDENCE RESULTED IN INEFFECTIVE ASSISTANCE OF COUNSEL**

211.    A defendant in a federal criminal trial has a Sixth Amendment right to receive effective assistance of counsel.  *McCann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("The right to counsel is the right to effective assistance of counsel.").  The Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), set forth a two-prong test to establish ineffective assistance of counsel.  A movant who is alleging ineffective assistance must show: 1) trial counsel's performance was deficient; and 2) the deficient performance prejudiced the defense at trial.  *Id.*  Counsel's performance is deficient if it was "objectively unreasonable  under the circumstances."  *Id.* at 688.  To show prejudice under *Strickland,* the movant must

87

demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

212. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

213. Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

### 1. The Prosecution's Expert Witness Withheld Potentially Exculpatory DNA Information From the Jury

214. DNA analysis is a process by which characteristics of a suspect's genetic structure are identified, are compared with samples taken from a crime scene, and, if there is a connection, are subjected to statistical analysis to determine the frequency with which they occur in the general population. *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994). A forensic scientist extracts and analyzes portions of DNA to help jurors draw inferences regarding a sample's source. DNA samples acquired as part of a criminal investigation are compared to known DNA samples from the body of a suspect or victim. However, when a finding of a "match" or "cannot exclude" is declared, the analyst has not determined the identity of the DNA's source. Instead there are 3 possible inferences for a "match": (1) that both samples are from the same individual; (2) that the evidence sample is from an unknown individual whose DNA patterns at the compared segment match a victim's or suspect's DNA patterns by chance; or (3) that the

88

evidence sample is DNA of the identical twin of a victim or suspect. *Id.* at 1155 n.14.

215.  Since there were no identical twins involved in this case, jurors should have been asked to infer whether the DNA in evidence might have come from a known victim or suspect or from an unknown person who matched the victim or suspect's DNA by chance.  Instead the Government's DNA expert Benita Bock provided no calculation of random probability for any "match" or "cannot exclude" finding attributed to Lezmond Mitchell or the other suspects.  This omission left jurors with only one possible inference, that a "match" or a "cannot exclude" finding could identify a particular person as the source of DNA evidence and that person was likely whomever Bock named in her testimony. *See Brown v. Farwell*, 2008 U.S. App. LEXIS 15393 at 6 (9th Cir. 2008)(citing  *Chischilly*, 30 F.3d at 1157).

216.  Worse than omitting one of two possible inferences is actively testifying that only one inference exists.  At times during her testimony, the DNA expert erroneously identified a source of DNA evidence for the jury.  Bock testified that  "(Slim) *was* the major component" and again that "DNA at both areas. . .*came from* Alyce Slim."  (RT 3210)(*emphasis added*)  Defense counsel asked Bock whether the "identifiable donor of the DNA on that chrome knife *was* Alyce Slim" and another time whether "bloodstains that (she) analyzed from those two rocks *came from* Tiffany Lee."  To both questions,  Bock answered, "That's right."  (RT 3225, RT 3231)(*emphasis added*).  In fact, that was not right.  There was a chance that the donor of the DNA was somebody else, and the jury did not hear that testimony.  Bock gave the jury her inaccurate and unreliable opinion that it was blood from Alyce Slim and blood from Tiffany Lee.  Bock's testimony was not

merely imprecise, it disregarded a relevant exculpatory conclusion and improperly reached an inculpatory conclusion for the jury.

217.   While expert witnesses are permitted to make reasonable inferences for a jury, stating that a DNA sample belongs to an identified person does not pass the *Daubert* test of admissibility.  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993); Fed. R. Evid. 702.  It is a scientifically invalid conclusion to match a person with a DNA sample without stating it as a probability.  *Chischilly*, 30 F.3d at 1154 n.11 (citing *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 858 (3d Cir. 1990)("finding that an allegation of failure to apply a scientific principle properly should support exclusion of an expert opinion only if 'reliable methodology was so altered (by a particular expert) as to skew the methodology itself'")).

**2.      The Prosecution's Expert Witness Misled the Jury by Presenting Partial Results and Misconstrued Outcomes To Make DNA Evidence Seem More Inculpatory**

218.   A forensic scientist can determine whether a sample of DNA evidence contains the DNA of one person ("single-source") or a combination of people ("multi-source").  When the evidence is a single-source sample of DNA, either a victim's or suspect's DNA will "match" the DNA in evidence or it will "not match."  However when the evidence contains a mixture of DNA from multiple sources, forensic scientists do not typically use the term "match."  They will testify that a suspect or victim either "cannot be excluded" or "can be excluded" as a possible donor of multi-source DNA evidence.

219.   This distinction becomes particularly important when a sample is only a "partial profile" of DNA, i.e., it is considered substandard, either too small or too degraded to obtain all 14 loci of DNA.  The term "match" must be used with care when the sample is a partial profile.  If the partial profile comes from just one

person's DNA, a forensic scientist can say they found a "match" at the amount of loci recovered. But when a partial profile contains a mixture of DNA, forensic scientists are careful to use the terms "cannot be excluded" or "can be excluded" rather than "match."

220. Government expert Benita Bock was not careful. She consistently used the term "match" when describing a possible contributor of multi-source DNA evidence. (*See, e.g.,* RT 3211, 3213, 3215, 3221) Even when the evidence contained only a partial profile, Bock used the term "match" and did not explain the amount of loci available for testing. Bock testified concerning a mixture of DNA found on a blanket: "I only obtained a partial profile that *matched* Ms. Slim." (RT 3211)(*emphasis added*) However this partial profile was so small or degraded that Bock admitted she could neither "include nor exclude (Lee) as a contributor to that stain" on the blanket. (*Id.*) As if the DNA sample on the blanket was not a mixed sample of a degraded partial profile, Bock's testifying to a "match" exaggerated the presence of Slim's DNA such that it ceased to be an accurate or reliable scientific opinion of her findings.

221. Similarly, Bock tested bloodstains on two rocks. Bock said, "The profile from the second rock . . . matched Ms. Lee at 12 of the 14 loci. The results of the other two were inconclusive." (RT 3221) When Bock mentioned the "other two," she gave no testimony to clarify whether she was talking about two more loci in a single-source DNA sample, two more sources of DNA from a multi-source DNA sample, or something else. Assuming she meant the results of the "other two" loci were "inconclusive," the jury needed to know what that meant and how an inconclusive result would affect the statistical probabilities of a match. Bock did not explain how a finding of 12 of 14 loci is different from a finding 14 of 14 loci. Instead the prosecutor requested statistics for a sample with 14 of 14 loci, and Bock

91

answered that it "occurs in one in 250 trillion Navajos" giving the jury the erroneous impression that all of the DNA found on both rocks could have come from only one Navajo who was Lee.  (*Id.*)

222.   Without accurate statistics or complete information, the jury had no way of knowing the import of Bock's testimony.  The jurors did not get a reasonable and properly supported expert opinion from which to draw a reasonable conclusion.  They were forced to speculate.  The testimony did not assist the trier of fact to understand or determine a fact in issue.  *See* Fed. R. Evid. 702. By presenting DNA data as if one set of statistics applied equally to samples of varying states of degradation and from various locations, i.e., from one rock to the next or from one portion of a blanket to the next, the Government violated federal rules of admissibility and relevance.  *Daubert*, 509 U.S. at 592; Fed. R. Evid. 403; *Chischilly*, 30 F.3d at 1156 ("Numerous hazards attend the courtroom presentation of statistical evidence of any sort.  Accordingly Rule 403 requires judicial vigilance against the risk that such evidence will inordinately distract the jury from or skew its perception of other, potentially exculpatory evidence lacking not so much probative force as scientific gloss.").

> **3.     The Prosecution's Expert Witness Made it Appear That She Had Identified the Contributors of a Multi-source Samples of DNA Evidence**

223.   When it is clear that a DNA sample is a mixture of sources, a forensic scientist can only determine the minimum number of people who contributed to a DNA sample in evidence but cannot know the maximum.  Government expert Benita Bock consistently misled jurors to believe that she not only knew the number of DNA contributors but also knew who they probably were.

224. She said there were "at least three individuals, that two individuals, Jakegory Nakai and Lezmond Mitchell, could not be excluded as contributors to the mixture . . . and Alyce Slim could not be excluded." (RT 3212). Without naming any of the other known people who could not be excluded, Bock's testimony characterized her results as if there were three named contributors she could identify for a three-source DNA sample in evidence.

225. Testimony connecting a defendant's DNA material to DNA evidence collected at a crime scene has no relevance when the evidence is a mixture of DNA from multiple people unless a DNA expert provides the weight of the evidence for the jury unless the juries hears the quality of the DNA sample in evidence; how many loci the analyst could distinguish within the evidence sample; how many known people (suspects and victims) could not be excluded from the DNA sample in evidence; and how many loci of theirs were replicated in the DNA sample in evidence. The jury also needs to know from the expert how many unknown people probably could have contributed to the sample. *See Chischilly*, 30 F.3d at 1157 n.19.

226. Without access to complete information, a juror cannot fully comprehend the chain of custody issue inherent in multiple sources of DNA residing on a piece of evidence. Omitting relevant details violated *Daubert* and did not assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 592; Fed. R. Evid. 702.

93

**4.     Defense Counsel's Performance Was Prejudicially Ineffective Because He Did Not Seek the Advice of an Independent DNA Expert to Give Him a Basic Understanding of the DNA Test Results**

227.   "It is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field." *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008).  "Defense counsel's failure on that matter may constitute deficient performance." *Id.*  Expert testimony for the defense would have established that the prosecution's expert had imparted on multiple occasions inexact, incomplete, misleading and false DNA testimony to the jury.

228.   A defense expert would have explained to the jury that nobody can say that "DNA on that chrome knife *was* Alyce Slim" or that "DNA at both areas . . . *came from* Alyce Slim" as the Government's expert had testified.  (RT 3225, RT 3210)(*emphasis added*).  A defense expert's testimony would have given the jury a proper basis to discount or reject improper statements in the prosecutor's closing such as "The masks are tested . . . (o)ne. . .comes back with cellular material that has his DNA.  And when I say 'his DNA,' I mean Lezmond Mitchell."  (RT 3490-91).  A defense DNA expert would have testified that those kinds of statements are false.

**5.     Defense Counsel's Performance Was Prejudicially Ineffective Because He Was Not Prepared to Challenge the Testimony of the Prosecutor's Expert Witness**

229.   A defense expert could have prepared defense counsel to effectively cross-examine the prosecutor's expert witness on what a juror could properly infer from the DNA test results.

230.   From his questions on cross-examination, it is evident that defense counsel did not understand that DNA testing cannot positively identify a contributor: "the identifiable donor on the DNA on that chrome knife *was* Alyce Slim; is that right?"  (RT 3225)(*emphasis added*)  Another time he asked, "the bloodstains that you analyzed from those two rocks *came from* Tiffany Lee, correct?"  (RT 3231)(*emphasis added*)  These questions were not foundational for a further cross-examination.  He did not attack these opinions or ask a follow-up question.  He asked the expert to validate and repeat the claims as her opinion.  This served no purpose for the defense.  Without the aid of his own expert, defense counsel's questions unwittingly supported the prosecution and set a precedent for the jurors to conclude erroneously that DNA tests can positively identify an individual as the source of DNA in evidence..

231.   When the Government expert answered affirmatively to both of those questions, a well-prepared defense counsel could have discredited her on this very basic tenet of DNA matching.  (RT 3231, RT 3225).  Defense counsel did not, because he did not recognize the fallacy in his own questions.

232.   Defense counsel was ill prepared to challenge Bock's testimony.  He did not object to her irrelevant DNA testimony offered on direct.  Counsel could have corrected and clarified Bock's testimony by eliciting relevant information about the number of discernable loci from DNA in evidence, the quality and size of every individual DNA sample in evidence, the number of known and unknown people who "matched" or "could not be excluded" from every DNA sample in evidence, and the related statistical probability assigned to every finding.  He could have corrected her every time she used the word "match" imprecisely.  Most importantly, trial counsel could have made Bock recant her testimony that DNA testing identifies an individual discrediting her level of expertise and revealing the

95

bias of her testimony to the jury.  Again at closing, counsel could have highlighted specific points in Bock's testimony where she was misleading and scientifically inaccurate.

233.   These relevant facts would have discredited the prosecution's theory that Mitchell was at the crime scene and would have added reasonable doubt by supporting a defense theory of a third-party DNA contributor at the crime scenes since all of the DNA samples connected to Mitchell were multi-source mixtures. Counsel should have crystallized for the jury that multi-source mixtures of DNA are less relevant than a piece of evidence covered with identified and unidentified fingerprints, some complete and some partial.  Individuals can be identified by their fingerprints, but DNA testing only determines a chance or statistical probability.

**6.    Defense Counsel's Failure to Consult a DNA Expert to Prepare a Defense Theory Led Him to an Unreasonable, Unsound, and Constitutionally Ineffective Defense Theory**

234.   Absent a thorough and adequate investigation of the DNA results with the assistance of a DNA expert, defense counsel's decision to present one defense theory regarding DNA over another more plausible theory was unsound and resulted in constitutionally deficient representation.  "The failure to investigate is especially egregious when a defense attorney fails to consider exculpatory evidence."  *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002).

235.   Defense counsel lost credibility with the jury by espousing the theory that Mitchell's blood or cells had been lifted by somebody else from one place and transferred to the evidence.  (RT 3222-23.)

236.   A more plausible exculpatory theory existed within the DNA data that defense counsel could have discovered had he consulted a DNA expert.  Defense counsel could have highlighted the fact that evidence was readily available within

the DNA data to implicate another person for every item containing DNA that Bock had connected to Mitchell.  All had multiple DNA contributors.  At least three people contributed DNA to the black-handled knife, the mask, and the cell phone. (RT 3225-26.)  At least two people contributed to the gloves and the chrome-handled knife.  (RT 3233.)  With a better understanding of the DNA results provided by a defense DNA expert, defense counsel could have used the more viable and effective theory to implicate third-party suspects.

237.   Defense counsel failed to investigate, develop or present DNA evidence on Mitchell's behalf.   The defense failed to offer contrary expert testimony to rebut the unfounded opinions of the Government's expert.  Expert testimony would have established that the prosecution's evidence was imprecise and sometime erroneous.  Defense counsel provided an unreasonable and unsound defense regarding DNA in the absence of adequate investigation into the DNA test results and without the advice and assistance of a DNA expert.  For all these reasons, defense counsel fell below reasonable standards of effectiveness and prejudiced the defense at trial.

H.   **INEFFECTIVE ASSISTANCE REGARDING JURY SELECTION**

238.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel in connection with the jury selection phase of his trial. *See Strickland v. Washington*, 466 U.S. 668, 688.  Defense counsel rendered ineffective assistance in the following ways, considered both individually and cumulatively.

239.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

240.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

### 1.    Failing to Challenge or Adequately Question Jurors Whose Convictions About the Death Penalty Substantially Impaired the Performance of Their Duties

241.   Defense counsel failed adequately to *voir dire* and challenge several prospective jurors who expressed opinions in favor of the death penalty that would "prevent or substantially impair the performance of his duties" as a juror with respect to the choice of penalty.  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).  Trial counsel rendered ineffective assistance in failing to challenge these persons, or at least question them carefully and reasonably to expose or confirm views concerning capital punishment that would have supported a challenge for cause or the intelligent exercise of a peremptory strike.

242.   A prospective juror who would automatically impose a sentence of death upon conviction of a capital offense is disqualified from sitting on a capital jury.  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).  "[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. . . . Any juror who would impose death despite the facts and circumstances of conviction cannot follow the dictates of law."  504 U.S. at 735.  Such individuals deem mitigating evidence to be irrelevant to the

penalty determination, despite the constitutional imperative that it is considered. *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982).

243.   A juror who would never consider evidence of an abusive childhood to be mitigating, for example, is not qualified to sit on a case in which the defendant relies wholly or primarily on such evidence, even if the juror could, in theory, find other type of evidence to have a mitigating effect.  Such a juror could not, in the case here, follow the constitutional imperative to "consider[] any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998); *Eddings*, 455 U.S. at 113-15 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. . . . [Sentencers] determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration.").

244.   If a juror expresses a disqualifying dogmatic preference in favor of imposing the death penalty, a concomitant pledge to "follow the law" will not save him.  "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *See Morgan*, 504 U.S. at 735 (footnote omitted).

245.   In the present case, Mitchell's counsel failed to challenge or appropriately question prospective jurors: (1) Veniremember #55 who admitted to having "no tolerance" for substance abuse and claimed that substance abuse is a "very touchy" subject for her (RT 172); (2) Veniremember #59 who stated he believes we should expand capital crimes to include more crimes against children including child molestation but that his beliefs would not affect his ability to judge a case involving the murder of a child (RT 543-4); (3) Veniremember # 83 who

stated he has young children of his own and that he would expect that the age of the victim would be an aggravating factor, that he would be "real disappointed in the drafters of the law if the age of the victim is not an aggravating factor," and that he would consider "a young defenseless child… a heavy aggravating factor" (RT 1130.)

246.  Furthermore, Mitchell's counsel failed to adequately challenge seated jurors #48, #43, and alternate juror #51.

### a.  Juror # 48

247.  During individual *Voir Dire*, Juror # 48 explained to Mr. Sears that she feels certain crimes are appropriate for the death penalty.  She explained that she felt what makes a death penalty case is one in which "there was no regard at all for human life."  (RT 1502.)

248.  It would be difficult to imagine a scenario where an individual committed murder, yet showed a regard for human life.  It would be doubly as difficult to imagine a scenario where an individual committed two murders, yet showed a regard for human life.  Nevertheless, defense counsel did not object to Juror # 48's suitability to serve as a juror, did not exercise a peremptory challenge regarding her service, or in any other way objected to Ms. Handel serving as a juror on this case.

### b.  Juror # 43

249.  Seated juror Juror #43 responded to questioning from the Court about his ability to impose the death penalty that he believed a sentence of life imprisonment without the possibility of parole is a more severe sentence than death. (RT 1333.)  No member of Mr. Mitchell's legal defense team asked Juror #43 a single question or objected to his eligibility to serve, and Juror #43 was subsequently placed on Mitchell's jury.

250. Juror #43's preference for a death sentence creates a serious burden shifting issue. It is the prosecution's burden at the penalty phase to prove aggravating circumstances beyond a reasonable doubt, and only upon a finding that said factors were present and that they outweigh any mitigating circumstances proven by a preponderance of the evidence can the death penalty be inflicted. Thus if the prosecution met its burden, Juror #43 could elect to select death, but if the prosecution did not meet its burden, Juror #43's inclination would be to give the lesser sentence, which in his case would amount to death. It would appear that if the defense put on the strongest mitigation evidence possible and successfully convinced Juror #43 not to choose the most severe punishment, he would decide a verdict of death.

### c.    Alternate Juror #51

251. Alternate Juror #51 told Mr. Sears that, after convicting Mr. Mitchell of the capital offenses, he would go into the penalty phase of the trial with the idea that Mitchell deserved to die for these crimes. (RT 2048-49.) Soon after that, Alternate Juror #51 told Sears that he would not go into the penalty phase thinking Mitchell deserved to die. (RT 2049-50.) Counsel never resolved these two contradictory positions. The fact is that Mitchell's lawyers had no idea about where Alternate Juror #51 stood on this issue, and yet did not resolve the question or move to strike for cause.

### 2.    Failing to Adequately Question or Attempt to Rehabilitate Prospective Jurors Who Initially Suggested That They Could Not Vote for the Death Penalty

252. The 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases stated that "[c]ounsel should be familiar with techniques for rehabilitating potential jurors whose initial indications

of opposition to the death penalty make them possibly excludable."  Guideline 11.7.2.B.[2]  Yet Mitchell's trial counsel failed entirely, or almost entirely, to attempt to rehabilitate a substantial number of prospective jurors in his case.  Counsel either failed to test the prospective jurors' stated opposition to the death penalty -- for example, by asking whether they would fail to consider the death penalty even for a defendant who committed multiple, brutal, intentional murders during residential burglaries or robberies -- or failed to reexamine the jurors after the prosecutor had led them to give disqualifying answers.

253.   The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated."  *Gray v. Mississippi*, 481 U.S. 648, 662-63 (1987).

254.   Defense Counsel's failure to rehabilitate prospective jurors permeated the entire *voir dire* and resulted in a record substantially different from the one that competent counsel would have produced through competent questioning. Identifying with confidence all of the stricken potential jurors whom competent counsel might have rehabilitated is impossible.  However, there are more than a few examples on the record where Defense Counsel did not meaningfully attempt to question and rehabilitate potential jurors whose initial indications of opposition to the death penalty made them potentially unqualified to sit on a death penalty jury: Veniremember # 81 (RT 504-9)(left decision to strike to Court's discretion); Veniremember #61 (RT 675-78)(no objection to Government's challenge); Veniremember #63 (RT 744)(asked no questions and made no objection to

---

2 *See Wiggins v. Smith*, 539 U.S. 510, 524, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (explaining that ABA Guidelines provide guidance in assessing defense counsel's performance under *Strickland* and citing other cases that support the same principle).

Government's challenge); Veniremember #9 (RT 1179)(asked no questions and made no objection to Government's challenge); Veniremember # 82 (RT 1183)(asked no questions and made no objection to Government's challenge); and Veniremember #13 (RT 1423)(asked no questions and made no objection to Government's challenge).

255.   Furthermore, in the case of Veniremembers  #15 (RT 2257) and #77 (RT 1911), defense counsel not only did not even bother to question the jurors, but rather relied entirely on questionnaire responses before stipulating to the jurors' removal.  This was not simply a matter of failing to rehabilitate, but an all out abandonment of Mr. Mitchell by trial counsel in failing entirely to take part in the *voir dire* process.

256.   Counsel's failure to rehabilitate and then object to the juror's removal resulted in a deficient record that significantly prejudiced appellate counsel. Several of the appellate claims were based upon jury selection, a large number focusing on the systematic exclusion of Native American jurors from Mitchell's trial.  Appellant Counsel's claims were weakened by the fact that they were procedurally barred from making claims with regards to 4 prospective jurors (Veniremembers #10, #13, #15, and #77) because defense counsel failed to rehabilitate and object to the jurors' excusal.  *See Defendant's Reply Brief on Direct Appeal*, Case No. CA-03-99010, at 44, n.15.

257.   There is a reasonable probability that competent counsel could have rehabilitated at least one prospective juror and prevented his or her excusal.  For example, Veniremember #61indicated to the court that graphic evidence and testimony would not effect his ability to be fair and impartial.  (RT 674)  He also answered that he could accept the law that stated that for certain crimes Native Americans are to be tried in Federal Court, even if he personally believed that

103

Native Americans should be tried by other Native Americans in tribal courts. (RT 674-75) This suggests that Venireperson #61, as a juror, could be fair and impartial and accept and apply a law (the Death Penalty) about which he has personal reservations. However, we will never know whether Venireperson #61 could be a fair and impartial juror and apply the law as instructed by the Court because Defense Counsel failed to rehabilitate him. Even more, if Defense Counsel did make rehabilitation attempt and the court still excused Veniremember #61, a record would have been established that could lead to the determination of reversible error under *Gray*. However, because Trial Counsel's failed to establish a record, Trial Counsel's abdication of his duty to rehabilitate potential jurors constituted ineffective assistance of counsel under *Strickland* and deprived Mitchell of his right to "a jury empaneled in compliance with the Fourteenth Amendment." *Morgan*, 504 U.S. at 739 (1992).

### 3. Appellate Counsel was Ineffective for Failing to Appropriately Object to the Improper Excusal of Native American Jurors

258. During the voir dire, the Court dismissed eight potential jurors due to their alleged opposition to the death penalty. Mitchell lodged objections to the excusal of Veniremembers #3 (RT 333), #6 (RT 198), #22 (RT 1257) and #24 (RT 1682-1683), but was overruled with regards to these four prospective jurors. Appellate counsel failed to raise the wrongful excusal of these four prospective jurors in Mitchell's opening brief, and only raised the issue for the first time in the reply brief. The Ninth Circuit thus ruled that the claim was waived and refused to rule on this issue. *Mitchell*, 502 F.3d at 953-954 n.2; *see also United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006)("Issues raised for the first time in an appellant's reply brief are generally deemed waived.").

259.   It is well settled that the Sixth Amendment accords criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 688 (1984). It is also settled that a criminal defendant is entitled to effective assistance of counsel on first appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985). An allegation of ineffective assistance must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense at trial. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if it was "objectively unreasonable under the circumstances." *Id.* at 688.

260.   In Mitchell's direct appeal, appellate counsel committed a large portion of the appellate opening brief to arguments related to jury selection and particularly emphasized the exclusion of Native Americans from the jury. Counsel, however, omitted to make claims related to Veniremembers 3, 6, 22, and 24 and their improper exclusion under *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Gray*.

261.   There is a reasonable probability that competent counsel could have successfully shown that at least one of these potential jurors was death-qualified, and therefore wrongfully excused. (*See supra* Claim I (regarding excusal of Venrireperson #3).

262.   The wrongful dismissal of any one of these jurors would then have been reversible error under *Gray*. Appellate counsel's failing constituted ineffective assistance of counsel under *Strickland* and *Evitts* and deprived Mitchell of his right to meaningful review.

263.   Furthermore, during *voir dire* the Court excused several jurors due in large part to the fact that Navajo was their first language. (Venirepersons #1, RT 601-02; #2, RT 119; #9 RT 1174; and #11, RT 390). Appellate counsel did attempt to raise this issue on appeal, but did so via a footnote in the opening brief. *See Defendant's Opening Brief on Direct Appeal*, Case No. CA-03-99010 at 37 n.6.

The Ninth Circuit considered appellate counsel's mentioning this issue in a footnote insufficient to raise the issue on appeal. *Mitchell,* 502 F.3d at 954 n.2.

264. Appellate counsel's inability to properly raise an appellate issue is deficient performance. Given the totality of issues related to Native Americans and their exclusion from Mr. Mitchell's jury, it was indeed prejudicial to omit this claim. Furthermore, United States citizens have a constitutional right to serve on juries and the defendant in a criminal case has standing to assert a violation of a prospective juror's constitutional rights regardless of the juror's ability to speak English. *State v. Rico,* 132 N.M. 570 (2002). The burden is on the trial court to make every reasonable effort to accommodate a prospective juror's language difficulty. *Id.*

265. Here, no effort was made to accommodate jurors. When Veniremember #1 and Veniremember #11 indicated, in English, that they had trouble with the English language, they were simply excused. (*See* RT 601-02; RT 390). Based upon the record, it seems no action was taken to see if these jurors could be accommodated or even to check to see if the court had a Navajo translator on staff. Despite the fact that Veniremembers #1 and #11 appeared to be able to follow what was happening in the courtroom and answer the questions they were asked, no examination was done to check their English proficiency.

266. The foregoing violations of Movant's constitutional rights, taken alone or in combination with the other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Motion, so infected

106

the integrity of the proceedings that this court cannot deem the error harmless.  The foregoing violations of Movant's  rights had a substantial and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

267.   In addition, the denial of his right to effective assistance of counsel substantially prejudiced Movant, rendered the appellate proceedings an exercise in non-meaningful review and made the trial fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. *See* John H. Blume, et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1209 & n.1 (2001) ("The conventional wisdom is that most trials are won or lost in jury selection.").  But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Movant was left without meaningful representation.  Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed.  *United States v. Cronic*, 466 U.S. 648, 656-662 (1984). Even assuming a showing of prejudice is required, Movant has made that showing here.  *Strickland v. Washington*, 466 U.S. 668 (1984).

268.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

I.   **THE TRIAL COURT DEPRIVED MOVANT OF HIS RIGHT TO AN IMPARTIAL JURY BY ERRONEOUSLY EXCLUDING POTENTIAL JURORS WHOSE CONCERNS ABOUT THE DEATH PENALTY WOULD NOT HAVE SUBSTANTIALLY IMPAIRED THE PERFORMANCE OF THEIR DUTIES**

269.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments because the trial court erroneously excluded for cause three prospective jurors who were actually qualified to serve, thus depriving Mitchell of his right to an impartial jury. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *see Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

270.   The trial court committed prejudicial error by granting the prosecution's motion to exclude prospective Venireperson #3 for cause.  None of these jurors expressed views regarding the death penalty that justified their exclusion under *Witherspoon*, 391 U.S. 510, or *Wainwright v. Witt*, 469 U.S. 412 (1985).

271.   In *Witherspoon*, the Supreme Court held that the prosecution in a capital case may challenge a juror for cause, on the basis of opposition to the death penalty, only when the juror makes it unmistakably clear that he "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]."  391 U.S. at 523 n.21.  The Court explained that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."  *Id.* at 522.

272.   The Court has never retreated from the central constitutional point it made in *Witherspoon*, that "[a] man who opposes the death penalty, no less than one

108

who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." 391 U.S. at 519. Indeed, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). A challenge for cause is warranted only when a juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)) (internal quotation marks omitted).

273. Accordingly, prospective jurors are not excusable under *Witherspoon* and *Witt* merely because they (1) "voice[] general objections to the death penalty or expressed conscientious or religious scruples against its infliction," *Witherspoon*, 391 U.S. at 522; (2) express nervousness or emotion stemming from the "potentially lethal consequences of their decision," *Adams*, 448 U.S. at 49; or (3) are otherwise "hesitant in their ability to sentence a defendant to death," *see Morgan v. Illinois*, 504 U.S. 719, 732 (1992). This is because "[i]t is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon*, 391 U.S. at 515 n.7.

274. "[I]t is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Witt*, 469 U.S. at 423. The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and

reveal[] that their concerns about the death penalty [are] weaker than they originally stated." *Gray*, 481 U.S. at 662-63. Improper exclusion of jurors in violation of *Witt* is harmful *per se* and no prejudice need be shown. *Id.* at 659-60.

275. Venireperson #3 permissibly expressed qualms about the death penalty and "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," *Witherspoon*, 391 U.S. at 522; *see Morgan*, 504 U.S. at 731. Ultimately, Venireperson #3 expressed unequivocally to Judge Murguia that he could set aside his religious beliefs, follow the law, and impose the death penalty where appropriate.

276. On his juror questionnaire, Venireperson #3 stated that he would always vote to impose the death penalty in a case where a person has been convicted of a capital crime. (RT 321.) He explains this view as being a part of his training in jurisprudence and a belief in "an eye for a eye… a life for a life." (RT 321.) These statements, however, were in contradiction to the responses Venireperson #3 provided to the court. Venireperson #3 explained that it would be against his religious beliefs to impose the death penalty and that he would favor life imprisonment. (RT 319, 320.) Venireperson #3 explained that his views had changed since sitting in court and listening to the Judge's comments, and he wanted to back off of the belief that death should be automatic in capital cases. Given this contradiction, Judge Murguia questioned Venireperson #3 in more depth to uncover his true feelings and see how much his views had changed.

> THE COURT: All right. Well, let me -- let me ask you,
> because you said you're a law enforcement officer.  It
> sounds like you respect the law. If I told you that the law
> was you have to consider both death penalty and life
> sentence, after hearing all the evidence that relates to the

sentencing in this case, would you be able to follow the law and consider both a death penalty sentence and a life sentence?

VENIREPERSON #3: Yes, Your Honor.

THE COURT: You would?

VENIREPERSON #3: Yeah.

THE COURT: Because you said you had some personal strong beliefs, and I just want to make sure you can set aside those beliefs if you were a juror in this case and make a decision based on the evidence and the law that I give you.

VENIREPERSON #3: I see what you're getting at, yes, Your Honor

THE COURT: Okay.  Do you think you can do that?

VENIREPERSON #3: Yes, Your honor.

(RT 322-3.)

277.   Given the fact that prospective Venireperson #3's opinions had changed to such an extent, Judge Murguia was cautious as to whether this was Venireperson #3's true feeling.  She continued to ask him questions in this same vein, and Venireperson #3 explained that he would consider both life imprisonment and death.  (RT 323.)  Venireperson #3 explained that he respects both the law and the "word of God" and that he would not set his beliefs aside, but if he had to make a decision in this case it would be in accordance with the law.  (RT 323.)

278.   The questioning then focused on the phrase "set aside your beliefs."  The Judge again asked if he could "set aside [his] beliefs" and Venireperson #3 says he could not.  The Judge did not pursue this point beyond this superficial level

111

despite the fact that Venireperson #3 had already stated that he could apply the law without setting his beliefs aside. (RT 323-24.)  After the prosecution very briefly questioned Venireperson #3 in the same vein as the Court, John Sears questioned Venireperson #3 for the defense.   Sears began by questioning Venireperson #3 about his religious beliefs and whether he could consider life and death after hearing all of the evidence, and Venireperson #3 responded in the affirmative.  So Sears clarified the issue of putting his "beliefs aside."

> MR. SEARS: And the Judge asked you several times whether you could put aside your religious beliefs to do that. What did you understand that to mean? What did you think the Judge was asking you to do?
>
> VENIREPERSON #3: If I were to put my religion aside, this is basically what I live on.  I live by the gospel. That's the way according with my beliefs, which I put higher above any other beliefs.  But I do have respect with the court, with the laws, with the government itself here. It is, but if I were to do that, I have to make my decision in accordance to what my belief it is.
>
> MR. SEARS: And that's what the law requires.  The law doesn't require you to stop being a religious person.  The law requires you to follow the law if you're a juror.  Do you understand that?
>
> VENIREPERSON #3: Yes.
>
> MR. SEARS: But the law, as the Judge told you, doesn't tell you what decision to make. The law just tells you what the choices are.

112

VENIREPERSON #3: Right.

MR. SEARS: And the choice we are talking about is if it gets to that point if Mr. Mitchell is convicted and he's convicted of the crime carjacking that results in the death of another person, then and only then would you as a juror be also asked to decide whether he lives or dies. Do you understand that?

VENIREPERSON #3: Yes.

MR. SEARS: And if that were the case, if you had been on a jury and you had convicted Mr. Mitchell of carjacking and a murder connected to that carjacking, would you in every case, no matter what the evidence was, if that was your job, avoid the death penalty and give him a life sentence?

VENIREPERSON #3: Like again I say, I would rather be on the side of what the law says. That's according to what my choice, my decision would be.

MR. SEARS: Well, the law is what the Judge just told you.

VENIREPERSON #3: Right.

MR. SEARS: The law says those are your choices, death or life. And the way it works is, we would have another trial. After you had the trial to decide whether he was guilty or not guilty, and if you found him guilty, then there would be a second trial to talk about what the punishment would be. And the government would put on

113

a case in support of the death penalty. They would ask for the death penalty. They would put on evidence and witnesses to persuade you to give the death penalty. And our job would be to present a case and evidence to persuade you for a life sentence. Those would be the choices.

What we need to know is, would you base your decision on the sentence, whether it's life or death, on what you hear in the courtroom? Would you do that?

VENIREPERSON #3: Yes, sir.

(RT 326-8.)

279. After Sears clarified Venireperson #3's stance and resolved the issues regarding Venireperson #3's misunderstanding regarding abandoning his religion, Judge Murguia asked him some additional questions which further emphasized his qualification. The Court then asked Venireperson #3 three times if he could set aside his religious beliefs, and Venireperson #3 answered in the affirmative. (RT 329.)

280. Finally the prosecutor got in a last word and posed three additional questions. The only question Venireperson #3 unequivocally answered was: "You would make the decision for life sentence?" to which Venireperson #3 responded "Yes, sir." (RT 331.)

281. The government subsequently made a motion to excuse Venireperson #3 for cause, to which the defense objected. (RT 332-3.) The Court ruled that Venireperson #3 was not qualified. This ruling was based upon Venireperson #3's response to a question in the questionnaire regarding the prosecution's burden in proving aggravating circumstances and also on the court's finding that

114

Venireperson #3 had stated that he would always vote for life over death.  (RT 336.) The Ninth Circuit affirmed this decision in as much as it ruled that the disqualification was not related to Venireperson #3's race, but rather his religion. *Mitchell*, 502 F.3d at 953.  Appellate counsel challenged Venireperson #3's exclusion on race-based and death-qualified grounds.  As the Ninth Circuit only rejected the race-based claim and stated that appellant counsel had waived this *Witherspoon* challenge, Movant reasserts this claim for judgement on its merits.  *Id.* at 953 n.2.  See infra Claim -- (re: ineffective assistance of appellate counsel)

282.   The district court's decision to find Venireperson #3 not qualified was erroneous.  The government's motion was based in part on the fact that Venireperson #3 stated in his questionnaire that he would hold the government to a higher standard of proof when deciding on the presence of aggravating factors. This issue, however, was not raised during either the Court's questioning or the government's questioning of Venireperson #3.  Given that Venireperson #3 stated in his questionnaire that he would vote for the death penalty automatically after convicting an individual of a capital crime, but was subsequently considered non-death eligible, his questionnaire responses should not have been given much effect without further clarification.

283.   The record clearly reflects Venireperson #3's confusion as to the Judge's inquiry regarding "putting his beliefs aside."  It appears Venireperson #3 thought the judge was asking him to abandon his beliefs entirely, but when Mr. Sears clarified this issue, Venireperson #3 was absolutely unequivocal in his responses to Sears and the Court that he could put his beliefs aside and impose the appropriate penalty.  *See Gray*, 481 U.S. at 653, 659 (holding that the exclusion of a juror whose testimony was "somewhat confused," but who "ultimately stated that

115

she could consider the death penalty in an appropriate case," violated the Constitution).

284. The purpose of this sort of questioning is to determine whether a juror, though opposed to capital punishment, is able and willing to "temporarily set aside his own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176; *see also Witherspoon*, 391 U.S. at 515 n.7 ("It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State."). A juror is obviously not required to abandon his beliefs, and once this was explained to Venireperson #3, he unequivocally stated he could impose whichever sentence the evidence merited.

285. In reaching its ultimate determination, the district court appears to have rested heavily on the single instance in which Venireperson #3 stated that he would always vote for life imprisonment. (RT 336.) "As *Witt* makes clear, however, our inquiry does not end with a mechanical recitation of a single question and answer." *Darden v. Wainwright*, 477 U.S. 168, 176 (1986). It is necessary to "examine the context surrounding [the venireperson's] exclusion." *Id.* Venireperson #3 had made clear that he would follow the law and that he would consider the death penalty, and given the construction of the question it is likely that Venireperson #3 deemed his response to indicate he would likewise consider life imprisonment, but not necessarily to the exclusion of the death penalty.

286. "[I]f prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams*, 448 U.S. at 47-48 (quoting *Witherspoon*, 391 U.S. at 522 n.21).

Considering the entire context of Venireperson #3's exclusion, it is clear that his exclusion was improper.

287. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984). (*See* Claim H, *supra*.)

288. The foregoing violations of Movant's constitutional rights, taken alone or in combination with the other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Movant's rights had a substantial and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

## J. THE TRIAL COURT FAILED TO ENFORCE THE LEGAL STANDARD FOR HARDSHIP DISMISSAL, RESULTING IN A "JURY OF VOLUNTEERS"

289. Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution

117

because the trial court failed to enforce the legal standard for hardship dismissal and, as a result, Mitchell was tried by a "jury of volunteers."

290.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

291.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

292.   The purpose of hardship *voir dire* is to determine which prospective jurors cannot be legitimately expected to serve on the jury for reasons that amount to more than just inconvenience.  *See Glasser v. United States*, 315 U.S. 60 (1942)(*superceded in part by statute/rule as stated in Bourjaily v. United States*, 483 US 171, 178-79).  Jurors are expected to state with specificity their reasons for being unable to serve, and upon a showing of such are rightly excused from service.

### 1.    Venireperson #77

293.   During questioning, Venireperson #77 explained that she babysits her grandchildren three or four days a week.  (RT 1006.)  Venireperson #77 then stated that her husband was in law enforcement and that experience might prejudice her against the defense.  (RT 1021.)  During group questioning, Mr. Altman, for the prosecution, asked if serving on the jury would pose a financial hardship for Venireperson #77 in terms of the babysitting duties she previously discussed. Venireperson #77 explained that it would not cause her any financial problems, as she does the work for free, but it would cause financial hardship to her daughter. (RT 1026-7.)

294.   The government proposed to excuse Venireperson #77 based on the financial hardship her daughter would be caused.  The defense objected and requested the opportunity to discuss these alleged hardships during individual questioning.  The Court, however, excused Venireperson #77 for "undue hardship or extreme inconvenience" over the defense objection, and refused to allow the defense an opportunity for individual *voir dire*.  No determination was made as to the daughter's ability to afford childcare aside from the fact that she recently moved and both she and her husband are self-employed.  (RT 1038-9.)

### 2.    Venireperson #78 and Venireperson #20

295.   When asked about potential hardships, Venireperson #78 explained that he has some scheduling conflicts with his job at the postal service and how that might affect his jury service.  (RT 1203-5.)  Mr. Altman, for the government, asked Venireperson #78 during hardship *voir dire* about a response on his questionnaire and Venireperson #78 explained that he had some misgivings about the legal system, but that he would be able to follow instructions and focus on what he hears in court.  (RT 1214.)  And then Mr. Sears discussed some issues related to his general, daily transportation and Venireperson #78 explained that his issues were a question of the expense and how Court was willing to reimburse him.  (RT 1215-7.)

296.   The government stated they believed Venireperson #78 had a valid hardship.  (RT 1222.)  Mr. Sears objected to the government's position and specifically requested that Venireperson #78 not be excused and that he be allowed to speak to Venireperson #78 during individual *voir dire*.  The Court, over defense objection, excused Venireperson #78 for undue hardship and extreme inconvenience.  In so doing the Court explained that given Venireperson #78's concerns over his job, transportation, and the legal system, the Court was speculate

119

that Venireperson #77 "would not be able to focus on the case." (RT 1223-24.) The Court went on to state that "I don't know that he would be able to follow the law." (RT 1224.) However, the fact remains that Venireperson #77 expressly told the court that he could follow the judge's instructions. In fact, he told the Government he could:

> MR. ALTMAN: Would you be able to follow [the Judge's instructions] and just focus on the things that you hear in here?
>
> VENIREPERSON #77: I think so.

(RT 1214.)

297. However, based upon the Court's subsequent comments, it is clear that the Court either did not know exactly what Venireperson #78's opinions were or whether or not he could follow the law. It appears the defense shared this view because John Sears specifically asked to speak to Venireperson #77 in individual *voir dire*. The Court, however, simply rejected the defense request and excused Venireperson #77 based upon the Judge's conjecture that somehow Venireperson #77 would have difficulty focusing on the case. (*See* RT 1224: "I think that he would not be able to focus on the case.")

298. The Court repeated this error with the examination of Venireperson #20. During group questioning, Venireperson #20 stated that Robert McWhirter, someone she believed the attorneys might know, was her fiance's public defender approximately ten years prior, but that this would not affect her ability to be fair and impartial in any way. (RT 2137.) Venireperson #20 subsequently explained to Mr. Sears during hardship *voir dire*, that her fiancé is currently incarcerated in the federal prison and that she visits him on weekends. She stated, however, that the schedule of the trial would be difficult on her because she has two young children

120

and while her sister could watch the children during the week, it would be difficult for her to be away from her children and she would be distracted by this. (RT 2154-55.)

299. The government expressed no objection to Venireperson #20 being excused. The defense, however, requested the opportunity to speak with Venireperson #20 during individual *voir dire*. The Court, however, stated that Venireperson #20's statement that she would be thinking about her children and not necessarily able to concentrate on the case is enough to excuse her. (RT 2166-67.)

300. These two episodes of denying the defense the opportunity to conduct adequate *voir dire* are contrasted with the defense's motion to excuse Venireperson #65. In group *voir dire*, Judge Murguia made a regular, appropriate practice of asking the panel if they knew anyone in the courtroom. When Judge Murguia asked this question on April 16, 2003, Venireperson #65 remained silent. Mr. Kirby, for the prosecution, questioned Venireperson #65 during hardship *voir dire* and established that his wife was a tribal prosecutor. Kirby then stated that he had worked closely with Venireperson #65's wife, and asked Venireperson #65 if he was aware of this. Venireperson #65 stated that he was, that he knew Mr. Kirby and his wife had worked together, and that this would not influence him. (RT 1569-1570.) On further questioning from Mr. Sears, Venireperson #65 admitted that he also knew one of the FBI agents involved in the case. (RT 1575.)   301. Mr. Sears raised the issue of Venireperson #65's fitness to serve as a juror, stating that Venireperson #65 should have indicated more about his wife's previous employment as a prosecutor in his questionnaire or to the Court, likely when the Court asked generally about experience with law enforcement and Venireperson #65 remained silent. Sears also raised concerns that Venireperson #65 remained silent when asked if he knew anyone in the courtroom or anyone involved in the

case. The Court refused to excuse Venireperson #65 and suggested Mr. Sears bring up these issues during individual *voir dire*. (RT 1583-1585)

302. Contrasting Venireperson #65's statements with Venireperson #20 and Venireperson #78, there does not appear to be neither rhyme nor reason as to when additional questioning is required. It is notable that no individual *voir dire* was allowed when the defense requested such, but individual *voir dire* was required when the defense challenged a prospective juror's fitness.

303. The result of all this is that Movant was tried by a jury culled from a throng of "volunteers" -- persons who for whatever reason *wanted* to serve on his jury. Particularly in a high-profile multiple-murder trial like Movant's, this group was highly unlikely to constitute an impartial tribunal consistent with the guarantees of due process and the Sixth and Eighth Amendments. This is why prospective jurors are supposed to be dismissed only for legitimate financial hardship, and not based on a thinly veiled personal preference against serving:

> Jury service is a duty as well as a privilege of citizenship;
> it is a duty that cannot be shirked on a plea of
> inconvenience or decreased earning power. Only when
> the financial embarrassment is such as to impose a real
> burden and hardship does a valid excuse of this nature
> appear. . . . "The motives influencing such tendencies may
> be of the best must not blind us to the dangers of allowing
> any encroachment whatsoever on this essential right.
> Steps innocently taken may one by one, lead to the
> irretrievable impairment of substantial liberties."

*Thiel v. S. Pacific Co.*, 328 U.S. 217, 224-25 (1946) (quoting *Glasser*, 315 U.S. 60, 86 (1942)).

304.    The foregoing violations of Movant's constitutional rights, taken alone or in combination with the other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Movant's  rights had a substantial and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

305.    To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

## K.    *VOIR DIRE* AT MOVANT'S TRIAL WAS INADEQUATE TO SECURE HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL AND  LIFE-QUALIFIED JURY

306.    Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the *voir dire* proceeding conducted at his trial was inadequate to secure his right to an impartial and life-qualified jury. *See Morgan*, 504 U.S. 719.

307.    The *voir dire* proceeding conducted at Mitchell's trial was constitutionally inadequate to secure his right to an impartial, life-qualified jury.

123

Two major factors contributed to the infirmity of the proceeding:  (1) at individual *voir dire*, the trial court's use of leading questions to rehabilitate prospective jurors prevented the defense from rightfully excusing non-life qualified jurors; (2) defense counsel was forbidden from asking prospective jurors questions specific enough to determine whether they could fairly and impartially serve, not on an abstract capital case, but on Mitchell's case in particular.  As a result, Mitchell was unable to probe prospective jurors in a meaningful fashion to determine whether they could be impartial.  Mitchell was similarly prevented from exercising his peremptory strikes in an informed and intelligent fashion.

308.    The Sixth Amendment guarantees criminal defendants trial by an impartial jury.  A juror who is not "life-qualified" -- that is, one who would automatically vote for the death penalty after conviction in every capital case -- is not considered impartial.  *Morgan*, 504 U.S. at 729.  "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors."  *Id.*  "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

309.    "Were *voir dire* not available to lay bare the foundation of Movant's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so."  *Morgan*, 504 U.S. at 733-34.  "Inadequacy of *voir dire*" itself -- completely apart from whether any of the seated

jurors was actually biased -- requires the reversal of a death sentence.  Indeed, this was the result in *Morgan* itself.  *Id.* at 739.

310.   As for the substance of *voir dire*, general questions about prospective jurors' fairness and impartiality are not sufficient to satisfy the Constitution. *Morgan*, 504 U.S. at 735.  The defendant must be permitted to inquire about the jurors' ability to discharge their sentencing obligations in the case at hand.  *See Uttecht v. Brown*, 55 U.S. 1, 13, 16 (2007) (upholding a trial court finding that a prospective juror was disqualified under *Witherspoon v. Illinois*, 391 U.S. 510 (1968), because his *voir dire* questioning revealed that "he had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence *under the facts of this case*" (*emphasis added*).

311.   It is both permissible and necessary to explore juror bias with respect to particular aggravating and mitigating factors likely to be presented to the jurors in the case before them.  *See generally United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005).  For example, a prospective juror who states, in response to abstract questions, that he could vote for life without parole, while in actuality, he could never so vote in a case of murder-for-hire, would not be qualified to serve in a murder-for-hire case.  Such a juror would certainly vote for death following conviction in that case, rendering the penalty phase a meaningless exercise.  If the defendant were forbidden from inquiring about the prospective juror's views on the death penalty in cases of murder for hire, the juror's bias could never be uncovered. *See State v. Williams*, 550 A.2d 1172, 1184 (N.J. 1988) (reversing conviction and death sentence largely because defendant was prevented from inquiring about prospective jurors' ability to vote for life in the case at hand, which involved murder and rape); *see also State v. Maxie*, 93-2158 (La. 4/10/95), 653 So. 2d 526,

125

538 ("A potential juror who indicates that she will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before her is subject to a challenge for cause."); *People v. Kirkpatrick*, 7 Cal. 4th 988, 1005 (1994) (as modified) ("A prospective juror who would invariably vote . . . for . . . the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating or mitigating circumstances, is therefore subject to challenge for cause . . . .").

312.   Movant's *voir dire* did not live up to the demands of the Constitution – it was not a serious, meaningful inquiry into the qualifications and biases of the prospective jurors.  The Court simply asked general questions, and once the defense established that an individual was not life-qualified, the Court would then adopt the posture of an "adjunct prosecutor" and "rehabilitate" that juror with general simple questions, sometimes calling jurors back into the courtroom after the defense raised a cause challenge.

313.   Mr. Sears first launched this objection on behalf of Mr. Mitchell on April 3, 2003.  (RT 487-9.)  The problem, however, continued unabashed.

314.   During the course of examining Venireperson #79 on April 11, 2003, Judge Murguia asked a series of questions regarding Venireperson #79's ability to be fair and to listen to the evidence.  The prosecution then asked her a series of questions.  The defense asked no questions.  Nothing about Venireperson #79's juror questionnaire was raised during the questioning to this point.  The Court then resumed questioning.

> THE COURT: All right. You indicated that in your
> questionnaire that with respect to mitigating factors that
> the defendant would have to prove these factors beyond a
> reasonable doubt. And I just want to make sure that you

126

would follow the law that I give you. And because the law would be that the mitigating factors the defense would only have to prove those mitigating factors by what we call a "preponderance" of the evidence.

VENIREPERSON #79: Okay.

THE COURT: So is that acceptable to you?  Would you be able to follow the law?

VENIREPERSON #79: Yes.

(RT 1321-2.)

Mr. Sears then asked some follow up questions with her.

MR. SEARS: Do you think that the defendant, my side of the case--

VENIREPERSON #79: Uh-huh

MR. SEARS: -- would have to in your mind prove mitigating circumstances, reasons why the death penalty should not be imposed, by a higher standard than a preponderance of the evidence?  For example, beyond a reasonable doubt or beyond all doubt, beyond any doubt, or every doubt.  Is that what you would require?

VENIREPERSON #79: Yes.

(RT 1324.)

At this point, Mr. Sears stated he had no further questions.  The Court, however, resumed questioning Venireperson #79.  After explaining reasonable doubt, the court went on and explained the standard of proof required for the defense on mitigation evidence.

THE COURT: The other one is beyond -- for mitigating

127

factors it's beyond -- it's a preponderance of the evidence. I don't know how familiar you are with the law, but there is a distinction. And my question is would you be able to follow the law that the court gives you regarding the standards of proof?

VENIREPERSON #79: Yes.

THE COURT: All right. But you just indicated to Mr. Sears that you would hold the defense to a higher standard. And like I said, there's no right or wrong answers.

VENIREPERSON #79: Well, on that questionnaire?

THE COURT: Yes.

VENIREPERSON #79: Well, then I -- I read the question or I read the question wrong then or misunderstood it.

THE COURT: Okay. And I want to be very clear regarding that.

VENIREPERSON #79: Okay.

THE COURT: Would you hold the defense to a higher burden of proof than what is called for?

VENIREPERSON #79: No.

(RT 1325.)

315.    Again, this was not an isolated occurrence. On April 15, 2003, there was perhaps a more blatant attempt to rehabilitate a prospective juror who in her responses to defense questioning made it evident that she was not life-qualified.

MR. SEARS: If you had just sat on the jury and you found after you heard the whole case at trial, all the

128

evidence, and you concluded that my client was guilty, that he committed carjacking and that he caused the death of two people, a nine-year-old girl and a 65-year-old woman, and then you are going to be asked what the punishment was, can you personally imagine yourself under any circumstances voting for anything other than the death penalty?

VENIREPERSON #32: No.

MR. SEARS: Thank you.

THE COURT: Can you tell me the answer to that last question.

VENIREPERSON #32: No.

THE COURT: So you didn't really understand the last question?

VENIREPERSON #32: I think I understood it.

THE COURT: What -- what was asked?

VENIREPERSON #32: If I believed that there could be, or let's see. If there was other appropriate punishment for this individual, I guess, after hearing all the evidence. Is that what you're asking?

THE COURT: Right. Would you consider evidence from both sides before you made a decision?

VENIREPERSON #32: Yes. Um-hmmm.

THE COURT: So Mr. Sears just asked you a question.

VENIREPERSON #32: Maybe I'm not understanding it.

129

THE COURT: It could be you did. I want to make sure. But he asked you whether -- I think he asked you if you could imagine, and I don't know that it was -- it seemed like it was a hypothetical question, but --

VENIREPERSON #32: Okay.

THE COURT: Would you automatically vote for the death penalty based on what you know about this case at this time?

VENIREPERSON #32: No, I would not.

(RT 1517-9.)

316.    In this situation, Venireperson #32 indicated that she understood the defense question; in fact she was able to repeat the question and clearly and unambiguously restated her answer.  The Court, however, followed up with re-stated and leading questions certain to elicit responses that would give Venireperson #32 the appearance of eligibility.  As Mr. Sears articulated to the Court immediately after Venireperson #32 left the room, the Judge's questions were designed to elicit one-word obvious answers.  Few people, Mr. Sears argued, are likely to answer "would you be fair?" "would you do what the Judge instructs you to do?" and "would you listen to the evidence" with anything other than an affirmative response.

317.    During individual *voir dire* with Venireperson #33 provided responses that undoubtedly disqualified her.

MR. SEARS: Going back to your views about the death penalty, and I appreciate that like so many people, this is not dinner table conversation every day. But these are obviously very important questions in this case.  You

130

heard the Judge describe the -- a little bit about the victims, a nine-year-old girl and a 65-year-old woman in this case. And you understand that my client is charged with carjacking that caused their death. That's the cause in this case.

VENIREPERSON #33: Yes.

MR. SEARS: Do you believe that if a person is guilty of causing the death of a nine-year-old child and a 65-year-old woman, that he should die for what he did?

VENIREPERSON #33: If he's the cause of it?

MR. SEARS: If he's found guilty of that.

VENIREPERSON #33: Yes.

(RT 1699.)

318. The Court, however, refused to grant a defense motion to excuse for cause, and instead called Venireperson #33 back into the courtroom. The Court resumed its practice of asking simple leading questions, and successfully rehabilitated Venireperson #33 and denied the defense motion to excuse for cause. (RT 1702-04, 1711-14.) Similarly, during individual *Voir Dire* with Venireperson #80, he stated that the appropriate punishment for someone who takes a life is death and that if someone takes a life, he should pay with his own life. (RT 554, 560.) The Court then attempted to rehabilitate Venireperson #80 by again asking leading questions that resulted in Venireperson #80's affirmative response that he would listen to the evidence presented. (RT 561.) The defense moved to excuse Venireperson #80 for cause, at which point the Court ordered Venireperson #80 back to the courtroom for further rehabilitation. (RT 567.) Not only is such practice highly inappropriate, but it was also in stark contrast to the manner in

131

which non death-eligible prospective jurors were treated who were never brought back into the courtroom for Court-led rehabilitation.

319.   Movant's life should not hang on the assurances of prospective jurors regurgitating affirmative answers to the Court's leading questions.  The jurors' answers were meaningless because the Judge had devalued their oath and the Court's actions rendered their responses untrustworthy.

320.   The second major flaw in Mitchell's *voir dire* was that defense counsel was forbidden from asking prospective jurors questions specific enough to determine whether they could fairly and impartially serve on Mitchell's case.

321.   Approximately two months before the *voir dire* proceedings, the prospective jurors received mailed questionnaires.  Question number 68 in questionnaire read: "If you are personally, morally, religiously or otherwise opposed to the death penalty, can you imagine any case or set of circumstances under which you could recommend a death sentence be imposed upon a defendant as punishment?"  Mr. Sears would often ask variations of this question to prospective jurors who appeared in favor of the death penalty,

> MR. SEARS: … Knowing yourself, we are just meeting
> you here today for the first time, could you imagine sitting
> through the trial, the guilt or innocence portion of the trial,
> hearing all the evidence about the case, the kind of case it
> is, what the crimes are alleged to be, what happened, and
> then deciding yourself, with the other jurors unanimously,
> that my client was guilty beyond a reasonable doubt,
> could you imagine, based on what you've heard about the
> case, who the victims were, voting for any other
> punishment other than the death penalty?

132

(RT 1465-6.)

322.   The Court, however, on multiple occasions stymied the defense efforts (*see, e.g.,* RT 1520, 2047) and insisted on non-hypothetical questions.  The Court expressed a problem with the fact that this question asks the person to assume certain facts that are not yet before them.  (RT 1521.)  However, it is well established that the defense must be allowed to inquire as to how jurors will approach their sentencing duties not just in the abstract, but specifically regarding the case at hand.  *Brown*, 551 U.S. at 14 (2007).  Obviously, during *voir dire*, the prospective jurors do not know the facts of the case, but the defense is duty bound and well within its right to inquire as to the juror's ability to fairly sentence the defendant once those facts are indeed in front of them, and the Court deprived the defense of this right by restricting their ability to ask such questions.

323.   Lezmond Mitchell has a constitutional right to present on a guilt and penalty phase defense before qualified jurors who consider the evidence fairly and impartially.  Without such jurors, the penalty phase is a useless exercise the outcome of which is already known.  A juror who would automatically vote for death after conviction on such charges is not qualified under the Constitution to serve in this case.  The trial court's restriction made it impossible for Mitchell to identify such jurors and, thus, deprived him of his constitutional rights.

324.   The foregoing violations of Movant's constitutional rights, taken alone or in combination with the other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993).  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected

the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Movant's rights had a substantial and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

325.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668(1984).

## L.    THE CUMULATIVE EFFECT OF ALL ERRORS DURING THE JURY SELECTION PROCESS RESULTED IN A JURY THAT WAS NOT IMPARTIAL

326.   Movant's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because of the cumulative effect of all of the errors that occurred during jury selection.  *Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007).

327.   If this Court should determine that each of the individual jury selection errors standing alone does not warrant a reversal of Movant's conviction, it must still determine whether the errors in combination may have contributed to the verdicts and sentence.  *See Parle*, 505 F.3d 922 (affirming habeas relief under AEDPA based on cumulative error); *see also Taylor v. Kentucky*, 436 U.S. 478, 487 (1978).  In addition, the Eighth Amendment guarantee of heightened reliability in death judgments, *Johnson v. Mississippi*, 486 U.S. 578, 584-85 (1988), also compels reversal when the cumulative effect of errors undermines confidence in the reliability of the judgment.  The Court and the prosecution committed numerous

134

errors in this case.  Ultimately, the jury that decided Movant's fate did not consist of twelve individuals who had demonstrated an ability to be fair and impartial and did not comport with the Sixth Amendment guarantee of an impartial jury.

328.   The errors committed by the trial court included the excusal for cause of qualified jurors and the denial of defense motions to excuse biased jurors.

329.   The dynamics of jury deliberation are particularly likely to magnify the effect of individual influence when that influence is not counterbalanced.  Thus, the presence of an improperly seated juror with a pro-prosecution bias will have even greater effect in the absence of an improperly rejected juror who is particularly cautious in approaching a guilty verdict or a sentence of death.  This is especially true given the wide discretion afforded to jurors in capital cases.

330.   As a result of the multiple jury selection errors detailed in Claims I, J and K, Movant was tried, convicted and sentenced to death by a jury that was unsatisfactory to him.  The cumulative effect of these errors deprived Movant of a fair trial before an impartial jury free from the risk of pro-prosecution and pro-death bias, in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

331.   Accordingly, whether viewed individually or collectively, the errors in the impanelment and the ultimate construction of the jury mandate reversal.

332.   The foregoing violations of Movant's constitutional rights, taken alone or in combination with the other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Movant's

rights had a substantial and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

M. **MITCHELL'S RIGHT TO A JURY CHOSEN FROM A FAIR AND REPRESENTATIVE JURY VENIRE WAS VIOLATED WHEN NATIVE AMERICANS WERE SYSTEMATICALLY EXCLUDED FROM JURY SERVICE**

333. Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments because Native Americans were systemically excused from his jury.

334. Mitchell had a right, under the Sixth Amendment, to have his jury chosen form a representative cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522 (1975). A defendant establishes a prima facie violation of the fair-cross-section requirement by showing "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

335. In the present case, the Ninth Circuit assumed that the Native Americans in Arizona constitute a distinctive group. *Mitchell*, 502 F.3d at 950. Thus Mitchell is assumed to have satisfied the first prong of the required showing. *Id*.

336. With regards to the second prong, the Ninth Circuit found that the absolute disparity between the percentage of the venire made up of Native Americans (30 venirepersons out of a total of 207) and the percentage of the

136

population of the division made up of Native Americans was constitutionally acceptable. *Id*. Moreover, they found the Prescott juror wheel in general had a constitutionally acceptable absolute discrepancy. *Id*. All of the Ninth Circuit's calculations regarding these issues were based on absolute disparity. This is, however, not the method that Ninth Circuit precedent recommends for determining such disparity. In fact, the Ninth Circuit has explicitly instructed that courts might be incorrect to rely on absolute disparity, and instead should use a standard deviation analysis which can be more reliable. *Hirst v. Gertzen*, 676 F.2d 1252, 1258 n.14 (9th Cir. 1982)("The Supreme Court has also suggested that analysis of the standard deviation is an appropriate way of determining whether the under-representation of a given group is significant. In our view, this method would have been an appropriate method of determining the significance of the degree of under-representation evidenced here."); *see also Casteneda v. Partida*, 430 U.S. 482, 496 n.17(1977); *United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005).

337. The Ninth Circuit applied a standard that it recognizes is not the most accurate. Mitchell will show that, using the correct standard, there was a substantial violation of the fairly representative venire requirement in his case and in the Prescott juror wheel. The full set of facts will be presented after full discovery, investigation, in which the Movant will seek to have a statistician appointed, access to this Court's subpoena power, and an evidentiary hearing.

338. Furthermore, Mitchell will show that the fact that only one Native American was placed on his jury and the 29 others were excused prior to peremptory challenges was a result of systematic exclusion and the improper transfer from Prescott to Phoenix. Mitchell's case was allegedly transferred from Prescott to Phoenix for concerns related to housing the defendants. This, however, became a non-issue when the trials were severed before their start. The concern

regarding where to house the co-defendant thus no longer applied to Mitchell's case.  The transfer resulted in rendering several of the Native American venirepersons excusable for undue hardship due to having to travel great distances to be in Phoenix. Mitchell will show that this transfer disproportionately affected Native American's ability to serve on his jury.

339.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

## N.   THE JUROR QUESTIONNAIRE CREATED FOR JURY SELECTION IN MOVANT'S TRIAL LACKED SPECIFICITY RENDERING IT INADEQUATE TO SECURE HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL AND  LIFE-QUALIFIED JURY

340.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the jurors' questionnaire lacked specificity rendering it inadequate to secure his right to an impartial and life-qualified jury.  *See Morgan v. Illinois*, 504 U.S. 719 (1992).

341.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

342.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by

reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

343.   The juror questionnaire distributed to prospective jurors in Mitchell's trial was inadequate to secure his constitutional right to an impartial, life-qualified jury.  While no Supreme Court precedent specifically addresses juror questionnaires, the Supreme Court has explicitly required that a defendant be provided adequate *voir dire* such that the Court can identify and excuse unqualified jurors, and that an impartial jury can try the defendant.  *Morgan*, 504 U.S. 719, 729 (1992) ("[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors.").  Failure to ask specific questions in *voir dire* violates the Constitution when it renders the trial fundamentally unfair. *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991); *see also Murphy v. Florida*, 421 U.S. 794, 799 (1975)("The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.'")(citation omitted)).

344.   In Claim K, Movant argues that his trial counsel was forbidden from asking prospective jurors questions specific enough to decide whether they could fairly and impartially serve on Mitchell's case.  The juror questionnaire asked prospective jurors their thoughts on the death penalty on such a superficial level that it added nothing to the *voir dire* process.  The combination of an inadequate *voir dire* process and a questionnaire lacking in any specificity resulted in a total deprivation of defense counsel's right to question prospective jurors in a meaningful fashion.

345.   The Sixth Amendment guarantees criminal defendants a trial by an impartial jury.  A juror who is "life-qualified" is one who would not automatically vote for the death penalty after conviction in every capital case.  A juror who is not life-qualified is not considered impartial, and is not eligible to serve as a juror on a

139

capital case.  One primary purpose of *voir dire* in the capital context is to identify these unqualified jurors.  *See Morgan*, 504 U.S. at 729.  *Voir dire* is vital in protecting a defendant's right to an impartial jury, and without adequate *voir dire*, the trial judge cannot fulfill her obligation to remove unqualified jurors.  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).

346.   The juror questionnaire is a valid medium for life-qualifying a prospective juror.  *See United States v. Johnson,* 366 F. Supp. 2d 822 (N.D. Iowa 2005).  Moreover, in *United States v. McVeigh*, the Tenth Circuit ruled that where the court barred defense counsel from asking specific questions related to the crime, it did not deny the defendant adequate *voir dire* due to, in part, the specificity in the juror questionnaire.  *United States v. McVeigh*, 153 F.3d 1166, 1208-1209 (10th Cir. 1998).

347.   For a time there was division in the Circuits, and the Tenth Circuit's decision in *McVeigh* was interpreted to stand for the proposition that all case-specific questions in *voir dire* are improper.  *See Johnson*, 366 F. Supp. 2d at 834.  The Supreme Court, however, clarified that the court must permit the defendant to ask about the jurors' ability to discharge their sentencing obligations in the *case at hand*.  *See Uttecht v. Brown*, 551 U.S. 1, 127 S. Ct. 2218, 2226 (2007).

348.   The trial court has an independent obligation to scrutinize juror questionnaires to assure that its inquiries are reasonably calculated to yield meaningful information without intruding too deeply into personal concerns. *United States v. Serafini*, 57 F. Supp. 2d 108, 111 (M.D. Pa. 1999); *United States v. McDade*, 929 F. Supp. 815 (E.D. Pa. 1996); *United States v. Edmond*, 730 F. Supp. 1144 (D.C. 1990).  Where the trial court fails to ensure that the questionnaire will provide meaningful case-specific information, the defendant's ability to life-qualify the jurors is at a serious disadvantage.  Where the trial court then bans the defense

140

from asking case specific questions during *voir dire*, the court deprives the defense's rights entirely.

349.   Here, the juror questionnaire yielded almost no meaningful information.  Of the seventy-seven questions in the questionnaire, two dealt with the alleged criminal activity with some specificity.  Question 66 asked if the juror would automatically impose a death sentence if one of the victims was a child, and question 67 asked if the juror would automatically impose a death sentence if one of the victims was elderly.  The questionnaire provided no synopsis of the alleged criminal activity.  It did not mention multiple murders, armed robbery, or defined carjacking.  The questionnaire did not provide any specifics as to the alleged aggravating factors -- a vital issue given the alleged brutality of the crimes -- and did not provide any detail how the perpetrators carried out the crimes.  In fact, by the Trial Court's own admission, the juror questionnaire here was ineffective and, if given the opportunity to rewrite the questionnaire, Judge Murguia would have done so.  (*See* RT 1537.)

350.   Exploring juror bias with respect to particular aggravating and mitigating factors likely to be presented to the jurors in the case before them is both permissible and necessary.  *See generally, Johnson*, 366 F. Supp. 2d 822.  For example, in *State v. Williams*, defendant's conviction and death sentence were reversed because the court barred his trial counsel from asking prospective jurors whether they would vote for death in a case involving rape and murder.  *State v. Williams*, 550 A.2d 1172, 1184 (N.J. 1988); *see also State v. Maxie*, 653 So. 2d 526, 538 (La. 1995) ("A potential juror who indicates that she will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before her is subject to a challenge for cause."); *People v. Kirkpatrick*, 7 Cal. 4th 988, 1005 (1994), *overruled in part by People v. Doolin*, 45

Cal 4th 390 (2009) ("A prospective juror who would invariably vote . . . for . . . the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating or mitigating circumstances, is therefore subject to challenge for cause. . . .").

351. If a juror cannot consider the factual "circumstances of the particular offense" before imposing the death penalty, then the death sentence violates the Eighth Amendment. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). In the present case, the entire jury selection process beginning with the questionnaire and ending with *voir dire* was an exercise in the blind leading the blind. Neither the Court nor counsel knew where the jury stood on issues vital to this case. The purpose of the questionnaire and *voir dire* is to remove this doubt such that the defendant is guaranteed his right to trial by an impartial jury. Without such impartiality, the penalty phase is a useless exercise with a foregone conclusion. A juror who would automatically vote for death after conviction on capital charges was not qualified under the Constitution to serve in this case. The trial court's admittedly ineffective questionnaire made it impossible for Mitchell to identify such jurors, and therefore deprived him of his constitutional rights.

352. The foregoing violations of Movant's constitutional rights, taken singly or in combination with the other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that this Court cannot deem the error harmless. The foregoing violations of Movant's rights had a substantial

142

and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See Id.* at 622, 637-38.

353. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

## O.   THE PROSECUTION'S FAILURE TO PRODUCE EXCULPATORY EVIDENCE VIOLATED MITCHELL'S CONSTITUTIONAL RIGHTS

354. Mr. Mitchell's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the prosecution violated its duty to disclose exculpatory evidence. *See Brady v. Maryland,* 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985).

355. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

356. Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

357. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

143

*Brady v. Maryland*, 373 U.S. 83, 87 (1963); *accord Banks v. Dretke*, 540 U.S. 668, 691 (2004).  In order to prevail on a *Brady* claim, a Movant must demonstrate that (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence was suppressed by the State either willfully or inadvertently; and (3) prejudice was ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008); *Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008)

358.   For prejudice to ensue, the suppressed, favorable evidence must be "material." *Brady*, 373 U.S. at 87.  Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Osborne v. Dist, Attorney's Office*, 521 F.3d 1118, 1136 (9th Cir. 2008); *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002). A reasonable probability is one that sufficiently undermines confidence in the outcome of the trial.  *Id*.  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also Cone v. Bell*, 129 S. Ct. 1769, 1787 (Roberts, C.J., concurring); *Tennison v. City & County of San Francisco*, 548 F.3d 1293, 1301 (9th Cir. 2008); *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005)

359.   On December 5, 2001, Mitchell's attorneys wrote the first of several letters to the government requesting *Brady* material, including all material related to sentencing and mitigation.

360.   During Mitchell's investigation, he discovered that, contrary to any discovery the Government provided to trial counsel previously (and to its position

144

at the trial), the FBI (consequently, the prosecution) and the tribal police had, pursuant to a tip from an unidentified individual, located and begun processing the scene where the bodies were found well before the date actually disclosed at trial.

361.   This information is significant to Mitchell's present defense to the charges and the death penalty.  As the Ninth Circuit noted, the testimony at trial was that Mitchell directed Navajo police officers to the site.  *United States v. Mitchell*, 502 F.3d at 944-45.  The descriptions of Mitchell "directing" law enforcement to the site allowed the jury to infer that Mitchell remembered well and immediately where the site was.  However, as described in Claims A and B, *supra* [SEAN'S IAC CLAIMS, Mitchell was still so intoxicated when he was arrested, even after waking up on November 4, that he was unable to recall and direct the site's location.  By not providing trial counsel with the information that the Government had already located and begun processing the site, the Government deprived Mitchell with evidence that was favorable to his lack-of-intent defense at the guilt and penalty phases of his trial.

362.   In addition to that violation, on May 13, 2003, the day before the penalty phase began, the government turned over several items of Brady material including a letter it had obtained over one and one-half years earlier from the Attorney General of the Navajo Nation to United States Attorney Paul Charlton indicating the Navajo Nations opposition to capital punishment in general and specifically with regards to Mitchell.  (*See* Defendant's Trial Ex. 22, Navajo Nation letter to Paul Charlton; *United States v. Mitchell*, 502 F.3d at 989.

363.   In Mitchell's direct appeal, the Ninth Circuit ruled that the aforementioned letter was indeed favorable and material to Mitchell's defense. *Mitchell*, 502 F.3d at 989.  The court, however, denied relief because it found that

145

Mitchell had failed to allege specifically how he was prejudiced by the suppression of the letter. *Id*.

364. On May 8, 2009, Movant's habeas counsel had an opportunity to speak with John Sears, Movant's trial counsel, who stated that had he received this letter in advance of the penalty phase, he would have arranged for Navajo officials to testify about why they opposed the death penalty. The Ninth Circuit noted that seven jurors had found that the letter was an additional mitigating factor because it expressed the Navajo Nation's opposition to the death penalty. *Mitchell*, 502 F.3d at 989. With a live witness, however, the jurors would have had the opportunity to listen and judge the credibility of a Navajo official who could explain fully all the issues of Navajo culture and religion, and how the death penalty contradicts those values. Certainly if a formal letter managed to influence seven jurors, live witness testimony would have easily influenced all twelve. *See United States v. Corley*, 348 F. Supp. 2d 970, 978 (N.D. Ind. 2004) ("when reliability is at issue and the fairness of Defendant's penalty phase is at stake, there can be no substitute for live testimony from direct occurrence witnesses.").

365. Furthermore, the prosecution in this case put Mitchell's status with the Navajo Nation at issue. During his penalty phase closing argument, the prosecutor suggested that Mitchell had turned his back on his religious and cultural heritage. *See* RT 4112, 4128-30; *Mitchell*, 502 F.3d at 995. Mitchell was left with only a letter to combat the prosecutor's improper argument. The presence of a politically powerful Navajo official in the courtroom would have been a powerful representation of the Navajo belief in forgiveness, would have demonstrated that Mitchell had not deserted his cultural heritage, and would have shown that Mitchell was not the pariah that the prosecution made him out to be.

146

366. Finally the simple fact that there were people willing to speak on Mitchell's behalf would have impacted the jury. A live person, representing the entire Navajo Nation, speaking directly to the jurors would have done much more for Mitchell than a letter ever could.

367. The prosecution in this case suppressed evidence in violation of Mitchell's constitutional rights. *See Brady*, 373 U.S. at 87. Mitchell has shown that the letter was favorable, it was suppressed by the government in that they had the letter for approximately five months before finally turning it over, and Mitchell suffered prejudice as a result. *See Greene*, 527 U.S. at 281-82. Therefore, Mitchell's death sentence is not "worthy of confidence," *Kyles*, 514 U.S. at 434, and Mitchell must be afforded habeas relief.

368. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

P. **THE GOVERNMENT'S COLLUSION WITH THE TRIBE VIOLATED MITCHELL'S CONSTITUTIONAL RIGHTS**

369. Federal and tribal law enforcement colluded to violate Mitchell's Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and his right to counsel, secured by the Fifth and Sixth Amendments.

370. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

147

371.    Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

372.    The documents the Government produced to trial counsel as discovery, testimony, and Mitchell's ongoing investigation show the following facts, which differ in significant respects from that presented to the Court before trial:

### 1.    The Court Violated Mitchell's Rights Through the Admission of Statements Obtained After His Right to Counsel Had Attached

373.    In September 2001, Navajo Nation police questioned Mitchell about an offense unrelated to Mitchell, and they later arrested him for vandalism of tribal property.  The tribal authorities released Mitchell and scheduled a court hearing for November 17, 2001.

374.    In the very early morning of November 4, 2001, pursuant to arrest warrants for the murders of Ms. Slim and Ms. Lee, the Government and the tribal police arrested Mitchell at Daisy Nakai's house, in Round Rock.

375.    The Government and the tribal police searched Daisy Nakai's house, and seized evidence later admitted against Mitchell.

376.    The Government and the tribal police executed two other arrest warrants, one at Round Rock school housing, the other elsewhere.

377.    Later that morning of November 4, law enforcement transported Mitchell to the tribe's facilities in Chinle.

378.    Also later that morning, the Government and the tribal police obtained Daisy Nakai's and her son Gregory Nakai's signatures purporting to authorize an

148

imminent search of the house, although the FBI had already searched the house and seized items.

379.  Special Agent Raymond Duncan, the investigating officer, arrived at Chinle to interrogate Mitchell.

380.  According to law enforcement summaries, prepared from handwritten notes not provided to counsel, Mitchell's first interrogation began shortly after Noon, on November 4.

381.  At 2:50 p.m. on November 4, law enforcement alleges that Mitchell waived his *Miranda* rights.  His interrogation continued until at least 3:15 p.m.

382.  That same day, the FBI purported to administer to Mitchell a polygraph examination by one of its agents.

383.  The FBI and the tribal police continued interrogating Mitchell until well past dark and into the early morning of November 5.

384.  By this time, the FBI and the tribal police had already been to the Tsailie crime scene.  They went to the scene after the FBI interrogated Mitchell and the others, while it was still daylight.  The FBI had called their evidence recovery team from Albuquerque.  The agencies were there for several hours.  They left that evening, leaving the location secure.

385.  In the early morning of November 5, the FBI and the tribal police finally permitted Mitchell to return to the Chinle jail to sleep.

386.  Mitchell's interrogations lasted at least twelve hours.

387.  On November 5, 2001, after noon, tribal police drove Mitchell  toward Tsailie.  Some place en route, two other tribal police took over transporting Mitchell.

388.  The FBI and tribal police already knew where the bodies were found.

149

389.   Once at the scene, another FBI special agent interrogated Mitchell out of earshot of the others.

390.   Eventually, the FBI and tribal police returned Mitchell to the Chinle jail.

391.   Tribal police placed Mitchell in a general population cell, *i.e.*, a cell with many other inmates.

392.   A couple days later, Mitchell appeared in tribal court on the robbery charges.

393.   The next day, the tribal court issued a bench warrant to Mitchell regarding his September 2001 arrest in which he allegedly vandalized police property.  The tribal authorities dropped the robbery charges.

394.   The day after that, tribal authorities transferred Mitchell to its jail in Window Rock, Arizona, on a long term hold.

395.   At some point before his transfer to another tribal jail in Window Rock, tribal authorities told Mitchell they had him in custody not for the Slim/Lee murders, but for the tribal matters.

396.   Mitchell remained at the tribe's Window Rock jail about two weeks.

397.   By Thanksgiving 2001, Mitchell was still in solitary confinement in a tribal jail.  (He was placed in solitary confinement after inmates assaulted him in the general population.)

398.   At some point, the tribe appointed an advocate (a lay person) to represent Mitchell on the tribal charges.

399.   On November 29, 2001, the Federal and tribal authorities did not return Mitchell to the tribal court; instead, they took him to Flagstaff, Arizona.

400.   In a Flagstaff office on November 29, 2001, the FBI "asked additional questions" of Mitchell regarding the Slim/Lee murders.

150

401.   On November 29, 2001, at 12:56 p.m., Mitchell waived his *Miranda* rights.

402.   Mitchell was in federal custody once the FBI arrested him at the Nakai household the morning of November 4, 2001.  The Navajo Nation and the Government colluded to delay the appointment of counsel for Mitchell regarding the Slim/Lee murders, and to delay Mitchell's presentment to a federal magistrate judge for arraignment.  Indeed, his arrest and interrogation were directed and coordinated by the Government to circumvent Mitchell's right to remain silent and right to the assistance of counsel.  As such, this Court should have suppressed his statements as a violation of his right to timely presentation before a magistrate and his right to counsel.

403.   Due to the delay in the appointment of counsel, Mitchell's Sixth and Fifth Amendment rights were violated, and his statements are inadmissible.

404.   Due to the delay in Mitchell's presentment to a magistrate judge, Mitchell's statements in the interim were inadmissible pursuant to 18 U.S.C. § 3501.

405.   Improper collaboration between federal and local law enforcement officers during a criminal investigation triggers federal procedural protections. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 359 (1994); *United States v. Red Bird*, 287 F.3d 709, 713-14 (8th Cir. 2002); *United States v. Doe*, 155 F.3d 1070, 1078 (9th Cir. 1998).

406.   If federal and local law enforcement officials act in collusion to delay a judicial determination of probable cause following an arrest by local law enforcement officials, custodial confessions are inadmissible unless they are voluntarily given within the meaning of 18 U.S.C. § 3501.  *United States v. Perez-Lopez*, 348 F.3d 839, 849-50 (9th Cir. 2003); *see Alvarez-Sanchez* 511 U.S. at 359;

151

*United States v. Wilson*, 838 F.2d 1081, 1085 (9th Cir. 1988).  Collusion is established by "deliberate intent" to deprive a defendant of federal procedural rights.  *United States v. Michaud*, 268 F.3d 728, 735 (9th Cir. 2001).

407.   Without seeking input from a tribal prosecutor, tribal investigators obtained a warrant because the Government indicated that an ideal course of action would be for federal agents to question Mitchell when he was in tribal custody. (3/11/03 RT at 75, 90-91.)  The tribal warrant was "an avenue to contact [the defendant] and interview [him]."  (*Id*. at 80.)  Federal agents were well aware that defendants in tribal custody would have fewer procedural protections than they would have in federal custody.  (*Id*. at 78, 104.)

408.   FBI agents ran the briefing on the morning of Mitchell's arrest. (RT 2702.)  Both FBI agents and tribal officers served the tribal arrest warrant at the Nakai home.  (1/30/03 RT at 187, 216.)  During the arrest, both FBI agents and tribal officers supervised the Navajo Tactical Team.  (01/30/03 RT at 232.)  The intent of federal agents when they arrested Mitchell was to have a Navajo police unit available  to take them to the Chinle jail.  (*Id*. at 188-189).

409.   After the FBI took Mitchell into custody on November 4, 2001, federal agents interrogated him a total of three times over twenty-four hours.  (*See* Exs. 18, 19 & 20; 1/30/03 RT at 21-31, 77, 81.)  The FBI conducted the third of these interrogations at the crime scene, where federal agents were directing the investigation.  (*See* Ex. 20; RT 2754, 3048, 3079, 3110.)  Federal agents interrogated Mitchell again, almost a month later, after they transported him to Flagstaff, within the hour before Mitchell was presented to a federal magistrate. (*See* Ex. 21; 1/30/03 RT at 32-33.)

410.   Federal law enforcement officers plainly controlled each stage of the investigation of this case.  They instigated Mitchell's arrest on a tribal warrant with

152

the intent to interrogate him while he lacked the procedural protections of the federal courts.  Consequently, Mitchell's confessions to law enforcement officials are inadmissible as they were involuntarily given and taken in violation of his rights to remain silent, to counsel, and to due process of law.

411.   Confessions are inadmissible when they are not voluntarily given.  18 U.S.C. § 3501; *United States v. Halbert*, 436 F.2d 1226, 1237 (9th Cir. 1970). "[C]ollusive police conduct designed to elicit an involuntary confession" and an unreasonable delay in arraignment are both factors undermining the voluntary nature of a confession.  *United States v. Manuel*, 706 F.2d 908, 913-914 (9th Cir. 1983).

412.   In some instances, delay in arraignment may be sufficient, in and of itself, to render a confession inadmissible."  *Manuel*, 706 F.2d at 913; *see Wilson*, 838 F.2d at 1086, 1087.  To render a confession inadmissible, the length of delay must have been longer than six hours (*Manuel*, 706 F.2d at 913), and not attributable simply to transportation problems or to the rendering of humanitarian assistance.  *United States v. Edwards*, 539 F.2d 689, 691 (9th Cir. 1976); *Manuel*, 706 F.2d at 914.

413.   By contrast, courts suppress confessions when a delay in arraignment was "deliberate and for the sole purpose of obtaining a confession."  *Wilson*, 838 F.2d at 1085; *see Halbert*, 436 F.2d at 1237 (holding that confession was admissible despite two-day delay in arraignment because there was no evidence that the delay contributed to defendant's confession).

414.   The evidence is uncontradicted that the Government and the Tribe designed the delay before appearing in court to secure a confession.  Mitchell was in custody for well over three weeks before he was presented to a federal magistrate.  (1/30/03 RT at 21, 32.)  The FBI arrested Mitchell on November 4,

153

2001.  He was presented to a federal magistrate on November 29, 2001.  There is no suggestion that this lengthy delay was due to anything other than the desire of federal agents to question him without federal procedural protections.  (3/11/03 RT at 75, 78, 80, 104.)

415.   In *Corley v. United States*, 129 S. Ct. 1558, 1571 (2009), the Supreme Court held that 18 U.S.C. § 3501(c) did not supplant *McNabb-Mallory* and that "[i]f the confession occurred before presentment and beyond six hours . . . the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Malory* cases, and if it was, the confession is to be suppressed."  The requirement remains that all confessions given during an unnecessary delay in arraignment should be suppressed.  None of Mitchell's confessions occurred within the six-hour safe harbor provision of 18 U.S.C. § 3501, and his statements to federal agents became increasingly more inculpatory the longer he was detained.  The FBI and the tribe arrested him at 7:00 a.m. on the morning of November 4, 2001, and Mitchell first spoke with federal investigators more than six hours later at 1:30 p.m. (1/30/03 RT at 40.)  He made no inculpatory statements during this first interrogation.  (*Id.* at 42.)  When the FBI interrogated him again, later that evening at 9:00 p.m., ten hours after his arrest, Mitchell agreed to take authorities to the location of the bodies.  (*Id*. at 29-30.)  At the scene the following day, the FBI interrogated him for a third time and gave a "more inculpatory statement" than he had the day before.  (*Id*. at 81.)  More than three weeks later, on November 29, the FBI interrogated him for a fourth time, and Mitchell "made certain admissions . . . to his involvement in the murder."  (*Id.* at 35.)

416.   The Supreme Court added, "In a world without *McNabb-Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy

154

leads to." *Corley*, 129 S.Ct. 1558, 1570.  Federal agents orchestrated the length of delay between Mitchell's arrest and presentment, knowing that it would assist them in obtaining confessions.  Consequently, Mitchell's statements to federal investigators were involuntary, and should have been suppressed.  Their admission violated his Fifth and Sixth Amendment rights.

### 2.    The Court Violated Mitchell's Rights Through the Admission of Post-Arrest, Pre-*Miranda* Statements

417.    The court violated Mitchell's Fifth Amendment rights when it admitted statements made by him after his arrest about where his clothing could be found in the Nakai house.  FBI Agent Hush testified that after the FBI and tribal police had arrested Mitchell, they held him handcuffed in the main room.  (RT 2960.)  While Hush was watching over him, he asked Mitchell where his pants were.  (*Id.*)  Mitchell was in his undergarments at the time.  (*Id.*)  In response to this question, Mitchell told Hush where his pants could be found.  (RT 2962.)  Hush then testified that when he grabbed the pants, a knife fell out.  (RT 2963.)  The Government admitted that knife against Mitchell as a potential knife used in the carjacking. (RT 2968.)

418.    The admission of this evidence violated Mitchell's *Miranda* rights. The evidence is unequivocal that the FBI and tribal police, acting at the direction of the prosecution, took these statements after they had arrested Mitchell on the morning of November 4, 2001, and that the FBI and tribal police had not advised Mitchell of his *Miranda* rights when he made these statements.  Moreover, the question asked was one that "the police should know [was] reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *see also Rhode Island v. Innis*, 446 U.S. 291 (1980) (questions other than those "normally attendant to arrest and custody" that police should know

155

are reasonably likely to elicit incriminating response responses, protected by *Miranda*).

419.   The courts have examined which questions fit within the exception of those "normally attendant to arrest and custody."  They have identified these questions as "routine booking questions" which the police have designed to secure the biographical data necessary for booking and pretrial services.  *Muniz*, 496 U.S. at 601.  Here, the questions asked did not fall within that exception.

420.   The Supreme Court has made clear that *Miranda* warning-based approach to determining the admissibility of statements is constitutionally based. *Dickerson v. United States*, 530 U.S. 428 (2000).  As such, this Court should adopt a per se approach to the exclusion of statements taken in violation of *Miranda*, rather than engage in a content-based analysis.  *Compare United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982).

421.   The testimony at issue here should not have been admitted.  The question Hush asked about the location of Mitchell's personal items in the house meets even a content-based analysis standard.  The FBI and tribal police arrested Mitchell in a house owned by another targets of this investigation, Gregory Nakai. At the time of Mitchell's arrest, many people whom the Government believed were involved in these offenses were also arrested in the home.  The offenses involved included homicides, evidence of which might exist on or in a suspect's clothing.  To use any evidence found in the house, the Government would have needed to link it to specific participants.  Thus, questions about whose property was where in the house was information that law enforcement and the Government designed to elicit an incriminating response.  As such, the court erred in admitting these statements in violation of Mitchell's Fifth Amendment rights.

156

### 3. The Court Violated Mitchell's Rights Through the Admission of Involuntary Statements Improperly Induced Through Deception and Lies

422. The court erred in admitting Mitchell's post-arrest statements that the Government obtained through deception and lies that came in many forms. Agents repeatedly implied to Mitchell that things would go "in a positive way" if he cooperated and that the courts would consider his cooperation in determining the outcome of this case. (1/30/03 RT at 103.) They even told him that he would have the right to have a lawyer appointed to help him, when no such lawyer was available or possible given the purported posture of the case. (RT 3149.) Such lies and deception render Mitchell's statements involuntary and thus their admission violated his rights to due process, a fair trial, and to a reliable sentencing determination under the Constitution.

423. The Court made a specific finding that Mitchell was not credible in his statements "regarding any benefit allegedly promised or implied by Special Agent Kirk." (CR 284.) However, the court's order does not address that the actual *Miranda* warnings themselves were lies if the Government's assertion that Mitchell was in tribal custody is accurate. As the agent himself admitted, if he were in tribal custody, Mitchell never had the right to have a lawyer appointed. (RT 3149.) No such right exists for those in tribal custody; the tribe in fact appointed only a lay person to "represent" Mitchell. The agent who administered those rights knew that either Mitchell was in federal custody, or what he was telling Mitchell about *Miranda* rights was not true. (RT 3149-50.) Such a fundamental lie to someone in Mitchell's situation is unconscionable. The agent's admission that he knew he was lying about something as basic as Mitchell's rights calls into question the credibility of all of the agent's other assertions. The court made its ruling on credibility

157

approximately two weeks before Kirk admitted to having lied to Mitchell about his rights. (CR 251.) As such, this Court should award no deference to that finding.

424.   Additionally, the Court never addressed the impact of Kirk's admission to lying about the rights to which Mitchell was entitled on the voluntariness of Mitchell's statements. However, the Court did rely heavily on its finding that the FBI and tribal police had given Miranda warnings in finding that the statements at issue were voluntary. (*See* CR 284.) Under these circumstances, Mitchell's statements to law enforcement should have been suppressed as involuntary.

## Q.   MOVANT WAS INCOMPETENT FROM THE CONCLUSION OF THE GUILT PHASE THROUGH THE PENALTY PHASE, AND THUS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS

425.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

426.   Those facts and allegations set forth in the motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

427.   The United States Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (citing *Medina v. California*, 505 U.S. 437, 453 (1992)).

428.   To be found competent for due process purposes, a defendant must meet two criteria: (1) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and (2) "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S.

158

402 (1960); *See United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008).  These criteria do not include a necessary finding of "mental disease or defect."  Moreover, in two of the seminal United States Supreme Court cases, failure to hold a hearing on competence was found reversible despite psychiatric reports falling short of such findings.  *See Drope v. Missouri*, 420 U.S. 162 (1975) and *Pate v. Robinson*, 383 U.S. 375 (1966).

### 1.   Doubt Raised as to Movant's Mental Competency Following the Jury's Return of a Guilty Verdict

429.   On May 8, 2003, the jury returned guilty verdicts on all counts against Lezmond Mitchell.  (RT 3581-84.)  Later that afternoon, Mr. Mitchell  for the first time expressed to the Court that he wished to waive his appearance for the penalty phase of his trial.  (RT 3597-3600.)  Mitchell was unable to clearly articulate any reason for wanting to waive his appearance to the Court aside from simply stating that he did not wish to attend.  The Court ordered him to come back the next day to discuss the matter further. (RT 3599)

430.   On May 9, 2003, Mr. Mitchell again addressed the court and stated that he wished to waive his appearance.  (RT 3604-20.)  He was again unable to clearly articulate why he did not want to attend aside from stating that he saw no relevance or benefit to attending the proceeding and he believed the jury had already made up its mind.  (RT 3608-09.)  Judge Murguia engaged Mr. Mitchell in conversation, which primarily consisted of the Court asking Mitchell questions which prompted a one-word response, and then Judge Murguia spoke with Mr. Mitchell's attorneys who, for the first time, moved to withdraw from the case due to their inability to communicate with their client.  John Sears, learned counsel for Mr. Mitchell, explained to the Court that he had tried to see Mitchell the previous day and Mitchell had refused to speak with him or the other attorneys.  (RT 3609-13.)  The

159

Court denied the motion to withdraw in large part due to the fact that Mitchell had no problem with his attorneys and that he would also refuse to attend or participate regardless of who was representing him. (RT 3614, 3618-19.)  Mr. Sears went on to explain that Mitchell began expressing his wish not to attend before the jury returned their verdict (RT 3616) and that if Mitchell was going to act inappropriately or not dress for court, then defense counsel would support his appearance being waived.  (RT 3617.)  The Court stated that Mr. Mitchell has been respectful of the proceedings and she had no reason to believe he would disrupt the proceedings in any way.  (RT 3617.)

431.   On May 13, 2003, the day before the penalty phase was scheduled to begin, Mr. Mitchell again addressed the court, stating the he would not dress for court and that he still wished to waive his right to appear.  (RT 3663-74.)  Mitchell stated that he did not wish to be brought to court the next day and that he felt it was a waste of time.  (RT 3666-67.)  Mr. Sears expressed to the Court that Mitchell still refused to speak to the attorneys or have any active role in his case.  (RT 3670.)  Sears went on to explain that originally Mitchell expressed a desire to testify, but now out of "despair or hopelessness or depression or whatever is motivating him, he's gone so far in the other direction." (RT 3671.)  Further, Sears reported that Mitchell told him he had a violent interaction with the marshalls at the jail when he refused to leave his cell.  (RT 3673.)  Finally, Sears noted that he had tried to give Mitchell some letters from relatives and friends, but Mitchell had just pushed the letters away and refused to read them. ( RT 3673.)
On May 14, 2003, against the advice of both the Court and his attorneys, Lezmond Mitchell officially waived his appearance for the penalty phase of his trial.  (*See* RT 3841-56, 3721.)  Mr. Sears renewed his motion to withdraw from the case, largely because Mitchell still refused to communicate with any of his attorneys, and

160

was again denied.  (RT 3851-53.)  Mitchell did not attend any of the penalty phase proceedings and only returned to court for the reading of his death verdict, six days later on May 20, 2003.

### 2. Defense Counsel's Failure to Request a Competency Proceedings Violated Movant's Constitutional Right to Effective Assistance of Counsel

432.   To prevail on a claim of ineffective assistance of counsel, Mitchell must show that his representation fell below the objective standards of reasonableness dictated by prevailing professional norms and that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.  *Strickland v. Washington*, 466 US 668, 687-88 (1984).  With regards to the first prong, it is Mitchell's burden to show that the challenged action could not be considered sound trial strategy.  *Id.* at 689.

433.   In 2002, the defense hired Dr. Barry Morenz of the University of Arizona Health Sciences Center to complete a psychiatric evaluation of Lezmond Mitchell.  On March 3, 2003, Dr. Morenz sent his report to Mitchell's attorney, Gregory Bartolomei.  (*See* Ex. 94, Morenz Report at p. 1.)  In Dr. Morenz's report, he indicates that Mitchell admitted using heroin, methamphetamine, cocaine, and psychotropic pills while in custody at the Madison Street jail.  (*See* Ex. 94 at p. 3.)  The report also indicates that Mitchell was often severely sleep-deprived, staying awake for three to four days at a time.  Further, the report states that Mr. Mitchell was self-medicating by purchasing the antidepressant Prozac from fellow prisoners. (*Id.*)

Mitchell's statements to Dr. Morenz are confirmed by Eric DeLuca.  Mr. DeLuca told post-conviction counsel that he was incarcerated with Mitchell in the Madison Street Jail at the time of Mitchell's trial in 2003.  Mr. DeLuca admits

161

selling illegal narcotics in the jail, and regularly sold to Mr. Mitchell.  DeLuca reports that Mitchell regularly drank home-brewed alcohol in the jail and regularly purchased heroin from Mr. DeLuca in quantities sufficient to abuse the drug on a daily basis.  (*See* Ex. 97, Eric DeLuca declaration at ¶¶ 2-4.)

434.   Mitchell's defense team was aware of Mitchell's hardcore drug use beginning in his formative years.  (*See* Ex. 94 at pp.15-16).  They were aware that his addiction did not end with his arrest and that he continued to abuse drugs in jail, feeding his addiction with powerful mind-altering narcotics.  *Id*. at 3.

435.   On May 14, 2003, when Mitchell formally waived his appearance for the penalty phase, the Court asked to hear from defense counsel.  Instead of taking this opportunity to request a competency hearing, or at least request the Court inquire as to whether Mitchell was currently under the influence of narcotics, Mitchell's defense team supported waiving his appearance.  (RT 3849.)

436.   Defense counsel saw a drastic change in Lezmond Mitchell over the course of this trial.   (RT 3609-13.)  Where he had once been cooperative, agreeable, respectful, and willing to go along with the Court's orders, Mitchell suddenly became severely withdrawn, totally irrational, and combative.  (RT 3673-4).  Despite the fact that John Sears recognized that Mitchell's conduct could be a result of psychological illness (RT 3671) and their knowledge of Mitchell's hardcore drug addiction, defense counsel failed to request a competency proceeding and supported Mitchell's motion to waive his appearance.  This could not be said to be part of a sound trial strategy as this course of action was, by both the defense's and the Court's own admissions, certainly not in Mr. Mitchell's best interest.  (RT 3598, 3608-09, 3666-67, 3847-48.)

437.   In this case, prejudice is shown by the fact that Mitchell's penalty phase proceeded without the initiation of a competency hearing.  A finding of

incompetence automatically results in reversal of the judgment – even absent a contemporaneous objection. Thus, prejudice is intrinsic. *See Pate*, 383 U.S. at 384 (failure to raise incompetence in trial court does not waive the issue on collateral review). This is because trial of an incompetent defendant is a violation of due process under the Fifth and Fourteenth Amendments. *Godinez v. Moran*, 509 U.S. 389, 396 (1993).

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper v. Oklahoma*, 517 U.S. at 354 (citing *Drope*, 420 U.S. at 171-72, and *Riggins v. Nevada*, 504 U.S. 127, 139-140 (1992) (Kennedy, J., concurring)).

438. A defendant alleging an ineffective assistance of counsel claim must demonstrate that counsel's performance was deficient and that he suffered prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In the present case, Mitchell was not competent to waive his presence at sentencing or proceed with a sentencing proceeding due to his drug addiction. Had counsel raised this issue, a competency proceeding would have indicated this fact. Once the competency proceeding reported this issue, the sentencing proceeding could not have continued and Mr. Mitchell could not have been sentenced. *Pate v. Robinson*, 383 U.S. 375 (1966). The proceedings would have been stayed until Mitchell was considered competent to proceed, at which point Mitchell would have, in all likelihood, proceeded as per his original intention

163

of taking part in the sentencing proceeding which both the Court and counsel agreed could reasonably have been expected to influence at least one juror to vote against a death sentence. (RT 3665).

Counsel's failure to raise this issue resulted in Movant being sentenced by a court lacking fundamental jurisdiction and deprived him of due process and full participation in the trial process.

### 3. Conclusion

439. The foregoing violations of Movant's constitutional rights, taken singly or in combination with the other errors alleged in the motion, constitute structural error and warrant the granting of this motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Movant's rights had a substantial and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See Id.* at 622, 637-38.

440. In addition, the denial of his right to effective assistance of counsel substantially prejudiced Movant, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Movant was left without meaningful representation. Although many of trial counsel's errors were, by

164

themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v. Cronic*, Movant has made that showing here. *Strickland v. Washington*, 466 U.S. 668 (1984).

To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

## R. LEZMOND MITCHELL'S CONVICTION AND SENTENCE SHOULD BE REVERSED BECAUSE THE VICTIMS' FAMILY'S CONDUCT UNDULY PREJUDICED MITCHELL AT BOTH THE GUILT AND PENALTY PHASE.

441. Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel in connection with the guilt and penalty phase of his trial. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

442. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

443. Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

165

**1.      Mitchell's Conviction and Sentence Should Be Reversed Because Family Members of the Victims Wore Buttons Depicting Slim and Lee During the Guilt Phase of Trial**

444.   The day before closing arguments was set to commence, Defense Counsel John Sears noted to the court that, during court proceedings from the week prior, members of the victims' family were "wearing buttons with the pictures of Alyce Slim and Tiffany Lee in the courtroom."  (RT 3409.)

445.   The controlling case on the prejudicial effect of a victim's family member wearing a pin depicting the victim is *Musladin v. Lamarque*, 427 F.3d 653 (9th Cir. 2005), *vacated on other grounds*, *Carey v. Musladin* 549 U.S. 70 (2006). Defendant Musladin was tried for murder in a California state court.  Before opening statements, the court denied Musladin's request for an order instructing family members not to wear the buttons.  During the 14-day trial, members of the victim's family sat in the courtroom wearing buttons with pictures of the victim displayed.  *Musladin*, 427 F.3d at 655.

446.   In 2005, the Ninth Circuit considered Musladin's habeas petition and granted relief, finding that the spectator's buttons created an unacceptable risk that impermissible factors would affect the jury, and thus were inherently prejudicial. *Musladin,* 427 F.3d at 658-659*; see Holbrook v. Flynn*, 475 U.S. 560, 570 (1986). The Ninth Circuit noted that in both *Estelle v Williams* (425 U.S. 501 (1976)), where the defendant in a criminal trial was required to come before a jury in a prison uniform and shackles, and *Norris v. Risley* (918 F.2d 828 (9th Cir. 1990), *overruled in part by Carey,* 549 U.S. at 76) where the court permitted spectators at a rape trial to wear anti-rape buttons, that the actions caused a risk of impermissible factors coming into play, and thus warranted relief.  The Ninth Circuit ruled that

there was no significant difference between the circumstances of *Williams* or *Norris* and Musladin's situation. *Musladin*, 427 F.3d at 660.

447.    Given that *Musladin* sought habeas review of a state court decision, section 2254 of the AEDPA applied, and the Ninth Circuit had to decide whether the state court had unreasonably applied clearly established Supreme Court law in denying Musladin relief.  As the Ninth Circuit had ruled that Musladin's situation was not significantly different from Supreme Court precedent as expressed in *Williams*, the court ruled that the state had unreasonably applied Supreme Court law in denying Musladin relief.  *Musladin*, 427 F.3d at 658.

448.    The United States Supreme Court reviewed and explained that *Williams* and *Flynn* had considered prejudicial conduct by state actors, while Musladin concerned prejudicial conduct by private citizens.  The Court explained that they had not decided a case involving the "potentially prejudicial effect of *spectators*' courtroom conduct of the kind involved" in *Musladin*, and thus there was no Supreme Court law for the state to have unreasonably applied.  *Carey*, 549 U.S. at 75-76 (emphasis added).  So the Supreme Court overruled the Ninth Circuit to the extent that the Ninth Circuit held that the state had unreasonably applied Supreme Court precedent.  *Carey*, 549 U.S. at 77.

449.    In Mitchell's direct appeal, the Ninth Circuit held that the family's buttons would be a problem "if it were 'so inherently prejudicial as to pose an unacceptable threat' to a defendant's right to a fair trial, meaning that 'an unacceptable risk is presented of impermissible factors coming into play' . . . " *United States v. Mitchell*, 502 F.3d 931, 971 (9th Cir. 2007) (quoting *Norris*, 918 F.2d at 830 and *Musladin*, 427 F.3d at 656-657).  The Ninth Circuit simply noted that "[a]ll the record reflects is that Mitchell's counsel told the court a week later, and in connection with a different matter, that some members of the victims' family

167

were wearing buttons and that he and government counsel had worked it out informally.  There was no plain error." *Mitchell,* 502 F.3d at 972.

450.   The Ninth Circuit stressed the deficiency of the record but, as the Supreme Court noted, the *Musladin* record was not much more detailed.  *Carey,* 549 U.S. at 73 n.1 (stating "[t]he record contains little concrete information about the buttons.  The buttons were apparently two to four inches in diameter and displayed only a photograph of [the victim].  It is not clear how many family members wore the buttons or how many days of the trial they wore them.").  Given the comparatively similar records and the strikingly similar facts concerning Mitchell's and Musladin's respective trials, this Court must recognize the inherent prejudice to Mr. Mitchell and grant him habeas relief.  If, however, the court finds the records are not sufficiently similar, then Mitchell contends that appellate counsel's failure to acquire and provide one of the buttons to the Court to supplement the record constitutes ineffective assistance of appellate counsel under *Evitts v. Lucey*, 469 U.S. 387 (1985).

## 2. Mitchell's Trial Counsel Provided Ineffective Assistance for Failing to Object in a Timely Manner to the Family's Conduct

451.   If this Court disagrees with Mitchell's position and finds *Musladin* is distinguishable from the circumstances of Mitchell's case, then Mitchell maintains that ineffective assistance of counsel caused the distinguishing factors.  While Mitchell's record admittedly "contains little concrete information about the buttons," (*Carey*, 549 U.S. at 73 n.1), this is largely because of defense counsel's omission.  At trial, defense counsel became aware of the buttons the victims' family members were wearing.  Instead of immediately bringing this issue to the court's attention and seeking to prohibit this conduct, making a full record, and requesting a

168

limiting instruction, defense counsel merely tried to "work this out informally" with the prosecutor.  (RT 3409-10.)  It was only when the prosecution asked the Court to allow witnesses in the courtroom during closing argument, the week after the buttons were openly worn, did defense counsel make any sort of record of the family's prejudicial conduct.

452.   A defendant alleging an ineffective assistance of counsel claim must demonstrate that counsel's performance was deficient and that he suffered prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

453.   "Due process requires that the accused receive a fair trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966).  The United States Supreme Court has ruled that "when the consequence of a courtroom practice is that an 'unacceptable risk is presented of impermissible factors coming into play,' there is 'inherent prejudice' to a defendant's constitutional right to a fair trial and reversal is required."  *Musladin*, 427 F.3d at 656 (quoting *Flynn*, 475 U.S. at 570).

454.   The Ninth Circuit unequivocally ruled in *Musladin* that where a court allows victim's family to wear buttons depicting the victim, the defendant's right to a fair trial by an impartial jury free from outside influences has been violated. *Musladin*, 427 F.3d at 654.  In the present case, however, it was not the court that perpetuated the prejudicial conduct, but defense counsel.  The Ninth Circuit has stated specifically that in response to such prejudicial conduct, "a reasonable jurist would be compelled to conclude that the buttons worn by [the victim's] family members conveyed the message that the defendant was guilty."  *Id.* at 661.  The Eleventh Circuit has further acknowledged that similar prejudicial conduct not only

169

communicates the defendant's guilt to the jury, but also a demand for the death penalty. *Woods v. Dugge*r, 923 F.2d 1454, 1459-1460 (11th Cir. 1991). Combining the Ninth and Eleventh Circuit standards, Mitchell easily shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland v. Washington*, 466 U.S. 668, 694 (1984), because reasonable jurors were compelled to vote for guilt and death as a result of defense counsel's failure to respond to the victims' family member's prejudicial conduct.

455. The foregoing violations of Movant's constitutional rights, taken alone or in combination with the other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Movant's rights had a substantial and injurious effect or influence on Movant's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

456. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

170

**S.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE FOR FAILING TO REQUEST THE TRIAL COURT TRIFURCATE THE PROCEEDINGS**

457.   Mitchell's sentences and death judgment violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Defense counsel rendered ineffective assistance for failing to request the trial court trifurcate the proceedings (*i.e.*, bifurcate the penalty phase).

458.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

459.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

460.   An allegation of ineffective assistance must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense at trial.  *Strickland*, 466 U.S. at 687.  Counsel's performance is deficient if it was "objectively unreasonable  under the circumstances."  *Id*. at 688.

461.   After the Supreme Court approved bifurcated proceedings in *Gregg v. Georgia*, 428 U.S. 153 (1976) (plurality opinion), federal death penalty cases in recent years have proceeded with bifurcated jury deliberations generally.  The Federal Death Penalty Act of 1994 ("FDPA") provides that, if the defendant has been found guilty of a capital offense, the trial judge "shall conduct a separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C.

171

§ 3593(b).  At this hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor," regardless of its admissibility under the Federal Rules of Evidence § 3593(c).  The government must prove, beyond a reasonable doubt, the existence of at least one of sixteen aggravating factors before the defendant is considered eligible for the death penalty.  The defendant has the burden of proving, by a preponderance of the evidence, any mitigating factor.  *Id.*  The jury then considers all of the information presented during the hearing.  If the jury finds true any aggravating factor, it must return "special findings" identifying the statutory and non-statutory aggravating factors it has unanimously found to exist, and also the mitigating factors that one or more jurors have found to exist.  If no statutory aggravating factor is found beyond a reasonable doubt, "the court shall impose a sentence other than death." § 3593(d).  If, however, the jury finds the requisite mental state and at least one statutory aggravating factor, then it "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" and, based upon this consideration, recommend by unanimous vote "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." § 3593(e)

462.   The Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), raises serious questions about the constitutionality of the unitary sentencing hearing, where the jury makes, in a single deliberative process, its "eligibility" decision (which under *Ring* should now have all the trappings of a guilt/innocence trial), and its "selection" decision.

463.   To the extent that FDPA's single sentencing hearing provisions survive constitutional challenge under *Ring*,[3] it is nonetheless necessary that courts structure the jury's deliberations so as to avoid the myriad problems associated with admitting information on one issue, such as a nonstatutory aggravating factor like victim impact, that is not relevant to another issue, such as a statutory aggravating factor related to the circumstances of the offense.   Several courts have ordered trifurcated proceedings for these reasons.   *See, e.g.*, *United States v. Natson*, 444 F. Supp. 2d 1296, 1309 (M.D. Ga. 2006); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1110-11 (N.D. Iowa 2005); *United States v. Mayhew*, 380 F. Supp. 2d 936, 955-57 (S.D. Ohio 2005); cf. *United States v. Jordan*, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005).

464.   Trial counsel failed to request a trifurcated proceeding, thus subjecting Mr. Mitchell's to an overly prejudicial sentencing hearing that violated his constitutional rights under *Ring v. Arizona* and resulted in his death sentence. In the first phase of a trifurcated proceeding, the "merits" phase, the jury deliberates on the defendant's guilt or innocence of the charged offenses.   In the second phase, the "eligibility" phase, the jury determines whether the government has proven the mental state factors[4] and the statutory aggravating factors beyond a reasonable doubt.   In the third phase, the "penalty" or "selection" phase, the jury decides on the nonstatutory aggravating factors and the mitigating factors, undertakes the process of weighing, and determines the sentence.

465.   Absent a trifurcated capital proceeding under the FDPA, a defendant is forced to have a jury decide whether the government has proven the remaining

---

[3]   Mr. Mitchell does not concede that the FDPA is facially constitutional.

[4]   *Johnson* uses the term "gateway" factors to describe the mental state factors because that is how they are described under 21 U.S.C. § 848 – the death penalty statute for continuing criminal enterprise offenses.

elements of a capital offense, *i.e.*, the defendant's eligibility for the death penalty, at the same proceeding where the jury ultimately decides whether to in fact impose such a punishment.  By allowing the jury's determination regarding death eligibility under the FDPA to be potentially tainted by evidence that relates to nonstatutory aggravating factors and the process of weighing the aggravating and mitigating factors, the FDPA commingles two fundamentally different decisions which, under *Ring* and the Constitution, must be kept separate: (1) whether the government has proven all elements of a capital offense beyond a reasonable doubt; and (2) if so, whether death or life without the possibility of release is the appropriate sentence.

### 1.     To Be Constitutional under *Ring v. Arizona*, Proceedings under the Federal Death Penalty Act Must Be Trifurcated

466.   It is now clear that statutory aggravating factors and the intent requirements of 18 U.S.C. § 3592 are elements of a charged capital offense because those factors serve to raise the lawful maximum penalty from life imprisonment to death.[5]  *Ring v. Arizona*, 536 U.S. 584 (2002).  *See United States v. Allen*, 406 F.3d 940, 943 (8th Cir. 2005); *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004); *United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003); *United States v. Quinones*, 313 F.3d 49, 53 n.1 (2nd Cir. 2002).[6]  In light of *Ring*, and to properly meet the requirements of the Fifth, Sixth and Eighth Amendments, proceedings under the FDPA must now be trifurcated.

467.   As *Ring* held, a jury's decision regarding the presence of a statutory aggravating factor and the presence of the requisite mental state each involve a determination as to an essential element of the charged capital offense.  Such

---

[5]    This argument assumes, without conceding, that the weighing of all factors is not an element of a capital offense.

[6]   The Supreme Court denied *certiorari* in *Robinson*, *Higgs* and *Quinones.*

174

determinations must be made in a proceeding that occurs after the trial on guilt/innocence, but before, and separate from the proceeding where the jury ultimately decides whether to impose the death sentence.  Any less of a procedure violates the defendant's Fifth Amendment right to enter the "eligibility" phase cloaked in the presumption that he is innocent of the death penalty – a difficult presumption to maintain in the context of a capital case.[7]  It also violates the defendant's rights to procedural due process under the Fifth Amendment and his rights to trial by jury and confrontation under the Sixth Amendment.

468.   The presumption of innocence is a basic tenet of American law, *Estelle v. Williams*, 425 U.S. 501, 503 (1976), which "lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895); *In re Winship*, 397 U.S. 358 (1976).  Under the presumption of innocence a defendant is presumed innocent until the prosecution proves all elements of the offense beyond a reasonable doubt.  For trials, a wide variety of procedures have evolved, which are designed to protect the presumption of innocence, hold the government to its burden of proof, and otherwise ensure a fair trial.  Chief among these are procedures governing the admissibility of evidence.  Testimony, exhibits, and other evidence not relevant to an element of the offense is inadmissible.

469.   Now that "eligibility" factors are functional equivalents of an element of the offense, the principles of *Winship*, 397 U.S. 358, require that the court and the jury presume the defendant innocent of those elements unless the government

---

[7]   *See* Jesse Nason, *Mandatory Voir Dire Questions in Capital Cases: A Potential Solution to the Biases of Death Qualification*, 10 Roger Williams U. L. Rev. 211, 219 (2004) (summarizing research on how death-qualified jurors may presume guilt, resolve ambiguities against the defendant, more readily accept the government's version of events, distrust defense witnesses, fill evidentiary gaps with their beliefs that defendant committed the crime; and were more likely to infer premeditation).  *See also United States v. Green*, 324 F. Supp. 2d 311, 329 (D. Mass. 2004) (citing studies that raise problem with whether death-qualified juries are more conviction prone).

175

has proven them to the jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (state must prove every element that distinguishes lesser from greater crime). A unitary capital sentencing proceeding, however, does not afford the kinds of procedural protections designed to protect the presumption of innocence. In a unitary sentencing proceeding, the jury is permitted to hear a wide variety of information on matters not relevant to the mental state and statutory aggravating factors (the elements), such as victim impact, the defendant's prior convictions, and a host of other information about the nature and circumstances of the offense and the defendant. Such information would rarely, if ever, be admissible in a trial-like proceeding designed to afford the defendant the full panoply of procedural protections commonly associated with the Fifth and Sixth Amendments. *See Williams v. New York*, 337 U.S. 241, 246 (1949) ("[t]ribunals passing on the guilt of a defendant have been hedged in by strict evidentiary procedural limitations"); *Huddleston v. United States*, 485 U.S. 681, 686 (1988) (extrinsic acts generally inadmissible unless relevant to motive, opportunity, or knowledge); *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (recognizing how prior convictions can taint fairness of proceeding); *Crawford v. Washington*, 541 U.S. 36 (2004) (Confrontation Clause of Sixth Amendment prohibits admission of testimonial statements not subject to cross-examination); *Sandstrom v. Montana*, 442 U.S. 510, 515 (1979) (holding unconstitutional instruction that law presumes ordinary consequences of defendant's voluntary acts).

470. For these reasons, the single sentencing hearing provision of the FDPA is at odds with *Ring*. The Supreme Court clearly stated in *Ring* that a defendant holds a Sixth Amendment right to have the government prove death "eligibility" factors to the jury beyond a reasonable doubt. The Court surely did not mean to provide such a right, but then deprive the defendant of all the procedural protections

commonly associated with it, including the presumption of innocence and a host of other procedural protections such as the rules governing the admission of evidence.

471.   Mr. Mitchell's attorneys, however, failed to object to this single sentencing proceeding, thus perpetuating this drastic violation of Mitchell's constitutional rights.  This omission on the part of trial counsel was objectively unreasonable.  Given that the constitutional rights implicated are basic tenets of criminal law, any reasonably competent criminal defense attorney would have advocated on behalf of Mitchell's rights.

### 2.      Counsel Should Have Moved for Trifurcation to Avoid Unfair Prejudice, Confusion of the Issues, and Misleading the Jury

472.   Even if this Court rules that the single sentencing hearing provision of the FDPA does not collide with *Ring* or the Fifth Amendment's procedural protections, trial counsel should still have moved for trifurcated proceedings.

473.   The court in *United States v. Johnson* found authority for trifurcating the proceedings in the provisions of the FDPA governing the admissibility of information.[8]  362 F. Supp. 2d at 1110-11;  *see also United States v. Bolden*, 545 F.3d 609, 618 (8th Cir. 2008) (holding that the FDPA does not require a single penalty phase and that trifurcation is permissible).  The court concluded that information relevant to the nonstatutory aggravating factors should be excluded from the jury's consideration of the mental state and statutory aggravating factors

---

[8]   The Court in *Johnson* construed the provisions of 21 U.S.C. § 848 – a statute that sets out penalty procedures for murders committed as part of a continuing criminal enterprise.  The statute's provisions on the admissibility of information are similar to the FDPA's – the only difference being that before the court may exclude information under the CCE statute, it must find that the probative value of the information "substantially outweighs" its prejudicial effect.  The FDPA, in contrast omits the phrase "substantially," giving the Court a broader basis to exclude information during the sentencing hearing.

because the probative value of the information was substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

474. The Second Circuit cautioned that district courts must carefully consider trifurcation, and explained that a "trifurcated proceeding allows a district court not only to avoid the admission of prejudicial evidence before the eligibility decision, but also to delineate clearly between the applications of the Confrontation Clause in the eligibility and selection phases." *United States v. Fell*, 531 F.3d 197, 240 n.28 and 239-240 (2d Cir. 2008) (internal citation omitted). In rejecting Fell's claim that the FDPA is unconstitutional under *Ring*, the Second Circuit explained that the ability to trifurcate the proceeding or to simply preclude proof of non-statutory aggravating factors during the eligibility phase when the evidence threatens to undermine the presumption of innocence, renders the FDPA constitutional. *Id.* at 240. Or put another way, without trifurcation the FDPA would be unconstitutional.

475. Mitchell's counsel did not avail itself of the remedies that render the FDPA constitutional, and as a result Mr. Mitchell was severely prejudiced. During Mitchell's sentencing hearing, in which the jury was expected to decide both eligibility for the death penalty and whether to impose the death penalty, the prosecution presented testimony of Leo Slim, the husband of victim Alyce Slim who was the mother of his seven children. (RT 3754-57). The prosecution then called Geraldine Slim, the daughter of Alyce Slim and Tiffany Lee's aunt. (RT 3757-65). Then, Kimberly Houston who also is Slim's daughter and Tiffany's aunt, testified. (RT 3765-75). And finally, Marlene Slim, who is Tiffany's mother and Slim's daughter, testified. (RT 3775-81). Each of these witnesses testified to the pain and suffering they experienced as a result of the murders of Mrs. Slim and

178

Ms. Lee. This highly emotionally charged testimony made up the entirety of the prosecution's case at sentencing.

476. Mitchell's sentencing hearing was exactly the type the Second Circuit cautioned district courts to avoid. It consisted entirely of highly prejudicial evidence that was entirely irrelevant to Mr. Mitchell's qualification for death. The Second Circuit stressed that trifurcation would prevent unfair prejudice resulting from the consideration of "death selection" evidence before "death eligibility" has been determined, *Fell*, 531 F.3d at 240, but no such trifurcation was suggested in Mr. Mitchell's case. The fact of the matter is that the jury found statutory aggravating factors unanimously based upon evidence that would have been inadmissible under the federal rules of evidence. If this is constitutional,[9] it is only so because Mr. Mitchell's attorneys could have moved for trifurcation, and the fact that they did not is deficient performance that prejudiced Mr. Mitchell.

477. Victim impact information has an undue tendency to suggest decision on the mental state and statutory aggravating factors on an improper basis. *Johnson*, 362 F.Supp.2d at 1106. This evidence had a profound affect on the jury in Mitchell's case, as is evidenced by the prosecution's limited sentencing phase presentation, and the jury's resounding response to it. Victim impact evidence can have unsurpassed emotional power on a jury even when limited in scope, amount, and length. As Judge Bennett observed in *Johnson*:

> To pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of

---

[9]   Mr. Mitchell does not concede that this is constitutional.

> information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias – sympathetic or antipathetic, depending on whether one is considering the defendant or the victim's families . . .
>
> Therefore, as a general matter – and certainly in this case – the danger of unfair prejudice arising from hearing victim impact' evidence or evidence on other 'nonstatutory' aggravating factors before the jury makes its determination on the defendant's 'eligibility' for the death penalty, on the basis of the 'gateway [mental state]' and 'statutory' aggravating factors, substantially outweighs any probative value of such evidence to the determination of the defendant 'eligibility' for a death sentence.

*Id*. at 1107-1108 (citing *United States v. Gabe*, 237 F.3d 954 (8th Cir. 2001)).

478. Having the jury decide the mental state and statutory aggravating factors before hearing victim impact evidence would have at least kept such evidence from infecting the jury's deliberations on whether the government had met its burden of proving the "eligibility" factors.

479. The need to avoid confusion of the issues under 18 U.S.C. § 3593, further should have motivated Mitchell's attorneys to move for trifurcating the proceedings and exclude from the jury's decision on "eligibility" factors any information on nonstatutory aggravating factors and mitigating factors. By excluding extraneous information, the jury could have focused its attention on the

government's proof of the statutory aggravating factors rather than the highly emotional evidence not relevant to this issue.

480.   Lastly, a trifurcated proceeding would have reduced the likelihood of the jury being misled by the multiple issues it faced under the FDPA.  *See* 18 U.S.C. § 3583 (danger of misleading the jury is grounds to exclude evidence).  As Judge Bennet wrote in *Johnson*:

> If the jury is permitted to hear information on all of the factors in one proceeding, the jury is reasonably likely to be misled into believing that all information is pertinent to the determination of all factors and the balance of factors, when the process under [the statute] is actually sequential and cumulative.  The jury must first find the defendant guilty; then must find one [mental state]; then must find at least one "statutory" aggravating factor; then may find one or more "non-statutory" aggravating factors and one or more mitigating factors; then must balance all of the factors to determine the appropriate penalty.

362 F. Supp. 2d at 1109.

481.   Findings from the Capital Jury Project lend further support to the conclusion that trifurcated proceedings would have helped lessen juror confusion about capital sentencing and increase juror comprehension of instructions.  Those findings reveal, among other things, grave problems with (1) jurors thinking that death is required upon proof of certain aggravating factors; and (2) jurors generally misunderstanding the complex instructions in a capital case.  *See generally* William J. Bowers and Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Criminal Law Bulletin 51, 63 (2003)

181

(44% of capital jurors believed that death required when offense was "heinous, vile, or depraved"; only 30% of jurors understood that aggravation had to be proven beyond a reasonable doubt; and 50% erroneously believed that mitigation had to be proven beyond a reasonable doubt).

482.   Mr. Mitchell's counsel failed to move to trifurcate these proceedings. This failure constitutes deficient performance in that it was objectively unreasonable under the circumstances.  Trial counsel was provided a witness list. They knew well in advance that the prosecution had to prove statutory aggravating factors and they knew that the prosecution intended to call family members of the victims.  Instead of trying to separate what called for profoundly different evidence, trial counsel made no objection to the sentencing hearing and simply allowed it to proceed in this constitutionally deficient manner.

483.   Whether trial counsel's deficient performance is based upon failing to object under *Ring* to a single sentencing hearing or failing to request trifurcation, either formulation resulted in substantial prejudice to Mr. Mitchell.  Looking at nothing other than the transcripts and the jury verdict, it is clear that the jury was profoundly affected by the victim impact evidence.  Beyond the record, a single sentencing proceeding has several inherent problems that prejudiced Mr. Mitchell, and a trifurcated proceeding would have alleviated some of these problems.  First, a trifurcated proceeding, where the jury in the second phase focuses only on the government's burden of proving the mental state and statutory aggravating factors in order to determine the defendant's "eligibility" for the death penalty, would have focused the juror's attention on the fact that a finding of guilt on an aggravating factor does not mean that death is the required sentence.  Rather, if the jury had been required to decide the defendant's "eligibility" for the death penalty, hear additional evidence only if they find him eligible, and return to deliberate in the

182

"selection" phase, the fact that the finding of an aggravating factor, while necessary for imposition of the death penalty, does not require such would have been clarified. Second, a trifurcated proceeding would have permitted the Court to break the deliberative process into more manageable parts.  The jury would not have been overwhelmed at one time by complex instructions about mental state, statutory aggravating factors, nonstatutory aggravating factors, mitigating factors, and weighing.  And finally, as explained fully above, the jury would not have been unduly prejudiced by highly charged, emotional evidence that was totally irrelevant to the issue of eligibility.  By breaking the process down, jurors would have better understood the Court's instructions and engaged in the sequential process contemplated under the FDPA.

### 3.    Conclusion

484.   In conclusion, the single sentencing provisions of the FDPA raises serious constitutional questions under *Ring*.  A trifurcated proceeding would have permitted the Court to structure deliberations in a way to minimize the danger of unfair prejudice, confusion of the issues, and misleading the jury.  The fact that the defense did not request such a proceeding prejudiced Mr. Mitchell and resulted in an unconstitutional death sentence.

### T.    <u>THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT MOVANT'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT</u>

485.   Mitchell alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the Government would carry out the

183

execution, would all result in the infliction of unnecessary pain and suffering violating the Eighth Amendment.

486.  In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

487.  Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

488.  While Movant's belief that the execution under the current lethal injection protocol would violate the Eighth Amendment, he believes this challenge is not appropriate at this time.

489.  First, since Movant's execution is far from imminent, the question is not yet ripe.

490.  Second, since the Supreme Court's decision in *Hill v. McDonough*, 547 U.S. 573 (2006), a condemned inmate may bring a challenge to lethal injection in a separate civil rights action under 42 U.S.C. § 1983.

491.  Finally, the appropriate lethal injection procedure is currently under review.  This Court sentenced Mitchell to death under the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3598, in connection with his conviction on two counts of carjacking resulting in death, 18 U.S.C. § 2119(3).  According to the FDPA, 18 U.S.C. § 3596(a), the method of execution is to mirror that of the state in which sentence was imposed.  Mr. Mitchell's sentence was imposed by Judge Murguia of the United States District Court for the District of Arizona.  (Reporter's Transcript, Sentencing Hearing 9/15/2003 at pp. 11-17); *see also United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007).  Therefore the Government should carry Mr.

184

Mitchell's execution out in Terre Haute, Indiana, but in accordance with Arizona state law and Arizona's lethal injection protocol. *See United States v. Hammer*, 121 F.Supp.2d 794 (M.D. Pa. 2000).

492. Following Arizona Criminal Code § 13-757(A): "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death . . . " Section 13-757 does not provide any further specifics on lethal injection. *See* ARS § 13-757. Mr. Mitchell does have the option of choose execution via lethal gas at least 20 days before the execution date. ARS § 13-757(B).

493. Arizona condemned inmates are currently challenging the Arizona lethal injection protocol, however, in a 42 U.S.C. § 1983 action in the District Court for the District of Arizona. *Dickens v. Brewer*, No. 2:07-CV-01770 (D. Ariz. 2007). The docket states that a Joint Report filed on April 9, 2009 is the most recent filing in the case, a hearing on the Defendant's motion for summary judgment has been set for June 24, 2009, and the Court has several unresolved issues yet to consider.

494. Arizona condemned inmates are also challenging the Arizona lethal injection procedure in an Arizona Supreme Court. *State v. Landrigan*, No. CR-90-0323 (2007). Here, the docket shows that the most recent filing was an order denying the State's motion to lift Mr. Landrigan's execution warrant pending the conclusion of post-conviction relief matters filed in state superior court regarding the lethal injection procedure.

495. Furthermore, federal condemned inmates are challenging the Government's lethal injection protocol, and until that the court resolves litigation, there is no valid protocol under which Mr. Mitchell's execution could proceed. *Roane v. Holder*, No. 05-2357 (D.D.C. 2007).

496. Movant will litigate this Eighth Amendment challenge when it is ripe.

185

497.    To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland v. Washington*, 466 U.S. 668 (1984).

U.    **THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING CASES IN WHICH THE FEDERAL DEATH PENALTY IS IMPOSED FROM THOSE IN WHICH IT IS NOT IMPOSED RENDERS THE FDPA UNCONSTITUTIONAL**

498.    In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

499.    Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

500.    The Supreme Court has held that the Constitution will not tolerate sentences of death that are imposed arbitrarily or capriciously.  *Furman v. Georgia*, 408 U.S. 238 (1972).  In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the "flipside" of this approach, insisting "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."

501.    The reality of the federal death penalty in practice is that there is no consistency or predictability in the manner in which federal judges and juries have imposed the federal death penalty.  In fact, there is no consistency in the cases that proceed to trial compared to those that plead out.  Included as Exhibits to this

motion are summaries of the facts and circumstances of the present status or resolution of every authorized federal death penalty case from 1988 until 2004, organized as follows: Ex. 79, Federal Capital Prosecutions Awaiting Trial; Ex. 80, Federal Capital Defendants Who Died Before or During Trial; Ex. 81, Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons; Ex. 82, Federal Capital Prosecutions in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty; Ex. 83, Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other than Death; Ex. 84, Federal Capital Defendants Who Were Found Not Guilty of the Capital Charge or Were Innocent; Ex. 85, Federal Capital Defendants Convicted of a Lesser Offense; Ex. 86, Federal Capital Cases Where the Death Penalty Has Been Rejected by Juries or Judges: Ex. 87, Federal Capital Cases Resulting in a Sentence of Death; Ex. 88, Federal Capital Cases Resulting in Execution; Ex. 89, A Listing of Former Federal Death Row Inmates.

502.    One cannot read these descriptions of the many ways in which man can demonstrate his capacity for inhumanity to his fellow man without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors.  Yet, for indiscernible reasons, some defendants were sentenced to death, but the vast majority were not.  If any basis can be distinguished, it is race and region.[10]  Fairness and consistency are the opposite of arbitrariness and caprice.  In the demonstrated absence of fairness and consistency, the federal death penalty must be set aside.

---

[10]    As discussed previously in Mr. Mitchell's litigation, the invidiousness and irrationality of these factors is an additional reason that the federal death penalty is unconstitutional.

503. This argument is not refuted by simply pointing out the difficulties inherent in comparing cases. Selected summaries of the cases quickly put that overly simplistic argument to rest:

1. *United States v. Timothy McVeigh* (D. Colo.). The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

2. *United States v. Terry Nichols* (D. Colo.). McVeigh's co-defendant. Tried, convicted, sentenced to life.

3. *United States v. Khalfan Mohamed and Rashed al`-Owhali* (S.D.N.Y.). Two defendants associated with Osama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

4. *United States v. Theodore Kaczynski* (E.D. Cal.). The Unabomber. Three murders by mailbombs. Plea agreement. Sentenced to life.

5. United States v. Joseph Minerd (W.D. Pa.). Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

6. *United States v. Coleman Johnson* (W.D. Va.). Pipe-bomb used to kill pregnant girlfriend and their

unborn child to avoid child support. Tried, convicted, sentenced to life.

7. *United States v. Christopher Dean* (D. Vt.). Defendant sent pipebomb through the mail killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

8. *United States v. Billy Cooper* (S.D. Miss.). Car-jacking killing of two victims. Tried, convicted, sentenced to life.

9. *United States v. Christopher Vialva and Brandon Bernard* (W.D. Texas). Carjacking double homicide. Tried, convicted, sentenced to death.

10. *United States v. David Paul Hammer* (M.D. Pa.). Prison inmate guilty of strangling to death cellmate at USP-Allenwood. Sentenced to death.

11. *United States v. Michael O'Driscoll* (M.D. Pa.). Prison inmate guilty of stabbing to death fellow inmate at USP-Allenwood. Same judge, same courtroom and same defense attorneys as *Hammer*. Sentenced to life.

12. *United States v. Storey* (D. Kansas). Prison inmate with Aryan Brotherhood ties killed fellow prisoner at USP-Leavenworth. Plea agreement. Sentenced to less than life sentence.

13. *United States v. Douglas Black and Steven Riddle* (D. Colo.). Inmates at USP-Florence attacked two

189

suspected "snitches," one killed one injured.  Plea agreements.  Substantially less than life sentences.

14. *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (E.D.N.Y.).  Chinese gang members who kidnap, rape and murder victims held for ransom.  Fu Xin Chen and Jai Wu Chen entered plea agreements.  Attorney General withdrew death authorization shortly before Peng trial.  Peng convicted after trial.  All three sentenced to life.

15. *United States v. Louis Jones* (N.D. Texas).  Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

16. *United States v. Corey Johnson, James Roane, and Richard Tipton* (E.D. Va.).  Eleven drug-related murders.  Tried, convicted, sentenced to death.

17. *United States v. Dean Anthony Beckford* (E.D. Va.).  Six drug-related murders.  Tried, convicted, life sentence.

18. *United States v. Clarence Heatley and John Cuff* (S.D.N.Y.).  14 drug-related murders.  Plea agreement.  Sentenced to life.

19. *United States v. Thomas Pitera* (E.D.N.Y.).  Seven drug-related murders in organized crime context.  Victims tortured and bodies dismembered.  Tried, convicted, sentenced to life.

190

20.    *United States v. German Sinisterra and Arboleda Ortiz* (W.D. Mo.).  One drug-related murder and one attempted murder.  Tried, convicted, sentenced to death.

21.    *United States v. Kevin Grey and Rodney Moore* (D.D.C.).  Thirty-one drug-related murders.  Tried, convicted, sentenced to life.

22.    *United States v. Daryl Johnson* (N.D. Ill.).  Two drug-related murders.  Tried, convicted, sentenced to death.

23.    *United States v. Peter Rollock* (S.D.N.Y.).  Eight drug-related murders, including some ordered by defendant while incarcerated.  Plea agreement. Sentenced to life.

24.    *United States v. Tommy Edelin* (D.D.C.).  Fourteen drug-related murders.  Tried, convicted, sentenced to life.

25.    *United States v. Reynaldo Villarreal and Baldemar Villarreal* (E.D. Texas).  Drug-related murder of law enforcement officer.  Tried, convicted, sentenced to life.

26.    *United States v. Juan Raul Garza* (S.D. Tex.). Three drug-related murders.  Tried, convicted, sentenced to death, executed.

27.    *United States v. Anthony Jones* (D. Md.).  Six drug-related murders.  Tried, convicted, sentenced to life.

191

28.   *United States v. Chevy Kehoe and Daniel Lee* (D. Ark.). Three murders in connection with activities of white supremacist organization. Tried and convicted together. Kehoe – considered more culpable – sentenced to life. Lee sentenced to death.

29.   *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y.). Millionaire Sikh businessman hired killers of two employees cooperating with authorities in criminal investigation of defendant. Tried, convicted, sentenced to life.

30.   *United States v. Trinity Ingle and Jeffrey Paul* (W.D. Ark.). Murder of elderly retired National Parks employee. Victim shot while bound and gagged. At separate trials, Ingle was convicted and sentenced to life; Paul was convicted and sentenced to death.

31.   *United States v. Kristen Gilbert* (D. Mass.). VA nurse murdered four patients and attempted to murder three more. Tried, convicted, sentenced to life.

32.   *United States v. LaFawn Bobbitt and Rashi Jones* (E.D. Va.). Fatal shooting of bank teller during robbery. Security guard also shot and blinded. Tried, convicted, sentenced to life.

192

33.    *United States v.Bille Allen and Norris Holder* (W.D. Mo.).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both sentenced to death.

504.   Ultimately, the full force of this argument derives from the cumulative effect of examining, in their entirety, the case-by-case summaries of authorized cases compiled in the Exhibits.  By definition, since all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should be) the worst of the worst the federal system has to offer.  Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (or would not) argue in summation, "If this case doesn't call for the death penalty, what case does?"  And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries returned life verdicts or plea agreements were offered and accepted.  If one cannot discern a principled basis for distinguishing between cases where death is imposed and cases where death is not, the death penalty falls as arbitrary and capricious.  If such a principled distinction exists, Movant challenges the Government to articulate it.  Should the government prove unable to meet their burden of showing a legitimate distinction, then Mr. Mitchell's sentence must be set aside.

193

## V.   **A SYSTEM WHERE THE DEATH PENALTY IS SOUGHT ON THE INVIDIOUS BASIS OF RACE, AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED AND THIS COURT SHOULD VACATE MR. MITCHELL'S SENTENCE**

505.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

506.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

### 1.   Background

507.   In a press conference that took place on June 28, 2000, President Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty." Responding to that question, the President had the following to say about the federal death penalty:

> The issues at the federal level relate more to the disturbing
> racial composition of those who have been convicted and
> the apparent fact that almost all the convictions are
> coming out of just a handful of states, which raises the
> question of whether, even though there is a uniform law
> across the country, what your prosecution is may turn
> solely on where you committed the crime.

194

> I've got a review underway of both those issues at this
>
> time.

Partial Transcript of the President's 6/28/2000 press conference.

508.    On September 12, 2000, the Department of Justice released a comprehensive study of how the federal death penalty has been administered from 1988 to the Summer of 2000 ("Ex. 73, DOJ Study").[11]  The Department filed a supplemental report on June 6, 2001 after the change in administration.[12]  The essence of the study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis.  As reported in the DOJ Study, after 12 years of discriminatory and irrational charging decisions, the federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other."  Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at that time had been sentenced to death in the South.  Virginia and Texas had contributed four defendants apiece.  No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.[13]

---

[11]    Defendant has filed a complete copy of the DOJ Study as a Exhibit 73 to this motion.

[12]    The supplemental report ("Supplemental DOJ Study") is located immediately after the DOJ Study in Exhibit 73.

[13]    In 2003, the year the government chose to pursue a death sentence in Mr. Mitchell's case, federal death row had 38 residents: nine were white and 21 were African-American.  In the modern death penalty era, there have been three federal executions: one white man (Timothy McVeigh), one black man (Louis Jones) and one Latino (Juan Garza).  As of May 29, 2009, there are 59 inmates on federal death row.  The federal districts in three "death friendly" states – Texas, Virginia and Missouri – account for almost half of this population (22 out of 59).  Two of the three federal prisoners executed were sentenced to death in Texas.  Not so coincidentally, the states of Texas, Virginia and Oklahoma regularly "lead" the nation in carrying out executions. *See* Exh. C, at ¶ 8.  Federal districts in Texas, Virginia and Missouri account for approximately 30% of all federal cases authorized for capital punishment since 1988.

195

509.    In terms of which defendant actually faced the federal death penalty, the DOJ Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%).  *(See* Ex. 73, Table 1A, at p. T-2.)  Thus, more than 70% of the federal defendants targeted for the death penalty were non-whites.

510.    In addition to the racial disparity in federal death-penalty prosecutions, the study revealed a regional bias to enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

1.    From 1995 onward, of the 94 federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution. (Ex. 73 at p. 14.)

2.    Twenty-two federal districts had never submitted a case for review at all.[14] (Ex. 73 at p. T-59.)

3.    Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to

---

[14]    Any murder committed with a gun during a robbery is a potential federal death penalty case.  18 U.S.C. § 924.  In *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.

196

seek the death penalty in any case.[15]

*Id.*

511.   The release of the report drew the following predictable public reactions from officials at the Justice Department and the White House:

> Saying she was 'sorely troubled' by stark racial disparities
> in the federal death penalty, Attorney General Janet Reno
> today ordered United States attorneys to help explain why
> capital punishment is not applied uniformly across ethnic
> groups.

M. Lacey and R. Bonner, *Reno Troubled by Death Penalty Statistics*, *N.Y. Times*, September 13, 2000.  The N.Y. Times also reported the reaction of Deputy Attorney General Eric Holder, at the time the highest-ranking African American at the Justice Department:

> 'I can't help but be personally and professionally
> disturbed by the numbers that we discuss today,' Deputy
> Attorney General Eric Holder said.  'To be sure, many
> factors contributed to the disproportionate representation
> of racial and ethnic minorities throughout the federal
> death penalty process.  Nevertheless, no one reading this

---

[15]   The recommendation that accompanies a submission is of great importance.  In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  (Ex. 73 at p. 43.)  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id.*  These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.  In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization.  The approval rate for those cases was 90%.  (Ex. 73 at p. 10.)

report can help but be disturbed, troubled, by this

disparity.'

*Id.* CNN, also reporting on the story, noted that Attorney General Reno wanted "a broader analysis."[16] White House deputy press secretary Jake Siewert responded to the release of the report in the following manner: " 'At first glance, those numbers are troubling. We need to know what's behind the numbers.' "[17] During his confirmation hearings, Attorney General Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." *See United States v. Bass*, 266 F.3d at 538 n.1.

512. "Troubled" and "disturbed" public officials, however, do not cure constitutional violations. Mr. Mitchell is entitled to know what is "behind the numbers" and that, in the absence of a convincing race- and region-neutral explanation for the Department of Justice's capital-charging practices, his death-sentence must be reversed. Mr. Mitchell seeks a hearing on this issue.

### 2.       The invidious circumstances of race-of-defendant and race-of-victim

513. Thirteen years ago, dissenting in *McCleskey v. Kemp*, Justices Brennan Marshall, Blackmun, and Stevens hypothesized an attorney-client conversation where an African-American defendant charged with capital murder asked his attorneys what the chances were that he would be sentenced to death. Based on the statistical analysis presented to the Court in *McCleskey*, it was the four dissenters'

---

[16]   In *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *reversed*, 536 U.S. 862 (2002) (per curium), the Sixth Circuit quoted at length the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. *Bass*, 266 F.3d at 538.

[17]   Considering the impact of the study, Judge Sand in *United States v. Bin Laden*, 126 F. Supp. 2d 256, 258 (S.D.N.Y. 2000), found the statistical evidence "indeed troubling," but ultimately rejected a challenge to that capital prosecution.

conclusion that, at some point in the dialogue, defense counsel would have to level with the client and tell him that race would play an important role – perhaps a determinative one – in the process of deciding whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey v. Kemp*, 481 U.S. 279, 322 (Opinion of Brennan, Marshall, Blackmun and Stevens, J.J., dissenting).[18]

514.   In truth, there is nothing that is either new or surprising about what the DOJ Study reveals (or about the present racial composition of federal death row). Attorneys in federal death penalty cases have been pointing out the issue of glaring racial disparity in the administration of the federal death penalty for years.  For just as long, Justice Department attorneys, pleading privilege, confidentiality and the end of civilization as we know it, resisted efforts to gather the kind of information that the Justice Department finally disgorged voluntarily with its 2000 Report.  *See*, *e.g.*, *United States v. Bradley*, 880 F. Supp. 271 (M.D. Pa. 1994).  When glaring racial disparities began to show up in the "early days" of the modern prosecution of federal death penalty cases, the House Subcommittee on Civil and Constitutional Rights investigated and concluded as follows:

> Race continues to plague the application of the death penalty in the United States.  On the state level, racial disparities are most obvious in the predominant selection

---

[18]   After his retirement from the bench, Justice Powell stated that the greatest regret of his many years on the high court was that he had voted with the majority, and authored the Court's opinion, in the 5-4 decision upholding the death-penalty in *McCleskey*.  *See* John C. Jeffries, Jr., *Justice Lewis F. Powell, Jr.: A Biography* 451-52 (Fordham University Press 1994).

of cases involving white victims.  On the federal level, cases selected have almost exclusively involved minority defendants.

*Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994.  That report notes that as of 1994 there had been 37 defendants targeted for capital punishment under the § 848(e) scheme, of whom 33 (87%) were black or Hispanic.  Earlier evidence of the race-effect of the death penalty was provided by the General Accounting Office in 1990.  At the time Congress enacted the § 848(e) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty.  21 U.S.C. § 848(*o*)(2).  The GAO in fact undertook that study and concluded as follows:

Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.

In 82 percent of the studies, race of victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks.  This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques.  The finding held for high, medium, and law quality studies.

200

*Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (GAO/GGD-90-57, Feb. 1990) at p. 5.  In his 1999 law review article, Professor Rory Little, writing with the perspective of one who had actually served on Attorney General Reno's Capital Case Review Committee, noted that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department.  R.K. Little, *The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Role* 26 Fordham Urban L.J., 347, 450-90 (1999).  With the resumption of federal executions now a matter of historical fact, this issue may no longer be swept under the rug.

515.   In response to the larger DOJ Study and the June Supplemental report, Professor David Baldus undertook an analysis of the Ashcroft Justice Department's rationale for the undeniable racial and regional disparities. *(See* Ex. 75, Baldus Memo).  That memorandum begins as follows:

> The following comments explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ report utterly fails to convince me that there is no significant risk of racial unfairness and geographic arbitrariness in the administration of the federal death penalty.

(Ex. 75 at p. 1.)  Professor Baldus' first observation was of a decided white-victim effect in the federal death penalty, noting that "the U.S. Attorney charging and DOJ authorization rates are much higher in white-victim cases than they are in minority-victim cases." *Id.*  Professor Baldus found a 16% differential in the authorization process, a difference statistically significant at the .001 level, the overall authorization rate for white-victim cases being 37% versus 21% in minority-victim

cases. *Id.* at p. 2. The DOJ Study also documented race-of-victim effects in the actual imposition of death sentences, with death verdicts returned in white-victim cases two times as often as in minority-victim cases. *Id.*

516. Professor Baldus found, as well, that the practice of death-sentencing in the federal system was, as of the September 2000 report, largely a Southern phenomena and that the June 2001 Supplemental Report did nothing to address that issue and, instead, intermixed the issue of regional disparity in the federal death penalty with issues of racial disparities. (Ex. 75 at p. 3.)

517. More than a century ago, in *Yick Wo v. Hopkins*, the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). In *United States v. Berrios*, the court commented:

> Nothing can corrode respect for a rule of law more than the knowledge that the government looks beyond the law itself to arbitrary considerations, such as race, religion, or control over the defendant's exercise of his constitutional rights as the basis for determining its applicability.

*United States v. Berrios*, 501 F.2d 1207, 1209 (2d Cir. 1974).

518. The historical truth is that in the United States capital punishment and race have always been inextricably intertwined. That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society. *See*, *e.g.*, C.J. Ogeltree, *Black Man's Burden: Race and the Death Penalty in America*, 81 Oregon L. Rev. 15 (2002); G.L. Pierce, M. L. Radlet, *Race, Region, and Death Sentencing in Illinois*, 81 Oregon L. Rev. 39 (2002); S. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the*

*Infliction of the Death Penal Penalty*, 35 Santa Clara L. Rev. 433 (1995); D. Baldus, *Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction,* 51 Wash. & Lee L. Rev. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion,* 41 Rutgers L. Rev. 27, 100-57 (1988).

519.    In *Furman*, Justice Douglas traced at length this ugly correlation and concluded:

> In a Nation committed to equal protection of the laws there is no permissible 'caste' aspect of law enforcement. Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, lacing political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position.  In ancient Hindu law, a Brahman was exempt from capital punishment, and in those days, '[g]enerally, in the law books, punishment increased in severity as social status diminished.'  We have, I fear, taken in practice the same position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted.)  Indeed, even as late as 1991 – more than 15 years after *Furman* – the execution of a white man for the murder of a black man was front-page news as an event that had not occurred in the nation for half-a-century.  *See Rarity for U.S. Executions: White Dies for Killing Black,* N.Y. Times, September 7, 1991 at p.1, col. 1.

203

520.   This preliminary showing, whether or not it continues to "disturb" or "trouble" anyone in the Justice Department, is sufficient to establish a colorable case of discrimination, and to shift the burden to the government to produce a credible non-discriminatory explanation for its practice of disproportionately seeking death sentences for minority defendants and to explain the arbitrary manner in which the federal death penalty has been administered. *Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986).  As a Native American/Pacific Islander growing up in the Navajo Nation , Mr. Mitchell is entitled to inquire further since, to all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).  The burden is now properly on the government to explain and justify, if it can, its capital-charging policies.  If, however, the government is unable to meet this burden, then Mr. Mitchell's sentence must be set aside.

## W.    LEZMOND MITCHELL'S SENTENCE IS DISCRIMINATORY AND THEREFORE MUST BE SET ASIDE

521.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

522.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

### 1.    Explicit Statutory Right to Justice Without Discrimination

523.    Subsection (f) of 18 U.S.C. § 3593 is entitled "Special precaution to ensure against discrimination," and provides that in any capital sentencing proceeding:

> [T]he court . . . shall instruct the jury that in considering whether the sentence of death is justified, it shall not consider the race . . . of the defendant or of any victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or victim may be.

Moreover, each juror in an FDPA case is required to sign a certificate "that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation . . . no matter what the race . . . of the defendant or any victim may be." While the explicit provisions of this section deal with jury instructions and jury decision making, the purpose of this subsection is broader. This provision is unique in the Federal Criminal Code. It demonstrates extreme sensitivity on the part of Congress to the danger of racial discrimination in capital prosecutions, and a commitment to eradicate any such discrimination.

524.    The Congressional debate on the death penalty provisions of § 848(e) – limited as it was – included extended discussion of the problem of racial discrimination, and of the Supreme Court's treatment of racial bias in the then-recent opinion in *McCleskey*. *See*, *e.g.*, *Congressional Record*, 57484 (June 9, 1988) (Sen. Orrin Hatch, Utah, discussing the requirements for proof of discrimination under *McCleskey*). In particular, Senator Alphonse D'Amato of New York,

205

the prime sponsor of the § 848(e) bill, emphasized, in conjunction with the enactment of § 848(o), that Congress intended to "take every step possible to eliminate discrimination by the juries, *by the prosecutors*, by the judges." *Congressional Record*, S15753 (Oct. 13, 1988) (*emphasis added*).  In the context of that debate, Senator D'Amato's comments reflect a clear legislative determination to take stronger measures than those already embodied in *McCleskey* and to eliminate discrimination in capital charging as well as capital sentencing.  They indicate that a federal capital defendant has an affirmative *statutory* right to justice without discrimination.

### 2.    Supervisory powers

525.    Moreover, regardless of the text of § 3593(f), this Court has the independent authority to curb charging discrimination and regional caprice by invoking its supervisory powers over the administration of federal criminal justice:

> '[G]uided by considerations of justice,' *McNabb v. United States*, 318 U.S. 332, 341 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.  The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights [citations omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury. [Citations omitted]; and finally, as a remedy designed to deter illegal conduct [citations omitted].

*United States v. Hastings*, 461 U.S. 499, 505 (1983).

526.   A court's supervisory authority to take action "not specifically required by the Constitution" is necessarily broader than its authority to enforce particular constitutional guarantees.  In state prosecutions, state courts exercise this general supervisory power, and federal courts (on *certiorari* in the Supreme Court or in habeas corpus) are restricted to enforcing the Constitution.  In federal prosecutions, the federal courts exercise both functions simultaneously.  This is why, as the Sixth Circuit noted in *United States v. Robinson*, 716 F.2d 1095, 1100 (6th Cir. 1983), when a "case is before the court on direct review, not habeas corpus relief, the standard of review is more stringent."  *McCleskey*, of course, was a review of state proceedings in habeas corpus.  The federal discrimination complained of here is subject to a "more stringent" standard of review.

## X.   BY OMITTING THE "PLAIN-ERROR" REVIEW, CONGRESS, HAS FAILED TO PROVIDE FOR MEANINGFUL APPELLATE REVIEW, AND THEREFORE THE FDPA IS UNCONSTITUTIONAL

527.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

528.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

529.   Meaningful appellate review is an indispensable component of a constitutional death penalty scheme.  Such review provides a necessary check on the arbitrary and capricious infliction of the death penalty.  *Parker v. Dugger*, 498 U.S. 308, 321 (1991) ("We have emphasized repeatedly the crucial role of

meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"); *see also Clemons v. Mississippi*, 494 U.S. 738, 749 ("this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency").

530.   In enacting the FDPA, Congress actually curtailed the scope of appellate review and, thereby, rendered the statute unconstitutional.  The relevant section reads as follows:

> **(b)**   **Review. –** The court of appeals shall review the entire record on the case, including –
>> (1)   the evidence submitted during the trial;
>> (2)   the information submitted during the sentencing hearing;
>> (3)   the procedures employed in the sentencing hearing; and
>> (4)   the special findings required under section 3593(d).
>
> **(c)**   **Decision and disposition. –**
>> (1)   The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports an aggravating

factor required to be considered under section 3592.

(2)    Whenever the court of appeals finds that –

(A)    The sentence of death was imposed under the influence passion, prejudice, or any other arbitrary factor;

(B)    the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C)    the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

18 U.S.C. § 3595 (*emphasis added*).

531.   By its plain language, the above-quoted provision precludes plain-error analysis by a court of appeals reviewing a capital case. *See* Fed. R. App. P. 52(b). The doctrine of plain error is available in all criminal appeals, and gives an appellate court the option of noticing obvious errors that were not brought to the attention of the district court. *See*, *e.g.*, *United States v. Frady*, 456 U.S. 152 (1982); *Silber v. United States*, 370 U.S. 717 (1962)  In *United States v. Olano*, 507 U.S. 725, 732 (1993), the Court held that an appellate court may reverse under plain error where: (1) there is an error; (2) the error is "obvious;" (3) the error affects substantial rights; and (4), the error " 'seriously affects the fairness, integrity or public reputation of the judicial proceedings.' " *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

532.   By failing to allow for plain-error review, the FDPA ignores the line of Supreme Court cases requiring meaningful appellate review as a pre-condition to a finding that a death-penalty scheme is constitutional.  It also ignores the fact that the Supreme Court has repeatedly recognized that "death is different" and, in recognition of that difference, has required heightened standards of reliability to justify death verdicts.  A death-verdict cannot be considered reliable if it was brought about by an error that was obvious, affected substantial rights and seriously affected the fairness, integrity or public's view of the judicial proceedings, even if that error was not raised before the district court.

533.   By limiting the scope of appellate review to two areas, evidentiary sufficiency and the absence of wholly arbitrary factors, Congress accomplished its political agenda of facilitating executions, but failed in the process to comply with the commands of the Supreme Court.  Additionally, for Congress to have singled out death-sentenced federal prisoners for diminished appellate review violates equal protection since Congress may not single out one class of inmates for such

diminished review while leaving open existing remedies to all other federal prisoners. *Cf. Lindsey v. Normet*, 405 U.S. 56 (1972). An individual's interest in his or her own life is fundamental. Thus, in the absence of some compelling governmental interest, this distinction may not stand.

534. A statute that requires an appellate court to affirm a death verdict which was returned as a result of plain error in the proceedings below is antithetical to concepts of heightened reliability, meaningful appellate review, and equal protection. Thus, an order should be entered declaring the statute unconstitutional.

Y. **MITCHELL WAS DENIED HIS CONSTITUTIONAL RIGHTS BECAUSE THE CUMULATIVE IMPACT AND EFFECTS OF ERRORS AT EACH PHASE OF HIS TRIAL REQUIRE REVERSAL OF HIS CONVICTION AND SENTENCE**

535. Mitchell's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his Fifth, Sixth, and Eighth Amendments and decisional law, because there are multiple instances of manifest error in Movant's pre-trial, trial, appeal, and post-conviction challenges. Each of the numerous errors discussed in this Motion, and the previous appellate briefs filed by Mitchell, challenging his conviction and sentence had a substantially prejudicial effect, with each contributing an essential part to either the finding of guilt or the determination in favor of the death penalty or the affirmance of the conviction and sentence. Had even a few of these errors not occurred, the outcome, in all probability, would have been a more favorable guilt, or at least penalty, verdict.

536. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

537.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

538.   In considering Movant's claims, the Court is required to examine the impact of the alleged errors cumulatively to determine whether Movant has been prejudiced. *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted."); *United States v. Green*, 648 F.2d 587, 597 (9th Cir. 1981) (reversing judgment where although "some of the errors . . . could be considered harmless in isolation, the combination of errors" prejudiced defendant); *Ewing v. Williams*, 596 F.2d 391, 395 (9th Cir. 1979) ("prejudice may result from the cumulative impact of multiple deficiencies").

539.   Counsel's failures to conduct adequate guilt and penalty investigations and to prepare for trial intensified the harms caused by other errors and defects in the proceeding.  The combined effect of counsel's inadequate performance and the other errors at trial compel a reversal of the conviction and sentence. *See, e.g.*, *Phillips*, 267 F.3d at 986 ("[c]onsidering the prejudice that might well have resulted if [defendant's] claim of ineffective assistance of counsel proves to be valid . . . together with the prejudice that might well have resulted from the use of [Colman's] false testimony, we conclude that [defendant] has presented a colorable claim that the combined effect of the alleged constitutional violations is sufficiently prejudicial" to warrant an evidentiary hearing]; *Mak v. Blodgett*, 970 F.2d 614 (reversing death judgment because of cumulative prejudicial effect of wrongful exclusion of evidence, faulty jury instruction and counsel's failure to present mitigating evidence to humanize the defendant); *see also Gonzalez v. McKune*, 247

F.3d 1066, 1078 (10th Cir. 2001)(*vacated in part by Gonzalez v. McKune*, 279 F.3d 922 (10th Cir. 2001)) ("we can see no basis in law for affirming a trial outcome that would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a [Movant's] claim for habeas relief").

540.   The cumulative effect of the errors affecting the guilt phase was to "provide[] a trial setting that was fundamentally unfair" on the question of Mitchell's guilt or innocence on the underlying charges and the truth or falsity of the special circumstance allegations, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  *Cooper v. Sowders*, 837 F.2d 284, 288 (6th Cir. 1988).  Accordingly, reversal of Mitchell's conviction is required.

541.   The cumulative effect of the errors affecting the penalty phase similarly deprived Mitchell his rights to a fundamentally fair proceeding and a reliable determination that death was the appropriate sentence, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  *See, e.g.*, *Johnson v. Mississippi*, 486 U.S. 578 (1988); *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985); *Lockett v. Ohio*, 438 U.S. 586 (1978).  Reversal of the penalty is therefore required as well.

542.   While the Government may urge that each of these errors, viewed individually, was harmless or not prejudicial, the cumulative effect of the multiplicity of errors cannot be ignored.  In order to meet the special need for reliability in any capital murder conviction, the cumulative effect of multiple individual errors must be reviewed.  *See Johnson v. Mississippi*, 486 U.S. 578 (1988); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).

543.   The totality of errors, by their number and importance, totally skewed the guilt and penalty determination so as to greatly increase the probability that the

213

jury would return a guilty verdict, that it would recommend the imposition of the death penalty on the basis of improper considerations, and that the unsound conviction and sentence would be affirmed.  The result was a trial and appeal process that was so fundamentally unfair that setting aside the guilt and penalty phase verdicts is required.

544.   These violations of Mitchell's constitutional rights warrant the granting of this Motion without any determination of whether those violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. at 638 n.9.  Furthermore, the constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, the violations of Mitchell's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, and resulted in a miscarriage of justice.

## III.

## PRAYER FOR RELIEF

Wherefore, movant Lezmond Mitchell respectfully moves this Court to:

545.   Vacate his conviction and death sentence;

546.   Permit Mr. Mitchell sufficient time to file such amendments to this Motion as may be necessary to bring all proper matters before this Court and ensure a reliable and fair resolution of his claims for relief;

547.   Grant Mr. Mitchell an evidentiary hearing on all claims raised herein;

548.   Grant Mr. Mitchell leave to pursue such discovery as may be necessary to fully develop the facts in support of his claims for relief; and

549.   Grant such other relief as may be appropriate.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  June 8, 2009          By   /s/ Statia Peakheart
                              STATIA PEAKHEART
                              Deputy Federal Public Defender

/

215

# CERTIFICATE OF SERVICE

XXX  I hereby certify that on ___JUNE 8, 2009___, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

~~VINCENT Q. KIRBY, AUSA~~
_____

XX  I hereby certify that on ___JUNE 9, 2009___, I served the attached document by
       MAIL
_____
(insert service method: mail, courier service, in-person delivery, e-mail)
on the following, who are not registered participants of the CM/ECF System:
       CAPITAL CASE STAFF ATTORNEY, EVO A. DECONCINI COURTHOUSE
_____
       405 W. CONGRESS, SUITE 1500, TUCSON, AZ 85701-5010

                                                    s/ AMY REEDY
_____