*UNITED STATES v. LEZMOND CHARLES MITCHELL*
CV09-8089-PCT-MHM(MEA)

EXHIBITS IN SUPPORT OF
MOTION TO VACATE SENTENCE

**EXHIBITS TO SPECIFIC ISSUES IN THE MOTION**

74.  Declaration of David Bruck, 2004

75.  Memo by David Baldus to Russell Feingold, 6/11/2001

76.  Article-Life, Death and Uncertainty, 7/8/2001

77.  Affidavit of Richard Dieter

78.  Declaration of Kevin McNally, 5/30/2002

**EXHIBITS IN SUPPORT OF SYSTEMIC CLAIMS**

79.  Federal Capital Prosecutions Awaiting Trial

80.  Federal Capital Defendants Who Died Before or During Trial

81.  Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons

82.  Federal Capital Cases in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty

83.  Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other Than Death

## DECLARATION OF DAVID BRUCK

David Bruck hereby declares under penalty of perjury, 28 U.S.C. § 1746, that the following is true and correct:

1. With Kevin McNally of Kentucky and Richard Burr of Houston, Texas, I currently serve as Federal Death Penalty Resource Counsel (FDPRC).  The purpose of this project, which is funded by the Defender Services Division of the Administrative Office of the United States Courts, is to assist court-appointed and defender attorneys with the defense of federal death-penalty cases at the trial, appellate, post-conviction and clemency stages of such cases.   I have served in that capacity since the inception of the Resource Counsel Project in January, 1992.  The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1] This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21

---

[1] In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases. That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See,* "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50.  The Report is available online at http://www.uscourts.gov/dpenalty/. The Report's recommendations were later adopted by the Judicial Conference of the United States.

U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994." 18 U.S.C. §3591 *et seq.*

2. In order to carry out our responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant. This information is regularly updated, and is checked for accuracy whenever possible against any available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts. The Project also attempts to collect penalty-phase verdict sheets reflecting the actual findings of federal juries at the penalty phase of aggravating and mitigating circumstances.

3. I have been asked by counsel for Roy Green to provide information to the Court regarding certain of the data that the Project has collected. I am prepared to testify as a witness as well. The areas I was asked to provide data concern: (1) the frequency with which the federal death penalty has been sought and imposed since 1988; (2) the race of the defendants as to whom a capital prosecution has been authorized; and (3), the frequency with which the federal death penalty is authorized and imposed on a regional basis.

2

EX 74 - 1356

## I.

## FREQUENCY WITH WHICH THE FEDERAL DEATH PENALTY IS SOUGHT AND IMPOSED

4. The Project has collected information regarding all federal executions and all potential and actual federal death penalty prosecutions initiated pursuant to 21 U.S.C. § 848(e) *et seq.*, enacted in 1988, and/or 18 U.S.C. §3591, *et seq.*, enacted in 1994.

5. Based on the Project's figures, as well as the reports published by the Department of Justice in September 2000 and June 2001, it appears that the "pool" of potential capital defendants in the system since 1988 totals 2,056.[2] This figure is current as of June 24, 2004. ......ists of 52 cases reviewed prior to the 1995 Death Penalty Protocols put into place ......ney General Reno,[3] 682 reviewed by Ms. Reno after the Protocols went into effect, ......viewed by Attorney General Ashcroft, and an additional 231 cases identified by United States Attorneys as potential capital cases that were never submitted for review.[4] The Project has identified additional cases that fall into this later category, *i.e.*, cases that were never

___

[2]Of these 2,056 defendants, 211 are currently pending review by the Department of Justice, bringing the total defendants reviewed to 1,845.

[3]Prior to the Protocols, which went into effect on January 27, 1995, the Attorney General reviewed only reviewed those cases in which a United States Attorney requested permission to seek the death penalty. Potentially capital cases where the local determination was not to seek the death penalty were not reviewed by Main Justice. The major 2001 change wrought by the Protocols was a requirement that *all* potential death-penalty cases, whether the United States Attorney wished to pursue the death penalty or not, be submitted to Main Justice for review and ultimate decision by the Attorney General.

[4]*See* the discussion of this figure at n. 10 of the June 2001 Supplemental Justice Department Study.

3

EX 74 - 1357

submitted for review and/or charged as capital offenses even though there was justification for doing so.

6. From this group of 1,845 potential capital defendants, a total of 318 defendants have actually been authorized for capital prosecution. Thus, the Department of Justice has authorized capital prosecutions in approximately 17% (318/1,845) of the cases in which the penalty could have been sought. To date, juries have sentenced 38 defendants to death. Four death sentences have been set aside on appeal. Three defendants have been executed. One defendant was granted clemency[5] There are 30 defendants presently on the federal death row under an active sentence of death whose cases are in various stages of review via direct appeal or post-conviction proceedings brought pursuant to 28 U.S.C. § 2255. There are 64 cases presently pending or in trial.

## II.

## RACE OF DEFENDANTS AUTHORIZED
## FOR FEDERAL CAPITAL PROSECUTIONS

7. The racial composition of the pool of 318 defendants whose cases were authorized for a federal capital prosecution is as follows: (1) African-American, 164 (52%); (2) Latino, 56 (18%); (3) Caucasian, 80 (25%); and (4), "other," 18 (5%). These figures are current as of May 31, 2004.

---

[5]Two federal executions took place in the year 2001 (Timothy McVeigh and Juan Garza) and one in the year 2003 (Louis Jones). Messrs. McVeigh and Jones were executed pursuant to the Federal Death Penalty Act of 1994. Mr. Garza was executed pursuant to the 1988 enactment, 21 U.S.C. § 848(e).

4

EX 74 - 1358

## III.

## REGIONAL VARIATIONS

8. Based on figures compiled by the Death Penalty Information Center (current as of May 31, 2004) the states which currently lead the nation in post-*Gregg* executions are Texas (322), Virginia (91), Oklahoma (73) and Missouri (61). The states whose federal districts have the most authorized federal death penalty prosecutions (including pending cases) are Virginia (39), New York (30), Texas (22) and Missouri (21). Federal districts in the following states have had more than one federal death sentence returned by juries: Texas (9), Missouri (6), Virginia (4), Georgia (3), Louisiana (2), Arkansas (2) and North Carolina (2). Of the 38 federal death sentences imposed by juries since 1988, 30 have come from the traditional "death belt" states. By way of contrast, there have been six federal death-penalty cases tried in New York State involving a total of nine defendants as follows: three trials in the Eastern District of New York, one in the Southern District of New York (two capital defendants) and two in the Northern District of New York (two capital defendants in each case).[6] No federal jury sitting in New York State has returned a death verdict, including the one case tried, *United States v. Bin Laden, et al.*, a case where two of the four defendants tried faced the death penalty for their roles in the simultaneous terrorist bombings of United States embassies in East Africa resulting in hundreds of deaths, thousands of injures, and the destruction of two United States Embassies.

---

[6]These are figures current as of the date of this declaration.

5

EX 74 - 1359

9. I have also been asked by counsel for Roy Green to provide information on the number of authorized federal death penalty cases, since 1988, by the state in which each such prosecution was brought. According to the Project's records, the following compilation accurately sets forth the particular state in which each of the 318 federal death penalty cases authorized since 1988 was prosecuted:

> Alabama (5), Alaska (1), Arizona (5), Arkansas (5), California (15), Colorado (6), Connecticut (3), DC (11), Florida (11), Georgia (7), Hawaii (1), Illinois (12), Indiana (4), Iowa (4), Kansas (4), Kentucky (3), Louisiana (7), Maryland (12), Massachusetts (4), Michigan (15), Mississippi (3), Missouri (21), New Jersey (2), New Mexico (6), New York (30), North Carolina (10), Oklahoma (4), Pennsylvania (11), Puerto Rico (17), Tennessee (12), Texas (22), Vermont (2), Virginia (39), West Virginia (4).

I declare, under penalty of perjury, that the foregoing is true and correct. Executed June 27, 2004.

DAVID BRUCK

6

EX 74 - 1360

June 11, 2001

To:     The Honorable Russell D. Feingold, Committee on the Judiciary, U. S. Senate, 716 Hart
        Senate Office Building, Washington D.C. 20510-4904

From:   David C. Baldus, Joseph B. Tye Distinguished Professor of Law, College of Law,
        University of Iowa

Re:     DOJ report on the Federal Death Penalty System (June 6, 2001)

I have read U.S. Department of Justice, The Federal Death Penalty System:

Supplementary Data, Analysis and Revised Protocols for Capital Case Review (June 6, 2001) ("the

report"), which supplements the DOJ report of September 12, 2000. The following comments

explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ

report utterly fails to convince me that there is no significant risk of racial unfairness and

geographic arbitrariness in the administration of the federal death penalty. I believe there is still

the just as much reason to be concerned about these issues as there was when the September 2000

report was issued.

1. The report completely overlooks the evidence of race-of-victim discrimination
documented in the September 12, 2000 report.

A main theme of the latest report (p. 10) is that the death penalty authorization rate is

higher for whites (.38) than it is for blacks (.25) and Hispanics (.20). These are the same figures

that appeared in the September 2000 report. The latest report's emphasis on these statistics

appears to suggest that white defendants are actually treated more punitively than minority

defendants.

A more plausible explanation for the higher authorization rates for the white defendants is

plainly documented in the September report – (1) white defendants are more likely to have killed

whites' and (2) the U.S. Attorney charging and DOJ authorization rates are much higher in white-

victim cases than they are in minority-victim cases. For example, data in the September 2000

---

' For the cases for which both race-of-defendant and race-of-victim data are available, 92% (109/119) of the white

1

report indicate that the Attorney General (AG) authorization rate for capital prosecutions is .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases – a 16 percentage point difference that is statistically significant at the .001 level. The more punitive treatment of *white-victim cases* is a plausible alternative explanation for the higher authorization rates in *white-defendant cases* that the new DOJ report does not even recognize, let alone dispel.

The September 2000 report also documents race-of-victim disparities in the actual imposition of death sentences in the federal system. Among all death-eligible offenders, those data indicate that the death-sentencing rate from 1995 to 2000 is twice as high in white victim cases as it is in minority victim cases. Nationwide, the rates are .05 (10/198) for the white-victim cases versus .02 (10/446) for the minority-victim cases; in the eleven states in which death sentences were actually imposed, the rate in the white-victim cases was .17 (10/59) versus .08 (10/119) in the minority-victim cases – a nine percentage-point difference.[1]

These are the same kinds of race-of-victim disparities documented in *McCleskey v. Kemp*.[2] The latest report simply ignores the data on race-of-victim disparities in the charging and authorization process, *and* in the actual imposition of federal death sentences.

---

defendant cases involved a white victim.

[1] The race-of-victim disparity nationwide is significant at the .06 level while the disparity in the states in which death sentences have been imposed is significant at the .09 level. The states in which death sentences were imposed between 1995 and 2000 are Arkansas, Georgia, Illinois, Kansas, Louisiana, Missouri, North Carolina, Oklahoma, Pennsylvania, Texas, and Virginia.

Of particular relevance are the race-of-victim disparities in case involving black defendants. Nationwide, in black defendant/*white victim* cases, the death-sentencing rate was .11 (6/55) while in the black defendant/*minority victim* cases, the rate was .03 (7/253), an 8 percentage-point difference significant at the .01 level. In the eleven death-sentencing states, the death-sentencing rate in the black defendant/*white victim* cases was .24 (6/25) while in the black defendant/*minority victim* cases, the rate was .07 (7/95), a 17 percentage-point difference significant at the .02 level.

[2] 481 U.S. 279 (1987).

2

2. The report confounds the issue of "regional disparities" in the administration of the federal death penalty with the issue of racial disparities in the distribution of death eligible cases.

The report argues that we should not expect the proportions of black, white, and Hispanic offenders among death-eligible cases that are *accepted* for federal prosecution to correspond to "the racial and ethnic proportions in the general population." (p.13) Perhaps, but that is not the question. The real issue in this regard is the racial composition of the pool of death-eligible cases that are *not accepted* for federal prosecution. The report offers no data on that question. As a result, we do not know to what extent the death-eligible cases that were prosecuted in federal court are representative of all homicides that could have been charged as federal capital crimes, in the districts that are discussed in the report (pp.14-18) and in the country as a whole.

More importantly, the report seeks to equate its arguments concerning geographic disparities in the *racial distribution of death-eligible cases* with an explanation for clearly documented geographic and regional disparities in the *administration of the death penalty*. (Pp. 17-18) This is extremely misleading. The patterns that need to be studied are differences between regions in the rates at which death sentences are (a) *sought* by United State's Attorneys, (b) *approved* by the Attorney General, and (c) *imposed* by juries.

The September 2000 report clearly shows that in practice the federal death sentencing system is largely a Southern program. Twelve of the 19 men on federal death row as of September were sentenced in the South, including 6 from Texas and 4 from Virginia. The new report focuses on *regional differences* in the *racial composition of the pools* of potential capital cases that the districts have generated (p. 17). This has nothing to do with regional disparities in the rates at which death eligible defendants in the system are capitally charged and sentenced to death.

3. The report presents no data or other compelling reasons to dispel concerns about the exercise of discretion by U.S. Attorneys in the post-authorization stage of the process.

3

EX 75 - 1363

One the most striking findings of the September 2000 report is that in the period after the AG has approved a capital prosecution, 48% of white defendants avoid the risk of a death penalty by entering a plea agreement to a non-capital charge, while the rates that blacks and Hispanics enter such agreements are 25% and 28% respectively. (p.19) The department is obviously concerned about this issue because it plans to limit the power of U.S. Attorneys to enter such agreements without AG approval. (p. 22)

The report seeks to dispel concerns created by these data by pointing out first that it "takes two to make a plea agreement" and the data do not reflect racial differences in the rates at which the government offered post-authorization plea agreements. This argument raises an empirical question about the 62 cases (as of the September 2000 report) in which a post-authorization plea agreement was *not* reached. Was a plea bargain offered by the prosecution in these cases and rejected by the defense, or was none offered? It would have been easy for the DOJ to ask its own prosecutors whether they offered plea agreements in these cases. Apparently, it was not done.

The report further argues that even if differential acceptance rates by white and minority defendants did not explain the race disparities in the post-authorization guilty pleas, the September 2000 report's findings on this issue "would not be suggestive of bias by the U.S. Attorney's offices." (p. 20) The argument is that the detection of discrimination by U.S. Attorneys must rest on an analysis of "what happens in the process as a whole" and that decisions taken "at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices." (p.20) Certainly it is important to view the system as a whole, but prior research demonstrates that race disparities may operate at discrete stages in a decision making process that overall appears to be evenhanded. There is serious cause for worry here, and the report makes no attempt to address it.[*]

---

[*] The report's argument also overlooks the fact that many of the post-authorization plea agreements are made in cases in which the U.S. Attorney's initial recommendation to waive the death penalty was overruled by the AG, a circumstance that needs to be factored into any analysis of the post-authorization decisions.

4

EX 75 - 1364

The claim that no differential treatment exists in the post-authorization plea stage is a mere assertion with no evidence whatever to support it. Without data on the comparative culpability of the offenders (and the race of the victims) in the cases affected by these post-authorization pleas bargaining decisions, one has no idea the extent to which similarly situated defendants were in fact treated comparably.

4. The report provides no compelling reason for the DOJ's failure to authorize a comprehensive state of the art study of fairness in the administration of the federal death penalty system.

The report notes a meeting of "researchers and practitioners on January 10, 2001" in Washington D.C. to consider the feasibility of conducting a comprehensive empirical study and evaluation of fairness in the administration of the federal system. (p.11) I was one of the researchers at that meeting.

The report correctly states that there was general agreement at the January meeting that the cost of such a study would entail a "multi-year research initiative." Two years would be the time line. In the meantime, half a year has passed since that meeting, and nine months since the release of the initial report, and neither the NIJ nor any other agency of the Department of Justice has taken any visible step to begin to make such a study possible. Quite the opposite. Attorney General Ashcroft's testimony last week suggested that he believes that the idea should be abandoned.

The report also states that "discussion" at the January 10 meeting "indicated," that such a study "could not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases." This was certainly not the consensus of the researchers at the January 10 meeting. On the contrary, the consensus was that such a study would provide the best possible evidence on the question. Certainly the results of such a study would yield far more definitive answers to the issue of racial fairness in the system than the arguments presented in the department's latest report.

5

The new report offers no reason at all why such a study should not be conducted even if it would require up to two years to complete. It also offers no reason why the DOJ appears unwilling to identify by defendant name and docket number the more than 700 death-eligible cases that make up the database for its latest study. With this information independent researchers could collect data on the cases in the DOJ database and conduct the kind of study that would provide the best evidence available on the question of fairness in the federal death sentencing system.

5. The report misconceives the nature of race discrimination in the administration of the federal death penalty.

A main theme of the report is that the core issue of racial fairness is whether U.S. Attorneys are consciously engaged in "favoritism towards White defendants." (p. 11) In other words, are their decisions based on "invidious" racial reasons (p.12) or motivated by "bias" (p. 20) or a "particular desire to secure the death penalty for minority defendants." (p. 17) This states the issue far too crudely. No one with an understanding of the system suggests that it is driven by such a conscious and blatant animus against minority defendants or defendants whose victims are white.

The concern about racial unfairness in the system is whether defendants with similar levels of criminal culpability and deathworthiness are treated comparably or differently because of their race or the race of their victims. The reasons for differential treatment by U.S. Attorneys - and by agents of the FBI, the DEA and other are federal law enforcement agencies - are almost certainly nonconscious. More importantly, the reasons for the differential treatment of similarly situated offenders on the basis of their race or the race of the victim are irrelevant. It is the fact that differential treatment cannot be explained by legitimate case characteristics that makes it morally and legally objectionable, when it exists. Without a systematic study based on full information concerning the criminal culpability and the race of the victims of all of the death eligible offenders,

6

we will remain in the dark about whether unexplained differential treatment based on the race of the defendant and victim exists in the federal death penalty system, and if so, what causes it.

7

EX 75 - 1367

# Life, death and unce. _.inty

by Judge Michael Ponsor, Boston Globe, July 8, 2001

To the judge in charge, the murder trial of Kristen Gilbert offered an unsettling lesson - and inescapable conclusion - about the ultimate cost of the death penalty. Federal judges are not allowed to offer opinions, at least not in any significant way, on cases or issues that were, are, or might be before them. That is as it should be. But an excessive reluctance to say anything about the legal process, even once a case is over, can deprive the public of important information, and produce a suffocating silence about conditions at the front lines of our justice system. Lawyers do sometimes comment, of course, but they are combatants, foot soldiers with their own biases and limitations. Legislators and appellate courts make their pronouncements far from the blood and shrapnel of the trenches. Judges are often positioned to see what others cannot, and sometimes what they see is important.

Consider what follows a somewhat mud-spattered dispatch from an advantageous hilltop - the bench - not about who was right or wrong, but about how one particularly fateful campaign for ju_ _.c unfolded.   The trial was United States v. Kristin Gilbert. Presiding over this, the 1st death r.c..nv case in Massachusetts in several decades, was the most complicated and stressful thing I've . ·· 'one (aside, perhaps, from raising teenagers).

The experience left me with one unavoidable conclusion: that a legal regime relying on the ·· 'enalty will inevitably execute innocent people - not too often, one hopes, but undoubtedly ----.es. Mistakes will be made because it is simply not possible to do something this difficult ..\y, all the time. Any honest proponent of capital punishment must face this fact. In saying this, . _.o position on the death penalty per se. Our Constitution gives Congress the duty to weigh the costs and benefits of particular statutes, and I apply them as enacted. Should another capital case come my way, I will again preside, and perhaps find myself with the duty to order a defendant put to death. I accept this. Nor does my conclusion about the inevitable fallibility of this system mean that I believe the jurors in the Gilbert case erred either in
finding the defendant guilty or in declining to impose the death penalty. I have no reason to think they did.

But the issue is not whether the Gilbert jurors got it right, or even whether the next 10, or 20, or 100 capital cases will go off without error. Eventually, in some courtroom somewhere, someone will get it wrong; the process is both too human and too complex to expect otherwise. And for some innocent defendant, that slip will be fatal. For all we know, it may already have happened. For those in the courtroom who decide the accused's fate - life or death - there is also a price to pay, but of a different and, of course, far lesser sort.

Kristin Gilbert, a 30-year-old nurse, was indicted in 1998 for murdering four of her patients and attempting to murder three others by injecting them with the heart stimulant epinephrine. Since she allegedly committed these crimes at a Veterans Affairs Medical Center, the federal death penalty statute applied. The fact that Massachusetts has no death penalty did not matter.

EX 76 - 1368

The method of execution proposed, like the defendant's modus operandi, was lethal injection. The 7 alleged victims were mainly elderly veterans with various ailments, men much loved by their families. The government's theory was never that these were mercy killings; only 1 of the 7 victims appeared to have been in immediate danger, or even in acute distress.

The facts charged were more lurid. Gilbert, the prosecutors said, injected her victims in order to trigger a "code," i.e., a medical emergency at which she could meet a security guard with whom she was having an adulterous affair. She was, in the words of the prosecutor, a "code bug" the way an arsonist is a "fire bug." If given clear proof beyond all possible doubt that someone committed despicable acts like these, few people would grieve if the murderer happened to be struck by a bolt of lightning, or suddenly died from, say, an undiagnosed heart condition. But trials seldom offer the luxury of absolute proof to a mathematical certainty - and when no smoking gun evidence exists, and when the mechanism for taking life is entirely in human hands, the task for jurors is complicated.

The defense argued that the government could not even prove that the veterans had died of foul play. Gilbert's medical experts - well-respected clinicians with excellent credentials - testified that all 7 may very well have suffered unexpected cardiac arrhythmias from perfectly natural or explainable causes. Even with considerable circumstantial evidence, including Gilbert's own apparently inculpatory statements, but no eyewitness testimony, the trial presented in large part a classic battle of experts.

The unpredictability of the courtroom was highlighted by the partial collapse of the government's toxicological case mid-trial. In his opening, the prosecutor promised that the jury would hear a nationally-renowned expert opine that post-mortem examination clearly revealed epinephrine poisoning. Halfway through the trial, he had to admit that on reexamination the results were inconclusive. His renowned expert, it seemed, had made a math error. In crude summary, those are the pertinent facts of the case. Here is the personal backdrop: As the trial date approached, a colleague from another court called to caution me about the level of stress I would be facing. He had had his own death penalty trial and had suffered a heart attack shortly afterward. It was a valuable warning.

After 17 years on the bench I do not consider myself particularly squeamish. I have had some tough cases: a drive-by shooting of a 12-year-old boy, a sale of heroin resulting in the customer's death, gang cases, gun cases, drug conspiracies. And although I do not say it with any pride, I have imposed many a horrendous sentence, gone home, eaten dinner, watched the Red Sox, helped with the homework, and slept soundly. You do your best, and you go on to the next case.

The Gilbert trial was different. Everyone had to devote a fair amount of attention just to staying healthy and reasonably rested. At a preliminary hearing, I ordered all counsel, only half humorously, to get at least 20 minutes of aerobic exercise four times a week, then followed my own order. A few days before trial I started having bad dreams, always featuring me either in the role of the executioner or the prisoner facing execution. Time and again, I found myself walking down a hall, breathless with terror at the imminence of death, with the shadows of the guards gliding alongside me. The executioner, a kindly looking, vaguely recognizable man, gazed at me, partly concealing the ax in the folds of his long black robe.

Jurors told reporters afterward that they had had their own nightmares. As the trial progressed, I got used to these dreams, and perhaps the jurors did too. Eventually the dreams ceased being frightening, and then stopped. I never thought I would preside over a death penalty case; most federal judges do not. It is unsettling to experience how quickly the unthinkable can become commonplace, then fade into part of a day's work. You get used to it. My reaction to the stress became almost embarrassing during jury selection. As potential jurors arrived for individual questioning in small groups, I would instruct them as follows: "You must understand, if the jury were unanimously to find that the death penalty should be imposed upon Ms. Gilbert," and here I nodded in her direction, "I would be required as the judge to sentence her to death. In other words, I could not change the jury's decision."

The jurors' rapt faces at this point always seemed to reflect their sense of the staggering responsibility they might have. Each time, you could hear a pin drop in the courtroom. The sheer effort of getting that passage out of my mouth affected me in a startling and ludicrous way. For four or 5 days, for the first and only time in my life, my grip on the word "decision" (a rather significant word for a judge) slipped badly. No matter how sturdily I braced myself as I sensed the word approaching, it started toppling out drunkenly as "desisson," "deshishon," or, most often, "deshizzon" - as in, "I could not change the jury's deshizzon." It was horrible. But, again, this passed, and by the end of the 1st week the unspeakable had become speakable - just ordinary words.

Apart from stress, the case presented almost endless logistical challenges, beginning long before trial actually commenced. For example, a death penalty case requires the appointment of at least 2 defense attorneys, one of whom is "death qualified," i.e., experienced in at least one prior capital case, and the assembly of a team of necessary defense experts. The shortage of qualified counsel in a state like Massachusetts with no death penalty, and the limitation on the hourly fee that can be paid ($125 per hour, a fraction of what prominent lawyers receive) made this task daunting. Ultimately, three outstanding lawyers agreed, essentially, to abandon the rest of their practices (and to a great extent their personal lives) for about a year to prepare and then try the case. The experts appointed to assist the defense team included, at various times, 3 investigators, 2 toxicologists, a pathologist, 2 cardiologists, a nursing consultant, a jury consultant, a venue analyst, 2 mitigation specialists (experts commonly used in capital cases to gather evidence for the penalty phase), a statistician, a neuropsychologist, a behavioral psychologist, a psychiatrist, an endocrinologist, and a paralegal.

In the end I was confident that the defendant's team reasonably balanced the government's, so that the outcome would emerge from the merits, not from imbalance in firepower. To assure this, defense lawyers' fees and experts' costs eventually came to over $1.6 million, all paid from public monies. In the months before trial, legal and logistical challenges continued to multiply. By my courtroom deputy's count, more than 250 motions were filed before and during the trial, some requiring many hours of hearings. The government took three of my rulings to the Court of Appeals; except for a minor point, I was affirmed. Some 1,500 jury summonses were sent out, and on Oct. 16, 2000, potential jurors - 800 of them - assembled at Springfield's Symphony Hall (rented because no room in our courthouse was large enough) to hear preliminary instructions and fill out a 15-page questionnaire. Then, for four weeks, hundreds of jurors came to court for follow-up questions. In the end, 12 jurors and six alternates (two alternates were eventually excused) would sit from Nov. 20,

EX 76 - 1370

2000, to March 26, 2001, receiving at first $40, then $50 per day plus 34 cents per mile for travel. The jurors' service was the most unparalleled demonstration of civic responsibility I have ever witnessed. How many of us could, or would, do it?

In the week before the trial, deputy marshals brought in from around the country arrived to assist our local deputies and court security officers. A pressroom and a portion of the courtroom were set aside for the media.

(The coverage, while generally balanced and accurate, was intense, particularly in the local media.) Throughout the 1st and larger portion of the trial, the guilt phase, both the government and defense took advantage of the extensive electronic resources in my courtroom. Video monitors and computer hookups allowed counsel to present evidence via a document presenter, CD-ROM, or a videotape.

This equipment, still rare in most courtrooms, made presentation of medical records, all of which had been electronically scanned, enormously easier. Direct testimony of the government's lead cardiologist unfolded with multicolored, animated diagrams of the heart, a tour de force presentation of expert testimony. The doctor, who testified for 5 days, was just one of roughly 70 witnesses. Over 200 exhibits were received into evidence, many of them medical records running to several hundred pages. The jury confronted concepts such as "accelerated ideo-ventricular rhythm," "right bundle branch blockage," and "contraction band necrosis." Unlike many judges, I allowed the jurors to take notes.

Given the technical nature of the testimony, some may have worried that none of the 12 jurors had a four-year college degree, though several had some college and three had worked in a medical area. In my own experience, formal education does not necessarily make for a better juror.

The trial, which began as the leaves were falling, marched on through the end-of-the-year holidays. There were three snow days, 4 sick days, and 3 medical emergency days; the defendant and 2 of the jurors got the flu, and 1 of the defense lawyers was briefly hospitalized with chest pains.

Then, on Feb. 21, evidence in the guilt phase concluded and the jury began its 1st-stage deliberations. The 12 days of deliberations were the longest by far I have ever waited through. Finally, the jury, looking utterly exhausted, returned its verdict: guilty on 3 counts of 1st-degree murder, and on several lesser charges.

Now the question was, would the jurors vote to sentence Kristin Gilbert to death?

The final, so-called penalty phase of the trial came down to a presentation by the government of aggravating factors and by the defense of mitigating factors. The jury was to weigh these in determining the sentence.

That may sound straightforward, but this portion of the trial was so strange - so unlike any legal proceeding I have ever been a part of that it is hard to describe.

EX 76 - 1371

In a typical criminal trial, including the guilt phase of a capital trial, the rules are clear and strict. But in the penalty phase of a death penalty trial, most of these rules are considerably looser. Both sides are given rather broad latitude to offer evidence about the defendant's background or character, or the nature of the crimes or their impact, that might affect the jury's decision.

What's more, the time-honored "beyond a reasonable doubt" standard does not apply; each juror is to decide whether death is - as the statute puts it - "justified," a term not defined in the statute or, as far as I know, anywhere else. With so few of the usual controls at hand, presiding over the penalty phase of a capital trial, from the judge's point of view, is like chuting the Colorado River on a tea tray.

It did not help that the journey was powered by the force of strong emotion. Probably the most dramatic evidence of an aggravating factor came from family members of the victims. Bravely, and occasionally tearfully, they took the stand one by one to show pictures of their sons, fathers, and brothers, and to speak, , sometimes in language that verged on poetry, of the enormity of their losses.

Never before have I understood so poignantly the devastating impact of a murder. It is hard to lose a loved one, harder to have had no opportunity to prepare for the loss, harder still to know that due to accident or mistake the loss was avoidable. But hardest of all - on a whole other level - is to perceive that the loss came through the deliberate viciousness of another person.

The victim family members delivered their testimony from a witness box no more than 10 or 12 feet from the defendant, passing by her as they walked to the stand almost close enough to touch, under the alert eyes of the deputy marshals.

Probably the most dramatic evidence of a mitigating factor came, in turn, from family members of the defendant. Gilbert's father took the stand, showing pictures of his daughter as an infant, toddler, girl, and young mother. Both the defendant's grandmothers tottered to the stand, recalling cookie baking and quilt making, describing the terrible impact Gilbert's death would have on them. As they spoke, Gilbert, just a few feet away, sobbed. Gilbert's former husband, who had appeared for the government during the guilt phase, submitted a statement now for the defense, expressing his deep concern about the injury his sons would suffer if their mother were executed.

The words of these witnesses were so profound that they almost became "testimony" in a religious sense. How does a judge modulate the impact of these voices fairly, and respectfully, knowing that they may determine whether someone lives or dies?

In the end, the jury's decision seemed to emerge from, or at least follow, a kind of loosely supervised psycho-legal community sharing. But this time the process did not produce unanimity.

After a day and a half, the jurors pronounced themselves deadlocked, and I imposed the only remaining possible sentence, mandatory life imprisonment without possibility of release. This phrase means what it says, by the way. Shortly after the trial, Kristin Gilbert was transferred to a high-security federal facility in Texas to be imprisoned until she dies.

It might be said that the unusual complexity of the Gilbert case made it more stressful and unwieldy than the ordinary capital proceeding. I do not know. The case had only one defendant, and she was of the same race and economic class, and spoke the same language, as most of the jurors. No headphones for translators.

The circumstances of the murders, while disturbing, were not gruesome or floridly violent in the usual sense. The lawyers on both sides were superb, and I had the enormous resources of the federal court. Unlike state judges, I did not have to confront the possibility of courtroom TV, which is banned in federal proceedings. Most of all, I was lucky. Logistically, the things that could have gone wrong were countless. Nothing did.

Did the jury get it right? I cannot say. I can say that no jury I have known ever showed more determination to do its job conscientiously. I have learned to live, at times, with a lack of absolute certainty. A few weeks before the start of the Gilbert trial, a defendant before me swore on the souls of his children that he was not the dealer who sold the super-pure heroin that killed a young drug user, even though 3 witnesses said he was. I sentenced him to life in prison without possibility of release.

To do my job, I must make my peace with possible error. Usually, part of this truce with [death] comes from knowing that, as long as there is life, the worst of a bad mistake can at least [theore]tically, and partially, be corrected.

Perhaps this is what some of the Gilbert jurors thought, too. On the verdict form three said [wh]ile the evidence was strong enough to prove guilt beyond a reasonable doubt, it was too weak [to just]ify the death penalty. As one of the potential jurors said during questioning," Life is so precious, and death is so permanent."

In 1650, Oliver Cromwell, in a letter to the Church of Scotland, wrote "I beseech you, in the bowels of Christ, think it possible you may be mistaken." Some 300 years later, Judge Learned Hand observed that these words should be engraved over the portal of every courthouse and legislature.

I love our judicial system, and I am proud to serve in it. As I believe this trial demonstrated, no structure of law, anywhere or at any time, has tried so earnestly to protect the rights of those involved in it. But I have a hard time imagining anything as complicated as a capital trial being repeated very often, even by the best system, without an innocent person eventually being executed.

The simple question - not for me as a judge, but for all of us as citizens - is: Is the penalty worth the price?

EX 76 - 1373

CITY OF WASHINGTON

DISTRICT OF COLUMBIA

## AFFIDAVIT OF RICHARD DIETER

I am currently the Executive Director of the Death Penalty Information Center (DPIC), in Washington, D.C.  I have held my present position since 1992. DPIC is a non-profit organization serving the media and the public with analysis and information on issues concerning capital punishment.  DPIC engages in research, provides in-depth reports, conducts briefings for journalists, and serves as a resource to persons working on the issue of capital punishment.

DPIC maintains an extensive archive concerning the practice of capital ⌐shment in the United States.  This archive contains newspaper articles, caselaw, ⌐rt pleadings, reports, books, legislation, legislative history and testimony, and materials relating to capital punishment.  I routinely rely upon DPIC's ⌐val information in preparing reports and answering questions regarding the ⌐ath penalty.

In 1993, DPIC was contacted by Rep. Don Edwards, who was then Chair of the Subcommittee on Civil and Constitutional Rights of the U.S. House of Representatives, and asked to prepare a report on the subject of innocence and the death penalty with examples of people who had been freed from death row in recent years.

I prepared a draft of this report, basing my research on court opinions, news articles, and on conversations with attorneys associated with particular cases. The original list of 48 cases used as examples to demonstrate the risk of executing innocent persons contained in this report were primarily drawn from the research of Professors Michael Radelet (currently of the University of Colorado, Boulder) and Hugo Bedau (Tufts University).  Portions of their research had been published in "Miscarriages of Justice in Potentially Capital Cases," 40 Stanford Law Review 21

(1987). This article contained many cases outside the scope of the report which DPIC prepared for Rep. Edwards, since it reported cases dating as far back as 1900, and included cases in which the defendant was not sentenced to death. A subsequent book, *In Spite of Innocence* (Northeastern University Press, 1992), by the same authors (along with Constance Putnam), was published about the same time as DPIC's report for the Subcommittee, and the research for that book was also a source of information for DPIC's work.

DPIC's draft report was submitted to Rep. Don Edward's Subcommittee and, with minor modifications, was published as a Staff Report of the Subcommittee in 1993. Subsequently, DPIC continued its research into cases of wrongful convictions from among those on death row and has maintained a list of such people.

Since DPIC has begun maintaining its own list, we have applied strict criteria for the cases that are added. The general conditions for adding a name to our list are that the person must have been sentenced to death; that their underlying conviction was finally overturned by an appropriate court; and that either the person has been re-tried and acquitted of all related charges, or that the government dropped those charges, with the final reversal occurring in 1973 or later. However, in three cases, the exoneration resulted from an absolute pardon by the governor.

To the best of my knowledge, all of the cases that have been added since the original list was prepared, and almost all of the original 48 cases, meet these criteria. Five cases, which were included and specially noted in the report issued by the Edwards's Subcommittee, did not fully meet these criteria in that either there was a plea to a lesser charge followed by immediate release from confinement, or a conviction on a charge other than murder at re-trial. No such cases have subsequently been added since DPIC began maintaining its list, which now numbers 101 cases. DPIC's list is now published on the organization's Web site.

Adherence to these criteria has led DPIC to exclude some cases that other researchers have included in their own lists. (See, e.g., M. Radelet, et al., "Prisoners Released from Death Rows since 1970 Because of Doubts About their Guilt," 13 Thomas M. Cooley L. Rev. 907 (1996); see also cases published by the Center for Wrongful Convictions in conjunction with their national conference in 1998 at Northwestern University.)

We believe that these criteria provide an objective basis for determining that a person's status of being innocent (i.e., not being proven guilty beyond a reasonable doubt) has been restored. To determine whether a case meets our standards, we consult court decisions, news accounts, attorneys involved with the cases, other experts, and reported research in this field.

All of the people on DPIC's list were exonerated in 1973 or later, though in six cases their conviction occurred prior to 1973. The year 1973 was chosen as a milestone because some states again began sentencing people to death in that year, following the passage of new death penalty laws in the wake of *Furman v. Georgia* (1972).

In 1997, DPIC published a new report, "Innocence and the Death Penalty: The Increasing Danger of Executing the Innocent," as a follow-up to the Subcommittee's 1993 report. Sixty-nine cases were included in this report.

FURTHER AFFIANT SAYETH NAUGHT

Richard C. Dieter
Death Penalty Information Center
1320 18th St. NW, 2d Fl.
Washington, DC 20036

## AFFIDAVIT OF KEVIN McNALLY

I, Kevin McNally, being first duly sworn and cautioned according to law, do hereby state the following under oath, TO WIT:

1. I currently serve, along with David Bruck of South Carolina and Richard Burr of Texas, as Federal Death Penalty Resource Counsel, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal court. I have served in that capacity since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Defender Services Division of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to capital defendants in such cases. This effort includes the collection of data on the initiation and on of federal capital cases.[1]

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases. I accomplish this by obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

4. There were signifi[   ]oubts about David Ronald Chandl[   ]uilt, as documented in his clemency petition. http://www.capdefnet.org/htm_library/Chandler1.htm. This is why the President of the United States granted clemency. This is why the Attorney General of the United States recommended clemency. "At the attorney general's request, I commuted one death sentence because the defendant's principal accuser later changed his testimony, casting doubt on the defendant's guilt." Clinton, "My Reasons for the Pardons," *New York Times* (2/18/01).

5. Federal prosecutors have filed, not counting Chandler, at least 20 capital charges against the legally or factually innocent, including 7 defendants acquitted after the Attorney General declined to order a death penalty trial[2] and 7 acquitted after extensive scrutiny in a three level review process within the Department of Justice,[3] producing a collective decision to file a "death" notice. Several Attorney Generals have sought the death penalty against 10 innocent citizens and prosecutor's have admitted that two or three of those were innocent. *United States v. Reginald Brown* (E.D. MI CR No. 92-81127) and *United States v. Antonio McKelton* (E.D. MI CR No. 98-80348).

6. So far, two inmates have been executed after review. One condemned inmate, Chandler, has been released from death row due to doubts about his guilt. 32 citizens have recently been condemned to die in federal court. Five death sentences have already been reversed and two of these individuals not resentenced to death. Only 15 of these death sentences have been affirmed on appeal, so serious error is committed thus far in approximately 1 in every 4 federal death penalty trials.

---

[2] *United States v. Derrick Kelley* (E.D. VA CR No. 93-162-N) (acquitted of all charges); *United States v. Michael Flanagan* (D. CO CR No. 96-357 M) (acquitted); *United States v. Donald George Brown* (E.D. NY CR No. 96-149 (S-5) (RJD) (acquitted of two counts and jury hung regarding co-defendant's involvement); *United States v. Franklin Moyler* (E.D. VA CR No. 96-00374-a) (acquitted); *United States v. Gary Benton* (E.D. KY CR No. 96-9) (acquitted in both state and federal court); *United States v. Anthony Urbistando* (S.D. NY CR No. 98-CR 566 (DLC)) (acquitted of murder) and *United States v. Ewan Bryce* (D. CT CR No. 99-CR-238-ALL) (acquitted).

[3] *United States v. Mack, et al.* (S.D. FL CR No. 93-252-CR-UUB)(three defendants); *United States v. Jacobo, et al.* (C.D. CA CR No. 99-83-(A)-DT)(two defendants) and *United States v. Ricky Lee Brown, Barbara Brown and Janette Ables* (N.D. WV CR No. 1:98CR34) ( two defendants acquitted, charges dropped as to the third).

7. Recently, former United States Attorney Michael Dettmer, of the Western District of Michigan, discussed "prematurely ... charging ... a defendant with a federal death penalty crime based only on circumstantial evidence, to then discover they had the wrong person. http://www.vera.org/publications/publications_5.asp?publication_id=161 Id. at 5. This was a reference to *United States v. John Flores Angiano and Tirzo Jorge Angiano* (W.D. MI CR No. 1:97-CR-23). Similar cases were *United States v. Jose Crecencio Martinez Vargas and Carlos Lopes* (W.D. OK CR NO. 99-CR-63-ALL) and *United States v. Angel Bernacett Cosme* (D. PR CR No. 99-346 (HL)).

7. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project, was not prepared in anticipation of its being used in litigation, and is accurate to the best of my knowledge, ability and belief.

Further, the affiant sayeth naught.

_____
Kevin McNally
Federal Death Penalty Resource Counsel

Sworn to and subscribed before me by Kevin McNally, who is personally known to me, this 30th day of May, 2002.

_____
Notary Public

x:\rcp materials\litigation guides\innocence\innocence affidavit.wpd

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

## David Bruck, Dick Burr & Kevin McNally
## Federal Death Penalty Resource Counsel Project

### TOPIC:

### Federal Capital Prosecutions Awaiting Trial

**Ferebee, Donald**
D. MD CR No. 96-96-2273
Race: B

A Baltimore drug dealer alleged to have arranged for the contract killing of a police informant who had implicated him in a prior dug-related murder. A female bystander was also killed accidentally during the shooting. The death penalty was authorized only for the murder of the witness/informant. The actual gunman is co-operating with the government and does not face the death penalty for either of the killings. The government also declined to seek the death penalty against the other perpetrator present at the scene of the killing. All defendants and both victims are African-American. Attorney General Reno authorized the death penalty against Ferebe in April, 1998, and the trial was postponed pending Ferebe's appeal since he is already serving a federal life-without-parole sentence for the initial murder. Attorney General Ashcroft rejected a plea agreement involving a life sentence.

**Green, Roy**
C.D. CA CR No. 98-337-CBM
Race: B

A prison murder at Lompoc FCI in California. Green, 40, an African-American, was indicted for the stabbing death of a 29-year-old white correctional officer in 1997. He is also charged with using the knife to assault four other officers who were wounded in the attack. Green was serving a 20-year sentence for drug possession in a Missouri case when he was sentenced to serve additional time for assaulting two officers at a Wisconsin prison. Green has convictions dating back to the 1970's for attempted murder, robbery, burglary and assaulting a police officer with a deadly weapon. He was found incompetent for a period of time.

**Peoples, Cornelius**
W.D. MO CR No. 98- 00149-02-CR-W-6
Race: B

The murder of a federal government witness. Peoples, 24, conspired with co-defendant Lightfoot to prevent the victim from testifying at Lightfoot's federal trial on charges of bank robbery. Lightfoot contracted the killing of his roommate for becoming a government witness. The victim, 33, was found dead of multiple gunshot wounds in his home in Kansas City. He contacted government witness, Anthony Hunter, who contacted Barfield who hired Haskell, the triggerman. Barfeeld did not face the death penalty and was acquitted. Haskell was sentenced to life in prison. All defendants are black. The victim is white. After Lightfoot was sentenced to life in prison, the government withdrew its request for the death penalty for Peoples. The Eighth Circuit reversed the convictions and the government is again seeking the

EX 79 - 1380

death penalty. 250 F.3d 360 (2001). An appeal is pending.

**Lightfoot, Xavier Lamar**
W.D. MO CR No. 98- 00149-02-CR-W-6
Race: B

The murder of a federal witness. Co-defendant Peoples, 24, conspired with Lightfoot to prevent the victim from testifying at Lightfoot's federal trial on charges of bank robbery. The victim, 33, was Lightfoot's roommate and was found dead of multiple gunshot wounds in their rental home in Kansas City. Peoples supposedly acted as a go-between (along with co-defendant Barfield) with the professional hit man (Haskell) who committed the murder which Lightfoot arranged from federal prison. Murder for hire is alleged as an aggravating circumstance. All defendants are black. The victim is white. After Lightfoot was sentenced to life in prison, the government withdrew its request for the death penalty for Peoples. The Eighth Circuit reversed the convictions and the government is again seeking the death penalty. 250 F.3d 360 (2001). An appeal is pending.

**Shakir, Jamal; Payne, Eben; Young, Donnell**
M.D. TN CR No. 3:98-00038 (NIXON)
Race: B

A gang called the "Rollin" 90s Crips or Bangside 90s faction out of Los Angeles which allegedly moved 150 kilos of crack to Las Vegas. From there sales operations were allegedly set up in Oklahoma City and Nashville. The group has also been called the "Shakir Enterprise." A Crips gang member and his wife were killed in Oklahoma City, and their 3 year old daughter, who was also shot, stayed with her dead parents and slept with them at night for several days. Richard Chambers, 59, was shot to death in Cheatham County, Tennessee. There may have been up to 13 killings in three states. Three victims were themselves charged with murder in the indictment. The indictment charges Shakir, 25, with six killings from 1995-97, Payne, 20, with participating in two killings and in the shooting of the gang associate's 3-year-old-girl, and Young, 24, with helping kill one person and assaulting and torturing two others. Four of the killings were said to be to silence potential witnesses, other slayings were allegedly motivated by revenge. Murder for hire is alleged as an aggravating circumstance.

**McIntosh, Richard; Knorr, Carl; Sahakian, David Michael**
S.D. IL CR No. 99-40044
Race: W

Three inmates at Marion alleged to be members of the Aryan Brotherhood. They are white and the victim black. Allegedly, Knorr held the victim while McIntosh stabbed him, on Sahakian's orders. Sahakian is allegedly one of three Aryan Brotherhood commissioners, the leader of the Aryan Brotherhood at Marion. The government claims the stabbing stems from an Aryan Brotherhood "war" with blacks from the District of Columbia transferred throughout the BOP from the District of Columbia facility at Lorton, Virginia.

**Hyles, Tyrese**
E.D. MO CR No. 01-CR-73-ALL
Race: B

A witness killing §1512 murder for hire involving interstate travel from Tennessee to Missouri. Hyles faced state drug charges. The victim was murdered after his preliminary hearing testimony. Attorney General Ashcroft required a capital prosecution.

**Garcia, Rico**
N.D. CA CR No. 00-CR-20018-ALL
Race: H

Involves multiple (five) Nuestra Familia murders including the 1998 RICO murder of another gang member in a war for control of the "Salinas regiment" of the Neustra Familia, a Latino prison gang. Garcia, 35, is charged as the triggerman in this killing. Two others were allegedly with him. This is another "Petite Policy" case as Garcia was originally charged in state court and plead to other charges for a 22 year sentence in exchange for the state dropping the homicide. The prosecution involves shootings, assaults, robberies and drug dealing. Ramirez is charged in two killings, Garcia was charged in three, now two, and the other defendants one each. Attorney General Ashcroft required a capital prosecution for Garcia. All involved are Hispanic.

**Quinones, Alan; Rodriguez, Diego**
S.D. NY CR No. 00 CR 0761 (JSR)
Race: H

murder of a New York Police Department informant, who was allegedly beaten or tortured. The victim, a drug dealer, had recently arranged two controlled buys from Quinones. Quinones is alleged to be the boss. Co-defendant Rodriguez allegedly participated in the killing. The victim's body was burned post-mortem. Murder for hire is alleged as an aggravating circumstance. Attorney General Ashcroft rejected a plea agreement and required a capital prosecution. A district court decision that the death penalty was unconstitutional due to the execution of innocents was reversed on appeal. United States v. Quinones, 313 F.3d 49 (2nd Cir. 2002). All involved are Hispanic

**Johnson, Angela; Honken, Dustin**
N.D. IA CR No. 00 CR 3034 MWB
Race: W

Five counts of murder in 1993 - a potential witness, his girlfriend and two daughters, in a drug conspiracy case. The fifth victim is Angela Johnson's former boyfriend, who disappeared in November of 1993. All involved are white.

**Williams, Michael; Williams, Xavier; Williams, Elijah Bobby**
S.D. NY CR No. 00-CR-1008
Race: B

Involves a multiple murder during a narcotics conspiracy. Three black men were killed in 1996. The defendants are also black. The Attorney General required a capital prosecution.

**Fell, Donald**
D. VT 00-M-66-ALL
Race: All W

Multiple (three) murders, a carjacking and an interstate kidnapping. The defendants were with Fell's mother and a male friend when an argument erupted. The victim's throat was slashed by Fell and Fell's mother stabbed to death by Lee, the co-defendant. The two then carjacked a middle-aged woman at a supermarket. Crossing into New York, they told her to get out and she attempted to run into the woods. They followed her and allegedly killed her by kicking her.

The defendants both made incriminating statements. All involved are Caucasian. Lee died in jail from asphyxiation, ruled an accident, but probably a suicide. Attorney General Ashcroft rejected a plea agreement and required a capital prosecution, stipulating life in prison. The Attorney General also rejected a bench trial. The court declared the FDPA unconstitutional. 217 F.Supp.2d 469 (2002). That decision is on appeal.

**Sablan, William; Sablan, Rudy**
D. CO CR No. 00-CR-531-ALL
Race: A

Inmate killing - evisceration stabbing of cellmate (in their cell). William Sablan allegedly confessed, on videotape, and said that he was defending himself. The letter "S" was written on the cell wall in the victim's blood. The USA requested permission to seek the death penalty and on her last day in office, Attorney General Janet Reno agreed. The defendants are Pacific Islanders, "Chmorran", from Saipan. The victim is Hispanic. The defendants, cousins, were doing federal time for a hostage-taking in Guam. Attorney General Janet Reno agreed to a capital prosecution on her last day in office.

**Taylor, Styles; Thomas, Keoin**
N.D. IN CR No. 2:01 CR 073 JM
Race: B

A robbery of a gun store and the killing of the proprietor. The defendants are African-American and the victim was white. Taylor was on parole. He has a juvenile record involving the robbery and shooting of a pizza delivery man.

**Lien, David**
N.D. CA CR No. 01-CR-20071-ALL
Race: A

Fugitive co-defendant Chang was married to a bomb victim's sister. There were domestic problems and a divorce. Lien was allegedly sent to the victim's home with a bomb inside a toy mechanical dog. The victim later purchases batteries, put them in the toy, which blew up, killing him. The Attorney General required a capital prosecution

**Agofsky, Shannon Wayne**
E.D. TX CR No. 1:03-CR 173
Race: W

Agofsky, along with his brother, was serving a life sentence for the 1992 abduction and murder of a president of a bank. Agofsky took him to the bank and forced him to open the vault and then killed him. Agofsky is now accused of beating, kicking and stomping to death a fellow inmate at a federal prison in Beaumont, Texas. The victim was serving a term for arson and firearms. The government alleges this was a premeditated "gang" hit. All involved are white. This is the fourth murder at Beaumont since March 1997.

**Jones, Milton; Canty, Raymond; Mitchell, Eugene**
E.D. MI CR No. 01-80571
Race: B

**EX 79 - 1383**

Involves a gang called the "Young Boys Inc.". Milton Jones, the alleged kingpin, is charged along with 13 others, including state representative Keith Stallworth. Three defendants face the death penalty. Jones is charged with multiple (two) murders in 1998. Murder for hire is alleged as an aggravating circumstance. One victim was a suspected government informant. Stallworth is charged with laundering money. Canty and Mitchell are charged with killing another in '97. Canty is charged in two murders. All involved are African-American. Attorney General Ashcroft required a capital prosecution.

**McClure, Cornell Winfrei**
D. MD CR No. 01-CR-367-ALL
Race: B

Shooting of a white woman at a secluded location on federal land. The victim was shot repeatedly with two different types of ammunition. There are signed confessions by both defendants. Millegan confessed that he committed the murder, along with McClure, both shooting the victim with their weapons. McClure wrote that he told Millegan they should "press her" about the robbery. The deceased was taken to a road on federal land in Beltsville, where both allegedly shot her. The defendants are black. The alleged motive was a belief that the victim had some involvement in the burglary of Millegan's apartment. The Attorney General required a capital prosecution

**Williams, Tyrone**
S.D. TX CR No. 03-CR-221-ALL
Race: B

An alien operation that led to mulitple (nineteen) immigrants' deaths in the back of a truck trailer driven by Williams. Joya is alleged to the leader of this smuggling ring. She was extradited from Guatemala. She is also accused of coordinating 3 smaller operations, gathering illegal immigrants together in South Texas, arranging them to be fed and housed and then placing them on trucks headed north. All involved are Latino, except Williams, who is black. Williams is the only one of the 17 defendants who will face the death penalty.

**Rudolph, Eric Robert**
N.D. AL CR No. 00-CR-422-ALL
Race: W

1998 Southside bombing of a Birmingham abortion clinic, resulting in the death of an off-duty white police officer and injury to a white clinic nurse. Rudolph, who is white, was described by Attorney General Ashcroft as "America's most notorious fugitive." Rudolph is also charged with three bombings in Atlanta: the 1996 Olympic park bombing that killed a black woman and two other bombings in 1997. He was captured after a 5 year manhunt.

**Moussaoui, Zacarias**
E.D. VA CR No. 01-CR-455-ALL
Race: B

An alleged foreign national co-conspirator in the September 11, 2001 terrorist attack on the World Trade Center and Pentagon which killed over 3,000 and resulted in four airline crashes in New York, Pennsyvlania and Washington, D.C. Moussaoui is French of Moroccan descent and is accused as a member of al-Qaida. He was in jail on September 11 after suspicious actions at a Minnesota flight school. There were victims of many nationalities and races.

**Cannon, Amesheo D.**
E.D. MO CR No. S1-1:01CR00073RWS
Race: B

A witness killing §1512 murder for hire involving interstate travel from Tennessee to Missouri. Hyles faced state drug charges. The victim, Coy L. Smith, Sr., was murdered after his preliminary hearing testimony. Cannon allegedly murdered the victim by shooting him in his bed. The Attorney General required a capital prosecution.

**Perez, Wilfredo; Gonzalez, Fausto**
D. CT CR No. 02-CR-7-ALL
Race: H

A drug gang, "the Perez Organization" at war with "the Savage Nomads" in Hartford, Connecticut over a turf dispute and a drug and money kidnapping and robbery. Gonzalez was the alleged triggerman in this murder for hire. The government claims that Gonzalez is a hired contract killer responsible for multiple (9) other murders. All involved are Hispanic. Attorney General Ashcroft required a capital prosecution.

**Mikos, Ronald**
N.D. IL CR No. 02 CR 137
Race: W

Involves the §1512 murder of a government witness to prevent her testimony before the grand jury. Mikos, a podiatrist, and another are accused in many counts of defrauding Medicare, HCFA and HHS. When the victim was served with a federal grand jury subpoena for her testimony regarding treatment/non-treatment by Mikos, he allegedly tried to persuade the victim to lie to the grand jury either by claiming lack of memory or stating that the surgery had been performed. When she refused he allegedly shot her. All involved are white

**Fulks, Chadrick; Basham, Branden**
D. SC No. 02-M-992-ALL
Race: W

A November 14, 2002 carjacking and interstate kidnapping from a WalMart parking lot of a woman who remains missing. Witnesses saw her with the defendants later that day in North Carolina. The defendants escaped November 4 from a Kentucky jail. Basham was arrested November 17, 2002 after allegedly trying to hijack a car at an Ashland, Kentucky mall. He has been charged with attempted murder and robbery. Fulks was arrested November 20, in Goshen, Indiana. The defendants are also suspected of kidnapping a Kentucky man and leaving him tied to a tree in Evansville, Indiana. Basham has told the FBI that he and Fulks abducted another victim, on November 11, 2003, a 19-year-old West Virginia college student, whose car was found burned in West Virginia. A separate federal capital indictment is pending in that state. All involved are white.

**Green, Darryl; Morris, Branden**
D. MA CR No. 02-CR-10301-ALL
Race: B

Two members of the Esmond Street Crew charged with the RICO shooting death of a gang rival ("Franklin Hill Giants") during the Caribbean Carnival in 2001. Key witnesses against them will be four members of the gang who have cut deals with federal prosecutors. Prosecutors allege four other shootings. Family members of the defendants claim the shooting was over a girl and not drugs. The grandmother of the victim and the state prosecutor criticized the decision to seek the death penalty. Both grew up in a violent neighborhood and Morris was shot when he was 16. An innocent bystander was spared when a bullet hit his rearview mirror.

**Skiba, Lawrence**
W.D. PA 01-CR-291-ALL
Race: W

An interstate mail fraud murder for hire, allegedly by uncharged hitman Eugene DeLuca, in 2000. Skiba and his brother-in-law, Shane Simeral, allegedly took out insurance policies on the victim in 1997. The United States alleges that Skiba was involved in two other suspicious deaths: a fatal fire at a hotel he owned in 1993 to collect insurance money and a 1998 suicide by a mentally challenged man after Skiba allegedly gave him a gun. Also alleged is an unsuccessful attempt to kill a man in 2000, three days before his death to collect on a $15,000 life insurance policy. All involved are white

**Corley, Odell**
N.D. IN CR No. 02-CR-116-ALL
Race: B

Five people, three African-American males, one African-American female and one white woman (the pregnant girlfriend of Johnson), rob a bank and shoot to death a white female teller, wounding a white male security guard and another male teller. Corley allegedly was the ring leader who burst into the bank shooting. Johnson was also a gunman. McGregor was a driver. Gay and Ramsey were some distance away.

**Foster, Aaron Demarco; Moses, Keon; Taylor, Michael Lafayette**
D. MD CR No. 02-CR-410-ALL
Race: B

Leaders of one of West Baltimore's most violent drug gangs, the Lexington Terrace Boys, who are charged in multiple (six) killings, including one potential government witness who was killed to prevent him from testifying about an earlier double homicide of two members of a rival gang, the Stricker Street group. Since 1999 the gang operated from the Lexington Terrace and Edgar Allan Poe Homes public housing projects. Foster was acquitted of attempted murder in state court in 1998. Taylor and Moses are charged together in the double homicide and in a witness killing. There was also an attempted kidnapping of another potential witness to the 2001 killings. The latest victim is the third brother of one family to die on the streets of Baltimore. Investigators claim the group is in some way connected to 40 homicides. Recently, a critical witness in the case was shot 10 times and killed. He had been shot at twice recently. All involved are African-American

**Cisneros, Luis; Cisneros, Felipe N.; Eppinger, Paul E.; Rivera, Angel R.**
D. AZ CR No. 03-CR-730-ALL
Race: All H

Multiple (three) RICO murders by a prison and drug gang, "the Cisneros Organization." Luis Cisneros and Alvarado are charged in all three murders, the others in two. A father and son were allegedly murdered six months apart by this Hispanic gang. The father was a suspected government withness/informant. 18 U. S. C. §924 and 1512. Numerous other murders, some of potential witnesses, are alleged as FRE 404(b) evidence. The least culpable were apparently Llamas and Alvarado, who will not face the death penalty. The prosecution was moved from New Mexico to Arizona after an alleged courthouse security leak. All involved are Hispanic

**Nelson, Brian**
E.D. LA CR No. 02-CR-304-ALL
Race: B

September 2002 killing of a New Orleans man and the carjacking of his wife. The United States Attorney said: "If we're given the green light, we will seek the death penalty." However, the defendants entered into plea agreements with the United States Attorney. The defendants are black and the victims a young white married couple. The defendants had been mistakenly released by state authorities after allegedly being involved in a rape and robbery spree. Dawson and Franklin entered into plea agreements which were accepted and approved. Attorney General Ashcroft rejected a plea agreement and required a capital prosecution against Nelson.

**Bolden, Robert, Sr.**
E.D. MO CR No. 4:02-CR 0557 CEF (AGF)
Race: B

A bank robbery murder. 18 U.S.C. §§1111, 2113 and 924(c). The victim is white, the son of a police officer. The defendants are African-American. Only Bolden will face the death penalty.

**James, Richard; Mallay, Ronald**
E.D. NY CR No. 02-773 (S-1) (SJ)
Race: B

Multiple (two) insurance fraud murders for hire involving foreign nationals from Guyana. The victims are also from Guyana. One died there. Both died from alcohol and drug ingestion. James is an insurance broker. Mallay, 57, has heart trouble. He and James are suspected of arranging other deaths in an insurance fraud scheme. Federal authorities are investigating 21 deaths of people insured through James.

**Zapata, Jairo**
E.D. NY CR NO. 01-516
Race: H

Attorney General Ashcroft rejected a plea agreement and required a capital prosecution against a foreign national from Columbia who had a signed cooperation agreement. Zapata is charged in one CCE drug-related murder for hire in 1993. Two separate homicides are alleged in aggravation, all three occurred during a seven month period in 1993.

**Ward, Israel; Smith, Thomas**
W.D. MO CR No. 3:02 CR 05025-ALL

Race: B

Multiple (two) gun murders during course of drug trafficking by black defendants from Tulsa selling crack in Tulsa. Smith is alleged to be a leader. A black victim allegedly stole drugs and was shot to death along with a white female who was with him at the time. Attorney General Ashcroft required a capital prosecution.

**Villegas, Hernaldo Medina; Roman, Lorenzo Catalan**
D. PR CR No. 3:02-CR-117-ALL
Race: H

The Hobbs Act robbery of a local credit union, while an armered bank truck was making a deposit. A gunfight ensued and an armed guard was killed with a second head shot by Villegas after he was down. Lorenzo Catalan and Hernando Medina are alleged to have participated in the actual robbery, while Quester Sterling was allegedly the lookout. The 924(j) murder weapon was allegedly obtained in a carjacking. There are additional non-capital charges for a prior robbery of the same credit union by the same group. Only Villegas and Roman will face the death penalty. All involved are Hispanic.

**Breeden, Shawn Arnette; Carpenter, Michael Anthony; Cassell, Kevin Thomas**
W.D. VA CR No. 03-CR-13-ALL
Race: All B

Involves four defendants from D.C. who drove to Virginia with the intent to commit robbery. Cassell was the driver. Breeden is allaged to be the organizer, having lost his girlfriend's car payment while gambling. Carpenter allegedly held the victim, a drug dealer, at gunpoint. Carpenter shot the victim in the knee with a shotgun. Then Breeden allegedly stabbed the victim at least 7 times in the chest and neck. Outterbridge then shot the victim in the head. All involved are African-American, except the victims of a violent, but non-fatal, robbery of a white couple using an ATM that resulted in serious injury. The group also committed another robbery. Attorney General Ashcroft required a capital prosecution against Breeden, Carpenter and Cassell. Outterbridge, 19 and the youngest, is a cooperator. Burden has a prior stabbing conviction

**Ayala-Lopez, Carlos L.**
D. PR CR No. 03-CR-55-ALL
Race: H

Robbery of a gun from a Veteran's Administrative Hospital guard and the murder of the security guard. Attorney General Ashcroft rejected a plea agreement calling for a sentence of 35 years to life and required a capital prosecution.

**Fields, Edward**
E.D. OK CR No. 6:03-CR-00073
Race: W

A robbery and multiple murder of a married couple in the Winding Stair Campgrounds on federal land. All involved are white. Fields has no prior criminal record, a good military record and a history of mental illness. Fields had been living in the forest. The district court set a deadline for a decision by the Attorney General on the death penalty. The murders occurred around July 10.

**Le, Cuong Gia**
E.D. VA CR No. 03-CR-48-ALL
Race: A

A Vietnamese American gang member who came to the United States when he was 10 or 11 years old. Le is accused of mulitple (two) murders, shooting at a rival gang member multiple times in a Vietnamese restaurant on May 13, 2001 hitting three people. One died immediately and one died later. The rival gang member survived, identifying Le. Le, a foreign national, fled and was arrested in July of 2003. The court denied a motion to bar the death penalty due to a belated notice of intent.

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

## David Bruck, Dick Burr & Kevin McNally
## Federal Death Penalty Resource Counsel Project

## TOPIC:

## Federal Capital Defendants Who Died Before or During Trial

**Pretlow, Bilal**
D. NJ CR No. 90-CR-238
Race: B

A young black New Jersey gang member committed suicide during his federal capital trial. He had been charged with two cocaine-and marijuana-related murders, one involving a 15-year-old-girl.

**Brown, Terrance**
E.D. MI CR No. 92-81127
Race: B

After a sealed indictment was handed down, an African-American man from Detroit was found murdered in Georgia, shot by other capital defendants, charged collectively with numerous homicides.

**Stephens, Charles Lee**
E.D. TX CR No. 2:99 CR 5
Race: B

Three young black defendants, who are members of the "Crips" gang, were involved in a series of robberies and killings in East Texas. Stephens, 21, Smith, 20, and Tatum, 20, faced the death penalty in both state and federal court for a botched bank robbery. They were accused of a bank robbery and fatally shooting teller Betty Paddle, 61. A 54 year old bank manager, was also shot, but survived. They are also charged with a kidnapping/robbery of a used car dealership (a Hobbs Act count) in which the victim was killed with a gun (a 924(j) count). The victim was a 63 year old retired minister. Stephens and Tatum were charged with another bank robbery in which a teller was killed. Tatum is charged in a November 4, 1998 slaying of Ronnie Dale Ritch, president of the First State Bank in Overton. Stephens and Tatum abducted Ritch, 50. Stephens had a brain tumor and died after surgery. The USA requested permission to seek the death penalty against all three, and was permitted to do so. All three deceased victims were white.

EX 80 - 1390

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

## David Bruck, Dick Burr & Kevin McNally
## Federal Death Penalty Resource Counsel Project

### TOPIC:

## Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons

**Williams, George Travis**
M.D. GA CR No. 1:92-CR-142
Race: B

A black Atlanta drug distributor who had capital charges dismissed in connection with three murders. Mr. Williams was accused of ordering the killing of one person in 1988, and killing two in 1989 and another in 1990. Murder for hire is alleged as an aggravating circumstance. In June, 1994, the district court dismissed the capital charges on double jeopardy grounds, because the government had already secured a conviction and 30-year sentence for much of the alleged drug-related conduct. A government motion to reconsider this ruling was denied. All involved were African-American.

**Garcia, Efraim**
E.D. MI CR No. 97-80727
Race: H

A gang known as the "Cash Flow Posse" charged with various racketeering crimes, including five murders and other assaults. The motive was a dispute over gang territory. Garcia was a 29 year old Columbian national. All the killings but one predate the effective date of the '94 act. Garcia was the only capital defendant. He was charged with personally carrying out all five murders. Garcia was offered a plea to life, signed a Rule 11 plea agreement but the plea agreement broke down during the colloquy in court. The United States then decided to seek the death penalty. However, the district court dismissed the capital count (a racketeering murder) because of an insufficent "Commerce Clause" nexus. 68 F.Supp.2d 802 (E.D. MI 1999). The government decided not to appeal.

**Colon-Miranda, Andres; Martinez-Velez, David; Rosario-Rodriguez, Edwin**
S. D. PR CR No. 95-029 JAF
Race: All H

A judge blocked a capital trial of three Puerto Rican defendants involved in a drug gang homicide. 985 F.Supp. 36; 992 F.Supp. 82. The government initially indicated that authorization would not be sought for a capital prosecution, but then attempted to reverse its position seven weeks before trial. The Attorney General required a capital prosecution. The district court declined to continue the trial and refused, despite the Attorney General's authorization and notice of aggravating circumstances filed shortly before trial, to permit the government to ask for the death penalty.

**EX 81 - 1391**

**Brown, Ricky Lee; Brown, Barbara M.; Ables, Janette A.**
N.D. WV CR No. 1:98CR34
Race: All W

Arson/murder by their parents of five children, after an insurance policy was issued on the dwelling and the Brown's children. Federal charges were based on the use of the mail and phones. However, the capital counts were dismissed after the Supreme Court's decision in United States v. Jones, 592 U.S. 848 (2000). After a non-capital trial, the Browns were acquitted. Ables pled guilty and became a government witness. All involved are Caucasian. State charges were also filed.

**Stewart, Charles Louis**
W.D. KY CR No. 4:99-CR-11-M
Race: W

Involves multiple killings - contract killing of men in Alabama and Kentucky. Lyon, 19, and co-defendant Charles Stewart, 54, are charged with conspiracy and murder for hire. Stewart and Richard Dorman, 62, are charged with being partners in an 18-month forged-check and fraud scheme, using the deceased's identity. Lyon and his deceased father, Stewart's nephew, were hired to murder James Norris in Kentucky. Norris was found under a bale of hay beaten to death in a barn behind his home. Lyon was also hired to kill James Nichols in Alabama, whose body was discovered in 1999 in a partially submerged van. Nichols' 85 year old mother was also in the van, but survived. Co-conspriator Dorman was kidnapped (interstate) and locked into the trunk of a car that was then run into the Green River in Henderson County. He survived to be charged as part of the conspiracy. The elder Lyon committed suicide to avoid apprehension. Stewart was arrested in the Spring of 2000 after appearing on "America's Most Wanted." The Court set a deadline for the Attorney General's decision whether to seek the death penalty. Lyon faced the death penalty but was sentenced to life in prison after his jury was instructed that Stewart would not because the Attorney General took too long to file a notice of intent to seek the death penalty. A third bank fraud victim is missing and presumed dead. Lyon committed an unrelated fourth murder. The Court set a deadline for the Attorney General's decision whether to seek the death penalty. All involved are white.

**Gomez-Olmeda, David**
D. PR CR No. 03-CR-73-ALL
Race: H

A killing during an FBI undercover sting operation involving guns. The victim was an FBI confidential informant who was wired at the time. The FBI witness was shot to death and robbed in an FBI surveillance van. A videotape recorded the murder. The money robbed was FBI money and the car stolen was an FBI car. David Gomez entered into a plea agreement. However, Attorney General Ashcroft rejected a plea agreement and required a capital prosecution.

**Pennington, Tiffany Dominique**
W.D. KY CR No. 01-CR-35-ALL
Race: B

A bank robbery/murder of a white woman by two black defendants. Pennington was the triggerman. Moore provided the gun and was the get-a-way driver. Only Pennington will face the death penalty. He attempted to plead guilty before the government filed a notice of intent

to seek the death penalty, but the plea was rejected and the government filed its notice. Thereafter, his guilty plea was accepted. Since the indictment does not allege Post-Ring "special findings," the District Court dismissed the Notice of Intent to seek the death penalty. A government appeal was dismissed.

**Frye, James Edward**
S.D. MS CR No. 01-CR-8
Race: All B

Involves carjacking and multiple killings of two black victims who were attempting to buy about $30,000 worth of cocaine and were ripped off and killed. Both African-American defendants confessed, blaming the other as the triggerperson. There was a post-mortem attempt to dismember and rebury the bodies. The Notice of Intent to Seek the Death penalty against Frye was dismissed as filed too late. Cooper's life sentence was affirmed. 2003 WL 21672845 (5th Cir.).

**Safarini, Zayd Hassan Abd Latif**
D. DC CR No. 91-CR-504-ALL
Race: AR

One of the four hijackers who used semiautomatic weapons, hand grenades and explosives to take over a Pan Am flight in Karachi, Pakistan in 1986, which left 22 people dead, including 2 Americans of Indian descent. Safarini is a Palestinian.

**Hatten, Charles**
D. DC CR No. 91-CR-504-ALL
Race: W

A drug gun murder of a possible government cooperating witness, a member of a multi-state methampetamine drug trafficking ring. Both the defendant and the victim have substantial criminal records. All involved are white. Attorney General Ashcroft required a capital prosecution but the District Court dismissed the Notice of Intent to Seek the Death Penalty as filed late. A government appeal was dismissed on motion by the Department of Justice.

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

## David Bruck, Dick Burr & Kevin McNally
## Federal Death Penalty Resource Counsel Project

### TOPIC:

### Federal Capital Cases in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty

**Mathis, Ronald Eugene**
M.D. FL CR No. 91-301-CR-T (18) (A)
Race: B

A black Tampa, Florida drug distributor, for having allegedly ordered a murder in retaliation for the theft of drugs. Murder for hire is alleged as an aggravating circumstance. In 1994, the government withdrew its notice of intention to seek the death penalty, and subsequently withdrew the 21 U.S.C. '848(e) homicide count as well. Trial began on the remaining (noncapital) counts and Mathis was convicted. This case had been authorized as a capital prosecution by Attorney General Barr in early 1992.

**Brown, Oliver; Green, William**
E.D. LA CR No. 92-468
Race: All B

Two black New Orleans inner-city gang members, in connection with an allegedly drug-related murder. In 1992, the Government dropped its request for the death penalty in this case. The defendants subsequently entered pleas to conspiracy to murder and a weapons offense in January, 1993. Brown received a 10-year sentence; Green received 15 years.

**Carrington, Arleigh; Chatfield, Tony**
M.D. GA CR No. 92-82MAC-WDO
Race: All B

Two black crack cocaine dealers in Macon, Georgia, in connection with the murders of two other crack dealers. Attorney General Barr authorized this death prosecution in his last week in office. In 1993, the government dropped its request for the death penalty against these two defendants. Both 848(e) murder charges were also later withdrawn, and the defendants subsequently pleaded guilty to various narcotics-related charges.

**Hoyle, Mark; McCollough, John; Goldston, Anthony; Harris, Mario**
D. DC CR No. 92-CR-284-01
Race: All B

Involves multiple killing. Four African-American D.C. residents who were charged with a total of eight murders as leaders of a District of Columbia drug gang known as the Newton Street

Crew. This case involved a triple slaying in which the killers wrapped the victims' heads in duct tape before shooting them at close range. Despite authorization to seek the death penalty by Attorney General Barr in 1992, the government did not ultimately request the death penalty at trial. McCollough participated in five murders. Goldston founded the gang. Hoyle ran the gang. The defendants and victims were all African-Americans.

**Murray, Michael**
M.D. PA CR No. 92-200
Race: B

A member of an African-American gang headed by one Jonathan Bradley, which involved the killing of a black Harrisburg drug dealer. DOJ declined to approve the U.S. Attorney's request to authorize the death penalty against Bradley, who allegedly ordered the killing, and against another participant in the shooting, Emmanuel S. Harrison. In 1994, after jury selection had already begun, Murray was permitted to plead guilty to a term of years, and the government withdrew its request for the death penalty. Judge Sylvia Rambo rejected the recommended less-than-life sentence and the case was reset for trial. In 1995, the Attorney General instructed the United States Attorney not to seek the death penalty on the eve of a capital trial scheduled to begin on the following Monday.

**Thomas, Vernon**
E.D. VA CR No. 3-92-CR- 68
Race: B

The last of the four Richmond, Virginia defendants in the "Newtown gang case." The government dropped its request for the death penalty on the eve of Thomas' separate trial from the other three capital defendants, just before an evidentiary hearing to determine whether the death penalty should be barred because the defendant had mental retardation.

**Tidwell, Tyrone**
E.D. PA CR No. 94-353
Race: B

A 35 year old African-American beauty salon owner who allegedly was a middle man between crack cocaine organizations in New York and Philadelphia. Tidwell solicited the killing of two black men in 1989 and 1991, one for selling crack on "his corner" and a second suspected of stealing drugs. Murder for hire is alleged as an aggravating circumstance. In 1996, the Attorney General authorized the death penalty for the 1989 homicide. However, shortly before the defendant's trial, the U.S. Attorney requested that the death penalty be withdrawn, and the Attorney General approved the request.

**Wyrick, Kevin**
W.D. MO CR No. 94-00194-01
Race: W

When the jury deadlocked on the punishment for the "boss" of a drug ring, Damon Moore, the government announced that it was withdrawing its request for the death penalty for Wyrick, the triggerman.

**Acosta, John Lefty**
D. NM CR No. 95-538-MV
Race: H

Involves multiple killings and murder in the aid of racketeering. The charges involve an L.A. gang, Sureno 13, moving crack and PCP from L.A. to Albuquerque. Among the seven murders connected to the gang one was of a high school student and another was a triple homicide. Five attempted murders were alleged, as well as a conspiracy to kill rival black drug dealers. Authorization was requested and granted by the Attorney General in 1996, for four of six defendants, but the government later withdrew its request for the death penalty as to one, after he was shown to be uninvolved in one of the two homicides originally charged against him. The remaining three entered guilty pleas: Mazzini received 25 years; Najar received 30 years; and De LaTorre received 22 years.

**DesAnges, Omar**
W.D. VA CR No. 95-00046RH
Race: B

The killing of an African-American, apparently a crack addict, who was a state's witness. The government withdrew its intention to seek the death penalty shortly before the scheduled April 1996 trial after the Attorney General declined to authorize the death penalty in an unrelated case in the Western District of Virginia, being prosecuted by the same Assistant United States Attorney. So the United States reached agreement with the defense on the drug distribution charges and agreed the homicide count would be tried as a non-capital case.

**Martin, Roy Ray; Mungia, Eli Trevino; Mungia, Ricky Rivera**
N.D. TX CR No. 5-95-CR- 0017-C (Cummings)
Race: W, H, H (resp.)

In the fall of 1994, three (one white, two Hispanic) young men randomly attacked blacks, killing one and seriously wounding two, in a racially motivated spree in Lubbock, Texas. Authorization was granted by Attorney General Reno in early October, 1995. The district court granted severance and the first defendant was scheduled for trial but the government withdrew the death penalty notice as to all three defendants who were then joined for trial and convicted.

**Peng, You Zhong**
E.D. NY CR No. 95 0870
Race: A

Two foreign national Chinese gang members who kidnaped intrastate Chinese nationals living in the U.S. for ransom to be paid by relatives in China. One victim was raped and severely abused before being strangled after her family failed to pay the ransom demanded. Jia Wu and Fu Xin Chen pled guilty and received life sentences in 1996. Capital authorization against a third defendant, You Zhong Peng, was withdrawn by the Department of Justice just three days before his scheduled 1997 trial.

**Williams, Jerry**
D. MD CR No. WMN 97-0355
Race: B

**EX 82 - 1396**

Involves multiple killings. Williams' co-defendant Anthony Jones faced death penalty for three murders, including an allegation that he ordered his step-brother killed from jail because he feared he was about to become a government witness. Williams was charged as the triggerman in a single homicide. Numerous other homicides were alleged in aggravation as to Jones. The cases were severed. Jones was convicted in 1998, and the jury recommended a life sentence. Thereafter, the government withdrew the request for the death penalty as to Williams, who was convicted and is serving a life sentence.

**Westmoreland, Guy; Lewis, DeAndre**
S.D. IL CR No. 98-30022- WDS
Race: W, B (resp.)

The murder of Debra Abeln in East St. Louis, Illinois, in front of her 12 year old son. Co-defendant Richard Abeln confessed to hiring Deandre Lewis, 23, through Westmoreland, to kill his wife. Murder for hire is alleged as an aggravating circumstance. Abeln faced the death penalty but pled guilty and received a life sentence. All involved are white, except Lewis, who is African-American.

**Marrero, Jose Rodriguez; Pena-Gonzalez, Nicholas**
D. PR CR No. 97-284 (JAF)
Race: All H

A large scale drug conspiracy and two 1996 killings by Valle-Lassalle and one by the others in 1996. The second was a witness elimination -- the government witness was cut up with a machete. Murder for hire is alleged as an aggravating circumstance. The Attorney General required a capital prosecution against all four defendants. All involved are Hispanic.

**Locust, Jeremiah**
W.D. NC CR No. 2:98CR185
Race: NA

The killing of 36 year old, white, National Park Service ranger for the Great Smoky Mountains National Park in 1998 by a Native American who was intoxicated. Locust was threatening visitors to the park with a rifle. Kolodski and other park rangers responded. (Locust fired at another ranger's car smashing the windshield.) Kolodski was wearing a bullet proof vest but the single shot grazed his vest before entering his chest and wounding him fatally. The jury rejected a premeditation theory and the government withdrew its request for the death penalty.

**Perez, Luis Gines; Perez, Ricardo Melendez**
D. PR CR No. 98-164 (DRD)
Race: All H

Drug smuggling and a single homicide of a co-conspirator. The defendants are Hispanic, college educated businessmen. There was a joint plan to kill and Gines was alleged to have shot the victim on Melendez's boat and together they dumped the body. Authorization was withdrawn when a key government witness flunked a polygraph on whether he was the actual killer.

**Best, Jason**
N.D. IN CR No. 2:00CR171RL

**EX 82 - 1397**

Race: B

A 1999 drug trafficking 924 (c) and (j), gang murder. The murder was allegedly revenge for the robbery of drug trafficking proceeds from Best's girlfriend. Best was alleged to be a member of the "Bronx Boys" who was released from prison in 1998 after a two year sentence for cocaine sales. Best pled guilty with others in 1996 after stray shots into a house killed a 10 year old boy in his bed in 1993. The Attorney General required a capital prosecution but eventually allowed prosecutor's to dismiss the murder count after Best was given a life sentence after a separate trial in the drug case. Murder for hire is alleged as an aggravating circumstance. All involved are African-American.

**McMillian, Christopher**
N.D. NY CR No. 3:00 CR-269-ALL
Race: B

Murder during a CCE, involving a drug rip off. Another drug dealer was beaten to death. His marijuana and cash were stolen. The Attorney General required a capital prosecution against three defendants, later withdrawing the notice of intent as to McMillian, who was found to be mentally retarded by both the defense and government experts. All involved are African-American.

**EX 82 - 1398**

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

## David Bruck, Dick Burr & Kevin McNally
## Federal Death Penalty Resource Counsel Project

### TOPIC:

## Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other Than Death

**Culbert, Stacy; O'Bryant, Lonnie; Williams, Michael; Wilkes, Charles**
E.D. MI CR No. 92-81127
Race: All B

Involves multiple killings - an innocent gang member. After insisting for nearly two years he had murdered four people, including a child, the government dismissed capital murder charges against a Detroit man and began prosecuting a co-defendant for the same killing. The AUSA has claimed the gang was connected to "more than 50 murders."

**Johnson, Darryl**
W.D. NY CR No. 92-159-C
Race: B

Involves multiple killings. An African-American from the West Coast charged with two cocaine-related killings by a California and Tennessee connected, Buffalo, New York group, suspected in as many as five other murders. Murder for hire is alleged as an aggravating circumstance. A guilty plea was entered in 1995, on the morning of trial. The defendant was sentenced to life imprisonment.

**Zambrano, Jesus**
E.D. TX CR No. 9:91-CR4
Race: H

A third co-defendant in the Villarreal case who testified against the two brothers at trial.

**Perry, Wayne Anthony**
D. DC CR No. 92-474
Race: B

Involves multiple killings and a hitman for a D.C. cocaine distribution ring between 1989-1991, facing eight homicide counts. Murder for hire is alleged as an aggravating circumstance. In 1994, the defendant pleaded guilty to five homicide counts in exchange for the government's dropping the death penalty. He received five consecutive nonparolable life sentences and was sent to the federal "super max" prison in Colorado, ADX Florence.

**Valle-Lassalle, Victor Manuel**
D. PR CR No. 97-284 (JAF)
Race: H

A large scale drug conspiracy and two 1996 killings by Valle-Lassalle and one by the others in 1996. The second was a witness elimination -- the government witness was cut up with a machete. The Attorney General required a capital prosecution against all four defendants. Murder for hire is alleged as an aggravating circumstance. All involved are Hispanic. Valle-Lassalle received a 40 year sentence.

**Woody, Charles**
C.D. CA CR No. 99-84-AHM
Race: H

One of three related Mexican Mafia cases. A previous case, involving 12 murders and attempted murders, United States v. Alex Aguirre, et al.(C.D. CA CR 95-345(A)-RSWL) was not prosecuted as a death penalty case. The Attorney General required a capital prosecution. One defendant in that case was found not guilty and he is said to have been killed by Woody, 28, in a generational power struggle. Woody was also involved in several murder conspiracies

**Furrow, Buford**
C.D. CA CR No. 99-838 (A) -RAP
Race: W

The racially motivated shooting and killing of an Asian (Filipino) postal worker in 1999. Furrow, 37 and Caucasian, is alleged to be a member of the Aryian Nation. He also walked into a Jewish Community Care Center and shot five people, including three children. Furrow then carjacked a Toyota. Furrow described this attack as "a wake up call to America to kill Jews."

**McCauley, Donzell**
M. D. DC CR No. 94-121
Race: B

A young black man from the District of Columbia who struggled with and shot to death a police officer. Attorney General Reno required a capital prosecution for the murder of a white law enforcement police officer despite the U.S. Attorney's initial decision that the death penalty not be sought. This authorization marked the first time in the post-Gregg era of capital punishment that the Attorney General required a capital prosecution in a federal criminal case despite the initial opposition of the local U.S. Attorney. Subsequently, the defendant entered a plea of guilty and was sentenced to life imprisonment.

**Vest, James; Vest, Mark; Vest, Steven**
W.D. MO CR No. 94-00037-04
Race: All W

Involves multiple killings - three white brothers from Kansas City who were approved for a capital prosecution in 1994. They were charged with the well- planned double homicide of two Mexican drug dealers. Graves were dug and the victims abducted and bound with duct tape, suffocating to death. A fourth brother, Darrell Vest, did not face the death penalty. One defendant was also charged with a separate murder count in another drug rip-off. Guilty pleas were negotiated for all three.

**Bonds, Andre**
E.D. MO CR No. 4:95CR332
Race: B

A black teenager in a cross-racial car jacking case involving an 18 year old African-American defendant (and his 16 year old co-defendant) who allegedly killed one white female, took her car across state lines, kidnaping and raping her girlfriend - another Caucasian. Mr. Bonds pled guilty in 1996 and was sentenced to life imprisonment. The victim was white.

**Chen, Fu Xin; Chen, Jia Wu**
E.D. NY CR No. 95 0870
Race: All A

Two foreign national Chinese gang members who kidnaped intrastate Chinese nationals living in the U.S. for ransom to be paid by relatives in China. One victim was raped and severely abused before being strangled after her family failed to pay the ransom demanded. Jia Wu and Fu Xin Chen pled guilty and received life sentences in 1996. Capital authorization against a third defendant, You Zhong Peng, was withdrawn by the Department of Justice just three days before his scheduled 1997 trial.

**Damon, Marvin; Williams, Robert Russell**
E.D. VA CR No. 3:95CR45
Race: All B

Two members of a drug ring, from Richmond, Virginia, African-American, 52 and 30 years old, charged with the distribution of heroin, mainly in one housing development in Richmond where another African-American was shot to death in 1994 by Damon, at co-defendant Williams' request. The government alleged numerous other homicides committed by Damon as Williams' enforcer. Murder for hire is alleged as an aggravating circumstance. Damon agreed to plead guilty, attempted suicide and finally entered a plea. Williams pled guilty after a jury was seated

**DeLaTorree, Jason; Mazzini, Marcos; Najar, Vincent**
D. NM CR No. 95-538-MV
Race: All H

Involves multiple killings and murder in the aid of racketeering. The charges involve an L.A. gang, Sureno 13, moving crack and PCP from L.A. to Albuquerque. Among the seven murders connected to the gang one was of a high school student and another was a triple homicide. Five attempted murders were alleged, as well as a conspiracy to kill rival black drug dealers. Authorization was requested and granted by the Attorney General in 1996, for four of six defendants, but the government later withdrew its request for the death penalty as to one, after he was shown to be uninvolved in one of the two homicides originally charged against him. The remaining three entered guilty pleas: Mazzini received 25 years; Najar received 30 years; and De LaTorre received 22 years

**Fleming, Lamont; Gist, Cory**
E.D. NC CR No. 4:95-CR-41-1-H-2
Race: All B

**EX 83 - 1401**

Involves multiple killings and a crack cocaine conspiracy alleging four 1995 murders by an African-American gang originating in Brooklyn, New York. Fleming, Gist and co-defendant Linton were triggermen. DOJ did not authorize capital prosecutions against four other defendants, including Linton. Guilty pleas were entered by the two capital defendants who were charged in two murders. The two capital homicides involved the separate murders of two participants in a prior drug-related murder. All involved are black. Attorney General Reno required a capital prosecution as to Gist.

**Haworth, Richard; Spivey, Everett**
D. NM CR No. 95-491 LH
Race: All W

Haworth was the leader of a New Mexico drug trafficking conspiracy, during the course of which he murdered at least three individuals (two Hispanic, one Anglo). The government dropped its request for the death penalty in exchange for his plea and a life sentence on the eve of his scheduled trial in February, 1997. After six weeks of jury selection, the government accepted Spivey's guilty plea to a single homicide count and a 30-year sentence. Both Haworth and Spivey are white.

**Beckford, Devon Dale**
E.D. VA CR No. 3:95CR00087
Race: B

Involves multiple killings. Another New York - Richmond cocaine connection was uncovered which involved members of a Brooklyn gang, all African-American, who transported crack cocaine to Richmond, Virginia. The 32-count indictment charged five of the alleged members of the so-called "Poison Clan" with capital murder in six killings, two in 1988 and four in 1994. (Devon Dale Beckford, 33, identified by the FBI as a gang leader was not arrested until July, 1997.) Murder for hire is alleged as an aggravating circumstance. After a seven-week trial, a jury declined to impose the death penalty on all four defendants: Dean Beckford, 32, Leonel Romeo Cazaco, 22, Claude Gerald Dennis, 28 and Richard Thomas, 22. Dean Beckford and Claude Dennis were found guilty of the 1998 double murder. (Dennis had previously been acquitted on these charges in state court in 1989.) Cazaco and Thomas were also convicted of a capital charge. Thomas had been acquitted in state court on the one homicide count on which he was convicted in federal court.

**Bennett, Daniel Ray; Stanley, Edward**
C.D. CA CR No. 96-1140(A)-ER
Race: All B

An African-American drug boss and a hitman. United States v. Daniel Ray Bennett and Edward Stanley (C.D. CA CR No. 96-1140(A)). In this first Ninth Circuit case to be authorized for death penalty prosecution, Stanley was accused of hiring Bennett to murder a former member of Stanley's drug trafficking operation in Las Vegas, Nevada. Murder for hire is alleged as an aggravating circumstance. Government court filings indicated that the murder conspiracy was monitored by wiretap. Both pled guilty. Attorney General Reno required a capital prosecution.

**Cable, Donald Thomas; Holloway, Tim**
M.D. TN CR No. 3:96- 00004
Race: All W

The 1995 killing of a federal grand jury investigation witness two days before her testimony. The female victim was in her early 40's and white, as are all the defendants. Cable was the triggerman who is said to have stabbed the victim to death. Dugger hired Cable after one David Day, the government's key witness, hired Dugger on behalf of a large-scale methamphetamine dealer, Tim Holloway. Dugger was in poor health (a recent liver transplant) and allegedly incompetent. Day received a 20 year sentence as a government witness.

**Clary, Moses**
D. NJ CR No. 96-576 (Rodriguez)
Race: B

A 19-year-old African-American defendant with a history of mental illness was charged with complicity because his deceased co-conspirator shot a security guard during a robbery of an armed car in a suburban Camden, N.J. shopping mall. The male victim was black and seventeen. A white bystander, a 14 year old girl, was accidentally shot and killed by the security guard during the robbery. Clary accepted an offer of life in 1998, attempted to withdraw it, and was refused

**Cuff, John: Heatley, Clarence**
S.D. NY CR No. 96 CR 515 (MJW)
Race: All B

Involves multiple killings in a CCE prosecution of the leaders of a drug organization which operated in the Bronx and Manhattan for a decade. Heatley, 43, ordered 14 homicides, admitting involvment in 13, ten of which were carried out by Cuff, who acted as Mr. Heatley's bodyguard and driver. Cuff had been a housing police officer from 1982 until 1986. Heatley pled guilty in return for a life sentence. On the 1999 trial date, Cuff also pled guilty. He also received a life sentence. Heatley has a serious history of crimes of violence, but was previously acquitted four times in state court trials.

**Kaczynski, Theodore John**
E.D. CA CR No. S-96-259
Race: W

The Unabomber case. The defendant faced capital indictments in two federal districts, Eastern District of California and District of New Jersey, for terrorist mail bombings over a period of 18 years. Three men were killed, in California and New Jersey, and 29 were injured, including one man whose arm was blown off and another who lost a hand. A plea was negotiated as opening statements were about to commence and after a BOP psychiatrist had confirmed defense experts' findings that the former Berkeley professor suffered from paranoid schizophrenia. Kaczynski tried, but failed, to withdraw his guilty plea. 2001 WL 114688 (9th Cir. 2001). He remains at ADX Florence

**Montanez, Ian Rosario**
D. PR CR No. 96-001 (PG)
Race: H

The first death penalty case to be authorized in a Puerto Rico federal court. The Attorney General required a capital prosecution against the alleged triggerman in a bank robbery during which a security guard was killed and several bystanders injured. Montanez pled guilty in April

**EX 83 - 1403**

1998 to a less-than-death sentence.

**Ortiz-Velez, Felix; Otero, Julio**
M.D. PA CR No. 3:CR-96- 005 (Rambo)
Race: All H

Two drug-related murders, one involving torture. Murder for hire is alleged as an aggravating circumstance. Ortiz pled guilty to being an "enforcer," acting on the instructions of Mr. Otero, who also pled guilty. Otero's homicide counts were dismissed although both received life sentences, Otero on the drug case.

**Storey, Gregory**
D. KS CR No. 96-40018-01-OES
Race: W

A white prison inmate who killed another white prisoner at the United States Penitentiary at Leavenworth. Storey may have had Aryan Brotherhood ties. The death penalty was initially sought. However, the prosecution ended in a negotiated guilty plea to second degree murder in 1997. Storey was sentenced to 327 months, to run consecutive to sentences imposed in Nevada and Colorado. He subsequently was charged in a nationwide Aryan Brotherhood RICO indictment in Los Angeles.

**Walter, Abram**
D. AK CR No. F96-026 (HRH)
Race: W

A white survivalist, charged with the robbery murder of a native Alaskan storekeeper whose remote outpost in a roadless Alaskan wilderness served as a U.S. Post Office. The Attorney General required a capital prosecution.

**Frank, Deric**
S.D. NY CR No. 97 CR 269 (DLC)
Race: B

Domestic killing - the March 11, 1997 intrastate kidnaping of the (former) girlfriend of co-conspirator, turned government wirness, Deric Frank, from Stamford, Connecticut. The defendants assaulted her and took her to the Bronx where she was burned alive in the trunk of her car. There were multiple orders of protection of the deceased due to repeated domestic violence complaints against Frank. Both the defendants, and the victim, 24, are black. Deric Frank was authorized for a federal capital prosecution, pled guilty and became a witness against Bailey. Bailey was sentenced to life in prison, but did not face the death penalty. All involved were African-American.

**Holland, Charles**
N.D. AL CR No. 96-B-0208-NE
Race: W

The 1991 killing of an informant in a drug conspiracy case who had been given a new identity and sent out of state. However, he returned and was spotted at a flea market in Ft. Payne. The drug ring boss, Marvin Holley, and Mr. Holland kidnaped the victim and killed him with

a hammer. Holley's trial in 1998 resulted in a life sentence. All involved are white.

**Lam, Tanh Huu**
E.D. CA CR No. S 97-054-WBS
Race: A

The throwing of a Molotov cocktail through a dining room window. One victim, a 9 year old Asian female, was killed. Others were injured. The target was alleged to be a man who had an affair with Lam's wife. There were two cars seen at the time of the bombing. Authorization for Lam was initially not sought or granted. The jury deadlocked at Lam's first trial. The government then produced a new witness who tape-recorded Lam talking about setting up another arson. The Attorney General gave the go-ahead to seek the death penalty at a retrial, but a conditional guilty plea was entered. Federal jurisdiction is based on the happenstance that an apartment building was bombed. All involved were Vietnamese.

**Reader, Arthur Charles**
E.D. TX CR No. 5:97 CR 15
Race: B

The abduction of a 27 year old African-American female by her 35 year old African-American boyfriend in Texarkana, Texas. After crossing the line over into Texarkana, Arkansas, the victim was stabbed eighty four times, hit in the head with a brick and left to die. The defendant allegedly would not tell law enforcement officials where she was because he wanted her to die.

**Wooldridge, Steven**
W. W.D. AR CR No. 4:97 CR 40013-001
Race: W

A Ft. Smith, Arkansas kidnaping, sexual attack and murder. Wooldridge asked for directions from the female victim in her front yard in Texarkana, Arkansas. He then forced her into his vehicle and took her to a storage shed in Texas where he may have sexually assaulted her. Eventually, Wooldridge took his victim to another location and killed her. Wooldridge confessed, denying sexual assault. All involved are white.

**Black, Douglas; Riddle, Steven**
D. CO CR No. 98-CR-196
Race: All W

Two "super-max", Florence, Colorado inmates, who attacked two suspected snitches. One inmate, an ex-police officer, was murdered. Another inmate survived the attack. The stabbing was witnessed by prison staff who were assaulted when they tried to get co-defendant Riddle off the victim. The United States Attorney did not seek permission to ask for the death penalty but the Attorney General required a capital prosecution. Riddle negotiated a 168 month cap. Black agreed to plead to aggravated assault in return for a sentence of no more than 84 months. Black had a prior murder. Riddle had a record of crimes in and out of prison. Riddle was sentenced to 120 consecutive months. Black's sentence was 78 consecutive months.

**Kauffman, Christopher; McMahan, Jamie**
S.D. IA CR No. 97 Wolle
Race: All W

Two carjackings/murders, a bank robbery and interstate flight by two young, white step-brothers. Two white women were murdered in their homes and their cars were used in the robbery of $70,000 from a bank. Each brother was a triggerman. The United States Attorney and defense counsel negotiated plea agreements shortly after the Attorney General required a capital prosecution.

**Llamas, Tamara; Wakefiled, Jimmy**
E.D. NC CR No. 7:97-CR-63-1-H
Race: All W

A murder-for-hire of an informant in a marijuana conspiracy. Llamas, a white female, allegedly ordered the killing of a drug informant. The triggerman was Wakefield. The drug informant was carelessly named in a warrant, and was murdered a month later. The marijuana conspiracy involved North and South Carolina, Texas and Oregon.

**Pena, Richard**
E.D. LA CR No. 97-CR- 145-ALL
Race: H

Involves multiple killings and the prosecution of an alleged cocaine drug lord (Richard) and his brother (Johnny). Richard Pena, a 32 year old Dominican Republican foreign national, who became an American citizen in 1994, was a drug kingpin of a group that moved large amounts of cocaine and marijuana in Southeastern United States. Murder for hire is alleged as an aggravating circumstance. This group involved numerous family members and a New Orleans police officer. Richard Pena was charged with eight homicides, four approved as capital counts by the Attorney General. Pena, himself, committed two of the murders, and ordered the death of the others. A non-capital co-defendant was an ex-police officer who arrested one victim in August of 1995 and delivered him to Pena and two associates. His remains were found two months later. Pena pled guilty and received a sentence of life without release.

**Rausini, Walder Pierre**
N.D. CA CR No. 95-0319- SI
Race: H

Involves the murder of the head of a "Continuing Criminal Enterprise." Lance Estes, a 34 year old white male, had been involved in drug trafficking for many years and had taken over a CCE, whose head had gone to prison. Charged with involvement in this CCE, Estes worked out a deal as an informant for the government but continued to direct his drug enterprise. Rausini was alleged to be working as a "cook" in the Estes organization, converting methamphetamine into "ice." He ordered the murder of Estes in an effort to take over Estes' organization. A co-defendant shot Estes, whose body turned up after Labor Day 1995 in a dumpster in Oceanside with a single gunshot wound to the head. Rausini is also accused of ordering a second murder of another member of the of the CCE because of his plans to become a government informant. Another co-defendant was the killer in this murder. Rausini was 26 years old at the time of the murders with which he is charged and had no serious prior convictions. Murder for hire is alleged as an aggravating circumstance. The government did not seek the death penalty against Rausini's codefendants. Rausini is a Brazilian foreign national of mixed race. The victims are both white.

**Abeln, Rick**

S.D. IL CR No. 98-30022- WDS
Race: W

The 1997 murder of Debra Abeln in East St. Louis, Illinois, in front of her 12 year old son. Richard Abeln and co-defendant Guy Westmoreland were indicted for conspiracy to distribute marijuana and cocaine, as well as the killing of Mrs. Abeln. Mr. Abeln confessed to hiring Deandre Lewis through Westmoreland to kill his wife. It was alleged that Mrs. Abeln was killed to cover up drug trafficking. Deandre Lewis has been identified as the gunman. Lewis' motivation was said to be a drug debt. Westmoreland was initially not authorized for a capital prosecution, but after Abeln's guilty plea, Westmoreland and Lewis were charged in a superseding capital indictment. Murder for hire is alleged as an aggravating circumstance . All involved are Caucasian, except Lewis, who is African-American.

**Rollack, Peter**
S.D. NY CR No. S4 97 CR 1293
Race: B

Eight racketeering murders between 1994 and 1997 by a gang headed by Rollack called "Sex, Money and Murder" which later affiliated itself with "the Bloods." Rollack approved a Thanksgiving 1997 double killing and personally killed four others, including a witness to another homicide. One victim in the Thanksgiving shooting was thought to be a witness in a North Carolina drug enterprise prosecution against Rollack, but actually was not. Only Rollack was targeted, and authorized for, a federal capital prosecution. All involved were African-American, or Hispanic. On January 3, 2000, just before jury selection was to begin, the defendant entered a guilty plea in exchange for a life sentence. He was sent to "super-max," with severe restrictions on who he may communicate with.

**Dean, Chris**
D. VT CR No. 2:98M0021
Race: W

A mail bomb which killed a 17 year old Vermont man and disfigured his mother. The bombing was motivated by an internet dispute involving the deceased's fraudulent behavior. All involved are white. The United States Attorney did not request that this be a capital prosecution, but the Attorney General required a capital prosecution. Main Justice disagreed. Both the defendant and his victim were white. Dean pled guilty in September of 1999 and was sentenced to life.

**Santiago, Jose**
S.D. NY CR No. 98-CR- 290
Race: H

Two- count RICO indictment charging murder in aid of racketeering. The defendants are members of the Latin Kings. Hector Colon put out a "terminate on sight order on the deceased." The victim had stabbed Colon after an argument over a girl. Santiago entered the victim's apartment alone, with a gun provided by another gang member, Angel Lugo, and shot the victim in front of his family, including two young children. Colon was killed in September of 1999 in a shootout with the FBI. The Attorney General required a capital prosecution against Santiago alone. The government first announced that Lugo (the superior who ordered the killing) would face the death penalty but decided to file a "notice" only as to Santiago. Santiago agreed to a 50 year sentence.

**EX 83 - 1407**

**Chong, Richard Lee Tuck**
D. HI CR No. 98-00416 ACK
Race: A

A defendant originally indicted in the State of Hawaii for murder and various firearms violations. He fled the jurisdiction. A federal prosecution under 18 U.S.C. §924(j), use of a firearm to commit a drug related murder, was filed. The 47 year old Chong has a lengthy record of convictions for serious offenses and a violent prison record, including sodomy/assault with an ice pick and starting a fire. He had only been recently released when he allegedly shot the victim over a $100 drug debt. The defendant is Asian and the victim is Hawaiin. Chong entered a guilty plea and was sentenced to life in prison.

**Lane, Robert**
D. MD CR No. L-98-73
Race: B

A series of carjackings, culminating in a cross-racial murder where the 86 year old victim apparently resisted and was beaten with a hammer or lead pipe on the head and killed by Lane who had been released from prison after abducting a woman. Lane faced the death penalty but was allowed to plead guilty.

**Bullock, Joseph**
E.D. VA CR No. 3:98CR150
Race: B

Involves multiple killings and another Richmond, multi-defendant, multiple murder, drug conspiracy prosecution ... this one involving four killings in 1993 and 1994. Two co-defendants, Hickman and Lightfoot, agreed to plead guilty before authorization was considered. Another co-defendant, Robert Lavelle Weaks, was not the target of a request to seek the death penalty and was not authorized for a capital prosecution.

**Glover, Cody**
D. KS CR No. 98-10059-01-MLB
Race: B

Another Kansas Hobbs Act prosecution involving a robbery/murder in a convenience store. Glover, who is black, confessed to entering the store, demanding money and then attempting to execute the two white store clerks who did not resist, killing one employee and critically wounding a second. Co-defendant Mark Holley admitted he was to receive part of the robbery proceeds for being the getaway driver. Holley was not authorized for a capital prosecution but Glover faced the death penalty for use of a gun during a crime of violence, although the United States Attorney apparently did not request authority to seek Glover's execution. The Attorney General required a capital prosecution. Glover pled guilty in April 1999 and received a life sentence

**Kee, Charles Michael**
S.D. NY CR No. 98 Mag 1603
Race: B

A Bronx gang member who attempted to extort money to repay a debt by keeping a female

**EX 83 - 1408**

juvenile hostage. A few days later, the girl's boyfriend was murdered by a juvenile in Kee's presence. Kee was a "Bloods" gang leader, organizing juveniles to commit crimes. The United States Attorney did not request permission to seek the death penalty, but the Attorney General required a capital prosecution.

**Aiken, Ian Orville**
S.D. FL CR No. 97-233-CR- GOLD
Race: B

Involves multiple killings and a racketeering indictment against a gang known as the "Moscow Posse," who engaged in acts of violence, including murder, robbery, kidnapping, witness tampering, narcotics trafficking and extortion. Ian Aiken, the kingpin, and Oliver Lyons were accused of murdering Derrick Christian in New York City on October 27, 1995. Roland Aiken, Daniel Aiken and Eric Morris are accused of gunning down Desmond LaTouch in a Florida parking lot the next day, at Ian Aiken's request. Aiken also faced state murder charges in Miami. (The Moscow Posse was being investigated by authorities since the massacre at the Taste of the Islands restaurant, where four people died and 18 others were wounded in a gang shootout in August of 1992.) It is alleged in aggravation that Aiken was involved in a total of four murders, an attempted murder, a burglary, a robbery and a kidnapping. There may have been as many as 15 homicides alleged. Only Aiken faced the death penalty

**Burgett, James Harold**
W.D. TN CR No. 98-20160- G
Race: W

A witness killing. Burgett killed his ex-wife because she helped authorities arrest him for making pornographic tapes of his 3 year old daughter. When Burgett found out she secretly tape-recorded him, he shot and killed Diane Wilcox and wounded his 18 year old step-daughter while on bail awaiting a 27 months prison term for child pornography. State capital charges were dismissed although Burgett pled guilty in a separate statutory rape state case. Both Burgett and Wilcox are white. Burgett pled guilty and was sentenced to life in prison

**Lawrence, Jonathan Huey; Rodgers, Jeremiah**
M. N.D. FL CR No. 3:98CR73 (RV)
Race: All W

An apparently motiveless murder on federal property. The defendants met while in a state prison mental health facility. The government's theory was that this was a thrill killing. Rodgers allegedly shot a man through a window a month later. All parties are white. The Attorney General required a capital prosecution. Both Lawrence and Rodgers pled guilty in exchange for the government's agreement not to seek the death penalty. Both subsquently received the death penalty in state court.

**Gomez, Edsel Torres**
D. PR CR No. 98-72
Race: H

Involves multiple (seven) killings in a cocaine and heroin trafficking conspiracy. In the "Cayey Massacre," four men were tortured and murdered. Later, three other men were shot and killed in two incidents. Gomez, one of Puerto Rico's major drug dealers, agreed, in concert with another drug dealer, to eliminate various competitions who were trying to take over Gomez's

market. Gomez was the only defendant authorized for a capital prosecution. Three co-defendants, including one accused of murders in 1991 and 1993, did not face the death penalty. Murder for hire is alleged as an aggravating circumstance. All persons involved are Latino.

**Nieves-Alonso, Heriberto**
D. PR CR No. 97-284 (JAF)
Race: H

A large scale drug conspiracy and two 1996 killings by Valle-Lassalle and one by the others in 1996. The second was a witness elimination -- the government witness was cut up with a machete. Murder for hire is alleged as an aggravating circumstance. The Attorney General required a capital prosecution against all four defendants. All involved are Hispanic.

**Clemente, Louis**
M.D. FL CR No. 98-436 CRT 26B
Race: H

Involves multiple killings - the murder of two suppliers to whom Clemente owed $35,000 for methamphetamine. The government had initially sought the death penalty against Clemente, and had said they would seek the death penalty against the two shooters, only one (Hernandez-Miranda) of whom was arrested. Duran and Krammer claim they were outside when the shooters went into the victims' house. The shooters disposed of the bodies in an orange grove. Clemente allegedly provided the bleach to clean the house and paid the shooters, who fled. Duran has a domestic battery conviction. Clemente has claimed that Duran, his uncle, is the main instigator of the murder.

**Cooper, Carl Derrick**
D. DC CR No. 99-0266 (Green)
Race: B

Three charges of felony murder. Cooper, 29, confessed in writing to shooting three employees, 25, 24 and 18, in a failed robbery attempt of Starbucks Coffee Shop. Cooper claimed in his confession to police that he had a struggle with the shop's manager. She apparently was shot while attempting to flee after being unable to open the safe. Cooper was also arrested in connection with the 1996 wounding of an off- duty Prince George's County police officer during an attempted robbery. Cooper is black and two of the three victims are white. The government also alleged a 1993 armed robbery and murder of a security guard, three 1989 armed robberies, three 1996 armed robberies, a 1997 armed robbery, various conspiracies to rob and various shootings. The Attorney General required a capital prosecution.

**Friend, Travis; Friend, Eugene**
E.D. VA CR No. 3:99CR201
Race: All B

The carjacking of a Chinese truck driver, who was murdered by out-of- work African-American truckers, who wanted to make off with the truck and its cargo. A third brother, a juvenile, 15, as well as the mother and a girlfriend are also involved but do not face the death penalty. Both defendants pled guilty. Eugene may have been involved in a second homicide.

**Carpenter, Robert L.; Carpenter, Antonio**
W.D. TN CR No. 99-20155
Race: All B

A cross-racial carjacking case in a suburb of Memphis. The victim was a 63 year old white female and the carjacking occurred "in broad daylight at noon" at a Sonic "drive-in." The defendants were 18 and 19 and African-American. A third, uncharged defendant was a juvenile. The Carpenter brothers plead guilty during jury selection. They were tried in Tennessee state court and sentenced to life in prison.

**Kendall, Michael Robbie**
N.D. MS CR No. 3:99CR102
Race: W

The murder of an Ole Miss senior accountancy major in 1999. Lowery was shot at Puskus Lake. Others were in the line of fire.

**Llera-Plaza, Carlos Ivan; Acosta, Wilfredo Martinez; Rodriguez, Victor**
E.D. PA CR No. 98-362
Race: All H

Involves a Puerto Rico/Philadelphia cocaine connection between 1996-1998 and multiple (four) murders for hire, three in Pennsylvania and one in Puerto Rico. Rodriguez allegedly ran the organization with a fugitive named Cacerez. Two victims were suspected of carjacking a courier and stealing cocaine. A $25,000 contract was allegedly offered but an innocent victim was mistakenly killed in Puerto Rico. One suspect was located in Philadelphia and two Hispanic males, ages 29 and 17, were killed. The 17 year old was an innocent victim, the high school student nephew of the target. Later, the second target was located and killed. Martinez-Acosta, 21, allegedly did the shooting in the first three, on orders of the alleged kingpin Rodriguez. Llera-Plaza was allegedly the middle-man in arranging the killings and the driver. The triggerman in the fourth killing is a principal government witness. The governement seeks the death penalty against Rodriguez in four killings, Llera-Plaza in three and Martinez-Acosta in two. Attorney General Ashcroft approved plea agreements for Llera-Plaza and Martinez-Acosta, specifying life sentences. Judge Pollak then declared a mistrial for Rodriguez. All involved are Hispanic.

**Stayner, Cary**
E.D. CA CR No. CR-F-00- 5217 AWI
Race: W

Involves multiple killings - four homicides in two separate incidents in Yosemite National Park. Stayner, 37 and a motel handyman, confessed to the (intrastate) kidnapping, sexual assault and decapitation killing of a park naturalist. He also confessed to killing three sightseers, a mother and two teenage girls, five months earlier. There were initially arrests of ex- convicts for the killing of the sightseers. Stayner's brother was a highly publicized kidnap victim in 1972. All involved are white. He faces the death penalty in state court

**Satcher, Steve**
D. MD CR No. AW00-0105
Race: B

A domestic killing - the carjacking, interstate kidnapping and murder of the mother of Satcher's child. Satcher engaged the services of co-defendants Horton and Stancil for one-half kilogram of cocaine. They abducted the victim and took her from Maryland to North Carolina in the trunk of her car. She was strangled and beaten. Horton and Stancil doused the car with gasoline and ignited it. Murder for hire was alleged as an aggravating circumstance. All three defendants are African-American, as is the victim. Stancil became a government witness. Attorney General Reno refused a request to seek the death penalty against Horton. Attorney General Ashcroft approved a plea agreement to a life sentence.

**Pham, Trung Thanh**
E.D. CA CR No. 00-CR-411-ALL
Race: A

The throwing of a Molotov cocktail through a dining room window allegedly by Pham. One victim, Hien Tran, a 9 year old Asian female, was killed. Others were seriously injured. The target was a man who had an affair with co-defendant Lam's wife. Authorization for Lam was initially not sought or granted. The jury deadlocked at Lam's first trial. The government produced a new witness who said Lam ordered the firebombing. Attorney General Reno gave the go-ahead to seek the death penalty at a retrial, but a guilty plea was entered. Later, the government decided to seek the death penalty against Pham, who, along with two others, was allegedly paid to do the firebombing. Federal jurisdiction is based on the happenstance that an apartment building was bombed. Attorney General Ashcroft later approved a plea agreement with Trung Pham who received a life sentence with a possible Rule 35 reduction to 30 years. Tu Trong and Quac Pham did not face the death penalty. All involved are of Asian descent.

**Lallamand, Sienky**
N.D. IL CR No. 00 CR 143
Race: B

Mr. Lallamand is accused under 18 U.S.C. §2232(a) with constructing a pipe bomb and delivering it to the victim who was married to a woman with whom Lallamand was having an affair. The defendant and the deceased are African-American. Lallamand defrauded the deceased of $200,000 using the victim's identification. A plea agreement was reached but the defendant withdrew. The Attorney General required a capital prosecution. Attorney General Ashcroft approved a plea of guilty with a life sentence. The victim was African-American.

**Wilson, Bryant Lakeith**
W.D. TN CR No. 01-20041-DV
Race: B

A bank robbery in which a 79 year old white woman was killed in front of her daughter. This was the last in a series of eight such heists from Houston to Memphis. The defendants are African-American. Attorney General Ashcroft required a capital prosecution against Wilson, but then approved a plea agreement specifying a life sentence, the same agreement reached in state court.

**Shorter, Ramon Lori**
W.D. TN CR No. 01-20041-DV
Race: B

A bank robbery in which a 79 year old white woman was killed in front of her daughter. This was the last in a series of eight such heists from Houston to Memphis. The defendants are

African-American. The Attorney General approved a plea agreement specifying a life sentence, the same agreement reached in state court

**Millegan, Rufus Jerry, Jr.**
D. MD CR No. 01-CR-367-ALL
Race: B

Shooting of a white woman at a secluded location on federal land. The victim was shot repeatedly with two different types of ammunition. There are signed confessions by both defendants. Millegan confessed that he committed the murder, along with McClure, both shooting the victim with their weapons. McClure wrote that he told Millegan they should "press her" about the robbery. The deceased was taken to a road on federal land in Beltsville, where both allegedly shot her. The defendants are black. The alleged motive was a belief that the victim had some involvement in the burglary of Millegan's apartment. The Attorney General required a capital prosecution, but then approved a plea agreement specifying a life sentence.

**Maxwell, William**
W.D. TN CR No. 01-CR-20247-ALL
Race: B

A bank robbery resulting in the death of a black female employee of Union Planters Bank. A security guard was also shot in the face by Johnson, but survived. The defendants are African-American. Haynes was a shooter. The state and federal government both sought the death penalty against Haynes and Maxwell but not against Johnson who may be retarded. A federal jury sentenced Haynes to life imprisonment. After this verdict, Attorney General Ashcroft reversed his position and approved a plea agreement specifying a life sentence for Maxwell