*UNITED STATES v. LEZMOND CHARLES MITCHELL*
CV09-8089-PCT-MHM(MEA)

EXHIBITS IN SUPPORT OF
MOTION TO VACATE SENTENCE

**DECLARATIONS AND TESTIMONY**

114.  Declaration of Ruth Roessel, 5/31/2009

115.  Declaration of Celia Rumann, 6/3/2009

116.  Declaration of Tammy Rose Sebahe, 5/30/2009

117.  Declaration of Donnarae Sowell, 5/16/2009

118.  Declaration of Cheryl Tsosie, 6/1/2009

119.  Declaration of Herman Tsosie, 6/1/2009

120.  Declaration of Celestial Wilson, 5/14/2009

121.  Declaration of Sonja Halsey, 6/6/2009

122.  Declaration of Richard Burr, 6/5/2009

123.  Declaration of Debra Garvey, 6/8/2009

124.  Declaration of Kevin McNally re Race, 6/8/2009

125.  Declaration of Kevin McNally re Innocence, 6/8/2009

126.  Declaration of Ken Murray, 6/8/2009

**DECLARATION OF RUTH ROESSEL**

I, Ruth Roessel, hereby declare as follows:

1. My name is Ruth Roessel. I am the Director of Navajo Studies at Rough Rock High School, in Rough Rock, Arizona, on the Navajo Reservation. I have been the Director for thirteen years. My husband is Robert "Bob" Roessel; he died in 2006.

2. Our home is about ten miles from George Mitchell's home, near Lukachukai, on the Reservation. I did not know Lezmond Mitchell, his mother Sherry, or his grandparents Bobbie Jo and George Mitchell, beyond very general information.

3. An investigator of the Office of the Federal Public Defender contacted me recently regarding Lezmond Mitchell. She explained that her Office represents Mr. Mitchell in federal court proceedings regarding his conviction and death sentence. Before I testified at Lezmond Mitchell's trial, I understand from the investigator that someone from his defense team interviewed me. I have no memory of that specifically, I believe that I was only present during the interview of my husband. As for my testifying at Lezmond Mitchell's trial, I remember that someone called my husband who then told me that we were both testifying at the trial. My husband told me this the day before we were to testify. No one from Mr.

1

R.R.

EX 114 - 1594

Mitchell's defense team prepared me for my testimony, nor did I even know what questions to expect during my testimony.

I declare under the penalty of perjury and the laws of the United States of America, that the foregoing is true and correct.  Signed this __31__ day of May, 2009.


_____
RUTH  ROESSEL

2

EX 114 - 1595

## DECLARATION OF CELIA M. RUMANN

I, Celia M. Rumann, hereby declare as follows:

1)      My name is Celia M. Rumann.    I am an Associate Professor of Law in Arizona.    Until 2008, I was a Deputy Federal Public Defender with the Office of the Federal Public Defender for the District of Arizona.    While I was at the Federal Public Defender's Office, I was Lezmond Mitchell's appellate counsel, *United States v. Mitchell*, 9th Cir. Case No. 03-99010 (D. Ariz. No. CR-01-1062-PCT-MHM), along with Michael O'Connor, Esq.    Michael O'Connor is also my spouse.

2)      In 2007, when Michael O'Connor and I represented Mr. Mitchell, I learned that another Deputy Federal Public Defender in my office, Karen Wilkinson, had to withdraw from a case because she had learned that her client had some relationship to the *Lezmond Mitchell* case.    I don't remember how I learned of the issue.

3)      After I learned this information, I was worried that it might present a problem for Mr. Mitchell, so first I spoke with Michael O'Connor about it and we decided we would try to learn more about the issue to assess whether there was a need for me to withdraw.

*CMR*
<u>C.M.R.</u>

1

EX 115 - 1596

4)    On August 6, 2007, I sent an email to Ms. Wilkinson and John Sands, the Federal Public Defender, which stated:

> I need more information to assess whether an actual or potential conflict exists and the extent of any such conflict and how to meet my obligations to protect my clients' interests. I may need more information, but at least initially, I need the following information.
>
> I need to know the name of the person Karen represented.
>
> I need to know when and how the conflict was discovered.
>
> I need to know when Karen got on and off the case.
>
> Karen has told me she has been instructed not to discuss this matter with me. There are not words to express how that dismays me. I have a personal obligation to assess how I address conflicts and how I protect my clients. It is not only my client; it is my bar card on the line. i also have to discuss this issue with co-counsel so he can also assess what he needs to do to protect Lezmond's interests.
>
> If I need more information after I get this initial information, I expect that Karen will be free to give my any information that will be helpful in my attempt to protect my client's interests. Thanks -- cmr

5)    After I raised the issue with Mr. Sands, he and one of Mr. Mitchell's trial attorneys, Deputy Federal Public Defender Gregory Bartolomei, came into my office to discuss it.   I don't remember the exact exchange, however, I recall they told me that Ms. Wilkinson had withdrawn from that client's case, and they did not

2

*C.M.R.*

believe that my withdrawing from Mr. Mitchell's was necessary, although if I chose to withdraw from Mr. Mitchell's case, they would not stop me.

6)    At that point in the conversation, I said that we needed to include Michael O'Connor because as co-counsel, he should be a part of this conversation. We called Michael and put him on the speaker phone.   I remember Michael telling them that they needed to give us the information to assess the situation and they refused.   At that point, it got very heated.   Michael told them they had an obligation to provide the information, but they continued to refuse.   Then, Mr. Sands left the room.   I picked up the telephone and told Michael that Mr. Sands had left; Mr. Bartolomei stayed in my office, but as I recall, he said nothing at all during the interaction.   I explained later to Mr. Sands, unsuccessfully, that from Mr. O'Connor's perspective, he essentially has co-counsel who is not cooperating.

7)    Later in the appeal process, another deputy in the office, possibly Karen Wilkinson, had told me that a 'wall' was between me and the trial attorneys, that is, the Office created an information barrier to keep me from learning privileged information from the trial team, and, I assume, vice versa.   I am sure that Jon Sands or Greg Bartolomei or Jeff Williams never told me about this wall. When I heard this, it made sense to me, because neither Jeff nor Greg helped me

3

C.M.R.

prepare for the oral argument. I had asked them to help prepare me, since they know the case so well, but neither helped me.

8)     For other reasons, the existence of a conflict wall also made sense of other events.   For example, after Michael O'Connor and I filed the briefs but before the opinion issued, a document clerk from the Office asked me, "What should we do with the *Mitchell* boxes that are in storage?"   I thought I had all the *Mitchell* files.   Greg Bartolomei certainly told me that I had all the files in the case when I agreed to handle Mr. Mitchell's appeal.   But, the fact that they kept boxes from me and Michael O'Connor made sense too.   When Michael O'Connor and I were reviewing the attorneys' files, sometimes we would find only copies of work-product, not the final document, and we could not find a final document in the files.   I remember I'd ask Greg for the final document, and he'd just tell me, "You have everything we have."

9)     When the document clerk showed me the boxes, I looked at them quickly and saw many items I had never seen before.   For example, Michael and I did not have the hard copies of the jurors' questionnaires, we had only a computer file of them.   I'd had to go to the district court to obtain the hard copies of the

4

C.M.R.

jurors' questionnaires.    Other items we didn't receive were trial counsels' notes of the jury interviews.

10)    I had all the materials in these boxes that were in the Office's storage scanned into PDF-format files.    When I turned over the *Mitchell* materials I had in my possession to Mr. Mitchell's 2255 counsel, I gave them a CD of these files.

11)    No one in my former office, the Arizona Federal Public Defender Office, ever told me Karen Wilkinson's client's name, the extent of the conflict, when they discovered the conflict, how long it had existed before they discovered it and before she withdrew, or what the Government had charged against Karen Wilkinson's client.

12)    To the extent that any issues concerning *voir dire*, systemic challenges to the death penalty, or competency are found to not have been raised on appeal, neither I nor my co-counsel deliberately failed to raise these issues.    No strategic choice was made to leave these issues out. The failure to raise any meritorious record-based issues that could have been raised but were not was solely due to oversight and not choice.

*cmr*

5

C.M.R.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.    Signed this 3rd day of June 2009.

_____
CELIA R. RUMANN

6

**EX 115 - 1601**

## DECLARATION OF TAMMY ROSE SEBAHE

I, Tammy Rose Sebahe, declare as follows:

1.     My name is Tammy Rose Sebahe.  Randy, Lorenzo and Tara Reed are my cousins, our mothers, Rose Sebahe and Freda Reed, are sisters.

2.     My family stayed in an apartment in Phoenix during the week; on weekends and holidays, we drove back to the reservation to our home in Round Rock, Arizona, on the Navajo Reservation.  I met Lezmond Mitchell several months before he started living with the Reeds.  My parents' house is a few hundred feet from the Reeds, so I saw Lezmond coming in and out of the Reed house all the time.

3.     Lezmond told me that he preferred staying with Lorenzo, rather than at his house, because they were both trying to finish school, and they encouraged each other.  Lezmond also said he liked that he and Lorenzo took the bus to school together.  I once overheard Lezmond telling Lorenzo that he felt as though his mother did not care for him.

4.     I considered Lezmond a cousin-brother, just like Lorenzo.  Lezmond encouraged me to keep up with school and not to mind boys; he told me to focus in school, and my education.  I was very comfortable around him.  He was nice

1


T.R.S.

EX 116 - 1602

and respectful; in fact, Lezmond was very respectful toward everyone. He was the type of guy who opened doors for a lady. He was funny and talkative especially when it came to sports such as football. He was smart and interesting to talk to. Lezmond was also very helpful with Freda Reed, Lorenzo's and Tara's mother, and others in the property. He enjoyed cooking at times, he made spaghetti and potato dishes. He babysat Tara Reed's two younger kids. I can still see him running to help unload grocery bags when Freda or Betty, our Grandma, came home from grocery shopping. I never saw Lezmond smoke or drink, and this includes the time Lezmond and Lorenzo lived with Randy in Phoenix.

5.     I met Lezmond's lawyers, an African American guy and a white, bearded guy, when I accompanied my mother to an appointment with them. The attorneys decided that my mother would not testify because she suffered from very bad anxiety attacks. One lawyer then asked me a few questions such as, "Do you know Lezmond too?" "How long have you known him?" The lawyers asked me to testify on Lezmond's behalf and I agreed. These two attorneys said that someone might show me some exhibits on the case. I met with these attorneys for only about ten minutes before I testified.



2

I declare under the penalty of perjury and the laws of the United States of America, that the foregoing is true and correct. Signed this __31__ day of May, 2009.

Tammy Rose Sebahe

3

EX 116 - 1604

## DECLARATION OF DONNARAE SOWELL

I, Donnarae Sowell, hereby declare as follows:

1.      My name is Donnarae Sowell.  Dr. Bobbi Mitchell and I worked together at Lakeside Elementary School, in Hanford, California.  We were both special education teachers, and our classrooms were next to each other.  My class was for learning disabled students; they spent the whole day in my classroom, in most cases.  Bobbi's students, on the other hand, were in the regular class and pulled out for one or two periods according to their individual education plan (IEP).  Her class was the Resource Special Program, or "RSP."  In 1997, I retired and did not see Bobbi again, however, we spoke many times on the phone.  She became a school psychologist (Doctor) and moved almost yearly.

2.      I  knew Dr. Bobbi Mitchell well and was acquainted with her daughter, Sherri Mitchell.  Sherri taught in Avenal, California.  I also knew Lezmond Mitchell, Sherri's son.  I met him when he was in kindergarten and remember the day I met Lezmond.  Bobbi and I were scheduled to attend a teachers' meeting that night and she asked me to keep an eye on Lezmond.  That evening, Lezmond and I had a great time, contrary to what Bobbi had predicted.  I remember asking him if his name was lizard.  Lezmond giggled and said, "My

1

DS

name is not lizard, it's Lezmond." He drew me a picture of a lizard and coyote (we had armed him with pad and pencil).

3.      I thought Lezmond was a gifted child, even at that early age. He drew beautifully detailed pictures; we would sit together and discuss them. He was a very bright boy.

4.      Lezmond attended kindergarten in Home Garden, which is just south of Hanford, California. Because Lezmond was not white, not black, and not Hispanic, other kids did not treat him very well. Lezmond had a very hard time at school. Other children also seemed to target him possibly not only because of his ethnicity, but also because "grandma" taught there. I think he felt trapped and could go nowhere, including his home, for anything positive.

5.      Bobbi told me that the Navajo way is to use shame and humiliation as discipline. Bobbi could be very verbally unkind toward kids at times, even the ones in her classroom. I remember Bobbi had a student who suffered severely from Tourette's Syndrome. According to Bobbi, this child was very violent because she had so many behavior problems with him, so the county school psychologist transferred him to my class which was a more restricted environment than her RSP class. In my class, this boy had no problems. However, instead of being happy with his improvement in behavior, Bobbi began coming into my

2

EX 117 - 1606

classroom just to check on him and at times belittled and put him down.  She scolded him for using the computer and she hovered over him.  During recess, Bobbi would keep him indoors as punishment.  Bobbi also said that he was not truly a real Tourette's case.  Bobbi at one point told this child that he was not moving into the next grade although his academic work was at 8th grade level, and that she would see to it that he would stay in her class another year – she told him this to upset and control him.  Once I felt I had to put a stop to her verbal abuse of this child, I went to our superintendent and told him what I had witnessed and that my aide and I felt it was an abusive situation.  Reporting Bobbi was extremely difficult for me.  I felt like I was betraying a friend but I knew it was the right thing to do.  It also  bothered me because Bobbi and the superintendent were friends of mine.  In Bobbi's mind, this was the Navajo way, using fear and humiliation, but that certainly was extremely unkind and unprofessional.  Another student, who was retarded, told me Bobbi was very mean.  In fact, he refused to take Bobbi a note because he said she said cruel things.

6.    After receiving her doctorate, Bobbi seemed to have  problems wherever she worked and usually moved yearly because her contract was not renewed.  I know this because she used to talk about this during our phone conversations.

3

DS

7. Bobbi could make a big crisis out of minuscule things. I remember she once reported some neighbor kids to the police because they moved her brick used to keep the door open when she came home with groceries. This incident actually came out in the community paper. On another occasion, she made a huge deal about neighborhood kids sneaking to steal oranges from the tree enclosed in her backyard.

8. Sherri and Bobbi were two strong-willed women in Lezmond's life. I think both had many psychological problems. Sometimes I felt that Sherri and Bobbi treated Lezmond like a bone between them.

9. Sherri and Bobbi argued constantly. One day, Bobbi told me she had argued with Sherri and that Sherri was throwing and breaking some ceramics that Bobbi had made. Sherri and Bobbi often seemed like a very dysfunctional family. I did not see much tenderness or warmth between them and I never saw them hug or touch each other or hug Lezmond. Everything was verbal. When they looked at you, there did not seem to be much warmth in their eyes (actually, it kind of reminded me of a dead fish's eyes).

10. Bobbi did not like to talk about personal things but one day, she shared that she had a very tough childhood. She said her mother was a drinker, an alcoholic, and that Bobbie was forced to work very hard since she was a child

4

DS

(about nine years old). She also said her mother hated Indians (Native Americans) and that they were no good although Bobbi's father was Cherokee.

11. On February 24, 2009, I was contacted by an investigator of the Office of the Federal Public Defender regarding Lezmond Mitchell. The investigator explained to me that her office represents Lezmond Mitchell in federal court proceedings reviewing his conviction and death sentence.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct to the best of my recollection. Signed this _16_ day of May 2009, in Lemoore, CA.

Donnarae Sowell

5

DS

## DECLARATION OF CHERYL TSOSIE

I, Cheryl Tsosie, declare as follows:

1.      My name is Cheryl Tsosie.  I am Herman Tsosie's sister.  I was born in1983, and Herman was born in 1984.

2.      I met Lezmond Mitchell at Round Rock Elementary School, at Round Rock, Arizona, on the Navajo Reservation, when my family moved to Round Rock from Chinle.  I was in the sixth grade, and Lezmond was an eighth grader.  However, I didn't get to know Lezmond better until he hung around with Herman and Lorenzo Reed.

3.      Lezmond was smart, outgoing, and a true gentleman toward me.  I still remember him opening doors for me, which is something the other guys didn't do.  Not only did I hear good things about Lezmond; I saw it for myself.  Lezmond was part of the Reed family, he lived with them for a long time.  Several times, I saw him chopping and hauling wood for Freda (Lorenzo's mother).  I also saw Lezmond chasing the sheep back to the corral.

4.      I remember when Lezmond and Lorenzo lived with Randy, Lorenzo's brother, in Phoenix, Arizona.  Once, while visiting the guys in Phoenix, it got late and so they told me to spend the night.  Lezmond told me that I could sleep in the couch.  I didn't realize that the couch was his bed, and I accepted his offer.  That night, Lezmond did not sleep; he stayed up all night watching television.  Lezmond never complained about this; he seemed happy to accommodate me.

1

5.      I felt sorry for Lezmond and often wondered why he was living with the Reeds, both on the Reservation and later in Phoenix, but I never asked him any personal questions.  My brother Herman told me that Lezmond said that his mother did not want him and that was the reason that he lived with his grandfather, George Mitchell. Lezmond also told Herman that his mother didn't love him because his (Lezmond's) father had left her and did not want anything to do with her.

6.      When the guys, Lezmond, Lorenzo and Randy, lived in Phoenix, I know they drank beer, but I never saw them drink it while at their apartment.  Although I was very young and didn't go out much, I did see Lezmond, Lorenzo, Randy, and Tara, Lorenzo's sister, drink, smoke cigarettes, and smoke pot at the lake and at social functions, such as parties.  A few times, some of the guys drank until they passed out, but not Lezmond, I never saw him drunk or passed out.

7.      My brother, Brent, graduated from Round Rock High School the same year as Lezmond and my family went to their graduation.  I remember Lezmond's speech vividly and how impressed I was when I heard him talk.  Even my dad, Herman Tsosie, Sr., said he had no idea how smart and popular Lezmond was at school.

8.      The last time I saw Lezmond was at my graduation reception at my aunt Della's house in Round Rock.  Lorenzo graduated that same year, although we graduated from different high schools, they organized the reception in both our honors.

9.      On May 30, 2009, an investigator from the Office of the Federal Public

2

EX 118 - 1611

Defender interviewed me.  The investigator told me that her office represents Lezmond

Mitchell in federal court proceedings challenging his convictions and death sentences.

No one from Lezmond Mitchell's defense team ever interviewed me before.  Had I been

asked, I would have willingly provided the information in this declaration, and testified to

it.

I declare under penalty of perjury under the laws of the state of Arizona and the

United States of America that the foregoing it true and correct.  Signed this ___1st___ day

of ~~May~~ June, 2009.


_____
CHERYL TSOSIE

3

EX 118 - 1612

**DECLARATION OF HERMAN TSOSIE**

I, Herman Tsosie, declare as follows:

1.    My name is Herman Tsosie.  I am Cheryl Tsosie's brother.  We also have a brother, Brent, who is older.  I was born in1984.  Lorenzo Reed is my cousin-brother.  My mother, Rita, and Lorenzo's mother, Freda, are sisters.

2.    I met Lezmond at Round Rock Elementary School when my family moved to Round Rock from Chinle.  Both Round Rock and Chinle are on the Navajo Reservation, in Arizona. I was in fifth grade, and Lezmond was an eighth grader.  I still remember the first time I saw Lezmond because he was arguing with my cousin Lorenzo Reed.  I don't know why they were arguing but I remember they made up and apologized to each other.  After that day, Lorenzo, Lezmond, Brent my brother, and I all became friends at school.  Our friendship lasted through high school.  Actually, to me, Lezmond was more than a friend – he was my brother.

3.    Lezmond's grandfather George Mitchell taught Navajo Culture at school. George could be mean and grumpy.  He was very strict.  If you did not behave or you did something wrong, he grabbed you by your arm really hard, and put you in the front of his class as punishment.

4.    Lorenzo, Lezmond, and I smoked pot (marijuana) in elementary school but not very frequently because we were so young and didn't have the money to buy it.  We smoked about two joints (marijuana cigarettes) a month during that first year.  My brother

1                                H.T.

Brent was part of our group but he did not smoke pot and, in fact, scolded me if he found out I had smoked pot.

5.     After Rough Rock Elementary School, Lezmond moved to Red Mesa High School, also on the Navajo Reservation, but he and I still hung out together after school and on weekends.  The three of us, Lorenzo, Lezmond and me, were very into music and that's all we cared about, making music.

6.     Lezmond was smart, and he was a very good friend to me.  I think I only made it through school because of Lezmond.  Math and English were hard subjects for me, so Lezmond helped me with my homework all the time.  Whenever we watched television, played video games, or just hung out, I'd pull out my homework and ask Lezmond questions about it.  He'd sit with me patiently, reading to me, tutoring me.  He was always happy to help me, and never once did he tell me that didn't have time to help me.

7.     Lezmond also protected me from other students.  He was always there when I needed him.  I remember he gave Lorenzo and I Christmas and birthday gifts, like a couple of sweaters, and birthday cakes.  He gave Freda and her mother Betty gifts too. He was a very generous person.

8.     Lezmond seemed close with his grandfather, George, but I say this only because I never heard Lezmond say anything bad about him, and because Lezmond lived with him.  Sometimes, Lezmond asked for me or Lorenzo's help when he needed to do

2

H.T.

EX 119 - 1614

yard work for his grandfather. I think I went to the Mitchell home about 100 times. While I was there, George never talked with us. Also out of those 100 or so times I went to the Mitchells, I never saw his mother or grandmother. (In fact, I did not know their names, Sherry and Bobbi Jo, until I was interviewed in May 2009.)

9.     Sometimes after school or on weekends, during high school, George dropped Lezmond off at the Reeds. During that period of our lives, Lezmond, Lorenzo and I were inseparable. A couple of times, a woman who looked white picked him up but she never introduced herself or talked to us. Lezmond told me that he and his mother did not get along, and that he did not like the way she treated him. I did not ask him any questions about this, but I wish I had. Whenever Lezmond came over, from his house, he looked sad, like he was deep in thought. I'd just leave him alone because I knew he had problems at home, and I figured he needed some time alone.

10.     I met Teddy Orsinger during my junior year in high school. One day, my cousins, Tilman and Lorenzo, and I were walking to the trading post in Round Rock when we saw Teddy standing outside his house. Teddy and his wife (or girlfriend) Shirley lived in school housing because Shirley was a teacher. We stopped to hello, and asked Teddy, "Hey man, what's up? Where are you from?" While we were talking, Teddy pulled out a joint, which we all smoked for a bit. The next day, we passed by Teddy's house again and this time, we met Teddy's son, Johnny Orsinger. Patrick and Jason Kinlicheenie were there too, they said that Johnny was their cousin.

3

H.T.

11.     Johnny Orsinger was a city kid who talked about gang-banging activities he'd been involved in while living in Albuquerque, New Mexico. At first, I thought Johnny was cool but then he began to get on my nerves because he (Johnny) thought he was better than the rest of us. I estimate that Lezmond, Lorenzo and I passed by Teddy's house about twenty times; of those times, I saw Johnny there only a couple of times.

12.     During this time, maybe once or twice a week, Lezmond, Lorenzo and I went up the hill, to the Nakais, to drink beer and smoke pot with the Nakais and the Kinlicheenies. Just about everybody got totally wasted, but not Lezmond. I saw him drink beer but Lezmond never passed out. At the hill (at the Nakais), smoking a twenty-bag of marijuana was normal for us – you can roll about fifteen regular-size joints or seven fat joints out of a twenty-bag.

13.     Right around this time, mid-2001, is when Lezmond started to hang out at the hill (at the Nakais) more than he did with Lorenzo and I. This was after Lezmond graduated from high school, and after he and Lorenzo came back from Phoenix, Arizona. Lorenzo and I began to worry about Lezmond and his friendship with the guys over at the hill, especially the Nakai brothers. The Kinlicheenies wanted to be like the Nakais. The Nakai brothers were crazy and ruthless, especially Gregory and Jakegory. I went out cruising with Gregory, Jakegory and Raushandall Combs a couple of times. Gregory and Jakegory were totally wasted and were shooting guns at cows, dogs and highway signs. They laughed like it was so funny. Those two really scared me.

4                                           H.T.

EX 119 - 1616

14.     At school, Gregory and Jakegory Nakai were always getting into trouble or suspended for fighting, or both.  They were known bullies.  They enjoyed instigating fights between people.  They were bossy and thought they were the leaders although they probably were because every time they were at the hill, they really were in control.

15.     One day, Lezmond came down from the hill to visit me and Lorenzo.  Lezmond's eyes were dilated and he was tweaking.  Lezmond told me that he had eaten mushrooms and had taken cocaine.  Lorenzo and I tried to stop Lezmond but he wouldn't listen.  He told us, "I'll be all right.  Don't worry about me."  We told Lezmond that the Nakais were only using him because they knew how smart he was.  I remember another time my mother telling me that, if they ever got caught, the Nakai brothers were going to get Lezmond into trouble or blame Lezmond because they knew he was alone.

16.     The last few times Lezmond came to visit Lorenzo and I, either Jason Kinlicheenie or Gregory Nakai picked him up and took him up the hill again.  When Lezmond got too involved with the guys over at the hill, he stopped coming down to visit me and Lorenzo.  By this time, later in 2001, we stopped going up the hill because our parents told us we couldn't go up there.

17.     The very last time I saw Lezmond was days before the arrest.  I was outside my mother's house.  Jakegory and Jimmy Nakai passed by in a white car.  Lezmond was in the back seat.  Jimmy asked me to hop in but I said no.  I saw Lezmond – he was strange, not himself that day.  Lezmond never looked at me when Jakegory and Jimmy

5

H.T.

pulled over; he just looked straight ahead without moving and showing no reaction to what was going on.

18.    I was interviewed by an investigator from Lezmond Mitchell's defense team, when I was at school. We talked for about thirty minutes. Had I been asked, I would have testified at Lezmond's trial, but I was never asked. On May 31, 2009, an investigator from the Office of the Federal Public Defender interviewed me. The investigator told me that her office represents Lezmond Mitchell in federal court proceedings challenging his convictions and death sentences. I would have willingly provided the information in this declaration, and testified to it.

I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that the foregoing it true and correct. Signed this ___1___ day of June, 2009.


Herman Tsosie

6

EX 119 - 1618

*Celestial* [handwritten] *Dw*

## DECLARATION OF ~~CELESTE~~ WILSON

*Celestial Dw* [handwritten]

I, ~~Celeste~~ Wilson, hereby declare as follows:

*Celestial Dw* [handwritten]

1.    My name is ~~Celeste~~ Wilson.  In 1997, Dr. Bobbi Jo Mitchell hired me as the office manager at the Community Center in Dos Palos, California.  I was only ~~twenty-two~~ *19 yrs, Dw* [handwritten] years old when Dr. Mitchell hired me, and the only work experience I had ~~was four years~~ *less than Two Years Dw* [handwritten] in the military and a few months working at a McDonald's.  Why Dr. Mitchell hired me as everyone else's supervisor is still puzzling to me because, at the time, I had no qualifications for the position.  When Dr. Mitchell interview me, she asked a couple of insignificant questions and then boom, I was hired.

2.    The community center was a confusing mess.  In the year I was at the center, I never understood what Dr. Mitchell did.  When she hired me, she told me that my responsibilities as the office manager were supervising the other employees, but actually she hired me to spy on everyone, particularly another employee, Mary Coronado.  I mean, she told me to spy on people for her.  I was required to complete logs that described exactly what everybody did that day, for her use.  This may sound like it is a normal thing for a boss to ask the office manager to do, but really Dr. Mitchell was paranoid and thought everyone was out to get her.

1

*C.W.* [handwritten initials]

EX 120 - 1619

3.      Dr. Mitchell's behavior was erratic; you were either on her good side, or on her bad side, there was no in-between.  Dr. Mitchell flipped out at the most minuscule of things.  For example, once she called me at home at about 5:30 a.m. on a Saturday to tell me that a Donald Duck picture was missing, and that she was sure that Mary Coronado, another center employee, had stolen it.  Dr. Mitchell yapped and yapped nonstop about that picture.

4.      I was pregnant when I was at the center.  Whenever I complained about my morning sickness or another discomfort, Dr. Mitchell would say to me, "Are you going to be a big girl and get to work, or are you going to be a baby and quit?"

5.      Dr. Mitchell asked me to get "evidence" for her to use against Mary Coronado, so she could get rid of Mary.  For reasons unknown to me, Dr. Mitchell hated Mary and so badly wanted to get rid of her.  Dr. Mitchell also wanted proof that Mary was embezzling money at the community center.  Mary was (and is) a smart and educated woman, and a well-respected member of the community with a long history of employment with the school district.  So, of course, I did not produce any proof against Mary – because there was none.  This made Dr. Mitchell, who was already obsessive, rude, and pushy, frustrated and very mad at me.

2


C.W.

EX 120 - 1620

6.     Dr. Mitchell talked negatively about her daughter Sherri at work; she never said anything positive about her.  They clashed and didn't get along with each other.  Just like she thought of everybody at the center, Dr. Mitchell also thought her daughter was conspiring against her.

7.     Dr. Mitchell could not stand kids.  She yelled at them constantly, and called them "spoiled kids" or "stupid kids."  Dr. Mitchell's attitude toward kids was awful and kids knew it, they stayed out of her way.

8.     At the center, I worked overtime without pay.  My regular hours were 7:30 a.m. to 3:30 p.m., but soon Dr. Mitchell was asking me to stay until 4:00 p.m., and then 5:00, and before long, I was working until 6:00 p.m.  Once, Dr. Mitchell asked me to come in to work on a Saturday; I did, but I did not get compensated for that work.  I was afraid to speak up for myself at the time because I was very young and naive.  To make things worse, my husband, Kevin Clinton, taught at Dos Palos, and Dr. Mitchell was his supervisor and so I feared for him as well.

9.     There was no structure or purpose to what the center did; I did not understand why Dr. Mitchell ran the center, because there was no program to run.  Anyway, if I were a parent at the time, I would never have allowed my child to go to the community center, and that is all because of Dr. Mitchell, everyone was scared of her.

3

C.W.

10.    I quit my job at the Community Center in February 1998 because I could not take it anymore.  Not only was I pregnant, but I also developed shingles due to the stress at the job.  I have never worked for anyone like Dr. Mitchell since then and I never will again.  If Dr. Mitchell raised her grandson, I feel very bad for him.  She was such a terrible person; I have always wondered if there was something bad going on in her life.

11.    On March 24, 2009, an investigator of the Office of the Federal Public Defender contacted me regarding Lezmond Mitchell.  The investigator explained to me that her Office represents Mr. Mitchell in federal court proceedings reviewing his conviction and death sentence.  Until that day, no one had ever interviewed me regarding Lezmond Mitchell or his case.  If anyone had asked me before this time about the above information, I would have been happy to provide this information and to testify to it.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.  Signed this ___ day of May 2009, in Merced, California.

Celeste Wilson
Celestial

4

C.W.

## DECLARATION OF SONJA HALSEY

I, Sonja Halsey, declare:

1.      I was Lezmond Mitchell's English teacher at Rough Rock High School.

2.      I testified at the penalty phase of Lezmond's capital murder trial. Around one year before, I was interviewed once by a woman who was on Lezmond's trial team.  I told her what I knew of Lezmond in my classroom, the Rough Rock High School and his family.

3.      I went to court for Lezmond's case in May, 2003.  Approximately two weeks before, I had received a subpoena to appear.  I traveled to Phoenix with John Fontes, a former colleague at Rough Rock School.  John was also asked to testify in Lezmond's trial.

4.      A half an hour or one hour before I took the stand, two or three of Lezmond's attorneys spoke with John and I in a conference room at the court house.  The attorneys had us look at photographs of the victims' bodies.  They didn't say anything specifically about why they were showing us the photographs but they addressed  me in a somewhat condescending manner.  They showed both of us the photos but one of the attorneys turned to me and  apologized for them.

SH

Even seeing this did not dissuade me from testifying on behalf of Lezmond.

5.    This was the first time I spoke with Lezmond's attorneys. I told the attorneys that I thought Lezmond's mother didn't seem to take an interest in him, that he seemed like a boy without a family and that I came to that conclusion from being around Lezmond for a year and a half. I recall what I said very clearly because of the way the attorneys reacted; they steered me away and told me to stick to only what I knew about Lezmond Mitchell in my classroom.

I declare under penalty of perjury under the laws of the United States of America this _6th_ day of June, 2009.


_Sonja Halsey_

Sonja Halsey

EX 121 - 1624

**DECLARATION OF RICHARD H. BURR**

Richard H. Burr, under penalty of perjury, declares the following:

1.      I am an attorney in private practice in Houston, Texas.  My practice has been devoted entirely to the trial, appellate, and post-conviction representation of defendants in capital cases since 1979.  I have represented persons in well over one hundred capital cases in twelve states and in numerous federal courts during this time.  Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.  96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work.  I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

2.      Because of my experience, I have been retained by the Office for Defender Services of the Administrative Office of the United States Courts, along with eight other similarly experienced attorneys, to serve through the Federal Death Penalty Resource Counsel project as an advisor and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts.  Through this project, I work extensively with counsel appointed to represent people charged in federal capital cases.  In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) – which was

1

adopted by the Judicial Conference – the work of our project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases...." *Id*. at 50.

3.     As part of my work with Federal Death Penalty Resource Counsel, I consulted at times with the trial defense team in *United States v. Lezmond Mitchell*, No. 3:01-cr-01062-MHM (D.Az.).

4.     The most significant contact came about through a request from an attorney in the Capital Habeas Unit (CHU) of the Federal Defender Office in the District of Arizona. Colleagues of this attorney in the Federal Defender Office were on the *Mitchell* trial defense team. The CHU attorney was concerned that the trial team was not developing the case in mitigation for Mr. Mitchell as well as it could be.

5.     As a result of this contact, on October 16, 2002, I participated in a conference call for approximately two hours with the *Mitchell* trial defense team. On the date of the call, trial was set to begin on January 28, 2003 – just three-and-one-half months later. The call focused on mitigation themes and evidence. Through the course of the call, it became apparent that considerably more work needed to be done with respect to the investigation of Mr. Mitchell's life history and with mental health experts who might be able to help the jury understand the significance of events in Mr. Mitchell's life and the mental health problems that flowed from these events and informed his behavior. I recall advising the team that they could not possibly get done the work they needed to do in the time that then remained before trial. We discussed at length the investigative work that still needed to be done before mental health experts could provide meaningful assistance.

6.     At the conclusion of this call, I offered to continue consulting with the trial team.

2

However, I had no further contact with any member of the team thereafter. (Some time after my conference call with the team, the trial date was reset for April 1, 2003, and that is the date trial commenced.)

On this 5th day of June, 2009, I declare, under penalty of perjury, that the foregoing statement is true and accurate.

_____

Richard H. Burr

3

## DECLARATION OF DEBRA GARVEY

I, Debra Garvey, declare:

1.      I am an investigator with the Office of the Federal Public Defender in Los Angeles, California.  My office represents Lezmond Mitchell in his § 2255 proceeding, and Sean Kennedy, the Federal Public Defender, asked me to work on Mr. Mitchell's case.

2.      I interviewed trial counsel's investigator, Karl Brandenberger, about his pre-trial work on Mr. Mitchell's case.

3.      The files we received from trial and appellate counsel did not include any work-product by Mr. Brandenberger.  When I interviewed him, I asked Mr. Brandenberger if he had his notes and/or memoranda of his investigation.  He told me he had neither his notes nor any memoranda.  Mr. Brandenberger said the trial attorneys directed him not to write any reports or memos of his investigation, consequently he did not produce any reports.  He said his notes were in a red well which he gave to the trial paralegal at the conclusion of the trial, to be sent to appellate counsel.

4.      I asked Mr. Brandenberger whom he had interviewed.  He told me that he had interviewed very few people on the traditional, guilt-side of the case.

1



EX 123 - 1628

He primarily drove Vera Ockenfels to her interviews, and kept her safe on the reservation.  Mr. Brandenberger said he was present for most of Vera's interviews. He said that he had interviewed Johnny Orsinger's grandmother in Albuquerque, as well as Johnny Orsinger.  Mr. Brandenberger said he interviewed Johnny before trial, but he remembered nothing about the interview, and that his notes would have that information.

5.     I asked Karl Brandenburg about Mitchell's drug use.  Mr. Brandenberger said he had no knowledge of Lezmond using drugs at any time pre-murder, pre-trial, or during trial.

6.     I asked Karl Brandenburg about an alternate suspect noted in one of the FBI's 302s.  He said he never investigated this alternative suspect.

I declare under penalty of perjury under the laws of the United States of America this _____8h____ day of June 2009.

_____
DEBRA GARVEY

2

DG

EX 123 - 1629

### DECLARATION OF KEVIN McNALLY REGARDING THE
### FREQUENCY OF FEDERAL CAPITAL PROSECUTIONS
### AND THE RACE OR ETHNIC BACKGROUND OF DEFENDANTS

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project (RCP), assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

EX 124 - 1630

by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. I have been asked by counsel for Lezmond Mitchell to provide information to the Court regarding certain of the data that the Project has collected. I am prepared to testify as a witness as well. The areas I was asked to provide data concern: (1) the frequency with which the federal death penalty has been sought and imposed since 1988; (2) the race or ethnic background of the defendants as to whom a capital prosecution has been authorized; and (3) the frequency with which the federal death penalty is authorized and imposed on a regional basis.

## I.

## FREQUENCY WITH WHICH THE FEDERAL DEATH PENALTY IS SOUGHT AND IMPOSED

5. The Project has collected information regarding all federal executions and all potential and actual federal death penalty prosecutions initiated pursuant to 21 U.S.C. § 848(e) *et seq.,* enacted in 1988, and/or 18 U.S.C. §3591, *et seq.,* enacted in 1994.

6. Based on the Project's data base, as well as the reports published by the Department of Justice in September 2000 and June 2001, it appears that the "pool" of potential capital defendants in the federal system since 1988 totals 2,847. This figure is current as of June 8, 2009. This consists of, among others, 52 cases reviewed prior to the 1995 Death Penalty Protocols put into place by Attorney General Reno,[2] 682 reviewed by Ms. Reno (1995-2000) after the Protocols went into effect (2000 DOJ Study), 641 reviewed by Attorney General Ashcroft (2001-2005), 423 reviewed by Attorney General Gonzales (2005-2007), 18

---

[2]Prior to the Protocols, which went into effect on January 27, 1995, the Attorney General reviewed only those cases in which a United States Attorney requested permission to seek the death penalty. Potential capital cases where the local determination was not to seek the death penalty were not reviewed by Main Justice. The major 2001 change wrought by the Protocols was a requirement that *all* potential death-penalty cases, whether the United States Attorney wished to pursue the death penalty or not, be submitted to Main Justice for review and ultimate decision by the Attorney General.

2

EX 124 - 1631

reviewed by Acting Attorney General Keisler (2007), 159 reviewed by Attorney General Mukasey (2007-2009), 2 reviewed by Acting Attorney General Filip (2009) and 32 reviewed by Attorney General Holder (2009). There are also an additional 304 cases identified by United States Attorneys as potential capital cases that were never submitted for review (2001 DOJ Report).[3] The Project has also identified additional cases reviewed by the various Attorney Generals. If we exclude defendants who were never submitted for review and/or charged as capital offenses (even though there was arguably justification for doing so) and potential defendants prior to 1995 who were not subject to Main Justice Review and 177 who are currently pending review by the Department of Justice, the total defendants reviewed by the several Attorney Generals so far is 2,219.

7. From this group of 2,219 potential capital defendants, a total of 460 defendants have actually been authorized for capital prosecution. Thus, the Department of Justice has authorized capital prosecutions in approximately 21% (460/2,219) of the cases in which the penalty could have been sought. To date, juries have sentenced 67 defendants to death. Two death sentences have been set aside on appeal. Two death sentences have been set aside by the trial judge prior to appeal. Three defendants have been executed.[4] One defendant was granted clemency. Two defendants are pending retrial. There are 57 defendants presently on the federal death row under an active sentence of death. These cases are in various stages of review via direct appeal or post-conviction proceedings brought pursuant to 28 U.S.C. § 2255. There are 39 defendants presently pending or in trial who have been "authorized" by the Attorney General.

---

[3] *See* the discussion of this figure at n. 10 of the June 2001 Supplemental Justice Department Study.

[4] Two federal executions took place in the year 2001 (Timothy McVeigh and Juan Garza) and one in the year 2003 (Louis Jones). McVeigh and Jones were executed pursuant to the Federal Death Penalty Act of 1994. Garza was executed pursuant to the 1988 enactment, 21 U.S.C. § 848(e).

3

EX 124 - 1632

## II.

### RACE OR ETHNIC BACKGROUND OF DEFENDANTS
### AUTHORIZED FOR FEDERAL CAPITAL PROSECUTIONS

8. The racial composition of the pool of 460 defendants whose cases were authorized for a federal capital prosecution is as follows: African-American, 237 (52%); Caucasian, 119 (26%); Latino, 85 (18%); and "other," 19 (4%). These figures are current as of June 8, 2009.

## III.

### REGIONAL VARIATIONS

9. Based on figures compiled by the Death Penalty Information Center (current as of June 8, 2009) the states which currently lead the nation in post-*Gregg* executions are Texas (438), Virginia (103), Oklahoma (90) and Missouri (67). The states whose federal districts have the most authorized federal death penalty prosecutions (including pending cases) are Virginia (52), New York (44), California (41), Texas (26) and Missouri (26). Federal districts in the following states have had more than one federal death sentence returned by juries: Texas (12), Missouri (8), Virginia (6), Georgia (3), Oklahoma (3), Louisiana (3), Maryland (2), Arkansas (2), Illinois (2), Iowa (2), North Carolina (2), South Carolina (2), California (2), West Virginia (2) and Florida (2).

10. Of the 67 federal death sentences imposed by juries since 1988, 43 have come from the traditional "death belt" states. By way of contrast, there have been seventeen federal death-penalty cases tried in New York State involving a total of twenty-four defendants as follows: ten trials in the Eastern District of New York (Pitera - 5/7/92, Dhinsa - 1/4/99, Dixon - 10/14/03, Wilson - 9/1/06, Aguilar - 10/30/06, Caraballo - 1/14/08, McGriff - 11/27/06, James and Mallay - 3/26/07, McTier - 10/15/07 and Pepin-Tavares - 9/15/08), five in the Southern District of New York (Al'Owhali and Mohamed - 1/5/01, Quinones and Rodriguez - 6/14/04, Williams and Williams - 3/14/05, Henderson - 11/8/06 and Barnes - 2/11/08) and two in the Northern District of New York (Diaz and Walker - 10/16/95; Matthews, Tucker and

4

EX 124 - 1633

McMillian - 2/3/03). Only one federal jury sitting in New York State has returned a death verdict (*Wilson* on January 30, 2007). The cases where life sentences were imposed include *United States v. Bin Laden, et al.*, a case where two of the four defendants faced the death penalty for their roles in the simultaneous terrorist bombings of United States embassies in East Africa resulting in hundreds of deaths, thousands of injures, and the destruction of two United States Embassies.

11. I have also been asked by counsel for Lezmond Mitchell to provide information on the number of authorized federal death penalty cases, since 1988, by the state in which each such prosecution was brought. According to the Project's records, as of June 8, 2009, the following compilation accurately set forth the particular state in which each of the 460 federal death penalty cases authorized since 1988 was prosecuted:

> Alabama (6), Alaska (2), Arizona (6), Arkansas (7), California (41), Colorado (6), Connecticut (5), DC (17), Florida (15), Georgia (9), Hawaii (2), Idaho (1), Illinois (12), Indiana (6), Iowa (4), Kansas (7), Kentucky (4), Louisiana (10), Maryland (26), Massachusetts (4), Michigan (19), Mississippi (3), Missouri (26), New Jersey (3), New Mexico (8), New York (44), North Carolina (10), North Dakota (2), Ohio (5), Oklahoma (5), Pennsylvania (17), Puerto Rico (23), South Carolina (3), Tennessee (15), Texas (26), Vermont (2), Virginia (52), West Virginia (7).

I declare, under penalty of perjury, 28 U.S.C. §1746, that the foregoing is true and correct. Executed on this 8th day of June, 2009.

KEVIN McNALLY

5

EX 124 - 1634

## DECLARATION OF KEVIN McNALLY REGARDING
## INNOCENT FEDERAL CAPITAL DEFENDANTS

1. I currently serve as the Director of the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts. I have served as Resource Counsel since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Office of Defender Services of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases. I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

EX 125 - 1635

4. There were significant doubts about David Ronald Chandler's guilt, as documented in his clemency petition. http://www.capdefnet.org/htm_library/Chandler1.htm. This is why the President of the United States granted clemency. This is why the Attorney General of the United States recommended clemency. "At the attorney general's request, I commuted one death sentence because the defendant's principal accuser later changed his testimony, casting doubt on the defendant's guilt." Clinton, "My Reasons for the Pardons," *New York Times* (2/18/01).

5. Federal prosecutors have filed, not counting Chandler, at least 51 capital charges against the legally or factually innocent, including 21 defendants acquitted after the Attorney General declined to order a death penalty trial,[2] and 20 acquitted of capital murder or exonerated (2 of the 20 had charges dismissed), who had been selected to face the death penalty after extensive scrutiny in a three level review process within the Department of Justice,[3] which produced a collective decision to file a "death" notice and 10

---

[2] 1) *United States v. Derrick Kelley* (E.D. VA CR No. 93-162-N) (acquitted of all charges); 2) *United States v. Michael Flanagan* (D. CO CR No. 96-357 M) (acquitted); 3) *United States v. Donald George Brown* (E.D. NY CR No. 96-149 (S-5) (RJD) (acquitted of two counts and jury hung regarding co-defendant's involvement); 4) *United States v. Franklin Moyler* (E.D. VA CR No. 96-00374-a) (acquitted); 5) *United States v. Gary Benton* (E.D. KY CR No. 96-9) (acquitted in both state and federal court); 6) *United States v. Anthony Urbistando* (S.D. NY CR No. 98-CR 566 (DLC)) (acquitted of murder); 7) *United States v. Ewan Bryce* (D. CT CR No. 99-CR-238-ALL) (acquitted); 8) *United States v. Curtis Barfield* (W.D. MO CR No. 00-CR-395-ALL) (acquitted); 9) *United States v. Judy Helen Taylor Nipper* (W.D. LA CR No. 00-CR-50066) (acquitted); 10) *United States v. Roderick Soto* (E.D. NY CR No. 1:03-CR 00315-ERK-ALL) (acquitted of murder, attempted murder and arson); 11) *United States v. Anthony Rodriquez* (S.D. NY CR No. 00-CR-949-ALL) (found not guilty on all counts); 12) *United States v. Brima Wurie* (D. MA CR No. 1:03-CR-10329-PBS-ALL) (found not guilty of all charges, including a murder and various assault and gun charges); 13) 14) 15) and 16) *United States v. Mark Brown, et al.* (S.D. NY CR No. S11 04 CR 801 (PKC)) (four defendants found not guilty of murder); 17) *United States v. Scott Grizzle* (C.D. CA CR No. 02-00938-GHK); 18) *United States v. Kenneth Reid* (D. SC No. 04-353) (acquitted of murder); 19) *United States v. Juan Oliva-Reyes* (S.D. TX No. M-07-1127) (acquitted); 20) *United States v. Nathaniel Dames* (S.D. NY No. 1:04-CR-01247-PAC) (acquitted) and 21) *United States v. Edgar Branch* (W.D. LA No. 07-10029-01) (acquitted of second degree murder).

[3] 1) 2) and 3) *United States v. Mack, et al.* (S.D. FL CR No. 93-252-CR-UUB)(three defendants); 4) and 5) *United States v. Jacobo, et al.* (C.D. CA CR No. 99-83-(A)-DT)(two defendants); 6) 7) and 8) *United States v. Ricky Lee Brown, Barbara Brown and Janette Ables* (N.D. WV CR No. 1:98CR34) ( two defendants acquitted, charges dropped as to the third); 9) and 10) *United States v. Alejandro and Martinez* (D. PR CR No. 99-044 (SEC)) (two defendants); 11) *United States v. Luke Jones* (D. CT CR No. 00-CR-

whose charges were dropped during the death penalty review process. Several Attorney Generals have sought the death penalty against legally or factually innocent citizens and prosecutors have admitted that at least two or three of those were innocent. *United States v. Reginald Brown* (E.D. MI CR No. 92-81127) and *United States v. Antonio McKelton* (E.D. MI CR No. 98-80348). Charges against another "authorized" defendant were dismissed when physical evidence pointed to a serial killer as the perpetrator. *United States v. Darrell David Rice* (W.D. VA CR No. 02-CR-26-ALL).

6. So far, three inmates have been executed after review. One condemned inmate, Chandler, was released from death row due to doubts about his guilt. 65 citizens have been condemned to die in federal court since 1988. Five death sentences have been reversed and two of these individuals were not resentenced to death.[4]

7. Former United States Attorney Michael Dettmer, of the Western District of Michigan, discussed "prematurely ... charging ... a defendant with a federal death penalty crime based only on circumstantial evidence, to then discover they had the wrong person." http://www.vera.org/publications/publications_5. asp?publication_id=161 at 5. This was a reference to *United States v. John Flores Angiano and Tirzo Jorge Angiano* (W.D. MI CR No. 1:97-CR-23). Murder counts have been dropped after indictment as to at least ten when it became clear the defendant was innocent during the Attorney General death penalty review process.[5]

---

238-ALL) (acquitted of one murder, Rule 29 granted as to the other); 12) and 13) *United States v. Walter Lefight Church and Wesley Gilmore* (W.D. VA CR No. 00-CR-104-ALL) (two defendants); 14) *United States v. Xavier Williams* (S.D. NY CR No. 00-CR-1008); 15) *United States v. Antwuan Ball* (D. DC CR No. 05-100-01); 16) *United States v. David Wilson* (D. DC CR No. 05-100-02); 17) *United States v. Dominic Samuels* (D. DC CR No. 05-100-17); 18) *United States v. Darryl Henderson* (S.D. NY No. 1:02-CR-00451-MBM) and 19) and 20) *United States v. Denis Rivera and Oscar Alexander Garcia-Orellana* (E.D. VA CR No. 04-CR-283).

[4]*United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), *reh'g denied*, 87 F.3d 1136 (1996) and *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000).

[5]2) *United States v. Rene Aguilar-Carballo* (S.D. FL CR No. 05-CR-60008-ALL); 3) *United States v. Eric Jones* (D. DC CR No. 98-264); 4) & 5) *United States v. Mario Hernandez-Cartagena and Jose Luis*

EX 125 - 1637

8. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project, and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 8th day of June, 2009.

Kevin McNally

---

Ramon-Martinez (D. PR CR No. 04-081 (PG)) (charges dismissed due to lack of witness' credibility); 6) and 7) *United States v. Jose Crecencio Martinez Vargas and Carlos Lopez* (W.D. OK CR NO. 99-CR-63-ALL); 8) *United States v. Angel Bernacett Cosme* (D. PR CR No. 99-346 (HL)); 9) and 10) *United States v. Corey and Jason Jones* (S.D. NY No. 08-CR-535).

EX 125 - 1638

# DECLARATION OF KEN MURRAY

I, Ken Murray, hereby declare as follows:

1. My name is Ken Murray. I am a Deputy Federal Public Defender with the Office of the Federal Public Defender for the District of Arizona.

2. I am an attorney in the Office's Capital Habeas Unit, which provides representation in federal court to persons under State-imposed sentences of death. Before I came to the Office in 1999, I practiced criminal defense in Ohio and in other jurisdictions.

3. A person whom the Federal Government has indicted for any death-eligible offense is entitled to the appointment of an attorney who is "learned in the law applicable to capital cases," meaning she has sufficient experience in capital defense litigation. Before I came to the Office, I was learned counsel in several federal capital cases; none of those clients received the death penalty. I was defense counsel in several capital cases in state courts. Only one of my state clients received the death penalty; he is now pursuing a claim of mental retardation in court.

4. Although I was a Deputy Federal Public Defender in the CHU, before the Office represented Lezmond Mitchell, the Office assigned me as learned counsel to three of its federal capital cases. None of those three clients received

1

K.M.

EX 126 - 1639

the death penalty. I believe that the Government withdrew the death-penalty before the cases went to trial or the Office settled for a sentence less than death.

5.     After the Office was appointed to represent Lezmond Mitchell, and it was apparent that the Government would seek the death penalty against him, I assumed I would be assigned to his case. After I inquired about whether I would be assigned the case, I received an e-mail from my supervisor that I would no longer be assigned to our office's trial level capital cases . Although the Office did not allow me to be a member of Mr. Mitchell's defense team, I was told I could be available to consult with Mr. Mitchell's trial attorneys, Greg Bartolomei and Jeff Williams, if they requested.

6.     Greg Bartolomei and Jeff Williams consulted with me a few times, but I cannot recall how many times. There were several occasions were one or the other of them, usually Jeff Williams, would see me and ask about something in the hallway or as we cross paths. As for substantive meetings with the team, my recollection is I probably did that less than five times. (I looked through my electronic mail and found none pertaining to Mr. Mitchell's case.) I do not recall how often (or whether) John Sears, Lezmond Mitchell's learned counsel, was involved in those particular conversations. I remember that I kept urging the team to keep looking for mitigation as they repeatedly emphasized the bad facts of the

2                                               K.M.

EX 126 - 1640

case and told me that there was no mitigation. I urged the team to pursue additional mitigation investigation because it is my experience that when a capital defense attorney says, in regards to mitigation, "There's nothing there," my belief and presumption, based on my experience, is that the necessary mitigation investigation has not been accomplished and/or the team is does not recognize the mitigation value of the information they have developed.

7.     I was a part of a consultation on the Mitchell case in mid-October 2002. Jeff Williams, Greg Bartolomei, Vera Ockenfels, and Richard Burr were present; John Sears joined the meeting telephonically. Ms. Ockenfels who was not an employee of the Office had been retained as a mitigation specialist. Richard Burr was (and is) an attorney with the Federal Death Penalty Resource Counsel Project, which provides assistance to counsel in federal capital cases. At this meeting I learned that the trial attorneys wanted Mr. Mitchell to either accept a sentence less than death or to let them negotiate with the prosecution for a life sentence. They asked me to see Mr. Mitchell and help convince him. I agreed to try to assist them in this task but noted, on several occasions, that Mr. Mitchell had no reason to believe or trust me as I had not been an active part of the team and had no opportunity to develop a relationship with him as a client. As a consequence, when I tried to assist there was no reason for Mr. Mitchell to trust me. (In my

3

K.M.

EX 126 - 1641

experience with clients who accepted a sentence less than death, trust of the trial attorney is the major factor in convincing a client to accept the offer or permit negotiations with the prosecutor to get an offer.) I met with Mr. Mitchell in a small room, I believe with some of his defense team, before a court hearing to discuss the life sentence and its benefits. My efforts were unsuccessful.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct. Signed this 8th day of June 2009.

KEN MURRAY

4

EX 126 - 1642