UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LEZMOND CHARLES MITCHELL | Case No.: CV-09-8089-MHM |

**Amended Motion Under 28 U.S.C. § 2255
To Vacate, Set Aside, or Correct Sentence
By a Person in Federal Custody,
Or, in the Alternative, Pursuant to 28 U.S.C. § 2241**

----------------

**Filed Pursuant to Rule 15(a)(1),
Federal Rule of Civil Procedure**

SEAN KENNEDY (Calif. Bar No. 145632)
Federal Public Defender
STATIA PEAKHEART (Calif. Bar No. 200363)
Deputy Federal Public Defender
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:   (213) 894-0081

Attorneys for Defendant-Movant
LEZMOND CHARLES MITCHELL

**TABLE OF CONTENTS**

**PAGE(S)**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.  Mr. Mitchell's Life History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.  Mitchell's maternal family. . . . . . . . . . . . . . . . . . . . . . . . . 14

            a.  The physical and psychological abuse suffered by Mitchell's mother when she was a child. . . . . . . . . . . 15

            b.  Bobbi's accusations of incest. . . . . . . . . . . . . . . . . . . . 20

        2.  Mitchell's paternal family. . . . . . . . . . . . . . . . . . . . . . . . . . 21

        3.  Mitchell's childhood – birth to high school. . . . . . . . . . . . . . 23

            a.  Mitchell's caretaker from infant to five years:  Bobbi Jo Mitchell. . . . . . . . . . . . . . . . . . . . 25

            b.  Mitchell's school years. . . . . . . . . . . . . . . . . . . . . . . . 31

            c.  The physical and psychological abuse, neglect and abandonment Mitchell suffered as a child. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

            d.  Mitchell's substance abuse and addictions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

i

**TABLE OF CONTENTS**

**PAGE(S)**

4.    Mitchell – post-high school to November 4, 2002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      a.    Johnny Orsinger. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      b.    Johnny Orsinger's first murder. . . . . . . . . . . . . . . . . . . 53

      c.    Mitchell's substance abuse at the Nakais.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

5.    Mitchell's arrest and the multiple interrogations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

B.    Mr. Mitchell's Capital Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

III.    <u>ISSUES FOR RELIEF</u>

A.    Counsel's Failure to Investigate, Prepare and Present Evidence of Intoxication Resulted in Ineffective Assistance at Guilt Phase.. . . . . . . . . . . . . . . . . . . . . . . . . 70

1.    Trial counsel's failure to thoroughly investigate intoxication was unreasonable.. . . . . . . . . . . . . . 74

2.    The lack of intoxication evidence prejudiced the most viable defense. . . . . . . . . . . . . . . . . . . . . 81

B.    Counsel's Failure to Investigate, Prepare and Present Evidence of Addiction and Intoxication Resulted in Ineffective Assistance at Penalty Phase. . . . . . . . . . . . . . 90

## TABLE OF CONTENTS

**PAGE(S)**

1.  Trial counsel's failure to investigate
    addiction and intoxication as mitigation
    was unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

2.  The failure to prepare and present evidence
    of addiction and intoxication prejudiced
    the mitigation defense. . . . . . . . . . . . . . . . . . . . . . . . . . 95

C.  Trial Counsel's Conflict of Interest Deprived
    Mitchell of the Right to Effective Assistance. . . . . . . . . . . . . . . . . 98

D.  Trial Counsel Was Ineffective with Respect
    to the Penalty Imposed. . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

1.  Trial counsel's performance was deficient. . . . . . . . . . . . . . 104

2.  Trial counsel's deficient performance
    prejudiced Mitchell.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    a.  Evidence of family mental
        health history and its effect on
        Mitchell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

    b.  The abuse and neglect endured by
        Mitchell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

    c.  Mitchell's drug and alcohol abuse. . . . . . . . . . . . . . . 125

    d.  Mitchell's permanent brain
        dysfunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

**TABLE OF CONTENTS**

**PAGE(S)**

    e.    Failure to present a complete and accurate social history and supporting expert testimony.. . . . . . . . . . . . . . . . . . . . . 127

    3.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

E.    Trial Counsel Provided Ineffective Assistance By Failing to Challenge Mitchell's Statements as Involuntary Due to His Brain Damage, His Addiction, and His Cultural Heritage.. . . . . . . . . . . . . . . . . . . . . . . 130

F.    Counsel's Failure to Investigate, Develop, and Challenge the Medical Examiner's Testimony and Autopsy Report Was Ineffective Assistance. . . . . . . . . . . . . . . . . . 132

G.    Counsel's Failure to Investigate and Challenge DNA Evidence and Testimony Comprised Ineffective Assistance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

H.    Trial Counsel Provided Ineffective Assistance In Jury Selection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

    1.    Failing to challenge or adequately question jurors whose convictions about the death penalty substantially impaired the performance of their duties.. . . . . . . . . . . . . . . . . . . . . . . . . 147

        a.    Juror No. 48. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

        b.    Juror No. 43. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

        c.    Alternate Juror No. 51. . . . . . . . . . . . . . . . . . . . . . . . 151

**TABLE OF CONTENTS**

**PAGE(S)**

2.   Failing to adequately question or attempt to rehabilitate prospective jurors who initially suggested that they could not vote for the death penalty.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

3.   Appellate counsel provided ineffective assistance for failing to appeal the improper excusal of Native American jurors.. . . . . . . . . . . . . . . . . . . . . 154

I.   The Trial Court Deprived Mitchell of His Right to an Impartial Jury by Erroneously Excluding Potential Jurors Whose Concerns about the Death Penalty Would Not Have Substantially Impaired the Performance of Their Duties.. . . . . . . . . . . . . . . . . . . . . . . . . . 158

J.   The Trial Court Failed to Enforce the Legal Standard for Hardship Dismissal, Resulting in a "Jury of Volunteers". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

1.   Veniremember No. 77. . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

2.   Veniremembers No. 78 and No. 20. . . . . . . . . . . . . . . . . . . . 168

K.   This Court Violated Mitchell's Constitutional Rights by Denying His Request to Interview the Jurors In His Capital Case. . . . . . . . . . . . . . . . . . . . . . . . . . 173

L.   *Voir Dire* Was Constitutionally Inadequate to Secure Mitchell's Constitutional Right to an Impartial and Life-qualified Jury. . . . . . . . . . . . . . . . . . . . . . . . . . 178

**TABLE OF CONTENTS**

**PAGE(S)**

M.    The Cumulative Effect of All Errors During the
      Jury Selection Process Resulted in a Jury That
      Was Not Impartial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

N.    This Court Violated Mitchell's Constitutional
      Rights by First Granting the Government's
      Motion to Transfer the Trial, Then Severing
      the Trials of Mitchell and Co-defendant Orsinger. . . . . . . . . . . . . 190

O.    Mitchell's Right to a Jury Chosen from a Fair
      and Representative Jury Venire Was Violated
      When Native Americans Were Systematically
      Excluded from Jury Service. . . . . . . . . . . . . . . . . . . . . . . . . . . 193

P.    The Juror Questionnaire Was Constitutionally
      Inadequate to Secure Mitchell's Constitutional
      Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

Q.    The Prosecution's Failure to Produce Exculpatory
      Evidence Violated Mitchell's Constitutional Rights. . . . . . . . . . . 200

R.    The Government's Collusion with the Navajo
      Nation Violated Mitchell's Constitutional Rights. . . . . . . . . . . . . 205

      1.    The Court violated Mitchell's rights
            through the admission of statements
            obtained after his right to counsel had
            attached.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

      2.    The Court violated Mitchell's rights through
            the admission of post-arrest, pre-*Miranda*
            statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

**TABLE OF CONTENTS**

**PAGE(S)**

   3.    The Government and the Court violated
Mitchell's rights through the admission
of involuntary statements improperly
induced through deception and lies. . . . . . . . . . . . . . . . . . . 215

S.    Mitchell Was Incompetent from the Conclusion
of the Guilt Phase Through the Penalty Phase, and
Thus Deprived of His Constitutional Rights. . . . . . . . . . . . . . . . 216

   1.    Doubt raised as to Mitchell's mental
competency following the jury's return
of a guilty verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

   2.    Trial counsel's failure to request a
competency proceedings violated Mitchell's
constitutional right to effective assistance
of counsel, and to due process of law, and a
reliable sentencing determination. . . . . . . . . . . . . . . . . . . . . 219

   3.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

T.    Mitchell's Conviction and Sentence Should Be
Reversed Because the Victims' Family's Conduct
Unduly Prejudiced Mitchell at the Guilt and
Penalty Phases.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

   1.    Mitchell's conviction and sentence should
be reversed because family members wore
buttons depicting the victims. . . . . . . . . . . . . . . . . . . . . . . 223

**TABLE OF CONTENTS**

**PAGE(S)**

2.    Trial counsel provided ineffective assistance
for failing to object in a timely manner to
the family's conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

U.    Counsel Provided Ineffective Assistance By
Failing to Request the Trial Court Trifurcate
the Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 228

1.    To be constitutional under *Ring v. Arizona*,
proceedings under the Federal Death Penalty
Act must be trifurcated. . . . . . . . . . . . . . . . . . . . . . . . . . 231

2.    Counsel should have moved for trifurcation
to avoid unfair prejudice, confusion of the
issues, and misleading the jury. . . . . . . . . . . . . . . . . . . . 235

3.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

V.    The Manner in Which the Government Would
Execute Movant Violates the Eighth Amendment. . . . . . . . . . . . . 240

W.    The Absence of a Principled Basis for
Distinguishing Cases in Which the Federal
Death Penalty Is Imposed from Those in Which
it Is Not Imposed Renders the FDPA
Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

X.    A System Where the Death Penalty Is Sought on
the Invidious Basis of Race, and the Irrational
Basis of Geography, Should Not Be Enforced and
this Court Should Vacate Mr. Mitchell's Sentence. . . . . . . . . . . . 249

**TABLE OF CONTENTS**

                                                                    **PAGE(S)**

1. Background.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

2. The invidious circumstances of race-of-
   defendant and race-of-victim. . . . . . . . . . . . . . . . . . . . . . . . 253

Y. Mitchell's Sentence Is Unconstitutionally
   Discriminatory and Therefore Must Be Set Aside. . . . . . . . . . . . . . 258

   1. Explicit statutory right to justice without
      discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

   2. Supervisory powers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

Z. By Omitting the "Plain-error" Review, Congress
   Has Failed to Provide for Meaningful Appellate
   Review, and Therefore the FDPA Is
   Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

AA. Mitchell Was Deprived of His Right to Effective
    Assistance of Appellate Counsel. . . . . . . . . . . . . . . . . . . . . . . 264

BB. The Cumulative Impact and Effects of
    Constitutional Errors at Each Phase of His Trial
    Require Reversal of His Conviction and
    Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265

IV. PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268

**Amended Motion under 28 U.S.C. § 2255**

**To Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody,**

**Or, in the Alternative, Pursuant to 28 U.S.C. § 2241**

1.     Pursuant to Federal Rule of Civil Procedure 15, subsection (a)(1), *Amending as a Matter of Course*, Mitchell hereby files an amended motion to vacate, set aside, or correct sentence.

2.     Mitchell filed Exhibits 1-126 in support of the June 9, 2009 motion; he does not file those exhibits again, although he refers to and incorporates Exhibits 1-126 by reference herein (Mitchell has served the Government with Exs. 1-126).  Mitchell files and serves concurrently Exs. 127-144.[1]

## PRELIMINARY STATEMENT

3.     Mitchell's trial counsel – one learned in capital defense[2] and two experienced criminal defense attorneys – *together had more than sixty years of experience* as attorneys.  Yet they completely failed to develop the powerful defense available to them.  Mitchell was convicted of first degree murder by a jury that was never told that, when the victims were killed and later dismembered, he was psychotic from sleep-deprivation "due to the drug binging, and ingesting as much crack, marijuana, alcohol and methamphetamine" as he could.  And the jury that sentenced him to death was never told of the voluminous compelling evidence of Mitchell's childhood of repeated physical and psychological abuse, neglect, and

---

[1]   The exhibits are cited as "Ex. ___" followed by a number assigned to each document.

[2]   "Learned counsel" refers to defense counsel who is "learned in the law applicable to capital cases."  18 U.S.C. § 3005.

1

abandonment, or his use of substances starting in the sixth grade, which was "indicative of the added stress of changing schools again and living with a mother who had previously abandoned him," and the escalation of his addiction to the point of using enormous quantities of substances just before the offenses.

4.      Counsel could have learned well before Mitchell's capital trial that the Diné (Navajo) are opposed to the imposition of the death penalty on its people, and should have presented that information to the Federal Government as further reasons why it should not seek the death penalty against Mitchell, a member of the Diné.  Instead, trial counsel could only complain when the Federal Government belatedly produced (at the penalty phase) a letter in which the Navajo Nation stated its decision not to support the imposition of the death penalty and requested the Federal Government not seek capital punishment in the name of either victim, who were also Diné.

5.      Counsel could have demonstrated to the Court well before trial, and at trial if necessary, the constitutional deprivations exacted on Mitchell by the orchestrated collusion between the governments of the United States and the Navajo Nation that

- Permitted both governments to arrest Mitchell pursuant to the Nation's arrest warrant for a misdemeanor;
- Permitted the Navajo Nation to hold him in its custody, depriving him of any possibility of the appointment of counsel, for twenty-five days;
- Permitted both governments to ignore the jail's mental health professional's recommendation that Mitchell receive treatment for his alcohol abuse;

2

- Permitted both governments to maneuver the Nation's misdemeanor proceeding such that, after his November 7 guilty plea to that offense, Mitchell's sentencing was set for more than two weeks later – the same day the Federal Government finally issued the arrest warrant for these underlying charges; and,

- Permitted the Federal Government to interrogate Mitchell no fewer than six times, often in unmonitored situations it knew were ripe for extreme abuse and coercion, before it extracted a damaging statement on the last day it could question Mitchell alone – the day he appeared finally before a Federal magistrate judge for the appointment of counsel on the underlying offenses.

6. The constitutional violations did not end there. Despite declaring the joint trial as a reason for the transfer to Phoenix, on the eve of Mitchell's trial, the Court severed the non-capital trial of sixteen-year-old co-defendant Johnny Orsinger from Mitchell's capital trial. The jury selection was rife with constitutional errors that ultimately deprived Mitchell of a fair trial. The Court's transfer of his case from Prescott to Phoenix denied Mitchell of a jury of his peers in that it rendered such undue hardship on potential Native American jurors as to effectively prohibit their participation in this trial. Furthermore, ineffective assistance of counsel, the Court's own jury questionnaire, and the limitations placed on counsel by this Court resulted in a *voir dire* that was devoid of fairness and due process.

7. Besides letting the governments' collusion pass, counsel failed to thoroughly investigate the Federal Government's forensic evidence (*e.g.*, blood

stains) which would have revealed an exculpatory version of events and provided bases for reasonable doubt to the significant charges. Instead, counsel relied entirely upon the Federal Government's DNA expert and apparently became convinced – without any bases for these decisions – that the experts' analyses could not be challenged. Counsel's lack of preparation failed to reveal that the Federal Government's DNA expert's testimony was unsupported by objective and competent science – blatant testimony that a defense expert could have exposed for counsel.

8.    The victims' causes and manner of death were an issue, but counsel made an unreasonable decision to forgo interviewing the medical examiner, explaining to the Court that doing so was too great a financial burden. Counsel did not seek the advice of any pathology expert and their inaction and lack of preparation permitted the Federal Government to present erroneous and incompetent expert testimony about the only *possible* fatal wound Mitchell may have caused.

9.    When trial counsel did retain and utilize experts, the experts' advice was disregarded, and counsel presented no expert testimony whatsoever. Most importantly, counsel's experts advised them that Mitchell was a young man with brain damage and an addiction to alcohol and drugs – all of which seriously affected his decision-making and impulse control. This should not have come as a surprise to trial counsel given the documented interactions the FBI had with Mitchell from the time of his arrest. After all, one of the first interactions Mitchell had with law enforcement, on November 4, 2001, perfectly illustrated his grave deficiencies. After allegedly being read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the investigating FBI agent and subsequently asked whether he would waive his rights, according to the agent,

Mitchell asked the agent for a coin.  The agent gave him a nickel.  Mitchell then flipped the coin and, it seems, waived his constitutional rights and elected to speak to the agent based upon that coin flip.  (*See* RT 3108-09.)

10.    Yet, at trial and in opening statements, counsel stayed within the confines of the very limited information Mitchell was able to provide.  Counsel opened with, "[W]e are not suggesting that you even consider the possibility that Lezmond Mitchell was not there."  It seems that counsel did just that.  Had counsel considered the possibility that the story the government advanced was not entirely accurate, and conducted a thorough investigation, they would have uncovered compelling evidence that would have provided reasonable doubt for the jury.

11.    Throughout the guilt phase, trial counsel represented to the Court that they intended to present witnesses on Mitchell's behalf.  They specifically mentioned the Nakais and Johnny Orsinger.  However, the defense rested without presenting any witnesses or introducing any evidence.

12.    Although all of the above information regarding Mitchell's tragic life history was readily available to trial counsel, only a fraction of it was ever presented to the jury that sentenced him to death.  Indeed, the defense presentation during the penalty stage of trial was abbreviated, largely superficial, and failed to meaningfully explain the trajectory of Mitchell's life.  Instead, the jury was presented with a misleadingly rosy picture of Mitchell's upbringing and background which failed to explore the abuse and neglect he suffered from infancy and the lack of stability and positive forces throughout much of his critical developmental years.  Nor did trial counsel present the ample evidence of Mitchell's drug use, or explore how his addiction was the result of the young Mitchell's attempts to self-medicate in order to cope with the fears and anxieties that came with growing up in a home where he was regularly beaten and

humiliated by his primary caretakers. The defense mitigation investigation stopped far short of what is required of competent capital counsel. If Mitchell's jury had heard testimony describing the nature and depth of his family's dysfunction and the manner in which it shaped the course of his life, there is a reasonable probability that at least one juror would have voted for a life sentence.

## I.

## INTRODUCTION[3]

13.     This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255 and 28 U.S.C. § 2241.

14.     Mitchell is in the custody of the Federal Bureau of Prisons and is incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register No. 486585-008).

15.     a.     Name and location of court that entered the judgment of conviction you are challenging: United States District Court, District of Arizona, Prescott Division, Phoenix, Arizona.

        b.     Criminal docket or case number: CR-01-1062-MHM.

16.     a.     Date of the judgment or conviction: May 20, 2003.

        b.     Date of sentencing: September 15, 2003.

17.     Length of Sentence: Death.

18.     Nature of crime (on all counts):

Counts 1 and 5:     CIR-First Degree Murder, Aid and Abet, 18 U.S.C. § 1153, 1111, and 2, a Class A felony.

---

[3]   References to transcripts of the trial proceedings before this Court are cited first by the date of the proceedings then as "RT" (Reporter's Transcript) followed by a page number or numbers.

| | |
|---|---|
| Count 2: | Carjacking Resulting in Death, Aid and Abet, 18 U.S.C. § 2119 and 2, a Class A felony. |
| Count 3: | CIR-Felony Murder, Robbery, Aid and Abet, 18 U.S.C. § 1153, 1111, 2111, and 2, a Class A felony. |
| Counts 4, 8, 10: | Robbery, Aid and Abet, 18 U.S.C. §§ 1153, 2111, and 2, Class C felonies. |
| Count 6: | CIR-Felony Murder, Kidnapping, Aid and Abet, 18 U.S.C. § 1153, 1111, 1201(a)(2), and 2, a Class A felony. |
| Count 7: | CIR-Kidnapping, Aid and Abet, 18 U.S.C. § 1153, 1201(a), and 2, a Class, A felony. |
| Counts 9 and 11: | Use of a Firearm in a Crime of Violence, Aid and Abet, 18 U.S.C. § 924(c)(1)(A)(i, ii, and iii), and 2, Class A felonies. |

19. What was your plea?  Not Guilty.

20. If you went to trial, what kind of trial did you have?  Jury.

21. Did you testify at a pretrial hearing, trial or post-trial hearing?  No.

22. Did you appeal from the judgment of conviction?  Yes.

23. If you did appeal, answer the following:

a. Name of court:  United States Court of Appeals for the Ninth Circuit.

b. Docket or case number:  9th Cir. Case No. 03-99010.

c. Result:  Affirmed.

d. Date of result:  September 5, 2007.

e. Citation of the case:  502 F.3d 931.

f. Grounds raised:

1. The application of the federal death penalty to a carjacking offense that occurred on the Navajo Indian Reservation involving members of the tribe violates the opt-in provision of the Federal Death Penalty Act.

7

2.      The use of the kidnaping offense, which was prosecuted under the MCS, as a gateway factor violated the opt-in provision of the Federal Death Penalty Act of 1994 ("FDPA").

3.      Mitchell was denied his rights to have his petit jury chosen from a fair and representative jury venire when Native Americans were systematically excluded from jury service in his case.

4.      Mitchell was denied due process and equal protection of the laws when jury selection procedures were used to exclude Native Americans and members of other racial minorities from service on his jury.

5.      The court failed to excuse biased members of Mitchell's jury venire in violation of his rights to due process, a fair trial, and a reliable sentencing determination.

6.      The court committed reversible error in excusing Veniremember No. 39 for "cause" based on her belief that the death penalty should be used in approximately two percent of all homicides, an accurate description of this penalty's use nationwide during the past two decades.

7.      The trial court informed members of Mitchell's jury that material elements of the crimes charged were true, impermissibly alleviating the prosecution's burden under *In re Winship* to prove these elements beyond reasonable doubt.

8.      Procedures used to obtain members of Mitchell's jury venire resulted in the under-representation of Native Americans in violation of the Religious Freedom Restoration Act and the American Indian Religious Freedom Act.

9.     The court erred when it admitted Mitchell's post-arrest statements in violation of his rights to remain silent and to counsel, secured by the Fifth and Sixth Amendments.

10.     The court erred in not severing counts.

11.     After its last minute decision to sever out Mitchell's co-defendants, the court erred by not continuing his trial.

12.     The numerous violations of the government's obligation to turn over evidence in a timely way requires reversal of Mitchell's conviction and death sentence.

13.     The court erred in many instances by improperly admitting evidence, violating Mitchell's rights to due process, a fair trial and a reliable sentencing determination.

14.     The court erred in excluding portions of his post-arrest statements to law enforcement in violation of Mitchell's right to due process, a fair trial, to present evidence and to confrontation.

15.     The court violated the dictates of *Bruton v. United States* through the admission of Orsinger's statements.

16.     Mitchell's Sixth Amendment Right to confrontation was violated.

17.     The questions and references to the race of the decedents and witnesses and the argument that suggested that Mitchell should be sentenced to death because he had offended Navajo culture were improper and violated the FDPA and Mitchell's rights to equal protection, due process, a fair trial, and a reliable sentencing determination.

18.     The instructions given by the court on aiding and abetting were inadequate.

9

19.     The improper statements and arguments of the government counsel in both the opening and closing and both the guilt and the penalty phase warrant reversal of Mitchell's conviction and sentence.

20.     The court violated Mitchell's right to be present when it questioned the United States Marshal Service on two occasions about different issues outside of the presence of Mitchell.

21.     The court erred in accepting Mitchell's waiver of his presence during the penalty phase without conducting a competency determination.

22.     The court erred in permitting Mitchell to waive his presence during the penalty phase under Federal Rule of Criminal Procedure 43.

23.     Given the total breakdown in communication that occurred between the defendant and his counsel before the penalty phase began, the court erred in not appointing new counsel.

24.     The FDPA is unconstitutional.

25.     The jury instructions and verdict forms given during the penalty phase violated Mitchell's rights to due process, and a reliable sentencing determination.

26.     The court erred during the penalty phase by admitting information that was irrelevant and unduly prejudicial and in excluding admissible information which Mitchell attempted to introduce.

27.     18 U.S.C. § 3593(c) is unconstitutional in that it does not allow the defendant rebuttal on the issue for which he carries a burden.

28.     Mitchell's conviction should be reversed because during the trial family members of the decedents sat in the courtroom wearing buttons depicting the pictures of Slim and Doe.

29.    The application of the death penalty to Mitchell, the less culpable co-defendant, violates Mitchell's rights to due process and a reliable sentencing determination.

30.    The death penalty is cruel and unusual punishment and a per se denial of due process.

31.    Death by lethal injection constitutes cruel and unusual punishment.

32.    The application of the death penalty to Mitchell is unconstitutional.

33.    The sentences imposed on all non-death counts must be remanded in light of *United States v. Booker*.

34.    Each of the alleged aggravating circumstances were unconstitutional either facially or as applied, or both.

35.    A weighing scheme may not constitutionally utilize non-statutory aggravating factors without also providing for mandatory proportionality review and, therefore, the FDPA is unconstitutional.

36.    The Fifth and Eighth Amendments forbid both the execution of Mitchell and his current conditions given that he is prohibited from participating in the Sweat Lodge Ceremony.

37.    The federal death penalty is unconstitutional in its application because it is applied disproportionately to racial minorities, to males in female victim cases in violation of due process, equal protection and the Eighth Amendment.

g.    Did you file a petition for certiorari in the United States Supreme Court?  Yes.

(i)    Docket or case number:  No. 07-9351.

(ii)     Result:  petition for writ of certiorari denied.

(iii)    Date of result:  June 9, 2008.

(iv)     Citation to the case:  128 S. Ct. 2902, 171 L. Ed. 2d 843.

(v)      Questions presented:

(1)     Can a court of the United States, by virtue of "decisional authority," assume jurisdiction of a criminal case arising in Indian Country, involving a crime between tribal members, and impose a death sentence in the absence of express congressional authorization, where the tribe had not 'opted-in' to the death penalty provisions of the Federal Death Penalty Act, and where the imposition of that penalty would violate inherent tribal sovereignty interests?

(2)     Did the district court's removal for cause of 433 of 434 (99.8%) of the Native American prospective jurors in a case involving the novel application of the Federal Death Penalty Act to a tribal member for offenses arising between Indians and Indian Country, violates due process, equal protection, the right to a fair trial and this Court's holding in *Alexander v. Louisiana*, 405 U.S. 625, 92 S. Ct. 1221, 31 L. Ed. 2d 536 (1972) particularly where the corresponding excusal rate for non-Native American jurors was 66%, and the district court repeatedly questioned only the prospective Native American jurors about the effect their race would have on their ability to be fair and impartial?

(3)     Are the protections of the Fifth and Sixth Amendments to the United States Constitution and 18 U.S.C. § 3501 violated when federal agents and a federal prosecutor direct tribal authorities to arrest a tribal member to facilitate federal interrogation of that tribal member, who was held in tribal custody for twenty-eight days, and interrogated by federal authorities

12

many times during that period, without counsel and without presentment to a Federal Magistrate?

(4)    Where the government files an untimely Appellee brief and fails to mention or discuss issues that were expressly raised and argued in Appellant's brief, does it violate equal protection, due process and a fair determination on appeal for the court of appeals to apply waiver rules against the appellant, and to overlook the waivers by the government?

24.    Other than the direct appeals listed above, have you previously filed and other motions, petitions, or applications concerning this judgment of conviction in any court?  No

25.    Name of each attorney who represented you in the following stages of the judgment you are challenging:

a.    At preliminary hearing:  Not applicable.

b.    At arraignment and plea:  Jeffrey Williams, Deputy Federal Public Defender, Office of the Federal Public Defender, 222 North Central Avenue, Suite 810, Phoenix, Arizona.

c.    At trial and sentencing:  John M. Sears, Esq., 107 North Cortez Str., Ste. 104, Prescott, Arizona; Deputy Federal Public Defenders Jeffrey Williams and Gregory Bartolomei, Office of the Federal Public Defender, Phoenix, Arizona.

d.    On appeal:  Celia Rumann, Esq., Office of the Federal Public Defender, Phoenix, Arizona; Michael O'Connor, Esq., 2617 South Palm Drive, Tempe, Arizona.

e.    In the post-conviction proceeding:  Sean Kennedy, Federal Public Defender, and Statia Peakheart, Deputy Federal Public Defender, 321 East 2nd Street, Los Angeles, California.

13

## II.

## STATEMENT OF FACTS

### A.    Mr. Mitchell's Life History

26.    Mr. Lezmond Mitchell is an only child, born to an unwed mother and to a father who apparently never saw, or even acknowledged, his oldest son.  The following facts, all of which were readily available to counsel, demonstrate that trial counsel had viable defenses to the capital offenses and the gateway factors, and that they had evidence that undermined the evidence in aggravation and mitigated the imposition of the death penalty.

#### 1.    Mitchell's maternal family

27.    As discussed below, following his infancy, Mitchell's caretakers were his grandmother Bobby Joe Erwin Mitchell ("Bobbi" or "Bobbi Jo"), and later his grandfather George Charlie Mitchell.

28.    Mitchell's maternal grandfather, George Mitchell ("George"), was born in 1923 on the Navajo Reservation (Ex. 42), and remained there until he enlisted in the United States Navy at the age of nineteen.  (Ex. 27.)

> George was honorably discharged in late 1945, and soon after, using his G.I. Bill benefits, enrolled in Northern Arizona University at Flagstaff as an Education major.  He was a dedicated student, and graduated from NAU in 1950 . . . .
>
> In 1956, George was teaching at the Chilocco Indian School in Chilocco, Oklahoma.  . . .  It so happened that Arkansas City was where Bobbi Jo Erwin, daughter of Jesse Carroll Erwin and Mary Protzman Erwin, was a student at the local high school.
>
> How George and Bobbi Jo met, and the details of the courtship, is not known, but they were married in Arkansas City [Kansas] on December 9, 1956. . . .
>
> [] Bobbi Jo and George set up housekeeping in Chilocco, and George continued to teach there.  Their first child, a daughter they named Sherry Lane, was born in May 1958 in the Arkansas City Hospital.  During the summer of 1966 the family moved to Hanford, California. George taught in the local schools there until 1972.  In the interim Auska, a son, was born in 1967.

14

(Exs. 43, 47.)

29.    Bobby Joe Erwin was born in 1942.  (Ex. 48.)  When she and George married in 1956, she was fourteen years old, and George was thirty-three.

30.    She obtained her Graduate Equivalency Degree two years later, and began college in 1970.  Bobbi continued her education and achieved a Doctorate in Education in 1989 from Northern Arizona University.  A few years later, she obtained credentials in Counseling and School Psychology.

31.    Sherry Lane Mitchell was born in 1958.  (Ex. 22.)  Because the Mitchells moved several times, Sherry attended several Bureau of Indian Affairs' ("BIA") schools before graduating from a BIA high school in 1976.  (Ex. 24.) Sherry continued her education until she attained a Bachelor degree that emphasized Early Childhood Education and Science.  (Exs. 26, 27, 28.)  Between 1989 and 1992, she attended colleges in Fresno, California, working toward a degree in teaching and special education.  From 1992 to 1995, she attended a Lemoore, California college, achieving a Master of Education in Curriculum and Instruction and Administration.  (Ex. 28.)

32.    Sherry's brother, Auska Kee Charles Mitchell, was born in 1967.  He graduated in 1985 from high school (Ex. 60), and enlisted in the United States Army that fall, and he remained in service until March 1991.  (Ex. 61.)  He later married Beverly Morgan, and they have two children, Auska Jr. and Analane, and Auska's step-son, Russell.  (Ex. 105.)

>           **a.    The physical and psychological abuse suffered by Mitchell's mother when she was a child**

33.    Despite Bobbi's and George's professions in child education, their own children's lives were, by anyone's standards, miserable and violently abusive.

34.     Sherry describes the routines of her early childhood, including their mother's physical abuse:

> When I was in the second or third grade, my parents, Auska and I moved [from the Navajo Reservation] to Hanford, California.  My mother was in school and my father was working, that was about the time I became responsible for the household duties.  My mother told me that taking care of Auska and the house and going to school was my job, and we have jobs [sic].  I did the laundry, the cleaning, the cooking, and taking care of Auska.
> . . .
> When I was in grade school, I was responsible for the housecleaning.  My mother was never satisfied with how I cleaned.  I remember a time she became angry with me because she didn't like how I vacuumed.  In those days, vacuums were made of steel.  She beat me with [the] vacuum's steel hose all over my body and head.  After that, I told her I'd never call her Mom or mother again.  This made her very angry, and she ordered me to call her Mother.  I never did; since then, I've always called her Bobbi.

(Ex. 105, ¶¶ 4, 6.)

35.     Sherry relates the occasion her mother announced to a crowd of people that Bobbi  had been raped:

> [When I was in grade school,] my friend Violet, whose parents knew my parents, told me that my mother had announced in a ceremony, in front of a lot of people, that she didn't know if Auska was my dad's because his brother Mike Mitchell had raped her.  I was so ashamed of what my mother did that I quit going to ceremonies and dances for a long time afterward.  As an adult, I've come to feel that my mother beat me with the vacuum hose that time because she had been raped, [and] learned she was pregnant.

(Ex. 105, ¶ 7.)

36.     Auska describes a significant turning point in his childhood:

> When I was ten months old, my family moved from the Navajo reservation to a trailer park in Hanford, California.  We lived in Hanford until I was five years old, when we returned to the reservation.  In my mind, the Hanford years were happier times because I think of my mother as affectionate back then.

16

(Ex. 104, ¶ 2.)  He reports further about the change in their mother:

> When we came back to the reservation, my mother worked at a school in Many Farms [Arizona, on the Navajo Reservation].  In my mind, that period is when my mother's behavior changed.  The talk at our home was that her brain was injured when a student threw her against a brick wall.  I do not know whether this is true or not, it is just what I remember hearing around the house. Whether that event even took place or not, that is what I think of as the dividing line between a happier, more peaceful time in my  family and what came later. There is a lot I don't remember or maybe just plain don't understand because I was a child, but I do know, and remember that my mother became, cold, changeable and suspicious.

(Ex. 104, ¶ 3.)

37.    And, Sherry remembers other unusual behavior in their mother:

> When I was little, Bobbi went into trances.  I didn't know what was going on, I thought there was something wrong with her.  I was in the 3rd grade when her trances started.  A trance would last a day or more, and the trances went on for a couple of years.  During this period, she saw a psychologist.  She was prescribed medication like Darvon and Valium.

(Ex. 105, ¶ 32.)

38.    Sherry remembers their parents' violence during her and Auska's childhoods:

> Both of my parents beat me.  My mother beat me with whatever was at hand.  My father beat me too.  He even hit me with a hammer once.  The last time he beat me, I took the belt away from him and he was never to touch me again.
> My parents fought each other all the time.  After one of their arguments when we were in Chilchinbito, my mother stormed out of the house with a gun, and went up to the mesa.  We heard the gun go off.  I started to go to her, but my father said not to, 'If she killed herself, she killed herself, let her go.'
> . . .
> My parents' fighting was a constant in our home. Auska's dream was to get away as soon as he was old enough and start his own family.  My dream was to have a child and be a single parent.  When I was in high school, we spent one year in North Carolina.  I lived in

17

> the unheated garage of the house and slept on a shelf, which I didn't mind because I was alone and away from them. Nevertheless, my mother and I still fought. One argument turned physical; my mother choked me, I protected myself and hit her on the head. I don't remember if I hit her with an object or not. She fell and I left. I told my father to check on Bobbi because she was down. I started to walk to my job and a friend pulled along side of me, I told her that she maybe shouldn't be my friend because I may have just killed my mother.

(Ex. 105, ¶¶ 8, 16.)

39.     Auska remembers this period very well, too:

> When my sister Sherry was in high school and I was eight or nine years old, my family moved to North Carolina. My father was the vice-principal of a Bureau of Indian Affairs (BIA) School at the Cherokee reservation. The fighting in the family was on full force by then. Once, my father got out a bow and arrow and threatened to kill my mother. Another time, my father pushed my mother against the wall and my mother pretended to lose her voice for a day or two. There were fights between Sherry and my parents also. Sherry lived in the same building as we did, but in the garage.

(Ex. 104, ¶ 5.)

40.     Auska remembers that Sherry was more of a mother to him than Bobbi was, and the strife in his and Sherry's lives that continued into their teen years:

> I recall that Sherry took care of me more than our mother, especially in my younger years. It was Sherry who did the typical mother things with me, like arts and crafts and painting Easter eggs. After she turned eighteen or nineteen, Sherry went off to school and wasn't home a lot. The last time I actually lived with my sister was in [Chilchinbito, Arizona]. Sherry was not happy in Chilchinbito and in general. Relations were so bad between Sherry and our parents, especially our mother, that when our dad and I visited Sherry at college and brought her a gift or even supplies, like a laundry basket, Sherry said, 'If it's from mom, take it back.'
> When I was in high school, I lived with Sherry for a short time after I was caught shoplifting. There was a tremendous amount of fighting among the three of them, Sherry and our parents, when I was in middle school.

> My mother had me see a therapist because I would snap suddenly, and because I wanted to run away from home.

(Ex. 104, ¶¶ 6-7.)  And, he describes how Bobbi treated him and Sherry when she was not beating them:

> Although it's difficult to speak ill of my own mother, my mother had a way of either pissing you off or giving you a guilt trip.  She was manipulative and would go pretty far to make you feel guilty, like the time she pretended to lose her voice.  I became so angry with her once when we were in the car that I threw a coffee cup and shattered the windshield.  She was harassing me, saying the same things over and over again, hounding me, as she hounded all of us in the family.  She refused to back off, it was her mode.  My mother always had to have her way and manipulated or demeaned you until she got what she wanted.  Demeaned and degraded is what I felt from the way she treated me, especially when she required that I do things like take off her shoes and socks or put on her socks and shoes.  This happened from the time I was in fourth grade until I was in middle school.  Her physical condition or weight didn't prevent my mother from taking care of herself but she wanted me and later Lezmond to do these basic things for her.  My mother had to be waited on hand and foot, literally.
> My mother had a cruel streak.  She always talked about how mean her father, my grandfather, had been.  And, in turn, tell me that my face looked just like her father's, commenting, 'You had to go and look just like him.'
> Both my parents beat me up pretty badly with a belt when was growing up.  My mother's beatings continued until one day when I took the belt away from her. I was in the seventh or eighth grade.
> . . .
> One day when I was still at home, and we were outside by the barn at the 'farm,' which is what we called our reservation homesite, I had an outburst and told my parents to just go ahead and kill me – I was so upset and could not bear my parents' constant fighting any more.  So, my mother told me to stand behind the truck.  She then got in the truck, put it in reverse, and hit the gas.  I managed to jump out of the way and avoided being hit before my mother slammed into the side of the barn.

(Ex. 104, ¶¶ 8-10, 12.)  He notes that, "After the conflicts my mother tried to make amends by buying things.  That's the way my mother showed she cared; she bought love." (*Id.*, ¶ 13.)  Sherry states that when "'Mommy Dearest' came out,

19

Auska and I told Bobbi to watch it [because] she was Joan Crawford, she was Mommy Dearest to us, we said, 'that's the hell you put us through.'"  (*Id*., ¶ 21.)

41.    George forced Auska to leave his home when Auska was still in high school:

> I couldn't wait to get out of my parents' home when I graduated from high school but my father preempted that when I was still a senior in school by telling me that I had to leave.  He said that I was the cause of fighting between him and my mother.  To this day, I don't understand what I did.

(Ex. 104, ¶ 11.)  Auska finished high school, living with a friend's family then a band teacher.  He remembers that Bobbi refused to attend his graduation, and George had to drag her to it.  (*Id*., ¶ 14.)

### b.    Bobbi's accusations of incest

42.    Sherry remembers Bobbi accusing George of sexual infidelity (Ex. 105, ¶ 10), and accusing her of having a sexual relationship with George:

> Bobbi also accused me and my father of having a sexual relationship.  She told this to my face.

(Ex. 105, ¶ 11.)  A mail order gift Sherry received prompted Bobbi to accuse Sherry, who was still a young girl, of having sex with her father.  (*Id*.)  This was not the only occasion that Bobbi accused them of incest:

> [Bobbi] constantly accused me of having sex with my father.  She said to me once, 'You're the little shit who came between me and Dad.'  She also let it slip one time, when we were fighting, that my Dad insinuated this to her too, that he and I were having a sexual relationship.

(Ex. 105, ¶ 12.)

43.    Sherry recalls that she and her father shared a hotel bed when they traveled to and from ceremonies, even after Bobbi quit traveling with them, "and people thought that Dad and I were husband and wife."  (Ex. 105, ¶ 13.)

44.     Bobbi's accusations against her daughter and husband did not end after Mitchell was born.  Sherry said:

> Some people thought that Lezmond was George's son.  I thought Bobbi fed those rumors.  For example, she told Lezmond to call George 'Poppa.'  I got mad at her, I told her George was not Lezmond's father, that Lezmond had a father.  Traditionally, your not supposed to refer to your grandfather as father.

(Ex. 105, ¶ 14.)

45.     It remains unresolved, even to Sherry, whether George had sex with her:

> When I was a teenager, something kissed me.  I felt whiskers, as though it was a man who hadn't shaved. I woke up and no one was there.  My father said the man was a spirit.  I don't believe my father had sex with me. A medicine man has told me that he thinks my father molested me.  I have this vision that my father had performed a binding ceremony with me when I was little. This ceremony meant that he bound me to him and I would become his wife, which included having sex with him.

(Ex. 105, ¶ 15.)

46.     As a child, Mitchell heard these accusations.  Later, when he was in the seventh grade, Bobbi said to him, "'Who knows who your father is, your mother was raped, you know!'  He remembers that Bobbi's vicious and untrue words "knocked me for a loop, I couldn't think of what to say."  (Ex. 135, ¶ 13.)

### 2.     Mitchell's paternal family

47.     Sherry did not tell Bobbi when she became pregnant with Mitchell by Foster Hemil. (Ex.105, e 22.)

48.     Foster Hemil was a native of the Marshall Islands, and was born in either 1958 or 1959.  He graduated from high school in June 1978, and began college that fall, at the Navajo Community College.  He and Sherry met when they both attended Northern Arizona University.  (Exs. 36-38; 105, ¶¶ 22, 29.)  Foster

21

and Sherry never married. Hemil left and attended several other colleges. (Ex. 37.) Sherry never saw Foster again, although she obtained default judgment against him for support for his son, Lezmond Mitchell (he never complied). (Ex. 32.)

49.    Hemil had a criminal history. In 1984, he was convicted of driving while impaired in Orange County, California. (Ex. 41.) Hemil lived in Costa Mesa at the time, and was using an alias when he was arrested. That same year, he was convicted of burglary and assault, and ordered to register as a sex offender. His plea statement stated that he had intended to commit a sexual battery in the house. It appears he evaded the jurisdiction, and returned to the Marshall Islands. (Ex. 40.)

50.    Lezmond Hemil, a half-brother to Mr. Mitchell, recounts the following about his and Mitchell's father:

> I was eight or nine years old when my mother died [in 1994]. I have very few memories of life with my father, Foster Hemil, after my mother died. However, I do remember that he drank beer every day; he drank beer like it was water. December 2002, my father died of illnesses related to his alcoholism. Given how much alcohol he drank even when I was around him years ago, I was not surprised at the cause of my father's death.

(Ex. 101, ¶ 4.)[4]

51.    By the time of his death in December 2002, Foster Hemil had been employed by the Ministry of Education, for the Government of the Republic of the Marshall Islands, since April 1996. He was the Chief of Food Services when he died. Foster Hemil died fairly suddenly, and as Lezmond Hemil related, his cause

---

[4]  When contacted by Mitchell's present counsel, Lezmond Hemil was not aware of Mr. Mitchell's existence, or that his father had a third marriage after his mother's death. (Ex. 65; Ex. 101, ¶ 6.)

of death was liver failure, chronic liver disease, and a chronic, active Hepatitis-B infection.  (Exs. 35, 39.)

52.    Mitchell never met his father or his father's family.  (*See* Ex. 105, ¶ 29.)  Foster Hemil died shortly before Mitchell's trial began.  Almost a year after their appointment, counsel and their investigator traveled to the Marshall Islands, but Mitchell's father was deceased by then; beyond gathering some records about Foster Hemil, and interviewing his widow and brother, counsel did nothing further to develop the paternal side of Petitioner's family.

### 3.    Mitchell's childhood – birth to high school

53.    Sherry did not tell Bobbi when she became pregnant by Foster Hemil.  "By this time," she recalls, "I was so tired of their fighting and how they treated me, I just wanted out from under them."  (Ex. 105, ¶ 22.)  She says,

> I was a student at Navajo Community College.  George found out I was pregnant because he came to visit me, but he didn't tell Bobbi because they were separated at the time.  Bobbi didn't find out until after the delivery, when I was still in the hospital.  The nurse eventually forbade Bobbi from visiting me in the hospital because every time she did, my blood pressure shot up from the stress she caused me.

(Ex. 105, ¶ 22.)[5]

54.    "Lezmond's birth records indicate that Sherry's pregnancy ran 10-½ months."  (Ex. 94, p. 6, fn. 15.)  When Sherry delivered Mitchell, "he had a cranial hematoma because he got stuck.  I nearly died from the blood loss."  (Ex. 105, ¶ 23.)  The medical record indicates that Sherry hemorrhaged and Mitchell was delivered by forceps.  (Ex. 29.)

---

[5]   This was Sherry's second pregnancy.  Her first pregnancy, by a man she became engaged to after high school ended when she terminated it.  (Ex. 93, pp. 5-6.)

55.    Sherry was attending college when Mitchell was born.  She remembers that she was "stressed out, because I needed to finish my degrees.  I breast-fed him but the stress dried me up so I could no longer breast-feed him.  I was so stressed that, occasionally, Lezmond had to live with Bobbi." (Ex. 105, ¶ 24.)

56.    According to Bobbi,

> After Lezmond sustained unexplained injuries – 'second degree bums all over his chest and stomach when Sherry spilled hot coffee on him and got a big bump on his head,' Sherry dropped Lezmond for George to raise in Chilchinbito, Arizona, back on the Reservation.

(Ex. 93, p. 7 (quoting Bobbi Mitchell).)  Mitchell was nine months old.  (*Id.*) While George was probably the least physically abusive of the trio, he "was busy all day himself [and] enlisted the help of a babysitter, who watched Lezmond [on] weekdays."  Lezmond was shuffled between Sherry in Flagstaff and George's homes in Chilchinbito, Kinlichee, Genado, and Sanders, AZ for the next few years."  (Ex. 93, pp. 7-8.)

57.    Hilary Weaver, D.S.W., a social worker with "expertise in cultural issues in the counseling process, cultural competence, with a particular emphasis on Native Americans," discusses [t]he Shaping Relationships in Lezmond Mitchell's Life," *i.e.*, Sherry, Bobbi and George.  Of Sherry at this point in Mitchell's life, she states:

> [Sherry's] decision [to give Lezmond to her mother, Bobbi] is a reflection of the depth of damage done to Sherry, inflicted on her by Bobbi Jo.  Sherry knew her parents were abusive; she knew her mother was demeaning, argumentative and violent.  Sherry knew her mother, in particular, had been abusive to her as a child and young adult.  Sherry knew her mother was already playing out the same abusive patterns on Lezmond. Knowing all of this, Sherry nonetheless left her son with her mother.  This act speaks to the tremendous pressures Sherry must have felt to complete her education, to have a measure of success in her life.  Both of her parents

24

> were well-educated.  Bobbi had obtained a doctoral degree.  They had given Sherry the message many times and in many ways as a child and adolescent that she had not measured up to her mother's expectations.  It is likely Sherry was both told and felt she had little choice but to put her own education over her child's well-being.  Sherry's desire to be independent and to support her child necessitated attaining a stable income.  (Ex. 105, ¶ 24-25.)  She hoped this would be a brief solution to her situation and told all involved that she would be able to reclaim Lezmond shortly.  These things likely played a part in the decision to deliver Lezmond to the person who was a source of so much pain in Sherry's own life, Bobbi Jo.  Sherry felt she had no choice; she had been so injured by her own mother that she could not recognize what she was going to Lezmond.
>
> Lezmond is clear about the pain this abandonment by his mother caused him.  His strongest memory from this time in his childhood is his heartbreak in trying to figure out why his mother was leaving him behind and why she did not allow him to go with her.  Throughout Lezmond's life thereafter, he knew Sherry was his biological mother and he continued to love her, he never again saw her as the primary adult in his life.  In conversation with Lezmond about his mother, he recounts all of his experiences with her with a taint of great sadness.

(Ex. 143, ¶¶ 28-29.)

### a. Mitchell's caretaker from infant to five years:  Bobbi Jo Mitchell

58.    Bobbi was known for hoarding and compulsive cleaning.  Auska described that behavior:

> My mother didn't last long at her jobs and after a while she could not longer find work as a school administrator on the reservation.  I don't know why but I suspect that it was my mother's personality that put her at odds with people.  She had to get work farther and farther away, even in Alaska for a time.  Wherever she went, she bought a household of things.  When she lost her job, as she invariably did, and move back to reservation, or when she went back to the farm during the summer, we had to rent big U-Haul trucks to transport her latest acquisitions back to the reservation.  I have memories of frequently moving the ever-increasing amount of things from place to place at the farm, or buy more storage units, to make more room for her stuff.  All of the

> buildings in the farm were packed full of her crap.  She even bought an old school bus and put it on the property then packed it to the brim with her belongings.

(Ex. 104, ¶ 16.)

59.   Auska suspicion about Bobbi's manner at her jobs was absolutely accurate.  One colleague who worked closely with Bobbi states,

> Bobbi told me that the Navajo way is to use shame and humiliation as discipline.  Bobbi could be very verbally unkind toward kids at times, even the ones in her classroom.  I remember Bobbi had a student who suffered severely from Tourette's Syndrome.  According to Bobbi, this child was very violent because she had so many behavior problems with him, so the county school psychologist transferred him to my class which was a more restricted environment than her RSP class.  In my class, this boy had no problems.  However, instead of being happy with his improvement in behavior, Bobbi began coming into my classroom just to check on him and at times belittled and put him down.  She scolded him for using the computer and she hovered over him.  During recess, Bobbi would keep him indoors as punishment. Bobbi also said that he was not truly a real Tourette's case.  Bobbi at one point told this child that he was not moving into the next grade although his academic work was at 8th grade level, and that she would see to it that he would stay in her class another year – she told him this to upset and control him. Once I felt I had to put a stop to her verbal abuse of this child, I went to our superintendent and told him what I had witnessed and that my aide and I felt it was an abusive situation. . . .  In Bobbi's mind, this was the Navajo way, using fear and humiliation, but that certainly was extremely unkind and unprofessional.  Another student, who was retarded, told me Bobbi was very mean. In fact, he refused to take Bobbi a note because he said she said cruel things
> After receiving her doctorate, Bobbi seemed to have problems wherever she worked and usually moved yearly because her contract was not renewed.  I know this because she used to talk about this during our phone conversations.

(Ex. 117, ¶¶ 5-6.)

60.   This individual, an educator herself, knew Sherry quite well, too.  She states of both women:

> Sherry and Bobbi were two strong-willed women in Lezmond's life.  I think both had many psychological problems.  Sometimes I felt that Sherry and Bobbi treated Lezmond like a bone between them.
> Sherry and Bobbi argued constantly. One day, Bobbi told me she had argued with Sherry and that Sherry was throwing and breaking some ceramics that Bobbi had made.  Sherry and Bobbi often seemed like a very dysfunctional family.  I did not see much tenderness or warmth between them and I never saw them hug or touch each other or hug Lezmond.  Everything was verbal.  When they looked at you, there did not seem to be much warmth in their eyes . . . .

(Ex. 117, ¶¶ 8-9.)

61.    Another co-workers describes Bobbi as "controlling to the point of being abusive" and that her "personality went from one end of the spectrum to the other." (Ex. 95, ¶ 3).  Another described her as "a very hard, demanding woman.  She was strange and rude.  Although she could be pleasant at times, she could be the total opposite in a minute"; "diabolical and a lunatic"; "a Dr. Jekyll and Mr. Hyde"; "crooked"; and related that the "kids at the community center were all terrified" of her.  (Ex. 96, ¶¶ 3, 4, 7.)  This individual relates an incident regarding some brownies, during which Bobbi confronted and screamed at her and accused her of being a thief:

> I began to [fall] backwards and almost fell.  I truly thought Dr. Mitchell was going to hit me that day.
> After that incident, I knew I had enough of Dr. Mitchell's abuse. . . .  I went directly to the superintendent's office and told him everything.  He told me not to worry about my job, to take the rest of the week off and that he would find another position for me.
> The following week, Dr. Mitchell harassed me by calling me at home, and at all hours.  She also parked in driveway three or four times, and honked her horn.  I really thought, and still think, that Dr. Mitchell was crazy. . . .
> Also during that week, someone at the center called and told me that Dr. Mitchell wanted me to come back to work, and that if I did come back, she would forget all about the brownies. On the other hand, I was told, if I didn't come back to the center, Dr. Mitchell said

she would make sure that no one hired me.  Dr. Mitchell was evil.

(Ex. 96, ¶¶ 10-13.)

62.    An employee of Bobbi's recounts their working relationship:

When she hired me, she told me that my responsibilities as the office manager were supervising the other employees, but actually she hired me to spy on everyone, particularly another employee, Mary Coronado. I mean, she told me to spy on people for her. I was required to complete logs that described exactly what everybody did that day, for her use.  This may sound like it is a normal thing for a boss to ask the office manager to do, but really Dr. Mitchell was paranoid and thought everyone was out to get her.

Dr. Mitchell's behavior was erratic; you were either on her good side, or on her bad side, there was no in-between. Dr. Mitchell flipped out at the most minuscule of things.  For example, once she called me at home at about 5:30 a.m. on a Saturday to tell me that a Donald Duck picture was missing, and that she was sure that Mary Coronado, another center employee, had stolen it. Dr. Mitchell yapped and yapped nonstop about that picture.

. . .

I quit my job at the Community Center in February 1998 because I could not take it anymore.  Not only was I pregnant, but I also developed shingles due to the stress at the job. I have never worked for anyone like Dr. Mitchell since then and I never will again. If Dr. Mitchell raised her grandson, I feel very bad for him. She was such a terrible person; I have always wondered if there was something bad going on in her life.

(Ex. 120, ¶¶ 2-3, 10.)

63.    A teacher/colleague of Bobbi's relates Bobbi's behavior toward children:

In 1996, I had a student who suffered from a severe case of ADHD (Attention Deficit Hyperactivity Disorder). He was taking significant medication, and he and I had to take care a lot of problems because of his medication. I decided to allow him to nap in the middle of the day.  I brought a large bean bag chair from my house where I let him lie down and sleep.  When Dr. Mitchell found out about this, she was not happy at all.  This was not acceptable to her.  She then came into my classroom often to disrupt the boy's nap or to tell me to wake him

28

up. After a while, I began to lie to Dr. Mitchell about the student by telling her he no longer took naps, although he still did. I did this to get her off my back, and so she would leave him alone. I thought this was a very strange way for a school psychologist to behave toward a child, especially one with ADHD.

(Ex. 103, ¶ 3.)

64.    An employee at a community center where Bobbi worked in 1996 recounts this about Bobbi and Sherry:

I worked at the community center in Dos Palos, California, for about six months in 1996 or 1997.
. . .
Before Dr. Mitchell took over the community center, there were kids there all the time, they loved to come to the center. But, once Dr. Mitchell came on board, kids stopped showing up. They knew, kids sense very well about people.
I recall Dr. Mitchell's daughter, Sherry, because she once came to the community center. I don't recall why she was there or what we talked about, but several of us were talking to her. At first, Sherry was fine but once Dr. Mitchell appeared, Sherry's demeanor changed. She was laughing and suddenly, once Dr. Mitchell walked in, she just went blank. Sherry was tense, like she could not be herself around her mother.
Dr. Mitchell was manipulative; she enjoyed playing mind games with you. She used her degree to demean you. She gave me lists of 'to do' things but she was never satisfied with my work. Dr. Mitchell was abusive. Also, Dr. Mitchell knew how to make you uncomfortable – I mean, she actually seemed to want you uncomfortable. . . .
I was not scared of Dr. Mitchell but I could not be myself around her. She intimidated me and made me feel insignificant every day I worked there. I just walked around with an awful feeling in me. Dr. Mitchell stood there, watching like a police officer. I believe she did not want anyone to be over her authority. I cannot say I ever caught her in a good day.

(Ex. 99, ¶¶ 1, 3-6.)

65.    A subordinate of Bobbi's describes her:

From 1997 and 1998, I worked in the Dos Palos-Oro Lorna Joint Unified School District, in Dos Palos, California, as a Resource Specialist for Special Education. At the time, Dr. Bobbi Jo Mitchell was the

29

school psychologist and vice principal.  In about 1997, I started a permanent teaching position at Dos Palos, and, before that, I was a substitute teacher for many years.

Because of my positions at the school, I interacted with Dr. Mitchell almost daily.  Dr. Mitchell made me feel bad often, and she even made me cry at times.  I remember going to my car to cry because of something she had done or said to me.  For example, at my first Independent Educational Plan (IEP) meeting, I was a bit intimidated, even scared, since I was meeting with my student's parents, the school principal, and Dr. Mitchell.  Dr. Mitchell scolded me in front of everyone at that meeting.  I felt so bad because I had worked very hard to prepare for that meeting.  Karen Weaver, another teacher, helped me deal with this situation.  She basically saved my job because I wanted to quit after that meeting.

Dr. Mitchell worked in Dos Palos for less than two years.  She was grumpy and cranky. She would say mean things to you if she wanted to.  I don't think she was very professional behaving that way.  Dr. Mitchell made me feel miserable just by being herself; in other words, Dr. Mitchell had the power to make you miserable, there was something about her essence and her personality that permeated through you and made you miserable.  I often could not sleep at night because of Dr. Mitchell.  . . .

. . .

I walked on eggshells whenever Dr. Mitchell was around because I never knew what mood she would be in. I did not know if she were going to snap at me or be pleasant.  She was unpredictable and moody.  On rare occasions, she was pleasant.  Also, I cannot picture her ever admitting she had done something wrong; in her mind, she was always right and had to have the final word.  She was scary to me. It is ironic that a psychologist can be so mean and make people feel bad.

. . .

One day, I heard that Dr. Mitchell would be leaving the school.  The District did not allow her to finish the school year.  I feel somewhat bad saying this, but the day she left was a happy day for us.  Finally, the dark cloud was going away.  Everyone seemed joyful as the word got around that Dr. Mitchell was finally gone. It was funny to me how everyone suddenly started to talk about her openly, relieved to hear that we were not the only ones that felt like this about Dr. Mitchell.  In fact, there was a party when Dr. Mitchell left.  Someone brought a cake that said:  DING, DONG, THE WICKED WITCH IS DEAD.

(Ex. 98, ¶¶ 1-3, 5, 9.)

66.    Adults could not abide Bobbi yet she was Mitchell's caretaker from the time he was an infant until he started kindergarten, and for more years after that, until he was in the seventh grade.

67.    Dr. Weaver describes Mitchell's home life during this period:

> During these years, Bobbi gave an outward appearance of being a concerned parental figure in Lezmond's life, available for school conferences, and participating in Lezmond's school life as a well-educated professional in the developmental needs of children. However, at home, Bobbi was cruel to Lezmond, using shame and humiliation as part of her parenting arsenal. She berated Lezmond about his weight. [] She frequently told him that he would not amount to anything. She called him vile names. [] The upheaval in Lezmond's life was all-encompassing. On any given day, Lezmond was not sure what would happen when he got home due to the persistent verbal and, sometimes, physical abuse. Even when Sherry was living with them, she did not intervene with her mother, on Lezmond's behalf. Lezmond only felt safe when his grandmother went to bed at night. []

(Ex. 143, ¶ 33 (internal citations omitted).)

### b.    Mitchell's school years

68.    Trial counsel's mitigation investigator, who had the benefit of interviewing both Bobbi and George (both died after Mitchell's trial), wrote the following summary about Mitchell's elementary and junior high school years:

> Lezmond began Kindergarten in Sanders, AZ, while still in George's care, but his school year was interrupted when Bobbi moved to Hanford, California in December, 1987, and took Lezmond with her. Sherry was 'trying to graduate [from college]' at the time, and 'neither she nor George had time for Lezmond.' Lezmond, recalling this move bitterly, reports that Sherry told just she and he were moving to California, as she 'wanted to get away from her parents.' To Lezmond's disappointment, Bobbi, whom he 'never liked,' not Sherry, took him to California. Lezmond 'didn't understand why [his] mother was leaving [him].' Sherry didn't join them until several months later, after she had finished college.
> Bobbi, Sherry and Lezmond shared an apartment in Hanford, Bobbi working in education, Sherry in a mill

until she landed her first job in education.  Sixteen or seventeen months later, Bobbi moved back to the Reservation.  They moved again twice – to Lemoore, then Avenal, California, both rural town several hours from Los Angeles where Sherry and Lezmond worked and attended school in the same school district.

In Lezmond's words, 'finally, it was just [him] and Sherry.'  However, their parent-child relationship had already deteriorated, and Lezmond developed behavioral problems as early as the age of 5, not long after he was moved to California.  . . .

Lezmond was defiant with his mother, and when he started school, with his teachers.  In 3rd grade, he embarrassed Sherry when he 'got into a lot of clashes' with his teacher. After all, Sherry reports, she was an educator, but 'couldn't even control her own son.' According to Sherry, she 'told Lezmond to stop acting out,' and that she 'could lose [her] job over him, but Lezmond wouldn't stop.'  Again choosing her career over her son, and concerned more about her reputation than her son, Sherry withdrew Lezmond from school in the middle of the semester and shipped him to his grandfather to deal with.  Lezmond recalls this move with regret.  He reports feeling the sting of rejection, which never went away, but subsided instead into anger. From Sherry's point of view, Lezmond 'cut [her] out of his life in third grade' from this time forward.  Lezmond lived with George in Round Rock until the beginning of 6th grade, when, in Sherry's words, 'for whatever reason he wanted to try it again,' and moved back to Avenal, California with her.  As Lezmond got older, the fights with his mother 'got worse' and this living arrangement was as short-lived as any other he'd had with his mother . . . .  Lezmond and Sherry 'got into a big fight' and Lezmond refused to go back to California with Sherry after a visit to the Reservation during Christmas of 7th grade.  According to Lezmond, Sherry hit him for the last time during this incident, and he'd 'had it.'

(Ex. 93, pp. 8-9.)

69.     The turmoil Mitchell experienced in his home life was reflected in his school work.  (All of Mitchell's school records were in trial counsel's files. (Exs. 7-15.))  In short, Mitchell's school work and school social skills were derailed by the chaos and discord he suffered at home.

70.     In August 1987, five-year-old Mitchell was enrolled in elementary school in Sanders, Arizona.  Sherry was noted as being a full-time student and,

that December, she gave full guardianship of Mitchell to Bobbi, who had supported Mitchell "for the past 6 years since he was a baby."  The teacher commented that "Lezmond participates in all activities.  He needs challenging and interesting lessons.  Grandmother always available for teacher conference.  Lezmond is very independent."

71.    A 1988 Sanders elementary school progress report shows that "Lezmond has become careless when doing his class work.  He needs to concentrate on the work and try harder."  A second report stated that "Lezmond is making great progress . . ."

72.    At the beginning of the next semester, in January 1988, the school records show that Mitchell lived in the Hanford, California School District; he was in kindergarten.  That fall, still in Hanford, Mitchell began the first grade.  The instructor noted that he needed improvement in certain areas of social skills. At the end of his first grade, the Standard Achievement Tests scores the following April ranked him in Grade 1.7.

73.    In the fall of 1989, Mitchell began the second grade at a Catholic school in Hanford.  By 1990, he and Sherry lived in Avenal, California.  The instructor's comments indicated that he still needed to improve socially.  His fall academic achievement report for the second grade noted him as a "C student with Unsatisfactory conduct behavior," and "His mother is very supportive."

74.    His second grade teacher wrote that he "Could excel in all third grade materials, Very likeable one-on-one but acts out when he has peer audience . . . ." At the end of his second grade, the Achievement Test results ranked him at grade 2.6.

75.    Mitchell was in the third grade in Red Mesa, Arizona.  The teacher wrote:  "Lezmond is on grade level for reading and math (3rd).  He received an

"N" for not applicable for work habits and application for work knowledge" and was passed to the fourth grade.

76.    In 1992, Mitchell started the fourth grade, still in Red Mesa.  A teacher wrote:  "Lezmond is very limited in listening and speaking, He has no fluency in reading and writing."

77.    In the fifth grade, 1993, Mitchell "needs improvement with his social habits. Lezmond needs to work harder and apply to his studies.  Needs to check work and slowdown, marked improvement."

78.    In 1995, Mitchell was disciplined for "annoying classmates, lack of cooperation, rude discourteous, excessive talking, and stole stapler."  A few weeks later, George received a letter that Mitchell was referred to the principal "for getting involved in a situation that did not concern him which resulted in Lezmond wrestling with another student.  The other student got hurt."

79.    Later that same school year, when he was in the seventh grade, Mitchell was disciplined again for "destruction of school property.  In computer class Lezmond got a hold at keyboard cleaner spray and inhaled the chemical." Mitchell continued acting up and receiving detention.

80.    In 1996, when Mitchell was in the eighth grade, he was disciplined for smoking.  It continued:  took another student's papers and destroyed them; picking on a younger girl; smoking a cigarette and "cannot keep his mouth shut"; and, "provoking a fight with a visitor, and talking rudely and disrespectfully to a teacher."

81.    Later in 1996, when he was in the ninth grade, Mitchell was disciplined for "shooting a water gun in the classroom"; "foul language on bus"; and, "lack of cooperation, rude discourteous, profanity and 2nd time fighting, excessive talking."

34

82. In 1997, still in the ninth grade, Red Mesa school disciplined Mitchell for "being tardy, rude, and discourteous"; and "cutting class, excessive tardies (seven unexcused), abusing the restroom." His grade point average was 2.25.

83. After a discussion about Mitchell's poor grades between a teacher and Bobbi and George, the teacher noted that Bobbi "had called several times. She feels the school is not teaching adequately. Apparently, she is refusing to listen to Lezmond's refusal to do his homework." Bobbi responded:

> I did not make the statement in the second sentence above. I probably did make the statement I was concerned about what was happening to Lezmond. Also I did not refuse to listen about homework! I believe this letter is not correct information of what took place in the telephone conversation.

(Ex. 12.)

84. Apparently, the school promoted Mitchell but his infractions continued: "smoking"; "throwing a chunk a plasterboard at Mr. Tweedie"; and, "ditching 3rd hour and lying to teacher about staff." His grade point average was 2.5. The disciplinary actions continued into the eleventh grade: "lack of cooperation, rude, never shuts up, excessive talking"; profanity and fighting"; "lack of cooperation, rude, discourteous, excessive talking, profanity and 2nd time fighting."

85. In the fall of 1998, Mitchell transferred to Rough Rock Community School. The records indicate that Sherry was employed at Window Rock School District; however, Mitchell signed many of the documents himself. (As discussed *infra*, Mitchell was living alone at the homesite.) The disciplinary actions continued: "resisting authority, insubordinate," and "sale or distribute controlled substance (marijuana)."

86.     In 2000, when he was a senior in high school, the National Grade Percentile Bands rank him fairly solidly in the 50th-percentile.  He graduated in May 2000 with a grade point average of 2.224, and a class rank of 22/45.

87.     It was well-known in 2002 that when a child is abused, neglected and abandoned, his fear and anxiety is often revealed in his conduct at school and with his peers.  As described in more detail in the next section, Mitchell was physically and psychologically abused, neglected and abandoned at every point in his life by his caretakers, Sherry, Bobbi and George.  The facts and witnesses concerning Mitchell's poor school performance and the abuse and neglect he suffered was readily available to trial counsel – most, if not all, was provided to them by their own mitigation investigator well before trial.

### c.     The physical and psychological abuse, neglect and abandonment Mitchell suffered as a child

88.     Bobbi was violent and cruel to Sherry and Auska.  While Sherry continued living in her parents' cruel and unloving environment, once George kicked Auska out of the house, Auska stayed away more often until, later, he left his family permanently:

> After I left my parents' home, I could be around my mother for only a maximum of one week at a time.  I couldn't handle her longer than that.  . . .  It was not only the way she treated everyone in the home but also how compulsive she was about cleaning, and what a control freak she was.  There was no peace when she was around.
> . . .
> I eventually turned my back on my mother, I had to.  When she became very ill and my sister refused to continue taking care of her, it was my wife who ended up tending to her.  My attitude was that my mother had dug her own grave by making our lives miserable.

(Ex. 104, ¶¶ 15, 17.)

36

89.     As discussed below, George was verbally abusive to Mitchell.  But in Mitchell's sad world where the three adult caretakers abused, neglected and abandoned him, George Mitchell was probably the least physically abusive.[6] Despite all she and her brother had experienced in their childhood, Sherry handed over her child to her parents.

90.     Pablo Stewart, M.D., who is a psychiatrist and has extensive experience and knowledge about the effects of substances on an individual's actions and behavior, provides the following about Mitchell's childhood:

> As a young child, one of Mr. Mitchell's earliest memories is the pain of losing his mother and not understanding why he could not be with her.  Other early memories are witnessing Bobbi hit his mother with her bare hands and anything she could grab in the midst of fights, and the vicious verbal arguments between his grandparents and his mother.
>
> Mr. Mitchell related that Bobbi was the main figure in his life; he remembers the good times but they were 'outweighed by bad times.'  His earliest memory of Bobbi was when he and George lived in Sanders, Arizona, and Bobbi and Sherry were visiting.  Five-year-old Lezmond was lying on the floor, trying to hit flies with a swatter.  He remembers that Bobbi and George were arguing, and Sherry and Bobbi were about to start fighting.  After a fly landed on Bobbi a second time, she grabbed the swatter and hit Lezmond on his back and legs; he covered his head with his hands and she hit his hands too.  He remembers that his mother and grandfather sat and watched, neither told Bobbi to stop. This was not the last time Bobbi would hit Lezmond.
>
> Mr. Mitchell remembers that Bobbi did not always hit him (by his accounting, she beat him 'only a few times a month'), but when she did, 'her beatings really made an impression on you.'  She hit him on the mouth or wherever she could on his body, she often aimed for his head and missed only because he reacted quickly. When Bobbi was younger, she hit him with her hands but after she developed arthritis, she hit him with whatever she picked up:  vacuum hose attachments, small appliances, knick-knacks.  She threw a book at his head several times.

---

[6]   George was some sixty years older than Mitchell, retired from teaching in the 1990s and spent his most of his last years in California, with Bobbi.

Before Mr. Mitchell started kindergarten, his grandfather George moved to Sanders, Arizona, and took Lezmond with him. Sherry visited her son occasionally. Mr. Mitchell's sadness about his mother's disappearance from his life continued. Midway through the school year, George moved to Kin-Li-Chee, Arizona, also on the Reservation, where Lezmond and George lived with Bobbi. Mr. Mitchell remembers the constant fighting; his grandparents fought verbally and physically, and frequently.

. . .

In 1988, Mr. Mitchell moved to Hanford, California, where Bobbi was employed as a special education teacher. Lezmond began kindergarten again; Sherry told him that he had to repeat kindergarten because he was immature. Sherry lived with them for a year, and she worked as a secretary. George Mitchell visited them during summer and holidays.

When he was in the first grade, Mr. Mitchell joined T-ball. He played T-ball for only one season, however, because Bobbi complained about having to take him to practice or attend games. When he was in the sixth grade, Sherry forced him to play Little League, although he did not enjoy it. While she had attended all Lezmond's T-ball games, Sherry watched only two or three of his twenty-five or so Little League games. When he played football for his high school, no one attended his games.

Mr. Mitchell stayed with his grandmother in California for three years, until 1991. During that time he attended three different elementary schools, transferring from public to private and back to public school. The changes in schools added to the chaos in Lezmond's home. Bobbi beat him regularly, with any thing that was handy – broom handles, the vacuum cleaner hose, a ruler. Mr. Mitchell remembers a time when he did not hear his grandmother calling him from the other room because he was listening to a cassette player with headphones. Bobbi came into the room, tore the headphones from his head and yelled at him. The cassette player hit Lezmond in the back – he had rolled over just in time to avoid it hitting his head. Sometimes the beating came when Lezmond had problems at school; other times, the beatings were unrelated to anything. Lezmond's school records of this era reflect his upheaval in noting his problems listening, following instruction, behaving in class and self-control.

By outward appearances, Bobbi was concerned, well-educated in the development of healthy children, and a seemingly-ready participant in Lezmond's education. Mr. Mitchell, however, remembers that Bobbi was 'night and day' around others – at home, she

38

was erratic, angry and a source of intense stress and violence.

Bobbi was cruel to Lezmond, berating him about his weight, telling him he would never amount to anything. Bobbi *and* Sherry called him terrible names beginning when he was a child and continuing for as long as they could. They called him *little shit, motherfucker, little fucking bastard, dickhead, shithead, son of a bitch,* and *fucking asshole.* He learned to retort, 'Yeah I'm a little shit [or whichever name he was called], what're you going to do about it!' Mr. Mitchell reports that his grandfather *only* called him a *dumb ass,* and would demand, *what are you, stupid!* or tell him, *smart people don't do that.* He learned not to cry because 'no one gave a shit about that.' He also remembers that none of them spoke up for him or intervened by asking the other to stop calling him names. The verbal abuse was not limited to Mr. Mitchell – Sherry and Bobbi called each other *whore* or *bitch* during their fights.

Lezmond's memory of this time was the constant uncertainty of what would happen when he went home because of the verbal and sometimes physical abuse, and the emotional abuse that he had to endure. George, Sherry and Bobbi came together for the holidays. He remembers that, 'Holidays sucked because of the fighting. It seems like the fights were started on her [Bobbi's] part with everyone. You couldn't get through one holiday without a fight. It was a constant. I don't like holidays, I don't like celebrating my birthday, holidays, Christmas, I don't like none of that shit.' The only time he felt safe and felt he could relax was after his grandmother went to sleep at night.

(Ex. 135, ¶¶ 12, 14-19.)

91.    As noted *supra*, Bobbi compulsively cleaned, and required everyone in the family to clean as well. Mitchell remembers that still about Bobbi, and recalls what it was like to live with Bobbi,

Even as a child, . . . weekends 'were meant for the heavy cleaning around the house. Vacuuming, dusting, sorting, throwing out extras if it was stuff she could part with. If you didn't clean in a specific way, use the correct cleaner, or missed a spot, that could tear her off. She would let it build up, by the fifth or sixth time, she'd throw something at you.' Only when he and George lived alone and together did Mr. Mitchell enjoy any quiet. On school days, George rose before dawn, following the old Navajo way, and gently nudged Lezmond awake too. George quietly ushered Lezmond

39

through the morning – letting him wake up slowly, getting himself dressed, and eating a bowl of cereal – then he walked Mr. Mitchell to school.

School days with Bobbi were another matter. Mr. Mitchell remembers that Bobbi let him stay up late on weekends, conditioned on him getting up to clean the next day and sometimes working in her classroom, cleaning and organizing it too. Sometimes during his kindergarten and first and second grades, he had two hours of sleep the night before because he had to get up to clean. During the summers, again Bobbi, George and Sherry came together, and Mr. Mitchell still had to get up and work at cleaning, there was no time for relaxing on weekends. The summers when all of them lived on the Reservation began with Bobbi making everyone clean nonstop for a month, then Bobbi stopped and stayed in bed for about two weeks. Then, just before she left for California, Mr. Mitchell, Bobbi and George 'pulled all nighters' fixing up or cleaning until the early morning.

(Ex. 135, ¶¶ 20-21.)

92.    For whatever reason, when Bobbi was Mitchell's care giver, she would not let him "play with other children at their houses, other children did not invite him over, and Bobbi allowed him to play only in front of the apartment or with skateboards on the sidewalk." He remembers playing at another child's house only one time in the years he lived with her. (Ex. 135, ¶ 22.)

93.    By now Mitchell was in the third grade, and he struggled at Avenal Elementary School. He recalls about the violence fights in the house: "'You [] don't know what was going to happen when you went home. You had to wait until everyone went to bed to know that it would be fine.'" (Ex. 135, ¶ 23.)

94.    When Mitchell lived with his mother, Sherry states, she was "'[d]etermined to break the cycle of abuse' she suffered at the hands of her mother, [and] denies any physical abuse of Lezmond." (Ex. 93, p. 9.) "However, other witnesses remember [] quite differently" Sherry's abuse toward her son. (*Id.*) "Auska, . . . Lorenzo Reed, Lezmond's friend, and Delilah, Lezmond's girlfriend,

report that Lezmond reported verbal and physical abuse by both Bobbi and Sherry. (*Id.*)

95.   In 1991, Sherry summarily dismissed Mitchell and sent him to live with George on the reservation; he was eight years old.  Dr. Stewart describes that event and the rest of Mitchell's school years:

> . . . [Sherry] was staying with Lezmond and Bobbi Jo during this period.  George had been visiting them in California for the holidays.  One morning as Sherry was leaving for work and Lezmond was getting ready for school, she told him, 'You're not going to school, you're going with your grandfather to Arizona,' then walked out the door.  Mr. Mitchell remembers that his mother did not say good-bye or hug him, she just left.  Later that day, Bobbi drove Mr. Mitchell and George to the bus station.  She told Mr. Mitchell, 'You brought this on yourself, your mom and I can't handle you.'  He relates that no one hinted that he would move, they just told him suddenly.  To him, it was as if his mother could not be bothered with him.  Lezmond returned to the Navajo Reservation and was placed in third grade at Round Rock Elementary School.  . . .
>
> At the end of his fifth grade, Lezmond was sent back to California to live with his mother for his sixth grade.  Lezmond had not lived with his mother for four or five years.  During this school year, Lezmond began smoking marijuana.  He also drank alcohol when he could get it.  . . .  Initially, Mr. Mitchell and Sherry got along until she became more 'controlling,' requiring that he return to the apartment and 'check in' every thirty minutes.  He remembers that she had her former Special Ed students  'spy' on Mr. Mitchell's behavior or conduct in school and report back to her.  He hated this because, to him, it was another way his mother tried to control him. . . .
>
> Mr. Mitchell spent the summer after sixth grade in Arizona with his grandparents.  The fighting and abusive behavior in that environment continued.  In a particularly corrosive pattern, after verbally abusing Lezmond, Bobbi cried and required him to hug her, to show that he forgave her, then she would offer to take him out to eat or to buy him something.
>
> Lezmond returned to California to begin seventh grade.  During a visit to the reservation over the holidays, Lezmond and his mother argued.  Lezmond left and walked toward the Round Rock trading post; his grandfather found him six or seven hours later.  When Sherry left for California, Lezmond stayed behind with

41

his grandfather.  Lezmond finished seventh and eighth grade at Red Mesa Junior High School in Arizona.  . . .

Mr. Mitchell relates that only with regard to disciplining him did Sherry 'act like a mother' – that is, she punished him.  Other than making sure he was fed and clothed (in what she wanted him to wear), he relates that she provided nothing further.  . . .

(Ex. 135, ¶¶ 24-29.)

96.    Dr. Weaver summarizes the following about his main care takers, Bobbi and George:

. . . Although Sherry remained in Lezmond's life, Bobbi Jo took on the role of primary care giver for much of Lezmond's early childhood, as discussed above. Indeed, Bobbi Jo treated Lezmond like he was her own son rather than a grandson; this was to Sherry's dismay who believed that Bobbi Jo undermined her parental authority throughout Lezmond's life.  Bobbi Jo was more advanced in her education and had more career opportunities than Sherry, which meant she was better situated financially to care for a young child.  Bobbi Jo's educational aspirations and frequent job changes, caused her to move frequently throughout Lezmond's early childhood.  This mobility was influential in that Lezmond changed schools frequently, lacking the continuity of learning that is vital for young children. The instability also gave Lezmond a limited cultural grounding in Navajo traditions, and left him with an inability to speak the language.  That limited exposure and grounding in his culture were quite traumatic for Lezmond when he returned to the reservation in third grade.  Finally, it left Lezmond with one less potential internal resource to use in coping with the failures of adults in his life to care for and nurture him.

. . .

Bobbi Jo was one of the most dominant forces in Lezmond's life.  She took on significant responsibilities for raising him as a child, even when his mother lived in the same household.  Bobbi Jo had an overpowering personality and was frequently abusive to Lezmond, as she had been to her own children.  People that she worked with documented that she commonly demeaned people, leading children that she worked with to fear her. There are occasions when Bobbi drove adults to tears or to quit a job because of her mistreatment of them.  Bobbi Jo's erratic and vindictive behaviors targeted the adults she supervised and disabled children alike.  Her

42

professional judgment and sense of boundaries were seriously compromised, at best. Bobbi Jo's inappropriate behaviors at work were doubtless a muted version of her interactions at home. While a school district could fire Bobbi Jo when she was out of control, Lezmond had no control over who was assigned as his guardian.

The arbitrariness of Bobbi Jo's violence against Lezmond contributed to his sense that no place was safe for him and that he had little control over the things that happened to him. Bobbi Jo's physical and mental health issues no doubt contributed to her conflictual relationship with her children, Sherry and Auska, and her grandson, Lezmond.

. . .

While George was always in Lezmond's life, the nature and quality of that relationship changed substantially. As a young child Lezmond had a positive image of his grandfather, largely because, unlike Lezmond's other parental figures, George asserted little control over Lezmond. The incident in Gallup is one small example of not only George's inattentiveness, but neglect as a guardian who prioritized his own desires over caring for a young child. It is telling that this is the most positive relationship Lezmond experienced during his childhood.

(Ex. 143, ¶¶ 62, 71-72, 93.)

97.    Dr. Stewart, a psychiatrist, opines that, as a result of the abuse, neglect, and abandonment he suffered throughout his childhood, Mitchell suffered from Post-traumatic Stress Disorder. (Ex. 135, ¶¶ 58-64.) He states:

Individuals who meet the criteria for a PTSD diagnosis are at an increased risk of substance use. PTSD 'independently increase[s the] risk of marijuana and drug abuse/dependence.' And, it is well-understood that individuals who suffer from PTSD, but who do not receive appropriate treatment, are disposed to use drugs and alcohol to modulate stressful experiences and recurrent effects from the trauma. That is, people self-medicate to deal with the physiological and psychological consequences of the trauma.

(Ex. 135, ¶ 65.)

43

### d.   Mitchell's substance abuse and addictions

98.   Dr. Stewart describes Mitchell's increase from substance abuse to addiction, noting that "[w]hile some experimentation is not unusual for adolescents, his use of substances starting in the sixth grade is indicative of the added stress of changing schools again and living with a mother who had previously abandoned him." (Ex. 135, ¶ 26.)  Mitchell's school friends remember that Mitchell started using substances very early and his abuse escalated to an addiction by the time he left high school.

99.   A schoolmate tells of their substance abuse:

> I met Lezmond Mitchell at Red Mesa High School located in Red Mesa, Arizona.  We were both in the 9th grade.  I believe I was introduced to Lezmond by Gregory Nakai.
>
> During that year, Lezmond Mitchell, Carlisle Haskan's, and the other guys I hung around with smoked pot every day.  We did not use rolling paper to smoke pot but rather used a metal pipe known as a bowl. . . .
>
> Every morning, as soon as the school bus dropped us off, Lezmond and I, and other friends of mine, immediately gathered behind a wall to smoke pot before making our way down the slope toward the school.  That was the best place for us to smoke because the buses parked in an elevated area to drop us off and we were also left unsupervised.  The security people were down by the school and so by the time our first class started, we were already high.  During lunch, we gathered by the football field or the metal shop to smoke pot.  After school, we smoked pot before taking our respective buses home.  We used to say that pot was our breakfast, lunch and dinner.
>
> Lezmond and Jason Nakai were the ones who usually brought pot to school.  I believe they got the pot from Gregory Nakai, Jason's older brother.  We usually had about five or six quarters (which is a quarter of an ounce) to sell around school.  We sold and smoked at the same time.  We smoked a lot of pot.  For example, if there were four of us, we smoked about three to four bowls if possible.
>
> That year on prom night, Lezmond and I went Chinle where he was going to score (buy) some rock cocaine from his uncle.  I remember we drove to Chinle to an apartment complex next to or behind the Coke factory.  I waited for Lezmond in the car.  Lezmond was

44

driving his grandfather s car that night. When he returned to the car, Lezmond showed me what he had bought. He had five rocks of crack cocaine with him and said he paid about $100.00 for it.

After leaving Chinle, we drove back to Lezmond's house in Round Rock where we picked up a big bag of pot. I believe we attended the prom for a little while and then proceeded to the Trading Post where we drank beer with some other guys. Later that night, we met up with three four other friends including Carlisle Haskan's and by midnight, we all ended up at Lezmond's house. His grandfather was not home. The rest of the night, the six of us drank beer, smoked pot, and finished the five rocks of crack cocaine. We partied until we passed out.

After finishing my freshman year at Red Mesa High School, my mother transferred me to Rough Rock High School. . . .

Shortly after I started my junior year, I saw Lezmond at school. He was now attending Rough Rock High School too. He told me he had been kicked out of Red Mesa High School for getting in a fight. Once again, Lezmond and I started to hang around with each other. We resumed our old ways of smoking pot several times throughout the day, every day.

By now, Lezmond and I not only hung out at school but also after school and on weekends. I think I must have partied at Lezmond s house around 15 to 20 times. Of those times, I only saw Lezmond s grandfather twice and only when he called out for Lezmond from the front door of his house. Lezmond and I usually stayed in the shed which was a detached structure from the main house. Other times, we drove to the Nakai house up the hill to score pot and drink beer. Lezmond and I smoked pot almost every time we saw each other during the years he and I hung out together.

During senior year, Gregory Nakai's connection got busted and so scoring pot became difficult for Lezmond. So, my brother and I began buying pot from another connection and usually bought two ounces each. We left two of the ounces at the dorm and took the other two to school to sell and smoke.

Lezmond never talked about his family or anything personal during the time I knew him. The only family member I knew was his grandfather who was never home and I never learned why his mother was not there. On one occasion, Lezmond did tell me that his mother had left him a long time ago. nothing further about her or anyone else.

When I read about the crime in the newspaper, I was shocked and could not believe that Lezmond was being accused of doing such a horrible thing. I never expected Lezmond to end up like this. I expected

45

something like that from Gregory Nakai or his brothers, but not Lezmond.  I remember Gregory Nakai always talked about his guns or about going out with his brothers to shoot his guns.

(Ex. 130, ¶¶ 1-12.)

100.  Haskan corroborates Lameman's statements:

I met Lezmond Mitchell at Red Mesa High School located in Red Mesa, Arizona. in the 9th grade.

Lezmond and I had almost all of our classes together including Media class.  I enjoyed having Lezmond in my classes because we challenged each other.  Lezmond was smart and different from all the other guys at school.  Lezmond had a thirst for knowledge.  He was the kind of guy that others went to with questions.  If Lezmond did not know the answer to a particular question, he would find it somehow.

At school, the rich kids we called jocks picked on us and we picked on them too. Basically, it was a Rich Indian-Poor Indian thing.  Lezmond and I were considered poor Indians because of the way we dressed and because we had no money.  Their attitude was, we're bigger, better, and we have a lot of things; therefore, you are less.

Growing up in the reservation was hard.  We, (Lezmond and I, and the other poor Indians) had no dreams for a better future; we simply lived in the moment.  I think this is why we, the poor Indians, smoked pot all the time during high school.  We always had pot and I was one of the main providers.

At school, we (Lezmond and I, and our friends) smoked in the morning before classes started, during lunch, and after school.  Lezmond and I hung out with Ferdinand Lameman, Jason Kinlicheenie and several other guys.  Sometimes, we also smoked during the day in Media class or inside the school s radio station when Lezmond snuck us in.  Lezmond was the school DJ and I know Lezmond was usually high when he was on the air.

It was easier for me, Lezmond, and my other friends to get pot than alcohol but we did get it sometimes. I know one time a friend of ours brought a bottle of Southern Comfort.  I don't forget that day because I got very drunk and sick.  In Rough Rock, cocaine was also very hard for us to get because we didn't have money but we did get it at least a couple of times.  I remember we snorted cocaine through a small apparatus we called the bullet.

During our sophomore year, on prom night, Lezmond and I, along with others, left the prom because it was not happening for us.  We didn't like the crowd

46

there and the music was not good and so we went driving around to look for people to party with. I remember we stopped at the Trading Post and we also went to a place known as The Haunted Woods. We drank and smoked for a few hours. After that, a bunch of us went to Lezmond's house. We partied all night and we all got wasted. We drank, smoked a lot of pot, and we also snorted cocaine that Lezmond has in his possession. . . .

Lezmond was kicked out of Red Mesa High School during our junior year for fighting with another student at least two times on the same day and so was I about three to four months later. My mother took me to Moab, Utah to finish the year. I then returned to the reservation the following year and was enrolled at Rough Rock High School.

In Rough Rock, our pot consumption escalated. Not only were we smoking more pot than before; we were drinking alcohol more frequently as well. At the time, it was easy for me to get alcohol through my brother-in-law, Rudy Goldtoothe.

I did not graduate the year that Ferdinand and Lezmond graduated because of my grades. I graduated the following year with Lorenzo Reed. Before our graduation, Lorenzo and I got together with Lezmond to smoke pot. We continued to smoke pot and drink after the graduation ceremony.

(Ex. 129, ¶¶ 1-10.)[7]

101.  Another school mate of Mitchell's states:

At the beginning of my freshman year at Red Mesa, I didn't know most of the students, including Lezmond. After about a couple of months or so, Lezmond and I began to talk; I found him to he a nice guy. Lezmond and his friends, whose names I cannot recall at this time, smoked almost every day. I did smoke with Lezmond and his friends but only occasionally, not every day like they did. I remember Lezmond and his friends used to smoke in the morning, during breaks, during lunchtime, etc. They basically took every opportunity they had to smoke.

In Red Mesa High School, at least when I was a student there, it was very easy to get pot if you wanted some. Sometimes Lezmond had pot, and sometimes one of his friends had the pot. In other words, if one didn't have it; the other one would.

---

[7]  As Haskan indicates, notwithstanding the education of his care takers, Mitchell's was *not* a "middle class" Navajo family. Counsel failed to recognize, develop and expose this false notion, and it undoubtedly prejudiced their client.

(Ex. 134, ¶¶ 2-4.)

102.    Yet another school friend of Mitchell's since they were young, Herman Tsosie, recalls that Mitchell's substance abuse started in elementary school:

> Lorenzo, Lezmond and I smoked pot (marijuana) in elementary school but not very frequently because we were so young and didn't have the money to buy it. We smoked about two joints (marijuana cigarettes) a month during that first year.

(Ex. 119, ¶ 4.)

103.    Lorenzo Reed recounts his and Lezmond's drug use when they were in school together, and later, in 2001.

> Lezmond and I smoked pot together at Red Mesa, but not that much because buying it was hard; also, we didn't have any money to buy it. For these reasons, we hardly drank beer.
>
> . . .
>
> At Rough Rock High School, Lezmond and I used pot even more, compared with when we were at Red Mesa High School. We were now smoking about five joints (marijuana cigarettes) every day.
>
> . . .
>
> On weekends, we hung around, walked around the neighborhood, smoked pot, listened to music, but we rarely drank beer.
>
> . . .
>
> I saw Lezmond buy cocaine once. During Lezmond's senior year in high school, Lezmond and me, along with other friends, drove to Chinle in hopes of scoring (buying) some pot. Instead of pot, Lezmond bought a small bag containing cocaine. I never saw Lezmond use the drug but assumed that he did.
>
> . . .
>
> Pot and beer were always available at the Nakai house and this is why everyone went there, including Lezmond and me.

(Ex. 111, ¶¶ 4, 6, 11, 14, 16.)

104.    Mitchell's substance abuse increased in his ninth and tenth grades, while he was still at Red Mesa.

48

> [He] completed the ninth and tenth grade at Red Mesa High School. His reliance on drugs increased. He reports using acid (LSD) as a sophomore in high school. Lezmond first smoked crack cocaine during his junior year of high school, initially using it every couple of months. During a four-month period when Lezmond was left to live alone in Arizona during the school year, he binged on cocaine, 'snorted an 8 ball [an eighth of an ounce of cocaine] and smoked a whole ounce of marijuana just to see what would happen.' He bought his first gram of glass (methamphetamine). He remembers that, for most of those four months, he was up all day, 'going, going, going.' Mr. Mitchell's use of alcohol also increased. He reports he drank alcohol on the weekends, always to intoxication.
>
> The school suspended Lezmond twice before transferring to a continuation school . . . for the remainder of high school. Lezmond's drug and alcohol use continued at the new high school. One of Lezmond's friends reported smoking five joints of marijuana a day with Lezmond during this time.
>
> . . . The previous year, Lezmond had been left on his own for nearly four months of the school year. Now, it appears that Lezmond's problems at school had become public, and George and Bobbi were forced to take some action. The initial mental health evaluation notes that Lezmond had experienced lots of family fighting since a young child, that he admitted to some marijuana and tobacco use, and that Lezmond spoke of suicidal ideation, though without a plan or past suicide attempts. It was this evaluation that recommended Lezmond participate in intensive psychotherapy. Lezmond attended only five counseling sessions over a seven-month period. During one of those sessions, the counseling notes show that Lezmond sobbed while talking about his feelings of needing to get away from his family conflict and his feelings of wanting to kill himself at times.

(Ex. 135, ¶¶ 30-32.)

105. As Dr. Stewart notes, despite his mother's and grandparents' advanced degrees in child education, Mitchell "did not get the intensive therapy recommended for him. No one in his family saw to it that he followed through on that recommendation." Dr. Stewart describes Mitchell's substance use:

> [He] continued to use substances to cope with his feelings. He reports that he drank alcohol when he could get it during his senior year of high school, and that he

drank alcohol heavily on the weekends.  When Lezmond was a senior in high school, he was the passenger in a roll-over motor vehicle accident during which the driver was killed.  Both boys had been drinking.

Lezmond's grandfather had been a passive, even neglectful, guardian during Lezmond's childhood. Lezmond spent a large part of the time he was living with his grandfather on his own.  Now, as Lezmond got older, George's response to Lezmond's drug and alcohol use and school problems was to attempt to impose strict rules on his behavior.  Lezmond's reaction was a mix of shame and avoidance of his grandfather.  The tension between George and Lezmond, along with the fights among all of the adults in Lezmond's family and a general loneliness, led Lezmond finally to move out of his grandfather's home before he finished high school.

As a child, he had found reasons to be by himself when Bobbi starting fighting.  One summer, the roof on the house was not finished, so he took that as an excuse to be on the roof, in the hot sun, just to avoid Bobbi. Other times, he went to the canyon nearby because 'when you knew it [the fighting] was coming, there was nothing you could do about it.'  He remembers the relief he felt from getting out of the way.  By the seventh grade, he had begun to think he was adopted.  He thought, 'Why are these people my family.  I know other families don't do this to each other,' and, 'These can not be my family members, family don't cause fights with each other,' and 'Why am I putting up with this shit?' – the latter question he asked himself to this day. . . .

(Ex. 135, ¶¶ 33-35.)

106.  In 2001, his childhood friend Herman Tsosie recalled about his drug use:

During this time [2001], maybe once or twice a week, Lezmond, Lorenzo and I went up the hill, to the Nakais, to drink beer and smoke pot with the Nakais and the Kinlicheenies.  Just about everybody got totally wasted, but not Lezmond.  I saw him drink beer but Lezmond never passed out.  At the hill (at the Nakais), smoking a twenty-bag of marijuana was normal for us – you can roll about fifteen regular-size joints or seven fat joints out of a twenty-bag.

. . .

One day, Lezmond came down from the hill to visit me and Lorenzo.  Lezmond's eyes were dilated and

he was tweaking.[8]  Lezmond told me that he had eaten mushrooms and taken cocaine.

(Ex. 119, ¶¶ 10, 15.)  As described later, Herman saw only a fraction of the substances Mitchell smoked and used in August-November 2002.

107.   Dr. Weaver concludes:

> Childhood is a time when a child should have a sense of security and support that can be built upon when striving to acquire new knowledge and master new tasks.  All aspects of his environment were filled with uncertainty.  Lezmond never had a solid foundation upon which to build and grow into a secure adult.  He was thus unable to establish any sense of control over his own life or believe that through his own efforts he would consistently be able to accomplish tasks that he set out to do.  From this extremely dysfunctional family context, addiction provided an escape.  . . .

(Ex. 143, ¶ 105; *see, e.g.*, Ex. 133.)

108.   After his review and evaluation, Dr. Stewart opines that, by October 28, 2002, Mitchell was dependent, within the meaning of the Diagnostic and Statistical Manual IV-T-R, on many substances.  (Ex. 135, ¶¶ 66-70.)

### 4.    Mitchell – post-high school to November 4, 2002

109.   Not long after Mitchell graduated from high school in 2000, he moved to Phoenix, Arizona, and lived with Lorenzo Reed's brother and uncle. (*See* Ex. 135, ¶ 38.)  He eventually lost every job he had (all of them menial); he drank alcohol every night.  (See Ex. 118, ¶ 6.)  After he lost his third and last job and could no longer pay his share of the rent, in July 2001, he moved to Lancaster, California, and lived with Bobbi.  They were cordial enough for a while, then

---

[8]    [Tweaking] occurs after the [methamphetamine] has been administered for a period of time and the brain starts to develop some tolerance to the affects of the drug.  When it is readministered, people feel restless and agitated.  This phase is characterized by irritability, anxiety, agitation, and paranoia. *Clark v. Hedgepeth*, No. CIV S-08-0163, 2009 U.S. Dist. LEXIS 5702 (E.D. Cal. 2009).

Bobbi "started yelling at him for not cleaning appropriately," so he left. Bobbi accused him of taking some items. (Ex. 56.)

110. Mitchell felt he could not return to the Reeds, in either Phoenix or on the Reservation. So, in August 2001, Mitchell returned to the reservation and moved in with Nakai brothers. (Ex. 135, ¶ 39).

111. The Nakais lived in a clutch of a four, closely-situated houses not far from George and Bobbi's homesite. The brothers, Gregory, Jimmy, Jr., and Jakegory, lived in one house, and their aunts and other family lived in the other houses. By this time, a friend of theirs Johnny Orsinger lived with the Nakai brothers.

### a. Johnny Orsinger

112. Johnny Orsinger was born 1985 to Teddy Orsinger and Bernice Weeks. Teddy Orsinger is illiterate and was in and out of jail his entire adult life, primarily on alcohol-related offenses. Bernice was abusive to Johnny and Vickie, as were her various boyfriends. More than once, a child services agency removed Johnny and his younger sister Vickie from Bernice because of Bernice's drug abuse, and her abuse and neglect of her children; when the agency removed them, the agency placed Johnny and Vickie with Mrs. Gandarilla, Teddy's mother.

113. Johnny had a violent criminal history:

a. In February 2000, Mrs. Gandarilla called the police because her son, Teddy, was drunk and had fought with fight Johnny – Teddy had pushed Johnny into a mirror, breaking it, and punched him in the mouth. When the police arrived, the police arrested both Teddy and Johnny, Johnny for possession of drug paraphernalia.

b. In October 2000, the police arrested Johnny because Johnny and Teddy had fought the previous night, and Johnny refused to go to school.

52

Mrs. Gandarilla described Johnny as disrespectful and out of control.  The police again arrested Johnny for possession of drug paraphernalia.

c.   In November 2000, Johnny assaulted Mrs. Gandarilla in her home.  Johnny appeared to be under the influence of drugs.  Mrs. Gandarilla confronted him about his drug use and a stray dog he had brought with him. Johnny kicked a table, attempted to kick Mrs. Gandarilla, and threatened to break the windows in her home and car.  Mrs. Gandarilla called the police, although Johnny threatened more damage if she called for help.  The police arrested Johnny and he was committed to juvenile detention in New Mexico for ninety days.  He was fifteen years old.

d.   Johnny was released on probation from the juvenile facility in April 2001.  By June 2001, Johnny was out of compliance with his probation order.

114.   After his release, Johnny went to Arizona, where Teddy lived most of the time, and spent the Summer and Fall of 2001 sleeping either at the Nakai's and at his father's house.  He used drugs and drank alcohol every day.  By his own description, he and the others staying at the Nakais, including Lezmond Mitchell, used all the drugs they could get their hands on.  (Ex. 109, ¶ 5.)  Johnny never completed the ninth grade.

### b.   Johnny Orsinger's first murder

115.   The following facts are taken, in large part, from *United States v. Johnny Orsinger*, No. CR 01-1072 (D. Ariz.).

116.   Early in the morning of August 20, 2001, Jakegory, Gregory and Jimmy Nakai, Jr., Johnny and his father Teddy Orsinger, and Dennie Leal went to Round Rock Lake to get drunk.  The Nakai group was in Gregory Nakai's car.

They had two or three cases of beer. Two other men were drinking nearby, in a Chevy Blazer. Gregory had sold these men beer earlier in the evening.

117. By five or six that morning, only the Nakai party and the two men in the Blazer remained at the lake. Everyone in Nakai's car decided to carjack the Blazer; meanwhile, the passenger in the Blazer woke up and walked to the Nakai car and asked to buy more beer, but did not have enough money. When the passenger turned to walk back to his car, the group rushed him and knocked him to the ground. Jimmy thought Johnny and Dennie were the main people beating the passenger. The passenger could not get up when told to do so.

118. Dennie pulled the driver out of the Blazer and kicked him, and either Leal or Jakegory hit him over the head with a beer bottle. The bottle shattered on the man's head and he fell against the Blazer, hitting his head and then fell to the ground. Either Johnny or Dennie bound the unconscious men, tying the mens' hands behind their back and binding their feet. Johnny also had a 9-mm pistol. Jakegory and Dennie put both men into the Blazer's hatch area.

119. Johnny drove the Blazer with Gregory leading in his car. At some point, Teddy, who had taken over driving Gregory's car, drove too fast and rolled the car. Everyone crawled out of the car and pushed it back over onto its four wheels. Gregory was angry at Teddy for crashing his car. The car started but two of the tires were blown out and flat. Gregory then got into the Blazer with Jimmy and Johnny. Everyone else remained with Gregory's car.

120. Johnny, Jimmy Jr., and Gregory drove the Blazer, with the two unconscious and bound men in the back, to an abandoned house. Johnny directed them to this site. Johnny and Gregory took the passenger out of the Blazer and sat him on the ground; he began to regain consciousness. Gregory took the driver out of the Blazer and sat him on the ground next to the passenger.

54

121.   Gregory or Johnny told Jimmy to get the tool box out of the Blazer. When Jimmy turned to get the tool box, he heard one gunshot.  Jimmy saw Johnny about ten feet away – he had shot the passenger in the forehead.  Jimmy "freaked out."

122.   Gregory, still unhappy about his wrecked car, took the gun from Johnny, and shot the driver in the head about five times.

123.   They covered the bodies with a blanket and put them in the Blazer, then drove back to the others who were waiting at Gregory's wrecked car. Everyone got inside the Blazer and saw the dead men.

124.   After realizing his sixteen-year-old son had participated in the deaths of two men, Teddy fled.  The group dragged the men's bodies away from the Blazer, piled dirty clothes they had found in the Blazer on top of the bodies, stacked wood on top, and set it on fire.  The next day, Jimmy, Dennie, and Gregory returned to the lake and found the victims' bones with flesh still attached.  Dennie put the bones in a trash bag and put the bag in the trunk of Gregory's car.  The three drove to another location and re-buried the bones.  The next night, Gregory, Jakegory, and Johnny returned to check on the second burial spot.  Gregory later told Jimmy Jr. that the hole was dug up and the bag was gone.

125.   In December 2002, well before Mitchell's trial in the instant case, a jury convicted Orsinger of these murders, and he was sentenced to multiple life terms of imprisonment.  Orsinger was a minor, thus, he was ineligible for the death-penalty.

### c.    Mitchell's substance abuse at the Nakais

126.  Randall Comb, Gregory Nakai's uncle, describes the Nakai brothers' house, when Mitchell moved in:

Lezmond Mitchell moved into the Nakai house the summer of 200l.  I already knew who he was because I knew his grandfather, George Mitchell.  . . .

I never met Lezmond's mother. I knew that his grandmother lived in California.  Lezmond told me he moved into the Nakai's house, because he had to move out of his family home once he turned 18 years old.  At that age, he was expected to live on his own.  He told me he had lived in California for a short time before moving in with the Nakais, but he didn't like California and decided to return to Round Rock.

In 2001, only my home in that 'compound' or group of homes, had running water and electricity.  All the young men who lived at the Nakais were in and out of my home all the time showering, and Shirley and I often made food for the boys.  They ran electricity from our house to theirs.  I knew those boys very well.  They were respectful to me and helpful with chores when I asked them to help me.  During the summer of 2001, Lezmond often joined me when he saw me working outside.  He would offer to help me with whatever project I was working on.  I knew Lezmond to be a good kid, a respectful young man, someone who was well spoken and could carry on an interesting conversation.

. . .

Selling alcohol is illegal on the Navajo Reservation.  However, I knew the boys at the Nakai house drank alcohol (although I didn't actually see them drinking), because many times I went over and broke up a fight and saw that they were drunk.  The kids really respected me and I could usually get them to calm down quickly.

It wasn't hard for the boys staying at the Nakai house to get alcohol. There were four bootleggers in our immediate area. . . .

The boys at the Nakai house didn't go out much and when they did, they didn't go far.  They were mostly at their house playing video games, hanging out and listening to music, and walked to the store and back. They really weren't doing much. . . .

(Ex. 128, ¶¶ 4-6, 8-10.)

127.   Mitchell had moved in with the Nakais in August 2001.  In the next two to three months, his addiction became uncontrollable.  Everyone who lived in this Nakai house recounts their and Mitchell's drug use from August through October 2001:

128. Padrian George:

> During the summer and through early November of 2001 all of us, including Lezmond Mitchell, who were staying at the Nakai house used a lot of drugs and drank beer and other alcohol.  We smoked marijuana and drank beer nearly every day.  We also used cocaine, both as powder and as crack cocaine, ecstacy and meth.  We used any drug we could get a hold of.  we used a lot of drugs.  We commonly rolled our marijuana cigarettes with some other stronger drug, like cocaine or dipped our marijuana cigarettes in something stronger such as meth.  We figured out how to make crack from powered cocaine; we smoked crack whenever we could get it.  Lezmond Mitchell used all the same drugs, drank as much beer or alcohol as anyone else and stayed high when he could.

(Ex. 100, ¶ 4.)

129. Dennie Leal:

> . . . I saw Lezmond and partied with him and the Nakai brothers about six or seven times.  On some of those occasions, our partying lasted for days, or the whole weekend.  When we got together, we smoked pot and although we usually drank beer, we definitely drank whatever alcohol was available.  We got wasted.

(Ex. 102, ¶ 5.)

130. Gregory Nakai:

> That summer, I stayed home drinking beer with my brothers and other friends; Lezmond Mitchell was a part of this group.  Lezmond, the other guys and I smoked marijuana every day.  We smoked crystal meth and cocaine and ate mushrooms once or twice during this time; Lezmond did too.  All of us, including Lezmond, used drugs, and whatever drugs we had, everyday.  One of the only drugs we didn't use was heroin.
>
> After August 2001, everybody's drug use increased, including Lezmond's; we used a lot more crystal meth and cocaine, and more often.  I don't remember how much we used or how much money we spent on drugs, because no one was keeping track.  But I do remember that everyone in the house, including Lezmond, used as much drugs as we could get our hands on each day.

(Ex. 107, ¶¶ 4, 5.)

57

131.  Jakegory Nakai:

My brothers Jimmy Jr., Gregory and I, and some of our friends, drank beer and smoked marijuana nearly daily the Fall of 2000.  I met Lezmond Mitchell when he started coming to our house during the Summer of 2001 to party with us.  Lezmond moved into our house not long after he started showing up; I never asked Lezmond why he came to live with us.

My brothers Jimmy Jr., Gregory, I, and our friends, drank a lot of beer, too. Although selling alcohol on the Navajo Reservation is illegal, if you want to buy alcohol, people will sell it to you; these people are well known. Most of the beer that we drank at our house we bought from who lived a few miles away. I don't know his last name.

During the summer and fall of 2001, I, Gregory, Jimmy Jr., and our friends, including Lezmond Mitchell, drank beer, smoked marijuana, and used crystal meth, cocaine and ecstacy whenever we could.  Our drug use increased between August 2001 and November 2001, and all of us hanging out at the Round Rock house used more and more drugs, including Lezmond Mitchell. We never stopped using drugs and drinking during those months. Whenever the drugs started to run low, someone went out and got more.  The drugs, marijuana, cocaine, and crystal meth were always available.  Lezmond Mitchell used as much drugs and drank as much beer as everyone else in the house.  There were times when we did not eat for a few days because we were using all of our money for drugs and had no money left over to buy food.

(Ex. 136, ¶¶ 6- 8.)

132.  Jimmy Nakai, Jr.:

I went to see my brothers and their friends in Round Rock at least twice a week during the summer of 2001, and sometimes more often.  When I was at the house, my brothers and their friends, including Lezmond Mitchell, and I regularly smoked crack cocaine together. We also used meth.  And we always smoked marijuana and we always drank beer.  There were times when we drank rum and Coca-Cola, but not every time.  It's hard for me to say exactly how much crack cocaine and meth we used, but I can say that it was enough drugs for the four or five guys at our family's house to use the drugs and stay high all day.  We used whatever drugs we could get a hold of and continued to use what drugs we had until they were gone.  From the conversations I overheard between my brothers and Lezmond, I believe they were

> all using drugs every day that summer, including days
> when I was not with them.

(Ex. 137, ¶ 6.)

133.    Johnny Orsinger:

> During this time, 2001, at the Nakais, we used a lot of
> drugs and drank a lot of beer.  Everyday, we drank as
> much as we could get a hold of and used all the drugs we
> could get our hands on.  On the weekend, we used even
> more drugs and drank more beer.  We smoked marijuana,
> used meth, smoked or snorted cocaine and used LSD.  We
> smoked as much PCP as we could get and that our brains
> could take.  We never used heroin or took pills, we didn't
> take any drug with a needle, just smoked or snorted it.
> Staying awake for days at a time partying was very
> normal for us, never sleeping and not eating.  Lezmond
> definitely used these drugs and drank beer as much as the
> rest of us.  A typical Friday night, Lezmond drank one or
> two twelve-bottle cases of 40 ounce beers (called '40s'),
> plus he took as much drugs as he could handle; so did I.
> Sometimes I wonder how we survived because of the
> amount of drugs and beer we used during that time; it
> should've killed us but it didn't.

(Ex. 109, ¶ 5.)

134.    In late October 2001, Johnny and Lezmond went into Gallup, New

Mexico.  Like every day before that, and for some time, they had used crack

cocaine and meth, along with other substances and alcohol.  They had been awake

for several days drinking beer and using drugs.  Johnny described that day:

> . . . We used as much drugs as we ever did, everything
> we could get a hold of by any means.  We didn't smoke
> just marijuana – we always added something to our
> cigarettes to make the marijuana stronger.  I always added
> cocaine and meth to my marijuana before I smoked it;  I
> don't know exactly what Lezmond added to his marijuana
> but it was along those lines.  By the time we got to
> Gallup, Lezmond and I had been awake for several days
> drinking beer and using drugs.  We'd been awake for so
> many days, it felt like walking around in a cloud.  It was
> like we were puppets, our bodies kept moving forward,
> but I'm not sure how.

(Ex. 109, ¶ 6.)

135.    Mitchell's substance abuse continued.  On Halloween 2001, Jakegory, Mitchell and Jason Kinlicheenie robbed the Red Valley Trading Post.  Mitchell reportedly tied up the two female employees in the safe and closed the door. Jakegory took the purse of one of the employees, while Jason filled the truck with gas.  The vehicle the three used was Mrs. Slim's.  By then, her and Ms. Lee's families had reported them missing; a witness to Mitchell's, Jason's and Jakegory's getaway noted the truck's tag, which was identified as belonging to Mrs. Slim.

136.    After her extensive review and investigation, Mitchell's social historian, Dr. Weaver, D.S.W., states, in sum:

> Lezmond suffered abandonment, extreme lack of stability, cultural isolation, violence and loss.  While many people, including addicts and alcoholics, can and do make appropriate choices in their lives, for twenty year old Lezmond Mitchell, the combination of these forces rendered him unable to make appropriate decisions that would lead him to find a healthy place in the world. These experiences and conditions formed the context for his behavior in November of 2001.

(Ex. 143, ¶ 107.)

137.    Dr. Stewart states the following about Mitchell's state of mind at the time of the capital offenses:

> The American Psychiatric Association defines *psychotic* as meaning grossly impaired in reality testing, which is defined as existing when individuals incorrectly evaluate the accuracy of their perceptions and thoughts, and 'make incorrect inferences about external reality, in the face of contrary evidence.  . . . ¶ The term *psychotic* is also appropriate when behavior is so disorganized that it is reasonable to infer that reality testing is grossly disturbed.'  [Kaplan & Sadock, Comprehensive Textbook of Psychiatry, p. 825 (7th ed. 2000).]  Psychotic disorders can occur in association with intoxication by alcohol, amphetamines and related substances, and by cannabis and cocaine.  [citation]
> My review of the following, along with my clinical judgment and experience, leads me to conclude that the polysubstance and alcohol abuse impaired Lezmond's mental state so much that he suffered Substance-Induced Psychotic Disorder ("SIPD") at the time of the offenses:

a. Lezmond Mitchell's history of his family/home life, his family history of alcohol abuse, medical/mental health, education, criminal record, and his substance dependence and abuse, leading to October 28, 2001;

b. Accounts of his substance abuse just before October 28;

c. The disorders he suffered by October 28 (PTSD, Substance Dependence, and Substance Intoxication), and his chronic lack of restful sleep by then;

d. The temporal relationship between the onset of Lezmond's substance use leading to October 28, and the onset of the symptoms or the full syndrome on October 28; and,

e. The law enforcement records regarding the October 28 offenses (including Lezmond's behavior and statements afterward).

(Ex. 135, ¶¶ 72-73.)

138. After the trading post robbery on October 31, Jakegory told his brother Jimmy Jr. about it, and Gregory told Jimmy Jr. about Mrs. Slim's and Ms. Lee's deaths. On November 2, 2001, Jimmy Jr. decided to call the FBI to report the trading post robbery and the Slim/Lee murders in hopes of getting reward money. Based on Jimmy's information, on November 3, 2001, the FBI and the Navajo Nation organized the execution of three arrest warrants.

139. Mitchell continued abusing many substances – marijuana, cocaine, crack, and alcohol – after October 28 and before his November 4 arrest.

140. Padrian George:

On the morning of November 3, 2001, at around 9:00 a.m., Gregory, Jimmy and Shaun came over to pick me up. I was staying in Sweetwater. When they came to get me, they were already high. We drove around Round Rock for awhile, smoking marijuana and waiting for Jason Kinlicheenie and Lezmond Mitchell to come back from buying beer for the group. The Navajo Reservation prohibits the sale of any alcohol, but there are bootleggers all around the Reservation where it is easy to buy beer when you want it and have the money. When Jason and Lezmond got to Round Rock with a couple of cases of beer, we all went to the Nakai house and started drinking beer. I only drank beer that night, but everyone else at the

house, including Lezmond, smoked cocaine and marijuana.

When the police arrived early the morning of November 4, 2001, we hadn't been asleep more than a couple of hours.  The whole group of us had been partying all night, continuing with the beer and the other guys smoking crack cocaine and marijuana.  I think some of the guys passed out from all the drinking and the drugs they were using.

(Ex. 100, ¶¶ 5, 6.)

141.  Jimmy Nakai, Jr.:

On the night before everyone was arrested in November of 2001, I was at my family's house with my brothers, Lezmond Mitchell, Padrian George and Johnny Orsinger.  I smoked marijuana that night and drank beer. I am not sure what drugs anyone else in the house was using that night.  I really wasn't paying that much attention because using drugs was a part of our lives at the time.  There was nothing unusual about us drinking and getting high.

(Ex. 137, ¶ 7.)

142.  Gregory Nakai:

The FBI and tribal police arrested me at my house very early in the morning on November 4, 2001, and my brothers, Jakegory and Jimmy, and Lezmond Mitchell and Johnny Orsinger.  . . .  I don't remember anything about the [police] questioning or the signing of the waiver [of rights] because all of us smoked a lot of marijuana and crack cocaine that night.  As a result, I don't remember anything about being interviewed by law enforcement on November 4, 2001.

(Ex. 107, ¶ 6.)

### 5.  Mitchell's arrest and the multiple interrogations

143.  On November 4, 2001, shortly before seven in the morning, lead by the Navajo Nation's tactical team, the FBI and the tribal police arrested Mitchell, Gregory and Jakegory, and Jimmy Jr. at the Nakai brothers' house.

144.  The FBI arrested Johnny on November 5, 2001, when he and his father appear at the police station.

62

145.    When Mitchell was arrested, Bobbi was a school psychologist in Palmdale, California (Ex. 54), George was retired (Ex. 47), and Sherry was a principal at an elementary school in Shonto, on the Navajo Reservation (Ex. 28). Sherry describes Mitchell before and the day of his arrest:

> I rarely saw Lezmond in the months before his arrest in October 2001; at that time, I was returning to the homestead only on weekends. Even so, I saw Lezmond high on drugs at least once every month.
> My brother called me when Lezmond was arrested. My father and I went to the jail. My father told the prosecutor, 'We're just going to let him go, we're not going to fight for him.' . . .

(Ex. 105, ¶¶ 34, 35.)

146.    The Nakai brothers' mother, Daisy, was visiting her family but staying in one of the nearby houses. She was awakened to the police activity

> In the very early morning hours of November 4, 2001, I woke up to my sister, Shirley, calling for me. Shirley also lives on the same family property. She was shouting for me to come outside, she said the police were surrounding my house. By the time I got out my mother's door, I saw my three sons, Gregory, Jimmy, Jr. and Jakegory, spread-eagle on the ground, face down in the dirt with police officers aiming a gun at each of them. On the ground and alongside my sons were two others, Lezmond Mitchell, and Padrian George who were also facedown in the dirt with police officers aiming guns at them. They must have been asleep when the police took them outside, because none were fully dressed and none had shoes on. Twelve to fifteen police cars surrounded my house. One or two police officers aimed guns at different parts of the property and my house. I was terrified.

(Ex. 106, ¶ 4.)

147.    Two years after Mitchell's arrest, at the January 30, 2003 hearing on Mitchell's voluntariness to waive his constitutional rights, FBI agents testified to their multiple interrogations of Mitchell. These interrogations occurred over a twenty-five day period during which Mitchell was kept in Navajo custody for a

misdemeanor, was not represented by counsel, and was suffering from withdrawal due to drug and alcohol addiction.

**November 4**

a.  07:00:  The FBI and Navajo Nation arrested Mitchell on a Navajo Nation warrant (which is a misdemeanor) and transported him to the Nation's jail in Chinle;

b.  13:30-15:30:  FBI agent Duncan interrogated Mitchell;

c.  17:00:  FBI agent Kirk arrived at Chinle to administer a polygraph to Mitchell

d.  18:20-18:30:  FBI agent Kirk conducted a "pre-test" interview of Mitchell.

e.  18:30-19:00:  FBI agent Kirk administered the polygraph to Mitchell.

f.  19:00:  FBI agent Kirk told Mitchell that the polygraph indicated that Mitchell was untruthful.

g.  19:00-20:53:  FBI agent Kirk interrogated Mitchell alone.

h.  20:53-about 23:00:  FBI agent Kirk reported that Mitchell agreed to provide a recorded statement, and a statement was recorded.  The tape recorder stopped at about 23:00, and the remainder of the interrogation is not recorded.

**November 5**

i.  13:30:  Mitchell was taken to the crime scene (Johnny and other officers are already present), where FBI agent Kirk again interrogated Mitchell alone for about thirty minutes.  Kirk reported that Mitchell gave a statement "more inculpatory" than prior ones.

j.      "Hours later":  FBI agent Kirk walked Mitchell to another area of the scene.

**November 7**

k.      Mitchell plead guilty to Navajo Nation charges of criminal damage regarding the vandalism of a police unit.  The Navajo Nation court continued the sentencing hearing to November 23, 2002.

**November 23**

l.      The Federal Government issued an arrest warrant for Mitchell regarding the capital offenses and the trading post robbery.

**November 29**

m.      FBI agents Duncan and Lintner transported Mitchell from Window Rock Jail to Flagstaff for his Initial Appearance in the underlying case.  Duncan testified they were "taking him out of tribal custody" so that he could be charged in Federal court.

n.      Instead of bringing Mitchell directly to the assigned courtroom upon their arrival at the federal courthouse, FBI special agents Duncan and Hush took Mitchell to a private room next to the courtroom where they again interrogated Mitchell without counsel present.  Mitchell's appointed counsel waited nearby for the arraignment to commence, not knowing of this secret interrogation.

o.      The Federal magistrate judge arraigned Mitchell and appointed the Federal Public Defender as counsel.

148.   This Court later determined that Mitchell's waivers were voluntary.

149.   Dr. Stewart describes Mitchell's state of mind at the time of the offenses, and when he was interrogated repeatedly on November 4 and 5:

> Mr. Mitchell's Substance-Induced Psychotic Disorder at the time of the offenses indicates that he was

65

grossly out of touch with reality, and was unable to appreciate what was actually occurring when he was suffering from SIPD. Because of his psychosis, his behaviors were not linked to the actual events.

. . .

[C]onsidering the significant amounts of various psychoactive substances [Mitchell] used before his arrest, and because we know that methamphetamine and cocaine/crack intoxications resolve over a period of twenty-four to forty-eight hours, had trial counsel provided me with the foregoing information, including the *many* interrogations he underwent without counsel, I would have recommended they question and investigate his ability to knowingly, intelligently and voluntarily waive his right to counsel.

(Ex. 135, ¶¶ 79, 83 (emphasis in original).)

### 6.    Counsel's deficient trial investigation

150.   The defense team was comprised of two investigators.  Mitchell has learned that:

a.    The guilt investigator interviewed "very few people on the traditional, guilt-side of the case."  Indeed, it appears he interviewed few if any beyond Johnny Orsinger, Orsinger's grandmother, and two paternal relatives who lived on the Marshall Islands and were not aware of Mitchell's existence.  (*See* Ex. 123; Ex. 109.)  Nothing of substance came from his interviews.

b.    The guilt investigator drove Ockenfels, the mitigation investigator, to some of her interviews, to "[keep] her safe on the reservation." (Ex. 123, ¶ 4.)

c.    The mitigation investigator Ockenfels' relationship with Sherry deteriorated early in the case to the point where Sherry no longer cooperated with the defense.  (Ex. 105, ¶ 35.)

d.    Ockenfels' "Social History" (Ex. 93) is sufficient in some areas, incomplete in others, but overall is inadequate.  That is not surprising, since at

some point, the trial team stopped the already-limited communication they provided her.

e.      The mental health professionals to whom counsel provided *some* information were given *nothing* regarding Mitchell's life history.  Two were left to develop the crucial information on their own, and from Mitchell only.  Counsel retained other professionals then simply informed them that they were not needed.

f.      As noted *supra*, trial counsel had between them several decades of legal experience.  However, it appears none grasped the significance of Mitchell's report to the FBI interrogators, on the day of his arrest, that he drank so heavily throughout the day that Mrs. Slim and Ms. Lee were killed that his memory was blank, and that he had black-outs that day.  Further, no one on the team attempted to interview Johnny Orsinger, Gregory Nakai, Jakegory Nakai, Jimmy Nakai Jr., Dennie Leal, or Padrian George and others, about Mitchell's substance abuse in the weeks, days and hours preceding the capital offense.  As discussed *infra*, each of these sources of information were available to counsel to develop and present as a viable presentations at both phases of the trial.

151.  It is not difficult to learn where counsel's investigation into and development of the case-for-life went wrong.  The mitigation investigator states the following about counsel's treatment of the guilt and penalty investigations she conducted and presented to them:

> As a result of my mitigation investigation in Mitchell's case, I learned, among other significant themes, that Mitchell was addicted to alcohol and drugs and that he had started using drugs at age eleven. However, *throughout my work on Lezmond Mitchell's case, all three of Mitchell's lawyers often remarked that there was 'no mitigation' in his case.  . . .*

(Ex. 131, ¶ 7.)

67

152. Ockenfels continues:

. . . I did not agree with the lawyers' assessment of the mitigation and told them so. I expressed my concerns about the trial lawyers' statement that there was no mitigation to DFPD Ken Murray, a colleague of Mitchell's lawyers and a lawyer in the Phoenix Federal Public Defender capital habeas unit with whom I had worked in the past. Murray consulted with Mitchell's lawyers on the case, but told me he could not do anything about it.

I also learned during my mitigation investigation that there was substantial evidence that Mitchell was drunk and high on drugs at the time of the killings. Based on my education, training and experience as a capital lawyer and mitigation specialist, I believed Mitchell's alcohol and drug use affected his state of mind prior to and during the killings.

Well before the trial date, I advised the trial lawyers about Mitchell's history of alcohol and drug use, and his significant drug and alcohol use before and at the time of the killings. Furthermore, government-provided discovery revealed additional evidence that Lezmond Mitchell was intoxicated before, at the time of and after the killings. I recommended that the lawyers consult with a psychopharmacologist or other appropriate expert about whether Mitchell was 'tweaking' from the effects of methamphetamine or other drug use and/or sleep deprivation and whether he was in a fugue state during the killings. I told them this evidence of an impaired mental state could be used at the guilt phase or as mitigation at the penalty phase, or both.

Bartolomei told me that the team did not intend to pursue evidence of Mitchell's significant history of drug and alcohol abuse, including evidence of intoxication at the time of the crimes, because Mitchell had denied being drunk or high on drugs at the time of the killings. I advised Bartolomei that Mitchell's substance abuse history and the bizarre circumstances of the crime strongly indicated that he was drunk or high at the time of the offenses. I also told him that in my experience investigating capital cases it is not uncommon for a client to falsely deny alcohol and drug use, in general or at the time of the offense. As a former criminal defense attorney in New Mexico, I also have significant experience with Native American clients and their culture. Based on this experience, I stressed to the trial lawyers that it is not uncommon for young Native American clients to minimize or even deny to their attorney their addiction to alcohol and drugs. I suggested that the trial team continue to investigate evidence of Mitchell's history of addiction, as well as evidence of his

68

> impairment at the time of the crimes.  The attorneys did not follow my recommendations.
>
> . . .
>
> I also recommended that the trial team consult and present a mental health expert to testify about Mitchell's background and upbringing to explain, among other things, how and why he turned to alcohol and drug use at such an early age.  I recommended . . . a forensic psychologist with whom I had worked on other capital cases, because I believed he was able to present Mitchell's social history and other mitigation evidence in a compelling manner.  To my knowledge, neither [he] nor any other mental health expert presented Lezmond Mitchell's social history or explained to the jury the circumstances of his life.

(Ex. 131, ¶¶ 7-10, 12; *see also* Ex. 126.)

## B.    Mr. Mitchell's Capital Trial

153.    Once the Court decided to hold Mitchell's trial in Phoenix, the *voir dire* it directed was constitutionally inadequate, and counsel provided ineffective assistance regarding the *voir dire.*

154.    Counsel was so ill-prepared that they let pass biased, erroneous and misleading testimony from the Government's DNA and pathology experts.  (*See* III.F and III.G, *infra*.)

155.    Most significantly, counsel's failure to develop Mitchell's intoxication at the time of the offenses meant that the jury heard nothing to vitiate the charges against Mitchell.  (*See* III.A, *infra*.)  Counsel's ineffective performances during the investigative stages of the guilt and penalty phases were compounded at the penalty phase where counsel again failed to present the significant evidence of Mitchell's childhood of abuse, neglect, and shame, and his substance addictions to the jury. Instead, counsel presented at the penalty phase several lay witnesses who now describe being interviewed – most, just briefly – by the mitigation investigator well before the trial even began, then being summoned to testify at Mitchell's penalty phase with a few words of instruction minutes beforehand.  Only two of the eight

defense penalty witnesses knew Mitchell longer than four years.  Mitchell's uncle Auska was so ill-prepared that he could not testify to the significant facts about his and Mitchell's lives.  (*Compare* Ex. 104.)  Not surprisingly, given how her colleagues described her, Bobbi's testimony, via video, was primarily about herself.  Sherry and George were absent from the penalty phase presentation.  No witnesses presented the wealth of information that § 2255 counsel has developed that demonstrates counsel's ineffective assistance at the guilt and penalty phases.

## III.

## ISSUES FOR RELIEF

156.   Mitchell moves for relief pursuant to 28 U.S.C. § 2255.  However, should the Court determine that any of his issues are not cognizable under § 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241, which is an instrument for relief as to any claim for which § 2255 is not an effective or adequate mechanism to test the legality of his detention and sentence.

### A.    Counsel's Failure to Investigate, Prepare and Present Evidence of Intoxication Resulted in Ineffective Assistance at Guilt Phase

157.   A defendant in a federal criminal trial has a Sixth Amendment right to receive effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970) ("The right to counsel is the right to effective assistance of counsel.").  The Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), set forth a two-prong test to establish ineffective assistance of counsel.  An allegation of ineffective assistance must show: 1) trial counsel's performance was deficient; and 2) the deficient

70

performance prejudiced the defense at trial.  *Id.*  Counsel's performance is deficient if it was "objectively unreasonable under the circumstances."  *Id.* at 688.  To show prejudice under *Strickland*, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

158.  The Ninth Circuit has specifically held that in a capital murder trial, counsel's failure to prepare and present evidence of intoxication at the time of the offenses is ineffective assistance of counsel.  *See Jennings v. Woodford*, 290 F.3d 1006, 1013 (9th Cir. 2002) (finding ineffective assistance at guilt phase because counsel failed to prepare and present mental-state defense where defendant had told the police that he was high on the night of the murder and had been "strung out on goddamn crank for over a year").  Counsel in this case did not prepare and present a mental-state defense at either phase even though they were confronted throughout their trial preparation with evidence of their client's longstanding drug and alcohol problem and of his intoxication on the night of the crime.

159.  In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

160.  Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

161.  On the day of his arrest (November 4, 2001), Mitchell gave a recorded statement in the presence of Navajo Nation criminal investigator Leander Morris and FBI Special Agents Ray Duncan and Trace Kirk.  (*See* Ex. 18.)  In the

statement, Mitchell admitted that he and co-defendant Johnny Orsinger planned to steal a truck and that he was present when Orsinger killed Mrs. Slim and her granddaughter Tiffany in order to obtain the truck. (*Id.,* pp. 2-4.)  He also stated several times that he drank so heavily throughout the day that his memory was blank as to significant events related to the instant offenses.  Mitchell told the agents that after the murders he and Orsinger drove the victim's truck towards Tsaile and that "[he] just started drinking again, just like, fuck, sat shot gun just started reaching for my shit, start drinking.  Somewhere along there I blacked out." (*Id.*, p. 5.)

162.   Mitchell said that they drove the truck to a remote location in the mountains so that Orsinger could dispose of the bodies.  They eventually stopped at a sheep camp in the mountains that had been used by Orsinger's late uncle.  Mitchell said that Orsinger dragged the bodies out of the truck while "[he] just started grabbing some more liquor and just started fucking drinking again." (Ex. 18, p. 6.)  FBI Special Agent Duncan asked Mitchell how long it took for them to drive from the sheep camp where the bodies had been disposed of to the nearest highway.  Mitchell replied, "It felt like a long time, but I mean, when you're drinking and shit, everything feels like a long time."  (*Id*., p. 8.)  Duncan asked whether Mitchell and Orsinger spoke on the way home from the sheep site.  Mitchell stated,

> Not really man.  I don't remember any conversations 'cause I know I just started drinking when he was trying to drag the bodies off.  I was just drinking, drinking, just kicking back, drinking, drinking, then fucking here, all of a sudden, he's all, let's go.  Then I was still drinking, then we took off, shit I don't even remember making it back to the highway, man.  Truly, I don't remember making it back to the highway.

(*Id.*)

163.   Special Agent Duncan asked Mitchell where he and Orsinger went after the bodies had been disposed of.  Mitchell replied, "We just started fucking driving, probably coming back down to Round Rock or some shit.  I don't know.  Here, probably fucking blacked out during that whole time." (Ex. 18, p. 9.)  When the investigator pressed Mitchell about where they hid the truck, he said Orsinger told him that he had stashed it on "the east side of Round Rock," but that he didn't really know because "during that time [he] blacked out." (*Id.*)  He stressed that he didn't know whether he directly participated in hiding the truck because he was "just too fucked up that night." (*Id.*)

164.   The next day, November 5, 2001, Navajo Criminal Investigators went with Mitchell to the sheep camp, where the bodies were.  Special Agent Kirk re-interviewed Mitchell inside a truck at the sheep camp.  Kirk memorialized the interview in a report.  According to Agent Kirk, Mitchell stated that Orsinger was stabbing Mrs. Slim and that he joined in and stabbed her, too.  (Ex. 20, p. 1.)  The report notes that, "Mitchell said he was so drunk (at the time of the murder) that he could not remember how many times he stabbed [the victim]." (*Id.*)  Kirk also claimed that Mitchell also admitted cutting Tiffany's throat twice.  (*Id.*)

165.   On November 29, 2001, FBI Agents Duncan and Kent Hush drove Mitchell from the Navajo custody facility to Mitchell's initial appearance in federal court in Flagstaff.  Prior to the first appearance in federal court, the agents re-interviewed Mitchell once again.  He told them that on October 28, 2001, he and Orsinger made plans to travel from Round Rock, Arizona to Gallup, New Mexico to "purchase liquor." (*See* Ex. 21, p. 1.)  According to Agent Duncan's report, "Mitchell indicated that he had consumed a couple of forty ounce bottles of beer prior to going to Gallup." (*Id.*)

73

166. Jail records reflect that Mitchell was evaluated and recommended for alcohol treatment in November, 2001, shortly after his arrest. The record does not reflect that he underwent treatment, however. In fact, Mitchell continued to consume drugs and alcohol while incarcerated prior to and during trial. He used heroin and drank "hooch" at the Madison Street detention facility and was drunk or high when he appeared at trial. (*See* Ex. 96, ¶¶ 3-4.)

167. Besides these specific indications that Mitchell had an alcohol problem that bore directly on his behavior during his encounter with the victims as well as on his ability to recall relevant events, there were more general reasons to investigate intoxication. The defense team's social historian, Vera Ockenfels, had warned them that "[a]lcohol abuse and addiction is a leading cause of health problems, early death and criminal activity on the Reservation. Alcohol is major factor in 50% of all homicides committed in Navajo Country." (*See* Ex. 93, p. 2.) Ockenfels also alerted the trial team that her social history investigation had revealed that Mitchell had a serious drug and alcohol problem, and that she believed Mitchell was severely impaired at the time of the killings. (Ex. 131, ¶ 9.)

### 1. Trial counsel's failure to thoroughly investigate intoxication was unreasonable

168. Despite all of these case-specific and more general indicators that alcohol was involved in the offenses, trial counsel did not conduct a reasonable investigation of Mitchell's drug and alcohol use, either generally or near the time of the killings. Fact investigator Karl Brandenberger did not conduct any investigation regarding Mitchell's state of intoxication at the time of the homicides.[9] The trial team did not seek any evidence independent of their own

---

[9] Brandenberger told a post-conviction investigator that he did not prepare any reports of investigations but that he took notes of all of his interviews. Trial counsel stated Brandenberger's notes were in the file provided to appellate

client regarding his state of intoxication.  If trial counsel had conducted an independent, reasonable investigation of Mitchell's history of drug and alcohol use, they would have learned that he had a serious, longstanding substance abuse problem since he was at least eleven years old, and that he was severely intoxicated at the time of the homicides.

169.   Mitchell came from a family of alcoholics.  His biological father, Foster Hemil, was a heavy drinker who died of an alcoholism-related illness. (Ex. 35.)  His maternal uncle, Auska Mitchell, is also an alcoholic.  Mitchell told the trial mitigation investigator that Auska drank a "30-pack" of beer in one day. (*See* Ex. 93, p. 32.)  Mitchell's maternal grandfather was described as a heavy drinker.  (*Id.*, p. 2.)  Two of Mitchell's cousins, who lived not far from him, are serving life in prison for alcohol-related murders on the Reservation.  (*Id.*)  Yet another cousin has frequent arrests on the reservation for alcohol-related offenses. (Ex. 132.)

170.   Mitchell himself had a serious drinking problem and used many different types of drugs.  Before trial, Mitchell reported to defense mental health expert Barry Morenz, M.D., that he first used alcohol in the sixth grade and was drinking "regularly" by eighth grade.  (Ex. 94, p. 15.)  Mitchell told Dr. Morenz that he started smoking marijuana in sixth grade and was using crack and cocaine powder in high school.  (*Id.*)  Mitchell's childhood friend, Lorenzo Reed, reported that he and Mitchell were smoking five joints per day in high school.  (Ex. 111, ¶ 6.)  Mitchell's grandmother, Bobbi, reported that he "could drink two six-packs of beer in less than one hour" while he was living with her in California when he was nineteen years old.  (*See* Ex. 93, p. 33.)

---

counsel.  Appellate counsel informed post-conviction counsel that they never received any investigator's notes in the trial file. (*See* Ex. 115.)

171.    Barry Morenz, M.D., the mental health expert trial counsel retained, reported that "Mr. Mitchell stated that he had been using heroine, cocaine and methamphetamines in at [sic] the Madison Street Jail." (Ex. 94, p. 3.)  These reports do not suggest casual, ordinary use of alcohol or recreational drugs.  They bespeak a serious substance abuse problem.  Yet, despite all these red flags apparent in counsel's files, the trial lawyers did not further investigate Mitchell's use of alcohol and drugs on the day of the homicides.  The Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), found a similar failure to investigate unreasonable because counsel "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of circumstances." *Id.* at 524.  The Court stressed that because counsel were confronted with "evidence that would have lead a reasonably competent attorney to investigate further," their failure to more thoroughly investigate mitigating factors could not be justified as a reasonable tactical decision, but was instead ineffective assistance. *Id.* at 534.  The same is true here.  Based on the discovery and the preliminary investigation of mitigation, counsel should have investigated Mitchell's alcohol and drug use further.

172.    A thorough investigation also would have revealed that Mitchell's use of drugs had rapidly escalated during the months prior to the crimes.  During the summer of 2001, George Mitchell, Mitchell's maternal grandfather and primary caretaker, kicked Mitchell out of the house because George believed Movant had been stealing from him to buy drugs and alcohol.  Having no money and nowhere else to go, Mitchell appeared on the doorstep of a home occupied by Gregory, Jakegory and Jimmy Nakai.  The Nakai brothers were well-known drug users and sellers on the Reservation.  (*See* Ex. 111, ¶ 16.)  They were known for accepting

76

young men on the Reservation who had no where else to stay.  The Nakais gave

Mitchell food and clothing and allowed him to live with them in exchange for his

assistance in selling marijuana out of their house.  (*See* Ex. 107.)

173.    All of the residents of the Nakai house (including Mitchell) used

marijuana, crystal meth, cocaine (crack or powder), PCP and mushrooms.  (*See*

Ex. 107, ¶ 5.)  Mitchell and the others commonly used drugs by rolling meth or

cocaine into their marijuana cigarettes or by dipping their marijuana cigarettes into

liquid PCP.  (*See* Ex. 109, ¶ 6.)  Mitchell also commonly drank one or two cases of

forty-ounce beers each weekend.  (*See Id.*, ¶ 5.)  Mitchell bought alcohol from

Kellywood Harvey, who conducted illegal sales of alcohol on the reservation.  (*See*

Ex. 19.)

174.    The evidence of substantial drug use in the months prior to the crime

is not limited to participants in the crimes.  Padrian George, who lived in the Nakai

house but was not charged with any crime, has declared:

> During the summer and through early November of 2001 all of us, including Lezmond Mitchell, who were staying at the Nakai house used a lot of drugs and drank beer and other alcohol.  We smoked marijuana and drank beer nearly every day.  We also used cocaine, both as powder and as crack cocaine, ecstasy and meth.  We used any drug we could get a hold of.  We used a lot of drugs.  We commonly rolled our marijuana cigarettes with some other stronger drug, like cocaine or dipped our marijuana cigarettes in something much stronger such as meth.  We figured out how to make crack form powdered cocaine; we smoked crack whenever we could get it.  Lezmond Mitchell used all the same drugs, drank as much beer or other alcohol as anyone else and stayed high when he could.

(*See* Ex. 100, ¶ 4.)

175.    Prior to traveling to Gallup, Mitchell and Johnny Orsinger had been up

for days smoking marijuana cigarettes laced with cocaine or PCP and drinking

beer.  (*See* Ex. 109, ¶¶ 5-6.)[10]  Both Mitchell and Orsinger were significantly impaired due to lack of sleep and drug and alcohol use.  Orsinger has declared,

> By the time we got to Gallup, Lezmond and I had been awake for several days drinking beer and using drugs. We'd been awake for so many days, it felt like walking around in a cloud.  It was like we were puppets, our bodies kept moving forward, but I'm not sure how.

(*See* Ex. 109, ¶ 6).

176.   Mitchell in his statements to the police consistently stated that they continued drinking (to the point of blacking out) at the time of the homicides and during their later efforts to dispose of the bodies.  He also had reported to social historian Verna Ockenfels that he was engaged in "heavy use of crystal methamphetamine during the months immediately preceding this incident." (Ex. 93, p. 33.)  He had specifically described his typical use of methamphetamine as buying it "whenever [he] could afford it" and splitting an "8 ball" with the Nakais, resulting in everybody staying up "3 nights in a row."  (*Id*.)

177.   Trial counsel have advised post-conviction counsel that they did not pursue a mental-state defense because they understood that Mitchell had not consumed drugs or alcohol prior to the killings.[11]  It is true that at some time during the representation Mitchell claimed to be "sober" when he saw co-defendant Johnny Orsinger kill the victims.  Because they did not know the extent of Mitchell's longstanding substance abuse problems, trial counsel accepted Mitchell's claim, even though it was contradicted by significant portions of the discovery and by percipient witnesses.  In addition, mitigation specialist Vera

---

[10]   Orsinger has declared that during the trip to Gallup "[they] used as much drugs as they ever did, everything [they] could get a hold of by any means." (Ex. 109 at ¶ 6.)

[11]   Learned counsel John Sears stated this to post-conviction counsel, but declined to sign any declaration.

Ockenfels advised the lawyers prior to trial that she believed Mitchell was severely intoxicated during the offenses.  (*See* Ex. 131, ¶ 9.)  Ockenfels also warned the team that she was skeptical of Mitchell's claim of sobriety during the killings because in her experience young Native Americans often lied to their attorneys about their drug and alcohol use in order to hide their addiction.  (*Id.*, ¶ 10.)  Despite this warning, trial counsel continued to rely on Mitchell's claim of sobriety as a basis for failing to conduct a full investigation of voluntary intoxication.

178.   The ABA Guidelines direct capital defense counsel to investigate guilt issues "regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt."  *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.7 (Feb. 2003).  The ABA Standards are a good mark for assessing the reasonableness of counsel's preparation for a capital trial.  *Wiggins*, 539 U.S. at 524 (the Supreme Court has long referred to [the ABA standards] as 'guides for determining what is reasonable'"), quoting *Strickland*, 466 U.S. at 688; *see also Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005) (noting that ABA standards are a guide to assessing reasonableness).

179.   Thus, Mitchell's single, false claim that he was sober during the offenses should not have dissuaded counsel from investigating such a significant defense as intoxication.  This is particularly true where, as here, the discovery contradicts the defendant's single claim of sobriety, and the defendant had previously revealed a long history of serious substance abuse during childhood to defense mental health experts.  As the Ninth Circuit has noted, "Strategic decisions based on information provided by the defendant are often reasonable and entitled to deference.  However counsel must consider all of the defendant's statements, not

just those that make his job easier." *Duncan v. Ornoski*, 528 F.3d 1222, 1238-39 (9th Cir. 2008) (internal citations omitted), *cert. denied*, No. 08-7440 (2009).

180.   A thorough investigation of Mitchell's substance abuse history and his use of drugs and alcohol prior to the killings would have revealed that it was unreasonable to rely solely on Mitchell's claim to trial counsel that he was sober during the crimes.  When Mitchell first spoke to the police without any counsel, he candidly told them that he was drunk and blacked out.  His long history and his drug and alcohol abuse, dating from age eleven until the time of his arrest, indirectly corroborated Mitchell's initial statements made without counsel and should have prompted the trial team to probe further into their client's mental state at the time of the offenses.  Their own mitigation investigator, Vera Ockenfels, who knew the most about Mitchell's background and upbringing, had advised the trial lawyers that Mitchell was hiding his substance abuse issues from them and that they should keep exploring the issue of intoxication at the time of the offense.  (*See* Ex. 131, ¶ 9.)  If the trial lawyers had heeded Ockenfels's advice, they would have learned that both Mitchell and Orsinger were severely intoxicated at the time of the crimes.

181.   It is true that counsel consulted mental health experts about traumatic brain damage, but it does not appear that these experts were advised that information from numerous sources indicated that Mitchell was severely intoxicated at the time of the offenses.  The mental health reports do not address this aspect of the case.  To the extent that Dr. Morenz addressed intoxication as a potential defense or mitigation, his report should have alerted trial counsel that more investigation was needed, and that evidence of intoxication could and should have been presented.  Dr. Morenz stated,

> Mr. Mitchell has abused alcohol, marijuana, cocaine, ecstasy and other drugs for a number of years.  His drug

80

> use contributed to some of the problems Mr. Mitchell has had in maintaining stability in his life and thus he warrants the diagnosis of polysubstance abuse that is now under some control because he is in a secure environment.[12]

(Ex. 94, pp. 17-18.)  Trial counsel's investigation was not reasonable because whatever was done to investigate the issue of Mitchell's mental state during the offenses did not uncover his long history of substance abuse, including substantial drinking and drug use on the day of the homicides.

### 2. The lack of intoxication evidence prejudiced the most viable defense

182.  Trial counsel's failure to present a mental state defense based solely on the client's claim of sobriety had serious negative consequences at guilt phase. At the beginning of trial, counsel conceded to the jury that Mitchell was present during the homicides and did nothing to help the victims.  He explained, "There's no question and we are not suggesting that you even consider the possibility that Lezmond Mitchell was not there." (RT 2563-64.)  Counsel also stressed that the evidence would give the jury "a complete understanding of how this nightmare began, how it progressed, and how it ended." (*Id.*)  He then suggested that Orsinger initiated the homicides in an act of rage, stressing "that this was not, contrary to the government's suggestion, a premeditated plan to steal a truck and kill the occupants of the truck." (*Id.*)  Given this opening statement and the evidence to follow, voluntary intoxication was Mitchell's best (if not only) chance to escape conviction of the specific intent offenses, including carjacking resulting in death, which was the only death-eligible offense charged in the indictment.

---

[12]  Dr. Morenz did not reconcile the last part of this statement with his previous statement that Mitchell admitted using heroin in the jail. (Ex. 94 p. 3.)

183.    The evidence that Mitchell was present at the scene of the killings and participated in some manner in the killings was strong.  One day after his arrest, Mitchell led the police to the site of the killings and identified where the victims' heads and hands had been buried.  (*See* Ex. 20.)  FBI Special Agent Trace Kirk claimed that at the site Mitchell had confessed to stabbing Mrs. Slim several times after Orsinger had already stabbed her.  (*Id.*, p. 1.)  Agent Kirk also claimed that Mitchell admitted that the evidence would show that he had cut Tiffany's throat a couple of times before ordering her to lie down on the ground and die.  (*Id.*)  He also said that Mitchell admitted that he threw rocks on top of Tiffany's head after Orsinger had done so first.  (*Id.*)  Jason Kinlicheenie, an accomplice in the robbery of the trading post who became a cooperating witness, claimed that after Mitchell and Orsinger returned from Gallup, Mitchell said they had found a truck and gotten rid of rid of two people, an "old one" and a "small" one.  (RT 2783.)  DNA testing revealed that Mrs. Slim's blood was similar to blood on the butterfly knife that fell out of Movant's pocket when he was arrested at the Nakai house.

184.    Throughout guilt phase, trial counsel represented to the court that they intended to call witnesses.  They specifically mentioned the Nakais and Johnny Orsinger.[13]  However, the defense rested without calling any witnesses or introducing any evidence.  (*See* RT 3366.)

---

    [13]   The defense subpoenaed Johnny Orsinger to testify at guilt phase. (RT 3332.)  In response to the Court's questions, trial counsel said that they wanted to question Orsinger about the "narrative that the government laid out." (RT 3327.)  They specifically mentioned the trip to and from Gallup, as well as "the events that took place in the truck, what [Orsinger's] involvement was and what was Mr. Mitchell's involvement, if any." (*Id.*)  Orsinger appeared in court and invoked his privilege against self-incrimination, which the court ruled was a proper invocation.  (RT 3332.)  Orsinger's observations of Mitchell's use of alcohol and drugs would not have implicated his right against self-incrimination. Yet, trial counsel did not request an opportunity to ask Orsinger about this.

185.   Given the state of the guilt phase evidence, it was important to develop a defense in which trial counsel could reasonably concede Defendant's participation in the offenses, but still argue that he lacked the specific intent to cause the victims' deaths.  Absent such intent, Mitchell could not be convicted of carjacking resulting in death, which was the only death eligible offense.

186.   It is well established that voluntary intoxication is a defense to any specific-intent crime.  *See United States v. Burdeau*, 168 F.3d 352 (9th Cir. 1999).[14] Carjacking requires proof that the defendant had "specific intent" to cause death or serious bodily injury.  *United States v. Randolph*, 93 F.3d 656 (9th Cir. 1997) (reversing conviction because evidence of specific intent to cause death or serious bodily injury was insufficient as a matter of law).  Thus the *mens rea* element of carjacking resulting in death can be negated by voluntary intoxication.  Perhaps this is why there are several Ninth Circuit opinions reflecting that a defendant charged with carjacking tendered voluntary intoxication to negate specific intent to cause death or bodily harm.  *See, e.g.*, *United States v. (Gregory) Nakai*, 413 F.3d 1019 (9th Cir. 2005); *United States v. Cortes*, 299 F.3d 1030 (9th Cir. 2002); *United States v. Goss*, 241 Fed. Appx. 440 (9th Cir. 2007).

187.   Trial counsel recognized the importance of voluntary intoxication to the defense of these specific-intent crimes.  They filed a memorandum requesting Ninth Circuit Model Instruction 6.8 (intoxication/diminished capacity) and citing *United States v. Lilly*, 512 F.2d 1259 (9th Cir. 1975), in support of that request. (*See* CR 301.)  The Ninth Circuit in *Lilly* held that a defendant who claimed to be drunk at the time of the offense was entitled to an instruction "to the effect that

---

[14]   Ninth Circuit Model Jury Instruction 6.8 (intoxication--diminished capacity) reads:  "You may consider evidence of intoxication in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with intent to commit (crime charged)."

intoxication may negate the existence of specific intent." *Lilly*, 512 F.2d at 1261. The prosecution in its memorandum opposed giving a voluntary-intoxication instruction, noting "There is currently no evidence in the record that the defendant was intoxicated at the time of the offense." (*See* Dkt. No. 304.)

188.   At the jury instruction conference, the Court stated that it would give the instruction even though the evidence was weak. (RT 3403.) The prosecutor argued against it because: "There has been absolutely no evidence of intoxication in this case." (RT 3404.) He reminded the Court that he had objected to the only question that trial counsel had asked Agent Duncan about intoxication and that the hearsay objection had been sustained. (*Id.*) The prosecutor stressed that, "There's no evidence that anybody was intoxicated, that there was any alcohol involved at during the commission of these offenses." (*Id.*)

189.   The Court asked trial counsel to enlighten it about what evidence supported the requested voluntary-intoxication instruction. (RT 3404-05.) Because the defense had not developed any evidence of intoxication, counsel was forced to admit that the prosecution was right. (RT 3405.) He explained that the defense had "submitted the proposed instruction some time ago[15] when [they] thought there was a chance of some additional statement. . . . But [he] couldn't disagree with [the prosecutor] on the state of the evidence now. It doesn't support the instruction." (RT 3405.) In light of this concession, the Court denied the requested instruction. (*Id.*)

190.   Armed with the knowledge that no voluntary-intoxication instruction would be given, the prosecutor was emboldened to portray the killings as the product of cold and calculated reflection, rather than the irrational result of drug

---

[15]   Actually, the defense had filed a memorandum requesting a voluntary instruction only the day before this concession. (Dkt. No. 301.)

and alcohol abuse.  (*See* RT 3482-88.)  He argued that Mitchell clearly had the required *mens rea* for first-degree murder and aggravated carjacking.  He argued that Mitchell carjacked the victims in order to get a truck to carry out the later robbery of the Red Valley trading post and that he killed the victims in order to eliminate any witnesses.  He made no mention of Mitchell's recorded statement that he had been drunk before and during the homicides.  He did not mention Mitchell's other statements to FBI agents, which were also documented in the discovery, that he had been drunk during the homicides.  (*See* RT 3480-90.)

191.   Instead, the prosecutor stressed that the homicides were committed with a plan in mind, stating that "none of this was thoughtless.  None of this was impulsive.  None of this was spur of the moment.  Might not have been the best plan in the world, but it was a plan."  (RT 3493.)  Although trial counsel had promised at opening to explain how Mitchell became involved in this "nightmare," he had no response at closing to the prosecutor's claim that Mitchell planned out the killings.  Trial counsel had denied, at the opening argument, that there was any "premeditated plan to steal a truck and kill the occupants," but he did not follow up with evidence of intoxication and expert testimony explaining how such intoxication interfered with the defendant's judgment and executive function, resulting in his involvement in impulsive, violent activity.  The prosecutor's closing argument simply highlighted that the defense had offered nothing in support of its claim that Mitchell lacked specific intent to kill the victims.  When the prosecutor during closing argument capitalizes on trial counsel's error, the likelihood that the error affected the outcome of the trial increases.  *See Reynoso v. Giurbino*, 462 F.3d 1099, 1118 (9th Cir. 2006) (finding *Strickland* prejudice for failure to investigate benefits given to witnesses when prosecutor emphasized witnesses' credibility during closing argument).

85

192.    A showing that Mitchell had been up for days before the offense smoking marijuana laced with cocaine, methamphetamine or PCP and drinking large quantities of alcohol would have enabled trial counsel to rebut the prosecutor's assertion that Mitchell was not impulsive and that he planned the brutal killings for the purpose of "witness elimination."  If trial counsel had thoroughly investigated Mitchell's substance abuse history and his use immediately before the homicides, they would have been able to give the mental health experts substantial evidence in support of such a defense.  For example, when post-conviction counsel thoroughly investigated intoxication, they identified numerous people who submitted declarations about Mitchell's heavy drug and alcohol use near the time of the homicides.  When post-conviction counsel confronted Mitchell with this evidence, he conceded to the mental health experts that he had been severely impaired immediately before, during and after the crimes.  Mitchell told Dr. Stewart that "before October 28, he had not slept for the three nights previous, and that he drank malt liquor and smoked a variety of drugs two nights before to the point of intoxication."  (Ex. 135, ¶ 50.)  He remembered "using methamphetamine, both snorting it and smoking it, during the week of October 28, increasing in its use before going to Gallup.  He also ingested Ecstasy and smoked crack cocaine and marijuana rolled together into P-dog cigarettes."  (*Id*.)

193.    If counsel had uncovered such evidence and presented it to their mental health experts, they would have been able to explain how consuming large quantities of drugs and alcohol for several days had affected Mitchell's executive functioning and impulsiveness.  Mental health experts could have explained that just because Mitchell, while under the influence of alcohol and drugs, followed Gregory Nakai's orders to obtain a truck, this did not mean that he had engaged in extensive planning and willful conduct, as argued by the prosecution.

86

194.    Mental health experts would also have explained how so much drug and alcohol use caused Mitchell to become impulsive during the carjacking.  If trial counsel had developed mental health expert testimony about the effects of alcohol and drugs use on brain structure and human behavior, they would have discovered many more mitigating factors.  Mitchell had a serious alcohol problem.  Alcohol can affect judgment reflected in impaired decision making.  Alcohol is also known to affect memory, and increased doses of alcohol can result in partial or complete memory loss for events that transpired while a person was drinking.

195.    Mitchell used methamphetamine on a regular basis and around the time of the homicides.  Methamphetamine, which causes increased activity, talkativeness, and a general sense of well-being, is a highly addictive stimulant that affects the central nervous system.  This drug is known to cause severe structural and functional changes in the areas of the brain controlling emotion and memory.  Emotional and cognitive problems are common in methamphetamine abusers.

196.    Mitchell also used powder and crack cocaine regularly and around the time of the homicides.  By the time he was living with the Nakais, from August of 2001 until his arrest, Mitchell smoked  "P-dogs" (marijuana cigarettes laced with crack) three or four times per week.  (*See* Ex. 135, ¶ 41.)  Crack cocaine, like methamphetamine, is a highly addictive stimulant.  It causes increased energy and mental alertness, but produce a relatively brief "high" which tends to result in users binging on the drug.  In addition to myriad physical problems, cocaine addicts tend to experience periods of irritability, restlessness, anxiety and paranoia.  Cocaine abusers can also experience temporary states of paranoid psychosis, where they lose their grip on reality and experience auditory hallucinations.

197.    In terms of hallucinogenic drugs, Mitchell was known to abuse, among others, LSD and phencyclidine (PCP).  One trait common to these

hallucinogenic drugs is that they are highly unpredictable and can produce totally different effects in different people or even in the same person during different periods of abuse. While a PCP high generally lasts four to six hours, LSD and other hallucinogen trips can last up to twelve hours. Hallucinogens are known to distort the user's perception of reality. They can cause rapid, intense emotional swings and affect behavior, muscle control and general responses to environment. Users can experience severe, frightening thoughts and may also suffer psychosis. Until 1965, PCP was used as an anesthetic in humans. Its use was discontinued due to its ability to make patients agitated, delusional and irrational. PCP is known, like other hallucinogens, to produce schizophrenic-like symptoms and can cause severe mood disturbances. Unlike other hallucinogens, PCP is considered an addictive drug.

198. A thorough presentation of Mitchell's use of alcohol and drugs, coupled with the testimony of appropriate mental health experts (such as a psycho-pharmacologist) about how such use affects brain structure and human behavior, would have allowed the defense to rebut the prosecutor's unsupported claims that Mitchell knew exactly what he was doing immediately before and during the bizarre homicides. In short, a person intoxicated by high potency stimulants will be impaired in all areas of mental function. As a consequence of a drug-induced psychotic state, the individual is unable to separate fact from fantasy (psychosis), and is subject to irrational fear (paranoia) that can trigger responsive and impulsive behavior from him. Events occur, and behaviors are seen that would not occur if it were not for stimulant intoxication. The appearance of drug-induced psychosis includes episodes of violence. Stimulant-related violence is typically impulsive, not planned, and the degree of violence is greater than that which is expected from the actions of the intoxicated individual. In a methamphetamine intoxicated

person, the rate of thought is extremely fast, and there is little ability to ponder the consequences or reasonableness of behavior. By virtue of stimulant intoxication, such individuals are unable to premeditate or form specific intent; their actions are not truly planned out, but should be viewed as arising from extreme irritability and distorted perceptions created by the drug.

199. A proper mental health investigation would have revealed that Mitchell was in just such a drug-induced, sleep-deprived state at the time of the homicides and that this affected his ability to form specific intent. Dr. Pablo Stewart, M.D., a psychiatrist with substantial experience in the effects of substance abuse and addiction, reviewed the evidence of Defendant's drug and alcohol abuse unearthed by post-conviction counsel and opined that Mitchell's extensive abuse of the above-mentioned drugs caused him to suffer from substance induced psychotic disorder (SIPD) at the time of the offenses. (*See* Ex. 135, ¶ 73.) Dr. Stewart concluded that Mitchell's condition at the time of the killings indicated "that he was grossly out of touch with reality, and was unable to appreciate what was occurring when he was suffering from SIPD." (*Id*., ¶ 79.) More specifically, Dr. Stewart concluded that Mitchell's drug and alcohol use, coupled with his pre-existing mental health problems, prohibited him from forming specific intent at the time of the crimes:

> When Mrs. Slim and Ms. Lee were killed, I (or a similar mental health professional) would have testified that Mr. Mitchell's severe intoxication, SIPD, and PTSD synergized with each other resulting in the alteration of Mr. Mitchell's cognitive and behavioral functioning, which severely impaired his ability to premeditate or intend to commit murder. In fact, the combinations of these conditions made him unable to appreciate the wrongfulness of his actions. While the question of whether Mr. Mitchell met the legal standard on the mental state prong of the charges would have remained with the province of the jury, I believe that the available evidence would inform a determination whether he actually formed

the mental state necessary to sustain a conviction for murder.

(*Id.*, ¶ 89.)

200.   If the ample evidence of intoxication and SIPD had been introduced, as well as the expert testimony explaining how such phenomena affected Mitchell's executive functioning and impulsivity,  the defense certainly would have been entitled to receive the requested voluntary intoxication instruction.  If the instruction had been given, there is a reasonable probability that the result of the guilt phase would have been different.  Trial counsel's failure to prepare and present such important evidence in support of the most viable defense at guilt phase constitutes ineffective assistance.

## B.    Counsel's Failure to Investigate, Prepare and Present Evidence of Addiction and Intoxication Resulted in Ineffective Assistance at Penalty Phase

201.   Even if a defendant's intoxication does not rise to the level of negating intent at guilt, addiction and intoxication may be a mitigating factor at penalty phase, particularly if, as in Mitchell's case, the defendant turned to drugs and alcohol in response to childhood abuse , neglect and mental illness.  The Federal Death Penalty Act explicitly categorizes "impaired capacity" as a statutory mitigating factor.[16]  Consequently, counsel may be ineffective for failing to investigate, prepare and present evidence of drug and alcohol abuse at penalty phase.  *See Jackson v. Calderon*, 211 F.3d 1148, 1163 (9th Cir. 2000) (finding

---

[16]    Section 3592 defines "impaired capacity" as "[t]he defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." 18 U.S.C. § 3592(a)(1) (West 2009).

ineffective assistance at guilt phase because counsel failed to prepare and present evidence that defendant was addicted to PCP); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001) (finding ineffective assistance for failure to investigate troubled childhood, history of substance abuse and emotional problems).

202.   The Ninth Circuit has stressed that "the reasonableness of counsel's investigatory and preparatory work at the penalty phase should be examined in a different, more exacting manner than other parts of the trial." *Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006).  Even if evidence of Mitchell's state of intoxication would not have changed the outcome of the guilt phase, it creates a reasonable probability of a different outcome at penalty phase.  The Ninth Circuit in *Frierson* found ineffective assistance because counsel failed to prepare and present intoxication evidence.  The panel stressed, "Evidence of a history of chronic drug abuse may not have been sufficient to demonstrate that [the defendant] lacked the requisite mental state for the crime, but the extent of [the defendant's] drug use from an early age was an important mitigating factor that the jury did not have an opportunity to discover." *Frierson*, 463 F.3d at 994.

203.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing. Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

204.   Mitchell's troubled, dysfunctional upbringing provided a compelling story for why he turned to drugs and alcohol so early in life.  Mitchell never met his father, and his mother, Sherry Mitchell, showed little interest in him after the first few months of his life.  She actually gave him to her parents to care for as she

pursued an education even though her own parents had physically abused her as a child. (*See* Ex. 93, p. 1.) Not surprisingly, Mitchell was beaten both by his mother and his grandmother, Bobbi Jo Mitchell. (*Id.*, p. 9; Ex. 111, ¶ 8.) He was also ridiculed and threatened by his caretakers throughout childhood.

205.    Later, Bobbi Jo Mitchell also moved to teach at a school off the Reservation, leaving Mitchell to be raised by his elderly grandfather. Friends and educators all remarked that nobody in the Mitchell family appeared to care about Mitchell's upbringing and education. Despite this, Mitchell graduated from high school.

### 1.    Trial counsel's failure to investigate addiction and intoxication as mitigation was unreasonable

206.    When Mitchell entered adolescence, he became increasingly disenchanted with his mother's abandonment of him and his grandparents' abuse and neglect of him. He developed post-traumatic stress disorder (PTSD) in response to the years of verbal and physical abuse and neglect. (*See* Ex. 135, ¶ 59.) As explained by Dr. Stewart, it is very common for individuals suffering from PTSD to self-medicate with drugs and alcohol as a way to deal with their mental health issues. (*Id.*, ¶ 65.) Mitchell is no exception, and his use of drugs and alcohol escalated throughout adolescence. Nearly everybody who interacted with Mitchell in the summer prior to the homicides observed him consuming large quantities of drugs and alcohol. As Mitchell descended into serious substance abuse, his behavior became self-destructive and erratic, culminating in his participation in the killings. The reality of Mitchell's situation is a far cry from the cold, calculating gang leader who plotted a murder to eliminate witnesses, as was argued by the government. The failure to investigate Mitchell's substance abuse

deprived the defense of its best opportunity to give an explanation for Mitchell's participation in such brutal crimes.

207.  Trial counsel recognized the potential value at penalty phase of Mitchell's state of intoxication during the killings.  They knew that the Federal Death Penalty Act listed "impaired capacity" as an enumerated mitigating factor. (*See* 18 U.S.C. § 3592(a)(1).)  They requested that the Court give an instruction at penalty phase that impaired capacity could be considered as a statutory mitigating factor.  (RT 4068.)  But as in the guilt phase, counsel had not sufficiently prepared and presented evidence of addiction and intoxication to make use of them as a mitigation defense.

208.  At the penalty phase, counsel examined FBI Special Agent Duncan regarding the November 4, 2001 taped statement where Mitchell repeatedly told the police that he had been so drunk during the killings that he "blacked out" and thus could not remember all of the details.  (RT 3959.)  However, relegating the presentation of voluntary intoxication to merely presenting this snippet of testimony from the case agent without readily available corroborating evidence proved prejudicial to the defense.  While Agent Duncan conceded that Mitchell volunteered he had been intoxicated during the offenses, he also used the opportunity to testify why he believed Mitchell had been lying about this and other issues.  (RT 3975-76.)  Specifically, he testified that Mitchell had falsely claimed he had no involvement in the killings and simply watched Orsinger kill the victims. Agent Duncan opined that Mitchell could not have been drunk during the killings because they happened on a Sunday evening, and Mitchell and Orsinger had just come from Gallup, where the sale of alcohol is banned on Sundays.  (RT 3996.)

209.  Because trial counsel had done so little to develop this aspect of their mitigation presentation, they had no real response to the case agent's assertions.

Agent Duncan was the last penalty phase witness.  Thus, the defense ended with the case agent's assertion that Mitchell had been lying about his participation in the homicides and his state of intoxication.  There was no mental health expert testimony describing how or why Mitchell's intoxication affected his behavior during the homicides.

210.    Having precluded the giving of a voluntary-intoxication at guilt phase, the prosecutor tried to preclude it again at penalty phase.  Seizing on the absence of mental health expert testimony about intoxication at the penalty phase, he opposed the instruction, noting, "The mere fact that [Mitchell] says he was drinking doesn't establish any inability to appreciate the wrongfulness."  (RT 4030.)  Although the Court ultimately rejected the prosecutor's argument that no instruction on "impaired capacity" should be given at penalty phase (RT 4068), the reality is that the prosecutor had identified the fundamental weakness of presenting evidence of alcohol use through the case agent alone.  The little evidence that there was of alcohol consumption came from the defendant himself and was called into question by the case agent's testimony.  But there was no reason for counsel to rely exclusively on Mitchell, particularly since they knew or should have known that the case agent would claim that he was lying.  There were numerous witnesses (including Orsinger, the Nakai brothers and Padrian George) who could have directly and indirectly corroborated Mitchell's statement to the case agent that he was drunk, but counsel didn't know of these witnesses because of their failure to investigate this issue.  As such, there was nothing but the most minimal attempt to link intoxication to the events of the crimes, which was then used by the case agent as an opportunity to accuse Mitchell of lying to manufacture a defense.  There were certainly no efforts to place Mitchell's use alcohol or drugs in the context of his entire background and character.

94

211.   Because trial counsel did not introduce any mental health expert testimony about how drug and alcohol consumption affected Mitchell's executive functioning and impulsivity, the jury had no way to evaluate how his claim of intoxication would have affected his "capacity to appreciate the wrongfulness of [his] conduct" or his ability to "conform his conduct to the requirements of law," even if his capacity was not so impaired as to constitute a defense to the charge. (*See* 18 U.S.C. §3592(a)(1).) Thus, one of the most important statutory mitigators in this case went unaddressed because trial counsel unreasonably failed to work up this aspect of the mitigation defense.

**2.      The failure to prepare and present evidence of addiction and intoxication prejudiced the mitigation defense**

212.   Trial counsel's failure to investigate addiction and intoxication prejudiced the penalty defense because it deprived them of the best opportunity to explain how or why Mitchell, a defendant with no significant prior criminal history, had become involved in such extraordinarily violent crimes.  During penalty argument, the prosecutor repeatedly stressed that Mitchell preplanned the murders to advance his scheme to rob the trading post. (RT 4108-09.)  The prosecutor then argued that Mitchell's intentional conduct was a strong reason for sentencing him to death, repeatedly stating that "our actions define us." (*See* RT 4108, 4110, 4131, 4177.)  Because defense counsel did not adequately investigate addiction and intoxication, he did not have an adequate response to the prosecutor's characterization of Mitchell as acting willfully and intentionally before, during and immediately after the killings.  Counsel argued that Mitchell and Orsinger "were drinking hard," but he had to concede that "there's some question as to whether they were able to buy liquor in Gallup on the Sunday." (RT 4143.) In the end, counsel was forced to rely on the case agent's testimony that during the

95

interrogation Mitchell had claimed he was drunk. (*Id.*) The problem with relying exclusively on Agent Duncan's testimony to prove an impaired mental state is that he also told the jury that he believed Mitchell was lying about being intoxicated. (See RT 3975, .)

213. If the trial counsel had thoroughly investigated Mitchell's drug and alcohol use, they would not have needed to rely on the case agent, who was hardly a friendly witness, to prove a major aspect of the penalty defense. Instead, the trial team would have unearthed extensive lay testimony that verified Mitchell had a serious drug and alcohol problem. Such testimony would have corroborated Mitchell's recorded statement to the police in which he claimed to be drunk at the time of the offenses. The Nakai brothers, Johnny Orsinger and Padrian George – each of whom spent a lot of time with Mitchell shortly before the crimes – have declared that Mitchell was consuming large quantities of drugs (including meth and crack) shortly before the killings. (*See* Ex. 100, ¶¶ 4-5; Ex. 107, ¶¶ 4-5; Ex. 109, ¶¶ 5-6; Ex. 136, ¶ 8; Ex. 137, ¶ 6.)

214. The lay witness testimony about Mitchell's extensive drug and alcohol use in turn could have been given to Dr. Morenz, the psychiatrist whom defense counsel consulted prior to trial, to inform his expert opinion whether Mitchell suffered from addiction and intoxication at the time of the crimes. If the extensive evidence of Mitchell's longstanding drug and alcohol problems had been given to Dr. Morenz, he would have advised defense counsel that Mitchell might have had impaired judgment and an altered perception of reality. Specifically, Dr. Morenz has declared:

> The information obtained by the Federal Public Defender Office's (Mitchell's present counsel), which describes Mr. Mitchell's substance and alcohol use in the months and days preceding the capital offenses in late October 2001, could have made a significant difference to me. If I had that information before Mr. Mitchell's trial, I would

have developed further with Mr. Mitchell that he may have been under the influence of major, strong, and powerful illicit drugs at the time of the offenses. Taken as true, the declarations from the individuals who saw Mr. Mitchell use alcohol and the illicit substances before the offenses indicate to me that he might have been heavily under the influence of substances at the time of the offenses and his perceptions of reality might have been altered.

(Ex. 144, at ¶ 4.)

215.   Armed with all of this lay and expert testimony, trial counsel could have expanded their evidentiary presentation regarding mental state well beyond the brief testimony of Agent Duncan that Mitchell had claimed to be drunk at the time of the murders.  Trial Counsel could have shown that Mitchell's claim of impairment was not limited to buying alcohol on one particular day in Gallup; rather, as an addict Mitchell had access to multiple substances from multiple sources.  More importantly, Mitchell's addiction problem would have explained how and why he became involved in the killings even though he had not planned them, as argued by the prosecutor.  Evidence that Mitchell's "perceptions of reality were altered" during the offenses would have rebutted the prosecutor's repeated claim that "our actions define us."

216.   The special verdict form demonstrates how the failure to develop mental health expert testimony about addiction and intoxication prejudiced the mitigation defense.  Only one juror found "impaired capacity" was present in this case.  (RT 4200.)  This suggests that the jury was left with the wrong impression that Mitchell was sober during the crimes, when, in fact, he was severely intoxicated, to the point of blacking out.  If trial counsel had presented all of the evidence of addiction and intoxication and called a mental health expert to explain how addiction had affected Mitchell's entire way of thinking, including his decisions to befriend Johnny Orsinger and participate in the carjacking, there is a

reasonable probability that the result of the penalty phase would have been different.

217.   The special verdict also demonstrates that his was not an open-and-shut case for death. All twelve jurors found that Mitchell's lack of a criminal record and the fact that Orsinger would not face the death penalty to be mitigating factors. (*See* RT 4199.)  Seven jurors found that the Navajo Nation's opposition to the death penalty in this case was mitigating.  (*See* RT 4200.)  Six jurors found that Mitchell's background and upbringing were mitigating.  (*Id.*)  All of this suggests that there were substantial mitigating factors to counterbalance the aggravating circumstances of the capital crime.  If counsel had presented more compelling evidence of intoxication to explain how and why Mitchell participated in such brutal killings it may have made a difference to at least one juror.  *See Wiggins v. Smith*, 539 U.S. at 537 (finding prejudice where "there is a reasonable probability that at least one juror would have struck a different balance").  Counsel's failure to adequately investigate, prepare and present evidence of Mitchell's addiction and intoxication at penalty phase requires relief.

## C.   Trial Counsel's Conflict of Interest Deprived Mitchell of the Right to Effective Assistance

218.   The Sixth Amendment right to counsel includes the right to undivided loyalty.  *Wood v. Georgia*, 450 U.S. 261, 272, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981).  The test for determining whether an alleged conflict of interest has deprived the defendant of his right to counsel in violation of the Sixth Amendment was established in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d (1980).  The Supreme Court explained that "in order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of

interest adversely affected his counsel's performance." *Id.* at 350.  Therefore to obtain habeas relief on the basis of an alleged conflict, Mitchell must show 1) that counsel actively represented conflicting interests, and 2) that an actual conflict of interest adversely affected his lawyer's performance.  *See id.*

219.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

220.   Those facts and allegations set forth in the Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

221.   The Ninth Circuit has found a *Cuyler* violation where counsel represented two clients who had conflicting interests even though they were not defendants in the same case.  *See Lockhart v. Terhune*, 250 F.3d 1223 (9th Cir. 2001).  In *Lockhart*, an attorney represented a defendant charged with murder and attempted murder.  The prosecution also alleged that Lockhart had committed a prior shooting that was not charged, but was used to buttress the prosecution's case that Lockhart committed the charged murder and attempted murder.  The same attorney also represented another client who had been identified by the informants as the shooter in the earlier murder that the prosecution now alleged Lockhart had committed.

222.   The Ninth Circuit held that this was an "actual conflict" under *Cuyler* because "[the attorney] could not fairly represent those conflicting interests." *Lockhart*, 250 F.3d at 1230; s*ee also United States v. Christakis*, 238 F.3d 1164 (9th Cir. 2001) (holding that trial counsel represents conflicting interests when one

client possesses information that he could use to implicate another client in exchange for a reduced sentence).

223.  As in *Lockhart*, there is evidence in this case to suggest that the Federal Public Defender's Office represented two clients who had actively conflicting interests even though they were not co-defendants in the same case.  At some point before trial, Assistant Federal Public Defender Karen M. Wilkinson notified Federal Public Defender Jon Sands that she was representing a client who had some involvement in the Mitchell case.  Sands directed Wilkinson to seek to be relieved as counsel based on a conflict-of-interest.  He also imposed an "ethical wall" around Wilkinson, which prohibited her from disclosing any information about her former client's participation in the Mitchell case to fellow assistant federal public defenders currently representing Mitchell in this capital case. (Ex. 115, ¶ 7.)

224.  The problem with this solution is that, as in *Lockhart*, it raises the specter of pitting one client against another.  The Federal Public Defender's efforts to protect Wilkinson's client resulted in a diminution of trial counsel's options to thoroughly investigate Mitchell's case.  As a defendant facing the death penalty, Mitchell had a strong interest in investigating all evidence and every potential witness in his case.  Indeed, the ABA Guidelines command trial counsel to do just that.  (*See* ABA Guideline 10.7(advising that counsel should investigate all eyewitnesses, potential alibi witnesses, life-history witnesses, members of the victim's family and should also review all police and forensic reports and view the scene of the crime)).  Mitchell also had a strong interest in ensuring that his counsel were not prohibited from probing any aspect of the investigation and prosecution of this case due to either a conflict or an ethical wall designed to resolve the conflict. The Federal Public Defender's restrictions on trial counsel prevented them from

looking into how Wilkinson's unnamed affected the investigation of this case. Thus the conflict adversely affected their performance.

225.  The problem only worsened with time.  In August 2007, Assistant Federal Public Defender Celia Rumann, who was representing Mitchell on direct appeal, learned that Wilkinson had conflicted off a case where Wilkinson's client had some involvement in the Mitchell case.  (*See* Ex. 115, ¶ 2.)  Although Federal Public Defender Jon Sands and Wilkinson knew the nature and scope of Wilkinson's client's involvement in the Mitchell case, neither of Mitchell's current counsel on appeal had any idea about the basis of the conflict.  Rumann notified private attorney Michael O'Connor, who was co-counsel on appeal.  After discussing the matter with O'Connor, Rumann sent an e-mail to Sands asking for "more information to assess whether an actual or potential conflict exists and the extent of any such conflict and how to meet my obligations to protect my client's interests."  (Ex. 115, ¶ 4.)

226.  Sands subsequently met with Rumann, O'Connor and the trial lawyers about the conflict.  O'Connor argued that the Federal Public Defender's Office had "an obligation to reveal the nature of the conflict so that [current counsel] could properly assess it."  (Ex. 108, ¶ 2.)  Sands persisted in his determination that no information about Wilkinson's former client would be shared with the Mitchell team, but agreed that Rumann could move to be relieved as counsel based on a conflict of interest.  (Ex. 115, ¶ 5.)  Rumann did not move to be relieved as appellate counsel and the conviction and sentence were affirmed.

227.  It does not appear that in the course of any of these discussions about the conflict that trial or appellate counsel ever advised Mitchell of the conflict to determine whether he agreed with going forward in this manner.

101

228.   Trial counsel have no written records regarding the conflict or discussions about how to proceed in light of the conflict except one e-mail from Rumann to Sands objecting to the secrecy surrounding Wilkinson's withdrawal. Consequently, post-conviction counsel contacted Wilkinson in an attempt to obtain the name of the case in which she had moved to be relieved as counsel based on the conflict.  After consulting with her office, Wilkinson declined to disclose any information about her former client, including his name.

229.   Trial counsel's continuous refusal to share any information about their former client with Mitchell puts him in an "impossible position" because Mitchell cannot know or prove to a court what his own lawyers certainly know, but feel bound not to tell him.  *See Lockhart*, 250 F.3d at 1231.  The failure to provide the requested information draws an inference that trial counsel "actively represented conflicting interests."  *See Cuyler*, 446 U.S. at 350.  The conflict is real and continuing because the Federal Public Defender feels such loyalty to the unnamed witness that it still will not provide Mitchell with the information that he needs to support his post-conviction claim.  The Federal Public Defender's refusal to share even the name of Wilkinson's former client is not compelled by law.  There is no basis in attorney-client privilege to withhold the name of a client.  *See United States v. Reiserer* , 479 F.3d 1160, 1165-66 (9th Cir. 2007) (holding that attorney could not oppose production to documents simply because they would disclose the identity of his clients); *United States v. Horn* (*In re Horn*), 976 F. 2d 1314, 1317 (9th Cir. 1992) (holding that the attorney-client privilege does not protect a client's identity from disclosure).  Thus, it appears that counsel has risked the rights of a capital client in order to protect the rights of another client over and above what the law requires.  This is the essence of legal conflict of interest.

230.    Counsel in Lockhart tried to obviate any Sixth Amendment problem by having each client waive the conflict.  *See also United States v. Martinez*, 143 F. 3d 1266, 1269 (9th Cir. 1998) (valid waiver of conflict-free representation because court informed defendant of right to conflict-free attorney and ability to receive outside legal advice and defendant affirmed desire to retain attorney).  The Ninth Circuit has stressed that a court "must 'ascertain with certainty' that [a defendant] knowingly and intelligently waived his right to conflict-free counsel . . . by 'focusing on what the defendant understood.'"  *Lockhart*, 250 F.3d at 1233 (internal citations omitted).  The panel ultimately rejected the waiver because counsel had not fully disclosed all of the evidence to Lockhart that his other client was the primary suspect in the earlier murder that the prosecution now accused Lockhart of committing.

231.    Here there is nothing in the record or in trial counsel's files to suggest that Mitchell was even notified of the conflict, what is more that he knowingly and intelligently waived the conflict.  Trial counsel admitted during trial that there was a breakdown in communication between them and Mitchell.  It is not likely that he would have waived any conflict if it had been brought to his attention by counsel.  Counsel's failure to notify their client in a capital case of a significant conflict of interest is further evidence of ineffective assistance of counsel.

232.    At the very least, Mitchell has made a prima facie showing of a conflict that adversely affected trial counsel's representation of him at trial and on appeal.  The court should grant discovery and compel the Office of the Federal Public Defender to disclose the basis of the conflict that prompted Wilkinson to move to be relieved as counsel for the unnamed client who has some involvement in this capital case.

103

**D.    Trial Counsel Was Ineffective with Respect to the Penalty Imposed**

233.    In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

234.    Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

**1.    Trial counsel's performance was deficient**

235.    In the third phase of a capital trial, the penalty phase, the jury decides the nonstatutory aggravating factors and the mitigating factors, undertakes the process of weighing, and determines the sentence.  In Issues A and B, *supra*, Mitchell shows that his trial counsel provided ineffective assistance at the merits/guilt and eligibility phases of his trial.  Here, he shows that his trial counsel provided ineffective assistance at the penalty phase.

236.    As discussed fully in issues A and B, *supra*, to establish ineffectiveness, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  In considering counsel's performance at the penalty phase, the Supreme Court has stated that the central question for this Court

> is not whether counsel should have presented a mitigation case.  Rather, [the] focus [is] on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable*.

*Wiggins v. Smith*, 539 U.S. at 523 (emphasis in original); *id.* at 521.  As the Ninth Circuit has explained, "[t]he Supreme Court has conveyed a clear, and repeated, message about counsel's sacrosanct duty to conduct a full and complete mitigation investigation before making tactical decisions, even in cases involving . . . egregious circumstances."  *Earp v. Ornoski*, 431 F.3d 1158, 1175 (9th Cir. 2005) (rape-murder of a toddler).

237.   "Together, *Wiggins* and *Williams* [*v. Taylor*] . . . emphasize counsel's duty to conduct a thorough investigation, and *Williams* in particular shows that counsel's duty is not discharged merely by presenting some limited evidence." *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004).  Courts "closely scrutinize an attorney's preparatory activities."  *Foster v. Lockhart*, 9 F.3d 722, 726 (9th Cir. 1993); *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments."); *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) (holding that counsel is deficient if he "neither conducted a reasonable investigation nor demonstrated a strategic reason for failing to do so"); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) ("[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client . . . ." (emphasis omitted)).

238.   Because the jury in a capital case must consider in mitigation "anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant,"[17] capital defense counsel's

---

[17]   ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 10.7, p. 80 (2003).  *See Tennard v. Dretke*, 542 U.S. 274, 284-87, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004) (describing the "low threshold for relevance" that applies to mitigating evidence; such evidence need "not relate specifically to petitioner's culpability for the crime he committed"; "the

"penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."  2003 ABA Guideline 10.7, Investigation, p. 81; *see also Woodson v. North Carolina*, 428 U.S. 280, 303-04, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (the Constitution requires an individualized determination that death is the appropriate sentence); *Clemons v. Mississippi*, 494 U.S. 738, 752, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990) (emphasizing the importance of the jury considering a defendant's mitigating evidence).

239.   The duty to thoroughly investigate and present mitigating evidence existed at the time of Mitchell's trial in 2003.  *Wiggins*, 539 U.S. at 514, 522, 524 (1989 trial); *Williams*, 529 U.S. at 368 (1986 trial); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(c), p. 93 (1989) (quoted in *Wiggins*, 539 U.S. at 524); 1 ABA Standards for Criminal Justice 4-4-1, cmt., p. 4-55 (2d ed. 1980) (cited in *Williams*, 529 U.S. at 396).  Here, counsel did not conduct a reasonable mitigation investigation, although many facts for an investigation were readily apparent and available to them.

240.   Where counsel's investigation did not discover or develop a fruitful area of mitigating evidence in the first place, the movant must show only that counsel failed in their duty "to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances. . . ."  *Williams v.*

---

question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death" (internal quotation marks omitted)); *Payne v. Tennessee*, 501 U.S. 808, 822, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) ("virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1984) (capital sentencer cannot refuse to consider or be "precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (internal quotation marks omitted)).

*Taylor*, 529 U.S. 362, 415, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (O'Connor, J., concurring).

241.   Mitchell's capital defense team was comprised of three attorneys, two with no capital defense experience and one experienced in capital defense ("learned counsel"), an investigator whose role was limited to only guilt investigation (*see* Ex. 123), and a mitigation specialist.

242.   Learned counsel John Sears did not join the team until several months after the Government had arraigned Mitchell on the capitally-eligible charges.[18] This was a crucial period for Mitchell's case.  The Commentary to Guideline 10.2 states:

> [E]arly investigation to determine weaknesses in the [prosecution]'s case and uncover mitigating evidence is a necessity, and should not be put off in the hope that the death penalty will not be requested, or that the request will be dropped at a later point.[ ]  Moreover, early investigation may uncover mitigating circumstances or other information that will convince the prosecutor to forego pursuit of a death sentence.[ ]

Commentary to Guideline 10.2, 2003 ABA Guidelines, pp. 58-59 (footnotes omitted).

243.   Counsel's mitigation evidence to the Government in support of their request to "de-authorize" or withdraw the death penalty stated that Mitchell suffered from "substance abuse and lethargy" and eye twitching.  *See* U.S. Dep't of Justice, United States Attorneys' Manual § 9-10.030 (1998) ("At the time an indictment charging a defendant with an offense subject to the death penalty is filed or unsealed, or before a United States Attorney's Office decides to request approval to seek the death penalty, whichever comes first, the United States Attorney should give counsel for the defendant a reasonable opportunity to present any facts,

---

[18]   The Government withheld its notice of intent to seek the death penalty against Mitchell until September 13, 2002.  (Dkt. No. 87.)

including any mitigating factors, to the United States Attorney for consideration."). While no court has held that trial counsel's insufficient de-authorization presentation, like counsel's here, comprises ineffective assistance of counsel, given that the Government has withdrawn the death penalty in many capital cases, once it is informed of the substantial mitigation evidence (*see* Exs. 82 & 83), and that the United States Attorney for the District of Arizona conflicted with the Federal Government's Department of Justice about seeking the death penalty against Mitchell.

244.    Failing to convince the Government to withdraw the death penalty, counsel must begin and accomplish a thorough, sophisticated mitigation investigation that starts when at their appointment.  *See* footnote 12 to Guideline 1.1 (citing, *e.g.*, *Williams v. Taylor*, 529 U.S. at 415; ABA Standards for Criminal Justice: Standard 4-4.1(a), in ABA Standards for Criminal Justice:  Prosecution Function and Defense Function (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . . The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.").  Here, by the time Mr. Sears became counsel for Mitchell, Ockenfels had completed most of her investigation.  As it turned out, learned counsel Sears did not work with the mitigation specialist anyway.  (*See* Ex. 93.)

245.    Mitchell is unaware of any substantive investigation conducted and developed by the guilt investigator Brandenberger, save his pretrial interview of the co-perpetrator Johnny Orsinger.  (*See* Ex. 123; Ex. 109.)  Section 2255 counsel requested Brandenberger's trial notes and memoranda to counsel but have been

informed that they no longer exist (*see* Ex. 123, ¶ 3), and he has no recollection of the substance of his conversation with Johnny Orsinger. (*Id*.) Orsinger state that he,

> remember[s] meeting with so many people before and during the trial so if someone from Lezmond Mitchell's defense met with me, I don't remember. If it'd been explained to me that our drug and alcohol use, and how many days we had been awake by then, could've been helpful to my case too, I would've provided the information in this declaration.

(Ex. 109, ¶ 7.)

246. Brandenberger drove Ockenfels to some of her interviews. (Ex. 123, ¶ 4.) He was, for example, at Ockenfels' interview with Sherry Mitchell, the client's mother. After that, because of the language he used with her, and because Ockenfels broke a promise she had made to Sherry,[19] Sherry no longer cooperated with the defense. (Ex. 105, ¶ 35.) Before sentencing, Sherry, of her own accord, sent a letter to this Court asking it to spare her son's life. (*See* Ex. 105, addendum)

247. As for Ockenfels, the mitigation specialist, her document titled, "Social History," is sufficient in some areas, incomplete in others, and overall is inadequate. That is not surprising, since at some point, the trial team stopped the already-limited communication they provided her. Instead of a "social history" of the type courts are used to seeing in capital trials where counsel have provided effective assistance (*cf. Wiggins*, 539 U.S. at 517), and the type the ABA Guidelines direct are mandatory to provide effective assistance in capital cases, Ockenfels' "social history" document is clearly for counsel's use only.

248. Still, Ockenfels' "social history" document gave counsel abundant sources of potential mitigation evidence that would have prompted any reasonable

---

[19]  Sherry wanted to inform Mitchell about facts about her life, before his birth, before Ockenfels did; later, Sherry learned that Ockenfels broke this promise and related the information to Mitchell on her own.

capital attorney to investigate further.  For example, an educator on the Reservation, who also knew the Mitchell family, was not alone in stating that, "Lezmond 'had no love' from George or anyone else in his family and 'was abandoned by his mother and grandparents.'" (*See, e.g.*, Ex. 93, p. 10.)  The Social History also described the abuse perpetrated against him by his mother Sherry and his grandmother Bobbi Jo.  *See*, section Preliminary Statement, *infra.*  Unfortunately, counsel failed to follow up on many of the leads, and as a result, important mitigation evidence was not presented.

249.  Counsel did not consult the mitigation investigator before presenting the witnesses they did at the penalty phase.  (Ex. 93.)

250.  Another area of strong mitigation that counsel failed to adequately develop from their mitigation specialist's document was this:

> Lezmond also experimented with 'acid' (LSD) in his sophomore year of high school.  He first smoked crack cocaine in his junior year of high school, and thereafter indulged about once every 2 months.  He reports 'heavy use' of crystal methampheamine [sic] during the months immediately preceding this incident.  While he was living with the Nakais immediately before his arrest in this case, he and the Nakais typically bought an 8 ball, split it between them 'and stayed up 3 nights in a row.'  Lezmond reports he took crystal meth 'whenever [he] could afford it,' and used it last in September, 2001.

(Ex. 93, p. 33.)  *See* Section B, *supra*, regarding counsel's ineffective assistance regarding the gateway intent and aggravating factors.

251.  No mental health or other experts or professionals testified on Mitchell's behalf despite red flags in the limited investigation that was done that indicated to counsel that Mitchell grew up in violent, abusive homes and that he had long suffered from drug addiction.  *See Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) ("[W]hen tantalizing indications in the record suggest that certain mitigating evidence may be available, those leads must be pursued."

(internal quotation marks omitted)); *see also Wiggins*, 539 U.S. at 525 ("[A]ny reasonably competent attorney would have realized that pursuing . . . leads [regarding the petitioner's traumatic childhood] was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background.").

252.    Indeed, trial counsel's files reveal that they had decided long before not to develop further or present any mental health expert testimony.  While the failure to present mental health testimony may not necessarily comprise ineffective assistance, counsel received mental health evaluations before trial that were fertile with potential mitigation evidence.  (*See, e.g.*, Exs. 94, 93, 92, submitted under seal.)  Yet, counsel abandoned those efforts and presented only a scattershot of disorganized lay testimony.  Considering the rich mitigation evidence they could have had, if they had developed it, coupled with the evidence they failed to develop (*see infra*), counsel's performance was deficient.

> [C]ounsel's duty to investigate all potentially mitigating evidence related to a defendant's mental health, family background, and prior drug use and to provide the sentencing court with a full presentation of the evidence that might lead the sentencer to spare his client's life is not discharged merely by conducting a limited investigation of these issues or by  providing the sentencing court with a cursory or 'abbreviated' presentation of potentially mitigating factors.

*Lambright v. Schriro*, 490 f.3d 1103, 1120 (9th Cir. 2009); *see also Jells v. Mitchell*, 538 F.3d 478, 495 (6th Cir. 2008), *reh'g denied* ("[I]n *Wiggins v. Smith*, the defendant was found to have been deprived of competent counsel when his 'counsel abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources,'" (quoting *Wiggins*, 539 U.S. at 524)).

253.   As the declarations by Mitchell's mental health experts show (*see*, *e.g.*, Ex. 135), counsel unreasonably failed to consult with appropriate and necessary experts, and failed to prepare and present expert testimony on Mitchell's life history, including his executive functioning deficits, his substance abuse and its consequences, and his upbringing and his family background.

254.   Besides learned counsel Sears, counsel had available to them other resources to aid in providing Mitchell effective assistance, all of whom counsel vastly underutilized.  One, a member of counsel's own Office, had performed as counsel and learned counsel in several other capital cases previously.  Another was a learned counsel whose job is actually to assist capital counsel – he is with the Federal Death Penalty Resource Counsel, a program designed to assist federal defenders and appointed counsel in federal capital cases where the Government seeks the death penalty.  Yet, Mitchell's defense attorneys – two of whom had never represented a federal capital defendant previously – underutilized the experience and expertise of these two capital defense attorneys.  Except for one notable meeting, their contributions were limited to the few occasions that trial counsel consulted with them briefly.  At that one meeting, counsel asked one of these attorneys to convince Mitchell to accept a sentence less than death.  Although the failure to consult other capital defense attorneys is not necessarily ineffective assistance, here, Mitchell's counsel unreasonably failed to utilize the mitigation evidence they did have, and presented, by way of a handful of witnesses, an unfocussed and brief mitigation presentation.

255.   While the 2003 Guidelines state confidently that "having a qualified mitigation specialist assigned to every capital case . . . insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the

112

guilty verdict" (Commentary to ABA Guideline 4.1, p. 33), the requisite "close scrutiny" of counsel's performance at the penalty phase reveals that having such a specialist on Mitchell's team failed to ensure this goal.

256.   It appears that all the penalty phase witnesses, whose role was to provide information that would "militate against the appropriateness of the death penalty," were unprepared for their testimony.  If counsel's unreasonable performance was because they were "still in shock at the guilty verdict," it is of no moment.  The case law is clear that counsel must prepare for the penalty phase even if counsel believe they have a strong defense to the guilt case-in-chief.  Here, counsel did not believe they had a strong guilt defense, yet they still prepared ineffectively for the penalty phase.

257.   The witnesses describe being interviewed – most, just briefly – by the mitigation investigator well before the trial even began, then being summoned to testify at Mitchell's penalty phase with a few instructions from counsel just minutes beforehand.  (*See* Ex. 104; Ex. 111; Ex. 121; Ex. 116; Ex. 127.)  One mitigation witness had only escorted her mother to testify for Mitchell, but ended up replacing her mother without much ado, or any preparation, from trial counsel.  (Ex. 116, ¶ 5.)  The mitigation specialist had interviewed Auska, Mitchell's uncle, several times before trial.  However, trial counsel did not tell him what they would ask him when he testified.  (Ex. 104, ¶ 23.)

258.   All the witnesses state that counsel showed them the photographs of the deceased victims, then asked if they were still sure they wanted to testify for Mitchell, and if they were sure Mitchell should not receive the death penalty.  (Ex. 104, ¶ 23; Ex. 111, ¶ 19; Ex. 116; Ex. 121, ¶ 5, Ex. 127, ¶ 3.)  All of the witnesses passed this test, apparently, and testified as well as they could.

259.   Still, only two of the eight defense penalty witnesses knew Mitchell longer than four years.  In response to counsel's questions, Auska stated that he saw Mitchell "off and on" during Mitchell's childhood; he never met Mitchell's father; Mitchell was close to his children, and he believed Mitchell's life should be spared.  Auska's direct testimony comprised only nine pages, including his own biographical information and his descriptions of five photographs of Mitchell.  (RT 3888-97.)

260.   As its last mitigation witness, the defense played a video-deposition of the only other mitigation witness who knew Mitchell before 1998:  Bobbi Mitchell, his grandmother.  As counsel later remarked to the jury, Bobbi spent a significant portion of the barely-one-hour video discussing herself.  (RT 4156.)

261.   As discussed in Section B, *supra*, counsel could have used much of this evidence to rebut evidence introduced to show intent and aggravation.  Because of counsel's failures, the jury had an incomplete, and in many ways, false, portrait of the man they sentenced to death.  *Bean v. Calderon*, 163 F.3d 1073, 1080-81 (9th Cir. 1998) (granting relief to a capital habeas petitioner because, at the penalty phase, trial counsel presented a portrait of the defendant's family that was an "unfocused snapshot" and mitigating evidence was presented "only in the vaguest terms").

262.   As for the mental health professionals counsel did consult, counsel did not give them adequate background information about Mitchell so they could give counsel a reliable, sound evaluation of and accurate testimony about him (which was impossible given the limited nature of the mitigation investigation); failed to guide them about the meaning of "mitigation evidence" as the case law broadly defines it; and failed to call them to testify before the jury.  These failures were unreasonable.

114

263.   Mitchell's counsel failed "in their obligation to conduct a thorough investigation of the defendant's background," *Williams v. Taylor*, 529 U.S. at 396, and "to 'present and explain the significance of all the available [mitigating] evidence.'" *Mayfield*, 270 F.3d at 927.  (*See* Exs. 135, 139, 141, 143.)

## 2.    Trial counsel's deficient performance prejudiced Mitchell

264.   Prejudice from counsel's errors must be "considered collectively, not item-by-item." *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).  The Ninth Circuit has emphasized that in ineffective assistance of counsel claims, "prejudice may result from the cumulative impact of multiple deficiencies." *Harris ex. rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc).  Thus, the Court must consider the cumulative prejudice resulting from trial counsel's deficiencies in all phases of Mitchell's trial, as opposed to considering prejudice based only on each individual instance of inadequate representation by counsel.[20]

265.   Here, not surprisingly, only half the jurors found the existence of "[o]ther factors in Lezmond Mitchell's childhood, background, record, character or any other circumstance of the offense . . ." as mitigating against the death sentences.  (Dkt. Nos. 945, 955.)  Seven jurors found as mitigating evidence the January 22, 2002 letter from the Navajo Nation to the Government expressing its opposition to the death penalty for Mitchell.  (*See* Defendant's Penalty Phase

---

[20]   Some of the errors counsel committed at the guilt phase (incorporated herein by reference) prejudiced Mitchell at the penalty phase too.  In addition, although each subclaim below provides an independent basis for relief on Mitchell's claim of ineffective assistance at the penalty phase, relief is also appropriate based on the cumulative prejudice arising from these different acts and omissions.

Ex. 22.)  These findings suggest strongly that this was not an open and shut case for death.

266.   The "classic mitigating evidence," *Correll v. Ryan*, 465 F.3d 1006, 1011 (9th Cir. 2008) (as amended), *cert. denied*, No. 08-430 (2009), that could and should have been presented at trial, but was not presented, includes the following:

267.   Lezmond Mitchell was an abandoned and abused child; an abandoned and abused teenager; and an abandoned young adult.  His mother and father may have contributed the biology that brought him into life, but neither of them were ever parents to Mitchell.  He never met his father nor any members of his father's family.  Under his mother's care, Mitchell was badly burned at the age of eight months, and his mother sent him to live with his maternal grandmother.  In his grandmother's care, Mitchell was beaten, bullied and shamed on a nearly daily basis.  When his grandmother would no longer take time for even his minimal care, she sent him to live with his maternal grandfather.  Mitchell's maternal grandfather was at best lax for his care, and negligent at worst.  There were years in Mitchell's life where his grandparents and mother moved him from household to household without regard for his schooling, his connections to the few friends he had, or even whether there would be an adult who would take care of him.

268.   Mitchell's maternal grandfather was Diné (Navajo), his grandmother was Scottish, and his mother a product of these two lineages.  Mitchell's grandfather was a well-regarded elder on the Navajo Reservation.  His grandmother had a doctoral degree in education.  His mother has an advanced degree also in education.  Despite all the traditional measures of success and internal resource this heritage might have been for Mitchell, no one took the time to teach him, raise him in a spiritual life, or help him see a productive place for himself on the Navajo Reservation.  His grandfather or mother never taught him the language, never

116

explained his mixed race or even supported in his exploration of the Native American Church. Mitchell was a boy without both internal and external resources.

269. Mitchell's immediate family had so little regard for him, it did not matter if school authorities requested their attention for problems, or cared about accomplishments he achieved – they had no time for him. When a concerned school official called Mitchell's mother asking her to come to a school conference regarding her son, she not only refused to attend, she forbade the school official ever to call her again. When Mitchell was a passenger in a car involved in an accident that killed the driver, no one from his family ensured that he received medical attention. In fact, despite various official documents recording the event, Mitchell's mother questions whether the accident and death of Lezmond's friend, the driver, even happened. Mitchell played football in high school – albeit on a team whose coach let everyone play because he always had a shortage of players – yet no one from his family ever attended a football game. Lezmond was chosen to give a graduation speeches at his high school graduation. None of his caretakers attended graduation. Lezmond Mitchell's childhood was neither witnessed, nor celebrated by anyone in his immediate family.

270. The attention Lezmond did receive from his family came almost exclusively as verbal or physical abuse. His mother hit and whipped him. His grandmother smacked and beat him, she shoved his head shoved into a stove. His grandparents and mother called him names, and told him that he would never amount to anything. They accused him of criminal activity before there was any in his life. They told him he was the product of rape, and that his mother was the product of incest. This only child witnessed violence in his household and was the target of violence himself. Lezmond watched the mental illness of his grandmother

117

and mother play out in horrible ways in his own life, including a struggle for power over Lezmond between them, where the only goal of the struggle was who would inflict abuse on him. A psychologist evaluating Lezmond in high school urged treatment for Lezmond's depression and suicidal ideation emanating from the family discord and his abandonment. No one in Lezmond's family sought the treatment Lezmond needed, nor encouraged him to seek treatment for himself.

271. In high school, for a brief period, Lezmond sought out a small community of support, the Reed family. The Reeds took Lezmond in, cared about, fed him, housed him and he flourished. He was the positive influence for his classmate, Lorenzo Reed. He was the babysitter for Tara Reed's baby daughter, he did chores, came home on time and was considered family. Lezmond's family homestead was no more than five miles away from the Reed's home, but that distance made a world of difference for Lezmond. He became a student body officer and graduated with some distinction from high school.

272. Untreated depression, the abandonment of a child who has grown to a young man with so little support from his family, and the slide into drug use came to define Lezmond's life after high school.

273. He tried working but had little ability to stay focused and substance free. When he ran out of money and had no job, Lezmond had to leave the Phoenix apartment of a Reed family member. He went back to living with his maternal grandmother, an arrangement destined to end badly. Lezmond left his grandmother's home when she violently berated him over his placement of a trash bag in a trash can, accused him of theft and sent him into the world knowing he really had no where to go. Lezmond headed back to Round Rock, disconnected from anyone in his family and homeless.

274.    The Nakai household was notorious in their community.  The three oldest Nakai brothers were known drug and alcohol sellers and suspected in many other criminal activities in and around their community.  A band of misfits collected at the household; young men who had nowhere else to go and were addicted to the illegal substances easily available through the Nakais.  Staying at the Nakai house had its own set of obligations, including supporting the drug and alcohol sales and consumption that went on there. One Nakai brother, Gregory, was the acknowledged manager of the household's illicit activities.  Gregory kept the records, engineered the sales of drugs and alcohol and ultimately murdered a man that bought beer from him, by shooting him in the head for simply being drunk at the wrong place and wrong time.

275.    Another young man who stayed periodically at the Nakai house, Johnny Orsinger, came there with a significant criminal background and a serious drug addiction.  In October 2001, he and Lezmond went to Gallup, New Mexico, after a binge of many days on marijuana, meth, and cocaine. They had not slept, and they had been drinking beer along with their drug use.  Johnny described feeling as though he and Lezmond were walking as puppets, with their bodies moving forward, but unsure how that could happen.  The capital crimes that occurred happened in that context.

276.    A predictable conclusion to Lezmond's abandonment throughout his life, neither Lezmond's grandmother, grandfather, nor his mother attended his capital trial.

### a.    Evidence of family mental health history and its effect on Mitchell

277.    Trial counsel presented no evidence that Mitchell had a family history of mental illness, and its effect on him.  Mitchell's grandmother, Bobbi Jo, who

was his primary caretaker as a child and adolescent, suffered from a mental illness. (*See* Exs. 135, 143; *see generally* Exs. 95, 96, 98, 99, 117, 120; Ex. 105, ¶¶ 32, 35; Ex. 104, ¶¶ 8-16.)  She was paranoid.  She could not maintain a steady position, despite having an advanced education and degree, because of her mental state. (*See, e.g.,* Exs. 95, 104, 117.)[21]  Had counsel not alienated Mitchell's mother at the outset (*See* Ex. 105), and had counsel investigated Bobbi Jo thoroughly, they would have discovered this information readily.  As it was, counsel never found the evidence of Bobbi Jo's mental illness, thus they were never able to explain the implications of the grandmother's illness to Mitchell's upbringing and development, particularly since Bobbi Jo abused Mitchell physically and psychologically.

278.   Counsel did not consult with a psychiatrist or any other mental health professional to investigate the implications of family mental illness for Mitchell and his case.  Counsel's deficient performance in failing to present evidence of this family history of mental illness and its implications for Mitchell requires relief. (Exs. 135, 143.)

**b.    The abuse and neglect endured by Mitchell**

279.   "[Counsel's] investigation should include inquiries into social background and evidence of family abuse."  *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (citing *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005)). Here, trial counsel presented no evidence of the physical, and emotional abuse Mitchell endured growing up, although counsel's mitigation specialist had found the fruits of that evidence:

> Lezmond's bond with his mother was severed as early as
> 9 months of age when Sherry delivered Lezmond to her

---

[21]   There was also evidence that Bobbi Jo's family, the Erwins, had a history of mental illness.  (Ex. 71.)  This too was undeveloped by counsel.

father – for the first of several times – to raise.  Lezmond had multiple caretakers before and after Sherry's abandonment, including several babysitters.

(Ex. 93, p. 7.)

After Lezmond sustained unexplained injuries – 'second degree burns all over his chest and stomach when Sherry spilled hot coffee on him and got a big bump on his head,' Sherry dropped Lezmond for George to raise in Chilchinbito, Arizona, back on the Reservation. Lezmond he was only about 9 months old, but according to Sherry, her NAU schedule was unmanageable, and she was 'too tired trying to do too much and not paying enough attention [to Lezmond].'

(*Id.* (emendments and quotations in original).)

Lezmond was defiant with his mother, and when he started school, with his teachers.  In 3rd grade, he embarrassed Sherry when he 'got into a lot of clashes' with his teacher.  After all, Sherry reports, she was an educator, but 'couldn't even control her own son.' According to Sherry, she 'told Lezmond to stop acting out,' and that she 'could lose [her] job over him, but Lezmond wouldn't stop.'  Again choosing her career over son, and concerned more about her reputation than her son, Sherry withdrew Lezmond from school in the middle of the semester and shipped him to his grandfather to deal with.  Lezmond recalls this move with regret.  He reports feeling the sting of rejection, which never went away, but subsided instead into anger. From Sherry's point of view, Lezmond 'cut [her] out of his life in third grade' from this time forward.

(*Id.* (emendments and quotations in original).)

Lezmond and Sherry 'got into a big fight' and Lezmond refused to go back to California with Sherry after a visit to the Reservation during Christmas of 7th grade. According to Lezmond, Sherry hit him for the last time during this incident, and he'd 'had it.'

(*Id.*, p. 9 (quotations in original).)

Before 'the Christmas Incident', Bobbi, George and Sherry report that Lezmond told his grandparents Sherry had been beating him, a 'story', Sherry reports, her parents 'chose to believe.'

(*Id.* (quotations in original).)

121

Bobbi states that, when Sherry 'lost it' with Lezmond, she would 'sock him.' According to Lezmond, Sherry started whipping him when he was in 3rd grade, and his mother and he got into several scuffles as a child. Lezmond told Bobbi and George that his mother frequently beat him when they went home for 'The Christmas Incident' in 7th grade. And, during The Christmas Incident, he reports Sherry grabbed Lezmond, 'hit [him], and shoved [him] up against the wall, and [he] reached [his] breaking point.' Bobbi and George, who 'cannot recall' the physical tussle Lezmond and Sherry got into during Christmas, ignored his reports of abuse, but offered him a place to live. When Sherry packed the car and demanded he get in it to return to California, 'he wouldn't budge.'

(*Id.* (emendments and quotations in original).)

Auska, Lezmond's uncle, Lorenzo Reed, Lezmond's friend, and Delilah, Lezmond's girlfriend, report that Lezmond reported verbal and physical abuse by both Bobbi and Sherry. Lezmond told Lorenzo when he was a senior in high school that his mother constantly 'put him down' and was 'always angry with him.' He told Lorenzo that his grandmother 'slapped him, and pushed him around all the time.' Once when Lezmond was cleaning the oven, Bobbi 'pushed him and he hit his head on the oven door handle.'

(*Id.*, p. 9 (quotations in original).)

According to Delilah, Lezmond reported that his mother was 'mean' and 'slapped him around' when he was little. During a recent interview, Lezmond reported he's 'gotten into pushing matches with Bobbi' several times.

(*Id.*, p. 10 (quotations in original).)

According to Lezmond, Sherry 'didn't want to have anything to do with [him]' and 'stopped being affectionate with him' by the time he vias in 3rd grade. He 'hated living with Bobbi [in California] because she rarely hugged [him] and always insisted that things be done her way or no way.' Dr. Robert Roessel, George Mitchell's friend who lived on the Reservation all of Lezmond's life, agrees that Bobbi and Sherry were both 'cold, domineering and stubborn.' According to Dr. Roessel, Bobbi and Sherry were 'opinionated, brash and the type that tolerates things being done only their way.' Auska agrees his mother was 'picky, overbearing and demanding.'

(*Id.* (emendments and quotations in original).)

According to Lezmond, George was 'never affectionate,' and life on the Reservation was 'boring and isolated.' Lezmond recalls wondering as a child 'what [he] did wrong to deserve his banishment to George's house in the middle of nowhere.'

According to George's friend, Dr. Robert Roessel, Lezmond 'had no love' from George or anyone else in his family and 'was abandoned by his mother and grandparents.' Dr. Roessel 'knows no one who really loved Lezmond,' who was 'on his own from the time he was born.' He was dumped into George's lap, a man who was 'not capable or interested in providing love or direction to anyone.' According to Dr. Roessel, George was a 'dour, sour man, who was never happy.' Bobbi, too, was an 'unhappy woman' and her absence 'was probably better' for all, as there was so much conflict between her and George, and together, they 'could see only the negative side of life.'

(*Id*. (emendments and quotations in original).)

Lezmond's uncle, Auska, reports that neither Bobbi or George were 'huggers,' and showed Lezmond affection instead by 'buying things.' According to Auska, Lezmond looked in the wrong places for the affection he never got from his family. Auska stated during a recent interview that Lezmond 'never had a chance' with his family.

(*Id*. (emendments and quotations in original).)

'Outsiders' noticed a troubled Lezmond in high school, and attempted to intervene with 'damage control,' but by then the neglect Lezmond had endured had taken Its toll and had hardened him. Dr. Roessel and his wife, Ruth, 'tried to help provide Lezmond direction because his family was not there for him.'

(*Id*. (quotations in original).)

According to Rough Rock High School Vice Principal John Fontes, Lezmond once told him 'every body had let [him] down.' Mr. Fontes noticed Lezmond's general 'disappointment with adults because the adults most important to him were not there for him.' Mr. Fontes recalls approaching Auska 'to encourage Lezmond [to graduate high school],' because it was obvious that 'Lezmond needed family support.' Rough Rock High School English teacher, Sonja Halsey, noticed that Lezmond's family had 'turned their backs on him' and

> > tried to boost his self-esteem by focusing on his academic successes.

(*Id.*, p. 12 (quotations in original).)

> > Sherry reports she attempted to 'take control' of Lezmond when she moved back to the Reservation in connection with employment she obtained during Lezmond's junior year.  However, her attempt was lame, fleeting and disingenuous.  According to John Fontes, Sherry didn't want any day to day involvement' with Lezmond or his issues at Rough Rock High School.  When he telephoned Sherry to discuss Lezmond's poor attendance and disciplinary problems, Sherry hung up on him in response.  She told him she 'didn't want to know about Lezmond's status or progress, and not to call again.'
> > Indeed, Sherry celebrated her son's failures.

(*Id.* (quotations in original).)

> > According to Dr. Roessel, Sherry was 'furious' when he convinced the school board to allow Lezmond stay in school to graduate when Lezmond faced expulsion for passing marijuana in the school hall.  *Dr. Roessel reports that Sherry was 'ecstatic' when Lezmond was arrested in the present charges.*

(*Id.* (emendments and quotations in original; emphasis added); Exs. 135, 143.)

280.    As described in this Amended Motion, the reality of Mitchell's childhood was much different than the vague and brief portrait of his childhood that trial counsel presented.  Counsel's failure to present readily available evidence of Mitchell's abusive upbringing requires relief.  *Boyde*, 404 F.3d at 1177 (granting penalty relief where trial counsel failed to present evidence of physical and sexual abuse in defendant's household but instead presented testimony suggesting defendant had a nonviolent childhood); *Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002) (finding failure to present evidence of childhood abuse by stepfather prejudicial); *Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2003) (vacating death sentence where "counsel failed to present testimony at the penalty phase of trial explaining the effects of the severe physical, emotional and psychological abuse to which [defendant] was subjected as a child").

### c.      Mitchell's drug and alcohol abuse

281.   As discussed *supra*, sections A and B, counsel was aware that Mitchell abused significant amounts of polysubstances.  "When put on notice that the defendant might be a drug user . . . [a capital defense] lawyer . . . ha[s] a duty to investigate the extent of the defendant's drug use and its effect on his behavior." *Belmontes v. Ayers*, 529 F.3d 834, 848 (9th Cir. 2008), *warden's cert. petition pending*.  In addition to defeating the gateway intent and mitigating factors with the powerful evidence of Mitchell's polysubstance abuse and addiction – particularly since it escalated before the capital offense – such evidence is "classic mitigation evidence."  *Correll*, 465 F.3d at 1011; *Frierson v. Woodford*, 463 F.3d 982.  In sum, counsel's failure to present evidence of the extent and breadth of Mitchell's polysubstance abuse was unreasonable because this evidence, if presented effectively, rose to the degree of a statutory mitigator.  *Correll*, at 1015-16.

282.   Here, this Court directed the jury to consider "Lezmond Mitchell's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, despite whether his capacity was so impaired as to constitute a defense to the charge."  (Dkt. Nos. 945, 955.) Although Mitchell *was* impaired at the time of the offense, as well as by permanent mental dysfunction stemming from heavy substance abuse, the jury heard only, regarding his substance abuse, that (1) he had one disciplinary problem at the Rough Rock school for smoking marijuana, which a witness described as "typical behavior" for Navajos who "don't know who they are," and resulted in Mitchell's suspension from school for several days (RT 3798; RT 3914-15), and (2) after smelling marijuana, his uncle Auska found Mitchell's pot pipe.  (RT 3891.)  Thus, it was no surprise that only one juror found that Mitchell's impaired capacity was mitigating.  (CT 945, 955.)

125

283.   As discussed *supra*, Mitchell has a history of addiction and substance abuse.[22]   (*See* Exs. 135, 143; *and see* Ex. 100, ¶¶ 1-2, 4; Ex. 102, ¶¶ 2, 5; Ex. 107, ¶¶ 4-5; Ex. 109, ¶¶ 4, 6; Ex. 111, ¶¶ 4, 6, 11, 14, 16; Ex. 119, ¶¶ 4, 10, 15.) Further, his polysubstance abuse escalated at the time of the offenses.  (*See id*.; *also see* sections A and B, *supra*.)

284.   Counsel failed to investigate Mitchell's anomalous use of enormous amounts of illicit substances and alcohol prior to the offenses alleged, and failed to present this information to the jury in the context of a well-detailed mental health history.  This history was available to trial counsel had investigated Petitioner's life history adequately.  This failure to adequately investigate and present mitigation evidence concerning Petitioner's life history was unreasonable under the prevailing professional standards and was highly prejudicial to Petitioner. *Correll*, 465 F.3d at 1016-17 (granting penalty relief where trial counsel failed to present evidence of drug use of defendant and his siblings); *Ainsworth v. Woodford*, 268 F.3d 868, 875 (9th Cir. 2001) (finding prejudice because omitted evidence of defendant's drug and alcohol use "would have been extremely important to the jury in its effort to decide whether to impose the death penalty"); *Mayfield*, 270 F.3d at 929 (reversing death judgment because counsel failed to present additional evidence of defendant's drug and alcohol use and failed to present expert testimony on the subject; prejudice found although "[t]he mitigation evidence presented at trial through the testimony of [an expert psychologist] was substantial").

---

[22]   Mitchell's purported statements that he was not drunk are an insufficient basis for counsel to forego an intoxication investigation and presentation in light of all the information available to counsel.  *See Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008).

### d.    Mitchell's permanent brain dysfunction

285.    Counsel had information that Mitchell has executive functioning deficits, in comparison to his other abilities, and had those deficits at the time of the crimes and trial.  (*See*, *e.g.*, Ex. 194, pp. 1, 19; *see also* counsel's letter to DOJ re: de-authorization, noted in D.1., *supra*.)  These deficits, along with the several head injuries he suffered, including an auto accident in which the driver was killed, Mitchell's life history and his substantial polysubstance abuse counsel could have developed were substantial mitigating evidence.[23]

286.    The failure to present evidence of Mitchell's permanent brain dysfunction requires habeas relief.  *Frierson*, 463 F.3d at 993-94 (granting penalty relief where trial counsel failed to present evidence of defendant's drug use and of brain injuries "that may have resulted in organic brain dysfunction"); *see Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (counsel deficient for failing to investigate readily available evidence of mental impairment).

### e.    Failure to present a complete and accurate social history and supporting expert testimony

287.    To the extent not already alleged in the foregoing sections, counsel was prejudicially ineffective in failing to investigate, prepare, and present a thorough and adequate social history of Petitioner, along with competent, adequately prepared experts to explain the effects of that history on Mitchell's development and functioning.  A well-prepared, competent social history exemplifies the type of presentation trial counsel could and should have made,

---

[23]    Moreover, a qualified and effectively prepared mental health professional could have testified that Mitchell's executive functioning deficits are such he would have done well as an inmate serving a term of life in prison.  And, a qualified and effectively prepared mental health professional could have testified that Mitchell is not so brain damaged that the structured environment of prison setting can not control him.  *See Skipper v. South Carolina.*

127

particularly one that would explain to the jury why Mitchell's polysubstance abuse escalated significantly before the capital offenses.

288.    Counsel was ineffective for not presenting a social historian to discuss Mitchell's life history and mental health experts to present and explain evidence of his brain dysfunction, and substance abuse and addiction.  Counsel also failed to consult with appropriate and necessary experts and, as for the experts he did consult, he failed to give them adequate background information about Mitchell, which would have been impossible given the limited nature of the mitigation investigation; failed to guide them about the meaning of "mitigation evidence" as the case law broadly defines it; and failed to call them to testify before the jury. (*See* Exs. 135, 143.)  *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997) (finding counsel ineffective for failing to provide expert with sufficient background information relating to defendant).

**3.    Conclusion**

289.    The mitigating evidence presented herein and readily available to counsel were likely to evoke sympathy for Mitchell.  "It is difficult to imagine . . . a tactical reason for failing to investigate and present the substantial mitigating evidence available."  *Ainsworth*, 268 F.3d at 874; *see also Bean*, 163 F.3d at 1080-81 (9th Cir. 1998) (finding prejudice where defendant's family portrait was an "unfocused snapshot"; other mitigating evidence was presented "only in the vaguest terms").

290.    It cannot credibly be argued that the aggravating evidence presented against Mitchell at trial preclude relief on this claim.  In a leading capital case, the jury heard an enormous amount of aggravating evidence, including convictions for armed robbery, burglary and grand larceny; two auto thefts; two separate violent assaults on elderly victims; an arson; another "brutal[] assault[]" on an elderly

128

woman, resulting in the victim being in a "vegetative state"; and an arson in jail while awaiting trial. *Williams*, 529 U.S. at 368. Despite all this aggravating evidence, the Supreme Court granted the writ because the omitted mitigating evidence "might well have influenced the jury's appraisal of [defendant's] moral culpability." *Id.* at 398; *see also Lambright v. Stewart*, 241 F.3d 1201, 1208 (9th Cir. 2001) ("Evidence of mental disabilities or a tragic childhood can affect a sentencing determination even in the most savage case."); *Smith v. Stewart*, 189 F.3d 1004, 1013 (9th Cir. 1999) ("The horrific nature of the crimes involved here does not cause us to find an absence of prejudice. In *Hendricks*, we rejected the argument that heinous crimes make mitigating evidence irrelevant, noting that the fact finder . . . has broad latitude to weigh the worth of the defendant's life."); *Silva v. Woodford*, 279 F.3d 825, 828, 847-50 (9th Cir. 2002) (finding prejudice where defendant kidnapped and robbed two college students; the male student was chained to a tree while the female student was repeatedly sexually assaulted; and defendant shot and killed the male and ordered his accomplice to dismember him with an axe); *see Mak*, 970 F.2d 614 (finding prejudice where defendant was convicted of murdering thirteen people).

291. Moreover, in evaluating prejudice, the Court must examine the cumulative impact of all the mitigating evidence that could and should have been presented. *Williams*, 529 U.S. at 397 (trial judge properly assessed prejudice where his conclusion "rested on his assessment of the totality of the omitted evidence" rather than on individual items of evidence). Viewing all of the evidence presented in this Amended Motion that counsel failed to raise at trial, the prejudice to Mitchell is apparent.

292. Counsel's deficient performance cannot be passed off as being the result of "strategic" decisions because any such decisions were not informed by

129

adequate investigation and trial preparation.  *Mayfield*, 270 F.3d at 927 ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments." (citing *Strickland*, 466 U.S. at 691)); *Jackson v. Herring*, 42 F.3d 1350, 1367-68 (11th Cir. 1995) (decision to forego presentation of mitigating evidence cannot be reasonable if it is supported by insufficient investigation).

**E.**   **Trial Counsel Provided Ineffective Assistance By Failing to Challenge Mitchell's Statements as Involuntary Due to His Brain Damage, His Addiction, and His Cultural Heritage**

293.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

294.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

295.   In making a full and proper determination of the voluntariness of a *Miranda* waiver, courts must take into consideration "all the surrounding circumstances – [including] the characteristics of the accused." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).  While the mental state and capacity of the accused are not entirely determinative of the voluntariness of a waiver of Fifth Amendment rights (*see Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)), mental state issues are particularly relevant in combination with police malfeasance, as is present in this case.

296.   As "interrogators have turned to more subtle forms of psychological persuasion," as was done here by Duncan, Hush, and the Navajo Nation police, "courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Connelly*, 479 U.S. at 164.

297.   Some characteristics of the accused relevant in making a voluntariness determination are:  his age, any substantial drug addiction, lack of education, low intelligence, emotional state, and sophistication. *See, e.g.*, *Schneckloth*, 412 U.S. at 226 (discussing age, education, and intelligence).

298.   At the time of Mitchell's interrogations, he was young, unsophisticated, had only a high school education, and suffered from severe drug and alcohol problems.  Further, as shown in the Amended Motion, Mitchell suffered from mental deficiencies at the time of the interrogations.  These mental deficiencies, in combination with the lies and deceit employed by the FBI and Navajo Nation police, and Mitchell's history of polysubstance addiction at the time of his arrest, rendered Mitchell's waivers involuntary.  Thus, his statements should not have been admitted into evidence at trial.

299.   The wrongful introduction of the statements prejudiced Mitchell. It allowed the prosecution to argue that Mitchell knew immediately where the bodies were located, that he had lied about his involvement in the crime, and that the purported lies were an admission that the charges against him were true.

300.   Mitchell's statements to the FBI influenced the outcome of the trial.

301.   The *Miranda* waivers were invalid because they were the product of a manipulative "softening up technique" prohibited by the Fifth Amendment to the Constitution, as well as the collusion between the Government and the Navajo Nation police.  (*See* related claim, *infra*.)

302.    Mitchell was raised by his Navajo grandfather, his grandmother, and his Navajo mother.  Counsel additionally provided ineffective assistance for failing to challenge Mitchell's statements as involuntary and unknowing because of his Navajo up-bringing and heritage.

303.    The statements should not have been admitted for the additional reason that because of Petitioner's profound cognitive impairments, as set forth *infra*, thus waiver was not voluntary.

304.    Trial counsel's performance in litigating the waiver issue constituted ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668.

305.    These violations of Petitioner's constitutional rights warrant the granting of this Amended Motion without any determination of whether those violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. at 638 n.9.  Furthermore, the constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, the violations of Mitchell's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, and resulted in a miscarriage of justice.

**F.      Counsel's Failure to Investigate, Develop, and Challenge the Medical Examiner's Testimony and Autopsy Report Was Ineffective Assistance**

306.    A defendant in a federal criminal trial has a Sixth Amendment right to effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. at 771 n.14 ("The right to counsel is the right to effective assistance of counsel.").  *Strickland v. Washington*, 466 U.S. at 687, set forth a two-prong test to establish ineffective assistance of counsel.  A movant who is alleging ineffective assistance must show that: 1) trial counsel's performance was deficient; and 2) the deficient performance

prejudiced the defense at trial. *Id.* Counsel's performance is deficient if it was "objectively unreasonable under the circumstances." *Id.* at 688. To show prejudice under *Strickland*, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

307.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

308.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

309.   Medical examiner Jerri McLemore conducted the autopsy of victim Ms. Lee, but McLemore's report gave contradictory findings on the extent of Lee's neck wounds. The autopsy report cited the neck wounds as a "cause of death" in one section. (RT 3353.) Another section of McLemore's autopsy report described the same wounds as "superficial." (RT 3325, 3337-39, 3346, 3353.) Since law enforcement reports indicate that Mitchell admitted to cutting Lee's neck with a knife (FBI report by Agent Kirk dated 11/05/2001), effective counsel would have interviewed McLemore before trial and determined her stance about this critical information regarding the extent of their client's culpability in Lee's death. However, the trial counsel did not interview McLemore because they believed that interviewing her was "financially impossible." (RT 3270, 3273.) The Court disagreed with trial counsel's estimate of costs:

> The Court: The defense did have the opportunity to
> interview the [Medical Examiner but] did not make a

133

> request for funds to do so.  I can't imagine the Court would have denied the opportunity for the defense to interview such a critical witness.  (RT 3280.)
>
> The Court (to defense counsel):  You . . . had a reasonable . . . obligation to investigate, didn't you?  (RT 3275-76.)

310.   Trial counsel's decision to wait until the medical examiner testified at trial about Lee's neck wounds to discover the cause of death was objectively unreasonable under the circumstances.  The decision left counsel unprepared to challenge the ambiguity in McLemore's testimony and contradictory autopsy report.  McLemore testified that "unfortunately, [she] could not assess how deep it went or what structures, if any, it had involved."  (RT 3353.)  However, McLemore's autopsy report noted that Lee's "strap muscles, . . . large vessels, and larynx [were] intact."  Without injury to the muscles, vessels, and larynx, the neck wounds were too superficial to cause Lee's death.  (Ex. 139, ¶ 4.)  A defense forensic pathology expert could have prepared trial counsel to effectively cross-examine McLemore with her own autopsy report statements.  Counsel could have inferred bias in McLemore's over-inclusiveness of neck wounds as a contributing cause of death in the autopsy report and in her testimony.  Instead, jurors were left with no reasonable or properly supported expert opinion from which to draw the reasonable conclusion that the neck wounds could not have caused Lee's death.  Jurors with reasonable doubt that Mitchell threw a rock onto Lee's head were still left to speculate whether Lee could have died from knife wounds inflicted by Mitchell.  Effective counsel would have given the jury a proper basis to reject that portion of McLemore's report and testimony.

311.   Trial counsel provided ineffective assistance by relying on FBI Agent Duncan's report which credited a medical anthropologist and not the medical examiner who performed the autopsy, for discovering Lee's neck wounds.  (RT 3262-63.)  The case law applying *Strickland* is clear that "[i]t is especially

important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field." *See Duncan v. Ornoski*, 528 F.3d at 1235. However, trial counsel chose neither to interview McLemore before trial nor to hire a defense pathology expert to determine whether the FBI agent's report was plausible despite his lack of expertise. Instead, trial counsel hoped to discredit the medical examiner at trial. The Court commented that this defense strategy "worked to their detriment." (RT 3280.) The Court added, "[Y]ou were going to try to catch the medical examiner in an error. And that error, as you're finding out, is not an error." (RT 3275.)

312. A defense pathology expert would have advised trial counsel that the FBI agent's accounting of events was unreliable since medical anthropologists do not render opinions on soft tissue wounds. (*See* RT 3266; Ex. 139, ¶ 5.) However, as a result of trial counsel's failed strategy of relying on the FBI report to completely discredit the pathologist at trial, trial counsel never conducted a reasonable pretrial investigation of the pathology issues and related defense theories to present to the jury.

313. Defense attorneys counsel's deficient performance allowed the Government to present Lee's neck wounds as evidence of a premeditated murder by a torturer with no regard for human life:

> The prosecutor: The medical examiner is going to tell you . . . [she] found what appears to be the beginning of what they call sharp force wounds . . . knife wounds in her neck area. But due to the dismemberment, she is unable to make any conclusions further than that. (RT 2558.)

> The prosecutor: Blood everywhere. Marches a nine-year-old out to the mountains and slices her throat. (RT 3486.)

> The prosecutor: We have a witness. What are we going to do with her? . . . . Have to try to slash her throat (RT 3497 & 3499.)

135

The prosecutor:  Is that a reckless disregard for human life?  What did he do to Ms. Lee?  Well, he slit her throat (RT 4115.)

The prosecutor:  Oh, was she physically tortured? Absolutely.  Her throat was slit. (RT 4122.)

The prosecutor:  Forty miles of planning, what's he going to do with Ms. Lee?  How is he going to get rid of her? Well, the first thought was he was going to slice her throat.  That ought to do it.  (RT 4125.)

314.  The defense knew from the photographs and other evidence that the prosecution would present evidence about Lee's neck wound.  (RT 3279.)  Trial counsel unreasonably asked the Court to exclude any information about the neck wounds.  (RT 3264-65, 3268, 3270-72, 3280.)  "The failure to investigate is especially egregious when a defense attorney fails to consider exculpatory evidence."  *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002.)  Trial counsel offered no alternate theory for why the same knife which the prosecution argued was still operable and used to kill Slim had only superficially injured Lee.  Unambiguous defense expert testimony that Lee's neck injuries were superficial and not the cause of Lee's death would have opened the door to defense arguments rebutting the prosecution's portrayal of Mitchell and his state of mind as he cut Lee's neck.  The defense decision to keep silent about Lee's neck was objectively unreasonable because the superficial injury could have created doubt in a juror about Mitchell's state of mind at the time, whether he was thinking clearly in full control of his actions, and whether he intended for Lee to die.

315.  Trial counsel was unreasonably deficient in failing to investigate or to challenge the medical examiner to provide a conclusive medical opinion that the neck wound could not have caused Lee's death.  Jurors were left with no reasonable or properly supported expert opinion from which to draw the reasonable conclusion that the neck wounds did not have caused Lee's death.  This

136

unreasonably prejudiced Mitchell by allowing the prosecution to present Lee's neck wounds as evidence of a premeditated murder by a torturer with no regard for human life.

**G.     Counsel's Failure to Investigate and Challenge DNA Evidence and Testimony Comprised Ineffective Assistance**

316.   A defendant in a federal criminal trial has a Sixth Amendment right to the effective assistance of counsel.  *McMann v. Richardson*, 397 U.S. at 771 n.14 ("The right to counsel is the right to effective assistance of counsel.").  The Court in *Strickland v. Washington*, 466 U.S. at 687, set forth a two-prong test to establish ineffective assistance of counsel.  A movant who is alleging ineffective assistance must show: 1) trial counsel's performance was deficient; and 2) the deficient performance prejudiced the defense at trial.  *Id*.  Counsel's performance is deficient if it was "objectively unreasonable under the circumstances."  *Id*. at 688.  To show prejudice under Strickland, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694.

317.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

318.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

319.   "Undoubtedly, the [DNA] expert's explanation was not a model of clarity." *United States v. Mitchell*, at 971.  However, the Government's DNA expert, Benita Bock, was not merely imprecise – rather, she disregarded relevant exculpatory information, and improperly reached an inculpatory conclusion usurping the jury's role as the ultimate fact finder.  Then, trial counsel left Bock's inaccurate testimony and conclusions unchallenged and unchecked but also contributed to the errors with similarly inaccurate questions on cross examination.  Trial counsel did not elicit an explanation of the relevance of statistical probability analysis either from the prosecution's DNA expert or from a defense-provided DNA expert.  As a result, the jurors had no reasonable and properly supported expert opinion from which to draw a reasonable conclusion.  Jurors had to speculate whether a given set of statistics applied equally to all samples in evidence.  While jurors could deliberate that DNA samples from persons known to them were similar to DNA samples in evidence, without an expert's statistical probability analysis they could not reasonably deliberate whether those similarities occurred by chance making the test results a false indication that a person known to them had contributed DNA to the sample in evidence.  This flaw in testimony put too much weight upon the similarities in the test results.  Exacerbating the Government expert's omission, both the defense and the prosecution erroneously provided the jury a conclusion of fact that DNA evidence positively identifies or points to an individual as a contributor.  They disregarded relevant exculpatory information, and improperly reached an inculpatory conclusion usurping the jury's role.

320.   The forensic DNA analyst extracts human DNA from evidence taken from the crime scene and determines from it a set of genetic traits comprising a DNA profile.  The analyst compares the evidence-DNA profile with a suspect (or

victim's) DNA profile and determines whether both profiles could have originated from the same individual.  If a common origin for the two samples is possible, the analyst determines the statistical probability that the similarity arose by chance. (RT 3201.)  A DNA expert's testimony is limited to stating those probabilities. The jury determines the weight of those probabilities and makes a conclusion about the source of DNA.  *See Brown v. Farwell*, 2008 U.S. App. LEXIS 15393, p. *6 (9th Cir. 2008) (citing *Chischilly*, 30 F.3d at 1157), *warden's petition for certiorari granted, McDaniel v. Brown*, No. 08-559.[24]

321.   The prosecution's DNA expert provided statistical analysis when it suited the prosecution's theory of the case.

> Bock:  The DNA profile . . . matched the DNA profile of Mrs. Slim in all 14 loci. . . .The profile occurs in one in 680 billion Navajos.

> Bock:  Mrs. Slim matched the major component of that profile at all 14 loci. . . . That major component would occur in one in 680 billion Navajos.

(RT 3207, 3215; *see also* RT 3208.)  However, she omitted the step of random probability analysis whenever the DNA evidence of association was weaker.  (*See e.g.*, RT 3212-13; 3216-17; 3217-18; 3219.)  Given this obvious omission, defense attorneys should have elicited the necessary information of statistical probabilities from the Government's DNA expert or their own defense expert.  But instead defense counsel asked only:

> Defense counsel:  Is it also possible, looking at it the other way, that [the suspects] actually did not handle that knife or come into contact with it?

---

[24]   The questions presented are irrelevant here as they concern federal court entertainment of 28 U.S.C. § 2254 claims of sufficiency-of-the-evidence, pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996.

(RT 3227.)  Bock's answer should have been simple and affirmative.  Yet Bock answered "no" at first and then begged the question before finally answering with a refusal to explain.

> Bock:  [N]o, they could not be excluded as contributors. They are – they are – which is what the report says, their profile is present in sufficient quantity.  It matches at all of those.  And so I don't feel I could say that I can exclude them given the profile that was found.  It's possible – well, that's as far as I want to go.

(RT 3227.)  Trial counsel allowed the Government's witness to end the line of questioning without ever eliciting real numbers for the jurors to weigh.  As a result, the jury was forced to speculate with no basis for measurement or comparison of the DNA evidence from which to draw their own reasonable conclusion.

322.  Jurors might have even assumed Bock's thrice repeated statistic of "one in 680 billion Navajos" applied across the board whenever she omitted an actual probability analysis.  This potential for confusion and error should have been noticed and avoided by defense counsel especially because not all of the DNA profiles matched at 14 loci but some were "partials" with only 12 of 14 loci or 6 of 14 loci.  (*See* RT 3221, 3219.)  "One in 680 billion" could not have been an accurate match probability statistic for every profile of every person implicated. Testimony connecting an individual's DNA material to DNA evidence collected at a crime scene has no relevance unless a DNA expert provides the weight of the evidence for the jury.  (Ex. 141, ¶¶ 4, 5).

323.  Further, Bock offered conclusions for the jury and worsened the prejudice to Mr. Mitchell by erroneously identifying a source of DNA from the crime scene evidence.

> Bock:  She *was* the major component.

> Bock:  The large majority of the DNA . . . *came from* Mrs. Slim.

140

(RT 3210 (emphasis added).)  Thus, notwithstanding the statistical probability that the contributor of DNA from the crime scene was someone other than Ms. Slim or Ms. Lee, Bock gave the jury her inappropriate conclusion that the blood was certainly from Alyce Slim and Tiffany Lee.  Bock's testimony was not merely unclear, she disregarded an appropriate weighting of her DNA evidence and improperly reached and testified to an inculpatory conclusion.  Bock left jurors with only one possible choice:  that she had identified a particular person as the source of the DNA from the forensic evidence.

324.  Expert witnesses are permitted to state reasonable inferences to a jury, but Bock's testimony that a DNA sample affirmatively belongs to an identified person does not pass the Daubert test of admissibility.  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); Fed. R. Evid. 702.  It is a scientifically invalid conclusion to match a person with a DNA sample without stating it as a probability.  (Ex. 141, ¶ 4.)

325.  Trial counsel contributed to this error by asking Bock leading questions that identified a source of DNA from the crime scene evidence.  Trial counsel's cross-examination of Bock evidences a fundamental misunderstanding of forensic DNA analysis:

> Trial counsel:  The identifiable donor on the DNA on that chrome knife *was* Mrs. Slim; is that right?
> . . .
> Trial counsel:  The bloodstains that you analyzed from those two rocks *came from* Ms. Lee, correct?
>
> Defense counsel:  Is *his* DNA on one of those knives proof beyond a reasonable doubt that he used that knife a week earlier to stab Alyce Slim?

(RT 3225, 3231, 3531(emphasis added to all).)  Bock answered affirmatively to these questions.  Trial counsel's questions were not foundational for a further cross-examination.  Counsel did not attack these opinions or ask a follow-up

question.  Without the aid of an DNA expert, trial counsel unwittingly supported the prosecution and set a precedent for the jurors to conclude erroneously that the DNA tests can positively identify an individual as the source of DNA in evidence.

326.   The prosecutor contributed to this error in closing arguments:

> Prosecutor:  The masks are tested . . . [o]ne. . . comes back with cellular material that has his DNA.  And when I say 'his DNA,' I mean Lezmond Mitchell.

> Prosecutor:  You heard the testimony about the DNA.  It matches our victims.  It matches the defendant.

> Prosecutor:  Was that blood tested?  Yes, it was.  Does it come back to Tiffany Lee?  Absolutely it does.  The DNA is Tiffany Lee's.

> Prosecutor:  Now, what great fortune that Benita Bock was able to get Alyce's DNA on that knife.  What - what a stroke of luck for Agent Kirk that we were able to do that.  And the cell phone, we have Mitchell's DNA on the cell phone that comes from Alyce.

> Prosecutor:  We get a Halloween mask with his DNA. We get rubber gloves. . . . Every step of the way Mitchell's name is there. . . .Everywhere you turn, the defendant pops up.  He has the knife.  He has the cell phone.  He has the DNA in the gloves.

(RT 3490-91, 3506-07, 3509, 3561, 3564.)  Competent trial counsel would have inoculated the jury from these misleading and scientifically inaccurate characterizations of the DNA evidence.  A defense DNA expert could have explained to the jurors that DNA can only be stated in terms of probabilities.  DNA "test[s]" do not "come[] back" specifically identifying DNA evidence as "his," "Lezmond Mitchell['s]," or any individual.  Had a defense DNA expert given the relevant statistical probabilities to the jury to weigh and measure, jurors would have recognized that the prosecution's closing argument was a scientifically inaccurate conclusion which they could disregard.

327.   A DNA analyst can determine whether the evidence-DNA profile originates from a single source or a combination of people ("multi-source").

142

(RT 3202.)  When the DNA evidence is a single-source sample, either a victim or suspect's DNA will "match" the DNA in evidence or it will "not match."  (*Id*.)  However when the evidence contains a mixture of DNA from multiple sources, DNA analysts do not use the term "match."  (*Id*.)  As Bock testified, "in some instances we come up with mixtures of DNA profiles from more than one profile . . . . There's [sic] certain cases where we can exclude someone.  But we can't say that . . . he matches the profile."  (*Id*.)  Instead, a competent forensic scientist will testify that a suspect or victim either "cannot be excluded" or "can be excluded" as a possible donor of multi-source DNA evidence.  (*Id*.)

328.   After testifying to this standard, Bock disregarded it.  She inaccurately used the term "match" when describing a possible contributor of multi-source DNA evidence.

> <u>Bock</u>:  The other area where we only – I only obtained a partial profile that *matched* Ms. Slim, I cannot include or exclude her as a contributor to that stain.

(RT 3211.)  Competent DNA analysts avoid the term "match" in these cases because it is confusing to a jury.  (Ex. 141, ¶ 6.)  While an analyst can recognize the mathematical reduction in probability when a "match" is of partial loci in a sample that is too small or degraded to include or exclude a contributor, jurors hear "match" as a lay person would, not as an issue of statistical probabilities.  Jurors do not assume the exculpatory possibility of exclusion.  Therefore, Bock's testifying to a "match" exaggerated the presence of Slim's DNA such that it ceased to be an accurate or reliable scientific opinion of her findings for the jurors. (Ex. 141, ¶ 6.)

329.   Bock testified that a profile "matched Ms. Lee at 12 of the 14 loci. The results of the other two were inconclusive."  (RT 3221.)  Assuming she meant the results of the "other two" loci were "inconclusive," the jury should have heard how this "inconclusive" finding affected the overall statistical probability of a

143

match.  The jury did not get a reasonable and properly supported expert opinion from which to draw a reasonable conclusion, so they were forced to speculate the statistical difference between a finding of 12 of 14 loci and a finding of 14 of 14 loci.  Defense attorneys made no attempt to clarify the difference.

330.   The DNA evidence was a significant part of the prosecution's case-in-chief.  Obviously, counsel knew about the DNA evidence because it reiterated its importance to the Court during several pretrial proceedings as a basis for continuing the trial.  (11/15/2002 RT 7, 12/18/2002 RT 32-33).  The case law applying *Strickland* is clear that "[i]t is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field."  *See Duncan v. Ornoski*, 528 F.3d at 1235.

331.   Trial counsel's files suggest that they never received most of the DNA test results or a full report of all results from the DNA expert.  Apparently, the Government gave the defense its DNA test results for only 4 of the 11 exhibits introduced during their DNA expert's direct testimony.  (Ex. 141, ¶ 4.)  DNA data is missing from trial counsel's files for the following items introduced at trial:  the three Halloween masks (*see* RT 3217; Trial Ex. 93); both cell phones (*see* RT 3216; Trial Ex. 48); blood in the vehicle's armrest (*see* RT 3204-3206; Trial Ex. 117); blood on the vehicle's floor mat (*see* RT 3207; Trial Ex. 113); blood on fabric from the driver's seat (*see* RT 3208; Trial Ex. 107); blood on fabric from the back passenger's seat (*see* RT 3209; Trial Ex. 109); and bloodstains on the blanket in the vehicle (*see* RT 3210; Trial Ex. 98).  Without the DNA results and reports, defense counsel could neither evaluate this portion of Government's tests for accuracy nor effectively cross examine the DNA expert's testimony regarding 7 of 11 DNA exhibits.  (RT 3203-19.)  Competent defense counsel would have requested samples for independent testing.  *United States v. Noel*, 708 F. Supp.

177, 178 (D. Tenn. 1989).  Counsel needed all of the underlying data used in government tests to aid in cross examination and independent testing.  *United States v. Yee*, 129 F.R.D. 629, 635-36 (D. Ohio 1990); *see also United States v. Siegfried*, No. CR-99-752, 2000, U.S. Dist. LEXIS 10411, at *3 (D. Ill. 2000).

332.    Trial counsel did not preserve the record for appeal if, in fact, the Government provided incomplete DNA results and reports although partial scientific results and reports are a clear violation of the Government's obligations under Fed. R. Crim. Pro. 16(a)(1)(D).  *United States v. Iglesias*, 881 F.2d 1519, 1523 (9th Cir. 1989).  *See also Stein v. New York*, 346 U.S. 156, 182, 73 S. Ct. 1077, 97 L. Ed. 1522 (1953) (due process entails concerns for the accuracy of the evidence adduced in the trial process); *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (exculpatory evidence); *Drope v. Missouri*, 420 U.S. 162, 172-73, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) (defendant's participation); *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985) (defense access to expert evidence).

333.    Prosecutors were allowed to rely heavily during closing arguments on DNA evidence missing from defense files:

> Prosecutor:  There's some other evidence you heard. . . . [I]t was relatively undisputed like the DNA and where it was found.  But think about what it means.  Alyce Slim's DNA is found in the blood, all throughout the back of the truck.  That's Alyce. . . .What does that mean. . .?  It's relatively simple.  Alyce Slim was killed in the truck, bled in the truck.

> Prosecutor:  Swabbed the ear of that cell telephone that's in evidence . . . And what do they find?  The DNA of Lezmond Mitchell.  He tried to use her phone.

> Prosecutor:  We get a Halloween mask with his DNA. . . . Every step of the way Mitchell's name is there. . . . Everywhere you turn, the defendant pops up.  He has the knife.  He has the cell phone.  He has the DNA in the gloves.

(RT 3490-91, 3506-07, 3509, 3561.)

334. Even if they had all of DNA expert's results and reports, defense counsel was not prepared to provide an alternate defense theory regarding DNA evidence. Since the only DNA samples connected to Mitchell were multi-source mixtures (RT 3211-12, 3217-18), effective counsel would have highlighted relevant statistical evidence readily available within the DNA analysis to implicate another possible contributor. At least three people contributed DNA to the black-handled knife, every mask, and the cell phone. (RT 3211, 3217, 3216.) At least two people contributed to the glove. (RT 3218.) A defense DNA expert would have illuminated the level of relevance and the chain of custody issues inherent in multi-source DNA. (Ex. 141, ¶¶ 7, 8.) Instead, the jurors did not get a reasonable and properly supported defense expert opinion from which to draw this alternate reasonable conclusion.

335. Trial counsel was ill-prepared to challenge Bock's testimony. Effective counsel would have corrected and clarified Bock's testimony by eliciting relevant information about the number of discernable loci from DNA in evidence, the quality of every individual DNA sample in evidence, and the related statistical probability assigned to every finding. Effective counsel would have corrected Bock every time she used the term "match" imprecisely. (*Cf*. Ex. 141, ¶¶ 4, 6, 7 (providing scientific support for effective counsel's examinations).) Most importantly, effective trial counsel would have made Bock recant her testimony that DNA testing can identify an individual.

336. Benita Bock's testimony was not just unclear. *United States v. Mitchell*, at 971. It was inaccurately biased. Effective defense counsel would have discredited Bock's expert analysis, would have revealed the prejudice in her testimony, and prevented the prosecution from leading jurors to a scientifically

inaccurate conclusion at closing like "the mask[] . . .comes back with . . . his DNA. And when I say 'his DNA,' I mean Lezmond Mitchell."  (RT 3490-91, 3505.)

## H.    Trial Counsel Provided Ineffective Assistance In Jury Selection

337.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel in connection with the jury selection phase of his trial.  *See Strickland v. Washington*, 466 U.S. at 688.  Trial counsel rendered ineffective assistance in the following ways, considered both individually and cumulatively.

338.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

339.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

### 1.    Failing to challenge or adequately question jurors whose convictions about the death penalty substantially impaired the performance of their duties

340.   Trial counsel failed adequately to *voir dire* and challenge several prospective jurors who expressed opinions in favor of the death penalty that would "prevent or substantially impair the performance of his duties" as a juror with respect to the choice of penalty.  *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)).  Trial counsel rendered ineffective assistance in

failing to challenge these persons, or at least question them carefully and reasonably to expose or confirm views concerning capital punishment that would have supported a challenge for cause or the intelligent exercise of a peremptory strike.

341.    A prospective juror who would automatically impose a sentence of death upon conviction of a capital offense is disqualified from sitting on a capital jury. *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). "[T]he belief that death should be imposed *ipso facto* upon conviction of a capital offense reflects directly on that individual's inability to follow the law. . . . Any juror who would impose death despite the facts and circumstances of conviction cannot follow the dictates of law." 504 U.S. at 735. Such individuals deem mitigating evidence to be irrelevant to the penalty determination, despite the constitutional imperative that it is considered. *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).

342.    A juror who would never consider evidence of an abusive childhood to be mitigating, for example, is not qualified to sit on a case in which the defendant relies wholly or primarily on such evidence, even if the juror could, in theory, find other type of evidence to have a mitigating effect. Such a juror could not, in the case here, follow the constitutional imperative to "consider[] any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998); *Eddings*, 455 U.S. at 113-15 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. . . . [Sentencers] determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.").

343.    If a juror expresses a disqualifying dogmatic preference in favor of imposing the death penalty, a concomitant pledge to "follow the law" will not save him.  "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *See Morgan*, 504 U.S. at 735 (footnote omitted).

344.    In the present case, Mitchell's counsel failed to challenge or appropriately question prospective jurors: (1) Veniremember No. 55 who admitted to having "no tolerance" for substance abuse and claimed that substance abuse is a "very touchy" subject for her (RT 172); (2) Veniremember No. 59 who stated he believes we should expand capital crimes to include more crimes against children including child molestation but that his beliefs would not affect his ability to judge a case involving the murder of a child (RT 543-34); (3) Veniremember No. 83 who stated he has young children of his own and that he would expect that the age of the victim would be an aggravating factor, that he would be "real disappointed in the drafters of the law if the age of the victim is not an aggravating factor," and that he would consider "a young defenseless child … a heavy aggravating factor" (RT 1130.)

345.    Furthermore, Mitchell's counsel failed to adequately challenge seated Jurors Nos. 48, 43, and Alternate Juror No. 51.

### a.    Juror No. 48

346.    During individual *voir dire*, Juror No. 48 explained to trial counsel that she feels certain crimes are appropriate for the death penalty.  She explained that she felt what makes a death penalty case is one in which "there was no regard at all for human life."  (RT 1502.)

149

347.    It would be difficult to imagine a scenario where an individual committed murder, yet showed a regard for human life.  It would be doubly as difficult to imagine a scenario where an individual committed two murders, yet showed a regard for human life.  Nevertheless, trial counsel did not object to Juror No. 48's suitability to serve as a juror, did not exercise a peremptory challenge regarding her service, or in any other way objected to Juror No. 48 serving as a juror on this case.

### b.    Juror No. 43

348.    Seated Juror No. 43 responded to questioning from the Court about his ability to impose the death penalty that he believed a sentence of life imprisonment without the possibility of parole is a more severe sentence than death.  (RT 1333.) None of the Mitchell's trial counsel asked Juror No. 43 a single question or objected to his qualifications to serve, and Juror No. 43 was subsequently empaneled on Mitchell's jury.

349.    Juror No. 43's opinion that death is a lesser sentence than life imprisonment creates a serious burden shifting issue.  It is the prosecution's burden at the penalty phase to prove aggravating circumstances beyond a reasonable doubt, and only upon a finding that said factors were present and that they outweigh any mitigating circumstances proven by a preponderance of the evidence can the death penalty be inflicted.  Thus if the prosecution met its burden, Juror No. 43 could elect to select death, but if the prosecution did not meet its burden, Juror No. 43's inclination would be to give the lesser sentence which, in his opinion, would be death.  It would appear that if the defense put on the strongest mitigation evidence possible and successfully convinced Juror No. 43 not to choose the most severe punishment, he would decide a verdict of death.

### c.   Alternate Juror No. 51

350.   Alternate Juror No. 51 told trial counsel that, after convicting Mitchell of the capital offenses, he would go into the penalty phase of the trial with the idea that Mitchell deserved to die for these crimes.  (RT 2048-49.)  Soon after, Alternate Juror No. 51 told counsel that he would not go into the penalty phase thinking Mitchell deserved to die.  (RT 2049-50.)  Counsel never resolved these two contradictory positions.  The fact is that Mitchell's lawyers had no idea about where Alternate Juror No. 51 stood on this issue, and yet did not resolve the question or move to strike for cause.

### 2.   Failing to adequately question or attempt to rehabilitate prospective jurors who initially suggested that they could not vote for the death penalty

351.   The 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases stated that "[c]ounsel should be familiar with techniques for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable." Guideline 11.7.2.B.[25]  Yet Mitchell's trial counsel failed entirely, or almost entirely, to attempt to rehabilitate a substantial number of prospective jurors in his case. Counsel either failed to test the prospective jurors' stated opposition to the death penalty – for example, by asking whether they would fail to consider the death penalty even for a defendant who committed multiple, brutal, intentional murders during residential burglaries or robberies – or failed to reexamine the jurors after the prosecutor had led them to give disqualifying answers.

---

[25]   *See Wiggins v. Smith*, 539 U.S. at 524 (explaining that ABA Guidelines provide guidance in assessing trial counsel's performance under *Strickland* and citing other cases that support the same principle).

151

352.   The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." *Gray v. Mississippi*, 481 U.S. 648, 662-63, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987).

353.   Trial counsel's failure to rehabilitate prospective jurors permeated the entire *voir dire* and resulted in a record substantially different from the one that competent counsel would have produced through competent questioning. Identifying with confidence all of the stricken potential jurors whom competent counsel might have rehabilitated is impossible.  However, there are more than a few examples on the record where trial counsel did not meaningfully attempt to question and rehabilitate potential jurors whose initial indications of opposition to the death penalty made them potentially unqualified to sit on a death penalty jury: Veniremember No.  81 (RT 504-09) (left decision to strike to Court's discretion); Veniremember No. 61 (RT 675-78) (no objection to Government's challenge); Veniremember No. 63 (RT 744) (asked no questions and made no objection to Government's challenge); Veniremember No. 9 (RT 1179) (asked no questions and made no objection to Government's challenge); Veniremember No. 82 (RT 1183) (asked no questions and made no objection to Government's challenge); and Veniremember No. 13 (RT 1423) (asked no questions and made no objection to Government's challenge).

354.   Furthermore, in the case of Veniremembers No. 15 (RT 2257) and No. 77 (RT 1911), trial counsel not only did not even bother to question the jurors, but rather relied entirely on questionnaire responses before stipulating to the jurors' removal.  This was not simply a matter of failing to rehabilitate, but an all out

abandonment of Mitchell by trial counsel in failing entirely to take part in the *voir dire* process.

355.  Counsel's failure to rehabilitate and then object to the juror's removal resulted in a deficient record that significantly prejudiced appellate counsel. Several of the appellate claims were based upon jury selection, a large number focusing on the systematic exclusion of Native American jurors from Mitchell's trial.  Appellant Counsel's claims were weakened by the fact that they were procedurally barred from making claims with regards to four prospective jurors (Veniremembers No. 10, No. 13, No. 15, and No. 77) because trial counsel failed to rehabilitate and object to the jurors' excusal.  *See Defendant's Reply Brief on Direct Appeal*, Case No. CA-03-99010, p. 44 n.15.

356.  There is a reasonable probability that competent counsel could have rehabilitated at least one prospective juror and prevented his or her excusal.  For example, Veniremember No. 61 indicated to the court that graphic evidence and testimony would not effect his ability to be fair and impartial.  (RT 674.)  He also answered that he could accept the law that stated that for certain crimes Native Americans are to be tried in Federal Court, even if he personally believed that Native Americans should be tried by other Native Americans in tribal courts. (RT 674-75.)  This suggests that Veniremember No. 61, as a juror, could be fair and impartial and accept and apply a law (the death penalty) about which he has personal reservations.  However, we will never know whether Veniremember No. 61 could be a fair and impartial juror and apply the law as instructed by the Court because trial counsel failed to rehabilitate him.  Even more, if counsel did make rehabilitation attempt and the court still excused Veniremember No. 61, a record would have been established that could lead to the determination of reversible error under *Gray*.  However, because trial counsel's failed to establish a

record, trial counsel's abdication of his duty to rehabilitate potential jurors constituted ineffective assistance of counsel under *Strickland*.

**3.     Appellate counsel provided ineffective assistance for failing to appeal the improper excusal of Native American jurors**

357.   During *voir dire*, the Court dismissed eight potential jurors due to their alleged opposition to the death penalty.  Mitchell objected to the excusal of Veniremembers No. 3 (RT 333), No. 6 (RT 198), No. 22 (RT 1257) and No. 24 (RT 1682-83), but was overruled with regards to these four prospective jurors. Appellate counsel failed to raise the wrongful excusal of these four prospective jurors in Mitchell's opening brief, and only raised the issue  for the first time in the reply brief.  The Ninth Circuit thus ruled that the claim was waived and refused to rule on this issue.  *Mitchell*, 502 F.3d at 953-54 n.2; *see also United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) ("Issues raised for the first time in an appellant's reply brief are generally deemed waived.").

358.   It is well settled that the Sixth Amendment accords criminal defendants the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 688.  It is also settled that a criminal defendant is entitled to effective assistance of counsel on first appeal.  *Evitts v. Lucey*, 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985).  An allegation of ineffective assistance must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense at trial.  *Strickland*, 466 U.S. at 687.  Counsel's performance is deficient if it was "objectively unreasonable  under the circumstances."  *Id*. at 688.

359.   In Mitchell's direct appeal, appellate counsel committed a large portion of the appellate opening brief to arguments related to jury selection and particularly emphasized the exclusion of Native Americans from the jury.  Counsel,

however, omitted to make claims related to Veniremembers No. 3, No. 6, No. 22, and No. 24 and their improper exclusion under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 77 (1968), and *Gray*.

360.   There is a reasonable probability that competent counsel could have successfully shown that at least one of these potential jurors was death-qualified, and therefore wrongfully excused.  (*See* Claim I, *infra* (regarding Venrireperson No. 3)).

361.   The wrongful dismissal of any one of these jurors would then have been reversible error under *Gray*.  Appellate counsel's failing constituted ineffective assistance of counsel under *Strickland* and *Evitts* and deprived Mitchell of his right to meaningful review.

362.   Furthermore, during *voir dire*, the Court excused several jurors due in large part to the fact that Navajo was their first language.  (Veniremembers No. 1, RT 601-02; No. 2, RT 119; No. 9, RT 1174; and No. 11, RT 390).  Appellate counsel did attempt to raise this issue on appeal, but did so via a footnote in the opening brief.  *See Defendant's Opening Brief on Direct Appeal*, Case No. CA-03-99010 at 37 n.6.  The Ninth Circuit considered appellate counsel's mentioning this issue in a footnote insufficient to raise the issue on appeal. *Mitchell,* 502 F.3d at 954 n.2.

363.   Appellate counsel's inability to properly raise an appellate issue is deficient performance.  Given the systematic exclusion of Native Americans from Mitchell's jury, it was indeed prejudicial to omit this claim.  (*See* Claim N, *infra*.) Furthermore, United States citizens have a constitutional right to serve on juries and the defendant in a criminal case has standing to assert a violation of a prospective juror's constitutional rights regardless of the juror's ability to speak English.  *State v. Rico*, 132 N.M. 570 (2002).  The burden is on the trial court to

make every reasonable effort to accommodate a prospective juror's language difficulty. *Id*.

364. Here, no effort was made to accommodate jurors. When Veniremember No. 1 and Veniremember No. 11 indicated, in English, that they had trouble with the English language, they were simply excused. (*See* RT 601-02; RT 390.) Based upon the record, it seems no action was taken to see if these jurors could be accommodated or even to check to see if the court had a Navajo translator on staff. Despite the fact that Veniremembers No. 1 and No. 11 appeared to be able to follow what was happening in the courtroom and answer the questions they were asked, no examination was done to check their English proficiency.

365. The foregoing violations of Movant's constitutional rights, taken alone or in combination with the other errors alleged in the Amended Motion, constitute structural error and warrant the granting of this Amended Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Amended Motion, so infected the integrity of the proceedings that this court cannot deem the error harmless. The foregoing violations of Mitchell's rights had a substantial and injurious effect or influence on Mitchell's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

366. In addition, the denial of his right to effective assistance of counsel substantially prejudiced Mitchell, rendered the appellate proceedings an exercise in non-meaningful review and made the trial fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict.

*See* John H. Blume, et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1209 & n.1 (2001) ("The conventional wisdom is that most trials are won or lost in jury selection.").  But for the denial of this right, it is reasonably probable that a more favorable result would have been attained, especially considering just one juror could have made a difference between a guilty verdict and a hung jury, and a death or life sentence.  Under these circumstances, the adversarial system completely broke down, and Mitchell was left without meaningful representation.  Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed.  *United States v. Cronic*, 466 U.S. 648, 656-62, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).  Even assuming a showing of prejudice is required, Mitchell has made that showing here.  *Strickland v. Washington*, 466 U.S. 668.

367.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. 722, 753-54, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Strickland v. Washington*, 466 U.S. 668.  (*See* Claim AA, *infra*.)

I.    **The Trial Court Deprived Mitchell of His Right to an Impartial Jury by Erroneously Excluding Potential Jurors Whose Concerns about the Death Penalty Would Not Have Substantially Impaired the Performance of Their Duties**

368.    Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments because the trial court erroneously excluded for cause three prospective jurors who were actually qualified to serve, thus depriving Mitchell of his right to an impartial jury. *Witherspoon v. Illinois*, 391 U.S. 510; *see Gray v. Mississippi*, 481 U.S. at 668.

369.    In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

370.    Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

371.    The trial court committed prejudicial error by granting the prosecution's motion to exclude prospective Veniremember No. 3 for cause. None of these jurors expressed views regarding the death penalty that justified their exclusion under *Witherspoon*, 391 U.S. 510, or *Wainwright v. Witt*, 469 U.S. 412.

372.    In *Witherspoon*, the Supreme Court held that the prosecution in a capital case may challenge a juror for cause, on the basis of opposition to the death penalty, only when the juror makes it unmistakably clear that he "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]." 391 U.S. at 523 n.21.  The Court explained that "a sentence of death cannot be carried

out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522.

373.   The Court has never retreated from the central constitutional point it made in *Witherspoon*, that "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." 391 U.S. at 519.  Indeed, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).  A challenge for cause is warranted only when a juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. at 45) (internal quotation marks omitted).

374.   Accordingly, prospective jurors are not excusable under *Witherspoon* and *Witt* merely because they (1) "voice[] general objections to the death penalty or expressed conscientious or religious scruples against its infliction," *Witherspoon*, 391 U.S. at 522; (2) express nervousness or emotion stemming from the "potentially lethal consequences of their decision," *Adams*, 448 U.S. at 49; or (3) are otherwise "hesitant in their ability to sentence a defendant to death." *See Morgan v. Illinois*, 504 U.S. at 732.  This is because "[i]t is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State." *Witherspoon*, 391 U.S. at 515 n.7.

159

375.   "[I]t is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Witt*, 469 U.S. at 423.  The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." *Gray*, 481 U.S. at 662-63.  Improper exclusion of jurors in violation of *Witt* is harmful *per se* and no prejudice need be shown.  *Id.* at 659-60.

376.   Veniremember No. 3 permissibly expressed qualms about the death penalty and "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522; *see Morgan*, 504 U.S. at 731.  Ultimately, Veniremember No. 3 expressed unequivocally to the Court that he could set aside his religious beliefs, follow the law, and impose the death penalty where appropriate.

377.   On his juror questionnaire, Veniremember No. 3 stated that he would always vote to impose the death penalty in a case where a person has been convicted of a capital crime.  (RT 321.)  He explains this view as being a part of his training in jurisprudence and a belief in "an eye for a eye… a life for a life." (RT 321.)  These statements, however, were in contradiction to the responses Veniremember No. 3 provided to the court.  Veniremember No. 3 explained that it would be against his religious beliefs to impose the death penalty and that he would favor life imprisonment.  (RT 319, 320.)  Veniremember No. 3 explained that his views had changed since sitting in court and listening to the Court's comments, and he wanted to back off of the belief that death should be automatic in capital cases.  Given this contradiction, the Court questioned Veniremember No. 3 in more depth to uncover his true feelings and see how much his views had changed.

160

The Court:  All right. Well, let me – let me ask you, because you said you're a law enforcement officer.  It sounds like you respect the law. If I told you that the law was you have to consider both death penalty and life sentence, after hearing all the evidence that relates to the sentencing in this case, would you be able to follow the law and consider both a death penalty sentence and a life sentence?

Veniremember No. 3:  Yes, Your Honor.

The Court:  You would?

Veniremember No. 3:  Yeah.

The Court:  Because you said you had some personal strong beliefs, and I just want to make sure you can set aside those beliefs if you were a juror in this case and make a decision based on the evidence and the law that I give you.

Veniremember No. 3:  I see what you're getting at, yes, Your Honor

The Court:  Okay.  Do you think you can do that?

Veniremember No. 3:  Yes, Your honor.

(RT 322-23.)

378.   Given the fact that prospective Veniremember No. 3's opinions had changed to such an extent, the Court was cautious as to whether this was Veniremember No. 3's true feeling.  She continued to ask him questions in this same vein, and Veniremember No. 3 explained that he would consider both life imprisonment and death.  (RT 323.)  Veniremember No. 3 explained that he respects both the law and the "word of God" and that he would not set his beliefs aside, but if he had to make a decision in this case it would be in accordance with the law.  (RT 323.)

379.   The questioning then focused on the phrase "set aside your beliefs." The Court again asked if he could "set aside [his] beliefs" and Veniremember No. 3 says he could not.  The Court did not pursue this point beyond this superficial level

despite the fact that Veniremember No. 3 had already stated that he could apply the law without setting his beliefs aside. (RT 323-24.) After the prosecution very briefly questioned Veniremember No. 3 in the same vein as the Court, trial counsel questioned Veniremember No. 3 for the defense. Trial counsel began by questioning Veniremember No. 3 about his religious beliefs and whether he could consider life and death after hearing all of the evidence, and Veniremember No. 3 responded in the affirmative. So counsel clarified the issue of putting his "beliefs aside."

> Trial counsel: And the Judge asked you several times whether you could put aside your religious beliefs to do that. What did you understand that to mean? What did you think the Judge was asking you to do?
>
> Veniremember No. 3: If I were to put my religion aside, this is basically what I live on. I live by the gospel. That's the way according with my beliefs, which I put higher above any other beliefs. But I do have respect with the court, with the laws, with the government itself here. It is, but if I were to do that, I have to make my decision in accordance to what my belief it is.
>
> Trial counsel: And that's what the law requires. The law doesn't require you to stop being a religious person. The law requires you to follow the law if you're a juror. Do you understand that?
>
> Veniremember No. 3: Yes.
>
> Trial counsel: But the law, as the Judge told you, doesn't tell you what decision to make. The law just tells you what the choices are.
>
> Veniremember No. 3: Right.
>
> Trial counsel: And the choice we are talking about is if it gets to that point if Mr. Mitchell is convicted and he's convicted of the crime of carjacking that results in the death of another person, then and only then would you as a juror be also asked to decide whether he lives or dies. Do you understand that?
>
> Veniremember No. 3: Yes.

Trial counsel:  And if that were the case, if you had been on a jury and you had convicted Mr. Mitchell of carjacking and a murder connected to that carjacking, would you in every case, no matter what the evidence was, if that was your job, avoid the death penalty and give him a life sentence?

Veniremember No. 3:  Like again I say, I would rather be on the side of what the law says. That's according to what my choice, my decision would be.

Trial counsel:  Well, the law is what the Judge just told you.

Veniremember No. 3:  Right.

Trial counsel:  The law says those are your choices, death or life. And the way it works is, we would have another trial. After you had the trial to decide whether he was guilty or not guilty, and if you found him guilty, then there would be a second trial to talk about what the punishment would be. And the government would put on a case in support of the death penalty. They would ask for the death penalty. They would put on evidence and witnesses to persuade you to give the death penalty.
    And our job would be to present a case and evidence to persuade you for a life sentence. Those would be the choices.
    What we need to know is, would you base your decision on the sentence, whether it's life or death, on what you hear in the courtroom? Would you do that?

Veniremember No. 3:  Yes, sir.

(RT 326-28.)

380.   After trial counsel clarified Veniremember No. 3's stance and resolved the issues regarding Veniremember No. 3's misunderstanding regarding abandoning his religion, the Court asked him some additional questions which further emphasized his qualification.  The Court asked Veniremember No. 3 three times if he could set aside his religious beliefs, and Veniremember No. 3 answered in the affirmative.  (RT 329.)

381.   Finally, the prosecutor got in a last word when he posed three additional questions.  The only question Veniremember No. 3 unequivocally

163

answered was: "You would make the decision for life sentence?" to which Veniremember No. 3 responded "Yes, sir."  (RT 331.)

382.   The Government subsequently made a motion to excuse Veniremember No. 3 for cause, to which the defense objected.  (RT 332-33.)  The Court ruled that Veniremember No. 3 was not qualified.  This ruling was based upon Veniremember No. 3's response to a question in the questionnaire regarding the prosecution's burden in proving aggravating circumstances and also on the court's finding that Veniremember No. 3 had stated that he would always vote for life over death.  (RT 336.)  The Ninth Circuit affirmed this decision in as much as it ruled that the disqualification was not related to Veniremember No. 3's race, but rather his religion.  *Mitchell*, 502 F.3d at 953.  Appellate counsel challenged Veniremember No. 3's exclusion on race-based and death-qualified grounds.  As the Ninth Circuit only rejected the race-based claim and stated that appellant counsel had waived this *Witherspoon* challenge, Mitchell reasserts this claim for judgement on its merits.  *Id*. at 953 n.2.  (*See* Claim AA, *infra*.)

383.   The Court's decision to find Veniremember No. 3 not qualified was erroneous.  The Government's motion was based in part on the fact that Veniremember No. 3 stated in his questionnaire that he would hold the government to a higher standard of proof when deciding on the presence of aggravating factors.  This issue, however, was not raised during either the Court's questioning or the government's questioning of Veniremember No. 3.  Given that Veniremember No. 3 stated in his questionnaire that he would vote for the death penalty automatically after convicting an individual of a capital crime, but was subsequently considered non-death eligible, his questionnaire responses should not have been given much effect without further clarification.

164

384.   The record clearly reflects Veniremember No. 3's confusion about the Court's inquiry regarding "putting his beliefs aside."  It appears Veniremember No. 3 thought the Court was asking him to abandon his beliefs entirely, but when trial counsel clarified this issue, Veniremember No. 3 was absolutely unequivocal in his responses to counsel and the Court that he could put his beliefs aside and impose the appropriate penalty.  *See Gray*, 481 U.S. at 653, 659 (holding that the exclusion of a juror whose testimony was "somewhat confused," but who "ultimately stated that she could consider the death penalty in an appropriate case," violated the Constitution).

385.   The purpose of this sort of questioning is to determine whether a juror, though opposed to capital punishment, is able and willing to "temporarily set aside his own beliefs in deference to the rule of law."  *Lockhart v. McCree*, 476 U.S. at 176; *see also Witherspoon*, 391 U.S. at 515 n.7 ("It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State.").  A juror is obviously not required to abandon his beliefs, and once this was explained to Veniremember No. 3, he unequivocally stated he could impose whichever sentence the evidence merited.

386.   In reaching its ultimate determination, the district court appears to have rested heavily on the single instance in which Veniremember No. 3 stated that he would always vote for life imprisonment.  (RT 336.)  "As *Witt* makes clear, however, our inquiry does not end with a mechanical recitation of a single question and answer."  *Darden v. Wainwright*, 477 U.S. 168, 176, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).  It is necessary to "examine the context surrounding [the Veniremember's] exclusion."  *Id.*  Veniremember No. 3 had made clear that he

165

would follow the law and that he would consider the death penalty, and given the construction of the question it is likely that Veniremember No. 3 deemed his response to indicate he would likewise consider life imprisonment, but not necessarily to the exclusion of the death penalty.

387.   "[I]f prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams v. Texas*, 448 U.S. at 47-48 (quoting *Witherspoon*, 391 U.S. at 522 n.21). Considering the entire context of Veniremember No. 3's exclusion, it is clear that his exclusion was improper, and considering one juror can be the difference between a life and death sentence, this juror's exclusion was highly prejudicial.

388.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668.  (*See* Claim AA, *infra*.)

389.   The foregoing violations of Mitchell's constitutional rights, taken alone or in combination with the other errors alleged in the Amended Motion, constitute structural error and warrant the granting of this Amended Motion without any determination of whether the violations substantially affected or influenced the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Amended Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Mitchell's rights

166

had a substantial and injurious effect or influence on Mitchell's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

## J.       The Trial Court Failed to Enforce the Legal Standard for Hardship Dismissal, Resulting in a "Jury of Volunteers"

390.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the trial court failed to enforce the legal standard for hardship dismissal and, as a result, Mitchell was tried by a "jury of volunteers."

391.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

392.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

393.   The purpose of hardship *voir dire* is to determine which prospective jurors cannot be legitimately expected to serve on the jury for reasons that amount to more than just inconvenience. *See Glasser v. United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942) (*superceded in part by statute/rule as stated in Bourjaily v. United States*, 483 U.S. 171, 178-79, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)). Jurors are expected to state with specificity their reasons for being unable to serve, and upon a showing of such are rightly excused from service.

### 1.      Veniremember No. 77

394.    During questioning, Veniremember No. 77 explained that she babysits her grandchildren three or four days a week.  (RT 1006.)  Veniremember No. 77 then stated that her husband was in law enforcement and that experience might prejudice her against the defense.  (RT 1021.)  During group questioning, Mr. Altman, for the prosecution, asked if serving on the jury would pose a financial hardship for Veniremember No. 77 in terms of the babysitting duties she previously discussed.  Veniremember No. 77 explained that it would not cause her any financial problems, as she does the work for free, but it would cause financial hardship to her daughter.  (RT 1026-27.)

395.    The government proposed to excuse Veniremember No. 77 based on the financial hardship her daughter would be caused.  The defense objected and requested the opportunity to discuss these alleged hardships during individual questioning.  The Court, however, excused Veniremember No. 77 for "undue hardship or extreme inconvenience" over the defense objection, and refused to allow the defense an opportunity for individual *voir dire*.  No determination was made as to the daughter's ability to afford childcare aside from the fact that she recently moved and both she and her husband are self-employed.  (RT 1038-39.)

### 2.      Veniremembers No. 78 and No. 20

396.    When asked about potential hardships, Veniremember No. 78 explained that he has some scheduling conflicts with his job at the postal service and how that might affect his jury service.  (RT 1203-05.)  Mr. Altman, for the government, asked Veniremember No. 78 during hardship *voir dire* about a response on his questionnaire and Veniremember No. 78 explained that he had some misgivings about the legal system, but that he would be able to follow instructions and focus on what he hears in court.  (RT 1214.)  And then trial

counsel discussed some issues related to his general, daily transportation and Veniremember No. 78 explained that his issues were a question of the expense and how Court was willing to reimburse him.  (RT 1215-17.)

397.    The Government stated they believed Veniremember No. 78 had a valid hardship.  (RT 1222.)  Trial counsel objected to the government's position and specifically requested that Veniremember No. 78 not be excused and that he be allowed to speak to Veniremember No. 78 during individual *voir dire*.  The Court, over defense objection, excused Veniremember No. 78 for undue hardship and extreme inconvenience.  In so doing the Court explained that given Veniremember No. 78's concerns over his job, transportation, and the legal system, the Court was speculate that Veniremember No. 78 "would not be able to focus on the case." (RT 1223-24.)  The Court went on to state that "I don't know that he would be able to follow the law."  (RT 1224.)  However, the fact remains that Veniremember No. 78 expressly told the court that he could follow the Court's instructions.  In fact, he told the Government he could:

> The prosecutor:  Would you be able to follow [the Court's instructions] and just focus on the things that you hear in here?
>
> Veniremember No. 78:  I think so.

(RT 1214.)

398.    However, based upon the Court's subsequent comments, it is clear that the Court either did not know exactly what Veniremember No. 78's opinions were or whether or not he could follow the law.  It appears the defense shared this view because trial counsel specifically asked to speak to Veniremember No. 78 in individual *voir dire*.  The Court, however, simply rejected the defense request and excused Veniremember No. 78 based upon the Court's conjecture that somehow Veniremember No. 78 would have difficulty focusing on the case.  (*See* RT 1224:

169

"I think that he would not be able to focus on the case.")  The inappropriate excusal of a juror is prejudicial given that unanimity is required in any death or guilt verdict and thus a single juror can be the difference.

399.   The Court repeated this error with the examination of Veniremember No. 20.  During group questioning, Veniremember No. 20 stated that Robert McWhirter, someone she believed the attorneys might know, was her fiance's public defender approximately ten years prior, but that this would not affect her ability to be fair and impartial in any way.  (RT 2137.)  Veniremember No. 20 subsequently explained to trial counsel during hardship *voir dire*, that her fiancé is currently incarcerated in the federal prison and that she visits him on weekends. She stated, however, that the schedule of the trial would be difficult on her because she has two young children and while her sister could watch the children during the week, it would be difficult for her to be away from her children and she would be distracted by this.  (RT 2154-55.)

400.   The Government expressed no objection to Veniremember No. 20 being excused.  The defense, however, requested the opportunity to speak with Veniremember No. 20 during individual *voir dire*.  The Court, however, stated that Veniremember No. 20's statement that she would be thinking about her children and not necessarily able to concentrate on the case is enough to excuse her. (RT 2166-67.)

401.   These two episodes of denying the defense the opportunity to conduct adequate *voir dire* are contrasted with the defense's motion to excuse Veniremember No. 65.  In group *voir dire*, the Court made a regular, appropriate practice of asking the panel if they knew anyone in the courtroom.  When the Court asked this question on April 16, 2003, Veniremember No. 65 remained silent.  The prosecution questioned Veniremember No. 65 during hardship *voir* dire established

170

that his wife was a tribal prosecutor.  The prosecutor stated that he had worked closely with Veniremember No. 65's wife, and asked Veniremember No. 65 if he was aware of this.  Veniremember No. 65 stated that he was, he knew the prosecutor and his wife had worked together, and this would not influence him.  (RT 1569-70.)  On further questioning from trial counsel, Veniremember No. 65 admitted that he also knew one of the FBI agents involved in the case.  (RT 1575.)

402.  Trial counsel raised the issue of Veniremember No. 65's fitness to serve as a juror, stating that Veniremember No. 65 should have indicated more about his wife's previous employment as a prosecutor in his questionnaire or to the Court, likely when the Court asked generally about experience with law enforcement and Veniremember No. 65 remained silent.  Trial counsel also raised concerns that Veniremember No. 65 remained silent when asked if he knew anyone in the courtroom or anyone involved in the case.  The Court refused to excuse Veniremember No. 65 and suggested trial counsel bring up these issues during individual *voir dire*.  (RT 1583-85.)

403.  Contrasting Veniremember No. 65's statements with Veniremember No. 20 and Veniremember No. 78, there does not appear to be neither rhyme nor reason as to when additional questioning is required.  It is notable that no individual *voir dire* was allowed when the defense requested such, but individual *voir dire* was required when the defense challenged a prospective juror's fitness.

404.  The result of all this is that Mitchell was tried by a jury culled from a throng of "volunteers" – persons who for whatever reason *wanted* to serve on his jury.  Particularly in a high-profile multiple-murder trial like Mitchell's, this group was highly unlikely to constitute an impartial tribunal consistent with the guarantees of due process and the Sixth and Eighth Amendments.  This is why

171

prospective jurors are supposed to be dismissed only for legitimate financial hardship, and not based on a thinly veiled personal preference against serving:

> Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience or decreased earning power. Only when the financial embarrassment is such as to impose a real burden and hardship does a valid excuse of this nature appear. . . . 'The motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may one by one, lead to the irretrievable impairment of substantial liberties.'

*Thiel v. S. Pacific Co.*, 328 U.S. 217, 224-25, 66 S. Ct. 984, 90 L. Ed. 1181 (1946) (quoting *Glasser*, 315 U.S. at 86). Given the requirement of unanimity for a guilt and death verdict, the inappropriate exclusion of a single juror constitutes prejudice.

405. The foregoing violations of Mitchell's constitutional rights, taken alone or in combination with the other errors alleged in the Amended Motion, constitute structural error and warrant the granting of this Amended Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Amended Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Mitchell's rights had a substantial and injurious effect or influence on Mitchell's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

406. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective

172

assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668. (*See* Claim AA, *infra*.)

**K.**     **This Court Violated Mitchell's Constitutional Rights by Denying His Request to Interview the Jurors In His Capital Case**

407.   Mitchell's conviction, sentences and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because he was deprived of the his right to fully and adequately investigate his habeas claims.

408.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

409.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

410.   Mitchell sought to complete a reasonable and diligent investigation into possible juror claims pursuant to *Williams v. Taylor*, 529 U.S. at 442-43, and sought this Court's permission to interview jurors. (Dkt. No. 1.)  On September 1, 2009, this Court denied Mitchell's request to interview the jurors who deliberated in his capital case. (Dkt. No. 21.)  This decision stated that Mitchell had failed to establish good cause to merit juror interview pursuant to Local Rule 24.2.  Mitchell respectfully disagrees with this Court's findings regarding good cause, and contends that this Court's ruling deprives Mitchell of the due process and Eighth Amendment guarantees of heightened reliability in capital cases.

173

411.   Assuming, without conceding, that Mitchell cannot make the requisite showing under Rule 24.2, Mitchell contends that without any opportunity to communicate with the jurors, it would be impossible for him to identify, much less prove, that an individual juror was biased or that the deliberations were otherwise compromised.  Nevertheless, given the importance of the constitutional right at stake and the grave sentence that Mitchell faces, this Court should have exercised its discretion in granting Mitchell a limited opportunity to interview jurors.

412.   "Our criminal justice system rests firmly on the proposition that before a person's liberty can be deprived, guilt must be found, beyond a reasonable doubt, by an impartial decisionmaker." *Virgil v. Dretke*, 446 F.3d 598, 605 (5th Cir. 2006); U.S. Const., amend. VI (guaranteeing the right to be tried by an impartial jury).  Due to the inherent limitations of criminal proceedings, juror bias is not always exposed during trial.  *Voir dire*, the primary mechanism for uncovering, among other situations, juror prejudice and bias, is utterly ineffective at exposing dishonesty or deliberate concealment.  *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 554, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) ("the necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious"); *Williams*, 529 U.S. at 440-44 (mandating hearing to address deliberate omission by juror).  Even when the court succeeds in empaneling a jury free from bias, the impartiality of the jury may later be subverted by unknown forces. *Remmer v. United States*, 350 U.S. 377, 381, 76 S. Ct. 425, 100 L. Ed. 435 (1956) ("the integrity of jury proceedings must not be jeopardized by unauthorized invasions"); *Parker v. Gladden*, 385 U.S. 363, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966) (comments by bailiff to jury about the defendant being "wicked" and "guilty"); *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) (holding extensive media coverage deprived defendant of a fair trial

"by an impartial jury free from outside influences"). Juror impartiality is a critical and necessary component of a fair trial and, in order to ensure such, the defendant must be afforded a meaningful opportunity to explore issues of juror misconduct. *See Irvin v. Dowd*, 366 U.S. 717, 721, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (recognizing the right to trial by jury as "the most priceless" among constitutional safeguards); *see also Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

413.    The right to investigate juror claims is commensurate with the Supreme Court's recognition of the defendant's right to an evidentiary hearing to address such claims.  In cases of juror bias, the Supreme Court has consistently held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  *Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).  The High Court has afforded the defendant a similar opportunity to prove allegations that extraneous influences affected the jury.  *Tanner v. United States*, 483 U.S. 107, 121, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987); *Mattox v. United States*, 146 U.S. 140, 148-49, 13 S. Ct. 50, 36 L. Ed. 917 (1892).  These decisions guaranteeing the defendant a right to an evidentiary hearing would be largely hollow if a defendant could be denied any and all avenues for investigating the underlying claim in the first instance.

414.    In addition to contravening well-established Supreme Court precedent, a complete deprivation of the opportunity to investigate juror claims would violate the spirit, if not the letter, of the federal evidentiary rules.  *See Carlisle v. United States*, 517 U.S. 416, 426, 116 S. Ct. 1460, 134 L. Ed. 2d 613 (1996) (holding that the district courts may not pass rules that "circumvent or conflict" with the Federal Rules of Criminal Procedure).  Rule 606(b), which is entitled, "Inquiry into validity of verdict or indictment," expressly permits inquiry of jurors into "extraneous

175

prejudicial information" or "outside influences" affecting the deliberative process. Fed. R. Evid. 606(b). Though circumscribing the type of information that may be elicited from jurors, the rule clearly contemplates questioning of the jurors.

415.    Even if juror access may be withheld in the typical case, this case warrants an exception as it is a capital case. The Supreme Court has consistently stressed the need for reliability in capital cases. *Lowenfield v. Phelps*, 484 U.S. 231, 238-39, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988) (the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"). *See McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964, 57 L. Ed. 2d 973 (1978). In fact, the Ninth Circuit cited the general principle in Mitchell's direct appeal and explained that, at least in terms of the penalty phase, increased reliability requires flexibility in the admission of evidence and an emphasis on the increased admission of evidence. *Mitchell*, 502 F.3d at 979-80. *See United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004) (citing *Gregg v. Georgia*, 428 U.S. 153, 203-04, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)); *accord United States v. Lee*, 374 F.3d 637, 648 (8th Cir. 2004) (agreeing that "the admission of more rather than less evidence during the penalty phase" enhances reliability). While an emphasis is put on the penalty phase, "heightened reliability is required at all stages of the capital trial." *Schriro v. Farley*, 510 U.S. 222, 239, 114 S. Ct. 783, L. Ed. 2d 47 (1994).

416.    The United States Supreme Court has explicitly ruled that death cases are distinct from non-death cases. Indeed the Supreme Court has explained "that death is 'different'" and described this doctrine as a "fundamental principle" of the legal system. *Schriro v. Farley*, 510 U.S. at 239 (quoting *Gardner v. Florida*, 430

U.S. 349, 357, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977) (plurality opinion)) (*citing Woodson v. North Carolina*, 428 U.S. at 305 (plurality opinion); *see also Furman v. Georgia*, 408 U.S. 238, 306, 92 S. Ct. 2726, 2760, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring)).  Mitchell believes this Court impliedly recognizes this distinction in that none of the cases the Court cites in support of its order rejecting Mitchell's request are capital cases, with the exception of Mitchell's direct appeal which does not address this issue.  (Dkt. No. 21, pp.2-6.)

417.   This fundamental principle applies in the context of juror impartiality. As the Supreme Court stressed more than a century ago: "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. at 149.  In keeping with this fundamental principle, Local Rule 24.2 should have been set aside in favor of a thorough and reasonable investigation to ensure the reliability of Mitchell's trial.  Juror interviews are a vital part of the investigative process that accompanies a § 2254 or § 2255 proceeding.[26]  (*See* Ex. 140.)  This Court's denial of Mitchell's request to reasonably and adequately investigate all possible claims violates his right to due process and his Eighth Amendment right to "increased reliability" of the process by which capital punishment may be imposed.  *Herrera v. Collins*, 506 U.S. 390, 405, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).

---

[26]   The Ninth Circuit has admitted juror declarations on the issue of juror misconduct or bias in several cases.  *See Ramirez v. Ayers*, No. CV 91-3802-CBM (9th Cir. 2008) (granting relief in a death penalty case based upon juror misconduct), *mandate issued*; *Fields v. Brown*, 503 F.3d 755, 778 (9th Cir. 2007) (en banc.); *United States v. Rosenthal*, 445 F.3d 1239, 1242 (9th Cir. 2006); *United States v. Saya*, 247 F.3d 929, 937 (9th Cir. 2001); *Erlandson v. Payne*, 163 F.3d 605 (9th Cir. 1998); *Lawson v. Borg*, 60 F.3d 608, 613 (9th Cir. 1995).

**L.**   ***Voir Dire* Was Constitutionally Inadequate to Secure Mitchell's Constitutional Right to an Impartial and Life-qualified Jury**

418.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the *voir dire* proceeding conducted at his trial was inadequate to secure his right to an impartial and life-qualified jury.  *See Morgan v. Illinois*, 504 U.S. 719.

419.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

420.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

421.   The *voir dire* at Mitchell's trial was constitutionally inadequate to secure his right to an impartial, life-qualified jury.  Two major factors contributed to the infirmity of the proceeding:  (1) at individual *voir dire*, the trial court's use of leading questions to rehabilitate prospective jurors prevented the defense from rightfully excusing non-life qualified jurors; (2) the Court forbade trial counsel from asking prospective jurors questions specific enough to determine whether they could fairly and impartially serve, not on an abstract capital case, but on Mitchell's case in particular.  As a result, Mitchell was unable to probe prospective jurors in a meaningful fashion to determine whether they could be impartial. Mitchell was similarly prevented from exercising his peremptory strikes in an informed and intelligent fashion.

422.   The Sixth Amendment guarantees criminal defendants trial by an impartial jury.  A juror who is not "life-qualified" – that is, one who would

automatically vote for the death penalty after conviction in every capital case – is not considered impartial.  *Morgan v. Illinois*, 504 U.S. at 729.  "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors."  *Id.*  "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (plurality opinion).

423.   "Were *voir dire* not available to lay bare the foundation of Mitchell's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would *never* do so."  *Morgan*, 504 U.S. at 733-34.  "Inadequacy of *voir dire*" itself – completely apart from whether any of the seated jurors was actually biased – requires the reversal of a death sentence.  Indeed, this was the result in *Morgan* itself.  *Id.* at 739.

424.   As for the substance of *voir dire*, general questions about prospective jurors' fairness and impartiality are not sufficient to satisfy the Constitution.  *Morgan*, 504 U.S. at 735.  The defendant must be permitted to inquire about the jurors' ability to discharge their sentencing obligations in the case at hand.  *See Uttecht v. Brown*, 551 U.S. 1, 13, 16, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007) (upholding a trial court finding that a prospective juror was disqualified under *Witherspoon v. Illinois* because his *voir dire* questioning revealed that "he had both serious misunderstandings about his responsibility as a juror and an attitude toward

capital punishment that could have prevented him from returning a death sentence *under the facts of this case.*") (emphasis added).

425.   It is both permissible and necessary to explore juror bias with respect to particular aggravating and mitigating factors likely to be presented to the jurors in the case before them.  *See generally United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005).  For example, a prospective juror who states, in response to abstract questions, that he could vote for life without parole, while in actuality, he could never so vote in a case of murder-for-hire, would not be qualified to serve in a murder-for-hire case.  Such a juror would certainly vote for death following conviction in that case, rendering the penalty phase a meaningless exercise.  If the defendant were forbidden from inquiring about the prospective juror's views on the death penalty in cases of murder for hire, the juror's bias could never be uncovered. *See State v. Williams*, 550 A.2d 1172, 1184 (N.J. 1988) (reversing conviction and death sentence largely because defendant was prevented from inquiring about prospective jurors' ability to vote for life in the case at hand, which involved murder and rape); *see also State v. Maxie*, 653 So. 2d 526, 538 (La. 1995) ("A potential juror who indicates that she will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before her is subject to a challenge for cause.").

426.   Mitchell's *voir dire* did not live up to the demands of the Constitution – it was not a serious, meaningful inquiry into the qualifications and biases of the prospective jurors.  The Court simply asked general questions, and once the defense established that an individual was not life-qualified, the Court would then adopt the posture of an "adjunct prosecutor" and "rehabilitate" that juror with general simple questions, sometimes calling jurors back into the courtroom after the defense raised a cause challenge.

427.   Trial counsel first launched this objection on behalf of Mitchell on April 3, 2003.  (RT 487-89.)  The problem, however, continued unabashed.

428.   During the course of examining Veniremember No. 79 on April 11, 2003, the Court asked a series of questions regarding Veniremember No. 79's ability to be fair and to listen to the evidence.  The prosecution then asked her a series of questions.  The defense asked no questions.  Nothing about Veniremember No. 79's juror questionnaire was raised during the questioning to this point.  The Court resumed questioning:

> The Court:  All right. You indicated that in your questionnaire that with respect to mitigating factors that the defendant would have to prove these factors beyond a reasonable doubt.  And I just want to make sure that you would follow the law that I give you.  And because the law would be that the mitigating factors the defense would only have to prove those mitigating factors by what we call a "preponderance" of the evidence.
>
> Veniremember No. 79:  Okay.
>
> The Court:  So is that acceptable to you?  Would you be able to follow the law?
>
> Veniremember No. 79:  Yes.

(RT 1321-22.)

429.   Trial counsel asked her follow-up questions:

> Trial counsel:  Do you think that the defendant, my side of the case –
>
> Veniremember No. 79:  Uh-huh.
>
> Trial counsel:  – would have to in your mind prove mitigating circumstances, reasons why the death penalty should not be imposed, by a higher standard than a preponderance of the evidence?  For example, beyond a reasonable doubt or beyond all doubt, beyond any doubt, or every doubt.  Is that what you would require?
>
> Veniremember No. 79:  Yes.

(RT 1324.)

430.   At this point, trial counsel stated he had no further questions.  The Court, however, resumed questioning Veniremember No. 79.  After explaining reasonable doubt, the Court explained the standard of proof required for the defense on mitigation evidence.

> The Court:  The other one is beyond – for mitigating factors it's beyond – it's a preponderance of the evidence. I don't know how familiar you are with the law, but there is a distinction.  And my question is would you be able to follow the law that the court gives you regarding the standards of proof?
>
> Veniremember No. 79:  Yes.
>
> The Court:  All right.  But you just indicated to [trial counsel that you would hold the defense to a higher standard.  And like I said, there's no right or wrong answers.
>
> Veniremember No. 79:  Well, on that questionnaire?
>
> The Court:  Yes.
>
> Veniremember No. 79:  Well, then I – I read the question or I read the question wrong then or misunderstood it.
>
> The Court:  Okay.  And I want to be very clear regarding that.
>
> Veniremember No. 79:  Okay.
>
> The Court:  Would you hold the defense to a higher burden of proof than what is called for?
>
> Veniremember No. 79:  No.

(RT 1325.)

431.   Again, this was not an isolated occurrence.  On April 15, 2003, there was perhaps a more blatant attempt to rehabilitate a prospective juror who in her responses to defense questioning made it evident that she was not life-qualified.

> Trial counsel:  If you had just sat on the jury and you found after you heard the whole case at trial, all the evidence, and you concluded that my client was guilty, that he committed carjacking and that he caused the death of two people, a nine-year-old girl and a 65-year-old

182

woman, and then you are going to be asked what the punishment was, can you personally imagine yourself under any circumstances voting for anything other than the death penalty?

Veniremember No. 32:  No.

Trial counsel:  Thank you.

The Court:  Can you tell me the answer to that last question.

Veniremember No. 32:  No.

The Court:  So you didn't really understand the last question?

Veniremember No. 32:  I think I understood it.

The Court:  What – what was asked?

Veniremember No. 32:  If I believed that there could be, or let's see.  If there was other appropriate punishment for this individual, I guess, after hearing all the evidence.  Is that what you're asking?

The Court:  Right.  Would you consider evidence from both sides before you made a decision?

Veniremember No. 32:  Yes.  Um-hmmm.

The Court:  So Mr. Sears just asked you a question.

Veniremember No. 32:  Maybe I'm not understanding it.

The Court:  It could be you did. I want to make sure.  But he asked you whether – I think he asked you if you could imagine, and I don't know that it was – it seemed like it was a hypothetical question, but –

Veniremember No. 32:  Okay.

The Court:  Would you automatically vote for the death penalty based on what you know about this case at this time?

Veniremember No. 32:  No, I would not.

(RT 1517-19.)

183

432. In this situation, Veniremember No. 32 indicated that she understood the defense question; in fact she was able to repeat the question and clearly and unambiguously restated her answer. The Court, however, followed up with re-stated and leading questions certain to elicit responses that would give Veniremember No. 32 the appearance of eligibility. As trial counsel articulated to the Court immediately after Veniremember No. 32 left the room, the Court's questions were designed to elicit one-word obvious answers. Few people, trial counsel argued, are likely to answer "would you be fair?" "would you do what the Judge instructs you to do?" and "would you listen to the evidence" with anything other than an affirmative response.

433. During individual *voir dire* with Veniremember No. 33 provided responses that undoubtedly disqualified her.

> Trial counsel: Going back to your views about the death penalty, and I appreciate that like so many people, this is not dinner table conversation every day. But these are obviously very important questions in this case. You heard the Judge describe the – a little bit about the victims, a nine-year-old girl and a 65-year-old woman in this case. And you understand that my client is charged with carjacking that caused their death. That's the cause in this case.
>
> Veniremember No. 33: Yes.
>
> Trial counsel: Do you believe that if a person is guilty of causing the death of a nine-year-old child and a 65-year-old woman, that he should die for what he did?
>
> Veniremember No. 33: If he's the cause of it?
>
> Trial counsel: If he's found guilty of that.
>
> Veniremember No. 33: Yes.

(RT 1699.)

434. The Court, however, refused to grant a defense motion to excuse for cause, and instead called Veniremember No. 33 back into the courtroom. The

184

Court resumed its practice of asking simple leading questions, and successfully rehabilitated Veniremember No. 33 and denied the defense motion to excuse for cause. (RT 1702-04, 1711-14.)  Similarly, during individual *voir dire* with Veniremember No. 80, he stated that the appropriate punishment for someone who takes a life is death and that if someone takes a life, he should pay with his own life.  (RT 554, 560.)  The Court then attempted to rehabilitate Veniremember No. 80 by again asking leading questions that resulted in Veniremember No. 80's affirmative response that he would listen to the evidence presented.  (RT 561.)  The defense moved to excuse Veniremember No. 80 for cause, at which point the Court ordered Veniremember No. 80 back to the courtroom for further rehabilitation. (RT 567.)  Not only is such practice highly inappropriate, but it was also in stark contrast to the manner in which non death-eligible prospective jurors were treated who were never brought back into the courtroom for court-led rehabilitation.

435.   Mitchell's life should not hang on the assurances of prospective jurors regurgitating affirmative answers to the Court's leading questions.  The jurors' answers were meaningless because the Court had devalued their oath and the Court's actions rendered their responses untrustworthy.

436.   The second major flaw in Mitchell's *voir dire* was that trial counsel was forbidden from asking prospective jurors questions specific enough to determine whether they could fairly and impartially serve on Mitchell's case.

437.   Approximately two months before *voir dire* proceedings, the prospective jurors received mailed questionnaires.  Question number 68 in questionnaire read: "If you are personally, morally, religiously or otherwise opposed to the death penalty, can you imagine any case or set of circumstances under which you could recommend a death sentence be imposed upon a defendant

as punishment?"  Trial counsel often asked variations of this question to prospective jurors who appeared in favor of the death penalty,

> Trial counsel:  . . . Knowing yourself, we are just meeting you here today for the first time, could you imagine sitting through the trial, the guilt or innocence portion of the trial, hearing all the evidence about the case, the kind of case it is, what the crimes are alleged to be, what happened, and then deciding yourself, with the other jurors unanimously, that my client was guilty beyond a reasonable doubt, could you imagine, based on what you've heard about the case, who the victims were, voting for any other punishment other than the death penalty?

(RT 1465-66.)

438.  The Court, however, on multiple occasions stymied the defense efforts (*see, e.g.*, RT 1520, 2047) and insisted on non-hypothetical questions.  The Court expressed a problem with the fact that this question asks the person to assume certain facts that are not yet before them.  (RT 1521.)  However, it is well established that the defense must be allowed to inquire as to how jurors will approach their sentencing duties not just in the abstract, but specifically regarding the case at hand.  *Uttecht v. Brown*, 551 U.S. at 14.  Obviously, during *voir dire*, the prospective jurors do not know the facts of the case, but the defense is duty bound and well within its right to inquire as to the juror's ability to fairly sentence the defendant once those facts are indeed in front of them, and the Court deprived the defense of this right by restricting their ability to ask such questions.

439.  Mitchell has a constitutional right to present a guilt and penalty phase defense before qualified jurors who consider the evidence fairly and impartially.  Without such jurors, the penalty phase is a useless exercise the outcome of which is already known.  Even one juror can seriously impact a case, and the inappropriate inclusion or exclusion of a single juror can prejudice a defendant.  A juror who would automatically vote for death after conviction on such charges is not qualified under the Constitution to serve in this case.  The trial court's restriction made it

186

impossible for Mitchell to identify such jurors and, thus, deprived him of his constitutional rights.

440.   The foregoing violations of Mitchell's constitutional rights, taken alone or in combination with the other errors alleged in the Amended Motion, constitute structural error and warrant the granting of this Amended Motion without any determination of whether the violations substantially affected or influenced the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Amended Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violations of Mitchell's rights had a substantial and injurious effect or influence on Mitchell's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice.  *See id.* at 622, 637-38.

441.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668.  (*See* Claim AA, *infra*.)

## M.   The Cumulative Effect of All Errors During the Jury Selection Process Resulted in a Jury That Was Not Impartial

442.   Movant's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because of the cumulative effect of all of the errors that occurred during jury selection.  *Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007).

443.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

444.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

445.   If this Court should determine that each of the individual jury selection errors standing alone does not warrant a reversal of Mitchell's conviction, it must still determine whether the errors in combination may have contributed to the verdicts and sentence.  *See Parle*, 505 F.3d 922 (affirming habeas relief based on cumulative error); *see also Taylor v. Kentucky*, 436 U.S. 478, 487, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978).  In addition, the Eighth Amendment guarantee of heightened reliability in death judgments, *Johnson v. Mississippi*, 486 U.S. 578, 584-85, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988), also compels reversal when the cumulative effect of errors undermines confidence in the reliability of the judgment.  The Court and the prosecution committed numerous errors in this case.  Ultimately, the jury that decided Mitchell's fate did not consist of twelve individuals who had demonstrated an ability to be fair and impartial and did not comport with the Sixth Amendment guarantee of an impartial jury.

446.   The errors committed by the trial court included the excusal for cause of qualified jurors and the denial of defense motions to excuse biased jurors.

447.   The dynamics of jury deliberation are particularly likely to magnify the effect of individual influence when that influence is not counterbalanced.  Thus, the presence of an improperly seated juror with a pro-prosecution bias will have even greater effect in the absence of an improperly rejected juror who is

particularly cautious in approaching a guilty verdict or a sentence of death. This is especially true given the wide discretion afforded to jurors in capital cases.

448. As a result of the multiple jury selection errors detailed in Claims H through L, *supra*, Mitchell was tried, convicted and sentenced to death by a jury that was unsatisfactory to him. The cumulative effect of these errors deprived Mitchell of a fair trial before an impartial jury free from the risk of pro-prosecution and pro-death bias, in violation of his Fifth, Sixth, and Eighth Amendment rights.

449. Accordingly, whether viewed individually or collectively, the errors in the impanelment and the ultimate construction of the jury mandate reversal.

450. The foregoing violations of Mitchell's constitutional rights, taken alone or in combination with the other errors alleged in the Amended Motion, constitute structural error and warrant the granting of this Amended Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Amended Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Mitchell's rights had a substantial and injurious effect or influence on Mitchell's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**N.**   **This Court Violated Mitchell's Constitutional Rights by First Granting the Government's Motion to Transfer the Trial, Then Severing the Trials of Mitchell and Co-defendant Orsinger**

451.   Mitchell's conviction, sentences and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the transfer and subsequent severance of his trial deprived Mitchell of his right to a fair trial.

452.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

453.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

454.   On July 12, 2002, the Government moved to transfer Mitchell and co-defendant Orsinger's trial from Prescott, Arizona to Phoenix, Arizona.  The government's justification was that the Prescott federal courthouse was not equipped to hold four in-custody defendants at the same time.  The Government contended that the trials of Gregory Nakai and Jason Kinlicheenie, Mitchell's co-defendants in the trading post robbery, were also pending and Mitchell, Orsinger, Nakai, and Kinlicheenie could not all be kept in Prescott.  The government also cited the fact that Orsinger was only seventeen years old at the time and thus could not be housed with adult defendants, which meant he would have to be housed elsewhere if the trial continued as scheduled in Prescott.  Five days after the Government filed this motion, Jason Kinlicheenie pled guilty to the charges against him. *United States v. Jason Kinlicheenie*, No. CR 01-1062 (D. Ariz.).

455.   On July 25, 2002, Mitchell formally opposed the Government's request to transfer and the Government subsequently filed its reply motion on August 9, 2002.  This Court granted the Government's motion on September 16, 2002.  The defense filed a motion for reconsideration on November 8, 2002 which was subsequently denied.

456.   On April 1, 2003, immediately before the start of *voir dire*, this Court severed the cases of Mitchell and Orsinger, and then began *voir dire* as to Mitchell alone.

457.   Assuming, without conceding, that the severance was indeed proper, the effect of such a last minute decision was to drastically change the face of the trial immediately proceeding the commencement of that trial.  Making this ruling at the literal last minute deprived the defense of the ability to have the trial transferred back to its appropriate location in Prescott, Arizona.

458.   Rule 18, Federal Rule of Criminal Procedure, mandates that "the government must prosecute an offense in a district where the offense was committed."  This case arose in the Prescott division and in accordance with Rule 18 and Local Rule 1.1(c), it should have been tried in Prescott.

459.   It is permissible, however, in certain circumstances to transfer a trial to a different district.  This was not such a situation.  The transfer was based purely on convenience to the government.  Their stated reason for transferring the trial was not valid when their motion was granted due to Kinlicheenie's plea.  Furthermore, when the case actually went to trial in Phoenix, the justification for that location was even less valid due to the severance.  As it was no longer necessary to bring Orsinger to trial every day, there was no longer a valid security concern and therefore Mitchell should have been transferred back to Prescott.

191

460.    Mitchell's constitutional rights were severely prejudiced as a result of this last minute decision.  The most notable violation was the composition of the jury.  In order to afford Mitchell a jury of his peers, this Court used a jury venire from Prescott for the trial in Phoenix.  In theory, this should have afforded Mitchell a similar jury to that he would have received had the trial proceeded in Prescott.  In practice, however, the undue hardship this placed on potential jurors resulted in a jury almost entirely free of Native Americans.  Prescott is located approximately 100 miles from Phoenix, and as such jurors were asked to either brave the commute every day or stay in a hotel provided by the Court.  Thus jury service in this case would require getting to and from Phoenix for the week, obtaining extended child care if staying in Phoenix, and not working during the pendency of the trial (a period of almost two months). For the economically disadvantaged, the transfer to Phoenix made their participation virtually impossible.  Unfortunately, a large percentage of the Navajo Nation lives in poverty, and it was foreseeable that several Native American Veniremembers would thus be excluded for undue hardship due to the transfer.  *See* juror claim.

461.    Due to the last-minute severance, this Court should have *sua sponte* granted the defense a continuance to fully analyze their changed circumstances and renew the issue of the transfer.  Its failure to do so violated Mitchell's constitutional rights.

**O.    Mitchell's Right to a Jury Chosen from a Fair and Representative Jury Venire Was Violated When Native Americans Were Systematically Excluded from Jury Service**

462.    Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments because Native Americans were systemically excused from his jury.

463.    In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

464.    Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

465.    Mitchell had a right, under the Sixth Amendment, to have his jury chosen form a representative cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975). A defendant establishes a prima facie violation of the fair-cross-section requirement by showing: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.'" *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

466.    In the present case, the Ninth Circuit assumed that the Native Americans in Arizona constitute a distinctive group. *Mitchell*, 502 F.3d at 950.

193

Thus Mitchell is assumed to have satisfied the first prong of the required showing. *Id*.

467.    With regards to the second prong, the Ninth Circuit found that the absolute disparity between the percentage of the venire made up of Native Americans (30 venirepersons out of a total of 207) and the percentage of the population of the division made up of Native Americans was constitutionally acceptable. *Id*. Moreover, they found the Prescott juror wheel in general had a constitutionally acceptable absolute discrepancy. *Id*. All of the Ninth Circuit's calculations regarding these issues were based on absolute disparity. This is, however, not the method that Ninth Circuit precedent recommends for determining such disparity. In fact, the Ninth Circuit has explicitly instructed that courts might be incorrect to rely on absolute disparity, and instead should use a standard deviation analysis which can be more reliable. *Hirst v. Gertzen*, 676 F.2d 1252, 1258 n.14 (9th Cir. 1982) ("The Supreme Court has also suggested that analysis of the standard deviation is an appropriate way of determining whether the under-representation of a given group is significant. In our view, this method would have been an appropriate method of determining the significance of the degree of under-representation evidenced here."); *see also Casteneda v. Partida*, 430 U.S. 482, 496 n.17, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977); *United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005).

468.    The Ninth Circuit applied a standard that it recognizes is not the most accurate. Mitchell will show that, using the correct standard, there was a substantial violation of the fairly representative venire requirement in his case and in the Prescott juror wheel. The full set of facts will be presented after full discovery, investigation, in which the Mitchell will seek to have a statistician appointed, access to this Court's subpoena power, and an evidentiary hearing.

194

469.   Furthermore, Mitchell will show that the fact that only one Native American was placed on his jury and the 29 others were excused prior to peremptory challenges was a result of systematic exclusion and the improper transfer from Prescott to Phoenix.  Mitchell's case was allegedly transferred from Prescott to Phoenix for concerns related to housing the defendants.  This, however, became a non-issue when one defendant pled to the charges against him several months before the start of Mitchell's trial, and Mitchell and Orsinger's trials were subsequently severed before their start.  *See infra* Claim N.  The concern regarding where to house the co-defendant thus no longer applied to Mitchell's case.  The transfer resulted in rendering several of the Native American venirepersons excusable for undue hardship due to having to travel great distances to be in Phoenix.  *See infra* Claim N.  Mitchell will show that this transfer disproportionately affected Native American's ability to serve on his jury.

470.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits.  *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668.  (*See* Claim AA, *infra*.)

## P.   <u>The Juror Questionnaire Was Constitutionally Inadequate to Secure Mitchell's Constitutional Rights</u>

471.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the jurors' questionnaire lacked specificity rendering it inadequate to secure his right to an impartial and life-qualified jury.  *See Morgan v. Illinois*, 504 U.S. 719.

195

472.  In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

473.  Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

474.  Before the start of *voir dire*, this Court sent a juror questionnaire to the potential jurors.  (Ex. 142.)  The juror questionnaire was inadequate to secure his constitutional right to an impartial, life-qualified jury.  While no Supreme Court precedent specifically addresses juror questionnaires, the Supreme Court has explicitly required that a defendant be provided adequate *voir dire* such that the Court can identify and excuse unqualified jurors, and that an impartial jury can try the defendant.  *Morgan*, 504 U.S. at 729 ("[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors.").  Failure to ask specific questions in *voir dire* violates the Constitution when it renders the trial fundamentally unfair.  *Mu'Min v. Virginia*, 500 U.S. 415, 425-26, 111 S. Ct. 1899, 114 L. Ed. 2d 493 (1991); *see also Murphy v. Florida*, 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) ("The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.'") (citation omitted)).

475.  In Claim L, Mitchell argues that his trial counsel was forbidden from asking prospective jurors questions specific enough to decide whether they could fairly and impartially serve on Mitchell's case.  The juror questionnaire asked prospective jurors their thoughts on the death penalty on such a superficial level that it added nothing to the *voir dire* process.  The combination of an inadequate

*voir dire* process and a questionnaire lacking in any specificity resulted in a total deprivation of defense counsel's right to question prospective jurors in a meaningful fashion.

476.    The Sixth Amendment guarantees criminal defendants a trial by an impartial jury.  A juror who is "life-qualified" is one who would not automatically vote for the death penalty after conviction in every capital case.  A juror who is not life-qualified is not considered impartial, and is not eligible to serve as a juror on a capital case.  One primary purpose of *voir dire* in a capital case is to identify these unqualified jurors.  *See Morgan*, 504 U.S. at 729.  *Voir dire* is vital in protecting a defendant's right to an impartial jury, and without adequate *voir dire*, the trial judge cannot fulfill her obligation to remove unqualified jurors.  *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (plurality opinion).

477.    The juror questionnaire is a valid medium for life-qualifying a prospective juror.  *See United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005).  Moreover, in *United States v. McVeigh*, the Tenth Circuit ruled that where the court barred defense counsel from asking specific questions related to the crime, it did not deny the defendant adequate *voir dire* due to, in part, the specificity in the juror questionnaire.  *United States v. McVeigh*, 153 F.3d 1166, 1208-09 (10th Cir. 1998).

478.    For a time there was division in the Circuits, and the Tenth Circuit's decision in *McVeigh* was interpreted to stand for the proposition that all case-specific questions in *voir dire* are improper.  *See Johnson*, 366 F. Supp. 2d at 834.  The Supreme Court, however, clarified that the court must permit the defendant to ask about the jurors' ability to discharge their sentencing obligations in the *case at hand*.  *See Uttecht v. Brown*, 551 U.S. 1.

479.    The trial court has an independent obligation to scrutinize juror questionnaires to assure that its inquiries are reasonably calculated to yield meaningful information without intruding too deeply into personal concerns. *United States v. Serafini*, 57 F. Supp. 2d 108, 111 (M.D. Pa. 1999); *United States v. McDade*, 929 F. Supp. 815 (E.D. Pa. 1996); *United States v. Edmond*, 730 F. Supp. 1144 (D.D.C. 1990).  Where the trial court fails to ensure that the questionnaire will provide meaningful case-specific information, the defendant's ability to life-qualify the jurors is at a serious disadvantage.  Where the trial court then bans the defense from asking case specific questions during *voir dire*, the court deprives the defendant's rights entirely.

480.    Here, the juror questionnaire yielded almost no meaningful information.  Of the seventy-seven questions in the questionnaire, two dealt with the alleged criminal activity with some specificity.  Question 66 asked if the juror would automatically impose a death sentence if one of the victims was a child, and Question 67 asked if the juror would automatically impose a death sentence if one of the victims was elderly.  The questionnaire provided no synopsis of the alleged criminal activity.  It did not mention multiple murders, armed robbery, or defined carjacking.  The questionnaire did not provide any specifics as to the alleged aggravating factors – a vital issue given the alleged brutality of the crimes – and did not provide any detail how the perpetrators carried out the crimes.  In fact, by this Court's own admission, the juror questionnaire was ineffective and, if given the opportunity to rewrite the questionnaire, the Court would have done so.  (*See* RT 1537.)  Instead of allowing defense counsel to ask questions more freely to compensate for the lacking questionnaire, this Court restricted defense counsel's line of questioning and thus rendered *voir dire* inadequate and prevented herself from fulfilling her obligation to ensure a life-qualified jury.  *See supra* Claim L.

481.   Exploring juror bias with respect to particular aggravating and mitigating factors likely to be presented to the jurors in the case before them is both permissible and necessary.  *See generally, Johnson*, 366 F. Supp. 2d 822.  For example, in *State v. Williams*, defendant's conviction and death sentence were reversed because the court barred his trial counsel from asking prospective jurors whether they would vote for death in a case involving rape and murder.  *State v. Williams*, 550 A.2d 1172, 1184 (N.J. 1988); *see also State v. Maxie*, 653 So. 2d 526, 538 (La. 1995) ("A potential juror who indicates that she will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before her is subject to a challenge for cause."); *People v. Kirkpatrick*, 7 Cal. 4th 988, 1005 (1994), *overruled in part by People v. Doolin*, 45 Cal 4th 390 (2009) ("A prospective juror who would invariably vote . . . for . . . the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating or mitigating circumstances, is therefore subject to challenge for cause. . . .").

482.   If a juror cannot consider the factual "circumstances of the particular offense" before imposing the death penalty, then the death sentence violates the Eighth Amendment.  *Woodson v. North Carolina*, 428 U.S. at 304.  In the present case, the entire jury selection process beginning with the questionnaire and ending with *voir dire* was an exercise in the blind leading the blind.  Neither the Court nor counsel knew where the jury stood on issues vital to this case.  The purpose of the questionnaire and *voir dire* is to remove this doubt such that the defendant is guaranteed his right to trial by an impartial jury.  Without such impartiality, the penalty phase is a useless exercise with a foregone conclusion.  A juror who would automatically vote for death after conviction on capital charges was not qualified under the Constitution to serve in this case.  The trial court's admittedly ineffective

questionnaire made it impossible for Mitchell to identify such jurors, and therefore deprived him of his constitutional rights.

483.   The foregoing violations of Mitchell's constitutional rights, taken singly or in combination with the other errors alleged in the Amended Motion, constitute structural error and warrant the granting of this Amended Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. at 637-38 & n.9. However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors alleged in this Amended Motion, so infected the integrity of the proceedings that this Court cannot deem the error harmless. The foregoing violations of Mitchell's rights had a substantial and injurious effect or influence on Mitchell's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See Id.* at 622, 637-38.

484.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668. (*See* Claim AA, *infra*.)

## Q.   The Prosecution's Failure to Produce Exculpatory Evidence Violated Mitchell's Constitutional Rights

485.   Mitchell's death sentence violates the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the prosecution violated its duty to disclose exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83; *Giglio*

200

*v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

486.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

487.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

488.   "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. at 87; *accord Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 116 (2004).  In order to prevail on a *Brady* claim, a movant must demonstrate that (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence was suppressed by the Government either willfully or inadvertently; and (3) prejudice was ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *see also United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008), *mandate issued*; *Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008), *mandate issued*.

489.   For prejudice to ensue, the suppressed, favorable evidence must be "material."  *Brady*, 373 U.S. at 87.  Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *United States v. Bagley*, 473 U.S. at 682; *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002). A reasonable

probability is one that sufficiently undermines confidence in the outcome of the trial. *Id*. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *see also Cone v. Bell*, 129 S. Ct. 1769, 1787, 173 L. Ed. 2d 701 (2009) (Roberts, C.J., concurring); *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005).

490.   On December 5, 2001, trial counsel wrote the first of several letters to the Government requesting *Brady* material, including all material related to sentencing and mitigation.

491.   During Mitchell's investigation, he discovered that, contrary to any discovery the Government provided to trial counsel previously (and to its position at the trial), the FBI (consequently, the prosecution) and the Navajo Nation police had, pursuant to a tip from a then-unidentified individual (now known to be Jimmy Nakai, Jr.), located and begun processing the scene where the bodies were found well before the date actually disclosed at trial.[27]   This information is significant to Mitchell's present defense to the charges and the death penalty.  As the Ninth Circuit noted, the testimony at trial was that Mitchell directed Navajo police officers to the site. *United States v. Mitchell*, 502 F.3d at 944-45.  The descriptions of Mitchell "directing" law enforcement to the site allowed the jury to infer that Mitchell remembered well and immediately where the site was.  However, as described in issues A and B, *supra*, Mitchell was still so intoxicated when he was arrested, even after waking up on November 4, that he was unable to recall and

---

[27]   The individual, a law enforcement officer who was at the crime scene throughout November 4, provided this information to counsel.  The individual refused to sign a declaration attesting to it although he confirmed it was true.  This fact, among others, demonstrates why Mitchell is entitled to discovery and an evidentiary hearing.

direct the site's location.  By not providing trial counsel with the information that *the Government had already located and begun processing the site* well before Mitchell, or even Orsinger, had lead them to the scene, the Government deprived Mitchell with evidence that was favorable to his lack-of-intent defense at the guilt and penalty phases of his trial.

492.   In addition to that violation, on May 13, 2003, the day before the penalty phase began, the Government produced several items of *Brady* material, including a letter it had obtained over one and one-half years earlier from the Attorney General of the Navajo Nation to United States Attorney Paul Charlton indicating the Navajo Nations opposition to capital punishment in general and specifically with regards to Mitchell.  (*See* Defendant's Trial Ex. 22, Navajo Nation letter to Paul Charlton; *United States v. Mitchell*, 502 F.3d at 989.)

493.   On appeal, the Ninth Circuit ruled that the aforementioned letter was indeed favorable and material to Mitchell's defense.  *Mitchell*, 502 F.3d at 989. The court, however, denied relief because it found that Mitchell had failed to allege specifically how he was prejudiced by the suppression of the letter.  *Id*.

494.   Had trial counsel received this letter in advance of the penalty phase they would have arranged for Navajo officials to testify about why they opposed the death penalty.  The Ninth Circuit noted that seven jurors had found that the letter was an additional mitigating factor because it expressed the Navajo Nation's opposition to the death penalty.  *Mitchell*, 502 F.3d at 989.  With a witness, however, the jurors would have had the opportunity to listen and judge the credibility of a Navajo official who could explain fully all the issues of Navajo culture and religion, and how the death penalty contradicts those values.  Certainly if a formal letter managed to influence seven jurors, live witness testimony would have easily influenced the all twelve jurors into weighing that mitigation more

heavily. *See United States v. Corley*, 348 F. Supp. 2d 970, 978 (N.D. Ind. 2004) ("when reliability is at issue and the fairness of Defendant's penalty phase is at stake, there can be no substitute for live testimony from direct occurrence witnesses.").

495. Furthermore, during his penalty phase closing argument, the prosecutor suggested that Mitchell had turned his back on his religious and cultural heritage. (*See* RT 4112, 4128-30; *Mitchell*, 502 F.3d at 995.) Since counsel presented nothing substantial about Mitchell's two cultures, they were left with only a letter to combat the prosecutor's improper argument. A defense presentation involving for example another Diné who could explain their beliefs against the death penalty would have demonstrated that Mitchell had not deserted his cultural heritage, and he was not the pariah that the prosecution made him out to be

496. Finally the simple fact that there were people willing to speak on Mitchell's behalf would have affected the jury. An individual person, representing the Navajo Nation, speaking directly to the jurors would have done much more for Mitchell than a letter ever could.

497. The prosecution in this case suppressed evidence in violation of Mitchell's constitutional rights. *See Brady*, 373 U.S. at 87. Mitchell has shown that the letter was favorable, it was suppressed by the government in that they had the letter for approximately five months before finally turning it over, and Mitchell suffered prejudice as a result. *See Greene*, 527 U.S. at 281-82. Therefore, Mitchell's death sentence is not "worthy of confidence" (*Kyles*, 514 U.S. at 434), and Mitchell must be afforded habeas relief.

498. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective

assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668. (*See* Claim AA, *infra*.)

### R.   The Government's Collusion with the Navajo Nation Violated Mitchell's Constitutional Rights

499.   Federal and Navajo Nation law enforcement colluded to violate Mitchell's Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and his right to counsel, secured by the Fifth and Sixth Amendments.

500.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

501.   Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

502.   The documents the Government produced to trial counsel as discovery, testimony, and Mitchell's ongoing investigation show the following facts, which differ in significant respects from that presented to the Court before trial:

### 1.   The Court violated Mitchell's rights through the admission of statements obtained after his right to counsel had attached

503.   In September 2001, Navajo Nation police questioned Mitchell about an offense unrelated to Mitchell, and they later arrested him for vandalism of tribal

property.  The Navajo Nation released Mitchell and set a hearing for November 17, 2001.

504.   In the very early morning of November 4, 2001, pursuant to arrest warrant for a misdemeanor, the Federal and Navajo Nation governments arrested Mitchell at Daisy Nakai's house, in Round Rock.

505.   The Government and the Navajo Nation police searched the Nakai house and seized evidence later admitted against Mitchell.

506.   The Government and the Navajo Nation police executed two other arrest warrants, one at Round Rock school housing, the other elsewhere.

507.   Later that morning of November 4, law enforcement transported Mitchell to the tribe's facilities in Chinle.

508.   Also later that morning, the Government and the Navajo Nation police obtained Daisy Nakai's and her son Gregory Nakai's signatures purporting to authorize an imminent search of the house, although the FBI had already searched the house and seized items.

509.   Special Agent Raymond Duncan, the investigating officer, arrived at Chinle to interrogate Mitchell.

510.   According to law enforcement summaries, prepared from handwritten notes not provided to counsel, Mitchell's first interrogation began shortly after Noon, on November 4.

511.   At 2:50 p.m. on November 4, law enforcement alleges that Mitchell waived his *Miranda* rights.  His interrogation continued until at least 3:15 p.m.

512.   That same day, the FBI administered to Mitchell a polygraph examination by one of its agents.

513.   The FBI and the Navajo Nation police continued interrogating Mitchell until well past dark and into the early morning of November 5.

206

514.   By this time, the FBI and the Navajo Nation police had already been to the Tsaile crime scene.  They went to the scene after the FBI interrogated Mitchell and the others, while it was still daylight.  The FBI had called their evidence recovery team from Albuquerque.  The agencies were there for several hours.  They left that evening, leaving the location secure.

515.   In the early morning of November 5, the FBI and the Navajo Nation police finally permitted Mitchell to return to the Chinle jail to sleep.

516.   Mitchell's interrogations lasted at least twelve hours.

517.   On November 5, 2001, after noon, Navajo Nation police drove Mitchell toward Tsaile.  Some place en route, two other Navajo Nation police took over transporting Mitchell.

518.   The Government and the Navajo Nation police already knew where the bodies were found, but Mitchell was nonetheless brought to the scene.

519.   Once at the scene, another FBI special agent interrogated Mitchell out of earshot of the others.

520.   Eventually, the Government and the Navajo Nation police returned Mitchell to the Chinle jail.

521.   Navajo Nation police placed Mitchell in a general population cell, *i.e.*, a cell with many other inmates.

522.   A couple days later, Mitchell appeared in Navajo Nation court on charge unrelated to the Slim/Lee offenses.

523.   The next day, the Navajo Nation court issued a bench warrant to Mitchell regarding his September 2001 arrest in which he allegedly vandalized police property.  The Navajo Nation dropped the robbery charges.

524.   The next day, the Navajo Nation transferred Mitchell to its jail in Window Rock, Arizona, on a long-term hold.

207

525.    At some point before his transfer to the Window Rock jail, Navajo Nation authorities told Mitchell they had him in custody not for the Slim/Lee murders, but for the Nation's matters.

526.    Mitchell remained at the Navajo Nation's Window Rock jail about two weeks.

527.    By Thanksgiving 2001, Mitchell was in solitary confinement in a Navajo Nation jail.  (He was placed in solitary confinement some two weeks earlier after inmates assaulted him in the general population.)  *See* Statement of Facts, *supra*.

528.    At some point during his incarceration, the Navajo Nation court appointed an advocate (a lay person) to represent Mitchell on its charges.

529.    On November 29, 2001, the Federal and Navajo Nation governments did not return Mitchell to the Navajo Nation court; instead, he was taken to Flagstaff, Arizona.

530.    In a Flagstaff federal building on November 29, 2001, the FBI "asked additional questions" of Mitchell regarding the Slim/Lee murders.

531.    On November 29, 2001, at 12:56 p.m., Mitchell waived his *Miranda* rights.

532.    Mitchell was in federal custody once the FBI arrested him at the Nakai household the morning of November 4, 2001.  The Navajo Nation and the Government colluded to delay the appointment of counsel for Mitchell regarding the Slim/Lee murders, and to delay Mitchell's presentment to a federal magistrate judge for arraignment.  Indeed, his arrest and interrogation were directed and coordinated by the Government to circumvent Mitchell's right to remain silent and right to the assistance of counsel.  As such, this Court should have suppressed his

statements as a violation of his right to timely presentation before a magistrate and his right to counsel.

533. Due to the delay in the appointment of counsel, Mitchell's Sixth and Fifth Amendment rights were violated, and his statements are inadmissible.

534. Due to the delay in Mitchell's presentment to a magistrate judge, Mitchell's statements in the interim were inadmissible pursuant to 18 U.S.C. § 3501.

535. Improper collaboration between federal and local law enforcement officers during a criminal investigation triggers federal procedural protections. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 359, 114 S. Ct. 1599, 128 L. Ed. 2d 319 (1994); *United States v. Red Bird*, 287 F.3d 709, 713-14 (8th Cir. 2002); *United States v. Doe*, 155 F.3d 1070, 1078 (9th Cir. 1998).

536. If federal and local law enforcement officials act in collusion to delay a judicial determination of probable cause following an arrest by local law enforcement officials, custodial confessions are inadmissible unless they are voluntarily given within the meaning of 18 U.S.C. § 3501. *United States v. Perez-Lopez*, 348 F.3d 839, 849-50 (9th Cir. 2003); *see Alvarez-Sanchez*, 511 U.S. at 359; *United States v. Wilson*, 838 F.2d 1081, 1085 (9th Cir. 1988). Collusion is established by "deliberate intent" to deprive a defendant of federal procedural rights. *United States v. Michaud*, 268 F.3d 728, 735 (9th Cir. 2001).

537. Navajo Nation investigators (detectives) obtained a warrant because the Government indicated that an ideal course of action would be for federal agents to question Mitchell when he was in Navajo Nation custody. (03/11/03 RT 75, 90-91; *see* Statement of Facts, *supra.*) The Navajo Nation warrant was "an avenue to contact [the defendant] and interview [him]." (*Id*. at 80.) Federal agents were well

aware that defendants in Navajo Nation custody would have fewer procedural protections than they would have in federal custody. (*Id*. at 78, 104.)

538. FBI agents ran the pre-arrest briefing the morning of Mitchell's arrest. (RT 2702.) Both FBI agents and Navajo Nation police served the Nation's arrest warrant at the Nakai home. (01/30/03 RT 187, 216.) During the arrest, both FBI agents and Navajo Nation police supervised the Nation's Tactical Team. (01/30/03 RT 232.) The intent of federal agents when they arrested Mitchell was to have a Navajo Nation police unit available to take Mitchell and the other arrestees to its Chinle jail. (01/30/03 RT 188-89.) This allowed the FBI to coordinate the arrest and run the case, effectively using the Navajo Nation to deprive Mitchell of the rights he would have been afforded under the Federal Constitution, but not under Navajo Nation law.

539. After the FBI took Mitchell into custody on November 4, 2001, federal agents interrogated him a total of three times over twenty-four hours. (*See* Exs. 18, 19 & 20; 1/30/03 RT 21-31, 77, 81.) The FBI conducted the third of these interrogations at the crime scene, where federal agents were directing the investigation. (*See* Ex. 20; RT 2754, 3048, 3079, 3110.) Federal agents interrogated Mitchell again, almost a month later, after they transported him to Flagstaff, within the hour before Mitchell was presented to a federal magistrate. (*See* Ex. 21; 01/30/03 RT 32-33.)

540. Federal law enforcement officers plainly controlled each stage of the investigation of this case. They instigated Mitchell's arrest on a Navajo Nation warrant with the intent to interrogate him while he lacked the procedural protections of the federal courts. Consequently, Mitchell's confessions to law enforcement officials are inadmissible as they were involuntarily given and taken in violation of his rights to remain silent, to counsel, and to due process of law.

541.   Confessions are inadmissible when they are not voluntarily given.  18 U.S.C. § 3501; *United States v. Halbert*, 436 F.2d 1226, 1237 (9th Cir. 1970). "[C]ollusive police conduct designed to elicit an involuntary confession" and an unreasonable delay in arraignment are both factors undermining the voluntary nature of a confession.  *United States v. Manuel*, 706 F.2d 908, 913-14 (9th Cir. 1983).

542.   In some instances, delay in arraignment may be sufficient, in and of itself, to render a confession inadmissible."  *Manuel*, 706 F.2d at 913; *see Wilson*, 838 F.2d at 1086, 1087.  To render a confession inadmissible, the length of delay must have been longer than six hours (*Manuel*, 706 F.2d at 913), and not attributable simply to transportation problems or to the rendering of humanitarian assistance.  *United States v. Edwards*, 539 F.2d 689, 691 (9th Cir. 1976); *Manuel*, 706 F.2d at 914.

543.   By contrast, courts suppress confessions when a delay in arraignment was "deliberate and for the sole purpose of obtaining a confession."  *Wilson*, 838 F.2d at 1085; *see Halbert*, 436 F.2d at 1237 (holding that confession was admissible despite two-day delay in arraignment because there was no evidence that the delay contributed to defendant's confession).

544.   The evidence is uncontradicted that the Government and the Tribe designed the delay before appearing in court to secure a confession.  Mitchell was in custody for well over three weeks before he was presented to a federal magistrate.  (1/30/03 RT 21, 32.)  The FBI arrested Mitchell on November 4, 2001. He was presented to a federal magistrate on November 29, 2001.  There is no suggestion that this lengthy delay was due to anything other than the desire of federal agents to question him without federal procedural protections.  (03/11/03 RT 75, 78, 80, 104.)

211

545.   In *Corley v. United States*, _ U.S. _, 129 S. Ct. 1558, 1571, 173 L. Ed. 2d 443 (2009), the Supreme Court held that 18 U.S.C. § 3501(c) did not supplant *McNabb-Mallory* and that "[i]f the confession occurred before presentment and beyond six hours . . . the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed."  The requirement remains that all confessions given during an unnecessary delay in arraignment should be suppressed.  None of Mitchell's confessions occurred within the six-hour safe harbor provision of 18 U.S.C. § 3501, and his statements to federal agents became increasingly more inculpatory the longer he was detained.  The FBI and the tribe arrested him at 7:00 a.m. on the morning of November 4, 2001, and Mitchell first spoke with federal investigators more than six hours later at 1:30 p.m.  (1/30/03 RT 40.)  He made no inculpatory statements during this first interrogation.  (RT 42.)  When the FBI interrogated him again, later that evening at 9:00 p.m., ten hours after his arrest, Mitchell agreed to take authorities to the location of the bodies.  (*Id*. at 29-30.)  At the scene the following day, the FBI interrogated him for a third time and gave a "more inculpatory statement" than he had the day before.  (*Id*. at 81.)  More than three weeks later, on November 29, the FBI interrogated him for a fourth time, and Mitchell "made certain admissions . . . to his involvement in the murder."  (*Id*. at 35; *see* Statement of Facts, *supra*.)

546.   The Supreme Court added, "In a world without *McNabb-Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to."  *Corley*, 129 S. Ct. 1558, 1570.  Federal agents orchestrated the length of delay between Mitchell's arrest and presentment, knowing that it would assist them in obtaining confessions.  Consequently, Mitchell's statements to federal

212

investigators were involuntary, and should have been suppressed. Their admission violated his Fifth and Sixth Amendment rights.

### 2. The Court violated Mitchell's rights through the admission of post-arrest, pre-*Miranda* statements

547. The Court violated Mitchell's Fifth Amendment rights when it admitted statements made by him after his arrest about where his clothing could be found in the Nakai house. FBI Agent Hush testified that after the FBI and Navajo Nation police had arrested Mitchell, they held him handcuffed in the main room. (RT 2960.) While Hush was watching over him, he asked Mitchell where his pants were. (*Id.*) Mitchell was in his undergarments at the time. (*Id.*) In response to this question, Mitchell told Hush where his pants could be found. (RT 2962.) Hush then testified that when he grabbed the pants, a knife fell out. (RT 2963.) The Government admitted that knife against Mitchell as a potential knife used in the carjacking. (RT 2968.)

548. The admission of this evidence violated Mitchell's *Miranda* rights. The evidence is unequivocal that the FBI and Navajo Nation police, acting at the direction of the Federal Government, obtained these statements after they had arrested Mitchell on the morning of November 4, 2001, and that the FBI and Navajo Nation police had not advised Mitchell of his *Miranda* rights when he made these statements. Moreover, the question asked was one that "the police should know [was] reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990); *see also Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (questions other than those "normally attendant to arrest and custody" that police should know are reasonably likely to elicit incriminating response responses, protected by *Miranda*).

213

549.   The courts have examined which questions fit within the exception of those "normally attendant to arrest and custody."  They have identified these questions as "routine booking questions" which the police have designed to secure the biographical data necessary for booking and pretrial services.  *Muniz*, 496 U.S. at 601.  Here, the questions asked did not fall within that exception.

550.   The Supreme Court has made clear that *Miranda* warning-based approach to determining the admissibility of statements is constitutionally based. *Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).  As such, this Court should adopt a per se approach to the exclusion of statements taken in violation of *Miranda*, rather than engage in a content-based analysis.  *Compare United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982).

551.   The testimony at issue here should not have been admitted.  The question Hush asked about the location of Mitchell's personal items in the house meets even a content-based analysis standard.  The FBI and Navajo Nation police arrested Mitchell in a house owned by another target of this investigation, Gregory Nakai.  At the time of Mitchell's arrest, many people whom the Federal Government believed were involved in these offenses were also arrested in the home.  The offenses involved included homicides, evidence of which might exist on or in a suspect's clothing.  To use any evidence found in the house, the Federal Government would need it linked to specific participants.  Thus, questions about whose property was where in the house was information that law enforcement and the Government designed to elicit an incriminating response.  As such, the Court erred in admitting these statements in violation of Mitchell's Fifth Amendment rights.

214

**3.      The Government and the Court violated Mitchell's rights through the admission of involuntary statements improperly induced through deception and lies**

552.    The Government obtained Mitchell's post-arrest statements through deception and lies that came in many forms. Agents repeatedly implied to Mitchell that things would go "in a positive way" if he cooperated and that the courts would consider his cooperation in determining the outcome of this case. (01/30/03 RT 103.) They even told him that he would have the right to have a lawyer appointed to help him, when no such lawyer was available or possible given the purported posture of the case. (RT 3149.) Such lies and deception rendered Mitchell's statements involuntary. The Government's misconduct in obtaining the statements and the Court's admission of these statements violated his rights to due process, a fair trial, and to a reliable sentencing determination under the Constitution.

553.    The Court made a specific finding that Mitchell was not credible in his statements "regarding any benefit allegedly promised or implied by Special Agent Kirk." (Dkt. No. 284; *see*, Statement of Facts, *supra.*) However, the Court's order does not address that the actual *Miranda* warnings themselves were lies if the Government's assertion that Mitchell was in Navajo Nation custody is accurate. As the agent himself admitted, if he were in tribal custody, Mitchell never had the right to have a lawyer appointed. (RT 3149.) No such right exists for those in the Navajo Nation's custody; the Nation in fact appointed only a lay person to "represent" Mitchell. The federal agent who administered those rights knew that either Mitchell was in federal custody, or what he was telling Mitchell about *Miranda* rights was not true. (RT 3149-50.) Such a fundamental lie to someone in Mitchell's situation is unconscionable. The agent's admission that he knew he was

215

lying about something as basic as Mitchell's rights calls into question the credibility of all of the agent's other assertions. The Court issued its ruling on the agents' credibility approximately two weeks before Kirk admitted to having lied to Mitchell about his rights. (Dkt. No. 251.) As such, this Court should award no deference to that finding.

554. Additionally, the Court never addressed the impact of Kirk's admission to lying about the rights to which Mitchell was entitled on the voluntariness of Mitchell's statements. However, the Court did rely heavily on its finding that the FBI and Navajo Nation police had given Miranda warnings in finding that the statements at issue were voluntary. (*See* Dkt. No. 284.) Under these circumstances, Mitchell's statements to law enforcement should have been suppressed as involuntary.

## S.    Mitchell Was Incompetent from the Conclusion of the Guilt Phase Through the Penalty Phase, and Thus Deprived of His Constitutional Rights

555. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

556. Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

557. The United States Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S. Ct. 1373, 134 L. Ed. 2d

216

498 (1996) (citing *Medina v. California*, 505 U.S. 437, 453, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)).

558.   To be found competent for due process purposes, a defendant must meet two criteria:  (1) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and (2) "a rational as well as factual understanding of the proceedings against him."  *Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960); *see United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008), *mandate issued*.  These criteria do not include a necessary finding of "mental disease or defect."  Moreover, in two of the seminal United States Supreme Court cases, failure to hold a hearing on competence was found reversible despite psychiatric reports falling short of such findings.  *See Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975), and *Pate v. Robinson*, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966).

**1.    Doubt raised as to Mitchell's mental competency following the jury's return of a guilty verdict**

559.   On May 8, 2003, the jury returned guilty verdicts on all counts against Lezmond Mitchell.  (RT 3581-84.)  Later that afternoon, Mitchell for the first time expressed to the Court that he wished to waive his appearance for the penalty phase of his trial.  (RT 3597-3600.)  Mitchell was unable to clearly articulate any reason for wanting to waive his appearance to the Court aside from simply stating that he did not wish to attend.  The Court ordered him to come back the next day to discuss the matter further.  (RT 3599.)

560.   On May 9, 2003, Mitchell again addressed the court and stated that he wished to waive his appearance.  (RT 3604-20.)  He was again unable to clearly articulate why he did not want to attend aside from stating that he saw no relevance or benefit to attending the proceeding and he believed the jury had already made up

its mind.  (RT 3608-09.)  The Court engaged Mitchell in conversation, which primarily consisted of the Court asking Mitchell questions which prompted a one-word response, and then the Court spoke with Mitchell's attorneys who, for the first time, moved to withdraw from the case due to their inability to communicate with their client.  Learned counsel for Mitchell explained to the Court that he had tried to see Mitchell the previous day and Mitchell had refused to speak with him or the other attorneys.  (RT 3609-13.)  The Court denied the motion to withdraw due, in large part, to the assumption that Mitchell had no problem with his attorneys and that he would also refuse to attend or participate regardless of who was representing him.  (RT 3614, 3618-19.)  Counsel explained that Mitchell began expressing his wish not to attend before the jury returned their verdict (RT 3616), and that if Mitchell was going to act inappropriately or not dress for court, then trial counsel would support his appearance being waived.  (RT 3617.)  The Court stated that Mitchell has been respectful of the proceedings and she had no reason to believe he would disrupt the proceedings in any way.  (RT 3617.)

561.  On May 13, 2003, the day before the penalty phase was scheduled to begin, Mitchell again addressed the court, stating the he would not dress for court and that he still wished to waive his right to appear.  (RT 3663-74.)  Mitchell stated that he did not wish to be brought to court the next day and that he felt it was a waste of time.  (RT 3666-67.)  Trial counsel expressed to the Court that Mitchell still refused to speak to the attorneys or have any active role in his case. (RT 3670.)  Trial counsel explained that initially Mitchell expressed a desire to testify, but out of "despair or hopelessness or depression or whatever is motivating him, he's gone so far in the other direction."  (RT 3671.)  Further, trial counsel reported that Mitchell told him he had a violent interaction with the marshalls at the jail when he refused to leave his cell.  (RT 3673.)  Finally, trial counsel noted that

218

he had tried to give Mitchell some letters from relatives and friends, but Mitchell had just pushed the letters away and refused to read them. ( RT 3673.)

562.  On May 14, 2003, against the advice of both the Court and his attorneys, Mitchell officially waived his appearance for the penalty phase of his trial.  (*See* RT 3841-56, 3721.)  Trial counsel renewed his motion to withdraw from the case, largely because Mitchell still refused to communicate with any of his attorneys, and was again denied.  (RT 3851-53.)  Mitchell did not attend any of the penalty phase proceedings and only returned to court for the reading of his death verdict, six days later on May 20, 2003.

**2.  Trial counsel's failure to request a competency proceedings violated Mitchell's constitutional right to effective assistance of counsel, and to due process of law, and a reliable sentencing determination**

563.  To prevail on a claim of ineffective assistance of counsel, Mitchell must show that his representation fell below the objective standards of reasonableness dictated by prevailing professional norms and that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.  *Strickland v. Washington*, 466 U.S. at 687-88.  With regards to the first prong, it is Mitchell's burden to show that the challenged action could not be considered sound trial strategy.  *Id*. at 689.

564.  In 2002, the defense retained Barry Morenz, M.D., to psychiatrically evaluate Mitchell.  On March 3, 2003, Dr. Morenz sent his report to Mitchell's attorney.  (*See* Ex. 94, p. 1.)  There, Dr. Morenz's indicated that Mitchell admitted using heroin, methamphetamine, cocaine, and psychotropic pills while in custody at the Madison Street jail.  (*See* Ex. 94, p. 3.)  The report also indicates that Mitchell was often severely sleep-deprived, staying awake for three to four days at

a time.  Further, the report states that Mitchell was self-medicating by obtaining the Prozac from fellow prisoners.  (*Id*.)

565.   Mitchell's statements to Dr. Morenz are confirmed by Eric DeLuca.  Mr. DeLuca told post-conviction counsel that he was incarcerated with Mitchell in the Madison Street Jail at the time of Mitchell's trial in 2003.  Mr. DeLuca admits selling illegal narcotics in the jail, and regularly sold to Mitchell.  DeLuca reports that Mitchell regularly drank home-brewed alcohol in the jail and regularly purchased heroin from Mr. DeLuca in quantities sufficient to abuse the drug on a daily basis.  (*See* Ex. 97, ¶¶ 2-4.)

566.   Mitchell's defense team was aware of Mitchell's hardcore drug use beginning in his formative years.  (*See* Ex. 94, pp.15-16).  They were aware that his addiction did not end with his arrest and that he continued to abuse drugs in jail, feeding his addiction with powerful mind-altering narcotics.  (*Id*., p. 3.)

567.   On May 14, 2003, when Mitchell formally waived his appearance for the penalty phase, the Court asked to hear from trial counsel.  Instead of taking this opportunity to request a competency hearing, or at least request the Court inquire as to whether Mitchell was currently under the influence of narcotics, Mitchell's defense team supported waiving his appearance.  (RT 3849.)

568.   Trial counsel saw a drastic change in Mitchell over the course of his trial.  (RT 3609-13.)  Where he had once been cooperative, agreeable, respectful, and willing to go along with the Court's orders, Mitchell suddenly became severely withdrawn, totally irrational, and combative.  (RT 3673-74).  Despite the fact that trial counsel recognized that Mitchell's conduct could be a result of psychological illness (RT 3671) and their knowledge of Mitchell's hardcore drug addiction, trial counsel failed to request a competency proceeding and supported Mitchell's motion to waive his appearance.  This could not be said to be part of a sound trial

strategy as this course of action was, by both the defense's and the Court's own admissions, certainly not in Mitchell's best interest. (RT 3598, 3608-09, 3666-67, 3847-48.)

569. In this case, prejudice is shown by the fact that Mitchell's penalty phase proceeded without the initiation of a competency hearing. A finding of incompetence automatically results in reversal of the judgment – even absent a contemporaneous objection. Thus, prejudice is intrinsic. *See Pate*, 383 U.S. at 384 (failure to raise incompetence in trial court does not waive the issue on collateral review). This is because trial of an incompetent defendant is a violation of due process under the Fifth Amendment. *Godinez v. Moran*, 509 U.S. 389, 396, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993).

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper v. Oklahoma*, 517 U.S. at 354 (citing *Drope*, 420 U.S. at 171-72, and *Riggins v. Nevada*, 504 U.S. 127, 139-40, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992) (Kennedy, J., concurring)).

570. A defendant alleging an ineffective assistance of counsel claim must demonstrate that counsel's performance was deficient and that he suffered prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694. In the present case, Mitchell was not competent to waive his presence at sentencing or proceed with a sentencing proceeding due to his drug addiction. Had counsel raised this issue, a competency proceeding would have indicated this fact. Once the competency proceeding reported this issue, the sentencing proceeding could not have continued and Mitchell could not have been

221

sentenced. *Pate v. Robinson*, 383 U.S. 375. The proceedings would have been stayed until Mitchell was considered competent to proceed, at which point Mitchell would have, in all likelihood, proceeded as per his original intention of taking part in the sentencing proceeding which both the Court and counsel agreed could reasonably have been expected to influence at least one juror to vote against a death sentence. (RT 3665.)

571. Counsel's failure to raise this issue resulted in Mitchell being sentenced by a court lacking fundamental jurisdiction and deprived him of due process and full participation in the trial process.

### 3. Conclusion

572. The denial of his right to effective assistance of counsel as to this issue substantially prejudiced Mitchell, rendered the trial proceeding fundamentally unfair, eroded the reliability of the verdict and had a substantial and injurious effect on the verdict. But for the denial of this right, it is reasonably probable that a more favorable result would have been attained. Under these circumstances, the adversarial system completely broke down, and Mitchell was left without meaningful representation. Although many of trial counsel's errors were, by themselves, so egregious as to require reversal, the extraordinary accumulation of errors and omissions over the course of the trial created a total breakdown in the adversarial process, so that prejudice is conclusively presumed. *United States v. Cronic*, Mitchell has made that showing here. *Strickland v. Washington*, 466 U.S. 668.

573. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v.*

*Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668.  (*See* Claim AA, *infra*.)

**T.    Mitchell's Conviction and Sentence Should Be Reversed Because the Victims' Family's Conduct Unduly Prejudiced Mitchell at the Guilt and Penalty Phases**

574.   Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel in connection with the guilt and penalty phase of his trial.  *See Strickland v. Washington*, 466 U.S. at 688.

575.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

576.   Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

**1.    Mitchell's conviction and sentence should be reversed because family members wore buttons depicting the victims**

577.   The day before closing arguments was set to commence, trial counsel noted to the court that, during court proceedings from the week prior, members of the victims' family were "wearing buttons with the pictures of Mrs. Slim and Ms. Lee in the courtroom."  (RT 3409.)

578.   The controlling case on the prejudicial effect of a victim's family member wearing a pin depicting the victim is *Musladin v. Lamarque*, 427 F.3d 653 (9th Cir. 2005), *vacated on other grounds*, *Carey v. Musladin*, 549 U.S. 70, 127 S.

Ct. 649, 166 L. Ed. 2d 482 (2006).  Defendant Musladin was tried for murder in a California state court.  Before opening statements, the court denied Musladin's request for an order instructing family members not to wear the buttons.  During the fourteen-day trial, the victim's family sat in the courtroom wearing buttons with pictures of the victim displayed.  *Musladin*, 427 F.3d at 655.

579.   In 2005, the Ninth Circuit entertained Musladin's habeas petition under 28 U.S.C. § 2254, and granted relief, finding that the spectator's buttons created an unacceptable risk that impermissible factors would affect the jury, and thus were inherently prejudicial.  *Musladin*, 427 F.3d at 658-59; *see Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).  Citing *Estelle v Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976) (criminal defendant was required to appear before his jury in a prison uniform and shackles), and *Norris v. Risley*, 918 F.2d 828 (9th Cir. 1990) (the court permitting spectators at a rape trial to wear anti-rape buttons caused a risk of impermissible factors coming into play), *overruled in part by Carey*, 549 U.S. at 76, the Ninth Circuit held that there was no significant difference between *Williams* or *Norris* and Musladin's situation.  *Musladin*, 427 F.3d at 660.

580.   The United States Supreme Court granted *certiorari*, and noted that *Williams* and *Flynn* had considered prejudicial conduct by state actors, while *Musladin* concerned prejudicial conduct by private citizens.  The Court explained that it had not decided a case involving the "potentially prejudicial effect of *spectators*' courtroom conduct of the kind involved" in *Musladin*, and thus there was no Supreme Court law for the State to have unreasonably applied, under § 2254.  *Carey*, 549 U.S. at 75-76 (emphasis added).  The Supreme Court overturned the Ninth Circuit to the extent that the Ninth Circuit held that the state had unreasonably applied Supreme Court precedent.  *Carey*, 549 U.S. at 77.

581.    In Mitchell's direct appeal, the Ninth Circuit held that the family's buttons would be a problem "if it were 'so inherently prejudicial as to pose an unacceptable threat' to a defendant's right to a fair trial, meaning that 'an unacceptable risk is presented of impermissible factors coming into play' . . . " *United States v. Mitchell*, 502 F.3d 931, 971 (9th Cir. 2007) (quoting *Norris*, 918 F.2d at 830 and *Musladin*, 427 F.3d at 656-57).  The Ninth Circuit simply noted that "[a]ll the record reflects is that Mitchell's counsel told the court a week later, and in connection with a different matter, that some members of the victims' family were wearing buttons and that he and government counsel had worked it out informally.  There was no plain error."  *Mitchell,* 502 F.3d at 972.

582.    The Ninth Circuit stressed the deficiency of the record but, as the Supreme Court noted, the *Musladin* record was not much more detailed.  *Carey*, 549 U.S. at 73 n.1 (stating "[t]he record contains little concrete information about the buttons.  The buttons were apparently two to four inches in diameter and displayed only a photograph of [the victim].  It is not clear how many family members wore the buttons or how many days of the trial they wore them.").

583.    Given the comparatively similar records and the strikingly similar facts concerning Mitchell's and Musladin's respective trials, this Court must recognize the inherent prejudice to Mitchell and grant him an evidentiary hearing to develop this claim.  If, however, the Court finds the records are not sufficiently similar, then Mitchell contends that trial and appellate counsel's failures to acquire and provide one of the buttons to the Court to supplement the record constitutes ineffective assistance of counsel.

## 2.    Trial counsel provided ineffective assistance for failing to object in a timely manner to the family's conduct

584.   If this Court disagrees with Mitchell's position and finds *Musladin* is distinguishable from the circumstances of Mitchell's case, then Mitchell maintains that ineffective assistance of counsel caused the distinguishing factors.  While Mitchell's record admittedly "contains little concrete information about the buttons" (*Carey*, 549 U.S. at 73 n.1), this is largely because of trial counsel's omission.  At trial, trial counsel became aware of the buttons the victims' family members were wearing.  Instead of immediately bringing this issue to the court's attention and seeking to prohibit this conduct, making a full record, and requesting a limiting instruction, trial counsel merely tried to "work this out informally" with the prosecutor.  (RT 3409-10.)  It was only when the prosecution asked the Court to allow witnesses in the courtroom during closing argument, the week after the buttons were openly worn, did trial counsel make any sort of record of the family's prejudicial conduct.

585.   A defendant alleging an ineffective assistance of counsel claim must demonstrate that counsel's performance was deficient and that he suffered prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694.

586.   "Due process requires that the accused receive a fair trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. at 362.  The United States Supreme Court has ruled that "when the consequence of a courtroom practice is that an 'unacceptable risk is presented of impermissible factors coming into play,' there is 'inherent prejudice' to a defendant's

constitutional right to a fair trial and reversal is required." *Musladin*, 427 F.3d at 656 (quoting *Flynn*, 475 U.S. at 570).

587.   The Ninth Circuit unequivocally ruled in *Musladin* that where a court allows victim's family to wear buttons depicting the victim, the defendant's right to a fair trial by an impartial jury free from outside influences has been violated. *Musladin*, 427 F.3d at 654.  In the present case, however, it was not the court that perpetuated the prejudicial conduct, but trial counsel.  The Ninth Circuit has stated specifically that in response to such prejudicial conduct, "a reasonable jurist would be compelled to conclude that the buttons worn by [the victim's] family members conveyed the message that the defendant was guilty." *Id.* at 661.  The Eleventh Circuit has further acknowledged that similar prejudicial conduct not only communicates the defendant's guilt to the jury, but also a demand for the death penalty.  *Woods v. Dugger*, 923 F.2d 1454, 1459-60 (11th Cir. 1991).  Combining the Ninth and Eleventh Circuit standards, Mitchell easily shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland v. Washington*, 466 U.S. at 694, because reasonable jurors were compelled to vote for guilt and death as a result of trial counsel's failure to respond to the victims' family member's prejudicial conduct.

588.   The foregoing violations of Mitchell's constitutional rights, taken alone or in combination with the other errors alleged in the Amended Motion, constitute structural error and warrant the granting of this Amended Motion without any determination of whether the violations substantially affected or influenced the jury's verdict.  *See Brecht v. Abrahamson*, 507 U.S. at 637-38 & n.9.  However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations, singly and in combination with the other errors

alleged in this Amended Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Mitchell's rights had a substantial and injurious effect or influence on Mitchell's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

589. To the extent that this Court finds that this claim should have been presented earlier, all prior counsel rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668. (*See* Claim AA, *infra*.)

## U.    Counsel Provided Ineffective Assistance By Failing to Request the Trial Court Trifurcate the Proceedings

590. Mitchell's sentences and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. at 688. Trial counsel rendered ineffective assistance for failing to request the trial court trifurcate the proceedings (*i.e.*, bifurcate the penalty phase).

591. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

592. Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

593.    An allegation of ineffective assistance must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense at trial. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if it was "objectively unreasonable under the circumstances." *Id*. at 688.

594.    After the Supreme Court approved bifurcated proceedings in *Gregg v. Georgia*, 428 U.S. 153 (plurality opinion), federal death penalty cases in recent years have proceeded with bifurcated jury deliberations generally. The Federal Death Penalty Act of 1994 ("FDPA") provides that, if the defendant has been found guilty of a capital offense, the trial judge "shall conduct a separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C. § 3593(b). At this hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor," regardless of its admissibility under the Federal Rules of Evidence. § 3593(c). The government must prove, beyond a reasonable doubt, the existence of at least one of sixteen aggravating factors before the defendant is considered eligible for the death penalty. The defendant has the burden of proving, by a preponderance of the evidence, any mitigating factor. *Id*. The jury then considers all of the information presented during the hearing. If the jury finds true any aggravating factor, it must return "special findings" identifying the statutory and non-statutory aggravating factors it has unanimously found to exist, and also the mitigating factors that one or more jurors have found to exist. If no statutory aggravating factor is found beyond a reasonable doubt, "the court shall impose a sentence other than death." § 3593(d). If, however, the jury finds the requisite mental state and at least one statutory aggravating factor, then it "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" and, based upon this consideration,

229

recommend by unanimous vote "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." § 3593(e)

595.   *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), raises serious questions about the constitutionality of the unitary sentencing hearing, where the jury makes, in a single deliberative process, its "eligibility" decision (which under *Ring* should now have all the trappings of a guilt/innocence trial), and its "selection" decision.

596.   To the extent that FDPA's single sentencing hearing provisions survive constitutional challenge under *Ring*,[28] it is nonetheless necessary that courts structure the jury's deliberations so as to avoid the myriad problems associated with admitting information on one issue, such as a nonstatutory aggravating factor like victim impact, that is not relevant to another issue, such as a statutory aggravating factor related to the circumstances of the offense.  Several courts have ordered trifurcated proceedings for these reasons.  *See, e.g.*, *United States v. Natson*, 444 F. Supp. 2d 1296, 1309 (M.D. Ga. 2006); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1110-11 (N.D. Iowa 2005); *United States v. Mayhew*, 380 F. Supp. 2d 936, 955-57 (S.D. Ohio 2005); cf. *United States v. Jordan*, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005).

597.   Trial counsel failed to request a trifurcated proceeding, thus subjecting Mitchell to an overly prejudicial sentencing hearing that violated his constitutional rights under *Ring v. Arizona* and resulted in his death sentence. In the first phase of a trifurcated proceeding, the "merits" phase, the jury deliberates on the defendant's guilt or innocence of the charged offenses.  In the second phase, the "eligibility" phase, the jury determines whether the government has proven the mental state

---

[28]   Mitchell does not concede that the FDPA is facially constitutional.

factors[29] and the statutory aggravating factors beyond a reasonable doubt.  In the third phase, the "penalty" or "selection" phase, the jury decides on the nonstatutory aggravating factors and the mitigating factors, undertakes the process of weighing, and determines the sentence.

598.    Absent a trifurcated capital proceeding under the FDPA, a defendant is forced to have a jury decide whether the government has proven the remaining elements of a capital offense, *i.e.*, the defendant's eligibility for the death penalty, at the same proceeding where the jury ultimately decides whether to in fact impose such a punishment.  By allowing the jury's determination regarding death eligibility under the FDPA to be potentially tainted by evidence that relates to nonstatutory aggravating factors and the process of weighing the aggravating and mitigating factors, the FDPA commingles two fundamentally different decisions which, under *Ring* and the Constitution, must be kept separate: (1) whether the government has proven all elements of a capital offense beyond a reasonable doubt; and (2) if so, whether death or life without the possibility of release is the appropriate sentence.

1.    **To be constitutional under *Ring v. Arizona*, proceedings under the Federal Death Penalty Act must be trifurcated**

599.    It is now clear that statutory aggravating factors and the intent requirements of 18 U.S.C. § 3592 are elements of a charged capital offense because those factors serve to raise the lawful maximum penalty from life imprisonment to death.[30]  *Ring v. Arizona*, 536 U.S. 584; *see United States v. Allen*, 406 F.3d 940,

---

[29]    *Johnson* uses the term "gateway" factors to describe the mental state factors because that is how they are described under 21 U.S.C. § 848 – the death penalty statute for continuing criminal enterprise offenses.

[30]    This argument assumes, without conceding, that the weighing of all factors is not an element of a capital offense.

231

943 (8th Cir. 2005); *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004); *United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003); *United States v. Quinones*, 313 F.3d 49, 53 n.1 (2nd Cir. 2002).[31]  In light of *Ring*, and to properly meet the requirements of the Fifth, Sixth and Eighth Amendments, proceedings under the FDPA must now be trifurcated.

600.    As *Ring* held, a jury's decision regarding the presence of a statutory aggravating factor and the presence of the requisite mental state each involve a determination as to an essential element of the charged capital offense.  Such determinations must be made in a proceeding that occurs after the trial on guilt/innocence, but before, and separate from the proceeding where the jury ultimately decides whether to impose the death sentence.  Any less of a procedure violates the defendant's Fifth Amendment right to enter the "eligibility" phase cloaked in the presumption that he is innocent of the death penalty – a difficult presumption to maintain in the context of a capital case.[32]  It also violates the defendant's rights to procedural due process under the Fifth Amendment and his rights to trial by jury and confrontation under the Sixth Amendment.

601.    The presumption of innocence is a basic tenet of American law, *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 12 (1976), which "lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S. Ct. 394, 39 L. Ed. 48 (1895); *In re Winship*,

---

[31]    The Supreme Court denied *certiorari* in *Robinson*, *Higgs* and *Quinones*.

[32]    *See* Jesse Nason, *Mandatory Voir Dire Questions in Capital Cases: A Potential Solution to the Biases of Death Qualification*, 10 Roger Williams U. L. Rev. 211, 219 (2004) (summarizing research on how death-qualified jurors may presume guilt, resolve ambiguities against the defendant, more readily accept the government's version of events, distrust defense witnesses, fill evidentiary gaps with their beliefs that defendant committed the crime; and were more likely to infer premeditation).  *See also United States v. Green*, 324 F. Supp. 2d 311, 329 (D. Mass. 2004) (citing studies that raise problem with whether death-qualified juries are more conviction prone).

397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 36 (1976).  Under the presumption of innocence a defendant is presumed innocent until the prosecution proves all elements of the offense beyond a reasonable doubt.  For trials, a wide variety of procedures have evolved, which are designed to protect the presumption of innocence, hold the government to its burden of proof, and otherwise ensure a fair trial.  Chief among these are procedures governing the admissibility of evidence. Testimony, exhibits, and other evidence not relevant to an element of the offense is inadmissible.

602.   Now that "eligibility" factors are functional equivalents of an element of the offense, the principles of *Winship*, 397 U.S. 358, require that the court and the jury presume the defendant innocent of those elements unless the government has proven them to the jury beyond a reasonable doubt.  *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (state must prove every element that distinguishes lesser from greater crime).  A unitary capital sentencing proceeding, however, does not afford the kinds of procedural protections designed to protect the presumption of innocence.  In a unitary sentencing proceeding, the jury is permitted to hear a wide variety of information on matters not relevant to the mental state and statutory aggravating factors (the elements), such as victim impact, the defendant's prior convictions, and a host of other information about the nature and circumstances of the offense and the defendant.  Such information would rarely, if ever, be admissible in a trial-like proceeding designed to afford the defendant the full panoply of procedural protections commonly associated with the Fifth and Sixth Amendments.  *See Williams v. New York*, 337 U.S. 241, 246, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949) ("[t]ribunals passing on the guilt of a defendant have been hedged in by strict evidentiary procedural limitations"); *Huddleston v. United States*, 485 U.S. 681, 686, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988)

(extrinsic acts generally inadmissible unless relevant to motive, opportunity, or knowledge); *Old Chief v. United States*, 519 U.S. 172, 181, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997) (recognizing how prior convictions can taint fairness of proceeding); *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (Confrontation Clause of Sixth Amendment prohibits admission of testimonial statements not subject to cross-examination); *Sandstrom v. Montana*, 442 U.S. 510, 515, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979) (holding unconstitutional instruction that law presumes ordinary consequences of defendant's voluntary acts).

603.   For these reasons, the single sentencing hearing provision of the FDPA is at odds with *Ring*.  The Supreme Court clearly stated in *Ring* that a defendant holds a Sixth Amendment right to have the government prove death "eligibility" factors to the jury beyond a reasonable doubt.  The Court surely did not mean to provide such a right, but then deprive the defendant of all the procedural protections commonly associated with it, including the presumption of innocence and a host of other procedural protections such as the rules governing the admission of evidence.

604.   Mitchell's attorneys, however, failed to object to this single sentencing proceeding, thus perpetuating this drastic violation of Mitchell's constitutional rights.  This omission on the part of trial counsel was objectively unreasonable. Given that the constitutional rights implicated are basic tenets of criminal law, any reasonably competent criminal defense attorney would have advocated on behalf of Mitchell's rights.

234

## 2.    Counsel should have moved for trifurcation to avoid unfair prejudice, confusion of the issues, and misleading the jury

605.    Even if this Court rules that the single sentencing hearing provision of the FDPA does not collide with *Ring* or the Fifth Amendment's procedural protections, trial counsel should still have moved for trifurcated proceedings.

606.    The court in *United States v. Johnson* found authority for trifurcating the proceedings in the provisions of the FDPA governing the admissibility of information.[33]  362 F. Supp. 2d at 1110-11; *see also United States v. Bolden*, 545 F.3d 609, 618 (8th Cir. 2008) (holding that the FDPA does not require a single penalty phase and that trifurcation is permissible).  The court concluded that information relevant to the nonstatutory aggravating factors should be excluded from the jury's consideration of the mental state and statutory aggravating factors because the probative value of the information was substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

607.    The Second Circuit cautioned that district courts must carefully consider trifurcation, and explained that a "trifurcated proceeding allows a district court not only to avoid the admission of prejudicial evidence before the eligibility decision, but also to delineate clearly between the applications of the Confrontation Clause in the eligibility and selection phases."  *United States v. Fell*, 531 F.3d 197, 240 n.28, 239-40 (2d Cir. 2008) (internal citation omitted), *reh'g en banc denied*. In rejecting Fell's claim that the FDPA is unconstitutional under *Ring*, the Second

---

[33]    The Court in *Johnson* construed the provisions of 21 U.S.C. § 848 – a statute that sets out penalty procedures for murders committed as part of a continuing criminal enterprise.  The statute's provisions on the admissibility of information are similar to the FDPA's – the only difference being that before the court may exclude information under the CCE statute, it must find that the probative value of the information "substantially outweighs" its prejudicial effect. The FDPA, in contrast omits the phrase "substantially," giving the Court a broader basis to exclude information during the sentencing hearing.

235

Circuit explained that the ability to trifurcate the proceeding or to simply preclude proof of non-statutory aggravating factors during the eligibility phase when the evidence threatens to undermine the presumption of innocence, renders the FDPA constitutional. *Id*. at 240. Or put another way, without trifurcation the FDPA would be unconstitutional.

608. Mitchell's counsel did not avail itself of the remedies that render the FDPA constitutional, and as a result Mitchell was severely prejudiced. During Mitchell's sentencing hearing, in which the jury was expected to decide both eligibility for the death penalty and whether to impose the death penalty, the prosecution presented testimony of Leo Slim, the husband of victim Mrs. Slim and the mother of his seven children. (RT 3754-57.) The prosecution presented Geraldine Slim, the daughter of Mrs. Slim and Ms. Lee's aunt (RT 3757-65); Kimberly Houston, another daughter of Mrs. Slim and Tiffany's aunt (RT 3765-75); and Marlene Slim, Ms. Lee's mother and Mrs Slim's daughter. (RT 3775-81.) Each testified to the pain and suffering they experienced as a result of the murders of Mrs. Slim and Ms. Lee. This highly emotionally charged testimony made up the entirety of the prosecution's case at sentencing.

609. Mitchell's sentencing hearing was exactly the type the Second Circuit cautioned district courts to avoid. It consisted entirely of highly prejudicial evidence that was entirely irrelevant to Mitchell's qualification for death. The Second Circuit stressed that trifurcation would prevent unfair prejudice resulting from the consideration of "death selection" evidence before "death eligibility" has been determined, *Fell*, 531 F.3d at 240, but no such trifurcation was suggested in Mitchell's case. The fact of the matter is that the jury found statutory aggravating factors unanimously based upon evidence that would have been inadmissible under

236

the Federal Rules of Evidence.  If this is constitutional,[34] it is only so because Mitchell's attorneys could have moved for trifurcation, and the fact that they did not is deficient performance that prejudiced Mitchell.

610.   Victim impact information has an undue tendency to suggest decision on the mental state and statutory aggravating factors on an improper basis. *Johnson*, 362 F. Supp. 2d at 1106.  This evidence had a profound affect on the jury in Mitchell's case, as is evidenced by the prosecution's limited sentencing phase presentation, and the jury's resounding response to it.  Victim impact evidence can have unsurpassed emotional power on a jury even when limited in scope, amount, and length.  As Judge Bennett observed in *Johnson*:

> To pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction.  Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias – sympathetic or antipathetic, depending on whether one is considering the defendant or the victim's families . . .
>        Therefore, as a general matter – and certainly in this case – the danger of unfair prejudice arising from hearing victim impact' evidence or evidence on other 'nonstatutory' aggravating factors before the jury makes its determination on the defendant's 'eligibility' for the death penalty, on the basis of the 'gateway [mental state]' and 'statutory' aggravating factors, substantially outweighs any probative value of such evidence to the determination of the defendant 'eligibility' for a death sentence.

*Id*. at 1107-08 (citing *United States v. Gabe*, 237 F.3d 954 (8th Cir. 2001)).

611.   Having the jury decide the mental state and statutory aggravating factors before hearing victim impact evidence would have at least kept such

---

[34]   Mitchell does not concede that this is constitutional.

evidence from infecting the jury's deliberations on whether the government had met its burden of proving the "eligibility" factors.

612.    The need to avoid confusion of the issues under 18 U.S.C. § 3593, further should have motivated Mitchell's attorneys to move for trifurcating the proceedings and exclude from the jury's decision on "eligibility" factors any information on nonstatutory aggravating factors and mitigating factors.  By excluding extraneous information, the jury could have focused its attention on the government's proof of the statutory aggravating factors rather than the highly emotional evidence not relevant to this issue.

613.    Lastly, a trifurcated proceeding would have reduced the likelihood of the jury being misled by the multiple issues it faced under the FDPA.  *See* 18 U.S.C. § 3583 (danger of misleading the jury is grounds to exclude evidence).  As Judge Bennet wrote in *Johnson*:

> If the jury is permitted to hear information on all of the factors in one proceeding, the jury is reasonably likely to be misled into believing that all information is pertinent to the determination of all factors and the balance of factors, when the process under [the statute] is actually sequential and cumulative.  The jury must first find the defendant guilty; then must find one [mental state]; then must find at least one "statutory" aggravating factor; then may find one or more "non-statutory" aggravating factors and one or more mitigating factors; then must balance all of the factors to determine the appropriate penalty.

362 F. Supp. 2d at 1109.

614.    Findings from the Capital Jury Project lend further support to the conclusion that trifurcated proceedings would have helped lessen juror confusion about capital sentencing and increase juror comprehension of instructions.  Those findings reveal, among other things, grave problems with (1) jurors thinking that death is required upon proof of certain aggravating factors; and (2) jurors generally misunderstanding the complex instructions in a capital case.  *See generally* William

238

J. Bowers and Wanda D. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Criminal Law Bulletin 51, 63 (2003) (44% of capital jurors believed that death required when offense was "heinous, vile, or depraved"; only 30% of jurors understood that aggravation had to be proven beyond a reasonable doubt; and 50% erroneously believed that mitigation had to be proven beyond a reasonable doubt).

615.   Mitchell's counsel failed to move to trifurcate these proceedings.  This failure constitutes deficient performance in that it was objectively unreasonable under the circumstances.  Trial counsel was provided a witness list.  They knew well in advance that the prosecution had to prove statutory aggravating factors and they knew that the prosecution intended to call family members of the victims.  Instead of trying to separate what called for profoundly different evidence, trial counsel made no objection to the sentencing hearing and simply allowed it to proceed in this constitutionally deficient manner.

616.   Whether trial counsel's deficient performance is based upon failing to object under *Ring* to a single sentencing hearing or failing to request trifurcation, either formulation resulted in substantial prejudice to Mitchell.  Looking at nothing other than the transcripts and the jury verdict, it is clear that the jury was profoundly affected by the victim impact evidence.  Beyond the record, a single sentencing proceeding has several inherent problems that prejudiced Mitchell, and a trifurcated proceeding would have alleviated some of these problems.  First, a trifurcated proceeding, where the jury in the second phase focuses only on the government's burden of proving the mental state and statutory aggravating factors in order to determine the defendant's "eligibility" for the death penalty, would have focused the juror's attention on the fact that a finding of guilt on an aggravating factor does not mean that death is the required sentence.  Rather, if the jury had

239

been required to decide the defendant's "eligibility" for the death penalty, hear additional evidence only if they find him eligible, and return to deliberate in the "selection" phase, the fact that the finding of an aggravating factor, while necessary for imposition of the death penalty, does not require such would have been clarified. Second, a trifurcated proceeding would have permitted the Court to break the deliberative process into more manageable parts. The jury would not have been overwhelmed at one time by complex instructions about mental state, statutory aggravating factors, nonstatutory aggravating factors, mitigating factors, and weighing. And finally, as explained fully above, the jury would not have been unduly prejudiced by highly charged, emotional evidence that was totally irrelevant to the issue of eligibility. By breaking the process down, jurors would have better understood the Court's instructions and engaged in the sequential process contemplated under the FDPA.

### 3.   Conclusion

617.   In conclusion, the single sentencing provisions of the FDPA raises serious constitutional questions under *Ring*. A trifurcated proceeding would have permitted the Court to structure deliberations in a way to minimize the danger of unfair prejudice, confusion of the issues, and misleading the jury. The fact that the defense did not request such a proceeding prejudiced Mitchell and resulted in an unconstitutional death sentence.

## V.   The Manner in Which the Government Would Execute Movant Violates the Eighth Amendment

618.   Mitchell alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs to be used,

240

the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the Government would carry out the execution, would all result in the infliction of unnecessary pain and suffering violating the Eighth Amendment.

619.  In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

620.  Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

621.  While Mitchell's belief that the execution under the current lethal injection protocol would violate the Eighth Amendment, he believes this challenge is not appropriate at this time.

622.  First, since Mitchell's execution is far from imminent, the question is not yet ripe.

623.  Second, since the Supreme Court's decision in *Hill v. McDonough*, 547 U.S. 573, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006), a condemned inmate may bring a challenge to lethal injection in a separate civil rights action under 42 U.S.C. § 1983.

624.  Finally, the appropriate lethal injection procedure is currently under review.  This Court sentenced Mitchell to death under the FDPA, 18 U.S.C. §§ 3591-3598, in connection with his conviction on two counts of carjacking resulting in death, 18 U.S.C. § 2119(3).  According to the FDPA, 18 U.S.C. § 3596(a), the method of execution is to mirror that of the state in which sentence was imposed.  The Court sentenced Mitchell.  (9/15/2003 RT 11-17); *see also*

*United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007).  Therefore the Government should carry Mitchell's execution out in Terre Haute, Indiana, but in accordance with Arizona state law and Arizona's lethal injection protocol.  *See United States v. Hammer*, 121 F. Supp. 2d 794 (M.D. Pa. 2000).

625.   Following Arizona Criminal Code § 13-757(A): "[t]he penalty of death shall be inflicted by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death . . ."  Section 13-757 does not provide any further specifics on lethal injection.  *See* Ariz. Rev. Stat. § 13-757.  Mitchell does have the option of choose execution via lethal gas at least twenty days before the execution date.  Ariz. Rev. Stat.§ 13-757(B).

626.   Arizona condemned inmates are currently challenging the Arizona lethal injection protocol, however, in a 42 U.S.C. § 1983 action in the District Court for the District of Arizona.  *Dickens v. Brewer*, No. CV 07-01770 (D. Ariz. 2007).  The docket states that a Joint Report filed on April 9, 2009 is the most recent filing in the case, a hearing on the Defendant's motion for summary judgment has been set for June 24, 2009, and the Court has several unresolved issues yet to consider.

627.   Arizona condemned inmates are also challenging the Arizona lethal injection procedure in an Arizona Supreme Court.  *State v. Landrigan*, No. CR-90-0323 (2007).  Here, the docket shows that the most recent filing was an order denying the State's motion to lift Mr. Landrigan's execution warrant pending the conclusion of post-conviction relief matters filed in state superior court regarding the lethal injection procedure.

628.   Furthermore, federal condemned inmates are challenging the Government's lethal injection protocol, and until that the court resolves litigation,

there is no valid protocol under which Mitchell's execution could proceed. *Roane v. Holder*, No. 05-2357 (D.D.C. 2007).

629.   Mitchell will litigate this Eighth Amendment challenge when it is ripe.

630.   To the extent that this Court finds that this claim should have been presented earlier, all prior counsel who failed to present the claim after the facts on which it is based became known or should have been known rendered ineffective assistance in not asserting it sooner, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland v. Washington*, 466 U.S. 668.  (*See* Claim AA, *infra*.)

**W.    The Absence of a Principled Basis for Distinguishing Cases in Which the Federal Death Penalty Is Imposed from Those in Which it Is Not Imposed Renders the FDPA Unconstitutional**

631.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

632.   Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

633.   The Supreme Court has held that the Constitution will not tolerate sentences of death that are imposed arbitrarily or capriciously. *Furman v. Georgia*, 408 U.S. 238.  In *Eddings v. Oklahoma*, 455 U.S. at 112, the Court referred to the "flipside" of this approach, insisting "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."

634. The reality of the federal death penalty in practice is that there is no consistency or predictability in the manner in which federal judges and juries have imposed the federal death penalty. In fact, there is no consistency in the cases that proceed to trial compared to those that plead out. Included as Exhibits to this motion are summaries of the facts and circumstances of the present status or resolution of every authorized federal death penalty case from 1988 until 2004, organized as follows: Ex. 79, Federal Capital Prosecutions Awaiting Trial; Ex. 80, Federal Capital Defendants Who Died Before or During Trial; Ex. 81, Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons; Ex. 82, Federal Capital Prosecutions in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty; Ex. 83, Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other than Death; Ex. 84, Federal Capital Defendants Who Were Found Not Guilty of the Capital Charge or Were Innocent; Ex. 85, Federal Capital Defendants Convicted of a Lesser Offense; Ex. 86, Federal Capital Cases Where the Death Penalty Has Been Rejected by Juries or Judges: Ex. 87, Federal Capital Cases Resulting in a Sentence of Death; Ex. 88, Federal Capital Cases Resulting in Execution; Ex. 89, A Listing of Former Federal Death Row Inmates.

635. One cannot read these descriptions of the many ways in which man can demonstrate his capacity for inhumanity to his fellow man without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for indiscernible reasons, some defendants were sentenced to death, but the vast majority were not. If any basis can be distinguished, it is race and region.[35] Fairness and consistency are the

---

[35] As discussed previously in Mitchell's litigation, the invidiousness and irrationality of these factors is an additional reason that the federal death penalty is unconstitutional.

opposite of arbitrariness and caprice.  In the demonstrated absence of fairness and consistency, the federal death penalty must be set aside.

636.    This argument is not refuted by simply pointing out the difficulties inherent in comparing cases.  Selected summaries of the cases quickly put that overly simplistic argument to rest:

a.    *United States v. Timothy McVeigh* (D. Colo.).  The Oklahoma City bombing case.  168 dead.  Hundreds injured.  Tried, convicted, sentenced to death, executed.

b.    *United States v. Terry Nichols* (D. Colo.).  McVeigh's co-defendant.  Tried, convicted, sentenced to life.

c.    *United States v. Khalfan Mohamed and Rashed al`-Owhali* (S.D.N.Y.).  Two defendants associated with Osama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

d.    *United States v. Theodore Kaczynski* (E.D. Cal.).  The Unabomber.  Three murders by mailbombs.  Plea agreement.  Sentenced to life.

e.    United States v. Joseph Minerd (W.D. Pa.).  Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter.  Tried, convicted, sentenced to life.

f.    *United States v. Coleman Johnson* (W.D. Va.).  Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support.  Tried, convicted, sentenced to life.

g.    *United States v. Christopher Dean* (D. Vt.).  Defendant sent pipebomb through the mail killing victim and disfiguring victim's mother.  Plea agreement.  Sentenced to life.

h.      *United States v. Billy Cooper* (S.D. Miss.).  Carjacking killing of two victims.  Tried, convicted, sentenced to life.

i.      *United States v. Christopher Vialva and Brandon Bernard* (W.D. Texas).  Carjacking and double-homicide.  Tried, convicted, sentenced to death.

j.      *United States v. David Paul Hammer* (M.D. Pa.).  Prison inmate guilty of strangling to death cellmate at United States Penitentiary-Allenwood. Sentenced to death.

k.      *United States v. Michael O'Driscoll* (M.D. Pa.).  Prison inmate guilty of stabbing to death fellow inmate at United States Penitentiary-Allenwood. Same judge, same courtroom and same defense attorneys as *Hammer*.  Sentenced to life.

l.      *United States v. Storey* (D. Kansas).  Prison inmate with Aryan Brotherhood ties killed fellow prisoner at United States Penitentiary-Leavenworth. Plea agreement.  Sentenced to less than life sentence.

m.      *United States v. Douglas Black and Steven Riddle* (D. Colo.). Inmates at United States Penitentiary-Florence attacked two suspected "snitches," one killed one injured.  Plea agreements.  Substantially less than life sentences.

n.      *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (E.D.N.Y.).  Chinese gang members who kidnap, rape and murder victims held for ransom.  Fu Xin Chen and Jai Wu Chen entered plea agreements.  Attorney General withdrew death authorization shortly before Peng trial.  Peng convicted after trial.  All three sentenced to life.

o.      *United States v. Louis Jones* (N.D. Texas).  Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

246

p.      *United States v. Corey Johnson, James Roane, and Richard Tipton* (E.D. Va.).  Eleven drug-related murders.  Tried, convicted, sentenced to death.

r.      *United States v. Dean Anthony Beckford* (E.D. Va.).  Six drug-related murders.  Tried, convicted, life sentence.

s.      *United States v. Clarence Heatley and John Cuff* (S.D.N.Y.).  Fourteen drug-related murders.  Plea agreement.  Sentenced to life.

t.      *United States v. Thomas Pitera* (E.D.N.Y.).  Seven drug-related murders in organized crime context.  Victims tortured and bodies dismembered.  Tried, convicted, sentenced to life.

u.      *United States v. German Sinisterra and Arboleda Ortiz* (W.D. Mo.).  One drug-related murder and one attempted murder.  Tried, convicted, sentenced to death.

v.      *United States v. Kevin Grey and Rodney Moore* (D.D.C.).  Thirty-one drug-related murders.  Tried, convicted, sentenced to life.

w.      *United States v. Daryl Johnson* (N.D. Ill.).  Two drug-related murders.  Tried, convicted, sentenced to death.

x.      *United States v. Peter Rollock* (S.D.N.Y.).  Eight drug-related murders, including some ordered by defendant while incarcerated.  Plea agreement.  Sentenced to life.

y.      *United States v. Tommy Edelin* (D.D.C.).  Fourteen drug-related murders.  Tried, convicted, sentenced to life.

z.      *United States v. Reynaldo Villarreal and Baldemar Villarreal* (E.D. Texas).  Drug-related murder of law enforcement officer.  Tried, convicted, sentenced to life.

aa.    *United States v. Juan Raul Garza* (S.D. Tex.).  Three drug-related murders.  Tried, convicted, sentenced to death, executed.

bb.    *United States v. Anthony Jones* (D. Md.).  Six drug-related murders.  Tried, convicted, sentenced to life.

cc.    *United States v. Chevy Kehoe and Daniel Lee* (D. Ark.).  Three murders in connection with activities of white supremacist organization.  Tried and convicted together.  Kehoe – considered more culpable – sentenced to life.  Lee sentenced to death.

dd.    *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y.).  Millionaire Sikh businessman hired killers of two employees cooperating with authorities in criminal investigation of defendant.  Tried, convicted, sentenced to life.

ee.    *United States v. Trinity Ingle and Jeffrey Paul* (W.D. Ark.).  Murder of elderly retired National Parks employee.  Victim shot while bound and gagged.  At separate trials, Ingle was convicted and sentenced to life; Paul was convicted and sentenced to death.

ff.    *United States v. Kristen Gilbert* (D. Mass.).  A nurse murdered four patients and attempted to murder three more.  Tried, convicted, sentenced to life.

gg.    *United States v. LaFawn Bobbitt and Rashi Jones* (E.D. Va.).  Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

hh.    *United States v. Bille Allen and Norris Holder* (W.D. Mo.).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both sentenced to death.

637.    Ultimately, the full force of this argument derives from the cumulative effect of examining, in their entirety, the case-by-case summaries of authorized

cases compiled in the Exhibits.  By definition, since all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should be) the worst of the worst the federal system has to offer. Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (or would not) argue in summation, "If this case doesn't call for the death penalty, what case does?"  And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries returned life verdicts or plea agreements were offered and accepted.  If one cannot discern a principled basis for distinguishing between cases where death is imposed and cases where death is not, the death penalty falls as arbitrary and capricious.  If such a principled distinction exists, Mitchell challenges the Government to articulate it.  Should the government prove unable to meet their burden of showing a legitimate distinction, then Mitchell's sentence must be set aside.

## X.     A System Where the Death Penalty Is Sought on the Invidious Basis of Race, and the Irrational Basis of Geography, Should Not Be Enforced and this Court Should Vacate Mr. Mitchell's Sentence

638.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

639.   Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

249

### 1.    Background

640.    In a press conference that took place on June 28, 2000, President Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty." Responding to that question, the President had the following to say about the federal death penalty:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime. I've got a review underway of both those issues at this time.

Partial Transcript of the President's 06/28/2000 press conference.

641.    On September 12, 2000, the Department of Justice released a comprehensive study of how the federal death penalty has been administered from 1988 to the Summer of 2000 ("Ex. 73, DOJ Study").[36] The Department filed a supplemental report on June 6, 2001 after the change in administration.[37] The essence of the study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. As reported in the DOJ Study, after 12 years of discriminatory and irrational charging decisions, the federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on

---

[36]    Defendant has filed a complete copy of the DOJ Study as a Exhibit 73 to this motion.

[37]    The supplemental report ("Supplemental DOJ Study") is located immediately after the DOJ Study in Exhibit 73.

federal death row at that time had been sentenced to death in the South.  Virginia and Texas had contributed four defendants apiece.  No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.[38]

642.    In terms of which defendant actually faced the federal death penalty, the DOJ Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%).  (*See* Ex. 73, Table 1A, p. T-2.)  Thus, more than 70% of the federal defendants targeted for the death penalty were non-whites.

643.    In addition to the racial disparity in federal death-penalty prosecutions, the study revealed a regional bias to enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

a.    From 1995 onward, of the 94 federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.  (Ex. 73, p. 14.)

b.    Twenty-two federal districts had never submitted a case for review at all.[39]  (Ex. 73, p. T-59.)

---

[38]    In 2003, the year the Government chose to pursue a death sentence in Mitchell's case, federal death row had 38 residents: nine were white and 21 were African-American.  In the modern death penalty era, there have been three federal executions: one white man (Timothy McVeigh), one black man (Louis Jones) and one Latino (Juan Garza).  As of May 29, 2009, there are 59 inmates on federal death row.  The federal districts in three "death friendly" states – Texas, Virginia and Missouri – account for almost half of this population (22 out of 59).  Two of the three federal prisoners executed were sentenced to death in Texas.  Not so coincidentally, the states of Texas, Virginia and Oklahoma regularly "lead" the nation in carrying out executions.  (*See* Ex. C, ¶ 8.)  Federal districts in Texas, Virginia and Missouri account for approximately 30% of all federal cases authorized for capital punishment since 1988.

[39]    Any murder committed with a gun during a robbery is a potential federal death penalty case.  18 U.S.C. § 924.  In *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed

c.    Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[40] *Id.*

644.    The release of the report drew the following predictable public reactions from officials at the Justice Department and the White House:

> Saying she was 'sorely troubled' by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, *Reno Troubled by Death Penalty Statistics*, *N.Y. Times*, September 13, 2000.  The New York Times also reported the reaction of Deputy Attorney General Eric Holder, at the time the highest-ranking African American at the Justice Department:

> 'I can't help but be personally and professionally disturbed by the numbers that we discuss today,' Deputy Attorney General Eric Holder said.  'To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process.  Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity.'

---

in the course of the robbery of a restaurant.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.

[40]    The recommendation that accompanies a submission is of great importance.  In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  (Ex. 73, p. 43.)  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id.*  These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.  In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization.  The approval rate for those cases was 90%.  (Ex. 73, p. 10.)

*Id*. CNN, also reporting on the story, noted that Attorney General Reno wanted "a broader analysis."[41] White House deputy press secretary Jake Siewert responded to the release of the report in the following manner: " 'At first glance, those numbers are troubling. We need to know what's behind the numbers.' "[42] During his confirmation hearings, Attorney General Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." *See United States v. Bass*, 266 F.3d at 538 n.1.

645.   "Troubled" and "disturbed" public officials, however, do not cure constitutional violations. Mitchell is entitled to know what is "behind the numbers" and that, in the absence of a convincing race- and region-neutral explanation for the Department of Justice's capital-charging practices, his death-sentence must be reversed. Mitchell seeks a hearing on this issue.

**2.    The invidious circumstances of race-of-defendant and race-of-victim**

646.   Thirteen years ago, dissenting in *McCleskey v. Kemp*, Justices Brennan Marshall, Blackmun, and Stevens hypothesized an attorney-client conversation where an African-American defendant charged with capital murder asked his attorneys what the chances were that he would be sentenced to death. Based on the statistical analysis presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some point in the dialogue, trial counsel would have to level

---

[41] I  n *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *reversed*, 536 U.S. 862, 122 S. Ct. 2389, 153 L. Ed. 2d 769 (2002) (per curium), the Sixth Circuit quoted at length the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. *Bass*, 266 F.3d at 538.

[42]   Considering the impact of the study, Judge Sand in *United States v. Bin Laden*, 126 F. Supp. 2d 256, 258 (S.D.N.Y. 2000), found the statistical evidence "indeed troubling," but ultimately rejected a challenge to that capital prosecution.

with the client and tell him that race would play an important role – perhaps a determinative one – in the process of deciding whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey v. Kemp*, 481 U.S. 279, 322, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (Brennan, Marshall, Blackmun and Stevens, J.J., dissenting).[43]

647.   In truth, there is nothing that is either new or surprising about what the DOJ Study reveals (or about the present racial composition of federal death row). Attorneys in federal death penalty cases have been pointing out the issue of glaring racial disparity in the administration of the federal death penalty for years.  For just as long, Justice Department attorneys, pleading privilege, confidentiality and the end of civilization as we know it, resisted efforts to gather the kind of information that the Justice Department finally disgorged voluntarily with its 2000 Report.  *See*, *e.g.*, *United States v. Bradley*, 880 F. Supp. 271 (M.D. Pa. 1994).  When glaring racial disparities began to show up in the "early days" of the modern prosecution of federal death penalty cases, the House Subcommittee on Civil and Constitutional Rights investigated and concluded as follows:

> Race continues to plague the application of the death penalty in the United States.  On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims.  On the federal level, cases selected have almost exclusively involved minority defendants.

*Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the

---

[43]   After his retirement from the bench, Justice Powell stated that the greatest regret of his many years on the high court was that he had voted with the majority, and authored the Court's opinion, in the 5-4 decision upholding the death-penalty in *McCleskey*.  *See* John C. Jeffries, Jr., *Justice Lewis F. Powell, Jr.: A Biography*, pp. 451-52 (Fordham University Press 1994).

Judiciary, 103rd Congress, 2nd Session, March 1994. That report notes that as of 1994 there had been 37 defendants targeted for capital punishment under the § 848(e) scheme, of whom 33 (87%) were black or Hispanic. Earlier evidence of the race-effect of the death penalty was provided by the General Accounting Office in 1990. When Congress enacted the § 848(e) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty. 21 U.S.C. § 848(o)(2). The GAO in fact undertook that study and concluded as follows:

> Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.
>
> In 82 percent of the studies, race of victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks. This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques. The finding held for high, medium, and law quality studies.

*Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (GAO/GGD-90-57, Feb. 1990), p. 5. In his 1999 law review article, Professor Rory Little, writing with the perspective of one who had actually served on Attorney General Reno's Capital Case Review Committee, noted that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department. R.K. Little, *The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Role* 26 Fordham Urban L.J., 347, 450-90 (1999). With the resumption of federal executions now a matter of historical fact, this issue may no longer be swept under the rug.

648. In response to the larger DOJ Study and the June Supplemental report, Professor David Baldus undertook an analysis of the Ashcroft Justice Department's

rationale for the undeniable racial and regional disparities. (*See* Ex. 75.) That memorandum begins as follows:

> The following comments explain why in the face of the findings and data in the DOJ September 2000 report, the latest DOJ report utterly fails to convince me that there is no significant risk of racial unfairness and geographic arbitrariness in the administration of the federal death penalty.

(Ex. 75, p. 1.) Professor Baldus' first observation was of a decided white-victim effect in the federal death penalty, noting that "the U.S. Attorney charging and DOJ authorization rates are much higher in white-victim cases than they are in minority-victim cases." (*Id.*) Professor Baldus found a 16% differential in the authorization process, a difference statistically significant at the .001 level, the overall authorization rate for white-victim cases being 37% versus 21% in minority-victim cases. (*Id.*, p. 2.) The DOJ Study also documented race-of-victim effects in the actual imposition of death sentences, with death verdicts returned in white-victim cases two times as often as in minority-victim cases. (*Id.*)

649. Professor Baldus found, as well, that the practice of death-sentencing in the federal system was, as of the September 2000 report, largely a Southern phenomena and that the June 2001 Supplemental Report did nothing to address that issue and, instead, intermixed the issue of regional disparity in the federal death penalty with issues of racial disparities. (Ex. 75, p. 3.)

650. More than a century ago, in *Yick Wo v. Hopkins*, the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 6 S. Ct. 1064, 30 L. Ed. 220 (1886). In *United States v. Berrios*, the court commented:

256

> Nothing can corrode respect for a rule of law more than the knowledge that the government looks beyond the law itself to arbitrary considerations, such as race, religion, or control over the defendant's exercise of his constitutional rights as the basis for determining its applicability.

*United States v. Berrios*, 501 F.2d 1207, 1209 (2d Cir. 1974).

651.    The historical truth is that in the United States capital punishment and race have always been inextricably intertwined.  That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society.  *See*, *e.g.*, C.J. Ogeltree, *Black Man's Burden: Race and the Death Penalty in America*, 81 Oregon L. Rev. 15 (2002); G.L. Pierce, M. L. Radlet, *Race, Region, and Death Sentencing in Illinois*, 81 Oregon L. Rev. 39 (2002); S. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty*, 35 Santa Clara L. Rev. 433 (1995); D. Baldus, *Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing and the 'Impossibility' of its Prevention, Detection and Correction*, 51 Wash. & Lee L. Rev. 359 (1994); Bienen, Weiner, Denno, Allison and Mills, *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion*, 41 Rutgers L. Rev. 27, 100-57 (1988).

652.    In *Furman*, Justice Douglas traced at length this ugly correlation and concluded:

> In a Nation committed to equal protection of the laws there is no permissible 'caste' aspect of law enforcement. Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, lacing political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position.  In ancient Hindu law, a Brahman was exempt from capital punishment, and in those days, '[g]enerally, in the law books, punishment increased in severity as social status diminished.'  We have, I fear, taken in practice the same position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted.)  Indeed, even as late as 1991 – more than 15 years after *Furman* – the execution of a white man for the murder of a black man was front-page news as an event that had not occurred in the nation for half-a-century.  *See Rarity for U.S. Executions: White Dies for Killing Black*, N.Y. Times, September 7, 1991, p.1, col. 1.

653.    This preliminary showing, whether or not it continues to "disturb" or "trouble" anyone in the Justice Department, is sufficient to establish a colorable case of discrimination, and to shift the burden to the government to produce a credible non-discriminatory explanation for its practice of disproportionately seeking death sentences for minority defendants and to explain the arbitrary manner in which the federal death penalty has been administered.  *Batson v. Kentucky*, 476 U.S. 79, 93-94, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).  As a Native American/Pacific Islander growing up in the Navajo Nation, Mitchell is entitled to inquire further since, to all appearances, there is "a clear pattern, unexplainable on grounds other than race."  *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).  The burden is now properly on the government to explain and justify, if it can, its capital-charging policies.  If, however, the Government is unable to meet this burden, then Mitchell's sentence must be set aside.

## Y.    Mitchell's Sentence Is Unconstitutionally Discriminatory and Therefore Must Be Set Aside

654.    In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

655.   Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

**1.     Explicit statutory right to justice without discrimination**

656.   Subsection (f) of 18 U.S.C. § 3593 is entitled "Special precaution to ensure against discrimination," and provides that in any capital sentencing proceeding:

> [T]he court . . . shall instruct the jury that in considering whether the sentence of death is justified, it shall not consider the race . . . of the defendant or of any victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or victim may be.

657.   Moreover, each juror in an FDPA case is required to sign a certificate "that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation . . . no matter what the race . . . of the defendant or any victim may be." While the explicit provisions of this section deal with jury instructions and jury decision making, the purpose of this subsection is broader. This provision is unique in the Federal Criminal Code.  It demonstrates extreme sensitivity on the part of Congress to the danger of racial discrimination in capital prosecutions, and a commitment to eradicate any such discrimination.

658.   The Congressional debate on the death penalty provisions of § 848(e) – limited as it was – included extended discussion of the problem of racial discrimination, and of the Supreme Court's treatment of racial bias in the then-recent opinion in *McCleskey*.  *See*, *e.g.*, *Congressional Record*, 57484 (June 9, 1988) (Sen. Orrin Hatch, Utah, discussing the requirements for proof of

259

discrimination under *McCleskey*).  In particular, Senator Alphonse D'Amato of New York, the prime sponsor of the § 848(e) bill, emphasized, in conjunction with the enactment of § 848(o), that Congress intended to "take every step possible to eliminate discrimination by the juries, *by the prosecutors*, by the judges." *Congressional Record*, S15753 (Oct. 13, 1988) (*emphasis added*).  In the context of that debate, Senator D'Amato's comments reflect a clear legislative determination to take stronger measures than those already embodied in *McCleskey* and to eliminate discrimination in capital charging as well as capital sentencing.  They indicate that a federal capital defendant has an affirmative *statutory* right to justice without discrimination.

### 2.    Supervisory powers

659.    Moreover, regardless of the text of § 3593(f), this Court has the independent authority to curb charging discrimination and regional caprice by invoking its supervisory powers over the administration of federal criminal justice:

> '[G]uided by considerations of justice,' *McNabb v. United States*, 318 U.S. 332, 341 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.  The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights [citations omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury. [Citations omitted]; and finally, as a remedy designed to deter illegal conduct [citations omitted].

*United States v. Hastings*, 461 U.S. 499, 505, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983).

660.    A court's supervisory authority to take action "not specifically required by the Constitution" is necessarily broader than its authority to enforce particular constitutional guarantees.  In state prosecutions, state courts exercise this general supervisory power, and federal courts (on *certiorari* in the Supreme Court

or in habeas corpus) are restricted to enforcing the Constitution. In federal prosecutions, the federal courts exercise both functions simultaneously. This is why, as the Sixth Circuit noted in *United States v. Robinson*, 716 F.2d 1095, 1100 (6th Cir. 1983), when a "case is before the court on direct review, not habeas corpus relief, the standard of review is more stringent." *McCleskey*, of course, was a review of state proceedings in habeas corpus. The federal discrimination complained of here is subject to a "more stringent" standard of review.

## Z.    By Omitting the "Plain-error" Review, Congress Has Failed to Provide for Meaningful Appellate Review, and Therefore the FDPA Is Unconstitutional

661. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

662. Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

663. Meaningful appellate review is an indispensable component of a constitutional death penalty scheme. Such review provides a necessary check on the arbitrary and capricious infliction of the death penalty. *Parker v. Dugger*, 498 U.S. 308, 321, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"); *see also Clemons v. Mississippi*, 494 U.S. at 749 ("this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency").

664.   In enacting the FDPA, Congress actually curtailed the scope of appellate review and, thereby, rendered the statute unconstitutional.  The relevant section reads as follows:

> . . .
>
> (b)   Review. – The court of appeals shall review the entire record on the case, including –
> (1)   the evidence submitted during the trial;
> (2)   the information submitted during the sentencing hearing;
> (3)   the procedures employed in the sentencing hearing; and
> (4)   the special findings required under section 3593(d).
>
> (c)   Decision and disposition. –
> (1)   The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports an aggravating factor required to be considered under section 3592.
> (2)   Whenever the court of appeals finds that –
> (A)   The sentence of death was imposed under the influence passion, prejudice, or any other arbitrary factor;
> (B)   the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or
> (c)   the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

18 U.S.C. § 3595 (emphasis added).

665.   By its plain language, the above-quoted provision precludes plain-error analysis by a court of appeals reviewing a capital case.  *See* Fed. R.

App. P. 52(b).  The doctrine of plain error is available in all criminal appeals, and gives an appellate court the option of noticing obvious errors that were not brought to the attention of the district court.  *See*, *e.g.*, *United States v. Frady*, 456 U.S. 152, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982); *Silber v. United States*, 370 U.S. 717, 82 S. Ct. 1287, 8 L. Ed. 2d 798 (1962).  In *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993), the Court held that an appellate court may reverse under plain error where: (1) there is an error; (2) the error is "obvious;" (3) the error affects substantial rights; and (4), the error " 'seriously affects the fairness, integrity or public reputation of the judicial proceedings. '"  *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)).

666.  By failing to allow for plain-error review, the FDPA ignores the line of Supreme Court cases requiring meaningful appellate review as a pre-condition to a finding that a death-penalty scheme is constitutional.  It also ignores the fact that the Supreme Court has repeatedly recognized that "death is different" and, in recognition of that difference, has required heightened standards of reliability to justify death verdicts.  A death-verdict cannot be considered reliable if it was brought about by an error that was obvious, affected substantial rights and seriously affected the fairness, integrity or public's view of the judicial proceedings, even if that error was not raised before the district court.

667.  By limiting the scope of appellate review to two areas, evidentiary sufficiency and the absence of wholly arbitrary factors, Congress accomplished its political agenda of facilitating executions, but failed in the process to comply with the commands of the Supreme Court.  Additionally, for Congress to have singled out death-sentenced federal prisoners for diminished appellate review violates equal protection since Congress may not single out one class of inmates for such

263

diminished review while leaving open existing remedies to all other federal prisoners. *Cf. Lindsey v. Normet*, 405 U.S. 56, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972). An individual's interest in his or her own life is fundamental. Thus, in the absence of some compelling governmental interest, this distinction may not stand.

668. A statute that requires an appellate court to affirm a death verdict which was returned as a result of plain error in the proceedings below is antithetical to concepts of heightened reliability, meaningful appellate review, and equal protection. Thus, an order should be entered declaring the statute unconstitutional.

## AA. <u>Mitchell Was Deprived of His Right to Effective Assistance of Appellate Counsel</u>

669. Mitchell's convictions, sentences, and death judgment violate the Fifth, Sixth, and Eighth Amendments of the United States Constitution because Mitchell was deprived of his right effective assistance of appellate counsel. *Strickland v. Washington*, 466 U.S. 668; *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) (*Strickland* applies to ineffective assistance of appellate counsel).

670. In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

671. Those facts and allegations set forth in the Amended Motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

672. Appellate counsel has no burden to raise issues that are frivolous or untenable, and need not raise every single possible issue. *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983); *Gustave v. United States*,

264

627 F.2d 901, 906 (9th Cir. 1980); *Turner*, 281 F.3d at 872.  However, where an issue is legally valid and would have merited relief had it been presented in a timely fashion, a claim of ineffective assistance of appellate counsel is appropriate. *Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991).  Given that the *Strickland* standard of deficient performance plus prejudice is applicable to appellate counsel, *Turner*, 281 F.3d at 872, where an appellate issue merits relief, but was never raised, appellate counsel was ineffective for failing to raise that claim.

673.   In the event that this Court rules that any otherwise meritorious claims raised above should have been presented at an earlier stage, all prior counsel rendered ineffective assistance in failing to raise the claims in question in a timely fashion.  *See Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

**BB.   The Cumulative Impact and Effects of Constitutional Errors at Each Phase of His Trial Require Reversal of His Conviction and Sentence**

674.   Mitchell's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his Fifth, Sixth, and Eighth Amendments and decisional law, because there are multiple instances of manifest error in Mitchell's pre-trial, trial, appeal, and post-conviction challenges.  Each of the numerous errors discussed in this Amended Motion, and the previous appellate briefs filed by Mitchell, challenging his conviction and sentence had a substantially prejudicial effect, with each contributing an essential part to either the finding of guilt or the determination in favor of the death penalty or the affirmance of the conviction and sentence.  Had even a few of these errors not occurred, the outcome,

265

in all probability, would have been a more favorable guilt, or at least penalty, verdict.

675.   In support of this claim, Movant alleges the following facts, among others to be presented after full discovery, investigation, access to this Court's subpoena power, and an evidentiary hearing.

676.   Those facts and allegations set forth in the amended motion, declarations, claims of constitutional violations, and the accompanying exhibits are incorporated by reference as if fully set forth herein to avoid unnecessary duplication of relevant facts.

677.   In considering Mitchell's claims, the Court is required to examine the impact of the alleged errors cumulatively to determine whether Mitchell has been prejudiced.  *Phillips v. Woodford*, 267 F.3d 966, 985 (9th Cir. 2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted."); *United States v. Green*, 648 F.2d 587, 597 (9th Cir. 1981) (reversing judgment where although "some of the errors . . . could be considered harmless in isolation, the combination of errors" prejudiced defendant); *Ewing v. Williams*, 596 F.2d 391, 395 (9th Cir. 1979) ("prejudice may result from the cumulative impact of multiple deficiencies").

678.   Counsel's failures to conduct adequate guilt and penalty investigations and to prepare for trial intensified the harms caused by other errors and defects in the proceeding.  The combined effect of counsel's inadequate performance and the other errors at trial compel a reversal of the conviction and sentence.  *See, e.g.*, *Phillips*, 267 F.3d at 986 ("[c]onsidering the prejudice that might well have resulted if [defendant's] claim of ineffective assistance of counsel proves to be valid . . . together with the prejudice that might well have resulted from the use of [Colman's] false testimony, we conclude that [defendant] has presented a colorable

266

claim that the combined effect of the alleged constitutional violations is sufficiently prejudicial" to warrant an evidentiary hearing); *Mak v. Blodgett*, 970 F.2d 614 (reversing death judgment because of cumulative prejudicial effect of wrongful exclusion of evidence, faulty jury instruction and counsel's failure to present mitigating evidence to humanize the defendant); *see also Gonzalez v. McKune*, 247 F.3d 1066, 1078, *vacated in part*, 279 F.3d 922 (10th Cir. 2001)) ("we can see no basis in law for affirming a trial outcome that would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a [Movant's] claim for habeas relief").

679.   The cumulative effect of the errors affecting the guilt phase was to "provide[] a trial setting that was fundamentally unfair" on the question of Mitchell's guilt or innocence on the underlying charges and the truth or falsity of the special circumstance allegations, in violation of the Fifth, Sixth, and Eighth Amendments.  *Cooper v. Sowders*, 837 F.2d 284, 288 (6th Cir. 1988). Accordingly, reversal of Mitchell's conviction is required.

680.   The cumulative effect of the errors affecting the penalty phase similarly deprived Mitchell his rights to a fundamentally fair proceeding and a reliable determination that death was the appropriate sentence, in violation of the Fifth, Sixth, and Eighth Amendments.  *See, e.g.*, *Johnson v. Mississippi*, 486 U.S. 578; *Caldwell v. Mississippi*, 472 U.S. at 329; *Lockett v. Ohio*, 438 U.S. 586. Reversal of the penalty is therefore required as well.

681.   While the Government may urge that each of these errors, viewed individually, was harmless or not prejudicial, the cumulative effect of the multiplicity of errors cannot be ignored.  In order to meet the special need for reliability in any capital murder conviction, the cumulative effect of multiple individual errors must be reviewed.  *See Johnson v. Mississippi*, 486 U.S. 578; *Mak*

*v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992); *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983).

682.   The totality of errors, by their number and importance, totally skewed the guilt and penalty determination so as to greatly increase the probability that the jury would return a guilty verdict, that it would recommend the imposition of the death penalty on the basis of improper considerations, and that the unsound conviction and sentence would be affirmed.  The result was a trial and appeal process that was so fundamentally unfair that setting aside the guilt and penalty phase verdicts is required.

683.   These violations of Mitchell's constitutional rights warrant the granting of this Amended Motion without any determination of whether those violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. at 638 n.9.  Furthermore, the constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  In any event, the violations of Mitchell's rights had a substantial and injurious effect or influence on the guilt and penalty judgments, and resulted in a miscarriage of justice.

## IV.
## PRAYER FOR RELIEF

Wherefore, movant Lezmond Mitchell respectfully moves this Court to:

684.   Vacate his conviction and death sentence;

685.   Permit Lezmond Mitchell sufficient time to file such amendments to this Amended Motion as may be necessary to bring all proper matters before this Court and ensure a reliable and fair resolution of his claims for relief;

686.   Grant Mr. Mitchell an evidentiary hearing on all claims raised herein;

268

687.   Grant Mr. Mitchell leave to pursue such discovery as may be necessary to fully develop the facts in support of his claims for relief;

688.   Grant Mr. Mitchell leave to file briefing on the merits of the issues in his Amended Motion;, and,

689.   Grant such other relief as may be appropriate.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  November 12, 2009          By   */s/ Statia Peakheart*
                                        STATIA PEAKHEART
                                        Deputy Federal Public Defender

269

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

VINCENT Q. KIRBY, AUSA

I hereby certify that on November 12, 2009, I served the attached document by mail on the following, who are not registered participants of the CM/ECF System:

Capital Case Staff Attorney
Evo A. De Concini U.S. Courthouse
405 West Congress Street, Suite 1500
Tucson, AZ 85701-5010

_____/s/ AMY REEDY_____

270