## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>LEZMOND CHARLES MITCHELL | Case No.: CV-09-8089-MHM |

**Exhibits 135-142 in Support of Amended Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Or, in the Alternative, Pursuant to 28 U.S.C. § 2241**

--------------

**Filed Pursuant to Rule 15(a)(1),
Federal Rule of Civil Procedure**

SEAN KENNEDY (Calif. Bar No. 145632)
Federal Public Defender
STATIA PEAKHEART (Calif. Bar No. 200363)
Deputy Federal Public Defender
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:   (213) 894-0081

Attorneys for Defendant-Movant
LEZMOND CHARLES MITCHELL

*UNITED STATES v. LEZMOND CHARLES MITCHELL*
CV09-8089-PCT-MHM(MEA)

EXHIBITS 135 - 142 IN SUPPORT OF
MOTION TO VACATE SENTENCE

135.   Declaration of Pablo Stewart, M.D., 11-12-2009

136.   Declaration of Jakegory Nakai, 10-06-2009

137.   Declaration of Jimmy Nakai, Jr., 09-29-2009

138.   Death Certificate of Foster Hemil Jr.

139.   Declaration of Jonathan Arden, M.D., 10-31-2009

140.   Declaration of Mónica Giner, 11-04-2009

141.   Declaration of Thomas Fedor, 11-04-2009

142.   Sample juror questionnaire used at trial.

## DECLARATION OF PABLO STEWART, M.D.

I, Pablo Stewart, M.D., declare:

1)      I am a psychiatrist licensed by the State of California and Hawai'i.   I list my education, publications and professional experience in my curriculum vitae, attached to this report as Exhibit A.

2)      Counsel for Mr. Mitchell, the Office of the Federal Public Defender in Los Angeles, California, retained me to address three questions.   First, in light of Mr. Mitchell's social history, his long history of substance abuse and alcohol abuse, and the evidence of his intoxication at the time of the capital offense, what was his mental state at the time of the capital offense.   Second, how did his substance dependence, intoxication, and withdrawal affect Mr. Mitchell post-arrest – including his capacity to waive rights knowingly and intelligently and his capacity to provide reliable information when interrogated.   Third, how did Mr. Mitchell's substance use, pretrial and during his trial, affect his capacity to assist trial counsel and to waive constitutional rights, including whether there was enough evidence to raise questions regarding Mr. Mitchell's competency.

3)      In conducting my evaluation and reaching my opinions, which are expressed below, I reviewed and relied on the materials listed in Exhibit 2.   I interviewed separately Mr. Mitchell and his mother. Sherry Mitchell.

1

**Ex 135 - 1722**

## SUMMARY OF MR. MITCHELL'S LIFE HISTORY

4)      Abuse, neglect and substance abuse mark Lezmond Mitchell's childhood and adolescence.   Mr. Mitchell's mother Sherry cared for him until he was a toddler then gave him to her own abusive mother to raise.   Mr. Mitchell's maternal grandmother Bobbi was relentlessly abusive and unstable toward her own children, Sherry and Auska, and her mistreatment continued with Mr. Mitchell. When Bobbi left the state for another job, Mr. Mitchell's maternal grandfather George took over his care, although Bobbi and Sherry visited the home on weekends and holidays.   Conflict and instability was a constant.   As a child and adolescent, Lezmond witnessed vicious arguments – often lasting the entire day or weekend – between Bobbi and Sherry, Bobbi and George, and Sherry and George. Lezmond even heard his grandmother, Bobbi accuse his mother of a sexual relationship with George, her own father.   Lezmond changed schools and homes seven times between kindergarten and fourth grade.   By all outward appearances, Sherry, Bobbi and George Mitchell valued education, yet none of them focused on his educational and developmental needs; instead, their attention was on their own education and careers.   In early adolescence, Lezmond began to use substances to manage his feelings and life circumstances.   At age seventeen, Lezmond saw a mental health counselor who noted Lezmond's suicidal ideation, disturbed behavior

2

and drug use.   The psychologist concluded that Mr. Mitchell needed intensive psychotherapy, including residential treatment.   Again, in a family with many outward appearances of educational and intellectual advantage, even success, no one ensured that Mr. Mitchell got the treatment he needed.   In the few months preceding and up to the capital offenses, Mr. Mitchell's addictions escalated to large amounts of dangerous substances, such as methamphetamine and a mixture of marijuana and crack cocaine.   By the time of the murders, Lezmond Mitchell was sleep-deprived due to the drug binging, and ingesting as much crack, marijuana, alcohol and methamphetamine until the supply was exhausted, then using as much as he could when he obtained more.

5)    Lezmond Mitchell is a twenty-seven-year-old condemned inmate incarcerated on death row in Terre Haute, Indiana, since December 2003.   Born in September 1981, Lezmond is one-fourth Navajo, one-fourth white, and one-half Marshallese.   Lezmond self-identifies as Navajo.   His maternal grandparents Bobbi and George were his primary caretakers, both separately and together. George Mitchell was full-blooded Navajo, and Bobbi Jo Mitchell was white, although she claimed a heritage from another Native American tribe.   Both of Lezmond's grandparents are deceased.   Lezmond's mother, Sherry Mitchell, presently lives on the Navajo Reservation.

3

Ex 135 - 1724

6)    Lezmond never met his father, Foster Hemil, a Marshall Islander, nor his paternal family.   Lezmond's half-brother reports that their biological father "drank beer like . . . water."  (Ex. 101, Declaration of Lezmond Hemil, ¶ 4.) Foster Hemil's death certificate lists the cause of death as liver failure secondary to chronic liver disease, which was itself due to a chronic and active Hepatitis B-infection.   (Ex. 35, Death Certificate of Foster Hemil.)   These diseases are typical of the most severe alcoholics.

7)    Mr. Mitchell was born in Fort Defiance, Arizona.   His mother Sherry Mitchell reports that she "nearly died" due to blood loss during Lezmond's delivery, and that her son had a "cranial hematoma because he got stuck."   The delivery records are sparse but from the partially-recorded Apgar Score and Sherry's postpartum hemorrhage, both noted in the medical records, inferring that Mr. Mitchell was a breech delivery and the hematoma was the result of a forceps delivery are reasonable conclusions.

8)    After his birth, Mr. Mitchell and his mother lived in Chilchinbito, Arizona, on the Navajo Reservation.   Sherry established a home for herself and her son, away from her parents.   She attended college and attempted to balance the needs of Lezmond with her education.   Eventually, Sherry decided she could not maintain herself, her toddler son and her education, and became reliant on her

parents for Lezmond's care.   Sherry knew that her mother was abusive, demeaning, argumentative and violent because, as a child, she had received such mistreatment herself from her mother, and her mother continued to mistreat her the same way, even while she was pregnant with Mr. Mitchell.   Nevertheless, Sherry gave up Lezmond to her mother's care.

9)    As a young child, one of Mr. Mitchell's earliest memories is the pain of losing his mother and not understanding why he could not be with her.   Other early memories are witnessing Bobbi hit his mother with her bare hands and anything she could grab in the midst of fights, and the vicious verbal arguments between his grandparents and his mother.

10)    Mr. Mitchell related that Bobbi was the main figure in his life; he remembers the good times but they were "outweighed by bad times."   His earliest memory of Bobbi was when he and George lived in Sanders, Arizona, and Bobbi and Sherry were visiting.   Five-year-old Lezmond was lying on the floor, trying to hit flies with a swatter.   He remembers that Bobbi and George were arguing, and Sherry and Bobbi were about to start fighting.   After a fly landed on Bobbi a second time, she grabbed the swatter and hit Lezmond on his back and legs; he covered his head with his hands and she hit his hands too.   He remembers that his

5

mother and grandfather sat and watched, neither told Bobbi to stop.   This was not the last time Bobbi would hit Lezmond.

11)    Mr. Mitchell remembers that Bobbi did not always hit him (by his accounting, she beat him "only a few times a month"), but when she did, "her beatings really made an impression on you."   She hit him on the mouth or wherever she could on his body, she often aimed for his head and missed only because he reacted quickly.   When Bobbi was younger, she hit him with her hands but after she developed arthritis, she hit him with whatever she picked up:   vacuum hose attachments, small appliances, knick-knacks.   She threw a book at his head several times.

12)    Before Mr. Mitchell started kindergarten, his grandfather George moved to Sanders, Arizona, and took Lezmond with him.   Sherry visited her son occasionally.   Mr. Mitchell's sadness about his mother's disappearance from his life continued.   Midway through the school year, George moved to Kin-Li-Chee, Arizona, also on the Reservation, where Lezmond and George lived with Bobbi. Mr. Mitchell remembers the constant fighting; his grandparents fought verbally and physically, and frequently.

13)    Added to the physical and verbal abuse Mr. Mitchell witnessed and experienced was Bobbi's cruelty.   Sherry reports that, among their acquaintances,

6

some thought that Mr. Mitchell was George's son, rather than his grandson.   Bobbi apparently fueled those rumors and more than once accused Sherry of having a sexual relationship with her father.   George's behavior with Sherry as a young woman, as well as his own insinuations about their relationship during arguments with his wife, makes it difficult to be sure of the truth.   (Ex. 105, Declaration of Sherry Mitchell, ¶¶ 11, 12.)   As a child, Mr. Mitchell heard these accusations but did not understand them until some years later.   Bobbi's cruelty took another twist when Mr. Mitchell was in the seventh grade.   She said to Mr. Mitchell, angrily: "Who knows who your father is, your mother was raped, you know!"   He remembers that Bobbi's vicious and untrue words "knocked me for a loop, I couldn't think of what to say."

14)    In 1988, Mr. Mitchell moved to Hanford, California, where Bobbi was employed as a special education teacher.   Lezmond began kindergarten again; Sherry told him that he had to repeat kindergarten because he was immature.   Sherry lived with them for a year, and she worked as a secretary.   George Mitchell visited them during summer and holidays.

15)    When he was in the first grade, Mr. Mitchell joined T-ball.   He played T-ball for only one season, however, because Bobbi complained about having to take him to practice or attend games.   When he was in the sixth grade, Sherry

7

Ex 135 - 1728

forced him to play Little League, although he did not enjoy it.    While she had attended all Lezmond's T-ball games, Sherry watched only two or three of his twenty-five or so Little League games.    By the time Lezmond was in grade school, his mother had disengaged from his life; attendance at a ball game was not a priority for her.    When Lezmond played football for his high school, the team had problems fielding enough players every game.    That meant Lezmond often played, yet no one from his family ever took the time to attend one of his games.

16)    Mr. Mitchell stayed with his grandmother in California for three years, until 1991.    During that time he attended three different elementary schools, transferring from public to private and back to public school.    The changes in schools added to the chaos in Lezmond's home.    Bobbi beat him regularly, with any thing that was handy – broom handles, the vacuum cleaner hose, a ruler.    Mr. Mitchell remembers a time when he did not hear his grandmother calling him from the other room because he was listening to a cassette player with headphones. Bobbi came into the room, tore the headphones from his head and yelled at him. The cassette player hit Lezmond in the back – he had rolled over just in time to avoid it hitting his head.    Sometimes the beating came when Lezmond had problems at school; other times, the beatings were unrelated to anything.

Ex 135 - 1729

Lezmond's school records of this era reflect his upheaval in noting his problems listening, following instruction, behaving in class and self-control.

17)    By outward appearances, Bobbi was concerned, well-educated in the development of healthy children, and a seemingly-ready participant in Lezmond's education.   Mr. Mitchell, however, remembers that Bobbi was "night and day" around others – at home, she was erratic, angry and a source of intense stress and violence.

18)    Bobbi was cruel to Lezmond, berating him about his weight, telling him he would never amount to anything.   Bobbi *and* Sherry called him terrible names beginning when he was a child and continuing for as long as they could. They called him *little shit*, *motherfucker*, *little fucking bastard*, *dickhead*, *shithead*, *son of a bitch*, and *fucking asshole*.   He learned to retort, "Yeah I'm a little shit [or whichever name he was called], what're you going to do about it!"   Mr. Mitchell reports that his grandfather *only* called him a *dumb ass*, and would demand, *what are you, stupid!* or tell him, *smart people don't do that*.   He learned not to cry because "no one gave a shit about that."   He also remembers that none of them spoke up for him or intervened by asking the other to stop calling him names.   The verbal abuse was not limited to Mr. Mitchell – Sherry and Bobbi called each other *whore* or *bitch* during their fights.

9

19)    Lezmond's memory of this time was the constant uncertainty of what would happen when he went home because of the verbal and sometimes physical abuse, and the emotional abuse that he had to endure.    George, Sherry and Bobbi came together for the holidays.    He remembers that, "Holidays sucked because of the fighting.    It seems like the fights were started on her [Bobbi's] part with everyone.    You couldn't get through one holiday without a fight.    It was a constant.    I don't like holidays, I don't like celebrating my birthday, holidays, Christmas, I don't like none of that shit."    The only time he felt safe and felt he could relax was after his grandmother went to sleep at night.

20)    Even as a child, Mr. Mitchell knew that weekends "were meant for the heavy cleaning around the house.    Vacuuming, dusting, sorting, throwing out extras if it was stuff she could part with.    If you didn't clean in a specific way, use the correct cleaner, or missed a spot, that could tear her off.    She would let it build up, by the fifth or sixth time, she'd throw something at you."    Only when he and George lived alone and together did Mr. Mitchell enjoy any quiet.    On school days, George rose before dawn, following the old Navajo way, and gently nudged Lezmond awake too.    George quietly ushered Lezmond through the morning – letting him wake up slowly, getting himself dressed, and eating a bowl of cereal – then he walked Mr. Mitchell to school.

10

21)    Schooldays with Bobbi were another matter.   Mr. Mitchell remembers that Bobbi let him stay up late on weekends, conditioned on him getting up   to clean the next day and sometimes working in her classroom, cleaning and organizing it too.   Sometimes during his kindergarten and first and second grades, he had two hours of sleep the night before because he had to get up to clean. During the summers, again Bobbi, George and Sherry came together, and Mr. Mitchell still had to get up and work at cleaning, there was no time for relaxing on weekends.   The summers when all of them lived on the Reservation began with Bobbi making everyone clean nonstop for a month, then Bobbi stopped and stayed in bed for about two weeks.   Then, just before she left for California, Mr. Mitchell, Bobbi and George "pulled all nighters" fixing up or cleaning until the early morning.

22)    When Mr. Mitchell lived at Hanford with Bobbi, he remembers that she did not allow him to play with other children at their houses, other children did not invite him over, and Bobbi allowed him to play only in front of the apartment or with skateboards on the sidewalk.   He clearly remembers being in the first or second grade and a schoolmate invited him over and he stayed for entire day.   That was the only time he remembers playing at another child's house.

Ex 135 - 1732

23)    Lezmond continued to struggle at Avenal Elementary School, where he began third grade in the fall of 1990.   A teacher's notes describe Lezmond as likeable but acting out for his peer audience.   Lezmond performed below grade level on all standardized tests that year.   Mr. Mitchell remembers that, "You [He] don't know what was going to happen when you went home.   You had to wait until everyone went to bed to know that it would be fine."

24)    Lezmond believes it is his school performance that prompted Bobbi to send him to live with George, in 1991.   His mother was staying with Lezmond and Bobbi Jo during this period.   George had been visiting them in California for the holidays.   One morning as Sherry was leaving for work and Lezmond was getting ready for school, she told him, "You're not going to school, you're going with your grandfather to Arizona," then walked out the door.   Mr. Mitchell remembers that his mother did not say good-bye or hug him, she just left.   Later that day, Bobbi drove Mr. Mitchell and George to the bus station.   She told Mr. Mitchell, "You brought this on yourself, your mom and I can't handle you."   He relates that no one hinted that he would move, they just told him suddenly.   To him, it was as if his mother could not be bothered with him.   Lezmond returned to the Navajo Reservation and was placed in third grade at Round Rock Elementary School.

12

**Ex 135 - 1733**

25)     Mr. Mitchell's grades improved, but other students teased and ostracized Lezmond for his lack of Navajo language skills.   For most of his fellow students, English was a second language; for Lezmond it was his only language.   His teacher noted that Lezmond needed to improve his social habits.   (Ex. 10, Round Rock Elementary School records.)   Lezmond's fourth grade teacher was his grandfather, George Mitchell; records again note his lack of fluency in reading and writing in the Navajo language.   (Ex. 10, Round Rock Elementary School records.)

26)     At the end of his fifth grade, Lezmond was sent back to California to live with his mother for his sixth grade.   Lezmond had not lived with his mother for four or five years.   During this school year, Lezmond began smoking marijuana.   He also drank alcohol when he could get it.   While some experimentation is not unusual for adolescents, his use of substances starting in the sixth grade is indicative of the added stress of changing schools again and living with a mother who had previously abandoned him.   In addition, Lezmond's family history for alcohol abuse made his early turning to alcohol as a coping method even more problematic.   (See e.g. Ex. 35, Death Certificate of Foster Hemil; Ex. 132, Shirlene Mitchell Moses Record.)   Initially, Mr. Mitchell and Sherry got along until she became more "controlling," requiring that he return to the apartment and "check in" every thirty minutes.   He remembers that she had her former Special Ed

13

students   "spy" on Mr. Mitchell's behavior or conduct in school and report back to her.   He hated this because, to him, it was another way his mother tried to control him.   Sherry was not a parent to Lezmond in any meaningful way, yet she imposed rigid rules without context or reason.   Lezmond wanted a mother.   Sherry responded by requiring him to comply with odd rules designed to keep him in close proximity to her.   It was the worst of all worlds.

27)    Mr. Mitchell spent the summer after sixth grade in Arizona with his grandparents.   The fighting and abusive behavior in that environment continued. In a particularly corrosive pattern, after verbally abusing Lezmond, Bobbi cried and required him to hug her, to show that he forgave her, then she would offer to take him out to eat or to buy him something.

28)    Lezmond returned to California to begin seventh grade.   During a visit to the reservation over the holidays, Lezmond and his mother argued. Lezmond left and walked toward the Round Rock trading post; his grandfather found him six or seven hours later.   When Sherry left for California, Lezmond stayed behind with his grandfather.   Lezmond finished seventh and eighth grade at Red Mesa Junior High School in Arizona.   The accumulation of broken family relationships is reflected in Lezmond's school records from this time; he was rarely out of trouble.

Ex 135 - 1735

29)    Mr. Mitchell relates that only with regard to disciplining him did Sherry "act like a mother" – that is, she punished him.   Other than making sure he was fed and clothed (in what she wanted him to wear), he relates that she provided nothing further.   This argument, when Mr. Mitchell was in the seventh grade, was the last time he and his mother spoke, beyond simple cordiality, until well after his incarceration on death row.

30)    Mr. Mitchell completed the ninth and tenth grade at Red Mesa High School.   His reliance on drugs increased.   He reports using acid (LSD) as a sophomore in high school.   Lezmond first smoked crack cocaine during his junior year of high school, initially using it every couple of months.   During a four-month period when Lezmond was left to live alone in Arizona during the school year, he binged on cocaine, "snorted an 8 ball [an eighth of an ounce of cocaine] and smoked a whole ounce of marijuana just to see what would happen."   He bought his first gram of glass (methamphetamine).   He remembers that, for most of those four months, he was up all day, "going, going, going."   Mr. Mitchell's use of alcohol also increased.   He reports he drank alcohol on the weekends, always to intoxication.

31)    The school suspended Lezmond twice before transferring to a continuation school in another part of the reservation for the remainder of high

15

school.   Lezmond's drug and alcohol use continued at the new high school.   One of Lezmond's friends reported smoking five joints of marijuana a day with Lezmond during this time.   (Ex. 111, ¶ 6.)

32)    Lezmond's grandparents initiated a counseling referral for Lezmond, following his forced resignation from high school to a continuation high school. The previous year, Lezmond had been left on his own for nearly four months of the school year.   Now, it appears that Lezmond's problems at school had become public, and George and Bobbi were forced to take some action.   The initial mental health evaluation notes that Lezmond had experienced lots of family fighting since a young child, that he admitted to some marijuana and tobacco use, and that Lezmond spoke of suicidal ideation, though without a plan or past suicide attempts. It was this evaluation that recommended Lezmond participate in intensive psychotherapy.   Lezmond attended only five counseling sessions over a seven-month period.   During one of those sessions, the counseling notes show that Lezmond sobbed while talking about his feelings of needing to get away from his family conflict and his feelings of wanting to kill himself at times.

33)    Lezmond did not get the intensive therapy recommended for him.   No one in his family saw to it that he followed through on that recommendation. Lezmond continued to use substances to cope with his feelings.   He reports that he

16

**Ex 135 - 1737**

drank alcohol when he could get it during his senior year of high school, and that he drank alcohol heavily on the weekends.   When Lezmond was a senior in high school, he was the passenger in a roll-over motor vehicle accident during which the driver was killed.   Both boys had been drinking.   (Ex. 5, Auto Accident Report.)

34)   Lezmond's grandfather had been a passive, even neglectful, guardian during Lezmond's childhood.   Lezmond spent a large part of the time he was living with his grandfather on his own.   Now, as Lezmond got older, George's response to Lezmond's drug and alcohol use and school problems was to attempt to impose strict rules on his behavior.   Lezmond's reaction was a mix of shame and avoidance of his grandfather.   In a repetition of George's pattern in raising his son, Auska, George wanted immediate compliance with his newly imposed rules.   When Lezmond reacted, George's response was to wash his hands of Lezmond, unwilling to expend real time and energy on his grandson when Lezmond needed him the most.   The tension between George and Lezmond, along with the fights among all of the adults in Lezmond's family and a general loneliness, led Lezmond finally to move out of his grandfather's home before he finished high school.   George let Lezmond go without a move to stop him.

35)   As a child, he had found reasons to be by himself when Bobbi starting fighting.   One summer, the roof on the house was not finished, so he took that as

17

an excuse to be on the roof, in the hot sun, just to avoid Bobbi.   Other times, he went to the canyon nearby because "when you knew it [the fighting] was coming, there was nothing you could do about it."   He remembers the relief he felt from getting out of the way.   By the seventh grade, he had begun to think he was adopted.   He thought, "Why are these people my family.   I know other families don't do this to each other," and, "These can not be my family members, family don't cause fights with each other," and "Why am I putting up with this shit?" – the latter question he asked himself to this day.   He berated himself for arguing too, thinking, "A normal person would not say this to someone they loved and cared about.   And here I am saying this."   So, he developed plans when he turned eighteen.

36)   On his eighteenth birthday, in 1999, Mr. Mitchell asked George for his social security card and birth certificate, and told him he was moving out.   George gave him the items and called Sherry into the room, who demanded to know, "What the hell are you doing?"   He told her that he was moving out, "I'm getting away from all you guys."   Lezmond moved into the home of a friend, Lorenzo Reed, who lived nearby.   Family life at the Reeds met a need in Lezmond.   He enjoyed living in a family setting that were peaceful and family centered.   (Ex. 110,

18

**Ex 135 - 1739**

Declaration of Freda Reed, ¶¶ 2, 3, 4, 6.; Ex. 113, Declaration of Tara Reed-Dayzie, ¶ 3, 5, 6, 7.)

37)    During his senior year of high school, Lezmond tried to join the Marine Corps.   The Navajo Nation has a long tradition of honorably serving in the Marine Corps, notably as Code Talkers during World War II.   The Code Talkers are revered on the Reservation, honored in an annual ceremony and in several public displays.   Consequently, the Marines have a particular allure for Navajo young adults.   Lezmond had the idea of joining the Marine Corps, but with no realistic possibility he would be accepted because of his school record.   When he applied, the Marine Corps rejected Lezmond due to his low math scores and his tattoos.

38)    After graduation, Mr. Mitchell returned briefly to his grandparents' house before he moved to Phoenix, Arizona, where he lived with Lorenzo Reed's brother and uncle.   In Phoenix, he was employed at a ballpark, as a construction worker, and as a dishwasher.   He drank alcohol every night.   When he lost his last job, Lezmond could no longer pay his share of the rent so, in July 2001, Lezmond moved to Lancaster, California, with his grandmother.   He stayed a short time; initially, Bobbi was calm and did not berate or abuse Mr. Mitchell.   Not long after, though, she started yelling at him for not cleaning appropriately.

19

39)    Mr. Mitchell decided to leave but could not turn to his other family members.    He had been told so many times and in so many ways he was not wanted by his mother or his grandfather.    Lezmond felt he could not stay in Phoenix, or go back to the Reeds on the Reservation.    The Reeds lived in a small home and had limited resources.    While they welcomed Lezmond during his high school years, he felt he could not ask more of them once he graduated.    In August 2001, Mr. Mitchell returned to the reservation and moved in with Nakai brothers.

40)    According to the records I reviewed, the homicides occurred on October 28, 2001, and the FBI arrested Mr. Mitchell on November 4, 2001.

41)    As stated above, from approximately August of 2001 until November 4, Lezmond Mitchell lived at the Nakai household on the Navajo Reservation.    He was no longer employed.    He lost himself in a life of getting high on drugs and drinking alcohol every day.    He smoked marijuana daily, and methamphetamine whenever it "came around" the household.    Three or four times a week, Lezmond inhaled "P-dogs," which is a combination of marijuana and crack cocaine rolled together into a cigarette, and he drank malt liquor, or 40's, to intoxication.    The malt liquor he drank contains 6% to 8.5 % alcohol by volume, compared with 4-to-5 % for standard beer.    In late October, a few days before the homicides, Lezmond smoked marijuana and methamphetamine continuously, as well as

20

ingesting methamphetamine nasally.   He also drank alcohol to the point of blacking out several times.   Addiction to substances is not only a brain disease, it includes the contributing factors of biology, behavior and environment.

42)    Alcohol intoxication has a host of possible effects that include irritability, violent behavior, and depression.   Alcohol is often used as a "self-medication" by people seeking to alleviate or lessen feelings of anxiety.   As with all of the substance abuse disorders, alcohol dependence and abuse have both genetic and environmental components.   Alcohol also is strongly associated with psychiatric and medical disorders.   Kaplan & Sadock, Comprehensive Textbook of Psychiatry, pp. 953-57 (7th ed. 2000) ("CTP").

43)    Marijuana use produces an increased sense of well-being and euphoria and is associated with disinhibition.   It appears that Lezmond's use of marijuana initially gave him a relief and a sense of well-being, followed by increased depression and lethargy as his usage increased.   Some marijuana users also experience adverse effects in the form of depersonalization, panic, and paranoia. Marijuana use affects higher cognitive functions, depending on the duration of its use.   It not only impairs short-term memory and when intoxicated a marijuana user may have difficulty integrating earlier experiences, expectations, and current perception into goal-directed actions.   CTP, pp. 953-57.

Ex 135 - 1742

44)    Lezmond first used cocaine in ninth or tenth grade.   He initially ingested it by snorting it in powder form.   He bought 1/16th ounce of cocaine every weekend.   In the tenth grade, Lezmond binged on cocaine for weeks at a time, and ingested at least 1/16 ounce of cocaine daily.   He cocaine use slowed later in high school, though he binged on cocaine periodically.

45)    Cocaine commonly produces a euphoria and well-being with concurrent feelings of anxiety, irritability and suspiciousness, often with paranoid ideation.   Judgment is usually impaired, and there is a decreased need for sleep and decreased hunger.   Lezmond's descriptions of his cocaine use and intoxication includes a feeling of being more hyped up than when he used marijuana alone, and more paranoid.   Lezmond first used crack cocaine at approximately the same time he began using powdered cocaine.   When Lezmond used crack cocaine, he felt paranoid and he lost track of time; he describes a feeling as if he "forgot to do something."   His use of cocaine in both forms was constant in the two or three years before the FBI arrested him.   Following the binge use of cocaine, the withdrawal symptoms typically last from one to three weeks and may consist of high anxiety, paranoia, dysphoria, depression, disorientation and apathy.   Cocaine psychosis, which looks like a psychotic disorder as it is characterized by hallucinations and/or delusions, develops more rapidly in those who have been

22

chronic users.   CTP, pp. 971-74; 1002-03, 1008.   National Institute on Drug Abuse [NDIA] funded research has found that the human liver combines cocaine and alcohol and manufactures a third substance, cocaethylene, that intensifies cocaine's euphoric effects, while increasing the risk of sudden death.

46)   The patterns of use, dependence and toxicity in methamphetamine users are similar to those of cocaine.   Smokers of methamphetamine experience a rapid onset of effects, comparable to intravenous administration.   Studies suggest that smoking methamphetamine increases the concentration of the drug in the blood, even if it is repeated only at fairly long intervals.   Methamphetamine has a longer plateau effect than cocaine, it's residual effects can last up to twelve hours. It is a mood elevator, producing greater alertness and euphoria.   Use of methamphetamine often makes the user talkative and lends a feeling of self-confidence,   It normally decreases both hunger and the need for sleep. Toxicity symptoms in a user include paranoia, suspiciousness, and overt psychosis that can look like schizophrenia; long term use has been implicated in the development of   psychosis.   The use of Ecstasy produces similar effects. Research findings also link Ecstasy's use to long-term damage to those parts of the brain critical to thought and memory.   It is believed the drug causes damage to the neurons that use the chemical serotonin to communicate with other neurons.

23

47)    Lezmond reports using methamphetamine beginning in tenth or eleventh grade.   He describes staying awake for six days at a time while using methamphetamine, and feeling irritable and paranoid.   Lezmond reports possible auditory hallucinations and seeing vague images in his peripheral vision when under the influence.   Lezmond's use of Ecstasy, which he first used in eleventh grade, gave him a euphoric high.

48)    Lezmond also used LSD, which is a hallucinogen, as well as hallucingenic mushrooms, which also alter perception and mood.   During 2001, Lezmond reports using not only LSD and mushrooms, but also PCP.   PCP has a significant range of effects from panic, rage and aggression to delirium and psychosis.

49)    My review of the records indicates that on October 28, 2001, Lezmond and Johnny Orsinger hitchhiked to Gallup, New Mexico, to steal a vehicle. Lezmond remembers smoking marijuana, methamphetamine, P-Dogs, and Ecstasy before Mrs. Slim picked them up.

50)    Lezmond reports that before October 28, he had not slept for the three nights previous, and that he drank malt liquor and smoked a variety of drugs two nights before to the point of intoxication.   He remembers using methamphetamine, both snorting it and smoking it, during the week before October 28, increasing in its

24

use before going to Gallup.   He also ingested Ecstasy and smoked crack cocaine and marijuana rolled together into P-dog cigarettes.   Lezmond recalls that he and Orsinger made it to Gallup on Saturday morning, October 27, and left that afternoon, and returned to the Nakai's on Monday morning, October 29.

51)    Lezmond continued smoking crack cocaine and marijuana, as well as drinking for a few days following October 28, and using other drugs until his arrest on November 4, 2001.

52)    Mr. Mitchell's reports of the duration of his substance dependence and abuse, as well as the many substances he took is substantively corroborated by others in their sworn declarations.

a.    Herman Tsosie:

Lorenzo [Reed], Mr. Mitchell, and I smoked pot (marijuana) in elementary school but not very frequently because we were so young and didn't have the money to buy it.   We smoked about two joints (marijuana cigarettes) a month during that first year.   . . .
. . .
During this time [2001], maybe once or twice a week, Lezmond, Lorenzo and I went up the hill, to the Nakais, to drink beer and smoke pot with the Nakais and the Kinlicheenies.   Just about everybody got totally wasted, but not Lezmond.   I saw him drink beer but Lezmond never passed out. At the hill (at the Nakais), smoking a twenty-bag of marijuana was normal for us - you can roll about fifteen regular-size joints or seven fat joints out of a twenty-bag.
. . .

25

One day, Lezmond came down from the hill to visit me and Lorenzo.   Lezmond's eyes were dilated and he was tweaking. Lezmond told me that he had eaten mushrooms and had taken cocaine.   Lorenzo and I tried to stop Lezmond but he wouldn't listen.   He told us, 'I'll be all right.   Don't worry about me.' . . .

(Ex. 119, Declaration of Herman Tsosie, ¶¶ 4, 12, 15.)

        b.     <u>Lorenzo Reed</u>:

During my freshman year, Lezmond and I attended different schools - I was at Rock Point and he was still at Round Rock Elementary school.   I began to smoke pot (marijuana) during my sophomore year (tenth grade).

After I finished ninth grade in Rock Point, I transferred to Red Mesa High School, in Red Mesa, Arizona on the reservation, where Lezmond and I met up again.   Lezmond and I smoked pot together at Red Mesa, but not that much because buying it was hard; also, we didn't have any money to buy it.   For these same reasons, we hardly drank beer.

. . .

At Rough Rock High School, Lezmond and I used pot even more, compared with when we were at Red Mesa High School.   We were now smoking about five joints (marijuana cigarettes) every day. . . .

I saw Lezmond buy cocaine once.   During Lezmond's senior year in high school, Lezmond and me, along with other friends, drove to Chinle in hopes of scoring (buying) some pot.   Instead of pot, Lezmond bought a small bag containing cocaine.   I never saw Lezmond use the drug but assumed that he did.

(Ex. 111, Declaration of Lorenzo Reed, ¶¶ 3, 4, 6, 13.)

26

**Ex 135 - 1747**

c.    Padrian George:

During the summer and [through] early November of 2001, all of us, including Lezmond Mitchell, who were staying at the Nakai house used a lot of drugs and drank beer and other alcohol.   We smoked marijuana and drank beer nearly every day.   We also used cocaine, both as powder and as crack cocaine, ecstasy and meth.   We used any drug we could get a hold of.   We used a lot of drugs.   We commonly rolled our marijuana cigarettes with some other stronger drug, like cocaine or dipped our marijuana cigarettes in something stronger such as meth.   We figured out how to make crack from powdered cocaine; we smoked crack whenever we could get it.   Lezmond Mitchell used all the same drugs, drank as much beer or other alcohol as anyone else and stayed high when he could.

(Ex. 100, Declaration of Padrian George, ¶ 4.)

d.    Dennie Leal:

After [I was released on 2000], I saw Lezmond and partied with him and the Nakai brothers about six or seven times.   On some of those occasions, our partying lasted for days, or the whole weekend. When we got together, we smoked pot and although we usually drank beer, we definitely drank whatever alcohol was available.   We got wasted.

(Ex. 102, Declaration of Dennie Leal, ¶ 5.)

e.    Gregory Nakai:

That summer [of 2001], I stayed home, drinking beer with my brothers and other friends; Lezmond

27

Ex 135 - 1748

> Mitchell was a part of this group. Lezmond, the other guys and I smoked marijuana every day. We smoked crystal meth and cocaine and ate mushrooms once or twice during that time; Lezmond did too.   All of us, including Lezmond, used drugs, and whatever drugs we had, everyday.   One of the only drugs we didn't use was heroin.
>
> That summer, any money I came across went for drugs.   After August 2001, everybody's drug use increased, including Lezmond's; we used a lot more crystal meth and cocaine, and more often.   I don't remember how much we used or how much money we spent buying drugs, because no one was keeping track. But I do remember that everyone in the house, including Lezmond, used as much drugs as we could get our hands on each day.

(Ex. 107, Declaration of Gregory Nakai, ¶¶ 4, 5.)

53)     During one of his interrogations on November 4, 2001, Lezmond told the FBI that before Mrs. Slim and Ms. Lee picked up him and Orsinger, he had been "partying," and he had been drinking alcohol so heavily he could not say with certainty the approximate time he and Johnny were picked up other than it "was . . . night."   After Mrs. Slim was killed, he "just started drinking again" to the point where he blacked out.   When they arrived at the location, he "just started grabbing some more liquor and just started . . . drinking again. ," He told the FBI that he "just started drinking when [Johnny] was trying to drag the bodies off. I was just drinking, drinking, just . . . drinking, drinking."   When he and Orsinger left in the truck, Mr. Mitchell "was still drinking."   He did not "remember making it back to

Ex 135 - 1749

the highway," and "probably blacked out during that whole time."   He told them he was "just too fucked up that night" to remember how he had gotten back to the road, where they left the bodies, or what happened to the truck.   (Ex. 18, pp. 1, 6, 8-9.)

54)   The following day, October 29, Lezmond reported that he began drinking again, and that he drank the entire day.   He described himself as, "just drinking, drinking, drinking," and he admits he got drunk before participating in the trading post robbery.   (Ex. 18, p. 12.)

55)   In another November 4, 2001 statement to the FBI, Mr. Mitchell said that, on the Saturday night (October 27), he spent the evening partying, and that he "blacked out from drinking."   The next morning, October 28, he purchased more beer and "blacked out again."   (Ex. 19, p. 1.)

56)   In a later statement to FBI Agents on November 29, 2001, Lezmond reported that when he and Orsinger went to Gallup, he (Mr. Mitchell) consumed "a couple of forty ounce bottles of beer prior to going to Gallup."   In Gallup, he and Orsinger bought more liquor, and headed back to the Reservation when they were picked up hitchhiking.   (Ex. 21, p. 1.)

57)   Johnny Orsinger said the following about his and Mr. Mitchell's drug and alcohol use:

> A group of five or six guys lived at the Nakai
> house when I last stayed there in 2001: Jimmy Nakai, Jr.,

29

Ex 135 - 1750

Gregory Nakai, Jakegory Nakai, Lezmond and me.   We starved like dogs most days, without any money to get anything to eat, but at least I had a place to sleep. We listened to music or watched a movie.   Other guys and girls hung out and partied with us sometimes.

During this time, 2001, at the Nakais, we used a lot of drugs and drank a lot of beer.   Every day, we drank as much as we could get hold of and used all the drugs we could get our hands on.   On the weekend, we used even more drugs and drank more beer.   We smoked marijuana, used meth, smoked or snorted cocaine, and used LSD. We smoked as much PCP as we could get and that our brains could take.   We never used heroin or took pills, and we didn't take any drug with a needle, just smoked or snorted it.   Staying awake for days at a time partying was very normal for us, never sleeping and not eating. Lezmond definitely used these drugs and drank beer as much as the rest of us.   A typical Friday night, Lezmond drank one or two twelve-bottle cases of 40 ounce beers (called "40s"), plus he took as much drugs as he could handle; so did I.   Sometimes I wonder how we survived

30

Ex 135 - 1751

because of the amount of drugs and beer we used during

that time, it should've killed us but it didn't.

(Ex. 109, Declaration of Johnny Orsinger, ¶¶ 4-5.)

## MR. MITCHELL SUFFERS FROM POSTTRAUMATIC STRESS DISORDER

58)    The Diagnostic and Statistical Manual, Fourth Edition, Text Revised

(DSM-IV-TR) lists the following criteria for a diagnosis of Posttraumatic Stress

Disorder:

A.    The person has been exposed to a traumatic event
in which both of the following were present:

(1)    the person experienced, witnessed, or was
confronted with an event or events that
involved actual or threatened death or
serious injury, or a threat to the physical
integrity of self or others

(2)    the person's response involved intense fear,
helplessness, or horror.   [note omitted.]

B.    The traumatic event is persistently reexperienced in
one (or more) of the following ways:

(1)    recurrent and intrusive distressing
recollections of the event, including images,
thoughts, or perceptions.

(2)    recurrent distressing dreams of the event.

(3)    acting or feeling as if the traumatic event
were recurring (includes a sense of reliving

Ex 135 - 1752

the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur on awakening or when intoxicated). [note omitted.]

(4)    intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

(5)    physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

C.    Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following:

(1)    efforts to avoid thoughts, feelings, or conversations associated with the trauma

(2)    efforts to avoid activities, places, or people that arouse recollections of the trauma

(3)    inability to recall an important aspect of the trauma

(4)    markedly diminished interest or participation in significant activities

(5)    feeling of detachment or estrangement from others

(6)    restricted range of affect (e.g., unable to have loving feelings)

32

Ex 135 - 1753

(7)     sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span)

D.     Persistent symptoms of increased arousal (not present before the trauma). as indicated by two (or more) of the following:

(1)     difficulty falling or staying asleep

(2)     irritability or outbursts of anger

(3)     difficulty concentrating

(4)     hypervigilance

(5)     exaggerated startle response

E.     Duration of the disturbance (symptoms in Criteria B, C, and D) is more than 1 month.

F.     The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

59)     The physical violence and abuse that Lezmond suffered and witnessed as a child, and his reactions to it, readily satisfies Criterion A of the diagnosis. Child abuse of the severity and frequency that Lezmond's grandmother and mother inflicted upon him is well-recognized as the type of stressor that can lead to the development of Posttraumatic Stress Disorder. The violence and abuse he witnessed between his grandparents, and his grandmother and mother, likewise satisfy the first factor of this criterion. The Diagnostic Criteria in DSM-IV-TR

33

include a note (not included above) to the second factor that states that children "may express[ the second factor] by disorganized or agitated behavior." Lezmond's response to the abuse and violence he endured and witnessed is evidenced by his behavior in kindergarten and elementary school.   My clinical and forensic experience with children and adults who suffered from exposures to violence, such as Lezmond's, confirm this.

60)    Lezmond Mitchell exhibits five of the persistent re-experiencing symptoms of Criterion B, one or more are required.   Among other descriptions,

a.    Lorenzo Reed reports that, even when he was removed from his source of stress, Lezmond continued to be "very stressed out with no one to turn to.  The things his mother and grandmother did to him were always with him."   (Ex. 93, p. 24.)

b.    In high school, Lezmond's thoughts frequently turned to his family problems and he was "pissed off all the time."

c.    Lezmond sat quietly and appeared to be "sad and deep in thought, thinking something personal."   (Ex. 113, Declaration of Tara Reed-Dayzie, ¶ 8.)

Ex 135 - 1755

d.    According to Lorenzo Reed, "Lezmond refused to visit George during his senior year while he lived with the Reed family because he 'didn't want to deal with memories of his mother and grandmother.'"  (Ex. 93, p. 14.)

61)    Lezmond exhibits at least five of the avoidant symptoms of Criterion C, three or more are required.   He avoids thoughts, feelings, or any conversations associated with his traumatic history beyond a monotone recitation of the chronology of his life and cursory responses to questions about his thoughts and feelings.   For example,

a.    According to Lorenzo Reed, Lezmond refused to visit his grandfather during his senior year, when he was living with the Reed family, because "he didn't want to deal with memories of his mother and grandmother." (Ex. 93, p. 14.)

b.    And, "[w]hen they (mother and grandparents) come down on him, he feels like going out and killing himself.   Sobbing at this point.   Just wants to get away from them as soon as he can."  (Ex. 93, p. 26.)

c.    As a child, Lezmond never wanted to do anything, just watch TV and play video games.   As he got older, his only outside activity was playing football.

35

d.      According to Bobbi Jo Mitchell, Lezmond always had a "death wish" and one of the last times she saw him before his arrest, he told her that he would die before his family does.   (Ex. 93, p. 19.)

e.      Mr. Mitchell started abusing substances and alcohol at an early age.

62)     Lezmond meets the requirements of Criterion D, persistent symptoms of increased arousal, in a variety of ways.   The DSM-IV-TR states that an individual should display at least two out of five criteria to satisfy this element of the diagnosis.   For example,

a.      A kindergarten teacher wrote that Lezmond "has become careless, needs to concentrate on the work and try harder."   (Ex. 93, p. 23.)

b.      Lezmond's second grade teacher described Lezmond as "easily frustrated." (He was then living with Bobbi Jo and Sherry in California.)   (Ex. 8)

c.      Bobbi thought Lezmond suffered from AD/HD and blamed Sherry for not getting him evaluated.   (Ex. 93, p. 23.)

d.      Pressure mounted and, according to Lezmond, he "snapped." He was disrespectful toward authority figures at school, he "went off" a lot in school and got into many fights.   According to Lezmond, if anyone "looked at [him] the

36

wrong way, or made a wisecrack, "it was enough to "set [him] off," and he estimates that he was in twenty-four fights in high school.   (Ex. 93, p. 24.)

e.      Marijuana calms and relaxes him, helps him to concentrate.

63)    The duration of the above-listed symptoms began in Lezmond's childhood and persists to this day.   Lezmond easily qualifies under Criterion E, which states that the duration of the symptoms is more than one month.

64)    Finally, the records I reviewed support the fact that Lezmond meets the requirements of Criterion F, which state that the disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning. He was unable to be gainfully employed, maintain a household, a significant long-term interpersonal relationship, or stay out of trouble.

65)    Individuals who meet the criteria for a PTSD diagnosis are at an increased risk of substance use.   PTSD "independently increase[s the] risk of marijuana and drug abuse/dependence."   And, it is well-understood that individuals who suffer from PTSD, but who do not receive appropriate treatment, are disposed to use drugs and alcohol to modulate stressful experiences and recurrent effects from the trauma.   That is, people self-medicate to deal with the physiological and psychological consequences of the trauma.   Lezmond's initial use of drugs and alcohol at such a young age, is further indication he was self-medicating.

37

## Diagnoses Related to Mr. Mitchell's Use of Substances

66)    It bears first noting that the DSM-IV-TR's Substance-Related

Disorders concern eleven classes of substances [alcohol; amphetamine or similarly

acting sympathomimetics; caffeine; cannabis; cocaine; hallucinogens; inhalants;

nicotine; opioids; phencyclidine (PCP) or similarly acting arylcyclohexylamines;

and sedatives, hypnotics, or anxiolytic] and in the years, and particularly within the

few months, before his arrest, Lezmond Mitchell used significant amounts of all

these substances except the inhalant, opioid, and the anxiolytic classes.   The latter

two he used before and during his capital trial.

## Mr. Mitchell was dependent on many substances before the crimes

67)    The DSM-IV-TR defines substance dependence is "as a cluster of

three or more of the symptoms listed below occurring anytime in the same

12-month period."   The criteria for substance dependence are:

> A maladaptive pattern of substance use, leading to
> clinically significant impairment or distress, as manifested
> by three (or more) of the following, occurring at any time
> in the same 12-month period:
>
> (1)    tolerance, as defined by either of the following:
>
> > (a)    a need for markedly increased amounts of
> > the substance to achieve intoxication or
> > desired effect
> > (b)    markedly diminished effect with continued
> > use of the same amount of the substance

38

Ex 135 - 1759

(2)    withdrawal, as manifested by either of the following:

    (a)    the characteristic withdrawal syndrome for the substance (refer to Criteria A and B of the criteria sets for Withdrawal from the specific substances)

    (b)    the same (or a closely related) substance is taken to relieve or avoid withdrawal symptoms

(3)    the substance is often taken in larger amounts or over a longer period than was intended

(4)    there is a persistent desire or unsuccessful efforts to cut down or control substance use

(5)    a great deal of time is spent in activities necessary to obtain the substance (e.g., visiting multiple doctors or driving long distances), use the substance (e.g., chain-smoking), or recover from its effects

(6)    important social, occupational, or recreational activities are given up or reduced because of substance use

(7)    the substance use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance (e.g., current cocaine use despite recognition of cocaine-induced depression, or continued drinking despite recognition that an ulcer was made worse by alcohol consumption).

39

Ex 135 - 1760

68)     At the time of his arrest, Lezmond manifested four of the seven factors as to alcohol, methamphetamine, cannabis, cocaine, and phencyclidine, supporting the conclusion he was dependent on these substances.   (He was also dependent on nicotine and caffeine, but I exclude those from further discussion here because of the common and less severe effects of the usage.)   It is possible, even likely, that he manifested additional factors but his lack of insight and those of his contemporaries at the Nakai house prevent my applying those other factors at this time.

### Consideration of Mr. Mitchell's abuse of other substances

69)     The criteria for substance abuse, as defined by the DSM-IV-TR, are:

A.     A maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12 month period:

(1)     recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)

(2)     recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by substance use)

40

(3)     recurrent substance-related legal problems
(e.g., arrests for substance-related disorderly
conduct)

(4)     continued substance use despite having
persistent or recurrent social or interpersonal
problems caused or exacerbated by the
effects of the substance (e.g., arguments with
spouse about consequences of intoxication,
physical fights)

B.     The symptoms have never met the criteria for
Substance Dependence for this class of substance.

70)     Criterion B excludes from this diagnosis alcohol, methamphetamine,

cannabis, cocaine, and phencyclidine, thus, I consider Lezmond's use of

hallucinogens only.   However, Lezmond had neither a job, a car, nor a family or

home of his own, nor did he attend college, have "*recurrent* substance-related legal

problems" before his arrest (tribal police arrested him for public intoxication in

2000, and vandalism in September 2001), or "continued substance use despite

having persistent or recurrent social or interpersonal problems caused or

exacerbated by the effects of the substance," because all the persons around whom

he used drugs were substance users themselves.   For these reasons, I cannot

consider this diagnosis further.   While it is very likely he experienced Substance

Intoxication from the hallucinogen use, again, his lack of insight and those of his

contemporaries at the Nakai house prevents me from going further with the

41

hallucinogens except to note them as another powerful and dangerous substance he used before his arrest.

## MR. MITCHELL'S STATE OF MIND AT THE TIME OF THE OFFENSES

71)    In the days leading to October 28, 2001, Lezmond and the others in the Nakai household described using to intoxication:   marijuana, crack, methamphetamine, P-Dogs, Ecstasy, and malt liquor.   Johnny Orsinger states the following about those days:

> In October 2001, Lezmond and I decided to go to Gallup, New Mexico. We used as much drugs as we ever did, everything we could get a hold of by any means. We didn't smoke just marijuana – we always added something to our cigarettes to make the marijuana stronger. I always added cocaine and meth to my marijuana before I smoked it; I don't know exactly what Lezmond added to his marijuana but it was along those lines.   By the time we got to Gallup, Lezmond and I had been awake for several days drinking beer and using drugs.   We'd been awake for so many days, it felt like walking around in a cloud. It was like we were puppets, our bodies kept moving forward, but I'm not sure how.

(Ex. 109, Declaration of Johnny Orsinger, ¶ 6.)

72)    The American Psychiatric Association defines *psychotic* as meaning grossly impaired in reality testing, which is defined as existing when individuals incorrectly evaluate the accuracy of their perceptions and thoughts, and make incorrect inferences about external reality, in the face of contrary evidence.   . . .

Ex 135 - 1763

¶ The term *psychotic* is also appropriate when behavior is so disorganized that it is reasonable to infer that reality testing is grossly disturbed." CTP, p. 825. Psychotic disorders can occur in association with intoxication by alcohol, amphetamines and related substances, and by cannabis and cocaine. DSM-IV-TR, p. 340.

73) My review of the following, along with my clinical judgment and experience, leads me to conclude that the polysubstance and alcohol abuse impaired Lezmond's mental state so much that he suffered Substance-Induced Psychotic Disorder ("SIPD") at the time of the offenses:

a. Lezmond Mitchell's history of his family/home life, his family history of alcohol abuse, medical/mental health, education, criminal record, and his substance dependence and abuse, leading to October 28, 2001;

b. Accounts of his substance abuse just before October 28;

c. The disorders he suffered by October 28 (PTSD, Substance Dependence, and Substance Intoxication), and his chronic lack of restful sleep by then;

d. The temporal relationship between the onset of Lezmond's substance use leading to October 28, and the onset of the symptoms or the full syndrome on October 28; and,

43

**Ex 135 - 1764**

e.     The law enforcement records regarding the October 28 offenses

(including Lezmond's behavior and statements afterward).

74)    The DSM-IV-TR criteria for SIPD are:

A.     Prominent hallucinations or delusions. []

B.     There is evidence from the history, physical examination, or laboratory findings of either (1) or (2):

(1)    the symptoms in Criterion A developed during, or within a month of, Substance Intoxication or Withdrawal

(2)    medication use is etiologically related to the disturbance

C.     The disturbance is not better accounted for by a Psychotic Disorder that is not substance induced. Evidence that the symptoms are better accounted for by a Psychotic Disorder that is not substance induced might include the following:   the symptoms precede the onset of the substance use (or medication use); the symptoms persist for a substantial period of time (e.g., about a month) after the cessation of acute withdrawal or severe intoxication, or are substantially in excess of what would be expected given the type or amount of the substance used or the duration of use; or there is other evidence that suggests the existence of an independent non-substance induced Psychotic Disorder (e.g., a history of recurrent non-substance-related episodes).

D.     The disturbance does not occur exclusively during the course of a delirium.

44

75)    Lezmond's post-arrest interrogations provide helpful information about Criterion A (I note here that although a lay person, who may have been biased, prepared these reports, rather than a trained clinician, they are nevertheless informative).   First, Lezmond has no insight that he had any psychotic symptoms, much less that they were substance induced.   CTP, p. 977.   "When patients do not recognize that their symptoms are drug induced, "a diagnosis of [cocaine- or] amphetamine-induced] psychotic disorder should be considered."   As I indicated above, all the substances that Lezmond ingested just before and on October 28 are either psychotogenic or psychotomimetic; the former causes "frank psychosis . . . and [is] associated with a clouded sensorium," and the latter types of substances "produces hallucinatory and other psychotic features while consciousness remains present and clear."   CTP, p. 1927.   The concurrent uses of both types, and their opposite effects, could indicate why Lezmond's recollections of October 28 are without detail and confused.   I believe Criterion A is met.

76)    The import of Lezmond's substance dependency to my diagnosis regarding Lezmond's mental state on October 28, 2001, is that, under the DSM-IV-TR, SIPD "should be made instead of a diagnosis of Substance Intoxication or Substance Withdrawal *only when the psychotic symptoms are judged to be in excess of those usually associated with the intoxication or*

45

*withdrawal syndrome* and when the symptoms are sufficiently severe to warrant independent clinical attention." (Emphasis added.)   Except his marijuana use (without more information), all of the substances Lezmond used just before the offenses can cause psychotic-like effects and psychosis, especially used in the quantities and duration he used them, and the lack of sleep.   Combined with the frankly bizarre manner of death (particularly the child's), and the postmortem cutting to the bodies, in my opinion, Criterion B is met.

77)    We further differentiate a primary mental disorder from a Substance-Induced Disorder, such as SIPD, by "the presence of features that are atypical of the primary disorder (*e.g.*, atypical age at onset or course)."   Other than the occasion Lezmond described what was likely an auditory hallucination from methamphetamine intoxication, he has no history of psychotic symptoms from substance dependence, intoxication or abuse, and he has no reliable family history, or prior diagnosis, of major mental disorder or disease with psychotic features. Thus, I believe Criterion C is met.

78)    I have found no evidence showing that "the disturbance occur[red] exclusively during the course of a delirium."   Criterion D is met.

46

79)    Mr. Mitchell's Substance-Induced Psychotic Disorder at the time of the offenses indicates that he was grossly out of touch with reality, and was unable to appreciate what was actually occurring when he was suffering from SIPD.

## THE EFFECTS ON MR. MITCHELL OF HIS WITHDRAWAL FROM SUBSTANCE DEPENDENCE

80)    Lezmond Mitchell continued using marijuana, cocaine, crack, and alcohol after October 28 and before his November 4, arrest.   An individual who was arrested with Lezmond states, regarding their arrests:

> On the morning of November 3, 2001, at around 9:00 a.m., Gregory, Jimmy and Shaun came over to pick me up.   I was staying in Sweetwater.   When they came to get me, they were already high.   We drove around Round Rock for awhile, smoking marijuana and waiting for Jason Kinlicheenie and Lezmond Mitchell to come back from buying beer for the group.   The Navajo Reservation prohibits the sale of any alcohol, but there are bootleggers all around the Reservation where it is easy to buy beer when you want it and have the money. When Jason and Lezmond got to Round Rock with a couple of cases of beer, we all went to the Nakai house and started drinking beer.   I only drank beer that night, but everyone else at the house, including Lezmond, smoked cocaine and marijuana.
>
> When the police arrived early the morning of November 4, 2001, we hadn't been asleep more than a couple of hours.   The whole group of us had been partying all night, continuing with the beer and the other

47

Ex 135 - 1768

guys smoking crack cocaine and marijuana.  I think some

of the guys passed out from all the drinking and the drugs

they were using.

(Ex. 100, Declaration of Padrian George, ¶¶ 5, 6.)

81)    Another individual who was arrested along with Mr. Mitchell states:

>        The FBI and tribal police arrested me at my house
> very early in the morning on November 4, 2001, and my
> brothers, Jakegory and Jimmy, and Lezmond Mitchell and
> Johnny Orsinger.  . . . I don't remember anything about
> the [police] questioning or the signing of the waiver [of
> rights] because all of us smoked a lot of marijuana and
> crack cocaine that night. As a result, I don't remember
> anything about being interviewed by law enforcement on
> November 4, 2001.

(Ex. 107, Declaration of Gregory Nakai, ¶ 6.)

82)    Jail records state that Lezmond was evaluated and recommended for

alcohol treatment shortly after his arrest.  The records do not show that he received

any treatment, however.

83)    The DSM-IV-TR describes withdrawal as, in part, "the development of

dysphoric mood and two or more of the following physiological changes: fatigue,

vivid and unpleasant dreams, insomnia or hyper-somnia, increased appetite, and

psychomotor retardation or agitation."  Since Lezmond was in the custody of law

enforcement and prosecution during the abrupt withdrawal from many substances,

48

and the jail gave no medical attention to him regarding his withdrawal (other than to note one aspect of it), I could not clinically diagnose him as having the withdrawal syndrome during his interrogations.   However, considering the significant amounts of various psychoactive substances he used before his arrest, and because we know that methamphetamine and cocaine/crack intoxications resolve over a period of twenty-four to forty-eight hours, had trial counsel provided me with the foregoing information, including the *many* interrogations he underwent without counsel, I would have recommended they question and investigate his ability to knowingly, intelligently and voluntarily waive his right to counsel.

## MR. MITCHELL'S SUBSTANCE ABUSE BEFORE AND DURING THE TRIAL

84)    Lezmond reported to a health professional that, after his arrest and while incarcerated in Phoenix, he used heroin, cocaine, methamphetamine, any psychotropic medication he could obtain (mainly Prozac), a jail-brewed alcoholic drink, and Artane.   He states that he used these substances during his capital trial in Phoenix.   Lezmond did not use heroin before his arrest – apparently due to its unavailability on the Reservation and cost.   He has no history of being prescribed Artane or Prozac before his arrest, post-arrest or in jail.

**Ex 135 - 1770**

85)    An individual who was incarcerated with Mr. Mitchell in the county jail states:

> During April 2002 to April 2003, Lezmond Mitchell was always getting high on drugs or hooch (jail-brewed alcohol).   He wanted to buy whatever drugs were available inside the Madison Street Jail.   I know that he was using heroin regularly because I saw him purchase it and use it.   Lezmond Mitchell wanted to get enough heroin to be high on a daily basis.   He often had enough money to get high on heroin daily.   I remember Mitchell buying as much as $300.00 worth of heroin at a time. The heroin available in the Madison Street Jail during this time was of a very high quality, at least as good as anything I ever got on the street.   If Mitchell ran out of money and wanted to get high, he could still get drugs because the closed custody inmates on the sixth floor of Madison Street Jail took care of one another.
>
> If one of us had drugs, we regularly shared drugs with other addicts whether or not they could pay for it. I was a drug user during that time.   I was particularly aware of who else in our closed custody unit was a drug user like me, and Lezmond Mitchell was a drug user too. Cocaine, Speed and Marijuana were also available in our unit at times.
>
> The few times when there was no heroin available to the inmates at Madison Street Jail, the inmates I knew made hooch, or home-brewed liquor, which they drank to get high.   They made the hooch from fermented citrus fruit and Starlight mints, which were purchased through the jail commissary.   If they could heat the mixture, the fermentation process sped up and the hooch was made more quickly.   I saw Lezmond Mitchell drink hooch regularly during the year between April 2002 and April 2003.

(Ex. 97, Declaration of Eric DeLuca, ¶¶ 3, 4.)

50

Ex 135 - 1771

86)    The effects of each drug Lezmond was using while incarcerated pre-trial and during trial are worth noting.

a.    Heroin is an opiate, which has potent mood changing and euphorigenic action. It can induce an indifference to anticipated distress, apathy, dysphoria, drowsiness, impaired judgment and a decreased ability to concentrate. Opioids are also strongly addictive.   See CTP, pp. 1040-41, 1045.

b.    Artane (trihexyphenidyl).   Physicians prescribe Artane to patients who, for instance, suffer from Parkinsonism, a syndrome not unlike Parkinson's disease in its physical manifestations; unlike Parkinson's, certain medications such as antipsychotic medication, may cause Parkinsonism.   As no record states a physician prescribed it to Mr. Mitchell, apparently he obtained it from a jail inmate for whom it was prescribed to treat that inmate's side effects from an antipsychotic medication.   (I know of no other conditions that would warrant a physician to prescribe Artane, or even a reasonable off-label use.)   Depending on the dosage of Artane Lezmond ingested, since he did not have Parkinsonism or suffer other side effects of antipsychotic medication, he would have experienced, for example, euphoria, reduced anxiety, drowsiness, and/or a false sense of well-being.

51

c.    Prozac (Fluoxetine hydrochloride).    Physicians prescribe Prozac to individuals who suffer from depression, obsessive-compulsive disorder, bulimia, and panic disorder.    As with Artane, no record states it was prescribed to Lezmond, thus apparently he obtained it from a jail inmate for whom it was prescribed.    Depending on the dose, frequency, and duration, the effects of Lezmond's casual use of Prozac may have been drowsiness, anxiety, trouble sleeping, loss of appetite, tiredness, among others.

d.    Other Antipsychotics.    Without knowing the dose, frequency, duration, and name of the other antipsychotic medications Lezmond took, determining the likely effects on him is not feasible.    Generally speaking, antipsychotic medications may cause few apparent side effects to quite severe and debilitating effects.    Given their pharmacodynamics generally, he may have experienced sedation, and reduced motivation and emotional expressiveness.

87)    If trial counsel had retained me before trial and provided me with the foregoing information, I would have advised counsel that Lezmond Mitchell had serious, long-standing alcohol and drug addictions at the time of the crime, and that Mr. Mitchell was severely intoxicated at the time of the homicides.    Given the significant amounts of substances Lezmond Mitchell used pre-trial and during trial, with his history of substance dependence and abuse, I would have informed counsel

52

that any one of these drugs, especially these drugs in combination, could have seriously inhibited Mr. Mitchell's ability to make reasoned decisions. Had Mr. Mitchell's counsel raised a question as to Mitchell's competency to stand trial or to waive his rights in a capital trial, it is my opinion that sufficient evidence existed to initiate an inquiry into Lezmond Mitchell's ability to assist his counsel, to make reasoned decisions, including the waiver of presence at his penalty phase.

## DIAGNOSTIC CONCLUSIONS

88)   It is my opinion, which I hold to a reasonable degree of medical certainty, that, at the time of the crimes, Lezmond Mitchell suffered from Posttraumatic Stress Disorder and Substance Dependence. Further, at the time of offenses, it is my opinion that Lezmond Mitchell suffered from Substance-Induced Psychotic Disorder.

89)   When Mrs. Slim and Ms. Lee were killed, I (or a similar mental health professional) would have testified that Mr. Mitchell's severe intoxication, SIPD, and PTSD synergized with each other resulting in the alteration of Mr. Mitchell's cognitive and behavioral functioning, which severely impaired his ability to premeditate or intend to commit murder. In fact, the combinations of these conditions made him unable to appreciate the wrongfulness of his actions. While the question of whether Mr. Mitchell met the legal standard on the mental state

Ex 135 - 1774

prong of the charges would have remained within the province of the jury, I believe that the available evidence would inform a determination whether he actually formed the mental state necessary to sustain a conviction for murder.

90) Had I been informed of Lezmond Mitchell's history of alcoholism, substance addiction, withdrawal, I would have questioned his ability to waive his right to counsel before the post-arrest interrogations, and I would have informed trial counsel that it was imperative they investigate and develop Lezmond Mitchell's ability to waive his constitutional rights during the post-arrest interrogations and proceedings.   And, given his history and his heroin use during the pre-trial phase of his capital trial, I would have informed counsel to develop; and investigate his ability to consult with them, with a reasonable degree of

///

///

///

54

rational understanding, and to evaluate Lezmond=s rational and factual understanding of the proceedings against him.

91)    The medical bases for my opinions were well-established and widely recognized in 2003.

I declare under the penalty of perjury that the foregoing is true and correct. Signed this 12ᵀᴴ day of November, 2009, at San Francisco, California.

Pablo Stewart, M.D.

56

Ex 135 - 1776

# EXHIBIT A

CURRICULUM VITAE

*PABLO STEWART, M.D.*
824 Ashbury Street
San Francisco, California 94117
(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com
(Updated 8/31/08)

| | |
|---|---|
| EDUCATION: | University of California School of Medicine, San Francisco, California, M.D., 1982 |
| | United States Naval Academy Annapolis, MD, B.S. 1973, Major: Chemistry |
| LICENSURE: | California Medical License #GO50899<br>Hawai'i Medical License #MD11784<br>Federal Drug Enforcement Agency #BS0546981<br>Diplomat in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

ACADEMIC APPOINTMENTS:

| | |
|---|---|
| September 2006-Present | Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 -Present | Academic Appointment: Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -June 1995 | Academic Appointment: Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -July 1989 | Academic Appointment: Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

EMPLOYMENT:

| | |
|---|---|
| December 1996-Present | Psychiatric Consultant<br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues.  (Client list available upon request). |

**Ex 135 - 1778**

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service training's for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u> Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco</u>.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

**Ex 135 - 1779**

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California</u> <u>San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatric course for UCSF second year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

**Ex 135 - 1780**

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nation-wide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-Present | California Association of Drug Court Professionals. |
| July 1997-June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 - June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 - June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 - April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 - June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 - June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 - | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 - January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000- April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001- Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002- June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003- April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003- January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004- June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004- January 2006 | Member of Human Services Commission, City and County of San Francisco. |

**Ex 135 - 1782**

| | |
|---|---|
| February 2006-<br>January 2007 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>Present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |

**Ex 135 - 1784**

| | |
|---|---|
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Alcoholism".  This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional.  This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital,  Department of Psychiatry.  Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 - August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital.  Teach and supervise medical residents in interviewing and communication skills.  Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

**Ex 135 - 1785**

COMMUNITY SERVICE:

| | |
|---|---|
| February 2006-<br>Present | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>Present | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>Present | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>Present | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |

Ex 135 - 1786

| | |
|---|---|
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-<br>July 1997 | Psychiatric Expert for the U. S. Federal Court in the case of Madrid v. Gomez.  Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 -<br>January 2000 | Psychiatric Expert for the U.S. Federal Court in the case of Gates v. Deukmejian.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July -<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>Present | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

**Ex 135 - 1787**

PRESENTATIONS:

1. San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2. Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3. Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference. (3/3/1991). "Planning a Satisfying Life in Medicine."

4. 24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California. (9/11/1991). "The Chronically Ill Substance Abuser."

5. Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6. Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7. First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8. American Group Psychotherapy Association Annual Meeting. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9. Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

**Ex 135 - 1788**

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., in conjunction sponsored this seminar with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41. Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42. "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47. Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48. Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51. California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52. California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, PEEL MEMORIAL HOSPITAL, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54. 1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55. "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56. Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57. "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22 & 2/5/99)

58. Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, (2/22-2/24/1999). Entry Level Process Group Leader.

60.     "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.     "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.     "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.     "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.     Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.     "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.     California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.     "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.     State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.     11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.     The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.    "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", Third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.    15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder."  Boise State University, Boise, Idaho.  (5/25/99)

76.    "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.    "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.    "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.    "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan.  (6/22/99)

80.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.    "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.    "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California.  (7/22/99)

84.    1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California.  (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center.  Kahului, Maui.  (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.    "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.     "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.     "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.     "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.     "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.     "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.     "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.     "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.     "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.     "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.     "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunderoad Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California.  (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.    "Wasn't One Problem Enough?"   Mental Health and Substance Abuse Issues. 2001California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.    "Dual Diagnosis-Assessment and treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.    Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.    National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."   I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.    Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders."  San Jose, California.  (6/15/01)

118.    Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser."  Olympia, Washington.  (11/15/01)

119.    The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

120.    Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

121.    3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

122.    New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

123.    Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

124.    California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

125.    San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

126.    First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

127.    Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.    Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.    "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130.    "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131.    "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132.    Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.    San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134.    "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135.    "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136.    Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

**Ex 135 - 1796**

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference. Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference. Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network. Medford, Oregon. (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar. San Francisco, California. (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference. London, England. (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California. (10/30/07)

147.   "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference. San Diego, California. (12/13/07)

148.   "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149.   "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150.   "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)


PUBLICATIONS:

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and outcome in a short-term therapy group for schizophrenic outpatients.* Hospital and Community Psychiatry, 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group process in short-term outpatient therapy groups for schizophrenics.* Group, Volume 13, Number 2, Summer 1989.

3)      Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4) Oct-Dec 1991, 387395.

4)      Banys, P., Clark, W.H., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol 11(1), 9-15.

5)      Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, W.H., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol 182(10), 570-575.

6)      Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W. O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trail Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), July-September 1996

7)      Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999

8)      Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)      Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. By Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)     Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)     James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)     Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)     Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon

# EXHIBIT B

*U.S. v. Lezmond Mitchell*

## DOCUMENT INDEX FOR PABLO STEWART, M.D

June 17, 2009

## LEZMOND MITCHELL – CLIENT

1. **Vital Records**

   a.   Birth Certificate, 9/17/1981

   b.   Tribal Affiliation-1/4 Navajo Indian Blood, 3/23/1984

2. **Medical Records**

   a.   Auto Accident, 10/9/1999

   b.   Edward Fields, Ph.D., 1998-1999

   c.   Red Mesa High School

3. **School Records**

   a.   Sanders Elementary School, Sanders, Arizona (Grades K-2)

   b.   Thomas McCarthy Catholic School, Hanford, California (Grades 1-2)

   c.   Avenal Elementary School, Avenal, California (Grades 2)

   d.   Round Rock Elementary School, Teec Nos Pos, Arizona (Grades 3-5)

   e.   Red Mesa Jr. High School, Teec Nos Pos, Arizona (Grades 7-8)

   f.   Red Mesa High School, Teec Nos Pos, Arizona (Grades 9-11)

   g.   Rough Rock High School, Rough Rock, Arizona (Grade 11)

   h.   Rough Rock Community School, Chinle, Arizona (Grade 12)

   i.   Disciplinary and Absentee Records

1

Ex 135 - 1800

4.   **Employment Records**

   a.   Levy Restaurants (Bank One Ballpark, Phoenix, Arizona), 7/2001-8/2001

5.   **Court Records**

   a.   Trial Court Judgment, Chinle, Arizona, 11/7/2001

   b.   Arrest Warrant, Phoenix, Arizona, 11/23/2001

   c.   Superseding Indictment, U.S. v. Mitchell, CR 01-1062-PCT-MHM, District of Arizona, 7/2/2002

6.   **Miscellaneous**

   a.   Photographs

   b.   Transcript of Interview of Client with Law Enforcement, 11/4/2001

   c.   Interview of Client with Law Enforcement, 11/4/2001

   d.   Interview of Client with Law Enforcement, 11/5/2001

   e.   Interview of Client with Law Enforcement, 11/29/2001

2

Ex 135 - 1801

**SHERRY LANE MITCHELL – CLIENT'S BIRTH MOTHER**

7. **Vital Records**

   a.  Birth Certificate, 5/27/1958

   b.  Dept. of Interior/BIA and Tribal Enrollment Records

8. **School Records**

   a.  Cherokee High School, Cherokee, North Carolina,1971-76

   b.  Dine Community College, Tsaile, Arizona, 1978-1981

   c.  Northern Arizona University, Flagstaff, Arizona, 1978-1983

   d.  Northland Pioneer College, Holbrook, Arizona, 1978-79; 1984; 1987

   e.  Curriculum Vitae of Sherry Mitchell

9. **Medical Records**

   a.  Birth Records of Lezmond Mitchell, Tsaile, Arizona, 9/1981

   b.  Tuba City Indian Medical Center, Tuba City, Arizona, 1964; 1977

   c.  R.M. Christian Hospital, Gallup, New Mexico, 6/2000; 2/2009

10. **Court Records**

   a.  Mitchell v. Hemil, Orange County Superior Court Case No. 40-21-32, Child Support Records (Orange County, California), 1984

   b.  Guardianship Records re Lezmond Mitchell, 12/1987; 9/1998

11. **Miscellaneous**

   a.  Photographs

3

Ex 135 - 1802

## FOSTER LEZMOND HEMIL – CLIENT'S BIRTH FATHER

12. **Vital Records**

  a.  Death Certificate, 12/1/2002

  b.  Governmental Form listing surviving children in the Marshall Islands

  c.  Medical Records-Armer Ishoda Memorial Hospital, Marshall Islands, 1985-2002

13. **School Records**

  a.  Dine College, Tsaile, Arizona, 1979-1980

  b.  Marshall Islands High School, 1974-1979

14. **Employment Records**

  a.  Verification letter re employment, Majuro, Marshall Islands, MH, 4/21/2009

15. **Court Records**

  a.  Child Support, 1984 (see child support records under Sherry Mitchell at Ex. 10a)

  b.  People v. Foster Hemil, Orange County Superior Court Case No. C51741, Sexual Battery, 1983

  c.  People v. Foster Hemil, Orange County Superior Court Case No. 84CS03093, DWI (Administrative Record Only), 1984

4

Ex 135 - 1803

## BACKGROUND INFORMATION

16. **Murder Book**

    a.    Co-Defendant/Conviction and Sentence Chart

17. **Privileged and/or Work Product From Trial Counsels' Files – Filed Under Seal**

    a.    Interview of Dr. Fields, 4/16/2002

    b.    Social History Prepared by Vera Ockenfels, 11/2/2002

    c.    Report by Dr. Morenz, 3/3/2003

18. **Declarations**

    a.    Kevin Clinton, 5/14/2009

    b.    Mary Coronado, 5/15/2009

    c.    Karin Dunn, 5/14/2009

    d.    Rene Escalante, 5/15/2009

    e.    Sonja Halsey, 6/6/2009

    f.    Lisa Loughridge, 5/15/2009

    g.    Freda Reed, 5/29/2009

    h.    Randy Reed, 5/29/2009

    i.    Tara Reed-Dayzie, 5/21/2009

    j.    Tammy Rose Sebahe, 5/30/2009

    k.    Donnarae Sowell, 5/16/2009

    l.    Celestial Wilson, 5/14/2009

5

Ex 135 - 1804

19. **Additional Declarations** (as of 10/28/2009)

   a.   Clah, Sherwin, 10-24-2009

   b.   Comb, Randall, 08-14-2009

   c.   DeLuca, Eric, 06-04-2009

   d.   Fontes, John, 06-05-2009

   e.   George, Padrian, 05-20-2009

   f.   Haskan, Carlisle, 08-15-2009

   g.   Hemil, Lezmond, 05-2009

   h.   Lameman, Ferdinand, 08-15-2009

   i.   Leal, Dennie, 05-31-2009

   j.   Mitchell, Alex, 10-22-2009

   k.   Mitchell, Auska, 06-04-2009

   l.   Mitchell, Sherry Lane, 05-07-2009

   m.   Nakai, Daisy, 05-20-2009

   n.   Nakai, Gregory, 05-15-2009

   o.   Nakai, Jakegory, 10-06-2009

   p.   Nakai, Jimmy Jr., 09-29-2009

   q.   Orsinger, Johnny, 06-02-2009

   r.   Reed, Lorenzo Jr., 05-30-2009

6

Ex 135 - 1805

s.    Roessel, Ruth, 05-31-2009

t.    Sebahe, Tammy Rose, 05-30-2009

u.    Tsosie, Cheryl, 06-01-2009

v.    Tsosie, Herman, 06-01-2009

## OTHER MISCELLANEOUS FAMILY RECORDS (as of 10/28/2009)

20.    a.    Shirlene Moses - Navajo Nation Court Records

b.    Foster Hemil, Jr. Death Certificate

Ex 135 - 1806

# DECLARATION OF JAKEGORY NAKAI

I, Jakegory Nakai, hereby declare as follows:

1.    My name is Jakegory Nakai.  I am an inmate in the Federal Bureau of Prisons; my release date is 2021.

2.    I was born on May 7, 1984.  Daisy Nakai and Jimmy Nakai, Sr., are my parents.  I am the younger brother of Jimmy Nakai, Jr. and Gregory Nakai.

3.    My paternal grandparents, Virginia and Russell Nakai, raised me in Red Valley, Arizona, on the Navajo Reservation.  My father lived with us off and on when I was young, although I mostly remember him being in prison; my mother Daisy lived elsewhere.

4.    When I was fifteen years old, I started to spend more time with my brothers at my parents' house in Round Rock.  During this period, my mother lived in Shiprock, New Mexico, with Sam Johnson.  Although our mother came to see us in Round Rock from time to time, no other adults lived at the Round Rock family house except Gregory.  In the Summer of 2000, when I was sixteen years old, I moved to Round Rock permanently.

5.    The Fall of 2000, I attended high school in Many Farms, on the reservation.  I rode the school bus to and from school.  I always liked school and

1

J.N.

got bored when I stayed around the house all day. I was very good at mathematics. My goal was to graduate from high school and join the Marine Corps.

6.      My brothers Jimmy Jr., Gregory and I, and some of our friends, drank beer and smoked marijuana nearly daily the Fall of 2000. I met Lezmond Mitchell when he started coming to our house during the Summer of 2001 to party with us. Lezmond moved into our house not long after he started showing up; I never asked Lezmond why he came to live with us.

7.      My brothers Jimmy Jr., Gregory, I, and our friends, drank a lot of beer, too. Although selling alcohol on the Navajo Reservation is illegal, if you want to buy alcohol, people will sell it to you; these people are well known. Most of the beer that we drank at our house we bought from ▮▮▮▮, who lived a few miles away. I don't know his last name.

8.      During the summer and fall of 2001, I, Gregory, Jimmy Jr., and our friends, including Lezmond Mitchell, drank beer, smoked marijuana, and used crystal meth, cocaine and ecstacy whenever we could. Our drug use increased between August 2001 and November 2001, and all of us hanging out at the Round Rock house used more and more drugs, including Lezmond Mitchell. We never

2

_J.N._
J.N.

stopped using drugs and drinking during those months. Whenever the drugs started to run low, someone went out and got more. The drugs, marijuana, cocaine, and crystal meth were always available. Lezmond Mitchell used as much drugs and drank as much beer as everyone else in the house. There were times when we did not eat for a few days because we were using all of our money for drugs and had no money left over to buy food.

9.    The police and FBI arrested me at our home in Round Rock very early in the morning on November 4, 2001. I was seventeen years old when the police arrested me. The police and FBI also arrested my brothers Gregory and Jimmy, Lezmond Mitchell and another friend of ours, Padrian George, at the house that day. We all had been up very late the night before smoking marijuana and crack cocaine. I don't remember very much about the morning of the arrest.

10.    No one from Lezmond Mitchell's defense team has ever spoken to me before . If I had been asked previously, I would have willingly talked about the information contained in this declaration.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct. Signed the __6__ of October 2009.

Jakegory Nakai

3

Ex 136 - 1809

Declaration of Jimmy Nakai, Jr.

I, Jimmy Nakai, Jr., hereby declare as follows:

1. I was arrested in November of 2001 on criminal charges related to the murders of David Kee Begay and Jaspert Sam. I was twenty-three years old. After I was convicted, the court sentenced me to seventy-two months in federal prison. I am in a community corrections program in Florence, Arizona.

2. I grew up on the Navajo Reservation. When I was little, I lived with my parents, Daisy and Jimmy Nakai, and my brothers, Gregory, Jakegory, and Jeffrey, and our sister on the Nakai family allotment in Red Valley, Arizona. My paternal grandparents also lived on the allotment, in another house. My parents broke up when I was 15 years old, in approximately 1993. When my parents split up, my mother took all of us kids to her family's allotment in Round Rock, Arizona, also on the reservation. My maternal grandmother, maternal great aunt and my aunt also lived there.

3. However, our mother did not live with us in Round Rock. She lived in Shiprock, New Mexico with her boyfriend. My siblings and I were initially cared for by our grandmother, but as we got older we grew more independent of her even though we continued to live in Round Rock.

1

Ex 137 - 1810

4. I first met Lezmond Mitchell when he was a student at Red Mesa High School. I am older than Lezmond and did not attend school with him. I met Lezmond through one of my cousins. I knew Lezmond well enough to say hello to him but I otherwise did not spend any time with him prior to the summer of 2001.

5. In 2001, I was living on the reservation in Red Mesa, Arizona with Parmeia George and our two children. I visited my brothers and sister at our family compound in Round Rock. I went there to hang out with my brothers two or three times a week. I remember Lezmond Mitchell showing up sometime during the summer of 2001.

6. I went to see my brothers and their friends in Round Rock at least twice a week during the summer of 2001, and sometimes more often. When I was at the house, my brothers and their friends, including Lezmond Mitchell, and I regularly smoked crack cocaine together. We also used meth. And we always smoked marijuana and we always drank beer. There were times when we drank rum and Coca-Cola, but not every time. It's hard for me to say exactly how much crack cocaine and meth we used, but I can say that it was enough drugs for the four or five guys at our family's house to use the drugs and stay high all day. We used whatever drugs we could get a hold of and continued to use what drugs we had until they were gone. From the conversations I overheard between my

2

Ex 137 - 1811

brothers and Lezmond, I believe they were all using drugs every day that summer, including days when I was not with them.

7. On the night before everyone was arrested in November of 2001, I was at my family's house with my brothers, Lezmond Mitchell, Padrian George and Johnny Orsinger. I smoked marijuana that night and drank beer. I am not sure what drugs anyone else in the house was using that night. I really wasn't paying that much attention because using drugs was a part of our lives at the time. There was nothing unusual about us drinking and getting high.

8. I have never before spoken with anyone from Lezmond Mitchell's defense team. If I had been asked, I would have gladly provided the information I have given here.

I declare under the penalty of perjury, the foregoing is true and correct. Signed this 9/29/09 day of September, 2009.

Jimmy Nakai, Jr.

3

Ex 137 - 1812

TYPE OR PRINT IN
PERMANENT INK
SEE HANDBOOK FOR
INSTRUCTIONS



# Ministry of Health Services
## REPUBLIC OF THE MARSHALL ISLANDS

# CERTIFICATE OF DEATH

FILE NUMBER BY REGISTRAR
Maju 2009-163

**DECEASED**

| DECEASED – NAME FIRST | MIDDLE | LAST | SEX | DATE OF DEATH (MONTH, DAY, YEAR) |
|---|---|---|---|---|
| 1. Foster | | EMIL JR. | 2. Male | 3. September 03, 2009 |

| AGE – LAST BIRTHDAY YEARS | UNDER 1 YEAR MOS. | DAYS | UNDER 1 DAY (CHECK) | DATE OF BIRTH (MONTH, DAY, YEAR) | COUNTRY OF DEATH |
|---|---|---|---|---|---|
| 4a. 20 | | | | 5. ▮▮ 1989 | 6a. Marshalls |

| ATOLL OR ISLAND GROUP OF DEATH | HOSPITAL OR DISPENSARY – NAME (IF NOT IN EITHER, GIVE VILLAGE, MUNICIPALITY, ISLAND) | HOSPITAL UNIT RECORD NUMBER |
|---|---|---|
| 6b. Majuro | 6c. Majuro Hospital | 6d. #36914 |

| ATOLL/ISLAND OF BIRTH | CITIZEN OF WHAT COUNTRY | MARRIED, NEVER MARRIED, WIDOWED, DIVORCED, (SPECIFY) | SURVIVING SPOUSE (IF WIFE, GIVE MAIDEN NAME) |
|---|---|---|---|
| 7. Majuro | 8. RepMar | 9. — | 10. — |

| SOCIAL SECURITY NUMBER | USUAL OCCUPATION (GIVE KIND OF WORK DONE DURING MOST OF WORKING LIFE, EVEN IF RETIRED) | KIND OF BUSINESS OR INDUSTRY |
|---|---|---|
| 11. — | 12a. — | 12b. — |

| RESIDENCE – MARSHALL ISLANDS | ATOLL OR ISLAND GROUP | VILLAGE OR HAMLET, MUNICIPALITY, ISLAND |
|---|---|---|
| 13a. Jenrok, Majuro | 13a. Majuro | 13b. Jenrok, Majuro |

**PARENTS**

| FATHER – NAME FIRST | MIDDLE | LAST | MOTHER – MAIDEN NAME FIRST | MIDDLE | LAST |
|---|---|---|---|---|---|
| 14. Foster | | Emil | 15. Diana | | Jamodre |

| INFORMANT – NAME | ADDRESS | DATE INFORMATION WAS GIVEN |
|---|---|---|
| 16. Hospital Records # 36914 | 16a. Majuro Hospital, Marhall Islands. | 16a. September 30, 2009 |

**CAUSE**

PART I. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR (a), (b) AND (c))  |  APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

17.

IMMEDIATE CAUSE
(a) SEVERE ASPHYXIA

CONDITIONS, IF ANY WHICH GAVE RISE TO IMMEDIATE CAUSE (a), STATING THE UNDERLYING CAUSE LAST
DUE TO, OR AS A CONSEQUENCE OF:
(b) SUICIDE BY HANGING

DUE TO, OR AS A CONSEQUENCE OF:
(c)

PART II. OTHER SIGNIFICANT CONDITIONS: CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (a)  |  AUTOPSY (YES OR NO)  18. No

**MEDICAL ATTENDANT**

| I CERTIFY THAT I ATTENDED THE DECEASED AND THAT DEATH OCCURRED ON THE DATE AND TO THE BEST OF MY KNOWLEDGE FROM THE CAUSES SHOWN | NAME OF PHYSICIAN 19a. Peter Asuo, MD | SIGNATURE 19b. | DATE SIGNED (MONTH, DAY, YEAR) 19a. 9/30/09 |
|---|---|---|---|

**NO MEDICAL ATTENDANT**

| OFFICIAL REPORT AND FINDINGS OF INVESTIGATION WHERE APPLICABLE WERE REVIEWED BY | NAME OF PHYSICIAN 20a. | SIGNATURE 20b. | DATE SIGNED (MONTH, DAY, YEAR) 20c. |
|---|---|---|---|

**INJURY**

| ACCIDENT, SUICIDE, HOMICIDE, OR UNDETERMINED (SPECIFY) 21a. | DATE OF INJURY (MONTH, DAY, YEAR) 21b. | HOW INJURY OCCURRED (ENTER NATURE OF INJURY IN PART I OR PART II, ITEM 17) 21c. |
|---|---|---|

| INJURY AT WORK (YES OR NO) 21d. | PLACE OF INJURY: HOME, FARM, ROAD, DOCK, ETC. 21e. | LOCATION (VILLAGE, HAMLET, ETC.) 21f. |
|---|---|---|

**DIST. HEALTH SERVICES**

| I CERTIFY THAT I HAVE REVIEWED THIS CERTIFICATE FOR COMPLETENESS AND ACCURACY (I HAVE ADDED INFORMATION ON INJURY WHEN APPLICABLE) 22a. Kennar Briand, MBBS | SIGNATURE OF SECRETARY OF HEALTH SERVICES OR AUTHORIZED DEPUTY | DATE SIGNED (MONTH, DAY, YEAR) 22b. 9.30.09 |
|---|---|---|

| NAME OF REGISTRAR 23a. | SIGNATURE 23b. | DATE RECEIVED BY REGISTRAR (MONTH, DAY, YEAR) 23c. Oct 19 2009 |
|---|---|---|

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF THE ORIGINAL WHICH IS ON FILE IN THIS OFFICE.

Registrar General
Republic Of The Marshall Islands

1990 Revision

Ex 138 - 1813

## DECLARATION OF JONATHAN L. ARDEN, MD

I, Jonathan L. Arden, MD, declare:

1.      I am a forensic pathologist certified by the American Board of Pathology in Anatomic and Forensic Pathology. I have conducted more than 2,300 autopsies. A true and correct copy of my *curriculum vitae* is attached as Appendix A hereto.

2.      The Office of the Federal Public Defender for the Central District of California, which represents Lezmond Mitchell in his federal habeas proceedings, asked me to evaluate the forensic evidence in Mr. Mitchell's case and render opinions regarding the extent of Tiffany Lee's neck injuries and whether they could have caused her death. I was also asked my opinion on whether a medical anthropologist would typically take part in an autopsy, as one did in Lee's.

3.      To prepare this declaration, I reviewed and relied upon the autopsy report and photographs, a number of police reports and trial exhibits (including photographs of the crime scene and victim), trial testimony, and assorted other documents. A complete list of these documents is attached as Appendix B hereto. These are the types of documents and information typically relied upon by forensic pathologists in forming professional opinions on the issues discussed herein.

Declaration of Jonathan L. Arden, MD

4.    I have reviewed the testimony of the Government's Medical Examiner Dr. Jerri McLemore presented at trial and compared it to her autopsy report.  Dr. McLemore described "neck injuries" in the "cause of death" section of her autopsy report.  These injuries were distinct and not part of the dismemberment wounds which she described as postmortem.  Dr. McLemore included these distinct "neck injuries" as a cause of death.  In my opinion, Dr. McLemore's cause of death theory is flawed and fails to account for the totality of the forensic evidence.  Her theory ignores the amount and distribution of the blood just under the surface of Lee's brain (subarachnoid hemorrhage) and the bruising in Lee's brain; both prove that Lee was alive when the rocks hit her head.  But more revealing is Dr. McLemore's own description of the neck injury.  The autopsy described the wound as $1/16^{th}$ of an inch deep and cited no injuries to the major blood vessels, larynx, or muscles in Lee's neck.  In my opinion, a neck wound which was not deep enough to injure a major blood vessel, the larynx, or muscles in the neck could not have been a significant threat to Lee's life. Evidence in the autopsy report clearly indicated a superficial wound, so the neck injuries should not have been included as a cause of death in the autopsy report.

2

Declaration of Jonathan L. Arden, MD

5.      A forensic anthropologist applies her education in skeletal and biological skills and techniques to aid in the assessment and identification of badly decomposed and skeletonized human remains.  Generally, a forensic anthropologist cannot opine on a decedent's soft-tissue wounds.  Only a physician who has studied extensively human anatomy, physiology and pathology and is qualified to perform human autopsies (i.e., an MD or DO, and especially a forensic pathologist) may opine on soft-tissue wounds as a cause of death.

6.      I hold the foregoing opinions to a reasonable degree of medical certainty.  The scientific bases for these opinions were available to forensic pathologists at the time of Mr. Mitchell's trial in 2003.  Had I been provided with the underlying information upon which I have relied here and had I been asked at the time of Mr. Mitchell's trial, I could and would have provided the explanations and opinions expressed here to Mr. Mitchell's jury.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on ___31 October 2009_____ in ___McLean, VA_____.

Jonathan L. Arden, MD

3

Ex 139 - 1817

# Appendix A

# **Arden Forensics**

Jonathan L. Arden, MD
President

Arden Forensics, PC
1400 Julia Avenue.
McLean, VA 22101

703.749.0227
www.ardenforensics.com

*Curriculum vitae* of Jonathan L. Arden, MD

## Employment

| | |
|---|---|
| 5/08—Present | **Forensic Pathologist (Part-time)**<br>**Office of the Chief Medical Examiner**<br>**State of West Virginia** |
| 1/06-Present | **President, Arden Forensics, PC** |
| 3/04-Present | **Consultant in Forensic Pathology and Medicine** |
| 12/03- 7/05 | **Medical Examiner, Northern Virginia Region (Part-time)** |
| 4/98-10/03 | **Chief Medical Examiner**<br>**Office of the Chief Medical Examiner**<br>**Washington, DC** |
| 3/89–4/98 | **Office of Chief Medical Examiner, City of New York**<br>**New York, NY** |
| 7/96–4/98: | First Deputy Chief Medical Examiner |
| 7/91–7/96: | Acting First Deputy Chief Medical Examiner |
| 8/89-6/91: | Deputy Chief Medical Examiner |
| 3/89-7/89: | Deputy Medical Examiner |
| 2/86-2/89 | **Assistant Medical Examiner**<br>**Office of the Chief Medical Examiner, State of Delaware** |
| 7/84–2/86 | **Deputy Medical Examiner-Pathologist**<br>**Office of the Medical Examiner**<br>**Suffolk County, New York** |

## Graduate Medical Training

| | |
|---|---|
| 7/83-6/84: | Resident in Forensic Pathology<br>Office of the Chief Medical Examiner, State of Maryland |
| 7/80-6/83: | Resident in Anatomic Pathology<br>New York University Medical Center |

## Education

University of Michigan Medical School: **MD**, 1980
University of Michigan: **BS** with High Distinction, 1976
The Johns Hopkins University, 1972-1974

Ex 139 - 1818

*Curriculum vitae* of Jonathan L. Arden, MD

## Medical Licensure

| | |
|---|---|
| West Virginia | 2008 |
| Maryland | 2005 |
| Virginia | 2003 |
| District of Columbia | 1998-2006 |
| Delaware | 1986-2001; reinstatement 2005 (lapsed by non-renewal) |
| New York | 1982 |

## Board Certification

1985    Diplomate, American Board of Pathology, Anatomic and Forensic Pathology

## Professional Memberships

National Association of Medical Examiners
        (Board of Directors, 2002-2008; Executive Committee, 2006-2008)
Medical Society of Virginia
Medical Society of the District of Columbia, 1998-2003

## Academic Appointments

Clinical Assistant Professor of Pathology, George Washington University School of Medicine, 1998-2003
Clinical Assistant Professor of Pathology, State University of New York Health Sciences Center at
        Brooklyn, 1989-1998
Clinical Assistant Professor of Forensic Medicine, New York University School of Medicine, 1989-1998

## Selected Professional Activities

Identification of the Missing focus group of the National Center for Forensic Science, National Institute of
        Justice (representing National Association of Medical Examiners), 2006-2007
Chair, Uniform Definitions and Standards Work Group, Center for Substance Abuse and Treatment's
        Project on Co-Occurring Disorders and Other Emerging Issues in Opioid Treatment, Substance
        Abuse and Mental Health Services Administration, US DHHS (representing National Association
        of Medical Examiners), 2004-2005
Environmental Clearance Committee for the Curseen-Morris Postal Facility (co-sponsored by US
        Environmental Protection Agency and DC Department of Health), 2003
Government of the District of Columbia:
        Child Fatality Review Committee, 1998-2003
        Mental Retardation and Developmental Disabilities Administration
            Fatality Review Committee, Chair, 2000-2003
        Emergency Preparedness Task Force and Emergency Preparedness Committee, 2001-2003
        Mayor's Health Policy Council, 1998-2003
Metropolitan Washington Council of Governments, Bio-terrorism Task Force, 2001-2003
Medical Society of the District of Columbia, Family Violence Task Force, 2000-2003
National Association of Medical Examiners, Interim Meeting, Program Chair, February 1997
New York State Commission on Domestic Violence Fatalities, 1996-1997
American Board of Pathology, Forensic Pathology Test Committee, 1992-1997
City of New York, Administration for Children's Services/Human Resources Administration, Child Fatality
        Review Panel, 1989-1998
City of New York, Criminal Justice Child Abuse Task Force, 1996-1998
New York City Multidisciplinary Child Fatality Review Team, Project Director, 1995-1998
Physician Assistant Program, The Brooklyn Hospital-Long Island University, Pathology Course Director,
        1991-1997

2

Ex 139 - 1819

*Curriculum vitae* of Jonathan L. Arden, MD

## Selected Continuing Medical Education

43rd Annual Forensic Dental Identification and Emerging Technologies Course of the Armed Forces
Institute of Pathology, March 12-16, 2007

22nd Annual Washington Neuroradiology Course of the Armed Forces Institute of Pathology, February 17-
18, 2007

15th Annual Anatomic Pathology Review Course of the Armed Forces Institute of Pathology, April 17-23,
2005

## Selected Lectures and Presentations

"Postmortem Changes and Time of Death," "Sudden Natural Deaths," and "Investigation of Early
Childhood Deaths," presented at the West Virginia Office of the Chief Medical Examiner 2009
Forensic Death Investigation Training Course, Sutton, WV, October 5-6, 2009

"Death Investigation," presented at the South Carolina Coroner's Association 2009 Training Conference,
Litchfield Beach, SC, June 10, 2009

"Forensic Pathology," presented at the Fifth National Seminar on Forensic Evidence and the Criminal
Law, Philadelphia, PA, January 9, 2009

"The Role of the Forensic Pathologist in Homicide and Capital Defense," lecture given at the Yale Law
School Capital Punishment Clinic, New Haven, CT, December 9, 2008

"Fatal Dissection and Rupture of a Coronary Artery Bypass Vein-Graft: Implications for ME Jurisdiction
and Practice," presented at the National Association of Medical Examiners Annual Meeting,
October 2008

"Recognition and Interpretation of Child Abuse Injuries," Annual Meeting, Virginia Association of
Orthopaedic Technologists, McLean, VA, March 31, 2007

"Pitfalls in the Practice of Forensic Pathology," Forensic Grand Rounds, Commonwealth of
Massachusetts Office of the Chief Medical Examiner and Boston University School of Medicine,
November 1, 2006

"The Role of the Forensic Pathologist in Homicide Defense," Seminar, Office of the Georgia Capital
Defender, July 6, 2006

"Be Careful What You Wish For..." presented at the National Association of Medical Examiners Annual
Meeting, October 2005

"Sudden Natural Deaths," presented at the Armed Forces Institute of Pathology Basic Forensic Pathology
Course, December 2, 1999

"Subtle Child Abuse Fatalities" presented at the National Association of Medical Examiners Interim
Meeting, February 1997

3

Ex 139 - 1820

*Curriculum vitae* of Jonathan L. Arden, MD

Teaching and lecturing for various audiences, including: physicians, graduate medical trainees and medical students, nurses and physician assistants, law enforcement, prosecutors and defense attorneys, and interdisciplinary government panels, 1986 - Present. Topics include:
- pediatric forensic pathology (child abuse and neglect, sudden infant death syndrome)
- death investigation and certification
- deaths in custody
- sudden natural deaths
- mistakes in homicide investigations
- courtroom testimony and procedures

## Publications

Shuangshoti S, Hjardemaal GM, Ahmad Y, Arden JL and Herman MM. Concurrence of multiple sclerosis and glioblastoma multiforme. Clin. Neuropath. 22:304-8, 2003.

Borio L, Frank D, Mani V, Chiriboga C, Pollanen M, Ripple M, Ali S, DiAngelo C, Lee J, Arden J, Titus J, Fowler D, O'Toole T, Masur H, Bartlett J, Inglesby T. Death due to bioterrorism-related inhalational anthrax: report of 2 patients. JAMA. 2001 Nov 28; 286(20):2554-9.

Flomenbaum MA, Arden JL. Final Considerations: Interacting with the Medical Examiner, Chapter 24 in *Emergency Diagnostic Testing, 2nd Ed,* Flomenbaum NE, Goldfrank L and Jacobson S, eds. Mosby-Yearbook, Philadelphia, PA 1995

Fried KS, Arden JL, Gouge TH, Balthazar EJ. Multifocal granular cell tumors of the gastrointestinal tract. Am J Gastroenterology 79(10):751-755, 1984

Smialek JE, Arden JL, Monforte JR. Changes observed in blood carbon monoxide levels due to decomposition. Abstract #c10, presented at National Association of Medical Examiners meeting, Miami, FL, 1981

Han SS, Holmstedt J, Geha-Mitzel M, Pirbazari M, Arden JL. *Biology of Aging.* Published by Program in Biology of Aging, University of Michigan Institute of Gerontology, Ann Arbor, MI, 1979

4

Ex 139 - 1821

## DECLARATION OF MONICA GINER

I, Monica Giner, hereby state and declare as follows:

1.      I am the Chief Investigator in the Capital Habeas Unit of the Office of the Federal Public Defender for the Central District of California. I have been Chief Investigator for approximately the past two years and an investigator in the Unit since August, 2000.

2.      The Capital Habeas Unit has twelve investigators. I assign investigators to work on the cases handled by the Unit, representing capital defendants in habeas corpus actions challenging their convictions and death sentences.

3.      As Chief Investigator, I am responsible for supervising and training the Unit's investigators and reviewing their work product. I also advise them and the attorneys in the Unit on how to conduct habeas investigations. As part of my job, I keep abreast of developing legal issues affecting how to conduct legally proper witness and jury interviews.

4.      Interviewing the jurors and alternate jurors selected for the trial resulting in the movant's conviction and death sentence is a routine part of a thorough habeas investigation. Although the habeas attorneys review the record and trial counsel's files, we rarely know whether jury misconduct occurred until the jurors are interviewed.

5.      One of my duties as Chief Investigator is to instruct investigators on how to conduct juror interviews. Our policy on conducting juror interviews is as follows: One or two investigators are assigned to each juror interview. The investigators usually contact the juror at his or her home at a convenient time, typically during the day, if jurors is of retirement age, or in the early evening or weekends, if the juror works, and never after 8:00 p.m. unless there is an agreement to meet after that time. The investigators inform the juror that they work for the Federal Public Defender, and that the Federal Public Defender now represents the defendant in federal court

1

Ex 140 - 1822

proceedings reviewing his conviction and death sentence. At least one, or sometimes both, of the investigators give the juror their business card. The cards are uniform: each states the investigator's name, title, and the Federal Public Defender's address and telephone number. The investigators ask the juror whether she would be willing to discuss her experience, as a juror in the defendant's trial. If the juror states that she does not want to discuss her experience the investigators stop the interview and leave promptly. For as long as I have been associated with the Office of the Federal Public Defender, our policy has been to advise jurors that they have an absolute right to discuss or not discuss their jury deliberations or verdict.

6.    If the juror agrees to provide a declaration, the investigators draft a declaration based on the interview and instruct the juror to read, verify, and correct the declaration, if necessary. The investigators ask the juror to review the declaration carefully to make sure it is accurate. The juror is asked to initial any corrections and/or interlineations and to initial each page of the finalized declaration. The juror also signs the finalized declaration under penalty of perjury. Since January 1, 2001, our policy has been to tell jurors that they have the right to receive a copy of any declaration they sign.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge.

DATED: November 4, 2009
MONICA GINER

2

## DECLARATION OF THOMAS FEDOR

I, Thomas Fedor, declare:

1.    I am a forensic serologist presently employed by the Serological Research Institute which is accredited by the American Society of Crime Laboratory Directors.  I have been a forensic scientist for 23 years, specializing in DNA analysis since 1990.  A true and correct copy of my *curriculum vitae* is attached as Appendix A hereto.

2.    The Office of the Federal Public Defender for the Central District of California, which represents Lezmond Mitchell in his federal habeas proceedings, asked me to evaluate the forensic DNA evidence in Mr. Mitchell's case and render opinions regarding the results of the DNA analysis and the accuracy of the prosecution's DNA expert witness Benita Bock's testimony at trial.

3.    To prepare this declaration, I reviewed and relied upon trial testimony, a transcript of defense attorney Jeffrey Williams' interview of Bock, and some of the reports of the prosecution's expert Benita Bock regarding her DNA findings in this case.  A complete list of these documents is attached as Appendix B hereto. These are the types of documents and information typically relied upon by forensic scientists in forming professional opinions on the issues discussed herein.

4.    Mr. Mitchell's present counsel provided me all the DNA analysis and report from trial counsel's files. From my review of that material, it appears that

the Government provided trial counsel with incomplete DNA test results and only a partial written report by its expert. Test data is missing for the following: blood in the vehicle (trial exhibits 107, 109, 113, and 117); both Halloween masks (trial exhibit 93); both cell phones (trial exhibit 48); and stains on the blanket in the vehicle (trial exhibit 98). Also, there is no report by the Government's expert witness regarding the DNA evidence and the Halloween masks or blood in the vehicle. Mr. Mitchell's § 2255 counsel has retained me to review the DNA data and Bock's testimony introduced against Petitioner at trial, but without the data on these items of evidence neither I nor any expert can evaluate the Government's test results.

5.    I reviewed Benita Bock's findings and compared them to her testimony. It is inaccurate to match an individual person to a DNA sample without stating a "random match probability" of coincidental matching. Unless the DNA analyst provides statistics of a match probability, a lay person cannot determine or correctly weigh the statistical chance that a DNA match could have arisen by chance.

6.    Providing match probability statistics for one source of DNA evidence but not for other sources, for example hair on two rocks or two stains on a blanket, leaves the lay person with the inaccurate opinion that match probabilities are the

same regardless of the DNA sample. Match probability statistics change depending upon DNA evidence profile and the DNA profile of the individual.

7.    When the DNA in evidence is a mixture of multiple contributors of DNA or a "multi-source" samples of DNA, an analyst might find a major contributor and a minor contributor. However, it is inappropriate to use the term "match" as Bock did to describe a finding in a multi-source sample of DNA. Instead of "match," DNA analysts use the term "cannot exclude" to more accurately describe the findings in multi-source DNA samples. Similarly, I would not use the term "match" for partial DNA profiles where results are unavailable for all 14 loci. The term "match" overstates the similarity for the lay person especially when the analyst does not supply statistical probabilities of coincidence.

8.    The scientific bases for these opinions were available to forensic DNA analysts at the time of Mr. Mitchell's trial in 2003. Had I been provided with the underlying information upon which I have relied here and had I been asked at the time of Mr. Mitchell's trial, I could and would have provided the explanations and opinions expressed here to Mr. Mitchell's jury.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on _Nov 4, 2009_ in _Richmond, California_

_Thomas Fedor_
Thomas Fedor

# Appendix A

Ex 141 - 1827



**SEROLOGICAL     RESEARCH     INSTITUTE**

# RESUME OF
# THOMAS FEDOR

## *EDUCATION*

**1975**              *University of Michigan, Ann Arbor, Michigan*
                 Bachelor of Science, Chemistry and Psychology

**1983**              *University of Michigan, Ann Arbor, Michigan*
                 Master of Science, Cellular and Molecular Biology

**1999**              *North Carolina State University, Raleigh, North Carolina*
                 Continuing Education Units, Forensic and Paternity Data Analysis,
                 Summer Institute in Statistical Genetics

## *EMPLOYMENT*

**2002-Present**      *Serological Research Institute, Richmond, California*
                 Forensic Serologist

                 Forensic analysis of human blood and body fluid stains; Critical evaluation of
                 forensic and paternity analyses undertaken in other laboratories; Preparation of
                 written reports for legal professionals and the Courts; Expert witness testimony.

**2001-2002**         *California Department of Justice, Richmond, California*
                 Criminalist Supervisor

                 Oversight of eight criminalists in the Convicted Offender DNA Databank
                 Laboratory.

---

3053 RESEARCH DRIVE   ·   RICHMOND, CA 94806   ·   (510) 223-7374 (SERI)   ·   FAX (510) 222-8887

**EMPLOYMENT *(Continued)***                                                       *Page 2*


*1996-2001*                    ***Serological Research Institute, Richmond, California***
                               Forensic Serologist

                               Forensic analysis of human blood and body fluid stains; Critical evaluation
                               of forensic and paternity analyses undertaken in other laboratories;
                               Preparation of written reports for legal professionals and the Courts; Expert
                               witness testimony.

*1995 - 1996*                  ***London, England, Private Practice***
                               Independent Forensic Science Consultant

                               Critical evaluation of forensic and paternity analyses undertaken in other
                               laboratories;  Preparation of written reports for legal professionals and
                               the Courts; Expert witness testimony.

*1991 - 1995*                  ***U.K. Forensic Science Services Limited, Melbourn, Royston,***
                               ***Hertfordshire, England***
                               Forensic Science Consultant

                               Forensic analysis of blood and body fluid stains; Microscopic comparison
                               of hairs and fibers; Microspectrophotometry of fibers and thin-layer
                               chromatography of fiber dyes; Footwear marks; Crime scene examination;
                               Critical evaluation of forensic and paternity analyses undertaken in other
                               laboratories; Preparation of written reports for legal professionals and the
                               Courts; Expert witness testimony.

*1989 - 1991*                  ***University Diagnostics Limited, University College London, England***
                               Senior Forensic Scientist

                               DNA analysis for disputed family relationships; Critical evaluation of
                               forensic and paternity analyses undertaken in other laboratories;
                               Preparation of written reports for legal professionals and the Courts; Expert
                               witness testimony.

*1988 - 1989*                  ***Pediatric Research Unit, Department of Medical Molecular Genetics,***
                               ***Guy's Hospital Medical School, London, England***
                               Research Assistant

                               Biochemical research and diagnostic testing of inherited diseases.

**EMPLOYMENT (Continued)**                                             *Page 3*

*1986 - 1988*                **Detroit Police Department, Detroit, Michigan**
                             Forensic Serologist

                             Forensic analysis of blood and body fluid stains; Microscopic comparison
                             of hairs and fibers; Footwear marks; Crime scene examination; Preparation
                             of written reports for legal professionals and the Courts; Expert witness
                             testimony.

## PROFESSIONAL CERTIFICATIONS

Diploma in Criminalistics, American Board of Criminalistics, 1997-2007

Fellow in Biochemistry and Molecular Biology, American Board of Criminalistics, 1998-2007

8/07

Ex 141 - 1830

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

United States of America,

        Plaintiff,

v.

Lezmond Mitchell and Johnny Orsinger,

        Defendants.

CR 01-1062-PCT-MHM

**JUROR QUESTIONNAIRE**

## I. Instructions

Please complete the following questionnaire to assist the Court and the lawyers in selecting a jury to serve in <u>United States v. Lezmond Mitchell and Johnny Orsinger</u>. The purpose of these questions is not to ask unnecessarily about personal matters. It is simply to determine whether you as a prospective juror can decide the case fairly and impartially. The information which you give in response to this questionnaire will be used only by the Court and authorized parties to select a fair and impartial jury. After a jury has been selected, all copies of your response to this questionnaire will be returned to the Clerk of Court and kept in confidence. Any person having access to this questionnaire is under court order to maintain the confidentiality of any information learned in the course of reviewing these questionnaires.

Please do not discuss the questionnaire or your answers with anyone at any time. It is very important that the answers be yours and yours alone. Remember there are no

Ex 142 - 1831

"right" or "wrong" answers; only truthful answers. Your answers to all questions are made under penalty of perjury as true and complete.

Please use ink and print your answers to ensure legibility. Please write your assigned juror number on EACH page in the upper right-hand corner. Please write only on the front of each page. If you need additional space, please use the front side of the blank page attached at the end of the questionnaire--please be sure to write the number of the question to which you are responding on that page.

Part I of the Questionnaire relates to information about you and your attitudes generally. Part II of the Questionnaire relates to the death penalty aspects of this case.

II.  Nature of the Case

Both the victims and the defendants in this case are Native Americans and the crimes charged are alleged to have occurred on the Navajo Reservation.

Defendants Lezmond Mitchell and Johnny Orsinger are accused of participating in the carjacking of a vehicle resulting in the deaths of two individuals, among other crimes. The jury in this case will decide whether Lezmond Mitchell and/or Johnny Orsinger are guilty of carjacking resulting in death, as well as whether either of them are guilty of other crimes.

Under certain circumstances, a defendant who is found guilty of "carjacking resulting in death" may be subject to the death penalty. The United States alleges such circumstances exist in this case with respect to Lezmond Mitchell and the United States seeks a sentence of death against ONLY Lezmond Mitchell. Therefore, if the jury finds Lezmond Mitchell guilty of the crime of "carjacking resulting in death," the jury will then be required to recommend whether he should be sentenced to death or to life imprisonment without possibility of release.

- 2 -

Juror No._____

**JUROR QUESTIONNAIRE**

1. What is your native language?

   ☐ English    ☐ Spanish    ☐ Native American dialect    ☐ Other

2. Do you ☐ read, ☐ write, ☐ speak and ☐ understand the English language?

3. (a) Do you have a physical impairment (for example with your sight or hearing) that would interfere with your ability to serve as a juror?

   (b) If yes, please describe:_____

   _____

4. (a) Are you regularly taking a medication that could affect your ability to serve as a juror?    ☐ Yes        ☐ No

   (b) If yes, please describe:_____

   _____

5. Is there anything going on in your personal life or at work that would prevent you from giving this case your full and complete attention?  ☐ Yes  ☐ No   If yes, please explain:_____

   _____

6. Is there anything else you feel the Court or the parties should know about you regarding your possible service as a juror in this case?    ☐ Yes  ☐ No   If yes, please explain:_____

   _____

7. (a) What is your age? _____

   (b) Are you:    Female____    Male____

8. In what town, city or rural area do you reside?  If a rural area, please provide the nearest major intersection and town to you:_____

9. What is your race or ethnicity?_____

   _____

- 3 -

Ex 142 - 1833

Juror No._____

10.  Are you currently:

☐ married          ☐ separated          ☐ single

☐ widowed          ☐ divorced           ☐ living with non-marital mate

11.  Do you have any children?          ☐ Yes          ☐ No

If yes, please provide their ages:_____

_____

12.  Do you have any grandchildren?  ☐ Yes          ☐ No

If yes, please provide their ages:_____

_____

13.  Please fill out the chart below about each member of your household, whether child or adult:

| Relationship | Gender F / M | Age | Level of Education | Occupation |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

14.  Are you:  (Check any that apply)

Self-employed  _____          Employed full-time ____

Employed part-time _____          Working in the home  ____

Unemployed/laid off _____          Disabled & unable to work ____

Retired ____          Full-time student  ____

Part-time student _____

- 4 -

Ex 142 - 1834

Juror No._____

15. If you are employed, who do you work for and what type of work do you do (if retired, unemployed or disabled, what type of work did you last perform and who was your employer)? _____

_____

16. (a)    Have you had other employment in the past ten years? ☐ Yes  ☐ No

(b)    If yes, list prior place(s) of employment and position(s) for each prior employment:_____

_____

_____

17. (a)    Have you ever served in any branch of the armed forces of the United States (including the military reserves, National Guard or ROTC)? ☐ Yes   ☐ No

(b)    If yes, when? _____

(c)    What branch of service: _____

(d)    What was your highest rank? _____

(e)    Any combat duty?  ☐ Yes        ☐ No

(f)    Did you ever participate in any capacity in a court martial? ☐ Yes  ☐ No

(g)    Did you attend any special schools or receive special training? ☐ Yes ☐ No

If yes, please describe: _____

(h).    Location where you were stationed: _____

(i)    Did you receive any medals, honors or commendations? ☐ Yes   ☐ No

18. (a)    What was your highest level of education?

☐    0-grade 8

☐    Some high school

☐    High school graduate

☐    Vocational school

- 5 -

Ex 142 - 1835

Juror No._____

☐      Some college

☐      College graduate

☐      Some graduate school

☐      Post-graduate degree

(b)    If you are presently a student, please describe briefly your area of study:___

_____

(c)    Name any college or vocational degrees you have earned and your major

areas of study:_____

_____

(d)    Even if you never earned a law degree, please describe any law courses or

legal training you have had (for example, business law classes or paralegal

training):_____

_____

19.   (a)    Have you received any special training, such as technical, medical,

psychological, scientific, or special skills acquired on the job? ☐ Yes      ☐ No

(b)    If yes, please describe:_____

_____

20.   Have you ever worked in a laboratory or medical research facility?

☐ Yes   ☐ No   If yes, please describe your duties there:_____

_____

21.   (a)    Have you or any member of your household ever taken any classes or had

any training in the following: ___ Law ___ Medicine ___ Law enforcement

___ Corrections    ___ Criminology    ___ Any health-related field

(b)    If yes, please tell us the relationship to you of the person who participated in

classes or training for each of the areas checked above and the name of the classes

or training received:_____

- 6 -

Ex 142 - 1836

Juror No._____

22. (a) Have you, any family member(s), and/or close friend(s) ever been employed by, or connected in any way (paid or unpaid) with, any law enforcement agency, including the ATF (Alcohol, Tobacco & Firearms), FBI (Federal Bureau of Investigation), DEA (Drug Enforcement Administration), INS (Immigration & Naturalization Service), IRS (Internal Revenue Service), U.S. Customs Service, U.S. Marshal's Service, Arizona Department of Public Safety, New Mexico State Police, any local police department, sheriff's office, tribal police department, any district or county attorney, U.S. Attorney's or Attorney General's Office, any jail or correctional agency, and any police reserves or auxiliaries?  ☐ Yes  ☐ No

(b) If yes, please indicate who, their relationship to you, the name of the agency, the job title or connection and approximate dates:_____

_____

_____

23. (a) Have you, any family member(s) or close friend(s), ever applied to work or actually worked in any area of law enforcement?  ☐ Yes  ☐ No

(b) Are you planning, or do you know that anyone in your family or close circle of friends is planning to apply for a law enforcement position?

☐ Yes        ☐ No

(c) If yes to either question, please describe: _____

_____

_____

24. Do you have any family member(s) or close friend(s) who are lawyers or who attend(ed) law school?  ☐ Yes  ☐ No  If yes, please describe your relationship with the person and, if you know, the type of law that individual practices:_____

_____

- 7 -

Juror No._____

25. Do you have any family member(s) or close friend(s) who have ever worked for a criminal defense lawyer or private investigator? ☐ Yes   ☐ No  If yes, please describe:_____

_____

26. Have you, any close family member(s) or close friend(s) ever consulted with and/or retained the services of an attorney for any reason?  ☐ Yes   ☐ No   If yes, describe the general circumstances and the attorney(s) consulted:_____

_____

27. Have you ever sued anyone or been sued by anyone?  ☐ Yes     ☐ No
If yes, please describe:_____

_____

28. Have you, any family member(s) or close friend(s) ever been accused, arrested, indicted, charged or convicted (including probation, deferred adjudication, conditional discharge or the like) of any offense other than a traffic ticket?
☐ Yes   ☐ No  If yes, please explain:_____

_____

29. Have you, any family member(s) or close friend(s) ever appeared or testified as a witness in any investigation or legal proceeding? ☐ Yes     ☐ No
If yes, please describe:_____

_____

_____

- 8 -

Juror No._____

30.  Have you, any family member(s) or close friend(s) ever been questioned in any matter by any local, state or federal law enforcement agency?  ☐ Yes    ☐ No

If yes, please describe:_____

_____

_____

31.  Have you ever had a dispute with any local, state or federal agency or any of its employees?   ☐ Yes    ☐ No    If yes, please describe:_____

_____

_____

_____

32.  Have you, any family member(s) or close friend(s) ever been the victim of or witnessed a crime (whether reported to the police or not)?  ☐ Yes    ☐ No

(a)   If yes, describe the crime(s) and indicate the relationship of the person who was involved (no names) either as a witness or victim:_____

_____

_____

_____

(b)   Was anyone arrested?  ☐ Yes  ☐ No

(c)   If there was an arrest, what was the outcome? _____

_____

_____

_____

(d)   If there was a trial, did you testify?  ☐ Yes  ☐ No

(e)   Were you satisfied with the way law enforcement handled the matter?

☐ Yes  ☐ No    If no, why not?_____

_____

- 9 -

Juror No._____

33.  Have you, or to your knowledge, has any family member(s) or close friend(s) ever been an informant or cooperating individual for any law enforcement agency?

☐ Yes  ☐ No    If yes, please explain:_____

_____

_____

34.  (a)    Have you ever served:

As a juror in a civil case?        ☐ Yes    ☐ No

As a grand juror?            ☐ Yes    ☐ No

As a juror in a criminal case?      ☐ Yes    ☐ No

If you sat as a juror in a criminal case, please fill out the following chart:

| Date | State or Federal Court | Type of Case | Jury verdict, if there was one |
|------|------------------------|--------------|-------------------------------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

(b)    If you sat as a juror in a criminal case, were you ever the jury foreperson?

☐ Yes      ☐ No

35.  Do you, any close family member(s) or close friend(s) belong to, participate in and/or make financial contributions to any civic, social, union, professional, fraternal, political, recreational or religious organizations, such as, but not limited to, Kiwanis, Rotary Club, Knights of Columbus, Veterans of Foreign Wars, American Legion, American Civil Liberties Union, National Rifle Association, League of Women Voters, Crimestoppers, neighborhood watch programs, shelters or crisis centers, or any other organized group?  ☐ Yes  ☐ No  If yes, please indicate the relationship of the involved person to you (no names) and describe the

- 10 -

Juror No._____

group and the level of involvement, including any offices or leadership positions held:_____

_____

_____

36.  Other than as indicated in response to the preceding question, have you ever worked for, or been associated (as a member or otherwise) with, an organization that is concerned with alcohol or drug abuse? ☐ Yes  ☐ No   If yes, please name the organization(s) and the extent of your involvement:_____

_____

_____

37.  Has your life, the life of a close family member(s) and/or close friend(s) been affected by alcohol abuse or an alcohol related incident? ☐ Yes  ☐ No If yes, please indicate the relationship of the person(s) to you and briefly describe the circumstances:_____

_____

_____

38.  Has your life, the life of a close family member(s) and/or close friend(s) been affected by drug abuse or a drug related incident? ☐ Yes   ☐ No If yes, please explain:_____

_____

_____

39.  Have you, a close family member(s) and/or close friend(s) been diagnosed or received treatment for alcoholism or drug abuse? ☐ Yes ☐ No   If yes, briefly indicate when and the circumstances:_____

_____

_____

- 11 -

Ex 142 - 1841

Juror No._____

40.    Are you, any close family member(s) or close friend(s) Native American? ☐ Yes ☐ No    If yes, please give details:_____

_____

_____

41.    Have you, any close family member(s) or close friend(s) ever lived or worked on an Indian Reservation or had substantial work or personal contacts with a Reservation and/or its tribal members? ☐ Yes ☐ No    If yes, please give details:_

_____

_____

42.    Is there anything in your contacts or relationships with Native Americans that would make it difficult for you to be a fair and impartial juror in this case when the defendants are alleged to be Native Americans? ☐ Yes ☐ No    If yes, please explain:_____

_____

_____

43.    For any reason (for example, based upon personal experiences, or what you have heard or read, or visits to a Reservation), do you believe that it would be difficult for you to be a fair and impartial juror in this case? ☐ Yes ☐ No    If yes, please explain:_____

_____

_____

44.    Have you, any close family member(s) and/or close friend(s) ever worked in an effort to change a law or the enforcement of a law? ☐ Yes ☐ No    If so, please briefly describe that effort and your/his/her participation:_____

_____

_____

- 12 -

Ex 142 - 1842

Juror No._____

45.   The United States government has the right to prosecute crimes like those charged here, which are alleged to have been committed by Native Americans on an Indian Reservation.

(a)   Do you have any views or opinions concerning this fact?

☐ Yes ☐ No  If yes, please describe:_____

_____

_____

(b)   Would it be difficult for you to be a fair and impartial juror in this case because the United States government is prosecuting this case?  ☐ Yes ☐ No  If yes, please explain:_____

_____

_____

46.   The Court will provide instructions of law concerning the criminal charges alleged against the defendants in this case.  Will you follow the instructions of law given by the Court?   ☐ Yes   ☐ No    If no, please explain:_____

_____

_____

47.   Do you read any newspaper(s) more than twice a week? ☐ Yes   ☐ No

If yes, which ones? _____

48.   What magazines do you generally read?_____

49.   Do you watch any television newscasts twice a week or more? ☐ Yes  ☐ No

If yes, which ones?_____

_____

50.   Do you listen to any radio newscasts twice a week or more? ☐ Yes  ☐ No

If yes, which ones?_____

_____

- 13 -

Juror No._____

51.  Do you listen to any radio talk shows twice a week or more?

☐ Yes  ☐ No  If yes, which ones?_____

_____

52.  The crimes alleged against Lezmond Mitchell and Johnny Orsinger have received some publicity and you may have heard about them or the crimes alleged against them.

(a)  Have you read, heard or seen anything on television, on the radio or in the newspapers about Lezmond Mitchell or Johnny Orsinger or the crimes alleged to have been committed by them?  ☐ Yes  ☐ No

(b)  If yes, please explain what information you have read, heard or seen on television, on the radio or in the newspapers and the source of the information?____

_____

_____

(c)  What stands out most in your mind about what you have read, heard or seen?_____

_____

(d)  What impressions have you formed as a result of what you have read, heard or seen about the defendants or the crimes alleged against them?_____

_____

_____

53.  Have you ever discussed the defendants in this case with anyone who claims to have special knowledge about the allegations against them or the circumstances of the crimes alleged against them?  ☐ Yes  ☐ No  If yes, identify the person and what was discussed:_____

_____

_____

- 14 -

Juror No._____

54.  Have you discussed the defendants in this case or the crimes alleged against them:

     a.  at work               □ Yes     □ No

     b.  in the neighborhood   □ Yes     □ No

     c.  at church          □ Yes     □ No

     d.  with family members   □ Yes     □ No

     e.  with friends        □ Yes     □ No

If yes, please briefly describe the nature of these conversations:_____

_____

_____

_____

55.  Have you otherwise heard anybody discussing the defendants or the crimes alleged in this case?  □ Yes  □ No

(a)    If so, please tell us who you heard and what you recall hearing:_____

_____

_____

(b)    Did the people you heard discussing this case indicate a preference either for the prosecution or the defendants?  □ Yes     □ No   If yes, please describe:___

_____

_____

56.  If you have heard or read about the charges against Lezmond Mitchell and/or Johnny Orsinger, have you formed any opinion about those charges?

□ Yes  □ No  If yes, please explain:_____

_____

_____

- 15 -

Ex 142 - 1845

Juror No._____

## PART II

If a defendant is found guilty of a crime that may be punished with a sentence of death, there is a second phase of trial. In this second phase, the jury considers additional evidence in deciding whether to recommend that the defendant be sentenced to death, or alternatively, sentenced to imprisonment for life without possibility of release.

In this second phase of trial, the United States will attempt to prove that certain facts are present, known as aggravating factors, that make the defendant subject to a sentence of death. The United States must prove to the jury that any aggravating factor exists "beyond a reasonable doubt." The defendant will in turn attempt to prove that certain other facts exist that weigh in favor of a sentence of life imprisonment without possibility of release, rather than death. These facts are known as "mitigating factors," the existence of which the defendant must prove to one or more jurors by "a preponderance of the evidence," that is, the defendant must prove that it is more likely than not that a particular mitigating factor exists.

If a jury unanimously finds that one or more aggravating factors exist "beyond a reasonable doubt," the jury will then decide whether the aggravating(s) factors sufficiently outweigh the mitigating factors to justify a sentence of death rather than life imprisonment without possibility of release. The jury then provides its recommendation to the court and the parties.

Because the United States seeks a sentence of death against Lezmond Mitchell for carjacking resulting in death, the Court and the attorneys need to know about your opinions and personal views toward the death penalty. However, by asking about your views on the death penalty now, the Court is in NO way suggesting that the jury in this case must, will or should find any defendant guilty.

57.    Are you a person who could never, under any circumstances, return a verdict which recommended a sentence of death?    ☐ Yes    ☐ No

- 16 -

Ex 142 - 1846

Juror No._____

58.    As a member of a jury, would you always vote to impose the death penalty in a case where a person has been convicted of a crime that may be punished with a sentence of death?  ☐ Yes      ☐ No

59.    As a member of a jury, would you consider recommending a sentence of life without possibility of parole, rather than a death sentence, if you were certain that it meant a defendant would never be released?  ☐ Yes      ☐ No

60.    If you knew that a defendant could be sentenced to death if you, as a member of the jury, found him guilty of a crime punishable by death, would your views or opinions regarding the death penalty prevent you from reaching a verdict of guilty as to that crime?      ☐ Yes          ☐ No    If yes, please explain:_____

_____

_____

61.    Would you follow the instructions given by the court in deciding whether a defendant was guilty or not guilty of a crime that may be punished with a death sentence?  ☐ Yes    ☐ No If no, please provide the reasons you would not:_____

_____

_____

62.    As a member of a jury who found a defendant guilty of a crime that may be punished with a death sentence, would your views or opinions regarding the death penalty prevent you from recommending the death penalty as a punishment?  ☐ Yes    ☐ No   If yes, please explain: _____

_____

_____

63.    As a member of a jury who found a defendant guilty of a crime that may be punished with a death sentence, would your views or opinions regarding the death

- 17 -

Ex 142 - 1847

Juror No._____

penalty <u>prevent</u> you from recommending life without the possibility of release as punishment?  □ Yes       □ No  If yes, please provide your reasons:_____

_____

_____

_____

64.   As a member of a jury who found a defendant guilty of a crime that may be punished with a death sentence, would you automatically vote to recommend a sentence of death as a punishment?   □ Yes  □ No  If yes, please provide your reasons:_____

_____

_____

65.   As a member of a jury who found a defendant guilty of a crime that may be punished with a death sentence, would you automatically vote to recommend a sentence of life without the possibility of release as a punishment?  □ Yes  □ No If yes, please provide your reasons:_____

_____

_____

66.   As a member of a jury who found a defendant guilty of a crime involving a child victim that may be punished with a death sentence, would you automatically vote to recommend a sentence of death as a punishment?   □ Yes    □ No  If yes, please provide your reasons:_____

_____

_____

67.   As a member of a jury who found a defendant guilty of a crime involving an elderly victim that may be punished with a death sentence, would you automatically vote to recommend a sentence of death as a punishment?

- 18 -

Ex 142 - 1848

Juror No._____

☐ Yes  ☐ No   If yes, please explain:_____

_____

_____

☐ Yes      ☐ No  If yes, please provide your reasons:_____

_____

68.   If you are personally, morally, religiously or otherwise opposed to the death penalty, can you imagine any case or set of circumstances under which you would recommend a death sentence be imposed upon a defendant as a punishment?  ☐ Yes      ☐ No  If yes, please provide your reasons:_____

_____

_____

69.   Will you consider all the evidence, whether it supports a death sentence or a sentence of life imprisonment without possibility of release, before making a decision to recommend either sentence? ☐ Yes     ☐ No   If no, please provide the reasons you would not:_____

_____

_____

70.   If the evidence in this case establishes beyond a reasonable doubt that a sentence of death is appropriate under the law as the judge instructs you, would you be able to vote to recommend that the defendant be sentenced to death as a punishment? ☐ Yes  ☐ No   If no, please provide the reasons you would not:_____

_____

_____

71.   If the evidence in this case does NOT establish beyond a reasonable doubt that a sentence of death is appropriate, would you be able to vote to recommend that the

- 19 -

Ex 142 - 1849

Juror No._____

defendant be sentenced to imprisonment for life without possibility of release as a punishment? ☐ Yes    ☐ No    If no, please provide the reasons you would not:____

_____

_____

72.    In determining whether a defendant is guilty of a charged offense, the law requires the government to prove that the defendant is guilty of that offense "beyond a reasonable doubt." Would you, as a member of a jury, nevertheless hold the government to a higher or greater burden of proof than "beyond a reasonable doubt," for example "beyond all doubt" or "beyond every doubt," if the crime is one that may be punished with a sentence of death? ☐ Yes    ☐ No If yes, please provide your reasons:_____

_____

_____

73.    If a jury finds a defendant guilty of a crime that may be punished with a sentence of death, the government must prove that at least one additional fact, known as an "aggravating factor," exists "beyond a reasonable doubt" before the defendant can be sentenced to death. Would you, as a member of the jury, nevertheless require the government to prove the existence of an aggravating factor by a higher standard than "beyond a reasonable doubt," for example "beyond all doubt" or "beyond every doubt"? ☐ Yes    ☐ No    If yes, please provide your reasons:____

_____

_____

74.    If a jury finds that the government has proven at least one aggravating factor beyond a reasonable doubt, the defendant may attempt to prove the existence of mitigating factors, which are facts that weigh in favor of a sentence of imprisonment for life without possibility of release, rather than death. The law

- 20 -

Juror No._____

requires that a defendant prove any mitigating factor by a preponderance of the evidence, that is, the defendant must prove that a mitigating factor more likely than not exists.   Would you, as a member of a jury, nevertheless require the defendant to prove the existence of any mitigating factor by a higher standard than by a preponderance of the evidence, for example "beyond a reasonable doubt," "beyond all doubt" or "beyond every doubt"?   □ Yes□ No  If yes, please provide your reasons:_____

_____

_____

_____

75.   Have you formed an opinion about this case?   □ Yes   □ No

If yes, please tell us your opinion:_____

_____

_____

76.   Is there any reason why you would not want to serve as a juror in this case?

□ Yes  □ No   If yes, please explain:_____

_____

_____

77.   Is there anything you would like to discuss privately with the Court?

□ Yes  □ No   If yes, please explain:_____

_____

_____

**Please read and sign below:**

**I declare under penalty of perjury that the information which I have provided in this juror questionnaire and any attachments is true and correct.  I further declare that I have completed this questionnaire without anyone's assistance.  I**

- 21 -

Ex 142 - 1851

Juror No._____

certify that I will not discuss this questionnaire or my responses to the questions.  I further certify that I will not make any investigation of the defendants identified herein or the crimes with which they are accused.


_____
Signature


_____
Date

- 22 -

Ex 142 - 1852

# CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

VINCENT Q. KIRBY, AUSA

I hereby certify that on November 12, 2009, I served the attached document by mail on the following, who are not registered participants of the CM/ECF System:

Capital Case Staff Attorney
Evo A. De Concini U.S. Courthouse
405 West Congress Street, Suite 1500
Tucson, AZ 85701-5010


　　　　　　　　　　　　　　　　/s/ AMY REEDY