DENNIS K. BURKE
United States Attorney
District of Arizona

VINCENT Q. KIRBY
Assistant U.S. Attorney
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004
Arizona State Bar No. 6377
Telephone (602) 514-7500

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Lezmond Mitchell, | **CV-09-8089-MHM (JI)** |
| Movant, | |
| v. | **GOVERNMENT'S RESPONSE TO MOVANT'S AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE** |
| United States of America, | |
| Respondent. | |

The United States of America, by and through undersigned counsel, hereby responds to the Petitioner's Amended Motion based on the attached Memorandum of Points and Authorities.

Respectfully submitted this 1st day of April 2010.

> DENNIS K. BURKE
> United States Attorney
> District of Arizona
>
> /s/  Vincent Q. Kirby
>
> VINCENT Q. KIRBY
> Assistant U.S. Attorney

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.      Nature of the Case; Course of Proceedings.**

On November 27, 2001, a grand jury in Phoenix, Arizona, returned a redacted, eleven-count indictment charging Lezmond Mitchell (Petitioner), Jason Kinlicheenie and Gregory Nakai with Premeditated First Degree Murder, Counts 1 and 5; Armed Carjacking, Count 2; Felony Murder - Robbery, Count 3; Robbery, Counts 4, 8 and 10; Felony Murder - Kidnaping, Count 6; Kidnaping , Count 7; and Use of a Firearm During a Crime of Violence,  Counts 9 and 11. (CR 1.)  The name of the juvenile murder victim was redacted from this indictment and all further court pleadings.  (CR 2.)

On November 29, 2001, Petitioner made his initial appearance, was arraigned and had counsel appointed to represent him.  Petitioner was ordered temporarily detained.  On December 4, 2001, Petitioner was ordered detained as a danger pending trial.  (CR 3, 5.)

On July 2, 2002, a superseding indictment was returned naming Johnny Orsinger as a co-Defendant in Counts 1 through 7.  (CR 47.)

On August 13, 2002 the government filed a Notice of Intent to Seek the Death Penalty against Petitioner, based on the charge of Armed Carjacking which resulted in a death, a violation of 18 U.S.C. 2119, as charged in Count 2 of the superseding indictment.  (CR 87.)

On November 19, 2002, a second superseding indictment was returned.  The grand jury made special findings in this indictment in support of the death penalty against Petitioner.  (CR 130.)

On April 1, 2003, the court severed co-Defendant Johnny Orsinger from Petitioner's trial. Lezmond Mitchell was the only Defendant to proceed to trial before District Judge Mary H. Murguia.  (CR 267.)  On May 8, 2003, following a 19-day trial, Petitioner was convicted on all counts, including Armed Carjacking as charged in Count 2.  (CR 311.)  Petitioner was eligible for the death penalty by virtue of his conviction for Count 2.  (CR 87.)

On May 14, 2003, the penalty phase began before the same jury, and on May 20 that  jury returned a recommendation of a sentence of death as to each victim.  (CR 327.)

2

On September 15, 2003, Petitioner was sentenced to death on Count 2 and to life imprisonment on Counts 1, 3, 6 and 7. A life sentence also was imposed on Count 5 and ordered to run consecutively to the life sentences imposed on Counts 1, 3, 6 and 7. A sentence of 300 months was imposed on Count 11 and ordered to run consecutively to the sentence imposed on Count 9. A sentence of 180 months was imposed in Counts 4, 8 and 10. Finally, an 84-month sentence was imposed on Count 9 and ordered to run consecutively to the sentence imposed on Count 5. Petitioner also was ordered to serve a period of supervised release of 60 months, assessed $1,100, and ordered to pay restitution of $22,069.19. (CR 425.)

## B.    Statement of Facts.

**The plan to get a truck to use in a robbery #1**

Petitioner, Johnny Orsinger, Gregory Nakai, Jakegory Nakai, and Jason Kinlicheenie concocted a plan to rob a trading post located on the Navajo Reservation in Arizona. (RT 2778.) As part of the plan, according to Kinlicheenie, Petitioner agreed to travel to Gallup, New Mexico, with Johnny Orsinger to steal a truck to use during the robbery. (RT 2779-80.) Orsinger and Petitioner left for Gallup on October 27, 2002. When he returned, Petitioner told Kinlicheenie that he had gotten a truck and had parked it in the mountains. (RT 2782-3.) Petitioner said that they had "taken out" an old lady and a small person to get the truck. (RT 2783.)

**The Discovery of the Bodies #2**

On November 4, 2001, approximately six days after they were last seen alive, the headless, handless, nearly nude bodies of 63 year old Alyce Slim and her nine year old grand-daughter (the juvenile victim) were discovered near Tsaile, Arizona, in the mountains of the Navajo Indian Reservation. (RT 2584, 3024.) Their severed heads and hands, along with a pair of latex gloves were later discovered buried near the bodies. DNA found on the gloves did not exclude Petitioner as its source. (RT 3055, 3058, 3219.)

Ms. Slim had been savagely stabbed, receiving approximately 33 wounds to her neck and upper body. (RT 3336, 3287-3303.) The injuries she suffered were consistent with infliction by two attackers from two different directions. (RT 3304, 3364.) She also suffered

3

approximately 16 wounds to her hands consistent with defensive injuries, such as trying to parry or grab a knife. (RT 3305-09.)

Her granddaughter suffered multiple fractures that shattered her skull into many small pieces. (RT 3342.) Her brain suffered hemorrhaging and bruising indicating very forceful impacts to her head. (RT 3344.) The damage was similar to that seen in a body ejected from a high speed car crash, and could have been caused by rocks or boulders weighing at least 20 pounds. (RT 3347-48.) Doe also had neck wounds consistent with a sharp object being drawn across the skin. (RT 3338-39.)

Both victims had suffered apparent *post mortem* chopping wounds that severed their heads and hands. (RT 3313, 3322.)

**The Last Hours for Slim and Doe #3**

On Sunday, October 28, 2001, Alyce Slim and her nine year old granddaughter, Jane Doe, left their home in Fort Defiance, Arizona, to travel to Tohatchi, New Mexico, so Alyce could seek the assistance of Betty Dennison to treat some of her ailments. (RT 2568-2571.) Jane Doe did not wish to go but her mother persuaded her to go along. (RT 2572-73.)

Ms. Slim met with Ms. Dennison at approximately 4:00 pm in Tohatchi. Ms. Dennison could not help Ms. Slim's particular leg problems, but she knew a medicine lady named Marie Dale, whom she thought might help. (RT 2587-88, 2593.) The three traveled to Twin Lakes, New Mexico, where Alyce made an appointment for the next evening with Ms. Dale. (RT 2596.)

The trio returned to Ms. Dennison's house to drop her off at approximately 5:00 pm. (RT 2589.) Ms. Slim and her granddaughter then left. (RT 2590.) It was the last time anyone they knew saw them alive.

**A Search for Slim and Doe #4**

Later that evening, Jane Doe's mother, Marlene, became concerned that the two had not returned, and tried to call her mother, Ms. Slim, on her cell phone. (RT 2576.) The next morning she tried to call her mother's house, but got no answer. (RT 2577.) She later drove to her mother's house. No one was there, and it appeared that no one had spent the night there.

4

(RT 2578.) She checked at Doe's elementary school, finding the little girl had not been there. (RT 2578.) She considered calling the police but decided to wait. (RT 2580.) Tuesday morning, Marlene drove to the bus barn where her mother was a school bus driver, and discovered that her mother failed to report for work. (RT 2580.) Eventually, Marlene called the police and filed a missing persons report. (RT 2581.) Police found the bodies of Slim and Doe, but not before the trading post had been robbed.

**The Trading Post Robbery #5**

On Wednesday, October 31, 2001, Charlotte Yazzie was working at the Red Rock Trading Post located in Arizona on the Navajo Indian Reservation. (RT 2599-2600.) As she mopped the floor, a male wearing a mask ran into the store, came up behind her, said "This is a stickup," and struck her in the head with a gun. (RT 2606.) Another male also wearing a mask joined the first gunman. (RT 2608-09.) One of them forced Ms. Yazzie to open the registers. (RT 2615.)

Another Trading Post employee, Kimberly Allen, saw Charlotte struck with the gun. (RT 2634.) The second armed robber, carrying a rope, grabbed Ms. Allen, pushed her against the counter, and demanded the combination to the safe. When Ms. Allen told him she didn't know the combination, he told her "If you lie to me or don't cooperate with us, we are going to kill you." (RT 2636.) He then forced her to turn on the gas pumps. As she did so, she observed a beige, double-cab Chevrolet pickup truck at the pumps, and another male standing nearby. (RT 2637.)

A third masked robber joined the two in the store. All wore purple latex gloves. (RT 2615, 2635.) They took Ms. Yazzie into a back room and demanded more money. She told them where to find it, and the robbers took cash and coins. (RT 2617.) They tied up the two women with rope and pointed guns at their heads. Ms. Yazzie was convinced they were going to be shot. (RT 2612.) The heavy-set male told them they would be shot if they did anything wrong. (RT 2622.)

The two women were locked in the backroom, and escaped only after another woman

5

came into the store. (RT 2623-24.) In total, the robbers took $5,530 and Ms. Yazzie's purse. (RT 3166, 2625.)

A customer saw two masked gunman in the Trading Post, at least one wearing purple gloves. (RT 2647-49.) Someone took down the license number of an extended cab pickup and gave it to the people at the Trading Post. (RT 2651, 2653.) Another witness saw the getaway truck and gave the license number to the police when they arrived. The police broadcast a description of the truck and the license number. (RT 2660, 2665.)

**The Discovery of the Getaway Vehicle–Alyce Slim's Pickup #6**

On Thursday, November 1, 2001, a Navajo Tribal Police officer located an abandoned pickup truck near Wheatfields, Arizona, on the Navajo Indian Reservation. (RT 2668-69.) The license number of the truck matched the one seen during the Trading Post robbery. When the officer opened the door he noticed that the interior had been partially burned and smelled of fuel. (RT 2673-74, 3004.) He found purple gloves, clothes and masks inside the truck. (RT 2903-04.) The truck was later identified as Ms. Slim's pickup truck.

**The Scientific Evidence from the Truck #7**

Petitioner's palm print was found on the truck. (RT 3190.) The masks found in the truck yielded DNA evidence. Petitioner could not be excluded as a contributor of the DNA. (RT 3217, 2792.) Samples taken from various locations in the truck, such as the floor mat, the rear seat, the driver's seat, windows and armrest were identified as Alyce Slim's blood. (RT 3205-11.)

**The Trading Post Robbery Arrests #8**

On the morning of Sunday, November 4, 2001, based on tips and investigation at the scene of the robbery, Tribal arrest warrants were served. Petitioner was found and arrested at the residence of Gregory Nakai. (RT 2698.) Petitioner had been sleeping, and was only wearing a shirt and boxer-type underwear when arrested. (RT 2960.) When asked where his pants were so they could be brought to him, he said they were in the bedroom between a door and the bunk bed. (RT 2962.) As an agent picked up the pants to bring them to Petitioner, a silver-handled butterfly knife fell out of the pants and onto the floor. Alyce Slim's blood was later found on

6

the knife. Petitioner's wallet was in the pants. (RT 2967, 2977, 3215.)

During a consent search of the residence, a newspaper detailing the robbery of the Trading Post was seized along with a police scanner tuned to the Chinle police department frequency, police radio codes and a $200 money wrapper. (RT 2979, 2982-2983, 3017.) A blood-stained, black-handled butterfly knife also was found. DNA analysis demonstrated that Ms. Slim could not be excluded as the source of the blood. (RT 2965, 2972, 3211-12.) Also found in the residence was Ms. Slim's cell phone. (RT 2972, 3101.) DNA evidence was found on the earpiece of the phone, and Petitioner could not be excluded as a possible contributor of that DNA. (RT 3216.)

**Petitioner's First Admission #9**

Petitioner was advised of his rights on Sunday following his arrest, and flipped a nickel to decide whether he would talk to the investigators. (RT 3108.) He admitted that he was present during the murders of Alyce Slim and juvenile Doe, but blamed the murders on 16-year-old Johnny Orsinger. Petitioner confirmed that he had participated in the robbery of the Trading Post. He explained that during the robbery he wore a mask and was armed with a 12-gauge shot gun. He took money and tied up one of the clerks. (RT 2722-23.) Later, he offered to assist the agents in finding the bodies of Alyce Slim and Doe. (RT 2723.)

**Orsinger's Arrest and the Pace of the Investigation Picks Up #10**

The next day co-Defendant Johnny Orsinger was arrested. He agreed to take agents to the bodies of Slim and Doe. (RT 2724.) When Orsinger had difficulties finding the location, agents called for Petitioner to be brought out to assist. Orsinger led the agents to the bodies shortly before Petitioner arrived. (RT 3310, 2710-12.)

**Petitioner's Second Admission #11**

At the bodies' discovery site, Petitioner was reminded of his Miranda warnings and agreed to talk. (RT 3112-13.) Agents told him that they had interviewed Orsinger. (RT 2726-27.) Petitioner, in a measured response, stated that he had stabbed the "old lady" and the evidence would show or witnesses would say that he had cut the young girl's throat twice. (RT 2727.) Petitioner further conceded that he told Doe to "lay down and die," and then he and

7

Orsinger dropped large rocks or boulders on her head as she lay on the ground. (RT 2727.)

Petitioner explained that they took the body of Ms. Slim from the rear of the truck and dragged her away to the woods. He recounted that after Orsinger found a shovel and an axe, Petitioner dug a hole while Orsinger severed the heads and hands. They dropped the severed body parts into the hole and buried them. (RT 2728.) Later they burned the victim's clothing, jewelry, glasses and any other identifiable items. (RT 2728.) Petitioner said he and Orsinger went to a nearby stream where they washed the blood from the knives, their faces and hands. (RT 2729.) Petitioner said the next day he washed the knives with alcohol to remove any blood. (RT 2729.)

Jane Doe's neck bore an incised wound consistent with sharp a object being drawn across the skin (RT 3337-38), as described by Petitioner. Twenty pound rocks containing blood and hair were found near with the bodies. (RT 3086, 3114.) Jane Doe's blood was found on both rocks. (RT 3220-21.) Investigators later found a burn site, as described by Petitioner, with remnants of items belonging to Ms. Slim. (RT 3031, 3035.)

**Petitioner's Third Confession #12**

Several weeks later, after he was once again read his *Miranda* rights, Petitioner advised two other agents that on the weekend of the murders, he and Orsinger hitchhiked from Round Rock, Arizona, to Gallup, New Mexico. (RT 3120.) He purchased a knife while Orsinger stole one. They caught a ride to Ya Ta Hey, New Mexico, as they headed home. (RT 3120.) They were next picked up by an older lady and a young girl near the Arizona-New Mexico border. (RT 3120.) According to Petitioner, he asked to be let off near the Navajo Reservation town of Saw Mill, Arizona. (RT 3120, 3123.) When the truck stopped, Petitioner said Orsinger attacked the woman with a knife. (RT 3121.) Petitioner admitted that he, too, stabbed the woman four or five times. (RT 3121, 2990.) They dragged the woman over the seat and put her body on the rear seat with the little girl. (RT 3122.) Petitioner drove the truck into the mountains on the Navajo Indian Reservation in Arizona, where they dragged Ms. Slim's body out of the car. (RT 3122, 3123.) He confirmed that they threw rocks on the little girl's head even though he knew

she was still alive. (RT 3122, 2990.) Petitioner admitted they severed the victims' heads and hands, but denied that it was his idea. He stated that he also would have severed the feet. (RT 3122-23.) Finally, he admitted having a discussion about robbing the Trading Post prior to traveling to Gallup. (RT 3124.)

**Accomplice Testimony #13**

Kinlicheenie supplied the masks used in the robbery, as well as his parents' car for use after abandoning the stolen truck. (RT 2786.) He drove them to the area where the truck was parked and waited for Petitioner to return. (RT 2788.) They changed clothes there, got into the truck and, with Petitioner driving, headed for the Trading Post. (RT 2788-89.) After they arrived at the Trading Post, they put on the masks and Petitioner, wearing an "old man" mask and carrying a 12-gauge shotgun, entered the store, along with Jakegory Nakai who was carrying a .22 caliber rifle. (RT 2790-92, 2797.) Kinlicheenie initially remained outside to pump gas but the pump was off, so he entered the store and saw the other two pushing around the women and turning off the lights. He went in and tried to force open a register. (RT 2797-99.) One of the women told him to push the "no sale" button; when it opened, Kinlicheenie took the cash. (RT 2799.) The robbers drove back to Kinlicheenie's car and then he followed the truck to the dump, where Petitioner set the truck on fire with kerosene stolen from the Trading Post. (RT 2804.) They returned to the Nakai residence and split the money; Kinlicheenie received $900. (RT 280.) The next day Petitioner asked for and received $300 from Kinlicheenie. (RT 2808.)

## LAW

### Legal Standard for Ineffective Assistance Claims

To prevail on a motion under 28 U.S.C. § 2255 based on a claim of ineffective assistance of counsel, petitioner's alleged errors must demonstrate "an omission inconsistent with the rudimentary demands of fair procedure," or "a fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471 (1962). In *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct 2052, 2064 (1984), the Supreme Court held the standard for evaluating claims of ineffective assistance of counsel is

9

whether counsel's conduct so undermined the proper functioning of the adversarial process, the trial could not have produced a just result.  To prove ineffectiveness of counsel, Petitioner must show (1) counsel's performance was deficient for Sixth Amendment purposes and (2) but for the deficient performance, a reasonable probability exists the result of the proceeding would have been different. 466 U.S. at 687, 104 S.Ct at 2064.  This standard is highly demanding. *Kimmelman v. Morrison*, 477 U.S.365, 382 (1986).  It requires that Petitioner point to specific errors made by trial counsel.  *United States v. Cronic*, 466 U.S. 648, 666 (1984).  The burden rests with the accused to prove a constitutional violation because " we presume that the lawyer is competent to provide the guiding hand that the Petitioner needs, . . . " *Cronic* at 658.

Deficient performance is demonstrated when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the Petitioner by the Sixth Amendment." *Id*. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686. There is no different test for capital cases. *Id*. 686. "Unless a Defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. 687.

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's performance was reasonable considering all the circumstances.  Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2 ed. 1980) ("The Defense Function") are guides to determine what is reasonable, but they are only guides.  *Id*. 688.

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

Defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." (internal citation omitted) *Id*. 689.

Even the best defense attorneys would not defend a particular client in the same way. *Id*. 689. It is not enough for the Petitioner to show that the errors had some conceivable effect on the outcome of the proceeding. *Id*. 693.

When a conviction is challenged the "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. *Id*. 695. When a death sentence is challenged, the question is "whether there is a reasonable probability that, absent the errors, the sentencer - including an appellate court, to the extent it independently reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* 695.

"In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the Defendant has met the burden of showing that the decision reached would reasonably likely be different absent the errors." *Id*. 696.

A court need not determine whether counsel's performance was deficient before determining the issue of prejudice. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. *Id*. 697.

Petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. *Id*. 694. Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008).

11

**Issue Previously Raised on Appeal**

The government submits that the following were raised and resolved on appeal: Issue G- Challenging DNA Testimony; Issue I - Challenging Removal of Juror #3;  Issue N– Challenging Transfer of Trial to Phoenix; Issue O - Challenging Exclusion of Jurors; Issue Q - Challenging Brady Material; Issue R - Challenging the Collusion of Law Enforcement; Issue S - Challenging Competency of Defendant Post-Guilty Verdict; Issue T - Challenging the Wearing of Buttons at Trial; and Issue Z - Challenging Lack of Plain Error Review on Appeal.

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting.  *Reed v. Farley*, 512 U.S. 339, 358 (1994) (Scalia, J. Concurring in part and concurring in the judgment) ("[C]laims will ordinarily not be entertained under § 2255 that have already been rejected on direct review."); *United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985) ( a claim rejected on direct appeal; "this claim cannot be the basis of a § 2255 motion"); *Eggers v. United States*, 509 F.2d 745, 748 (9th Cir. 1975).

A claim was presented previously if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments."  *Molina v. Rison*, 886 F.2d 1124, 1129 (9th Cir. 1989).  A court must entertain a successive claim only if there is "manifest injustice" or a change in law.  *Walter*, 969 F.2d at 816; *Polizi v. United States*, 550 F.2d 1133, 1135-36 (9th Cir. 1976).

**Failure to Raise Issue on Appeal**

The government submits that Petitioner failed to raise the following: Issue E - Challenging Voluntariness of Petitioner's Statements; Issue I - Challenging Juror Removal for Hardship; Issue L - Challenging Voir Dire; Issue P - Challenging the Questionnaire; Issue U - Challenging Failure to Trifurcate the Proceedings; Issue W - Challenging Unprincipled Basis for Imposing Death; Issue X - Challenging the Seeking Death on Basis of Race; and Issue Y - Challenging Death Sentence as Unconstitutional.

If Petitioner failed to raise an issue before the appellate court, he is barred from raising it in this proceeding unless and until he can show "both cause excusing his procedural default,

12

and actual prejudice resulting from the claim of error." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993). A § 2255 petition is an "extraordinary remedy," however, and " 'will not be allowed to do service for an appeal.' " *Bousley v. United States*, 523 U.S. 614, 621, 118 S. Ct. 1604, 1610 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354, 114 S. Ct. 2291, 2300 (1994)). "Once the Defendant's chance to appeal has been waived or exhausted, ... we are entitled to presume he stands fairly and finally convicted, especially when ... he has already has had a fair opportunity to present his federal claims to a federal forum." *United States v. Frady*, 456 U.S. 152, 164 (1982).

To demonstrate cause, the Petitioner must demonstrate that some "objective factor external to his defense" impeded his efforts to raise the issue on appeal. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) A prisoner suffers "actual prejudice" if an alleged error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982). If he fails the test, he may only raise the issue in an extraordinary case "when a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 495 (1986).

Ineffective assistance of counsel on appeal satisfies the "cause and actual prejudice" standard only if Petitioner can meet the *Strickland* test of deficiency and prejudice. *United States v. Ratigan*, 351 F.3d 957, 965 (9th Cir. 2003). "[T]he mere fact that counsel failed to recognize the factual or legal basis for the claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Id.* (failure of trial counsel to challenge government's failure to prove a bank was federally insured did not deprive the defendant of a fair trial and therefore did not excuse procedural default).

To show prejudice, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not

13

warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.   Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008).  The burden is on the petitioner to demonstrate prejudice. *Wong v. Belmontes*, 130 S.Ct. 383, 390 (2010).

The court may proceed directly to the prejudice prong. *Jackson v. Calderon*, 211 F.3d 1148, 1155 n. 3 (9th Cir. 2000). The court may not, however, assume prejudice solely from counsel's allegedly deficient performance. *Jackson*, 211 F.3d at 1155.

**Evidentiary Hearings**

An evidentiary hearing is not required if "...' the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' 28 U.S.C. § 2255" *United States v. Chacon-Palomares* 208 F.3d 1157, 1159 (9th Cir. 2000).

Habeas is not meant to allow for a "fishing expedition" in order that a petitioner can find whether a case exists. *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) Discovery is only available in the discretion of the court and for good cause shown. *Id* 1068.  In order to be entitled to the evidentiary hearing he must allege specific facts, which if true, would entitle the petitioner to relief. *Benally v. United States*, 2008 WL 2561883 *1 (D. Ariz.)). "Merely conclusory statements in a §2255 motion are not enough to require a hearing." *United States v. Hearst*, 638 F..2d 1190, 1194 (9th Cir. 1980).  Section 2255 is not designed to provide criminal Defendants multiple opportunities to challenge their sentence. *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).

**Claim Pursuant to §2241**

Petitioner also seeks relief pursuant to 28 U.S.C. § 2241 but he is prohibited from this course of action.

> A federal prisoner authorized to seek relief under section 2255 may not petition for habeas corpus relief pursuant to section 2241 "if it appears the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255;

14

*United States v. Pirro*, 104 F.3d 297, 299 (9th Cir.1997).

## ISSUES

Petitioner sets forth a number of issues, many of which he failed to raise either at trial or on appeal.  A significant number were already rejected by the Ninth Circuit.

## A.  Failure to Raise Intoxication Defense

Petitioner asserts that his trial counsel was ineffective for failing to pursue a voluntary intoxication defense based on his alleged substance abuse history and the findings of Dr. Barry Morenz.  He argues that this evidence should have been presented to negate the specific intent of crime of car jacking.

### 1.  Issue Waived

He failed to raise this issue on direct appeal even though there was ample information in the record that Petitioner had claimed he was drinking heavily around the time of the crime. Therefore he is barred from raising it in this proceeding unless and until he can show "both cause excusing his procedural default, and actual prejudice resulting from the claim of error." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir.  1993).

### 2.  Discussion

Petitioner precluded this defense by emphatically denying, on more than one occasion to his trial counsel, that he was under the influence of drugs or alcohol at the time of he murders, even after he was confronted with statements to the FBI of drinking to a level of "blackout." (Govt. Ex. 1 p 15, 18, 22, 33, 58; Govt. Ex. 2 p 9, 26, 38; Govt. Ex. 3 p. 14.)[1]   Counsel also reviewed the crime scene photos of the Nakai residence, the car jacked truck and the area where the victims were recovered in an attempt to refute Petitioner's claim that he was sober but found nothing. (Govt. Ex. 1 p 58.)  Petitioner failed to testify at trial and the government successfully filed a motion to preclude Petitioner from introducing his exculpatory statements, including his

---

[1]  Petitioner's exhibits will be referred to a "Ex";,the Government's exhibits will be referred to as "Govt. Ex.", "Reporter's Transcript will be referred to as "RT", Court Record will be referred to as "CR".

claims of substance abuse, through any witness other than Petitioner.  (CR 230.)

Petitioner now argues that Johnny Orsinger should have been called to testify as the amount of alcohol and drugs the two consumed on the day of the carjack/murders.  Prior to trial, counsel sought permission from Orsinger's counsel to interview Orsinger but was refused. (Govt. Ex. 1 p. 20.)  Despite the refusal the defense called Orsinger as witness.  During a break in the trial, Orsinger, with his counsel present, personally advised the court that he would invoke his 5th Amendment right against self-incrimination.  (RT 3328, 3332.)  At that moment he was awaiting trial in the instant case and pending sentencing for his carjack/murder conviction in CR-01-1072-PCT-FJM.

In light of Orsinger's invocation of his right against self-incrimination, he was unavailable as a defense witness, regardless of what Orsinger now claims about drinking or drugs at the time of the crimes.  Moreover, at the time of arrest, Orsinger never alleged that the two had been drinking at the times of murders.

In light of Petitioner's adamant denials of being under the influence of drugs or alcohol at the time of the murders, there was no avenue for the defense to pursue an intoxication defense. The Sixth Amendment does not require counsel to do the impossible.  *United States v.  Cronic*, 466 U.S. 648, 656 n. 19 (1984).

This issue is without merit and should be dismissed.

**B.  Failure to Investigate, Prepare and Present Evidence of Addiction and  Intoxication**

Petitioner argues that his trial counsel was ineffective for failure to investigate and present evidence of his long term substance abuse during the mitigation phase.

**1. Issue Waived.**

Petitioner failed to raise this issue on direct appeal and he is therefore barred from raising it now.

**2.  Discussion**

Under *Strickland*  counsel is presumed competent.  *Duncan v.  Ornoski*, 528 F.3d 1222, 1234 (9th Cir.  2008).  "While a lawyer is under a duty to make reasonable investigations, a

lawyer may make a reasonable decision that particular investigations are unnecessary." *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir.  1998).  "As long as a reasonable investigation was conducted, a reviewing court should defer to counsel's strategic choices." *Cox v. Ayers*, 588 F.3d 1038, 1049 (9th Cir.  2010).

Petitioner raised a significant obstacle to raising this mitigation by emphatically denying, on more than one occasion to his trial counsel, that he was under the influence of drugs or alcohol at the time of he murders, even after he was confronted with his statements to the FBI of drinking to the level of "blackout." (Govt. Ex. 1 p. 15, 18, 22, 33, 58; Govt. Ex. 2 p 9, 26, 38; Govt. Ex. 3 p.14.)  Counsel looked for evidence of alcohol use in the numerous crime scene photos of the Nakai residence, the car jacked truck and the location of the bodies but found nothing. (Govt. Ex. 1 p. 58.)  "The reasonableness of counsel's actions may be determined or substantially influenced by the Defendant's own statements or actions." *Strickland,* 466  U.S. at 691.

Nonetheless, trial counsel were fully aware of Petitioner's substance abuse history.  The mitigation specialist, Vera Ockenfels, detailed his abuse of alcohol and drugs. ( Ex. 93 p. 32-34.) Dr. Morenz provided additional information as well as a diagnosis of polysubstance abuse.  (Ex. 94 p. 15-18.).  Counsel knew that Petitioner partied quite a bit but as it related to the date of the crime, but determined that it was not relevant.  (Govt. Ex. 2 p. 21-2.)  The defense theory, consistent with Petitioner's repeated assertions to counsel, was that Petitioner did not commit the murders. (Govt. Ex. 2 p.  25, 34.)  Had they deviated from Petitioner's position, he would have refused to cooperate any further.  (Govt. Ex. p. 43-4.)  *Cox v.  Ayers*, at 1050.

Petitioner has submitted statements from a number of witnesses who claimed that the summer of 2001 was full of drug and alcohol abuse by Petitioner and themselves.  However, almost all of those witnesses were under indictment themselves and *not available to testify* including Gregory, Jakegory and Jimmy Nakai, Dennie Leal and Johnny Orsinger. (Exs.107, 136, 137, 102, 109.)  Other statements offered by Petitioner contradict the substance abuse claim. (Randy Reed, Ex. 112; Tara Reed, Ex. 113; Tammy Rose Sebae, Ex. 116; Cheryl Tsosie, Ex. 118).

17

Padrian George, now claims that Petitioner and others drank cases of beer the night before Petitioner's arrest. (Ex. P100.) However, only a couple of old beer bottles were found under a desk in a bedroom at the time of arrest as well as some marijuana at the Nakai residence. There were no indicia of cocaine, ecstacy, methamphetamine or any other drugs.

The substance abuse history was extensively considered but ultimately rejected as at odds with the "life worth saving" path that was ultimately selected as the mitigation theme. (Govt. Ex. 2 p. 40-41; Govt. Ex. 3 p. 14-15.) *Cox v. Ayers*, at 1053. "And we felt it would detract from the positive things we wanted to present about Lezmond." (Govt. Ex. 2 p. 41.) Additionally, there were concerns that these "excuses" would not be well received by the jury given the atrocious conduct that led to the deaths of the victims, especially since it could not be raised during the guilt phase. (Govt. Ex. 3 p. 31, 35-36.)

> Strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

In light of the reasoned decision to portray Petitioner's life as "worth saving" and to forgo the substance abuse route, there was no need to investigate every cumulative witness who could provide evidence of Petitioner's substance abuse history. *Bobby v. Hook*, 130 S.Ct 13, 19 (2009). Trial counsel had more than sufficient information upon which to make a reasoned decision. Counsel was not ineffective.

The burden is on Petitioner, not the government, to show a reasonable probability that the result would have been different. *Wong v. Belmontes*, 130 S.Ct. 383, 390-91 (2009). Furthermore, given the heinous nature of the crimes and Petitioner's conduct throughout, he fails to prove that the results of the proceeding would have been different. *Strickland,* 466 U.S. at 687. The aggravating circumstances were overwhelming. *Bible*, 571 F.3d at, 872; *Mitchell*, 502

F.3d at 996.

## C. Trial Counsel's Conflict of Interest.

Petitioner alleges a conflict of interest between his trial counsel from the Phoenix Federal Public Defender's Office and another Defendant, who allegedly had a connection to Petitioner's case, and was briefly represented by Karen Wilkinson of the same office.   An actual conflict is only an issue if it impairs counsel's ability to effectively advocate on behalf of the complainant. *Mickens v.  Taylor*, 535 U.S. 162, 172  n. 5 (2002).

The conflict arose while Petitioner's case was on appeal and Petitioner was already at the Terre Haute, Indiana prison facility. (Govt. Ex. 2 p. 83, 85-6.) The opinion affirming Petitioner's conviction and sentence was issued September 5, 2007. Apparently, Ms. Wilkinson immediately withdrew from the case and was advised not to disclose any information to the trial team or appellate counsel. Greg Bartolomei was somewhat aware of the issue. However, when pressed for details, he asserted attorney client privilege on behalf of Karen Wilkinson's former client. (Govt. Ex. 2 p. 55.)

Additionally, Mr.  Bartolomei disputes Ms. Rumann's version of the August 7, 2010 meeting regarding the alleged conflict. (Ex. 115) He recalls that the conversation was one-sided during which Mr.  O'Connor was very loud and rude.  (Govt. Ex. 2 p. 62.)  He also denied that there was any wall erected around the appellate attorneys and that he turned over all his materials to those in his offices who were responsible for shipping it to appellate counsel. (Govt. Ex. 2 p. 63.)

Trial counsel was never advised by their client that anyone but Petitioner and Johnny Orsinger were responsible for these murders.  (Govt. Ex. 1. p. 35; Govt. Ex. 2. p. 57.)  There is no evidence that this issue ever prevented trial counsel effectively representing Petitioner.

## D. Ineffective Assistance of Counsel at the Penalty Phase.

Petitioner claims trial counsel were ineffective at the penalty phase for failing to conduct a reasonable investigation into potential mitigation evidence.

**1. Discussion**

Under *Strickland* counsel is presumed competent. *Duncan v. Ornoski*, 528 F.3d 1222, 1234 (9th Cir. 2008). "While a lawyer is under a duty to make reasonable investigations, a lawyer may make a reasonable decision that particular investigations are unnecessary." *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). "As long as a reasonable investigation was conducted, a reviewing court should defer to counsel's strategic choices." *Cox v. Ayers*, 588 F.3d 1038, 1049 (9th Cir. 2010). There comes a point when the search for cumulative evidence distracts from more important duties. *Van Hook*, 130 S.Ct. at 19. This is not a case in which trial counsel failed to act "while potentially powerful mitigating evidence stared them in the face." *Van Hook*, 130 S.Ct. at 19.

> Strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgements support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Counsel is not required to investigate potential mitigation that would not assist a defendant at sentencing. *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691. The ABA guidelines are not "inexorable commands with which all capital defense 'must fully comply.'" *Bobby v. Van Hook*, 130 S.Ct. 13, 18 (2010). [2] "What we have said of state requirements is *a fortiori* true of standards set by private organizations: '[W]hile the States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes

---

[2] The current 2003 ABA Guidelines for capital defense were not adopted until February, 2003, just a month before jury selection and are therefore inapplicable to this case.

20

one general requirement: that counsel make objectively reasonable choices.'"(internal citations omitted) *Id*.

Petitioner's primary argument is that trial counsel did not present theories of mitigation that he now believes they should have been put before the jury. However, he fails to address the many dangerous pitfalls that each of those avenues presented and why they were ultimately rejected by trial counsel.

Trial counsel began their investigation with Petitioner's repeated statement that he was sober at the time and that he did not kill the victims. (Govt. Ex. 1 p. 15, 18, 22, 33, 58; Govt. Ex. 2 p. 9, 26, 27, 38; Govt. Ex. 3 p.14.) "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland,* 466 U.S. at 691. They firmly believed that they could not disregard Petitioner's repeated statement that he did not kill either the grandmother or the little girl. (Govt. Ex. 2 p. 43.) If they had, Petitioner would have refused to cooperate with them. As proof, counsel experienced the wrath of Petitioner's anger when he continued his attempts to persuade Petitioner to attend the mitigation hearing. (Govt. Ex. 2 p. 44, 48.) "A lawyer is entitled to an extra measure of deference if he acts in conformity with the client's wishes." (Internal citation omitted) *Landrigan v. Stewart*, 272 F.3d 1221, 1226 (9th Cir. 2001). A mental health or substance abuse or abused childhood would in essence have been an admission of guilt and conflicted with the "life worth saving" and "proportionality" theme that was ultimately chosen. (Govt. Ex. 2 p. 34.) It did not help the defense themes when Petitioner knowingly absented himself from the hearings during the time his friends and family testified that his life should be spared. (Govt. Ex. 2 p. 51.)

Trial counsel spoke with Petitioner in great detail of his childhood, grandparents, as well as his schooling and other matters. (Govt. Ex. 2 p. 13-16.) His background documents were gathered as was information concerning Petitioner's father. (Govt. Ex. 2 p. 14.) They even sent an investigator to the Marshall Islands to interview the father about his alleged sexual misconduct but discovered he had died three to four weeks earlier. (Govt. Ex. 2 p. 24.)

Mitigation Specialist Vera Ockenfels, who came highly recommended by the habeas

capital attorneys, was added to the defense team. (Govt. Ex. 2 p. 14.) Dr. Susan Parrish, a psychologist, was brought in to help develop any psychological evidence. (Govt. Ex. 2 p. 12.) Counsel also attempted, with very little success, to obtain information from Petitioner's mother, Sherry Mitchell. Using Petitioner's mother as a witness was considered very problematic since she was a "loose cannon" and had made it abundantly clear that she was more concerned with the embarrassment to herself because of Petitioner's conduct than her own son's welfare. (Govt. Ex. 1 p. 28; Govt. Ex. 2 p. 17, 44; Govt. Ex. 3 p. 34.) The defense wanted to underscore the fact that Petitioner was from a family of educated people and did not want Sherry Mitchell's problems to carry over to Petitioner and detract from his positive attributes. (Govt. Ex. 2 p. 80.)

The attorneys, particularly Mr. Bartolomei who primarily handled the mitigation, were looking for anything and everything they could find to present to the jury, especially positive aspects of Petitioner's life. (Govt. Ex. 1 p. 27.) Counsel traveled to the reservation with Ms. Ockenfels. He also interviewed Dr. Roessel and Mrs. Ruth Roessel, the football coach, visited the Petitioner's school, spoke with Auska Mitchell, Petitioner's uncle, and grandparents Bobbi and George Mitchell. (Govt. Ex. 2 p. 17-21.) Ms. Ockenfels also reached out to Petitioner's friends. (Govt. Ex. 2 p. 21; Ex. 93.)

Ms. Ockenfels, prepared a very detailed report entitled "Social History of Lezmond Charles Mitchell" which contained a wealth of information about Petitioner's life story, substance abuse history and psychological makeup. (Ex. 93.)

The 42 page document was broken down into several categories: "The Mitchell Family" with separate discussions of Bobbi and Sherry Mitchell; followed by "Lezmond Mitchell" that was further divided into **A**. Conception, Pregnancy and Birth; **B**. Lezmond's Childhood - 1. Discontinuous and Multiple Homes, Early Separation and Rejection By Mother; 2. Physical Abuse; 3. Inadequate and Insensitive Caretakers; **C**. Conflict Within in the Family and With the World; **D**. Education - 1. Schooling; 2. Lezmond as Leader; 3. After High School; **E**. Behavioral Issues; - 1. Oppositional Behavior; 2. Attention Deficits; 3. Mounting Anger and Tension; 4. Animal Abuse; **F**. Psychological Evaluations and Counseling; **G**. Identity Issues - 1. Lezmond's

Father; 2. Cultural Identity - a. Weak Enculturation; b. Lezmond's Rejection of Navajo Culture; **H**. Substance Abuse - 1. Family History of Substance Abuse; 2. Lezmond's Substance Abuse; Lezmond's Use of Alcohol In and Around the Date of This Incident; **I**. Gang Involvement; **J**. Girlfriends and Sexual Relationships; **K.** Health, Medical Issues, Injuries - 1. Family Health History; 2. Lezmond's Health History; 3. Injuries; and **L**. Prior Criminal History.

Thirty-two individuals were listed as having had some level of contact with Petitioner over the course of his life, including many who testified in mitigation. Even Petitioner, in his Amended Motion, quotes extensively from the social history report prepared by Vera Ockenfels. Trial counsel was fully aware of all of this information which covered medical history, schooling, upbringing, etc.

Counsel also reviewed Dr. Fields' interview relating to his treatment of Petitioner from September of 1998 through May 1999 which included Petitioner's claims of his dysfunctional upbringing. (Govt. Ex. 2 p. 16; Ex. 92.) The doctor reported that Petitioner was abandoned by his mother at an early age, that she rejected him, the grandparents were problematic and that Petitioner had great anger toward those individuals. (Ex. 92.) Similar information was provided by Petitioner to Dr. Barry Morenz during a psychological evaluation. Ms. Ockenfels reported it as well. (Ex. 94 p. 7-11; Ex. 93.)

Dr. Barry Morenz, a psychiatrist, was retained to conduct an exhaustive battery of tests on Petitioner including a neuropsychological evaluation, a neurologic evaluation, a brain imaging study, an MRI of the brain, an EEG exam, laboratory studies as well as several one on one interviews with Dr. Morenz. The doctor also spoke with both public defender investigator, Karl Brandenberger and mitigation specialist Vera Ockenfels concerning the information they had developed about Petitioner and his family. (Ex. 94. p. 2.)

The various tests did not produce any findings of a permanent brain dysfunction or mental defects. He was, however, diagnosed as suffering from "anti-social personality disorder." According the DSM -IV-TR, an individual with this diagnosis fails to conform to social norms with respect to lawful behavior, may repeatedly perform acts that are grounds for arrest, disregard

the rights or feelings of others and are frequently deceitful and manipulative in order to gain personal profit or pleasure.  They also tend to lack empathy, are callous, cynical and contemptuous of the feelings, rights and sufferings of others.

After, receiving the report, counsel visited with Dr. Morenz to discuss the findings and contents of the report.  It was decided that there was no basis to ask for a different evaluation by another mental health expert.  (Govt. Ex. 2 p. 57, 86-7.)

Counsel could not afford to open the door and allow this damaging diagnosis to be placed before the jury given the horrific facts of the murders.  *Wong v. Belmontes*, 130 S.Ct 383, 385 (2010).  Petitioner's statements to Dr. Morenz would have been even more devastating; "I'm running this equation in my head that 9 times out of 10 if we let that little girl go, the cops will be after us."  (Ex. 94 p.7.)  His express desire to kill the individual who called the FBI and identified Petitioner as a suspect, or "if you piss me off enough, I'm liable to kill you."  (Ex. 94 p. 7.)   Additionally, all of his criminal acts such as animal abuse - throwing dogs from bridges, the forming of his own gang (East Side Thugs), involvement in a shooting over his bale of marijuana during which an innocent girl was shot in the neck, would have also been placed in front of the jury.  (Ex. 94 p. 7, 12-16.)  Similar information was gathered by Ms. Ockenfels, such as: purely for entertainment value, Petitioner would throw dogs off bridges and on other occasions he would shoot dogs; that it was not like the movies where the dog would just plop over dead, "They suffer first."  He also recalled being humored at a party when a "Satanist" raised a dog over his head, slit the dog from throat to belly, catching the blood in his mouth."  (Ex. 93 p. 25.)  Counsel did not want to make the jury any more fearful of Petitioner than the case facts had already clearly established.  *Wong v. Belmontes*, 130 S.Ct 383, 388-9;  (Govt. Ex. 2 p.31-3, 79.)

The only "brain dysfunction," found by Dr. Morenz was "some *mild* deficits in executive functioning (impulsiveness and poor planning)," nothing that could have offer a satisfactory basis for the jury to spare his life. (Ex. 94 p. 1513.)  Moreover, the trial evidence clearly refuted the alleged deficits.  There was a plan to rob a Trading Post, go to New Mexico to steal a truck,  and when they could not find a truck to steal, a truck was car jacked.  In the dark, Petitioner drove the

truck with the dying grandmother and frightened, screaming child into the mountains where he eliminated the only witness, burned evidence and later hid the truck in a remote canyon. Despite the murders and the beheadings, several days later Petitioner, demonstrating no remorse, took this truck and carried out the planned armed robbery of the Trading Post while wearing a mask and carrying a shotgun. He also attempted to burn the truck in order to avoid leaving any identifiable evidence linking him to the murders. Nothing Petitioner did in connection with these crimes was impulsive.

Counsel found that it very unlikely that Petitioner did not know what he was doing or was totally strung out on drugs based on Petitioner's claim that he was given a ride at some point by a trooper, shopped for knives in a mall and some how convinced the victims to give them a ride. (Govt. Ex. 2 p. 38.)

Petitioner also argues that certain experts, such as a social historian, should have been called to testify. Mr. Sears generally did not call mitigation specialists as witnesses because he did not want to have to turn over the reports to the government, which in this case contained very damaging information about Petitioner. (Govt. Ex. 3 p. 38.) He viewed these specialists as the collector of information and that the particular source was the witness. (Govt. Ex. 3 p. 38.). Had he called the specialist, the door to the anti-social conduct perpetrated by Petitioner, that the defense desperately wanted kept from the jury would have swung wide open. *Wong v. Belmontes*, 130 S.Ct 383 (2010).

Petitioner has also submitted a statement of another psychiatrist who routinely testifies for the defense in capital habeas proceedings. Trial counsel retained their own mental health expert team but they never provided a suggestion of post traumatic stress disorder. Furthermore, Dr. Stewart either ignored Petitioner repeated statements that he was sober at the time of the murders or was not provided that information. He also relied on the statements of witnesses who were under indictment and not available to the defense such as Dennie Leal and Gregory Nakai. He accepted at face value, Petitioner's claim that he was heavily under the influence of drugs while incarcerated but he apparently did not contact the trial attorneys for verification. Trial counsel

have stated, under oath, that they never observed the defendant under the influence at anytime during their representation.  Rather, Dr. Stewart chose to accept the word of Eric DeLuca who has convictions for Manslaughter, Robbery, Misconduct Involving Weapons and Promoting Prison Contraband .

His opinion that Petitioner suffered post traumatic stress disorder is a stretch in light of the DSM -IV's usual requirement of exposure to some type of a traumatic event, such a violent death, which Petitioner never experienced.  Regardless, Petitioner cannot continue to seek opinions long after the conclusion of the case when he was fully and competently evaluated prior to trial.  Additionally, Dr. Stewart's opinion, based in part on Dr.  Morenz' Report as well as Vera Ockenfels', would have opened the same door to all of the anti-social acts that the defense desperately did not want in front of the jury.  *Wong v.  Belmontes*, 130 S.Ct 383 (2010).

The trial attorneys discussed this case with any number of individuals both inside and outside of the Federal Public Defenders's Office. (Govt.  Ex. 1 p.51-3; Govt. Ex.2 p. 34-7; Govt. Ex. 3 p. 36-7.)  Jeff Williams even attended the related car jack trial of co-defendant Johnny Orsinger in the hopes of  finding a way to pin the murders on Orsinger. (Govt. Ex. 1 p. 19.)  Any statement to the fact that there was no mitigation only referred to the fact that there was no clear "nugget" that could absolutely save Petitioner from a death sentence. (Govt. Ex. 1  p. 29; Govt. Ex. 2 p. 27.)  Counsel's recollection of the conversation with Richard Barr was that it dealt with finding a way to plead the case, which Mr. Bartolomei attempted in a very aggressive way during a recess in jury selection. (Govt. Ex. 2 p. 36, 29-30.)

Counsel John Sears had great concerns that a jury, in the post 9/11 era, would not be receptive to psychiatric, substance abuse or a defendant's background arguments.  They would likely reject them as mere excuses as he had discovered in prior capital cases. (Govt. Ex. 3 p. 35-6.)  Further, such evidence would constitute an inherent contradiction to the positive attributes of Petitioner they intended to present. (Govt. Ex.  3 p. 35- 6.)  His concerns were borne out when just one juror found substance abuse as a mitigating factor but seven jurors took the time to physically write that they found the "Navajo letter" in mitigation. (RT 4199-4200; 4202-05.)

Counsel was satisfied that all areas of mitigation had been sufficiently investigated. (Govt. Ex. 2 p. 37.)  After a thorough investigation in which all avenues of mitigation were considered over and over, the trial team chose to accentuate the positive aspects of Petitioner.  (Govt. Ex. 2 p. 54.)  They also pursued the idea that if Orsinger and Gregory Nakai did not face the death penalty then under a theory of proportionality, neither should Petitioner.  All twelve jurors found the proportionality argument as a mitigating factor. (Govt. Ex. 2 p. 41, 51, 54; Govt. Ex. 3 p. 30-32.)  The witnesses who testified in mitigation only spoke of what they knew in a positive way of Petitioner which did not require much preparation by counsel.  They provided all of the positive information to the jury about Petitioner that the defense had sought. (Govt. Ex. 2 p. 51-4.)  Petitioner fails to demonstrate any prejudice from their testimony.

The inquiry is not whether other counsel would pursued a different path but whether the choices made by the trial team were reasonable.  *Babbit v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)  Counsel reasonably decided not to present Petitioner's family life, substance abuse history and any possible psychological testimony because of the very damaging effect on the jury. The Ninth Circuit, in *Cox v. Ayers*, 588 F.3d 1038 (9th Cir. 2009), upheld a very similar decision to forgo presenting defendant's background to avoid raising, "inferences that his abusive childhood turned him into a hardened criminal who was quite capable of murdering four people." *Id*. at 1050; *Raley v. Yslt*, 470 F.3d 792, 802-03 (9th Cir. 2006).  Petitioner's anti-social conduct would have easily led his jury to the same conclusion.

As required, the defense team fully investigated Petitioner's background and made reasonable strategic choices which are entitled to deference.  *Cox*, 588 F.2d at 1049.  Counsel then  chose the mitigation themes that they believed presented the least amount of danger and were designed to put Petitioner in the best light before a jury that had just heard one of the most heinous crimes in memory.  These reasoned decisions were made after careful consideration of all aspects of Petitioner's background, upbringing, schooling, issues with his mother, substance abuse history, mental makeup and anti-social personality diagnosis and conduct.

Even if trial counsel were found to be ineffective, the burden is on Petitioner, not the

27

government, to prove that there is a reasonable probability that the result would have been different. *Wong v. Belmontes*, 130 S.Ct. 383, 390 (2009).  In *Wong*, the Court found that counsel was not ineffective for deciding not to present more mitigation evidence than he did for fear that it would open the door to evidence of a prior murder committed by that defendant. *Id*. 385.  In order to assess the prejudice the court must consider all of the relevant evidence including additional mitigation but also any additional aggravating evidence.  *Id*. 390.  The Court also rejected the assertion that the mitigation would have carried greater weight if an expert testified, as Petitioner urges here.  It found the evidence was neither complex nor technical.  *Id*. 388.

The jury found six separate and powerful statutory aggravating factors, including pecuniary gain; the manner of committing the offense was especially heinous, cruel, or depraved; substantial planning and premeditation; vulnerability of the victims, multiple killings; and the death of Jane Doe occurred during the commission of another felony, kidnapping.[3]    They also found that Petitioner caused injury, loss and harm to the family.  (RT 4198-99; 4202-04.)

In mitigation, all of the jurors found that Petitioner did not have a significant prior criminal record; another equally culpable person would not be punished by death and he would be sentenced to life in prison without any possibility of release if he is not sentenced to death.  Two jurors found that he would respond well to structured environment in prison if a life without parole sentence was imposed.  One juror found that his capacity to appreciate the wrongfulness of his conduct was impaired; six jurors found his background, and character might mitigate against imposition of a death sentence and seven jurors wrote in that they found the  Navajo letter as mitigation.  (RT 4199-4200; 4202-05.

If the proposed additional mitigating evidence was presented as well as the additional damaging aggravating evidence, such as the anti-social acts and threats to kill the government's cooperating witnesses, or "if you piss me off enough, I'm liable to kill you," there is no reasonable probability that the sentence of death would not have been imposed. The psychiatric

---

[3] The factor of cruel, heinous and depraved was questioned but found harmless error at best on appeal.  *U.S. v. Mitchell*, 502 F.3d at 977.

testimony alone would have given the jury concrete evidence of what they had already divined from his murderous actions in the case. *Bible*, 571 F.3d at 870. The aggravating circumstances were powerful and insurmountable. *Bible*, 571 F.3d at 872. The evidence was overwhelming considering the gruesome nature of the crimes and its impact on the family. *Mitchell*, 502 F.3d at 996.

Petitioner is not entitled to relief and this issue should be dismissed.

**E. Petitioner's Statements Were Involuntary**

Petitioner claims that his waiver of his *Miranda* warnings was not voluntary.

**1. Issue Waived**

Trial counsel conducted a voluntariness hearing at which time Petitioner testified. The Court found the waiver of rights to be voluntary with no inappropriate threat or promises made by law enforcement. (CR 251, 284.) Petitioner failed to raise this issue on direct appeal and is therefore barred from raising it now.

**2. Discussion**

The test for the voluntariness of a statement: "is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the subject's will was overborne.*" United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). A court must find that a Defendant's waiver of his Miranda warnings to voluntary, knowing and voluntary. *United States v. Doe,* 170 F.3d 1162, 1168 (9th Cir.1999)

Petitioner's counsel never had any belief, nor any information, that he was not capable of waiving his *Miranda* warnings. (Govt. Ex. 1 p. 38-9.) Dr. Barry Morenz found Petitioner competent to stand trial, enter a plea agreement and rationally and meaningfully assist his counsel. (Ex.94 p. 18.) The only alleged "deficit" suffered by Petitioner dealt with impulsivity and poor planning but nothing to suggest Petitioner was neither unable to knowingly and intelligently waive his *Miranda* warnings nor to make a voluntary statement.

Petitioner never complained, during his testimony, of any educational or cultural deficits

that caused him difficulty understanding and waiving his rights.  To the contrary, he freely testified that he had been advised of his rights on several occasions and knowingly waived them. (RT 0126, 0132.)  *United States v.  Bautista-Avila*, 6 F.3d 1360, 1366 (9th Cir.  1993) (defendant's admission that he understood his rights vitiates later argument that he did not knowingly waive his *Miranda* warnings due to his cultural background.)  Furthermore, one of his witnesses, a teacher, during the mitigation stage, described him as a voracious reader, highly intelligent and full of potential and she used him to help other students.  (RT 3937-39.)

This issue is without merit and should be dismissed.

**F.  Failure to Challenge Medical Examiner**

Petitioner alleges, for the first time, that trial counsel was ineffective for failing to challenge whether the possible neck wound on Jane Doe was not fatal and could support his new found defense theory that he tried to save the girl's life by only inflicting a superficial neck injury.

**1.  Issue Waived**

Petitioner failed to raise this issue on direct appeal and is therefore barred from raising it in this proceeding.

**2.  Discussion**

The trial theory was that although that Petitioner was present, he did not murder the victims.  Counsel did not wish to lose credibility in front of the same jury that they later would be asking to spare Petitioner's life. (Govt. Ex. 1 p. 31; Govt. Ex. 3 p. 11.)  There was no issue that the cause of death for the little girl was blunt force trauma and there was nothing to support the defense's theory to be gained from the medical examiner.  (Govt. Ex. 1 p. 39-42; Govt. Ex. 3 p. 23-25.)  Counsel also wished to minimize the length of time that this horrendous evidence would be before the jury. (Govt. Ex. 1 p. 42.)

Petitioner also claims that the medical examiner mislead the jury by inferring that the incised neck injury could have been a cause of death.  Contrary to Petitioner's assertion, the knife injury was never given as a cause of death at trial nor was it ever argued.  The evidence of the sharp force wound to neck was introduced as corroboration of Petitioner's statement to Agent

Kirk that he slit the young girl's throat. (RT 2727.)  During trial, the Medical Examiner testified that as to the cause of death:

A.  From taking the entire findings of the examination, the cause of death in this particular case was certainly the **injuries to the head, the fractures, the bruising of the brain, and the injuries on the side of the head**.

Q.  What did these injuries do to the brain that would cause death?

A.  The force that's transmitted to the brain, because it was certainly enough to cause skull fractures, the brain is a vulnerable organ.  That's why it's encased in this bony structure is for its protection.  The trauma that is transmitted to the brain with this much force can disrupt the functioning of the brain.  The brain is necessary not only for us to act and be who we are, but also to keep such vital functions going like beating of the heart and breathing.

Q.  Would the injuries that you found be consistent with multiple blows of rocks?

A.  It's certainly possible that these injuries could have been inflicted by more than one blow.

(RT 3348-49.) (emphasis added.)  Further, she described the force required to produce these injuries as similar to an ejection from a high speed crash.  (RT 3348.)

In regards to the neck wound, Dr. McLemore testified: "In the area of the neck along with, of course, the skin edges that had a combination of tearing injuries consistent with the chopping defects, on the left aspect of the neck there was a very small area of an apparent incised wound that had very sharp tissue edges, which is characteristic of an incised wound.  This area blended into the chopping defects that were immediately underneath it."  (RT 3337-38.)

Nothing was ever suggested or hinted by Petitioner, especially in his confession to Special Agent Trace Kirk that by slicing the nine-year old's throat he was somehow attempting to "save her life."  Certainly his statements that he told her "lay down and die" are at extreme odds with his noble claim, as was the raining down of 20 pound boulders on her head.  (RT 2727.)  Without Petitioner's testimony, the defense could not pursue any "plausible" defenses, especially in light of his statement to Dr.  Morenz and his counsel that it was Johnny Orsinger and not Petitioner

31

who slit the girl's throat.  (Ex. 94 p. 1501.) (Govt. Ex. 2 p. 25.)

The court need not reach the issue whether counsel was ineffective because Petitioner has failed to demonstrate the requisite prejudice.  This issue is without merit and should be dismissed.

## G.  Failure to Challenge DNA Testimony.

Petitioner argues that there were errors in the presentation of the DNA evidence and that his counsel was ineffective for failing to challenge it.

### 1.  Issue Previously Raised on Appeal

There was no objection to the DNA evidence at trial but this issue was raised on appeal. Although the Court found that the examiner's explanation "was not a model of clarity," it did find that the jury likely understood, "DNA evidence linked Mitchell to the black knife and Slim's cell phone, and somewhat linked him to the mask and glove.  It definitely connected Slim's blood to the chrome knife found in Mitchell's pants."[4]  *United States v.  Mitchell*, 502 F.3d 901, 969 (9th Cir.  2007).  The Court found no plain error.  *Id*.  969.  Petitioner is now barred from raising it anew in a habeas setting.

### 2.  Discussion

As previously stated, the trial theory was not to deny that although Petitioner was present, he did not murder victims.  Counsel also did not wish to lose credibility in front of the same jury that they would later ask to spare Petitioner's life.  (Govt. Ex. 1 p. 31; Govt. Ex. 3 p. 11.) Counsel did not view the DNA evidence as damaging to their theory.

Petitioner confessed that he was present with Johnny Orsinger, stabbed Alyce Slim, slit the little girl's throat, then used a 20-pound rock to cave in her head and later used the car jacked truck to rob the Red Rock Trading Post at gunpoint.  (RT 2723, 2726- 29; 2987-90; 3116-24). He also admitted that he put the victims' severed heads and hands of the victims into a dirt hole. (RT 2728, 3123).  His fingerprints were located on the car jacked truck belonging to Slim.  (RT

---

[4] This knife was found in the Petitioner's pants at the time of his arrest.  (RT 2962-63; 3214-15.)

32

3185-90).   Co-Defendant Jason Kinlicheenie testified to the admission of guilt made by Petitioner. (RT 2782-83.)  The case did not rise and fall on the DNA evidence alone.

The DNA evidence consisted of 3 separate blood spatters from the victims' truck which matched Alyce Slim at all 14 loci, as did blood taken from the floor mat, a bloodstain from the rear seat cushion and the driver's seat.  The probability of her DNA profile being found with another person was 1 in 680 billion Navajos. (RT 3204-3211.)

The knife found in Petitioner's pants at the time of his arrest - (Trial Ex. 34.), contained blood in which Alyce Slim's DNA was found at all 14 loci with the stated probability of finding a similar profile at 1 in 680 billion Navajos.  (RT 3214-15.)  Petitioner confessed that he used a knife to stab Ms.  Slim.  (RT 2727, 3121.)

The silver cell phone recovered from the residence where Petitioner was arrested (Trial Ex.  52.) was identified as Ms. Slim's.  (RT 2987, 3101.)   Petitioner could not be excluded as a contributor to DNA located on the phone at 12 of 14 loci.  (RT 3216.)

One of the Halloween masks was identified by co-defendant Jason Kinlicheenie as worn by Petitioner during the Trading Post robbery by.  (Trial Ex.  93) (RT 2792.)  Petitioner could not be excluded as a possible contributor of DNA located in the same mask.  (RT 3217-18.) Petitioner admitted using a mask and a shotgun during the armed robbery of the Trading Post. (RT.  2723.)

A pair of latex gloves (Trial Ex.  160.) was found in the dirt hole along with the hands and heads of the victims.  (RT 3058, 3068.)  The DNA expert explained that she could only raise a partial profile, that it fell below the lab's threshold but Petitioner could not be excluded at 6 loci. (RT 3218-19.)  Petitioner admitted that he helped to bury the heads and hands.  (RT 2728, 3123.)

The blood on the rocks found at the murder scene used to crush the head of the nine year old, (Trial Exs. 161 and 162.), was found to contain her DNA at all 14 loci and her DNA profile was found to occur in 1 in 250 trillion Navajos.  (RT 3087, 3219-21.)  Petitioner confessed to using rocks to smash her head.  (RT 2727, 3122.)

Furthermore, the defense did challenge the DNA evidence by establishing that the expert

33

was unable to tell how Petitioner's DNA got on a certain item or when.  He also ran through a litany of names as possible suspects who could not be excluded as contributors.  (RT 3222-35.)

The argument that there is no probative value to "cannot be excluded" was rejected on appeal with the Court finding "the expert's testimony indicates that a "cannot exclude" finding can tell a lot, and can increase the probability that the person's DNA is present, depending on the number of loci at which the person cannot be excluded." *Mitchell,* 502 F.3d at 970.

This Court should reject Petitioner's claim because the Ninth Circuit has already rejected the "basic thrust or gravamen" of this claim on direct appeal, and he has failed to demonstrate manifest injustice.  Furthermore, the court need not reach the issue of ineffective assistance as Petitioner fails to demonstrate the requisite *Strickland* prejudice.  This issue is without merit and should be dismissed.

**H.  Ineffective Assistance of Counsel During Jury Selection**

Petitioner argues that trial counsel failed to properly voir dire or challenge a number of venire persons.

**1.  Issue Waived**

This issue was not raised by appellate counsel and Petitioner is therefore procedurally barred from raising the issue.  On appeal, plain error was not found in the jury selection process.

**2.  Discussion**

Counsel is accorded particular deference when conducting *voir dire,* their actions are considered to be matters of trial strategy and unless a counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness, the decisions cannot form the basis for an ineffective assistance claim.  *Keith v. Mitchell*, 455 F.3d 662, 676 (9th Cir. 2006).  Even if counsel's conduct is found to be objectively unreasonable, a petitioner must still show that it substantially undermined the fairness of the trial.  *Id*. 676

Petitioner has never alleged nor can he prove now that his jury was not fair and impartial.  His challenges to Venire persons #55, #59 and #83 are of no moment as they did not sit.  *Mitchell* 502 F.3d at 954.

34

He did not argue on appeal that Jurors 48, 43 and 51 should have been peremptorily struck by defense counsel. He is now barred.  Further, he cannot prove that the fact that Jurors 48 and 43 sat in judgement undermines confidence in the verdict.  During voir dire, Juror No. 48 told trial counsel that even after she had convicted Petitioner of causing the death of a grandmother and her granddaughter she could still imagine voting for a sentence other than death. (RT 1503.) Juror No. 41 gave the same answer. (RT 2050.) Juror No. 51 was an alternate.  Great deference is accorded trial counsel in selecting a jury, based in part on their ability to observe the demeanor of a venire person. Counsel must also consider other potential jurors who are less favorable to the defense when assessing who to strike.   No prejudice ensued from the inclusion of these jurors.

He also now argues that counsel was ineffective for failing to rehabilitate potential jurors who professed a deep-seated belief against the death penalty which he did not raise on appeal and is therefore procedurally barred.  Although he opines and concludes that "competent" counsel could have rehabilitated these individuals, it is mere speculation and nothing more.  He offers no concrete evidence of how this could have been done. He again fails to prove that he suffered *Strickland* prejudice.

Venire person #81 told counsel that the death penalty was flawed and he repeatedly said he could not set aside his beliefs and would always vote for a sentence of life imprisonment. Any objection would clearly have been overruled.  (RT 0500-07.)

Venire person #61 repeatedly and steadfastly stated that he would never impose the death including telling counsel that he would not remain open minded.  (RT 0677-78.)

Venire person #63 made it abundantly clear that her beliefs prevented her from ever considering recommending a sentence of death even if the case involved a nine-year and a 65-year-old.  She also stated that she could not be fair and impartial given the graphic nature of the evidence.  (RT 0741-44.)

Venire person #9 stated clearly, based on his Apache culture, he could never set aside his beliefs and recommend a sentence of death.  (RT 1172-80.)

Venire person #82 in several answers to the Court's questions stated that he could not set

aside his beliefs and ever consider a death penalty. (RT 1181-83.)

Venire person #15 made it quite clear from the answers in his questionnaire that he could not set aside his beliefs and ever consider a death sentence. Therefore there was no reason to question this juror also in light of the fact that #15 personally knew Petitioner and thought he had committed a heinous act. (RT 2152, 2257.)

Venire person #77 was disqualified for hardship. He also told the court that he felt the judicial system was not strong enough because the person who killed his cousin and only got a couple of years in jail, "who got off basically and that is still in my mind these days." (RT 1907 -11.)

Petitioner next alleges that counsel was ineffective for failing to challenge the excusal of venire persons Nos. 1, 2, 9, 11 due to problems with the English language. The Jury Service and Selection Act, 28 U.S.C. 1865(b)(1), (b)(2) and (b)(3), requires that all jurors be proficient in the English language. *United States v. Torres-Hernandez*, 447 F.3d 699, 702 n.1 (9th Cir. 2006).

Finally, Petitioner argues that appellate counsel was ineffective for failing to challenge the removal of several venire persons due to their intractable opposition to the death penalty and inability to set aside their beliefs. Those removals were raised on appeal based on race issues. However, the Court found that their removals were for death qualifying reasons that were "well-supported" in the record in regard to #3 and #22 and that there were grounds supporting the removal of #24. *Mitchell*, 502 F.3d at 953.

Venire person #6 was found by the Court to be quite fixed in opposition to the death penalty. She stated that she would always vote for a life sentence because of her beliefs. It did not matter that the victims were elderly and a young child. She told counsel she could not keep an open mind. (RT 0198-99.) There was no error in her removal and Petitioner can show no prejudice.

Petitioner fails to demonstrate, in light of all of the circumstances, that counsel's identified acts or omissions were outside the wide range of professionally competent assistance. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Furthermore, he fails to prove that the results of the

36

proceeding would have been different. *Strickland,* 466 U.S. at 687. Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales*, 515 F.3d at, 1015-16. His jury was fair and impartial which is all that is required.

## Issue I.  Erroneous Removal of Potential Jurors For Views of the Death Penalty

Petitioner now alleges that the trial court improperly excluded Juror #3 based on his views regarding the death penalty. On appeal he raised the issue that Juror #3 had been improperly removed based solely on his race. The argument was rejected and the removal upheld. "The lengthy questioning and discussion relating to # 3 had almost nothing to do with race; he was excused for cause on account of his perceived inability to set aside religious opposition to the death penalty. *Mitchell*, 502 F.3d at 953. No plain error was found.

### 1.  Issue Waived

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising it again in a habeas setting. *Reed*, 512 U.S. at, 358 (Scalia, J. concurring in part and concurring in the judgment) *Redd*, 759 F.2d at, 701; *Eggers*, 509 F.2d at, 748.

A claim was presented previously if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments." *Molina*, 886 F.2d at, 1129. A court must entertain a successive claim only if there is "manifest injustice" or a change in law. *Walter*, 969 F.2d at 816; *Polizi*, 550 F.2d at, 1135-36. This Court should reject Petitioner's claim because the Ninth Circuit has already rejected the "basic thrust or gravamen" of this claim on direct appeal, and he has failed to demonstrate manifest injustice.

Additionally, even though he also claims ineffective assistance of appellate counsel for failing to raise this specific claim he is procedurally barred from raising the issue in a habeas proceeding. "Section 2255 may not be invoked to relitigate questions which were or should have been raised on direct appeal." *Hammond*, 408 F.2d at, 483.

### 2.  Discussion

Courts are accorded great deference when conducting voir dire because they are in

superior position to determine a venire person's demeanor and credibility. *Uttecht v. Brown*, 551 U.S. 1, 7 (2007). These findings "may be upheld even in the absence of clear statements from the juror that he or she is impaired because 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death penalty, or may be unable to articulate, or may wish to hide their true feelings." (Internal citation omitted). Thus, when there is ambiguity in the prospective juror's statements, "the trial court, aided as it undoubtedly [is] by its assessment of [the veniremman's] demeanor, [is] entitled to resolve it in favor of the State." *Id*. at 7.

The inquiry does not end with a mechanical recitation of a single question and a venire person's response. *Uttecht,* 551 U.S. at 8 Even if the precise wording of the question and answer do not compel a conclusion that he or she could never under any circumstances impose the death penalty, the need to defer to the trial court because so much depends on the demeanor of the potential juror. *Uttecht*, 551 U.S. at 8.

"A prospective juror may be excluded for cause because of her views on capital punishment when "the juror's views would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with[her] instructions and [her] oath.' " *Wainwright*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45, (1980). The juror need not indicate that she would "automatically" vote against the death penalty, nor need the bias be shown with "unmistakable clarity"; the trial court need only be left with a "definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id*. at 425-26. Deference is owed to the trial judge who sees and hears the juror." *Mitchell*, 502 F.3d at 955.

The test for disqualifying jurors in capital cases is as follows:

> We therefore take this opportunity to clarify our decision in *Witherspoon,* and to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

38

We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.  Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra,* this is why deference must be paid to the trial judge who sees and hears the juror.

*Wainwright v. Witt*, 469 U.S. 412, 424-25 (1985).

We noted that the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations were entitled to deference even on direct review; "[t]he respect paid such findings in a habeas proceeding certainly should be no less.

*Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  This holding applies equally well in a capital case. *Wainwright*, 469 U.S. at 429.

In his questionnaire, Juror #3 responded "Yes" to question #57 "Are you a person who could never, under any circumstances, return a verdict which recommended a sentence of death?" He initially marked "No" but crossed it out.  To question #58 he answered that he "would always vote to impose the death penalty . . . " He answered "Yes" to question #60 which asked would your "views or opinions regarding the death penalty prevent you from reaching a verdict of guilty as to that crime?"  He then added "only under the circumstances that the Defendant repent of what he has done to God that only forgive sin and judge him on the day of judgement for the crime he has done."  He answered "No" to question #62 which asked if "your views or opinions regarding the death penalty prevent you from recommending the death penalty as a punishment."

39

Finally, he stated in question #64 that he "would *automatically* vote to recommend a sentence of death as a punishment."(emphasis added).  He also stated that he would hold both the government to a standard greater than "reasonable doubt" and the defense greater than "preponderance of the evidence" for proving mitigating factors.  (Questions 73, 74.)

Juror #3's answers in court were just as inconsistent but he never unequivocally stated that he could set aside his beliefs and impose the death penalty if it were the appropriate sentence:

THE COURT:  And my question for you, [Juror #3], is could you consider imposing either of these two options, life without the possibility of release or the death penalty?  Could you consider these two options?

JUROR #3: My choice, my decision concerning to that question, it is like for being in a place of my position and being as I've been involved with the law enforcement, I do believe in the criminal law in justice, as well as I'm a police chaplain.  And it would be very well as I'm a police chaplain.  And it would be very critical for me to make a draw for a decision to death penalty according to what my beliefs is in the gospel and the word of God. And that is what is basically upon our government has been based upon.  So that's the reason why.  If the Defendant has been found guilty in accordance to the law, I would not assume to make or draw a decision to make a person be death penalty is the reason why it would be against my conviction.

THE COURT: You're saying it would be **against your religious beliefs** to impose the death penalty.

JUROR #3:  **Absolutely.**  But I truly do believe if a person is being responsible and being accountable for what the thing that he does wrong, it is, but for me to be placing that I have a very strong conviction because I leave that up to God himself for that.  It is, because I will live the decision that what I have to make, I have to live it with the rest of my life.  It is.  That's the only thing is, my concerning about that to answer that question it is.  But if – it if's going to be like life imprisonment, I would make – rather make that choice, that decision.  It is – but again, my decision is in accordance with the laws itself concerning that.  But I don't see any problem with that making a decision concerning about like in that – in the area of being life imprisonment without being released.

THE COURT:  **It sounds like you would favor a life imprisonment without release as opposed to the death penalty.**

 JUROR #3:  **That's right**.

THE COURT:  And my question is, would that be in  every case?  Would you --

40

irregardless of what is presented, would that be in every case?

JUROR #3: It may not be in every case, but **especially specifically in this case itself like that it is.**

THE COURT: Okay. Because I know we've discussed the case a little bit. But why would you say in this case itself it would be?

JUROR #3: Because if the Defendant is being found guilty like that it is. If I were to make a decision for a death penalty, it wouldn't be. I would make that decision, a choice on that.

THE COURT: You would make a choice of what?

JUROR #3: **Making a choice of -- of not making a death penalty.**

(RT 0319-21.) (emphasis added)

**Later the juror again stated that he could not set aside his beliefs:**

THE COURT: Okay. So despite your religious beliefs, being against the death penalty, and you're entitled to have those beliefs, you would be able to set aside those beliefs. And if you're forced to make a decision, you will consider both; is that correct?

JUROR #3: Yeah. I do have respect for the natural laws of this land but I also do have respect for the word of God. My beliefs in that perspective it is. But I can see -- I understand what you're trying to point -- the point that you're trying to make to me. **But I would not set my -- my faith and my beliefs and to set it aside**, but I do believe if I were to make a decision, it has to be in accordance with the law itself and the law says that this is what the punishment for the man it is possibly that I would do the same thing for what the law says.

THE COURT: Okay. Because the law, I wouldn't tell you what the punishment is. That would be for the jury to decide, okay. And so right now you said -- I want to make sure I understand because you said you wouldn't set aside your briefs. And I need to know whether you would or you wouldn't if you were part of the jury that had to decide between the death penalty and life in prison. **Would you be able to set aside your beliefs?**

JUROR #3: **No, Your Honor.**

THE COURT: You don't think you could?

41

JUROR #3: **No.**

THE COURT: Okay. Let me ask you, would that be true in this case if it was presented that the Defendant had murdered a child? Would that make a difference to you in setting aside your beliefs?

JUROR #3: **No, Your Honor**.

THE COURT: You don't think so?

JUROR #3: Huh-uh.

(RT 0323-24.) (emphasis added.)

Juror #3 later confirmed his opposition to the death penalty and that he would only be open to a sentence of life imprisonment.

MR. ALTMAN: Hi, [Juror #3]. I'm Kurt Altman. I just wanted to follow up on a couple of things. You said you would follow the law and what the law required you to do; is that right?

JUROR #3: Yes, sir.

THE COURT: So if -- if we got to the penalty phase in this case, that means the Defendant was found guilty. We are not saying you have to do that, but if we got to that point and the law told you as a potential juror that you now have two choices, you can impose a sentence of life imprisonment or a sentence of death, **would you always impose the sentence of life imprisonment based upon your religious beliefs?**

JUROR #3: **Yes, sir**.

(RT 0325.) (emphasis added)

In response to a defense query:

MR. SEARS: And the Judge asked you several times whether you could put aside your religious beliefs to do that. What did you understand that to mean? What did you think the Judge was asking you to do?

JUROR #3: If I were to put my religion aside, this is basically what I live on. I live by the gospel. That's the way according with my beliefs, which I put higher above any other beliefs. But I do have respect with the court, with the laws, with

42

the government itself here.  It is, but if I were to do that, I have to make my decision in accordance to what my beliefs it is.

(RT 0326.)

After the government moved to strike the juror and the defense responded the Court ruled:

THE COURT:  Well, [Juror #3] answered key questions that -- in a way that would support finding him qualified and finding him not qualified.  He indicated he cannot -- or when I was asking him questions that he could not set aside his -- after telling me what his religious beliefs were, that he could not set aside his religious beliefs, took him through the process.  He indicated he thought he could.  However, also when asked questions of whether or not -- and let me just state, I think there was confusion on [Juror #3's] part.  And I don't know if he clearly understands that he would be given a choice.  He clearly would support the law he indicated.  And I got the distinct impression that if he had to make the decision, and he felt that was what the law was, he would support it.  **However, when questions really honed in on it if he was part of the jury during the sentencing phase and he had a choice, he clearly indicated that he would always vote for the life sentence. I'm concerned that in his questionnaire he does state that he would -- or he indicates that he would put the government to a higher burden.  And my impression is that he does not clearly understand that he would have to make the decision.  And when it got to the point where he sort of recognized that possibility, he indicated that he could not impose the death penalty. Therefore, I am going to find that he is not qualified.**

(RT 035-36.) (emphasis added.)

In the instant case, the trial court correctly excused Juror #3 under the *Witherspoon* analysis.  The venire person never clearly stated that he could temporarily set aside his beliefs against the death penalty and follow the law.  *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). The court's assessment was supported by the juror's inconsistent answers to the questionnaire as well his inconsistent answers in the courtroom.  The juror need not indicate that she would "automatically" vote against the death penalty, nor need the bias be shown with "unmistakable clarity"; the trial court need only be left with a "definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id*. at 425-26, 105 S.Ct. 844.  Deference is owed to the trial judge who sees and hears the juror. *Id*." *Mitchell*, 502 F.3d at 955.  This juror did not provide that assurance and was properly excused.

This issue should be dismissed based on the appellate court's previous findings.  Further,

43

in light of the Court's finding that the dismissal of Juror #3 was based on his "perceived inability to set aside religious opposition to the death penalty," and was not plain error, Petitioner fails to demonstrate that his appellate counsel was ineffective. *Strickland*, 466 U.S. at 690. Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales*, 515 F.3d at, 1015-16. Furthermore, *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991) does not support his claim that the Court must hear the issue on its merits despite the fact that this issue was not properly raised at trial or on appeal. The Court only held that when counsel, who is not constitutionally mandated to represent a Defendant, fails to file a timely claim, there is no ineffective assistance of counsel. *Id*.

**J.  Jurors Excused for "Hardship"**

Petitioner alleges, for the first time, that the court's removal of three jurors for "hardship" violated the legal standard.

**1.  Issue Waived**

He failed to raise the issue on direct appeal and is therefore barred from raising it in this proceeding unless and until he can show "both cause excusing his procedural default, and actual prejudice resulting from the claim of error." *Johnson*, 988 F.2d at 945. No plain error was found on appeal.

**2.  Discussion**

A district court's actions during voir dire are reviewed for an abuse of discretion. *United States v.Milner*, 962 F.2d 908, 911 (9th Cir. 1992)  A trial judge is required to make an independent assessment of a juror's ability to render a fair and impartial verdict. *United States v. Egbuniwe*, 969 F.2d 757, 762 (1992). Broad deference is given to district judges, who observe the *voir dire* first hand. *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). It is solely within the court's discretion to allow supplemental questioning. *United States v. Howell*, 231 F.3d 615, 628 (9th Cir. 2000).

Venire person No. 77 was excused for more than just hardship. She reported that her

husband was a Yavapai County Deputy Sheriff for eight years and that he spoke with her on many occasions about his work.  Juror #77 advised the court that this situation could quite possibly interfere with her ability to be fair and impartial.  (RT 1022-23.)

THE COURT: Juror #77 will be excused.  She indicated that she's the primary caretaker for her daughter who has a 7- and 4-year-old and she takes care of them three to four days a week.  She indicated it would be a financial hardship for her daughter.  And it was clear from the impression of the court it would cause her great distress to be -- to have her daughter put in the position having to find some other child care and whether or not that would even be feasible.  In addition, she indicated the fact that her husband was a deputy sheriff for Yavapai County for eight years and that that connection **might tend to have her side with one side, and I presume that that was the prosecution.**  But those **two combination** of reasons I am going to  find Juror #77 should be excused due to undue hardship or extreme inconvenience.(RT 1038-39.) (emphasis added.)

JUROR # 78 was properly excused for financial hardship.  He advised the court that:

I work for the Postal Service.  I was – I recently applied for and was approved in a new position that involves doing training programs throughout the Pacific area.  And I was selected as one of four trainers that have some extensive obligations in training commitments.  And the length and the dates of this trial are going to conflict with at least four weeks of training commitments that I have been committed to, so.

THE COURT:   And I guess is that hardship for you or for your place of employment? Is that going to hinder you in your employment there if you can't do this training?  Can you go to the next scheduled training if you were selected as a juror?

JUROR #78:  I'm the trainer.

THE COURT:  I'm sorry?

JUROR #78:  I'm supposed to be doing the training.

THE COURT:  Let me ask you.  Can someone fill in for you?

JUROR #78:  Not easily.

THE COURT:  Okay.  And I know that this kind of service affects more than just

the individuals who appear here in court today as potential jurors, and has all kinds of effects for family and business and employers, but I would need to try to assess if it -- if it's possible for someone to do that for you, the Postal Service could bring in someone to do that for you. And you say not easily; is that right?

JUROR #78:  Well, their selection process to bring me onboard as a trainer took a couple of months.  And so it puts me in a position of not meeting the commitments I made to them when I accepted that position.

JUROR #78:  **Conceivably, yes.  I'm feeling conflicted about being here**.

(RT 1203-05.) (emphasis added.)

JUROR #78 additionally was forced to rent a car, at his expense, to drive from Flagstaff to Phoenix because his personal vehicle was not reliable enough to make the journey.  In response to defense counsel Juror #78 stated:

MR. SEARS:  The schedule in this case is now somewhat fragmented because the jury selection process is taking a considerably longer period of time than we originally planned when you all were notified.  And so it looks now, as Judge Murguia told you, that if you're chosen to sit on this jury, the trial would begin at the end of this month, the first part of next month, and it could run, if it went out all the way, into early June.  Would you be in a position of having to rent a car to make the trips back and forth during that period of time also?

JUROR #78:  Yes.

MR. SEARS:  Is that something you would be willing to do?

JUROR #78:  It's a question of expense.  That's the main thing.

MR. SEARS:  I will have to rely on Judge Murguia and the Jury Administrator to see whether you can be reimbursed for that expense.  I just don't have that answer. Have you looked into that?

JUROR #78:  How much it will cost?

MR. SEARS:  And whether you can possibly be reimbursed for part or all of that expense?

46

JUROR #78: I don't know who I would contact to find out. All I was told is that I would be paid the miles driven at a rate of 30-some cents per mile. I don't recall.

MR. SEARS: I imagine it costs more than that to rent a car.

JUROR #78: Well, one round trip to Phoenix would cover about two days car rental. If I was down here for four days in a row, the mileage wouldn't cover the car rental.

MR. SEARS: Knowing that, is that -- when you add that to the issues about missing the training that you just signed on to perform and the other things we've talked about here this morning, have we now put you in an impossible position if you were to be chosen to sit on this juror?

JUROR #78: You've put me in a difficult position, yes.

MR. SEARS: Maybe impossible is a little over the top?

JUROR #78: Yes.

MR. SEARS: It's becoming more difficult for you to imagine sitting?

JUROR #78: Yes.

(RT 1215-17.)

The government asked that Juror #78 be excused as a hardship and his stated problems with the legal system. After the defense objected, the court excused Juror #78:

THE COURT: Well, he said it wasn't -- we put him in a very difficult position due to his position with the Post Office . He has been selected to be a trainer and that he is conflicted about being here, even today. And because of the -- and I think in response to my question, he said he wasn't sure he would be able to focus completely on the case because of that. It would be hard. Coupled with the rental car issue in terms of -- and he noted that early -- this is one of the persons who had been raised prior based on his response to the questionnaires, that he had discussed previously because of his transportation issue. Then in addition at the very end when asked if he could follow the law, he paused and said, "I think so." **All of those three bases**, I think that he would not be able to focus on the case. It's created a very difficult position for him and so I am going to excuse him as a juror at this time due to undue hardship and extreme inconvenience, and then in addition, **I don't know that he would be able to follow the law.**

(RT 1223-24.) (emphasis added)

Finally, JUROR #20, in direct response to a defense question, clearly stated that her mind would not and could completely focus on the trial because of her two children:

MR. SEARS:  -- with you being here? Is there anything else about the schedule of this case, the days that we would be here, and the length of time that you would have to be away from your home and your family, that would be a hardship for you?

JUROR #20:  Yes.

MR. SEARS:  Could you tell us what that is, please?

JUROR #20:  Yes, I have two children that I am raising on my own since my fiancé is in prison.

MR. SEARS:  Could you speak up just a little bit, Ms. Nez.

JUROR #20  :  I said it would be hard on me and my two children because I am raising them on my own.

MR. SEARS:  How old are the kids?

JUROR #20:  My oldest is **five and the youngest is one.**

MR. SEARS:  Is there someone watching them today?

JUROR #20:  Yes, my sister.

MR. SEARS:  Would she be able to watch them most of the week?

JUROR #20:  Yes.  Yes.

MR. SEARS:  For four to six weeks?

JUROR #20:  Yes, she would.

48

MR. SEARS: Would being away from your children be in your mind difficult for you?

JUROR #20: Definitely, yes.

MR. SEARS: **Would it affect your ability to concentrate what was going on here in the courtroom?**

JUROR #20: **Yes, it would**.

(RT 2154-55.) (emphasis added)

The government agreed with the court's assessment that Juror #20 should be excused for hardship but the defense objected.

THE COURT: Well, it was in response to your question, Mr. Sears, that she indicated she does have two kids at home and it would affect her ability to concentrate on the trial. So I'm inclined to excuse her at this time. Tell me why I shouldn't.

MR. SEARS: Your Honor, I -- my impression of Ms. Nez was that she was very shy. She's clearly the youngest person on the panel today and was reluctant to speak. She spoke so softly, I could barely hear her. And she indicated, for example, in her questionnaire that she wanted to visit her boyfriend, the father of her children, in prison, and that that was apparently a concern of hers but then indicated this morning that she could do that on the weekends. She indicated that her sister could watch her children. And I came away with the idea that in response will you miss your children, sure, sure she will. And I think in all due respect, she could be questioned further about that subject. But at this point, we are not prepared to simply stipulate that she can be excused.

THE COURT: It's been pretty much, if they are not able to concentrate, and I don't have any reason to question her. My impression is, I think this is a bit --this whole process seems to be a bit complicated. And once when asked squarely the question about the kids, she did respond quite sincerely, yes. In fact, **there was emphasis, that it would affect her ability to concentrate**, so I am going to excuse her at this time.

(RT 2166-67.) (emphasis added.)

Additional voir dire could never have changed the mind of a mother of small children. The Court did not abuse its discretion by excusing these potential jurors.

49

There is not a scintilla of evidence to back Petitioner's claim that he was tried by juror composed solely of those who *wanted* to serve on the jury. Such statements are a great disservice to the court, the parties and the people who answered the call to perform their civic duty. The jury selection process extended over a four week period, included a 21 page questionnaire containing 77 questions, as well as group and individual voir dire by both the court and the respective attorneys. Petitioner cannot point to one seated juror and prove that they were not fair and impartial

Petitioner fails to demonstrate, in light of all of the circumstances, that appellate counsel's identified acts or omissions were outside the wide range of professionally competent assistance. *Strickland*, 466 U.S. at 690. Furthermore, he cannot prove that the results of the proceeding would have been different. *Strickland,* 466 U.S. at 687. Further, *Coleman*, 501 U.S. at, 753-54 does not support his claim that the Court must hear the issue on its merits despite the fact that this issue was not properly raised at trial or on appeal. The Court held that when counsel, who is not constitutionally mandated to represent a defendant, fails to file a timely claim, there is no ineffective assistance of counsel. *Id*.

## Issue K.   Juror Interviews Post-Verdict

Petitioner raises for the first time in his Amended Habeas Motion that the court erred by denying his request to interview jurors post-verdict.

### 1.  Issue Waived

This issue was not raised in his initial Habeas Motion and should therefore be dismissed. The burden in on Petitioner to show that the matters in the amended motion properly relate back to the original motion. *Mayle v. Felix*, 545 U.S. 644, 664 (2005). He will argue that the issue had not been resolved by the court at that time. As the Court noted, he never offered any explanation why the issue could not have been raised well in advance of the AEDPA deadline.

### 2. Discussion

50

Petitioner argues that the Court rested its denial of his motion to interview jurors solely on LRCiv. 39.2.  However, the ruling was primarily based on the law: "Petitioner must, at a minimum, make a preliminary showing of juror misconduct to establish good cause to conduct juror interviews. *See United States v. Stacey*, 475 F.2d 1119, 1121 & n.1 (9th Cir. 1973); *Smith v. Cupp*, 457 F.2d 1098,1100 (9th Cir. 1972)."  This Court found none.  Petitioner cites no case that has ever held that in capital cases, the Federal Rules of Evidence are to be interpreted differently.

The Supreme Court has made it abundantly clear that verdicts are sacrosanct, and jurors are to be protected:

> [L]et it once be established that verdict solemnly made  and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct to set aside a verdict.  If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation-to the destruction of all frankness and freedom of discussion and conference.

*McDonald v.  Pless*, 238 U.S. 264, 267-68 (1915).

> There is little doubt that post verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts after irresponsible of improper juror behavior.  It is not at all clear, however, that the jury system could survive such efforts to perfect it.  Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupts the finality of the process . . . Moreover, full and frank discussion in the jury room, juror's willingness to return an unpopular verdict, and the communities trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct"

*Tanner v.  United States*, 483 U.S. 107, 120-21 (1987).

This issue should be dismissed as it was not timely raised and further there is no legal basis to support it.

**L.  Inadequate Voir Dire**

Movant alleges, for the first time, that his voir dire proceedings were constitutionally inadequate.

### 1. Issue Waived

The issue was not raised on appeal and he is therefore procedurally barred from raising the issue.  No plain error was found on appeal.

### 2. Discussion

Petitioner cannot argue that the voir dire in this case "was not a serious meaningful, inquiry into the qualifications and biases of the prospective jurors." (Pet. Motion p. 126.)  Voir dire took the better part of four weeks to complete.  Trial counsel never complained that the court was not conducting a thorough and complete questioning of the venire.  Even appellate counsel saw no reason to complain.

Counsel is accorded great deference during voir dire along with a strong presumption of competence. *Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006).

The Court should reject Petitioner's unwarranted assault on the integrity of the Court.  He claims, without any support from the record, that [t]he jurors' answers were meaningless because the Judge had devalued their oath and the Court's actions rendered their responses untrustworthy."

Trial counsel asked a significant number of probing questions.  The Court took issue with only one hypothetical question posed by the defense:

> If you had just sat on the jury and  you found after you heard the whole case at trial, all the  evidence, and you concluded that my client was guilty, that he committed carjacking and that he caused the death of two people, a nine-year-old girl and a 65-year-old woman, and then you are going to be asked what the punishment was, can you personally imagine yourself under any circumstances voting for anything other than the death penalty?

(RT 1517.)   It found the question to be misleading, incomplete and not germane to the issues (RT 1520-27.)

The Court was correct in ruling that the answer to this defense hypothetical question did not satisfy the test set forth by the Supreme Court of "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at, 424.  The Court was obligated to ask follow-up questions to clarify that issue.  It did not have to accept the defense strategy of ignoring case law.

Petitioner then attempts to argue that his counsel were "forbidden from asking prospective jurors questions specific enough" to determine whether they could fairly and impartially serve on Mitchell's case.  However, he cannot point to one example where he was denied a right to ask a death/life qualifying questions of the venire.

Petitioner fails to demonstrate, in light of all of the circumstances, that appellate counsel's identified acts or omissions were outside the wide range of professionally competent assistance. *Strickland*, 466 U.S. at 690.  Furthermore, he fails to prove that the results of the proceeding would have been different. *Strickland,* 466 U.S. at 687.  Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales*, 515 F.3d at, 1015-16.

This issue should be dismissed.

**M. Cumulative Effect of Errors During Jury Selection**

**1. Issue Waived**

Petitioner never objected, either at the time of the proceedings or now, that his jury was not fair and impartial. The issue was not raised on appeal and he is therefore procedurally barred from raising the issue in a habeas motion.  No plain error was found on appeal.

**2. Discussion**

There were no errors during jury selection .  The true focus is whether the jurors who sat in judgment were fair and impartial. *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988).  Petitioner does not allege that any members of the jury were not fair and impartial.  The essence of his attacks on jury selection is that venire persons, whom he believed *might* have been favorable to him or

were *likely* to provide fertile areas for additional appeals, were excused.  Only in cases in which the government's evidence is weak is a defendant more likely to be prejudiced by the effect of cumulative errors. *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).  The combined effect of multiple trial errors is a violation of due process only where it renders the criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S.284, 298, 302-03. (1973).  Petitioner was afforded his right to a fair and impartial jury trial.

This issue is without merit and should be dismissed.

**N. Trial Transfer and Severance of  Co-defendant Orsinger**.

Petitioner raises, for the first time in his Amended Habeas Motion, that the court erred by transferring the trial from Prescott to Phoenix and later *sua sponte*, severing co-Defendant Orsinger from the trial.  He did not raise these two issues in his original Habeas Motion and therefore they must be dismissed.  The burden in on Petitioner to show that the matters in the Amended motion properly relate back to the original motion. *Mayle*, 545 U.S. at 664.

**1.  Issue Previously Raised on Appeal**

He raised the transfer issue at trial, but the court denied relief which was was affirmed on appeal.  He also argued, for the first time, that the court should not have severed co-Defendant Orsinger from the trial.[5]  Both arguments were rejected.  "Mitchell asserts that his trial was improperly transferred from Prescott to Phoenix, but abandons the point by developing no argument with respect to it." *Mitchell*, 502 F.3d at 950.

> Orsinger was severed from Mitchell's trial on the morning that jury selection began. Mitchell now claims that this decision dramatically changed the nature of the case for which he was selecting a jury, but at the time did not object or request a continuance. He points to nothing in the record that indicates any effect of this decision on counsel's strategy or that calls into question his counsel's judgment in going forward with voir dire. There was no plain error.
>
> Nor did the court plainly err in proceeding with jury selection rather than, sua

---

[5] The severance was based on Petitioner's request to introduce Fed R. Evid 609 evidence related to the "cowboy carjack murders" against Orsinger.

sponte, starting it anew after the severance. Mitchell argues that his jury was tainted by Orsinger's participation in drafting the juror questionnaire, listing stipulated juror excusals, and making arguments at a hearing with respect to for-cause dismissals. Yet he points to no evidence (and does not claim) that he and Orsinger disagreed over any decision along the way, or that Orsinger took any action that prejudiced Mitchell. No plain error appears.

*Mitchell*, 502 F.3d at 959.

This Court should reject Petitioner's claim because the Ninth Circuit has already rejected the "basic thrust or gravamen" of this claim on direct appeal, and he has failed to demonstrate manifest injustice.

## 2. Discussion

Petitioner can only speculate that he was severely prejudiced by the transfer of the trial from Prescott to Phoenix even though the Prescott jury panel was used. Security, the sole reason for the transfer, was always a concern for the district court's first death penalty trial which included at least two potential in-custody witnesses to testify as well as the in custody defendant. There is no evidence in the record to support the claim that the trial in Phoenix posed any greater hardship to the venire panel than had the trial taken place in Prescott. The hardships listed such as the length of the trial, spending nights in hotels and impact on employment would have also been present in Prescott. Speculation is not sufficient.

This issue was resolved on appeal and should therefore be dismissed.

## O. Native Americans Systematically Excluded from Jury Selection Process

Petitioner once again alleges that Native Americans were systematically excluded from jury service in his case.

### 1. Issue Previously Raised on Appeal

He raised the issue at trial and lost. On appeal this same argument was rejected, "Because Mitchell does not show that the under representation of Native Americans on venires such as his was either substantial or systematic, and because the right to a representative cross-section does

55

not extend to petit jury selection, Mitchell fails to establish a constitutional violation arising out of the procedures that were followed. *Mitchell,* 502 F.3d at 951.

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting. *Reed*, 512 U.S. at, 358 (Scalia, J. concurring in part and concurring in the judgment)*. Redd*, 759 F.2d at 701. *Eggers*, 509 F.2d at, 748. A claim was presented previously if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments." *Molina*, 886 F.2d at, 1129. A court must entertain a successive claim only if there is "manifest injustice" or a change in law. *Walter*, 969 F.2d at 816; *Polizi*, 550 F.2d at, 1135-36.

This Court should reject Petitioner's claim because the Ninth Circuit has already rejected the "basic thrust or gravamen" of this claim on direct appeal, and he has failed to demonstrate manifest injustice.

### 2. Discussion

Petitioner now argues that the Court should use a standard deviation analysis only mentioned by footnote, in *Hirst v. Gertzsen*, 676 F.2d 1252 n. 14(9th Cir. 1982). He failed to raise this particular argument on appeal and is therefore procedurally barred from bringing it now.

Despite Petitioner's contention, *Hirst* did not establish a precedent and since that time every court has engaged the absolute disparity test. *Mitchell*, 502 F.3d at 950; *United States v. Sanchez-Lopez,* 879 F.2d 541, 547 (9th Cir. 1989.); *United States v. Esquivel*, 88 F.3d 722, 725 (9th Cir. 1996); *United States v. Etsitty,* 130 F.3d 420, 425 (9th Cir. 1997). The Supreme Court has not adopted any one method. *Berghuis v. Smith*, 2010 WL 1189555 *10.

A mathematical calculation does not end the inquiry. Petitioner must still prove that the disparity occurred in venires other than his own and that any under representation was due to a systematic exclusion of this group. *Esquivel*, 88 F.3d at, 725. A one time anomaly does not qualify as systematic. *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005). Petitioner failed to carry his burden at trial and on appeal. He has failed to establish any evidence of

systematic exclusion. *Berghuis v. Smith*, 2010 WL 1189555 *10.

This issue was resolved on appeal and should therefore be dismissed.

## P. Jury Questionnaire Lacked Specificity

Petitioner claims that the questionnaire was inadequate to secure his right to an impartial jury.

### 1. Issue Waived

He failed to raise the issue either at trial or on appeal. He is therefore procedurally barred from raising the issue in a habeas motion. No plain error was found on appeal.

### 2. Discussion

Petitioner argues as though the questionnaire was sole basis for qualifying the venire panel. It was prepared with the assistance of both parties as a means to initially screen prospective jurors and to reduce the time necessary to question the members of the venire. At the beginning of each venire panel, the court summarized the charges against Petitioner and also advised that if Petitioner was convicted of the carjack offense, the government would seek the death sentence. (RT 0034-36.) The Court also described the process involved including the trial, aggravation and mitigation presented by each of the parties. (RT 0037-40.) Group questioning went first and then a lengthy process of individually questioning each potential juror ensued with significant defense participation. The potential jurors were questioned in detail by the Court and the parties, based in large part on their answers to the questionnaire

Contrary to his assertions, Petitioner's counsel was not forbidden from asking specific questions concerning venireperson's ability to be fair and impartial in a death penalty case. He was only prevented, about half way through jury selection process, from asking his highly improper "imagine" hypothetical question which did nothing to assist the court. (Issue K.) Petitioner does not point to any other part of the record where trial counsel was denied the opportunity to ask questions of venire persons dealing with issue of the death penalty. Appellate

counsel found no need to question this process.

Petitioner fails to demonstrate, in light of all of the circumstances, that appellate counsel's identified acts or omissions were outside the wide range of professionally competent assistance. *Strickland*, 466 U.S. at 690. Furthermore, he fails to prove that the results of the proceeding would have been different. *Strickland,* 466 U.S. at 687. Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales*, 515 F.3d at, 1015-16.

**Q. Exculpatory Evidence**

Petitioner argues that the government withheld items of evidence from him in violation of *Brady v. Maryland,* 372 U.S. 83 (1963).

### 1. Issue Previously Raised on Appeal

This issue of the Navajo letter was on appeal and rejected. "Assuming that the evidence was favorable and material (the Navajo letter certainly was, though it is unclear whether the victim impact statements would have been), there was no prejudice. . . . [R]egardless, the court received the letter as evidence in mitigation, Mitchell made effective use of it, and seven jurors found the letter was an additional mitigating factor. In short, there is no reasonable probability that earlier disclosure would have produced a different result." *Mitchell,* 502 F.3d at 989.

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting. *Reed*, 512 U.S. at, 358 (Scalia, J. concurring in part and concurring in the judgment); *Redd*, 759 F.2d at9, 701; *Eggers*, 509 F.2d at, 748. A claim was presented previously if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments." *Molina*, 886 F.2d at, 1129. A court must entertain a successive claim only if there is "manifest injustice" or a change in law. *Walter*, 969 F.2d at 816; *Polizi*, 550 F.2d at3, 1135-36.

### 2. Discussion

Petitioner claims, without any authority that he has revealed, that the bodies were found

on a date other than that presented at trial. That is simply not true. It appears that Petitioner is confusing the fact that simultaneously with the investigation of this case, law enforcement was also dealing with a car jack/murder of Jasbert Sam and David Begay. Based on information provided by Jimmy Nakai, Criminal Investigator Louis St. Germaine located one of the burial sites of Sam/Begay which confirmed that Nakai was telling the truth. (RT 0071, 0086.)

Petitioner was arrested on November 4, 2001. (RT 3096.) The bodies were located the next day, November 5, 2001 with the assistance of the co-Defendant, Johnny Orsinger, but only after he heard Agent Duncan request Petitioner be brought out. (RT 0087; 3109-10.) Criminal Investigator Darrell Boye met Petitioner on November 5, 2001 for the purpose of locating the bodies of the victims. (RT 2710.) Furthermore, there was no evidence that Petitioner was intoxicated when he was arrested nor the next day when he directed agents to the crime scene. (RT 2710-12.) They reached the location of the victims solely from the directions provided by Petitioner. (RT 2711-12.) By the time they arrived, the bodies had been located. (RT 2712, 3110.) There was no prior discovery of the bodies as Petitioner alleges.

The Ninth Circuit concluded that the letter from the Navajo Nation, expressing its opposition to the death penalty was disclosed in time for the defense to make proper use of it. *Mitchell,* 502 F.3d at 989. Moreover, the information was not in the exclusive control of the government since it was well known that the Navajo Nation was opposed to the death penalty. (RT 3705-06).

The Navajo Nation letter was furnished to the defense on May 13, 2003 but trial counsel never requested a continuance in order to subpoena the authors of the letter. The sentencing phase continued on May 14th and 15th, with closing arguments on May 16th, 2003. There was ample time to bring in witnesses and clearly a continuance would have been granted if needed. (CR 327.)

Petitioner claims that a live witness from the Navajo Nation would have rebutted the government's closing argument that Petitioner had "not deserted his cultural heritage and that he

59

was not the pariah that the prosecution made him out to be." He certainly cannot prove that claim in light of the letter which states "Navajo holds life sacred. . .  Committing a crime not only disrupts the harmony between the victim and the perpetrator but it also disrupts the harmony of the community."  Cross-examination by the government would have more clearly shown that Petitioner by his cold, cruel and deliberate acts rejected the life as sacred belief of his people and thereby the Navajo culture.  Even trial counsel now suggests, in hindsight, he might have called these witnesses but acknowledges: "[i]n the end, I'm not sure that anything we could have presented to the jury at sentencing about the tribe's position would have overcome the prejudicial effect to .of Mr. Mitchell of who died and how they died." (Govt. Ex. 3 p. 63.)

Most importantly, Petitioner can only engage in rank speculation that more jurors would have found the letter as a mitigating factor had there been live testimony.  Speculation is not sufficient to establish prejudice under *Strickland*. *Gonzales*, 515 F.3d at, 1015-16.  Conjecture that more jurors might have been persuaded to find this as an additional mitigating factor requires even more speculation that this sole factor would have overcome all of the aggravating factors that warranted a sentence of death.  None of the seven who found the letter as  mitigation found it sufficient to overcome the aggravating factors.  Given the heinous nature and brutality of the crime, it is extremely unlikely that this jury would have returned a different verdict. *Bible*, 571 F.3d at 872.

This Court should reject Petitioner's claim because the Ninth Circuit has already rejected this claim on direct appeal.  Petitioner has also failed to demonstrate the requisite prejudice.  This issue is without merit and should be dismissed.

**R.  Impermissible Collusion with Tribal Officers**

Petitioner once again alleges that the FBI and tribal authorities colluded to deprive him of his rights.  He also claims that he should have been advised of his rights prior to his being asked if he wished to have his pants after he was arrested.

### 1. Issue Previously Raised on Appeal

These issues were raised both before this Court as well as on direct appeal and were rejected. *Mitchell*, 502 F.3d at 960-620. Therefore, he is barred from raising them again.

The Appellate Court upheld the finding that there was no impermissible collusion between federal and tribal authorities. Therefore, Petitioner was not under federal arrest until November 29, 2001, the date of his initial appearance. *Id*. 962; *United States v. Corley*, 129 S.Ct. 1558 (2009).

Petitioner's argument that his statement immediately after his arrest as to the location of his pants, where one of the knives was found, required *Miranda* was rejected on appeal. *Mitchell*, 502 F.3d at 963. "As Mitchell admitted, the officer probably would not have gone to retrieve his pants if he-Mitchell-had not asked for them. In these circumstances, the officer cannot possibly have believed that asking Mitchell where his trousers were would be reasonably likely to elicit anything incriminating." *Id*. at 963.

Finally, Petitioner argues that his post-arrest statements should be suppressed due to "lies and deception." but it was likewise rejected:

> Finally, Mitchell asserts that his confessions were involuntary in that agents implied that things would go in a positive way if Mitchell cooperated, and told him he would have the right to have a lawyer appointed for him when, in fact, no appointment was possible for individuals in tribal custody. The district court credited the agents' testimony and its findings were not clearly erroneous. Mitchell offered no evidence that he was confused by any promise made by the agents, or that he ever asked for counsel.

*Mitchell*, 502 F.3d at, 963. If authorities decide not to furnish a lawyer to a suspect who has requested one in a reasonable time, there is no violation of the suspects Fifth Amendment rights so long as the police do not question him further. *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).

This Court should reject Petitioner's claim because the Ninth Circuit has already rejected the "basic thrust or gravamen" of this claim on direct appeal, and he has failed to demonstrate manifest injustice.

61

### 2. Discussion

As discussed above, Petitioner's right to counsel did not attach until November 29, 2001 on the occasion of his arrest on the Indictment as found by this Court as well as the Ninth Circuit. The facts recited by Petitioner do not meet his burden of proving actual collusion to deprive him of his federal procedural rights. "A bare suspicion that there was cooperation between the two agencies designed to deny fundamental rights is not sufficient. . . ." *United States v. Doe*, 155 F.3d 1070, 1078 (9th Cir. 1998). This Court found the agents to be credible and properly determined that this was a joint operation and that public safety warranted the tribal arrests while the investigation continued.

Petitioner's request for his pants was not the product of interrogation and therefore should not have been suppressed under *Miranda*. Finally, the fact that there was no procedure in place to appoint counsel is irrelevant. *Miranda* requires that if a suspect requests counsel prior to answering questions then all questioning must cease until he is afforded counsel at some point.

These issues were resolved on appeal and therefore should be dismissed.

## S. Petitioner Incompetent Post-Guilty Verdict

Petitioner alleges, as he did on appeal, that he was not competent post-guilty verdict but provides no new evidence.

### 1. Issue Previously Raised on Appeal

The issue was not raised at trial but was on appeal and rejected:

It is clear from the record that Mitchell understood the nature of the proceedings and that his chances of avoiding the death penalty could ride on his presence. He points to no psychiatric evidence that he was somehow clinically incompetent. Finally, Mitchell was not disruptive, did not launch into emotional outbursts, maintained appropriate demeanor, and did not behave erratically. Cf. Torres v. Prunty, 223 F.3d 1103, 1109 (9th Cir.2000) (describing bizarre courtroom conduct by a habeas petitioner who had been diagnosed with a severe delusional disorder, which included wearing jailhouse blues; threatening to assault his attorney; continually disrupting the proceedings; and insisting that he be handcuffed as well as shackled). In short, Mitchell gave the judge no "reason to doubt [his] competence." *Godinez v. Moran*, 509 U.S. 389, 402 n. 13, 113 S.Ct. 2680, 125 "L.Ed.2d 321 (1993).

While Mitchell recognized that his decision might be self-defeating, he made it anyway. The court did its best to talk Mitchell out of doing something that it believed was imprudent and not in his best interests. Mitchell acknowledged what the court, and his counsel, thought but, as he put it at one point, "Isn't that my decision?" As manifest by the extensive exchanges, Mitchell was alert, understood what he was doing, and gave no hint of lacking a rational grasp on the proceedings. Accordingly, the district court did not err in failing to hold a more complete competency hearing sua sponte.

*Mitchell*, 502 F.3d at, 986-87.

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting.

**2. Discussion**

Petitioner does not argue that he was not competent through the many motion hearings, the four weeks of jury selection and the five days of trial. Dr. Morenz clearly found that Petitioner was able to "rationally and meaningfully assist his attorney in his own defense." (Ex. 94 p. 1513.)

This Court repeatedly addressed Petitioner concerning his decision and saw no hint at that time or at any other time that he was under the influence of any substance. Additionally, the Court conducted a thorough examination of Petitioner before it accepted his waiver of appearance during the penalty phase. (RT 3841-50.)

Other than Petitioner's boasts and a general statement by a jail-house drug dealer, who has at least four felony convictions to his credit, there is no credible evidence to support a finding that he was "high" during any of the proceedings. All three veteran trial counsel have stated that they never, ever saw any evidence that Petitioner was under the influence of any substance during any of their contacts with him, including the courtroom. (Govt. Ex. 1 p. 25; Govt. Ex. 2 p. 26-7, 64; Govt. Ex. 3 p. 21-22.) If the Court, who personally addressed Petitioner numerous times post guilty verdict, three veteran defense attorneys and the U.S. Marshals, who delivered him to court, did not spot any evidence of substance abuse, there is no reason to believe he was under the influence.

"[A] trial judge should order a competency hearing on its own motion if it has a good faith doubt about the Defendant's competence to stand trial, there must be 'substantial evidence of incompetence.'" *Deere v. Woodford,* 339 F.3d 1084, 1086 (9th Cir.2003); *Amaya-Ruiz v. Stewart,* 121 F.3d 486, 489 (9th Cir.1997).  The court's determination is subject to clear error review. *United States v. Gastelum-Almeida*, 298 F.3d 1167, 1171 (9th Cir. 2002).  Trial counsel saw no evidence that Petitioner had suddenly become incompetent after the jury return the guilty verdict. (Govt. Ex. 1 p. 47-49; Govt. Ex. p. 49; Govt. Ex. 3 p. 28-29.)  Competency does not mean that one cannot make a well-informed decision with which others may disagree.  His position was not illogical even though it may have been ill-advised.  *Mitchell*, 502 F.3d at 987.

This Court should reject Petitioner's claim because the Ninth Circuit, has already rejected this claim on direct appeal.

## T.  Victims' Family Conduct

Petitioner once again claims that use of buttons worn by family members depicting the victims deprived him of his right to a fair trial.

### 1.  Issue Previously Raised on Appeal

This issue was  raised at the trial level with the government and it was quickly dealt with to the satisfaction of trial counsel.

It was raised on appeal and the Court held there was no plain error, finding no basis to support a finding that "an unacceptable risk is presented of impermissible factors coming into play."  *Mitchell*, 502 F.3d at, 971-72.  If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting.  *Reed*, 512 U.S. at, 358 (Scalia, J. concurring in part and concurring in the judgment);. *Redd*, 759 F.2d at, 701 (9th Cir. 1985) ( a claim rejected on direct appeal; "this claim cannot be the basis of a § 2255 motion"); *Eggers*, 509 F.2d at, 748.  A claim was presented previously if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments."  *Molina*, 886 F.2d at, 1129 (9th Cir. 1989).  A court must

entertain a successive claim only if there is "manifest injustice" or a change in law. *Walter*, 969 F.2d at 816; *Polizi*, 550 F.2d at, 1135-36.

### 2. Discussion

Trial counsel, Jeff Williams, early on in the trial,contacted the government concerning some buttons that he observed being worn by the victims' family. He expressed his concern with allowing the buttons to be seen by the jury and the issue was resolved quickly. Had it not been, he would have moved for a mistrial. (Gov. Ex. 1 p. 58-9, 78; RT 3409-10.) At trial, the defense acknowledged that the spectators were calm, collected and not disruptive but found no need to raise the buttons as an issue. (RT 3410).

There is no evidence that the wearing of any buttons in this case rose to the level that "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (the presence of four uniform state troopers seated immediately behind the Defendant at trial was not so inherently prejudicial that it denied the Defendant a fair trial). Nor did it rise to level of *Norris v. Risley*, 918 F.2d 828 (9th Cir. 1990), in which the Ninth Circuit reversed a sexual assault conviction due to the presence of buttons in the courtroom proclaiming that some of the spectators belonged to "Women Against Rape." *Id.* 830-31.

Counsel was not ineffective because they recognized the issue with the buttons early on, asked that they be removed and it was quickly resolved to their satisfaction. This is a nonissue and should therefore be dismissed.

## U. Trifurcation of Proceedings.

Petitioner claims that his trial counsel were ineffective for failing to seek to trifurcate the proceedings. He argues that there should have been separate hearing for the jury to determine whether he was eligible for the death penalty by finding one or more gateway intent factors and another hearing to decide the sentence.

### 1. Issue Waived

However, he failed to raise the issue of trifurcation both at trial and on direct appeal. He

65

is therefore barred from raising it in this proceeding unless and until he can show "both cause excusing his procedural default, and actual prejudice resulting from the claim of error." *Johnson*, 988 F.2d at, 945. The Court did reject the Petitioner's argument that the FDPA was flawed because the Federal Rules of Evidence do not apply. *Mitchell*, 502 F.3d at 979-80. No plain error was found on appeal.

### 2. Discussion

The Second Circuit has rejected the argument that the FDPA is unconstitutional because it does not allow for trifurcation. *United States v. Fell*, 531 F.3d 197, 240 (2d. Cir 2008). The Court found that the Petitioner suffered no prejudice as a result of the process provided for in the statute. *Id*. 240. In the case cite by Petitioner, *United States v. Johnson*, 362 F.Supp.2d 1043, 1103-04, the district court rejected the argument that *Apprendi*, required a separate "trial" on the gateway intent and statutory aggravating factors. *Apprendi* only required that the aggravating factors be charged in an Indictment and proved to a jury beyond a reasonable doubt. *Id*. at 1103.

There is no authority that trifurcated proceedings are mandated. Some courts have followed the Second Circuit's advice that district courts, "consider carefully the ramifications of presenting victim impact evidence, or any evidence that would otherwise be inadmissible in the guilt phase of a criminal trial, to a jury that has not yet made findings concerning death eligibility." *Fell*, 531 F.3d at 240 n. 28. The Eighth Circuit concurred in *United States v. Bolden*, 545 F.3d 609, 618-19 (8th Cir. 2008); *but see United States v. Milburn*, 2008 WL 2557975 (rejected a request to trifurcate the proceedings); *United States v. Williams*, 2008 WL 4644830 (any improper influence by non-statutory factors to improperly influence the jury can be cured by a limiting instruction). There is no presumption of innocence during the penalty phase. *United States v. Williams*, 2008 WL 4644830 *11.

In the case at hand, the government did not just present victim impact evidence. All of the horrendous trial evidence related to the requisite mental state and the statutory aggravating factors were presented during the course of the trial. At trial, the jury found Petitioner guilty of Premeditated First Degree Murder, which mirrors the first "gateway intent factor" under 18

U.S.C. § 3591(a)(2) "intentionally killed the victim." (RT 4197, 4201.) Petitioner was convicted of two separate murders, a statutory aggravating factor. (RT 4199, 4203.). The convictions for Kidnaping Jane Doe 2 (Count 7) and Robbery of the truck, (Count 4) satisfied other statutory aggravating factors (RT 4198, 4203, 4204.) There can be little question that this jury would have found the requisite statutory factors even had they not heard victim testimony. There is no doubt that had the sentencing proceedings been bifurcated the result would have been the same. Petitioner fails to prove otherwise.

The Court took very measured steps to force the jury to properly follow the process. It provided an overview specifically directing the jury, step by step, how to conduct their deliberations. (RT 4078-81.) They had to find that he was 18 years of age. If they did so, then they had to unanimously find at least one gateway intent factor beyond a reasonable doubt. Only if they found at least one could they move on the third step and consider statutory aggravating factors. If they unanimously found the existence of at least statutory aggravating factor beyond a reasonable doubt then they could consider the appropriate punishment. (RT 4780.) They were further instructed that at this point they could consider any non-statutory aggravating factors, then the mitigation evidence and finally decide whether the aggravating factors after considering the mitigation was sufficient to call for sentence of death. (RT 4781.)

Then, in much greater detail, the court took them through the necessary steps. (RT 4081-94.) The verdict form was laid out in a specific fashion that forced the jurors to follow the court's methodical instructions. The court specifically told the jurors that only if they had found a gateway intent factor and a statutory aggravating factor, each beyond a reasonable doubt, could they then consider a non-statutory aggravating factor. (RT 4094.)

There was more than sufficient evidence to support the jury's findings of statutory aggravating factors beyond a reasonable doubt as well as their ultimate decision. *Fell*, 531 F.3d at 240. Petitioner cannot demonstrate the requisite prejudice in this case by showing that in his case the victim impact evidence cause his jury to find the statutorily required factors that did not exist.

67

There was no prejudice and Petitioner fails, other than in conclusory language, to prove a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  Furthermore, given the heinous nature of the crimes and Petitioner's conduct throughout, he fails to prove that the results of the proceeding would have been different.  *Bible*,  571 F.3d at, 871.  Speculation is not sufficient to establish prejudice under *Strickland*.  *Gonzales*, 515 F.3d at 1015-16.   This issue should be dismissed.

## V.  Legality of Lethal Injection

Petitioner argues that the manner in which the government will carry out his execution violates the Eighth Amendment.

### 1.  Discussion

He failed to raise this issue at the trial court level.  The issue was raised on appeal but the Court declined to review.  *Mitchell*, 502 F.3d at 983.

The United States Supreme Court has never held that lethal injection constitutes cruel and unusual punishment, *see Baze v. Rees,* --- U.S. ----, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).  The Ninth Circuit has previously concluded that death by lethal injection in Arizona does not violate the Eighth Amendment. *See LaGrand v. Stewart,* 133 F.3d1253, 1264-65 (9th Cir.1998).  Moreover, Arizona's death penalty protocol has routinely been upheld.  Most recently the Honorable Neil V. Wake issued an opinion upholding the State of Arizona's death penalty protocol in *Dickens v.  Brewer*, 2009 WL 1904294 (D.Ariz.)) "Based on undisputed facts, the Arizona Protocol is substantially similar to the lethal injection protocol approved in *Baze*.  As written, the Arizona Protocol does not subject inmates to a substantial risk of serious harm and does not violate the Eighth Amendment.  Further, the record does not demonstrate a substantial risk that Defendants will violate the Arizona Protocol in the future in a manner that is sure or very likely to cause needless suffering." *Id*. at \*25.  Arizona's lethal injection protocol has also been

68

upheld in *Hedland v. Ryan*, 2009 WL 2761920 (D.Ariz.); *McKinney v. Ryan*, 2009 WL 2761927 (D.Ariz.) and *Mann v. Ryan*, 2009 WL 2450473 (D.Ariz.).

He now argues that he will challenge the method of execution at a later time, pursuant 42 U.S.C. §1983. The Government will respond appropriately.

**W. FDPA Unconstitutional Due to Absence of a Principled Basis to Distinguish Who Is Sentenced to Death**

Petitioner argues that because there is no consistency or predictability in the manner in which juries have decided to impose the federal death penalty, it is unconstitutional.

### 1. Issue Previously Raised on Appeal

He failed to raise this issue at the trial court level but did so on appeal. It was rejected. "That federal executions are rare, however, does not render the FDPA unconstitutional. The relevant question-whether capital punishment in the abstract violates the Eighth Amendment-was answered in the negative by *Gregg*, 428 U.S. *at* 187, 96 S.Ct. 2909." *Mitchell*, 502 F.3d at 983.

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting. *Reed*, 512 U.S. at, 358 (Scalia, J. concurring in part and concurring in the judgment); *Redd*, 759 F.2d at 701; *Eggers*, 509 F.2d at, 748.

### 2. Discussion

Petitioner argues that because the outcomes of jury trials are unpredictable and sometimes difficult to understand, the death penalty is unconstitutional.

The Supreme Court has rejected this argument. "The Constitution is not offended by inconsistency in results based on objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt. *McCleskey v. Kemp*, 481 U.S. 279, 307 n. 28 (1987) "Thus, it is the jury that is a criminal defendant's fundamental"protection of life and liberty against race or color prejudice. *McCleskey,* 481 U.S. at 310. Jurors are individuals who bring

their own unique life experiences which in many cases is unknown. "It is not surprising that such collective judgements often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgement that defy codification and that 'build discretion, equity, and flexibility into a legal system.' H. Calvin and H. Zeisel, The American Jury 498 (1966)" *McCleskey*, 481 U.S. at 311. "As we have noted, a prosecutor can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case. . . . Of course, 'the power to be lenient [also] is the power to discriminate,' K. Davis, Discretionary Justice 170 (1973), but a capital punishment system that did not allow for discretionary acts of leniency 'would be totally alien to our notions of criminal justice.'" *Gregg v. Georgia,* 428 U.S., at 200, n. 50, 96 S.Ct., at 2937, n. 50." *Id*. at 312.

This issue was resolved on appeal and should be dismissed.

## X.  Death Penalty Sought on Basis of Race.

.    Petitioner alleges that he is the victim of a discriminatory application of the death penalty.

### 1.  Issue Previously Raised on Appeal

Petitioner failed to raise this issue at trial. but did so on appeal where it was rejected.

The bare allegation that the federal death penalty is "racist to its very core" cannot sustain a constitutional challenge. It is axiomatic that "capital punishment be imposed fairly, and with reasonable consistency, or not at all," *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 71 ?"L.Ed.2d 1 (1982), but Mitchell makes no effort to explain in what manner race has infected the FDPA sentencing process.  His related claim regarding disproportionate impact relies solely on statistical data and is, without more, likewise insufficient. *See McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 ?"L.Ed.2d 262 (1987) ("[T]o prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in his case acted with discriminatory purpose."); *Harris v. Pulley*, 885 F.2d 1354, 1374-77 (9th Cir.1988). His unexplained and unsubstantiated claim regarding prosecutorial discretion is foreclosed. *See Campbell v. Kincheloe*, 829 F.2d 1453, 1465 (9th Cir.1987) (observing that a challenge to a state capital punishment statute on the ground that it "vests unbridled discretion in the prosecutor to decide when to seek the death penalty ... has been explicitly rejected by the Supreme Court") (citations omitted).

*Mitchell,* 502 F.3d at 983.

70

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting. *Reed*, 512 U.S. at, 358 (Scalia, J. concurring in part and concurring in the judgment); *Redd*, 759 F.2d at, 701; *Eggers*, 509 F.2d at, 748. A claim was presented previously if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments." *Molina*, 886 F.2d at, 1129. A court must entertain a successive claim only if there is "manifest injustice" or a change in law. *Walter*, 969 F.2d at 816; *Polizi*, 550 F.2d at 1135-36.

This Court should reject Petitioner's claim because the Ninth Circuit has already rejected the "basic thrust or gravamen" of this claim on direct appeal, and he has failed to demonstrate manifest injustice.

**2. Discussion**

Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987) (quoting *Whitus v. Georgia,* 385 U.S. 545, 550 (1967)). Petitioner "must prove that the decision makers in his case acted with discriminatory purpose." *Id.*

To succeed on this claim, "defendant must demonstrate that (1) other similarly situated individuals have not been prosecuted and (2) his prosecution was based on an impermissible motive. *United States v. Culliton,* 328 F.3d 1074, 1081 (9th Cir.2003) (per curiam). The standard for proving such a claim "is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully." (1999)." *United States. v. Sutcliffe*, 505 F.3d 944, 954 (9th Cir. 2007).

Great deference is accorded to the Attorney General and United States Attorneys to enforce the criminal laws. "As a result, '[t]he presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that

71

they have properly discharged their official duties'" (internal citation omitted) *United States v. Armstrong*, 517 U.S. 456, 464 (1996).   Therefore, a defendant must prove that a federal prosecutorial policy not only had a discriminatory effect but that it was motivated by discriminatory purpose. *Armstrong*, 517 U.S. at 467.  "Colorable basis" or substantial threshold showing" are not sufficient. *Id*. at 468.  He must also demonstrate that the decision makers in his case acted with a discriminatory purpose. *United States v. Sutcliffe*, 505 F.3d at 954

Petitioner argues that a 2001 Department of Justice study, "The Federal Death Penalty System:  A Statistical Survey (September 12, 2000)" provides the basis to hear his claim. However, in *McCleskey*, the Supreme Court rejected a similar statistical study by Professor Baldus as insufficient to demonstrate that decision makers *acted with discriminatory purpose*. *McCleskey,* 481 U.S. at 297 (emphasis added).  The study of Georgia's death penalty cases by Professor Baldus was rejected as insufficient evidence of purposeful discrimination.  *Id*. at 312-13.  "Similarly, the policy considerations behind a prosecutor's 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, 'often years after they were made.'" *Id*. at 296. Due to the nature of capital sentencing, each decision to impose a death sentence is made by juries unique in their composition and based on innumerable factors dependent on the characteristics and backgrounds of the Defendant and the individual facts of each render it an improper subject to rely solely on statistics.  *Id*. at 294.

More recently, the Supreme Court has rejected this same argument based on the DOJ Study. *United States v. Bass*, 536 U.S. 862 864 (2002) (*per curiam*).  The Court, in overturing a district court order requiring the government to disclose information related its capital charging decisions, reaffirmed that a defendant "must make a 'credible showing' that similarly situated individuals of a different race were not prosecuted. *Id.*  at 863.  The Court found that the "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants.  Id.* at 864 (emphasis in original).

This issue was resolved on appeal.  To the extent that Petitioner argues otherwise, it is then waived.  Given the current case law there is no prejudice for having failed to raise this issue.

This issue should be dismissed.

## Y.  Discriminatory Sentence

Petitioner raises the issue that his sentence is discriminatory but does not offer any specific details.

### 1.  Issue Waived

This issue was not raised at trial or on appeal and therefore is procedurally barred unless and until he can show "both cause excusing his procedural default, and actual prejudice resulting from the claim of error." *Johnson*, 988 F.2d at, 945.

### 2.  Discussion

Petitioner fails to prove that he was a "victim" of discrimination.  The jurors in this case individually signed a document indicating that race played no part in his or her decision. (RT 4201, 4206.) There is no specific allegation that the government engaged in impermissible discrimination against Petitioner.  There is no cause of action and the matter should be dismissed.

## Z.  FDPA's Failure to Allow for "Plain Error" Review

### 1.  Issue Previously Raised on Appeal

This issue was raised on appeal and rejected:

We note Mitchell's suggestion that the Federal Death Penalty Act is infirm in failing to allow for plain-error review, but we have no need to address the question here because the government does not argue that any of his claims are not subject to plain error analysis under the FDPA..

*Mitchell,* 502 F.3d at 968 n. 10.

If an issue was previously raised before the appellate court, Petitioner is procedurally barred from raising this issue in a habeas setting.  *Reed*, 512 U.S. at, 358 (Scalia, J. concurring in part and concurring in the judgment); *Redd*, 759 F.2d at, 701; *Eggers*, 509 F.2d at, 748.  A claim was presented previously if "the basic thrust or 'gravamen' of the legal claim is the same, regardless of whether the basic claim is supported by new and different legal arguments."

73

*Molina*, 886 F.2d at, 1129. A court must entertain a successive claim only if there is "manifest injustice" or a change in law. *Walter*, 969 F.2d at 816; *Polizi*, 550 F.2d at, 1135-36.

This Court should reject Petitioner's claim because the Ninth Circuit has already rejected this claim on direct appeal as his case was reviewed for plain error.

**2. Discussion**

Petitioner, does not allege that there was any failure of the Appellate Court to take note of any obvious errors. In addition to the Ninth Circuit's use of "plain error" review in this case, the Eighth Circuit in *United States v. Lee*, 374 F.3d 637, 653 (8th Cir. 2004) as well as the Fourth Circuit in *United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) have reached the same conclusion.

The issue was resolved on appeal and therefore should be dismissed.

**AA. Ineffective Assistance of Appellate Counsel.**

Petitioner makes a generalized claim that his appellate counsel was ineffective. He points to no specific issues and fails to explain how those issues are not procedurally barred.

Ineffective assistance of counsel on appeal satisfies the "cause and actual prejudice" standard only if Petitioner can meet the *Strickland* test of deficiency and prejudice. *United States v. Ratigan*, 351 F.3d 957, 965 (9th Cir. 2003). "[T]he mere fact that counsel failed to recognize the factual or legal basis for the claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Id.* (failure of trial counsel to challenge government's failure to prove bank was federally insured did not deprive Defendant of a fair trial and therefore did not excuse procedural default.

To show prejudice, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the

judgment." *Strickland*, 466 U.S. at 691.  Speculation is not sufficient to establish prejudice under *Strickland*.  *Gonzales*, 515 F.3d at, 1015-16.  The burden is on the Petitioner to demonstrate prejudice. *Wong v. Belmontes*, 2009 WL 3805746.

*Coleman v. Thompson*, 501 U.S. 722 (1991) does not support his claim that the Court must hear the issue on its merits despite the fact that this issue was not properly raised at trial or on appeal.  Petitioner must still demonstrate that the appellate attorney's performance fell below the acceptable level and there was *Strickland* prejudice to him as well.  *Id*. at 752.

Appellate counsel raised issues ranging from A all the way through KK.  They asked for and received permission to file a brief of 44, 902 words which was well in excess of the Ninth Circuit limit for capital appeals.  It is difficult to imagine that they missed significant issues because they were acutely aware of the procedural bar if they did.

Due to Petitioner's failure to demonstrate how any appellate error would undermine confidence in the outcome of this case, this issue should be dismissed.

**BB.  Cumulative Error at Each Phase of the Trial**

Petitioner contends that the cumulative effects of the errors he alleges is sufficient to warrant a reversal.  However, only if errors are found can their cumulative effect be considered. *United States v. Gutierrez*, 995 F.2d 169, 173 (9th Cir. 1993).

On collateral review, constitutional errors of the trial type are subject to the harmless error standard, that is whether the error had "substantial and injurious effect or influence on determining the jury's verdict." (Internal citation omitted).  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (improper use of post *Miranda* silence - harmless error.)

There is no basis for this argument and it should be dismissed.

**Conclusion**

The Court properly conducted the voir dire and did not abuse its discretion by removing venire persons when appropriate.  The Ninth Circuit did not find any errors with the jury selection

process that were plain, affected substantial rights, and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Jordan,* 256 F.3d 922, 926 (9th Cir. 2001).

There is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689. At every stage, counsel's performance was well within that range. A thorough background search of Petitioner was conducted. Counsel thoughtfully and carefully considered all of the mitigation avenues to pursue and reasonably chose, "a life worth saving" and proportionality. The other avenues would have placed Petitioner in a far worse light and given the horrific facts of the case would have guaranteed a quick verdict. Petitioner must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." (internal citation omitted) *Strickland,* 466 U.S. at 689. He was fairly tried and convicted, and affirmed on appeal. He cannot demonstrate that any conduct by his counsel so undermined the proper functioning of the adversarial process that the conviction and sentence cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. at 686. The evidence supporting the sentence of death was overwhelming considering the gruesome nature of the crimes and its impact on the family. *Mitchell*, 502 F.3d at 996.

The files and the records conclusively establish that Petitioner is not entitled to relief. Therefore, a hearing is not required and the Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 should be denied.

Respectfully submitted this 1st day of April, 2010.

DENNIS K. BURKE
United States Attorney
District of Arizona


/s/ Vincent Q. Kirby


VINCENT Q. KIRBY
Assistant U.S. Attorney

76

CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Sean Kennedy
Stacia Peakheart, attorneys for Petitioner

/s/ Joan K. Hoyle