INDEX OF GOVERNMENT'S EXHIBITS

Exhibit 1          Transcript of Deposition of Jeffrey A. Williams
                   Dated February 11, 2010

Exhibit 2          Transcript of Deposition of Gregory A. Bartolomei
                   Dated February 11, 2010

Exhibit 3          Transcript of Deposition of John M. Sears
                   Dated February 18, 2010

# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

———————

LEZMOND CHARLES MITCHELL,      )
                               )
              Plaintiff,        )
                               )
         vs.                    )      No. CV-09-8089-MHM(JI)
                               )
UNITED STATES OF AMERICA,       )
                               )
              Defendant.        )
_____)

Phoenix, Arizona
February 11, 2010
9:44 a.m.

DEPOSITION OF JEFFREY A. WILLIAMS

Original Transcript
Prepared for:
THE COURT

COPPERSTATE REPORTING SERVICE
Court Reporters
12601 North 59th Place, Suite 100
Scottsdale, Arizona 85254-4312
(602) 795-5515

Reported by:                DOREEN C. BORGMANN, RMR
                            CR # 50644



2

I N D E X

JEFFREY A. WILLIAMS                                    PAGE
EXAMINATION

  BY MR. KIRBY                                            5

  BY MS. PEAKHEART                                       60

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Federal Bureau of Investigation report dated 11/05/2001 | 102 |

COPPERSTATE REPORTING SERVICE - (602) 795-5515

THE DEPOSITION OF JEFFREY A. WILLIAMS, witness herein, was taken pursuant to notice by the parties through their respective attorneys before DOREEN C. BORGMANN, RMR, a Certified Reporter #50644 in and for the State of Arizona, at the offices of United States Attorney, Two Renaissance Square, 40 North Central Avenue, Suite 1200, Phoenix, Arizona on February 11, 2010, commencing at the hour of 9:44 a.m. of said day.

Further, this deposition was taken pursuant to the Rules of Civil Procedure.

APPEARANCES:

    FOR THE PLAINTIFF:
        Federal Public Defender
        By:  STATIA PEAKHEART, Esq.
             SEAN K. KENNEDY, Esq.
             GUY IVERSEN, Esq.
        321 East Second Street
        Los Angeles, CA 90012

    FOR THE DEFENDANT:
        U.S. Attorney, District of Arizona
        By:  VINCENT Q. KIRBY, Esq.
        40 North Central Avenue, Suite 1200
        Phoenix, Arizona 85004-4408

    FOR THE WITNESS:
        Federal Public Defender
        District of Arizona
        By:  HEATHER ERICA WILLIAMS, Esq.
        407 West Congress, Suite 501
        Tucson, Arizona 85701-1355

                                        Phoenix, Arizona
                                        February 11, 2010
                                        9:44 a.m.


                    JEFFREY A. WILLIAMS,

the witness herein, after having been first duly sworn,

was examined and testified as follows:


                    MR. KIRBY:   All right.   Today is February

11.   It's approximately 9:43.   My name is Vincent

Kirby, Assistant United States Attorney, District of

Arizona.   And we're here for the purposes of taking the

deposition of Jeff Williams, Federal Public Defender,

trial counsel for Lezmond Mitchell.

                    And if the rest would announce your

presence as well.

                    MS. PEAKHART:   Statia Peakheart with the

Office of the Federal Public Defender in Los Angeles,

California.   We represent Movant Lezmond Mitchell.

                    MR. KENNEDY:   Sean Kennedy with the

Federal Public Defender's Office.

                    MR. IVERSEN:   Guy Iversen, Federal Public

Defender's Office.

                    MS. WILLIAMS:   Heather Williams with the

Federal Public Defender in Arizona.

                    (Next page, please.)

EXAMINATION

BY MR. KIRBY:

Q.    Mr. Williams, first of all, do you know why you're here today?

A.    I do.

Q.    You are aware that I have obtained an order regarding the attorney-client privilege?

A.    Correct.

Q.    Have you seen it?

A.    Yes.

Q.    Do you want me to read it for the record purposes, or are you okay with that?

A.    I'm okay.

Q.    Mr. Williams, how long have you been an attorney?

A.    Twenty plus years.

Q.    And where was your first office?

A.    Maricopa County Public Defender's Office.

Q.    How long were you there?

A.    Three years.

Q.    What kind of cases did you do?

A.    Everything from felony DUI's to first degree murder.  I take that back.  Second degree murder.

Q.    And then after you left the Public

Defender's Office, where did you go?

A.    I was a sole practitioner for 10 years.

Q.    What kind of work did you do?

A.    I had a contract with the county, a contract with the city, anything from DUI's to capital cases.

Q.    So during that 10-year period of time, you did do capital cases?

A.    I did.  I tried two by myself.  I tried at least two.

Q.    In how many cases were you involved at the capital level?

A.    Oh, five, six, maybe.

Q.    Was that, like, a second chair?

A.    Yes.

Q.    And after that 10 years, where did you go?

A.    Federal Public Defender's Office.

Q.    And do you recall what year you started there?

A.    I want to say it was August of 2001.

Q.    And what sorts of cases have you been doing for the Federal Defender in Phoenix?

A.    Anywhere from theft of stolen mail to this capital case.  Probably -- well, there, maybe a half dozen murder cases.  A lot of immigration cases, postal

stuff.  Just general federal crimes.

Q.     And have you, during that period of time, represented individuals charged with crimes from the various reservations in the district?

A.     Mostly.  The crimes I -- defendants I represent are from the reservation, violent crimes off the reservations.

Q.     And the range of those kind of cases?

A.     Anywhere from sexual assault to physical assault to murder.

Q.     Do you have any idea how many folks on the reservation you may have represented over that course of time?

A.     Oh, boy.  Because the 10 years I was a sole practitioner, I was also on the CJA panel.  So I have represented federal defendants there.  So you want the entire time?  Boy, I don't know.  Three, four, five hundred.

Q.     Now, how did you become involved in *United States vs. Lezmond Mitchell*?

A.     It was one of the first cases that was assigned to me when I joined the office.

Q.     And who else was appointed or who else joined you to represent Mr. Mitchell?

A.     Mr. Greg Bartolomei.

Q.    And at that time it was just the two of you?

A.    Yes.

Q.    And then did Mr. Sears join the team?

A.    He did a little bit later.

Q.    Couple of months?  Six months?

A.    Yeah.  I don't recall exactly.  But it was sometime around there.

Q.    And when you and Mr. Bartolomei got together to discuss the case, at some point did you have a plan to divide up the responsibilities for the case?

A.    Yes.  Mr. Bartolomei was going to be responsible for mitigation, and I was going to be responsible for the guilt phase.

Q.    And did you --

A.    Not solely.  We were going to work with each other.  But that was the way we decided to divide it up.

Q.    And over the course of time, you consulted with one another as to what each were doing?

A.    Often.

MS. PEAKHART:  Objection.  Vague as to who did he consult with.

MR. KIRBY:  Mr. Bartolomei.

THE WITNESS:  Mr. Bartolomei.

BY MR. KIRBY:

Q.    Now, do you recall the first time you met with Mr. Mitchell?

A.    I believe the first time would have been at his initial appearance in Flagstaff.  Greg Bartolomei and the investigator assigned, we drove up to the Flagstaff courthouse to meet him.

Q.    And did you have an opportunity to have any discussion with him on that occasion?

A.    Boy, if we did, it wasn't of any length.

Q.    And you said there was an assigned investigator.  Who was that person?

A.    Karl Brandenberger.

Q.    Had you worked with Mr. Brandenberger before?

A.    I may have.  I had not been at the office that long, so I don't recall.  I may have.

Q.    Do you recall the first time that you had any in-depth discussion with Mr. Mitchell?

A.    Yes.  When it was exactly, no.  But I do remember when we first met, yes.

Q.    And where did that take place?

A.    I believe it would have been -- I think he was housed in CCA.  So it probably would have been

there.  Or it may have been when he was in lockup at the Marshal's.  I forget here.

Q.    And who was present during that discussion?

A.    Greg.

Q.    Bartolomei?

A.    Yes.

Q.    Was your investigator along at that time?

A.    I don't recall if Karl was there or not.

Q.    And let me just make -- do you have your notes here with you today?

A.    I do not.

Q.    Have you had an opportunity to review them?

A.    I have looked at some of them, yes.

Q.    And what did you discuss with Mr. Mitchell at that first meeting?

A.    We got to know each other.  And then we got -- we discussed the facts of the case.

Q.    Now, at that point that you had the first discussion with him, can you recall whether you had received any of the discovery from the case from the Government?

A.    My gut reaction is to say that we had not because it was so soon in the process.  But, honestly,

I don't recall.

Q.    And did you discuss with him his recollection of the case?

A.    Mr. Mitchell?

Q.    Mr. Mitchell.

A.    Yes.

Q.    What did Mr. Mitchell tell you?

A.    He gave us a history of what had happened regarding the incident, who was there, what roles were played, and the general circumstances of it.

Q.    And did he explain the history?  What was the history?

A.    That they, meaning Mr. Mitchell, Mr. Orsinger, and I think there was discussions with others, were planning to rob a trading post, as I recall.  And they were under the impression that the trading post had a safe that was mobile.  And so as a result, they needed a vehicle to transport the safe.

And so they made efforts to find a vehicle, which took them to Gallup, as I recall.  They drove to Gallup, or somehow they got to Gallup.  They went to a mall there.  Mr. Mitchell and Mr. Orsinger. And they looked in the parking lot of the mall for a vehicle to steal.  And it was specifically a truck they were looking for.  And it was either they could not

find one or the circumstances were such that they didn't feel comfortable that they could steal one there.

So they -- the backup plan was to hitchhike and carjack a vehicle.

Q.    Was there any discussion about knives at that point?

A.    There must have been, because I know soon after that or sometime after that, we went to -- they had purchased some knives. And it was either in Gallup or somewhere in New Mexico. Because we went to the location where they purchased the knives to see what we could find out.

Q.    Were you able to find anything out when you went to that store?

A.    We did find the store. We did talk to -- I don't recall if it was the owner or someone who was -- just worked there. They seemed to have -- boy, I thought they had a vague -- my recollection is they may have a vague recollection of selling the knives to someone. But they didn't go into much detail.

Q.    Now, during this discussion with Mr. Mitchell on this first occasion, did the topic of alcohol or drugs come up?

A.    It did come up. Not in conjunction with

this.  I think -- I want to say that they had been drinking or something before.  But on the trip to Gallup, I don't recall that they were drinking either going or coming.

Q.    Okay.  So after they decided, I think you said, to hitchhike and carjack a vehicle, what did they do?  What did he tell you they did?

A.    They were on the highway.  I forget which one it was.  And they were thumbing.  And they were just -- they did that until someone decided to pick them up.  It turned out to be, I think, Ms. Slym, Tiffany, I recall.

Q.    Did he give an approximate location of where they were picked up?

A.    I think he did the best he could.  We tried to find it, and I'm not sure we ever found the exact location where we thought they were picked up.  But I believe it was in Arizona.

Q.    Okay.  He said they were picked up by Ms. Slym in the pickup truck.  Then what took place?

A.    Johnny got in the back seat behind the driver.  And Lezmond was in the back seat behind the young girl.  And they took off.  And at some point in time, Johnny or one of them indicated that they were sick or for some reason needed to pull over, and that

when they pulled over, Johnny then began to stab the older woman, Ms. Slym. And then at some point in time, Lezmond assisted.

They put -- once it appeared that Ms. Slym was probably dead, she was placed in the back seat on top of the young girl. I got the impression that the young girl was lying across the back seat. The grandmother was laid on top of her. Lezmond or Johnny began to drive. I think Johnny started first, and then Lezmond took over.

And then they drove to a location way up in the mountains -- we actually went up there and found the location -- where at that point in time, Tiffany was either asleep or in shock or both. I don't know. But they did something to jar her to wake her up and got her out of the vehicle. She was standing outside the truck or near the truck area.

They may have walked -- now that I think about it, they walked a little ways up further into the woods. It was an open area. But it was a little ways from the truck where Johnny attempted to cut her throat. And that the girl stood there with a dazed look on her face, arms down, blood beginning to trickle down her blouse or whatever it was she was wearing. And they may have tried to cut her twice. I don't

recall honestly.  But -- and I don't recall if Lezmond indicated that he jumped in at that point in time.  But whatever was going on, it was -- it didn't work.

And somebody was upset about that fact.  And I don't recall if it was Johnny or Lezmond, but somebody said, "The bitch won't die.  Why don't you just die, bitch" or something like that.  And then they laid her down.  They had her get on the ground.  And both of them at that point in time found rocks and crushed her skull.

And you brought up the issue about alcohol.  I was kind of shocked by those circumstances, which is why I asked him if he had been drinking.  And I was shocked by the response that they had not been or that he was not under the influence, because that was a pretty -- pretty heinous crime that -- well, I was just shocked that they weren't under the influence or did not appear to be.

Q.    You mentioned when Johnny Orsinger was stabbing Ms. Slym, you said that Mr. Mitchell assisted. Did he describe how he assisted?

A.    He said he stabbed her a few times, but indicated that primarily 95 percent of it was done by Mr. Orsinger.

Q.    Do you know how long that first meeting

lasted?

A.    Oh, it was probably maybe an hour, hour and a half, maybe.  Maybe.  Boy, I don't remember.

Q.    At least from your recollection, other than this scenario that you laid out for us, did you touch on any other areas with Mr. Mitchell?

A.    At the first meeting?

Q.    Yeah.

A.    I don't recall.  I mean, it would have been my practice to ask him, you know, questions like if he'd ever been treated for a mental health condition.  It was -- boy, I don't recall.  I don't recall.

Q.    Okay.  So with that, how did you decide to prepare or investigate the case?

A.    I think the first thing we decided to do was to get a -- to get him evaluated.

Q.    By?

A.    I believe Greg could probably speak better.  He was handling that.  But I believe it was Dr. Susan Parrish.  I had worked with her on other cases, and she has always been very helpful in -- sometimes in difficult cases.

Q.    And are you aware did Ms. Parrish prepare a report?

A.    I don't believe she did.  Based on her findings, I want to say we told her not to.  But I'm not sure about that.  What I can say is that there was no report prepared on it.

Q.    And were you aware of what her findings were?

A.    That Lezmond was sociopathic.  It was briefly -- again, Greg could probably tell you better about that.  But the gist of it was "You do not want to call me as a witness."

Q.    Now, in your role of preparing for the trial, did you speak with Mr. Mitchell at some point about his drug and alcohol history?

A.    Yeah.  We knew that he was -- first of all, it's not uncommon in reservation cases.  So that's something you would normally ask.  And we did talk somewhat.  My recollection was that his drug of choice was primarily marijuana, and he did some drinking.  I think he experimented with some other drugs.  But primarily, marijuana was his drug of choice.

Q.    Now, for your purposes, you spoke with him early on, and he advised that he had not been drinking at the time of these events; correct?

A.    Correct.

Q.    You learned from the FBI statements

attributed to Mr. Mitchell that he claimed that he had been drinking to the point of blacking out.

A.    Yeah.

Q.    Did you discuss that with --

A.    We did.

Q.    -- Mr. Mitchell?

A.    We did.  And it was kind of that's just the kind of stuff he was telling them.  But he had never indicated to me or Greg that I'm aware of that he was under the influence of anything at the time, which was of grave concern to me.

Q.    Now --

A.    And -- well, and just because I think the next day they went and severed the heads and hands. And I remember asking him, "Clearly, you had to be under the influence when you did that," because that's not a very common thing.  And even the next day they hadn't, indicated that they -- that they hadn't been.

Q.    Did he indicate whose idea that was?

A.    To sever the heads and hands?

Q.    Yes.

A.    I think it was one of the Nakai brothers. It was an attempt to hide the identities of the victims.  And so I think it was one of the Nakai brothers.

Q.    In your discussions with Mr. Mitchell, now, you were aware that there was a somewhat related carjacking that occurred previously?

A.    Oh, yeah.  I watched that trial just to -- to see if I could get something out of that that would assist us if we could somehow put it on Johnny, which I thought was difficult because of his size.  But, yeah, I knew there was one, and I watched most of that trial.

Q.    That trial was Gregory Nakai and Johnny Orsinger?

A.    Correct.

Q.    In your discussions with Mr. Mitchell, was he aware of what had taken place during that carjacking?

A.    I'm sure -- I think he was aware of it. I'm not sure if I was aware of the details of it.

Q.    He was not present at that time; right?

A.    No, he wasn't involved in any way that I recall.  So I think he may have -- he may have been aware of it, but not any detail.

Q.    Now, as these cases go, after you've reviewed discovery as far as the actual events that took place, were there many civilians to be interviewed?

A.    In relation to this case?

Q.    Yes.

A.    There weren't many witnesses.  There was Johnny and Lezmond and I think -- I mean, obviously, the Nakais.  But, no, there weren't that many.

Q.    Did you direct Mr. Brandenberger to go out and interview anyone?

A.    I don't know if it was me or Greg.  I'm sure I did, but I don't recall off the top of my head.

Q.    Do you recall receiving any reports from Mr. Brandenberger?

A.    I do.  I haven't seen them recently.  I don't know.  If he generated some, obviously, he would have given it to me.  But to be honest with you, I don't recall.

Q.    Well, let me ask you this:  Were any of the co-defendants available to interview?

A.    I knew Johnny's lawyer, Mr. Bernais.  And I think we -- as just knowing what the answer is, I recall asking him if we could interview Johnny.  Got the typical laughing "no."  I think there was an attempt to try to interview the other folks, but I don't recall if it took place or not.

Q.    Is it fair to say that most of the individuals in this case were under some sort of Indictment at the time of this case?

A.   Yes.

Q.   Now, you indicated you went out and visited some of the scenes?

A.   Yes.  We went to try to get -- one, to try to figure out timing and everything.  We drove out to the mall where they went originally.  And then we went to the store where the knives were purchased.  And then we drove to the location where the bodies were ultimately left, mutilated.

Q.   Did you go past the Nakai residence?

A.   I don't recall if we did that or not.  I mean, I remember seeing something, because it was, like, referred to as the compound or something.  Because my recollection is that they lived in a group of houses or something.  But I don't recall if we went there specifically.  I -- I -- I remember going to the knife store.  I remember going to the mall.  And I definitely remember going up to the scene.  Whether we went by the Nakai residence, I did not.  Karl may have on some other occasion.  But not on that occasion, because there was me, Karl, and Greg on that particular day.

Q.   Now, did you have a copy of a statement provided by Johnny Orsinger?

A.   Boy, you know, I was -- I did.  But I

don't recall today what it said.

Q.    Well, let me just ask you in general terms.  You had discussed with Mr. Mitchell his apparent statement to you that he had not been under the influence.  Do you recall anything in Johnny Orsinger's statement contradicting that?

A.    I do not.  Because if there would have been, then I would have had -- I would have questioned Lezmond more about whether or not he had been drinking.  But I don't recall anything to suggest that they were drinking on that occasion.

Q.    Did you have any information that they had been up for three straight nights and binging on drugs prior to going to Gallup?

A.    No.

Q.    With Mr. Mitchell and his history of drugs, did you go back to the usual -- did you discuss the first time what type of stuff, how often did it become, anything like that?

A.    Yeah.  Because, one, Lezmond was kind of, well, different in some respects as to the other people who lived and came from the reservations.  His -- well, he didn't seem to come from the poverty that the other kids, including Johnny Orsinger, came from.  As I recall, his mother was educated.  His grandparents were

educated, which was uncommon in reservation cases. And I know that he had -- he had done fairly well in high school. And there was some talk about football scholarship to some -- Dine' College or something like that.

And so I did go back, because it just -- well, one, because he said he wasn't under the influence at the time, and, two, just to get a history, we did talk some about his past. And, again, what I got from it was that his -- he liked to smoke marijuana and consumed alcohol.

Q.    Now --

A.    May have experimented with some other stuff, but I never got the impression that he was addicted to, for example, meth or cocaine or anything like that.

Q.    As you sit here now, your recollection from the items seized from the Nakai residence after the arrest, do you recall a lot of drug or alcohol paraphernalia --

A.    Paraphernalia stuff?

Q.    -- being seized?

A.    I do not.

Q.    Now, after you apparently had a report or some kind of statement from Dr. Parrish, did you seek

out another evaluation of Mr. Mitchell?

A.     We did.  But Greg at this point -- this was starting to get into kind of the mitigation stuff, and Greg was primarily involved with that.  But my recollection was that he was sent down to Tucson to be evaluated, I think for a neuropsych, because we were trying to find out if -- I mean, we needed something to explain why this happened.  Because at that point in time, I wasn't seeing it.  So -- nor was Greg.  And so we -- he was sent down to Tucson to be evaluated.

Q.     And was that report authored by Dr. Barry Morenz?

A.     I know now that it was.  I don't recall if I saw the actual report.  Greg was handling that stuff. But Greg always apprised me of what was going on, what the results were.

Q.     Were you aware at some point that Mr. Mitchell claimed he was using drugs while housed in the Madison Street Jail?

A.     Yes.  Well, I don't know if it was drugs or if it was hooch, as they call it.  But there was some reference, I think.  Because I tried a pretty bad homicide before that a defendant was doing that.  But I think there was some discussion.  I think Lezmond mentioned that he was able to get stuff while he was in

custody.

Q. During the time that you represented him, the time spent selecting the jury, the trial, did it ever strike you that he was under the influence of any substance?

A. No, never in my presence, nor did I smell anything like alcohol. No, he never appeared to be out of it, meaning, you know, not -- his thinking was always linear. Fairly pleasant guy to be around, actually. No unusual mood swings. I can't recall a time when we met with him one day where he appeared to be different than the next time. He was always the same. So I -- I don't recall a time when I met with him when he was under the influence. But Greg met with him a lot more than I did.

Q. But at least in your time in the courtroom?

A. During the course of the trial?

Q. Yes.

A. Oh, no. I never -- no. Not one time.

Q. How did Mr. Mitchell strike you on the intelligence level?

A. He seemed to be of at least average intelligence. I never got the impression that he was slow. He seemed to be at a minimum of average

intelligence.  I never -- I wouldn't say he was a rocket scientist, but he had a -- he understood everything that was going on.

Q.    Was there anything during your visits with him, anything to raise the issue of competency?

A.    No.

Q.    Did he appear to understand who and what you did?

A.    Yes.

Q.    What the prosecution did?

A.    Oh, yeah.

Q.    The Court?

A.    Oh, yeah.

Q.    How the case was proceeding, what was going on during court appearances?

A.    Yes.

Q.    In fact, he testified during a voluntariness hearing.

A.    Boy, did he?  I think he did.

Q.    Was there anything during the course of this investigation that led you or gave you any hope of presenting an insanity defense?

A.    No.

Q.    Now, you are aware that Dr. Morenz did an evaluation.  Were you aware of generally what those

findings were?

A.    That he was competent.

Q.    Do you know whether he gave him a diagnosis in the DSM?

A.    That I don't know.  Greg was primarily dealing with that stuff.

Q.    But you were not provided with any information to suggest that, "Well, maybe I missed something, and we should pursue that angle"?

A.    No.  We were trying everything we could with this case.  Because it seemed pretty clear from the outset that this was going to be getting to the death phase, at least in my opinion.  And we were trying to do everything we possibly could to find what we could to explain why this happened.

Q.    Did you talk with his mother?

A.    Tried.  I forget the day it was.  But the mother -- and I think it's Sherry -- and her husband drove down, and I -- it was just me on that day.  It was a weekend.  And they were staying at a hotel up here on Black Canyon -- on I-17 near.  And I met with them, and I talked with the grandmother and grandfather at length.

The mother was there.  I recall she had some kind of attitude that -- I want to say she thought

we were blaming her for all of this. And when I entered the room, she left, and she remained gone until we were done. And then she came back, and that was the extent of my contact with her. But my recollection is that she was never very helpful and really seemed to be more concerned about how this impacted her.

Q.     Do you know who Vera Ockenfels is?

A.     Yes. She was the person that we -- I don't know if "retained" is the word, but she was our mitigation person.

Q.     Did you have contact with her?

A.     I did. Greg had most of the contact, but, yes, there were times when we met.

Q.     And did she prepare a report?

A.     I think she prepared several, as I recall. But, again, Greg was the one working primarily with her.

Q.     Did you review any of the reports?

A.     Yes.

Q.     Did you discuss the reports with her?

A.     I think there was a couple times when we discussed some of her -- what her findings were. Because I just happened to look at -- I forget what you call it -- something that she had filed as part of this to refresh my recollection. Her declaration, I guess.

Q.    That would be Exhibit -- I think it's 133. Let me see if we have it.    131.

MR. KIRBY:    Just for the record, we're going by the exhibits as prepared by habeas counsel in this case.

THE WITNESS:    I have it in front of me.

BY MR. KIRBY:

Q.    Have you reviewed that?

A.    I've reviewed that.    I've seen it within the last few days.    Because I recall being shocked by -- because -- well, I've tried probably 150 felony trials, maybe 130, dozen murders.    And tend to be -- I don't know, sometimes we minimize or make light of what it was.    Because when I saw her comment that we made comments about there being no mitigation, I was kind of shocked by that.

Q.    Do you recall making any statement?

A.    Yeah.    And what I -- and then when I saw that, what I meant was that what we were looking for was something that would explain this.    There was obviously mitigation.    I didn't mean that there was absolutely nothing.    But we were looking for that -- that nugget that would give us some explanation as to why.    Something that we could convince the jury that that would explain this type of behavior.

Q.    Are you talking on something like finding that the defendant is insane to give you a real shot at a defense?

A.    Yeah.  Or that he had some brain damage, or there was something that would -- you know, if he'd been beaten or molested or something as a -- physically abused as a child.

Q.    There's obviously information that she gathered about his long career with drugs and alcohol.  Do you recall seeing that?

A.    I knew that he had had a history.  I don't know if I got it from her or him directly or both.  But I knew he had a history of alcohol use, which is not uncommon for the reservation, and drug use.  But, again, I thought the drug use was primarily marijuana.  I know he experimented with some harder stuff.  But I was never under the impression that he was addicted to meth or coke.  In fact, I think I recall meth was probably just getting on the reservation back then.  It wasn't very common.

Q.    At least in connection with the trial, what was your assessment going forward of how that looked for the defense?

A.    Me personally and professionally?  I was very, very concerned.  And in trying to come up with a

trial strategy in light of the fact that there was at least one confession and more, as I recall, and a lot of physical evidence, strong case, that I had -- well, knowing that we were going to have to go back in front of that same jury asking to save his life, I was very concerned about losing credibility with them and losing them on a defense, you know, for example, saying he wasn't there when the evidence was clear that he was there. So I was very concerned about losing them in the guilt phase and then not having them at all for the sentencing phase.

So I don't know if that answers your question. But it was -- it was prompt.

Q.    Did you discuss with Mr. Mitchell the possibility of his testifying?

A.    Oh, yeah. We did. Greg did a lot of that, actually. Again, I'm trying to -- I don't know if that was in connection with him testifying in the sentencing phase or the guilt phase. But I know Greg had and we had conversations about him testifying.

Q.    And in your opinion, would that have been a good thing or a bad thing for him to have testified in the trial?

A.    It would have been risky. And I found this in another case that I had that was just as

horrible as this. It would have been risky. He was very defensive. He was very defensive. And it caused him to be -- I don't know -- act tougher than he really was. But we discussed it, and there have been problems there.

Q. Were you concerned about how he might hold up under cross-examination?

A. No. He's a smart guy. But like I said, he was very defensive. I can tell you I would have been concerned that he was going to come off as being very aggressive and push back, which would have not been good in a case like this. We were trying to invoke sympathy from the jury at some point in time.

And he was going to tell the truth, for example, would have testified that he wasn't drinking. There was problems with his testimony. But I tried to convince him to testify at the sentencing phase, and he wouldn't.

Q. So insofar as a defense of intoxication, was it there?

A. No. It wasn't even close.

Q. Now, you have -- maybe you have not seen. Have you seen some statements that are part of these exhibits from some of the co-defendants some eight years later?

A.    Yes.

Q.    Have you seen the statement by Johnny Orsinger?

A.    I have not seen it, but I'm aware of it, that now he's claiming that they were drinking at the time.

Q.    But at the time that you were engaged in the trial, you did not have that information?

A.    No.  We only had the information that Lezmond provided in the early interviews that he gave, which he later denied adamantly.

Q.    I'm sorry.  The last part of that, denied --

A.    Adamantly.  He never indicated he was under the influenced of anything.  In fact, there was some discussion about making sure they were clear-headed.  I think that was a suggestion of Nakai or something.  But I think the orders were -- they had some hierarchy, I think -- that they were not to screw this up.

Q.    Now, you were responsible primarily in the trial phase, but did you consult with Mr. Sears and Mr. Bartolomei about matters that might more properly be dealt with in the mitigation phase?

A.    Yes.

Q.    Were there discussions about trying to go with the alcohol abuse, the drug abuse, as mitigation?

A.    I don't recall if there was or not.  My -- as I sit here today, I don't remember that we had enough other than that he may have been a chronic marijuana user and periodically he used other drugs for recreation.

Q.    Were you aware of statements other than Ms. Ockenfels' report that Mr. Bartolomei learned of folks that had drinking with him and smoked marijuana, took drinks with him?

A.    Well, I know there were -- you mean other than, like, the Nakais and the Orsingers?

Q.    Yes.

A.    I was not aware of anyone.

Q.    Now, one other issue.  There appears to be an issue concerning Karen Wilkenson, another attorney in your office, possibly representing someone possibly connected to this case.  Do you have any information as to that?

A.    I remember something about it.  I was not told anything what the details were.  I believe she tried or did withdraw from whoever that was.  And that's all I was ever told about it.

Q.    During the course of your investigation,

Q.    You've done a number of murder cases.  But in your own mind, did anything you see there raise any questions as to the causes of death of both Ms. Slym and Tiffany?

A.    No.  Mrs. Slym had 32 or '3 stab wounds, and the girl's head was crushed.

Q.    You were aware of the sharp force injury to the neck?

A.    Of the young --

Q.    Of the young girl.

A.    Yeah.

Q.    Now, Mr. Mitchell told an FBI agent that he slit Tiffany's throat.  Is that correct?  Is that your recollection?

A.    I looked at it again today.  I think so.

Q.    But he told you it was Johnny Orsinger?

A.    I -- boy, it's been so long.  As we sit here today, I don't recall if they both participated or which one said they actually -- in speaking with Lezmond, what actually occurred.

Q.    Your understanding of the cause of death of Tiffany?

A.    Blunt force trauma to the head.

Q.    From?

A.    Being crushed with a rock numerous times.

Q.    Did you interview the medical examiner ahead of the trial?

A.    Did not.

Q.    Any particular reason?

A.    I recall -- I was looking at some of the stuff the last couple of days.  Because I saw there was -- for some reason it was claimed or alleged that we did so -- we did not because of financial reasons. And I don't -- we -- I don't recall our office had any problems with spending money in this case.

Although there was some -- I do recall that the medical examiner wanted to be paid in addition.  Because I thought he was a county employee. No, I forget -- I'm sorry.  The question was did we --

Q.    Interview the medical --

A.    We did not.

Q.    Any particular reason why you did not?

A.    I can't -- none that I can think of right now.

Q.    Were you comfortable with the materials, the information, that you had concerning what the medical examiner was going to testify to?

A.    Yes.

Q.    Did you have any reason to suspect there was anything to be obtained from the medical examiner

by additional questioning?

A.    No, I didn't think anything would support any defense that we had.

Q.    In these kinds of cases -- I think you've indicated you've done a number of murder cases.  Do you have a practice or a theory on dealing with medical examiners that you don't really have very many questions for?

A.    It would depend on the case.  I can recall one case where -- well, these kids had been killed and not discovered for nine months.  And there was quite a few questions on the cause of death in those cases.

In this case, I can tell you, with the pictures, with where it was, I wouldn't want that guy up on the stand -- or her or whoever it was.  I don't recall -- very long, having to look at those pictures over and over again.  Or even the nature of the testimony.  I mean, it was just pretty gruesome.

Q.    Did you ever have any information that Mr. Mitchell may have slit Tiffany 's throat in a way to try to make Mr. Orsinger go away or, in essence, try to save Tiffany's life?

A.    I saw that written somewhere.  I had no information on that.  In fact, that was the first I'd ever heard of that.  Because I can tell you, in trying

to come up with a theory of defense in this case, one of them was Johnny had already killed two people, been involved with the murder of two people.  Maybe he was the loose cannon that just went off.

But one of the problems that was presented is that Lezmond was two or three times as big as Johnny.  It never appeared to me that he was frightened of Johnny in any way.

Q.    By the way, did Mr. Mitchell ever tell you whether or not he was aware that Johnny had killed in the previous case?

A.    I don't remember offhand.  But I don't know how he could not have known.  They were both going on at the same time.  I don't know how he could not have known.  But I don't recall having -- I don't recall specifically having a conversation with Lezmond about that.

Q.    Was there DNA evidence in this case?

A.    There was.

Q.    Do you recall all of the D NA evidence?

A.    I want to say it was the truck and one or two knives.  At least one knife.  And there may have been some clothing.  But I do recall the truck and the knife.

Q.    And was one of the knives found with

Mr. Mitchell's pants?

A.    As I recall, they were going to arrest -- they were at, I think, the Nakai residence.  It was -- may have been early -- Lezmond was undressed, went to put on some pants or something, and a knife fell out or something to that effect.

Q.    Do you recall whether or not either of the victims' blood was found on either of the knives?

MS. PEAKHART:  Objection.  Clarification on knives.  Knife that fell out of Mitchell's pants or some other knife?

THE WITNESS:  Do I -- you want me to clarify, or you want him to clarify the question?

BY MR. KIRBY:

Q.    Let me ask you.  You believe a knife fell from Mr. Mitchell's pants.

A.    Correct.

Q.    Can you recall whether or not either of the victims' blood DNA was found on that knife?

A.    In some fashion, it was.  There was some question about whether or not it was a mixture.  Major or minor component, I forget.  I've tried some DNA cases, but I try to forget that stuff as soon as it's over.

Q.    Do you recall whether you were consulted

with anyone about DNA in this case in terms of the appeals and the process?

A.    I mean, I've -- boy, like I said, I've tried two or three DNA cases, and I have a general familiarity with it.  But this kind of reminded me of a -- you know, claiming consent in a rape case.  Why question the DNA?

In this case, as I recall, Lezmond -- in the statements that he made, there was nothing -- nothing to suggest that whatever evidence we had was somehow in error.  And I don't recall if we consulted with someone or not.

Q.    Do you recall in some of that DNA evidence whether it was just a matter of not able to exclude the defendant and others?

A.    Correct.  I think -- right.  That I'm not sure if it was a clear match.  But there was an indication that it could have come from, for example, the grandmother.  I think her blood was on it.  And maybe some third person.

Q.    In your estimation, did the DNA itself harm your theory of the case?

A.    No.  You mean -- I'm not sure what you mean.  Of course, it's always harmful to the case.

Q.    I mean in and of itself compared to all of

the other evidence introduced.

A.    The other evidence, primarily, the statements of the guys, was so strong that even if no DNA was found on the knives, I'm not sure it would have made that big of a difference, if that's what you mean.

Q.    Mr. Mitchell -- do you recall if his fingerprints were found on the truck?

A.    I do.  I believe it was the outside of the truck, I think.

Q.    Do you recall one or more of Ms. Slym's telephones being found?

A.    No, I don't.  Don't remember that.

Q.    Now, during the course of that part of the trial -- by the way, do you recall how many days the trial portion, the guilt portion, took?

A.    No.  Two, three weeks, I think.  Maybe a week.  Seemed forever.

Q.    At some point during -- and, again, during the trial itself as the evidence for the guilt was being put on, you observed Mr. Mitchell?

A.    Yes.

Q.    Was he cooperative during the trial?

A.    Yeah.  We never -- Greg and I -- at least I.  I never had a problem with Lezmond.  Even when we were trying to get him to come out and testify at the

sentencing phase, he was always respectful, stated his opinion, and we never -- there was never any animosity between us, me and Lezmond, Greg and Lezmond, that I could see. He just stated his position, and we tried to convince him to do otherwise.

Q.    Now, there is an issue raised about whether Mr. Mitchell was competent after the verdict. Did you see anything that changed your opinion of him from before the trial?

A.    No.    Other than he just said that he was not going to testify at the sentence -- he was done, he wasn't going to come out anymore.

Q.    Did he explain why he was done?

A.    He was not going to beg those people for his life.    And I tried to explain to him that that wasn't necessary, that he could -- well, for a couple of reasons.    One, because we knew that there was going to be some kind of post -- there was going to be an appeal, etcetera, that all he would have to say is he's sorry that that day happened or at least come out.    But he -- at that point in time, he was -- just said he wasn't going to beg those people for his life.

Q.    Do you recall when he may have first brought up the idea?

A.    Of?

Q.     Not coming for -- maybe I'll ask it a little clearer.  Did a discussion begin prior to the guilty verdict?

A.     No.  Not that I'm aware of.  I don't remember.  He may have said something to Greg.  But I never had a conversation with him where he said, "If they find me guilty, I'm not coming out.  I quit."

Q.     And you made the Court aware of this?

A.     Of when he said he wasn't going to come out?  Yeah.  I talked to him.  I tried to talk to him.  I tried to convince him.  And once it was clear that he wasn't coming out, then we obviously had to let the Court know.  Because I believe we had a hearing, and the question was do we drag him out or not.

And I thought -- I can tell you I thought it was better that, if he does not want to come out, to let him stay out than have some type of outburst or anything that would -- well, I thought it would be best that he -- if he absolutely didn't want to come out, then we shouldn't force him.

Q.     I can't remember.  Do you recall whether the Court -- there was some information that he might fight the marshals?

A.     I don't recall that.  Boy, I mean, in my experience with Lezmond, he was always compliant.  And

I don't have any recollection of him giving anybody any difficulty. And I don't recall any issue about him going to fight the marshals. I know he was pretty adamant about not coming out, though.

Q. And while the mitigation phase was in process, did you make any other attempts to have him come out?

A. I'm sure I talked to him throughout. I forget how many days it went on, if it was more than one day. I forget. But I know I had multiple discussions with him to come out and just sit there and at least show your face.

Q. And you discussed with him the possibility that he could simply allocute to the jury?

A. Yes. That if he wanted to -- well, what we -- what I wanted was to show some type of remorse, something that would suggest that this was not just a cold-blooded killing. And the only way that I can think of -- I mean, I didn't want him to get up there and admit anything. But -- and that's why I came up with this solution about, you know, maybe it was a horrible day, and you just wish it had never happened. That at least shows a little remorse, and it doesn't say anything about his participation. But -- it may not be much, but it's better than nothing.

Q.    Mr. Mitchell never came out?

A.    No.

Q.    He came out for the verdict?

A.    I think he did, yeah.  I think so.  I mean, he was never out while witnesses, etcetera were being called.

Q.    Do you recall, when he was brought out for the Court to address on occasion whether he continued?

A.    To maintain his wish?

Q.    Yes.

A.    Yes.  I think, as I recall, Judge Murguia was also concerned.  Who wouldn't?  It's obviously an issue.  And she was obviously concerned about it as well.

Q.    Did you see anything in your discussions with him that suggested it was time to have another psych evaluation?

A.    No.

Q.    Obviously, you've described that it would have been in his best interests to appear.  But was there at least something to his argument?

A.    You mean to not come out?  Something that made sense?  Well, it didn't make sense to me.  His argument was "I'm not begging those people for my life," end of story.

Q.    Did you discuss the case with others in the office or out of the office?

A.    I discussed that case with everybody.  It was -- I discussed that case with a lot of people.

Q.    In your office?

A.    In my office, outside of my office.

Q.    Did you go talk to attorneys that had county experience in these kinds of matters?

A.    Yeah.  I have friends that do all capital, only capital.  Yeah, I discussed this case with everybody I could think of.  It was not a run-of-the-mill murder.

Q.    And did you find a lot of suggestions or things that you hadn't thought of that --

A.    I'm sure we did.  I mean, people give their opinions as to what you should and should not do.  I remember discussing with one person particularly, for example, about jury selection.  I forget -- I don't think we -- I don't know if we used it or not.  But that's when that Colorado method was talked about.  So, yeah.

And, in fact, originally, we attempted to get somebody from our habeas unit on the case.  But for some reason, that was nixed, and that's why Mr. Sears was on there.

Q.      And which attorney was that?

A.      Ken Murray.

Q.      Did you consult with attorneys in your habeas unit?

A.      I'm sure we -- I talked to -- Ken is the only one that I would have talked to.  And I don't recall -- I know early on we probably talked to him, but as the case progressed, I don't recall talking to him that much, if at all.  But Greg may have.

Q.      Who else of the attorneys in your office did you speak with?

A.      Oh, I have a brother that works with us. I'm sure I would have talked to Mr. Sands about it. I'm trying to think.  I don't know.  We don't have many people with capital experience.  But we do have maybe Titterington, T-I-T-T-E-R --

MS. WILLIAMS:    -- I-N-G-T-O-N.

THE WITNESS:    Thank you.  But I wasn't shy about asking anybody about this case, because it was bad.

BY MR. KIRBY:

Q.      Did you talk to the folks about -- I think you mentioned about ideas for jury selection.

A.      Yes.

Q.      Did you speak with the folks on the

outside as well?

A.    Yes.

Q.    Had you selected death penalty juries?

A.    No.  Really hadn't come down.  When I -- the cases that I tried, it was still decided by judges.

Q.    So you --

A.    There weren't many people around who had done that in our jurisdiction.

Q.    But you talked to a few that had?

A.    Yeah.

Q.    Can you tell us what the theory for mitigation was and how that was decided?

A.    We wanted to show that there was some -- some reason that Lezmond should live, that there was some value to him that -- that life in prison is no cake walk and -- not in the federal system.  There's no possibility of parole, that it would not be a cake walk.  But we tried to show that there was some value to his life and some reason why he should be spared.

Q.    Was a discussion about his upbringing discussed as a possible avenue to pursue in mitigation?

A.    I'm sure it was, which is why his grandmother -- she was deposed, I think.  I'm sorry. Could you repeat that.

Q.    Was there any discussion about pursuing

the angle of his upbringing, all of the various abandonment issues, discipline issues?

A.    There may have been some.  I don't recall many specifics about it.  Greg could probably talk to you more about that.  Like I said, I knew he had a -- not the best childhood in the world, but at least the information that we had -- well, Greg would be better to talk to you about that.

Q.    Let me ask you.  Through my -- I think you said you did not see Dr. Morenz's report, but you saw some of what Vera Ockenfels had done.  Were you aware of some of the claims that Mr. Mitchell had made about some of the things that he had done in his youth of a criminal nature?

A.    Such as?

Q.    Throwing dogs from a bridge.

A.    Boy, I want to say that that may have come up in our discussion regarding what to do with Dr. Parrish.  But I don't recall.  So I shouldn't say.

Q.    Drug dealing?

A.    I knew -- we knew of it, that Mitchell -- that Lezmond wasn't a saint.

Q.    I'm not sure.  It was in one of the reports about a gun battle he was involved in in which an innocent girl was shot in the neck.

A.      Boy, I don't recall if I have seen that or not.

Q.      Did you ever speak with Celia Rumann during the appellate process?

A.      Couple of times.  I'm trying to think.  I can't recall if she was with our -- she wouldn't have been with our office.  She had been with our office, left, and then, I think, came back.  But I'm certain we did talk.

Q.      Did you hold anything back from her during the discussion?

A.      Did I?

Q.      Yes.

A.      No.

Q.      Was there any decision to try to lock her out from any information?

A.      No.  Not that I'm aware, no.

Q.      Do you recall whether they asked you to participate in the moot court for the oral argument?

A.      I don't recall specifically.  I know it's generally the practice around our office to just send out an e-mail saying that we're going to have a moot court.  Being involved in the trial, I'm sure she would have at least asked if I was available.  But I don't recall, to be honest with you.

Q.    Do you recall if you participated in it?

A.    I don't believe I did.

Q.    As far as your notes and everything, were those all boxed up and provided?

A.    As far as I know, everything we had was sent to her.

Q.    You don't have anything back in a bottom drawer --

A.    No.

Q.    -- or file cabinet?

A.    No.  We don't do that.

Q.    Do you recall discussions -- maybe one of them was telephonic -- with a Richard Burr?

A.    That name sounds familiar.  Is he a capital guy?

Q.    I believe he is with the Federal Death Penalty Resource Center.  Federal death penalty resource counsel.

A.    I remember the name.  I don't know if it's because I remember it from talking to the guy or if I remember it from reading it.  But I don't recall talking to him.

Q.    Let me ask you -- I think in front -- if you'll look at Exhibit 122.  If you could take a moment to review that.

A.      (The witness complied.)

Okay.  I've read it.

Q.      Do you recall now whether you participated in that phone conference?

A.      I -- to be honest with you, I don't remember.

Q.      Do you recall, in general, concerns from outside, including Ms. Ockenfels, about mitigation, lack of mitigation, or --

A.      She never expressed any concerns to me.

Q.      Did she ever discuss with you her belief that Mitchell had to have been under the influence of drugs and alcohol when he did it?

A.      I'm sure we discussed it.  But I honestly don't recall her expressing any concerns.  And if -- I don't know what she would have based her belief that he was under the influence on other than Mr. Mitchell's statements early on.

Q.      But you were shocked when he told you that he wasn't?

A.      Oh, yeah.  I mean --

Q.      You covered that on more than one occasion with him?

A.      Yes.  I mean --

Q.      Hoping that he might give you something?

A.    Yeah.    I mean, most -- most homicides on the reservation involve alcohol.    So that's one of the first things that you would look for.    And I recall that this -- being surprised because, as bad as this was, at least the information that I had, that it didn't.    But it seems like I read -- and I don't recall who did request at least a diminished capacity defense -- I mean instruction.    But other than Mr. Mitchell's statement early on, I don't -- I don't recall alcohol being involved.

But I think -- and it may have been -- I forget how long after the events, but they obviously had photographs of the scene.    Because I think we were looking for evidence, because I think Mitchell or somebody in their statements indicated that either up at the scene or at some point in time he continued drinking.    So we were trying to find some evidence that would support him.    I don't recall finding anything other than his statement.

Q.    Oh, do you recall discussing the issue of buttons at trial?

A.    I would say early on.    I thought it was early on.    I can't remember if it was jury selection or shortly after.    But there were some people -- and I don't even remember how many -- wearing, like, campaign

buttons with photographs. And they may have said something like, "In memory of." And I saw them. I may have raised it with you and requested that they take them off. And that was the end of it.

Q. And to the best of your recollection as you sit here today, was the problem resolved?

A. It was. I'm not even sure if any of the jurors saw it. But, yeah, it was resolved. It was resolved relatively quickly. And I believe this was early on, like I said, either during jury selection or shortly thereafter. They obviously probably would not have been in the courtroom during jury selection. So it probably -- I think it was at the beginning of the trial that I noticed it. I think it was I that noticed it, asked if we could get those taken off.

Q. And to the best of your recollection, that problem was resolved?

A. Yes.

Q. And at least in your recollection, that did not have an impact on the proceedings?

A. Not that I'm aware of.

Q. And you don't recall seeing them in the middle of trial --

A. No.

Q. -- or towards the end of trial?

MR. KIRBY:  I think that's all I have for now.

MS. PEAKHART:  Do you need a break?

THE WITNESS:  I'm fine.

MS. PEAKHART:  Do you?

THE REPORTER:  I'm okay.

MS. PEAKHART:  Actually, I would like a break.

(Whereupon, a recess was taken from 11:12 a.m. to 11:19 a.m.)


                    EXAMINATION

BY MS. PEAKHART:

Q.    Good morning, Mr. Williams.

A.    Good morning.

Q.    You stated earlier that you have represented several defendants in capital cases.

A.    Yes.

Q.    Is that the State?

A.    State.

Q.    And was Lezmond Mitchell your first federal capital defendant?

A.    Yes.

Q.    Who were your clients in the state?

A.    Loretta Greer.  Capital or first degree?

Q.    Let's go capital first.

A.    I'm trying to think of the -- I believe Gilbert Brown started out.  Way after a mistrial was decapitalized.  I can only tell you the judge and the parties.  I was second chair, although I did the opening and most of the witnesses.  Gilbert Brown.  Did I mention that?

Eulandus Flowers, *State vs. Flowers*.  That was another one that -- I think it was after the -- it may have just been before the first trial but after the mistrial that that was decapitalized.  I think those are the ones.

Q.    So I have Loretta Greer, Gilbert Brown, and Eulandus Flowers.

A.    Correct.  And there's a fourth that was capital throughout, and he did not receive the death penalty.  But I cannot think of the name, but it was in front of Peter T. DeAngelo, if that would help you.  Jess Lorona was co-counsel.

Q.    What year was that?  Do you remember?

A.    Loretta would have been late '70's, mid to late -- '90's.  Excuse me.  All of them would have been in the '90's.

Q.    And that was here in Maricopa County?

A.    Yes.

Q.    Loretta Greer, that case was a capital case?

A.    Yes.  She was accused of killing her two small children.  Yeah.

Q.    And how did that case resolve?

A.    She received life.

Q.    By the judge?

A.    Yes.

Q.    But it was capital throughout?

A.    Yes.

Q.    And Mr. Brown, you said it was decapitalized?

A.    Yeah.  I want to say that they initially were seeking a death penalty.  I know it did not -- by the time we reached the verdict, it was not a capital case.  So it was just an issue of life versus 25 to life.

Q.    Do you think it was decapitalized before you started jury selection?

A.    It definitely was -- that was -- in both that and Flowers, it was a mistrial.  And I -- I recall -- I forget which one, but I want to say that we started out that way.  It was a mistrial, and the Government decided to not seek it during the second trial.  But I -- I think.  And I don't recall if that

was Brown or Flowers when that happened.  It probably would have been Brown, because Flowers was a juvenile transfer.

And then the other fourth case did go to sentencing, and judge did not impose the death penalty. But I don't recall the defendant's name.

Q.    Do you recall why the Gilbert Brown case, death was removed?

A.    There were some issues during the first trial that resulted in a mistrial that I think caused some question as to whether or not he may have been the actual killer.  It involved Gilbert, and there were three co-defendants, as I recall.

Q.    And what about the Flowers case?

A.    There -- well, boy.  That may never have been -- he was a juvenile transfer.  And that may never have been a capital case.  That may have just been a first degree homicide.

Q.    And then the case you had with Jess Lorona, who was lead counsel in that?

A.    Mr. Lorona was.  However, we split the duties up right down the middle.

Q.    And that case remained death, and the jury -- was it still judge sentencing?

A.    Still judge sentencing.

Q.    And the judge sentenced him to less than death?

A.    Yes.

Q.    So Greer and the DeAngelo case were the two cases you had that had gone to a jury?

A.    Sentencing.  I've never tried a death case to a jury.

Q.    Okay.  I've got it.  Sorry.

A.    I mean jury sentencing.

Q.    Right.  I've got it.  But Greer and the DeAngelo case both went to penalty phase?

A.    Correct.

Q.    Now, in the -- let's talk about your federal experience.  Had you handled any first degree murder cases before Mr. --

A.    Yes.

Q.    -- Mitchell's?

A.    Federal cases?

Q.    Yes.

A.    Yes.  I was not with our office at that time.  I was a sole practitioner then.  But I had several -- well, one that went to verdict.  That would have been *United States vs. Matthew Lindsey*.  He was found not guilty.

Q.    First degree murder, federal, whether

you're CJA or defender, any other first degree murder cases?

A.    Jury -- jury trials?

Q.    That went to trial.

A.    Yes.  Boy, I don't recall if *United States v. Austin*, Vernon Austin, started out first degree and he was found guilty of a lesser or if he was only charged with second degree.  But I guess you could find that out.  But Vernon Austin was a homicide case that I tried in federal court.

Q.    Were there any other first degree murder cases in federal court?

A.    Not that went to trial.

Q.    What about that didn't go to trial then?

A.    Oh, I can't think of any other ones off the top of my head.  But that -- I mean, boy, I could get you a list.  I don't -- I mean, I've handled a number of them.  I just don't remember off the top of my head.

Q.    So if they didn't go to trial, then you settled them?

A.    Correct.

Q.    Okay.  How many murder cases, first degree murder cases, have you handled where the crime occurred on a reservation other than Mr. Mitchell's?

A.    Vernon Austin.  You mean that went to trial?

Q.    Any -- any kind.

A.    Let me think about that and get back to you.  I've had a number of them.  I just can't seem to think of any of them.  None of them seem to stand out like this one.  But I've had a few of them.

Q.    Okay.  Maybe we'll come back to it.  Maybe something will -- now, in preparation for this deposition, did you prepare for the deposition?

A.    Yeah.  I read the pleadings, spoke with Mr. Bartolomei about it.

Q.    Which pleadings did you read?

A.    The appeal, the 2551.  Is that -- Petition and the Amended Petition.

Q.    Do you mean the 2255?

A.    Yeah.  I'm sorry.

Q.    Did you review any exhibits we filed with the 2255 or the Amended Petition?

A.    No.

Q.    And you spoke to Mr. Bartolomei?

A.    Correct.

Q.    What did you two discuss?

A.    Just our -- what happened during the course of the trial.  We discussed some of the things

that were in the Petition, primarily, the issue of alcohol and some, a little bit, about the insanity issue or diminished capacity, whatever the allegation was.

Q.    The allegation, do you mean in the motion, the 2255 Motion?

A.    Correct.

Q.    Did you discuss this deposition with anyone else?

A.    I've discussed it with Ms. Williams.

Q.    And what did you two talk about?

A.    Same things.  Oh, actually, because she wasn't there, we just discussed what to expect.

Q.    What to expect today?

A.    Yes.

Q.    Anyone else?

A.    Formally or informally?

Q.    Anyone else, informally as well.

A.    I vented with my secretary yesterday.

Q.    And why did you vent?

A.    I was not exactly pleased with some of the things that were in the petition.

Q.    You've been an attorney for more than 20 years?

A.    I believe I passed the Bar in 1989.

Q.    And you've been a defense attorney for --

A.    Throughout.

Q.    Have you ever had allegations of ineffective assistance alleged against you?

A.    I think there was one time that I recall for which we had a hearing.

Q.    Was that in State court?

A.    Yes.

Q.    Do you remember the defendant's name?

A.    I do not.

Q.    Do you remember the attorney's name who represented him at that hearing?

A.    No, I don't.  Bolton was the judge at that time.  Judge Bolton, Susan R. Bolton was the judge in State court.

Q.    Do you remember about when that was?

A.    No.

Q.    So this is the second time in your career that IAC, ineffective assistance of counsel, has been alleged against you?

A.    Formally, yeah.

Q.    Did you ever talk with John Sands about your deposition today?

A.    Did we have a formal conversation?  No.

Q.    Any, formal or informal.

A.      No.  A comment was made about "Have fun," that type of thing.

Q.      Have you spoken with the Assistant U.S. Attorney present about this case since your representation of Mr. Mitchell ended?

A.      About the case?

Q.      Yes.

A.      Formally or informally?

Q.      Either way.

A.      Yeah, we've spoken about it.  I mean, I've known Mr. Kirby for years, and in passing there might be some conversation about it.

Q.      What sort of conversation?

A.      It was a bad case.  The other prosecutor at the time is now a defense attorney.  It may come up.  I saw him yesterday.  So we did discuss that this was coming up.  But nothing in detail.

Q.      Did Mr. --

A.      I think our office refused to provide a formal interview.

Q.      Why was that?

A.      Because although we no longer represent Lezmond Mitchell, at least I did not think it's our job to do anything to assist them on their path to continue to execute him.

Q.    When you spoke with Mr. Kirby about the case, did he tell you what types of questions he would ask you today?

A.    In detail, no.  Just that there were going to be questions.  Because I was primarily involved with the guilt phase, that's what we would be talking about.

Q.    How long did that conversation last?

A.    Thirty seconds.  That would be a stretch.

Q.    I believe you testified earlier that you reviewed some experts, your notes.  Do you remember that?

A.    Yeah.  Actually, I think it was Greg's notes or some of Greg's notes.  I reviewed whatever we still have in the office, what I have.  Oh, I don't have anything in the office.  I talked to Greg about it.  In retrospect, I don't think I looked at any notes that I have as we sit here.

Q.    So when you said you reviewed your notes, what were you referring to?

A.    Pleadings.  Apparently, the pleadings.

Q.    Did you have any notes?  Did you create any notes during this case?

A.    I -- if I did, they were all turned over, and I've not seen them.  I'm sure there were notes throughout the trial, for example, but everything I

have was turned over.

Q.    I'll represent to you that we have no handwritten notes from you.  Does that surprise you?

A.    Not really.

Q.    Why is that?

A.    Well, I wouldn't know, to be honest with you.  The notes that I would have kept -- or would have had were the notes that I would have taken during the course of trial.  Beyond that, and what happened to those, I don't know.

Q.    You don't take notes during or after a meeting with a client?

A.    Greg, yeah.

Q.    So Greg was responsible for the note-taking?

A.    Well, there was nobody that was assigned to take notes.  But I know Greg is one to do those types of things.

Q.    You're not one to take notes?

A.    It depends.

Q.    On what?

A.    Whether I think I need to or not.

Q.    You didn't think you needed to in Mr. Mitchell's case?

A.    Take notes?

Q.    Correct.

A.    If I didn't, I didn't think I needed to.

Q.    So I'm clear, you have nothing in your possession regarding Mr. Mitchell's case?

A.    I don't.

Q.    Does your office?

A.    Nor my office that I'm aware of.

Q.    Do you recall the allegations we have in the motion regarding the Government's collusion with the tribes law enforcement?

A.    I did see that, yes.

Q.    Is it generally accepted in your office that the FBI has some sort of arrangement with, for example, the Navaho Nation such as what happened in this case?

A.    I'm sorry.  I don't understand the question.

Q.    You're aware that Mr. Mitchell was arrested?

A.    I think originally tribally, I think, and then turned over to the feds, yeah.

Q.    But you're aware that the search warrant related to this case?

A.    The search warrant that related to the Nakai residence?

Q.    Yes.

A.    Yeah.  I knew there was a search warrant.

Q.    And you're aware that the arrest warrants related to the Slym/Lee murders?

A.    I can't remember if they initially were arrested for something else or if they were arrested in connection with this case.  It's not uncommon for the tribe to arrest someone and then turn that person over to federal jurisdiction.  So -- and sometimes they arrest them for something unrelated.  But I don't recall in this case what he was arrested for originally.

Q.    Does November 29, 2001, sound like an accurate date as when you first met Mr. Mitchell?  I believe that was the date of his arraignment in Flagstaff.

A.    Yeah.  I was just -- because I do recall it was very cold, and so it would have been in November.  I mean in the wintertime.  But the specific date, no, I don't recall.

Q.    Do you recall that there was a period of 24 days when Mr. Mitchell was arrested until his arraignment in this matter?

A.    I -- I read something about that recently that indicated that.  And I knew that there was some

reason why we felt we needed to get up there for the arraignment. I -- I do believe that there was a time, a gap in between the time he was arrested obviously and the time we met with him. But I don't recall the specifics of that.

Q.    Is it your practice to advise your clients to speak with FBI agents?

A.    No.

Q.    Would you generally say that you encourage your clients not to speak with anyone after you're appointed?

A.    Not only not to talk to anyone, but don't talk -- be careful what you say on the phone, etcetera, yeah.

Q.    Do you recall advising Mr. Mitchell of this warning?

A.    Do I recall it specifically?

Q.    Uh-huh.

A.    No. But I -- I would have told him that as a matter of course.

Q.    Are you aware that before you were appointed in the case, in that 24-day period, are you aware that Mr. Mitchell had already been interrogated four times by the FBI?

A.    I knew it was -- I knew it was several

times.  I think it was even on the day we went up there on the 29th, I think they talked to him.

Q.    Before you got up there?

A.    Right.

Q.    That same day?

A.    While we were there even.  I want to say -- something tells me that he was spoken to on that day.

Q.    Do you know what that was?

A.    What what was?

Q.    What told you.  What informed you that he had --

A.    Lezmond probably told me.

Q.    And you're aware that those interrogations, those four interrogations, resulted in Mitchell providing a full confession?

A.    Oh, yeah.

Q.    And you're aware that the interrogations led to Mitchell taking federal and tribal authorities to the crime scene?

A.    Yes.

Q.    How damaging did you feel those statements were to Mr. Mitchell's case?

A.    I don't know of anything more damaging than a confession other than an eyewitness, I guess.

Q.    Did you investigate what had happened --
the circumstances of that 24-day period?

A.    I don't -- what do you mean by
"investigate"?  Did we try to find out where he was
or --

Q.    Why they delayed taking him to -- before a
magistrate judge for 24 days, they being the
Government.

A.    I can only assume because he wasn't in
federal custody.  But why they delayed taking him to
federal custody?  I don't know.  My guess is, if you
want my -- I don't know.  I'd be speculating.

Q.    Is that unusual for the federal government
to have a gap between the time a Native American
defendant is taken into custody, held in custody, and
then there's a gap of time before he is presented to
federal authorities?

A.    Is that unusual?

Q.    Yes.

A.    I know it happens.  Sometimes people will
serve a tribal sentence before they get turned over.
Sometimes they're released, and it's just -- there's a
period of time before a complaint is filed.  So is it
an everyday thing?  No.  But it's not unusual.

Q.    Turning to the allegations in our motion

about the buttons --

A.    Uh-huh.

Q.    -- worn by someone in the audience or someone.  Were you familiar with the Slym and Lee families?

A.    You mean prior to this?

Q.    Yes.  I'm sorry.  Prior to the trial starting.

A.    You mean did I recognize them by face --

Q.    Yes.

A.    -- or know them?

Q.    Yes.

A.    No, I don't think so.

Q.    Do you recall any audience members who were the family of Slym and/or Lee?

A.    Specifically?

Q.    Yes.

A.    No.

Q.    If I represent to you that the concern about the audience members or member wearing a button happened much later in the trial, does that change your opinion that it happened early in the jury selection?

A.    It doesn't change mine.  That's what I recall happening.  I mean, I don't recall if I moved for a mistrial.  But if it would have been later, I

probably would have. So I think it -- for example, if I had gotten an impression that they'd been sitting there throughout the trial and walking around the courtroom -- courthouse with them, I would have been more concerned. But my recollection is it was early on and it was resolved quite quickly.

Q. Can you describe one of the buttons?

A. I -- my recollection is that it had the photographs of them and maybe some wording like "In memory of" or something. I mean, they were, I think, about the size of a Coke can. And they were in the gallery.

Q. Coke can in height or circumference?

A. Oh, no. Circumference around. You know, like a campaign button.

Q. That's a large Coke can you're gesturing for.

A. Just a typical 12-ounce can.

Q. Maybe three inches in diameter?

A. I'd be speculating. But it was -- it reminded me of a campaign button.

Q. How far were you from the wearer of the button?

A. I think I noticed it -- I must have passed them by as they were coming in or going out or

something.  That would have been the only way.  I mean, they weren't very big that you couldn't see from a distance.  So I would have had to have been fairly close to them when I saw it.

Q.    You're speaking in the plural.  Was more than one person wearing a button?

A.    I don't recall.  I know -- all I know is there was at least one button.  I didn't like it, and I asked that it be removed.  There could have been more.

Q.    Could have been more?

A.    Could have been more, but I don't remember.

Q.    Do you recall that originally Mr. Mitchell's trial was supposed to be in Prescott?

A.    Yes.  All cases that occur where the crime occurs in the northern part of the state, they are held in the Prescott courthouse.

Q.    And then you recall that the trial was later transferred to Phoenix?

A.    Yes.  I think we objected.  And I think -- and I think the solution was to bring what we call a Prescott jury down here.

Q.    Do you recall why the trial was moved from Prescott to Phoenix?

A.    I don't believe it was at our request.  I

don't think.  So that would have probably been by someone higher up than me.  The judge maybe.

Q.    Do you recall your views on why the case was transferred?  Your opinion.  Did you think it was a good or bad thing?

A.    Well, I guess we objected.  So we thought it was a bad thing.  We wanted to be -- I mean, the reason for having him up there was because of the Native American population.  And they are not always the most mobile.  They have transportation problems. Sometimes getting to Phoenix is more difficult than getting to the Prescott courthouse, although you're 90 -- an hour apart.

Q.    So you thought it was important for Mr. Mitchell's case to be held in Prescott?

A.    I suppose.  That would be ultimately the best solution.  And then the second best solution would be having the jury come down here.  I thought that wherever it was, the idea -- the location did not matter as much as the ability to have other Native Americans to be able to sit on the jury.

Q.    The day voir dire began, do you recall the Court severing Mr. Mitchell's trial from Mr. Orsinger's?

A.    Yes.  Now I do, and I'm trying to remember

what the reason was.  I don't recall what the reason
was.  But I do remember them being severed.  Something
happened.  I think it was Mr. -- I want to say
Mr. Bernais raised that issue and was granted.

Q.    And Mr. Bernais was counsel for?

A.    Johnny Orsinger.

Q.    Johnny Orsinger?  I think you stated
earlier that you did not consult an independent expert
for the DNA.

A.    I don't recall doing that.

Q.    Did you consult with any expert regarding
the Government's expert Benita Bock regarding the topic
of statistical probabilities?

A.    I don't recall doing so.

Q.    Did you consult a defense pathologist or
forensic anthropologist regarding the cause or manner
of death?

A.    We did not definitely.  I don't believe we
talked to a forensic anthropologist.  I recall there
being discussions about consulting someone.  At the
time I believe it was Keane, who was here.  I don't
know if anybody else spoke with him.  I don't recall
speaking with him on this case.  So I did not that I
recall.

Q.    And if I understand correctly, you were in

charge of the guilt?

A.    Phase, yes.

Q.    Guilt phase.  So if you didn't consult, then no one else consulted?

A.    Mr. Sears may have.  I think there was discussion about him knowing Dr. Keane.  But I don't recall if he did.  I don't think so.  But I don't recall there being discussion with him.

Q.    Who is Dr. Keane?

A.    He was the Medical Examiner for Maricopa County at the time.  But I -- I believe he was at the time.

Q.    Would defense counsel often discuss with Dr. Keane?

A.    Dr. Keane specifically?  I would -- whoever is over there is who I would talk to.

Q.    Is it your memory that Dr. Keane was the medical examiner in this case?

A.    No.  Not on this case, no.  Which is why we were going to consult with him.  He was not on this case.

Q.    So defense counsel would consult with Dr. Keane?

A.    I'm sorry?

Q.    So defense counsel would consult with

Dr. Keane about their case?

A.    Are you talking about in general or --

Q.    I'm asking why is Dr. Keane relevant to --

A.    Oh, because he's a local medical examiner. He was not involved in this investigation.  So if he'd be willing to consult.  I think he did that on a private basis as well as his position as a medical examiner.

Q.    I see.

A.    As well as others from his office.

Q.    You stated earlier that you had cases involving DNA previously.

A.    Yes.

Q.    Generally, what were the DNA issues?

A.    What do you mean by what were the issues?

Q.    Was it identification?  Was it involving mixture?  Was it --

A.    One was identification.  In fact, I think that's the only case of its sort.  That was *State vs. Bogan*.  Because that involved plant DNA.

*Arizona vs. Stoute*.  That was six or seven counts of rape, five counts of rape maybe.  And that was identification.  There have been a few others.  I don't recall what off the top of my head.  There are two others, but I can't recall off the top of my head.

Those two cases I remember because they went to trial.

Q.    Did you consult with a DNA expert in Bogan?

A.    Yes.

Q.    Did you consult with the DNA expert in Stoute?

A.    Yes.

Q.    Had you ever consulted with a pathology expert in any case before Mr. Mitchell's trial?

A.    You mean -- you don't mean interview the pathologist, a separate one outside of the case?

Q.    Correct.

A.    Before this?  I mean --

Q.    Correct.

A.    I may have in Bogan.  And I believe I did in *United States vs. Austin*.  I'm almost certain I did in that case.  And I know some after, one after.

Q.    Regarding Austin, what influenced your decision to hire an expert in that case?

A.    There was a question as to the cause of death.

Q.    Did Austin involve only one potential perpetrator?

A.    Yes.

Q.    What influenced your decision to hire an

expert in Bogan?

A.    And I'm not certain I did in that case, because cause of death was not at issue.  But I think I was looking for timing of death.

Q.    Who on Mr. Mitchell's defense team was responsible for requesting budget approval for hiring an expert?

A.    I don't know.  Anyone could have requested it.  Well, I would say either me or Greg.

Q.    Did budget concerns influence your strategy for impeaching Benita Bock, the Government's DNA expert?

A.    As far as I know, we had no budget concerns.

Q.    So that that would be the same answer for impeaching Jerry McLemore?

A.    Correct.

Q.    Were there any non-budget-related reasons which influenced your decision to forego hiring any experts for guilt-related issues?

A.    Regarding?

Q.    For example, DNA.

A.    Again, in my mind, this reminded me of -- I mean not directly, but reminded me of a consent case. I mean, it was four statements, admitting being there,



fingerprint there.  That was the reason.  If, for example, Lezmond had denied being there, then, obviously, we would challenge it.  Or if he denied stabbing anyone at that time.

Q.    What was your reasoning behind interviewing Benita Bock then?

A.    I'm sorry?

Q.    What was your reasoning behind interviewing Benita Bock then?

A.    I have to tell you off the top of my head, I don't recall interviewing her.  But if I did, it would have just been just as part of the investigation.

Q.    But you're just assuming because you don't remember?

A.    You said I did.  That's why.

Q.    But you don't remember?

A.    I don't remember.

Q.    Do you assume the results of the Government's DNA expert were accurate?

A.    Did I assume they were accurate?  Assume, no.  But, again, since we had Lezmond placing himself there as well as Johnny, as I recall, and that was not in dispute, it did not seem -- well, that was the reason.

Q.    As the person in charge of the guilt

phase, were you also in charge of the DNA testimony?

A.    I want to say Sears did that.  And it -- it really -- I mean, in charge is -- I was lead counsel.  But everybody was fairly experienced, and we just did what we thought was necessary.

Q.    What do you mean, you were lead counsel?

A.    I was assigned the case originally.  That's all.  So my name was on it.

Q.    Did lead counsel indicate that you had more --

A.    Authority.

Q.    -- experience?

A.    Not that I know of.  To be honest with you, I'm not sure.  I know Greg had practiced a long time.  Frankly, I assume that he had more experience than I did because he's practiced longer.

Q.    What about were you lead counsel with regard to Mr. Sears?

A.    Like I said, lead counsel is just a title, I suppose.  So we worked together, and no one, as I see it, had authority over the other.

Q.    What was Mr. Sears' role in the case?

A.    We just thought -- well, as it turned out or -- I mean, he was co-counsel.

Q.    Let's start with what you thought

initially.

A.    What I thought?

Q.    Uh-huh.

A.    In capital cases, usually, we just thought it would be better to bring somebody from the outside to assist.

Q.    Better?  In what way?

A.    Three heads are better than two.

Q.    Better in what way?

A.    Three heads are better than two.

Q.    And as it turned out, what was Mr. Sears' role in the case?

A.    He did quite a bit, actually.  At least during the trial.

Q.    In terms of examining witnesses?

A.    Correct.

Q.    Did he do a lot before trial?

A.    I don't know what you mean.  I mean, obviously, we met in preparation for trial.

Q.    How often did you meet?

A.    He was around quite a bit.  I don't recall the specifics.

Q.    Did you have a regular schedule of meetings?

A.    Regular schedule, no.



Q.    Would you meet maybe once a week?

A.    I don't recall.

Q.    I'm still unclear.  Going back to the DNA, who was responsible for the DNA issue?

A.    I guess I would have been.

Q.    So going back to my question, did you assume the results of the tests were accurate?

A.    I'll put it to you this way:  Lezmond said he was there more than once.  So I didn't think that that was in dispute.  He said he was involved more than once.  And so I did not see -- and, I mean, I saw some allegation about what it could have done had we done that.  But I did not see any benefit from it.  Like I said, same as I would not challenge a DNA in a consent case.

Q.    Did you provide appellate counsel with all of the DNA results that you had at trial?

A.    I provided them -- we provided them with everything we had.  As far as I know, she got it.

Q.    Are you aware that the files provided to appellate counsel are missing DNA test results?

A.    I'm not aware of that.

Q.    Did you have test results before trial for the blood in the truck?

A.    I would hope so.  But I don't recall.  You

would think so if it was available.

Q.    Did you have test results before trial for both Halloween masks?

A.    Are these masks -- did they come from the trading post, or did they come from this?  I don't recall.

Q.    Did you have test results before trial for both cell phones?

A.    I will put it to you this way.  It may help you.  I personally don't recall getting any late disclosure regarding any scientific analysis.  I don't recall it.  I'm not saying it didn't happen.  But I don't recall that being an issue.  I don't recall, as we sit here today or as I look back on it, at the time thinking somehow -- I don't recall any late disclosure of anything as far as I recall.

Q.    Do you recall seeking a continuance in the trial because DNA test results were still pending from the Government?

A.    I do not.

Q.    Do you recall having any test results before trial for the blanket stains?

A.    I do not.  Again, I have no independent recollection of receiving anything.  So it may have happened, but I don't recall it.

get out of there.  So I don't -- I don't think that would have ever happened.

Q.    You stated earlier that you had another case whose facts were just as horrible, you said.

A.    It would have been the Greer matter.

Q.    Okay.

A.    I should say as difficult a trial and difficult facts when they found a two- and four-year-old had been murdered.

Q.    You stated earlier that you recall asking Mr. Bernais for permission to interview his client.

A.    I think so, yeah.  I mean, that's something that I would have done.  If I would have seen him, I would have said -- I mean, I don't recall sending him a formal letter or anything.  But I do recall asking -- at least, it would have been my practice to ask him if we could interview Johnny, knowing that he would likely say "no" or would say "no."

Q.    If I represent to you that Karl Brandenberger interviewed Mr. Orsinger --

A.    Yeah.  I saw that.  And I don't -- I don't remember that being the case.

Q.    Would Mr. Brandenberger's interview be different than an interview you would have done?

A.    I don't -- I can't answer that.

Q.    Did you ever ask to interview the other members of the Nakai household?

A.    I don't recall doing so.

Q.    Did you ever seek to interview any of the members of the Nakai household who were not involved in either the cowboy murders or Slym/Lee murders?

A.    Do I recall?  No.

Q.    Do you recall directing Mr. Brandenberger to?

A.    I don't recall if I directed him to, and I don't recall if he did.

Q.    We obtained the logs from Madison Street Jail, and it shows for the year -- one year, one calendar year from December, 2001, to November, 2002, it says that you saw Mr. Mitchell for a total of eight hours and 34 minutes.

A.    Could be.

Q.    Does that sound right?

A.    Could be.  Greg visited with him more than I did, much more.

Q.    Why wouldn't you see him as much, too?

A.    I saw him as much as I thought necessary. Greg is different than I.  He is, I guess, a kinder, gentler person.  I've never had a reputation for -- and

this is not a social event for me.  So I saw him since I was working on the guilt phase to develop that.  And then Greg would have saw him more often because he was doing the mitigation part of it.

Q.    When you were trying to persuade Mr. Mitchell to allocute to the jury --

A.    Uh-huh.

Q.    -- do you feel that had you spent more than eight hours and 34 minutes, you would have had a relationship to him to do that?

A.    Oh, no.  I thought I had a good relationship, at least in my opinion.  He seemed to trust me.  And like I said, we've never had any problems.  And Greg was also there and assisted in trying to get Mr. Mitchell to participate in that phase.

Q.    From what I understand, you have little awareness about the conflict of interest issue?

A.    Almost none, yeah.  I knew there was an issue.

Q.    How did you find out there was an issue?

A.    Somehow, it was brought to my attention that Karen represented somebody that was involved in the case and that there was going to be some action taken.  I don't recall what the detail -- I don't

recall.  I just remember that there was an issue. Because Karen's office is right next to me.  Or was. But I don't recall how it came up.  I just know that it came up.

Q.    Did it come up after Mr. Mitchell's trial?

A.    Oh, boy, I don't think so.  I mean, during the appeal?

Q.    Yes.

A.    I thought it was before the trial.  But I'm not sure.  But I thought it was before.

Q.    Do you recall who told you that there was an issue with Karen Wilkenson's client?

A.    It would have likely been Karen.  But I don't recall.

Q.    Did you have a conversation with your co-counsel about this issue?

A.    About what we should do?

Q.    Yes.

A.    I don't recall.  Because I don't even recall who the person was.  So I don't really know -- I mean, I -- I -- I don't know who the person was.  So I don't know what impact it had.  Nothing so serious as to, for example, file a motion to withdraw, that type of thing, came to my mind.

Q.    Who was handling this conflict of interest

issue?

A.    I don't know.  I just -- I know there was a problem, and somehow it was resolved.

Q.    And that was sufficient to you?

A.    Well, other people knew -- nobody indicated to me that it was a problem.  So yeah.

Q.    Who would no one be?

A.    Anyone.  If someone said, "We've got a problem.  This is the problem, and it's significant," and we discussed it, nothing like that ever happened.

Q.    Did you ever talk about this issue with Mr. Mitchell?

A.    I would have liked to say that I would have.  But I don't recall.

Q.    Were you aware that there was an ethical wall in place between yourself, Greg Bartolomei, and Celia Rumann?

A.    A Chinese wall, you mean?  Or ethical wall, whatever you call it?

Q.    Yes.

A.    That there was what between --

Q.    An ethical wall, a wall where Ms. Rumann is walled off from information.

A.    Ms. Rumann or Ms. Wilkenson?

Q.    Ms. Rumann.

A.    She was walled off from information from us?

Q.    Yes.

A.    As she was working on the appeal?

Q.    Yes.

A.    I don't recall that.

Q.    Do you know why some boxes and information such as PDFs, electronic files, were withheld from Ms. Rumann but later turned over to my office?

A.    It was nothing withheld from Ms. Rumann that I know of.  I had heard something about -- well, there was nothing -- there was nothing withheld from her that I know of.  I mean, one, she worked in our office.  Two, she was representing our client.  I don't know why we would withhold anything from her.

Q.    Did you read Ms. Rumann's declaration?

A.    I've heard about it.

Q.    You have not read it?

A.    No.  If you have it somewhere, I would --

Q.    Sure.  Why don't you take a look at that?

MS. WILLIAMS:  You want to state for the record what exhibit it is?

MS. PEAKHART:  Exhibit 115.  Movant's Exhibit 115.

MR. KIRBY:  I have it at 108.  I mean,

115 --

MR. IVERSEN:  I've got 115.

THE WITNESS:  For the record, what I'm reading is a declaration of Celia M. Rumann.  It says Exhibit 115.

MR. KIRBY:  Okay.  Got it.

BY MS. PEAKHART:

Q.    Had you heard about the August 6, 2000, e-mail referenced on page 4 in paragraph 2?

A.    I can tell you a couple weeks ago it was brought to my attention that there was a problem where I think Ms. Rumann had made claims that things had been kept from her.  And that was all I knew about it.

Q.    And who told you about this?

A.    I think Greg would have.

Q.    This e-mail doesn't ring a bell with you?  You hadn't seen it before?

A.    Oh, no, I've never seen this.

Q.    Had you heard about it before reading about it today?

A.    I didn't know that anything was kept from the appellant.

Q.    I'm sorry.  I'm talking about -- I'm on page 2 --

A.    Uh-huh.

Q.    -- paragraph 4.  This is the e-mail where she's talking about the conflict.  She's not talking about --

A.    No, I was not aware of this e-mail.

Q.    And the discussion she notes in paragraph 5 and 6, were you a part that have discussion?

A.    No, I was not.

Q.    Were you told about it after it happened?

A.    No.

Q.    Was Karen Wilkenson also walled off from you and Mr. Bartolomei?

A.    I want to say she was, but I don't recall specifically.  But I want to say that she was because -- the only reason why I say that is I would have been curious as to who the person was.

Q.    Are you speculating?

A.    Yeah, I am.  I don't -- I don't even recall if I spoke with Karen about it.

Q.    In that binder that you have, I'd like you to look at the document at Tab 3.  Does the document look familiar to you?  This is Exhibit 18 of Movant's exhibits.

A.    Yes, it is.  Yes, it does.

Q.    I'd like to direct you to the first page of the transcript, which is the second page of the

document.

A.    Uh-huh.

Q.    And in the fourth paragraph where Mr. Mitchell is speaking, he's talking about the hitchhiking.  And he says, "We're just hitchhiking, fucking partying out somewhere."

A.    Yes, I see that.

Q.    And then go to the bottom of the page where Mr. Mitchell's last statement?

A.    Yes.

Q.    He says, "We're drinking and shit."

A.    Uh-huh.

Q.    Does that contradict what he told you?

A.    Yes.

Q.    And you talked to him 24 days after this statement was made?

A.    I -- he -- he never -- in my conversation with him, however long it was, whatever it was, he never said this was true.

Q.    Did you ever confront him with the statement?

A.    Yes.

Q.    And what did he say?

A.    What I've told you he said.  He said that -- my recollection is that he -- you mean why did

he say this?  Did he say why he said this?

Q.    No.  I'm asking did you ever confront him with --

A.    Of course.  I mean, there's a clear conflict between what he's telling us, there was no drinking, and what he tells these agents whenever this was.  And of course we wanted to find out what was --

Q.    Had you ever had a client not tell you facts that you know are correct or vice versa?

A.    You mean have I ever had a client lie to me?

Q.    Yes.

A.    Many times.

Q.    I tried to say it better.

Turn to the next tabbed document, Number 4.  This is not an exhibit in Movant's exhibits.  This is an 11-5-2001 FBI two-page 302.

MS. WILLIAMS:  We should probably have it marked as an exhibit for the purpose of the deposition.

(Whereupon, the Deposition Exhibit No. 1 was marked for identification.)

MS. WILLIAMS:  What's it been marked as?

THE REPORTER:  1.

MS. WILLIAMS:  Very good.

BY MS. PEAKHART:

Q.    Do you see in the second paragraph of this document is a sentence "Mitchell said that he was so drunk at the time of the murder he could not remember how many times he stabbed this individual"?  Second paragraph in the middle of the paragraph.

A.    I'm sorry.  You said Number 4?

Q.    Right.  Tab 4.

A.    My Tab 4 says, "Maximum Prison Penalty."

MS. WILLIAMS:  Why don't you just go ahead and use the exhibit.

THE WITNESS:  Okay.  Now, what were you referring to?

BY MS. PEAKHEART:

Q.    Do you see the sentence says in the middle of the second paragraph, "Mitchell said that he was so drunk at the time of the murder that he could not remember how many times he stabbed this individual"?

A.    Oh.  Yes, I do see that.

Q.    And did you confront Mr. Mitchell with that statement?

A.    We did.

Q.    You stated earlier that you were displeased with certain aspects of our 2255 motion; right?

A.    Yeah, I was.

Q.    What aspects?  What were you displeased with?

A.    Oh, there was some comment about the overall evidence that they were under the influence at the time of the event, and that just -- I don't know where that came from other than Mr. Mitchell's statement.

Q.    What was the theory of the guilt phase?

A.    At trial or --

Q.    Yes.

A.    I think Mr. Sears said in an opening statement that he didn't do it.

Q.    Can you explain then why Mr. Sears attempted to voir dire jurors on Mr. Mitchell's life, alcohol, and drugs?

A.    You'd have to ask him.

Q.    What was the defense --

A.    Well, we also knew that there were potential that there could be evidence of that.  So, I mean, he did make a statement saying that.

Q.    You were in charge of the guilt phase?

A.    I was lead counsel.

Q.    Well, you've said that lead counsel just meant it was assigned to you.

A.    Correct.

Q.    But you were in charge of the guilt phase?

A.    What do you mean, in charge?

Q.    Did you decide this is the theory of our case?

A.    Actually, I did not.  Mr. -- I did not.

Q.    Who did?

A.    Mr. Sears.

Q.    What was your preferred if you were lead counsel?

A.    As I told Mr. Kennedy, I think it is, at some point in time, in my opinion, the guilt phase, there was a lot of evidence.  A lot.  And what I did not want to do, for example, was say Lezmond was not there when he was.  The evidence clearly showed.  What I -- I thought what would be a possible theory is to put the Government to its burden, not -- by making them prove what happened and who did what, without presenting a defense that might not seem credible for fear that we would lose the jury for the sentencing phase.  So put them to their burden.  Reasonable doubt. They have to prove what happened, who did what.  Make them prove who did what and force them to do that and try to show, if we can, that they couldn't show exactly what happened.

But not try to convince them this guy was

anything other than blue for the fact that I thought it was most important that they believe us at the sentencing phase. Because I in my mind was certain we were going to get there. And that was where the battle would have been fought.

Q.    In your view, was that presentation made at the guilt phase?

A.    What?

Q.    What you just described.

A.    What presentation? What do you mean?

Q.    The theory that you just described.

A.    Was that put forward at the guilt phase?

Q.    Yes.

A.    I want to say in Mr. Sears' opening statement that he said Mr. Mitchell didn't do it. So that speaks for itself.

Q.    Is that the first you'd heard that Mr. Sears would take a different tack?

A.    Oh, no. We discussed it. We discussed my thinking of what -- yeah, we discussed it.

Q.    What is the reasoning then why an intoxication instruction was requested?

A.    I would always request it. If there was any evidence of it anywhere, I'm requesting it. Because it's beneficial to us. There, one, has to be

evidence to support it.  But if there's any evidence of it during the course of the investigation and we can have a basis for requesting, even if we don't argue it, it's in front of the jury.  The jury can make their own decision as to whether or not they think that's the case.

So even if we are not using that specifically as a defense, if it's an instruction that we can get, just like -- well, if it's an instruction we can get, then I'm going to ask for it.

Q.    What was the theory at the penalty phase?

A.    In -- what do you mean?

Q.    What was the plan?  What was the --

A.    Try not to get him executed if we could.

Q.    And how did you plan to do that?

A.    By presenting the evidence that we did.

Q.    Taking your thread that you requested the instruction because there was some evidence of alcohol use, taking that, why did you try to elicit testimony about Lezmond Mitchell and Johnny Orsinger drinking alcohol in Gallup from the case agent rather than presenting affirmative evidence yourself?

A.    Can you run that by me one more time?

Q.    Taking your thread that you used to propose the intoxication instruction at the guilt phase

because you had some thread of evidence that you wanted to present to the jury to consider, using that, why did you use the case agent to try to elicit testimony about Lezmond Mitchell's alcohol use that day in Gallup?

A.    Was it I or Mr. Sears?

Q.    It was you.

A.    Then I'm trying to -- I'm trying to get some evidence that would support that instruction.

Q.    Why did you try it through the case agent?

A.    Pardon me?

Q.    Why did you try it through the case agent?

A.    As opposed to who?

Q.    As opposed to anyone.

A.    I thought he had -- because he would have had knowledge of it.  I don't recall if the case agent was the one that did the interview.  But if that was the case, then that would have been the reason.

MS. PEAKHART:  May I have a moment?

MR. KIRBY:  Sure.

(Brief pause in the proceedings.)

MS. PEAKHART:  I don't have anything further.

MR. KIRBY:  I have nothing further.  Thank you.

THE REPORTER:  Read and sign?

MS. WILLIAMS:  Before the end, can we request that Jeff be notified when the transcript's available so he can review it and make any corrections?

MR. KIRBY:  I think we can do that.

MS. PEAKHART:  Yes, I believe the original -- right? -- goes to the deponent for his review, and he has a period of time to, on a separate page, make corrections.  And then those are sent to -- since this is the Government's deposition, I believe the transcript is sent to him and then is provided to us.

MS. WILLIAMS:  Corrected transcript.

(Whereupon, the deposition was concluded at 12:46 p.m.)

-ooOoo-

LEZMOND CHARLES MITCHELL,

vs.

UNITED STATES OF AMERICA

Thursday, February 11, 2010

J U R A T

I, JEFFREY A. WILLIAMS, having read the foregoing deposition consisting of my testimony at the aforementioned time and place, do hereby attest to the correctness of the transcript under penalty of perjury.

(Signed) _____

(Dated) _____ 3/15/10 _____

STATE OF ARIZONA      )
                      )  ss.
COUNTY OF MARICOPA    )

BE IT KNOWN that the foregoing deposition was taken before me, that I was then and there a Certified Reporter #50644 in and for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth and nothing but the truth; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed under my direction, and that the foregoing pages are a full, true and accurate transcript of all proceedings had and adduced upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am not related to nor employed by any of the parties thereto, and have no interest in the outcome hereof.

DATED at Phoenix, Arizona, this 12th day of Feb., 2010.

_____
Doreen C. Borgmann, RMR CMR
Certified Reporter #50644
Notary Public

D-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    11/06/2001

Lezmond Charles Mitchell, date of birth, 9/17/81, Social Security Account Number, 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, was re-contacted at the scene of a homicide investigation. Mitchell had been brought to the scene by Navajo Criminal Investigators to help investigators locate bodies (and body parts) of the victims of the homicide. Mitchell had agreed to help investigators when he was initially interviewed the previous day (11/04/01.) Mitchell was reminded of the rights contained in the FD-395, Advice of Rights form that he had signed the previous day. He stated that he knew what his rights were. He further stated: "Ask your questions!"

Mitchell was told that a preliminary examination of the body of the older female victim indicated what appeared to be numerous stab wounds. Mitchell was also told that Johnny Orsinger had admitted to some of the stab wounds but insisted that Mitchell had also stabbed the older female victim. Mitchell then admitted that he did stab the older female several times at the same time Orsinger was stabbing her while they were all in the victim's truck. Mitchell said that he was so drunk (at the time of the murder) that he could not remember how many times he stabbed this individual. He said that he used the "butterfly knife" (that was seized from him when he was arrested the previous day) to stab this "older woman."

Mitchell was asked about his role in the little girl's death. Mitchell seemed to think for a long time. He then replied, "Well, the evidence is probably going to show and/or the witnesses are going to say that I did cut her throat. I may as well admit it. I did it. I cut her throat twice." Mitchell said that he cut her throat while he and the girl were standing near where the bodies (were then) located. When asked if he had, subsequent to slashing her throat twice, pointed to the little girl, who was still standing and saying to Orsinger, "Look this bitch won't die. Lay down and die, bitch!" Mitchell said that he did not remember clearly but did say something like that. After the little girl laid down as commanded, Mitchell and Orsinger obtained one large rock each. Orsinger threw his rock on the girl's head. Mitchell followed with his rock. Mitchell recalled that they each threw or dropped their respective rocks on the girl's head several times.

Investigation on    11/05/2001    at    Tsalie, AZ

File #    198A-PX-70309                                Date dictated    11/06/2001

by    Trace L. Kirk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

302a (Rev. 10-6-95)

198A-PX-70309

tinuation of FD-302 of _____ Lezmond, Charles Mitchell _____ ,On 11/05/2001 ,Page __2.__

     Mitchell and Orsinger then pulled the body of the older woman from the truck to the area where the young girl was located. Orsinger left for a short time and came back with a shovel and axe. Mitchell does not know where Orsinger located these tools. While Mitchell dug a hole in the ground near the bodies, Orsinger cut the heads and hands off the bodies with the axe. He also removed the clothing, glasses and other identifying items from the body. Both Orsinger and Mitchell threw the heads and hands into the hole. Mitchell described approximately where this hole had been located, pointing in the general direction using his cuffed hands and chin to signal in the general direction. He recalled that these body parts were less than a foot deep in ground in a pile. The clothing and other personal items were placed in the back of the bed of truck.

     After they buried the body parts and pulled the torsos into the wooded area, they drove to an area about 150 yards from the area of the bodies. They burned the clothing and identifiable items from the truck. Mitchell pointed again with his hands and chin to an area, already marked by investigators with orange flags, as the area for this fire.

     After burning the aforementioned items, Mitchell and Orsinger descended to a small creek near where they burned the clothing. The duo washed the blood from their knives, hands and faces in the stream. They then left the area. Mitchell does not know what they did with the axe nor shovel. He said that he did wash both his and Orsinger's knives the next day in alcohol.