# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

————————

LEZMOND CHARLES MITCHELL,     )
                              )
            Plaintiff,        )
                              )
        vs.                   )     No. CV-09-8089-MHM(JI)
                              )
UNITED STATES OF AMERICA,     )
                              )
            Defendant.        )
_____)


Phoenix, Arizona
February 11, 2010
1:29 p.m.


DEPOSITION OF GREGORY A. BARTOLOMEI


Original Transcript
Prepared for:
THE COURT


COPPERSTATE REPORTING SERVICE
Court Reporters
12601 North 59th Place, Suite 100
Scottsdale, Arizona 85254-4312
(602) 795-5515


Reported by:          DOREEN C. BORGMANN, RMR
                          CR # 50644

2

I N D E X

GREGORY A. BARTOLOMEI                                    PAGE
EXAMINATION

  BY MR. KIRBY                                            4

  BY MS. PEAKHEART                                        65

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| | (None offered.) | |

THE DEPOSITION OF GREGORY A. BARTOLOMEI, witness herein, was taken pursuant to notice by the parties through their respective attorneys before DOREEN C. BORGMANN, RMR, a Certified Reporter #50644 in and for the State of Arizona, at the offices of United States Attorney, Two Renaissance Square, 40 North Central Avenue, Suite 1200, Phoenix, Arizona on February 11, 2010, commencing at the hour of 1:29 p.m. of said day.

Further, this deposition was taken pursuant to the Rules of Civil Procedure.

APPEARANCES:

                FOR THE PLAINTIFF:
                    Federal Public Defender
                    By:  STATIA PEAKHEART, Esq.
                         SEAN K. KENNEDY, Esq.
                         GUY IVERSEN, Esq.
                    321 East Second Street
                    Los Angeles, CA 90012


                FOR THE DEFENDANT:
                    U.S. Attorney, District of Arizona
                    By:  VINCENT Q. KIRBY, Esq.
                    40 North Central Avenue, Suite 1200
                    Phoenix, Arizona 85004-4408


                FOR THE WITNESS:
                    Federal Public Defender
                    District of Arizona
                    By:  HEATHER ERICA WILLIAMS, Esq.
                    407 West Congress, Suite 501
                    Tucson, Arizona 85701-1355

Phoenix, Arizona
February 11, 2010
1:29 p.m.


GREGORY A. BARTOLOMEI,

the witness herein, after having been first duly sworn,

was examined and testified as follows:


EXAMINATION

BY MR. KIRBY:

Q.    Would you give us your name, please.

A.    Yes.  Gregory is my first name.  Middle initial A.  Last name is Bartolomei.

Q.    Do you want to spell it?

A.    B-A-R-T-O-L-O-M-E-I.

Q.    And where are you currently working?

A.    I'm with the Office of the Federal Public Defender.  I work for John Sands.

Q.    And how long have you been with the office?

A.    2001.

Q.    And how long have you been a lawyer?

A.    Since 1980.

Q.    And where did you start?

A.    New York.  Westchester Legal Aid Society.

Q.    How long were you there?

A.    Three years, ten months, three weeks, and something like that.  It was almost four years.

Q.    What kind of cases were those?

A.    They were only felony cases.

Q.    Serious crime?

A.    Oh, yes.

Q.    Homicides?

A.    Yes.  We didn't do any misdemeanors at that particular office.

Q.    Did you do murder cases while you were there?

A.    We had -- I don't recall that I actually tried a murder case when I was with them.

Q.    Were there any capital cases in the office at the time that you can recall?

A.    I don't remember.  And I don't even recall if there was no capital punishment at that time.  I'm sorry.  I just do not remember.

Q.    All right.  And then you left there.  Where did you go?

A.    I went to private practice in Westchester County.

Q.    And what did you do?

A.    Criminal defense.

Q.    For how long?

A.     Well, we -- until we moved out here, which was in 1988.

Q.     Okay.  And what sort of cases did you handle?

A.     Felonies, primarily.  Misdemeanors as well.  And, you know, retained cases, court-appointed cases.  They have a different appointment system in New York.

Q.     During that period of time, did you have occasion to deal with homicide cases?

A.     Violent crime.  I don't recall in private practice then that I had homicide.

Q.     All right.  You got out here in 19 --

A.     88.

Q.     -- 88.  And where did you go?

A.     Went in with a private firm that did civil litigation.  Stayed with them for a short time. They're not around anymore.  Then went in with another private firm.  Did some civil litigation.  And then I went out on my own again.

Q.     Until then you joined the --

A.     It was around 1991 that I opened up my own.  And then in 2001, I went in with Mr. Sands.

Q.     And while you were on your own in the '90's, what kind of cases?

A.   Criminal, primarily.  Almost exclusively.

Q.   Federal?  State?  Both?

A.   Both.  During that time, I also became the Criminal Justice Panel representative from the District of Arizona.

Q.   During that time, you were doing cases federally.  Were you doing reservation cases?

A.   Yes.

Q.   Violent crimes cases?

A.   Yes.

Q.   Any homicide?

A.   There were some deaths.

Q.   Any capital litigation experience?

A.   No.

Q.   So then I went into the Federal Defender's Office in 2001?

A.   Right before that, I went to the Death Penalty College in Santa Clara.  Just so you know.  And then I went into John Sands' office.

Q.   What is the Death Penalty College?

A.   It was a week class of intensive training by very qualified death penalty counsel.

Q.   Any of these guys there?

A.   I don't recall.  But they were excellent, excellent lawyers there.

Q.    So you joined the office.  And at some point, did you become involved in *United States vs. Lezmond Mitchell*?

A.    Yes, I did.

Q.    And how were you chosen?

A.    I don't recall other than being told, "This came in, and we want you to go up to Flagstaff immediately."  And Jeff, myself, and Karl Brandenberger, the investigator, got in a car and drove up to Flagstaff.

Q.    And you were then on the case from that point up until after sentencing?

A.    That's correct.

Q.    And what was your general role or assignment or --

A.    We didn't really do assignments.  But it naturally turned into my establishing a relationship with Lezmond Mitchell.

Q.    How did you do that?

A.    I saw him a lot, met with him a lot, and basically spent time with him.

Q.    And you discussed the case with him?

A.    Absolutely.

Q.    And did you discuss his -- when you first met with him, did you discuss his or ask him his

version of why he was indicted?

A.    Yes.

Q.    And do you recall what he told you?

A.    Yes.  Lezmond denied killing these people. And in the course of also obtaining -- starting to obtain the reports, which I reviewed with him, there were some inculpatory statements.  And then I started noticing that the inculpatory statements were generally made when he was in the presence of Johnny Orsinger. But Lezmond had a bit of a wise-guy attitude, and at times he would say one thing, and at other times he would say another.

Q.    At least in your presence, did he ever acknowledge any responsibility?

A.    I do not recall that he acknowledged responsibility.  In fact, he was pretty adamant.  And there came a point in time where he got angry.  And from then on in, it was clear he was not going to be accepting any responsibility for what Johnny Orsinger did.

Q.    Was there any discussion about the use of alcohol and/or drugs during the time of this crime?

A.    Any time he mentioned drugs or alcohol, I would jot it down.  But he was -- he made it clear that he had not been ingesting or drinking the day of the

crime and the whole period of time right through.

Q.    Did that include the next day when they returned to the bodies?

A.    I don't recall that.  But -- because I think they went back to Greg Nakai's house afterwards.

Q.    By the way, do you have or did you take notes at the time?

A.    Yes.

Q.    Have you had a chance to review those notes?

A.    Yes.  I received a CD from Ms. Peakheart, who -- at my request.  I contacted her and Mr. Kennedy, and they sent me a CD with notes on it.

Q.    And you had a chance to review them?

A.    I did look at them, yes.

Q.    And do you have them with you today?

A.    No, I do not.

Q.    So your testimony is from your recollection of your review of the notes and your recollection?

A.    That is correct.

Q.    So how did you decide to proceed in this case?

A.    We immediately -- well, let me back up a little bit.  It was not just my case.  So Jeff Williams

was assigned.  And then there was the consideration of bringing in -- and the discussion of bringing in learned counsel.  That turned out to be John Sears.  So --

Q.    Was he first choice?

A.    I don't recall.  He may have been.  I don't -- perhaps it might have been Larry Hammond.  But I'm sorry.  I just don't recall at this time.  But once -- in any event, I knew that it was important to start getting the investigation under way.  Karl Brandenberger has a lot of experience, and had even then, on the reservation.  So he was sent out to start investigating.

Q.    And did you receive reports from Mr. Brandenberger as the investigation continued, or was it -- well, let me ask it.  Did you receive written reports from Mr. Brandenberger?

A.    I'm inclined to say yes.  But I don't recall specifically.  I think Karl took notes of everything.

Q.    And you had discussions with Karl about what he was finding out on the reservation?

A.    Yes, I did.

Q.    What was your assessment of Mr. Mitchell in the early -- early going?

A.    How do you mean?

Q.    Did he strike you as intelligent?

A.    Yes.

Q.    Did he strike you as competent?

A.    Yes.

Q.    Any reason to suspect he didn't understand what was going on?

A.    No.

Q.    Would that have been something you were looking for in the early stages the case?

A.    I most certainly was.

Q.    Did you have him psychologically evaluated early on?

A.    I know we had, I think, Susan -- Dr. Susan Parrish come in initially.  But she was really more to assist in coordinating or reviewing materials or giving ideas and things like that.  I believe she did meet with him as well.

Q.    Had she provided any opinion of expert opinion on the psychological aspect of Mr. Mitchell?

A.    I do not recall.  But what I -- what I also don't recall is her ever saying that he was not competent.

Q.    Did she ever make a DSM-IV assessment that you're aware of?

A.    I don't believe she did.  Later, we had him evaluated by the team.

Q.    At that point as things began, did you obviously consider an insanity defense?

A.    Yes, we did.  And -- well, we did consider it.

Q.    And you said you went to the Death Penalty College?

A.    Yes.

Q.    Did they discuss the ABA guidelines?

A.    Yeah, I'm sure they did.

Q.    Are you aware of the ABA guidelines in capital litigation?

A.    Yeah, at this time.  But I don't --

Q.    You can't quote them chapter and verse?

A.    No, I can't.

Q.    Did you talk to Lezmond about his background --

A.    Yes, I did.

Q.    -- in great detail?

A.    Yes, I did.

Q.    How far back did you go?

A.    We talked about his childhood, his interests, things he did, his grandparents, his schooling, things like that.

Q.    Did you obtain any of his background records?

A.    I didn't myself.  But the office did. Because at some point -- I don't know if it was Karl, or I don't know if it was Vera Ockenfels.

Q.    And do you know what kind of records were obtained?

A.    They were obtaining everything.  One of the things that I wanted was also information on Lezmond's father in case there was some sort of an issue there that we could at least pursue that as well.

Q.    And you mentioned Ms. Ockenfels.  What was her role in the investigation?

A.    We needed, in my opinion, a mitigation specialist.  That's what I wanted.  And we got one. She was highly recommended.

Q.    Do you remember by whom?

A.    I believe it was Ken Murray.

Q.    Who's in your office?

A.    Yes.  In the capital habeas unit.

Q.    And did you have opportunities to meet or talk with Ms. Ockenfels as the investigation developed?

A.    Yes.  In fact, I even went up to the reservation with her.  And I had the opportunity of going to the home of Lezmond's mother, Shirley.

Shirley Mitchell.

Q.    And did you meet with Sherry?

A.    Sherry.  That was her.

Q.    Sherry Mitchell?

A.    Yes, I met with her.

Q.    And what did you discuss with her?

A.    I don't recall specifics, but we did go into Lezmond's background and things like that.  And she was a lot more, I think, receptive to Vera than she was to me.  She didn't like me.

Q.    As the investigation progressed, did you feel you had a fair handle on Mr. Mitchell's upbringing?

A.    Yes.

Q.    His schooling, when and where he lived?

A.    I think we did.  And meeting his grandmother and the grandfather and seeing that he came from basically a family of educators, yes, I think we did.

Q.    Did Lezmond Mitchell discuss with you issues that he had either with his mother or with his grandparents?

A.    Yes, he did.

Q.    What sort of things did he tell you?

A.    There were some anger issues regarding --

or towards his mother.  I think he had some relating problems with his grandfather.  His grandfather was a very classic type of fellow, a storyteller, you know, tell stories.  But things like that.  And then I guess he had some natural conflicts with discipline that his grandmother wanted in the house.

Q.    How did he describe his upbringing?  I mean, happy upbringing?  Bad upbringing?  So-so?

A.    As far as I recall, he did not recall -- refer to it in those terms.  And it was always more of he was in control of his upbringing.  And, basically, he was going to do what he wanted to do.

Q.    Did you discuss with Lezmond Mitchell any psychiatric history that he might have had?

A.    Probably did.  I don't recall any specifics right now, but I believe I -- that's something I would normally ask about in terms of medical history.

Q.    Did you become aware at some point of an examination or report concerning a Dr. Fields?

A.    I think through Vera.

Q.    Okay.  Did you talk to Dr. Fields yourself, or did you take the information from Ms. Ockenfels?

A.    I believe I just took the information from

Vera Ockenfels.

Q.     Did you ever have a real full sit-down discussion with Sherry Mitchell about Lezmond's life?

A.     We tried.

Q.     What happened?

A.     I don't think -- she was -- she displayed her dislike very strongly, I thought.

Q.     How?  How did she do that?

A.     She start -- she just started rambling and talking about herself and being embarrassed herself and how this affected her life and things like that.  And I almost -- I did feel inside that we were about to be thrown out of her house.

Q.     At some point was there a total breakdown of communication with Sherry Mitchell?

A.     I can tell you that my door was never closed.  But I did learn that, apparently, she had spoken to the FBI after Lezmond's arrest and made some comments about him that were not helpful.

Q.     Is it fair to say that you did not get much of a history of Lezmond's life from his mother?

A.     No.

Q.     How about did you speak with Bobbi Mitchell?

A.     Oh, yeah.

Q.   Bunch of times?  Couple times?

A.   Yeah.  We spoke quite a bit.  I think she came down and visited as well.  She was in very bad health.  And also went up to the house.  So, yeah, we spoke.  We spoke quite a bit.

Q.   And she provided her version of Lezmond's upbringing?

A.   To some extent, yes.

Q.   And how did she describe his mother?

A.   There seemed to have been a conflict between the two of them.  But I don't recall the specifics.  I'm sorry.

Q.   Did you talk to George Mitchell?

A.   Yes.

Q.   And did George have some information to relate about his raising of Lezmond?

A.   Not really.  George -- you would talk to him, and he'd kind of walk towards the back, towards the field.  You know, and you didn't know if he still wanted to talk to you or didn't want to talk to you. But, no, he never really said very much.

Q.   Did you talk to any other members of the Mitchell family?

A.   His uncle.  Lezmond's uncle.

Q.   And his name is?

A.    He works at a school.  Or used to work at a school.  Oh, boy.

Q.    Is that the one that ends with an A?

A.    I think so.

Q.    Auska Mitchell?

A.    I think it's Auska Mitchell, yes.

Q.    Auska, I think is what you used to say in court.

A.    Yeah.  I think it -- I think it was -- it's A-U-S-K-A Mitchell, something like that.

Q.    Anyway, you spoke with --

A.    I went and visited him.

Q.    I'll say it Auska Mitchell.

A.    Uh-huh.

Q.    Did he have things to say about upbringings?

A.    His upbringing, first of all.  I've -- to the best of my recollection, he did not have a problem with his upbringing.  And if I recall, he seemed to think that Sherry Mitchell had a problem.

Q.    And did he describe it either directly or --

A.    I don't recall.  I'd be guessing at this point.  I don't want to do that.

Q.    What did he tell you about Lezmond?

A.    He told me a lot of positive things about Lezmond.

Q.    Such as?

A.    Sports, school.  He was a bit of a -- I don't know if you'd call him a hardhead or stubborn, but those are the things that were discussed.

Q.    And were you looking for positive things for Lezmond Mitchell?

A.    I was looking for everything.  I was looking for something that would say Lezmond wasn't qualified to make the statements he was making, and I was looking for whatever positive things I could find on Lezmond Mitchell.

Q.    And in the course of the investigation, you found some negatives?

A.    Sure.

Q.    Who else did you talk to about him?

A.    I went to the home of Dr. and Mrs. Roessell.  Actually, I went to the hogan, the whole bit.  Went to see his coach, football coach. Went to the school.  Went to the house, coach's house. So I made those trips.

Q.    Did you have an opportunity to talk to any of Lezmond's friends?

A.    Yes.  There was -- there was a gal that he

was in touch with who spoke with me.  I think she came to the office as well.  But Vera, I think, was primarily reaching out to all of Lezmond's friends.

Q.    And reporting back to you in some fashion?

A.    Yes, she was.

Q.    Did you learn whether or not Lezmond Mitchell may have had either an alcohol or drug or both type of problem?

A.    Lezmond Mitchell was partying a lot.  As to whether he had a problem, I can't say.  I think Vera included that in her report, and she saw it as a problem.  But then again, relating it to the crime and the date of the crime and so forth, it didn't seem to apply.

Q.    And I believe -- and we'll talk a little bit, but it is mentioned, or do you recall it being mentioned in Dr. Morenz's report?

A.    Barry Morenz, yeah.

Q.    Is it his report that talks about the history?

A.    Yes.  Lezmond was relating, I guess, what his partying was.

Q.    And you've reviewed Dr. Morenz's report in some detail?

A.    Yes, I did.

Q.    Were you aware, either through Ms. Ockenfels or through your own, other people relating either they had partied or heard of Lezmond partying, taking drugs, that sort of thing?

A.    I don't understand your question.  I'm sorry.

Q.    You didn't talk to too many of the friends, but Ms. Ockenfels did?

A.    Yes.

Q.    In those reports or those discussions, were they reporting that he was partying and using the drugs?

A.    Yes.  And he was selling marijuana.

Q.    There were also some other things in that report not very flattering?

A.    Yes.

Q.    Did you attempt to talk to any of the other individuals who were involved directly in Lezmond's case as well as what's generally referred to as the cowboy murders?

A.    I wanted to question Johnny Orsinger.

Q.    Did that happen?

A.    No.  Johnny Orsinger was represented by Michael Bernais.  And this is where my friend Ken Murray, I think, has misspoken in his declaration.  Not

Ken Murray. I'm sorry. Vera. Because she had said that Karl Brandenberger went out to interview Johnny Orsinger.

And what happened was I wanted Johnny in court. I wanted him to look at Lezmond. And I wanted him on the stand. So I had him served with a subpoena. And he came to court, and he got on the stand and stood next to Michael Bernais and would not budge. He was going to abide by the advice of his lawyer and was not going to provide any information.

Q.    Were you then in any position to try to ask any questions of Mr. Orsinger?

A.    He made it clear he was going to abide by the advice of his counsel.

Q.    And I believe that was done on the record?

A.    I believe it was, yes.

Q.    How about Gregory Nakai?

A.    I don't recall if we reached out to them. I don't believe I did. I don't know if the other lawyers did.

Q.    As to Jimmy Nakai, Gregory Nakai, Jakeory?

A.    Jakeory. No, I don't recall.

Q.    Denny Leal?

A.    I can't say that I did. I don't recall.

Q.    And those folks were under Indictment?

A.    And represented.

Q.    And represented.  What did you learn about Lezmond's father?

A.    Well, we learned that he had had some sort of a prior misconduct.  It might have been sexual misconduct kind of thing.  Kind of refreshed my recollection when I looked in one of the binders.  And then we found out he was living in the Pacific.  I put Karl in charge of finding him.  We did find him.  And I sent Karl to the Marshall Islands.

Q.    And was the father interviewed?

A.    He had died about three weeks, maybe four weeks before Karl got there.

Q.    Did you learn what the father died from?

A.    No, I don't recall.

Q.    Had the father had any contact with Lezmond at all?

A.    As far as I recall, I don't think he had anything to do even with Sherry after she became pregnant.  I think he just sort of, like, "I'm out of here."

Q.    Let me just ask you.  You mentioned that Lezmond was very adamant that he had nothing to do with the death of either the grandmother or the granddaughter.  Did you point out or did you confront

him with the FBI statements containing or purporting to contain his admissions?

A. Yes.

Q. And what did he say as to those reports?

A. He disputed one of the reports as "That's not what I said." But then he insisted "I did not kill those people." And then when we looked at them, I think it was the first -- November 4th statement or something like that -- he made the -- he denied doing any of the killing.

And then when he was brought to the location, they brought Johnny Orsinger out, and that's when he made himself part of everything that had happened. But away from Johnny Orsinger, he denied doing anything. And he was adamant about that.

Q. Do you recall the statement made at the courthouse?

A. In Flagstaff? That was -- I don't recall it specifically, but I know that was the day we were heading up there. And I think the FBI went to interview him right before we got there.

Q. And do you recall whether he made an admission at that time to the two agents?

A. He may have.

Q. Okay. And you obviously are obtaining

some information about drugs and alcohol use. Did you ever go back and confront him with that information?

A.    Yes, I did.

Q.    And what did he say, if anything, about the day in question?

A.    His participation on the day in question was as follows: He was to keep an eye on Johnny Orsinger. He was to steal a truck so that it could be used to do a robbery later on. Okay? And then Johnny Orsinger was a loose cannon. So he was to pay attention to what Johnny did, and that was it. Lezmond's entire goal was to do that, steal a truck from the parking lot, take it back to the Nakais. That's not what happened. So as far as the alcohol and substance on that day, he denies it.

Q.    During all of the time that you've represented Lezmond Mitchell, was there any occasion where you questioned whether or not he was under the influence of any substance in your presence?

A.    No, there was never any question. He was kept in a separate wing at the jail. Do you mean, like, while he's in jail? No.

Q.    Did you see in Dr. Morenz's report Lezmond's claim that he was scoring drugs?

A.    I saw that.

Q.    Did you talk to him about it?

A.    I don't remember specifically if I spoke to him about it.  But I never observed anything like that.  Not in my visits, and not in the courtroom.

Q.    And at any time during when he was waiving his appearance for the sentencing phase?

A.    Oh, no, not at all.

Q.    Was there concern about the mitigation aspect of the case?

A.    Yes.

Q.    And why was that?

A.    It was -- there are many sides to that. We felt that it would be best from the defense point of view if we had some sort of a psych defense that everything just sort of went black, you know, blacked out, and this happened, and all these issues, these things came up, these things were done.

Lezmond's position is that is not what happened.  And we kept saying, "But" -- you know, and I think this was Vera's position -- "this couldn't have happened but for, you know, that kind of drug use or alcohol use or some sort of psychotic episode."  But Lezmond was insistent that that was not the case.  So we were very concerned with that and very uncomfortable with that.

28

Q.    And you had him evaluated?

A.    Yes, we did.

Q.    By Dr. Morenz?

A.    It was not just Dr. Morenz.  When we retained Dr. Morenz, he indicated he would have a team do an evaluation.  And my understanding from his report is they did the EEG and brain imaging and all that other stuff.  So, yes, neuropsych.

Q.    And, essentially, what did you learn from the report?

A.    Essentially, Lezmond was competent.  And there was no question about his intelligence level.  No problem there.  Nothing to indicate that he had difficulty with communicating.

And from -- I don't know.  From our perspective, when you take that and then you look at what happened in this case and you juxtapose it or compare it with what Johnny did in the cowboy case, this crime has Johnny's signature all over it.  I mean, everything from the assault in a vehicle to transporting people to -- everything.  You know, mutilating the bodies.  It's all -- it's got Johnny Orsinger's signature.

And Lezmond made it clear he was not taking the fall for that guy.

Q.    And what did he mean by that?

A.    He wasn't going to plead guilty.  He wasn't going to acknowledge that he did something that he did not do.  And I tried.

Q.    Do you recall a recess during jury selection?

A.    Yes.

Q.    And what was the purpose of the recess?

A.    There had been some indication that perhaps the government might offer a plea.  Now, this is what I recall.  And I think the Government prosecutors would remember that I kept pressing for some sort of a plea offer.  At that time, if this is what I remember correctly, if this is a correct incident, there was some indication that there may have been a possible plea offer.  So I wanted Lezmond to at least consider it.

So I put Lezmond in the jury room, and I had attorneys other than us come down from the office.  And we did a full court press on Lezmond just trying to get him in a posture where he would at least consider a plea.  And that's what we did.

Q.    Were you successful?

A.    He indicated that he would consider it, not that he would accept it.

And that's not the only thing I did.  I had also -- this gets back to my friend Ken Murray here.  Ken Murray was never ignored.  Okay?  Ken Murray received, I think, an e-mail or an instruction from Dale Baich telling him he was not going to be involved in the case.  Okay?  That never stopped me from going to Ken to talk to him about the case.  And it never stopped Ken from talking to me about the case.

And one of the things Ken did was we discussed a client that he had had who made a difficult decision of accepting life, and, in fact, that client had prepared some sort of a video.  So I went and saw the video, and then Ken put me in touch with that client.  And then I was going to do a video thing with Lezmond so that Lezmond could communicate with that client.  And this was all to try to put, you know, Lezmond in a posture where, if he's not sincere about the "I didn't do it," then please consider the plea offer.  And Lezmond didn't want anything to do with it.

Q.    So from Dr. Morenz, you got a diagnosis?

A.    Right.

Q.    Do you recall what the diagnosis was?

A.    In part.  That he was competent and that there was possibly something in his frontal lobe.  But it wasn't anything necessarily conclusive.

Q.   Do you remember what the DSM-IV?

A.   No, I don't.

Q.   Let me just have you take a look at the exhibit in front of you, 94.  Just take a look at page 17, if you would.

MS. PEAKHEART:  Tab 16.  I'm sorry. That's not my notebook.

MR. KIRBY:  I gave you your book back.

MS. PEAKHEART:  I have it.

BY MR. KIRBY:

Q.   Page 17 of Dr. Morenz's report.

A.   I can't make the detail out.  Oh, here you go.  Okay.

Q.   About the middle of the page, you see the assessment?

A.   Uh-huh.  Yes.

Q.   You see Axis II?

A.   Yes.

Q.   What is Axis II?

A.   It says, "Antisocial personality disorder."

Q.   Overall, did this report give you something to use at trial either as an insanity defense or as something possibly for mitigation?

A.   I don't believe it did.

Q.    And why is that?

A.    Because I think this would have opened up other doors and would have affected the jury in a very negative way.

Q.    Can you give me some examples?

A.    Well, this case had ugly facts.  And I don't think the jury would have been very sympathetic to hearing even more negative things about this young man.  And when you look -- when you consider that and the effects on a jury, when we had positive things to say about Lezmond to argue that he is life worth saving, then this didn't help us.  But it did -- it did satisfy me, at least, that he was competent.

Q.    And there were discussions he made admissions to conduct that such as throwing dogs off bridges that --

A.    Uh-huh.

Q.    -- you were concerned it might well wind up in front of a jury?

A.    Yes.

Q.    In your estimation, this report probably would have been disclosed to the government?

A.    Yes.

Q.    And the government, if you didn't, would probably have made use of some of the more negative

COPPERSTATE REPORTING SERVICE - (602) 795-5515

aspects?

A.    I believe you would have.

Q.    And in your estimation, would you have been able to somehow shorten or only use part of this report and keep us from using the rest of it?

A.    No, I don't believe we would have been able to do that.  I just think it would all have come in.

Q.    Oh, let me just ask you this:  Again in here, you saw again his claims of drug and alcohol abuse.  You discussed those with Mr. Mitchell?

A.    Yes, I did.

Q.    You looked for information in his background?

A.    Based on the reports that Vera provided, yes.

Q.    In your assessment of that information that you had, could you have used that successfully or at least potentially successfully before the mitigation and in the mitigation, this alcohol and drug abuse history?

A.    I don't believe so at all.

Q.    Did you consider having anybody, a specialist of some sort, other than Dr. Morenz taking a look, a polysubstance abuse expert or --

A.    No.   Nor do I think it would have had any bearing given the position of the defense at trial.

Q.    And what was that position?

A.    Lezmond didn't do it.

Q.    And was that one of the theories you pursued at the trial?

A.    Yes, it was.

Q.    Were there any other evaluations performed on Mr. Mitchell other than the ones contained in Dr. Morenz's report and whatever role Dr. Parrish may have had?

A.    I don't recall at this time.  I know there were some people that were talked about, but I don't -- I don't recall.  Sorry.

Q.    Did you discuss this case with others?

A.    Meaning?

Q.    Asking opinions from other lawyers?

A.    My whole office was open to discussion. As I indicated, Ken Murray was available for discussions on this.

Q.    Did you talk with anybody outside the office?  Any attorneys --

A.    John Sears.

Q.    I mean like any attorneys that may have done capital cases in the county or --

A.      You know what?  In general, you know, defense lawyers tend to present hypotheticals when they see each other at lunch and talk about things.  But I don't recall a specific conversation.

Q.      But discussions within the office?

A.      Oh, yes.

Q.      Do you recall did you have any discussions with Dale Baich?

A.      I may have.  And it may have been Dale, or it may have been Ken who said to -- originally said to call Dick Burr.

Q.      And did you do that?

A.      Sure.

Q.      Okay.  And what sort of discussions did you have with him?

A.      We had a telephonic conversation, probably more than one, but I can only recall one right now.

Q.      Have you had a chance to review his statement that's contained in the materials?

A.      I know he made some sort of statement.  But I don't recall it.

Q.      Let me ask you if I can find it.  Exhibit 122.  If you can just take a look at that.

A.      Sure.  (The witness complied.)

        Okay.

Q.   Is that a fair assessment of your recollection of the meeting?

A.   No, I don't recall that.

Q.   And what is it you recall?

A.   I recall Mr. Burr saying that the facts were very ugly and, if there were a way to plead the case out, to plead it.  I believe we advised him of what the facts were in the case.  And more specifics than that, I don't remember.  He probably said he was willing, as he always is as far as I know with everybody, willing to be of assistance.  He was like that.

Q.   Do you recall discussing any of the mitigation angles at that time or another time with him?

A.   I don't recall.

Q.   Were there concerns about the mitigation?

A.   There were concerns about the mitigation in terms of the position that Lezmond was taking.

Q.   Were there any concerns about the nature of your investigation into his background and substance abuse?

A.   I did not -- I don't believe I had any concerns.

Q.   Was there any area that you wanted covered

or investigated that you can recall was not delved into?

A.    I don't recall that I had any such concerns.  And I was happy working with Vera Ockenfels and with Dr. Morenz's team.

Q.    Did you get any information that there may have been any mental illness in Lezmond's family?

A.    I didn't have a positive impression of his mother.  But as far as actual mental illness, they seemed like a very bright family.  And my understanding is Lezmond did okay in school, considered a leader, president of the student council, that kind of thing.

Q.    Were there times at least that you yourself were aware of that there were some issues when he was going through elementary school and some middle school with behavioral problems?

A.    I seem to recall that.  I seem to recall also that his mother bounced him around.  She was pursuing her own degree.  I think had something to do with getting her own educational degree.

Q.    Were you aware when he at school got into fights and issues with teachers?

A.    I don't recall specifically.  But probably.

Q.    By the way, have you had a chance to look

at the Johnny Orsinger statement?

A.    No.

Q.    Let me have you take a look at Exhibit 109?

A.    (The witness complied.)

Okay.

Q.    That information, did you ever hear any of that information from Lezmond Mitchell?

A.    No.

Q.    Did you have any of that information from anybody at the time of your representation?

A.    When I'm saying "no," I'm referring to the part about the going to Gallup.  Because Lezmond insisted that he was sober and straight.

And then to support that, you know, term, what we thought support that had version of it, because we always questioned what he said to see if there were any factual bases for it, he was given a ride by a trooper, some sort of police officer, as they were hitchhiking.  They spent the day at the mall.  They bought, you know, whatever they bought, knives and what have you.  And then they got a ride from a Hispanic, Mexican fellow.

And the fact that he was given a ride by Ms. Slym, don't know that it makes sense that she would

give a ride to two people who were whacked out.

Q.    During your investigation, did you physically find any evidence that may have supported the binging, the drinking binges or the drug binges, other than the Nakai residence or up at the scene where the bodies were found?

A.    I don't recall seeing any.

Q.    Did you go out to the scene?

A.    Yes, I did.

Q.    How did you find the scene?

A.    Karl Brandenberger had the GPS coordinates.  And we -- it took a while to find it, but we eventually drove through to this road.  And we also, I think, at that time knew that it was property that belonged to Johnny Orsinger's uncle.

So eventually, we came upon the scene. First we went to the wrong place, and -- Jeff Williams, myself, and Karl.  That's what it was.  And then you couldn't even -- I've never been in a place like that before.  You're not near anything.  And all of a sudden I turned around, and they're not around.  I don't know where the hell they are.  I'm just standing there by myself.  And they walk around, and then Karl came back later and said that he thought it was the wrong place, and then we found the place.

Q.    A dirt road with a lot dirt roads off the dirt road?

A.    Pretty much.  And then some sort of pile of dung that looked like it came from a bear and scared the hell out of me.

Q.    Let me ask you to take a look at Exhibit 144, statement by Dr. Morenz.  I think I have that right.  Let me make sure.  Yeah.  Do I have that right?  Yes.

A.    Okay.

Q.    Have you seen that before?

A.    No.

Q.    Just take a look through it.

A.    (The witness complied.)

Okay.

Q.    Is that your recollection?

A.    What part?

Q.    Furnished with the history of alcohol and drug abuse?

A.    I seem to recall we furnished someone with whatever we had.  But I don't recall specifics.  And I'm not sure what he's referring to.  I can't tell from this statement.

Q.    So you considered intoxication as a possible mitigation route?

A.    Yes.

Q.    And you chose or decided that it was not what?  Viable in your estimation under the circumstances?

A.    It was not viable.  It was not applicable. And we felt it would detract from the positive things we wanted to present about Lezmond.

Q.    And what was the theory going into the sentencing phase?  What were you hoping?

A.    Lezmond is a life worth saving.  And he had a lot of good qualities and a lot of people behind him.

Q.    And are those the reasons that the witnesses who testified were chosen?

A.    Yes.

Q.    Did Ms. Ockenfels discuss with you her concerns about the alcohol abuse and use?

A.    She probably did.

Q.    Do you want to take a look?  Do you have Exhibit 131 in front of you?

A.    I can get it.  This is her thing, yeah.

Q.    I'm sorry.  I got the wrong one.

A.    This is the declaration.

Q.    Declaration.  Okay.  You're on the right page.

A.    Okay.  I have read this before.

Q.    And do you agree with the portion in there about her concerns with the alcohol use?

A.    Lezmond denied it.

Q.    And you had no real information other than Lezmond's statement to contradict?

A.    That's true.  I mean, you look at the -- what we had was Lezmond's firm position and then the facts of the cowboy killings and the facts of the killings in this case.

Q.    Do you recall saying there was no mitigation?

A.    No, I don't recall saying that.

Q.    Would you have liked more mitigation?

A.    I don't think any lawyer would say no.  We all want as much mitigation as we can possibly get.

Q.    So you considered the substance abuse route for mitigation.

A.    Yes.

Q.    Did you consider the psychiatric route for mitigation?

A.    Yes.

Q.    And what did you decide about that?

A.    That that was not a viable route.  That was a dangerous route, and that would have destroyed

the positive things we had to present about Lezmond. It would have had a negative and adverse effect on the jury.  And that was the decision we made.

Q.    And that was discussed among the lawyers on the case as well as you just discussed with Mr. Murray?

A.    I don't know that that was discussed with Mr. Murray.  I can't say that.  Ken always had his door open.  But the three of us, we definitely discussed everything.

Q.    And did you give this considerable thought in trying to pick an avenue or a theme that you thought was the best?

A.    Yes.  It was a lot of worry that went into that.

Q.    You have gray hair.

A.    Oh, boy.

Q.    But did you definitely advocate each of those positions?

A.    I'm sure we did.  Because there was -- we just didn't feel very, you know, comfortable.  But we had a very intelligent and competent client as far as we were concerned, no reason to disbelieve his position.  And, I mean, it was his position.  And just felt that, in light of the facts, that we couldn't

disregard his say in this.  If we had disregarded, you know, this is the thing about Lezmond.

If we had disregarded what he was telling us, there would have been no working with him at all.  Because he was dead set this is -- "I didn't kill anybody.  To hell with Johnny Orsinger.  I don't want to see Jakeory or Jimmy Nakai again."  And, you know, he just -- he wasn't going to take the fall.

Q.   Did you consider calling his mother as a witness?

A.   Jeff went out to see her.  They met in a hotel or motel or something like that.  And my understanding is that she walked out of the meeting, didn't want meet with him.

Q.   Did you make any attempts to contact her prior to trial?

A.   After that experience at her house, I don't believe that I did personally.  Vera may have.

Q.   Did you have concerns of putting her on the stand?

A.   Yeah.

Q.   What were those?

A.   She was so focused on how embarrassed she was and how shamed she was that I -- I feared she would have pointed a finger at Lezmond and basically

condemned him right there. And this gets back to what I said earlier. My understanding is she went to the FBI when Lezmond was arrested and basically said that he was where he belonged, something to that effect.

Q. Did you consider whether or not to put the social historian on the stand?

A. I don't think that -- I don't remember discussing that. I really -- we may have.

Q. Were there aspects of her report that presented positive things for the defense?

A. You're asking about Vera?

Q. Yes.

A. Positive in terms of the Mitchell family being bright, the grandmother being smart. She was an educator herself. But Vera's whole take on the thing, I believe, was this could only happen with blackouts or with some sort of psychosis.

Q. Do you recall whether her report also contains some of the same criminal acts that Dr. Morenz's report referred to?

A. I don't recall. May have.

Q. Let me ask you to look at Exhibit 93.

A. Okay.

Q. First of all, you've read that report before?

A.      Yeah.

Q.      You spent some time going through it backwards, forwards?

A.      I have, yeah.

Q.      Let me just ask you to take a look at page 25 of Exhibit 43.  I'm sorry.  93.

A.      Okay.

Q.      In that first paragraph, you provided some statements --

A.      Right.

Q.      -- that indicated some -- I guess described as antisocial conduct involving the dogs.

A.      This talks about him being a football player.

Q.      Which 25 are you looking?  No.  Up in this one here.

A.      I'm sorry.

Q.      That would probably be in the 32.

A.      Sorry about that.  Yeah, I remember -- and I remember her bringing that to my attention.

Q.      And that was talking about how they would kill dogs?

A.      Uh-huh.

Q.      Or at least according to him.

A.      Right.

Q.    And those items, if you had gone in that direction, might well have made it before the jury?

A.    I think so.

Q.    And that would be in contrast to your decisions to go with the positive route?

A.    Right.  And there were people that were saying that there was no way Lezmond could hurt children or the elderly.  And I think I wrote that and presented that to DOJ when we had the -- the don't-go-for-death presentation.

Q.    Now, after the jury returned the guilty verdict, Mr. Mitchell made a decision.

A.    Uh-huh.

Q.    He didn't want to come to the next phase of the proceeding.

A.    Right.

Q.    Had you had discussions with him prior to the jury's verdict about that?

A.    About what?

Q.    About his not coming.  Did he say, "If the jury finds me guilty, I'm not coming"?

A.    No.

Q.    Okay.  When and how did that first come up?

A.    When he said he wasn't coming out.  And I

think it was one of the Marshals saying, "He's not coming out."

I said, "What are you talking about?"

"He's not coming out."

Q.    And was that at the time of the verdict?

A.    It was after the verdict.

Q.    After the verdict. And did you have discussions with him about his reasons for it?

A.    We went down and met with him. I met with him alone. I think we all met with him. And then we had an in camera hearing in front of the judge.

Q.    And what was his basic position?

A.    His basic position was "I'm not going to" -- "I don't want to participate. I'm not going to be part of this." I think he was embarrassed that there were people that were there for him, and he didn't want to face them.

Q.    Did you attempt to persuade him to change his mind?

A.    Yes, we did. And he got angry with me. But Lezmond was always respectful.

Q.    At any point now -- he's decided he's not going to participate. Anything in there give you pause to ask for a competency evaluation?

A.    No. I don't recall if we discussed it.

We may have. But I honestly don't recall at this time.

Q.    But in your dealings with him, anything raise a red flag?

A.    No.

Q.    Had a flag been raised, would you have sought an evaluation?

A.    Absolutely.

Q.    Regardless of the fact we were in the middle of trial?

A.    I wouldn't have cared about that.

Q.    But you didn't see anything -- did he strike you, in that portion of the proceedings where you were trying to convince him to come into court, under the influence?

A.    Oh, no.

Q.    Did you check with him every day as the proceedings --

A.    I sat right next to him.

Q.    But when the sentencing phase began --

A.    Uh-huh.

Q.    -- did you check with him? He was in the side Marshal's jail cell.

A.    Yes. I would have meetings with him and try to continue to convince him to come out. The judge gave us whatever time we needed.

Q.    Did the judge address him on several occasions?

A.    I know of one, when we had the in camera hearing and she pressed him.

Q.    Did she try to talk him into changing his mind?

A.    Yes, she did.

Q.    Did you discuss with Lezmond Mitchell whether he was going to make a statement at the sentencing phase?

A.    Did I discuss it with him when?

Q.    At any point either prior to trial or during this phase where he didn't want to come to court.

A.    We had also discussed the possibility of Lezmond testifying.

Q.    During a trial or the sentence?

A.    Both.

Q.    Both.

A.    And I had prepared -- I was in the process of preparing him for that kind of testimony.  And I just wanted to get him into the flow of it.  And I know I had prepared written questions so that he could see the questions and then we could work with the answers and that kind of thing.  But then that was not to be.

Q.    And how did that -- what about the sentencing Phase?  Did you discuss with him making a statement to the jury?

A.    We probably did.  I don't recall him saying -- I don't recall having the actual conversation.  But he was advised of the entire process.

Q.    Do you think it hampered your presentation him not being there?

A.    Yes.  We wanted to show his humanity.  And we thought we could have -- we could have done that with him sitting there and watching someone like Dr. Roessell make the kind of presentation that he made as a witness.  Dr. Roessell is, in my opinion, a very fine man.

Q.    And at least as the presentation went in your mind, did the presentation come off as you had envisioned or had hoped?

A.    We got out everything we wanted from the witnesses.

Q.    Now, you are aware that some of the witnesses have made statements that either they didn't speak with you directly or did not spend lots of time in preparation?

A.    I saw that.

Q.    What was your general approach to these folks?

A.    I don't coach.  But I do go over the process.  I want to know what -- why they're witnesses and what they have to say.  Explain the procedures.  And sit down.  But I don't -- I don't recall, you know, who would have said that.

Q.    Can you recall had you previously spoken to each of those witnesses yourself?

A.    I seem to recall that I did.

Q.    Or else is it possible that on at least one or two, you had had information from the investigation team that this person had this to say, and you went with it?

A.    That's true.  But then I still would have seen them outside the courtroom.  I would have seen them in the office.  And I think everybody had to be brought down.

Q.    Do you recall showing them photos from the case?

A.    No.

Q.    Would there have been a reason to --

A.    I don't recall.  Sorry.

Q.    Let me ask you to take a look at Exhibit 121.

A.    Okay.

Q.    Declaration of -- is it Sonja?

A.    Sonja.

Q.    Halsey?

A.    Uh-huh.

Q.    Okay.  Is that your recollection?

A.    Not really.  But I don't recall anything else, anything specific.  I'm thinking to myself.  I'm sorry.  I can't really comment on this.  I don't really recall anything.

Q.    What did you want from each of these witnesses as it pertained to Lezmond Mitchell?

A.    Talk about Lezmond personally and what they knew of him and how they knew him.

Q.    Did you wish to go into his drug dealing?

A.    No.

Q.    Drug usage?

A.    No.

Q.    Crazy mother?

A.    No.  I don't even think she came to the trial.

Q.    Issues about the upbringing?

A.    No.

Q.    With this presentation, what were you hoping in connection with the jury you might attain?

A.    This was someone that had potential, that could be a leader, that had somewhat of a gift as a person.  And I think Dr. Roessell even testified to that when he -- when he testified at the mitigation. He was a life worth saving.  There were good qualities about Lezmond.

Q.    And at least in your estimation as you presented, did you believe those witnesses got that information to the jury?

A.    Yes.

Q.    Would it have helped in your estimation for Lezmond Mitchell to have said something to the jury?

A.    We would have had to be very careful about what Lezmond would say, because if Lezmond had continued cooperating, he probably could have made a very good statement, and they could have seen the Lezmond that I spent a lot of time with.

Q.    Describe your relationship with Lezmond Mitchell.

A.    As I said before, he was always respectful.  There was never a time that I recall where he was disrespectful to me, Vera, or Karl or anybody else.

There were times when he would -- if there

were people walking around outside, you know, the lockup section of the old jail, he would, you know, slant and have a different kind of body posture and so forth. But other than that, he was pretty easy to talk to. He talked about sports all the time and things that interested him, painting. Sometimes I would just visit him just to visit him, just to see how he is, just to see if he had any kind of complaints or had anything to say.

Q.    Was Mr. Mitchell ever offered a polygraph?

A.    I don't believe that he was. I know a lot of lawyers in our office tend to frown on that. That doesn't help the attorney-client relationship in most cases.

Q.    There is an issue that's been raised involving Karen Wilkenson.

A.    Uh-huh.

Q.    It is alleged that she apparently represented someone who may have somehow been involved in this case. Do you know anything about that representation?

A.    I cannot answer that question on grounds of attorney-client privilege. That privilege does not belong to Lezmond. That privilege belongs to whoever that person was.

Q.    Well, let me put it this way.  You are aware there was an issue?

A.    I'm aware that something came up.

Q.    You being the attorney in this case, did you have any concerns that whatever it may have been could have or would have impacted this investigation?

A.    I can't answer that question.  Sorry, Vince.  I'll take the attorney-client privilege position on that question.

Q.    Well, we may have to deal with that another day.  In your discussions with Mr. Mitchell or anyone else in connection with the case, did any other potential suspects come up?

A.    Potential suspects?

Q.    That were not part -- we --

A.    No.

Q.    You are aware we had the cowboy murder case.

A.    Yeah.

Q.    We had a certain number of defendants there.

A.    Yeah, I remember that.

Q.    We have this particular case.  So we had a universe of suspects, defendants.  In your investigation, did any other names come up that were

not part of the original investigation?

A.    Pertaining to Lezmond's case?

Q.    Pertaining to Lezmond's case.

A.    I don't recall.  I don't believe so.

Q.    And more importantly, during your investigation discussion with Mr. Mitchell, it was he and Johnny Orsinger at the scene of the crime?

A.    Yes.

Q.    And no one else?

A.    That's correct.

Q.    Dr. Morenz's report, there is some executive functioning -- I'll have to look it up, how he worded that.  Some mild deficits in executive functioning.  Did you discuss any of these matters with Dr. Morenz yourself?

A.    I went down and discussed the report with him.  But I don't recall what that conversation was. It was a long time ago.

Q.    But did anything come out of that discussion with Dr. Morenz that caused you to say, "We'd better get another evaluation"?

A.    No.

Q.    Or "We need to reevaluate the competency of Mr. Mitchell"?

A.    No, sir.

Q.    Did it raise any questions for you as to the voluntariness of his statements and waiver of Miranda?

A.    Not really.

Q.    Do you believe that, the members of the team that you assembled, that you had received sufficient evidence of Mr. Mitchell's background, both -- either in school, to make an assessment of a defense?

A.    Yes.

Q.    Do you know whether his medical records were collected?

A.    I think Vera got them.

Q.    Nothing in those records that were obtained, most of those were summarized in juror's report?

A.    I believe so.

Q.    And/or discussed with you and Vera by phone or in person?

A.    Probably in person.

Q.    And how often did you meet with Ms. Ockenfels?  Do you recall?

A.    I don't recall.  But she was available.

Q.    Where is she based?

A.    New Mexico at the time.  She would fly in,

and then Karl Brandenberger would meet her. That was the usual MO.

Q. So some teachers were interviewed. Friends of Mr. Mitchell, family members of Mr. Mitchell were interviewed. Can you think of anyone else outside that realm that were spoken to about the case?

A. Nothing comes to mind right now.

Q. Again, anybody not interviewed that you believe should have been interviewed?

A. I don't believe so.

Q. Bobbi Mitchell testified in mitigation. And how did it come about that it was by video?

A. She had deteriorating health. And she had wanted to come down and do it in person. She reached the point where she couldn't move. I asked the judge for permission to suspend or continue -- give us additional time, and then I ran up there to do that interview.

Q. Well, let me ask you this: Once the case concluded, the sentencing -- the actual sentencing came down, I believe, in September of '03 -- what did you do with your files?

A. Everything was given for boxing. So all -- Jeff had the primary file. And everything was then handed over. And they put everything for

appellate counsel, sealed it, and whatever they did.

Q.    Who was responsible for the actual boxing?

A.    Whoever the clerks were.  All I did was hand my stuff in, and then I didn't see it again until Ms. Peak -- I didn't see anything again until Ms. Peakheart sent me a CD of the notes.

And let me backtrack a little bit on that. When Celia returned to the Federal Public Defender's Office, she had I don't know how many boxes in her office that pertained to Lezmond Mitchell.  I never looked at them.  So when the case ended, I handed everything in, and that was the last I saw of it.

Q.    So to the best of your recollection, everything in your possession went to boxing for the appellate attorneys?

A.    That's correct.

Q.    Were you part of any plan to wall Ms. Rumann off from the trial attorneys or from the rest of the office?

A.    At what point?

Q.    Well, have you reviewed her statement?

A.    Yes.

Q.    At the point that she's discussing.  I'm guessing once she took possession of the case.

A.    Oh, no.

Q.    It's not very clear.

A.    When the issue that I'm asserting the attorney-client privilege on came up, there was a freeze. I said, "Hold it. Everything has to be frozen here." And I talked to John Sands. And then that was it. We didn't -- you know, we had to respect the privileges involved.

Q.    Did you attend or were you part of this phone call?

A.    I don't know if that makes sense to you.

Q.    Was there a time when there was a meeting in, I believe -- according to Ms. Rumann in Exhibit 115, paragraph 5, she discusses a meeting that took place, I believe, in her office involving you and Mr. Sands. Did that take place?

A.    Yeah.

Q.    And the discussion was about Ms. Wilkenson and some case of hers. And --

A.    I recall that. Sorry.

Q.    And Michael O'Connor was on the phone and was part of this conversation. Do you recall?

A.    I remember the whole incident.

Q.    And did it kind of go in the way that it's described here in paragraph 6?

A.    No.

Q.    How did it go?

A.    Mr. Sands went in to explain, as I understood it, that there was an ethical issue that needed to be looked at.  Celia Rumann said, "I want to get Michael on the phone."  She got Michael on the phone.  And Michael was on speaker phone.

John Sands did not get a word out edge-wise before he was being yelled at by Michael O'Connor at the top of his lungs in a very rude manner.  I was very surprised.  I have met Michael O'Connor before.  I didn't expect that.  And he was, you know, very upset on the phone.  And John never got a chance to say anything and just said, "It's not worth it at this point."  You know, because there was no communication.

So there was never any heated discussion.  It was Mr. O'Connor was very angry and yelling at Mr. Sands.  And if you know Mr. Sands at all, he doesn't engage in heated discussions.

Q.    In paragraph H, she references a conflict wall -- that's what I was trying to explain -- and apparently claims that certain files did not make it to her.

A.    I don't know anything about that.  I really don't.  That was a total surprise to me.  The

only files I -- there are -- there was a box of files missing that I heard, but it came from California counsel.

Because it was after Celia and Michael O'Connor had been working on the appeal, and once that was done, it was going to come to habeas counsel. Everything was boxed up to be mailed. It was at that point that I learned that California counsel did not receive Karl Brandenberger's notes. And that's the only box of files that I have ever heard were missing and the only time.

Q. Do you know whether or not that box has been found?

A. Not in our office. If it did, it would have been turned over right away.

Q. And --

A. And I don't know if it was lost in shipping. I have no idea if it was lost -- and Celia was not part of our office for a good part of this. So they had their own -- they had everything. And during that time I never heard that they didn't have Karl's notes.

Q. During the pendency of the appeals process, did you have any discussions with Ms. Rumann or Mr. O'Connor?

A.    Mr. O'Connor, no, none that I recall.

Q.    How about with Ms. Rumann?

A.    With Celia?  No, just general stuff. Mostly, I was concerned how Lezmond was doing.

Q.    In Dr. Morenz's report, Lezmond alleges that he's using drugs and alcohol in the jail.  Did you see that statement?

A.    I read that.

Q.    Did you have a discussion with Lezmond about the accuracy of his statement that you can recall?

A.    None that I can recall.  But I never saw it.  And I saw him quite a bit, and I think he would have said something to me.  I recall his notes.  And I was surprised given where he was being held.

Q.    Did that line sort of put you on notice to be looking a little closer at him?

A.    Well, it would have.  I don't recall anything that said to me that there was any truth to it, that caused me concern.  I know Lezmond was very good at, for example, betting.  He's good at sports and, you know, what teams are going to win.  So I guess the inmates would yell at each other who was betting what on the game.  That's the only thing I know he was participating in.

Q.    And what do you understand his confinement conditions were at the main -- was he at Madison at the time?

A.    Yeah.  He was at Sheriff Joe's hotel.

Q.    In maximum security?

A.    Yeah.

Q.    And what were his accommodations?  Do you know?

A.    He was in a highly restricted unit.  I think it was fifth floor, something like that.  And they had very limited access to other inmates or to, you know, freedom to walk around.  That was my understanding.

MR. KIRBY:  I don't have any further questions.  Do we want to take a short --

MR. IVERSEN:  Can I just get some water? Run down and fill this up.

(Whereupon, a recess was taken from 2:57 p.m. to 2:57 p.m.)

EXAMINATION

BY MS. PEAKHEART:

Q.    Good afternoon, Mr. Bartolomei.

A.    Hi.

Q.    If I have it correctly, that before

Mr. Mitchell's case, had you not defended a capital client?

A.   That's correct.

Q.   And how many first degree murder cases had you worked on before that?

A.   SEE CORRECTION I honestly don't recall.  It may have been one or two.

Q.   Okay.

A.   But they were not capital cases.  They were cases involving death.  In fact, I don't even remember if they were Murder 1 or 2.  I can't say they were.

Q.   Were those one or two in Arizona?

A.   Yes.

Q.   You stated throughout your direct examination that you met with Mr. Mitchell a lot.

A.   Yeah.

Q.   And you talked to him quite a bit.

A.   Uh-huh.  Yes.

Q.   Where would you see him?

A.   At the jail.

Q.   Is that the Madison Street --

A.   Uh-huh.

Q.   -- Jail?

A.   Yes.

Q.    And that process is sign in and sign out?

A.    Yes.

Q.    And you can't leave without signing out?

A.    I don't know about the signing out part. But just sign in. You have to go through, present ID, and depending on the officer, they would either accept your ID or ask for something else.

Q.    We have obtained the logs from Madison Street Jail. Would it surprise you that in December, 2001, you only met with Mr. Mitchell seven and a half hours?

A.    I don't recall. I don't recall the times.

MR. KIRBY:  Excuse me. What was that time period?

MS. PEAKHEART:  Seven and a half --

MR. KIRBY:  I mean the --

MS. PEAKHEART:  December, 2001.

MR. KIRBY:  Just the month?

MS. PEAKHEART:  Yes.

MR. KIRBY:  Okay.

BY MS. PEAKHEART:

Q.    January, 2002, two hours and 23 minutes?

A.    Don't recall.

Q.    February, 2002, you didn't meet with him at all?

A.    I don't recall.

Q.    March, 2002, you met with him for 40 minutes?

A.    Don't recall.  I don't recall the times.

Q.    April, 2002, three hours and 51 minutes?

A.    Don't recall.

Q.    May, 2002, four hours and 32 minutes?

A.    Don't recall.

Q.    June, 2002, two hours and 20 minutes?

A.    Don't recall that either.

Q.    July, 2002, 58 minutes?

A.    Don't recall.

Q.    August, 2002, one hour and 20 minutes?

A.    Don't recall.

Q.    September, 2002, one hour and 20 minutes?

A.    Same answer.  Don't recall.

Q.    October, 2002, four hours and 56 minutes?

A.    Don't recall.

Q.    Did you ever meet with Mr. Mitchell when he was being held in Tucson?

A.    Don't believe so.

Q.    How long had you been at the office when you were assigned to this case?

A.    I don't remember.  But I joined in in August of 2001.

Q. The arraignment was November 29, 2001.

A. Then you have it.

Q. So the new guy gets the case, I guess.

A. Well, it went to Jeff Williams.

Q. Then how were you put on the case then?

A. I was asked to join in.

Q. Who asked you?

A. I don't remember if it was John Sands or not. Probably was.

Q. What was your responsibility in the case?

A. Basically, to participate. There was no -- I don't recall any individual saying, "You are going to do this or that."

Q. Did you work on any of the DNA issues?

A. No, I don't recall doing any of that. I know I worked on the issue -- one of the motions dealing with -- may have been jurisdiction on the carjacking statute.

Q. Did you work on any of the issues regarding calls or manner of death?

A. I don't recall that.

Q. Is it accurate that your work was primarily regarding the mitigation?

A. I think that's how it turned out.

Q. Are you aware that when you first met

Mr. Mitchell -- you first met him at the arraignment; correct?

A.    In Flagstaff.

Q.    Flagstaff.

A.    Was the initial appearance.

Q.    And that was November 29, 2001, I'll represent to you.

A.    Okay.  I take that.

Q.    Were you aware that he had already been incarcerated 24 days?

A.    We may have just learned that.  All I -- my understanding and my recollection is that when the call came in, that that -- that Lezmond was there, that this whole thing had developed, I think our office first became aware of it, we were told, "Get in a car and get up there."

Q.    As literally the same day?

A.    I believe it was the same day.

Q.    Were you aware when you --

A.    I didn't answer your prior question.  I was not aware that he had been there 24 days at that time.

Q.    Did you later find out he had been?

A.    I think later in the course of the discovery, we found that out.

Q.    And during the course of the discovery, you found out he had already been interrogated at least four times?

A.    Yes.

Q.    And you're aware that those four interrogations resulted in him providing a full confession to the FBI?

A.    They provided statements.  Lezmond didn't necessarily agree with what the reports said.

Q.    And you are aware from discovery that the interrogations resulted in Mitchell taking federal and tribal authorities to the crime scene?

A.    Yes.

Q.    How damaging did you feel those statements or interrogations were to Mr. Mitchell's case?

A.    I felt they were pretty damaging, but he had an explanation for it.

Q.    At the time of the trial, were you familiar with the victims' families, Mrs. Slym's family and Ms. Lee's family?

A.    Familiar in what way if?

Q.    Enough to recognize them.

A.    Oh, no.  When it first happened?

Q.    No.  At the time of the trial.

A.    Oh, yeah, I think so.

Q.    Did you see any of them in the courtroom during the trial?

A.    They came in as a group.  We had seen pictures.  They had photos of the Mrs. Slym and ███████ ███ I don't recall the specifics.  I'm sorry.  There was a tribal advocate with them the entire time.  And they were kept on the other side of the courtroom.

Q.    You said they came in as a group.  How large was the group?

A.    To the best of my recollection, it would have been between six and ten people almost all the time, and if not more.

Q.    How large is the courtroom?

A.    We have five rows on each side.

Q.    Were the six to ten family members, were they in view of the jury?

A.    Yes.  They were sitting essentially on the same side as the jury.

Q.    Do you recall at some point being aware -- becoming aware that members of that group were wearing buttons?

A.    Yes.

Q.    Do you recall what those buttons looked like?

A.    I seem to recall that they had a photo of

████████.    But I don't recall whether it had a photo of Ms. Slym or if they had any wording on them.    That -- that's my image.

Q.    Do you recall how large the buttons were?

A.    I seem to recall them being about two inches across.    That's -- I'm having an image, and I'm just trying to describe it.    So I'm saying about two inches across.

Q.    You just gestured, and that's a little bit bigger.    That's about three inches.

A.    I'll give you two to three.

Q.    Okay.

A.    I don't recall seeing it up close, either.

Q.    The day voir dire began, do you recall the court severing Mitchell's trial from Orsinger's?

A.    Talking about voir dire?

Q.    Uh-huh.

A.    Yes, I do.    Yes, I do.

Q.    Do you feel the case was prejudiced from the late severance?

A.    I thought it was.

Q.    How so?

A.    I wanted the jury to see Johnny.    I really did.

Q.    And what value would that have been?

A.    Lezmond gives -- gave a much better presentation as a person than Johnny.  Johnny just looked like a scary individual.  And Lezmond looked like a chubby kid.  I think that is the best way I can put it for you.  And then if we were able to present the better things about him, it would have -- I think the jury could have had some sympathy for him.

Q.    Did you have a role in the selection of any of the experts for guilt phase-related issues?

A.    We all shared.  The three lawyers spoke about all these things.

Q.    Had you ever worked with a DNA expert before?

A.    I don't recall that I did.

Q.    Had you ever worked with a pathology expert before?

A.    In terms of interviewing them, things like that, yes, but in terms of presenting them at trial, no.

May I -- may I back up for one second.  Does that include, like, doctors testifying about a stab wound with -- I have cross-examined, you know, that kind of witness before.  So I just wanted to clarify.

Q.    Okay.  But had you ever worked with a --

A.    In terms of my presenting?

Q.    Yes.

A.    No, I don't recall doing that.

Q.    You testified earlier that Ken Murray was wrong in stating that Johnny Orsinger had been interviewed by the defense team.

A.    Yeah.  I misspoke.  I think it was Vera. And I thought I had corrected that.  I think Vera was the one that said that she was not allowed to participate in the interview of Johnny Orsinger and that Karl Brandenberger was not qualified to do that kind of interview.  But Karl had not interviewed Johnny Orsinger.  It was not Ken Murray.

Q.    Would it surprise you to hear then that Karl Brandenberger told our investigator that he had interviewed Johnny Orsinger?

A.    That would surprise me.  What I know he did is that he delivered a subpoena.  And I don't know when he would have interviewed Johnny Orsinger.

Q.    Do you know how long Karl Brandenberger has been an investigator?

A.    No, I don't.  He was there before me.

Q.    But do you think he would know the difference between merely serving a subpoena versus interviewing somebody?

A.    Yes, he would.

Q.    Regarding Dr. Morenz, were you the one who had the primary relationship with him?

A.    I would say yes.

Q.    Did he prepare the report at your direction?

A.    I don't recall the circumstances for that.

Q.    What was it you asked him to do when you referred your client to Dr. Morenz?

A.    I don't recall what I would have said.  I mean, I could guess, but that would just be a guess.  But I -- we generally follow that up with a letter.  And you should have a copy of the letter, which would have explained what it is we expected from the expert.

Q.    When you testified to competency issues earlier, were you referring to competency to stand trial?

A.    I was referring to competency to stand trial and to assist counsel in his defense.

Q.    Okay.  And that's all you meant by competency?

A.    Well, in terms of being able to relate the facts and work with us, I felt that's -- that's what I include with competency.

Q.    What was the plan for the presentation at

the penalty phase?

A.    To present favorable witnesses about Lezmond Mitchell and to have Lezmond there to make the tie between those witnesses and Lezmond.

Q.    I believe you testified earlier that you saw no value to presenting evidence of his drug history.

A.    That's correct.

Q.    Can you explain then why your co-counsel, Mr. Williams, examined Case Agent Duncan about Mr. Mitchell's intoxication?

A.    During the trial?

Q.    At the penalty phase.

A.    No, I can't.

Q.    Did you have a role in that decision-making for him to do that?

A.    No, I don't -- I don't remember discussing that with him ahead of time or -- no, I just don't remember anything, any discussion with Mr. Mitchell about that -- I mean Mr. Williams about that.

Q.    Did you discuss it with Mr. Sears?

A.    I don't recall discussing it with either of them.

Q.    Was that a surprise to you he asked about Mr. Mitchell's intoxication?

A.    I believe I was focused on other things with Lezmond.  I just don't recall.  I'm sorry.

Q.    You reviewed with the Government earlier the categories of people interviewed to develop mitigation.  And I believe you said teachers, family, and friends.  What about people who lived with the Nakai brothers and Mr. Mitchell?  Were they interviewed?

A.    I don't recall specifics.  But I know that Karl Brandenberger and possibly Vera may have.  Where the Nakais lived was kind of like a half-circle group of homes, which was probably south of the Lukachukai Mountains.  And it was like a little compound.  So I believe -- it's very likely that Karl would have interviewed those people.  But I don't recall.

And then there's nothing else near those homes.  You know, you have to go a ways down.

Q.    So if Mr. Brandenberger had interviewed them and it were helpful information, that's something you would have considered?

A.    Yes, we would have considered it.

Q.    You testified earlier that going the psychiatric route would be dangerous at the penalty phase.  Can you explain how that would be?

A.    There was a lot of -- I believe a lot of

information would have come out about Lezmond being somewhat antisocial or angry or things like that. And the facts in this case already instill fear in people. And we didn't want to present anything else, us presenting it, that made Lezmond look like someone the jury should be afraid of. We didn't want that.

We wanted them to see him as I indicated earlier, as something different. Let them look at Johnny that way, but we didn't want them to look at Lezmond that way.

Q.    You stated earlier that Sherry Mitchell, Lezmond's mother, went to the FBI.

A.    I think so.

Q.    We have no record of that. Do you recall how you learned that?

A.    I don't recall if I saw it in a report or if I heard it from someone. But it's a memory I have. I wish I could be more specific, but I just don't -- I can't help you with that.

Q.    Regarding the letter that the defense team sent to the Department of Justice --

A.    Yes.

Q.    -- who, if anyone, did you consult with before preparing and sending that letter?

A.    It would have been John Sears. It would

have been the defense team at that point.  We also made a personal appearance.

Q.    Can you explain why it would not have been helpful to present as "the crazy mother" to the jury?

A.    One of the things we were underscoring was that Lezmond was from a family of -- or what we wanted to underscore was he was from a family of educators and educated people.  She was also an educator and is an educated woman.  There wasn't any need to go into that.

For whatever she suffered in terms of her Lezmond's father leaving her, abandoning her, whatever issue she had, I didn't see those as relevant or anything that should carry over to Lezmond.

Q.    How did you prepare for this deposition?

A.    Your notes.  I mean the notes you sent me. And then I received, like, five of these volumes.  And I would go through some of it, too.

Q.    Did you go through all of it?

A.    Not all of it.

Q.    Did you read our amended petition -- amended motion?

A.    I believe I downloaded.  Is that the one with the red line?

Q.    There's two versions.

A.    Yeah, there's two versions.  I went

through some of it, but --

Q.   Did you speak with anyone?

A.   As in?

Q.   In preparation for your deposition.

A.   SEE CORRECTION Oh, Heather.   And I wanted to make sure we -- I was concerned with ethical issues.   And so I did speak with Heather, and I did look at articles. And I refused to give an interview to the Government. I wanted a deposition.   And I wanted you there.

Q.   Do you recall what the strategy was for the guilt phase?

A.   I thought I answered.   The guilt phase? Oh, I'm sorry.   Raising the doubt that Lezmond did it.

Q.   When did you become aware of the issue of Karen Wilkenson's client relating to Mr. Mitchell's case?

A.   I think I'm going to have to assert the privilege in answering that as well.

Q.   Can you tell me how that is privileged?

A.   Because if we get into a time frame, it may disclose whether he -- when he or she may have been at the office or what have you.   And I don't think that would be appropriate.

Q.   Was this a client you represented?

A.   No.   I don't know the name of the client.

I never saw the file.  I never spoke to him, nothing like that.  I just had information, froze everything.  That's it.

Q.    Who brought -- I'm sorry.

A.    I just wanted to look at the ethical issue before anything was done.

Q.    Who brought the ethical issue to you?

A.    When I became aware of it, it was, I believe, Karen.

Q.    What did she say to you?

A.    Again, at this point, I'm going to assert the attorney-client privilege on behalf of that client. I'm not going to say anything else.

Q.    Who did you speak to about it?

A.    John Sands.

Q.    Did you ever feel the need to raise the issue with the Court?

A.    No, I did not.

Q.    Why not?

A.    I just didn't.  I can't -- it never came up.  I thought that was something that would be handled internally in the office and that that would be sufficient.

Q.    Was there ever discussion about an unburdened counsel speaking with Mr. Mitchell about the



issue?

A.    I don't recall any such conversation.

Q.    Did you ever speak to Mr. Mitchell about this issue?

A.    I haven't spoken to Lezmond Mitchell in a while.  I wrote to him, with Mr. Kennedy's permission, a few months back and never heard back from him.  And I copied you on the letter.  But I haven't spoken with Lezmond.  Sorry.

Q.    So from what I gather, Mr. Mitchell was already in Terra Haute when you learned of this issue?

A.    That's correct.  That's correct.

Q.    Did you ever request to withdraw from Mr. Mitchell's case because of the conflict?

A.    I never did.  And at that point, he was represented by Ms. Rumann and Michael O'Connor.

Q.    In preparation for this deposition, have you recently confirmed that the attorney-client privilege that you are citing has not been waived?

A.    I have not confirmed it in any which way or form.  Ms. Wilkenson has not been part of the our office for a while.

MS. WILLIAMS:  She's been employed by our office, but been on assignment to Washington, D.C.

THE WITNESS:  Thank you.  I stand

corrected.  I have not independently determined or heard that the privilege was waived.

BY MS. PEAKHEART:

Q.    Was there an ethical wall put in place regarding this conflict?

A.    I'm not sure what you would mean by an ethical wall.  But I know our office withdrew.

Q.    Withdrew?

A.    From the other case.

Q.    And am I right that you don't even know the identity of the person?

A.    That's correct.

Q.    So under what theory do you claim a privilege for that client you do not represent and who you don't even know?

A.    Any client that comes into the office is represented by John Sands.

Q.    Did you ever question the creation of an ethical wall was an overbroad remedy?

A.    I SEE CORRECTION never considered anything an ethical creation of any wall.  I just wanted to freeze everything from the moment to find out what needed to be done.  And that was really it.

Q.    Do you know if this other client was facing a death penalty?

A.    I can't answer that question.

Q.    Why?

A.    For the same reason, privilege.

Q.    Do you believe this privilege or wall has ever been breached in this case?

MS. WILLIAMS:  I'm going to go ahead and ask to stop this now.  I think that we've established that the Federal Public Defender's Office's representation, at least for trial level purposes --

Let me ask this:  Greg, by the time Karen talked to you about a possible ethical conflict, the case was on appeal?

THE WITNESS:  Can I answer that?

MS. WILLIAMS:  Well, I think we've already established that Lezmond was at Terra Haute.  So that would mean that it was on appeal at the time or after the appeal was finished.

MR. IVERSEN:  Was it after the trial?

MS. WILLIAMS:  After the trial.  So after what --

THE WITNESS:  May I have a moment to speak with her?

MS. WILLIAMS:  Yeah.

(Whereupon, a recess was taken from 3:25 p.m. to 3:28 p.m.)

MS. PEAKHEART:  I don't remember my last question.

MR. KIRBY:  It was her question.

MS. WILLIAMS:  It's not going to matter. Because we're going to assert the privilege right now and object on relevance ground.  It's clear that whenever this happened, it was after sentencing.

Our office, the Federal Public Defender's Office, represented Lezmond for purposes of appeal. The conflict issue may or may not have even been an issue for appeal, because we were stuck with the record at the trial court.  And that the possibility of some other dude having been involved would be something for a 2255.

MR. IVERSEN:  We will accept that representation even though it's not under oath.

MS. WILLIAMS:  Thank you.  And if anybody wants to argue it to Judge Murguia, so be it.

BY MS. PEAKHEART:

Q.    With regard to Barry Morenz's report having potentially damaging facts in it, did you ever contemplate retaining a second psychiatrist?

A.    I think we did.

Q.    And what happened to that?

A.    I think a decision was reached that we

would not go any further, that we had what we had.  And that's what we had to work with.

Q.    Who made that decision?

A.    The best of my recollection, it would have been all through of us.

Q.    Did any budget considerations have something to do with that?

A.    No.

Q.    There was a question earlier about a social historian testifying.  And was there any consideration to retaining a social historian to testify other than Vera Ockenfels?

A.    I don't recall that there was such a discussion to speak of.

MS. PEAKHEART:  Okay.  I have nothing further.

MR. KIRBY:  Nothing further.

THE WITNESS:  I have nothing further.

MR. KIRBY:  Oh, I'm sure you do.

THE REPORTER:  Read and sign?

MS. WILLIAMS:  We would just again request that the copy of the deposition be made available to Greg so that he can go ahead and review it and make any corrections as necessary.

(The deposition was concluded at 3:31 p.m.)

LEZMOND CHARLES MITCHELL,

vs.

UNITED STATES OF AMERICA

Thursday, February 11, 2010

J U R A T

I, GREGORY A. BARTOLOMEI, having read the foregoing deposition consisting of my testimony at the aforementioned time and place, do hereby attest to the correctness of the transcript under penalty of perjury.

(Signed) _____

(Dated) __3/01/2010_____

STATE OF ARIZONA      )
                      )   ss.
COUNTY OF MARICOPA    )

        BE IT KNOWN that the foregoing deposition was taken before me, that I was then and there a Certified Reporter #50644 in and for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth and nothing but the truth; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed under my direction, and that the foregoing pages are a full, true and accurate transcript of all proceedings had and adduced upon the taking of said deposition, all done to the best of my skill and ability.

        I FURTHER CERTIFY that I am not related to nor employed by any of the parties thereto, and have no interest in the outcome hereof.

        DATED at Phoenix, Arizona, this 12th day of Feb., 2010.

                        _____
                        Doreen C. Borgmann, RMR CMR
                        Certified Reporter #50644
                        Notary Public

## COPPERSTATE REPORTING SERVICE

### 12601 N. 59th Place Suite 100
Scottsdale, AZ. 85254

Please make all changes or corrections on this sheet, showing page, line, and reason, if any, for Reporter's insertion into the original deposition. Sign this sheet; sign the deposition at end on line provided; and return the original deposition or signature page together with this sheet to the above address for filing with the responsible attorney for said deposition, no later than _March 19 '10_. Thank you.

WITNESS: _Gregory R. Bartolomei_     REF: _Legmond C. Mitchell VS U.S.R._

| PAGE | LINE | CORRECTION OR CHANGE | REASON |
|---|---|---|---|
| 66 | 6 | ALL OF THE PRIOR MURDER CASES THAT I WORKED ON WERE RESOLVED BEFORE TRIAL. | CLARIFICATION |
| 81 | 5 | I RECALL ASKING KARL BRANDENBERGER TO CONFIRM WHETHER OR NOT HE HAD EVER INTERVIEWED JOHNNY ORSINGER. HE SAID HE HAD NOT EVER INTERVIEWED HIM. | CLARIFICATION |
| 84 | 20 | KAREN WILKINSON WAS ADVISED TO NOT DISCUSS HER CASE. I AM NOT AWARE OF ANY OTHER WALL INVOLVING THE FPD'S TRIAL ATTORNEYS | CLARIFICATION |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | _(signature)_ — 3/01/2010 | |
| | | | |