# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

_____

LEZMOND CHARLES MITCHELL,      )
                               )
            Plaintiff,         )
                               )
        vs.                    )      No. CV-09-8089-MHM(JI)
                               )
UNITED STATES OF AMERICA,      )
                               )
            Defendant.         )
_____)

Phoenix, Arizona
February 18, 2010
9:34 a.m.

DEPOSITION OF JOHN M. SEARS

Transcript Prepared for:
THE COURT
(Original)

COPPERSTATE REPORTING SERVICE
Court Reporters
12601 North 59th Place, Suite 100
Scottsdale, Arizona 85254-4312
(602) 795-5515

Reported by:            DOREEN C. BORGMANN, RMR
                        CR # 50644





2

I N D E X

JOHN M. SEARS                                          PAGE
EXAMINATION

    BY MR. KIRBY                                          4

    BY MS. PEAKHEART                                      38

E X H I B I T S

NUMBER                    DESCRIPTION                    PAGE

(None offered.)

THE DEPOSITION OF JOHN M. SEARS, witness herein, was taken pursuant to notice by the parties through their respective attorneys before DOREEN C. BORGMANN, RMR, a Certified Reporter #50644 in and for the State of Arizona, at the offices of United States Attorney, Two Renaissance Square, 40 North Central Avenue, Suite 1200, Phoenix, Arizona on February 18, 2010, commencing at the hour of 9:34 a.m. of said day.

Further, this deposition was taken pursuant to the Rules of Civil Procedure.

APPEARANCES:

```
        FOR THE PLAINTIFF:
            Federal Public Defender
            By:  STATIA PEAKHEART, Esq.
                 SEAN K. KENNEDY, Esq.
                 GUY IVERSEN, Esq.
            321 East Second Street
            Los Angeles, CA 90012


        FOR THE DEFENDANT:
            U.S. Attorney, District of Arizona
            By:  VINCENT Q. KIRBY, Esq.
            40 North Central Avenue, Suite 1200
            Phoenix, Arizona 85004-4408
```

Phoenix, Arizona
February 18, 2010
9:34 a.m.

JOHN M. SEARS,

the witness herein, after having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. KIRBY:

Q.    All right.  Please give us your name.

A.    John Sears, S-E-A-R-S.

Q.    Mr. Sears, what do you do for a living?

A.    I'm an attorney.

Q.    And for how long have you done that?

A.    Be 35 years this year.

Q.    And what kind of practice have you generally engaged in?

A.    For the last 18 years, I've been a sole practitioner.  My practice has been entirely devoted to criminal defense.

Q.    And how about before that?

A.    I had a general practice with an emphasis in criminal defense.  And for part of my career, I was a legal services lawyer.

Q.    And where is your practice located?

A.    In Prescott, Arizona.

Q.    And do you primarily practice in Yavapai County Superior Court?

A.    I do.

Q.    Occasionally venture out from the Prescott area?

A.    I do.

Q.    Have you tried murder cases over the course of time?

A.    I have.

Q.    Any idea how many that might --

A.    Probably more than 10 and less than 20 went to trial.

Q.    And have you had an opportunity to be involved in capital cases?

A.    I have.

Q.    And how many capital cases have you been involved with?

A.    I think in federal court, I have been learned counsel in perhaps six -- I'd have to stop and name them -- since reinstatement in the mid '90's.  And I have done an equal number in State court over the same period of time.  Perhaps even a bit longer.

Q.    The federal cases, were they all within the District of Arizona?

A.    They were.  I was involved in a case called *United States vs. Cisneros* as it was transitioning from the District of New Mexico to Arizona.  I was principally appointed in that case because it was coming to Arizona.

Q.    Did that case predate or postdate *U.S. vs. Lezmond Mitchell*?

A.    Postdated.

Q.    And prior to *U.S. vs. Mitchell*, how many capital cases were you involved with federally?

A.    Federally.  I'm trying to think.  I may miss more than one here.  But I know I was involved with the Federal Defender's Office in *United States vs. Benashley*, B-E-N-A-S-H-L-E-Y, *United States vs. Keesed*, K-E-E-S-E-D, and *United States vs. Moore*, M-O-O-R-E, and I can't recall whether Moore overlapped one way or the other with Mitchell.  My recollection is it probably overlapped, if at all, at the end of that case.  And then since then I did, of course, the Cisneros case, which was the most complex and longest lasting.

Q.    And did Cisneros go to trial?

A.    It did not.  It settled about six weeks before trial.

Q.    How about the other cases you mentioned,

Benashley, Keesed --

A.    Keesed.

Q.    -- and Moore?

A.    All of those cases were resolved by having death taken off the table by the Department of Justice. Mitchell was the only case that went to trial.

Q.    Now, before we get into things here, have you had an opportunity to review any materials prior to your appearance today?

A.    I have looked at the Amended Petition For Habeas Corpus Relief that you sent me.  And that would be -- I have not looked at anything else.

Q.    Do you have any notes from the trial?

A.    I probably do, but I don't have them with me.

Q.    And you did not review any other materials other than the Amended Petition?

A.    That's right.

Q.    Did you discuss what's in the Petition with anybody in any particular detail?

A.    I talked to Greg Bartolomei at the Federal Defender's Office briefly, and we exchanged some short e-mails in which he told me that he had some materials that you had provided him.  But we couldn't find the time where I could be here to review them before today.

Q.    And are you currently involved in a capital case?

A.    I am.

Q.    And what's the name of that one?

A.    State of *Arizona vs. DeMocker*, D-E capital M-O-C-K-E-R.  And it's pending in the Yavapai Superior Court set for trial on May 4 of this year.

Q.    And have you been involved in preparations for this?

A.    Since July of 2008.

Q.    Can you recall when you became involved with the Lezmond Mitchell case?

A.    Not specifically.

Q.    Were you the initial counsel?

A.    No.  The Federal Defenders Office was appointed, and I was later appointed as learned counsel.

Q.    And do you have an approximate sense of --

A.    If the case went to trial in the spring of 2003, which is my recollection, it would have been sometime in early 2002.  It might have been in late 2001.  I'm not certain.

Q.    And who contacted you about coming on?

A.    John Sands.

Q.    And did you then become involved with Jeff

Williams and Greg Bartolomei?

A.    I did.

Q.    And did you meet at some point with the defendant, Lezmond Mitchell?

A.    Yes.

Q.    Do you recall where that first meeting?

A.    My -- my guess, it probably would have been in the Madison Street Jail.  I don't remember in this particular case going to see him in CCA.

I will just tell you generally, Mr. Kirby, that these are events that took place eight years ago for the most part.  And as you can imagine, my memory is not as clear today as it would have been at the time.

Q.    Over the course of time, do you have an idea of how many times you may have met with Mr. Mitchell either by yourself or with the other attorneys?

A.    I don't.

Q.    Did you establish a relationship with Mr. Mitchell?

A.    To a degree, yeah.  I think he had a better working relationship with Mr. Bartolomei and then to a lesser extent with Mr. Williams.  I think of the three of us, I had the least contact with him.

That would be my guess.

Q.    Now, were you involved with the presentation to the Capital Litigation Unit?

A.    I was.

Q.    And was that with Mr. Bartolomei?

A.    Yes.

Q.    Now, as the investigation proceeded, did you have a particular area that you were working on either in conjunction with or separate from?

A.    We worked, I thought, exceedingly well as a team.  And without sitting down one day and assigning roles, I think it became -- became clear that, as we got closer to trial, I was going to be the courtroom presence for the defendant.  I was going to speak in court primarily.  Those were all matters subject to change, but that's the way it came out.

Let me go back to an earlier question. I'm now trying to remember the Capital Case Committee presentation in this case.  And the only thing I can -- if this was the one that was done by videoconference, then I -- then I believe I was involved.  And I have to confess as I sit here today, I don't have a clear recollection of that.  I'd done a number of them. Unfortunately, they tend to blur a bit.  But I believe it was one that was done by videoconference as opposed

to an in-person meeting at Main Justice.

Q.    During the preparation for the trial, did you meet with any individual witnesses yourself?

A.    Just me?

Q.    Yes.  Well, you in conjunction with the attorneys.  Did you participate in any interviews with witnesses?

A.    I can't remember.

Q.    You said it developed that you were going to be the courtroom presence.  What was the theory? What was your theory going into trial?  What were you going to try to attempt?

A.    Well, this was obviously something we talked about constantly inside the team and refined it. I think going forward as we got closer to trial, we decided that, based on what we knew about the co-defendant, Johnny Orsinger, and his prior involvement in what we came to call the cowboy murders and the dynamics inside this group that Lezmond belonged to on the reservation, this so-called gang, that it was likely that Lezmond's role in this case was to go along with Johnny Orsinger on this trip to try to steal a truck in Gallup, and that there was some suggestion that Lezmond's role was to keep Johnny in line so that Johnny didn't go crazy again.

We looked at all kinds of other ways to present this case, to present Lezmond as some sort of damaged person, either socially or through drugs and alcohol, and concluded that there was not evidence there that would support that. And we thought that presenting Lezmond simply as somebody who was there when Johnny Orsinger again went crazy was about the most we could do under the circumstances. That was a difficult decision to make, but that's the way in which we presented the theory, that Lezmond was there, but that the impetus for all of the actual violence at the end of this came from Johnny.

Q.    You mentioned the cowboy murders and the group that Mr. Mitchell was involved with. Were most of them under Indictment in some fashion at that time?

A.    The cowboy murder case, as I recall, was pending in Judge Martone's court at the time. And I can't tell you as I sit here today who else was indicted with Johnny in that case. But there was certainly overlap between the cast of characters in this murder case and in that one.

Q.    Were you ever able to interview any of those involved, as you recall, with the cowboy murders?

A.    No. I think they were all represented by counsel. In fact, I'm sure they were.

Q.    Do you recall any discussion about, given your approach to the trial, whether Mr. Mitchell would, should, or could testify?

A.    That was a matter of discussion up to and including, as I recall, during the trial itself.  I do remember meeting with Mr. Mitchell during the trial in which we had a lengthy discussion.  I'm thinking that was in the Madison Street Jail.  I don't think 4th Avenue was open yet.  And the topic of that was whether Mr. Mitchell could or should testify.

Q.    During the trial, Johnny Orsinger was called.  Do you recall that?

A.    I remember that he was called essentially to assert his Fifth Amendment privilege outside of the presence of the jury.  I do remember that brief hearing.

Q.    And was there any attempt to do the same with Gregory Nakai?

A.    Not that I recall.

Q.    Gregory Nakai was involved in the cowboy murders with Johnny Orsinger?

A.    I believe that's true.

Q.    Now, as you prepared for trial, did you consider a number of defenses?

A.    We considered -- well, that's probably

overstating it.  But we considered a number of ways to present a case in the guilt/innocence phase of this. Whether any of them amounted to complete defenses or not, I suppose, is questionable.  That was, in part, the reason that we went the way we did, that we didn't have any other avenue that we thought gave us a defense that could win the day.

Q.    You have said you had some conversations. Can you recall whether Mr. Mitchell told you whether he was under the influence of either drugs or alcohol at the time of the murders?

A.    I believe that he told us that he was not.

Q.    And did you consider an intoxication defense?

A.    After that -- that statement, no.  And in addition, there was a considerable discussion over time among the three of us, the attorneys working on the case and the rest of the team, about whether trying to present evidence of intoxication in the guilt/innocence phase was a good idea if our mitigation case was going to be themed primarily on positive attributes of Lezmond and Lezmond has a life worth saving.

And among the reasons, I think, that led us to move away from intoxication or anything related to intoxication in this case was that idea that we

wanted to tie the defense in the guilt/innocence case to a theme that Lezmond was a good person led astray under circumstances, and that we thought evidence of intoxication or excess of drug use, even if it were true, was -- was contradictory.

Q.    If you had proceeded with intoxication, there were how many witnesses that you could have called?

A.    Other than Mr. Mitchell. He would have done that, I suppose. Had Johnny Orsinger waived his Fifth Amendment privilege, he would have been the other witness. But I don't believe there was anyone else that I can think of as I sit here today, all these years ago that would have supported that. They were alone for the most part of the day.

Q.    Did you pursue a psychiatric angle?

A.    A complete workup had been done. And I believe it had been completed and arranged for before I came on board in the case by Dr. Morenz and the team in Tucson. So I didn't arrange it. But there was one done by the defense.

Q.    Did you see the report?

A.    I did.

Q.    Let me just ask you to take a look, if I can have the numbers. And I think it's going to be in

that one.  Just for the record, we're using the exhibit filing system that the Petitioner has filed with the court.  We'll be looking at Exhibit 94.

A.    Yes.

Q.    Do you recall having seen that report back during trial preparation?

A.    I believe so.

Q.    In your estimation, was there anything in the nature of an insanity defense contained within that report?

A.    I -- to answer that question completely, I would probably need to stop here and read all of it.  But my recollection at the time, and I think the collective sense of all of us, was that there was no basis from this report to assert an insanity defense in the law.

Q.    And I know you're just kind of reviewing it for the first time in a while.  Do you recall if there were certain information in that report that you would have preferred the Government not to know about?

A.    Oh, I'm sure there was.

Q.    Some of the other activity that Mr. Mitchell engaged in while on the reservation?

A.    I believe that would be among the things we would have just as soon you not know.

Q.    Do you happen to know, in addition to the report that you're referring to at the moment, whether there had been an earlier psychiatric evaluation by Dr. Susan Parrish?

A.    That does sound right.  I can't tell you why I think that, but that sounds right.  I don't see that as being part of what the University of Arizona relied on.

Q.    Did you have any occasion to speak with a Vera Ockenfels?

A.    On a number of occasions.

Q.    And if you would take a look at Exhibit 93.

A.    Yes.

Q.    Do you recall seeing Exhibit 93?

A.    I do.

Q.    And what is 93?

A.    That is a social history prepared by Ms. Ockenfels in connection with this case.

Q.    And you have reviewed that report?

A.    I'm sure I did.

Q.    Did you discuss it with Ms. Ockenfels?

A.    I remember some meetings with the Federal Defenders Office here in Phoenix that she attended. Whether she had written the report at that time or not,

I can't recall.

Q.    But information from her investigation was discussed?

A.    Yes.

Q.    Do you recall being made aware that Ms. Ockenfels had concerns about the defendants' use of alcohol or drugs at the time of the offense?

A.    You know, I've been aware since this Petition was filed that -- that she has prepared a declaration in this case and has said something -- I've not read her declaration, but has said something about that and the way it was done.  Do I have a clear recollection today of Vera saying something specific about that?  No.  I think we all knew collectively from her work and from other places that Lezmond and these other young people had a long history of substance abuse.

Q.    In light of the information you had, did Mr. Mitchell continue to deny the use of drugs and alcohol on the occasion of this carjacking?

A.    To us, he did, yeah.  I can't tell you how many times he did that, but I do have this one recollection of meeting with him in which he said they were not high.

Q.    Did that surprise you?

A.    My cynical answer would be very little surprises me.

Q.    Let me be a little more clear.  You have represented Native Americans from the Navaho Reservation and other reservations?

A.    I think, yeah.  I'm sure I have.

Q.    And in your collective experience, alcohol and drugs tend to be a part of many of the reservation crimes?

A.    You know, Mr. Kirby, they tend to be part of crimes often on the reservation.  But you're right. There is a particular problem.  I think we all apprehend about substance abuse on the Navaho Reservation.

Q.    And again my question:  In light of your experience and knowledge, did it surprise you that he was insisting that he was not under the influence?

A.    Did I think -- we had a sense that we developed during the trial that Mr. Mitchell's behavior and responses and his attitude generally about a lot of different things was different when Johnny Orsinger was literally around him or he thought somehow the information would be passed through to Mr. Orsinger or Mr. Orsinger's attorney.  There seemed to be some sort of disconnect between -- between what Mr. Mitchell

would say and do in this group dynamic -- and the group being the so-called gang -- and what he would do alone with his defense team.

Q.    And you are aware that the statements given to the FBI, he had told them that he was drinking to the point of blacking out?

A.    I know that he said that.

Q.    During your representation of Mr. Mitchell, did you ever have any questions of his competency?

A.    No.

Q.    And there was Dr. Morenz's report as well?

A.    I know that he also concluded that Mr. Mitchell was competent.  But just on a personal level, Mr. Mitchell was engaged, appropriate, understood, or at least appeared to understand all of what was being discussed in his presence.  I thought he was a particularly intelligence person given his background circumstances.

Q.    There are allegations or admissions by Mr. Mitchell that he was using drugs and alcohol while confined pending trial.  Are you aware of that?

A.    I've just heard that.  When I say "just," just since this Petition was filed.

Q.    Anything in your representation indicate

to you or lead you to question whether, on any particular day during the many motion hearings, the jury selection, the trial, that Mr. Mitchell was under the influence of some substance?

A.    No.

Q.    And had he been under the influence, would you have taken some sort of action?

A.    I'm sure we would have.  And let me just say by way of comparison, in *United States vs. Moore*, that case went to trial as a non-capital case after the Department of Justice took death off the table.  I was no longer involved after -- after that decision was made.  But shortly before trial, a plea was floated by your office, and I agreed to come down with trial counsel, my friend and colleague Larry Hammond and an attorney from his office, and we spent a day with Mr. Moore in the jail and concluded after that that he wasn't competent.

I testified as a witness before Judge Teilborg in that case on behalf of a motion seeking to declare him incompetent before trial.  It didn't succeed.  The matter went up on appeal.  Mr. Moore was convicted, and the matter went up on appeal, and the Ninth Circuit reversed his conviction.

And the opinion in that case commented

that even though it wasn't an issue, that perhaps the Court in the future might want to consider the observations of trial counsel, particularly Mr. Hammond and me, both of whom said we had never been in the presence of such an impaired client.

I say that only to support the idea that I think I might have understood questions of competence and whether or not Lezmond was sitting across from me under the influence of something based on my experience.

Q.    Mr. Mitchell made statements to the FBI.

A.    He did.

Q.    Was there anything in your discussions with Mr. Mitchell, the information that you had, that led you to conclude that the statements that he made were not voluntary?

A.    As I recall -- and I think I would have to look at the record, but I recall a motion aimed at the statements -- certainly the statements that were made on the day that Johnny Orsinger and Mr. Mitchell were taken separately up to the scene in the mountains where the bodies were located.  I remember the testimony of the agents about how that was done.  I particularly remember how they handled Mr. Orsinger.  There was one agent that became very agitated and had to be separated

from Mr. Orsinger.   But I think there were some questions about the way in which those statements were taken.

I don't recall precisely the legal issues, but I do have some recollection of that hearing.  I remember it being recorded and cross-examining the agent in that case.

Then I also have a question about the last set of statements that were made, a legal question that I think was raised about the statements that were made on the day they were first seen by a judge and counsel was appointed in which they were being questioned in the building while Mr. Williams and Mr. Bartolomei were sitting downstairs.  I thought there were some issues about that.

Q.    Do you recall a voluntariness hearing when Mr. Mitchell himself testified?

A.    I don't remember if he did or not.

Q.    There was a medical examiner in the case, Dr. Jerry McLemore.

A.    Uh-huh.

Q.    Did you interview Dr. McLemore ahead of her testimony?

A.    I don't -- I don't remember doing it myself.  I don't know whether Dr. McLemore was

interviewed by another representative or not.

Q.    Let me if I might, there is an issue referencing statements, I believe -- and the record will bear me out -- I believe made by you dealing with a knife injury to the little girl.

A.    I'm sure there would have been.  But I don't remember what it is.

Q.    And more particularly, that Dr. McLemore was not interviewed because she wanted to charge some expert fee.  Is that --

A.    That wouldn't have been a particular concern of mine, I don't think.  I wouldn't have been responsible for paying it.

Q.    As you investigated the case and read the report, did you have any question as to the cause of death of both Alice Slym and ███████?

A.    No.

Q.    You have read the medical examiner reports before?

A.    Many times.

Q.    Interviewed medical examiners?

A.    Many times.

Q.    Cross-examined medical examiners?

A.    Many times.

Q.    Do you recall anything in that report that

you thought could have changed any dynamic of the case or any perspective of the case?

A.     Well, my sense was that Mr. Mitchell denied and continued to deny to us that he was involved in this, although he made statements to the contrary. There were questions about the number and sequence of the knife injuries to the grandmother that I recall. And there were questions about where people were located and how the actual stabbing was conducted in this case.

And I think those matters were argued. I'm sure they were argued at the penalty phase about whether Mr. Mitchell actually inflicted any lethal injuries or not in this case.  But more than that, I can't remember today.

Q.     You're familiar with DNA evidence?

A.     I am.

Q.     You've had cases before involving DNA?

A.     I'm in the middle of one right now.

Q.     You've spoken to experts in the field before?

A.     Yes.

Q.     Questioned experts on the stand during either pretrial hearings or trials?

A.     I have.

Q.    The DNA evidence in this case, can you recall how you viewed it?

A.    I'm trying to think precisely what the DNA evidence was in this case to begin with.

Q.    There -- and I don't want -- the record is much clearer than I will be.  But there was at least one or two knives recovered that had some blood in it.  There was some blood found in the pickup truck that had been taken.  There were some Halloween masks used in the trading post robbery.

A.    I remember those.

Q.    Some latex gloves that were recovered from the scene that had some DNA in it.  I believe a cell phone belonging to Alice Slym.  Generally, that was the -- there may be one or two more items, but that was the general --

A.    In general terms, I don't think we ever seriously considered, or if we -- we seriously considered, it was put away quickly, a defense that involved Mr. Mitchell not being present for any of this.  We thought that -- that a defense like that had no prospect of the success and that the DNA evidence was simply part of the circumstance.

But based on Mr. Mitchell's statements, which we believed were likely to come in against him,

and all the other circumstances, we didn't think there was any way possible to argue that Mr. Mitchell was not present for all of the events in this case, including the armed robbery at the trading post.

I remember, of course, we wouldn't have known until -- until trial whether any of the other individuals involved would have been immunized and testified against Mr. Mitchell in this case beyond the ones that did.

Q.    At the conclusion of the trial when Mr. Mitchell was found guilty, there arose an issue from Mr. Mitchell about not wanting to attend any further proceedings.  Do you recall that?

A.    I do.

Q.    Can you tell us a little bit about how that came about, the initial -- were there discussions prior to the verdict?  Right at the verdict?  Right after the verdict?

A.    Well, as I recall -- and my memory on this is not -- is not particularly complete.  But I know that we had discussions with the Court about a brief delay between the return of the verdict at the guilt/innocence phase and the beginning of the penalty phase trial.  I can't recall how much time we were given between the two phases.

But at some point, my recollection is that Mr. Bartolomei called me and said that -- either called me or e-mailed me and said that Mr. Mitchell was no longer going to dress out and come to court, that he was done.

Q.   Did you have any discussions or were you part of any discussions with Mr. Mitchell about that decision?

A.   I'm sure I was.

Q.   Anything about that process that led you to conclude that maybe Mr. Mitchell was no longer competent?

A.   No.  I -- I -- I thought that Mr. Mitchell was thinking clearly and incorrectly.  We had many sessions with him in which -- many sessions.  We had sessions with him in which we told him what the consequences of that decision would be, that it would impact in a bad way our ability to present him in the way that we had hoped to present him.

I know that particularly Mr. Williams, my co-counsel, was -- was -- was directly involved in those discussions and was doing his best, as we all were, to persuade Mr. Mitchell to rethink his position. And at some point it became clear that we weren't likely to change his mind.

Q.    And do you recall whether the Court was involved in some of those discussions?

A.    I recall moving to withdraw, asking that we all be withdrawn, that Mr. Mitchell -- advised the Court what Mr. Mitchell's intentions were, that we had advised him to the contrary.  I think we probably had an ex parte hearing with the Court about that.  My expectation would be that's what we would have done.

And I remember an in-court appearance with Mr. Mitchell in which Judge Murguia had inquired directly of him about this decision.  And my recollection is we renewed our motion to withdraw at that point.

Q.    Which was denied?

A.    Yes.

Q.    Again, with some information that maybe he was under the influence of something, during those discussions, anything strike you as demonstrating that he was under the influence of something other than maybe an illogical mind?

A.    No.  I'm certain that if -- if any of us had sensed any of that, we would have acted on it.  And I think all three of us collectively are experienced trial attorneys who have dealt with clients with all sorts of disabilities in appearance.

I'll just mention again I'm also in -- in the Cisneros case, there were issues about the defendants consuming -- making and consuming homemade alcohol in Sheriff Arpaio's jail, shocking as that may be.

Q.    Now, I believe you were -- you said that you were primarily involved with the guilt phase.

A.    Yes.

Q.    Mr. Bartolomei was primarily involved in the -- which phase?

A.    In the mitigation and the sentencing phase.

Q.    But you all -- did all of you discuss these matters as issues arose, evidence arose?

A.    Yes.

Q.    And did you consider -- and maybe you've already mentioned -- consider different avenues to present at the mitigation phase?

A.    We did.  We did.  From time to time we would move in the direction of trying to emphasize to the sentencing jury the deprivation of Lezmond's background, his isolation, the way in which he was treated by his family, particularly his mother, and his gravitation towards this gang and the way in which they behaved.  And I think, in general, those issues were

31

presented to the jury.

But our -- we wanted to develop a theme, as I think all capital litigators are trained to do, that connects to the presentation you make if you make one at the guilt/innocence phase, that carries through so that you're not suddenly pivoting at the sentencing phase and offering something new and dramatically different about the defendant.  And we thought, as I think Ms. Ockenfels' report demonstrates, that there was a lot of positive information about Mr. Mitchell that could be presented to the jury.

Q.    And in presenting Mr. Mitchell in a positive light, what is the goal?  What is counsel looking for from the jury?

A.    Well, I think in general terms, that -- that -- and, in fact, there are even seminars that are offered to mitigation teams and specialists.  Sometimes they're called "Life in the Balance."  But one of the persuading themes is a life worth saving.  Is this a life worth saving?  Is there something about this particular defendant, Mr. Mitchell, that would justify, notwithstanding what the jury convicted him of doing, of granting him some degree of mercy?

Q.    And how many jurors do you have to convince of that?

A.    In federal court, one.

Q.    And was that more or less the hope of the team?

A.    We thought -- well, I don't know that we thought we were playing just to the one juror.  You always think that.  But we thought that, if presented properly, there was -- there were serious questions of proportionality in this case about the conduct of Johnny Orsinger matched against the conduct of Mr. Mitchell.

Of course, these are decisions and discussions we had before the jury made a decision. And we wouldn't know going forward to penalty phase what they really thought about Mr. Mitchell's conduct, whether they thought all of this was smoke and mirrors or whether he really was less of a player than Mr. Orsinger in the actual killings.

And we thought that there was a chance that we could demonstrate that Mr. Mitchell was caught between different cultures, that he was a bi-racial individual, as far as we could tell, that he didn't really fit in in the Hispanic community in California, and he fit in even less efficiently in this particular part of the reservation, a very isolated, very deprived part of the reservation where he spoke no Navaho, had

no traditional values, and generally was an outsider.

Q.    Did you ever have a discussion with his mother, Sherry Mitchell?

A.    I'm not sure that I did.

Q.    Did you ever talk to his grandmother or grandfather, Bobbi and George Mitchell?

A.    No.   I think Mr. Bartolomei conducted those interviews.   I know there was a videotape of the grandmother that was played during the mitigation phase that I found somewhat disturbing.   I think I pointed that out to the jury.

Q.    Were you part of a discussion or did you discuss with Mr. Mitchell whether he would make a statement to the jury in the mitigation phase?

A.    I cannot recall whether we talked to him about allocution or whether he would testify.   I know that all of that changed dramatically when he -- that it was permitted not to be present.

Q.    How do you mean?

A.    He was not going to be present in court to make a statement directly to the jury.

Q.    Had he changed his mind at any point, would he have been allowed back into the courtroom?

A.    I'm sure he would have.   We certainly would have wanted him back in.

Q.    Do you recall any discussions about him advising the marshal that he might become combatant if forced to the courtroom?

A.    I don't remember.

Q.    Let me just ask.  While you may not have spoken with Sherry Mitchell, do you recall as you sit here today any information provided by either Mr. Bartolomei or Mr. Williams or anyone else about Sherry Mitchell?

A.    Oh, yeah.

Q.    And what do you recall?

A.    My general impression was that she was trying to distance herself from this problem and her son, that she was a -- as her mother apparently before her, was a self-centered, selfish individual, that somehow she thought that what Lezmond was accused of doing would reflect badly on her, which I think is illustrative of her lack of empathy for her son.

And then I had lots of the kind of biographical general information that was developed about the social history that she went off in search of her education and sent Lezmond back to live with her family while she was doing that.

Q.    Do you recall if you spoke with Mr. Mitchell about his upbringing?

A.    I'm sure I did.

Q.    You have discussed more or less the path or theme that you pursued at the sentencing mitigation phase.  Was there any discussion about trying to go psychiatrically with anything in Dr. Morenz's report?

A.    There were certainly discussions about it. And I think at the end we thought that that was an example of the inherent contradiction in presenting either a mental health or substance abuse/mental health component of the mitigation case.  We felt that there was enough positive that we could say about Mr. Mitchell that the jury would look at this as excuses.

There was a particular concern -- this case arose not long -- went to trial not long after September 11.  And based on the extensive jury selection process and the questionnaire responses that were generated, I personally observed what I thought was a real hardening and real shift in the attitude of the potential jurors and the seated jurors about lots of things that, historically, I had used in other capital cases and that, put in simplest terms, that things that you would say about a defendant, about a defendant's background or a defendant's mental challenges by way of explanation or even a defense in

2003 were likely to be looked at as excuses for terrible conduct and would be negative.

And we had a number of observations inside the group about that dynamic. And we all agreed that this was something that we saw even in routine cases that -- that the jury questionnaire responses in this case were as harsh as any I've ever seen.

And they were from a mix of people. Sometimes you will see those from certain kinds of jurors that fit some sort of general profile, but these were harsh responses from educated people, from people that you would not otherwise expect to do that. I remember it somewhat as being chilling, that they objected to the waste of time that a trial would take and suggested that people be taken out back and shot.

Q.    You mentioned that you and the group had any number of discussions. Do you recall whether you discussed any of these issues in general outside of the group to colleagues not necessarily involved with the case?

A.    I can't remember specifically. That's certainly my practice. I'm active in a number of associations and groups, and it's a pretty tight network of people who do capital defense, particularly at the federal level.

Q.    Is that in the nature of either bouncing ideas off someone else, raising hypotheticals to get -- to make sure that you're on track?

A.    Yeah.

Q.    You mentioned before you had been to some training.  Have you gone to capital litigation seminars, trainings, over the course of time?

A.    Yes.

Q.    What types do you recall?

A.    I have been to a number of National Association for Defense Lawyers seminars that would have capital case tracks.  I have been to our State affiliate as seminars.  I've been to sessions put on either by the Maricopa County Public Defenders Office or some other agency.  Primarily, the seminars I went to were aimed at the defense of capital cases at the State court level.

Q.    Do you know what kind of records were produced in the investigation of Mr. Mitchell in terms of his social history, school records, social services records?

A.    I've -- I have a -- I couldn't tell you specifically, but I have a recollection that Ms. Ockenfels, who I had never worked with before, did a workman-like job of assembling the records for social

history.  And I know that that is a -- an early task of all mitigation specialists, and I believe she was able to do that.

Q.    Do you know if there was ever a discussion about whether Ms. Ockenfels should testify?

A.    I don't remember any discussion like that. My practice typically is to not have a mitigation specialist testify.

Q.    And why is that?

A.    There are a number of reasons.  One is it has to do with, particularly in the State court, the discoverability of their work product if they're going to be a testifying witness, which is a different concern in federal court.  But I view mitigation specialists as a -- as a multidisciplined investigator who's consulting with the defense team and not a testifying witness to offer ultimate opinions about some of those matters.

Q.    And do you recall in Ms. Ockenfels report whether there were items again that perhaps you would not want the Government to be aware of?

A.    I'm sure there were.  If I sat here and read it, I could probably point to them.  That would be expected.

MR. KIRBY:  I don't have any other

questions.

EXAMINATION

BY MS. PEAKHEART:

Q.    Good morning.

A.    Good morning.

Q.    You stated that you read only the amended motion in preparation for the deposition?

A.    I think that's right.

Q.    Did you read the entire motion?

A.    I think I looked at the motion and saw that it was similar to what I think was the original motion, which I read at or about the time that it came down.  I think I went on line and looked at it about the time it was filed.  It's been some time now.

Q.    What about any of the exhibits?  Did you look at any of them?

A.    No.

Q.    Is there a reason why you didn't?

A.    I wasn't able to find the time to do it.

Q.    And when did you speak to Mr. Bartolomei about the deposition?

A.    I talked to him earlier this week.  I couldn't tell you what day it was.

Q.    And what did he tell you?

A.    He told me that it was very cordial.  You were very polite to him.  It lasted about three hours.  You asked him questions.  And then when he left, he felt like he wasn't competent to handle a barking dog case.

Q.    I'd like to talk to you about the role of learned counsel.  Where does that phrase come from?

A.    The statute.

Q.    That's a federal statute?

A.    Yes.

Q.    And what does it state?

A.    You'd have to show me the statute.  It talks about a lawyer who can be appointed in a capital case and who is learned in the law of death penalty defense, generally.

Q.    And what does that mean?  What does that encapsulate, the law of death penalty defense?

A.    Well, I think there is a requirement, as there is in State court, that you demonstrate a level of experience, generally experience in defense of capital cases and a familiarity with the appropriate jurisprudence, particularly at the United States Supreme Court level, applicable to capital cases.

Q.    Would that, for example, include investigating a capital case?

A.      Yes.

Q.      And would that include investigating and developing mitigation?

A.      Yes.

Q.      Would that include investigating and developing mental health defenses?

A.      To the extent they were available and real, yes.

Q.      And would that include, for example, investigating and developing defense to the Government's scientific evidence?

A.      It would certainly involve investigating it.  Whether it could be developed or not would depend on your investigation.

Q.      Now, when you were brought on the case, what did John Sands tell you?

A.      The case was going to be tried in Prescott about 100 feet from my office.

Q.      So you are a perfect fit.

A.      For about a week, it seemed like I was.

Q.      Had there been learned counsel on the case before your appointment?

A.      I don't believe so.

Q.      Do you know why that was?

A.      I said I don't believe so.

Q.    Do you know why that was?

A.    No.

Q.    And so when you came on the case, had you worked with Jeff Williams before?

A.    No.

Q.    Had you worked with Greg Bartolomei?

A.    No.

Q.    And what was your first meeting with them like?

A.    It was cordial, and I thought they were fully capable of handling barking dog cases and this case. I remember going to the Federal Defenders Office when it was in the Security Building not far from here and having a pretty lengthy meeting with John Sands and Mr. Bartolomei and Mr. Williams. I can't remember if any of the investigators or anyone else were present. But they gave me an overview of the case at that point. They explained to me that they were sorry that the case had been moved from Prescott. And I explained to them not as sorry as I was.

Q.    Now, do you remember about when in 2002 that happened?

A.    I'm sorry. I don't.

Q.    Would it possibly be in April?

A.    Could have been.

Q.    So what is the role of learned counsel in a three-attorney team?

A.    I don't think there's a defined role.  I think that we developed a working relationship based on our collective abilities and experience that I thought was very effective.  I thought we were a good team.  I thought that this was not a case in which the lawyers that I was going to be asked to work with were so inexperienced or so -- so new to the game that I was going to have to be some sort of mentor or ship's captain.  I think we had a relationship that allowed us all to make decisions individually and collectively that were respected, otherwise significant.

Q.    Were you familiar with Mr. Williams' experience as a defense attorney in murder cases?

A.    No, not particularly.  I know that he worked at the Federal Defenders Office for some period of time.  But I couldn't tell what you his particular experience was.

Q.    What about Mr. Bartolomei?  Did you know his experience?

A.    No.

Q.    Why wouldn't you want to know their experience?

A.    I'm not really sure that, as we began to

get involved in the case, that either of them were demonstrating such a complete lack of experience or ability that it would have ever been a concern.  I don't know that they knew what my experience was.

Q.    Well, they knew you had some experience because you're a learned counsel.

A.    I would assume so.

Q.    According to the guilt phase, what was your strategy as the presence in the courtroom?

A.    As I told Mr. Kirby here, that based on the totality of our work to that point, we thought that going to trial, the most we could say on behalf of Mr. Mitchell was that, although he was there, the horrible behavior in this case was instigated by and almost entirely carried out by Johnny Orsinger and that Mr. Mitchell's presence there seemed to have somehow been part of a plan to ride herd on Johnny Orsinger to keep him from doing what he ultimately did, that the plan as we came to understand it was simply to get a truck to use in this armed robbery and not to kill people in the course of doing that.

Q.    So would establishing that Mr. Mitchell had no role in the murders, why would that not have involved attacking the DNA evidence?

A.    As I think I told Mr. Kirby here a moment

ago, I don't think we ever thought that it was plausible or possible under the circumstances to say that Mr. Mitchell had no role in the murders. Mr. Mitchell had made statements that we knew were going to come into evidence against him that he'd been present, that Johnny began the attacks, that he thought he may have stabbed Ms. Slym a few times, and that he participated in the next event taking them up into the mountains and at least being present for the murder of Tiffany in this case.

To us collectively, the DNA evidence didn't offer a completely exculpatory avenue to the point where it made sense for us to attack it. Because the idea that we would somehow be suggesting to the jury that Mr. Mitchell wasn't there or that he was sitting quietly while Mr. Orsinger committed all these crimes, there was just too much evidence putting Mr. Mitchell in contact with the knives and putting Mr. Mitchell at the stabbing, at the carjacking, and at the subsequent mutilation of the bodies.

Q.    So your strategy going into the guilt phase was contrary to the DNA evidence?

A.    You'd have to be more specific with me about what it was in the DNA evidence that is contrary to what I've just told you.

Q.    Well, you've just said that the DNA evidence did not exclude Mr. Mitchell.

A.    No, I didn't say that.

Q.    I'm sorry.  Repeat for me again what you said.

A.    Okay.  My sense generally, the DNA evidence -- and understand this is evidence that I would have reviewed eight years ago -- that the DNA evidence in this case was not likely to produce an argument that was completely exculpatory to Mr. Mitchell, that it was not -- that it was simply part of the Government's evidence against Mr. Mitchell, that their case was not based on the DNA evidence completely.

So I can't -- I can't say for you that the DNA evidence was contradictory to the defense that we put on at trial.  We were simply trying to demonstrate to the jury that Mr. Orsinger was the person with this prior behavior.  Mr. Orsinger was the person that inflicted the majority of the wounds.  Mr. Orsinger was the wild card in this transaction.

It was not, in our judgment, appropriate or productive for us to argue that Mr. Mitchell either wasn't there or didn't handle the weapons or didn't participate in the armed robbery.

Q.    Arm robbery, what do you mean by that?

A.    I'm sorry.  I don't mean armed robbery.  I mean the robbery the trading post.

Q.    That's a later event that I believe --

A.    There's DNA evidence.  Mr. Kirby pointed out there was DNA evidence, I recall, from these Halloween masks that they used.

Q.    Well, I'm just focusing on the capital murder, the two murders.

A.    All right.

Q.    You're aware that Mr. Williams interviewed Benita Bock, the Government's DNA expert?

A.    I remember that.

Q.    Did his interview of her raise any red flags for you?

A.    I can't remember what she said in her interview.

Q.    Were you concerned that she stated and testified that there was a match when, in fact, there wasn't?  I'm sorry.  That, in fact, she overstated when she said there was a match?

A.    I have since this case and, in fact, in the case I'm involved in now, pay particular attention to the propensity of DPS criminalists to overstate their conclusions or to testify that they are told that

they have to have a match at all 14 loci before they can call it a match, but their personal opinion is that a partial match is a match, nonetheless.

In this particular case, I think for the reasons that I've already given, I was not particularly focused or concerned on the DNA evident or that testimony or the possibility that that criminalist would overstate somehow the results of her investigation.  In other cases where the prosecution hinges largely on the DNA evidence, I see that as a much greater problem.  I did not see it that way in this case.

Q.    You didn't see it as a problem that she said this was a match?

MR. KIRBY:  I'll have to object.  You'll have to be a little more specific as to which item we're talking about.

MS. PEAKHEART:  I'll come back to that.
BY MS. PEAKHEART:

Q.    Do you recall asking prospective jurors during voir dire about Mr. Mitchell's life history and drug use?

A.    I don't.  I don't remember, no.  Jury selection in this case took, I think, 16 days.

Q.    Fourteen.

A.    All right.

Q.    But you don't remember why you would have done that?

A.    Why I would have done what?  I'm sorry.  I don't understand the question.

Q.    Why you would have asked the prospective jurors about Mr. Mitchell's life history and alcohol and drug abuse.

A.    If I did -- and I don't recall whether I did -- I'm sure I would have been looking for responses from potential jurors about such issues that would have given us pause in the jury selection process and, if that juror was seated, would have caused us to think hard about that evidence and how it could or could not be used in the case.

I think generally speaking, the way in which we approached jury selection in this case was complicated by this sort of constellation of concepts that you had Native American on Native American crime, but it involved such horrible violence and such vulnerable victims, and there was some overarching senselessness that we saw the jury -- that the jury would latch onto about this, that this could happen to people over a pickup truck, that I think we wanted to look at -- as we always do in jury selection, look for

attitudinal answers from people about things that would red flag for them.

You've asked me about red flags. Red flag for those jurors. If you ask a question like that and a juror sits up and says, "If you're going to argue that they were drunk or high, don't bother with me. I don't want to hear that. That's no excuse." Those are the kinds of things we were -- I would imagine, in general, we were looking for, those questions.

The same with social history. We were also looking for -- at least this was a source of conflict with the judge. We were looking for attitudinal answers from prospective jurors about the vulnerability of the victims. I remember a series of layered hypothetical questions about would your answer change if the victim was a 65-year-old woman? Would your answer change if it was a nine-year-old girl and a 65-year-old woman? We wanted to see if we could test the jurors' responses.

And those are the kinds of highly emotional issues that we thought might provoke important responses from jurors. That's why we wanted sequestered individual voir dire and were given it ultimately.

Q.    Why would you ask the jurors about an

issue that you had no intention of presenting?

A.    Well, this was a case in which we had the ability to change our approach and likely would have changed our approach if circumstances had dictated it. If -- if there was going to be evidence in the case from other people about substance abuse, even if we were not going to offer that as a defense in the guilt/innocence phase or as a theme in the penalty phase, I personally would have wanted to know.

As the one conducting the majority of the voir dire, I would have wanted to know if there were people among the group of prospective jurors who had strong negative attitudes about alcohol and substance abuse, particularly if they saw it, as I said earlier, as some sort of an excuse. I would want to know that, because even if we weren't going to present that theme, if other people were going to come forth and testify, FBI agents, if other people were going to testify about claims of alcohol or drug abuse in this case, I didn't want somebody sitting on this jury that would be so inflamed by that that they would ignore the rest of the evidence.

Q.    Why would the Government present witness to testify about your client's drug use and alcohol life history?

A.    If I knew why the Government did everything it does in cases, I suppose I could just quit.  I wouldn't have expected the Government -- I understand the point of your question.  I wouldn't have expected the Government to open that door for us.  But I couldn't be sure in federal court -- in a world of limited discovery compared to State court, I couldn't be sure that somehow the idea that this was a group of hard- partying, potentially violent, socially irresponsible young people wouldn't come before the jury.

What I didn't want to have happen was to find out in the middle of the trial that a juror or a group of jurors were going to convict our client simply because of that conduct, that I had a sense that the jury was going to get a picture, not entirely from the defense, of who these young people were and how they behaved.

And that's why I -- why I wanted -- you know, in a vacuum, would it make sense to do -- to ask questions about something you weren't going to present?  No.  But I think in the context of the kind of jury we were looking to seat in this case, I think it did make sense.

Q.    Why would it be contrary to your guilt

defense to present who these socially irresponsible young people were?

A.     Well, "socially irresponsible" is my phrase.  I think -- I think that's a polite way of describing who these young people were.  And I think I would have had less credibility than I ultimately turned out to have with this jury if I had simply tried to present this group as a social organization of disaffected youth coming together around some common interest in music or something else.

This was a horrible crime of unimaginable detail.  We knew that.  We also knew that -- at least I knew that, in my collective experience, the decision to vote for death or life often hinges on who was killed and how they're killed.  And starting out in this case, we had the most helpless and vulnerable victims imaginable killed in the most grotesque and violent way imaginable.  And we had to work away from that.

And so the most -- what I wanted to know from the jurors as we were going through the 14 days of jury selection in this case was whether they came to court with some preconceived set of ideas about young people and gangs, if this was real gang, and violence so that they would just shut down and not listen and not be open to -- to some argument that we were going

to make about guilt or innocence or saving Lezmond's life.

That's where that went.

Q.    Can you tell me why the defense requested an intoxication instruction for the guilt phase?

A.    I can't.  I don't remember whether we did or not.

Q.    You did.

A.    Okay.

Q.    Do you remember why that came up?

A.    No.

Q.    Did you have a role in that?

A.    I don't remember.

Q.    Do you remember having a dispute or a series of disputes -- maybe "dispute" is too strong -- strong conversations with Mr. Williams about the guilt strategy?

A.    Not particularly.

Q.    One more DNA question.  Where did the idea of DNA transference come from?  You had examined Ms. Bock about that.

A.    I'd have to be told the context of that question.

Q.    Had you worked on a DNA case before Mr. Mitchell's?

A.    I've had any number of cases in which DNA was used.

Q.    Why not interview Jerry McLemore, the pathologist?

A.    Well, I heard Mr. Kirby's question that somebody had suggested that somebody didn't want to pay for it.  I don't recall that, and I can't imagine that that would have been the end of the discussion in this case.  I really can't give you a concrete explanation, Ms. Peakheart, about why we chose not to interview the pathologist in this case except to say again that our theme was aimed at -- our theme, our defense, was aimed at Johnny Orsinger did it as opposed to how these people died.  I came away with the conclusion that there was very little question about how they died, particularly when their heads were cut off.

Q.    But there is a question about Mr. Mitchell's role in all that; correct?

A.    Yes.

Q.    So asking the pathologist who did the autopsies about causes or manner of death might have been helpful?

A.    In hindsight, probably.

Q.    Not in foresight as a learned counsel?

A.    You know, I don't -- I'm sorry.  I don't

have the benefit of the report there. And it's difficult for me to reconstruct here what our thinking was. But we certainly knew that we could have interviewed Dr. McLemore. And I'm imagining that there was a conscious decision not to do it. And it probably had to do with what we thought was our ability to make the points we wanted to make on cross-examination simply from the report.

Q. Why not interview all the Government's intended -- try to interview their intended witnesses on this evidence, for nothing else than to cross it off a list?

A. Oh, I suppose that -- you know, that, in hindsight -- again, that would have been something that we could have done. Have I ever gone to trial before where I've not interviewed every single witness? I'm sure I have. I may be forced to go to trial in a State court case not having interviewed every witness. Do I think we interviewed the witnesses that we wanted to interview? Yeah.

I guess maybe put another way, I'm not certain that, as a matter of law, the standard for learned counsel or any counsel in a capital case requires absolutely interviewing every witness on the Government's list. I'm just not sure that that's the

standard. Is it best practices? Perhaps.

Q. But this is the witness who would testify to the cause and manner of death that your client is charged with.

A. Yeah. But I was convinced that that witness was not going to say that my client -- that witness could not and would not say that my client inflicted some particular injury to this person. The medical examiner was simply going to say that injuries were sustained by these people.

Q. But you don't know that because you didn't interview her.

A. We could debate this, I guess, the rest of the day. I don't -- of course I don't know what that person would say if I didn't interview them. But that was the judgment we made at the time.

Q. Do you remember seeking a continuance for the trial because of still waiting on some DNA evidence?

A. No.

Q. Regarding the penalty phase, how often did you talk to Ms. Ockenfels?

A. I didn't tell you.

Q. More than once?

A. I'm sure.

Q.    More than 10 times?

A.    I don't know.

Q.    Did you ever speak to her in person?

A.    Yes.

Q.    How many times?

A.    I have a recollection -- a recollection of a meeting in Phoenix in a small conference room. Whether that's several meetings morphed into one, I can't tell you.

Q.    When you came on the case, do you remember the fact that, when Greg Bartolomei and Jeff Williams first met Mr. Mitchell, that Mr. Mitchell had already been in jail about 24 days?

A.    Yes.

Q.    And in that 24 days, he had been interrogated many times?

A.    I remember that.

Q.    And do you remember that -- well, you do, because you stated earlier the last interview happened on the day that they were there to make their appearance.

A.    That's right.

Q.    And that from those interrogations yielded confessions?

A.    I'd have to look at their statements.    I

can't remember.  I think they made inculpatory statements while they were being held in the tribal jail.

Q.    And how damaging were those inculpatory statements?

A.    Ultimately, very damaging.

Q.    Do you recall reading in our amended motion about the conflict of interest issue?

A.    If you're talking about an issue related to the representation of someone else connected to the case by another attorney in the Federal Defenders Office, I remember generally looking at that.

Q.    Did you have any knowledge of that before you read the motion?

A.    I don't believe so.

Q.    Does that concern you?

A.    I'd have to go back and look at the arguments that you made.  If it's a genuine conflict of interest, I do have a problem.

Q.    But no one told you about it at the time?

A.    Not that I recall.

Q.    There's an issue of the judge's -- the Court's severance, literally, on the eve of trial, of Mr. Orsinger.

A.    It was actually the morning of trial.

Q.    The morning of trial.  Even worse.

A.    Yes, it is.

Q.    What was the prejudice from that?  How did the defense suffer from that?

A.    Well, you know, I've thought about this. I have -- there was a very strange beginning to the case.  We really thought as we sat there -- we were just about to embark on jury selection.  The judge delayed, I think, coming on the bench and came out and began to read an order into the record reconsidering sui sponte her denial of what I thought was a well-taken motion to sever that had been denied sometime in the past.

I remember looking over to Mr. Bernais, who was representing Mr. Orsinger, and he had this look on his face like you would expect a man who was just given three months of his life back to him by the judge.  And I think we were just flat-footed by that. We were going to have a particular problem, I think, frankly, pointing the finger at Mr. Orsinger if he were sitting at counsel table.  And we thought there was rub-off prejudice based on that.  Ironically, some of that was probably cured by having an empty chair for Mr. Orsinger that we could point to rather than Mr. Orsinger himself.

But I think a better approach by us in hindsight would have been to ask for a continuance at that point to assess what prejudice or impact this severance might have on the case.  You know, we didn't know.  We didn't have a joint defense agreement.  We didn't know, for example, whether Mr. Orsinger was going to testify.  We didn't know whether the Government, in some midnight surprise, was going to immunize Mr. Orsinger.  It's hard to imagine that they would have.  But, again, I never cease to be surprised in this job, and they might have.

But I think just as we probably should have asked for a continuance when we were handed materials just at the beginning of the penalty phase to allow us to assess that, I think it probably, in hindsight, would have made sense for us to ask for a continuance to step back and take a look at what the severance might do to the case.

But to answer your question, which I'm sure is what you want me to do, I can't point to any particular prejudice that was created by this reconsideration and the granting of the severance.

Q.    You mentioned the late production of a letter.  That would be the letter from the Navaho Nation to the Government --

A.    Yes.

Q.    -- that was produced to you?  Was there any discussion among the attorneys of contacting the Navaho Nation yourselves?

A.    You mean after that letter was revealed to us?

Q.    Before.

A.    Yes.  We had a number of discussions.  And our assessment was that it seemed to us largely as a result of the cowboy murders and this case and a change in the leadership of the Navaho Nation, the election of a new tribal chairman, the tribe was for the first time reassessing in a serious way their view on capital punishment, the incredible escalation of violence among young people on the reservation.

I'm sure you know there were, if not hearings, at least town hall meetings conducted at chapter houses talking about these issues.  We could not -- and I'd have to defer to Mr. Bartolomei and the work that was done either before I got involved in the case or by them separately about the tribe.  But our sense was -- or my sense was that the tribe's position was not going to be helpful now and that it wouldn't do us much good to bring on people connected with tribal leadership who were no longer in office, for example,

the author of that letter.

What we did have, though, was the ability to present some evidence at the penalty phase about the tribe's unwillingness to opt in and the general culture in the tribe about death and about capital punishment. And I think we were able to present that evidence. We were also able to get the letter in over the Government's objection and use that.

I think -- as I said, in hindsight, I think we would have been better served to ask for a delay and see if we could do something more than what we were able to do at the penalty phase with that information. In the end, I am not sure that anything we could have presented to the jury at sentencing about the tribe's position would have overcome the prejudicial effect to of Mr. Mitchell of who died and how they died.

Q.    There was also an issue of family members wearing buttons.

A.    Yes.

Q.    Do you remember what the button looked like?

A.    No.

Q.    Do you remember how big it was?

A.    No.

Q.    Was it, say, as big as the name tag on your --

A.    No.

Q.    You don't remember at all?

A.    I have this vague recollection of seeing a button that may have had ███████ picture on it.  But I may just be imagining that.  That came at about the worst point in the trial for me.  That was about the time that the Government presented the graphic photos in this case.  I remember.  I wake up today thinking about being in court when that happened in this case.

I do remember, I think, saying something to the marshal about that.  And I don't remember the family members wearing buttons throughout the remainder of the trial.  I couldn't tell you as I sit here today whether that's a fact or how that happened.  But I have some recollection of us speaking to the marshal about that issue.

Q.    Were the family members a large presence in the courtroom?

A.    There was a group -- I couldn't tell you how many -- of the family, probably less than a dozen, whom I recall attending most, if not all, of the sessions in court.  And they were certainly there for the most important parts, and they were there for much

of the penalty phase.  And I particularly remember the woman who lost her mother and her daughter.

Q.    You mentioned earlier that one of your first federal capital claims was Mr. Benashley.

A.    Yes.

Q.    Is he Native American?

A.    Yes.

Q.    From what nation?  Do you know?

A.    White River.

Q.    What about Mr. Keesed?

A.    Mr. Keesed has decided that he's an Orthodox Jew because he liked the food better in the Bureau of Prisons that was offered to people that were kosher.  Mr. Keesed is an Anglo.

Q.    What about Mr. Moore?

A.    That's -- he is a person of mixed race.  A little difficult with his family history, but we think he is likely part African-American, part native.

Q.    And Mr. Cisneros?

A.    Hispanic.

Q.    Did Mr. Benashley's offense occur on the White River Reservation?

A.    It did.

Q.    Was it against a White River victim?

A.    He's alleged to have killed their tribal

officer during a dispute with the tribal officer.

Q.    And under what circumstances did that case settle to something less than death?

A.    I guess it would be cynical to say Janet Reno had a lot to do with it.  The circumstances of the case, there was an argument of several defense.  The officer shot Mr. Benashley first.  And Mr. Benashley lashed out.

Mr. Benashley had been involved -- he was very intoxicated.  He and his son had broken into a campground store up in the White Mountains and stolen some beer, and they were driving back on logging roads and had the misfortune to run into this tribal officer. The officer drew his weapon, made a big mistake, tried to put handcuffs on Mr. Benashley, only got one on. Mr. Benashley lunged at him.  He shot Mr. Benashley. Mr. Benashley got the gun away from him, shot him, and then finished him off with a rock.

Q.    And what role did Janet Reno have in --

A.    She was the Attorney General of the United States at the time that case was presented, if I recall.  The position of the Capital Case Commission was, I thought, very different than during the Ashcroft and later the Gonzales era in terms of which cases would be authorized to go forward as capital cases.

And I thought that the presentation we made to Main Justice about Mr. Benashley's circumstances and particularly about the circumstances of this case -- and there was a legal issue about whether at the moment of his death, the officer was a sworn federal peace officer. He'd been cross-deputized and then had been either suspended or fired for a period of time. And there was a question of fact that arose about whether he was actually a federal officer when he was shot. And Mr. Benashley pled to a term of years.

Q.    When you got on the case, Mr. Williams and Mr. Bartolomei had already represented Mr. Mitchell for several months?

A.    Yes.

Q.    How did you get up to speed?

A.    I read materials they provided me. I talked to them a lot. We had probably more than one lengthy meeting here in Phoenix to talk about the case. Very much the way I got up to speed on Cisneros. Cisneros had been litigated actively for over a year in New Mexico before I got involved.

Q.    I want to go back to your six State cases. Do you remember the names of those defendants?

A.    Boy, I would have no -- I remember one

that was Aaron Holliday, H-O-L-L-I-D-A-Y, who in Arizona, of course, was known as Doc Holliday.  I do remember that case.  Went to trial.

Q.    Did all six go to trial still as capital?

A.    No.  I think Holliday may have been the only one that went to trial.

Q.    And was he sentenced to life in prison?

A.    No.  He was given a term of years.

Q.    And of those six, how many went to trial?

A.    I think just the one.

Q.    I'm sorry.  I think I asked and you said that.  How many times do you think you met with Mr. Williams and Bartolomei?

A.    I couldn't tell you.  I'm sorry.

Q.    Would you come down to Phoenix?

A.    If we had -- I don't think we ever had any meetings in Prescott.  I couldn't think of a reason to lure them up to Prescott.  So if we had face-to-face meetings, they were always here.

Q.    So you may not have had face-to-face meetings other than the first one?

A.    Oh, I probably did several times.

Q.    How did you prepare for the presentation to the Capital Litigation Unit?

A.    Again, I'd have to go back and look at

what was done.  Typically, we would prepare a letter. I don't know whether a letter was prepared in this case.  But that letter would be essentially a mitigation presentation that would include social history, legal issues if there were any, other issues regarding, for example, the legal issues and the cultural issues raised by the Navaho Nation's having not opted into the Federal Death Penalty Act.

And then I do recall in this case -- and it's one of the many regrets I have about this case, but one of the particular ones is that, if this was the case I'm thinking of where we did this by videoconference, I think that was probably something I would not do again.  In every other case that I've been involved in, the presentations were made in person in Washington, D.C.  And even though they are brief and sometimes very abrupt, I think there is, on balance, a better dynamic that's developed when you're sitting in a room than when you're looking at a television set at the end of a conference table.

Q.    Did you question any of the work product given to you by Mr. Bartolomei or Mr. Williams?

A.    Questioned in what way?

Q.    "Can we look at this again?"  "This doesn't seem right to me."  Or "What about this?"

A.    I can't remember the details.  I'm not a shy person.  If I thought there was something that needed to be worked on, I'm sure I would have said it. Neither Mr. Bartolomei nor Mr. Williams are particularly shy either.

Q.    So as I understand it, you talked to Mr. Mitchell about whether he was intoxicated or not?

A.    When?  When he was intoxicated at what point?

Q.    At the time of the crimes.

A.    I remember being with Mr. Mitchell when we talked about that, and Mr. Mitchell denied that he was. I couldn't tell you at what point in the case that took place or even precisely where it was.  But I do have a recollection of him saying that.  And the reason I say that is because that -- that cemented in my mind the idea that we would go forward with the defense that didn't claim that he was intoxicated.

Q.    Do you recall if it was perhaps in the courtroom?

A.    Oh, I'm sure it wasn't.  I'm sure it was a place where we could talk in more detail.  I'm thinking it was at the jail.

Q.    Is that Madison Street?

A.    He would have been held in Madison Street

Jail.  He was being held -- as I recall, pretrial, he was held at CCA in Florence some distance from here.  And the -- I think the Public Defender had at that time the capacity to videoconference.  But I don't remember doing any videoconferences with Mr. Mitchell.  My recollection of meetings with him was when he was up here.

Q.    And you stated that you spoke to him about his upbringing?

A.    Yes.

Q.    And how long was that conversation?

A.    I couldn't tell you.

Q.    Did you ask him detailed questions or general questions or --

A.    I don't think I was alone.  I think it was a group.  I couldn't tell you who else was there.  There was probably more than one meeting.  And I think people were asking questions to fill in details from an investigation that was being conducted both by Ms. Ockenfels and also by the staff investigation for the Defenders Office.

Q.    Do you believe that took place at the jail?

A.    I think so, but I can't be sure.  I can't think where else I would have been with Mr. Mitchell.

Q.    Had you been to Madison Street Jail before?

A.    Sadly, yes.

Q.    What is the process for attorneys to sign in?  Do you just get to walk in or --

A.    It's not -- you don't have to be preapproved.  You simply have to have ID and a Bar card and appear.  And there's nothing particularly difficult about getting in.

Q.    Do you sign in and then sign out?

A.    I'm sure, yeah.  I'm sure you do.

Q.    And after you sign in, is there a wait till you get to the client or the client is brought to you?

A.    Yeah.  I'm trying to think.  At Madison Street, you would get a card.  You would go in through Security, and they would give -- there would be some kind of either four-by-six or five-by-seven card that was created.  I don't know why.  You would go up, and you would turn the card in when you were done, I think.

Q.    So when you went to -- so when you got the card, you were signed in, and then you went to --

A.    My recollection is then you turned the card back in before you got on the elevator and went down and let yourself out.

Q.    Do you sign in at the bottom of the elevator or --

A.    Yeah.  Yeah.  You can't get -- you can't -- as I recall it, you couldn't get -- they wouldn't even open the door and let you go through the metal detector until you had signed in.  You know, every county jail is different.  Every county jail is different, and they change on a regular basis.  And so that's what I remember about that.

I do remember when they opened the 4th Avenue Jail, It became even more bureaucratic because they were keeping our capital clients in a maximum security wing in the county jail.  An amazing place.

Q.    But Mr. Mitchell wasn't at that place; right?

A.    I don't believe so.  I don't believe it opened.  I remember when they opened the Cisneros case and they paraded the defendants in that case in pink their underwear on the sidewalk and invited TV the cameras in and had a crawler under there saying "The worst of the worst," which for us death penalty lawyers has a particular meaning.

Q.    We've obtained the logs in from Madison Street Jail.  And does it surprise you it indicates you visited Mr. Mitchell only once?

A.    It does.

Q.    Do you think you went there more?

A.    I couldn't tell you.  You know, perhaps my billing records that would have been filed with the Court ex parte under seal might answer that question. I would trust my billing records more, frankly, than the jail records.

Because one of the -- one of the things that I remember about the jail was that if there was nobody in the cage on the floor, you just left the slip there.  So I can't be sure whether you're looking at a copy of the slip that was filled out below or something that was returned up above.  I don't know how they maintain their records.

Q.    But you think you went there more than once?

A.    I would think so.

Q.    Because this single visit was in May, 2002, for 28 minutes.

A.    I'm sure I spent more time with Mr. Mitchell than that.

Q.    Will you sign a release for us letting us get your billing records?

A.    Can't you get them from the court?

Q.    No, we can't, actually.

A.      Yeah.   I don't have a problem with that. I would assume you could get them from the court with an order.

Q.      Well, with your release, too.   Because we would want them not from an -- from an order, we would probably have to share with Mr. Kirby.   And we're not inclined to share this.

A.      Well, if you send me a release, I'll take a look at it.

MS. PEAKHEART:   Okay.   Can we take a break?

THE WITNESS:   I don't need one.   If you do.

MS. PEAKHEART:   I do.

MR. KIRBY:   Sure.

(Whereupon, a recess was taken at 11:13 a.m. until 11:20 a.m.)

BY MS. PEAKHEART:

Q.      Just a couple more questions.   Do you recall in the penalty phase when Mr. Williams, Jeff Williams, cross-examined Special Agent Duncan about intoxication in Gallup?

A.      I'm sorry.   I don't.

Q.      You stated earlier that the client denied using any alcohol or drugs on the day of the offenses;

right?

A.    I'm not sure about that.  I know that they talked -- I'm sorry.  I know that Mr. Mitchell talked, and I think to us, about having consumed a large amount of beer.  I cannot today remember whether he was talking about the period before they went to Gallup or somehow during the day.  What sticks in my mind is the idea that by the time they were on the road and picked up by the victims in this case, he said they were not high.  That's what I remember.  I can't tell you whether he said they had not had anything to drink or any drugs during that period of time.  I just don't have a clear recollection of that.

Q.    And you could recall the FBI report stating that Mr. Mitchell's statement that he was drinking and blacking out during the time of the offenses?

A.    I do.

Q.    And in your mind, did Mr. Mitchell deny that to you?

A.    I think -- I think it was -- it was to get his take on that report that this conversation arose.  I think that was the context.  That's my recollection.

Q.    And you believed Mr. Mitchell telling you versus him having told the FBI?

A.    I do.

Q.    Why is that?

A.    That's an overstatement.  Do I believe -- do I believe Mr. Mitchell?  What I came away with was the idea that Mr. Mitchell would say something different if Johnny Orsinger was around or in the vicinity or if he thought what he said was going to get back to Mr. Orsinger or the rest of the young people in this case as opposed to what he would tell us in confidence.

And I was not comfortable and would not have been comfortable going forward with an argument not simply because -- that he was intoxicated and impaired at the time of the offense not because I was concerned about what the truth was.  The decision really was more nuanced than that.  The decision was based, in part, on that and our belief that he was more likely to be telling us what really happened in private than puffing himself up for Johnny Orsinger, but more to the question of whether this was a winning defense to present to the jury.

In the context of 2002-2003, given what had happened and who had died and how they had died, we made a collective decision, I believe, that ultimately that the best defense was simply that this was Johnny,

that Johnny -- this was -- everything about this crime, the way it was committed, why it was committed, the senselessness of it, all those things were Johnny Orsinger and not Mr. Mitchell.

And the presentation of this "We were all drunk," "We were all high," or some combination of that or "blacking out" didn't fit in our minds with that argument. I don't know that we saw it as an either/or proposition, that you could only present one.

But we concluded that strategically it just didn't make any sense to argue this is what happened, this is how it happened. But "By the way, I don't really remember because I was blacking out," we just didn't see that as an appropriate way to present that information to the jury. It was a decision that we made. In hindsight, could we or should we have gone in a different direction? I'm sure we could have.

Q.    You stated earlier that there are such things as joint plea agreements. And as I understand it, these are when defendants agree on a --

A.    Joint defense agreements.

Q.    Joint defense agreements?

A.    Yes.

Q.    And that is negotiated by defense counsel talking to each other?

A.    Oh, there's a very elaborate procedure for doing that.  I'm sure even now.  We had a joint defense agreement in the Cisneros case that required a great deal of effort and maintenance to get that done.  That was a multidefendant racketeering death penalty case.

But the answer to your question is yes, they're negotiated by the attorneys.  But, ultimately, the defendants have to sign off in the courthouse to approve.

Q.    So even before getting to that point, there are discussions among defense attorneys or can be discussions among defense attorneys who have clients?

A.    There could be.  There could be if it looked like the defenses were going to line up.  If you're asking about this particular case, I think we decided early on, as I've tried to explain, that this was going to be a finger-pointing case, that we were never going to be in a position where our defense was consistent with or in line with whatever Johnny Orsinger was going to say, unless Johnny Orsinger was going to plead guilty and accept full responsibility, which didn't seem like it was about to happen.

Q.    Even though your client was possibly in a better posture because Johnny Orsinger had already committed two murders prior?

A.    That still wouldn't, in my limited view of joint defense agreements, been a basis for the kind of information sharing and privilege waiving that goes along with joint defense agreement.

Q.    I'm not even talking about something as formal as that.  I'm just talking about speaking with his counsel.

A.    I'm -- I'm sure we spoke to Mr. Bernais. All of us know Mr. Bernais, and we knew him before the case.  And I'm sure we spoke to Mr. Bernais about this particular case.

Q.    And what about the attorneys for the other defendants in the other case, especially the trading post robbery?

A.    I'm sorry.  I don't even recall who represented the other defendants.  They probably were panel attorneys, but I just don't remember.

MS. PEAKHEART:  Okay.  I have nothing further.

MR. KIRBY:  Nothing further.

THE REPORTER:  Read and sign.

MS. PEAKHEART:  Yes, he will be sent --

MR. KIRBY:  He will be sent a copy to review, and he will be entitled to let us know of any corrections or deletions, additions.

THE WITNESS:  Thank you.

(Whereupon, the deposition then adjourned at 11:28 a.m.)

-ooOoo-

LEZMOND CHARLES MITCHELL,

vs.

UNITED STATES OF AMERICA

Thursday, February 18, 2010

J U R A T

I, JOHN M. SEARS, having read the foregoing deposition consisting of my testimony at the aforementioned time and place, do hereby attest to the correctness of the transcript under penalty of perjury.

(Signed) _____

(Dated) _____

STATE OF ARIZONA          )
                          )  ss.
COUNTY OF MARICOPA        )

            BE IT KNOWN that the foregoing deposition was taken before me, that I was then and there a Certified Reporter #50644 in and for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth and nothing but the truth; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed under my direction, and that the foregoing pages are a full, true and accurate transcript of all proceedings had and adduced upon the taking of said deposition, all done to the best of my skill and ability.

            I FURTHER CERTIFY that I am not related to nor employed by any of the parties thereto, and have no interest in the outcome hereof.

            DATED at Phoenix, Arizona, this 18th day of Feb., 2010.


                        DOREEN C. BORGMANN, RMR, CRR
                        Certified Reporter #50644

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Lezmond Charles Mitchell,  )
)
)
Plaintiff,  )        No.  CV-09-8089-MHM (JI)
)
Vs.  )        AFFIDAVIT
)
United States of America,  )
)
)
Defendant,  )
)
)

STATE OF ARIZONA  )
)    ss.
COUNTY OF MARICOPA  )

BE IT KNOWN that the forgoing deposition of John M. Sears, was taken before me, Doreen C. Borgmann, RMR, CR No. 50644, on February 18, 2010; that the witness elected to read and sign the deposition before filing with the noticing attorney; that on February 23, 2010, the signature page from the original transcript was forwarded to John M. Sears, Esq. so that the transcript could be reviewed and corrections and/or changes made and the executed signature page returned to this office for insertion into the original transcript for subsequent filing.

Having not received said signature page, and being charged with the responsibility for filing of the original transcript, I herewith file said deposition.

Dated at Phoenix, Arizona, this 29th day of March, 2010.



WILLIAM A. MCNUTT III
Notary Public—Arizona
Maricopa County
Expires 07/15/2013

Certified Court Reporter

SUBSCRIBED and sworn to before me this 29th day of March, 20 10.

Notary Public

My Commission expires: 7/15/2013

**COPPERSTATE REPORTING SERVICE**