SEAN KENNEDY (Calif. Bar No. 145632)
sean_kennedy@fd.org
Federal Public Defender
STATIA PEAKHEART (Calif. Bar No. 200363)
statia_peakheart@fd.org
Deputy Federal Public Defender
Office of the Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:   (213) 894-0081

Attorneys for Defendant-Movant
LEZMOND CHARLES MITCHELL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| LEZMOND CHARLES MITCHELL,<br><br>Movant,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | No. CV-09-8089-MHM<br><br>**Reply to Response to Amended § 2255 Motion** |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendant-Movant Lezmond Mitchell replies to the arguments in the Government's response to his amended motion to vacate, set aside, or correct sentence ("Response").  Mitchell reasserts all factual and legal allegations contained in the pleadings he has filed to date in this action.  In every instance in which Mitchell does not reply specifically to arguments made by the Response, he relies on the factual and legal allegations in his first amended § 2255 Motion and all evidentiary exhibits thereto. Mitchell does not waive any challenge to his conviction and/or sentence previously asserted in this proceeding.

The Response fails to rebut Mitchell's issues for relief from his conviction and sentence.  Mitchell has presented hundreds of pages of documents and declarations that substantiate his allegations about, *e.g.,* his trial counsel's errors and omissions and the government's failure to fulfill its obligations under *Brady*.  Moreover, to date, there is one Native American inmate on Federal Death Row – that inmate is Lezmond Mitchell.  At the time of trial, this was a groundbreaking case in that the Federal Government overrode the local United States Attorney and subjected Mitchell to capital punishment despite Navajo opposition to the death penalty and the tribe's refusal to opt into the federal death penalty.  The Navajo Nation played an important role in this case.  The investigation into the crimes involved both federal and Navajo authorities, Mitchell was held in Navajo custody for over three weeks before being transferred to federal custody, and the Nation officials intervened in an attempt to keep the federal government from seeking the death penalty. (Defendant's Trial Ex. 22, Navajo Nation letter to Paul Charlton; *United States v. Mitchell*, 502 F.3d at 989; Declaration of Former Attorney General of the Navajo Nation Levon Henry, Ex. 165)  Furthermore, given that both of the victims in this case were Native American, the Navajo position in this case should have been especially persuasive.  Strictly legal issues aside, the Navajo culture was an important issue in this case.  Mitchell lived on the Navajo

reservation, attended Navajo schools, and practiced the Navajo religion. Mitchell's family was active on the reservation and his friends were other Navajos. Issues affecting the Navajo Nation's population in high frequency, such as chemical dependency and psychological disorders, were central themes in Mitchell's life. Given the importance of the Navajo Nation in this case, a competent attorney would have, at the very minimum, familiarized himself with the basics of Navajo law, including the tribe's position on capital punishment, and culture. Counsel in this case made no such efforts. (*See* Declaration of Attorney General of the Navajo Nation Louis Denetsosie, Ex. 152; Declaration of Former Attorney General of the Navajo Nation Levon Henry, Ex. 165). To present an accurate and complete picture of Mitchell's life, counsel would at least need some sense of the reservation and the ability to speak knowledgeably about life thereon. As is evident from the trial record, however, trial counsel in this case had no such knowledge. Counsel's failure to challenge issues related to collusion demonstrate counsel's failure to acquire any knowledge of tribal law. The fact that counsel's ineffectiveness at voir dire and the unjustified transfer of the case to Phoenix resulted in a jury of only one Native American rendered counsel's failures with respect to tribal knowledge all the more damaging.

Mitchell will not attempt a point-by-point refutation of the government's confusing presentation, but instead will confine this Reply to addressing the broad disputes of fact and law that exist between the parties, to assist the Court in determining what further proceedings are necessary to resolve this case.

**I.**

**The Government's Defenses Do Not Bar Review or Relief**

**A.    Issues Raised Previously on Appeal Do Not Bar Review of Relief**

The Government asserts that the following issues were raised and resolved on appeal, and therefore are barred from review:

G.    Challenging DNA Testimony;

I.      Challenging Removal of Juror No. 3;

N.      Challenging Transfer of Trial to Phoenix;

O.      Challenging Exclusion of Jurors;

Q.      Challenging *Brady* Material;

R.      Challenging the Collusion of Law Enforcement;

S.      Challenging Competency of Defendant Post-Guilty Verdict;

T.      Challenging the Wearing of Buttons at Trial; and,

Z.      Challenging Lack of Plain Error Review on Appeal.

(Response, p. 12.)

First, the Government is mistaken because all of Mitchell's issues, except I, T and Z, rely on facts outside the record, which are properly asserted in proceeding under 28 U.S.C. § 2255.[1]  Issues that require the development of facts outside the trial record cannot be fully presented in a direct appeal and may only be adequately developed and considered in collateral proceedings. *See Massaro v. United States*, 538 U.S. 500, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003) (explaining that many claims can be fully presented only in collateral proceedings and holding that these claims "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal"); Liebman and Hertz, Federal Habeas Corpus Practice and Procedure , p. 1731 (4th ed.).  Although this exception to the general default rule is most often invoked in the context of claims of ineffective assistance of counsel, *see, e.g.*, *United States v. Harris*, 310 F.3d 1105, 1111-12 (8th Cir. 2002), it applies to other types of claims as well. *See, e.g., United States v. Marroquin*, 885 F.2d 1240, 1245-46 (5th Cir. 1989) (federal prisoner's double jeopardy challenge to multiple sentences – originally asserted on direct appeal – is more properly presented in

---

[1]   Issue T also requires factual development outside the record, a procedure that is not yet available to Mitchell.

3

§ 2255 proceeding, which permits district court to hold evidentiary hearing); *United States v. Prince*, 868 F.2d 1379, 1383-86 (5th Cir. 1989) (claims concerning disclosure and examination of pre-sentence investigation reports are cognizable in § 2255 proceedings if they could not have been raised on direct appeal); *United States v. Jones*, 287 F.3d 325, 332-33 (5th Cir. 2002) (entertaining, in capital proceeding under § 2255, constitutional claim that death penalty was imposed on racially discriminatory basis); *United States v. Garza*, 165 F.3d 312, 314-15 (5th Cir. 1999) (entertaining, in capital § 2255 proceeding, constitutional claim that defendant was denied due process in connection with Government's presentation of evidence alleging defendant's involvement in unadjudicated murders in Mexico); *United States v. Murphy*, 899 F.2d 714, 716 (8th Cir. 1990) (claim that "guilty plea was involuntary and that a plea bargain was not kept" could be raised on collateral attack because it "[could not] be advanced without the development of facts outside the original record"); *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir. 1990) (where "facts outside the record may be introduced to show that the [jury trial] waiver was not made voluntarily, knowingly, or intelligently," "the proper vehicle for doing so is [a proceeding] under 28 U.S.C. § 2255"); *see also Bousley v. United States*, 523 U.S. 614, 621, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (suggesting "an exception to the procedural default rule for claims that could not be presented without further factual development"). For these reasons, the Government's reliance on *Molina v. Rison*, 886 F.2d 1124 (9th Cir. 1989), is misplaced because, there, the Ninth Circuit addressed the movant's successive (three) § 2255 motions for relief. Here, Mitchell raised different – from his appeal – grounds, bases and facts in support of these issues. Moreover, *Molina v. Rison* held that "any doubts as to whether two grounds are different or the same 'should be resolved in favor of the applicant.'" *Molina*, 886 F.2d at 1128 (quoting *Sanders v. United States*, 373 U.S. 1, 15, 10 L. Ed. 2d 148, 83 S. Ct. 1068 (1963)); *id.*, at 1127 (noting that *Sanders* is "[t]he

4

leading Supreme Court case concerning the import of successive motions under § 2255"). Because all of these issues, except two, require development of facts outside the record, they are properly raised in the amended § 2255 motion.

Second, even if the Government is correct, Mitchell can establish cause and prejudice under *United States v. Frady*, 456 U.S. 152, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982). To the extent that the Court finds that any issue presented in this proceeding could or should have been raised at trial or on appeal, Mitchell asserts ineffective assistance of counsel as "cause," *i.e.*, that his attorneys performed deficiently in failing to raise such issues at the appropriate juncture, and that he was prejudiced thereby within the meaning of both *Frady* and *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 2674 (1984); *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996) ("Ineffective assistance of counsel is cause for a procedural default" in a § 2255 proceeding); *United States v. Kissick*, 69 F.3d 1048, 1054-55 (10th Cir. 1995) (same). Given an evidentiary hearing, Mitchell can prove these allegations to permit the Court to review all his claims on the merits.

**B.**     **The Failure to Raise an Issue on Appeal Do Not Bar Review of Relief**

The Government asserts that the following issues were not raised on appeal, therefore, they are barred from review:

E.     Challenging Voluntariness of Mitchell's Statements;

I.     Challenging Juror Removal for Hardship;

L.     Challenging *Voir Dire*;

P.     Challenging the Questionnaire;

U.     Challenging Failure to Trifurcate the Proceedings;

W.     Challenging Unprincipled Basis for Imposing Death;

X.     Challenging the Seeking Death on Basis of Race; and,

Y.     Challenging Death Sentence as Unconstitutional.

(Response, p. 12.)

Had Mitchell raised issues E, I, L, and P in his appeal previously, the Government would be alleging they are barred from review for that reason. However, as the amended § 2255 motion states, Mitchell has alleged extra-record facts in support of those issues.  As for issues, U, W, X and Y, Mitchell has alleged that appellate counsel provided ineffective assistance for failing to raise them on appeal.  (*See*, *also*, Ex. 108, Michael O'Connor Decl.; Ex. 115, Celia Rumann Decl.)

## II.

### The Government's Reply Demonstrates the Necessity
### for an Evidentiary Hearing

Mitchell has pleaded detailed facts in support of his issues, and supported those allegations with numerous declarations and other evidentiary documents. The Government, for its part, has offered only speculation, misstating the record and submitting not a single piece of evidence to substantiate its defenses to Mitchell's constitutional challenges.  At a minimum, because the parties' pleadings reflect numerous disputes of material fact, an evidentiary hearing will be required once discovery is complete.

> Section 2255 requires the district court to hold an evidentiary hearing 'unless the motions and files and records of the case conclusively show that the prisoner is entitled to no relief.'  28 U.S.C. § 2255, [*United States v. Espinoza*, 866 F.2d, 1067, 1069 (9th Cir. 1988)]. An evidentiary hearing is usually required if the motion states a claim based on matters outside the record or events outside the courtroom. *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988); *Marrow v. United States*, 772 F.2d 525, 526 (9th Cir. 1985).  The district court may deny a section 2255 motion without an evidentiary hearing only if the movant's allegations, viewed against the record, either do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal. *Id.*; *Baumann v. United States*, 692 F.2d 565, 570-71 (9th Cir. 1982).

///

///

///

*United States v. Burrows*, 872 F.2d 915, 917 (9th Cir. 1989).[2]  Furthermore, the *Burrows* Court held that where the movant's "claims raise facts which occurred out of the courtroom and off the record[,] the district court should have held an evidentiary hearing unless something in the record conclusively shows that []trial attorney was not ineffective."  *Id*.; *Sinisterra v. United States*, 600 F.3d 900 (8th Cir.) (remand for evidentiary hearing where "the record does not affirmatively refute the factual assertions upon which Sinisterra's claim is based"), *pet'n for reh'g denied, mtn to stay mandate pending cert. pet. denied, and mandate issued* (July 6, 2010);

While it may be possible to resolve some cases without hearing evidence, the Supreme Court has emphasized that if the "specific and detailed factual assertions of the petitioner . . . cannot be said to be incredible," and if true would entitle him to relief, "the function of 28 U.S.C. § 2255 can be served . . . only by affording the hearing which its provisions require."  *Machibroda v. United States*, 368 U.S. 487, 495-96, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962).  This standard creates a robust presumption that a § 2255 proceeding will include an opportunity for the Mitchell to prove his allegations in an evidentiary hearing.

Nor did Congress change this longstanding approach when it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  "Although the AEDPA modified, to some extent, the [previously existing] standard for

---

[2] *See also, e.g., Grady v. United States*, 269 F.3d 913, 919 (8th Cir. 2001) (district court may not deny a prisoner § 2255 relief without holding an evidentiary hearing to resolve disputed questions of fact) (citations omitted); *United States v. Lopez*, 100 F.3d 113, 119 (10th Cir.1996) (district court should conduct an evidentiary hearing in a § 2255 case [u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief") (quotation and citation omitted); *United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999) (a district court that receives a federal prisoner's § 2255 motion is obliged to "grant a prompt hearing" unless the motion itself and the files and records of the case conclusively show that the prisoner is entitled to no relief); *Chang v. United States*, 250 F.3d 79, 85 (2nd Cir. 2001) (district court must conduct hearing where petitioner's claim "is not so clearly bereft of merit as to be subject to dismissal on its face").

obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the Townsend standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases." *Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D.S.D. 1999) (citing *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963)).  Consistent with *Machibroda*, under *Townsend*, a hearing is mandatory if the material facts have not been otherwise developed and the prisoner's "allegations, if proved, would establish the right to [the relief sought]." *Townsend*, 372 U.S. at 307.

Further, an evidentiary hearing is mandatory because almost all Mitchell's issues concern events which took place outside the Court's presence and which do not appear on the trial record.  In such circumstances, only an evidentiary hearing can ensure the fair and reliable determination of the underlying facts.  *Machibroda v. United States*, 368 U.S. at 494-95 (evidentiary hearing necessary where petitioner's allegations "relate[] primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light"); *White v. United States*, 366 F.3d 291, 302 (4th Cir. 2004) (same, citing *Machibroda*); *Armienti v. United States*, 234 F.3d 820, 825 (2nd Cir. 2000) ("[A]ctions taken by counsel outside the presence of the trial judge . . . [can] not ordinarily be resolved by him without . . . a hearing"); *United States v. Cervantes*, 41 Fed. Appx. 918, 920 (9th Cir. 2002) (a hearing is "usually required if the motion . . . states a claim based on matters outside the record or events outside the courtroom").  In particular, because a claim of ineffective assistance of counsel typically "involves off-the-record interactions [between the movant and] his trial counsel," such a constitutional challenge "cannot be determined by examining the motion, files, and records before the district court." *Chang v. United States*, 250 F.3d 79,85 (2nd Cir. 2001) (citation omitted).

Mitchell need not demonstrate conclusively that he is entitled to relief in order to trigger this Court's duty to hold an evidentiary hearing. *See United States v. Rodrigues*, 347 F 3d 818, 824 (9th Cir. 2003) ("section 2255 imposes a fairly lenient burden on the petitioner" to obtain an evidentiary hearing); *Smith v. United States*, 348 F.3d 545,551 (6th Cir. 2003) ("We have observed that a Section 2255 petitioner's burden for establishing an entitlement to an evidentiary hearing is relatively light," citing *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)).  Mitchell's burden at this stage of the proceedings is simply to allege facts which, if true, would entitle him to relief.  He has not only done so, but has supported his allegations with extensive documentary evidence including sworn declarations.

**A.     Counsel's Failure to Investigate, Prepare and Present Evidence of Intoxication Resulted in Ineffective Assistance at Guilt Phase**

For the reasons described *supra*, Section II, Mitchell has not waived this issue because it was not raised on appeal.

Whether trial counsel's actions were actually the product of strategy or tactics, and whether any claimed "strategy" was one which a reasonably competent attorney defending a federal capital case in would have pursued, are questions of fact which demand a hearing. *Bryan v. Mullin*, 335 F.3d 1207, 1221 n.17 (10th Cir. 2003) (en banc) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact") (citing *Provenzano v. Singletary*, 148 F.3d 1327, l330 (11th Cir. 1998)).

The Government argues that trial counsel did not provide ineffective assistance because counsel testified that Mitchell "emphatically den[ied], on more than one occasion to his trial counsel, that he was under the influence of drugs or alcohol at the time of the murders, even after he was confronted with statements to the FBI of drinking to a level of 'blackout.'"  (Response, p. 4; *see* Gov't Exs. 1, 2 & 3.)  The Government also points out that counsel "reviewed the crime scene

photos of the Nakai residence, the car jacked truck and the area where the victims were recovered in an attempt to refute Mitchell's claim that he was sober but found nothing." (Response, p. 4.)

The depositions of counsel did not enlighten whether trial counsel had a coherent guilt defense. (*See, e.g.*, Gov't Exs. 1, 2 & 3 to Dkt. No. 49.)  It appears that possibly the defense involved some theme of 'challenging the Government's case' – although counsel did not consult with forensic experts, for example, before deciding on that defense.  It also appears the defense involved some argument that "Mitchell did not do it" – but what they hoped to prove remained then remained unsettled after the depositions, because besides not consulting with forensic experts before trial, they then examined the prospective jurors about intoxication, and even sought from the Court an instruction about intoxication.  What **is** apparent from the depositions is that counsel's decision-making with regard to the guilt defense barely went beyond their brief and occasional meetings with their capital client.  (*See* Ex. 146.)  Counsel join with the Government in asserting that their preparation for Mitchell's capital trial,

> does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste. . . .

*Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); (Response, p. 18; *and see* Exs. 1-3.)  Thus, here, counsel "drew the line" at Mitchell's purported "emphatic denials" to them about his intoxication. Dismantling the Government's and trial counsel's joint position permits Mitchell the opportunity to further demonstrate that his entitlement to discovery, an evidentiary hearing, and relief.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 2674 (1984). "In

10

judging the defense's investigation, as in applying [*Strickland*] generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made . . . ." *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689).  When a challenged act or omission is defended as the product of a tactical decision, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000).

Besides the FBI interviews where Mitchell relates his condition and substance abuse preceding and during the offenses, Mitchell has filed with this Court and the Government/trial counsel numerous lay declarations and historical records describing his substance use, abuse and addiction.  He also filed two declarations from a social historian and a psychiatrist, both based on extensive documentation about Mitchell as well as interviews, regarding his life history that lead to his substance abuse and addiction at the time of the offenses.  Additionally, he obtained declarations from the two mental health professionals utilized by trial counsel whose declarations, that are likewise based on their evaluations and interviews of Mitchell, state viable and sound support for the intoxication defense.  Mitchell has filed declarations from the several inhabitants of the Nakai household – including declarants who were not under indictment with Mitchell for these offense – that describe, in detail, their substance abuse and addiction leading up to the offenses.  (*See also* Ex. 157.)

The vague, unfocused guilt defense that trial counsel ultimately presented to the jury bears little resemblance or strength to the investigation developed and presented by Mitchell here.  Yet, in response to this evidence in support of an intoxication defense, the Government and trial counsel respond only that Mitchell denied abusing substances, and the photographs they reviewed provided "no indicia of cocaine, ecstacy, methamphetamine or any other drugs."

The Supreme Court dealt with an almost identical response from the Government and trial counsel in *Rompilla*. There, counsel made some reviewed two historical records, had the defendant evaluated, and interviewed the defendant. The Supreme Court noted that the defendant's "own contributions . . . were minimal. Counsel found him uninterested in helping . . . There were times when Rompilla was even actively obstructive by sending counsel off on false leads." *Rompilla*, 545 U.S. at 2462.

After noting that the sources counsel found were not "particularly helpful," the Supreme Court held that two records alone provided "red flags" that should have indicated to trial counsel that their investigation, such as it was, was far from complete. Likewise, the exhibits filed here that describe Mitchell abusing substances at an early age and continuing through the time of the offenses were "red flags" to trial counsel.

As to counsel's limited interviews of Mitchell and a few family members, "[n]o reasonable lawyer would forgo [a thorough guilt phase investigation] thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging . . . ." *Rompilla*, 545 U.S. at 2467; *see also Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005) (quoting ABA Standards for Criminal Justice 4-4.1 (2d ed. 1980): counsel's duty "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction . . . exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty."). Here, as in *Rompilla*, the Government's and trial counsel's conclusions – that Mitchell ended any intoxication investigation "excused them" from looking further – puts the cart before the horse. The Supreme Court has made clear, well before Mitchell's 2003 trial, that characterizing counsel's decision as "strategic" is not appropriate unless the decision is a deliberate choice between two legitimate

and rational alternatives – the decision-making must be approached with caution, not happenstance, inattention, or neglect. *See Wiggins v. Smith*, 539 U.S. 510, 526, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)(counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); *Strickland,* 466 U.S. at 690-91.

Although this Court must afford deference to counsel's strategic decisions under *Strickland,* 466 U.S. at 690-91, for this deference to apply, there must be some evidence that the decision was just that:  strategic.  Here, without counsel not having conducted the reasonable investigation, their response is the result of inattention, neglect, or happenstance – well below the minimum standard the Constitution requires of effective assistance of counsel.

Had counsel raised a reasonable doubt in the mind of a single juror as to whether Mitchell's intoxication prevented him from forming the specific intent, Mitchell could not have been convicted of first-degree murder, and thus would not have been eligible for a death sentence.  A reasonable probability of such an outcome is sufficient to show prejudice. *Turner*, 158 F.3d at 457.  "A reasonable probability does not mean that we must determine that the jury more likely than not would have returned a verdict for something beside first degree murder, but only that [Petitioner] has shown 'a probability sufficient to undermine confidence in the outcome.'" *Jennings*, 290 F.3d at 1016 (citing *Strickland*, 466 U.S. at 694).  Such a reasonable probability exists in this case.

Furthermore, counsel's failure to investigate and present a mental state defense at the guilt phase of Mitchell's trial continued to prejudice Mitchell during the penalty phase.  Had any of the jurors harbored lingering doubts, due to a mental state defense presented at the guilt phase, such doubts could appropriately have been considered during penalty deliberations.  In any event, mental health evidence that does not establish a legal defense to conviction at the guilt phase may nonetheless carry weight as mitigating evidence during the penalty phase.

13

*See Williams*, 529 U.S. at 398; *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003).  The same is true of evidence of chronic drug abuse.  *Frierson v. Woodford*, 463 F.3d 982, 994 (9th Cir. 2006) (finding the extent of the petitioner's drug use from an early age to be an important mitigating factor, even if not sufficient to demonstrate that the petitioner lacked the requisite mental state for the crime).

**B. & D.      Counsel's Failure to Investigate, Prepare and Present Evidence of Addiction and Intoxication Resulted in Ineffective Assistance at Penalty Phase, and Trial Counsel Was Ineffective with Respect to the Penalty Imposed**

The Government's Response to counsel's failures at the penalty phase are near-identical to those at guilt:

- Mitchell raised "a significant obstacle" to mitigation;
- The photographs they reviewed of the Nakai house provided "no indicia of cocaine, ecstacy, methamphetamine or any other drugs";
- Mitchell's history of substance abuse history "was extensively considered but ultimately rejected as at odds with the 'life worth saving' path that was ultimately selected as the mitigation theme";
- Counsel had "concerns that "'excuses' would not be well received by the jury given the atrocious conduct that led to the deaths of the victims, especially since it could not be raised during the guilt phase";

As with counsel's guilt phase investigation, considering counsel's performance at the penalty phase "is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made . . . ." *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689).  However, before considering counsel's woeful, ineffective performance, what constitutes mitigation, according to the United States Supreme Court, must be clarified, as the Government and counsel are confused about that constitutional obligation.

First, mitigation is not an "excuse."  The major requirement of the penalty phase of a capital trial is that the sentence be individualized by focusing on the particularized characteristics of the individual.  *See Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).  The breadth of mitigating evidence has been clear since the Supreme Court first established that individualized sentencing is a constitutional requirement when the punishment is death.  In *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976), the Court held that, "a process that accords no significance to relevant facets of the character and record of the individual offender . . . excludes from consideration . . . the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *See also Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir. 1989) ("The Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy"), *vacated on other grounds*, *Angelone v. Deutscher*, 500 U.S. 901, 111 S. Ct. 1678, 114 L. Ed. 2d 73 (1991).

Two years later, in *Lockett v. Ohio*, 438 U.S. 586, 587, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), the Court concluded that the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering as a mitigating factor, any aspect of a defendant's character . . . that the defendant proffers as a basis for a sentence less than death."  All relevant mitigating information must be unearthed for consideration at the capital sentencing phase. *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).  This is critical because "the determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts.  The statutory factors give the jury broad latitude to consider amorphous human factors, to weigh the worth of one's life against his culpability." *Id*. (*quoting Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir. 1995).  Even in the face of strong

aggravating evidence, a death sentence is rendered unreliable "if we cannot conclude with confidence that the jury would unanimously have sentenced . . . [the defendant] to death . . . if [counsel] had presented and explained all of the available mitigating evidence." *Mayfield v. Woodford*, 270 F.3d 915, 929 (9th Cir. 2001) (*en banc*) (*citing Williams v. Taylor*, 529 U.S. 362, 368-69, 399, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)); *Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004) (requiring a nexus between mitigation and the offense is unconstitutional because the only test is "whether the evidence is of such a character that it 'might serve "as a basis for a sentence less than death"'"").

Counsel's mitigation investigator, Ockenfels, conducted a social history investigation:

> A social history investigation is an exhaustive study of the client's social and psychological background, including his upbringing, extended family history, academic, mental health and medical history as it is developed through extensive interviews of anyone acquainted with the client and his family, particularly his caretakers, extended family members, school teachers and medical and psychological treatment providers. Also, various records are amassed pertaining to the client and his caretakers/family which objectively document his social history such as employment, education, medical and mental health records.

(Ex. 93, at ¶ 5.) One result of her investigation was that she learned that "among other significant themes, that Mitchell was addicted to alcohol and drugs and that he had started using drugs at age eleven." (*Id*., at ¶ 7.) She also learned,

> that there was substantial evidence that Mitchell was drunk and high on drugs at the time of the killings.  Based on my education, training and experience as a capital lawyer and mitigation specialist, I

believed Mitchell's alcohol and drug use affected his state of mind prior to and during the killings.

(*Id.*, ¶ 8.) And, Ockenfels "advised the trial lawyers about Mitchell's history of alcohol and drug use, and his significant drug and alcohol use before and at the time of the killings." (*Id.*, ¶ 9.) However, rather than develop Ockenfels' investigation further, including testifying expert witnesses (such as Drs. Weaver and Stewart), counsel decided on a superficial and vague presentation that Mitchell's life was "worth saving." Of course, such a presentation is the goal of an effective mitigation presentation; however, counsel's was limited to individuals who were wholly unprepared to testify, and whose selection to testify was seemingly random in light of the presentation Mitchell makes in his Amended § 2255 motion.

As discussed, *supra*, and *see* Issue A, counsel's constitutional obligation to effectively investigate the case does not end with the defendant's statements to counsel, no matter how much counsel "firmly believed" otherwise. Here, counsel's claim that Mitchell would have "refused to cooperate" if they had presented a case in mitigation that revealed his life history has no basis since their decision about mitigation was made well before the penalty phase (indeed, the entire trial) ambled along a haphazard and superficial presentation that married "a life worth saving" with cross-examination about Mitchell's intoxication, and football.

The Government's argument that counsel need not "investigate every cumulative witness who could provide evidence of Petitioner's substance abuse history" also ignores that counsel did not interview the lay declarants here who stated facts about Mitchell's substance abuse and addiction as an adolescent, teenager, and through the time of the offenses. Further, the Government's assertion that "[t]rial counsel had more than sufficient information upon which to

17

make a reasoned decision" about mitigation is belied by their testimony about a specific and fruitful area:

> Q. Did you get any information that there may have been any mental illness in Lezmond's family?
> A. I didn't have a positive impression of his mother.  But as far as actual mental illness, they seemed like a very bright family.  And my understanding is Lezmond did okay in school, considered a leader, president of the student council, that kind of thing.

(Bartolomei RT 37)

As for the ""many dangerous pitfalls" presented by Ockenfels' "social history," Ockenfels prepared the document for counsel only.  Counsel never testified that they intended Ockenfels would testify at trial and counsel did not provide her "social history" to their potential experts; accordingly, any argument that the contents of the social history permitted them to avoid a mitigation presentation fails – it was entirely work-product and undiscoverable.  Finally, nothing in the case indicates that the Government was aware of the "anti-social" conduct in the "social history."

The Government argues that "there comes a point when the search for cumulative evidence distracts from more important duties."  Given how little time counsel devoted to his case, Mitchell fails to see what was distracting counsel from their obligations.  Lastly, the Government's argument that, "this is not a case in which trial counsel failed to act 'while potentially powerful mitigating evidence stared them in the face'" is belied by the substantial lay declarations, life history records, and experts declarations filed in support of the Amended § 2255 motion.

Had counsel performed effectively, this Court and the jury would have learned of the "kind of troubled history" that the Supreme Court has declared is "relevant to assessing a defendant's moral culpability."  *Wiggins*, 539 U.S. at 535; *Porter v. McCollum*, __ U.S. __, 130 S. Ct. 447, 454, 175 L. Ed. 2d 398 (2009).  They would have heard about Mitchell's childhood history of neglect, extreme, third-world-like deprivation, and the physical and psychological abuse and torture

he suffered. *See Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) ("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable'"). Instead, the jury heard next-to-nothing about that evidence. As discussed *supra*, the evidence counsel failed to develop and present was evidence the Supreme Court has held is the type that "might well have influenced the jury's appraisal of [Petitioner's] moral culpability." *Williams*, 529 U.S. at 398; *Porter*, 130 S. Ct. at 454; *Wiggins*, 539 U.S. at 524 ("[C]ounsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."); *see also id*., at 454-55 (the Constitution requires that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor," quoting *Eddings v. Oklahoma*, 455 U.S. at 112).

**C.      Trial Counsel's Conflict of Interest Deprived Mitchell of the Right to Effective Assistance**

Depositions of trial counsel revealed nothing about trial counsel's conflict of interest because trial counsel invoked the attorney-client privilege – not for their condemned client, however, but on behalf of the unnamed criminal defendant-client. The Government's assertions that "[t]rial counsel was never advised by their client that anyone but Petitioner and Johnny Orsinger were responsible for these murders," and that "[t]here is no evidence that this issue ever prevented trial counsel effectively representing Petitioner" are not so much disputes as they are bald statements. Moreover, a dispute of fact exists as to whether trial counsel and the Office of the Federal Public Defender for the District of Arizona "walled" Mitchell's appellate counsel from the deputies who tried Mitchell's capital case. This Court must authorize Mitchell to conduct full discovery, access to this Court's subpoena power, and an evidentiary hearing.

**E.     Trial Counsel Provided Ineffective Assistance By Failing to Challenge Mitchell's Statements as Involuntary Due to His Brain Damage, His Addiction, and His Cultural Heritage**

Mitchell's *Miranda* waiver was involuntary as his cultural heritage and cognitive ability prevented him from executing a knowing, intelligent, and voluntary waiver of his rights.

The Government contends this issue is waived. The Government is incorrect. To begin with, this issue was not settled by the trial court. The trial court found that no inappropriate threat or promises were made to Mitchell. Answer at 29. Mitchell's claim is not that he was induced by threats or promises, but rather that his mental capabilities combined with the trained officers interrogation tactics rendered his waiver invalid. The Government then contends that the issue is waived because it was not raised on direct appeal. Mitchell has pled a general ineffective assistance of appellate counsel claim (see Claim AA) and thus the failure to previously raise this issue does not bar Mitchell from raising it in this proceeding.

The United States Supreme Court has recognized the prejudicial impact of an improperly admitted confession and the need for careful review of the resulting prejudice. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

> A  confession is like no other evidence.  Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.... [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.'

*Id*. at 296 (quoting *Bruton v. United States*, 391 U.S. 123, 139-140, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)).  Trial counsel confirmed the damaging nature of the Mitchell's confessions.  (Government Ex. 2, Transcript of Deposition of Gregory

A. Bartolomei, p. 71).  Despite the impact of a confession, trial counsel made no effort to investigate Mitchell's waiver.  Had trial counsel actually examined this issue, they would have found Mitchell was not capable of providing a valid waiver.  The Government contends that Mitchell's statement that he waived his rights settles this issue.  Answer at 29-30.  Whether Mitchell waived his right is not in dispute.  The issue is whether that waiver was knowing, intelligent and voluntary.  Despite a defendant's claim to understanding a right, a defendant who does not have the ability to understand that right cannot validly execute a knowing, intelligent, and voluntary waiver.

**F.       Counsel's Failure to Investigate, Develop, and Challenge the Medical Examiner's Testimony and Autopsy Report Was Ineffective Assistance**

The Government responds that there was no issue regarding cause of death and that the neck wound was "never given as a cause of death . . . nor was it argued."

However, the medical examiner did include Ms. Lee's incised neck wound as a cause of death.  It first appeared as a cause of death in her autopsy report.  In the same report, she wrote that the neck wound was "superficial."  The medical examiner's testimony was similarly contradictory.  When asked whether the neck wound was fatal, she answered, "Unfortunately . . . most of the injury was obscured . . . I couldn't assess how deep it went or what structures, if any, it had involved."  RT 3353.  This answer was contrary to her autopsy report which stated that the incised wound did not appear to be deep or involve muscle, vein, or trachea damage.

Highlighting a contradiction in an autopsy report would not have impacted "the length of time that this horrendous evidence would be before the jury" as the Government suggests.  It simply would have discredited the medical examiner and raised a reasonable doubt regarding her report, the testimony, and her bias.

21

The Government argued at guilt-phase closing, "And this is killing on purpose. . . But he didn't slice her throat well enough. So what's he do? . . . find some rocks . . . You've seen the exhibit from the medical examiner. . ." RT 3488. At the end of the penalty phase, the Government argued, "Her neck sliced with a butterfly knife and then her head, because remember, remember, because she wouldn't die." RT 4120. These arguments insinuate that the neck wound could have contributed to Ms. Lee's death. The fact that the medical examiner also gave the rocks as a cause of death did not clarify the issue with regard to the incised neck wound.

Competent counsel would have elicited the bias in the medical examiner's over-inclusiveness of neck wounds as a contributing cause of death. Because defense counsel left the cause of death unclear, jurors with reasonable doubt regarding whether Mitchell threw a rock on Ms. Lee's head were still left to speculate whether the neck wound contributed to her death.

At the end of the penalty phase, the Government described Ms. Lee's neck wound as "torture, or serious physical abuse of the victim in addition to killing them" and as "cruel." RT 4120. The government defined "serious physical abuse" as "a significant . . . amount of injury . . . to the victim's body, which involved a substantial risk of death . . . extreme pain . . . substantial disfigurement." RT 4123. The medical examiner had already testified that wounds from the rock would have made Ms. Lee immediately unconscious. RT 3351. So, the Government was referring to the neck wound and not the rock wound as a cruel and tortuous cause of death at penalty phase when they argued that "Defendant, Lezmond Mitchell, inflicted serious physical abuse on both of these people in the manner that he killed them." RT 4123.

22

**G.    Counsel's Failure to Investigate and Challenge DNA Evidence and Testimony Comprised Ineffective Assistance**

As the Government pointed out, the Ninth Circuit found that the Mitchell's jury understood that DNA evidence "definitely connected Slim's blood to the . . . knife." *United States v. Mitchell*, 502 F.3d 901, 969 (9th Cir. 2007).  Mitchell agrees with the Ninth Circuit; the court bolsters Mitchell's assertion that counsel was ineffective in failing to challenge the DNA expert's testimony.  Evidence of a DNA "connection" can only be expressed as a probability.  It is not possible to be definite.  When the Government's DNA expert told jurors that DNA evidence was Slim's blood, the Ninth Circuit is correct that jurors believed the expert had "definitely connected" Slim and the knife which came from Mitchell's pocket.  Counsel was ineffective in failing to reveal the expert's testimony as unscientifically biased.  Counsel neither highlighted the bias nor the fact that the bias favored the Government which had hired the expert.

The Ninth Circuit's finding that jurors came to understand from the expert's testimony that DNA evidence "somewhat linked" Mitchell to a glove at the crime scene is even more helpful to Mitchell's issues of ineffective assistance.  Any juror or fact finder who came to a decision about the strength of a connection between DNA in evidence and Mitchell's DNA no matter where that decision fell from "no connection" to "somewhat connected" to "definitely connected" assumed scientific facts that were not provided by the expert and had not been introduced into evidence.  Jurors were not qualified to make that determination.  Connections varied among the DNA in evidence, but jurors were left without expert assistance to determine first that variations existed, then that some connections were more tenuous, and then the relevance of other people, known and unknown, also being "somewhat linked" to DNA in evidence.  Defense counsel failed to elicit that data from the Government expert and failed to check the DNA test results or prepare for inaccurate testimony with the assistance of a defense DNA expert.  The Ninth

23

Circuit and jurors were left to guess "somewhat" of a connection as if the science did not exist. The answer did exist, but defense counsel ignored it. Counsel was ineffective in not seeking the assistance of an expert to break down the DNA results and clarify their relevance.

### 1.    Counsel Had No Legitimate Trial Tactic

The Government responded that DNA testimony is so powerful to a jury that defense counsel purposely chose to forgo a challenge of the DNA expert's scientific method and math. According to the Government, defense counsel fully understood the faults inherent in the expert's testimony and all of the associated mathematical probabilities without the aid of an expert despite missing information in the Government expert's own report and despite the expert's admission to defense counsel that she went beyond her lab's protocol, but defense counsel chose to face the expert at trial purposefully mute on those very issues. Any questioning of a DNA expert's methods or math would result in lost credibility for defense counsel and contribute to a death sentence at penalty.

However, that was not defense counsel's strategy. Counsel asked the expert, "if someone's blood was found on a particular item, there's no way for you to know, as a forensic biologist, precisely how that blood got on the object you were examining, correct?" (RT 3228.) Counsel understood that aspect of DNA science enough to highlight it as a weak point in the relevance of the DNA expert's testimony on direct. With this question, defense counsel introduced a trial theory that Mitchell was not present at the time of the murder or alternatively, that other more culpable persons handled the evidence. His DNA was transferred to incriminating evidence by somebody else or his DNA was mixed with others and the DNA expert cannot provide a time line for DNA deposits. Defense counsel had not decided that these theories were too incredible to present to the jury. When counsel recognized that a scientific challenge was available, counsel challenged the DNA expert. But without the assistance of a DNA expert, counsel

24

failed to recognize more relevant errors in the expert's testimony, that she was not providing the rate of error and that she had gone beyond her own laboratory's threshold for accuracy to provide a connection between Mr. Mitchell and the glove. Counsel missed relevant DNA cross-examination as a result of unpreparedness, not as a legitimate tactic.

> ### 2. Counsel Was Unprepared to Rebut the Perception That DNA Was "Everywhere"

The Government lists multiple items of the DNA evidence at trial, including DNA evidence on the truck, rocks, cell phone, mask, knife, and glove. None of it proves that Mitchell was at the murders of Ms. Slim and Ms. Lee.

Victims' DNA is expected to be at a crime scene. That Ms. Slim's DNA was present in her truck with a probability of a similar profile in "1-in-680-billion Navajos" does not place Mitchell at the crime scene. In fact, it is highly likely that Ms. Slim's DNA was present in her truck even before she was murdered.

Ms. Lee's DNA with a profile of "1-in-250-trillion Navajos" was discovered on rocks at the murder scene, but it does not place Mitchell at the crime scene.

It is telling that probabilities of a similar profile, *i.e.*, 1-in-680 billion or 1-in-250-trillion, were only presented by the DNA expert for the victims' DNA. Victims' DNA samples were single source and not degraded. By revealing only what must have been the smallest error rate of all the DNA the expert tested in this case, the DNA expert persuaded jurors that all DNA evidence is similarly accurate and fool-proof as if the quality and size of the sample or the mixed race of a contributor would not affect the probability calculation and relevance to the jury.

Mitchell admitted that he robbed the Trading Post after the murder and using Ms. Slim's truck. He used the mask during the Trading Post robbery. Neither his fingerprint on the truck nor the mask place Mitchell at the murder of Ms. Slim and Ms. Lee. Similarly Mitchell could have touched Ms. Slim's cell phone after the murder. He could have found the knife after the murder.

25

The only piece of DNA evidence with the potential to place Mitchell at the crime scene was the latex glove at the victims' burial site. But, this DNA evidence was degraded by dirt. Also, the expert could only detect a partial profile from the glove. The available DNA material was so slight and so degraded that the expert's certified lab would not vouch for its accuracy. For DNA samples as small as the DNA detected on the glove, the expert's lab had pre-determined that the amount of amplification required would distort the results beyond an accurate reading. Every lab has a threshold like this, and the threshold is usually very low as this expert's lab was. Although her lab was accredited and the expert was not certified, the expert went beyond her lab's threshold and declared a connection between the DNA material on the glove and Mitchell's DNA. Most experts' jaws would drop at this level of disregard for scientific fact and bias in favor of the Government. On cross examination, when the expert said "we have a threshold" and "I was able to create a profile," defense counsel missed the importance of her statement and merely repeated "you were able to create a profile" then asked, "what were the results?" (RT 3219.)

So while the Government prefers to list DNA evidence, including even the victim's DNA, as if all DNA evidence has the same meaning and relevance, the list itself is an inaccurate portrayal of the case against Mr. Mitchell. Once scientific meaning and relevance are attached to every piece of DNA evidence, it becomes clear that the DNA evidence in this case does not even "somewhat connect" Mitchell to the murders of Ms. Slim and Ms. Lee. None of it connects Mitchell to the crime scene at the time of the murder. The scrap of degraded DNA evidence at the victim's burial place could not be accurately amplified to determine whose DNA it matches according to the expert's own lab. The expert's testimony was false and misleading. It went unchallenged due to defense counsels' ignorance of the science and unwillingness to secure expert assistance.

### 3.    Counsel Did Not Formulate a Coherent Guilt-Phase Defense Strategy Based Upon a Reasonable Investigation of Incriminating Evidence

The Government responds that the expert's misleading, inaccurate DNA testimony left unchallenged by defense counsel did not prejudice Mitchell's case because Mitchell had confessed. Mitchell's confessions to law enforcement officials were involuntary and taken in violation of his right to remain silent and right to counsel. But also recent DNA exonerations prove that defendants confess to serious crimes which they have not committed. Not only do people falsely confess but often with surprisingly rich, detailed, and accurate information.[3]

Most of what Mitchell admitted as highlighted by the Government were not admissions to the murders of Ms. Slim and Ms. Lee. He confessed to robbing the Red Rock Trading Post on a separate day. He confessed to being with Johnny Orsinger. He confessed to slitting Ms. Lee's throat superficially. He admitted burying the victims.

Had defense counsel thoroughly investigated the DNA information with the assistance of an expert, the challenges to the DNA evidence would have become abundantly clear and counsel would have understood that DNA evidence was not enough to prove beyond a reasonable doubt that Mitchell committed the murders. A reasonable strategy to challenge the confessions could have been supported by the weakened relevance of the DNA evidence.

Counsel should have presented a coherent theory either that Mitchell was not present during the critical time or that Mitchell was not the primary participant, but counsel did not conduct the groundwork investigation required for either of those two viable defense strategies.

---

[3] Brandon L.Garrett, *The Substance of False Confessions*, 62 Stan. L. Rev. 1051 (2010).

The Government claims that Mitchell's fingerprint on Ms. Slim's truck would have been enough to prove beyond a reasonable doubt that Mitchell committed the murders even if the DNA evidence was discounted by jurors. Mitchell admitted that he was in Ms. Slim's truck during the Trading Post robbery. His fingerprint was left on the truck well after the murders when he drove to the robbery.

Because death-qualified jurors are more concerned with crime control,[4] less remorseful over wrongful convictions,[5] more regretful with respect to erroneous acquittals,[6] and more impressed with prosecution witnesses,[7] competent defense counsel would have investigated and prepared a defense strategy taking all of the forensic evidence into account to present a coherent theory to jurors. The fingerprint expert's analysis of the "match" was as scientifically flawed as the DNA expert's testimony.

### a.   Fingerprint analysis generally

American courts have accepted fingerprint analysis evidence without assessing its reliability or its underlying methodology for more than 100 years. Courts "simply piggy-backed . . . apparently believ[ing] that if fingerprint evidence was good enough for . . . other states, then it must be good enough for

---

[4]   *See* Robert Fitzgerald & Phoebe C. Ellsworth, *Due Process vs. Crime Control:  Death Qualification and Jury Attitudes*, 8 Law & Hum. Behav. 31 (1984).

[5]   *See* Phoebe C. Ellsworth, *To Tell What We Know or Wait for Godot?*, 15 Law & Hum. Behav. 77 (1971).

[6]   *Id*.

[7]   William C. Thompson et al., *Death Penalty Attitudes and Conviction Proneness:  The Translation of Attitudes Into Verdicts*, 8 Law & Hum. Behav. 95, 96 (1984).

their states as well."[8]  By the late 1930's, "fingerprint identification evidence had been accepted blindly by all except five states.  But not one court had considered the essential question of the reliability of latent fingerprint identification."[9]

The primary justification for admitting latent fingerprint evidence was that courts had done so for a very long time.  American courts admitted latent fingerprint evidence beginning with *People v. Jennings*, 252 Ill. 534, 96 N.E. 1077 (1911).  In *Jennings*, the Supreme Court of Illinois relied on the fact that "[t]his class of evidence is admitted in Great Britain," India, and "several European countries."  *Id*. at 1081.

Proponents of latent fingerprint identification "have turned the scientific method on its head."[10]  Validity rests on proclamations of success over time; any hypotheses or suppositions are assumed to have been asked, tested, and found to be true due to the passage of time.  However, that is not the case.  The model of assuming science is valid before it is tested "was once pervasive in applied settings, especially in medicine, and produced such time-tested technologies as bloodletting and phrenology."[11]

Latent fingerprint identification continues to be admitted despite the Supreme Court's clear admonition that expert testimony is not admissible if it rests upon a methodology that has not been shown to be reliable.  *See Daubert v. Merrill Dow Pharm.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 19 S. Ct. 1167, 143 L. Ed. 2d

---

[8]  Robert Epstein, *Fingerprints Meet Daubert:  The Myth of Fingerprint "Science" is Revealed*, 75 S. Cal L. Rev. 605, 616 (2002).

[9]  *Id*. at 617 (footnote omitted).

[10]  Michael J. Saks and David L. Faigman, *Failed Forensics:  How Forensic Science Lost Its Way and How It Might Yet Find It*, 4 Ann. Rev. Law. Soc. Sci. 149, 150 (2008).

[11]  *Id*.

29

238(1999).  The Supreme Court held that federal trial judges, when faced with a proffer of expert scientific testimony, must first determine whether the "reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93.

In 2002, a federal public defender appealed a district court's automatic acceptance of latent fingerprint analysis.[12]  He based this argument on years of questioning from various sources of the accuracy of friction ridge (fingerprint) identification.  The underlying premises of fingerprint identification had never been tested to determine whether positive results could be falsified.

The federal defender cited sources from the late 1990's including law review articles discussing how "considerable forensic evidence made its way into the courtroom without empirical validation of the underlying theory and/or its particular application"[13] and clarifying that "fingerprint identification depends upon . . . probabilistic inquiry, [but] its practitioners use no probability models and have no probability data to use . . . they rely on intuitions and assumptions that have not been tested rigorously . . ."[14]

The problem of inaccurate fingerprint science and testimony was recognized again in 2000 by the Department of Justice (DOJ) itself.  Compelling proof of the lack of empirical testing on fingerprint identification came from the DOJ in March 2000 when the National Institute of Justice (NIJ), a division of the DOJ, issued a solicitation for fingerprint validation studies.[15]  Citing *Daubert* and its requirement

---

[12]    *United States v. Rose*, 672 F. Supp. 2d 723 (D. Md. 2009) (Dkt. No. 46).

[13]    Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test*, 78 Minn. L. Rev. 1345, 1353 (1994).

[14]    Michael J. Saks, *Merlin and Solomon:  Lessons from the Law's Formative Encounters With Forensic Identification Science*, 49 Hastings L.J. 1069, 1105-06 (1998).

[15]    http://www.latent-prints.com/NIJ.htm.

30

of "scientists to address the reliability and validity of methods used in their analysis," the NIJ solicitation letter addressed the need "to provide greater scientific foundation for forensic friction ridge (fingerprint) identification."[16]

The NIJ highlighted that the Federal Bureau of Investigation (FBI) had already "recognized the need for standardized procedures for friction ridge examination [and] hosted a meeting of latent print examiners to discuss development of consensus guidelines, . . . preserve and improve the quality of service provided by examiners nationwide" in 1995.[17]

In 1997, the American Society of Crime Laboratory Directors (ASCLD) requested that the NIJ identify issues in forensic science. The NIJ review resulted in a 1999 NIJ publication including a section on latent print examinations and identifying a number of needs including the validation of the basis for print (friction ridge) individualization and standardization of comparison criteria.

In May 1999, the NIJ assembled a Fingerprint Research Advisory Panel (FRAP) to solicit research to determine the scientific validity of individuality of friction ridge examination based on measurement of features, quantification, and statistical analysis. The solicitation called for the development of standard procedures for fingerprint comparisons and for testing of those procedures once adopted. By this solicitation, the DOJ conceded that verification standards and procedures had never been done.[18]

_____

[16] *Id.*

[17] *Id.*

[18] In February 2009, the National Research Council of the National Academy of Sciences (NAS) issued a report titled *Strengthening Forensic Science in the United States: A Path Forward* which identified a need for published peer-reviewed studies and the setting of national standards in various forensic evidence disciplines, including fingerprint identification. The report provoked further attention to this issue in the scientific community, but it was not the first call to action. *See* http://www.nap.edu/catalog/12589.htm.

31

Given all of the available evidence from the late 1990's and from various sources including the FBI that latent fingerprint comparisons of friction ridge examinations had no basis in verified science, defense counsel should have objected to latent fingerprint examiner Richard A. Erfert's testimony of a positive friction ridge (fingerprint) identification between the latent prints on the victim's truck and Mitchell's prints. (RT 3170-94.) Erfert's testimony should have been suppressed because it did not meet the standards of reliability established by *Daubert* and was based upon unreliable principles and methods which did not comply with Federal Rule of Evidence 702. The technique employed by Erfert[19] still has not been tested, has not been subjected to peer review and publication, is subjective with a high potential rate of error, and has no standards controlling its operation. The technique was questionable and was as fraught with human error as any other eyewitness identification. The verification process was similarly questionable. Yet, defense counsel did not question the expert.

### b.    *Fingerprint identification expert's testimony*

The probative value of the fingerprint examination is a combination of the diagnosis of a match and the reliability of the reported match. The greater the number of matched characteristics from one print to the next, the more likely it is that the two prints actually match. However, a high number of matching characteristics would not by itself determine probative value. If the examiner has made an error in matching characteristics, the number of matches would no longer be probative. So both a high number of matching characteristics and a low probability of error are required for the fingerprint evidence to be probative for the jury. Defense counsel failed to elicit any of this information for the jury.

Though Erfert's testimony regarding print identification was limited to one partial right side of a latent palm print where he found one "loop" and one "delta"

---

[19]   (RT 3178.)

32

and called it a match (RT 3188), defense counsel did not cross examine Erfert on what was missing in the print or its lack of quality. Defense counsel never determined whether Erfert was relying only upon the one loop and one delta, never determined the similarity in the latent and Mitchell's loop and delta, and never asked Erfert how many similar characteristics are required to make a positive identification.

Regarding the second print which Erfert claimed matched Mitchell's middle finger, Erfert never testified and defense counsel never elicited any information at all. Defense counsel did not ask what part of the finger was represented by the latent print: its tip, middle, side, or bottom. Trial counsel did not ask whether it was a partial print. If it was a partial print, defense counsel did not determine how much more difficult it is to match a middle section of a finger than the top section. Defense counsel failed to determine what characteristics of the latent print matched what characteristics of Mitchell's finger.

Erfert had testified, "if two fingerprints were identical . . . I would be suspicious of maybe it was a copy. Because they will never be the same because your fingers are soft. . . . Fingerprints are never totally identical." (RT 3182-83.) Defense counsel was alerted that not all characteristics of a latent print and a known print will match.

Yet defense counsel did not determine what standard is used to determine a "match" between characteristics. Counsel never determined how many matching characteristics are required for a positive identification. Defense counsel did not determine the scientific source of that number or standard. Nor did counsel discover how many matching characteristics Erfert found in each print or whether the matches differed in quality or scale.

If some matches were less conclusive than others, defense counsel did not determine whether lesser matches are weighted to decrease their overall importance in a determination of a positive identification. Defense counsel did not

33

elicit from the expert whether he determines these calculations on his own or relies upon a scientific national standard for calculating the value of ridge matches in his overall calculation of a positive identification.

From Erfert's testimony, jurors could assume that he was using and had even exceeded some scientific standard for fingerprint matching. He said:

> Well, we don't have a particular number. In the past the number 12, 12 points of identification, there have been some research on 12 points of identification. And it would be one in I think it's 20 – I don't even know what the number is, but it's way past what we have today any of the numbers.

(RT 3182.)

But that response to the prosecutor's clear question "Is there a certain number of ridge details . . . that you require before . . . positive identification is made" should have alerted defense counsel that Erfert was no longer an expert in the field and was flying solo on the science. The expert's testimony should have alerted defense counsel to the obvious follow-up questions on scientific standards and verification techniques.

In *Daubert* and *Kumho*, the Supreme Court stated that trial courts "should consider the known or potential rate of error." When the prosecutor asked how certain Erfert was that both the partial palm print and the fingerprint matched Mitchell's prints, Erfert answered, "I'm positive." (RT 3190.) That answer was false. The technique Erfert employed involved a person looking at each set of fingerprints and making subjective determinations. Even DNA tests have an error rate. Fingerprint matching does not have a zero rate of error.[20]

---

[20] A report of the Office of the Inspector General (OIG) titled *A Review of the FBI's Handling of the Brandon Mayfield Case* confirms that individual examiners can and do make mistakes. Any claim of a "zero" error rate for fingerprint identification that does not acknowledge the possibility of examiner error is false. The report recommends independent verification of an examiner's findings and highlights the importance of giving the defendant an opportunity to have an independent expert examine the latent prints at issue to determine whether a misidentification has been made.

34

Erfert offered nothing in the way of data, statistical probability, uncertainty, or error rates. Unlike DNA tests, the fingerprint matching absolutely required Erfert's subjective judgement. Neither the court, the prosecutor, nor defense counsel elicited any statistical likelihood of human error or error in the technique itself. After eliciting the expert's inaccurate testimony, the prosecutor did nothing to clarify or correct it.

Earlier in his testimony, Erfert said that fingerprints "cannot be identical" and their positions must be "relative" for an identification. (RT 3179, RT 3182.) These statements are not consistent with a zero error rate and should have alerted counsel and court to the expert's false testimony.

Defense counsel asked absolutely nothing about the prints in evidence or their identification. Instead defense counsel only asked the expert what surfaces are best for obtaining latent prints and whether he was asked to obtain prints from other items in evidence. (RT 3192-93.) The failure to elicit testimony from the expert went beyond failing to assign probative value to the evidence and failing to discredit the expert.

Erfert acknowledged that the inside of the truck had smoke damage and that he could not collect prints from the inside without first "dousing" the soot with water. (RT 3191.) Erfert mentioned that the black soot inside the truck was similar to the dusting powder he used to lift prints. (RT 3191.) On redirect in response to the prosecutor's question, Erfert explained that if he were to lift a print from an item before the serologist examined it, his technique could destroy DNA evidence. Defense counsel did not ask a follow-up question or determine what part of the fingerprint lifting technique could destroy DNA evidence. There are only two parts: dusting and lifting. Since dirt is destructive of DNA, there is a good chance that fingerprint dusting powder is what would destroy the DNA evidence. Erfert described the fingerprint dust as "like fine soot." The amount of regular soot inside the truck would have called all DNA evidence from the truck

35

into question.  Defense counsel failed to clarify or elicit the fact that the DNA may have been compromised by soot.

Defense counsel did not ask Erfert whether he knew what time or what day the two latent prints were left on the truck.  Though he asked these questions about DNA evidence, defense counsel failed to remind the jury that the prints on the truck did not necessarily relate in time to the murders of Ms. Slim or Ms. Lee.  They could have been made days afterward.

Although Erfert made several lifts of prints from the truck and said they were not "usable," defense counsel never elicited what characteristics make a print usable, whether there is a sliding scale of usability and clarity, and where the two latent prints in evidence would fit on that scale of clarity.

When Erfert claimed that his results had been reviewed by another fingerprint analyst, defense counsel did not elicit what technique the verifier used.  It could have been a matter of Erfert taking the latent print and Mitchell's print to a co-worker, telling the co-worker he had found a match, and asking the co-worker if he or she agreed.  We have no idea, because the defense attorney did not ask what sort of verification process was used.

In the mid- to late-1990's, the scientific community, the Department of Justice, and the FBI had already expressed their growing concern about the dearth of peer-reviewed, published studies establishing the scientific bases and validity of latent fingerprint identity.  But even without much scientific awareness, a competent defense attorney would have realized that human error is inherent in human matching.  The fingerprint analyst has the same temptation to overestimate a match as any other eyewitness.  This is a common defense.  It was not a reasonable trial tactic to stand mute while facing the major possibility of human error by a witness who claims to be "positive."

36

The deliberate deception of a court and jurors through the presentation of evidence known to be false violates the Fourteenth Amendment. The same violation obtains when the government, although not soliciting false evidence, allows it to go uncorrected when it appears. *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). In other words, the government cannot create a materially false impression regarding the facts of the case or the credibility of the witness. Relief is compelled when the false impressions are "material," which means when "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935); *Roulty v. Singletary*, 33 F.3d 1279 (11th Cir. 1994); *Campbell v. Reed*, 594 F.2d 4 (4th Cir. 1979); *Boone v. Paderick*, 541 F.2d 441(4th Cir. 1976).

When a fingerprint examiner declares a match between a print from a defendant and a latent print recovered from a crime scene, his word may seal the defendant's fate like no other evidence save, perhaps, DNA. There is a reasonable likelihood that jurors in Mitchell's case considered Erfert's false evidence that he was "positive" of his findings. There is a reasonable likelihood that jurors could not accurately gauge and instead over estimated the relevance of the fingerprint evidence because they were not given the number of matching characteristics or a scientific standard for comparison. It is reasonably likely that jurors felt positive about a match because the expert was "positive" he had made a positive identification and neither the prosecutor, court, or defense counsel challenged his junk science.

Defense counsel failed to offer contrary expert testimony to rebut the unfounded opinions of the Government's expert. Expert testimony would have established that the Government's evidence was imprecise and sometimes

37

erroneous. Defense counsel provided an unreasonable and unsound defense regarding fingerprint identification evidence in light of widespread critique of the lack of a scientific basis.

### 4.    Conclusion

When Mitchell claims that a portion of the forensic testimony was neither based in science nor accurate and that competent defense counsel would have been prepared to challenge the evidence and expert testimony, the Government points to other faulty testimony and forensic evidence to show a lack of prejudice. These claims are necessarily proven separately because of the nature of the different scientific fields, however defense counsel's failure to challenge the forensic evidence should be viewed in whole.

Defense counsel developed no reasonable strategy to ameliorate or eliminate Mitchell's involvement in these crimes via a coherent challenge to weak forensic evidence. Weakness in the evidence would have been readily available to counsel with the assistance of defense experts. When experts testified went beyond the limits of their field in obvious bias in favor of the Government, defense counsel was ill prepared to cross examine them on the science.

It is not enough to argue as the Government has that defense counsel was concerned about the penalty phase and so resisted a vigorous guilt-phase defense for fear of turning off the jury. Competent capital counsel makes those decisions with a clear understanding of the relevance and potential weaknesses of the forensic evidence.

### H.    Trial Counsel Provided Ineffective Assistance in Jury Selection

The Government contends this issue was waived when appellate counsel failed to raise this issue on direct appeal. The Government is incorrect. As Movant alleged in his amended § 2255 motion, to the extent appellate counsel failed to raise any of these issues on appeal, Mitchell pleads ineffective assistance of appellate counsel. (*See* first § 2255 motion Issue AA and Issue AA, *supra*.)

38

With respect to Jurors 48, 43, and 51, the Government states no prejudice ensued from their inclusion as Jurors.  Rather than rely on the Government's guesswork, Mitchell attempted to fully investigate this issue by failing a motion in this Court for permission to interview the jurors. (*See* Dkt. No. 1.)  The Government, however, adamantly opposed the motion.  (*See* Dkt. No. 18.) Ultimately Mitchell was denied the opportunity to fully develop the factual basis of his claims by interviewing jurors.  (*See* Dkt. No. 21.)

As the Government has opposed Mitchell's attempts to affirmatively establish the factual basis of his issues, he is left only with the record.  The record clearly establishes that Mitchell's attorneys provided ineffective assistance in jury selection which deprived him of meaningful *voir dire*.  Specifically the record establishes that: (1) Juror 48 stated she felt the death penalty was the appropriate punishment for a case like Mitchell's (RT 1502); (2) Juror 43 would impose the death penalty regardless of the penalty phase evidence; and (3) Alternate Juror 51 provided conflicting statements as to whether he would impose death.  The views expressed by these jurors reflected attitudes that prevented them from performing their duties as jurors in Mitchell's trial, and therefore they should have been excluded.  *See Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Morgan v. Illinois* 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).

After successfully advocating that Mitchell should be denied any opportunity to investigate his juror issues, the Government now contends that Mitchell has failed to provide any concrete evidence concerning how trial counsel could have rehabilitated prospective jurors dismissed by the Government for cause.  Absent any opportunity to interview these jurors, Mitchell is again forced to rely on the record.  The record clearly establishes Mitchell's ineffective assistance of counsel issue. Per *Wiggins v. Smith* and the ABA Guidelines, Counsel has a duty to attempt to rehabilitate jurors who express initial opposition

39

to capital punishment.  Instead, trial counsel in this case made almost no attempt to rehabilitate any jurors who expressed opposition to capital punishment and in some instances did not ask a single question before allowing the Government to remove potentially favorable jurors.  (*See* Amended § 2255 Motion, pp. 151-57.) The effect of this was the virtual exclusion of any potential juror who expressed doubt as to capital punishment and almost every Native American from the panel. Due to trial counsel's failure to present a complete penalty phase defense combined with the dearth of Native Americans on the jury, there was no way for the jury to accurately understand the facts and circumstances of Mitchell's upbringing, his cultural history, and the abusive and coercive nature of federal investigations into tribal crimes.

**I.**      **The Trial Court Deprived Mitchell of His Right to an Impartial Jury by Erroneously Excluding Potential Jurors Whose Concerns about the Death Penalty Would not Have Substantially Impaired the Performance of Their Duties**

Mitchell has alleged that the trial court erred by dismissing Veniremember No. 3 for cause based upon his views of the death penalty.  Veniremember No. 3's views did not justify his excusal under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), or *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).  (*See* Amended § 2255 Motion, Issue I, pp. 158-67.)

As with several other Issues, the Government contends Mitchell waived this issue because it was raised on direct appeal.  (*See* Response, p. 37.)  As Mitchell has explained, this issue was litigated in a very limited manner before the Ninth Circuit purely based on the issue of whether Veniremember No. 3 was excluded for race-based reasons.  *Mitchell*, 502 F.3d at 953.  Further, the Ninth Circuit found that appellate counsel had waived the *Witherspoon* challenge with respect to Veniremember No. 3 because appellate counsel had apparently abandoned this issue.  *Id*. at 953 n.2.  As Mitchell has contended, and as the case law clearly

states, Mitchell has a right to effective assistance of counsel at the appellate stage. (*See* Amended § 2255 Motion, Issue AA.) To the extent appellate counsel waives valid appellate issues, Mitchell has suffered ineffective assistance of counsel. The Government, however, maintains the issue is waived despite ineffective assistance issues and cites to *Hammond v. United States*, 408 F.2d 481 (9th Cir. 1969), in support of this position. The Government's reliance on *Hammond* is misplaced. To begin with, *Hammond* does not speak in any way to ineffective assistance of counsel. Secondly, the Supreme Court principle recognizing the application of *Strickland* to appellate counsel post-dates the Ninth Circuit's ruling in *Hammond*. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). And finally, as a practical matter, if the Government's position is accurate that ineffective assistance of counsel is not cognizable in a § 2255 proceeding, then there would essentially be no opportunity to ever litigate an ineffective assistance of appellate counsel issue. This position cannot stand.

Mitchell and the Government appear to agree that the relevant standard, as stated by *Wainwright*, is whether the "juror's views would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Wainwright*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980)). (*See* Response, p. 38.)

It is evident from the record that Veniremember No. 3 was confused at certain portions of the *voir dire* process. Indeed she dramatically changed her answers from the time she filled out the questionnaire to the time she provided oral answers in court. Veniremember No. 3 oral answers were, at best, ambiguous. So the Court took Veniremember No. 3 on *voir dire* and ultimately established:

> The Court:  And so my question to you is would you be willing to impose the death penalty if after hearing all the evidence and the sentencing phase, and you found it was appropriate to do so, could you part with you religious beliefs and impose the death penalty?

41

<u>Veniremember No. 3</u>:  Yes, Your Honor.

(RT 330.)

The record clearly establishes that Veniremember No. 3 was qualified to serve as a juror in this case.  A juror is not obliged to abandon his personal beliefs or convictions, but rather is required only to carry out his duties as the court's instructions and juror oath requires.  *Wainwright*, 469 U.S. at 424.  The Court questioned Veniremember No. 3 and he made it "unmistakably clear" that he could carry out his duties as required.  *Uttecht v. Brown*, 551 U.S. 1, 7, 27 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007).  The trial court thus erroneously excused Veniremember No. 3 over the defense objection.  (RT 332-33).  *See Gray v. Mississippi*, 481 U.S. 648, 653, 659, 107 S. Ct. 2045, 95 L. Ed. 2d 622 (1987).

**J.      The Trial Court Failed to Enforce the Legal Standard for Hardship Dismissal, Resulting in a "Jury of Volunteers"**

Mitchell contends that the strict standards of hardship *voir dire* were not adhered to in his trial.  A potential juror is only rightfully dismissed after specifically stating reasons s/he cannot serve which the court finds amount to more than simply inconvenience.  *See Glasser v. United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942).

**1.      Veniremember No. 77**

Veniremember No. 77 stated that juror service would be inconvenient for her because she looks after her grandchildren 3-4 days per week.  She also stated that her husband was employed in law enforcement and therefore she might be biased in this case.  (RT 1021).  Over the defense objection, this Court dismissed Veniremember No. 77 for "undue hardship and extreme inconvenience." (RT 1038-39.)

The Government contends that Veniremember No. 77 was excused for more than just hardship, and quotes this Court's presumption that Veniremember No. 77

42

might be biased for the prosecution. (Response, p. 45.) While Mitchell does not contend that the Government is misquoting this Court, Mitchell does contend that bias is neither undue hardship nor extreme inconvenience, and therefore possible bias is not a valid factor in this Court's decision to excuse Veniremember No. 77 for "undue hardship or extreme inconvenience." (RT 1038-39). Furthermore, if bias was indeed a concern for this potential juror, that should have been the basis of a for cause challenge, and the defense should have been given an opportunity to rehabilitate this potential juror. Instead, the defense was denied any opportunity to examine Veniremember No. 77 on individual *voir dire*.

On the issue of hardship, Veniremember No. 77 provided no specific information concerning possible hardship. The record is unclear whether someone else could satisfy Veniremember No. 77's babysitting duties or to what extent her daughter could afford to pay for a babysitter for the time Veniremember No. 77 was serving as a juror. The Government does not address the issue of Veniremember No. 77's hardship.

### 2.    Veniremember No. 78

During hardship *voir dire*, Veniremember No. 78 expressed some concern over scheduling issues at his job and some misgivings about the legal system in general. Veniremember No. 78's scheduling issues lack specificity in that it was unclear how easily the training events he described could be rescheduled, and his stated misgivings were also undefined in that the Court could only guess as to his abilities to serve as a juror. (RT 1224). Thus defense counsel objected to excusing Veniremember No. 78 and moved to examine him further in individual *voir dire*. The defense request was, however, rejected and Veniremember No. 78 was excused. Mitchell contends that, under *Glasser* and its progeny, this was erroneous.

In response, the Government simply quotes large portions of the transcript and announces Veniremember No. 78 was validly excused for financial hardship.

43

It is entirely unclear from the record how Veniremember No. 78 would have suffered financially by serving as a juror. He clearly states he is one of four trainers, and given that he works for the Postal Service – a quasi-federal entity – it would be difficult to imagine the Postal Service not making allowances for federal jury service. Granted, it is clear from his statements that his employers might be disappointed that he would be unavailable for the period of time he is serving on a jury, but such is the expected reaction of any employer when their employee is called to perform their civic duty. (RT 1203-05).

The Government then emphasizes this Court's finding of uncertainty that Veniremember No. 78 would be able to follow the law. (Response, pp. 47-48.) Again, this statement was made during hardship *voir dire* with no defense opportunity to truly rehabilitate. Ability to follow the law is a question for individual *voir dire*, and the defense should have been afforded an opportunity to follow up on this particular area with Veniremember No. 78.

### 3.      Veniremember No. 20

Veniremember No. 20 stated that she may know someone that the defense attorneys might know, but that this would not affect her in anyway. (RT 2137). She then stated that she had young children at home, who her sister could watch, but that she might be worried about them during the trial. (RT 2154-55). The defense requested an opportunity to speak to Veniremember No. 20 during individual *voir dire* and objected to her dismissal. The Court, however, excused her on the basis of her concern for her children. (RT 2166-67).

The Government responds that *voir dire* cannot change the "mind of a mother of small children." (Response, p. 49.) The purpose of *voir dire* is not necessarily to change anyone's mind, but rather to understand that person's views. In this particular case, Veniremember No. 20's views were not clear. As defense counsel noted, several of her original concerns were clarified during *voir dire* and she noted her sister could watch the children while she was away. Defense

44

counsel sought a full and fair opportunity to speak to Veniremember No. 20 in order to clarify her views, but was denied such opportunity.

### 4. Jury of Volunteers

Mitchell offered a side-by-side comparison of a juror who wanted to be on the case but presented potential problems and jurors who did not want to be on the case who presented potential problems. (Amended § 2255 Motion, pp. 168-73.) Only the juror who wanted to be on the case was allowed to proceed to individual *voir dire*. The Government's response is limited to conclusory statements that Mitchell's allegations are a disservice to the Court because Mitchell allegedly has no evidence to support his issue. (Response, p. 50.) The Government's argument is not well taken because the Government has adamantly opposed Mitchell's requests to interview jurors and thus, despite the fact that Mitchell has been limited to the record, the Government does not respond to the side-by-side comparison Mitchell offered in his Amended § 2255 Motion. Furthermore, the Government cites the juror questionnaire as further proof of the adequacy of the voir dire process – a document which this Court has already deemed inadequate. (RT 1537). And finally, it is the Government who does a disservice to this Court and the criminal justice system at large by attempting to deny Mitchell his right to fully develop his issues. Indeed, the Government should welcome any opportunity to right an unjust criminal proceeding.

### K. This Court Violated Mitchell's Constitutional Rights by Denying His Request to Interview the Jurors in his Capital Case

The Government contends that this issue was not timely raised because Mitchell had not raised it in his first § 2255 motion, but rather in his Amended § 2255 Motion. As the Government notes, however, Mitchell could not raise this issue in his original motion because the issue had not been resolved. (Response, p. 50.) Indeed, Mitchell filed his motion to interview jurors on May 22, 2009 – over two weeks before the date he filed his first § 2255 motion. (*See* Dkt. Nos. 1

45

and 9a.)  This Court denied Mitchell's motion to interview Jurors on September 4, 2009 – over four months after Mitchell filed the original request.  (*See* Dkt. No. 21.)  Post-conviction counsel for Mitchell made his best efforts to file the motion as early as possible, and successfully filed the motion to interview jurors in advance of the one-year deadline.

The Government then contends that Mitchell's issues should be denied because Mitchell allegedly failed to establish good cause to conduct the interviews.  (Response, p. 51.)  The Government is incorrect.  In addition to the four subissues Mitchell has alleged which provide good cause to interview the jurors – counsel's duties under the ABA guidelines, prosecutorial misconduct, publicity, juror misconduct – Mitchell relies on the "death is different" doctrine, *Schriro v. Farley*, 510 U.S. 222, 239, 114 S. Ct. 783, 127 L. Ed. 2d 47 (1994), and the clearly established principle that death verdicts require increased reliability. *Lowenfield v. Phelps*, 484 U.S. 231, 238-39, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988); *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978).

The need for juror interviews is evident.  Mitchell has outlined several areas of issues related to jurors, and in every instance the Government faults Mitchell for failing to affirmatively prove his issues.  In addition to the fact that Mitchell is not obligated to affirmatively prove his case in his Amended § 2255 Motion, but rather should be permitted to avail himself of full discovery, access to this Court's subpoena power, and an evidentiary hearing, Mitchell further contends that the Government should be estopped from the defense that Mitchell cannot affirmatively prove any of his juror-related issues because of the Government's position prohibiting Mitchell from interviewing any of the jurors.  As a matter of equity, Mitchell cannot be deprived of his right to fully investigate his issues and

also be faulted for failing to provide information only available via full investigation.

This Court's denial of Mitchell's reasonable request to adequately investigate his issues violates both the due process clause, and the longstanding Eighth Amendment right to "increased reliability" of the process by which capital punishment may be imposed.  *Herrera v. Collins*, 506 U.S. 390, 405, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).

**L.**    ***Voir Dire* Was Constitutionally Inadequate to Secure Mitchell's Constitutional Right to an Impartial and Life-qualified Jury**

Mitchell explained in his Amended § 2255 Motion that *voir dire* at his capital trial was constitutionally inadequate because this Court inappropriately rehabilitated jurors and prevented defense counsel from asking prospective jurors questions specific to Mitchell's case.  (Amended § 2255 Motion, pp. 178-87.)  The Government responds that *voir dire* took approximately four weeks to complete.  (Response, p. 52.)  Mitchell assumes that the Government is well aware that a lengthy *voir dire* does not equate to an adequate *voir dire*.  Indeed, *voir dire* could last years, but the relevant inquiry is whether it meets the standards set forth by the Supreme Court.  *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992).  The Government then contends that trial counsel did not object to the nature of the questioning of the venire.  The Government misstates the record.  In fact, John Sears, learned counsel for Mitchell, made this precise objection several times.  (*See, e.g.*, RT 486-89.)  Finally, the Government contends that appellate counsel did not raise this issue.  To the extent appellate counsel failed to raise this issue, they provided ineffective assistance.  (*See* Amended § 2255 Motion, Issue AA.)

The Government does not respond to Mitchell's issue concerning this Court's inappropriate rehabilitation of pro-death jurors and cites from the record to prove this issue.  Thus, Mitchell assumes the Government concedes this point.

The Government then contends that it was appropriate to not permit Mitchell to ask prospective jurors if they convicted Mitchell of the crimes for which he was accused, whether they could imagine themselves voting for a penalty other than death.  (Response, p. 52.)  The Government misstates the case law.  The Supreme Court has explicitly ruled that the defense has a right to ask questions specifically regarding the case at hand.  *Uttecht*, 551 U.S. at 14.  Indeed, if in every case in which a carjacking was committed resulting in the death of a grandmother and granddaughter a juror would vote for the death penalty, that juror would not be qualified to serve as a juror in that case.  This is the purpose of death and life qualification and Mitchell's deprivation of this right was unconstitutional and contrary to clearly established federal law.  *Uttecht*, 551 U.S. at 13; *Morgan*, 504 U.S. at 733-34.  Moreover, it is noteworthy that this precise question but phrased to flesh-out the jurors in favor of a life sentence was Question Number 68 in the Juror Questionnaire, and this point was made and objected to as part of the *voir dire* process.  (RT 1536).  Mitchell is at a loss to understand how a question designed to find the death qualified jurors is appropriate, but the exact same question designed to discover the life qualified jurors is inappropriate.

**M.      The Cumulative Effect of All Errors During the Jury Selection Process Resulted in a Jury That Was Not Impartial**

Mitchell has provided a series of prejudicial errors that occurred in connection with jury selection.  These errors individually, or commutatively, warrant reversal of Mitchell's conviction.

**N.      The Court Violated Mitchell's Constitutional Rights by First Granting the Government's Motion to Transfer the Trial, Then Severing the Trials of Mitchell and Co-Defendant Orsinger**

Mitchell contends that his constitutional rights were violated when his trial was transferred from Prescott, Arizona to Phoenix, Arizona for invalid reasons.  Further, his rights were violated when the case was not transferred back to

Prescott after the last-minute severance of the trial.  The prejudicial effect of these last minute changes was a dramatic change to the trial immediately before the state of the case and the virtual total exclusion of Native Americans from the jury. (Amended § 2255 Motion, pp. 190-92.)

The Government contends that these issues must be dismissed because Mitchell did not raise them in his first § 2255 motion, but only in his Amended § 2255 Motion. (Response, p. 54.)  This is not entirely true.  In his first motion, Mitchell contended that his right to a jury chosen from a fair and representative jury venire was violated when Native Americans were systematically excluded from jury service.  (*See* first § 2255 Motion, Issue M, pp. 136-38.)  The basis of this issue was, in part, the undue hardship excusals of 29 of the 30 Native American potential jurors as a result of the invalid transfer of the trial from Prescott to Phoenix.  (First § 2255 Motion, pp. 137-38.)  The Supreme Court ruled in *Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562 (2005), that an amended habeas petition does not relate back to the timely filed original petition when it states new grounds for relief supported by facts that differ in both time and type from those set forth in the original pleading.  Here, Mitchell's Amended Issue N is little more than an expansion of the first Issue M.  This Issue concerns the same overall effect – the lack of Native Americans on the jury – and the wrongful transference and severance that brought about that result.  While the ground for relief may be stated somewhat differently in the first motion (*compare* First § 2255 Motion, Issue M, to Amended § 2255 Motion, Issues M and O), it is based on the same nucleus of operative facts.  Thus, per *Felix*, 545 U.S. at 657-65, because Mitchell's Amended § 2255 Motion Issue N concerns facts not separated in time or place from first § 2255 Issue M, the former relates back to the latter.

The Government then contends that this issue was resolved on direct appeal, and should thus be dismissed. (Response, p. 55.)  The Government is wrong.  This issue was not resolved on appeal, rather appellate counsel abandoned the issue and

never connected the improper transference and severance to the impact it had on the jury.  Thus the "basic thrust or gravaman" of the issue was not decided on direct appeal, and therefore is appropriate for adjudication.  The Government then contends that Mitchell can only speculate concerning the prejudice resulting from the inappropriate transfer from Prescott to Phoenix.  The Government is incorrect.  Despite the fact that the Government has actively prevented Mitchell from fully investigating issues related to the jury, the record shows 29 of the 30 Native Americans were excused for hardship – several of those claiming economic strain likely associated with the commute from the Prescott area to Phoenix.  The Government contends that the potential of two in-custody witnesses testifying at the trial justifies the transfer.  (Response, p. 55.)  The Government's position is contrary to the law.  Per Rule 18 of the Federal Rules of Criminal Procedure requires that this trial should have been prosecuted in the district where the offense was committed – that district was Prescott.  While it may have been more convenient for the Government to not have to transfer these two "potential" witnesses, convenience is not a valid reason to deprive Mitchell of his constitutional rights.

**O.     Mitchell's Right to a Jury Chosen From a Fair and Representative Jury Venire Was Violated When Native Americans Were Systematically Excluded from Jury Service**

The Government rightly points out that Mitchell must prove that the disparity in Native Americans occurred in venires other than his own, and that any under representation was due to a systematic exclusion of Native Americans.  (Response, p. 56.)  As Mitchell notes in his Amended § 2255 Motion, Mitchell will rely on full discovery and access to this Court's subpoena power to fully establish this Issue.

**P.     The Juror Questionnaire Was Constitutionally Inadequate to Secure Mitchell's Constitutional Rights**

Mitchell contends that given the inadequacy of the *voir dire* process in his case, the juror questionnaire served a vital purpose in securing a qualified jury. The questionnaire failed in this purpose as it sought no specifics from the jurors that could be used to determine life and death qualification.

The Government contends that the questionnaire was not the "sole basis for qualifying the panel." (Response, p. 57.) The Government is mistaken. The *voir dire* process was so lacking (*see infra* Issues H-M) that Mitchell was forced to rely solely on the questionnaire to qualify the panel. The Government makes no argument with respect to the questionnaire itself, thus Mitchell can only assume the Government agrees it was deficient.

**Q.     The Prosecution's Failure to Produce Exculpatory Evidence Violated Mitchell's Constitutional Rights**

Mitchell showed in his Amended § 2255 Motion that the Government violated his rights under *Brady* by failing to provide, until literally the last possible moment, exculpatory evidence in the form of a letter from the Attorney General of the Navajo Nation to Paul Charlton, the United States Attorney for Arizona, stating that the Navajo Nation (of the Diné) was opposed to subject Lezmond Mitchell to capital punishment. (Amended § 2255 Motion, pp. 200-04.) The Government's conduct with respect to this letter was part of a pattern and practice of the Government's failure to disclose any information concerning the Navajo Nation's involvement in this case. Despite the defense demands for discovery and the confines of the *Brady* doctrine, Mitchell was provided with almost no discovery material with respect to Navajo Nation involvement. On the most basic level, the Government contends that Mitchell was in Navajo Nation custody prior to federal custody and that the Navajo Nation authorities validly worked with federal authorities in investigating this case. While Mitchell disputes

51

this (*see infra* Issue R), he contends that even, if there was some sort of a valid working relationship between the Navajo Nation authorities and the federal agents, trial counsel was provided virtually no information concerning Navajo Nation involvement.  Indeed, Mitchell even raised *Miranda* issues at trial, and was still provided no information.

The Government contends that the even if trial counsel had called a live witness to testify regarding the contents of the letter, counsel speculates that it would have made no difference to the outcome of the case.  (Response, p. 60.)  Mitchell has continually alleged that through the use of the discovery process and this Court's subpoena power, he can fully develop his issues and prove he is entitled to relief.  The Government was afforded the rare opportunity of discovery in the form of depositions prior to filing their Response.  While Mitchell maintains that such was improper, he also objects to the profoundly unfair position the Government has taken that Mitchell's issues should be dismissed without further factual development despite the fact that the Government has already benefitted from the discovery process.

The Government further contends that Mitchell's factual assertions "are simply not true."  Clearly, there are factual disputes that need to be resolved, and the appropriate manner to resolve such disputes is via discovery and an evidentiary hearing.

**R.    The Government's Collusion with the Navajo Nation Police Violated Mitchell's Constitutional Rights**

The Government contends that this issue was previously raised on direct appeal, and therefore that Mitchell is barred from raising the issue again.  The Government is incorrect.  This Issue was raised on direct appeal, and adjudicated in the Ninth Circuit, as a record-based claim.  Movant claims now, in Issues E and P, that the admission of the evidence related Mitchell's alleged confession and the evidence obtained therefrom was unconstitutional and counsel was ineffective for

52

failing to appropriately challenge the statements. The Ninth Circuit examined the issue purely based upon the record and denied Mitchell relief. *Mitchell*, 502 F.3d at 960. The difference between direct review of a criminal trial and a proceeding initiated by filing a motion under 28 U.S.C. § 2255 is the opportunity to fully develop a factual record prior to adjudication and to raise extra-record claims that the movant has not previously been given the opportunity to raise. Mitchell did not raise an ineffective assistance of counsel issue with respect to this issue on direct appeal, and therefore he is not foreclosed from doing so now. Furthermore, Mitchell did not raise the extra-record aspects of the collusion issue on direct appeal and had no opportunity to develop his Issues via an evidentiary hearing, this Court's subpoena power, or any other avenue which is available in a § 2255 proceeding but not at the direct appeal stage. Thus the Ninth Circuit has not rejected either the "basic thrust or gravamen" of this issue on direct appeal and Movant is not barred from raising this issue.

The Government then contends that there is no merit to Movant's Issue because his federal rights did not attach until November 29, 2001, and there was no actual collusion to deprive him of his federal rights. (Response, p. 62.) The Government is again incorrect. The Government fails to acknowledge its role in the Navajo Nation arresting Mitchell and the manner in which the Nation confined Mitchell. The simple fact that Mitchell was in Navajo Nation custody does not render federal rights unavailable. *United States v. Alvarez Sanchez*, 511 U.S. 350, 359, 114 S. Ct. 1599, 128 L. Ed. 2d 319 (1994); *United States v. Red Bird*, 287 F.3d 709, 713-14 (8th Cir. 2002); *United States v. Doe*, 155 F.3d 1070, 1078 (9th Cir. 1998).

In this case, Mitchell was jointly arrested by the FBI and Navajo Nation police officers on November 4, 2001 based on a Navajo Nation warrant issued for armed robbery. After three days of interrogation, Mitchell finally appeared in Navajo Nation court on November 7, 2001, regarding a criminal damage charge

53

filed against him on September 19, 2001. (*See* Ex. 164, Criminal Complaint, Case No. CH-CR-1711-01.) The Navajo Nation robbery charges were dropped and Mitchell allegedly pled to one count of criminal damage in violation of 17 Navajo Nation Code § 380.A.1. (*See* Ex. 164, Judgment and Mittimus.) Despite the fact that this offense carries no possibility of jail time, *see* 17 NNC § 380.B.1-5, Mitchell was remanded to the Navajo Nation jail until such time that "judgment has been satisfied" in his Navajo Nation case.[21] (*See* Ex. 164, Judgment and Mittimus.)

Consistent with the possible sentences noted in 17 NNC § 380.B.1-5, Mitchell's Navajo Nation sentence should have been restitution, community service, or some combination thereof. Mitchell, however, remained in Navajo Nation custody where FBI officials continually interrogated him for over two weeks.

The Government contends that Mitchell is not entitled to relief because he has failed to show "actual collusion" between the FBI and the Navajo Nation police. (Response, pp. 61-62.) The Government misstates Mitchell's burden. The Ninth Circuit explicitly stated in *United State v. Michaud,* that collusion is established by deliberate intent to deprive a defendant of federal procedural rights. 268 F.3d 728, 735 (9th Cir. 2001). If Mitchell could be arrested on Navajo Nation charges for armed robbery, then there was no reason he could not have been arrested on federal charges for armed robbery. Instead the FBI opted to use the Navajo Nation authorities to arrest Mitchell and then, following his alleged guilty plea, kept him illegally confined while he was continually interrogated. Illegal

---

[21] Mitchell was not actually sentenced on November 7, 2001. Rather his sentence was deferred until a sentencing hearing which never took place. Ultimately, the case was closed on October 20, 2003 on the Government's motion. (See Ex. 164, Order of 10/20/2003, No. CH-CR-1711-01)

confinement in a Navajo Nation jail sufficiently demonstrates the federal government's deliberate intent to deprive Mitchell of his federal procedural rights.

**S.      Mitchell was Incompetent from the Conclusion of the Guilt Phase Through the Penalty Phase, and Thus Deprived of His Constitutional Rights**

It is well established that a criminal defendant must be competent at all stages of a trial. *See Cooper v. Oklahoma*, 517 U.S. 348, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996). Doubt was raised as to Mitchell's competency and counsel was constitutionally ineffective for failing to raise this issue. (Amended § 2255 Motion, pp. 216-23.)

The Government contends that Mitchell is procedurally barred from raising this issue because it was decided by the Ninth Circuit on direct appeal. (Response, pp. 62-63.) The Government is incorrect. The issue decided on direct appeal was whether this Court should have held a competency hearing *sua sponte* based on Mitchell's in court conduct. The Ninth Circuit rejected that position. *Mitchell*, 502 F.3d at 986-87. Mitchell now contends that trial counsel should have requested a competency hearing based in part off of Mitchell's conduct and also based on the report of Barry Morenz, M.D.. (*See* Issue R.) The Ninth Circuit has not previously examined the facts and circumstances of this claim.

The Government contends that neither the Court nor the United States Marshals' saw any evidence of Mitchell's substance abuse. (Response, p. 63.) While the Government was granted the opportunity to depose trial counsel, Mitchell has not been made aware of any depositions either of this Court or of the Marshals. Thus Mitchell is at a loss as to the Government's alleged knowledge of this Court's or of the Marshals' knowledge with respect to Mitchell's substance abuse. Regardless, these opinions are not relevant to the question at hand. Neither this Court, the Marshals, nor Mitchell's trial counsel are mental health professionals. The only mental health professional consulted on this issue wrote a

55

report concluding that Mitchell was abusing drugs in custody. These conclusions are supported by inmates in custody with Mitchell, with no interest in this case, who personally observed Mitchell ingesting several drugs. (*See* Exs. 97 and 161) Trial counsel was in possession of that report, and the documented drug abuse in combination with Mitchell's behavior would have led any reasonable trial counsel to request a competency proceeding.

**T.**  **Mitchell's Conviction and Sentence Should be Reversed Because the Victim's Family's Conduct Unduly Prejudice Mitchell at the Guilt and Penalty Phases**

During Mitchell's trial, Slim and Lee's family members who pins depicting the deceased at the trial. This conduct was highly prejudicial to Mitchell. *Musladin v. Lamarque*, 427 F.3d 653 (9th Cir. 2005), *vacated on other grounds by Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006). And trial counsel was ineffective for failing to timely object to the display of these buttons.

The Government contends this Issue was already dealt with on appeal. (Response, pp. 64-65.) The basis of this claim is ineffective assistance, and this issue was not deal with on appeal. *See Mitchell*, 502 F.3d at 971-72. The Government then contends that trial counsel was not ineffective because "they recognized the issue with the buttons early on. . . ." (Response, p. 65.) The Government offers nothing in the record to support this contention. The fact of the matter is that there is nothing in the record to indicate how quickly trial counsel addressed the issue with the buttons. Trial counsel failed to make an appropriate record on this issue. All that is clear from the record is that highly prejudicial information was displayed to the jury which unfairly prejudiced Mitchell. Mitchell is therefore entitled to, at minimum, further factual development of this issue via discovery and access to this Court's subpoena power.

56

**U.     Counsel Provided Ineffective Assistance By Failing to Request the Trial Court Trifurcate the Proceedings**

Mitchell claims that trial counsel was ineffective for failing to request that his proceedings be trifurcated – meaning the "penalty phase" be split into two separate phases where the jury first decides eligibility for death and then in a separate phase decides where to impose death.  The purpose for this generally, and specific to this case, is that prosecutors offer extremely prejudicial, highly emotional evidence at a standard penalty phase that is irrelevant to the issue of eligibility for death.  Mitchell's attorneys did not challenge this proceeding and request trifurcation, and thus Mitchell was deemed eligible for death on a finding of statutory aggravating factors based on inadmissible evidence.  (Amended § 2255 Motion, pp. 228-40.)

The Government points out that this issue was not raised at trial or on appeal.  (Response, p. 65.)  This is true.  This issue was not raised at trial, and counsel was ineffective for failing to do so.  This issue was not raised on direct appeal because ineffective assistance of counsel is an extra-record claim cognizable as a post-conviction remedy.  The Government contends that Mitchell cannot show prejudice from trial counsel's failure to request trifurcation.  Mitchell objects to this argument in that the showing of prejudice would most naturally derive from juror interviews – a practice the Government has successfully prevented the defense from taking part in.  Fortunately, however, prejudice can be established from the record itself.  The victim impact evidence was so inflammatory that *per se* prejudice resulted.  Moreover, the Federal Rules of Evidence exist for several purposes.  One of those purposes is to attempt to ensure fair trials.  Given that Mitchell's penalty phase proceeding did not comply with the Rules of Evidence, the proceeding was inherently flawed.

**V.     The Manner in Which the Government Would Execute Movant Violates the Eighth Amendment**

Mitchell maintains that the Government's intended method of execution is unconstitutional. (Amended § 2255 Motion, pp. 240-43.) At present, this Issue is not ripe and Mitchell will renew this claim, if necessary. *See Hill v. McDonough*, 547 U.S. 573, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006).

**W.     The Absence of a Principled Basis for Distinguishing Cases in Which the Federal Death Penalty is Imposed from Those in Which it is not Imposed Renders the FDPA Unconstitutional**

Mitchell contends that the Federal Death Penalty is unconstitutionally imposed in a haphazard fashion that violates the mandate against arbitrary and capricious sentences. *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

The Government contends that the haphazard manner is due to the differing experiences of jurors. (Response, pp. 69-70.) While that might partly be true, race and region play key roles in the imposition of the federal death penalty onto defendants, which are impermissible considerations. The result of the interplay of all of these factors is a death penalty scheme that is applied in an unfair manner with no level of consistency. The Supreme Court has specifically held that such a system cannot stand. *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).

**X.     A System Where the Death Penalty is Sought on the Invidious Basis of Race, and the Irrational Basis of Geography, Should Not be Enforced and this Court Should Vacate Mitchell's Sentence**

Mitchell contends, and the statistics objectively establish, that the manner in which the federal death penalty is sought is unconstitutional. (Amended § 2255 Motion, pp. 249-58.)

58

The Government's response is largely focused on pointing out evidentiary deficiencies in Mitchell's Issue. (*See* Response, p. 71.) Mitchell admits this claim requires further factual development, and just as the Government has already been granted discovery, Mitchell should be granted access to this Court's subpoena power, discovery, and any other opportunity to further develop the factual bases of this issue.

**Y.    Mitchell's Sentence Is Unconstitutionally Discriminatory and Therefore Must Be Set Aside**

Mitchell contends that is sentence is unconstitutional. As with his other assertions related to this issue, *see* Issues W and X, Mitchell will rely on this Court's subpoena power and discovery to fully establish the factual basis of this Issue.

**Z.    By Omitting the "Plain-error" Review, Congress Has Failed to Provide for Meaningful Appellate review, and Therefore the FDPA is Unconstitutional**

Mitchell contends that the FDPA is unconstitutional on its face and as applied to his case. (Amended § 2255 Motion, pp. 261-64.) The Government responds that issue of the constitutionality of the FDPA as applied to Mitchell was resolved on direct. (Response, pp. 73-74.) The Government does not respond to the contention in the general sense. Mitchell maintains the FDPA is unconstitutional on its face for the reasons set forth in his Amended § 2255 Motion.

**AA.   Mitchell Was Deprived of His Right to Effective Assistance of Appellate Counsel**

Throughout his Amended § 2255 Motion, Mitchell has made claims of ineffective assistance of appellate counsel. Essentially Mitchell alleges that to the extent that this Court finds that any of Mitchell's claims, while meritorious, are barred because of appellate counsel's failure to raise the issue on direct appeal, the

59

issue is cognizable in this post-conviction proceeding under the ineffective assistance of counsel doctrine. *See Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); *Turner v. Calderon*, 281 F.3d 851 (9th Cir. 2002).

The Government contends, as they did with respect to *voir dire*, that quantity equates to quality. (Response, p. 75.)  This is simply not the case.  Just because the appellate brief filed in this case was lengthy does not mean it was adequate.  Indeed the appropriate analysis here is for this Court to consider each of Mitchell's issues on their merits.  When this Court finds that the claims are indeed meritorious, the issue of ineffective assistance of appellate counsel is then rightfully determined.  Should this Court find that these issues warrant relief, then the deficient performance and *Strickland* prejudice are established.  (Amended § 2255 Motion, pp. 264-65.)

**BB.   Cumulative Error**

There are factual disputes that need to be resolved, and the appropriate manner to resolve such disputes is via discovery and an evidentiary hearing.

**III.**

**Conclusion**

For the foregoing reasons, the Court should grant the relief requested in Mitchell's mended § 2255 motion.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  July 6, 2010                    By    */s/ Statia Peakheart*
                                         STATIA PEAKHEART
                                         Deputy Federal Public Defender

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Vincent Q. Kirby, AUSA

I hereby certify that on July 6, 2010, I served the attached document by mail on the following, who are not registered participants of the CM/ECF System:

Capital Case Staff Attorney
Evo A. De Concini U.S. Courthouse
405 West Congress Street, Suite 1500
Tucson, AZ 85701-5010

_/s/ Statia Peakheart_