*UNITED STATES v. LEZMOND CHARLES MITCHELL*
CV09-8089-PCT-MHM(MEA)

EXHIBITS 156 - 164 IN SUPPORT OF MOVANT'S
REPLY TO OPPOSITION TO MOTION
TO VACATE SENTENCE

156.  Declaration of Johnnie Grey, 4/29/2010

157.  Declaration of John Hannah, 6/22/2010

158   Declaration of James Laughter, 4/29/2010

159.  Declaration of Willie Nez, 4/29/2010

160.  Declaration of Mary Lee Alice Reed, 5/6/2010

161.  Declaration of Samuel Stone, 5/7/2010

162.  Declaration of Bryant Wilson, 3/12/2010

163.  Arizona Department of Public Safety Fingerprint Report, 1/9/2002

164.  Lezmond Mitchell - Navajo Nation Judgment & Closure Order

165.  Declaration of Levon Henry, 6/4/2010

DECLARATION OF JOHNNY GREY, JR.

I, Johnny Grey, Jr., DECLARE AS follows.

1. My name is Johnny Grey, Jr., AND I RESIDE IN Chilchinbeto, Arizona, on THE NAVAJO Reservation, where I'VE Lived All of my Life. My Date of BIRTH IS June 8, 1972.

2. I attended Chilchinbeto Community school from FIRST GRADE through EIGHTH GRADE. George Mitchell WAS the school PRINCIPAL.

3. IN 1986, I was attending HIGH school IN Rough Rock, Arizona while still Living in Chilchinbeto.

4. I remember HEARING rumors that George Mitchell HAD molested a student in Chilchinbeto AND that HE, George Mitchell, WAS FIRED BECAUSE of that. I Also HEARD this FROM MY MOTHER AND one of my TEACHERS BUT I CANNOT RECALL who the TEACHER WAS RIGHT now.

5. On April 29, 2010, AN INVESTIGATOR of the Office of the FEDERAL Public Defender CONTACTED me REGARDING Lezmond Mitchell. The INVESTIGATOR EXPLAINED to me that her office REPRESENTS Lezmond Mitchell in FEDERAL COURT PROCEEDINGS REGARDING his CONVICTION AND DEATH SENTENCE. Until that day, no one HAD EVER INTERVIEWED me REGARDING Lezmond Mitchell OR HIS CASE. IF I HAD Been ASKED previously I WOULD HAVE willingly PROVIDED the information contained IN this DECLARATION AND testified to it.

-1-

I DECLARE UNDER the penalty of PERJURY and the laws of the UNITED STATES of AMERICA, that the foregoing is true and correct.

Signed this 29th day of April, 2010, in Chilchinbeto, Arizona,

Johnnie Grey Jr.

JOHNNY GREY, JR.

EX 156 - 2036

## DECLARATION OF JOHN HANNAH

I, John Hannah, hereby declare as follows:

1.  My name is John Hannah. I am an attorney licensed to practice law in the State of Arizona. I was trial counsel for Gregory Nakai in *United States v. Gregory Nakai*, et al., No. 01-CR-01072-FJM (D. Ariz.).

2.  Gregory Nakai's trial began in December 2002, the jury convicted him on December 19, 2002, and the trial court denied the motion for new trial in February 2003. I have reviewed Gregory Nakai's declaration, dated May 15, 2009; Mr. Nakai's report of the enormous amount of drugs and alcohol he used preceding and during August and late October 2001 was consistent with our trial defense. Had Lezmond Mitchell's defense counsel asked, I would have allowed Gregory Nakai to speak to an investigator for Mitchell – in my presence – about the alcohol and drugs Gregory and Lezmond used before the FBI and Navajo Nation police arrested them in November 2001. I would have allowed Mr. Nakai to sign an affidavit summarizing that information.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.

Signed June 22d 2010.

_____
John Hannah

DECLARATION OF JAMES LAUGHTER

I, James Laughter, declare as follows:

1.  My name is James Laughter.  I am retired and reside in Chilchinbeto, <u>Arizona</u>, on the Navajo reservation, where I have lived all of my life.

2.  In the 1980's, I was the Vice President of the Chapter House in Chilchinbeto, Arizona.  I knew George Mitchell because he was the Principal of the Chilchinbeto Community School.

3.  Around 1985 or 1986, two community members brought complaints against George Mitchell to the Chapter House board members.  I don't recall the specifics of their complaints, but it was serious enough for the Chapter House and the Chilchinbeto school board to remove George Mitchell from the school and the community.  George Mitchell was paid out the rest of his contract and asked to leave.

4.  On April 29, 2010, an investigator of the Office of the Federal Public Defender contacted me regarding Lezmond Mitchell.  The investigator explained



JL

1

EX 158 - 2038

to me that her Office represents Lezmond Mitchell in federal court proceedings regarding his conviction and death sentence. Until that day, no one had ever interviewed me regarding Lezmond Mitchell or his case. If I had been asked previously, I would have willingly provided the information contained in this declaration and testified to it.

I declare under the penalty of perjury and the laws of the United States of America, the foregoing is true and correct. Signed this 29 day of April, 2010, in Chilchinbeto, Arizona.

James Laughter

2

EX 158 - 2039

DECLARATION OF WILLIE NEZ

I, Willie Nez, declare as follows:

1.  My name is Willie Nez and I am eighty (80) years old.  I am retired and reside in Chilchinbeto, Arizona, on the Navajo reservation, where I have lived all of my life.

2.  In the 1980's, I was the President of the ~~Chapter House~~ School Board in Chilchinbeto, Arizona.  I knew George Mitchell because he was the Principal of the Chilchinbeto Community School.

3.  In the mid 1980's, certain complaints were brought against George Mitchell.  I don't remember what the outcome was regarding those allegations but I do remember that George Mitchell left Chilchinbeto shortly after that.

4.  On April 28, 2010, an investigator of the Office of the Federal Public Defender contacted me regarding Lezmond Mitchell.  The investigator explained to me that her Office represents Lezmond Mitchell in federal court proceedings regarding his conviction and

*Willie J Nez*

1                                    WN

EX 159 - 2040

death sentence.  Until that day, no one had ever interviewed me regarding Lezmond Mitchell or his case. If I had been asked previously, I would have willingly provided the information contained in this declaration and testified to it.

I declare under the penalty of perjury and the laws of the United States of America, the foregoing is true and correct.  Signed this 29 day of April, 2010, in Chilchinbeto, Arizona.

_____
Willie Nez

2

EX 159 - 2041

**DECLARATION OF MARY LEE ALICE REED**

I, Mary Lee Alice Reed, declare:

1. My name is Mary Lee Alice Reed. I was born on February 21, 1951, in Arkansas City, Kansas. My maiden name is Graham. I had a half sister named Bobbi Jo Mitchell. I recently learned that Bobbi Jo's daughter, Sherry Lane Mitchell, had a son named Lezmond Mitchell.

2. Everyone called my father Bill Graham. His given name was either Willie Floyd Graham or William Floyd Graham. There was no birth certificate and my father's older sisters disagreed on the name he had been given at birth, but the younger sister won out and Willie stuck.

3. My father married Ida Marydean Protzman after she divorced Jesse Carl Erwin. My parents had two children. Floyd Dale, whom I still call, Billy, was born on October 17, 1947 and I was born four more ~~five~~ years later.

4. I had four half siblings from my mother's first marriage: Billy Don, Jimmey Dean, Bobbi Jo and Julia "Judy" Olive. Of the four, I only considered Judy a real sister. She and I were close until she passed away in 1995.

5. My father and mother separated when I was two years old. I lived with our mother until I ended up in the hospital with a pneumonia shortly after


MLAR

1

the separation; at that point my father took me.  Billy was already living with him.

6.      After I became a mother, I wondered at some of the decisions made by my half sister Bobbi Jo.  One time, Bobbi Jo left two or three week old Sherry Lane under Billy's care.  Billy, who was ten years old and wanted to be outside playing with his friends, left me in charge of the baby.  I was six at the time.  When Bobbi Jo returned, she was not pleased that Billy wasn't there and asked in an angry tone how long Billy had been gone.  I told her that it had been as long as she had been gone.

7.      I visited Bobbi Jo and her husband George Mitchell in Chilocco before they had Sherry Lane.  I went there with my brother Billy.  I recall feeling very uncomfortable with George who kept looking at me.

8.      When I was nine years old, Bobbi Jo, George and Sherry Lane lived in a small stucco apartment in Arkansas City.  Shortly before they left that apartment, my dad wanted me to stay the night at Bobbi Jo and George's place while he and Billy did something on their own.  I begged my dad not to leave me there.  My dad told me in front of everyone, including Bobbi Jo and George, that I was being selfish by not wanting him and my brother to have time alone.  I

MLAR

**2**

couldn't tell dad  George made me uncomfortable.  I myself didn't  understand why.

9.     That night they made a bed for me on the couch.  I went to sleep but was later awakened by someone's touch.  It was George, who was rubbing my vagina.  I felt him insert his finger in me all the while whispering to me, "Doesn't it feel good?"  When George went back to the bedroom, I went into the bathroom and took the hottest bath I could stand.  The water was so hot it scalded my skin.  I stayed in the bathroom for a long time, I couldn't stop crying.  While I was in the tub, George knocked on the door and asked me if I was okay.  I told him to go away.

10.    I always had the feeling that Bobbi Jo knew what George did to me.  The apartment was very small and I could look into the bedroom from the couch.  When George was beside me, I could see Bobbi Jo's legs in an odd position.  She had one leg straight out in front of her on the bed and the other leg bent at the knee but off the bed, hovering a little above it.  I thought Bobbi Jo couldn't be asleep and hold that position.

11.    I separated from myself after what George did to me, I felt very ashamed and dirty.  I remember feeling sore but I also have the sense that there


MLAR

3

are chunks of time I don't recall at all.  I was completely alone with what

became my secret.  I couldn't tell my father because I had taken him literally

when he said he would kill anyone who harmed me.  And, I could tell anyone

else because my father would have found out.

12.    There were times when I could forget I was dirty but when I least

expected it the feeling would creep up on me.  One time, I was invited to go

along with a classmate and her mother to the home of a teacher who was ill.

This teacher was a favorite of mine and I was very excited  about the visit.  At

my teacher's  home, I sat on the white couch in the living room but started

feeling uncomfortable.  I recall squirming and moving from side to side, I was

afraid that my filth would come out of me and stain the pretty white couch.

*I was sitting w/ head down - hair covering my face. She sat beside patted my leg - said, "It's ok. It's ok." MLAR*

13.    The day after George molested me, I recall being seated next to

Sherry Lane on the steps ~~outside of the house~~ *across the street of a huge church. put* . [Sherry Lane was screaming at

her parents at the top of her lungs, "I hate you! I hate you!"  George and Bobbi

Jo were just tossing a ball.  The thought of a little girl with so much anger in her

has stuck with me. *]→ happen the day before. MLAR*

14.    On March 30, 2010, I was contacted by an investigator from the

Office of the Federal Public Defender.  The investigator explained to me that the

4

*MLAR*
MLAR

Office of the Federal Public Defender represents Lezmond Mitchell in legal proceedings examining his death sentence. This was the first time anyone from a legal team representing Lezmond Mitchell contacted me. Had I been asked before, I would have been willing and able to provide the information herein and testify thereto in a court of law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true an correct this day six of May, 2010.

Mary Lee Alice Reed

5

EX 160 - 2046

DECLARATION OF SAMUEL R. STONE

I, Samuel Stone, hereby declare as follows:

1. My name is Samuel Stone. I am an inmate of the Bureau of Prisons and currently housed at Florence Administrative Maximum facility in Colorado. I am serving two life sentences without the possibility of parole. I was convicted and sentenced in the Arizona federal court.

2. When I was in Phoenix on my case, I was housed in the Maricopa County Jail on Madison Street in downtown Phoenix. I was housed in closed-custody on the sixth floor; inmates with serious felony charges were ⨯ SRS kept in closed-custody. While I was on the sixth floor of the Madison Street Jail, I met Lezmond Mitchell, who was also housed on the sixth floor.

3. Sixth-floor closed-custody at the Madison Street Jail had four sections, with four pods in each. There were approximately thirteen inmates in each pod. Lezmond and I were housed in the same area of the

SRS
[S.R.S.]

1

facility for part of the time I was there.  Closed-custody inmates get to leave their cells for one hour a day.  During that hour, an inmate could take a shower, use the phone, talk to other inmates, basically do anything within the pod.

4.  I had a ready supply of drugs while I was on the sixth-floor in closed-custody.  I got drugs a variety of ways. ██████████████████████████  Inmates in our pod used heroin, crystal meth, marijuana and cocaine frequently.  I saw Lezmond use heroin and marijuana regularly.  I also saw Lezmond periodically use crystal meth and cocaine, when it was available.  It's hard to give a specific quantity of any one drug Lezmond used because we got different quantities each week, but I can say that Lezmond used any and all drugs, as much as he could, when I knew him.  I never saw him turn down an opportunity to use any of these drugs.

5.  One way meth got into the jail was on cards.  People who were not incarcerated melted the crystal meth

S R S

2                    [S.R.S.]

to a liquid and then poured the liquid onto a card in a specific spot, where it dried. When the card came in the mail, the inmate receiving the card knew which part of the card to cut up and then soak in water. Once the card broke down in the water, the inmate could snort or shoot up the meth with a syringe. The pod I was in on the sixth floor always had one syringe for inmates to use to inject a drug. I saw Lezmond inject meth with that needle several times.

6. There was a part of the old jail where an inmate could poke a hole in the cell wall to the outside. He dropped a line, or string, out of that hole all the way to the ground. Someone outside the jail tied contraband onto that line, and the inmate pulled up the string into the jail. Drugs came in to the jail that way also.

7. The closed-custody inmates on the sixth floor had homemade alcohol available most days. Lezmond drank homemade alcohol nearly every day. At that time, Madison Street Jail only fed its inmates twice a day.

S.R.S

3        [S.R.S.]

One way they tried to compensate for not serving three meals, was to serve the inmates a lot of fruit. Many closed-custody inmates on the sixth floor made alcohol, myself included. I used the fruit we were served with meals, and put it with Starlight Mints I got through the commissary. When that mixture fermented, it made alcohol. I saw Lezmond high and drunk at least a few times each and every week we were housed together at Madison Street Jail.

8. I represented myself at my trial with stand-by counsel from the Federal Public Defender's Office in Phoenix. I know I was sentenced and left Madison Street Jail and went in to the Bureau of Prisons before Lezmond's trial was concluded.

9. On May 5, 2010, I was interviewed by Debra Garvey of the Federal Public Defender's Office in Los Angeles. She explained to me that her office represents Lezmond Mitchell in his habeas case, challenging his trial and death sentence. I have never before spoken to

SRS
_____
[S.R.S.]

4

anyone from Lezmond Mitchell's defense team.  If I had been asked, I would have willingly provided the information I have given here, and testified to it.

I declare, under the penalty of perjury, under the laws of the United States of America, the foregoing is true and correct.  Signed this 7th day of May, 2010.

_____
Samuel R. Stone

5

[S.R.S.]

EX 161 - 2051

Declaration of Bryant Wilson

I, Bryant Wilson, hereby declare as follows:

1. I met Lezmond Mitchell when we both attended Rough Rock High School in Rough Rock, Arizona. I was a grade ahead of Lezmond. When I first met him, I was living in Chinle. I moved to Round Rock to stay with my aunt in 2000.

2. Lezmond and I hung out together and we became close friends when Lezmond was a senior at Rough Rock High School. It was during that school year that Lezmond moved out of his grandfather's house and moved in to a trailer my family owns next to my aunt's house. Lezmond never told me why he had to move out of his grandfather's house and I never asked. I knew he and his grandfather argued about things quite a bit. Lezmond stayed with us for about a month then he moved in with another friend of his, Lorenzo Reed. Lezmond continued to stay with me a few days here and there, but he mostly lived with Lorenzo's family for that school year.

3. Lezmond is a good guy. He was quiet and respectful, even when he was drunk. He was polite. You could count on Lezmond if you needed his help. He

1

EX 162 - 2052

was a good friend to have.

4. I had a cousin, Jeremy Gorman, who I was close to. In the fall of 1999, Jeremy lost his job in Phoenix. He planned to come to Round Rock to live in a family hogan across the highway from my aunt's house. One day in early October, Jeremy invited me to go with him to Phoenix to pick up his last paycheck. We took another friend of ours, Tyler, with us. Jeremy borrowed his father's van for the trip. When we got to Phoenix, Jeremy picked up his check, we ate dinner, bought some alcohol and stayed in a hotel room for the night. The next day, Jeremy and I drove to Many Farms to see a girl who lived there. Jeremy and I ended up sleeping in the van parked outside the girl's house that night.

5. The next day Jeremy and I drove to Gallup and bought some more alcohol. On the way back to Round Rock, we stopped in Window Rock and parked on the outdoor basketball court behind Window Rock High School. I was a little worried about getting arrested for parking there, but Jeremy wanted to sit there and drink and talk about his high school memories.

6. By the time Jeremy started to drive from Window Rock to Round Rock, he had trouble driving because he was so drunk. We managed to make it to Round

2

EX 162 - 2053

Rock. I asked Jeremy to stop at Gregory Nakai's house on the way to my house. Lezmond was there and I asked him if he wanted to come cruising with us. I was pretty worried about Jeremy's driving by now, so I called my mother and asked her if I could come and get her car. She said I could use her car, so we drove toward Lukachukai to pick it up.

7. When we got to my mother's house, I got her car and followed Jeremy driving his van back to Round Rock. Jeremy parked his car in Round Rock and I drove the three of us - Jeremy, Lezmond and me - in my mother's car. We went to pick up Jeremy's sister, Bernice. We also hooked up with another guy, Roger, who drove a car. There were five of us in two cars. We went to a sheep camp to sit and drink. We were there for a little while when I decided to go back into Round Rock to get some speakers for our music. Bernice, Roger and I were going to drive in Roger's car. I left the car keys to my mother's car with Lezmond and Jeremy because it was cold. I told them to run the car motor to keep warm.

8. Roger, Bernice and I had not driven very far, when Roger noticed that Jeremy and Lezmond were driving toward us in my mother's car at a high rate of speed. I could tell they were driving fast because I saw the headlights bouncing

3

EX 162 - 2054

along over the dirt, coming toward us quickly. We stopped in a wash to wait for Jeremy and Lezmond to catch up to see what they were doing. They went flying past us in my mother's car with Jeremy driving and Lezmond in the passenger seat. Just past the wash was a curve in the dirt road. I couldn't actually see the car crash because of the curve, but I saw a big cloud of dust above the ridge and knew right away that Jeremy had been driving too fast to make the curve and had crashed.

9. By the time we drove up to the car, I saw Lezmond walking around, trying to catch his breath. The music was blaring in the car, but there was no one inside. I looked around and saw Jeremy lying on his back a few hundred yards from the car. The side and back windows were completely broken out of the car. The frame of the car was bent, from the car being rolled. I knew it wasn't a good idea to move someone who was thrown out of a car, so we didn't try to move Jeremy.

10. None of us had cell phones at that time. Lezmond got in the car with Roger, Bernice and me and we quickly drove to my house to call the ambulance. Roger and Bernice decided to take off before the police arrived. Lezmond said he

4

would stay to talk to the police, as he was sure they would want to interview him. Lezmond and my brother-in-law and I drove back to the scene of the accident. Jeremy hadn't moved.

11. The ambulance came and took Jeremy to the hospital, even though he was dead. The autopsy later showed that he had died instantly of a broken neck.

12. Jeremy had a big funeral in Chinle. He came from a big family, so many people attended his services. Round Rock is a small place and this was big news. I think it would be hard to live in the area at the time and not know about this accident and Jeremy's death.

13. Lezmond and I never really talked about what happened after the night of the accident, except he told me that the car insurance company called him to talk about the accident. The insurance company eventually decided the car was totaled.

14. Jeremy's family blamed me for the accident at first, because the tribal police told them that our two cars were racing. I didn't know that was what they had been told until a few weeks later. It took some time for our family to heal from that false information the police gave Jeremy's parents.

5

15. Kellywood Harvey, the Round Rock Chapter president, also had a terrible car accident that killed people. It happened the same year. He was drinking and driving his truck with people in the back of the truck when he hit a bus. Several people were killed and he was arrested and charged with manslaughter.

16. During the summer of 2001, I went over to see Gregory Nakai at his house a couple of times a week. His brothers were usually there, along with Lezmond, sometimes Johnny Orsinger and Jason Kinlicheenie. Other people showed up some of the time, Teddy Orsinger, ▓▓▓▓▓▓ and some of our girlfriends. When I was there, we usually all smoked marijuana. All of us, including Lezmond, used whatever drugs were in the house. I can remember times when we all smoked cocaine and meth, which we called glass. We often drank beer and sometimes hard liquor. When we drank beer it was usually 40 ounce cans. I could go through a couple of cases myself, as did Lezmond. We all drank a lot of beer. It wasn't hard to get alcohol on the reservation. You could buy it from just about anybody. I know before I was 21 years old I bought beer from various bootleggers in the area. It was easy to do.

6

BW
EX 162 - 2057

17. I left for the Job Corps in August of 2001. I was sent to a job site in Roswell, New Mexico. I called Gregory a few times while I was in Roswell. I remember him telling me that the police were around asking him and the other guys about a couple of murders at Round Rock Lake. Everyone was arrested while I was still in the Job Corps. I came back to Round Rock right before Christmas of 2001. I tried to follow Lezmond's trial, but there were so many rumors about what was happening to him and the other guys, it was hard to know what was true and what wasn't.

18. I have never before been interviewed by anyone about Lezmond Mitchell. If I had been asked, I would have gladly testified to the above information.

I declare under the penalty of perjury, under the laws of the United States of America, the foregoing is true and correct. Signed this __12__ day of March, 2010.

_____
Bryant Wilson

7

EX 162 - 2058

...ssi...
...o bring one
...ral admission is $
...uid.
air kicks, page 2

# 2 men die in wrecks

By Diné Bureau

CHINLE, Ariz. — Two men died in separate one-vehicle traffic wrecks Saturday in the Chinle Police District, according to the Navajo Department of Law Enforcement.

Jeremy Gorman, no age listed, of Chinle died around 1:17 a.m. about 1.2 miles east of the Round Rock Trading Post on an unnamed road, according to Officer Matthew Duran, press officer for Chief of Police Leonard Butler.

He was ejected from his 1996 Ford Taurus when he hit a depression in the road, lost control of the car, and rolled several times.

Officers Carlos Yazzie and Dempsey Harvey of the Chinle Police District found him beside the vehicle and he did not respond. Emergency Medical Technicians from the Navajo Fire and Rescue Department also could not revive him.

The case was turned over to the Criminal Investigations Department.

In the second fatal wreck, Nolan Burbank, 21, of Chinle was crushed under a 1998 Ford half-ton short-wheel base pickup truck when it went off Navajo Route 59 and down a 50-foot embankment to the bottom of a gully at Mile Post 176 near Rough Rock.

A second person in the vehicle, Lisa Jones, no age or home chapter listed, caught a ride with a passing motorist and went to the U.S. Public Health Service's Chinle Comprehensive Health Care Center.

dent
se,
do-
are

cess
aining
d pro-
hy do

pressures
and fa-
a few of
nt of the
BFS re-

EX 162 - 2059

JAN-28-2002  13:52        GALLUP FBI                                                P.04/07



# ARIZONA DEPARTMENT OF PUBLIC SAFETY

## SCIENTIFIC EXAMINATION REPORT

DR NO. 2001070586

Page 1 of 1

| | |
|---|---|
| AGENCY | US FBI, Flagstaff |
| FILE NO. | 198APX70309 |
| OFFICER | ROMINGER, #12049 |
| DATE | January 09, 2002 |
| NAME(S) | ORSINGER, JOHNNY |
| | MITCHELL, LEZMOND |
| | NAKAI, JACKORY |
| | SLIM, ELLIS R. |
| | LEE, TIFFANY N. |
| | KINLICHEENIE, JASON |

## ITEMS:

#JCJ01.     Major case prints of Orsinger, Johnny 6/1/1985.

#JCJ02.     Major case prints of Kinlicheenie, Jason 9/4/1982.

#JCJ03.     Major case prints of Mitchell, Lezmond 9/17/1981.

## EXAMINATION REQUESTED:

Latent Prints

## RESULTS:

Major case prints JCJ01, JCJ02 and JCJ03 were compared with all latent prints of value on file DR#2001070586 and the following identifications made:
Lifts #19 & 20 contain the right palm print of Lezmond Mitchell (JCJ03).
Lift #15 contains the right middle finger print of Lezmond Mitchell (JCJ03).
Lifts were developed on the left side of the pickup bed (crime scene 11/5/2001).

CUSTODY OF EVIDENCE

RECEIVED      D.P.S. Property

DISPOSITION   Latent Print Unit Files

RICHARD A. ERFERT, #2626
Latent Print Examiner
Northern Regional Crime Laboratory
(928) 773-3687

*Accredited by the ASCLD Laboratory Accreditation Board*

EX 163 - 2060

06/17/2010 10:59 FAX ☑007/008



IN THE DISTRICT COURT OF THE NAVAJO NATION

JUDICIAL DISTRICT OF

CHINLE, ARIZONA

THE NAVAJO NATION )
)
)
vs. )
)
Lezmond Charles Mitchell   C# unk SS# 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) )
)
6.5 east of Round Rock Arizona )

CH-CR-1711-01

CRIMINAL COMPLAINT

The above-named Defendant is charges by this complaint with the offense of

_____   Criminal Damage   _____ in violation of Title 17-380.A.1 of the Navajo Nation, and

contrary to the peace and dignity of the Navajo Nation to wit:

**The defendant intentionally damages tangible property of another (The Navajo Nation- Chinle Police Dept).**

Between 3:00 am and
The said Defendant did on or about the 12ᵗʰ day at about the hour of 6:21 AM

Of _____ September _____ 2001 within the jurisdiction of this court at U.S. 191 mile post 480.5, Round Rock

Arizona.

Facts:   The defendant used his person to damage a Navajo Nation Police vehicle, by applying force against the vehicle's right rear door. He caused the top of the door to deviate outward, bending the door about two inches out. The incident occurred between the hours of 3:am to 6:21 am. The damages were not observed until about 6:21 am. Mr. Lezmond Charles Mitchell was the only person in the vehicle between this time frame. The damages were not there prior to him being there. Mr. Mitchell indicated that he was trying to get the attention of Officer Carlton Jim Sr. which resulted in the damages of him kicking the door.

Witnesses:
1. Dempsey Harvey, Police Officer Chinle Police District
2. Amos Ben, Police Officer Chinle Police District
3. Carlton Jim Sr., Police Officer Chinle Police District
4. Carlos Yazzie, Police Officer Chinle Police District

Date: 9-19-01

*Victoria Yazzie*

Clifton Smith, Police Officer #3157
CHINLE POLICE DISTRICT
Post Office Box 96 Chinle Arizona
(928) 674-2111

I HEREBY CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE INSTRUMENT ON FILE
IN THE CHINLE DISTRICT COURT.

_____ COURT CLERK

EX 164 - 2061

06/17/2010 10:59 FAX                                                              ☑006/008

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,
                    Plaintiff,                    Case No. CH-CR-1711-01
    vs.

LEZMUND MITCHELL C#UNK.
DOB:09/17/1981 SS#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
6 1/2 MI. E/O ROUND ROCK TRADING POST
                    Defendant.

### JUDGMENT and MITTIMUS

YOU, *LEZMUND MITCHELL* [ ] have been acquitted, [X] have pleaded guilty, [ ] have been found guilty, [ ] by a jury of your peers, [ ] by the Court, of the offense of *CRIMINAL DAMAGE* in violation of Title *17* and Section *380.A.1* of the Navajo Tribal Code, and in accordance with the mandate of said code, YOU ARE SENTENCED:

[ ] To jail for a period of __ days [ ] To payment of a fine of $ ___
**SENTENCE DEFERRED UNTIL SENTENCING HEARING.**
[ ] To jail for a period of __ days AND payment of a fine of $_____.

Sentence commences on *November 7, 2001* Date of release _____

Further you are order to make restitution to _____ (injured party) in the following manner:

[ ]Your sentence is SUSPENDED and PROBATION/CSW is granted for _____ months/hours.
Contact the Probation Officer for this Judicial District for further instructions.

[XX] You are committed to the custody of the keeper of the Navajo jail at *WINDOW ROCK/CHINLE, AZ* and there to be confined until this judgment has been satisfied.

DATED this *7* day of *November*, 2001.

                                        _____
                                        JUDGE, District Court of the Navajo Nation

### MITTIMUS

To: THE KEEPER OF THE JAIL AT *WINDOW ROCK/CHINLE NDPS*. You are hereby ordered to take and receive and safely keep the person of *LEZMUND MITCHELL* until he/she has satisfied the above judgment.

DATED this *7* day *November*, 2001.

                                        _____
                                        JUDGE, District Court of the Navajo Nation

I HEREBY CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE INSTRUMENT ON FILE
IN THE CHINLE DISTRICT COURT.

_____
            COURT CLERK

EX 164 - 2062

06/17/2010 10:59 FAX                                                   ☑005/008

## IN THE DISTRICT COURT OF THE NAVAJO NATION
### JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,                          No. CH-CR-1711-01

Plaintiff,

vs.                                ORDER of
                                   INDEFINITE CONTINUANCE
LEZMUND MITCHELL,

Defendant.

Upon an oral motion of the Navajo Nation and the court having been informed that the defendant is in Federal custody, and good cause appearing,

IT IS ORDERED that the above entitled cause is continued for indefinite period until such time the Navajo Nation makes arrangements with the United States Attorneys Office for the proper disposition of this case. The court further finds that this continuance is necessary for a full, fair and proper presentation of the issues.

DATED: _____January 24th_____, 2002.


_____
DISTRICT COURT JUDGE

I HEREBY CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE INSTRUMENT ON FILE
IN THE CHINLE DISTRICT COURT.

_____
COURT CLERK

EX 164 - 2063

06/17/2010 10:59 FAX                                                                      ☑004/008

Victoria R. Yazzie, Senior Prosecutor
OFFICE OF THE PROSECUTOR
Post Office Box 1057
Chinle, Arizona 86503
Telephone: (928)674-2217

### IN THE DISTRICT COURT OF THE NAVAJO NATION
### JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,                          NO.CH-CR-1711-01
            Plaintiff,

Vs.                                         MOTION REQUEST FOR
                                            CLOSURE

LEZMUND MITCHELL, DOB:09/17/81
            Defendant,

COMES NOW, Plaintiff by and through the undersigned Prosecutor and respectfully moves the court requesting for closure of the above entitled docket numbered case, on grounds as follows:

That an Order of Indefinite continuance was issued on January 24, 2002, which also stayed and deferred defendant's sentencing. Defendant was taken into Federal Custody while awaiting Deferred Sentencing. See Memo (attachment) dated October 16, 2003 by Chinle Probation Officer, Anderson Jones, recommends that this matter be closed due to the long term federal incarceration,

WHEREFORE, Plaintiff prays the court to grant the closure of the above entitled docketed number case.

Dated this 20ᵗʰ day of October, 2003.

Victoria R. Yazzie, Prosecutor

CERTIFICATION:
I hereby certify that a copy of the foregoing Motion
Was sent to AUSA on this 20 day of Oct. 2003, BY:

I HEREBY CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE INSTRUMENT ON FILE
IN THE CHINLE DISTRICT COURT.

_____
        COURT CLERK

EX 164 - 2064

06/17/2010 10:59 FAX                                                    ☑003/008

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,                          NO.CH-CR-1711-01
                  Plaintiff,

Vs.                                              O R D E R

LEZMUND MITCHELL, DOB:09/17/81
                  Defendant,

UPON receiving and reviewing the foregoing Motion for Closure of the above docketed number cause, good cause having been shown,

IT IS THEREFORE HEREBY ORDERED THAT THE FOREGOING MOTION FOR CLOSURE SHALL BE GRANTED,

IT IS FURTHER ORDERED THAT THE ABOVE ENTITLED DOCKETED NUMBER CAUSE SHALL BE DEEMED CLOSED,

SO ORDERED THIS _20_ DAY OF OCTOBER, 2003.

_____
DISTRICT COURT JUDGE

I HEREBY CERTIFY THAT THIS
IS A TRUE AND CORRECT COPY
OF THE INSTRUMENT ON FILE
IN THE CHINLE DISTRICT COURT.

_____
COURT CLERK

EX 164 - 2065

## DECLARATION OF LEVON HENRY

I, Levon Henry, hereby declare as follows:

1.      My name is Levon Henry.   I was the Attorney General for the Navajo Nation from May 1999 to January 2003.   I attach my résumé as Exhibit A.

2.      Lezmond Mitchell's counsel, the Office of the Federal Public Defender in Los Angeles, California, showed me a letter dated January 22, 2002.   I attach the January 22, 2002 letter as Exhibit B.

3.      I wrote and sent the January 22, 2002 letter at the request of either Paul Charlton, the United States Attorney for Arizona, or Vincent Kirby, an Assistant United States Attorney in Mr. Charlton's office, asking for the Navajo Nation's position on the issue of the death penalty against one of the Nation's members.

4.      When the Nation received this request from the United States Attorney in Phoenix, the United States was pursuing homicide charges against Lezmond Mitchell and other Navajo members in two cases I cited in the letter, *United States v. Nakai, Nakai, Jr., Leal and Orsinger*, No. CR-01-1072-PCT, and *United States v. Mitchell and Kinlicheenie*, No. CR-01-1062-PCT, and it was considering seeking the death penalty in those cases.   As I recall, all of the defendants in those two cases were members of the Navajo Nation.   The United States' inquiry, and later request for a letter stating our position, caused a discussion among the Nation's

1

EX 165 - 2066

government:    I, as the Attorney General, and the Nation's Public Safety Committee and Judiciary Committee discussed whether the Nation should consider opting-in to the application of the death penalty to our members.    (The Federal Death Penalty Act leaves it to the individual Tribe to opt-in to the application of the death penalty against its members.)    As the January 22, 2002 letter states clearly, the Nation maintained its long-standing position against the death penalty; the Nation still opposes the death penalty.

5.    After I sent the letter on or about January 22, 2002, I heard nothing more from the United States Attorney's Office until I received either a telephone call or a letter from the United States Attorney's Office informing me that they decided to seek the death penalty against one of our members anyway; I understand they sought it only against Lezmond Mitchell, and not any other Navajo Nation member who was also eligible for the death penalty.    That was the last I heard from the United States Attorney's Office about that issue.

6.    Until Mr. Mitchell's present attorneys recently showed me a copy of the January 22, 2002 letter, I had never heard from, or spoken to, Lezmond Mitchell's counsel asking about that letter, or the Nation's position on the death penalty.    As the Nation's Attorney General, it would have been my and my Office's role to handle such a significant legal issue.    Had Mr. Mitchell's trial

2

counsel asked, I or someone else from the government would have testified at Mr. Mitchell's trial about the Nation's position against the death penalty.

7.    Mr. Mitchell's present counsel informed that Mitchell was arrested pursuant to a misdemeanor warrant issued by the Nation; the FBI interrogated Mitchell while he was in custody of the Nation pursuant to that warrant; and, the FBI took Mitchell from the custody of the Navajo Nation.   During my term as the Attorney General, and even now, it is not uncommon for the FBI to join the Nation police in arresting a member of the Nation, and for the FBI to walk into the tribal jail and interrogate the arrestee about a federal (non-tribal) crime.   It is also not uncommon for the FBI to "badge out" the tribal inmate; they walk in, tell the jailer they are taking the inmate, and the Nation does not know until the inmate misses a tribal court date.

I declare under the penalty of perjury of the laws of the United States of America, the foregoing is true and correct.   Signed this ___4th___ day of June 2010.

Levon Henry

3

EX 165 - 2068

# EXHIBIT A

# EXHIBIT B



*June*
*FYI*

**NAVAJO NATION DEPARTMENT OF JUSTICE**
*OFFICE OF THE ATTORNEY GENERAL*

LEVON B. HENRY
ATTORNEY GENERAL

BRITT E. CLAPHAM II
DEPUTY ATTORNEY GENERAL

2002 JAN 28  A 4: 51

U.S. ATTORNEY
PHOENIX, AZ

January 22, 2002

Paul Charlton, United States Attorney
U.S. Department of Justice
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, Arizona 85004-4408

        RE:  <u>U.S v. Nakai, Nakai, Jr., Leal and Orsinger</u>,
            No. CR-01-1072-PCT
            <u>U.S. v. Mitchell and Kinlicheenie</u>, No. CR-01-1062-PCT

Dear Mr. Charlton:

    As you requested, this letter will express the current position of the Navajo Nation with respect to the possibility of the United States seeking capital punishment in the above cases. The Nation realizes that your office is not necessarily seeking whether the Nation wants to "opt in" to the idea of capital punishment under 18 U.S.C. 3598; rather the question is whether the Nation would support the death penalty sentencing option under 18 U.S.C. 2119 in these specific instances. Although the Nation has not adopted a comprehensive policy on capital punishment, in these cases, the Nation would not support a death penalty option.

    I wish to thank you for the information you provided on the pending cases, although the details of the cases were shocking it was, nevertheless, helpful in our decision making process. The information which you provided was shared with the Speaker of the Navajo Nation Council, members of the Public Safety Committee of the Navajo Nation Council, and members of the Judiciary Committee of the Navajo Nation Council. Pursuant to your request the information was kept privileged and all copies which were distributed were collected at the conclusion

P.O. Drawer 2010 ● Window Rock, AZ  86515 ● (928) 871-6343 ● FAX No. (928) 871-6177

EX 165 - 2071

Letter to: Paul Charton
January 22, 2002
Page 2

of our meeting.   It is with this understanding and based on the cultural reasons outlined below that the Navajo Nation's position on the capital punishment sentencing option remains unchanged at this time.   The Navajo Nation would not support and therefore requests that the U.S. Attorney's Office not seek capital punishment in either of these cases.   This position is limited solely to the two cases listed.

Previously the Public Safety Committee of the Navajo Nation Council initiated public hearings on the issue of capital punishment in light of 18 U.S.C. § 3598.   The Committee, unfortunately, has not yet completed the hearings due to factors beyond their control.   In light of the issue you raised, the Committee, in conjunction with the Judiciary Committee of the Navajo Nation Council, may have an opportunity to address the issue.   At the present time, however, it is the consensus of all Committee members to hold to the Navajo Nation's previous position on capital punishment.

The three branch chiefs of the Navajo Nation - the President, the Speaker of the Navajo Nation Council, the Chief Justice - adopted two guiding principles, one of which speaks to the preservation of Diné culture, language and values.   As part of Navajo cultural and religious values   we do not support the concept of capital punishment.   Navajo holds life sacred.   Our culture and religion teach us to value life and instruct against the taking of human life for vengeance.   Navajo courts recognize traditional peacemaking as part of the judicial system.   It is through traditional peacemaking that harmony is restored in situations which have been disturbed through an act of crime.   Committing a crime not only disrupts the harmony between the victim and the perpetrator but it also disrupts the harmony of the community.   The capital punishment sentence removes with any possibility of restoring the harmony in a society.

The Navajo Nation leadership is looking for solutions to address crime   on   the   Nation.    The   Nation's   leadership   emphasizes

Letter to: Paul Charton
January 22, 2002
Page 3

preventative and rehabilitative services for the offenders and counseling and support services for the victims and the communities. This positive approach is in keeping with Navajo culture and values.

On behalf of the Navajo Nation I wish to express the Nation's appreciation for your respect of the government-to-government relationship which exists between the Navajo Nation and the United States. The Navajo leadership values the working relationship established with your office and requests the support of your office in any efforts to address the crime issues here on the Navajo Nation. The Navajo Nation may, at some time in the future, take a formal position on capital punishment generally after full consultation with the governing body and the executive offices. However, in light of the need for a response to your office, it is, at this time, the consensus of the Public Safety Committee of the Navajo Nation Council and the Judiciary Committee of the Navajo Nation Council to maintain the historic position of the Navajo Nation opposing the sentencing option of capital punishment for crimes committed on the Navajo Nation under any section of the United States criminal code.

Sincerely,

NAVAJO NATION DEPARTMENT OF JUSTICE

Levon B. Henry, Attorney General
Office of the Attorney General

xc:   Kelsey A. Begaye, President
      The Navajo Nation
  :   Edward T. Begay, Speaker
      The Navajo Nation Council
  :   Public Safety Committee Members
  :   Judiciary Committee Members
  :   Navajo Division of Public Safety

EX 165 - 2073