*UNITED STATES v. LEZMOND CHARLES MITCHELL*
CV09-8089-PCT-MHM(MEA)

EXHIBITS 166-169 IN SUPPORT OF
MOTION TO ALTER OR AMEND JUDGMENT PURSUANT TO RULE 59(e) OF
THE FEDERAL RULES OF CIVIL PROCEDURE

166.  Navajo Nation v. Jason Kinlicheenie Court File, Case No. CH-CR 2020/2021/2049-01

167.  Navajo Nation Report on Death Penalty Hearings

168.  Resolution of the Dineh Medicine Association, Incorporated, 09-03-2003

169.  Supplemental Declaration of Hilary Weaver, D.S.W., 10-20-2010

# EXHIBIT 166

IN THE DISTRICT COURT OF THE NAVAJO NATION

JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,

Plaintiff,

vs.

KINLICHEENIE, JASON   C# 5/8, 674

SS# 601249919   DOB: 9/4/82

1.5 mi SE/OF 12/191 JCT

Defendant.

ROUND ROCK, AZ

No.: CH-CR-2020-01

CRIMINAL COMPLAINT

FILED
NOV 5 2001
CHINLE DISTRICT COURT

The above-named Defendant is charged by this complaint with the offense of _____

ARMED ROBBERY _____ in violation of Title

17 § 492(a)(2) Code of the Navajo Nation, and contrary to the peace and dignity of the

Navajo Nation to wit: HE IN THE COURSE OF COMMITTING A ROBBERY AS DEFINED IN 17 N.T.c. 491, HE OR AN ACCOMPLICE USES OR THREATENS TO USE A DEADLY WEAPON OR DANGEROUS INSTRUMENT.

FACTS: THE DEFENDANT AND ACCOMPLICES ENTERED THE RED VALLEY TRADING POST WEARING MASKS AS TO CONCEAL THEIR IDENTITIES IN THE PROCESS OF TAKING IN ACCESS OF $5,000.00 WHILE BRANDISHING FIREARMS AND A KNIFE.

The said Defendant did on or about the  31st  day at the hour of  6:30  a.m./p.m. of

OCTOBER , 2008, within the jurisdiction of this court at  RED VALLEY STORE

NAVAJO NATION, ARIZONA.

WITNESSES:

CHARLOTTE YAZZIE; DOB 05/29/74
P.O. BOX 140
RED VALLEY, ARIZONA

Date: November 5, 2001

Witness to Complainant's signature:

Victoria Yazzie
Prosecutor

KIMBERLY ALLEN; DOB 8/12/76
PO BOX 2385
SHIPROCK, NM

C.G. Yazzie
Complainant's Signature (or thumbprint)
CARLOS G. YAZZIE # 665
NOLE, CHINLE, AZ
(928) 674-2111

EX 166 -2074

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,                    NO.CH-CR-~~~~~~~~/2049-01
        Plaintiff,                    CH-CR-2020-2001

Vs.                                   O R D E R

JASON KINLICHEENIE, DOB:09/04/82
        Defendant,

        UPON receiving and reviewing the foregoing Motion for Closure of the above

docketed number cause, good cause having been shown,

        IT IS THEREFORE HEREBY ORDERED THAT THE FOREGOING MOTION

FOR CLOSURE SHALL BE GRANTED,

        IT IS FURTHER ORDERED THAT THE ABOVE ENTITLED DOCKETED

NUMBER CAUSE SHALL BE DEEMED CLOSED,

        SO ORDERED THIS _20_ DAY OF OCTOBER, 2003.

                                      _____
                                      DISTRICT COURT JUDGE

EX 166 -2075

Victoria R. Yazzie, Senior Prosecutor
OFFICE OF THE PROSECUTOR
Post Office Box 1057
Chinle, Arizona 86503
Telephone: (928)674-2217

## IN THE DISTRICT COURT OF THE NAVAJO NATION
## JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,                    NO.CH-CR-2020/2021/2049-01
            Plaintiff,

Vs.                                   MOTION REQUEST FOR
                                      CLOSURE

JASON KINCLICHEENIE, DOB:09/04/82
            Defendant,

_____

COMES NOW, Plaintiff by and through the undersigned Prosecutor and respectfully moves the court requesting for closure of the above entitled docket numbered case, on grounds as follows:

That a JUDGMENT AND MITTIMUS was issued on November 5, 2001, which also stayed and deferred defendant's sentencing. Defendant was taken into Federal Custody while awaiting Deferred Sentencing. See Memo (attachment) dated October 16, 2003 by Chinle Probation Officer, Anderson Jones, recommends that this matter be closed due to the long term federal incarceration,

WHEREFORE, Plaintiff prays the court to grant the closure of the above entitled docketed number case.

Dated this 20th day of October, 2003.

Victoria R. Yazzie, Prosecutor

CERTIFICATION:
I hereby certify that a copy of the foregoing Motion
Was sent to AUSA on this 20 day of Oct. 2003, BY

EX 166 -2076

## IN THE DISTRICT COURT OF THE NAVAJO NATION
## JUDICIAL DISTRICT OF CHINLE, ARIZONA

THE NAVAJO NATION,                            No. CH-CR-2020/2021/2049-01
        Plaintiff,

      vs.                                    O R D E R of
JASON KINLICHEENIE,                           INDEFINITE CONTINUANCE
        Defendant.

---

Upon an oral motion of the Navajo Nation and the court having been informed that the defendant is in Federal custody, and good cause appearing,

IT IS ORDERED that the above entitled cause is continued for indefinite period until such time the Navajo Nation makes arrangements with the United States Attorneys Office for the proper disposition of this case. The court further finds that this continuance is necessary for a full, fair and proper presentation of the issues.

DATED: _____, 2002.

_____
DISTRICT COURT JUDGE

EX 166 -2077



NAVAJO NATION JUDICIAL BRANCH
PROBATION AND PAROLE SERVICES

IN THE MATTER OF                    }
                                    }
     KINLICHEENIE, Jason            }          CH- CR- 2020/ 2021/2049- 01
                                    }
                                    }

---

## PRE-SENTENCE REPORT

| | | |
|---|---|---|
| Prepared for | : | Chinle District Court |
| Prepared by | : | Aurelia C. Barlow, Probation Officer |
| | | 928- 674- 2062 |
| Sentencing Date | : | December 20, 2001 @ 2:00 PM |
| Offenses | : | Possession of Marijuana |
| | | Robbery, Armed Robbery |

**IDENTIFYING DATA**

| | | |
|---|---|---|
| Date of Birth | : | September 4, 1982 |
| Social Security Number | : | 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 |
| Address | : | PO Box 203  Round Rock, AZ |

**Prosecutor**                          **Defense**
Victoria Yazzie
Chinle District
Chinle, AZ 86503

COURT COPY

EX 166 -2078



## GENERAL INFORMATION

This Presentence report involves the offense of Robbery, Armed Robbery and Possession of Marijuana. The defendant is schedule for sentencing on November 30, 2001 at the hour of 9:00 AM.

## THE OFFENSE

The defendant pled guilty to the offenses of Robbery, Armed Robbery and Posssession of Marijuana on November 5 and November 7, 2001. The defendant stated that the offense occurred on Halloween night, October 31, 2001 at the Red Valley Trading Post, Red Valley, AZ.

The defendant stated that he was at home in Round Rock, AZ when his cousin, Jakegory Nakai and his friend, Lezmond Mitchell stated that they wanted to rob a store. He stated that he agreed and checked the gas gauge on his father's car and it was almost empty. His friends gave him five dollars for gas, and they headed to Tsaile where they got gas. He stated they then headed towards Red Valley, they took the road behind the Ranger's Station. While enroute, the boys told him to drop them off about 2.5 miles down the road, this was where they stated that they left a vehicle. The defendant stated he drop them off while he waited approximately two miles down the road. After waiting for several minutes, the other boys came up in a silver/ gray truck, which they stated they got from Gallup, N.M.

The defendant stated that after this they arrived at Red Valley, AZ and drove past the store, and parked at the Catholic Church. They waited until all the customers were gone. They then approached the store, parked by the gas pumps and put on their mask. The defendant stated that he started pumping gas while the other two individuals went inside the store. He stated that after he finish filling up the gas, he went inside the store to find the two individuals pushing the two clerks (women) away from the windows and towards the back wall. He stated at this time, he went to the first cash register and ask one of the clerks how to open the register. Mr. Kinlicheenie stated the clerk stated to hit the NS (No Sale) button. The defendant then took out the money that was in the cash register. He stated that he then went to the back and got two gas cans, and went outside to fill them with gas. He stated that Lezmond and Jake were still inside and came out when he was done filling the gas cans. He stated that as they were ready to leave, two vehicles came up. The defendant stated that they left the area and on their way, the other two defendant stated that they had placed the two ladies in the safe. One of the defendants stated that they got their attention when they hit them. The defendant stated that they went back to

☑ 006/017

EX 166 -2079

 

where he had parked his car and and followed each other towards Wheatfields on the back roads. It was on this road that they parked the vehicle off to the side and lit the vehicle on fire. They all then left in the defendant's vehicle and headed home.

The defendant stated that he got approximately $200.00 from the the cash register and the other two defendants gave defendant approximately $300.00. He stated that he went to Farmington on Saturday and spent the money on several items.

The defendant stated that the following morning (Sunday) they were arrested. Defendant stated that he should not have gone with the other individuals that day. He stated that he regrets everything. He stated that he did all this for nothing.

Defendant stated that he should be placed on Probation because he knows that he can change for the better. He stated that he wants to turn his life around and teach others not to do these activities.

## SOCIAL HISTORY

The defendant is a nineteen year old Navajo indian male residing in Round Rock, AZ. The defendant is single and does not have any children. Defendant's parents are Edison and Mae Kinlicheenie. Defendant has three siblings: Darrie, Edison and Patrick. Defendant stated that both parents raised him and his siblings. Defendant stated he enjoys drawing and composing music.

## CRIMINAL HISTORY

Defendant's criminal history include:

    None
Defendant's traffic history include:

    CH- TR- 5698-00     14-201      DEFAULT

## EDUCATIONAL/ EMPLOYMENT HISTORY

Defendant's education include:

    Round Rock Elementary School, ( K- 6), Round Rock, AZ
    Tsaile Middle School, (7th grade) Tsaile, AZ
    Round Rock Middle School,(8th grade), Round Rock, AZ

EX 166 -2080



Rough Rock High School, (9th grade) Rough Rock, AZ
Red Mesa High School, (10th grade) Red Mesa, AZ
Rough Rock High School,(11 & 12th grade) Rough Rock, AZ

Defendant's employment include:
SYETP, June- July, 1994, six week program, Round Rock, AZ
JTPA, June- July, 1997, six week program, Round Rock, AZ
Little America Truck Stop, March- April, 2000, Flagstaff, AZ

## ALCOHOL/ DRUGS
The defendant states that he consumes alcoholic beverages approximately once a month. He stated he does use marijuana approximately four times a month. Defendant stated he would like to stop smoking marijuana.

## HEALTH
The defendant is in good health and does not have any disabilities. Defendant is also not on any prescription medication.

## FINANCIAL
The defendant stated that he does not have any assets. He does assist his family with bills such as electricity, and pawn bills.

## MITIGATING CIRCUMSTANCES
Defendant has expressed remorse for his actions and has plans to attend a higher educational institution.

## AGGRAVATING CIRCUMSTANCES
The severity of the offense, use of a deadly weapon during the incident, and this needs to be understood by the defendant.

## VICTIM'S STATEMENT
The victim in this case, Robbery/ Armed Robbery is the owner of the Red Valley Trading Post, Mr. Jed Foutz. Mr. Foutz was interviewed on November 26, 2001 at 1:50PM. He stated that he recommended that the defendant be sentenced the maximum sentence allowable. In addition, he

EX 166 -2081

would like the defendant to pay back the amount that was taken:

> CASH:  $ 5, 539.00
> GAS:  $  28.00
> Total:  $ 5, 567.00

Therefore, this Officer recommends:

1.    For the offense of:
      **Armed Robbery:** 1 yr. jail time
      **Robbery:**       1 yr. jail time
      **Possession of Marijuana:** 6 months jail time

2.    In addition, for the defendant to pay reparation for the amount taken: $ 5, 567.00 to Mr. Jed Foutz, owner of Red Valley Trading Post, Red Valley, AZ.

3.    For the defendant to receive alcohol/ drug abuse counseling. The defendant needs to be educated on such issues that may have perpetuated any criminality.

4.    In addition, any other relief deem just and proper by the Court.

Respectfully Submitted,

Aurelia C. Barlow, Probation Officer
Chinle District Court

xc:  pps file
     Office of the Prosecutor
     Court Copy
     defendant

EX 166 -2082

*IN THE DISTRICT COURT OF THE NAVAJO NATION*

*JUDICIAL DISTRICT OF CHINLE, ARIZONA*

---

*THE NAVAJO NATION,*

*. Plaintiff,*

*vs.*                                                       *No. CH-CR-2020/2021/2049-01*

*JASON KINLICHEENIE, C#UNK*
*DOB: 09-04-82  SS#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*
*1/2 MI SE/O ROUND ROCK T.P., ROUND ROCK, AZ*
*Defendant.*

---

### NOTICE OF SENTENCE HEARING
*(RE-SCHEDULED)*

*TO:*   **OFFICE OF THE PROSECUTOR**          *TO:*   **JASON KINLICHEENE**
        *via Courthouse box*                           *via Detention Box*
        **CHINLE, AZ  86503**                          **CHINLE, AZ**

*TO:*   **PROBATION/PAROLE SERVICES**
        *via Courthouse box*
        **CHINLE, AZ**

 *You, and each of you, are hereby notified that the above-entitled matter has been scheduled and will be heard on* __20th__ *day of* __DECEMBER__ *, 2001 at* __2:00 PM.__

 *As Counsel of Record, you, and each of you, are required to notify your clients and be present at the time set with such evidence and witnesses as may be necessary for the hearing of said cause of action.*

  *Dated this* _____11th_____ *day of* __December__ *, 2001.*

       __DLAFRANCE__
       *CLERK, District Court of the Navajo Nation*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
*PROOF OF SERVICE*

 *I have on this* _11th_ *day of* _December,_ *2001, served a copy of the above notice to* __Office of the__

__Prosecutor/PPS, via Courthouse box and JASON KINLICHEENIE, via Detention box__ *.*

       _dlafrance_
       _CLERK_

EX 166 -2083



## IN THE DISTRICT COURT OF THE NAVAJO NATION

### JUDICIAL DISTRICT OF CHINLE, ARIZONA

-------------------------------------------------------------------------------

THE NAVAJO NATION,
         Plaintiff,

        vs.

JASON KINLICHEENIE C#UNK
DOB: 09-04-82 SS# 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
1/2 MI SE/O ROUND ROCK T.P., ROUND ROCK, AZ
        Defendant.

NO. CH-CR-2020/2021/2049-01

*ORDER*
*TEMPORARY COMMITMENT*

-------------------------------------------------------------------------------

TO:  The Keeper of the Jail

**WHEREAS**, the above-named Defendant has been lawfully arrested and is before the Court; and

**WHEREAS**, good cause has been shown why he should be detained until the final hearing or decision of his case, you are hereby commanded to receive the above-named Defendant now in custody and hold him until the _20th_ day of _December_, 2001, at the hour of _2:00 P.M._ for SENTENCE HEARING.

Defendant may be admitted to bail upon posting a cash bond in the amount of $_-0-_

Dated this _11_ day of _December_, 2001.

_____
JUDGE, District Court of the Navajo Nation

☑011/011

08/17/2010 10:32 FAX

EX 166 -2084

IN THE DISTRICT COURT OF THE NAVAJO NATION

JUDICIAL DISTRICT OF CHINLE, ARIZONA

---

THE NAVAJO NATION,

        Plaintiff,

vs.                        No.    CH-CR-2020/2021-01

JASON KINLICHEENIE, C#UNK.
DOB: 09/04/1982  SS#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
1/2 MI. SE/O TRADING POST
        Defendant.

---

## NOTICE OF SENTENCING HEARING
### (Pre-Sentence Report to be submitted)

TO:  **OFFICE OF THE PROSECUTOR**      TO:  **JASON KINLICHEENIE**
      *via Courthouse box*                       **C/O DEPT OF CORRECTION**
      **CHINLE, AZ  86503**               **CHINLE, AZ  86503**

AND TO: **PROBATION/PAROLE SERVICE**
      *via Courthouse box*
      **CHINLE, AZ  86503**

      *You, and each of you, are hereby notified that the above-entitled matter has been scheduled and will be heard on __30TH__ day of __NOVEMBER__, 2001 at __9:00 A.M.__.*

      *As Counsel of Record, you, and each of you, are required to notify your clients and be present at the time set with such evidence and witnesses as may be necessary for the hearing of said cause of action.*

      Dated this ___5TH___ day of ___November___, 2001.

                          V. OWENS
                          CLERK, District Court of the Navajo Nation

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PROOF OF SERVICE

      *I have on this __5TH__ day of __November__, 2001, served a copy of the above notice to __Office of the Prosecutor, Probation/Parole Service (TO SUBMIT PRE-SENTENCE REPORT) and to Jason Kinlicheenie.__*

                          V. OWENS/ab

                          Deputy Court Clerk

EX 166 -2085

IN THE DISTRICT COURT OF THE NAVAJO NATION

JUDICIAL DISTRICT OF CHINLE, ARIZONA

---

THE NAVAJO NATION,
          Plaintiff,

      vs.

JASON KINLICHEENIE C#UNK.
DOB: 09/04/1982 SS# 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
1/2 MI. SE/O TRADING POST
          Defendant.

NO. CH-CR-2020/2021-01

**ORDER**
**TEMPORARY COMMITMENT**

---

      **TO:** The Keeper of the Jail

      **WHEREAS,** the above-named Defendant has been lawfully arrested and is before the Court; and

      **WHEREAS,** good cause has been shown why he should be detained until the final hearing or decision of his case, you are hereby commanded to receive the above-named Defendant now in custody and hold him until the **30TH** day of **NOVEMBER, 2001,** at the hour of **9:00 A.M,** for **SENTENCING HEARING.**

      Defendant may not be admitted to bail.

      Dated this _5_ day of _November_ , 2001.

                        JUDGE, District Court of the Navajo Nation

IN THE DISTRICT COURT OF THE NAVAJO NATION

☑ 013/017                                        08/17/2010 10:32 FAX

EX 166 -2086

IN THE DISTRICT COURT OF THE NAVAJO NATION
JUDICIAL DISTRICT OF CHINLE, ARIZONA

-----------------------------------------------------------------------------------

THE NAVAJO NATION,
                    Plaintiff,                    Case No. CH-CR-2020-01

         vs.

KINLICHEENIE, JASON C#518,674
DOB:9-4-82 SS#601=24-9919
ADDRESS:1.5 MI SE/O 12/191 JCT ROUND ROCK, AZ.
                    Defendant.

-----------------------------------------------------------------------------------

JUDGMENT and MITTIMUS

YOU, *KINLICHEENIE, JASON* [ ] have been acquitted, [X] have pleaded guilty, [ ] have been found guilty,
[ ] by a jury of your peers, [ ] by the Court, of the offense of *ARMED ROBBERY* in violation of Title *17* and
Section *492* of the Navajo Tribal Code, and in accordance with the mandate of said code, YOU ARE
SENTENCED:

[ ] To jail for a period of __ days [ ] To payment of a fine of $ _. DATE DUE:
**DEFERRED SENTENCE UNTIL SENTENCING HEARING.
[ ] To jail for a period of __ days AND payment of a fine of $_____.

Sentence commences on *November 5, 2001* Date of release _____

Further you are ordered to make restitution to _____ (injured party) in the following manner:

[ ] Your sentence is SUSPENDED and PROBATION/CSW is granted for _____ months/hours.
Contact the Probation Officer for this Judicial District for further instructions.

[X] You are committed to the custody of the keeper of the Navajo jail at *CHINLE, AZ* and there to be confined
until this judgment has been satisfied.

DATED this _5_ day of *November*, 2001.

                                        _____
                                        JUDGE, District Court of the Navajo Nation

                                        MITTIMUS

To: THE KEEPER OF THE JAIL AT _CHINLE NDPS_. You are hereby ordered to take and receive and
safely keep the person of *KINLICHEENIE, JASON* until he/she has satisfied the above judgment.

DATED this _5_ day *November*, 2001.

                                        _____
                                        JUDGE, District Court of the Navajo Nation

☑ 014/017                                                          08/17/2010 10:32 FAX

EX 166 -2087



Victor J. Clyde, District Prosecutor
Victoria Yazzie, Asst. Prosecutor
Office of the District Prosecutor
P.O. Box 1057
Chinle, Arizona 86503
Telephone: (520) 674-2217
Fax: (520) 674-2222

### IN THE DISTRICT COURT OF THE NAVAJO NATION
### JUDICIAL DISTRICT OF CHINLE, ARIZONA

| | | |
|---|---|---|
| THE NAVAJO NATION | ) | NO. CH-CR- 2020 - 01 |
| | ) | CH-CR- 2021-01 |
| Plaintiff, | ) | |
| Vs. | ) | |
| | ) | |
| | ) | MOTION AND ORDER TO |
| Jason Kinlicheenie  C#518,674 | ) | DENY RELEASE |
| Round Rock, AZ | ) | |
| Defendant. | ) | |

COMES NOW, the Plaintiff respectfully motions the Court for a Denial of Release of the above named Defendant.

Pursuant to the Navajo Nation Criminal Procedures, Rule 15 (d), Denial of Release, the defendant may be denied release from custody. The Plaintiff grounds for release are serious charges were filed against the defendant and if the defendant is released there are serious reasons to believe that:

    __x__   The Defendant is dangerous to the public's safety.

    __x__   The Defendant will commit a serious crime.

    __x__   The Defendant will seek to intimidate witnesses/victim.

    __X__   The Defendant will unlawfully interfere with the administration of justice.

    _____   Other (allowed by law):

Should the Court deny this motion, the defendant be ordered to abide by condition(s) necessary to the orderly administration of justice and post a cash bond of $ _0_ before being release from custody.

The facts that support this motion: The defendant's parents are requesting a detainment order due to the fact that he is a threat to the family members and they fear for their safety.

The following charges have been filed against the defendant:   Armed Robbery T17 § 492 and Possession of Marijuana T17 § 391.

EX 166 -2088

WHEREFORE, The plaintiff prays that Court grant the Motion to Deny Release.

Defendant remain in custody pending (   ) arraignment ( x ) Final disposition of case.

Dated this ___5th___ day of _November_, 20 _01___.

_____
Prosecutor
Office of the District Prosecutor

CERTIFICATION
I hereby certify that a true copy of the foregoing was _handcarried_ to the defendant on
this_____ day of _____, 20 01.
BY: _____

## ORDER
This matter having come before the Court by a Motion to Deny Release filed by

the Plaintiff, the Court having review the Motion find sufficient grounds have been

shown to consider this motion and good cause have been shown.

IT IS THEREFORE ORDERED that the Motion to Deny Release is hereby

GRANTED / DENIED.

(   )    The defendant remain in custody until arraignment

(X)    The defendant remain in custody pending the final disposition

SO OREDERED this ____05____ day of _____,20 2001.

_____
DISTRICT COURT JUDGE

# LISTING OF ATTORNEYS/ADVOCATES

Andy Smith
P.O. Box 644
Chinle, AZ 86503
Telephone: (505) 406-0573

John Chapela
P.O. Box 648
Window Rock, AZ 86515
Telephone: (928) 871-5297

William P. Battles
P.O. Drawer 460
Window Rock, AZ 86515
Telephone: (928) 871-2525

Michael Day
P.O. Box 1211
Keams Canyon, AZ 86034
Telephone: (928) 738-5523

Justin Jones
4604 Atlantic Street
Farmington, NM 87402
Telephone: (928) 697-2648

Thomas Laughter
P.O. Box 7710
Shonto, AZ 86054
Telephone: (928) 672-2417

DNA-Peoples' Lega Services, Inc.
P.O. Box 767
Chinle, AZ 86503
Telephone: (928) 674-5242

Lee R. Belone
P.O. Box 1969
Ft. Defiance, AZ 86504
Telephone: (928) 729-5311

Samuel Pete
P.O. Drawer 1910
Shiprock, NM 87420
Telephone: (928) 871-4168

Loretta Nez
P.O. Box 2984
Tuba City, AZ 86045
Telephone: (928) 283-5380

Genevieve Chato
P.O. Box 158
Kayenta, AZ 86033
(928) 697-3447

3/31/09

# EXHIBIT 167

Report on the Death Penalty
Presented to the 20th Navajo Nation Council
Summer Session
Window Rock, Navajo Nation, Arizona
by the Public Safety Committee

Honorable Delegates of the 20th Navajo Nation Council, Mr. President, Mr. Vice President, the Honorable Chief Justice, distinguished guests and visitors, the Public Safety Committee is honored to present the Death Penalty Report.

We are making history today, as this is the first Council Session that will hear its first ever report on the Death Penalty.

THE PUBLIC SAFETY COMMITTEE HELD EXTENSIVE PUBLIC HEARINGS THROUGHOUT THE NAVAJO NATION ON THE QUESTION OF WHETHER THE NATION SHOULD OPT-IN TO THE FEDERAL DEATH PENALTY.

The Navajo Nation, the largest Indian tribe in the United States, through the Public Safety Committee of the Navajo Nation Council held hearings across the Navajo Nation to consider "opting in" on the federal death penalty. Hearings were held on the following dates and locations:

September 11, 2003:  Shiprock, New Mexico
September 15, 2003:  Crownpoint, New Mexico
September 18, 2003:  Ft. Defiance, Arizona
September 23, 2003:  Chinle, Arizona
September 29, 2003:  Tuba City, Arizona
November 12, 2003:  Tohajiilee, New Mexico
November 21, 2003:   Kayenta, Arizona

We heard from 106 witnesses, including Navajos from around our Nation, ranging from high school students to tribal council members, and experts from outside the Nation. An additional 200 or so persons who attended the hearings, but did not testify, submitted their comments in writing. The purpose of the hearings was to allow full public input on the question of whether the Nation should allow federal prosecutors to pursue capital punishment for first degree murders that occur on tribal lands.

Of the 106 persons who testified, 75 people (71%) recommended that the Nation should not opt-in to the federal death penalty, and 31 people (29%) recommended that the Nation should opt-in. Some organizations testified, including the Dineh Medicine Association, Incorporated, the National Association of Criminal Defense Lawyers, the Arizona chapter of the National Association of Social Workers, the Coalition of Arizona to Abolish the Death Penalty. Each of these organizations and Fredric Kay, the then-Federal Public Defender for Arizona, Jon Sands, the new and current Federal Public Defender for Arizona, Stephen

EX 167 - 2091

McCue, the Federal Public Defender for New Mexico, Richard Burr, Federal Death Penalty Resource Counsel, Geri Singer Hale, a Navajo who is a public defender in Tucson, and Esther Yazzie Lewis, who is the federally-certified Navajo language interpreter in the federal courts, urged the Navajo Nation not to opt-in to the federal death penalty.

In addition, two committee members and the legislative advisor attended a public forum organized by Native American law students Catherine Bryan and Vincent Knight at the University of New Mexico Law School in Albuquerque on December 5, 2003.

Here are some examples of individuals' testimony in our committee hearings:

Juan Melendez was a poor non-English speaking farmworker when he was charged in Florida with a murder he did not commit. He was convicted and spent 18 years on death row, several times coming close to execution, until it was discovered that all along the prosecutor had a tape-recording of the real killer confessing to the murder. He was released in January, 2002, but lost 18 years of his life unjustly. He described to the committee the devastating impact of being wrongly convicted and urged the committee not to opt-in to the death penalty.

Wallace Dale's 16 year old daughter, Diedra Dale, was murdered near Crownpoint. He attended several of the committee's hearings, and tearfully testified to the terrible impact this crime has had on his family. At the earlier hearings, he urged the committee that the Nation should opt-in to the death penalty. However, he later testified that he now believes the Nation should not opt-in to the death penalty; rather he urged that the Navajo Nation provide grief counseling and assistance to the families of murder victims.

Marlene Slim of Crystal, New Mexico, the daughter of Alyce Slim and mother to Tiffany Lee, testified before the Committee. She stated that she is a victim of homicide because both her mother and daughter were murdered in the mountains of Tsaile, Arizona. This incident really affected and impacted the family, relatives and friends. She attended the sentencing hearing of Lezmond Mitchell in Phoenix, Arizona, who murdered her mother and daughter. Ms. Slim indicated that the issue of the Death Penalty is a very touchy issue, and opting-in would diminish the sovereignty of the Navajo Nation, and that she opposes the Nation opting-in to the death penalty. Her request to the federal prosecutor to have the murderer of her mother and her daughter serve life without parole was ignored and dishonored.

EX 167 - 2092

LEGISLATIVE HISTORY: IN 1994 THE U.S. CONGRESS ALLOWED INDIAN TRIBES/NATIONS TO CHOOSE WHETHER TO HAVE THE FEDERAL DEATH PENALTY APPLY TO FIRST DEGREE MURDERS ON THAT TRIBE OR NATION'S LAND.

The United States Supreme Court ruled in 1972 that the arbitrary way executions were carried out violated the Eighth Amendment of the United States Constitution. The Eighth Amendment bans the use of cruel and unusual punishment. Many states reacted by enacting laws designed to reduce the arbitrariness, and in 1976, the Supreme Court allowed capital punishment to continue. In 1989 and 1990 the U.S. Congress considered legislation to resurrect the federal death penalty.

Tova Indritz, Attorney, on behalf of the National Association of Criminal Defense Lawyers, Native American Justice committee, testified before the Committee on the legislative history of the Death Penalty. Ms. Indritz is a criminal defense attorney from Albuquerque, New Mexico. Formerly Federal Public Defender for New Mexico, she has been a lawyer since 1975, is recognized by the New Mexico Board of Legal Specialization as a trial specialist in criminal law, and has been in private practice since 1995. Ms. Indritz provided testimony before the Committee that the United States Attorneys in the three states within the Navajo Nation already have the power to decide which felony cases arising on Navajo reservation to prosecute. Under current law tribal courts can only hear misdemeanor and petty misdemeanor cases. However, if the Navajo Nation opts-in to the death penalty it will be giving those United States Attorneys the power and authority to decide whether to seek the death penalty against a member of the Navajo Nation, and the Nation will have no power to decide on any particular case or even have the right of consultation with the U.S. Attorney in any case. Further, juries who decide whether an individual Navajo would be put to death would include few, if any, Native Americans.

When Congress was considering the shape of legislation to resurrect the federal death penalty after the U.S. Supreme Court had invalidated the prior method for imposing the death penalty, Ms. Indritz had the privilege of testifying before the U.S. Senate Judiciary Committee, and the U.S. House of Representative Judiciary Committee's Subcommittee on Crime regarding the impact on Native Americans of the death penalty provisions of the pending crime bills. At those hearings, Ms. Indritz testified to Congress if there was "truth in labeling" Congress should call the proposed law to resurrect the death penalty the "Indian Death Penalty Act" because it would primarily affect Native Americans. This is based on the fact that most murder cases go to the State courts, and Native Americans are among the few peoples who live on land over which there is federal jurisdiction. Further, all of the tribes who testified on this issue before Congress stated that the death penalty is against their religious beliefs and urged Congress to exempt Indian Country from the death penalty. Due to the testimony and suggestion of then-Navajo Nation Chief Justice Tom Tso, Congress in enacting the Violent

EX 167 - 2093

Crime Control and Law Enforcement Act of 1994, which became federal law on September 13, 1994, exempted murders in Indian Country by the following language:

> "18 U.S. Code §3598. Special provisions for Indian Country"
> "Notwithstanding sections 1152 and 1153, no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151 of this title) and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction."

Thus, this provision allows a tribe the choice to opt-in to the federal court having power to impose the death penalty in first degree murder cases arising on that tribe's land.

The ability of tribes to make a choice about the death penalty allows tribes to take into account traditional tribal beliefs about how social conflict should be handled and how wrong-doers should be punished.

Of the 520 federal recognized tribes, thus far the only tribe that has opted-in to the Death Penalty is the Sac and Fox Tribe of Oklahoma, a small tribe of a few hundred members. This decision was made only by the Tribe's Business Committee and not by their Tribal Council.

## THE HISTORY OF THE DEATH PENALTY INCLUDES ITS EARLY APPLICATION TO NATIVE AMERICANS.

The first recorded execution in America occurred in 1608. The victim was George Kendall, a Virginian accused of plotting to betray the colony to the Spanish. Hanging was the preferred method of execution in the colonies at that time, although slaves and Indians were sometimes burned at the stake.

The United States' largest mass execution was the simultaneous hanging of 38 Santee Sioux on December 26, 1862, in Mankato, Minnesota; in fact 303 Native Americans were sentenced to death but President Abraham Lincoln reduced that number to "only" 38. After the hanging it was found that two Santees were executed by mistake.

## OUR CHOICE: THE NAVAJO NATION CAN CHOOSE TO SUBJECT ITS MEMBERS TO THE FEDERAL DEATH PENALTY OR CAN CHOOSE TO REFUSE TO ALLOW FEDERAL PROSECUTORS AND FEDERAL JURIES TO KILL NAVAJOS.

Here, the Navajo Nation has two choices:

EX 167 - 2094

1) to take no action, and thus to continue to have the maximum penalty for first degree murder on Navajo land, as it now is, life without parole. Persons convicted spend their whole life in prison and never come back to our community.

2) The second choice is to opt-in to have the death penalty apply to any first degree murder, thereby giving the federal prosecutors, specifically the Attorney General after hearing the recommendation of the local U.S. Attorney, authority to decide against whom to pursue the death penalty, and in which cases not to go after the death penalty, and a non-Indian jury decide whether a Navajo should die.

Either way, the Tribe will have no choice over which murder cases are death penalty cases.

## WHAT FACTORS SHOULD THE 20TH NAVAJO NATION COUNCIL CONSIDER IN MAKING ITS CHOICE?

### 1. NAVAJO TRADITION, BELIEF, AND MORALITY HOLD THAT THE CREATOR AND THE HOLY PEOPLE MADE LIFE AND WE HUMANS CANNOT TAKE ON OURSELVES THE POWER TO TAKE AWAY LIFE. CHRISTIAN BELIEF IS SIMILAR.

The Navajo Medicine Men's Association testified and also submitted written testimony. They gave eloquent testimony, attached hereto, prepared after four years of "intimate and public discussion" that

> "Nothing in our traditional laws give us direction and procedures for killing our own as a punishment to correct behavior which is not ours. . . .
> It is the negative force of the Creator to extract, destroy that which is not in the good interest of Dineh society, we have been created for goodness. This negative force is the domain of destruction is best left to the Creator and in its power and wisdom. . . .
> History has indicated [the death penalty] does not work as a deterrent or prevention. As medicine people of the Dineh, and as Dineh we are in a position to advocate only for Life and healing. The "Penalty of Death" is best to be left to the beings who strongly use such measures. It is not a part of our society to use goodness to Kill another. . . .
> Death and destruction are the teachings of punishment, which are not ours, and ought to be left outside of our domain and jurisdiction, outside of our Four Sacred Mountains. This is the position of the Dineh Medicine People."

The Catholic Church is also against the death penalty. For example, Sister Margaret Sullivan of Shiprock, New Mexico, came to our first hearing and wrote, in her own words,

> "It isn't the right of humans to take away another person's life. God gives Life and it is only He who calls that life back in His timing."

5

EX 167 - 2095

## 2. A DECISION TO OPT-IN TO THE FEDERAL DEATH PENALTY WILL DIMINISH THE SOVEREIGNTY OF THE NAVAJO NATION.

Professor Kenneth "Kip" Bobroff of the University of New Mexico Law School, an expert in Indian law and a member of the Navajo Nation Bar Association, testified that the U.S. government has consistently used its authority to take power away from the Navajo Nation and that opting-in to the federal death penalty will further diminish Navajo sovereignty. Opting-in to the death penalty would mean that non-Indians, instead of Navajos, would be making critical decisions about justice both for Navajo victims and defendants. If the Navajo Nation opts-in, then any changes in federal law or procedure pertaining to the death penalty would apply to Navajos, regardless of the wishes of the Navajo Nation, since the Nation would have already surrendered it sovereignty over those decisions.

The Navajo Nation, if it opts-in to the federal death penalty, would be giving over to the U.S. Attorneys for Arizona, New Mexico, and Utah, and to U.S. Attorney General John Ashcroft complete power to decide which accused Navajos to charge with the death penalty. If the Navajo Nation opts-in, it will not have the power to make a decision about the death penalty in any particular case; the Nation would have no voice on whether the case is prosecuted as a death penalty case or whether a particular tribal member is executed. The Nation would be relinquishing more of its sovereignty to the federal government.

As stated above, a 1994 expansion of the federal death penalty allows for a Tribe or Nation to opt-in to the federal death penalty. Once a Nation chooses to "opt-in", the decision to apply the death penalty in a particular case is no longer in the hands of the tribe, but in the hands of the federal government. Although the appointed United States Attorney (in our case the United States Attorneys for the Districts of Arizona, New Mexico, and Utah) can recommend to the U.S. Attorney General John Ashcroft whether or not to seek the death penalty in any particular case, Attorney General Ashcroft has rejected the local U.S. Attorney's recommendation not to pursue death in far greater proportion than any prior Attorney General, and in many cases has required the local U.S. Attorney to seek the death penalty, even where the local U.S. Attorney recommended not to do so.

When the U.S. Department of Justice decides to try to execute a Navajo, the actual decision would be made by a federal court jury on which there would be few, if any, Navajos. Who would be on juries that would consider whether a Navajo should be executed? The cases will be tried in a federal court before a jury on which Native Americans may well be underrepresented and certainly on which Native Americans will not be the majority. The actual decision of whether an individual is to be executed is up to the federal jury. Even where Native Americans are fully represented in the jury pool, they are usually a small percentage of the state's population, and thus a small percentage of a federal jury. Native Americans are often under-represented on the federal court jury rolls, particularly in those federal court

6

EX 167 - 2096

districts where the jury rolls are taken exclusively from the state's voter list, as is the case in federal court in Arizona, New Mexico, and Utah. For example, the U.S. District Court Clerk for the District of New Mexico's own figures show the great under-representation of Native Americans who are 8% of the New Mexico adult population and only 3% of the state-wide jury pool (a 166% comparative disparity), and in the Albuquerque/Santa Fe division, the location where the cases arising on the New Mexico portion of the Navajo Nation would be tried, Native Americans are 11% of the adult population but only 3% of the jury pool (a 266% comparative disparity). Also, federal trials are always held off the reservation, in cities such as Phoenix, Albuquerque, and Salt Lake City. As the federal court clerk in Arizona noted, many Native Americans live far from the places where court is held, have difficulty traveling, or insufficient money to pay for their travel, so they seldom serve on juries. Native American defendants in federal court seldom have other Native Americans, no less from their own tribe, on their juries.

To the extent that the death penalty may be in conflict with traditional Navajo beliefs and values, Navajos will be excluded from serving on juries in which a Native American is facing the death penalty. Any Navajo called to jury duty who expresses the view, explained by the Dineh Medicine Association, that the death penalty is inconsistent with Navajo customs and beliefs, and thus those Navajo's traditional or religious beliefs prevent them from ever imposing the death penalty, they will be excluded from jury duty in any death penalty case, under the U.S. Supreme Court's holdings in <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968) and <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985).

3. THERE IS A LONG-STANDING HISTORY OF RACIAL PREJUDICE IN THE IMPOSITION OF THE DEATH PENALTY AND A DEFINITE PATTERN OF FEDERAL PROSECUTORS SEEKING THE DEATH PENALTY DISPROPORTIONATELY AGAINST MINORITY RACE PERSONS.

The death penalty is racist in its application. Racial minorities in the United States receive the death penalty far out of their proportion to the population, especially where the victim is a white person. Study after study has shown that race of the defendant or the race of the victim, or both, influence the decision to apply the death penalty more than any other factor.

According to a U.S. Government General Accounting Office study done in February, 1990, on death penalty sentencing, "in 82% of the studies [reviewed], race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty".

Any tribe whose members have felt the sting of discrimination by the non-Indian community may be aware that racial stereotypes and prejudices have been reflected in

7

EX 167 - 2097

statistical patterns of imposition of the death penalty, although they may be hard to prove in any individual case.

More than half of the defendants now on death rows in the U.S. are racial minorities.

Currently 20 of the 29 people on the federal death row, 69%, are minorities, including Lezmond Mitchell, a Navajo. Of the three federal prisoners already executed, one was Hispanic and one was Black.

Of the 300 people against whom the federal death penalty has been authorized since its reinstatement in 1988 to 2000, 75% are members of minority racial groups. From 1995-2000, 80% of all the federal cases submitted by U.S. Attorneys involved defendants from minorities. Under Attorney General Janet Reno, 72% of the defendants against whom the federal death penalty was sought were minorities. Under current Attorney General John Ashcroft 74% of the defendants against whom the federal death penalty was sought were minorities. This problem of racism in the application of the death penalty continues; even after review by the Attorney General, 72% of the cases approved for death penalty prosecution involved minority defendants.

The National Association for the Advancement of Colored People (NAACP) in 2000 called for a moratorium on all death sentences.

As described above, juries in any Navajo death penalty case in federal court in Arizona, New Mexico, or Utah, will be almost exclusively non-Indians.

The Navajo Nation's election for the death penalty may subject a Navajo to harsher punishment than is available in the state court. For example, New Mexico's death penalty is not available in all first degree murder cases, but only in the presence of certain circumstances, such as the killing of a witness, police officer, or prison guard, or murder for hire, or a killing while escaping from prison, NMSA §31-20A-5, whereas opting-in to the federal death penalty allows the prosecutor to seek the death penalty in any first degree murder case.

If the Navajo Nation opts-in to the federal death penalty, Navajos would be subject to the death penalty in cases where a non-Indian would not. For example, if the victim of the murder were a non-Indian (a circumstance in which classically there is a greater risk of imposition of the death penalty on a minority person), a non-Indian co-defendant would be prosecuted in state court even though the crime happened on a federal jurisdiction Indian reservation, whereas an Indian co-defendant in the same case would be subject to the death penalty if the tribe had opted to have the death penalty apply on their land.

8

EX 167 - 2098

Although the 1994 crime act requires that the jurors certify that they did not take into account the race of the defendant or the victim in deciding to impose the death penalty, this certainly does not guarantee the lack of racism. First, the mere fact that people say they did not take racial issues into account does not necessarily, in human experience, mean that they did not. More importantly, in order for a federal court to have jurisdiction over an Indian Country murder in the first place, one of the elements of proof is that the government prove beyond a reasonable doubt that the offense occurred in Indian country and that either the defendant or the victim is an Indian. Thus, the jury will hear evidence on this and have to be convinced beyond a reasonable doubt that the defendant is an Indian or that the victim was an Indian. Then the same jurors would be asked to turn to the death penalty phase of the trial and to totally erase from their minds the fact that the defendant is an Indian or the race of the victim in deciding whether to impose the death penalty. This is simply an unsustainable fiction.

## 4. MURDER RATES ON THE NAVAJO NATION ARE HIGHER THAN THE NATIONAL AVERAGE AND RECENTLY THERE HAVE BEEN HIGH PROFILE NON-TYPICAL MURDERS.

The number of murders on the Navajo Nation increased in the last ten years, peaking in 1996. Although the number of murders has dropped slightly since then, and appeared to stabilize, the murder rate is higher on the Navajo Nation than it is nationwide.

The Navajo people have recently heard or read about several high-publicity tragic murders. Several examples of recent violent crimes on the Navajo Nation include a father who gunned down his four daughters, a mother who opened fire on her three children, a man who strapped on an ammunition belt and opened fire on his family Hogan, killing four relatives. Such high profile violent crimes have brought forth discussions of capital punishment on the Navajo Nation.

The worst case involved a young Navajo man with no prior criminal record who was prosecuted for murders which occurred on Navajo Indian land, but he was prosecuted based on the jurisdictional basis that it was a murder in the course of a carjacking. The facts of this case are highly unusual for a Navajo murder case, and quite upsetting. In the fall of October, 2001, 65 year old Alyce Slim and her 9 year old granddaughter, Tiffany Lee, drove to New Mexico to visit a medicine woman. Ms. Slim had a leg ailment and went to see a traditional Navajo medicine woman to seek relief. That evening, while driving home, their pickup truck was hijacked at a local gas station by 19 year old Lezmond Mitchell, a Navajo from Rock Point, Arizona. Ms. Slim's truck was later used to rob the Red Valley Trading Post for $5,000. According to information provided by the Federal Bureau of Investigation, Mr. Mitchell stabbed Ms. Slim thirty-three (33) times with butterfly knives in a wooded area in the Tsaile mountain. Ms. Slim, according to the autopsy reports, put up a fight against her hijackers. Tiffany, according to testimony provided by one of the attackers indicated that she

9

did escape from her attackers, but was recaptured. They then shoved her body in back of her truck along with her grandmother Alyce. Mitchell then slit the throat of 9 year old Tiffany and told her to "lay down and die". They then stoned her to death with a 20 pound rock. A few days later, they returned to the bodies, chopped off their heads and hands, buried them in a hole and burned their clothes. In September, 2003, Lezmond Mitchell was sentenced to die by a federal jury in Phoenix, Arizona. He is the first Native American to be sentenced to death by a federal court since the federal death penalty was reinstated nine years ago.

## 5. THE COUNCIL MUST CONSIDER WHETHER PREVENTIVE MEASURES OR THE DEATH PENALTY WILL BE MORE EFFECTIVE IN COMBATING THIS PROBLEM IN THE LONG TERM.

In many communities, the public would be better served by measures such as the hiring of additional police officers, the implementation of community policing, drug interdiction programs, early childhood intervention programs, weapon control programs, or better funded probation and parole departments, than by an occasional death sentence on an isolated individual, to be carried out, if at all, only many years later. The death penalty may fascinate the media and the public, but it is truly peripheral to our efforts to make our society safer.

During the hearings several of the family members of murder victims testified to their great grief and loss, and that they had to go outside of the Navajo Nation to receive any grief counseling services. This lack of services presents particular problems to those who wish to express their grief and family disruption in their own Navajo language and to persons sensitive to Navajo culture. The Public Safety Committee recommends that the Navajo Nation establish grief counseling and family services to the survivors of homicide throughout the Nation, at no cost to those seeking such services, and with appropriate training for service providers and adequate resources to address the backlog of unaided victims' families over many years.

## 6. THE DEATH PENALTY DOES NOT DETER MURDER.

Another expert who testified before the Committee was Professor Michael Radelet, a Professor of Sociology at the University of Colorado. For 22 years before that, he was a professor at the University of Florida in Gainesville. While in Florida he worked with approximately 50 men and woman who were executed. He has worked extensively with families of homicide victims and currently serves on the Board of Directors of an organization called "Families of Homicide Victims and Missing Persons". Professor Radelet addressed three issues before the Committee: deterrence, erroneous convictions and disparities in the application of the death penalty. He submitted a paper showing that leading scholars have concluded that the "available evidence remains 'clear and abundant' that, as practiced in the United States, capital punishment is not more effective than imprisonment in deterring murder",that there is widespread agreement among leading criminologists and law

10

EX 167 - 2100

enforcement officials that capital punishment has no effects on homicide rates that are superior to long term imprisonment, and that 85% of leading experts agree that the empirical research on deterrence has shown that the death penalty never has been, is not, and never could be superior to long prison sentences as a deterrent to criminal violence.

## 7. IN THE UNITED STATES THERE HAVE BEEN MANY INNOCENT PEOPLE SENTENCED TO THE DEATH PENALTY. EXECUTIONS ARE PERMANENT; MISTAKES CANNOT BE CORRECTED.

> "Perhaps the bleakest fact of all is that the death penalty is imposed not only in a freakish and discriminatory manner, but also in some cases upon defendants who are actually innocent."
> Justice William J. Brennan, Jr., U.S. Supreme Court, 1994

Since 1973, 114 men and women in 25 states have been exonerated and released from death row with evidence of their innocence, including one Native American. Six innocent people were exonerated in Arizona and four in New Mexico.

There were 10 such releases in 2003, and already 4 more in 2004. Thus it is clear that even in very serious cases, or maybe even especially in serious cases where the community desires to punish someone for a heinous crime, sometimes it is the wrong "someone" who is convicted. DNA evidence was a significant factor in only about 10% of the exonerations; the problems are erroneous eye-witness identifications, false testimony by jailhouse informants, false confessions, incorrect forensic evidence, and sometimes inadequate defense resources.

The possibility for such errors increases where there are language difficulties, cultural differences, communications problems between investigators and the potential witnesses, and technological problems with the collection of physical evidence, all factors present in Navajo cases.

At least 23 innocent people have been executed in the U.S. in the 20th century.[1] Federal court review of state court death penalty cases have found that error occurred in 40% of the cases.

If the wrong person is convicted during hysteria over an ugly crime, or if a person's rights are violated, or if it later turns out that the person was innocent, there is no way to undo an execution.

Because of such mistakes, the Governor of Illinois placed a moratorium on the imposition of the death penalty, and then later granted clemency for all the people on death row. Maryland has now also placed a moratorium on the death penalty, and other States have to consider that people on death row were wrongfully convicted and were in fact innocent. The American Bar Association, a

---

[1] Innocence and the Death Penalty: Assessing the Danger of Mistaken Executions, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, One Hundred Third Congress, First Session, October, 1993, see also Radelet and Bedau, In Spite of Innocence, Northwestern University Press, 1991.

11

EX 167 - 2101

conservative national organization of lawyers, has called for a nationwide moratorium on the death penalty.

## 8. FIRST DEGREE MURDER ON NAVAJO LAND IS ALREADY PUNISHABLE BY LIFE WITHOUT PAROLE.

The current alternative to the death penalty in a first degree murder case in federal court is life without parole. Under federal law and the Federal Sentencing Guidelines, if a person is convicted of first degree murder, he or she will receive a life sentence and cannot be paroled. Thus, the tribe is not facing return of an individual in such a circumstance to the community. The person will be banished and therefore incapacitated from any future harm to the community.

## 9. IMPOSITION OF THE DEATH PENALTY IS MORE EXPENSIVE THAN IMPOSITION OF A LIFE SENTENCE.

A 1993 Duke University study showed that the Death Penalty in North Carolina costs $2.16 million dollars more per execution than a non-death penalty murder trial. Research in other states indicates executions are three to six times more costly than life imprisonment.

## 10. MOST CIVILIZED NATIONS IN THE WORLD HAVE REJECTED THE DEATH PENALTY.

Since the United States reinstated the death penalty in 1976, over 40 countries have abolished it. In December 1998, the European Parliament called for immediate and global abolition of the death penalty, with special notice to the U.S. to abandon it. Abolition is a condition for acceptance into the Council of Europe, leading countries such as Russia and Turkey to abolish the death penalty. Recently, South Africa, Canada, France and Germany have ruled against extraditing prisoners to the U.S. if death sentences would be sought. The World Court, in a unanimous decision reached on February 5, 2003, ruled that the United States must delay the execution of three Mexican citizens while it investigates the cases of all 51 Mexicans on death row in the U.S. The Mexican government asserts that the U.S. has violated the Vienna Convention by not informing its citizens that they have the right to contact their consulate when arrested. The death penalty has long been a source of tension between the U.S. and countries that oppose capital punishment.

The United States faces international pressure to eliminate the death penalty. Amnesty International, the international human rights watchdog, reports that while 112 countries have abolished the death penalty by law or practice, 83 countries continue to utilize capital punishment. In 2002, 81 percent of all known executions took place in three countries: China, Iran, and the United States. Other countries that use the death penalty include Afghanistan, Iraq, Egypt and Kuwait. International human rights treaties prohibit executing

12

EX 167 - 2102

children or anyone under 18 years old at the time the crime was committed. Since 1990 seven countries executed children: Congo, Iran, Nigeria, Pakistan, Saudi Arabia, Yemen, and the country with the greatest number of child executions, the United States. In 2002, Amnesty International recorded three child executions; all three were in the state of Texas.

The Public Safety Committee has received international attention from as far away as the country of Germany. Their interest in the Navajo Nation's decision is closely monitored.

## CONCLUSION AND RECOMMENDATION

Should the Navajo Nation "opt in" to the death penalty? Put another way, should the Navajo Nation Council allow the federal government to pursue the death penalty against Navajos before non-Navajo, and indeed non-Indian, federal juries? The Public Safety Committee recommends to the 20th Navajo Nation Council the following:
1. That the Navajo Nation establish a program to provide grief counseling and direct service assistance to the families of victims of homicide on the Navajo Nation.
2. That the Navajo Nation, for all the reasons set forth above, adopt legislation stating that the Navajo Nation rejects the federal death penalty and chooses not to opt-in to the federal death penalty.

Respectfully submitted,

Hope MacDonald-LoneTree, Chairperson
Public Safety Committee

June _____, 2004

13

EX 167 - 2103





## TOVA INDRITZ
### ATTORNEY AT LAW
### TRIAL SPECIALIST -- CRIMINAL LAW
715 TIJERAS AVENUE, NW
ALBUQUERQUE, NEW MEXICO 87102
TELEPHONE (505) 242-4003
FACSIMILE (505) 242-3125

SEP 2003
RECEIVED
OFFICE OF THE
LEGISLATIVE
SERVICES

September 2, 2003

Mr. Lawrence John
Public Safety Committee
Navajo Nation
P. O. Box 3390
Window Rock, Arizona 86515

Sent by fax (928) 871-~~7630~~ 7259

Dear Mr. John:

As we discussed on the telephone today, I am faxing to you another copy of the flyer showing the speaking tour of Juan Melendez, who was recently released from the Florida death row after 18 years on death row, when evidence showed he was completely innocent. Note that he will be in Gallup on Sunday, September 7, and hopefully members of the Public Safety Committee could attend.

Thank you.

Sincerely,

Tova Indritz
Attorney at Law

TOVA INDRITZ
ATTORNEY AT LAW
SPECIALIST — CRIMINAL LAW
TIJERAS AVENUE, NW
RQUE, NEW MEXICO 87102
PHONE (505) 242-4003
SIMILE (505) 242-3125

September 2, 2003

ꝗ

...he today, I am faxing to you another copy of the flyer
...ndez, who was recently released from the Florida death
... evidence showed he was completely innocent.  Note
...ptember 7, and hopefully members of the Public Safety

Sincerely,

Tova Indritz
Attorney at Law

### TOVA INDRITZ
#### ATTORNEY AT LAW
#### TRIAL SPECIALIST — CRIMINAL LAW
715 TIJERAS AVENUE, NW
ALBUQUERQUE, NEW MEXICO 87102
TELEPHONE (505) 242-4003
FACSIMILE (505) 242-3125

September 8, 2003

Mr. Lawrence John
Public Safety Committee
Navajo Nation
P. O. Box 3390
Window Rock, Arizona 86515        Sent by fax (928) 871-7259

Dear Mr. John:

As you and I discussed this morning, there are certain witnesses who have a great deal of knowledge about how any decision by the Navajo Nation to opt-in to the federal death penalty would impact Navajos on a very practical level, and each of the following would be willing to come to the Public Safety Committee hearing, but only if they receive an invitation from the Committee.

The Federal Public Defenders in New Mexico and Arizona currently represent the great majority of persons charged with first degree murders on Navajo land, and they can give practical information about the circumstances of the cases they have had, and how opting in to the death penalty would affect Navajos in a practical sense. They are as follows:

Stephen McCue, Federal Public Defender for the District of New Mexico
111 Lomas Avenue, NW
Albuquerque, NM 87102
fax number (505) 346-2494
could attend the hearing in Crownpoint on September 15

Frederic Kay, Federal Public Defender for the District of Arizona
     and his Assistant in Charge of the Phoenix Office, Jon Sands
407 West Congress Street, Suite 501
Tucson, Arizona 85701
fax number: (520) 758-7600
could attend the hearing in Fort Defiance, September 18

EX 167 - 2114



September 8, 2003
Page 2

Because these offices have limited experience in death penalty cases, they would rely on the advice of the national Federal Death Penalty Resource Counsel Project, which has six lawyers who assist the lawyers throughout the United States in federal death penalty prosecutions. The one of these six who covers the southwestern part of the United States is Richard Burr. He has extensive experience with the federal death penalty and could also give a very practical picture of how the federal death penalty operates.

Richard Burr
Federal Death Penalty Resource Center
10511 Dunbrook Drive
Houston, Texas 77070
fax number (713) 893-2500
could attend the hearing in Chinle on September 23

I believe that their testimony would be helpful to the committee, and of course, each of them would answer any questions the committee may have.

Thank you, and I look forward to meeting you on Thursday, September 11.

Sincerely,

Tova Indritz
Attorney at Law

## TOVA INDRITZ
ATTORNEY AT LAW
### TRIAL SPECIALIST – CRIMINAL LAW
715 TIJERAS AVENUE, NW
ALBUQUERQUE, NEW MEXICO 87102
TELEPHONE (505) 242-4003
FACSIMILE (505) 242-3125

September 8, 2003

Mr. Lawrence John
Public Safety Committee
Navajo Nation
P. O. Box 3390
Window Rock, Arizona 86515          Sent by fax (928) 871-7259

Dear Mr. John:

Enclosed is my testimony for the Public Safety Committee, as I promised.

Thank you, and I look forward to meeting you on Thursday, September 11.

Sincerely,

Tova Indritz
Attorney at Law

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:



*it is an excuse. I believe in the saying, an eye for an* [illegible]

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
Yes ( x )  No (   ) Comment:
*I believe it is no one class position to dictate to navajo people who should die as result of crimes. I would rather see our people, our Legislators, President's ofc take the stand and decide. For too long the Government has dictated to us how we should act and speak. Although the Christian world oppose this, the God we worship has given us the Agency to choose for ourselves, right and/or Wrong. The adversary lives and thru this adversarial spirit (Satan) our people are led into committing heinous crimes. Navajo witchcraft plays a role too, just as it is said to be in non-Indian society.*

If you would like to share your name and mailing address please fill in the blank below:

*Olive N Bonally*

/3

Upon completing this form please hand it to the Legislative Staff who will collect this form.

EX 167 - 2117

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment: I agree w/ the Death Penalty; Reason: If the crime is henious enough, the act should be carried through.
   This country — the United States of America was founded by the U.S. Constitution, therefore we, as a Nation within a Nation should abide by the laws of the land.
   The laws maybe considered crude, yet the Navajos/Dine are as well as other diverse Nations are running along side the laws of the land. "United We Stand."

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ✓ )  No (   )  Comment:
   I support the Death Penalty 100%.

   ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮

   The adoption of the D.P. will NOT change the way we live NOW But!... in the long run, we/the Dine will need stronger more prevalent laws.

If you would like to share your name and mailing address please fill in the blank below:

Debra K. Abeita
P.O. Box # 3951
Milan, N.M. 87021

Upon completing this form please hand it to the Legislative Staff who will collect this form.

EX 167 - 2118

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

If you would like to share your name and mailing address please fill in the blank below:

Barbara Bitsilly-Tunell — *Qc of Navajo Women & Family*
928-871-6627
PO Box 3643
Window Rock, AZ 86515

Upon completing this form please hand it to the Legislative Staff who will collect this form.

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   *Only in Serious cases*

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( / )  No ( )  Comment:

   *For Serious Crimes. (Murder) (Federal Crimes involving death)*

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

Upon completing this form please hand it to the Legislative Staff who will collect this form.

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   █████ mment:

   no.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes (   )   No (X) Comment:

If you would like to share your name and mailing address please fill in the blank below:


Shorty Willie

Upon completing this form please hand it to the Legislative Staff who will collect this form.

EX 167 - 2121

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:



2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( ✓ ) Comment:

If you would like to share your name and mailing address please fill in the blank below:

Mildred Hejn
P.O. Box 561
Crownpoint NM 87313

Upon completing this form please hand it to the Legislative Staff who will collect this form.

EX 167 - 2122



# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
Yes ( X ) No (   ) Comment:

*pre planned murder.*

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

_____

Upon completing this form please hand it to the Legislative Staff who will collect this form.

EX 167 - 2123

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Eastern Agency, Crownpoint Chapter House
### September 15, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:



themself are not to family. People to

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
Yes ( X ) No ( ) Comment:

If you would like to share your name and mailing address please fill in the blank below:

*Ella Holiday*

Upon completing this form please hand it to the Legislative Staff who will collect this form.



Member, Ft. Defiance Community

# Death penalty a personal debate for Navajo attorney

Gallup
Independent
Sept. 4, 2003

By Elizabeth Hardin-Burrola
Staff Writer

WINDOW ROCK — For Kath-
leen Bowman, the debate about the
death penalty is nothing new — she
debated the issue within her own



# THE GAMBLER AND THE BIG SNAKE

NARRATOR: Once long ago, not long after humans were created, the Gambler was given a turkey as a pet from the Holy People. The Gambler was a very mischievious and curious person who needed someone to help him through hard times.

One night after a long day of planting corn, the Gambler was lying under the turkey's wing when he noticed a light to the East.

GAMBLER: Hey, T'azh! check out that light way over there. Do you see it?

TURKEY: (Sleepily) Now what? (To Gambler) Yeah Yeah I see the light.

GAMBLER: Hey, Hey, Let's go over now! Hey, it's getting brighter and brighter, hey let's go now! Hurry, hurry! Let's go!

TURKEY: Whoa, askii adi kai, hold up. Slow down. You don't know what's making that light. There might be danger behind it. Let's wait awhile.

GAMBLER: Well, okay. Let's wait awhile. If it gets brighter, then we'll move up a little bit.

(The Gambler sits impatiently continuously looking toward the light. He begins shifting around by tapping his fingers, shaking his legs and biting his nails.)

TURKEY: Well, it doesn't look like the light is getting any brighter. go check on the corn, quick!

GAMBLER: Oh boy. Hey, look, wait, T'azh it just got brighter. Go check on the the corn quick!

TURKEY: Corn? Why?

GAMBLER: Because you know someone might be running our way to steal our corn. Go now, hurry!

(The Turkey leaves to check on the corn. As soon as the turkey's back is turned, the Gambler runs off toward the light.)

GAMBLER: (Running huffing and puffing)
Ha! Ha. That foolish turkey took my word! Tazhi is so gullible. Now let's go find out what that light is.

NARRATOR: The Gambler ran through the dark. He leaped over cactus

EX 167 - 2127

skipped around yucca barley missing a pinon tree.  Finally he reached the source of the light.

GAMBLER:  (While hiding behind a bush)
Wow!  Too bad turkey isn't here to see this.  Who would build such a huge fire?

(Big Snake'd daughter comes out and tends to the fire)

GAMBLER:  Wowee!  Who's that babe?  Wonder if she's ... uh single?

BIG SNAKE'S DAUGHTER:
Is someone there?

GAMBLER:  (Sits quietly and mumbles to himself)
Oh, man, she heard me... Gosh,1 I wish T'azi was here...What do I do?  What do I say?  I've never talked to a girl before much less seen one.

BIG SNAKE'S DAUGHTER:
(In a comforting tone)
Hey, it's okay, come on out whoever you are.  Come sit with me by the fire. (Pause)  Oh, there you are.  Don't be afraid, come on out.

(She goes to pull the Gambler out of the bushes)

So, big boy, what's your name?

GAMBLER:
Uh..Um...Um...It's Askii Akali...Oh no... I mean Ashkii Adikaii.

(She smiles at him)

BIG SNAKE'S DAUGHTER:
Well, why don't you come sit by the fire with me?

(The Gambler goes to sit with Big Snake's Daughter by the fire and they start chatting)

NARRATOR: The Gambler was so much in love with this beautiful girl that he kept coming back to see her.  Then one day, the girl surprised him by introducing him to her parents.

BIG SNAKE'S DAUGHTER:
Mom?  Dad?  This is the man I want to marry, Askii Adikaii.

(Big Snake slowly circles the Gambler checking him out from head to toe)

BIG SNAKE:     Ya'a teeh, sha da ne.  So you're the Gambler.  Well if you're gonna marry our daughter we're gonna have to make some plans.  Why don't you come back in four days?

EX 167 - 2128

NARRATOR:       The Gambler returnes home while the Big Snake family gathers around a fire to discuss the wedding. (pause)   and other things as we shall find out.

BIG SNAKE:      Well, daughter, it looks like you got yourself another Tsizii to elminiate.  How should we rid the world of this one?  Wife?

BIG SNAKE'S WIFE:  Well, for the wedding ceremony I'll whip up a fresh batch of corn must and poison his portion of the mush. What do you think?

BIG SNAKE AND DAUGHTER:  (At the same time)  Yeah!

NARRATOR: As you can see there's more to the Big Snake family than appears.  The Big Snake family are  evil   and the Gambler being a curious and mischievous person as he is, is drawn into this dilemma.  The day of the wedding arrives, the Gambler appears all spiffied up and ready to wed.  He sits to the West and a basket of corn mush is placed before him.  Just before he eats his portion of the mush he suddenly hears a whispter in his ear from a messenger, the Wind.

WIND:       (Whispers)  Don't eat the East side of the mush.  Twirl the basket around and eat the opposite end of the mush.

NARRATOR: The Gambler proceed to eat some of the mush from other three directions and only pretends to eat from the East direction.  The Big Snake's family was surprized that the Gambler didn't die and over the three days they continued to poison his mush.  Each time the wind warns the Gambler not to eat it.  On the fourth day, the window said the whole rim of the mush would be poisoned.  The gambler completely refused to eat the mush.  By this time the Big Snakes are desperate to kill the Gambler.  Also on the fourth day, the Gambler finds out why the family wants to kill him.

WIND: (Whisper)  Hey, Askii Adikaii, you got yourself in big trouble here boy.  You see the Big Snakes are ' evil   and they are doing what they can to kill you.  Big Snake is jealous of you because he is also married to his daughter.

GAMBLER:  What?!  My wife?!  How can that be?

WIND:      Well this particular family do not recognize the value of family.  They do not know the meaning of k'e.  This is what will be known as "incest".  This is one of the ways the Big Snakes get others in trouble.  They've done this before by killing other male visitors who have come for their daughter. They will continue to try and kill you, so be careful!  I will continue to help you, but you must listen to me.

SCENE THREE
(The Big Snake family talk about what to do next to get rid of Askii Adikaii)

EX 167 - 2129

BIG SNAKE:        Ya dii la, why isn't he dying?  He must know
    somehow, that we're trying to kill him, either that or he's
    smarter than he looks.

(They all look at each others)

ALL TOGETHER:  Naa.

MOTHER SNAKE:  Someone must be warning him.

BIG SNAKE:        (Turns to his daughter)
    Are you a traitor to us?

BIG SNAKE'S DAUGHTER:
    (Shaking her head)
    No, its not me!
    Askii Adika'ii is not very smart if you tell him not to do
    certain things, he'll do it anyway.  So let's send him out to
    the most dangerous places starting to the East.  If that
    doesn't work, then we'll send him to the south, then to the
    west, then to the North.  One of those dangerous obstacles
    in each direction will be sure to kill him.

BIG SNAKE:        Well how do we get him to go in those directions?

MOTHER SNAKE:  Well, we know that he is pretty dumb so tell him NOT
    to go in that direction and we all know he WILL go there.

NARRATOR:        In each of the directions there lived dangerous
    obstacles:  To the East lived Lighting, to the South lived
    Lood tso (Sores)  To the West lives the Deer, and to the North
    lived the bear.  Although the Big Snake instructed the Gambler
    not to go to the East, South, West and North directions, as
    curious as the Gambler was, he decides to go in those
    directions just as the Big Snake Family had hoped.  But just
    as the Wind promised, the Wind helped the Gambler.

WIND:      As you go in each direction you will encounter dangerous
    obstacles that may harm you.  You need to overcome these
    hardships through prayers, songs and medicine  that I will
    teach you how to use.  If you overcome these hardships at the
    end of each these directions, you will bring back a reward
    that will later help these human beings overcome these same
    obstacles.  It's your curiosity and mischievousness that got
    you into this situation and human beings will now also have
    these same characteristics that may lead to the same types of
    hardships you are about to encounter.  These rewards that
    you'll bring back as well as the prayers, songs and medicine
    that I'm teaching you about will help human beings overcome
    them later.  Some of these obstacles are disease, illness,
    temptation and laziness.

GAMBLER:        You've helped me before so I will learn these
    prayers and songs and use the medicine wisely so human beings

can overcome the hardships that people like the Big Snakes cause.

NARRATOR: Today, many of the songs and prayers used by the Dine are those same songs taught to the gambler by the wind. Many of the herbs used for medicine and plants used for food are what we use tday. The rewards he brought back are times used in ceremonies to overcome these same hardships.

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:
   THE NAVAJO NATION SHOULD SUPPORT IT, BECAUSE TAKE NO ONE HAS A Right To TAKE A LIFE, IF he SHOULD LIVE THEN He SHOULD, WITH THE DEATH PENALTY
   PM      the

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( X ) No ( ) Comment:

   ██████████████████

If you would like to share your name and mailing address please fill in the blank below:

Melvin Yang

██████████████████

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**



# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:
   I am very much opposed to the death penalty. No one has the right to kill, whether to satisfy our feelings or seeking revenge. Our navajo people never want to kill w/sound minds etc. We are all humans created by God and He is the only one who can take it.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( X ) Comment:

   Believe in our beliefs, our faiths, our long (never ending) kinships. You get healed only when you forgive. My own father was murdered in Gallup - the persons committing the crime were convicted and went to prison - and this because of my father's faith - we eventually got healed thru our faith. → over

If you would like to share your name and mailing address please fill in the blank below:

se hand it to the Legislative Staff who will collect this form.

EX 167 - 2133

There were other members of my family killed by unknown persons, but again our faith sustained us thru these horrible experiences.

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment: I do not support the Death Penalty. It is wrong. Culturally and morally. To take a life because he/she has taken a life will not bring back the first life taken.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( X ) Comment: This would impede our Navajo Nation's sovereignty. Once the Navajo Nation opts-in we will not be able reverse our decision.

If you would like to share your name and mailing address please fill in the blank below:

Phefelia B. Johnson

P.O. Box 5453

<span style="background:black">████████</span>

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2135

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty? ▮▮▮
   Comment: ▮ it. Criminals need to be punished — ▮le without parole for those guilty of first ▮ murder. However, taking life does not teach us not to take life.

2. Should the Navajo Nation support or (not support) the issue of the Death Penalty?
   Yes ( ) No ( X ) Comment:

If you would like to share your name and mailing address please fill in the blank below:



**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2136

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:
   We shouldn't put someone to die. We are not God to take someone life but they will paid when it comes to judgement day. God is the one who each one of us on this earth.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No (X) Comment:
   Its going to take our sovereignty away from the tribe. People who committ a bad crime should just put put in prison.

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2137

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:   AN EYE FOR AN EYE... A TOOTH... RELATE TO THE PUNISHMENT ON ALL LEVELS.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( X ) No ( ) Comment: AGAIN, THE CRIME MUST REQUIRE AND ABIDE BY EXISTING RULES. WE AS PEOPLE CAN FORGIVE, BUT IF THE ACT IS SEVERE ENOUGH FOR THE DEATH PENALTY, THEN TEACH OTHERS THE POSSIBLE REPERCUSSIONS OF SUCH ACTS. THAT'S WHAT LAWS ARE MADE FOR, TO PROVIDE GUIDANCE FOR AN TO SOCIETY.

If you would like to share your name and mailing address please fill in the blank below:



ROB PLATERO

FT. DEFIANCE AZ.

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   I oppose the Death Penalty.
   As humans we do not possess the right to judge
   and take another human life. As Navajos we
   are committed to heal and restore harmony to the world
   and our fellow man.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes (   )   No ( ✓ ) Comment:

   Navajo Nation should not support the Death
   Penalty. Soverienty is the issue at stake and
   the Death Penalty is an emotional issue that is
   clouding our minds and judgement with the
   Opt in clause.

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2139

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   *I not against death penalty - my Brother was killed by a person - but, my Bro, won't be back*

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( Y )  No (   ) Comment:

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2140

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   *Do not support DP. very much against it.*

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( )  No ( )  Comment:

   *Navajo nation should not support the Death Penalty. who are one to end life even though the murderer killed someone. need a lot of right minded persons to over come this.*

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2141

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   I don't not believe in Death Penalty. We shouldn't put someone to death and that won't bring our love one back. We should make stricter laws. We should leave death to our creator.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( √ ) Comment:

   Navajo Nation should not support the issue of the Death Penalty. Navajo Nation should make stricter laws on the Navajo reservation.

If you would like to share your name and mailing address please fill in the blank below:

Delores Dale

█████████████████

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2142

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Fort Defiance Agency, Fort Defiance Chapter House
### September 18, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   Why should police officers, federal judges, council members have better justice than the average citizen.
   They are human beings just like the rest of us. All people should be treated equally.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ✓ )  No (  )  Comment:

   If the crime is obviously a henious and gruesome crime, the death penalty should be imposed. I don't agree with opt-in, that's why we the Navajo Nation should give the federal government what we want and not what they want.

If you would like to share your name and mailing address please fill in the blank below:

Wallace Dale
857 Leupaun Drive
Gallup , NM  87301

Upon completing this form please hand it to the Legislative Staff who will collect this form.

( Continued on back ) ⇒

EX 167 - 2143

Our young children lack the discipline in the home, the discipline that was taught by our elders. Some children talk back to their elders, their mom and dad and their brothers and sisters.

Social services took that disciplining away from us. Nowadays, our children are hiding behind the Child Abuse Act.

Our children choose to use alcohol, drugs, and join gangs.

Many families don't even talk to their children, or other family members.

Instead of working together, our Navajo people have always worked against each other. Our own people, our own families our friends and relatives.

Not every murder case is going to be a death penalty case.

Even if the life sentence is imposed, is the Federal government going to build more prisons to house these prisoners and are we going to be taxed even more. Should we pay out of our tax dollars as tax payers to feed, cloth, train and protect these murderers.

Criminals have more justice than we the victims.

# FEDERAL PUBLIC DEFENDER

District of Arizona
407 West Congress, Suite 501
Tucson, Arizona 85701-1310

FREDRIC F. KAY
Federal Public Defender

(520) 879-7500
(800) 758-7054
(FAX) 879-7600
fred_kay@fd.org

September 24, 2003

Lawrence John
Office of Legislative Services
Navajo Nation Counsel Delegates Office
P.O. Box 3390
Window Rock, AZ 86515

Re: Public Hearings on Death Penalty

Dear Mr. John:

I have recently received a July, 2003 updated report on federal capital prosecutions. From the report, it is stated:

> "Of the total of 292 defendants against whom the Attorney General has authorized the government to request the death penalty, 74 have been white, 50 Hispanic, 14 Asian/Indian/Pacific Islander/Native-American, 3 Arab and 151 African-American. 218 of the 292 or 75 percent of the defendants approved for capital prosecution by three attorney generals to date are members of minority groups. 18 of the 24 defendants now on federal death row under active death sentences, or 75 percent, are non-white".

I bring this information to the Committee to emphasize the jeopardy that Native-Americans would be under, as a minority group, if they were to opt in for the death penalty. I would greatly appreciate your dissemination of this letter to the Public Safety Committee.

Sincerely,



nds

EX 167 - 2145

# FEDERAL PUBLIC DEFENDER

District of Arizona
407 West Congress St., Suite 501
Tucson, ~~Arizona 85701~~ 1310

FREDRIC F. KAY
Federal Public Defender

(520) 879-7537
(800) 758-7054
FAX (520) 879-7600
Fred.Kay@fd.org

September 22, 2003

Lawrence John
Office of Legislative Services
Navajo Nation Council Delegates Office
P.O. Box 3390
Window Rock, Arizona 86515

<u>Re: Public Hearing on Death Penalty</u>

Dear Mr. John:

Jon Sands and I want to thank you for the courtesy you extended to us in facilitating our appearance before the Public Safety Committee at Fort Defiance. We felt it was very important for the Committee to hear what we had to say.

Mention was made of a position paper that was submitted by the Medicine Men. If that paper is available, would you please send me a copy.

Attached is a letter to the Public Safety Committee members. Would you please see that they each receive a copy.

Again, thank you for your assistance.



enc.

Page 1 of 1

EX 167 - 2146

# FEDERAL PUBLIC DEFENDER

District of Arizona
407 West Congress St., Suite 501
Tucson, Arizona 85701-1310

FREDRIC F. KAY
Federal Public Defender

(520) 879-7537
(800) 758-7054
FAX (520) 879-7600
Fred.Kay@fd.org

September 22, 2003

Public Safety Committee
  Hope MacDonald-LoneTree, Chair
  Benjamin Curtis, Vice Chair
  Pete Ken Atcitty
  Harry D. Brown
  Harry Clark
  Lorenzo Curley
  Harry Willeto

### Re: Public Hearing on Death Penalty, Ft. Defiance

Dear Committee Members:

I write to thank each of you for the invitation to appear before you and the courtesy and attention you gave to Jon Sands and me at Ft. Defiance on September 18, 2003. We believe you are considering a subject of extreme importance and your decision, and that of the Navajo Nation, is not being undertaken lightly. We believe public hearings are very appropriate under the circumstances.

I mentioned in my comments that if the Nation gives up to the Federal Government its sovereign discretion to bar the death penalty, the Nation will have no voice in deciding that the death penalty is not appropriate in any particular case. That decision will be made by non-Indian judges, non-Indian juries, and non-Indian prosecutors. This is especially important given the uniqueness of Indian jurisdiction under the Major Crimes Act, 18 USC 1153. Presently, as we stressed, the

EX 167 - 2147

Federal Government can seek death for offenses falling under federal general jurisdiction, and has done so despite recommendations against death made by those sovereigns involved (i.e. Puerto Rico and the Navajo nation).

We have made the points, and continue to do so, that the death penalty does not deter criminal actions. This is especially true in those offenses where judgment is impaired by intoxication or diminished capacity. A conviction for first degree murder results in a punishment that is banishment: life imprisonment without parole. The defendant will never be released and will die in prison.

The last fact is that the death penalty has been used far more frequently against minorities. This means that the Navajo will be at risk to be executed at a higher rate than non-minorities, especially if the victim happens to be Anglo or non-Indian.

I again urge the Committee, and the Nation, to not give up its discretion to the Attorney General, a political position whose views may be markedly different from the Nation, and which, once abandoned, can never be retrieved.

If this office can provide further information or answer any questions, please do not hesitate to contact us.



Fredric F. Kay

Page 2 of 2

# DEATH PENALTY FACTS

The United States Supreme Court admitted in 1972 that the arbitrary way executions were carried out violated the Eighth Amendment of the United States Constitution. Many states reacted by enacting laws designed to reduce the arbitrariness, and in 1976, the Supreme Court allowed capital punishment to continue.

Currently, the Supreme Court allows for capital punishment. It ruled that the death penalty does not violate the Sixth and Eighth Amendments. The Eighth Amendment bans the use of cruel and unusual punishment.

The United States faces international pressure to eliminate the death penalty. Amnesty International, the international human rights watchdog, reports that while 112 countries have abolished the death penalty by law or practice, 83 countries continue to utilize capital punishment. In 2002, 81 percent of all known executions took place in three countries: China, Iran, and the United States. Other countries that use the death penalty include Afghanistan, Iraq, Egypt and Kuwait.

International human rights treaties prohibit executing children or anyone under 18 years old at the time the crime was committed. Since 1990 seven countries executed children: Congo, Iran, Nigeria, Pakistan, Saudi Arabia, Yemen, and the country with the greatest number of child executions, the United States. In 2002, Amnesty International recorded three child executions. All three were in Texas.

The death penalty is racist in its application. The National Association for the Advancement of Colored People reports that although African-Americans make up only 13 percent of the population, they make up 42 percent of the death row population. In 2000, the NAACP called for a moratorium on all death sentences. Study after study has shown that race of the defendant or the race of the victim, or both, influence the decision to apply the death penalty. The NAACP reports in its action call to end the death penalty in the United States that a defendant is four times more likely to receive the death penalty if he is African-American.

Robert Nozick writes in his book "Anarchy, State, and Utopia," that no new rights emerge at the group level: "individuals in combination cannot create new rights which are not the sum of preexisting ones" (90). This has wide implications for the death penalty. If I have no right to kill someone, because of moral side constraints, then why does the state have the right to execute someone? Proponents of the death penalty might say that it constitutes self-defense, which individuals do have a right to, but self-defense is done at the time of *immediate danger*. I cannot kill someone after I detain him and then allow him testimony and judge that he is a threat to me. The danger, in order to justify self-defense, should be immediate.

The death penalty cannot be revoked once it is carried out. Humans, and our systems, are fallible. The justice system is fallible. According to Amnesty International, since 1973, 107 prisoners in the U.S. were released from death row after evidence surfaced of their innocence. In January 2003, outgoing Illinois Governor George H. Ryan commuted all the death sentences in his state after having to pardon four people on death row.

EX 167 - 2149



# University of Colorado at Boulder

**Department of Sociology**

Ketchum 219
327 UCB
Boulder, Colorado 80309-0327
(303) 492-6410
Fax: (303) 492-8878

Michael L. Radelet
Professor & Associate Chair
(303) 735-5811 Direct
Radelet@Colorado.edu

September 24, 2003

Mr. Lawrence John
Office of Legislative Services
Navajo National Council Delegates Office
200 Parkway Administration, Building 3
Window Rock AZ  86515

Via Federal Express

Dear Lawrence,

Thank you very much for your generous hospitality yesterday and for allowing me to participate in the Death Penalty Hearings. It was a real honor for me to be involved and to meet so many wonderful people. I especially appreciate your suggestion to travel back to Durango via Lukachukai and Red Valley – that road is now totally paved, and it was one of the most beautiful drives that I have taken in recent years.

In response to Mr. Curley's questions, enclosed please find several items:

William J. Bowers and Glenn L. Pierce, "Deterrence or Brutalization: What is the Effect of Executions?" Crime and Delinquency, Vol. 25, pages 453-484 (1980). A classic study finding a brutalization effect after New York executions, 1907-1963. On average, there were two more homicides than expected in the month following an execution.

John K. Cochran, Mitchell B. Chamlin, and Mark Seth, "Deterrence or Brutalization? An Impact Assessment of Oklahoma's Return to Capital Punishment," Criminology, Vol. 32, pp. 107-134 (1994). This study found that stranger homicides increased, rather than decreased, after Oklahoma's return to capital punishment in the early 1990s.

Ruth D. Peterson and William C. Bailey, "Is Capital Punishment an Effective Deterrent for Murder? An Examination of Social Science Research," pp. 251-282 in James R. Acker, Robert M. Bohm, and Charles S. Lanier (eds.), America's Experiment With Capital Punishment (2003). This is the most recent and most thorough review of all social science research on the deterrence issue (in fact, the book was just published last week).

Michael L. Radelet and Ronald L. Akers, "Deterrence and the Death Penalty: The Views of the Experts," Journal of Criminal Law and Criminology, Vol. 87, pp. 1-16 (1996). This reports on our survey of 75 top criminologists in the U.S.; 90 percent responded that their reading of the

research on deterrence leads them to conclude that the death penalty is not, never has been, and never will be a stronger deterrent to murder than long imprisonment.

"The Death Penalty: The Religious Community Calls for Abolition." This pamphlet contains statements from a wide array of religious communities about the death penalty. Several allude to the question posed by Mr. Curley to the Catholic Nun at the hearings: the difference between Old Testament ("eye for an eye") and New Testament teachings (see especially the statement from Disciples of Christ, page 11).

\* \* \* \* \*

Please remind the councilors that I remain prepared to send them whatever additional information they might find useful on any aspect of capital punishment. I hope our paths cross again soon.

Yours sincerely,

Michael L. Radelet

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:
   If the death penalty is to be done away with, then do away with it completely. That includes the laws that protect Councilman, Judges, Police Officers and Federal employees. All people should be treated equally and treated with respect because, under our great spirit we are all equals. and should be treated as such.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( X ) Comment:
   I'm changing my views on the death penalty because, of the comments and opinions of the people. I respect their viewpoints and in the traditional sense, we didn't create the human being and we are not able to say who dies or who lives. We need more feed back on the life in prison with no parole issues.

If you would like to share your name and mailing address please fill in the blank below:



Wallace Dale

EX 167 - 2152

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment: Traditional Culture, Death Penalty on the reservation is not for the people. I do not believe in the Death Penalty,

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No (X) Comment:

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2153

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment: *The person who commented the Crime didn't have respect for the person's life or she Killed I say put them on Death Roll.*

If you would like to share your name and mailing address please fill in the blank below:

*Albert H Kinfichee*
*PO. Bx 1869*
*Chinle Az 86503*

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:



2. Should the Navajo Nation support or not support the issue of the Death Penalty?
Yes ( ✓ )  No (   ) Comment:

*Of course - Do unto others as others do to you. Just maybe — ~~the~~ a potential murderer may have second thoughts of killing, knowing our gov't supports the issue!*

If you would like to share your name and mailing address please fill in the blank below:



**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2155

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   I oppose the Death Penalty as a form of serving justice. The right to take life is in the hands of Creator or our deity

   Oppose option "N"

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No (X) Comment:

   1. Violates the Diné Culture / tradition
   2. Violates the eighth amendment of the U.S. Constitution
   3. It is racist against color, income, & ~~tribal~~ Tribes
   4. Discriminates against Diné Culture & biased Jury
   5. Erosion of Navajo Nation sovereignty - Need law enforcement

If you would like to share your name and mailing address please fill in the blank below:

Amos Johnson

P.O. Box 1531

███████████ 3

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

## DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:



2. Should the Navajo Nation support or not support the issue of the Death Penalty?
Yes (   )  No ( ✓ ) Comment:

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2157

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:



2. Should the Navajo Nation support or not support the issue of the Death Penalty?
Yes ( ) No ( ✓ ) Comment:

*As Navajos or any individual we don't have the right to put someone to death it's not our to deal with — we as myself forgi one another we have faith in our God that is very strong stronger than a jury & the law. We need to learn how to forgive.*

If you would like to share your name and mailing address please fill in the blank below:

*Betty Rose Draper*

*541*

*6503*

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment: √ very mixed feelings – I don't believe in killing people – period. I also realize some crimes are so awful there may be no alternative. Giving of life and the taking of life belongs to the Creator, not to governments.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( X ) Comment:

If you would like to share your name and mailing address please fill in the blank below:

Polly A Ney
P.O. Box 3337
Chinle Az 86503

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2159

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment: *NO. LET OUR CONGRESS DO THE KILLING. OR THE FEDERAL GOVEMENT AS THEP did MANY YEARS AGO.*

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes (   )   No ( X )  Comment:

If you would like to share your name and mailing address please fill in the blank below:



_TED NEZ_

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2160

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:



... are they put' te on this World.

If you would like to share your name and mailing address please fill in the blank below:

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2161

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   I oppose the death penalty. The death process is not in our hands as Navajo People. It is in the hands of the holy people. Death is an easy answer to the the question of the punishment of the act committed by the wrongdoer. The guidance of the punishment should be left in the hands of the creator.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes (   )  No ( X ) Comment:

   It would be one of the biggest mistake. our Nation will make to opt in. Lets be wise and leave it as is, rather than trying to do the job we are not blessed to do, nor

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2162

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
Comment:

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
Yes ( ✓ )   No (    )   Comment:

If you would like to share your name and mailing address please fill in the blank below:

Ida Price

Box 1312

Chinle, Arizoe
86503

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2163

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE
## DEATH PENALTY:



the Navajo Nation (support or not) support the issue of the Death Penalty?
( ) No ( ) Comment

*A Wake up call →*
*Our young teens & gangs*

If you would like to share your name and mailing address please fill in the blank below:

_____

_____

_____

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2164

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Central Agency, Chinle Chapter House
### September 23, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:



If you would like to share your name and mailing address please fill in the blank below:

LT( Dwayne Billie

Box 25

Upon completing this form please hand it to the Legislative Staff who will collect this form.

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Western Agency, Tuba City Chapter House
### September 29, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:

   I am opposed to the death penalty.

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( X ) Comment:

   The death penalty is unfairly administered, is very expensive, and does nothing to deter crime or bring healing to the families of victims. It is a bad policy that will erode the sovereignity of the Navajo Nation.

If you would like to share your name and mailing address please fill in the blank below:



1313 W. Edgemont Ave

Phoenix AZ 85007

a member f the Navajo Nation)

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

# DEATH PENALTY PUBLIC HEARING
## COMMENT SHEET
### Western Agency, Tuba City Chapter House
### September 29, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment: *I am opposed to the death penalty.*

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes ( ) No ( ✓ ) Comment:

If you would like to share your name and mailing address please fill in the blank below:

Kate Lawenstein

2161 Massachusetts Avenue

Cambridge, MA 02140

**Upon completing this form please hand it to the Legislative Staff who will collect this form.**

EX 167 - 2167

## NASW-AZ CHAPTER
## PUBLIC POLICY COMMITTEE

## RE: NAVAJO NATION DEATH PENALTY ISSUE
### 9/8/03

The Arizona Chapter of the National Association of Social Workers (NASW-AZ) firmly believes that the death penalty should be abolished and strongly endorses a policy against the death penalty for the Navajo Nation. This position is based on the following:

1. All social workers ascribe to the broad principle of respect for the inherent dignity and worth of the individual.
   - The death penalty is contrary to this principle.

2. All social workers adhere to a *Code of Ethics* that prohibits discrimination or exploitation of any group or class of people.
   - The death penalty, as it has been imposed, has been differentially applied to people who are poor, disadvantaged, of limited mental or intellectual capacity, or who are from ethnic or racial minority groups.

3. All social workers believe in the capacity of individuals to change or reform their behavior.
   - The death penalty permanently removes the possibility that an individual has to reform, even within the confines of a life sentence.


EX 167 - 2168

# DEATH PENALTY PUBLIC HEARING
## *COMMENT SHEET*
### Tohajiilee Chapter House - Tohajiilee, New Mexico
### November 12, 2003

## PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING

Upon completing this form please hand it to the Legislative Staff who will collect this form. You may also mail it in to our office: **Public Safety Committee, Mr. Lawrence John, Legislative Advisor, Post Office Box 3390, Window Rock, Arizona 86515 TELEPHONE: (928)871-7253/7254 FAX: (928)871-7259** Deadline for submission is: December 12, 2003

over

EX 167 - 2169

When the crime bill was drafted and being considered by the federal gov't, the federal gov't and state gov'ts wanted the death penalty to apply to all people for certain crimes. However, b/c of lobbying efforts by the Navajo Nation and other Indian gov'ts, we said that death penalty should not apply to Indian defendants b/c Indian people are special people and b/c of our unique sovereignty. So after much lobbying, the crime bill included the opt-in provision to give Indian gov'ts the opportunity to decide for themselves whether the death penalty will apply to their Indian people.

It is very important for the council to understand, that once the Navajo Nation opts in, the Navajo Nation can't change its mind. And the death penalty will apply to all death penalty type crimes not just to certain cases.

Please vote no.

# PLEASE ANSWER THE FOLLOWING QUESTIONS REGARDING THE DEATH PENALTY:

1. What is your position on the issue of the Death Penalty?
   Comment:   *I am against Death Penalty.*

2. Should the Navajo Nation support or not support the issue of the Death Penalty?
   Yes( )          No(X)
   Comment:   *Please Vote NO!*

If you would like to share your name and mailing address please fill in the blank below:

_Helen Bonnaha_

████ 293

K████████ ████3

Upon completing this form please hand it to the Legislative Staff who will collect this form. You may also mail it in to our office: **Public Safety Committee, Mr. Lawrence John, Legislative Advisor, Post Office Box 3390, Window Rock, Arizona 86515 TELEPHONE: (928)871-7253/7254 FAX: (928)871-7259** Deadline for submission is: December 12, 2003

September 15, 2003

PO Box 2092
Kirtland, NM 87417

Mr. Lawrence John
Legislative Advisor to the Public Safety Committee
PO Box 3390
Window Rock, Arizona 86515-3390

Dear Mr. John:

My position concerning the issue of the death penalty is that I am for this penalty. Due to the fact that a strong message needs to permeate to the communities on and near the Navajo Nation that vicious acts such as homicides committed by its own members will be tried according to the law(s) and if found guilty through trial by his/her peers, then consequently the death penalty is an option available in sentencing.

Today's Navajo society had evolved and is very different than the traditional society that was decades ago. As a spiritual person, my morals and mores were shaped by my parents and extended family. They were brought up with these same strong Navajo traditions and beliefs for generations. This basically kept order and harmony in the family and community.

The Navajo society has changed and though most families still have strong family ties and upbringings, there are a few that go against the mainstream and either by choice or circumstance commit unspeakable crimes. Yes, these individuals needed assistance prior to committing a vicious crime, but if there is no help or prevention, then there is the possibility of an altercation to happen that could have been prevented.

This has a personal impact on my family, because of my maternal aunt and young niece who were kidnapped and brutally murdered on the Navajo Reservation, in October 2001. My aunt had many roles, as a mother, sister, and grandmother to her family. She was a loving, gentle, religious, generous and productive person in her community, and then she and my niece were suddenly taken away from us in an incomprehensible manner.

Do we let these types of individuals continue to harm and control our neighborhoods and communities? The Navajo Nation as a whole needs to toughen its laws and judicial system if it wants to operate as a sovereign entity. The people that commit these types of crimes need to know what the consequences will be. Excuses should no longer be tolerated, such as monies not available for adequate police protection and crime prevention, and a more proactive mindset should be implemented to turnaround our communities, for a safer family environment and continuation of traditional values.

That is why the Navajo Nation should support the issue of the death penalty. Thank you for the opportunity to submit my comments.

Sincerely,

# Death penalty hearing dates set

By Diné Bureau

WINDOW ROCK — The 20th Council's Public Safety Committee on Monday set the dates for public hearings on the Navajo Nation's position on the death penalty.

All five hearings will begin at 10 a.m. in the Chapter Houses of the agency capitals, starting with the Northern Agency in Shiprock on Sept. 11. The rest are Sept. 15 in Crownpoint for the Eastern Agency, Sept. 18 in Fort Defiance for the Fort Defiance Agency, Sept. 23 in Chinle for the Central Agency and Sept. 28 in Toh Nanees Dizi (Tuba City) for the Western Agency.

Several horrendous multiple murders in recent years by tribal members against tribal members prompted the panel to seek the grassroots people's comments on whether to change the current position of no death penalty in most federal jury decisions.

Some very important hearings are being conducted by the Navajo Nation. The Gallup Independent article gives the dates for each agency's hearing.

A short explanation of the enclosed papers:

1. Navajo Traditional View of Life and Death was compiled by Navajos
2. Facts about the Death Penalty on the Navajo Nation (see p. 2 for source) is little known by ordinary people. "opt in" is a legal term with far reaching consequences. Only 2 small tribes in the U.S. have "opted in".
3. Revised (Shortened) Facts apply to the whole U.S.
4. Facts about the Death Penalty give the longer version of Shortened Facts. It cites the studies quoted if anyone doubts the fact. Email or call New Mexico Coalition for help. They are eager to give anyone additional support.
5. The letter from Art Riffenburgh was emailed to me Aug. 29th. It can be given to your local news paper for publication. They may contact him or could call me to forward the original email to them.

I would be happy to answer any questions you may have.

Sincerely,

*S. Josephine*

S. Josephine Goebel, CSA
P.O. Box 680, St. Michaels, AZ 86511
928-871-4173 (4171)

EX 167 - 2173

# NAVAJO TRADITIONAL VIEW OF LIFE AND DEATH

Every aspect of Navajo traditional way depends on life: life is beautiful, given for human beings to complete every aspect of one's dream for good things, to complete their spiritual fulfillment. In the Navajo view, Life is given by the Great Spirit, the highest and most powerful Spiritual Being and it is only that Being who determines when one's spiritual fulfillment has been accomplished.

Human beings exist in the physical world to live in harmony with the living things around them. The other living beings such as birds, animals, plants , trees, and sacred elements of earth, water, wind and fire lend their powers to assist human beings to achieve a harmonious way of life.

When a person does something wrong, Navajos might say, ajisii, "he missed the goal or target". The person, his family and those who care for him must assist him in seeking restoration to harmony. Destroying another person's life is not a way to restore that person to harmony.

Death is not to be spoken of lightly and when it is spoken of it is done so with great respect to the sacredness of  human life.  One does not use the same terminology to talk about death of other beings that one uses for human beings.  There is a special way to reference the death of a human being that ties into the Navajo teachings about life.  When someone dies, it is said, "Bee iina' ni ní t'i'".  Literally translated "Bee" refers to "with this particular one of his or her".  "Iina'" refers to "given movement" or "life".  "Ni ní t'i'" refers to the ending of a path or cord.  Put together, the translation is, "This particular strand (of a cord) of life's movement has been fulfilled."  The teaching is that life is given to human beings in a way similar to the way a child receives  life through an umbilical cord.  But when "death" occurs only one strand of this "life cord"  is ended, the spiritual aspect continues from its source.  The source of life determines both the beginning and end of the life strand of the cord.  That is not to be done by human beings.

In the Navajo way, if a person takes a life, he or she must answer to the Holy Beings in his or her own time and manner.  But as part of our society, it is our responsibility to make him a part of our family, community and society.  We have no right to judge his actions and to announce punishment.  The Navajo only has the blessing ways to help a person get back in harmony with his or her  people and his or her surroundings. As human beings we are responsible to each other as relatives on Earth's surface to assist in one's restoration to harmony.  As traditional Navajo People we cannot support the culmination of disharmony by our entry into God's ultimate realm.

EX 167 - 2174

# FACTS ABOUT THE DEATH PENALTY ON THE NAVAJO NATION

1) If the Navajo Nation opts in to the death penalty, it would have no right to decide whether the death penalty is appropriate and no right even to be consulted on the matter. The local U.S. Attorney would seek approval from the Attorney General, currently John Ashcroft.

2) Juries will decide whether an individual is to be executed. Indians, if called at all, are a small percentage of a federal jury.

3) Federal trials are always held off the reservation, in cities such as Phoenix, Albuquerque, and Salt Lake City.

4) There is a history of racial prejudice in the imposition of the death penalty. Racial minorities in the U.S. receive the death penalty far out of proportion to their population, especially where the victim is a white person. Those who murdered whites were more likely to be sentenced to death than those who murdered blacks or Indians.

5) 81% of the person for whom the federal government has sought the death penalty have been minorities (60% Blacks, 15% Hispanics, and 6% Asians). About 2/3 of all first degree murder prosecutions brought in the federal court system are prosecutions of Indians.

6) The death penalty may subject an Indian to harsher punishment than is available in the State Court. For example, New Mexico's death penalty is not available in all first degree murder cases, but only in the presence of certain circumstances, such as the killing of a witness, police officer, or prison guard, whereas opting-in to the federal death penalty allows the prosecutor to seek the death penalty in any first degree murder case.

7) Indians would be subject to the death penalty in cases where a non-Indian would not. If the victim and defendant were non-Indian the defendant would be prosecuted in state court. But an Indian defendant in the same case would be subject to the death penalty in Federal Courts

8) The alternative to the death penalty, life sentence without parole, would keep a convicted murderer permanently away from further harm to the community.

9) Most civilized Nations in the world have rejected the death penalty. As Indian tribes exercise their sovereignty, they may want to look to the example of other civilized nations in the world. Every western democracy except the United States has abolished the death penalty. Since 1976, when the U.S. reinstated the death penalty, 43 countries have abolished the death penalty, including Canada, Russia, France, Germany, Brazil, Portugal, Romania, the Netherlands, and South Africa.

EX 167 - 2175

10) The death penalty is not a deterrent to criminal conduct, especially where intoxication is involved. Most Indian cases are alcohol related and involve family members or people who know each other. The availability of the death penalty does not protect the community from crime.

11). Opting into the death penalty would not affect crimes committed previous to that time. The horrible murder cases pending at present or any cases up to the time of opting-in would be prosecuted under present law.

12) Executions are permanent. Mistakes cannot be corrected. If the wrong person is convicted during hysteria over an ugly crime, or if a person's rights are violated, or it later turns out that the person was innocent, there is no way to undo an execution.

SOURCE: Tova Indritz, Attorney at Law
National Association of Criminal Defense Lawyers'
Native American Justice Committee
715 Tijeras Avenue, NW
Albuquerque, NM 87102
505-242-4003
FAX 505-242-3125

# REVISED (SHORTENED) FACTS ABOUT THE DEATH PENALTY

*Many family members of murder victims do not want the death penalty, and actively oppose it. They have stated "our opposition to the death penalty is rooted in our direct experience of loss and our refusal to respond to that loss with more killing."

*U.S. Supreme Court Justice Sandra Day O'Connor has stated that the U.S. legal system "may well be allowing some innocent defendants to be executed."

*The death penalty is no longer a liberal vs. conservative or Republican vs. Democrat issue. Prominent leaders such as the Pope oppose executions.

*The death penalty is more expensive than to impose life imprisonment. Death cases in Texas cost **3 times** the amount of confining an inmate in prison for 40 years. Another study found that executions cost $2.16 million _more_ in North Carolina than prosecuting a non-capital murder case. The death penalty costs taxpayers far more than keeping killers locked up.

*Of the 111 people released from Death Rows because of the discovery of evidence of innocence, 40+ were on Death Row for 10 years or longer. Death penalty appeals cannot be shortened without running a great risk of executing the innocent.

*For every 7 executions for murder, one person on Death Row was released after evidence of their innocence was discovered.

*Innocent people have been convicted and sentenced to death based on false testimony and police misconduct. There have been 23 known cases since 1960 where innocent people were executed. In New Mexico, 4 of 21 men sentenced to death since 1960 (19 per cent) were later proven innocent. No state is exempt from the danger of executing the innocent.

*A national survey of police chiefs ranked the death penalty as the _least_ cost-effective method of controlling crime.

*The death penalty is applied in a discriminatory manner. In New Mexico, 20 of 21 men sentenced to death were convicted of killing whites, even though non-white murder victims account for about half of all murder victims in the state.

*States that don't have the death penalty tend to have lower homicide rates. The death penalty does not reduce murders.

*The United States is the only Western country to continue to practice capital punishment. The U.S. joined China, the Congo, Iran and Saudi Arabia in accounting for 85% of the over 1800 people executed in 1999.

EX 167 - 2177

\*Most major denominations, including Roman Catholic, Presbyterian, Lutheran, Methodist, Unitarian, Quaker, Jewish, among many others, maintain strong statements condemning the use of the death penalty.

\*Public opinion supports alternatives to the death penalty. A national survey found only 60% favor the death penalty for murder. Support further declined to 38% when those polled were offered the alternative of a life sentence plus restitution.

SOURCE:   The New Mexico Coalition to Repeal the Death Penalty
          P.O. Box 8552
          Santa Fe, NM 87504
          Phone 505-986-9536,  e-mail: nmrepeal@aol.com
          Website:  www.nmrepeal.com

# Facts About the Death Penalty

**Scientific research indicates capital punishment is not a deterrent to homicide or other violent crimes.** A recent New York Times survey found states without the death penalty have lower homicide rates than states with the death penalty. Average murder rates in 1999 were 5.5 per 100,000 in death penalty states and only 3.6 in non-death penalty states. Statistics indicated the regions of the country that use the death penalty the least are the safest for police. Police are most in danger in the South, where, in 1999, 80% of all executions occurred. A 1995 Hart Research Associates poll of police chiefs showed police chiefs rank the death penalty last as a way of reducing violent crime – behind curbing drug use, more police officers, more jobs and reducing guns. 80% of experts from a 1995 survey of the American Society of Criminology, Academy of Criminal Justice Science and the Law and Society Association believe research fails to show any deterrence value in the death penalty.

**Innocent people have been convicted and sentenced to death.** In 1974, New Mexico sentenced to death four innocent men – Thomas Gladis, Ronald Keine, Clarence Smith and Richard Greer, based on false witness testimony and police misconduct. Since 1973, 99 innocent men and women have been released from death rows across the country (Northwestern University, DP Information Center). Researchers Radelet and Bedau found 23 cases since 1900 where innocent people were executed (*In Spite of Innocence*, Northeastern University Press, 1992)

**The death penalty is more expensive to impose than life imprisonment.** A 1993 Duke University study showed that the death penalty in North Carolina costs 2.16 million dollars per execution more than a non-death penalty murder trial. Research in other states indicates executions are three to six times more costly than life imprisonment. In 1999, the New Mexico State Public Defender Department estimated the state would save $1-2.5 million dollars per year on Public Defender costs alone if the death penalty was replaced with an alternative sentence.

**The death penalty is applied unfairly and arbitrarily.** In 1999, the American Bar Association, a conservative group of 400,000 lawyers, reiterated its call for a moratorium on executions because of serious concern with racial disparity in death sentences and the failure to provide adequate counsel and resources to capital defendants. In January 2000, Republican Governor George Ryan called for a moratorium on executions in the state of Illinois. All three of the men currently on New Mexico's death row could not afford to hire their own lawyers. In January 2002, Republican Governor Gary Johnson declared New Mexico's death penalty was bad public policy because it was not applied fairly and innocent people could be executed.

**Many family members of murder victims don't want the death penalty – and actively oppose it.** Groups such as Murder Victims Families for Reconciliation have been created to provide support to the growing number of families of murder victims who seek solutions other than the death penalty. The parents of Santa Fean Amy Biehl bore individual witness against the cycle of violence and vengeance when they forgave the South Africans who murdered their

daughter. Another New Mexican, Michelle Giger, who is President and CEO of the Center for Civic Values, is the daughter of a murder victim and speaks out personally before the legislature and the public in favor of healing and putting an end to the cycle of violence. They join many survivors who believe money spent on capital punishment should, instead, be directed towards long-term counseling and financial assistance for families of people who are murdered.

**The United States is the only Western country to continue to practice capital punishment.** Since the U.S. reinstated the death penalty in 1976, over 40 countries have abolished it. In December 1998, the European Parliament called for immediate and global abolition of the death penalty, with special notice to the U.S. to abandon it. The U.S. joined China, the Congo, Iran and Saudi Arabia in accounting for 85% of the over 1800 people executed in 1999. The U.S. and Iran were the only two countries to execute juvenile offenders that year. Recently, both Canada and France refused to extradite prisoners to the U.S. unless promises that the individuals would not face the death penalty were made.

**The vast majority of mainline religions and faith groups hold positions opposing the death penalty.** Most major denominations, including Roman Catholic, Presbyterian, Lutheran, Methodist, Unitarian, Quaker, Jewish, among many others, maintain strong statements condemning the use of the death penalty. Pope John Paul II has repeatedly called for abolition of the death penalty and New Mexico's Catholic Bishops, along with the New Mexico Conference of Churches, have taken similar stands. Many Jewish, Protestant, Buddhist and other faith group leaders support alternatives to the death penalty and encourage their congregations to pray and study about this issue.

**Public opinion supports alternatives to the death penalty.** A March 2001 national survey conducted by Peter D. Hart Research Associates, Inc. found only 60% favor the death penalty for murder. Support further declined to 38% when those polled were offered the alternative of a life sentence plus restitution. Issues that raised doubts about using the death penalty included danger of executing innocent people, racism in application and failure of the penalty as a deterrent to crime. On October 8, 2000, The New Mexican newspaper cited a Mason-Dixon September 2000 poll that showed New Mexicans' support for the death penalty drops from 65% to 47% when given an alternative.

**For further information on above facts and studies, please contact:**

The New Mexico Coalition to Repeal the Death Penalty
P.O. Box 8552, Santa Fe, NM 87504
Phone: 505-986-9536, E-mail: nmrepeal@aol.com, Website: www.nmrepeal.com

The Death Penalty Information Center,
1320 18th Street NW, Washington, DC 20036
Phone: 202-293-6970, Website: www.deathpenaltyinfo.org,

Religious Organizing Against the DP Project c/o American Friends Service Committee
1501 Cherry Street, Philadelphia, PA 19102
Phone: 215-241-7130, Website:deathpenaltyreligious.org.

Dear Concerned Citizen,

Many years ago, as a NM State Policeman, I thought the death penalty was OK. Then I became a US Probation/Parole Officer working for the Federal Court in Albuquerque. I was assigned to northwest New Mexico which included Indian Country. Over a period of 22 years I came to believe the death penalty was terribly wrong and have been against it ever since. How did I make such a change? I'll try and tell you.

I spent a lot of days over those 22 years trying to help my clients in Indian Country live crime free and sober lives. I drove many miles over dirt roads in summer heat and winter cold. I came to know such places as Pinedale, Crownpoint, Chee-chil-geetho, Window Rock, Sheep Springs, Shiprock, Beclabito and Counselors.

Counselors. I remember old Ben who lived several miles south. First time I looked for him I had to hire an interpreter and guide at the trading post. Found him, all right, clean and sober and sad, wearing his usual bright colored scarf wrapped tightly around his neck, even in the heat of summer. Seems years ago he and his wife had gotten drunk and had a big fight during which he cut her throat and passed out. Next morning he awoke, in bed with her dead body. Enraged and heartbroken he took the knife and cut his own throat from ear to ear. It didn't work as he failed to get the jugular vein. Bleeding seriously he had made his way from his hogan to the road and asked the first vehicle he saw to go for help.

Ben plead guilty in US District Court, known locally as the "Washingtone Court," was given 15 years for manslaughter, was paroled after 10, and had worn his neck scarf every minute of every day to hide the gruesome evidence of his crime. He never remembered killing his wife but plead guilty as he knew he was guilty. He finished his parole just fine and became a sober and respected member of the Counselors area.

I heard many stories over the years, and like to think I learned at least a little. I learned how terribly confusing it was for Indians in Federal Court. They would be assigned a lawyer who knew nothing about Navajo ways and beliefs and who often had to have an interpreter help explain the white man's law to a person whose concept of justice was on an entirely different level. One very frustrated lawyer said to me, "how the hell can I explain anything to my client when the interpreter can't understand it himself?" Good question.

EX 167 - 2181

In the larger society we anglos are learning over and over again that innocent people have been executed. And 111 innocent people who were wrongfully convicted have been released from death rows across this country. We just can't seem to get it right. We know some convictions are based on incompetent investigations by police. We know that some district attorneys are so anxious to get convictions that they overlook witnesses who could have told what really happened. We know that some defendants are tried, convicted and sentenced to death in a court where the judge may be lazy, politically motivated or just doesn't really care much whether the man before him lives or dies. (There are, of course, many notable exceptions.)

Please remember - all this is happening in the larger society where it seems everyone grew up learning how the system works and where it seems everyone speaks the same language. We have learned the death penalty has no effect whatever on others from committing murder. We have learned the death penalty really does not provide "closure" for the wives and families of the victim even though TV news and cop shows make us think it will. Perhaps the worst that these shows teach is that life is not really precious, that to kill is just a casual act where nobody really cares much, like happens in "The Terminator" and other such trash. Small wonder violence against one another is on the rise!

So much for our precious "larger society." If we can't solve these problems then how in the world could a Navajo be expected to deal with them? How could he figure it all out so that he would get a fair shake in the courts he is required by law to attend? How could he ever explain to such people his religious beliefs and feelings about death?

I hear there is pressure in the Navajo Nation to go back to using the death penalty. Please, please do not do this! It would do nothing to make your homes safer that life in jail couldn't accomplish. More important is that it would take away from the dignity and respect that your people have worked so hard and so long to achieve.

Art Riffenburgh, Albuquerque, Tel. 505-344-5986 or artriff@nmia.com

2414 Arbor NW
Albuquerque, NM 87107

## RESOLUTION OF THE JUDICIARY COMMITTEE
## OF THE NAVAJO TRIBAL COUNCIL

Opposing Senate Bill 32, Senate Bill 36, and Title
II of Senate Bill 1225, Death Penalty Act of 1989, and to
urge U.S. Senators to vote for the "Biden Amendment", which
will prohibit the Death Penalty in Indian Country.

WHEREAS:

1.   The   Judiciary   Committee   is   a   standing
committee   of   the   Navajo   Tribal   Council   since   its
establishment on August 14, 1959; and

2.   The "Committee" has as one of its purposes "to
promote   the   interests   of   the   Navajo   people   through
sponsorship of projects and legislation to improve the
quality of the system of justice within the Navajo Nation";

3.   Information has been received that the U.S.
Senate   currently   is   debating   federal   death   penalty
legislation (S. 32, S. 36, and Title II of S. 1225) which
would   resurrect   a   federal   death   penalty   for   24   crimes
including first degree murder; and

4.   The   proposed death penalty   legislation will
more likely be applied to first degree murder cases,   yet two
thirds   to   three quarters of all first degree   murder   cases
prosecuted   in the federal system involve   Indian   defendants
thereby disproportionately subjecting Indian defendants to   a
death penalty; and

5.   That   in those states without a death   penalty
or a limited version and where state law will govern, Indians
will   be subject to a death penalty in circumstances where   a
non-Indian would not face that ultimate punishment; and

6.   That   a death penalty being applied in   Indian
country   will   not deter further   criminal   behavior   because
almost   all Indian murder cases arise between family   members
and   acquaintances   in   the   "heat   of   passion"   where   the
defendant   and   decedent   at   the time   of   death   were   both
intoxicated; and

7.   That   a   death penalty will   not   address   the
roots of criminal behavior in Indian communities but   alcohol
rehabilitation   and   treatment   programs,   and   education   of
Indian youth to prevent alcohol abuse will attack the problem
and prevent further Indian murders; and

8. That states have the authority to determine whether to impose the death penalty within their jurisdiction but Indian tribal governments do not; Congress must therefore act as trustee on behalf of tribal governments who overwhelmingly oppose the death penalty; and

9. That a death penalty goes against the cultural beliefs and traditions of Indian people who value life and place greater emphasis on restitution by making the family and community whole again.

NOW, THEREFORE, BE IT RESOLVED THAT:

1. The Judiciary Committee of the Navajo Tribal Council having been informed of the negative impact of the proposed Death Penalty legislation on American Indians by disproportionately and discriminating against American Indians, including the Navajos, by virtue of federal law and jurisdiction to prosecute first degree murder cases in Indian Country hereby opposes passage of said bills by Congress.

2. Be it further resolved that the Judiciary Committee of the Navajo Tribal Council strongly urge the members of the U.S. Senate to vote in favor of an amendment to be offered by Senator Joseph Biden, Chairman of the Judiciary Committee, that would prohibit the death penalty from being imposed in Indian Country through 18 U.S.C. Sections 7, 1152, and 1153.

3. Be it further resolved that the Judiciary Committee of the Navajo Tribal Council urge the Navajo Tribal Council to also adopt a resolution opposing the Bill.

## CERTIFICATION

I hereby certify that the foregoing resolution was considered by the Judiciary Committee of the Navajo Tribal Council at a duly called meeting at Window rock, Navajo Nation (Arizona), at which a quorum was present and that same was passed by a vote of _6_ in favor and _0_ opposed, this 20th day of October, 1989.

Judiciary Committee

**Wallace Dale**
857 Lewann Drive
Gallup, New Mexico 87301
Cellular: 505-979-8116

October 01, 2003

Honorable Hope MacDonald-Lone Tree
Navajo Nation Public Safety Committee
ATTN: Lawrence John
P.O. Box 3390
Window Rock, AZ 86515

Dear Honorable MacDonald-Lone Tree:

I am in tears and my heart is heavy from the pain that I am feeling due to the violent nature that my sixteen-year old daughter must have endured. I could only imagine what she must have felt in her heart, her mind and her physical body on the night of this brutal murder.

I can recall the times that I held all three of my children, in my arms, when they first came into this world. I was there when my granddaughter was born, too. It's a feeling of love and compassion. Which is hard to explain in words but it's explainable through one's actions. Nothing can change the way I feel about my children and granddaughter.

Over the years, my daughter, Deirdre grew up to be a very beautiful young lady. We used to tease her, calling her "Little China Girl" because she looked more Oriental, rather than Native American. Her passion was music and dancing. She turned on ordinary looking flute into a musical instrument that played some beautiful music. On the dance floor, she was light years ahead of everybody, while everybody was still trying to perfect the disco era. She loved rap music and wanted to be the first Native American rap music artist to hit the charts.

At home, she loved to cook, bake cookies and cakes. I would always find her cookies and sandwiches in my lunch box, when I go to work. At times, I would come home and she would ask me, "Dad are you hungry?" then she would just always help with keeping the house clean and doing the laundry. Lots of times, you wouldn't even have to tell her what to do. She was very

1

EX 167 - 2185

mature and responsible for her age. She always called to let us know where she is. When she's coming home and what she is doing, while some of her friends chose to go out and party. She chose not to get involved in that kind of atmosphere.

Deirdre wanted to get her drivers license so she worked very hard with her homework from school. She took driver's education and made an effort to pass that class. At home, I was her teacher behind the wheel. She put into practice what she learned in her Driver's Ed. Class. I was impressed but she still needed practice with her straight parking and parallel parking. Our next driving lesson was on the dirt and gravel road but that never happened.

My daughter was very excited because she was getting very close to graduating from High School. Her plans were to finish school, join the US Navy, go to college and make her dreams come true with her music. She was so vibrant and full of energy. She was the type that spoke her mind and was always protective of me. She had own special way of making people laugh. She was daddy's girl.

The time she came up missing, her mom and I didn't waste any time in trying to find her. We made a missing person report with the Gallup Metro Police, called several of her friends and went to see a medicine women, who did hand trembling and crystal gazing. Right away, we knew something was wrong but we were hopeful and tried to think positive. The medicine women know what had happened to our precious baby, but she didn't want to tell us. She told us that our daughter was with three people, two males and a female. They were standing over my daughter's body because they had just beaten her up and put her in the trunk of the car that they were traveling in. Then she told us that my daughter was screaming, yelling and kicking while still in the truck of the car. The medicine woman told us that the perpetrators might have burned my daughter's clothes after they put them in a cardboard box. She told us that she would show up in two days.

Two days later, my daughter's body was found by a family traveling back from Gallup. I was working at Intel in Rio Rancho, NM during that time. My family came by to see me that night. We had to identify my daughter's body the next day at the Office of the Medical Investigators at

2

EX 167 - 2186

University Hospital in Albuquerque. Part of me died that day, thinking how could anyone be so cold blooded, cruel and selfish. My little baby girl never hurt anybody in her life. Everything was a blur for months to come. During and after the loss of my daughter, I have experienced Post-Traumatic Stress Disorder. The symptoms that I am having to deal with are: intense and persistent feelings of anxiety, nausea, inability to sleep, irritable outbursts, difficulty concentrating, extreme vigilance and an intensified startle response. Also, loss of appetite.

After my daughter's funeral, I stayed home for over a month. I was employed with Big J Enterprise, as a Journeyman Electrician. My co-workers were kind enough to raise some money for us and my employer matched these funds and gave us a check for $1,200.00 to help us pay for our bills.

There was emotional support from family, friends and relatives. I found myself all alone in my motel room. I just cried and cried and couldn't sleep at night.

I called Gloria Vigil with Office of the Medical Investigators. She told me to come in the following morning for some grief counseling at her office at UNM Hospital. Her recommendations for me were to attend support group meetings with New Mexico Survivors of Homicide in Albuquerque. I stated attending those meetings every Tuesday nights form then on. I got to meet other families who were going through the same thing that I was going through. We also attended their annual conferences, which is held at the Marriot Hotel in Albuquerque and got a chance to meet other families from around the State of New Mexico.

During the Annual NMSOH Conference in June of 2003, we had the honor and privilege of meeting Collene Campbell. She is currently working on making changes on the 28th Amendment of the US Constitution, which protects the rights of criminals. The way it stands today, these criminals have more rights than any of the victims of these violent crimes. During the trial and sentencing, the criminals are held by the hand, walked through the whole process in our legal justice system. While us, the victims of these crimes are left on the back burner and many times, have to figure out what's going on with the investigations, the trial, sentencing or the parole

3

EX 167 - 2187

hearings on the criminals, that pertains to our case. You could just imagine what the victims are already going through while all these processes are on-going.

After the criminals are sentenced and hauled off to prison, they get free medical attention, three square meals a day, free television, get to educate themselves on computers and study to be their own lawyers in the prisons libraries, they get their GED's, study to get their degrees and live in comfort in their cells with heating and air conditioning. We pay the taxpayers all this.

For us the victims, we get hit hard financially. Lots of times, we don't even eat three square meals a day. Many times we have to scrounge around to get a meal on the table. This very moment, my son and I are living on my unemployment checks, which is only $258.00 per week. It was supposed to be $285.00 per week but I chose to have the taxes deducted out of my checks. Every year, I end up paying back taxes and the IRS can't wait to get their greedy hands on our hard earned money so they can misuse that money. I am two months behind on my trailer. I am two months behind on my trailer space rent here in Gallup. I haven't pay for the gas and electric bills. My phone bill is over $500.00 because family, friends and relatives were calling, wanting to know about the investigation trial and sentencing. The trial and sentencing was postponed and moved up numerous times and we had to call everybody back and let them know what is going on.

The finance company on our trailer is threatening us, saying that they are going to repossess the trailer and for my son and I to move out so, we were moving out this month.

The finance company on my vehicle didn't want to give me an extension either. Finally, I told them. "If you're not going to give me an extension for July and August/ then take it," I barely paid for September's payment.

Southwest Indian Foundation here in Gallup was kind enough to pay for our gas bill this past winter. Our gas was shut off because I wasn't able to pay for it. During that time, I was working at Four Corners Power Plant and had to drive to and from work every day. My transmission on my vehicle broke down and cost me $1800.00 to repair. We had no gas for heating and cooking and had to improvise but we survived. All we had was a portable heater and had to borrow an

4

EX 167 - 2188

electric skillet from my brother to cook with. Just last month, Southwest Indian Foundation paid for our trailer space rent that is $205.00 per month. They also paid for our gas and electric bill, too.

My wife and I are separated and plan on getting divorced. According to this book that I read about victims of violent crimes, 85% of those married couples end up getting divorced. My former wife chooses to self medicate herself, by turning to alcohol. She is unemployed and has no income, whatsoever, she wanted to move the trailer back to Arizona, where she is from and wanted to take over the payments and I said fine but nothing has happened.

I am getting counseling and on medication from Gallup Indian Medical Center. My son is on medication and he was an inpatient with Rehobeth McKinley Christian Hospital Behavioral Health several times. During that time his hospital bill went up to $17,000.00 plus another $900.00. My insurance paid for part of his medical bill and is now useless because my insurance is depleted. I am unemployed and my insurance is cancelled right now. Which means, I would have to pay out of my own pocket to get any services. I tried Medicaid but was denied. They said I make too much money because I work as an Electrician with the Union.

My son also was getting counseling with Western New Mexico Counseling Services and that bill went up to $785.00 plus another $40.00.

I used to take my son and oldest daughter to Albuquerque for counseling with New Mexico Survivors of Homicide, but it became too much. It takes a lot of fuel, wear and tear on my vehicle, and it was taking me away from work a lot. Many times, my bosses would not understand why I have to take off from work all the time to take my children to counseling plus my counseling sessions. For court appearances, I even took my son to Las Cruces to Mesilla Valley to get him into a Residential Treatment Program because he is going through a depression. We got to Mesilla Valley and told us they had a bed available for him, but we filled out the paperwork and they did the evaluation and told us he wasn't acute and wouldn't take him.

5

EX 167 - 2189

Then, we tried to get him into Halverson House in Farmington, NM, again. At Gallup High School where my son attended school, we as a group with all his teachers, his counselors from RMCH, Western NM Counseling Services, and from GIMC. But, he didn't want to, and by law, we couldn't force him to go to a residential treatment center if he does not want to go.

He's very withdrawn. He isolates himself by staying in his room most of the time. He's a loner, gets angry and frustrated easily. He gets mad when people are laughing or making any kind of noise. He doesn't want to go to school; he's depressed and used to self-mutilate himself. He used to talk of suicide and about hurting those people who killed his sister.

Right now, we're trying to get a court order through the Juvenile Probation Officer here in Gallup, so he'll be able to get some help that he really needs. I worry about my son and about my daughter. My daughter lives in Albuquerque with her friend. She's working and is waiting to get into Job Corps. Her daughter was taken away by Social Services here in Gallup, and she's struggling to get her back.

Those counselors that we have available out here are not trained and qualified to do Grief Counseling. We need Grief Counselors on the Navajo Nation, and in the cities of Gallup, NM, Farmington, NM, and Flagstaff, AZ. These counseling services should also include traditional healing services, sweat lodges, etc.

I have driven many miles, spent a lot of money out of my own pocket for expenses, and spent countless hours to get some traditional ceremonies conducted by medicinemen and women who sometimes charge a lot for their services. But, I was able to get reimbursed from Crime Victims Reparation.

I even went to my Chapter (Tohatchi), where I am a registered voter, and was told that I would have to write a letter to the Planning Committee to get financial assistance of $50.00, which is a very small amount of money.

6

EX 167 - 2190

I disagree with the Opt-In too. I also don't believe in the death penalty because we don't make human beings. Who are we to take another person's life? I'm in total support of changing the laws to life-in-prison with no parole for murderers

Stiffer fines and sentences should also be imposed on people who get caught for DUI/DWI's on the Navajo Nation, and to share these records with State databases as well. Which also includes speeding on the Navajo Nation. Sovereignty should not be used as an excuse to let repeat offenders get away with these serious issues. If you think about it, what are we teaching our younger generation?

May people agree that the laws are to lenient on the Navajo Nation. I've heard many times, you can get away with anything on the reservation. Which includes murder, DUI/DWI's, speeding and robbery---to name just a few. Everybody likes to talk and complain. I feel that we are fortunate enough to not only talk about it, but also to do something about it.

Another issue that stands out is jobs. We need jobs! Every year, we encourage and send our children to school. We teach them to get educated and come back to help their people, but there is no employment for them. So, our children end up making the whiteman rich, and we end up with more handouts from the federal government.

I'm planning on going back to school in January at SIPI. My plans are to get an Associate Degree in Electronics Technology which will take two years. If I do good, I plan to further my education by earning a Bachelors Degree. After I'm done, if there's work for me on the Navajo Nation, I'll be back. If not, I'll end up doing what our younger generation are doing. Go where there's work available. It is sad, but true.

It has been a very stressful and painful three years of my life. Some days, I don't want to get out of bed to face the world for another day due to the fact that the Dale Family has had to deal with tremendous losses:

> June 14, 1992 My nephew, Glen Walters, Jr., was murdered on the Navajo Nation. Case was closed with no arrests made.

7

EX 167 - 2191

December 23, 1996   My father, Hoskie D. Dale, passed away.  He was medicineman and a Roadman with the Native American Church.

January 06, 1999   My uncle, Charlie Manuelito, passed away.  He was also a medicine man and a Roadman with the Native American Church.  He was 80% disabled and a World War II veteran.  Also, the last grandson of Chief Manuelito.

March 03, 2001   My daughter, Deidre Dale was murdered by Nicola Gabaldon, Frank Gabaldon, and Raldon Charles Begay on February 24, 2001.

April 03, 2001   My brother, Cedri Dale, was stabbed in the stomach by Jeremy Lucero.  Case is still open.

June 01, 2001   My nephew, Shawn Dale, was stabbed in the neck and died instantly while trying to defend another friend, who was not able to defend himself.  Defendant was sentenced to 7 year in prison.

November 27, 2001   My brother, Ernest Dale, Sr., passed away.  He was a loving father, husband, grandfather, and brother.

My dad and my uncles used to stress education.  My uncle always used to say, "Don't ever feel sorry for yourself".

Despite our great losses, we are able to adapt and overcome these obstacles placed before us.  I pay my respects to them, and I know in my heart and in my mind that they are in a better place than we are.  Someday, I hope to see them again in the "happy hunting ground".  They are my strength and my protectors.  Both the Navajo and Comanche people who are now spirit people up above.

8

EX 167 - 2192

I teach my children where they are coming from and where they are at so, that they may know where they are going. As a father of my children, I try to instill in them to have respect for all people and all living creatures on this planet. To have respect for and take care of our Mother Earth, so that in return she may take good care of us. To carry on our traditions, our culture, our religion and to be proud of who they are.

I tell them to go out into the world and get educated, but to always come back to our motherland. Come back to help our people and to always be thankful. This much I would like to share with you. Thank you for caring and understanding.

Respectfully,



Wallace Dale

EX 167 - 2193



EX 167 - 2194

The murder of Deirdre Dale remains unsolved. Please click here to view her unsolved case page.


"Someone I Love Was Murdered"

[ Back ] [ Next ]

[ Site Map ][ Memorials ] [ Unsolved ] [ Grief ] [ Reflections ] [ Resources ] [ Bulletin Board ]
[ Organization ] [ Feedback ] [ Contact ] [ Search ]

New Mexico Survivors of Homicide, Inc., 12400 Menaul NE, Suite 100, Albuquerque, NM 87112
Phone: 505-232-4099 Toll Free: 877-700-8500 Fax: 505-268-6962
www.nmsoh.org   email: webmaster@nmsoh.org

Web site design by marchonline.com This site is lovingly dedicated to the memory of Gary James March

EX 167 - 2195



**Resources**

**Bulletin Board**

As you browse this section you will find information on all of our local support group chapters on our Meetings page and any upcoming events will be found on our calendar page.

In addition to the organization selections above we felt that it might be helpful to provide you with a little history of our organization.

In January, 1995, the New Mexico Grief Services Program of the New Mexico Office of the Medical Investigator, realized that, during 1994, a group of about 20 families in the Albuquerque Metropolitan Area had children who had been murdered. Two of the grief counselors contacted these families and began an eight-week support group designed to help these parents meet others whose children had been murdered and to begin the healing process.

In February, 1995, a group of about 12 parents met for the first time at St. Paul's Lutheran Church in Albuquerque. About six members of this group completed the eight weeks. At the end of that time, they all indicated that they had grown so close to one another that they would like to continue meeting on a regular basis. And so, on July 18, 1995, the group began regular monthly meetings at the NM Office of the Medical Investigator. Since 1995, NMSOH chapters have formed in Farmington, Las Cruces, and Roswell, with plans to begin chapters in Taos-Rio Arriba counties and McKinley county sometime in 1998.

In 1996, the group became affiliated with the National Parents of Murdered Children (POMC), Inc., but for a variety of reasons chose to incorporate as the New Mexico Survivors of Homicide (NMSOH), Inc., in September, 1997, a non-profit organization. (Certificate of Incorporation #1884089)

The first annual NMSOH State Conference was held in March, 1997, and was attended by 68 people representing 28 families. The group elected a Board of Directors, and the Board, in turn, elected officers for the year 1997-98. We have continued to hold the annual state conference each year since.





EX 167 - 2196

[ Home ] [ Site Map ][ Memorials ] [ Unsolved ] [ Grief ] [ Reflections ] [ Resources ]
[ Bulletin Board ] [ Organization ] [ Feedback ] [ Contact ] [ Search ]

New Mexico Survivors of Homicide, Inc., 12400 Menaul NE, Suite 100, Albuquerque, NM 87112

*Web site design by marchonline.com This site is lovingly dedicated to the memory of Gary James March*

EX 167 - 2197



ally when you are attempting to resolve conflict, forgive yourself or others for errors of the past, or when you are faced with new challenges in your spiritual path. There is a particular kind of depression of the spirit sometimes associated with the deep introspective stage of transition and change. When this occurs, Bear is a reminder that there is a parallel between depression and the natural state known as hibernation, when involvement with the outer world is minimized in order to focus more energy on the inner processes necessary for a successful transition.

Bear reminds us that one of the great powers we have is the power of turning to solitude and introspection through which we integrate new experience and change. If you are feeling overwhelmed by events, Bear can help you meditate on the symbolic parallels between your present state of mind and the bear at the door of the cave. You may be reluctant to step out of the cave into the sunshine after a long period of hibernation. You may retreat into the cave again and return to a state of solitude. However, you may be assured that no matter what the circumstances, you can choose peace instead of the conflict or disturbance you are feeling.

Bear represents the healing power within every living thing. Many of us are unprepared to make use of the potential power we possess in our capacity for introspection and solitude. The wisdom of Bear can help you realize this power and use it during those times in your life when the change created by cataclysmic events feels overwhelming.

Bennett, HZ. *Zuni Fetishes: Using Native American Objects for Meditation, Reflection, and Insight*. San Francisco: Harper San Francisco, 1992, p.97-100

EX 167 - 2198

[ Home ] [ Site Map ][ Memorials ] [ Unsolved ] [ Grief ] [ Reflections ] [ Resources ]
[ Bulletin Board ] [ Organization ] [ Feedback ] [ Contact ] [ Search ]

New Mexico Survivors of Homicide, Inc., 12400 Menaul NE, Suite 100, Albuquerque, NM 87112
Phone: 505-232-4099  Toll Free: 877-700-8500  Fax: 505-268-6962

*Web site design by marchonline.com This site is lovingly dedicated to the memory of Gary James March*

EX 167 - 2199



**Resources**

us are surviving the murder of someone dear to us--a child, a sibling, a grandchild, a niece/nephew, a friend. None of us ever wanted to belong to this group, but the choice was made for us by the person(s) who murdered our loved one. And so, we extend our condolences on your loss and encourage you to contact us when you feel the need to.

A sudden death - especially one where the life was deliberately and maliciously taken - gives rise not only to the usual feelings of grief, it creates a whole other set of reactions. One of the most common, we have found, is the feeling that you are "going crazy". We want to reassure you that you are not going crazy. The feelings you are having are normal responses to an abnormal event. Unless you plan to harm yourself or someone else, almost anything you feel is "normal."

We want you to know that we are available if you have questions or just want to talk. Friends and relatives quickly "burn out", leaving you without your usual support system.

We encourage you to think of yourself not as a homicide "victim" but as a homicide "survivor." You will survive, even though there are days when you will not feel able to go on.

We hope that the information provided here may give you at the very least some insight in to what you are experiencing.



Was Murdered"

New Mexico Survivors of Homicide, Inc., 12400 Menaul NE, Suite 100, Albuquerque, NM 87112
Phone: 505-232-4099  Toll Free: 877-700-8500  Fax: 505-268-6962
www.nmsoh.org   email: webmaster@nmsoh.org

Web site design by marchonline.com This site is lovingly dedicated to the memory of Gary James March

10/9/2003

EX 167 - 2200



We are feeling overwhelmed by Anne's death and by the amount of senseless violence in our country. We live in a violent society; none of us is immune. Something must be done to prevent violence; we must not simply watch it continue to escalate. Otherwise, Anne, and so may others like her who die in random acts of violence, will have died in vain.

The trial ended last week in a conviction. But the agony continues. Words cannot describe the impact of Anne's loss on us all. How can one summarize 23 years of love, joy, shared laughter, delighted cries of surprise on Christmas morning, tender hugs and tears, the "I love you, Mommies" and "Thank you, Daddies"?

**Now** we look at accumulated photos, newspaper clippings, letters from those who knew and loved Anne and wonder why we hold onto them, why we can't bear to throw them away, even the duplicates. Then, with a spasm of grief, we realize this is all that's left of our only daughter. There will be no new photos. Anne's story has been stopped at the threshold of her adult life, cut off deliberately by her assailant as she walked from her apartment to the Rosslyn Metro at 8 o'clock on a Saturday evening, March 31, 1990.

Anne graduated from Tufts University in May 1989, an international relations major, and moved to the Washington area where she worked as a legal assistant. She brought with her a quick sense of humor and a wonderful zest for living. Always proud of her country, she was challenged and excited to be working and living in the nation's capital. Her work clarified her goals and she decided to apply to law school. She told her grandfather, just one month before her death, she wanted to be a lawyer so that she could use her skills to advocate for freedom and justice. This was Anne: intelligent, reliable, perceptive and sensitive to other's needs, eager to build on her accomplishments.

These goals will never be met. Anne's most basic right, her right to life,

EX 167 - 2201

was cruelly and unjustly taken from her. Anne's dreams of becoming a lawyer, of someday marrying and having children, of living a full, mature life, have been denied to her.

We have also been robbed by Anne's murderer. The loss to us is immeasurable. In killing Anne, her murderer also killed a part of us. We struggle daily to find some purpose and meaning in our life without Anne, but also to cope with the agony of the fear, horror, evil and pain she faced at her death. We go through the motions of living but there is no rest, no peace, no joy.

Our family is forever changed. We and our two sons watch relatives' and friends' lives move on, with weddings, and graduations, knowing their whole families will participate. One son said, "We have to learn to be a family all over, a family of four instead of five." They both struggle to find purpose in such a chaotic world. Her grandparents have been robbed of peace of heart in their old age. The joy of a cousin's recent wedding was dampened by Anne's absence. A younger cousin will not even be able to remember Anne. We all long for her gentle teasing, genuine care and interest in our lives, her laughter and her hugs.

**The** mother-daughter relationship was especially strong between us. Anne was my best friend. We laughed and cried together, had our silly private jokes, worried over family problems, planned and cooked for holiday celebrations. Although living in separate cities, we were closely joined in spirit. Anne was my connection to the future, part of the unbroken bond shared by women through the generations. I saw in Anne characteristics of both her grandmothers, and of her great-grandmother, as well as of me. She was our immortality; our future has been destroyed.

As her father, I relive the tragedy of Anne's vicious murder constantly. The path I walk every day between my office building and parking area reminds me of Anne's final terrified moments on that Arlington sidewalk. When I pull into our driveway, I see a house not a home. The home, a place for refuge from the world, has been invaded by violence. It is just a place to eat, and sleep, never to hold the joy of a daughter. The days of joyful, whole-family celebrations are over. Happiness will be forever tainted by not being shared with Anne.

Friends have also felt the loss and anger and are victimized by her murder. Two of her closest friends were married this year; Anne would have been in the wedding parties. Many friends still leave flowers at her grave, under the apple tree we tend there. Her absence is palpable whenever her friends gather. All Anne's friendships - from childhood to the last days of her life - have been shattered by the murder. One close friend told us the grief of Anne's loss is so painful she hesitates to become close to others for fear of another loss. Others, seeing our pain, express reservations about bearing children in such a violent world.

We hope to keep Anne's wonderful spirit alive in scholarships established at Tufts and in our high school in Lexington, Mass. We hope to see the world again as she would have us see it - with lively perceptions, humor and forbearance. But these hopes cannot replace her. compelled us to attend the trial in Arlington of Michael Satcher, accused of murdering our daughter, Anne Elizabeth Borghesani. We wished to represent Anne

EX 167 - 2202

at the proceedings, to see justice done and to attempt to understand what happened to Anne and why. Many of our questions have been answered, pieces of the tragic puzzle have fallen into place and justice has been done. However, the reason for the violent tragedy remains elusive.

We are feeling overwhelmed by Anne's death and by the amount of senseless violence in our country. We live in a violent society; none of us is immune. Something must be done to prevent violence; we must not simply watch it continue to escalate. Otherwise, Anne, and so may others like her who die in random acts of violence, will have died in vain.

The trial ended last week in a conviction. But the agony continues. Words cannot describe the impact of Anne's loss on us all. How can one summarize 23 years of love, joy, shared laughter, delighted cries of surprise on Christmas morning, tender hugs and tears, the "I love you, Mommies" and "Thank you, Daddies"?

**Now** we look at accumulated photos, newspaper clippings, letters from those who knew and loved Anne and wonder why we hold onto them, why we can't bear to throw them away, even the duplicates. Then, with a spasm of grief, we realize this is all that's left of our only daughter. There will be no new photos. Anne's story has been stopped at the threshold of her adult life, cut off deliberately by her assailant as she walked from her apartment to the Rosslyn Metro at 8 o'clock on a Saturday evening, March 31, 1990.

Anne graduated from Tufts University in May 1989, an international relations major, and moved to the Washington area where she worked as a legal assistant. She brought with her a quick sense of humor and a wonderful zest for living. Always proud of her country, she was challenged and excited to be working and living in the nation's capital. Her work clarified her goals and she decided to apply to law school. She told her grandfather, just one month before her death, she wanted to be a lawyer so that she could use her skills to advocate for freedom and justice. This was Anne: intelligent, reliable, perceptive and sensitive to other's needs, eager to build on her accomplishments.

These goals will never be met. Anne's most basic right, her right to life, was cruelly and unjustly taken from her. Anne's dreams of becoming a lawyer, of someday marrying and having children, of living a full, mature life, have been denied to her.

We have also been robbed by Anne's murderer. The loss to us is immeasurable. In killing Anne, her murderer also killed a part of us. We struggle daily to find some purpose and meaning in our life without Anne, but also to cope with the agony of the fear, horror, evil and pain she faced at her death. We go through the motions of living but there is no rest, no peace, no joy.

Our family is forever changed. We and our two sons watch relatives' and friends' lives move on, with weddings, and graduations, knowing their whole families will participate. One son said, "We have to learn to be a family all over, a family of four instead of five." They both struggle to find purpose in such a chaotic world. Her grandparents have been robbed of peace of heart in their old age. The joy of a cousin's recent

EX 167 - 2203

wedding was dampened by Anne's absence. A younger cousin will not even be able to remember Anne. We all long for her gentle teasing, genuine care and interest in our lives, her laughter and her hugs.

**The** mother-daughter relationship was especially strong between us. Anne was my best friend. We laughed and cried together, had our silly private jokes, worried over family problems, planned and cooked for holiday celebrations. Although living in separate cities, we were closely joined in spirit. Anne was my connection to the future, part of the unbroken bond shared by women through the generations. I saw in Anne characteristics of both her grandmothers, and of her great-grandmother, as well as of me. She was our immortality; our future has been destroyed.

As her father, I relive the tragedy of Anne's vicious murder constantly. The path I walk every day between my office building and parking area reminds me of Anne's final terrified moments on that Arlington sidewalk. When I pull into our driveway, I see a house not a home. The home, a place for refuge from the world, has been invaded by violence. It is just a place to eat, and sleep, never to hold the joy of a daughter. The days of joyful, whole-family celebrations are over. Happiness will be forever tainted by not being shared with Anne.

Friends have also felt the loss and anger and are victimized by her murder. Two of her closest friends were married this year; Anne would have been in the wedding parties. Many friends still leave flowers at her grave, under the apple tree we tend there. Her absence is palpable whenever her friends gather. All Anne's friendships - from childhood to the last days of her life - have been shattered by the murder. One close friend told us the grief of Anne's loss is so painful she hesitates to become close to others for fear of another loss. Others, seeing our pain, express reservations about bearing children in such a violent world.

We hope to keep Anne's wonderful spirit alive in scholarships established at Tufts and in our high school in Lexington, Mass. We hope to see the world again as she would have us see it - with lively perceptions, humor and forbearance. But these hopes cannot replace her.

*Elizabeth and Roger Borghesani live in Lexington, Mass.*

*Taken From: The Washington Post - Sunday Outlook - August 4, 1991*



[ Back ] [ Next ]

[ Site Map ][ Memorials ] [ Unsolved ] [ Grief ] [ Reflections ] [ Resources ] [ Bulletin Board ]
[ Organization ] [ Feedback ] [ Contact ] [ Search ]

New Mexico Survivors of Homicide, Inc., 12400 Menaul NE, Suite 100, Albuquerque, NM 87112
Phone: 505-232-4099 Toll Free: 877-700-8500 Fax: 505-268-6962
www.nmsoh.org   email: webmaster@nmsoh.org

EX 167 - 2204

*Web site design by marchonline.com This site is lovingly dedicated to the memory of Gary James March*

EX 167 - 2205



# COALITION OF ARIZONANS TO ABOLISH THE DEATH PENALTY

CAADP
COALITION OF ARIZONANS TO
ABOLISH THE DEATH PENALTY

Post Office Box 333 • Tucson, Arizona 85719
(520) 795-7673
www.azabolitionist.org

September 30, 2003

Navajo Nation Public Safety Committee
Attn: Lawrence John, Legislative Advisor
Post Office Box 3390
Window Rock, Arizona 86515

**Re: Federal death penalty**

Dear Committee Members:

It is our understanding that the Public Safety Committee is holding hearings regarding whether or not the Navajo Nation should consider opting in to the federal death penalty. On behalf of the Coalition of Arizonans to Abolish the Death Penalty (CAADP), we encourage the committee to consider the overwhelming data that the death penalty does not deter murder nor lower crime rates. Since the death penalty has historically been administered with racism and error, CAADP opposes it in all forms.

On September 12, 2000, the U.S. Justice Department released a study that found disturbing racial disparities in the federal death penalty. The study reported that 80% of the cases submitted by federal prosecutors for death penalty review in the preceding five years had involved racial minorities as defendants. Since the time of this study, the federal government has continued to target non-white defendants with the death penalty at significantly higher rates than white defendants. Most of the federal defendants currently on death row are racial minorities.

There is no sound evidence that the death penalty deters murder, nor that it lowers crime rates. The Federal Bureau of Investigation's own crime reports indicate that the murder rate in the South is increasing and the murder rate in the Northeast is decreasing. The South accounts for approximately 80% of all executions since 1976, while the Northeast accounts for approximately 1%. Comparisons between states with the death penalty and states without indicate that the murder rates in the majority of death penalty states are higher than the murder rates among non-death penalty states.[1]

---

[1] The FBI's report is available at http://www.fbi.gov/ucr/cius_02/02prelimannual.pdf.

Perhaps the most disturbing data about the death penalty is that which reveals a large error rate. The James S. Liebman Columbia University Studies released in 2000 and 2002 concluded that two-thirds of all death penalty convictions in the United States have been riddled with such serious mistakes that reversals or new trials were ordered. The study found that Arizona's serious-error rate was 79% and that Pima County led the nation in imposition of death sentences. Professor Liebman concluded that "Our results reveal a death-penalty system collapsing under the weight of its own mistakes."[2] There is no dispute that numerous innocent defendants have been sentenced to death in the United States in the past three decades.

Thank you for allowing us to submit this letter to your committee. We appreciate your attention to our comments.

Sincerely yours,

Suzanne Rabe
President

Dennis Seavers
Vice President

---

[2] See http://www2.law.columbia.edu/instructionalservices/liebman/liebman/Liebman%20Study/docs/1/executivesummary.html.



Menu  Compose  Search          | Personal Account Options... | ▓   Help  Logout

lawrencejohn's
## Main Mail

- Print
- Header

FROM:    AnetteSydow@aol.com | Save Address
DATE:    Wed, 08 Oct 2003 13:39:04 -0400
TO:      <lawrencejohn@navajo.org>
SUBJECT: Press request death-penalty discussion

**Dear Mr. John,**

**I´m a german journalist working at the Washington DC office of the german press agency (dpa). I´m writing on a story for the german newspapers about the Navajo death-penalty "opt-in"-discussion. I just found a story about that topic in the "Navajo Times" from october, 2nd. There it said that the last of the public hearings ended some days ago.**

**Could you or someone appropriate from your office give me the current results of the public hearings and answer some questions to me?**
**What will happen next in the process? How likely is it that the campaigners will suceed? For when do you count on a result?**

**Thank you very much for your help!**

**Regards,**

**Anette Sydow**

▆▆▆▆▆▆ext   ▆▆▆▆▆▆▆▆▆▆▆▆

Powered by IMail.

EX 167 - 2208

# FEDERAL PUBLIC DEFENDER
### District of Arizona
### 850 West Adams Street, Suite 201
## PHOENIX, ARIZONA 85007

**FREDRIC F. KAY**
Federal Public Defender

(602) 382-2743
1-800-758-7053
(FAX) 602-382-2800

October 2, 2003

Hope MacDonald- LoneTree, Chair
Attn: Mr. Lawrence John
Public Safety Committee
Navajo Nation
P. O. Box 3390
Window Rock, Arizona 86515

Dear Mr. John:

I am responding to your solicitation for any materials that we believe would help the Public Safety Committee of the 20th Navajo Nation Council in its deliberation on the critical issue of "opting in" for the death penalty. It seems that at the various hearings that the Public Safety Committee has held, there have been some questions as to the distinction between general and specific federal jurisdiction. This is part of the legacy of federal Indian law. To help answer any questions the Committee might still have, I am enclosing an article that I wrote on "Indian Crimes and Federal Courts," that appeared in the *Federal Sentencing Reporter*, a national publication specializing in sentencing issues, in November/December 1998. I hope it will be helpful.

If I can provide any further information, please do not hesitate to contact me.

Sincerely,

JON M. SANDS
Asst. Federal Public Defender

JMS:mlb
public safety ltr

Enclosure

cc:     Fredric Kay, Federal Public Defender

EX 167 - 2209



# FEDERAL SENTENCING REPORTER

November/December 1998• Volume 11, Number 3

# The Federalization of Criminal Prosecution and Sentencing

EDITOR'S OBSERVATIONS    123
Nora V. Demleitner, *The Federalization of Crime and Sentencing*

Deanell Reece Tacha, *Preserving Federalism in the Criminal Law: Can the Lines Be Drawn?*    129

Chief Justice William H. Rehnquist
    — *Remarks, Federalization of Criminal Law,*    132
    *American Law Institute, May 11, 1998*

    — *The 1998 Year-end Report of the Federal Judiciary*    134
    *to Congress, January 1, 1999*

James A. Strazzella, *Assessing The Impact of Federalization: The ABA Report*    137

Ronald Weich, *Managed Care and Managed Sentencing — A Tale of Two Systems*    139

Robert L. Wilkins, *Federal Influence on Sentencing Policy in the District of Columbia: An Oppressive and Dangerous Experiment*    143

Scott Wallace, *Creative Coalitions: New Brakes on Congress's Drive to Federalize Crime*    149

Jon M. Sands, *Indian Crimes and Federal Courts*    153

Jonathan Schmidt and Laurel Beeler, *State and Federal Prosecutions of Domestic Violence*    159

GAO Report, *Truth in Sentencing: Availability of Federal Grants Influenced Laws in Some States (GAO/GGD 98-42, Feb. 1998)*    163

United States v. Snyder, 136 F.3d 65 (1st Cir. 1998)    168

The Federal Sentencing Reporter is published for
the Vera Institute of Justice by the University of California Press

EX 167 - 2210

# Indian Crimes and Federal Courts

Federal jurisdiction over Indian crimes[1] is a small but significant part of federal criminal practice.[2] While Indian offenses amount to less than ten percent of the overall federal caseload, they constitute a significant portion of the murders and assaults in federal court — over twenty percent — and close to seventy-five percent of all manslaughter and sexual abuse cases.[3] Indian offenses are a major part of the practice of federal criminal law in a few districts, such as Arizona, New Mexico, South Dakota and Montana, and a significant part in others, such as Washington and Minnesota.[4]

Indians and certain specific offenses occurring on Indian Reservations fall under federal jurisdiction. In those cases the federal guidelines control sentencing.

The history of federal criminal jurisdiction over Indians is a continuing legacy. The federalization of Indian crime began two centuries ago. Federal criminal jurisdiction, which determines the application of substantive law, procedure and the federal sentencing guidelines, is controlling on many Reservations. The Indian Tribes have no choice but to be governed by federal law.

## I. Criminal Jurisdiction in Indian Country

Federal criminal jurisdiction over Indians in Indian Country is narrow but confusing.

### a. Historical Background

Statutes authorizing federal criminal jurisdiction in Indian Country are found primarily at 18 U.S.C. §§ 1151 - 1153. The language of these sections draws significant jurisdictional distinctions based on whether the victim or the accused is an Indian. The basis for these classifications lies in the historical purpose for which federal jurisdiction was conferred: initially to protect the interest of settlers from the Indians, and later to protect the Indians against their hostile neighbors.

Federal authority over Indian Country derived from a basic doctrine of federal Indian law: the dependent status of Indian tribes. In *Cherokee Nation v. Georgia*, one of the earliest cases examining the tribal/federal relationship, the U.S. Supreme Court characterized the Indian tribes as "domestic dependent nations" because their rights as independent nations had been diminished and they occupied the Reservations only by the consent of the United States.[5] The Court found the basis for this hierarchical



**JON M. SANDS**

Assistant Federal
Public Defender,
District of Arizona

relationship, and subsequent authority over the tribes by Congress, in the Supremacy Clause of the Constitution, "which empowers Congress to 'regulate commerce with foreign nations, and among the several states, and with the Indian tribes'."

Congress's legislative power over criminal offenses in the Indian territories was firmly established in *United States v. Rogers*.[6] The defendant in *Rogers*, a White man, had sought to avoid federal prosecution for the murder of another White man in Indian territory by claiming Indian status for himself and the victim, through marriage and adoption into the Cherokee Tribe. The Court held, however, that "Congress may by law punish any offense there, no matter whether the offender be a White man or an Indian." Thus, as the Court stressed 130 years later, "Congress had undoubted constitutional power to prescribe a criminal code applicable in Indian Country."[7]

### b. Jurisdictional Framework

Although jurisdiction over crimes by Indians in Indian Country was originally vested exclusively with the tribes, Congress has greatly limited the jurisdiction of the tribes by making certain criminal acts federal offenses.[8] Chief among the grants of criminal jurisdiction over offenses committed in Indian Country are the Major Crimes Act, 18 U.S.C. § 1153 and the Federal Enclaves Act, 18 U.S.C. § 1152, also known as the General Crimes Act. The Major Crimes Act mandates federal jurisdiction over 13 serious intra-Indian offenses committed in Indian Country. The Federal Enclaves Act provides for federal jurisdiction over offenses committed in Indian Country that violate the general laws of the United States. However, the Act does not confer state jurisdiction, and does not extend to offenses committed by one Indian against another Indian or to Indian perpetrators who have been previously punished under tribal law.

For those offenses which are not specifically enumerated in the Federal Criminal Code, the Assimilative Crimes Act, 18 U.S.C. § 13, which incorporates state law, makes a violation of state criminal law within a federal enclave a federal offense. In short, jurisdiction over crimes committed by Indians in Indian Country lies with the tribe and/or the federal courts but not with state courts absent expressed congressional consent, such as that provided by Public Law 280, which now allows states to assume Indian criminal jurisdiction with the

EX 167 - 2211

consent of the tribe.

## II. The Major Crimes Act

An Indian who commits one of the 13 offenses enumerated in the Major Crimes Act against any person in Indian Country is subject to federal prosecution under 18 U.S.C. § 1153, the major federal jurisdictional statute for crimes committed on Indian land by Indians. The Major Crimes Act was inspired by and passed within two years of an extremely unpopular Supreme Court decision, *Ex Parte Crow Dog*.[9] Crow *Dog*, a Sioux Indian, had murdered another Sioux Indian, Spotted Tail, within Indian Country. The murder allegedly occurred because Spotted Tail had turned in Chief Crazy Horse. Crow Dog was convicted in a federal district court and sentenced to death. The Supreme Court, however, found no federal jurisdiction and decided that only the Indian tribe possessed jurisdiction to try and punish an Indian for the murder of another Indian. Crow Dog went free.

The Major Crimes Act expressed the congressional view that tribal law was insufficient to punish major crimes adequately. In *United States v. Kagama*,[10] the Supreme Court found the Act to be within Congress' constitutional authority because the federal government owed a duty of protection to the dependent Indian tribes.[11]

The federal jurisdiction provided by the Act precludes state jurisdiction in those states that have not assumed jurisdiction over Indian land within their boundaries. In the six states that have assumed such statutory jurisdiction under 18 U.S.C. § 1162, however, federal jurisdiction does not lie. Federal and tribal jurisdiction runs concurrent in those states that have assumed voluntary jurisdiction under 25 U.S.C. § 431.

The Major Crimes Act can be viewed as an intrusion into the otherwise exclusive jurisdiction of the Indian tribes.[12] While neither the language in the federal statutes nor legislative history prohibits tribes from exercising concurrent jurisdiction over criminal acts, tribal courts may only impose up to one year imprisonment and/or a fine of $5,000. It is not uncommon for a defendant to be prosecuted in tribal court before federal prosecution, resulting in increased punishment. Such double punishment has been determined not to violate the Double Jeopardy Clause in most cases.

Moreover, because criminal jurisdiction under Indian law is so fragmented, different participants in the same or similar crimes may be subject to prosecutions by different sovereigns under different laws, depending on whether they are Indian or non-Indian. This result has been held not to violate principles of equal protection. In *United States v. Antelope*, the Supreme Court found federal legislation with respect

to Indian tribes "not based on impermissible classifications" because it is "rooted in the unique status of Indians as 'separate people' with their own political institutions."[13] Therefore, "Indian," as construed by the Court, is a political, not a racial classification.

## III. General Jurisdiction And The Major Crimes Act: "Peculiarly Federal" Exceptions

While some acts are federal crimes no matter where in the United States they are committed or by whom, the Major Crimes Act enumerates particular Indian Country offenses that can be tried in federal court.

If the crime is not one of the 13 offenses listed under the Major Crimes Act, the case cannot initially be brought in federal court.[14] In *Keeble v. United States*[15] the Supreme Court decided that a defendant can be convicted of a lesser included offense not listed in the Major Crimes Act. It held that, because Indians are entitled to be tried under the Act "in the same manner" as non-Indians committing the same crime, an Indian charged with committing a felony against an Indian victim under the Act was entitled to a lesser included offense instruction despite the absence of any independent federal jurisdiction over the lesser offense. The list of offenses in the Major Crimes Act has been further judicially extended to include firearm and conspiracy counts. Courts have held that even though firearm offenses are not listed in the Major Crimes Act, federal jurisdiction exists. Jurisdiction lies under 18 U.S.C. § 924(c) when the underlying felony, e.g., murder, was listed in the Major Crimes Act since the Act provides that the laws and penalties of the United States apply to its offenses.[16]

In conspiracy cases the government has successfully argued that conspiracy is a general law of the United States and therefore applies to Indians as well as others regardless of the location of the crime.[17] This argument, however, conflicts with the legislative history of the Major Crimes Act which allows merely two exceptions to the rule that only the crimes enumerated in the Act are subject to federal jurisdiction: (1) for crimes committed in Indian Country in those states where federal laws have ceded complete or concurrent jurisdiction to certain states; and (2) for crimes that are "peculiarly federal," such as assaulting a federal officer or defrauding the United States.[18]

As a result of the legislative history, the Second Circuit, in *United States v. Markiewicz*, concluded that not all federal statutes with general applicability apply to Indian Territories by their own force, but only those that involve a peculiarly federal interest. Therefore, under *Markiewicz*, it is not sufficient for the subject of the conspiracy to be a listed Major Crime. Rather, there must be a heightened federal interest to tie a conspiracy or an offense, such as use of a firearm to a listed Major Crime. However, the Second Circuit

EX 167 - 2212

found both firearms offenses and conspiracies aimed at obstruction of federal law enforcement interests to meet the test. This result would have harmonized the decisions in the Ninth and the Eighth Circuits involving firearm counts and conspiracy to obstruct justice with the legislative history behind the Major Crimes Act.

The Ninth Circuit, however, declined to adopt the "peculiarly federal" interest rationale. It has held that conspiracy is a crime of general applicability and the statute is "of nationwide applicability, and therefore applies equally to everyone, everywhere within the United States, including Indians in Indian Country."[19] In rejecting the *Markiewicz* approach, the Ninth Circuit found jurisdiction over an alleged conspiracy in the Major Crimes Act since its objects — kidnaping, assault and burglary — were all listed as substantive offenses in the Act.

### IV. Double Jeopardy

The principles of double jeopardy do not bar prosecution in federal court subsequent to conviction in tribal Court. As the Court explained in *United States v. Wheeler*,[20] the tribes have inherent sovereign powers which are not derived from the federal government and can therefore punish tribe members. However, they lack jurisdiction to punish crimes committed by non-Indians in Indian Country. The only exception is where a tribe retains the right to exclude non-members from its territory, the tribe can properly try a non-Indian for a tribal offense so long as the only punishment is banishment from tribal territory. Although the lack of general jurisdiction by the tribes was deemed inconsistent with their status as domestic dependent nations, the Court indicated that Congress could confer such jurisdiction. To date, Congress has not done so.

In *Duro v. Reina*,[21] the Supreme Court held that Indian tribes lack jurisdiction over Indian non-tribal members. Congress subsequently amended the Indian statutes to give tribal courts such authority.[22] "Indian" now means any person who will be considered an Indian under 18 U.S.C. § 1153.

The Eighth Circuit recently interpreted this statute. In *United States v. Weaselhead*, an Eighth Circuit panel held that the dual sovereignty exception to double jeopardy does not apply to an Indian tribe's prosecution of an Indian who belongs to a different tribe.[23] In *Weaselhead*, a tribe prosecuted a non-tribal Indian for a sexual offense. The federal authorities then brought a federal charge under the Major Crimes Act. The Eighth Circuit found that the statutory change which granted the tribes criminal jurisdiction over other Indians is neither inherent nor sovereign, but rather exists solely as authority of the United States delegated by Congress. Since the power of the

tribe to punish non-tribal Indians and the power of the federal government to charge the defendant subsequently both came from the same source — Congress — there was a double jeopardy bar. On December 4th, 1998, the Eighth Circuit granted en banc review and vacated the opinion. Subsequently, on January 29, 1999, an equally divided en banc court affirmed the district court's denial of the double jeopardy claim.

Nevertheless, the Ninth Circuit in *Means v. Northern Cheyenne Tribal Court*,[24] a habeas case, found for the petitioner who argued that a tribal prosecution of him, a non-tribal Indian, was barred. It concluded that Congress had affirmatively delegated jurisdiction to the tribes which consequently became the same sovereign as the United States with respect to non-member Indians, for double jeopardy purposes.

Under *Wheeler* and *Duro*, and following the analysis of *Means*, the following situation now exists. Two Indians are charged with committing a crime against another in Indian Country. One Indian, A, is a tribal member; the other Indian, B, is not. Both Indians are convicted in tribal court. There is no double jeopardy protection for A because his tribe has inherent sovereignty over him. B is protected by double jeopardy because the tribe has no inherent sovereignty over him; the jurisdiction to try him was conferred by Congress, as is federal jurisdiction.

### V. Sentencing
#### a. The Applicability of the Guidelines
The federal sentencing guidelines apply to crimes under the Major Crimes Act and the Assimilative Crimes Act. Courts were initially split on the issue of what sentencing law applies to those offenses (notably burglary) that are to be "defined and punished" according to state law. In 1990, Congress amended 18 U.S.C. § 3551(c) to make the guidelines applicable to all Major Crimes Act and Assimilative Act offenses.

#### b. Departures for Indian Defense
#### i. Criminal History
Under the guidelines, tribal convictions and sentences do not count in assessing criminal history points.[25] Tribal misdemeanors, however, may be considered in setting a sentence. In *Nichols v. United States*,[26] the Supreme Court held that a defendant's prior uncounseled misdemeanor convictions may be considered in subsequent sentencing so long as they did not result in a sentence of imprisonment. *Nichols* overruled a number of decisions that had barred consideration of uncounseled misdemeanors for upward departures. A court may now consider uncounseled misdemeanors for an upward departure under adequacy of criminal history, but only if no imprisonment resulted.

However, such a departure remains open to

EX 167 - 2213

challenges on the reliability of tribal convictions. Many tribal convictions are imposed without counsel or an advocate representing the defendant and occur in a court system where the protections of due process might be questioned.

### ii. Extraordinary Circumstances

The Sentencing Reform Act mandates that the Commission bear in mind the uniqueness of Indian issues. Prior to the promulgation of the guidelines the Commission was urged, at public hearings and in written submissions, to consider the special circum-stances that surround sentencing Indian offenders and to be sensitive to the tribes' sense of justice.[27] When the guidelines were finally issued, however, special consideration of Indians fell under Chapter 5H factors that were disfavored in sentencing.[28]

Nonetheless, in districts that regularly deal with Indian defendants, federal courts have recognized the uniqueness of Indian crime. In *United States v. Big Crow*, for example, the Eighth Circuit upheld the appropriateness of a downward departure, from four to two years imprisonment, in an Indian assault case.[29] The departure was based on the high rate of unemployment, alcohol abuse and socio-economic deprivations on an Indian Reservation. The question before the Court was whether the Commission had considered these dire economic straits in setting sentencing ranges. The Eighth Circuit, in affirming the departure, found that the Commission had not considered that tribal culture did not prepare tribal members to deal with devastating socio-economic difficulties found on the Reservations.

*Koon v. United States*[30] may be of special relevance in the cases of Indian defendants where unusual and extraordinary factors often take a case out of the heartland. A less restrictive use of departures may allow courts to consider the uniqueness of Indian culture in sentencing. While this is not an unprec-edented departure,[31] it may be particularly applicable to Indian offenders.

### c. Death Penalty and Three Strikes

Congressional initiatives in areas of capital punish-ment and three-strikes legislation included "opt in" provisions for the Indian tribes. These provisions allow the Indian tribes to decide whether to have the provisions applied to them. For offenses that are controlled by the Major Crimes Act and Assimilative Crimes Act, a tribe must opt in for the death penalty to apply. In spite of aggressive lobbying by law enforce-ment agencies and pressure from many U.S. Attor-neys in districts with Indian reservations, so far no Indian tribe other than the Sacanfox of Oklahoma have "opted in" to the death penalty or "three strikes" legislation under the 1994 Anti-Crime Bill.

The reasons for such reluctance are concerns about the implementation of the legislation, tribal sovereignty, Indian culture, and the tribal world view:

- Capital punishment is considered contrary to most Indian tribal cultures and religions.
- Opting in means turning over to the U.S. Attorney and Department of Justice, which are staffed with almost no Indians, the power to determine which Indians would face the death penalty.
- Indians are represented on federal court juries in extremely low numbers.
- Racial issues strongly impact the death decision. Although the death penalty statute requires the jury to certify that it did not take race into account in imposing the death penalty, in Indian cases the defendant's and often the victim's status are an element of proof to obtain federal jurisdiction. As such, the jury must expressly consider race in reaching its decision.
- Opting in would result in a potential distinction between Indian defendants, who would face the death penalty under federal jurisdiction, and non-Indian defendants who would not face a federal death penalty were the victim non-Indian.
- The death penalty is not generally a deterrent. That is especially true in alcohol-related and intra-family murders which form the great majority of homi-cides on reservations.
- The penalty for first degree murder under the federal statute is life without release.

During the congressional hearings on the 1994 Crime Bill, the Navajo Nation, the country's largest tribe, with a Reservation the size roughly of West Virginia, summarized the concerns of the Indian tribes:

> The issue, for the Navajo Nation and the other Indian tribes, is not whether the death penalty is good or bad, but whether Indian tribes should have the right to determine for themselves the severity of the punishment for major crimes committed on their Reservations. It is incumbent upon the federal government to allow Indian tribes the choice of whether the death penalty should be extended to our territory.

> Finally, the death penalty is counter to the cultural beliefs and traditions of the Navajo people who value life and place great emphasis on the restoration of harmony through restitu-tion and individual attention. The vast majority of major crimes committed on the Navajo Nation and within other Indian Reservations are precipitated by the abuse of alcohol. The death penalty will not address the root of the problem; rather rehabilitation efforts will be more effective.[32]

EX 167 - 2214

Even though all tribes but one have declined to opt in to the death penalty or three-strikes legislation, U.S. attorneys can seek the death penalty for homicides that occur under general federal criminal jurisdiction, such as the murder of a tribal police officer and killings connected to drug conspiracies that reach onto the Reservation.

## IV. Conclusion

To respect tribal sovereignty, Congress should treat tribes over which the federal government has criminal jurisdiction as distinct political entities. While some tribes may desire a strong federal law enforcement presence, for prosecution and punishment, others, especially the larger ones, may wish to prosecute and punish offenders within their own criminal justice framework. One policy cannot and should not bind all. Indeed, for tribes, such as the Navajo, that have a sophisticated police force and criminal justice system, federal presence should defer to the tribe's wishes as to the role federal law enforcement should play.

One way to accomplish this goal is to allow tribes to "opt out" of federal criminal jurisdiction. At the same time, the tribes need punishment for defendants. Any tribe that sets up its own criminal jurisdiction must train law enforcement personnel, and ensure adequate criminal justice procedures to guarantee justice for the victim and the defendant. Punishment can be set by tribal law, and reflect the special concerns of each individual tribe. For the incarceration of offenders, arrangements can be made either within the tribe or, as many jurisdictions are doing, through contracts with private jails. Such an option would allow for prosecution and punishment that are fairer and more just than what we have now because they would be more appropriate for tribal Indians.

## Notes

1. Since the major jurisdictional statutes use the term "Indian," the usage is continued here to avoid confusion. Other racially identifying terms, such as "White," are also used for this reason.
2. See generally U.S. Sentencing Commission, *1997 Sourcebook of Federal Sentencing Statistics*; U.S. Sentencing Commission, *Manslaughter Working Group Report to the Commission* (1997).
3. *1997 Sourcebook, supra* note 2; *see also* Fox Butterfield, *Indians are Crime Victims At Rate Above U.S. Average*, N.Y. TIMES, Feb. 15, 1999, at 12.
4. *Id.*
5. In later cases the Supreme Court has consistently affirmed that the Indian tribes are subject to the jurisdiction of the federal government. *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978); *United States v. Rogers*, 45 U.S. (4 How.) 567 (1846); *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543 (1823). *See generally* Felix Cohen, HANDBOOK OF FEDERAL INDIAN LAW (1982); William Canby, AMERICAN INDIAN LAW (1988); Jon M. Sands, *Indian Jurisdiction in Federal Court in* DEFENDING A FEDERAL CRIMINAL CASE ch. 20 (1998); Robert

Clinton, *Criminal Jurisdiction Over Indian Lands: A Journey Through A Jurisdictional Maze*, 18 ARIZONA L. REV. 521 (1976).
6. 45 U.S. (4 How.) 567 (1846).
7. *United States v. Antelope*, 430 U.S. 641, 648 (1977). Interestingly, in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Supreme Court held that Congress does not have the power under either the Indian Commerce Clause or the Interstate Commerce Clause to abrogate a state's Eleventh Amendment immunity from suit. In so holding, the Court implicitly rejected petitioner's argument that the abrogation of a state's sovereign immunity is "necessary to protect Indian Tribes from state action denying federally guaranteed rights." *Id.* at 60.
8. The questions of "Who is an Indian?" and "What constitutes Indian Country?" fall outside this discussion. These determinations are intensely fact-bound; significant case law exists on the matter. *See generally* Cohen, *supra* note 5; Canby, *supra* note 5.
9. 109 U.S. 556 (1883).
10. 118 U.S. 375 (1886).
11. In *United States v. Lomayaoma*, 86 F.3d 142 (9th Cir.), *cert. denied*, 117 S. Ct. 272 (1996), the Ninth Circuit upheld the constitutionality of the Major Crimes Act in the wake of a Commerce Clause challenge under *United States v. Lopez*, 514 U.S. 549 (1995).
12. *See Keeble v. United States*, 412 U.S. 205 (1973); *United States v. Young*, 936 F.2d 1050 (9th Cir. 1991); *United States v. Center*, 750 F.2d 724 (8th Cir. 1984).
13. 430 U.S. 641, 648 (1977).
14. *See Keeble v. United States*, 412 U.S. 205 (1973); *United States v. Narcia*, 776 F. Supp. 491, 494 (D. Ariz. 1991).
15. 412 U.S. 205 (1973).
16. *See United States v. Laughing*, 855 F.2d 659 (9th Cir. 1988); *United States v. Goodface*, 835 F.2d 1233 (8th Cir. 1987).
17. *See, e.g., United States v. Dodge*, 538 F.2d 770, 776 (8th Cir. 1976), *cert. denied*, 429 U.S. 1099 (1977).
18. *See United States v. Markiewicz*, 978 F.2d 786, 799-800 (2d Cir. 1992), *cert. denied*, 506 U.S. 1083 (1993).
19. *United States v. Begay*, 482 F.3d 486, 499 (9th Cir. 1994).
20. 435 U.S. 313 (1970).
21. 495 U.S. 676 (1990).
22. *See* 25 U.S.C. § 1301(4).
23. 156 F.3d 818 (8th Cir. 1998), en banc review granted and opinion vacated, Dec. 4, 1998, district court affirmed by equally divided en banc court, 1999 WL 49096 (8th Cir. 1999).
24. 154 F.3d 941 (9th Cir. 1998).
25. U.S.S.G. § 4A1.2(i).
26. 511 U.S. 738 (1994).
27. *See, e.g.*, Tova Indritz, Testimony before U.S. Sentencing Commission, Denver, CO (Nov. 5, 1986); Letter from Fredric F. Kay, Federal Public Defender, Dist. of Arizona, to the Hon. William W. Wilkins, Chair, U.S.S.C. (Aug. 9, 1989). *See generally* Jon M. Sands, *Departure Reform and Indian Crimes: Reading the Commission's Staff Paper With "Reservations"*, 9 FED. SENT. R. 144, 145 (1996).
28. *See* Sands, *supra* note 27.
29. 898 F.2d 1326 (8th Cir. 1990).
30. 518 U.S. 81 (1996).
31. Courts have used cultural differences as grounds for departure in atypical cases. *See, e.g., United States v. Sherpa*, 97 F.3d 1239 (9th Cir. 1996) (consideration of "the defendant's Buddhist beliefs in reincarnation and punishment for simple acts, lack of knowledge of Western culture or of drug trafficking among the Nepali, and a neighborly obligation in Sherpa culture"); *United States v. Valdez-Gonzalez*, 957 F.2d 643 (9th Cir. 1992) (permitting

EX 167 - 2215

consideration of the social, economic and international
politics of the drug trade along the Mexican border for
downward departure); *United States v. Swapp*, 719 F. Supp
1015 (D. Utah 1989) (unique cultural history of religious
extremist group allows departure).

[32] *Crime Prevention and Criminal Justice Reform Act of 1994:
Hearings on H.R. 3315 before the Subcomm. on Crime and
Criminal Justice of House Judiciary Comm.*, 103d Cong., 2d
Sess. (Feb. 22, 1994) (statement of Helen Elaine Avalos,
Assistant Attorney General, Navajo Dept. of Justice, on
behalf of Peterson Zah, President of the Navajo Nation)
(1994 WL 14168801, at 17). This view recently was
reaffirmed in a letter from the Navajo Attorney General
opposing the federal government's seeking of the death
penalty against a Navajo. Letter from Herb Yuzzie, Attorney
General, Navajo Dept. of Justice & Donovan D. Brown, Sr.,
Acting Chief Prosecutor, Navajo Dept. of Justice to John J.
Kelly, U.S. Attorney, Dist. of New Mexico (Oct. 23, 1998)
("The Navajo people overwhelmingly oppose the death
penalty.")

*State and Federal Prosecutions of Domestic Violence,
continued from page 162*

[27] *See* Jennifer L. Bradfield, *Anti-Stalking Laws: Do They
Adequately Protect Stalking Victims*, 21 HARV. WOMEN'S L.J.
229 n. 80 (1998). In 1993, only Alabama, Arkansas,
Delaware, Illinois, and Massachusetts classified a first
offense of stalking as a felony. *See* Salame, *supra* note 11,
at 76. Many states classify aggravated forms of stalking,
such as second offenses or stalking in violation of a
protection in order, as felonies. *See, e.g.*, Cal. Penal Code §
646.9.

[28] United States Attorney's Manual 9-60.1100; 18 U.S.C. §
2263. The other factors to be considered are (1) if the
interstate nature of the offense makes it difficult for law
enforcement to investigate, and (2) the potential release of
the defendant on bond in States without pretrial detention
status.

[29] Many local prosecutors have adopted "no drop" policies
for domestic violence cases. *See* Hanna, *The Paradox of
Hope, supra* note 12, at 1521 n.52; Gena L. Durham, Note,
*The Domestic Violence Dilemma: How Our Ineffective And
Varied Responses Reflect Our Conflicted View Of The
Problem*, 71 S. CAL. L. REV. 641, 650 (1998).

[30] *See* U.S.S.G. § 2A6.2.

EX 167 - 2216

# EXHIBIT 168

# RESOLUTION
## OF THE
## DINEH MEDICINE ASSOCIATION, INCORPORATED

RESOLUTION SUPPORTING THE DINEH MEDICINE ASSOCIATION, INCORPORATED "POSITION PAPER" DATED SEPTEMBER 2ND, 2003 WHICH WAS READ IN ENGLISH AND TRANSLATED INTO THE DINEH LANGUAGE DURING A DULY CALLED MEETING OF THE DINEH MEDICINE ASSOCIATION (DMAI) ON SEPTEMBER 2ND, 2003. THE DINEH MEDICINE ASSOCIATION "DO NOT SUPPORT THE DEATH PENALTY", IT SUPPORTS LIFE AND HOZHO NAHADŁEE'. IT SUPPORTS THE ATTACHED POSITION PAPER MARKED AS EXHIBIT "A". THIS IS IN RESPONSE TO THE AUGUST 28, 2003 MEMORANDUM OF THE CHAIRPERSON OF THE PUBLIC SAFETY COMMITTEE AND THE GENERAL DIRECTION OUR LEADERSHIP IS LEADING TOWARD. THE POSITION PAPER MAKES IT CLEAR AS TO OUR PURPOSE AND FUNCTION AS TRADITIONAL PEOPLE OF THE GREAT NAVAJO NATION.

**WHEREAS:**

1.    The Medicine Association, Incorporated has been in association to discuss matters of this nature and seeks to be heard about these matters among other matters relater to our traditions and cultural ways which we have responsibility to protect, promote, perpetuate and to preserve, and;

2.    This Association is providing this position and guidance as the official position of the medicine people of the Navajo Nation, and;

3.    We direct this be provided to the Navajo Nation President, The Navajo Nation Speaker, the Navajo Nation Chief Justice and the Dineh at large about our position, and;

4.    We will continue to provide guidance and our Positions concerning the

EX 168 - 2217

Dineh per authority in Dineh Traditional Laws, Dineh Customary Laws, Dineh Natural Laws and Dineh Common Laws (CN-69-02), and;

5.    We acknowledge the existence of the new Laws of the Navajo Nation per CN-69-02 and we are appreciative of the recognition of our Dineh Cultural and Traditional ways.

NOW THEREFORE BE IT RESOLVED:

1.    THE DINEH MEDICINE ASSOCIATION, hereby provides this "Position Paper" and provides information for the guidance of our leaders, the people and the Medicine Peoples of the Dineh. We have captured our thoughts and traditional laws in the Attached "Position Paper" marked as "EXHIBIT A".

2.    We direct the President, the Speaker and the Chief Justice to include this matter of our Position Paper, our sacred voice and mind to be heard and involved in the matters concerning our people.

3.    We direct this Position Paper to be made Public Knowledge.

CERTIFICATION

    I do herby certify that the forgoing resolution was duly called meeting in Window Rock, Navajo Nation (Arizona) at which a quorum was present and that the same was passed by a vote of 32 in favor, 0 opposed and 0 abstained, this 2nd day of September 2003.

Thomas Morris, President of the DMAI

Sammie Slivers, Sr. Vice President of the DMAI

Anthony Lee, Secretary of the DMAI

Motion: Henry Albert Yazzie
Second: Norris Nez

EXHIBIT "A"

# POSITION PAPER

of the

## DINEH MEDICINE ASSOCIATION, INCORPORATED

—————— – ——————

# "Death Penalty on the Navajo Nation"

1.    The Dineh Medicine Association, Incorporated (DMAI) is a group of Dineh individuals, Healing Practitioners, Traditional Helpers and Apprentices and their healthy families who have formed as an entity for the Purpose of Protecting, Promoting, Preserving, Perpetuating the Dineh Traditional Philosophy and Teachings of the Dineh Practice of Medicine and Healing, Traditional Law and Keeping the Integrity of the System of Healing and Peace using the time proven traditional strategies.

2.    The Association's position is to practice and promote many positive Dineh issues pertaining to Life, Liberty and the Pursuit of happiness. In all of our strategies and in the practice of traditional healing, it involves the perpetuation of a good and healthy life, the accumulation and use of our positive intellectual properties, the accumulation and use of durable goods, the regeneration of goodness. This establishes us to be an entity of healing, compassion, forgiveness, humility, the reforming and recreation of wayward beings or relative who need healing not punishment. Our strategy of healing goes to the negative inner spirit of beings who are displaying overt manifestations of needing healing. This is of paramount importance, we are healers and stand firm on healing. Nothing in our traditional laws give us direction and procedures for killing our own as a punishment to correct behavior which is not ours. Behavior which is not ours is the opportunity to heal again and to allow the wrong doer to redeem self to society. We want to destroy the bad spirit, the evil intentions, the

1

DMAI: Position Paper - <u>Death Penalty on the Navajo Nation</u> malformed

reason and bad conduct. We do not kill the physical being, it is not our place as Dineh. There are other beings who may have that capacity and we do not promote the killing of others.

3.    In all matters of the use of the Warrior Way, it involves the extraction of negative forces away from the person who outwardly displays aggression to our own. It is usually considered to be a point in time for healing of that person, their inner spirit, their body and their psychology. It is not a point of destroying the Physical Being who displays the manifestations of conduct contrary to the Dineh societal norms and expectations. When the spirit who becomes negatively overt in its conduct, it is then a time to evaluate the deep rooted causes which may be a Sacred cause, a physical or psychological imbalance. This is the places the Medicine People would look to find the probable causes for the overt conduct which negatively affects Dineh society. The medicine people are for healing our people and others who may be sincere in healing. However, other cultures will directed to find healing within their own society as a first strategy.

4.    Another powerful force at work is the natural affects on waywardness, and contrary conduct. It is the negative force of the Creator to extract, destroy that which is not in the good interest of Dineh society, we have been created for goodness. This negative force is the domain of destruction is best left to the Creator and in it's power and wisdom.

5.    Another powerful force is the spirit and ability of man's codified law, which is not that of the Dineh. We understand that those laws designed by others who are not Dineh and are formulated laws to control societies by implying they can control the conduct of their people by the use of a "Death Penalty". History has indicated this does not work as a deterrent or prevention. As medicine people of the Dineh, and as Dineh we are in a position to advocate only for Life and healing. The "Penalty of Death" is best to be left to the beings who strongly use such measures. It is not a part of our society to use goodness to Kill

2

EX 168 - 2220

DMAI: Position Paper - <u>Death Penalty on the Navajo Nation</u>

another. Death is employed by those beings who disassociate, who become detached, unlinked from the teaching of relatedness, respect and responsibility. They act on their own when they become to the point of Destruction of self and others.

6.   The greatest tool at our disposal is the healing effects of Traditional Education, the promotion of Respect, Responsibility and the formation of Proper Relationships with one another as the Dineh. This is the qualities of the Dineh K'eh process. Nowhere, in our healing strategies, does it say we are to Kill and destroy one another. Instead it describes the methods and strategies of healing. Death and destruction are the teachings of punishment, which are not ours, and ought to be left outside of our domain and jurisdiction, outside of our Four Sacred Mountains. This is the position of the Dineh Medicine People.

7.   The Federal Laws and State Codified Statues already exist for those things which involve the "Death Penalty". Creating a Death Penalty for ourselves will not Sophisticate or make us "Civilized", it is an exercise of creating still yet another proverbial monster for ourselves. The Death Penalty is their own, not ours, self-imposed responsibility. It has no real positive educational qualities, it employs fear, and fear employs ignorance. We feel that ignorance and fear breed oppression and as a traditional people we experience that from codified laws. We cannot be reasonable beings if we cannot find the proper strategies within our own tradition, values and ways. We do not want to put on a cloak which does not fit us.

8.   We advise our Legislators and Leaders to look to the healing qualities of our people instead of the perpetuation of death and destruction. What is it that makes the traditional people a real strong force of Traditional Government who still function to heal outside of codification of Law. We do not need more laws, we need to realistically employ what we already have, to redirect the energies for healing and not for punishment and oppression. There are lessons to be learned and to be taught. We are and always have been postured to help. As we

3

EX 168 - 2221

DMAI: Position Paper - <u>Death Penalty on the Navajo Nation</u>

speak, at this moment, there is healing going on at someone's home or family. This is a powerful force which cannot be captured nor regulated by man. We can only be instruments of the power of healing.

9.     Additionally, the new law based on Navajo Council Resolution "CN-69-02" : NNC Title 1, Chapter 1, Sections 1-6 General Provisions, The Foundations of the Dineh, Dineh Law and Dineh Government", is the Law of this Land, within our Rainbow (Sovereignty) and we must always participate and be included to issues pertaining to us as keepers and practitioners of Dineh Traditions, Culture and Laws. However, we do not promote "Punishment" (NNC Title 1, Ch. 1, § 3,E), that is up to the Courts of the Navajo Nation, we give strong caution not to punish but to heal. We would like to be the Organization to be the firt to be considered for the implimentation of the "Security Branch" of this Government, per NNC Title 3, §3,F.

This position paper postures itself from a traditional approach in its content, verbiage and spirit. This is one of many topics which concern traditional Dineh. We will continue, by these tools, to reflect the collectve Position of the Traditional Dineh in issues which directly affect the lives of every Dineh person. We do this with sincerity and genuine concern that our Elected form of Government has not ,in the past, been cognizant of traditional people, their desires to be included and not be excluded. We genuinely know the intimacies of Traditional Government and our practical use of them on a daily basis. This is our life and purpose.

This position is formed from approximately 4 years of intimate and public discussion among the Dineh Medicine people. We must honestly say there are those who have opinion and practice which may be not completely congruent to the majority opinion. We consider these to be opportunities to apply traditional laws and healing strategies. It reflects the general feeling and desires of a traditional sector of Dineh Society who continues to exist, wants to and has asked to participate in

4

DMAI: Position Paper - <u>Death Penalty on the Navajo Nation</u>

all matters of Dineh self government. We understand and realize the power and methodologies of the imposed form of government and we want to provide good, beneficial traditionally original alternatives to what is deemed to be not functional.

We the Undersigned attest to this and create this Paper to be heard, to be considered, to participate and to heal the Dineh Society.

Signed and attested to on September 02, 2003.

_Thomas Morris_

Thomas Morris, President - DMAI

_Sammie Slivers_

Sammie Slivers, Sr. Vice President - DMAI

_Unavailable for Signature_

Anthony Lee, Secretary - DMAI

WITNESSED AND OBSERVED BY
PHILMER BLUEHOUSE, MEMBER-DMAI

Sept. 2, 2003 BLUEHOUSE

5

EX 168 - 2223

# EXHIBIT 169

SUPPLEMENTAL DECLARATION
OF HILARY N. WEAVER, D.S.W.

1. My name is Hilary N. Weaver; I am a Doctor of Social Welfare. I am a professor of social work with expertise in cultural issues in the counseling process, with a particular emphasis on Native Americans.

2. I previously submitted a declaration on behalf of Lezmond Mitchell, identified as Exhibit 143 in his case, No. CV 09-8089. A copy of my curriculum vitae is attached to my first declaration as Attachment A; my education, publications and professional experience have not substantially changed since I submitted my first declaration in November of 2009.

3. In reaching my professional opinion, I have reviewed additional evidence to that which I reviewed prior to my first declaration. A true and correct copy of the listed materials I reviewed is attached as Exhibit A to this declaration.

4. Additional information pertinent to Lezmond Mitchell's social history has been discovered since the filing of my first declaration. As noted in that declaration, Lezmond Mitchell's maternal grandfather, George Mitchell was one of three people with strong shaping influences on Lezmond's life. The suspicions of child molestation noted in my first declaration have been validated by newly obtained information.

1

EX 169 - 2224

5. Bobbi Jo Mitchell is George Mitchell's wife, thus, she is Lezmond's grandmother. Floyd Graham, Bobbi Jo's younger half-brother, lived with George, Bobbi Jo and Sherry Mitchell, Lezmond's mother, when Floyd was a teenager; Sherry was a child during this time. In 1964, while Floyd was living with the Mitchell household, he regularly provided child care for a three year old neighbor girl [not Sherry]. One evening Floyd left the neighbor girl in George's care, in order to attend his high school prom. The day following the prom, Bobbi Jo Mitchell was extremely upset with Floyd. She blamed Floyd for giving George the opportunity to sexually molest the three year old child. "Bobbi Jo said that if I hadn't gone to the prom, the little girl and George wouldn't have ended up together alone. Bobbi Jo let me know that George did something sexual to the little girl. I could not understand why Bobbi Jo could hold me responsible for something her husband did to a little girl." [Exhibit 155, ¶10.] Floyd recalls that, after this incident, George was transferred to teach at another school district the next school year. [Exhibit 155, ¶10.]

6. Perhaps most telling about this exchange between Bobbi Jo and Floyd Graham, is Bobbi Jo's statement reflecting her knowledge that George was a sexual predator who could not be trusted when small children were left alone with him.

EX 169 - 2225

7. George Mitchell molested other children as well. Floyd Graham's sister, Mary Lee Alice Reed, was also molested by George. Floyd Graham recalls that, "[t]he incident in Tuba City [with the three year old neighbor girl] came to mind when years later my sister, Mary Lee, said that George Mitchell molested her when she was eight or nine years old." Floyd realized George molested his sister at about the same time her behavior changed radically, "...as though the light just left her." The change in Mary Lee following the molestation was so drastic that her family remarked on the difference. [Exhibit 155, ¶11.]

8. Mary Lee confirmed that she sometimes stayed with her half-sister, Bobbi Jo Mitchell, and Bobbi Jo's husband, George. Before their daughter, Sherry, was born Mary Lee visited Bobbi Jo and George in Chilocco. Mary Lee stated, "I recall feeling very uncomfortable with George, who kept looking at me." [Exhibit 160, ¶7.]

9. Mary Lee points out Bobbi Jo's questionable judgment; on at least one occasion, Bobbi Jo left her ten year old brother, Billy, in charge of Bobbi Jo's baby daughter, Sherry. Sherry was just two or three weeks old at the time. Billy wanted to play outside and passed the care of the young infant to six year old Mary Lee. It is another instance when the behavior of the adults in the Mitchell household put children at risk. [Exhibit 160, ¶6.]

3

10. When Mary Lee was nine years old, she stayed with Bobbi Jo, George and Sherry Mitchell in their apartment in Arkansas City. A bed was made up on the couch for Mary Lee. Mary Lee went to sleep, but woke up when she felt someone touching her. "It was George, who was rubbing my vagina. I felt him insert his finger in me all the while whispering to me, 'Doesn't it feel good?' When George went back to his bedroom, I went into the bathroom and took the hottest bath I could stand. The water was so hot it scalded my skin. I stayed in the bathroom for a long time, I couldn't stop crying. While I was in the tub, George knocked on the door and asked me if I was okay. I told him to go away." [Exhibit 160, ¶9.]

11. Due to the small size of the Mitchell's apartment and because Mary Lee could see Bobbi Jo in her bedroom while George molested her, Mary Lee believes Bobbi Jo knew of the molestation as it happened, and did nothing in response. [Exhibit 160, ¶10.]

12. The next day, three year old Sherry, sat with nine year old Mary Lee and tried to comfort her by patting her leg and telling her "it's okay, it's okay." Later, Sherry screamed at her parents at the top of her lungs, "I hate you! I hate you!" George and Bobbi Jo ignored her, while tossing a ball back and forth as though nothing had happened. [Exhibit 160, ¶ 13] This attempt on a three year old's part

4

to provide solace to Mary Lee, strongly suggests that Sherry understood that something terrible had happened to Mary Lee. It seems that at least Bobbi Jo knew George molested Mary Lee. [Exhibit 160, ¶13.] Like so many survivors of sexual assault, Mary Lee carried feelings of shame, guilt and dirtiness for years.[1] These feelings washed over her unpredictably, triggered by seemingly normal events, such as sitting as a white couch which prompted Mary Lee to worry about staining the fabric. [Exhibit 160, ¶12.]

13. Johnny Grey, Jr. has lived his entire life in Chilchinbeto, Arizona. He attended Chilchinbeto Community School through elementary and junior high school, when George Mitchell was the principal there. In 1986, Johnny attended high school in Rough Rock while still living in Chilchinbeto. During that school year, Johnny remembers hearing from his mother, one of his teachers, and others in the community that George Mitchell was fired from his position as school principal because he had molested a student. [Exhibit 156, ¶¶2-4.]

14. George's behavior came to the attention of people outside his immediate family. Willie Nez, past-president of the Chilchinbeto School Board, recalls complaints filed in the mid-1980s against George by parents of school children.

---

[1] Parsons, Erwin R., Bannon, Luerena K. (2004); Stress Responses in Sexual Trauma Victims and in Others Experiencing Overwhelming Events. *Incidents of Sexual Abuse*, 3-4).

EX 169 - 2228

(This was apparently before George was fired, as noted by Mr. Grey.)  Mr. Nez does not recall the substance of the complaints of thirty years ago against George. He does remember that George left the school district shortly after the complaints were filed.  [Exhibit 159, ¶¶2-3.]

15.  James Laughter, a life-long resident of the Navajo reservation and the Vice President of the Chapter House at Chilchinbeto also recalls that in 1985 or 1986, two community members brought complaints against George to the Chapter House Board members.  Similarly, James Laughter no longer recalls the specifics of those complaints, but does recall that the charges were serious.  Mr. Laughter reports that the Chapter House and Chilchinbeto School Board removed George from his position as school principal.  George's contract was paid off and he was asked to leave the community.  [Declaration of James Laughter, Exhibit 158, ¶¶2-3.]

16.  Neither Mr. Nez nor Mr. Laughter, now elderly men, were able to detail the charges against George Mitchell.  However the charges were serious enough to terminate George's employment contract and for the leaders of the Chapter House to ask him to leave the community.  The recollections about the charges from varied and multiple sources, coupled with the earlier instances of child molestation and George's continued involvement with children, suggest that George's sexual

6

misconduct continued.

17. As I discussed in my previous declaration, during Lezmond's childhood he was often left to live with George Mitchell. There are multiple indicators that George had an ongoing pattern of molesting young children; indeed, it is known that child molesters are recidivists, even those who do receive incarceration or treatment for their criminal behavior. Child molestation is terrifying and traumatic for the victim, usually leaving life long scars. Lezmond lived under the care of a man that molested multiple children over the course of at least several years. Throughout her childhood, Lezmond's mother, Sherry, was subjected to sexually suggestive behavior by her father and likely molested by him. George was not only sexually assaulting children outside his family, he was sexually inappropriate within his immediate family. George was a man who indulged himself sexually, without regard for boundaries, biology or the age of his victims.

18. While Lezmond moved frequently during his lifetime, being Navajo was his identity. As an enrolled member of the Navajo Nation, Lezmond's blood quantum is documented as one-quarter Navajo. This in itself can be somewhat misleading as blood quantum and cultural identity are not synonymous. Identity is largely shaped by the social environment of the individual and the perceptions of others. Lezmond is one-half Marshallese through his father's bloodline, yet

7

EX 169 - 2230

Lezmond knows nothing of the Marshall Islands and indeed, has never met anyone from that side of his family. He has had no exposure to the Marshallese culture, therefore it had no shaping influence on Lezmond's identity.

19. Lezmond is also one-quarter White through his grandmother Bobbi Jo's lineage. It appears she adapted as much as possible to a Native American cultural context and later even claimed some vague connection to a Native American bloodline as well. While Lezmond spent some time living outside the Navajo reservation in predominantly non-Native contexts, he does not appear to have assimilated into a mainstream White environment. Accounts of his time in California suggest that Lezmond felt he did not fit in there because he was neither White nor Hispanic. Phenotypically, Lezmond clearly does not present as White. The only aspect of his identity left for Lezmond to connect with is being Navajo.

20. As a Navajo, Lezmond experienced painful alienation because he was not fluent in the language and did not grow up immersed in the culture. (This aspect is peculiar since George, who became and remained Lezmond's primary caretaker, taught Navajo culture at the school.) Nevertheless, though out his life Lezmond participated in Navajo traditional ceremonies both attending with family members as a child and on his own in later years. The Native American Church belief system has always been and remains significant to Lezmond. Likewise, he

8

espouses a clear and unwavering belief in witchcraft as it is defined within the Navajo belief system.

21. I have previously discussed the enormous influence the various Mitchell family conflicts had on Lezmond. He had a childhood of instability, with a combination of physical moves and a nearly constantly changing constellation of care givers. Lezmond was the target of adult behavior intended to shame, humiliate and isolate him. The adults around Lezmond put themselves and their personal needs first, to his detriment throughout his life. Finally, Lezmond's mother and grandmother knowingly gave up his care for extended periods of time to his grandfather, a man whom they knew sexually preyed on children.

22. George Mitchell sexually assaulted children over a period of many years. His behavior was known in the communities in which he lived, brought to the Chapter House board's attention in at least one community, resulting in George losing his job and his family being asked to leave the area. His behavior was known by his wife, Bobbi Jo, who did nothing to protect the children around him, but chose to blame others for allowing George "access" to these children. It appears she allowed George to molest children in her home, and did nothing to protect her own daughter, Sherry, from George's assaults. In that environment Lezmond had not a single family member he could count on, no one who took his

9

EX 169 - 2232

personal safety and well-being as their responsibility.

23. Lezmond lived many of his formative years in a community that experienced a high rate of violence, substance abuse and trauma. Lezmond had a near death experience when he was in high school and survived a car accident that killed the driver, Jeremy Gorman [Exhibit 162]. Drug and alcohol use were rampant in a community that outlawed alcohol sales within its borders. Lezmond's own drug use escalated following his graduation from high school, primarily as a means of escape from the chaos that permeated his life.

24. Lezmond's behaviors in the instance offense are anathema to traditional Navajo beliefs about balance, harmony, and how life should be lived. Nonetheless, Lezmond's life still fits well within the Navajo explanatory framework. As stated in the Resolution of the Dineh Medicine Association, "Death is employed by those beings who dissociate, who become detached, unlinked from the teaching of relatedness, respect and responsibility." [Exhibit 168 Lezmond's fragmented and trauma-filled life was indeed disconnected in this way.

25. The Navajo Nation is a nation with a rich cultural heritage, and yet Lezmond was never given the tools to fully draw from it both strength and identity. George was a full-blooded Navajo, fluent in the language, who could have passed the richness and grounding of his culture to Lezmond and did not. Whether it was

10

George's lack of interest in helping shape Lezmond, or George's own self indulgence that kept him from teaching Lezmond about their culture, isn't clear. What is clear is that while Lezmond identifies as Navajo, he was given little help in preparing to live as a functioning adult in any context, including within his own Navajo cultural context.

I declare under the penalty of perjury the foregoing is true and correct.

Signed this ___20___ day of October, 2010.

Hilary N. Weaver

11

Documents Reviewed by Hilary N. Weaver for the Supplemental Declaration:

Exhibit 155.  Declaration of Floyd Dale Graham, 5/15/2010

Exhibit 156.  Declaration of Johnny Grey, 4/29/2010

Exhibit 158.  Declaration of James Laughter, 4/29/2010

Exhibit 159.  Declaration of Willie Nez, 4/29/2010

Exhibit 160.  Declaration of Mary Lee Alice Reed, 5/6/2010

Exhibit 162.  Declaration of Bryant Wilson, 3/12/2010

Exhibit168.  Resolution of Dineh Medicine Association.