*UNITED STATES v. LEZMOND CHARLES MITCHELL*
CV09-8089-PCT-MHM(MEA)

EXHIBITS 170-171 IN SUPPORT OF
MOTION TO ALTER OR AMEND JUDGMENT PURSUANT TO RULE 59(e) OF
THE FEDERAL RULES OF CIVIL PROCEDURE

170.   Declaration of Kathleen Bowman, Esq., 10/29/2010

171.   Declaration of Monica Giner, 11/02/2010

# EXHIBIT 170

## DECLARATION OF KATHLEEN BOWMAN, ESQ.

I, Kathleen Bowman, Esq., declare, under penalty of perjury as follows:

1.     I am an attorney duly licensed to practice law in the state of Arizona. I received my Juris Doctorate from Arizona State University and I was admitted to the State Bar of Arizona on October 25, 1986.  In 1993, the Government of the Navajo Nation formed its first public defender office.  I worked with the Navajo Nation to form this office and I was named the first Public Defender of the Navajo Nation.  I have been the Public Defender for the Navajo Nation for 17 years.

2.     I have spent my legal career focused on criminal defense, and for the past 17 years have focused exclusively on criminal defense in Navajo courts.  I have represented literally hundreds of Navajo men and women and have tried numerous cases in the Navajo courts.  In addition to my trial caseload, I handle appellate matters and have argued in front of the Supreme Court of the Navajo Nation several times.

3.     I was familiar with Lezmond Mitchell's case as his trial and conviction was a major event in the Navajo community given the fact that the United States government was considering the death penalty.  I was not consulted about this case, however, until habeas counsel for Mr. Mitchell approached me

1

_KB_

with questions about Navajo criminal procedure.

4.      I have reviewed the relevant portions of Mr. Mitchell's post-conviction motion filed under 28 U.S.C. § 2255 and the relevant accompanying records.  Post-conviction counsel also provided me with several other documents, which I have listed in full in the attached addendum.  Based on my review, I understand the facts of Mr. Mitchell's arrest, as alleged by Mr. Mitchell, to be as follows:

5.      On or about September 12, 2001, Navajo Nation investigators questioned Mr. Mitchell about a criminal offense.  It was apparently determined that Mr. Mitchell had no involvement in this offense.  At some point, however, the investigators allegedly locked Mr. Mitchell in a police truck for an extended period of time.  At some point, Mr. Mitchell began kicking the door of the car.  The Navajo Nation investigators arrested Mr. Mitchell for criminal damage of tribal property, in violation of 17 NNC § 380.A.1, a misdemeanor.  The records indicate Mr. Mitchell was subsequently released on his own recognizance.

6.      On November 4, 2001, early in the morning, FBI and Navajo Nation agents arrested Mitchell, pursuant to a tribal arrest warrant for armed robbery, at Daisy Nakai's house, in Round Rock.  Some combination of federal and tribal law

2

KB

enforcement agents then transported Mr. Mitchell to the Navajo Nation's custodial facilities in Chinle, Arizona.

7.    At about noon on November 4, 2001, Special Agent Raymond Duncan of the FBI began the first interrogation of Mr. Mitchell.  At about 2:50 p.m. on November 4, Mr. Mitchell waived his Miranda rights.  His interrogation lasted for at least 25 minutes.  The FBI then administered a polygraph examination to Mr. Mitchell.  Federal and Navajo Nation agents continued to interrogate Mr. Mitchell until the early morning of November 5.  Mr. Mitchell's interrogations lasted at least twelve hours.

8.    On November 5, 2001, after noon, Navajo Nation investigators drove Mr. Mitchell, allegedly at his direction, toward the location of the victims' bodies in Tsaile.  Once at the scene, an FBI special agent interrogated Mr. Mitchell.  Eventually, the federal and Navajo Nation agents returned Mr. Mitchell to the Chinle jail.

9.    Also on November 5, 2001, Jason Kinlicheenie appeared in the Navajo Court and pled guilty to one count of armed robbery in connection with the Trading Post robbery committed on October 31, 2001.  Mr. Kinlicheenie, Mr. Mitchell, and Mr. Nakai were subsequently all convicted in federal court of this

3

KB

offense.

10.    I am informed that there is no Navajo Nation case file regarding the armed robbery charge with respect to Mr. Mitchell.  I note that there is no record of any conviction suffered by Mr. Mitchell in any Navajo Court for armed robbery. It appears Navajo Nation prosecutors dropped the robbery charge, or otherwise did not pursue it.

11.    On November 7, 2001, Mr. Mitchell appeared in the Navajo Nation Court in relation to the misdemeanor criminal damage charge.  The Ninth Circuit opinion indicates that, at some point, the Navajo Nation court allegedly appointed an advocate (a lay person) to represent Mr. Mitchell on its charges.[1] *United States v. Mitchell*, 502 F.3d 931, 960 n.3 (9th Cir. 2007).  The records indicate that Mr. Mitchell pled guilty to this offense.  Mr. Mitchell was remanded into custody pending a sentencing hearing.  The records do not reflect that other tribal charges were pending against Lezmond Mitchell at this time.  The Navajo Nation transferred Mr. Mitchell to its jail in Window Rock, Arizona pending sentencing.

12.    On November 29, 2001, federal agents took Mr. Mitchell from the Navajo jail where he was still awaiting sentencing, and transported him to the

---

[1]Counsel for Mr. Mitchell indicates to me that they have found nothing that confirms the Ninth Circuit's belief that Mr. Mitchell was appointed an advocate.

*KB*

KB

4

federal courthouse in Flagstaff, Arizona to charge him with a series of federal offenses including the murders of Tiffany Lee and Alice Slim, and the Trading Post robbery.

13.   After arriving at the federal court in Flagstaff, the federal agents interrogated Mr. Mitchell again concerning the murders of Tiffany Lee and Alice Slim.  At 12:56 p.m., Mr. Mitchell waived his Miranda rights and provided a full confession.  Immediately after this interrogation, Mr. Mitchell made his initial appearance in federal court and was appointed counsel.

14.   From January 30-31, 2003, this Court conducted a pre-trial hearing concerning Mr. Mitchell and Mr. Orsinger's post-arrest statements.  This Court then conducted a second pre-trial hearing on whether the federal and Navajo Nation officials collaborated to deprive Mr. Mitchell of his federal procedural rights.  *Mitchell*, 502 F.3d at 960.  Based upon the testimony of the federal and tribal agents, this Court found that Mitchell was arrested on tribal charges because there was "insufficient evidence" to arrest him on federal charges.  *Id.* at 961.

15.   Counsel for Mr. Mitchell has asked me, as an expert on Navajo criminal law and procedure, to address four questions related to Mr. Mitchell's arrest, incarceration, and the federal agents' involvement in the Navajo Nation's

5

*KB*
_____
KB

investigation and prosecution.

**(1) Was Mr. Mitchell's extended detention (November 7-November 29) in tribal custody valid under tribal law?**

16. According to the Judgment and Mittimus filed in the District Court of the Navajo Nation, Mr. Mitchell pled guilty to one charge of criminal damage in violation of 17 N.N.C. § 380.A.1. This document indicates that sentencing was deferred until a sentencing hearing could take place. The next filing in tribal court in this case seems to have been an order of indefinite continuance of Mr. Mitchell's case on January 24, 2002 stating that Mr. Mitchell was in federal custody. This latter filling leads me to believe that no sentencing hearing was ever scheduled for Mr. Mitchell.

17. Regardless, the question of the legality of Mr. Mitchell's detention depends entirely on the offense upon which he was convicted. In this case, Mr. Mitchell was convicted of violating 17 N.N.C. § 380.A.1. The penalty for a violation of this code section is laid out in 17 N.N.C. § 380.B and provides:

1. The trial court shall review all charges to ascertain whether there is a personal victim of the offense(s) and whether restitution or nályééh shall be paid to the

_KB_
KB

6

EX 170 - 2241

victim(s).

2.     The trial court may utilize the services of the Navajo Peacemaker Court to determine nályééh and make a sentencing recommendation regarding that sentence, and the trial court may require the defendant to pay the fee of the peacemaker.

3.     The trial court may consider the imposition of a peace or security bond upon the defendant, including the pledges of family or clan sureties.

4.     Upon the imposition of a bond or security pledges, the district Office of Probation and Parole shall counsel the sureties of the consequences of breach of the bond or pledge.

5.     The trial court shall consider the utility of labor or community service sentences, under the supervision of the Navajo Nation Department of Public Safety or a public or private organization, including the chapter in which the defendant resides.

*KB*

KB

EX 170 - 2242

17 N.N.C. § 380.B does not provide for any jail term for a conviction of 17 N.N.C. § 380.A.1.

18.    An individual in a Navajo court may only be punished in a manner consistent with Navajo law. A punishment in addition to that recognized by the law is cruel and unusual punishment and violates the Navajo Bill of Rights. *See* 1 N.N.C. § 9; *Martin v. Antone*, No. Sc-CV-48-02, slip. op at 2 (Navajo Supreme Court, August 13, 2003).[2]

19.    I conclude that Mr. Mitchell's incarceration from November 7 until November 29, when he was taken from tribal custody by federal agents, violated Navajo law.

### (2)    What is the significance of the tribal prosecutors not pursuing Mr. Mitchell's robbery charge?

20.    Post-conviction counsel for Mr. Mitchell has represented to me that Mr. Mitchell was arrested for armed robbery, presumably related to the Trading Post robbery for which Mr. Mitchell was ultimately convicted in federal court. Counsel has further represented that, despite their diligent efforts, they have been

---

[2] It is my understanding that keeping a criminal defendant in custody after the lawful basis for incarceration expires is also a violation of federal law. *McNeil v. Dir., Patuxent Inst.*, 407 U.S. 245, 246, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

8                                                    KB

unable to procure a copy of this warrant.  In answering this question, I will assume counsel's representation is accurate.

21.    Armed robbery is considered a much more serious offense in the Navajo criminal justice system than criminal damage.  Indeed, looking at the penalties for robbery and armed robbery, both carry the maximum penalty available under Navajo law - 365 days imprisonment.  *See* 17 N.N.C. §§ 491.B.1, 492.B.  I find it strange that if a man were charged with one non-serious crime such as criminal damage, and one serious crime such as armed robbery, the prosecutor would drop the robbery charge and pursue criminal damage unless there was insufficient evidence to convict on the more serious charge.  However, given that Mr. Mitchell's federal co-defendant Jason Kinlicheenie pled guilty to the armed robbery of the Trading Post on November 5, 2001, I find it difficult to believe there was insufficient evidence.  I will address this further with respect to the next question.

22.    The practical effect of dropping the armed robbery charge was to deprive Mr. Mitchell of an attorney.  The Ninth Circuit, in a footnote, discusses the right to counsel in tribal court.  They noted that, "The record here shows that the Navajo Tribe at the time of Mitchell's arrest did at least in some circumstances

9

KB

appoint advisors for indigent defendants, but these advisors were not necessarily licensed attorneys, and that some such nonlawyer advisor was appointed for Mitchell." *Mitchell*, 502 F.3d at 960 n.3. This is not accurate. At the time of Mitchell's arrest in 2001, the Navajo Nation provided attorneys for indigent people charged with criminal offenses that carried possible jail time. Because there is no potential for a jail sentence for a charge of criminal damage, the defendant would not be eligible for appointed counsel. I have been informed that Mr. Mitchell was indigent at the time of his arrest and was defended at his capital trial by two federal public defenders, and a private appointed attorney.

23.    There have been, what I believe are, advances in the relationship between tribal and federal law over the course of the last few years. The Ninth Circuit noted that the Sixth Amendment does not apply in Tribal proceedings. *Mitchell*, 502 F.3d at 960 n.3. However, where an individual is appointed or retains an attorney in tribal court on a charge such as armed robbery, such appointment implicates the defendant's Sixth Amendment right to counsel in federal court on the same offense.

24.    Had the armed robbery offense not been dropped in the Navajo court, Mr. Mitchell would have been entitled to a public defender, and the appointment

10

KB

of an attorney would have implicated Mr. Mitchell's Sixth Amendment rights in federal court and limited the government's access to Mr. Mitchell without the presence of his attorney.

**(3)    Comparing the Navajo Nation standards to the federal standards, is it likely that the Navajo Nation would have had sufficient evidence to arrest Mr. Mitchell for robbery when the federal government apparently did not have enough evidence?**

25.    It is my understanding, based upon representations made by counsel and as noted in the Ninth Circuit opinion, that federal agents testified in the district court that there was insufficient evidence to arrest Mr. Mitchell on federal charges.  The testifying agents stated that this was the reason Mr. Mitchell was arrested on tribal charges instead of on federal charges.  *Mitchell*, 502 F.3d at 961.  I find the agents' testimony difficult to reconcile with certain facts.

26.    Two days before Mr. Mitchell appeared in the district court of the Navajo Nation, Jason Kinlicheenie appeared in that same court charged with armed robbery in violation of 17 N.N.C. § 492.  Mr. Kinlicheenie pled guilty to that offense.  Both Mr. Mitchell and Mr. Kinlicheenie were subsequently convicted of this robbery in federal court.

*KB*
KB

11

27. A tribal arrest requires a warrant or probable cause just as a valid arrest by federal agents. Compare 17 N.N.C. § 1803, 1804 to Fed. Rule Crim. Proc. 4, 18 U.S.C. § 3041. I have reviewed the federal robbery statute, and in my view it is identical to the Navajo statute. Compare 17 N.N.C. § 491 to 18 U.S.C. § 2111.

28. Given the burden placed on the federal government and that the robbery offense is the same in federal and Navajo court, one of Mr. Mitchell's alleged accomplices was charged in tribal court with armed robbery, and Mr. Mitchell was himself originally arrested for armed robbery, I simply do not understand the representations made by federal agents that there was insufficient evidence to charge Mr. Mitchell federally, but there was sufficient evidence to charge him in tribal court. It would seem to me that if there was sufficient evidence to charge him in tribal court, there must have been sufficient evidence to charge him federally, and I have to question the justification for pursuing tribal charges.

**(4) What is your opinion of collaborative efforts between the federal government and tribal authorities?**

29. In my experience, these collaborative efforts tend to result in an abuse

12

_KB_

EX 170 - 2247

of the Navajo courts and misuse of the Navajo Nation investigators by the United

States Attorney's Office.  Indeed, it is well known amongst those of us practicing

in the Navajo courts that this is a problem.  In a 2003 hearing in the Window Rock

District Court, Navajo Prosecutor Leonard Livingston, speaking of the Navajo

Nation criminal investigators, stated: "a dilemma [the Navajo criminal

investigators] bear, they wear two hats.  One is that they answer to the U.S.

Attorney's office for all major crimes committed on the reservation; the other is

that they answer to the Navajo Nation...."  Livingston went on to explain that the

Navajo Nation has "no control over the investigators.  I wish I would have ...

control over [them] ... it appears they answer to another entity which is the United

States Attorney's office...." Exhibit 1, Transcript of Window Rock District Court,

Hearing 6.24.2003.

30.    Having reviewed some records in Mr. Mitchell's case, I think this

case exemplifies the problems with collaborative efforts amongst the federal

government and the nation.  In this case Mr. Mitchell was confined for almost

three weeks in tribal custody while federal agents interrogated him at will.  His

tribal rights were violated such that he could be kept for federal interrogation.

Navajo courts are not a tool for the United States Attorney's Office or the Federal

13

_KB_
KB

Bureau of Investigations to use to help strengthen their cases.

I declare under the penalty of perjury of the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct. Signed this 29th day of October 2010 in Window Rock, Arizona.

_Kathleen Bowman_

Kathleen Bowman

14

KB

EX 170 - 2249

Addendum

Index of Material Sent to Kathleen Bowman by the Federal Public Defender
(Lezmond Charles Mitchell)

a.    *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007).
b.    Relevant portions of Mr. Mitchell's Amended Motion, under 28
      U.S.C. § 2255, to vacate, set aside, or correct sentence.
c.    Law enforcement memorandum concerning interrogations of Mr.
      Mitchell.
d.    Navajo Nation court file concerning Mr. Mitchell.
e.    Navajo Nation arrest report concerning arrest of Mr. Mitchell on
      criminal damage charge.
f.    Navajo Nation court file concerning Jason Kinlicheenie.
g.    Consent to search form signed by Gregory Nakai.

*KB*

15

KB

EX 170 - 2250

# EXHIBIT 171

# DECLARATION OF MÓNICA GINER

I, Mónica Giner, hereby declare as follows:

1.    I am an investigator in the Office of the Federal Public Defender for the Central District of California.  My office represents Lezmond Charles Mitchell in his § 2255 proceeding, and I am assigned to Mr. Mitchell's case.

2.    During my work on Mr. Mitchell's case, I contacted several Navajo Nation law enforcement officers who were involved in Mr. Mitchell's case. Navajo Nation officer Wallace Billie told me that, on November 4, 2001, officers with the FBI and Navajo Nation went to the site, near Tsaile, Arizona, where Ms. Slim and Ms. Lee's bodies were located – before Johnny Orsinger and Lezmond Mitchell were taken to the scene on November 5, 2001.  Mr. Billie refused to sign a declaration stating these facts.

3.    Navajo Nation officer Esther Charley showed me the crime scene near Tsaile, Arizona.  Ms. Charley, however, refused to be formally interviewed about her and her Office's work on Mr. Mitchell's case unless an Assistant United States Attorney was present.

4.    I attempted to interview Louis St. Germaine, another Navajo Nation officer and Ms. Charley's partner, about his and his Office's work on Mr. Mitchell's case .  Mr. St. Germaine did not return my calls.

5.    I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge.

DATED: November 2, 2010

MÓNICA GINER