**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEZMOND C. MITCHELL, AKA Lezmond Charles Mitchell, *Petitioner-Appellant*, v. UNITED STATES OF AMERICA, *Respondent-Appellee.* | No. 18-17031 D.C. Nos. 3:09-cv-08089-DGC 3:01-cr-01062-DGC-1 OPINION |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted December 13, 2019
Phoenix, Arizona

Filed April 30, 2020

Before: Sandra S. Ikuta, Morgan Christen,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Ikuta;
Concurrence by Judge Christen;
Concurrence by Judge Hurwitz

2          MITCHELL V. UNITED STATES

## SUMMARY[*]

### Criminal / Fed. R. Civ. P. 60(b) / 28 U.S.C. § 2255

The panel affirmed the district court's denial of Lezmond Mitchell's motion pursuant to Fed. R. Civ. P. 60(b) for relief from the district court's denial of his 2009 motion for authorization to interview jurors at his 2003 criminal trial in order to investigate potential juror misconduct.

Mitchell argued that the Supreme Court's intervening decision in *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), which held that jury statements demonstrating racial animus could be admissible in a proceeding inquiring into the validity of the verdict, changed the law governing requests to interview jurors for evidence of racial bias, and that this change constituted an extraordinary circumstance justifying relief under Rule 60(b)(6).

The panel held that the district court had jurisdiction to decide the Rule 60(b) motion. The panel explained that the motion, which at best would give Mitchell the opportunity to attempt to develop a claim that the jurors were biased, does not present a substantive claim on the merits and thus is not a disguised second or successive 28 U.S.C. § 2255 motion.

The panel held that Mitchell presents no extraordinary circumstances or district court errors that would justify reopening his case, and that the district court therefore did not abuse its discretion by denying the Rule 60(b) motion. The

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel explained that although *Peña-Rodriguez* established a new exception to Fed. R. Evid. 606(b), which generally prohibits jurors from testifying regarding their deliberations, this change in law left untouched the law governing investigating and interviewing jurors and thus did not give rise to "extraordinary circumstances" for purposes of Rule 60(b).

Concurring, Judge Christen wrote that it is worth pausing to consider why Mitchell, who did not receive the death penalty for his murder convictions, faces the prospect of being the first person to be executed by the federal government for an intra-Indian crime, committed in Indian country, by virtue of a conviction for carjacking resulting in death.

Concurring, Judge Hurwitz wrote to suggest that the current Executive take a fresh look at the wisdom of imposing the death penalty in this case in which the crimes were committed by a Navajo against Navajos entirely within the territory of the sovereign Navajo Nation, and where the Navajo Nation, and members of the victims' family, have opposed imposition of the death penalty on the defendant.

## COUNSEL

Jonathan C. Aminoff (argued) and Celeste Bacchi, Deputy Federal Public Defenders; Amy M. Karlin, Interim Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Petitioner-Appellant.

4          MITCHELL V. UNITED STATES

William G. Voit (argued), Assistant United States Attorney; Krissa M. Lanham, Deputy Appellate Chief; Michael Bailey, United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Respondent-Appellee.

**OPINION**

IKUTA, Circuit Judge:

In May 2009, Lezmond Mitchell asked the district court for authorization to interview the jurors at his criminal trial in order to investigate potential juror misconduct. The district court denied the motion because Mitchell identified no evidence of juror misconduct, and therefore failed to show good cause. In March 2018, Mitchell filed a motion under Rule 60(b)(6) of the Federal Rules of Civil Procedure for relief from the 2009 ruling. Mitchell argued that the Supreme Court's intervening decision in *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), changed the law governing requests to interview jurors for evidence of racial bias, and that this change constituted an extraordinary circumstance justifying relief under Rule 60(b)(6). The district court denied this motion as well. We affirm.

I

A

We have described the facts of this case in detail in two prior opinions, *see United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) (direct appeal) ("*Mitchell I*"); *Mitchell v. United States*, 790 F.3d 881 (9th Cir. 2015) (appeal of denial of motion under 28 U.S.C. § 2255) ("*Mitchell II*"), so we

MITCHELL V. UNITED STATES                5

summarize them only briefly.  In October 2001, Mitchell and three accomplices plotted to carjack a vehicle to use in an armed robbery of a trading post on the Navajo reservation. Mitchell and an accomplice, Johnny Orsinger, abducted 63-year-old Alyce Slim and her 9-year-old granddaughter in Slim's GMC pickup truck.  Somewhere near Sawmill, Arizona, Mitchell and Orsinger killed Slim, stabbing her 33 times and moving her mutilated body to the back seat next to her granddaughter.  After driving the truck into the mountains, Mitchell dragged Slim's body out of the car and ordered the granddaughter to get out of the truck and "lay down and die."  Mitchell slit her throat twice, and then dropped rocks on her head to finish her off.  Mitchell and Orsinger later returned to the scene to conceal evidence. They severed the heads and hands of both victims and pulled their torsos into the woods.  Mitchell and Orsinger also burned the victims' clothing, jewelry, and glasses.

Three days after the murders, Mitchell and two accomplices drove the GMC pickup truck to the trading post. Once there, they struck the store manager with a shotgun, threatened another employee, and stole some $5,530 from the store.  Mitchell and his accomplices drove the GMC pickup truck back to a location where one of the accomplices had parked his own vehicle.  Mitchell set the truck on fire and left the scene in the other vehicle.

A Navajo police officer discovered the pickup truck a mile and a half south of a town within the Navajo Indian reservation.  Criminal investigators discovered evidence in the truck connecting Mitchell to both the robbery and the murders. When the FBI arrested Mitchell at an accomplice's house, Mitchell (who was in bed) "asked for his pants, which he told an FBI agent were near a bunk bed on the floor."

6                    MITCHELL V. UNITED STATES

*Mitchell I*, 502 F.3d at 944.  When the agent picked them up, "a silver butterfly knife fell from a pocket."  *Id.*  After the accomplice and his mother consented to a search of the house, FBI agents retrieved the silver butterfly knife.  "Trace amounts of blood from the silver knife were matched to Slim."  *Id.*

After signing a waiver of his *Miranda* rights, Mitchell admitted that he had been involved in the robbery and had been present when "things happened" to Slim and her granddaughter.  *Id.*  He directed Navajo police officers to the site where he and Orsinger had buried the bodies, and he told the officers "that he had stabbed the 'old lady,' and that the evidence would show and/or witnesses would say that he had cut the young girl's throat twice."  *Id.* at 944–45.  He also admitted that "he and Orsinger [had] gathered rocks, and with Orsinger leading on, the two took turns dropping them on [the granddaughter's] head."  *Id.*  "Mitchell indicated that he and Orsinger retrieved an axe and shovel, severed the heads and hands, buried the parts in a foot-deep hole, burned the victims' clothing, and cleaned the knives in a stream."  *Id.*  Mitchell stated that it was Orsinger's idea to sever the victims' heads and hands "because [Mitchell] would also have severed the feet."  *Id.*

Mitchell was indicted for eleven crimes, including premeditated first degree murder, armed carjacking resulting in death, felony murder, robbery, kidnapping, and use of a firearm in a crime of violence.  The government filed a notice of intent to seek the death penalty as to Mitchell based on the charge of carjacking resulting in death.

MITCHELL V. UNITED STATES                7

Jury selection in Mitchell's trial began on April 1, 2003.[1] Potential jurors filled out prescreening questionnaires, and were subjected to a twelve-day voir dire in which they were asked questions about their qualifications, including their ability to be impartial towards Native Americans. A petit jury, including one member of the Navajo Nation, convicted Mitchell on all counts.

The penalty phase began on May 14, 2003. Consistent with the Federal Death Penalty Act, 18 U.S.C. §§ 3591–3598, the district court instructed the jury that "in your consideration of whether the death sentence is appropriate, you must not consider the race, color, religious beliefs, national origin, or sex of either the defendant or the victims," and that "[y]ou are not to return a sentence of death unless you would return a sentence of death for the crime in question without regard to race, color, religious beliefs, national origin, or sex of either the defendant or any victim." *See* 18 U.S.C. § 3593(f). In addition, the jury was required to "return to the court a certificate, signed by each juror, that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be." *Id.* Each juror signed the certificate. *Mitchell I*, 502 F.3d at 990.

In order to impose the death penalty under the Federal Death Penalty Act, the jury was required to "unanimously

---

[1] Then District Judge Mary Murguia presided over the trial and sentencing.

find beyond a reasonable doubt: (1) the defendant was 18 years of age or older at the time of the offense; (2) the defendant had at least one of four enumerated mentes reae (often referred to as 'gateway intent factors'); and (3) the existence of at least one of sixteen statutorily defined aggravating factors." *Id.* at 973 (internal citations omitted). Here, the jury found the four gateway intent factors, the necessary statutory aggravating factors, and one non-statutory aggravating factor. *Id.* at 946. "After weighing the aggravating and mitigating factors, the jury recommended imposition of a sentence of death." *Id.*

The court sentenced Mitchell to death on September 15, 2003. As the jurors were discharged, the district judge stated:

> You are free to talk about the case with anyone or not talk about it as you wish. If someone asks you about the case, and you don't want to talk about it, just advise them of the fact and they will honor your request.
>
> The lawyers will be standing in the hallway as you exit. If you choose to talk to them, if you have any questions for them, you may approach them and ask them questions. They've been instructed not to approach you. It's only if you want to talk or discuss the case with lawyers on either side as you wish, you may do. So if you decide to just exit the building, you may.

On direct appeal, Mitchell contended that the procedures used to empanel jurors caused an under-representation of Native Americans. *Id.* at 949–50. Mitchell also argued that

his constitutional rights "were violated when the government elicited testimony bearing on race, religion and cultural heritage, and made statements in closing argument impermissibly plying on the same factors." *Id.* at 989. We rejected these arguments. With respect to the government's statements in closing, we "accept[ed] the jurors' assurance [in their certifications] that no impermissible considerations of race or religion factored into the verdict." *Id.* at 990.

Mitchell alleged additional errors related to race and religion at the penalty phase. He argued that the government erred by suggesting, in closing, that "Mitchell turned his back on his religious and cultural heritage." *Id.* at 994–95. We rejected this argument as well. Because Mitchell had introduced a letter from the Attorney General of the Navajo Nation indicating opposition to capital punishment and relied on this evidence in mitigation, we held that "it was not plainly erroneous for the government to challenge the credibility of Mitchell's reliance." *Id.* at 995.

B

Nearly six years later, in May 2009, Mitchell filed a motion in the district court requesting to interview members of the jury in order to ascertain "whether any member of the jury panel engaged in *ex parte* contacts, considered extrajudicial evidence, allowed bias or prejudice to cloud their judgment, or intentionally concealed or failed to disclose material information relating to their qualifications to serve as jurors in [his] case."

10              MITCHELL V. UNITED STATES

Mitchell's request to interview jurors was governed by District of Arizona Local Rule Civil 39.2,[2] which requires a defendant seeking permission to interview jurors to file "written interrogatories proposed to be submitted to the juror(s), together with an affidavit setting forth the reasons for such proposed interrogatories, within the time granted for a motion for a new trial." The rule provides that permission to interview jurors "will be granted only upon the showing of good cause." Mitchell argued that good cause existed because an investigation into potential juror misconduct was a necessary part of any federal capital post-conviction investigation. Despite lacking evidence of juror impropriety, Mitchell speculated that jurors could have been affected by the prosecutor's comment regarding Mitchell's turning his back on the Navajo religion. In connection with this argument, Mitchell cited *United States v. Henley*, 238 F.3d 1111, 1120 (9th Cir. 2001), to support his argument that Rule

---

[2] Local Rule Civil 39.2(b) states:

Interviews with jurors after trial by or on behalf of parties involved in the trial are prohibited except on condition that the attorney or party involved desiring such an interview file with the Court written interrogatories proposed to be submitted to the juror(s), together with an affidavit setting forth the reasons for such proposed interrogatories, within the time granted for a motion for a new trial. Approval for the interview of jurors in accordance with the interrogatories and affidavit so filed will be granted only upon the showing of good cause. See Federal Rules of Evidence, Rule 606(b).

This rule is made applicable to criminal cases by Local Rule Criminal 24.2.

606(b) of the Federal Rules of Evidence,[3] which generally prohibits jurors from testifying regarding their deliberations, cannot preclude evidence regarding jurors' racial or religious bias. Mitchell also speculated that the jurors might have been affected by publicity about the trial, or might have been influenced by outside sources.

The district court denied Mitchell's request. The court ruled that Mitchell had not complied with the procedural requirements of Local Rule 39.2, because the motion was untimely and Mitchell had failed to file proposed interrogatories to the jurors or submit an affidavit setting

---

[3] Rule 606(b) of the Federal Rules of Evidence provides:

> (b) During an Inquiry into the Validity of a Verdict or Indictment.

> (1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

> (2) Exceptions. A juror may testify about whether:

> (A) extraneous prejudicial information was improperly brought to the jury's attention;

> (B) an outside influence was improperly brought to bear on any juror; or

> (C) a mistake was made in entering the verdict on the verdict form.

12          MITCHELL V. UNITED STATES

forth reasons for interrogatories.  In any event, the court held that Mitchell had failed to establish "good cause," as required by Local Rule 39.2, because there was no preliminary showing of juror misconduct; rather Mitchell's allegations of juror misconduct were "based on wholesale speculation." According to the court, the prosecutor's statement that Mitchell "turned his back on his religious and cultural heritage" did not raise a potential for juror bias because the Ninth Circuit had determined on direct appeal that the statement was not improper.  Moreover, the court reasoned that any testimony regarding the subjective effect of the prosecutor's statements on the jury's deliberation would be barred by Rule 606(b) of the Federal Rules of Evidence. Further, Mitchell had provided no evidence that prejudicial news articles about his case existed or that any juror saw such articles.  The district court concluded that in the absence of any showing of juror misconduct or any other basis for good cause, Mitchell was not entitled to interview jurors.

C

After the denial of his request under Local Rule 39.2, Mitchell brought a federal habeas motion under 28 U.S.C. § 2255 to challenge his sentence on multiple grounds, primarily focusing on ineffective assistance of counsel.  His eleventh claim (Claim K) alleged that the district court had violated the Fifth, Sixth, and Eighth Amendments by denying his request to interview the jurors.  According to Mitchell, denying his interview request deprived him of the opportunity to ensure that his jury was impartial and that the verdict was reliable.  The district court rejected Claim K because it alleged an "error in a postconviction proceeding, not at trial or sentencing," and therefore failed to state a cognizable claim for relief under § 2255.  *See Franzen v. Brinkman*,

877 F.2d 26, 26 (9th Cir. 1989).  The district court did not grant a certificate of appealability for this claim.  On appeal, we denied a certificate of appealability with respect to all uncertified claims and affirmed the district court's denial of Mitchell's § 2255 motion.  *Mitchell II*, 790 F.3d at 894 & n.7.

D

Two years after *Mitchell II*, the Supreme Court decided *Peña-Rodriguez*, which held that, notwithstanding Rule 606(b), juror statements demonstrating racial animus could be admissible as evidence.  137 S. Ct. at 869.  Nearly a year later, in March 2018, Mitchell filed a motion under Rule 60(b)(6) of the Federal Rules of Civil Procedure, seeking relief from the district court's judgment in light of *Peña-Rodriguez*.[4]  Although Mitchell's Rule 60(b)(6) motion ostensibly sought to reopen his § 2255 proceeding, it actually challenged the district court's denial of his May 2009 request to interview jurors.  The district court[5] denied the motion, and Mitchell timely appealed.

We have jurisdiction pursuant to 28 U.S.C. § 1291.  We review the denial of a Rule 60(b) motion for abuse of discretion, *Harvest v. Castro*, 531 F.3d 737, 741 (9th Cir.

---

[4] Rule 60(b)(6) provides:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding.  On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (6) any other reason that justifies relief.

[5] Judge David Campbell was assigned to the case after Judge Murguia was appointed to the Ninth Circuit.

14                MITCHELL V. UNITED STATES

2008), but we review questions of law underlying the district court's decision de novo, *Hall v. Haws*, 861 F.3d 977, 984 (9th Cir. 2017). We review de novo whether a § 2255 motion is an unauthorized second or successive motion. *See Jones v. Ryan*, 733 F.3d 825, 833 (9th Cir. 2013).

II

Before addressing the merits of Mitchell's Rule 60(b)(6) motion, we must first determine whether the district court had jurisdiction to hear it. *See* 28 U.S.C. § 2255(h); *Washington v. United States*, 653 F.3d 1057, 1062 (9th Cir. 2011). We conclude that it did.

Under Rule 60(b), a court may "relieve a party or its legal representative from a final judgment, order, or proceeding" for specified reasons, including the catchall "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). In *Gonzalez v. Crosby*, the Court held that, like other Federal Rules of Civil Procedure, Rule 60(b) applies in the habeas context "only to the extent that it is not inconsistent with applicable federal statutory provisions and rules." 545 U.S. 524, 529 (2005) (cleaned up). This means that Rule 60(b) does not apply to the extent it is inconsistent with the habeas rules' limitations on second or successive applications. *Id*. at 529–30; *see* 28 U.S.C. §§ 2244(b), 2255(h).[6]

_____

[6] Although *Gonzalez* addressed only the extent to which Rule 60(b) is inconsistent with § 2244 (the provision providing the second-or-successive bar for habeas petitions filed by state prisoners under § 2254), 545 U.S. at 529 n.3, we held in *United States v. Buenrostro* that the reasoning in *Gonzalez* applies equally to § 2255 motions filed by federal prisoners. 638 F.3d 720, 722 (9th Cir. 2011). *But see Williams v. United States*, 927 F.3d 427, 434–36 (6th Cir. 2019) (holding that § 2244(b)(1)'s prohibition on claims in a second or successive petition that were not

MITCHELL V. UNITED STATES          15

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court has only limited authority to hear a claim presented in a second or successive habeas motion.  The court must deny a second or successive motion unless the court of appeals first certifies that the motion relies on a new rule of constitutional law that is retroactively applicable or presents new evidence that meets the criteria set forth in § 2255(h).  *See Burton v. Stewart*, 549 U.S. 147, 149 (2007); *Gonzalez*, 545 U.S. at 531–32.

According to the Supreme Court, these rules require courts to examine Rule 60(b) motions carefully in order to determine whether they raise "claims."  *Gonzalez*, 545 U.S. at 530–31.  If a Rule 60(b) motion raises a claim, it "is in substance a successive habeas petition and should be treated accordingly."  *Id.* at 531.  In other words, a Rule 60(b) motion presenting a claim cannot proceed without certification from the court of appeals; otherwise, "Rule 60(b) would impermissibly circumvent" the second or successive bar.  *Id.* at 531–32.

A Rule 60(b) motion advances a "claim" for purposes of AEDPA when it contains an "asserted federal basis for relief from a state court's judgment of conviction."  *Id.* at 530.  As explained in *Gonzalez*, an argument is a "claim" if it "substantively addresses federal grounds" for setting aside a prisoner's conviction.  *Id.* at 533.  This includes an argument seeking to add a new ground for relief, or attacking the federal court's previous resolution of a claim on the merits.  *Id.* at 532.  It also includes a request to present "'newly discovered evidence' in support of a claim previously

raised in a prior habeas petition does not apply to motions made by federal prisoners under § 2255).

denied," or an argument "contend[ing] that a subsequent change in substantive law is a 'reason justifying relief.'" *Id.* at 531 (internal citation omitted); *accord Washington*, 653 F.3d at 1063. An "attack based on the movant's own conduct, or his habeas counsel's omission . . . in effect asks for a second chance to have the merits determined favorably" and amounts to a claim. *Gonzalez*, 545 U.S. at 532 n.5.

However, not all arguments in a Rule 60(b) motion constitute claims. *Gonzalez* gave examples of challenges that could be included in a Rule 60(b) motion without turning it into a second or successive habeas motion. For instance, an argument that a court's procedural error precluded a prisoner from obtaining a merits determination does not raise a habeas "claim." *Id.* at 532 n.4. Procedural errors include errors in determining whether the prisoner had exhausted state remedies, whether the prisoner had procedurally defaulted a claim, or whether a claim was time-barred. *See id.* Nor does a motion asserting some defect in the integrity of a habeas proceeding, such as a claim of fraud on the federal habeas court, advance a "claim." *Id.* at 532 n.5.

The government argues that even if a Rule 60(b) motion does not present a claim on its face, it should be treated as a disguised second or successive § 2255 motion if its end goal is to discover and assert a claim. The government relies on a Fifth Circuit case in which a federal prisoner brought a Rule 60(b)(6) motion claiming that the district court had erroneously denied his request to interview jurors regarding potential racial bias. *In re Robinson*, 917 F.3d 856, 861–66 (5th Cir. 2019), *cert. denied sub nom.*, *Robinson v. United States*, No. 19-5535, 2020 WL 872217 (U.S. Feb. 24, 2020). The prisoner argued that his motion was not a disguised second or successive § 2255 motion because he was

challenging a procedural "defect in the integrity of the habeas proceedings." *Id.* at 864. The Fifth Circuit rejected this characterization of the § 2255 motion because the district court had not made any procedural error in denying habeas discovery. *Id.* at 865. Because the § 2255 motion was not challenging a procedural defect, the Fifth Circuit concluded that the prisoner's request to interview jurors regarding racial bias had to be viewed as "attempting to advance a new habeas claim related to jury impartiality" and constituted a second or successive § 2255 motion. *Id.*

We decline to follow *In re Robinson*. The Fifth Circuit read *Gonzalez* as holding that a prisoner could use a Rule 60(b)(6) motion only for a single category of challenges (challenges to procedural errors); all other challenges were forbidden merits-based claims. But, rather than narrowing the use of Rule 60(b)(6) motions to a single type of challenge, *Gonzalez* did the opposite: it excised a single category of challenges from the arguments that could be raised under Rule 60(b)(6), holding that a prisoner could *not* bring a substantive merits-based claim as a Rule 60(b)(6) motion. *Gonzalez* did not preclude a prisoner from bringing any other sort of argument under Rule 60(b)(6).[7]

Because the Fifth Circuit bifurcated Rule 60(b)(6) motions into permitted challenges to procedural errors and merits-based claims, it failed to distinguish between a request

---

[7] Perhaps realizing the gap in its analysis, *In re Robinson* adds that "[e]ven if we were to find that Robinson's impartial-jury claim did not constitute a second or successive habeas petition, we would undoubtedly conclude that he fails to show that, as a result of the denial of his discovery request, extraordinary circumstances exist to justify the reopening of the final judgment under Rule 60(b)(6)." 917 F.3d at 866 n.18 (cleaned up) (quoting *Gonzalez*, 545 U.S. at 535).

18          MITCHELL V. UNITED STATES

for evidence to develop a possible new claim and an effort to bolster a prior claim, concluding that both fell within the category of disallowed substantive challenges. Again, we disagree. Consistent with *Gonzalez*, we have held that a request for "newly discovered evidence in support of a claim previously denied" qualifies as a "claim." *Wood v. Ryan*, 759 F.3d 1117, 1120 (9th Cir. 2014) (quoting *Gonzalez*, 545 U.S. at 531) (holding that a state prisoner's Rule 60(b)(6) motion seeking relief from the district court's denial of his motion for evidentiary development in support of a *previously denied* ineffective assistance of counsel claim was a second or successive petition); *see also Washington*, 653 F.3d at 1065 (holding that a motion seeking "a fresh opportunity to air the arguments *that failed at . . . trial*" was a second or successive § 2255 motion) (emphasis added).

But *Gonzalez* did not hold that a prisoner's request to develop evidence for a potential new claim also qualifies as a "claim." Such a request does not meet *Gonzalez*'s definition of a substantive merits-based claim because it does not assert a federal basis for relief from the prisoner's conviction or sentence. Here, for instance, Mitchell's Rule 60(b)(6) motion argues that the district court erred in denying Mitchell's request to interview the jurors who recommended the death penalty. Mitchell does not claim that the correction of this alleged error would entitle him to relief or affect the validity of his conviction or sentence. Nor does Mitchell seek to present newly discovered evidence to support a prior claim or argue that a change in law justifies relief from his conviction or sentence. *See Gonzalez*, 545 U.S. at 531. At most, a favorable ruling would give Mitchell the opportunity to attempt to develop a claim that the jurors were biased. Because Mitchell's motion does not present a substantive claim on the merits, "allowing the motion to proceed as

denominated creates no inconsistency with the habeas statute or rules." *Id.* at 533.  Therefore, we conclude that Mitchell's motion is not a disguised second or successive § 2255 habeas motion, and the district court had jurisdiction to decide his Rule 60(b)(6) motion.

### III

We therefore turn to whether Mitchell has established "'extraordinary circumstances' justifying the reopening of a final judgment." *Id.* at 535 (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)).  In considering whether there is an "extraordinary" circumstance for purposes of a Rule 60(b)(6) motion, we consider a number of factors, including the "degree of connection between the extraordinary circumstance and the decision for which reconsideration is sought." *Hall*, 861 F.3d at 987 (citing *Phelps v. Alameida*, 569 F.3d 1120, 1135–40 (9th Cir. 2009)). Said otherwise, we consider whether the alleged extraordinary circumstance, such as a change in the law, was material to the prisoner's claim.

### A

"[A] change in intervening law" can constitute an extraordinary circumstance. *Id.* at 987–88. *Gonzalez* made clear, however, that not every change in intervening law "provides cause for reopening cases long since final." 545 U.S. at 536; *see also Ritter v. Smith*, 811 F.2d 1398, 1401 (11th Cir. 1987) ("[S]omething more than a 'mere' change in the law is necessary to provide the grounds for Rule 60(b)(6) relief."). For instance, *Gonzalez* held that a Supreme Court decision that changed an interpretation of controlling law was not an "extraordinary circumstance" even though it would

20          MITCHELL V. UNITED STATES

have saved a prisoner's habeas petition from being time-barred.  545 U.S. at 537–38.  According to the Court, development of the Supreme Court's jurisprudence in a particular area does not necessarily justify "reopening cases long since final";  indeed, it is "hardly extraordinary" that the Supreme Court arrives at a different interpretation of the law after a prisoner's case is no longer pending.  *Id.* at 536.  Moreover, where an argument is available and raised by other litigants (and even litigated all the way to the Supreme Court), but the prisoner did not diligently pursue the argument, the change in law is "all the less extraordinary." *Id.* at 537.  Thus, a mere development in jurisprudence, as opposed to an unexpected change, does not constitute an extraordinary circumstance for purposes of Rule 60(b)(6).

B

Mitchell argues that *Peña-Rodriguez* was an intervening change in law that constituted an extraordinary circumstance requiring the district court to give Mitchell relief from the prior order denying his request to interview jurors.  In addressing this argument, we consider the legal history leading up to the decision in *Peña-Rodriguez.*

We have long imposed restrictions on lawyers seeking access to jurors.  These rules derive their authority from the common law, where "judges placed the veil of secrecy about jury deliberations."  *N. Pac. Ry. Co. v. Mely*, 219 F.2d 199, 201 (9th Cir. 1954).  Rules restricting lawyers' access to jurors "(1) encourage freedom of discussion in the jury room; (2) reduce the number of meritless post-trial motions; (3) increase the finality of verdicts; and (4) further Federal Rule of Evidence 606(b) by protecting jurors from harassment and the jury system from post-verdict scrutiny."

*Cuevas v. United States*, 317 F.3d 751, 753 (7th Cir. 2003). Indeed, "[i]t is incumbent upon the courts to protect jurors from the annoyance and harassment of such conduct," *Bryson v. United States*, 238 F.2d 657, 665 (9th Cir. 1956), and "it is improper and unethical for lawyers to interview jurors to discover what was the course of deliberation of a trial jury," *People of Territory of Guam v. Marquez*, 963 F.2d 1311, 1315 (9th Cir. 1992) (quoting *Smith v. Cupp*, 457 F.2d 1098, 1100 (9th Cir. 1972)). Therefore, in cases where there has been no showing of juror misconduct, we have held that a district court "d[oes] not abuse [its] discretion in refusing to allow postverdict interrogation of jurors." *United States v. Eldred*, 588 F.2d 746, 752 (9th Cir. 1978) (upholding an earlier version of the District of Arizona local rule restricting access to jurors in the absence of "some showing of sufficient reason"). We have also held that a district court's "denial of a motion to interrogate jurors" does not raise a constitutional problem where "there has been no specific claim of jury misconduct." *Smith*, 457 F.2d at 1100.

The judicial authority to exercise discretion regarding whether to grant lawyers permission to conduct jury interviews also undergirds Rule 606(b) of the Federal Rules of Evidence, which also stems from long-established common law rules. Rule 606(b) generally provides that a juror may not testify about statements and incidents that occurred during the jury's deliberations. Specifically, "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). Further, a court "may not receive a juror's affidavit or evidence of a juror's statement on these

matters." Fed. R. Evid. 606(b)(1).[8]  This "no-impeachment rule" "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict," and "gives stability and finality to verdicts." *Peña-Rodriguez*, 137 S. Ct. at 865.

Prior to *Peña-Rodriguez*, the Supreme Court had declined to recognize any exceptions (other than those in Rule 606(b)) to the no-impeachment rule. In *Tanner v. United States*, for instance, the Court "rejected a Sixth Amendment exception for evidence that some jurors were under the influence of drugs and alcohol during the trial," based on the "existing, significant safeguards for a defendant's right to an impartial and competent jury," such as voir dire, the opportunity to observe jurors during trial, and the opportunity for jurors to report misconduct before a verdict is rendered. *Peña-Rodriguez*, 137 S. Ct. at 866 (citing *Tanner v. United States*, 483 U.S. 107, 125–27 (1987)); *see also Warger v. Shauers*, 574 U.S. 40, 47–48 (2014).

Notwithstanding the Supreme Court's historical hesitance to interfere with the operation of Rule 606(b), we have long explained that the protections provided by this evidence rule are not absolute. *See Henley*, 238 F.3d at 1120.  Noting the longstanding "conflict between protecting a defendant's right to a fair trial, free of racial bias, and protecting the secrecy

---

[8] Rule 606(b) contain several exceptions, allowing a juror to testify about whether "(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

MITCHELL V. UNITED STATES                  23

and sanctity of jury deliberations," we suggested that there may be an exception to Rule 606(b) in cases where there was evidence of juror racial bias. *Id.* at 1119. Although we did not decide "whether or to what extent the rule prohibits juror testimony concerning racist statements made during deliberations," *id.* at 1121, we agreed that "a powerful case can be made that Rule 606(b) is wholly inapplicable to racial bias," *id.* at 1120.

Vindicating our views in *Henley*, *Peña-Rodriguez* subsequently recognized an exception to Rule 606(b) to allow jurors to testify about statements showing racial bias. In *Peña-Rodriguez*, a criminal defendant was convicted of unlawful sexual contact and harassment for sexually assaulting two teenage sisters. 137 S. Ct. at 861. After the jury was discharged, two jurors told the defendant's counsel that another juror had expressed anti-Hispanic bias against the defendant and the defendant's alibi witness during deliberations. *Id.* According to the jurors' affidavits, the biased juror stated he thought the defendant was guilty because "Mexican men ha[ve] a bravado that caused them to believe they could do whatever they wanted with women," and made similar statements evincing racial prejudice. *Id.* at 862. The trial court denied the prisoner's motion for a new trial, finding the affidavits would be inadmissible under Rule 606(b).[9] *Id.*

---

[9] Although the trial court decided the admissibility of the affidavits under Rule 606(b) of the Colorado Rules of Evidence, the Colorado rule is substantively identical to its federal counterpart, and the Supreme Court on appeal analyzed Rule 606(b) of the Federal Rules of Evidence. *Peña-Rodriguez*, 137 S. Ct. at 864–65.

The Supreme Court reversed, holding that the Sixth Amendment guarantee of an impartial jury required the admission of evidence of juror racial bias. *Id.* at 870. The Court held that racial bias is a "familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Id.* at 868. According to the Court, "racial bias implicates unique historical, constitutional, and institutional concerns." *Id.* Further, "[a] constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right." *Id.* at 869.

While acknowledging the safeguards that protect the right to an impartial jury (and urging trial courts to use such "standard and existing processes designed to prevent racial bias in jury deliberations," *id.* at 871), the Court noted that "their operation may be compromised, or they may prove insufficient" in addressing juror prejudice, *id.* at 868. For instance, "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." *Id.* at 869.

In light of these concerns, the Court held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant," then "the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* The Court did not set down a rule for determining "[w]hether that threshold showing has been satisfied" but rather held that such a decision "is a matter committed to the substantial

discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence." *Id.*   The Court noted that "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry."  Instead, "there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict" and "the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id.*

Despite establishing this exception to Rule 606(b), *Peña-Rodriguez* acknowledged and confirmed the longstanding rules giving trial courts discretion over lawyer efforts to investigate and interview jurors.  The Court stated that "[t]he practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors." *Id.*  Limits on contact with jurors "seek to provide jurors some protection when they return to their daily affairs after the verdict has been entered" and can be found even in jurisdictions "that recognize a racial-bias exception" to the no-impeachment rule. *Id.* at 869–70.  The Court explained that jurors "may come forward of their own accord" to report racial bias notwithstanding rules prohibiting lawyers from initiating such contact, a practice that "is common in cases involving juror allegations of racial bias." *Id.* (collecting cases).

26          MITCHELL V. UNITED STATES

C

Mitchell's theory is that *Peña-Rodriguez*'s recognition of the threat posed by racial bias to the judicial system worked a sea change in the law applicable to his case. Although *Peña-Rodriguez*'s immediate effect was to make an exception to the rule precluding admissibility of evidence of racial bias in jury deliberations under Rule 606(b), Mitchell argues that this exception would have no practical effect if defendants could not acquire evidence of juror bias. As a result, Mitchell reasons, *Peña-Rodriguez* made an equally significant change to the precedents allowing district courts to deny lawyers leave to interrogate jurors and to rules such as Local Rule 39.2, which require lawyers to show good cause before they can interview jurors. These rules must now be set aside, according to Mitchell, because they impose an unreasonable burden on a criminal defendant's ability to ensure that no racial bias impacted the jury's verdict. Therefore, Mitchell claims, *Peña-Rodriguez* made a fundamental change in the law relevant to his request to interview jurors, and as such the district court was obliged to grant his Rule 60(b)(6) motion.

We disagree. Although *Peña-Rodriguez* established a new exception to Rule 606(b), this change in law left untouched the law governing investigating and interviewing jurors. *See Hall*, 861 F.3d at 987 (listing the "degree of connection between the extraordinary circumstance and the decision for which reconsideration is sought" as a factor for a court to consider when ruling on a Rule 60(b) motion). Indeed, *Peña-Rodriguez* acknowledged that juror-access rules would impose limitations on the use of the new racial-bias exception to Rule 606(b) because "[t]he practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and

local court rules, both of which often limit counsel's post-trial contact with jurors." 137 S. Ct. at 869; *see also id.* at 870 (referencing various rules setting limits on juror contacts). Rather than override the limitations on lawyers' access to jurors, *Peña-Rodriguez* emphasizes the important purpose of such limitations in providing "jurors some protection when they return to their daily affairs after the verdict has been entered." *Id.* at 869.

Because *Peña-Rodriguez* does not override local court rules or compel access to jurors, it is not "clearly irreconcilable" with our precedent, *Miller v. Gammie*, 335 F.3d 889, 893 (2003) (en banc), and therefore did not make any change in the law regarding lawyer access to jurors, let alone one so significant that it would constitute "extraordinary circumstances" for purposes of Rule 60(b). *Peña-Rodriguez* permits district courts to continue to exercise their discretion in granting motions to interview jurors, *see Smith*, 457 F.2d at 1100, and to implement and adhere to rules such as Local Rule 39.2 requiring a showing of good cause, *see Eldred*, 588 F.2d at 752.

All other circuits that have considered this issue have reached the same conclusion. The Second Circuit rejected the argument that *Peña-Rodriguez* required a district court to grant a request for juror interviews, and instead upheld a district court's denial of a request to interview jurors where there was no "clear, strong, substantial and incontrovertible evidence" that an impropriety occurred. *United States v. Baker*, 899 F.3d 123, 134 (2d Cir. 2018) (citation omitted). As the Second Circuit explained, *Peña-Rodriguez* established "a narrow exception to the no-impeachment rule," but "d[id] not address the separate question of what showing must be made before counsel is permitted to interview jurors post-

verdict to inquire into potential misconduct." *Id.* at 133–34. Rather "as to this question, the decision simply reaffirms the importance of *limits* on counsel's post-trial contact with jurors." *Id.* at 134; *see also United States v. Birchette*, 908 F.3d 50, 55–60 (4th Cir. 2018) (affirming the denial of a request to interview jurors, even when presented with some evidence of potential racial bias, because the evidence did not satisfy the local rule's "good cause" requirement); *cf. United States v. Robinson*, 872 F.3d 760, 770 (6th Cir. 2017) (affirming the denial of a motion for a new trial based on evidence of a juror's racial bias obtained in violation of local rules because of *Peña-Rodriguez*'s "reaffirmation of the validity of . . . local rules" regulating access to jurors).

Given this conclusion, Mitchell has failed to show an intervening change in law that constituted extraordinary circumstances.

D

We reject Mitchell's other arguments. First, Mitchell points to the district court's statement that procedural safeguards implemented during trial, such as voir dire and the in-court observation of jurors, helped protect Mitchell's conviction from the influence of racial bias, and weighed against finding "extraordinary circumstances." Mitchell argues that the district court erred in making this statement, because *Peña-Rodriguez* held that procedural safeguards, such as those presented in *Tanner* and its progeny, were insufficient to protect the right to a fair trial free from racial bias. This argument fails. Although *Peña-Rodriguez* indicated that procedural safeguards might be insufficient by themselves to protect against racial bias, 137 S. Ct. at 868–69, it also stated that they could effectively limit the impact of

racial bias, *id.* at 871.  Here, the district court took significant steps to prevent racial bias.  Jurors were asked in voir dire about their attitudes towards Native Americans, were instructed not to consider race, and were required to sign a certification attesting that they did not consider race.  In addition, they were given the opportunity to speak with the lawyers as they left the courtroom.  *Peña-Rodriguez* noted that these and similar procedural safeguards "deserve mention" for their role in helping to avoid racial bias in deliberations.  *Id.*

Second, Mitchell argues that the district court should have revisited the question whether Mitchell lacked "good cause" for purposes of Local Rule 39.2 in light of *Peña-Rodriguez*. This argument also fails.  *Peña-Rodriguez* did not change our controlling precedent on the issue of jury access.  Moreover, the district court did not err in denying Mitchell's request for lack of good cause, given that Mitchell did not offer any "specific claim of jury misconduct."  *Smith*, 457 F.2d at 1100; *see Eldred*, 588 F.2d at 752.  We previously concluded in Mitchell's case that the racial composition of the jury pool and petit jury, the government's use of peremptory challenges, and comments made by the prosecutor in closing argument did not constitute errors at trial, *see Mitchell I*, 502 F.3d at 946–51, 957–58, 970–71, and thus they do not support Mitchell's claim that he had good cause to interview jurors.  We also decline to adopt a per se rule that good cause is always satisfied in capital cases.

Because Mitchell presents no extraordinary circumstances or district court errors that would justify reopening his case, we conclude that the district court did not abuse its discretion by denying Mitchell's Rule 60(b) motion.

E

Our decision today does not mean that defendants will lack opportunities to learn of racial bias occurring in their cases. Although Mitchell asserts that local rules that require a preliminary showing of juror bias before allowing parties to interview jurors operate as an "all-out ban" on the ability of criminal defendants to learn of any racial bias that impacted the jury's deliberations, *Peña-Rodriguez* explained that the "pattern" of jurors approaching the lawyers in the case to report racial bias expressed during deliberation "is common in cases involving juror allegations of racial bias." 137 S. Ct. at 870 (collecting cases). It was pursuant to this pattern that the criminal defendants in *Peña-Rodriguez*, *id.* at 861, and *Henley*, 238 F.3d at 1113, obtained information of jurors' racial bias, *see also Baker*, 899 F.3d at 128–29; *Birchette*, 908 F.3d at 55. There were ample opportunities for jurors in Mitchell's case to report any racial bias, including the opportunity that the district judge gave the jurors to "discuss the case" with the lawyers as the jurors exited the courtroom.

Nor does our decision mean that local rules will never give way to the "unique historical, constitutional, and institutional concerns" of racism that motivated *Peña-Rodriguez*. 137 S. Ct. at 868. If a criminal defendant makes a preliminary showing of juror bias, a district court may set aside a procedural hurdle limiting access to jurors, just as the Supreme Court made an exception to Rule 606(b) of the Federal Rules of Evidence in the face of evidence of racial bias. Indeed, the district court did not rely on Mitchell's failure to comply with the procedural requirements of Local Rule 39.2 in denying Mitchell's request to interview jurors. We save questions regarding the extent to which procedural rules must give way to the right to an impartial trial for

another day, however, because Mitchell has presented no evidence of racial bias here.

**AFFIRMED**.

---

CHRISTEN, Circuit Judge, concurring:

I join the majority's considered opinion in full, but write separately because the lengthy history of this case may make it easy to lose track of the fact that Mitchell did not receive the death penalty for his murder convictions. Mitchell was sentenced to death because, in the course of committing their atrocious crimes, he and his accomplice also committed a carjacking. In my view, it is worth pausing to consider why Mitchell faces the prospect of being the first person to be executed by the federal government for an intra-Indian crime, committed in Indian country, by virtue of a conviction for carjacking resulting in death.

For intra-Indian offenses committed in Indian country, the Major Crimes Act allows federal prosecution of serious crimes such as murder and manslaughter. 18 U.S.C. § 1153(a). The Major Crimes Act was enacted in 1885, in direct response to the Supreme Court's decision in *Ex parte Crow Dog*, 109 U.S. 556 (1883), which held that the federal government lacked jurisdiction to try an Indian for the murder of another Indian in Indian country. *Keeble v. United States*, 412 U.S. 205, 209–10 (1973). More than one hundred years later, Congress eliminated the death penalty for federal prosecutions of Indian defendants under the Major Crimes Act, subject to being reinstated at the election of a tribe's governing body—the so-called "tribal option." 18 U.S.C.

§ 3598; *United States v. Gallaher*, 624 F.3d 934, 936 (9th Cir. 2010).[1]  The tribal option was an important recognition of tribal sovereignty.  *See Gallaher*, 624 F.3d at 938–39.  In short, the tribal option "place[d] Native American tribes on an equal footing with states: they may decide whether or not . . . first degree murder committed within their jurisdiction is punishable by death, even [when] first degree murders . . . are prosecuted in federal court."  *Id.* at 939.  The Navajo Nation, like many other tribes, declined to opt in to the federal death penalty.

Because of this history, when the United States prosecuted Mitchell for the murders of Alyce Slim and her nine-year-old granddaughter, it could not seek the death penalty for those charges.  The United States circumvented the tribal option by also charging Mitchell with carjacking resulting in death and seeking the death penalty for that charge.  The death penalty was not authorized for carjacking until 1994.[2]  Because carjacking is a "crime of nationwide applicability,"[3] rather than a Major Crimes Act offense, the

---

[1] The tribal option also extends to crimes prosecuted under the Indian Country Crimes Act, 18 U.S.C. § 1152.  But because the Indian Country Crimes Act does not extend to *intra-Indian* offenses committed in Indian country, *United States v. Begay*, 42 F.3d 486, 498 (9th Cir. 1994), I limit my discussion to the Major Crimes Act.

[2] Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60003(a)(14), 108 Stat. 1796, 1968 (1994).

[3] Crimes of nationwide applicability are laws that "make actions criminal wherever committed."  *Begay*, 42 F.3d at 498.  By contrast, enclave laws—such as those prosecuted under the Major Crimes Act—"are laws in which the situs of the offense is an element of the crime—places such as military bases, national parks, federal buildings,

tribal option is inapplicable to it. *United States v. Mitchell*, 502 F.3d 931, 948 (9th Cir. 2007).

The decision to seek the death penalty in Mitchell's case was made against the express wishes of the Navajo Nation, several members of the victims' family, and the United States Attorney for the District of Arizona. As the Attorney General of the Navajo Nation Department of Justice explained, although "the details of [Mitchell's] case[] were shocking," the Navajo Nation did not support the death penalty for Mitchell because Navajo "culture and religion teaches us to value life and instruct against the taking of human life for vengeance." To be sure, the evidence of Mitchell's guilt was overwhelming, as the majority explains, but those who opposed the death penalty in his case did not doubt the horrific nature of Mitchell's crimes. The imposition of the death penalty in this case is a betrayal of a promise made to the Navajo Nation, and it demonstrates a deep disrespect for tribal sovereignty. People can disagree about whether the death penalty should ever be imposed, but our history shows that the United States gave tribes the option to decide for themselves.

Our court has already decided that the United States was legally permitted to seek death pursuant to the carjacking statute, *Mitchell*, 502 F.3d at 946–49, and I do not revisit that conclusion. I write to underscore only that the United States made an express commitment to tribal sovereignty when it enacted the tribal option, and by seeking the death penalty in this case, the United States walked away from that

and the like." *United States v. Anderson*, 391 F.3d 1083, 1086 (9th Cir. 2004).

34              MITCHELL V. UNITED STATES

commitment.  For all of these reasons, this case warrants careful consideration.

_____

HURWITZ, Circuit Judge, concurring:

Judge Ikuta's opinion ably and comprehensively addresses the issue raised in this appeal, and I join it in full.

I write separately to stress a point aptly made earlier in the long history of this case by Judge Reinhardt.  *See Mitchell v. United States*, 790 F.3d 881, 894–97 (9th Cir. 2015) (Reinhardt, J., dissenting in part).  The heinous crimes that gave rise to this case occurred entirely within the territory of the sovereign Navajo Nation.  The defendant is a Navajo, as were the victims.  The Navajo Nation has, from the outset of this case, opposed imposition of the death penalty on the defendant, as have members of the victims' family.

The Attorney General nonetheless decided to override the decision of the United States Attorney for the District of Arizona not to seek the death penalty.  Because this case involved a carjacking, I do not question the government's legal right to seek the death penalty; indeed, we have already held that it had the statutory right to do so.  *See United States v. Mitchell*, 502 F.3d 931, 946–49 (9th Cir. 2007).  But that the government had the right to make this decision does not necessarily make it right, and I respectfully suggest that the current Executive should take a fresh look at the wisdom of imposing the death penalty.  When the sovereign nation upon whose territory the crime took place opposes capital punishment of a tribal member whose victims were also tribal members because it conflicts with that nation's "culture and

religion," a proper respect for tribal sovereignty requires that the federal government not only pause before seeking that sanction, but pause again before imposing it.  That is particularly true when imposition of the death penalty would contravene the express wishes of several members of the victims' family.

The decision to pursue—and to continue to pursue—the death penalty in this case spans several administrations.  The current Executive, however, has the unfettered ability to make the final decision.  *See* U.S. Const. art. II, § 2, cl. 1.  Although the judiciary today has done its job, I hope that the Executive will carefully consider whether the death penalty is appropriate in this unusual case.